**WILENTZ, GOLDMAN & SPITZER, P.A.**
900 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, New Jersey 07095-0958
(732) 636-8000

**POMERANTZ HAUDEK BLOCK GROSSMAN**
**& GROSS LLP**
100 Park Avenue
New York, New York 10017
(212) 661-1100

Counsel for Plaintiffs and the Class
(Additional Counsel Listed on Signature Page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MICHELE COOPER, individually, MICHELE WERNER, individually and on behalf of her minor child, and DARLERY FRANCO, individually, and on behalf of all others similarly situated, | : : : : : : | |
| | : | Case No.: 07cv3541(FSH)(PS) |
| Plaintiffs, | : : | |
| -against- | : : | **SECOND AMENDED** **CLASS COMPLAINT** |
| AETNA HEALTH INC. PA, CORP., AETNA HEALTH MANAGEMENT, LLC, AETNA LIFE INSURANCE  COMPANY AETNA HEALTH and LIFE INSURANCE COMPANY, AETNA HEALTH INC., and AETNA INSURANCE COMPANY OF CONNECTICUT, | : : : : : : : : | **JURY TRIAL FOR ALL** **CLAIMS SO TRIABLE** |
| Defendants. | : | |

Plaintiffs Michele Cooper ("Cooper"), residing in Short Hills, New Jersey, Michele

Werner ("Werner"), residing in Arlington, Virginia, and Darlery Franco ("Franco"), residing in

#3828422.08

Newark, New Jersey, to the best of their knowledge, information and belief, formed after an inquiry reasonable under the circumstances, for their Second Amended Class Action Complaint (hereinafter "Amended Complaint") assert the following against Defendants Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc. and Aetna Insurance Company of Connecticut (collectively "Aetna" or "Defendants").

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

1.      From November 2003 through September 2005, Cooper was a member/beneficiary of her husband's group health insurance plan with his New Jersey employer, Rosenberg & Associates.   Cooper's group health plan was fully insured and administered by Aetna.

2.      Werner is a former member of a group health insurance plan offered through her employer, the American Psychiatric Association.  During the period of time in which Werner was a member of this group plan, it was fully insured and administered by Aetna.  Werner, her minor child and her husband were all Aetna members.

3.      Franco is a former member of a group health plan offered through her employer, ACSA Trust.  During the period of time in which Plaintiff Franco was a member of this group plan, it was fully insured and administered by Aetna.

4.      Plaintiffs' health care plans were offered to them as an employee benefit.  As a result, Aetna, as the company that offers, insures and administers these plans, is subject to the Employee Retirement Income Security Act of 1973 ("ERISA").

5.       Aetna issues an Evidence of Coverage ("EOC" or "Certificate") to its participants and beneficiaries ("Aetna Members") that sets forth the benefits that Aetna promises to pay its members.   According to Aetna's publicly available website designed for use by Aetna Members, Aetna defines a member as "a subscriber or dependent who is enrolled in and covered by a health care plan." *See* www.aetnanavigator.com (Glossary).

6.       According to its website, Aetna's Certificate represents a "legal agreement between an individual subscriber or an employer group ('Contract holder') and a health plan that describes the benefits and limitations of the coverage." *Id.*

7.       Aetna's website defines "Health Benefit Plan" as "[t]he health insurance or HMO product offered by a licensed health benefits company that is defined by the benefit contract and represents a set of covered services or expenses accessible through a provider network, if applicable, or direct access to licensed providers and facilities." *Id.*

8.       Under Plaintiffs' plans, Aetna Members have an express right to providers who have **not** entered into contracts with Aetna as to the fees they will accept.   These are known as nonparticipating ("Nonpar") providers.   For other plans, including certain Health Maintenance Organization ("HMO") plans, Aetna Members can use Nonpar providers in emergencies, when they are out of the area, or when no participating provider is qualified or available to perform the necessary service.   When Aetna Members receive Nonpar services, Aetna's payment is based on the lesser of the billed charge or the usual, customary and reasonable ("UCR") amount for that service in the geographic area in which it was performed.   Aetna uses the terms UCR, "customary and reasonable" and "reasonable charge" interchangeably.

9.    As explained on Aetna's website, Aetna will calculate reimbursement for Out-of-

Network or Nonparticipating providers by calculating UCR:

> **Out-of-Network**.  The use of health care providers who have not contracted with
> the health plan to provide services.  Members enrolled in preferred provider
> organizations (PPO) and point-of-service (POS) coverages can go out-of-network
> for covered services, but will pay additional costs in the form of deductibles and
> coinsurance and will be subject to benefit and lifetime maximums.  Because
> reduced fees are not negotiated with out-of-network providers, Aetna will
> calculate reimbursement based on the usual, customary and reasonable ["UCR"]
> charge (see *definition*).  Members are responsible for all charges above UCR in
> addition to any deductible and coinsurance provisions.

10.    Aetna calculates benefits for Nonpar services based on its determination of the

UCR for the services at issue.  Aetna's website defines the Customary and Reasonable charge as

follows:

> The amount customarily charged for the service by other providers in the same
> Geographic area (often defined as a specific percentile of all charges in the
> Community), and the reasonable cost of services for a given patient.  **Also called
> "Usual, Customary, and Reasonable" (UCR).**

11.    Aetna's  website  also  includes  on  its  website  its  standard  definition  for

"Reasonable Charge," as follows:

> The charge for a covered benefit, which is determined by Aetna to be the
> prevailing charge level, for the service or supply in the geographic area where it is
> furnished.  Aetna may take into account factors such as the complexity, degree of
> skill needed, type or specialty of the Provider, range of services provided by a
> facility, and the prevailing charge in other areas in determining the Reasonable
> Charge for a service or supply that is unusual or is not often provided in the area
> or is provided by only a small number of providers in the area.

12.    Aetna  treats  all  of  its  definitions  of  UCR  in  its  plans  as  having  identical

meanings and applies uniform policies for calculating UCR.

13.     Aetna often refers to UCR as the "amount allowed." Aetna makes clear in its EOCs, as well as in other written communications with its Members, that the Member is financially responsible for the difference between UCR (amount allowed) and the provider's billed charge for Nonpar services.   For example, Aetna's website states that "Members are responsible for all charges above UCR in addition to any deductible and coinsurance provisions." *Id.* The difference between UCR and the billed charge is often referred to in Aetna's Explanation of Benefits ("EOB") sent to its Members as "excluded expenses." Excluded expenses are not credited toward its Members' annual deductible for Nonpar services, nor the annual out-of-pocket maximum.

14.     In-network or contracted or participating ("Par") providers enter into contracts with Aetna to accept reduced or discounted fees for their services. When a Member uses a Par provider, his or her financial responsibility is limited to a specified co-payment, typically in the range of $10 to $30 per service.

15.     Aetna's website defines "Non-Participating Provider" as follows: "This term is generally used to mean providers who have not contracted with a health plan to provide services at reduced fees.  Also called Non-Preferred Care Provider." When an Aetna Member uses a Nonpar provider, Aetna imposes additional costs on the Member in the form of higher deductibles and coinsurance, and benefit and lifetime maximums. Aetna does not begin to pay for Nonpar services until the Aetna Member has satisfied his or her calendar year deductible. Once a Member satisfies the deductible, then Aetna will pay a share (typically 80%) of the allowed amount for Nonpar Services. If and when a Member reaches a maximum amount of out-of-pocket expenses for Nonpar services, typically in the range of $1,500 - $3,000, the Member

has no further coinsurance obligation (*e.g.*, 20% of the allowed amount) for any additional Nonpar services for that calendar year. Aetna does not credit amounts above UCR to the Member's deductible or out-of-pocket maximum.

16.     In certain instances, such as when a referral from a primary care physician is not obtained, Aetna considers a Par provider to be Nonpar. Aetna pays the service that was rendered by the Par provider at UCR, as if it were rendered by a Nonpar provider, and the Member is responsible for any unpaid amounts above UCR.

17.     Aetna is obligated to pay accurate UCR to its Members for Nonpar services consistent with the UCR definition.

18.     Aetna fails to comply with its own UCR definition by failing to pay benefits based on accurate UCR rates to its Members for Nonpar services (whether by Nonpar providers or by Par providers considered Nonpar by Aetna).

19.     To determine UCR, Aetna primarily relies on a computer database of provider charge data obtained from a third party, Ingenix, Inc. ("Ingenix"), which is a wholly-owned subsidiary of United Healthcare Corporation, another major insurer. Ingenix's databases are also known as the Prevailing Healthcare Charges System ("PHCS") and Medical Data Research ("MDR") (collectively, "Ingenix Databases").

20.     In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products, including MDR. In October 1998, Ingenix purchased the PHCS database from the Health Insurance Association of America ("HIAA"), a trade group for the insurance industry.

21.     Aetna is a contributor of provider charge data to the Ingenix Databases.  Prior to contributing its data to Ingenix, Aetna deleted valid high charges.  Following receipt of the data from Aetna, Ingenix then removed additional valid high charges from all contributors' data. Ingenix then published the corrupted database.  Aetna and Ingenix "cooked the books."  The corruption of the data invalidates its use by Aetna as the basis for determining UCR for Nonpar providers' services.  These actions (among others referenced herein) violated both ERISA, a federal law designed to protect group health plan members and the Racketeer Influenced and Corrupt Organization Act ("RICO").

22.     In addition to UCR determinations based on the Ingenix Databases, Plaintiffs and class members challenge other Nonpar benefit reductions, including those imposed by use of the following methods: use of discounted amounts or Par provider fee schedules; use of Medicare data; use of the average wholesale price ("AWP") to determine UCR for pharmaceutical drugs; failing to pay appropriately for emergency room ("ER") services; failing to properly credit deductible amounts and out-of-pocket maximums; failing to provide an appropriate appeals process mechanism; approving requests for preauthorization without disclosing its nonpayment of a large percentage of the billed charges; threatening to refer members and Nonpar providers to collection agencies based on baseless allegations of overpayment by Aetna; and other improper practices (collectively, along with UCR, "Nonpar Benefit Reductions").

23.     Nonpar Benefit Reductions leave Aetna Members financially responsible for unpaid amounts and act as exclusions from coverage.  As the entity excluding benefits through its Nonpar Benefit Reductions, Aetna has the burden to demonstrate that its exclusions comply with its contractual and legal obligations.  Plaintiffs allege that Aetna cannot sustain its burden

regarding its Nonpar Benefit Reductions, and seek unpaid benefits and other relief for themselves and on behalf of ERISA Class members.

24.     Plaintiffs, on behalf of themselves and all similarly situated Aetna Members, allege that Aetna's Nonpar Benefit Reductions violate ERISA and RICO.  Cooper, who was a member of a small employer health plan ("SEHP") under New Jersey law, also alleges that Aetna's ERISA and RICO violations arise, inter alia, as a result of Aetna's violations of New Jersey law specific to New Jersey SEHP members.  Plaintiffs' class action claims, including the respective "Class Periods," are defined in Paragraphs herein.

## THE DEFENDANTS

25.     Defendants, Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc., and Aetna Insurance Company of Connecticut, offer, insure, underwrite and administer commercial health benefits, including those of Plaintiffs referenced above.  Several of the Defendants, including Aetna Health, Inc. and Aetna Life Insurance Company, have offices located in Cranbury, New Jersey, and are licensed to do business in New Jersey.

26.     "Aetna" is a brand name used for products and services provided by one or more of the Aetna group of subsidiaries that offer, underwrite, or administer benefits.  When used in this Amended Complaint, "Aetna" includes all Aetna subsidiaries owned and controlled by any of the named Defendants whose activities are interrelated and intertwined with them. Due to the manner in which they function, all of the Defendants are functional ERISA fiduciaries and, as such, they must comply with fiduciary standards.  In this Amended Complaint, "Aetna" refers to

all named Defendants and all predecessors, successors and subsidiaries to which these allegations pertain.

## JURISDICTION AND VENUE

27.     The rights and duties of insurance companies and Aetna Members with employer sponsored health care plans are governed by 29 U.S.C. § 1132.  Plaintiffs assert subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) for ERISA claims.  For Plaintiffs' RICO claims, jurisdiction arises under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

28.     Venue is appropriately laid in this District for Plaintiffs' ERISA  and RICO claims under 28 U.S.C. § 1391 and 18 U.S.C. §  1965 because (i) Aetna resides, is found, has an agent, and transacts business in this District and (ii) Aetna conducts a substantial amount of business in this district and insures and administers group health plans both inside and outside this District, including from offices located in New Jersey.

29.     This Amended Complaint is filed as related to existing litigation pending in this District, namely, *Wachtel v. Health Net,, Inc.,* Case No. 01cv4183 (FSH)(PS); *McCoy v. Health Net*, Case No. 03cv1801 (FSH)(PS); *Franco v. Connecticut General Life Insurance Co*., Case No. 04cv1318 (FSH) (PS); and *Scharfman v. Health Net,* Case No. 05cv301 (FSH)(PS).

### PLAINTIFFS' GROUP HEALTH PLANS

#### Cooper's Aetna Plan for New Jersey Small Employer Members

30.     From November 2003 through September 30, 2005, Cooper was a beneficiary in her husband Justin Cooper's group plan through his employer, Rosenberg & Associates. Pursuant to the terms of the plan, both she and her husband are covered as Aetna Members.

31.     Throughout the Class Period, Cooper and her husband received UCR benefit reductions from Aetna. For example, on January 3, 2005, Justin Cooper received health care services from a Nonpar provider, for which the provider billed $4,000. In addition, Justin. Cooper received two treatments of pharmaceutical drugs, for which the Nonpar provider billed, respectively, $315 and $740. Thereafter, a claim was submitted to Aetna on behalf of the Coopers, in compliance with the terms of their health care plan, seeking payment of benefits as required under the Aetna contract.

32.     The Coopers subsequently received an EOB from Aetna by mail dated May 13, 2005 to report on its payment of benefits concerning these health care services. In the EOB, Aetna reported that it had excluded $499 from the billed amount for the first service, thereby leaving an amount allowed of $3,501. Aetna further excluded $280 from the first drug, allowing only $35, and excluded $490 from the second drug, allowing only $250. The Coopers remained liable for the unpaid portion of the bill. After reducing the benefit further to take into account the Coopers' deductible and co-insurance for using Nonpar services, including $450 for a cardiovascular stress test that was allocated to the deducible, Aetna paid only $2,265.20 of the total bill of $5,505.00. The EOB specified that the "total expenses submitted" by the Coopers was $5,505.00, that Aetna's "total payment" was $2,265.20, and that "your total responsibility" (referring to the Coopers) was $3,239.80.

33.     To explain the excluded expenses totaling $1,269, Aetna used Code 0120, which was defined in the EOB as follows: "This portion of the expense which is greater than the reasonable and customary charge is not covered under your plan."

34.     Following Aetna's nonpayment, Justin Cooper's provider, Manhattan Nuclear Cardiology, appealed this determination to Aetna by letter dated September 14, 2005.  In its letter, the provider pointed out that "Our charges are not over and above usual and customary for this area."  It pointed out that "The patient will be responsible for any amounts you do not allow."

35.     By letter dated September 26, 2005, Aetna denied the provider's appeal on behalf of Justin Cooper.  Aetna's appeal denial stated:

> "Based on our review of available information, including the member's policy, the company is not modifying its previous determination.  The above listed claim was previously processed correctly according to the member's QPOS plan.  According to Aetna's guidelines, the usual and customary rate for A4641 is $125.00; for J1245 is $35.00, for 78492 is $3501.00 and for 93015 is $450.00.  A total of $1970.80 was applied to the member's out-of-network deductible and co-insurance.  Therefore, no additional payment will be made with respect to the above listed claim(s)."

36.     Contrary to ERISA and federal regulations, Aetna did not treat the provider's appeal as required and did not provide a "full and fair review."   Aetna did not disclose the fee schedule used, nor did it address the basis for the appeal the provider had provided.  Aetna did not send a copy of the denial to the member.  Finally, Aetna did not disclose that the member's plan was a New Jersey SEHP plan, with specific payment rules even for providers located outside the state of New Jersey (such as Manhattan Nuclear Cardiology).  Aetna's payments did not comply with the New Jersey Regulation applicable to SEHP members.

37.     Pursuant to ERISA regulations, an appeal decided by a process that violates procedural safeguards will be deemed exhausted.

38.     On November 8, 2005, the Nonpar provider billed the Coopers for the total unpaid portion of the bill, or $3,239.80.  In a comment printed on the bill the Coopers were told:  "We have submitted the claim to your insurance company and per your insurance company the balance is your responsibility."

39.     On the front page of the EOB, Aetna stated that if the Coopers had any questions about the claims they should contact Aetna at www.aetnanavigator.com.  That is a secure website provided to Aetna's Members, including the Coopers, for obtaining additional information about the benefits and services provided by Aetna.  Aetna's "Glossary" of terms on the website defined "UCR" and "Customary and Reasonable" costs for Nonpar providers.  All Members were told that Aetna's UCR determination was purportedly based on "the amount customarily charged for the service by other providers in the same geographic area," and that, in determining a "reasonable charge" for services, Aetna would determine "the prevailing charge level, made for the service or supply in the geographic area where it is furnished," after taking into account "factors such as the complexity, degree of skill needed, type or specialty of the Provider, range of services provided by a facility, and the prevailing charge in other areas in determining the Reasonable Charge for a service or supply that is unusual or is not often provided in the area or is provided by only a small number of providers in the area."

40.     On the back of the EOB, Aetna stated that the Coopers "are entitled to a review (appeal) of this benefit determination if you have questions or do not agree."  Aetna stated this could be done either by telephone or in writing, and the member should include "any comments, documents, records and other information you would like to have considered, whether or not submitted in connection with the initial claim."  Aetna, however, did not disclose what type of

#3828422.08                                    12

information, if any, would be considered as part of a review of a UCR determination. The EOB further stated that "you may also review documents relevant to your claim." Yet, Aetna did not have access to material aspects of the claim determination, including the underlying methodology and data used by Ingenix to derive the numbers upon which Aetna used as UCR.

41.     During the first half of 2005, Cooper also received medical care from Nonpar providers, and subsequently submitted claims for benefits to Aetna. Aetna responded by mailing her EOBs, including an EOB dated June 1, 2005, which reflected a billed amount of $285 for a particular service, for which Aetna excluded $106.04, citing Code 0120 to explain that the provider's bill was "greater than the reasonable and customary charge." In another EOB dated August 17, 2005, Aetna responded to an additional claim for benefits for services received by the same Nonpar provider, reporting that it was excluding $10 from the bill of $285, again explaining by reference to Code 0120 that the bill was "greater than the reasonable and customary charge."

42.     Cooper received further services from other Nonpar providers during 2005, for which she submitted claims for benefits to Aetna. Aetna sent additional EOBs to the Coopers dated, respectively, July 6, 2005, August 17, 2005, and August 25, 2005. Each of these EOBs reported that certain expenses had been excluded, again using Code 0120 to report that the billed charges were "greater than the reasonable and customary charge." In these EOBs, Aetna excluded $42.76 from a $150 bill; $4.15 from a $49.99 bill; and $1.03 from a $72.45 bill.

43.     Each of the EOBs contained the total amount that remained the Coopers' "responsibility," which included the amount that had been excluded by Aetna as in excess of UCR. Further, each EOB referred the Coopers to Aetna's website, www.aetnanavigator.com, for

answers to their questions and provided the same summary for potential reviews or appeals of benefit determinations.

44.     Under her SEHP Plan, Cooper had an individual $1,000 annual deductible for Nonpar services.  Her individual annual out-of-pocket limit was $3,000 for Nonpar services.  Under the plan, the Coopers' annual family deductible for Nonpar Services was $2,000, while their family out-of-pocket limit was $6,000.  The Coopers' coinsurance for Nonpar services (once the deductible was met) was 30% of the UCR.  If and when the Coopers satisfied the individual or family out-of-pocket limit, Aetna was contractually required to pay 100% of UCR.  During the Class Period, Cooper and her husband were financially responsible for unpaid amounts in excess of the UCR determined by Aetna.

45.     During the Class Period, Aetna failed to properly calculate deductibles, coinsurance and out-of-pocket maximums in violation of Cooper's health care plans, as described in the EOCs.  By failing to properly calculate these amounts, Aetna subsequently underpaid Cooper and other Aetna Members for Nonpar services.  Despite complaints by Cooper regarding Aetna's underpayments, Aetna did not correct or remedy its underpayments.

46.     At times during the Class Period, Aetna paid Nonpar hospital and medical services by using repricing vendors.  In the event a Nonpar provider had a contracted agreed-to fee with a repricer accessed by Aetna, Aetna would pay the agreed-to fee.  Despite Aetna's payment to the provider of the contracted agreed-to fee, Aetna would nevertheless calculate the Member's coinsurance at the higher amount applicable to services from Nonpar providers.  Aetna should have applied the lower fee's reduced co-insurance applicable to contracted

services.  Aetna's improper calculation of coinsurance violated the New Jersey Regulation and

SEHP plans.

47.     Those protections imposed by New Jersey law required health insurance

companies, including Aetna, to reimburse Nonpar hospital services provided to SEHP members

based on the hospital's billed charge.  New Jersey law prohibits Aetna and other insurers from

using fee schedules or other databases to reduce payment to its SEHP members who receive

hospital services.  Instead, Aetna was obligated by law to pay the Nonpar hospital's billed charge

less any applicable coinsurance.  Aetna failed to comply with New Jersey law.

48.     New Jersey law also requires that Aetna reimburse Nonpar medical (non-

hospital) services provided to SEHP members at the 80th percentile of the most updated Ingenix

fee schedule.  Such payment must be made without other reductions, such as for multiple or

bilateral procedures.

49.     Aetna failed to comply with New Jersey law applicable to Nonpar hospital and

medical services, to the detriment of Cooper and other SEHP members.

50.     Cooper was entitled to seek medical care from Nonpar providers pursuant to her

SEHP EOC.  In her EOC, Aetna defined the use of UCR to establish reimbursement levels for

Nonpar providers as follows:

> With respect to Network services and supplies, the negotiated agreement.  With
> respect to non-network benefits, an amount that is not more than the usual and
> customary charge for the service or supply as We Determine, based on a standard
> approved by the Board.  The Board will decide a standard for what is Reasonable
> and Customary for the Non-Network benefits under the contract.  The chosen
> standard is the amount which is most often charged for a given service by a
> Provider within the same geographic area.

51.     The term "standard approved by the Board" in the preceding paragraph refers to the Nonpar regulation promulgated by the New Jersey Small Employer Health Board ("SEH Board"), codified at 11 N.J.A.C. § 11.21-7:13(a) ("New Jersey Regulation"). The New Jersey Regulation requires insurers to pay Nonpar hospital services based on the billed charge and Nonpar medical services at the 80th percentile of the most updated Ingenix PHCS fee profile. The SEH Board imposes other requirements, including requiring coverage of certain services. The New Jersey Regulation suspends preauthorization requirements for Nonpar services rendered to New Jersey small plan members.

52.     Although the New Jersey Regulation requires insurers to pay UCR based on the updated PHCS database, Aetna misrepresents in its EOB that the database "is the amount which is most often charged for a given service by a Provider within the same geographic area." For the reasons detailed herein, this statement is false and Aetna cannot comply with this provision of the New Jersey Regulation by using the Ingenix Databases.

53.     As described herein, Aetna and Ingenix individually and together manipulated and submitted charge data used by the Ingenix database to understate the 80th percentile amounts. As a result of their joint and intentional manipulation of the Ingenix database, the New Jersey Regulation was violated and its stated intention – to protect New Jersey consumers of Nonpar services – was thereby thwarted. Aetna and Ingenix concealed its manipulation from the New Jersey regulators who enforce the New Jersey Regulation, and from employers and its members. In fact, Aetna and Ingenix's manipulations ensured that the 80th percentile of the Ingenix Databases was inaccurate and that all SEHP members as well as members in its other plans nationwide were **underpaid**.

54.     Aetna's UCR determinations, based on the manipulated Ingenix Databases, violated Aetna's legal and contractual obligations, and preclude it from relying on the New Jersey Regulation as a defense to its wrongful use of the invalid Ingenix Databases to determine UCR rates during the Class Period.

55.     Aetna should be compelled to pay billed charges to all SEHP members as to whom Aetna determined UCR in violation of the New Jersey Regulation and plan language, in violation of ERISA.

56.     On July 23, 2007, the State of New Jersey Department of Banking and Insurance ("NJDOBI") ordered Aetna to pay nearly $10 million for systematic unfair business practices related to Aetna's determination of UCR for Nonpar services rendered to New Jersey Aetna members.   NJDOBI determined that Aetna had calculated UCR by using a percentage of Medicare rates.  For example, Aetna determined UCR for certain services (including lab and durable medical equipment) at 75% of the Medicare rate.  For other services, Aetna determined UCR at 125% of the Medicare rate.  Aetna's undisclosed and unauthorized use of Medicare rates to determine UCR for its Members left them with large unpaid balances for which they were financially responsible.  Plaintiffs and the members of the Class are owed unpaid benefits for Aetna's Nonpar Benefit Reductions, in violation of its contractual and legal obligations.

57.     The unlawful payment methodology, resulting in the fine imposed by NJDOBI, was not limited to New Jersey but, rather, was used by Aetna nationwide.  This Amended Complaint seeks reimbursement of unpaid benefits for these and other Nonpar Benefit Reductions.

58.     Cooper seeks to represent a class of SEHP members subject to the New Jersey Regulation who Aetna underpaid for all hospital and medical services (including surgery, ER, hospital, physician, laboratory, anesthesia, chiropractic, mental health, dental, pharmaceutical, or other medical services and supplies) rendered by Nonpar providers (or other providers considered Nonpar by Aetna) through the Class Period.  She seeks unpaid benefits and other relief for herself and the "New Jersey SEHP Class."

59.     Aetna made numerous UCR and other Nonpar Benefit Reductions for Cooper based on practices challenged herein as violative of New Jersey law, including UCR based on manipulated and invalid data from the Ingenix Databases or based on Medicare rates.

60.     During the Class Period, in violation of its EOC, SPD and plan language, Aetna failed to properly calculate deductibles, coinsurance and out-of-pocket maximums.  By failing to properly calculate such amounts, Aetna subsequently underpaid the Coopers and other Members for Nonpar services.

61.     Aetna's EOBs reflecting Nonpar Benefit Reductions did not adequately disclose the basis for, nor the reasons behind, the Nonpar Benefit Reductions.  Aetna did not disclose whether it used a particular database, or Medicare rates, or some other methodology. Nor did it provide the required information about how the Members might successfully appeal the Nonpar Benefit Reductions.  Aetna did not provide the specific reasons regarding Nonpar Benefit Reductions, or impart necessary information about the appeals process, or provide other information required under ERISA.  Various procedural rules that covered Cooper's  appeals were violated.

62.    Aetna's substantive and procedural violations prevent Aetna from relying on defenses to Plaintiffs' claims, such as exhaustion or statutes of limitations.

63.    Aetna discouraged appeals by vouching for its Nonpar Benefit Reductions Aetna's conduct toward Plaintiffs and Class Members clearly demonstrate  that appeals of Aetna's Nonpar Benefit Reductions are futile.  As shown above, when a provider appealed, Aetna did not provide necessary and critical information, and did not provide the member with a copy of the appeals decision.

64.    Aetna's failure to reveal critical information during the appeals process, made a "full and fair review" unavailable to Aetna Members.  In certain cases, Aetna circumvented the appeals process, by handling complaints outside of the formal appeals process and not issuing written decisions.

65.    Aetna is legally obligated to adhere to the specific provisions of its Members' group health plans.

66.    Aetna cannot make Nonpar Benefit Reductions if they are not authorized or accurately disclosed in Aetna Members' Certificates and SPDs.  During the Class Period, Aetna breached Members' Certificates and SPDs when it made Nonpar Benefit Reductions.

67.    As an ERISA fiduciary, Aetna is and was obligated to fully inform its Members of material facts related to their benefits and must comply with federal regulations governing claims procedures both as to initial claim denials and appeals.

68.    During the Class Period, Aetna materially failed to comply with ERISA.

69.    Plaintiffs and Class Members challenge Aetna's systematic application of rules and policies in making Nonpar Benefit Reductions that are not authorized by Aetna Members'

#3828422.08                                            19

Certificates and SPDs; its routine violation of its fiduciary duties; and its failure to comply with ERISA, federal claims procedure regulations, federal common law and other applicable law.

70.     The EOBs sent by Aetna regarding its Nonpar Benefit Reductions during the Class Period did not comply with legal requirements, including federal claims procedure regulations.  The EOBs failed to advise Aetna Members of the specific reasons for the denial, the specific plan provisions, and their appeal rights.  Aetna's EOBs reflecting UCR determinations failed to advise Plaintiffs of the data Aetna used to calculate UCR.  Examples of Aetna's omissions of required disclosure on EOBs include the following:

• Absent or inadequate "Notes" describing Aetna's benefit reductions and failure to provide the required "specific" reasons for the disallowed amounts above UCR;

• The particular fee schedule or data or methodology used to determine UCR;

• Incomplete information about the appeal process and appeal rights;

• The characteristics (resulting in the invalidity) of the Ingenix Databases used to determine UCR;

• The disclaimer that accompanies Ingenix data;

• Aetna's manipulations of the data contributed to the Ingenix Database, and Ingenix's manipulations of the data from all contributors;

• Aetna's use of certain Medicare rates that reduced benefits and left its Members financially exposed.