**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, NJ  07095-0958
Telephone:  (732) 636-8000

**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP**
100 Park Avenue
New York, NY  10017
Telephone:  (212) 661-1100

**Counsel for Plaintiffs and the Class**
[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHELE COOPER, individually, MICHELE WERNER, individually and on behalf of her minor child, and DARLERY FRANCO, individually, and all on behalf of all others similarly situated, | Case No. 07-cv-3541 (FSH) (PS) |
| Plaintiffs, | |
| -against- | **RICO CASE STATEMENT** |
| AETNA HEALTH INC., PA, CORP., AETNA HEALTH MANAGEMENT, LLC, AETNA LIFE INSURANCE COMPANY, AETNA HEALTH AND LIFE INSURANCE COMPANY, AETNA HEALTH INC. and AETNA INSURANCE COMPANY OF CONNECTICUT, | |
| Defendants. | |

# **TABLE OF CONTENTS**

**PAGE**

INTRODUCTION .................................................................................................................. 1

QUESTION NO. 1: ............................................................................................................... 1

RESPONSE TO QUESTION NO. 1: ................................................................................... 1

QUESTION NO. 2: ............................................................................................................... 3

RESPONSE TO QUESTION NO. 2: ................................................................................... 3

QUESTION NO. 3: ............................................................................................................... 4

RESPONSE TO QUESTION NO. 3: ................................................................................... 4

QUESTION NO. 4: ............................................................................................................... 5

RESPONSE TO QUESTION NO. 4: ................................................................................... 5

QUESTION NO. 5: ............................................................................................................... 7

RESPONSE TO QUESTION NO. 5: ................................................................................... 8

QUESTION NO. 6: ............................................................................................................. 18

RESPONSE TO QUESTION NO. 6: ................................................................................. 19

QUESTION NO. 7: ............................................................................................................. 23

RESPONSE TO QUESTION NO. 7: ................................................................................. 23

QUESTION NO. 8: ............................................................................................................. 24

RESPONSE TO QUESTION NO. 8: ................................................................................. 24

QUESTION NO. 9: ............................................................................................................. 24

RESPONSE TO QUESTION NO. 9: ................................................................................. 24

QUESTION NO. 10: ........................................................................................................... 25

RESPONSE TO QUESTION NO. 10: ............................................................................... 25

QUESTION NO. 11: ........................................................................................................... 25

RESPONSE TO QUESTION NO. 11: ............................................................................... 25

## TABLE OF CONTENTS

**PAGE**

QUESTION NO. 12: ...................................................................................................................25

RESPONSE TO QUESTION NO. 12: .......................................................................................25

QUESTION NO. 13: ...................................................................................................................26

RESPONSE TO QUESTION NO. 13: .......................................................................................26

QUESTION NO. 14: ...................................................................................................................26

RESPONSE TO QUESTION NO. 14: .......................................................................................27

QUESTION NO. 15: ...................................................................................................................27

RESPONSE TO QUESTION NO. 15: .......................................................................................27

QUESTION NO. 16: ...................................................................................................................27

RESPONSE TO QUESTION NO. 16: .......................................................................................27

QUESTION NO. 17: ...................................................................................................................27

RESPONSE TO QUESTION NO. 17: .......................................................................................27

QUESTION NO. 18: ...................................................................................................................27

RESPONSE TO QUESTION NO. 18: .......................................................................................27

QUESTION NO. 19: ...................................................................................................................28

RESPONSE TO QUESTION NO. 19: .......................................................................................28

QUESTION NO. 20: ...................................................................................................................28

RESPONSE TO QUESTION NO. 20: .......................................................................................28

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*American Med. Ass'n v. United Healthcare Corp.,*
  2006 WL 3383440 (S.D.N.Y. Dec. 29, 2006) ................................................................4, 23, 26

*Barr Labs., Inc. v. Bolar Pharm. Corp.,*
  Civil Action No. 91-4374,
  1992 U.S. Dist. LEXIS 22883 (D.N.J. July 14, 1992). ...........................................................18

*Bath Unlimited, Inc. v. Ginarte, O'Dwyer, Winograd & Laracuente,*
  No. Civ. A. 04-03919 (KSH), 2005 WL 2406097 (D.N.J. Sept. 29, 2005) ...............................1

*Concern Sojuzvneshtrans v. Buyanovski,*
  80 F. Supp. 2d 273 (D.N.J. 1999) ..........................................................................................18

*Darrick Enterprises v. Mitsubishi Motors Corp.,*
  No. Civ. A. 05-4359 (NLH),
  2007 WL 2893366 (D.N.J. Sept. 28, 2007) .......................................................................passim

*Eli Lilly & Co. v. Roussel Corp.,*
  23 F. Supp. 2d 460 (D.N.J. 1998) .............................................................................................7

*Emcore Corp. v. PricewaterhouseCoopers LLP,*
  102 F. Supp. 2d 237 (D.N.J. 2000) ...........................................................................18, 19, 23

*Farmers & Merchts. Nat'l Bank v. San Clemente Fin. Group Sec., Inc.,*
  174 F.R.D. 572  (D.N.J. 1997) ...............................................................................................18

*H.J. Inc. v. N.W. Bell Tele. Co.,*
  492 U.S. 229  (1989); ..............................................................................................................18

*Hollis-Arrington v. PHH Mortgage Corp.,*
  205 App'x 48 (3d Cir. 2006) ...................................................................................................19

*Hughes v. Consol-Pa. Coal Co.,*
  945 F.2d 594 (3d Cir. 1991),
  *cert. denied,* 504 U.S. 955 (1992); ........................................................................................18

*In re Craftmatic Sec. Litig.,*
  890 F.2d 628 (3d Cir. 1989) ...............................................................................................28, 29

# TABLE OF AUTHORITIES (cont'd)

**PAGE**

*In re Ins. Brokerage Antitrust Litig.,*
 No. MDL 1663, Civ. 04-5184
 (GEB), Civ. 05-1079 (GEB) 2007 WL 1062980 (D.N.J. Apr. 5, 2007) ..............................16, 23

*In re Midlantic Corp. S'holders Litig.,*
 758 F. Supp. 226 (D.N.J. 1990)...................................................................................................29

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.,*
 311 F.3d 198 (3d Cir. 2002) .......................................................................................................16

*Kievit v. Rokeach,*
 Civ. Action No. 86-2592  1987 U.S. Dist. LEXIS 16131 (D.N.J. Oct. 29, 1987) ....................23

*Kronfeld v. First Jersey Nat'l Bank,*
 638 F. Supp. 1454 (D.N.J. 1986)................................................................................................29

*Lum v. Bank of Am.*
 361 F.3d 217 (3d Cir. 2004) .........................................................................................................3

*Maio v. Aetna, Inc.,*
 221 F.3d 472  (3d Cir. 2000) .......................................................................................................7

*Michaels Bldg. Co. v. Ameritrust Co.,*
 848 F.2d 674 (6th Cir. 1988 .......................................................................................................29

*Mruz v. Caring, Inc.,*
 991 F. Supp. 701  n.26 (D.N.J. 1998)..........................................................................................1

*Northland Ins. Co. v. Shell Oil Co.*
 930 F. Supp. 1069  (D.N.J. 1996).................................................................................................1

*Rosenberg v. JCA Assocs., Inc.,*
 No. Civ. 03-0274 (JBS), 2007 WL 1038893,
 (D.N.J. Mar. 30, 2007) .................................................................................................................7

*Sedima, S.P.R.L. v. Imrex Co.,*
 473 U.S. 479 (1985) .................................................................................................................3, 7

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,*
 742 F.2d 786 (3d Cir. 1984), *cert. denied,*
 469 U.S. 1211 (1985) ...........................................................................................................16, 19

## TABLE OF AUTHORITIES (cont'd)

**PAGE**

*South Broward Hosp. Dist. v. MedQuist, Inc.*
    516 F. Supp. 2d 370 (D.N.J. 2007),
    *aff'd on other grounds*, No. 07-2076, 2007 WL 4394391
    (3d Cir. Dec. 18, 2007) ............................................................................3, 16, 23, 29

*Tabas v. Tabas,*
    47 F.3d 1280 (3d Cir.) (*en banc*), *cert. denied,* 515 U.S. 1118 (1995) ....................................18

*United States v. Irizarry,*
    341 F.3d 273 (3d Cir. 2003),
    *cert. denied*, 540 U.S. 1140 (2004) ........................................................................23

*United States v. Turkette,*
    452 U.S. 576  (1981) .............................................................................................23

*Zavala v. Wal-Mart Stores, Inc.,*
    393 F. Supp. 2d 295 (D.N.J. 2005)........................................................................29

**Statutes**

18 U.S.C. §  664 .......................................................................................................16

18 U.S.C. § 1341 .......................................................................................................8

18 U.S.C. § 1343 .......................................................................................................8

18 U.S.C. § 1961(1)(B) .............................................................................................14

18 U.S.C. § 1961(4).................................................................................................18

18 U.S.C. § 1961(5).................................................................................................9

18 U.S.C. § 1962 ......................................................................................................1

18 U.S.C. § 1962(a).................................................................................................25

18 U.S.C. § 1962(b).................................................................................................25

18 U.S.C. § 1962(c).............................................................................................6, 26

18 U.S.C. § 1962(d).................................................................................................26

18 U.S.C. § 1964(c).............................................................................................5, 7

18 U.S.C. §§ 1961-1968 ..........................................................................................1

## TABLE OF AUTHORITIES (cont'd)

**PAGE**

29 U.S.C. § 1002(1)(A) ...................................................................................................................15

**Rules**

Fed. R. Civ. P. Rule 8(a).................................................................................................................19

## INTRODUCTION

Plaintiffs, Michele Cooper ("Cooper"), Michele Werner ("Werner"), and Darlery

Franco ("Franco"), by counsel and pursuant to Local Civil Rule 16.1(b)(4) and this

Court's Order dated December 20, 2007 (Docket # 60), hereby file their RICO Case

Statement, which addresses federal civil racketeering claims alleged in Plaintiffs' Second

Amended Class Complaint ("SAC, ¶ __"), filed on November 27, 2007 (Docket # 49).[1]

## QUESTION NO. 1:

**State whether the alleged unlawful conduct is in violation of 18 U.S.C. §**
**1962(a), (b), (c) and/or (d).**

## RESPONSE TO QUESTION NO. 1:

The alleged wrongful conduct is in violation of Section 1962(c). In Counts VII

and VIII of the SAC, Plaintiffs assert claims against Defendants, Aetna Health Inc. PA,

Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health &

Life Insurance Company, Aetna Health, Inc. and Aetna Insurance Company of

Connecticut (collectively, "Aetna"), for violations of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. SAC, ¶¶ 1-24 (summary

---

[1]     For purposes of Defendants' pending Motion to Dismiss (Docket #58), "all
allegations contained in th[is] RICO Case Statement will ... be deemed true." *Bath
Unlimited, Inc. v. Ginarte, O'Dwyer, Winograd & Laracuente,* No. Civ. A. 04-03919
(KSH), 2005 WL 2406097, at *1 (D.N.J. Sept. 29, 2005) (citing *Mruz v. Caring, Inc.,* 991
F. Supp. 701 (D.N.J. 1998)); *see also Darrick Enterprises v. Mitsubishi Motors Corp.,*
No. Civ. A. 05-4359(NLH), 2007 WL 2893366, at *2-4, *5, *26 (D.N.J. Sept. 28, 2007)
(statements contained in RICO Case Statement may be considered by court, in
conjunction with allegations in plaintiffs' complaint, to determine whether civil RICO
claim has been stated); *Northland Ins. Co. v. Shell Oil Co.,* 930 F. Supp. 1069, 1073-74
(D.N.J. 1996) (citing Supreme Court and Third Circuit decisions in which courts "have
relied upon the RICO Case Statements filed by parties ... for a full statement of the
plaintiff's claims").

of Aetna's underpayment scheme); ¶¶ 25-26 (identification of Defendants); ¶¶ 254-278 (Count VII – RICO violations); and ¶¶ 279-297 (Count VIII – violations of RICO in ERISA plans).[2]

In Count VII (SAC ¶¶ 254-278), suing on behalf of themselves and the members of the RICO Class, Plaintiffs allege that in violation of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), Aetna carried out the underpayment scheme in connection with the conduct of an association-in-fact "enterprise" comprised of Aetna and Ingenix – the "Aetna-Ingenix Enterprise" – through a "pattern of racketeering activity." SAC ¶ 256 (alleging violation of Section 1962(c); *see also* ¶ 255 (identifying Aetna as liable "person"); ¶¶ 258-265 (describing "Aetna-Ingenix Enterprise"); ¶¶ 187-202, 266-275 (describing Aetna's "pattern of racketeering activity"); ¶¶ 276-278 (describing injuries to Plaintiffs' and RICO Class members' business or property).

In Count VIII (SAC ¶¶ 279-297), suing on behalf of themselves and the members of the RICO Class who are also members of the ERISA Class, Plaintiffs similarly allege that in violation of Section 1962(c) of RICO, Aetna carried out the underpayment scheme in connection with the conduct of an association-in-fact "enterprise" comprised of Aetna and Ingenix – the "Aetna-Ingenix Enterprise" – through a "pattern of racketeering activity." SAC ¶ 279 (alleging Aetna's violations of Section 1962(c); ¶¶ 187-202, 280-293 (describing Aetna's "pattern of racketeering activity"); ¶¶ 294-297 (describing injuries to Plaintiffs' and RICO Class members' business or property by reason of

---

[2]     In Count VII, Plaintiffs sue on behalf of themselves and the members of the "RICO Class," which is defined in ¶ 205 of the SAC. In Count VIII, Plaintiffs sue on behalf of themselves and the members of the "RICO Class" who are also members of the ERISA Class and described as members of the "ERISA Section 664 Subclass," which is defined in ¶ 206 of the SAC.

Aetna's underpayment scheme). Each element of Plaintiffs' claims for Defendants' violations of Section 1962(c) of RICO is properly alleged in Counts VII and VIII of the SAC.[3]

**QUESTION NO. 2:**

**List each defendant and state the alleged misconduct and basis of liability of each defendant.**

**RESPONSE TO QUESTION NO. 2:**

As set forth above (*see* Response to Question No. 1), in Counts VII and VIII of the SAC, civil RICO claims are asserted against Defendant Aetna for carrying out an underpayment scheme in connection with the conduct of the Aetna-Ingenix Enterprise through a pattern of racketeering activity. Defendant Aetna's underpayment scheme is described in detail in ¶¶ 5-24, 30-70, 71-119, 120-131, 132-182, 183-186, and 187-202 of the SAC. As alleged in ¶¶ 1-4 and 203-208 of the SAC, Plaintiffs and Class members are members and beneficiaries of group health insurance plans that were offered to them as employee benefits. Defendant Aetna, the company that offers, insures and administers those plans, is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"). Under the health care plans either directly insured or administered by Aetna, Plaintiffs and Class members are entitled to obtain health care services from "out-of-network" or "non-participating" health care providers; that is, providers who have not

---

[3]     In order to adequately plead a violation of Section 1962(c) of RICO, Plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, and a "pattern of racketeering activity" requires at least two predicate acts of racketeering. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985); *accord Lum v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir. 2004); *Darrick Enters.,* 2007 WL 2893366, at *4 (same); *South Broward Hosp. Dist. v. MedQuist, Inc.* 516 F. Supp. 2d 370, 388 (D.N.J. 2007) (same), *aff'd on other grounds*, No. 07-2076, 2007 WL 4394391 (3d Cir. Dec. 18, 2007).

entered into contracts with Aetna to serve as part of its provider network. Under these health care plans, subscribers are reimbursed a certain percentage of the "usual, customary and reasonable" ("UCR") fees for such services based on Aetna's calculation of the UCR rates. *See American Med. Ass'n v. United Healthcare Corp.,* 2006 WL 3383440, *1, 3, 8-16 (S.D.N.Y. Dec. 29, 2006) (refusing to dismiss similar RICO claims arising out of same underpayment scheme and brought against health care plan insurer and administrator).

Plaintiffs' SAC alleges that Defendants intentionally underpaid UCR based on an Ingenix Database to which it contributed falsified data. Aetna knew that its falsified contributions would decrease UCR data and save itself money at the expense of Plaintiffs and Class members.

**QUESTION NO. 3:**

**List each of the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.**

**RESPONSE TO QUESTION NO. 3:**

Paragraphs 19-21 of Plaintiffs' SAC identify an additional wrongdoer, other than Defendant Aetna; namely, Ingenix, Inc., which is a member of the Aetna-Ingenix Enterprise:

> To determine UCR, Aetna primarily relies on a computer database of provider charge data obtained from a third party, Ingenix, Inc. ("Ingenix"), which is a wholly-owned subsidiary of United Healthcare Corporation, another major insurer. Ingenix's databases are also known as the Prevailing Healthcare Charges System ("PHCS") and Medical Data Research ("MDR") (collectively, "Ingenix Databases").

> In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products, including MDR. In October 1998, Ingenix purchased the PHCS database from the Health Insurance

4

> Association of America ("HIAA"), a trade group for the insurance industry.
>
> Aetna is a contributor of provider charge data to the Ingenix Databases. Prior to contributing its data to Ingenix, Aetna deleted valid high charges. Following receipt of the data from Aetna, Ingenix then removed additional valid high charges from all contributors' data. Ingenix then published the corrupted database.   Aetna and Ingenix "cooked the books."   The corruption of the data invalidates its use by Aetna as the basis for determining UCR for Nonpar providers' services. These actions (among others referenced herein) violated both ERISA, a federal law designed to protect group health plan members and the Racketeer Influenced and Corrupt Organization Act ("RICO").

SAC ¶¶ 19-21.

As alleged in Paragraph 21, Plaintiffs allege that these actions committed by Defendant Aetna and Ingenix violate both ERISA and RICO; however, Ingenix is not named as a Defendant in Counts VII or VIII.

**QUESTION NO. 4:**

**List the alleged victims and state how each victim was allegedly injured.**

**RESPONSE TO QUESTION NO. 4:**

Plaintiff Cooper, her Aetna health care plan, and how Aetna's underpayment scheme injured her and other New Jersey Small Employer Health Plan members are described in SAC ¶¶ 30-70.   Plaintiff Werner, her Aetna health care plan, and how Aetna's underpayment scheme injured her and other ERISA plan members are described in SAC ¶¶ 71-119.   Plaintiff Franco, her Aetna health care plan, and now Aetna's underpayment scheme injured her and other ERISA plan members are described in SAC ¶¶ 120-131.  Under Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs and Class members allege that they have been injured in their "business or property."   Count VII of the SAC alleges:

5

> Plaintiffs and Members of the RICO Class were injured by reason of Aetna's RICO violations because they directly and immediately were underpaid benefits. Aetna further deprived them of the knowledge necessary to challenge its underpayments. Their injuries were proximately caused by Aetna's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Aetna's RICO violations (and commission of underlying predicate acts) and, but for Aetna's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

SAC ¶ 277. Count VIII of the SAC alleges:

> Aetna's RICO violations injured Plaintiffs and RICO Section 664 Subclass members by depriving them of hundreds of millions of dollars in guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations, and their injuries were proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Aetna's RICO violations (and commission of underlying predicate acts), and but for Aetna's RICO violations (and commission of underlying predicate acts), Plaintiffs and RICO Section 664 Subclass members would not have suffered the injuries suffered by them.

SAC ¶ 295.

In addition, as set forth in their attached affidavits, each of the named Plaintiffs paid out-of-pocket to their nonpar providers for amounts underpaid by Aetna. Plaintiff Michele Werner paid $6,233.50 out-of-pocket to her nonpar provider, at least $2,973.60 of which is not attributable to coinsurance and deductible amounts; rather, that $2,973.60 reflects the amount Werner paid as the difference between the provider's billed charge and Aetna's UCR amount. *See* Werner Declaration, ¶ 5. Werner acknowledges that if there are any unpaid amounts still owed to her provider, she will apply any additional amounts recovered from Aetna through this litigation to satisfy such debt. *Id.,* ¶ 4.

Plaintiff Darlery Franco paid at least $11,400 out-of-pocket to nonpar providers, at least $3,170.73 of which is not attributable to coinsurance and deductible amounts. At

least $3,170.73 reflects the amount Franco paid as the difference between the provider's billed charge and Aetna's UCR amount. *See* Franco Affidavit, ¶ 5. Franco states that she will use any additional benefits recovered from Aetna through this litigation to satisfy unpaid debts owed her providers. *Id.,* ¶ 4.

Plaintiff Michele Cooper has made "numerous payments in excess of the applicable deductibles and coinsurance to nonparticipating providers, including by credit card." *See* Cooper Affidavit, ¶ 5. Because she has recently moved and is pregnant, Michele Cooper's precise payment information is still being gathered. *Id.,* ¶ 6. She confirms, along with Werner and Franco, that she will use any additional benefits recovered from Aetna through this litigation to satisfy unpaid debts owed her providers. *Id.,* ¶ 4.

The above-referenced allegations of the SAC and the attached affidavits submitted by Plaintiffs are more than sufficient to show that they were injured in their "business or property," as required by Section 1964(c) of RICO, 18 U.S.C. § 1964(c).[4]

**QUESTION NO. 5:**

**Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim. A description of the pattern of racketeering activity shall include the following information:**

**a.     List the alleged predicate acts and the specific statutes which are allegedly violated;**

---

[4]     *See, e.g., Sedima,* 473 U.S. at 496; *Maio v. Aetna, Inc.,* 221 F.3d 472, 482-83 (3d Cir. 2000); *Eli Lilly & Co. v. Roussel Corp.,* 23 F. Supp. 2d 460, 483 (D.N.J. 1998); *cf. Rosenberg v. JCA Assocs., Inc.,* No. Civ. 03-0274 (JBS), 2007 WL 1038893 (D.N.J. Mar. 30, 2007) (summary judgment standard for showing that plaintiffs have sustained "concrete financial loss" proximately caused by defendants' RICO violation).

7

b.      Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;

c.      If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of the securities, provide the "circumstances constituting fraud or mistake [which] shall be stated with particularity." Fed. R. Civ. P. 9(b). Identify the time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made;

d.      State whether there has been a criminal conviction in regard to the predicate acts;

e.      State whether civil litigation has resulted in a judgment in regard to the predicate acts;

f.      Describe how the predicate acts form a "pattern of racketeering activity"; and

g.      State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe in detail.

**RESPONSE TO QUESTION NO. 5:**

a.-c.    <u>Defendant Aetna's Predicate Acts</u>

In Counts VII and VIII, Plaintiffs allege that Defendant Aetna violated Section 1962(c) of RICO by conducting the affairs of the Aetna-Ingenix Enterprise through a "pattern of racketeering activity." SAC ¶¶ 256, 266, 279, 295. The alleged "racketeering activity" consisted of violations of the federal mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. Count VII alleges:

8

Aetna, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the RICO Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for Nonpar services, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Such predicate acts include the following:

(a)   by mailing or causing to be mailed and otherwise knowingly agreeing to the mailing of various materials and information including, but not limited to, materially false and invalid UCR determinations and EOBs, for the purpose of saving Aetna money at its Members' expense, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

(b)   by transmitting or causing to be transmitted and otherwise knowingly agreeing to the transmittal of various materials and information including, but not limited to, materially false UCR determinations and related explanation of such determinations, by means of telephone, facsimile, and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

As set forth above, Aetna instructed its claims personnel to make Nonpar Benefit Reductions which were contrary to law and its members' EOCs and SPDs. Aetna knew that the data contributed to Ingenix was flawed and incomplete, but Aetna continued to use the Ingenix Databases anyway.

In furtherance of its underpayment scheme for Nonpar services, Aetna, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to further all aspects of the intentional underpayment to its member by delivering and/or receiving materials, including EOCs and SPDs, EOBs, appeal determinations, and other materials necessary to carry out the scheme to defraud Plaintiffs and other Members.

The foregoing communications via U.S. mail and interstate wire facilities contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of Aetna's scheme to defraud described in this Amended Complaint. Further, they were used to provide the under-payment scheme for Nonpar services with an appearance of legitimacy and regularity, and/or postpone ultimate discovery and

complaint of the under-payment scheme for Nonpar services, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

SAC ¶¶ 267-270.  Similar allegations concerning Aetna's predicate acts of mail and wire fraud may be found in Count VIII, *see* SAC ¶¶ 288-289.

Even more particularized allegations detailing Aetna's predicate acts of mail and wire fraud (and which are incorporated into Counts VII and VIII) are contained in the section of the SAC entitled "Aetna's RICO Predicate Acts," which alleges:

During the RICO Class Period and RICO Section 664 Subclass Period, Aetna engaged in a series of predicate acts underlying its RICO violations. These predicate acts include the dissemination through the U.S. Mail of numerous fraudulent, misleading and deceptive EOBs and other communications to Class Members, and by transmitting through the internet fraudulent, misleading and deceptive representations on its public website, as detailed in this Amended Complaint.

Aetna disseminated through the U.S. Mail numerous EOBs to Cooper including, but not limited to, EOBs dated May 13, 2005, June 1, 2005, July 6, 2005, August 17, 2005 and August 25, 2005. Each of these EOBs misrepresented that Aetna's reduction of the allowed amount below the billed charge was because the billed charge was "greater than the reasonable and customary charge."

Aetna mailed Franco correspondence including on December 11, 2003, December 19, 2003 and January 9, 2004 about her "authorized" and "approved" surgery. These statements were intentionally misleading. Aetna knew that its Nonpar Benefits Reductions would leave Franco financially responsible for tens of thousands of dollars.

Aetna sent EOBs to Franco dated March 18, 2004, March 22, 2004, August 19, 2004, and August 27, 2004 and September 1, 2004 that falsely advised her that her providers' surgery charges were "greater than the reasonable and customary charge" for the procedures.

These representations were knowingly false and misleading.  Aetna knew and recklessly disregarded that its method for setting reimbursement levels for Nonpar providers was fatally flawed and did not properly determine valid UCR levels, and that it did not have a valid basis upon which to

represent that the providers' bills were "greater than the reasonable and customary charge" for the relevant services.

Aetna similarly disseminated false statements in numerous EOBs it sent through the U.S. Mail to Werner including, but not limited to, EOBs dated April 1, 4 and 15, 2006, May 13, 2006, June 9, 2006, July 25, 2006, August 19, 2996, September 14, 2006, October 17, 2006, January 20, 2007, February 14, 2007, April 24, 2007, May 8, 2007, June 20, 2007 and July 19, 2007.

Each of Werner's EOBs misrepresented that the UCR reduction was based on the "prevailing charge level" for services "in the geographic area where it is provided." Neither statement is true because Aetna had no means by which to determine the "prevailing charge level" for the various services for which claims were submitted; nor did the data it relied upon provide valid charges for the geographic area in which the services were provided.

Aetna's overpayment recovery service also baselessly represented in dunning letters to its members that Aetna had overpaid UCR benefits and improperly referred the claimed underpaid bills to collection agencies when the alleged overpayments were not immediately refunded to Aetna.

In addition, all of Aetna's EOBs to Werner after date of service September 1, 2006 falsely stated that the UCR amount ($72) was the "prevailing charge level" for her Nonpar provider, without disclosing that Aetna was in fact unlawfully changing the base UCR from $120 to $72 by way of its undisclosed behavioral health tiering policy.

In making its UCR determinations, Aetna relied primarily on the Ingenix Databases and, from time to time, used Medicare rates. Neither methodology is a proper basis for UCR. With regard to the Ingenix Databases, Aetna, while serving as a major contributor of the data underlying the Ingenix Databases, knowingly submitted data to Ingenix that Aetna had improperly pre-edited to remove high charges, thereby artificially lowering the reported charges that were used to set UCR. The Ingenix Databases are flawed for numerous other reasons, as detailed in this Amended Complaint. Similarly, Medicare rates are not designed to and do not, establish UCR, and cannot legitimately be used for that purpose.

Regardless of whether the data Aetna relied upon from the Ingenix Databases were based upon actual or derived charges, they do not fall within the description provided by Aetna in its various EOBs. Because of the manipulation of the data by Aetna and Ingenix, as well as (among other reasons) the inclusion of data from all health care providers, regardless of licensure or experience, and the omission of modifiers, the

number based on actual data nevertheless failed to reflect the prevailing or customary charges. For derived data, which represents the vast majority of CPT Codes in PHCS and all of the charges in MDR, the numbers reported by Ingenix have no relation to actual billed charges, whether prevailing or otherwise. Thus, during the Class Period, Aetna defrauded its members through its false and misleading EOBs.

As a further aspect of its scheme to reduce Nonpar benefits below the level it was otherwise contractually required to pay, using the U.S. Mail and/or interstate wire facilities, Aetna submitted fraudulent certifications to Ingenix concerning its data. In particular, Ingenix requires its Data Contributors (including Aetna) to attest that the data being submitted for inclusion in the Ingenix Databases reflected all of the available data from the contributor, without being pre-edited or otherwise manipulated. Aetna falsely attested to this fact even though it had internal policies that precluded substantial data from being included in its submission to Ingenix. The impact of Aetna's manipulation of the data it submitted to Ingenix for inclusion in the Ingenix Databases was to lower the amount of the reported charges so as to reduce the ultimate numbers that Ingenix would report and which Aetna would use for making its UCR determinations. All of this material information was withheld from Plaintiffs and Class Members.

The EOBs sent by Aetna to Plaintiffs via U.S. Mail and reflecting UCR benefit reductions did not adequately disclose the basis for, nor the reasons behind, the exclusion of expenses, and thereby precluded Plaintiffs from the information they needed to challenge Aetna's UCR determinations. Aetna did not disclose whether it used a particular database, or Medicare rates, or some other methodology, and it did not disclose the required information about how Plaintiffs and Class Members might successfully appeal the UCR benefit reductions. Aetna failed to provide the specific reasons regarding unpaid Nonpar benefits, failed to impart necessary information about the appeals process, and failed to provide other information required under ERISA.

Aetna's correspondence by U.S. Mail to Franco misrepresented to her that various procedures specified by her surgeon (including the price for each specific code) were "authorized" and "approved." In fact, Aetna intended not to pay knowing that these procedures would leave tens of thousand of dollars unpaid by Aetna, for which Franco would be financially responsible.

Further predicate acts of mail and/or wire fraud were committed by Aetna in its responses to Werner's internal appeals of the UCR reductions. In its responses, disseminated by Aetna via U.S. Mail, Aetna made the following false and misleading statements:

- In its May 9, 2006 denial of Werner's first leave appeal, Aetna represented that it determined UCR rates "based on Reasonable Charges taking into consideration [the Nonpar provider's] type of specialty and her licensure." This was false because the Ingenix Databases do not permit any distinction to be drawn based on specialty and licensure.

- In the same letter, Aetna represented that, in determining UCR, it "refer[s] to statistical profiles of physicians' charges for the same or similar services in a geographic area." This was false because the Ingenix Databases do not provide a "statistical profile of physicians' charges" and do not report ". . . charges for the same or similar services . . . " at all, nor charges in a "geographic area" which is appropriately defined.

- In its June 26, 2007 denial of Werner's second level appeal, Aetna stated that it set UCR based on the PHCS database, representing it as "a statistical profile of provider's charges that has been developed for this purpose." This is false because not only do the Ingenix Databases not provide a "statistical profile of providers' charges," but the statement that PHCS "has been developed for this purpose" is directly contrary to and in violation of Ingenix's disclaimer, which specifically warns Aetna and other users of the Ingenix Databases that it was not intended to serve as a basis for providing UCR determinations.

- In its July 31, 2007 letter to Werner, Aetna claimed Werner had been overpaid for dates of service in October 2006 because "the correct allowed amount per date should have been $72.00 and paid $43.20. We should have paid a total of $172.80. The patient's responsibility is $115.20 coinsurance." These statements are false, because the allowed amount for that date (according to the Ingenix database) was $120, and was payable at $120. Plaintiff's coinsurance obligation ended on October 11, 2006. Further, Aetna's threat to send the overpayment to collection if she did not repay it was improper and harassing. Aetna subsequently sent Werner for collection action, which it stopped only after the Virginia DOI sent Aetna a "cease and desist" letter.

- In its July 31, 2007 letter to Werner's Nonpar provider, Aetna claimed that the Nonpar provider had been overpaid $57.60 by stating: "Our payment should have been $172.80, because we would have paid 60% of the prevailing fees." This statement was false because $72 was not the prevailing fee for the services at issue in Washington, DC. Aetna's threat to send the overpayment to recovery (or offset it from future payments) was without a proper basis.

13

Aetna's Internet website, to which its EOBs directed its Members for answers to their questions, was also fraudulent and misleading. The website represented to Aetna's Members, via the Internet (which utilizes interstate wire facilities), that Aetna made its UCR determinations based on the prevailing charges of what other providers charged for similar services. Moreover, the website represented that Aetna would take into account various factors, including the specialty of the provider and, if there were few charges or a small number of providers submitting charge data in a particular geographic area, it stated and represented that Aetna would consider the prevailing charges in other areas.

These statements, as disseminated to Plaintiffs and Class members via Aetna's Internet website, were false. In fact, the Ingenix Databases use derived data for the vast majority of CPT Codes, such that when there are less than nine charges reported in a particular geographic area prevailing charges from other areas are not used, as Aetna falsely represents. Further, even if there are more than eight charges contained in the Ingenix PHCS Database, and they are used to provide a dollar amount for a CPT code at a given percentile, the eight or more charges could all come from one provider, or a few providers of different licensure, specialties, training and experience performed at different places of service for patients of different ages, gender and disparate health conditions.

All of these factors affect the reasonableness of the billed charge. None of these factors are accounted for in the Ingenix Databases. Aetna has no way of knowing the number of providers who submitted data, or a way to differentiate between them, so that Aetna is unable to satisfy its representation on its website of checking the actual charges from other areas when there were only a small number of instances that a certain service was provided in an area. In addition, even when actual charge data was reported by Ingenix in the Ingenix PHCS Database, Aetna had no basis for concluding that these data reflected actual prevailing charges for the reasons cited above and in light of the manipulation of data by Ingenix as well as the improper pre-editing of submitted data by Aetna itself.

SAC ¶¶ 187-202.

In Count VIII of the SAC, Plaintiffs allege that Aetna also engaged in violations of Section 664 of Title 18 that constitute "racketeering activity":

Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under   . . . [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act.   18 U.S.C. § 1961(1)(B). Section 664 of Title 18 provides:

**Theft or embezzlement from employee benefit plan**

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

Each of the Aetna healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision of title I of the Employee Retirement Income Security Act of 1974," 29 U.S.C. § 1001, *et seq.*, is included in this Count, including Plaintiffs' plans.

Each of the Aetna healthcare plans that is subject to ERISA is funded by insurance coverage Aetna provides or administers. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

Plaintiffs' governing plan documents warrant that all benefits due under the plans will be paid. By improperly reducing payments on Nonpar claims, Aetna intentionally caused Plaintiffs and the members of the RICO Class who were *also* members of the ERISA Class (the "ERISA Section 664 Subclass") to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

For fully insured health care plans, in which Aetna both administered the plans and paid the benefits from its own assets, Aetna benefited from the conversion of assets from its ERISA plans. Whereas these assets should have been held by Aetna in its fiduciary capacity under ERISA, and paid to its Members, Aetna improperly withheld such funds and maintained them as part of its own assets for Aetna's own benefit. For self-funded health care plans, Aetna improperly prevented payment of benefits to the plan participants and beneficiaries in order to justify its receipt of administrative fees. Insurers such as Aetna benefited in the same way, while Ingenix benefited indirectly through the savings generated by its parent, United Healthcare, and directly through the licensing fees it received from Aetna and other insurers who used the flawed Ingenix Databases to commit RICO violations.

Aetna acted with specific intent to deprive Plaintiffs and RICO Section 664 Subclass members of guaranteed benefits, and was sufficiently aware of the facts to know that it was acting unlawfully and contrary to the trust placed in them by Plaintiffs and RICO Section 664 Subclass members and the insurers whose plans it was administering.

15

> Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended beneficiary, for Aetna's direct or indirect benefit.

SAC ¶¶ 280-286.

To the extent that the dates of, participants in, and description of facts surrounding the above-referenced predicate acts of "racketeering activity" are known to the Named Plaintiffs, the specifics are alleged in the above-referenced paragraphs of the SAC.[5]

### d.    Criminal Conviction

Plaintiffs are not aware of any criminal convictions in federal or state court arising out of Defendant Aetna's underpayment scheme and/or its commission of the above-referenced RICO predicate acts.

### e.    Civil Litigation

Paragraphs 46-55 of the SAC allege that Defendant Aetna's underpayment scheme violated New Jersey law and regulations.  Paragraph 56 of the SAC alleges:

> On July 23, 2007, the State of New Jersey Department of Banking and Insurance ("NJDOBI") ordered Aetna to pay nearly $10 million for systematic unfair business practices related to Aetna's determination of UCR for Nonpar services rendered to New Jersey Aetna members.

---

[5]     As to the pleading of the fraud-based RICO predicate acts that require Rule 9(b) specificity – violations of the federal mail and wire fraud statutes – the above-referenced allegations of the SAC inject the requisite amount of precision and substantiation required by the Third Circuit and the courts of this District because they allege who made the false and misleading statements, when they were made and to whom they were made. *See, e.g., Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied,* 469 U.S. 1211 (1985); *accord In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002); *Darrick Enters.,* 2007 WL 2893366, at **4-6, 8-9; *In re Ins. Brokerage Antitrust Litig.,* No. MDL 1663, Civ. 04-5184 (GEB), Civ. 05-1079 (GEB) 2007 WL 1062980, **5-6 (D.N.J. Apr. 5, 2007); *South Broward Hosp. Dist.,* 516 F. Supp. 2d at 384-85.

> NJDOBI determined that Aetna had calculated UCR by using a percentage of Medicare rates. For example, Aetna determined UCR for certain services (including lab and durable medical equipment) at 75% of the Medicare rate. For other services, Aetna determined UCR at 125% of the Medicare rate. Aetna's undisclosed and unauthorized use of Medicare rates to determine UCR for its Members left them with large unpaid balances for which they were financially responsible. Plaintiffs and the members of the Class are owed unpaid benefits for Aetna's Nonpar Benefit Reductions, in violation of its contractual and legal obligations.

SAC ¶ 56.

### f.   Pattern of Racketeering Activity

In Counts VII and VIII of the SAC, Plaintiffs allege that Defendant Aetna's above-referenced predicate acts constitute a "pattern of racketeering activity":

> The above-described acts of mail and wire fraud are related because they each involve common members, common Nonpar claim practices, common results impacting upon common victims, and are continuous because they occurred over several years, and constitutes the usual practice of Aetna such that they amount to and pose a threat of continued racketeering activity. Aetna's scheme to defraud is open-ended and not inherently terminable.
>
> \*\*\*
>
> The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of Aetna such that they amount to and pose a threat of continued racketeering activity.
>
> The purpose of Aetna's false payment schemes was to underpay the guaranteed benefits to which Plaintiffs and RICO Section 664 Subclass members are entitled to under health group plans, and convert those withheld funds for its own direct or indirect financial gain. It created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiffs and RICO Section 664 Subclass members, in order to increase revenue through its plan and claims administration business.

SAC ¶¶ 275, 292-293.

17

g.     **Common Plan**

The SAC alleges that Defendant Aetna's predicate acts of "racketeering activity" relate to each other as part of a common plan; namely, the illegal sales and marketing scheme. SAC ¶¶ 275, 292-293.

Counts VII and VIII sufficiently allege that Defendant Aetna engaged in a "pattern of racketeering activity" during the Class Period.[6]

**QUESTION NO. 6:**

6.     **State whether the existence of an "enterprise" is alleged within the meaning of 18 U.S.C. § 1961(4).  If so, for each such enterprise, provide the following information:**

(a)     **State the names of the individuals, partnerships, corporations, associations or other legal entities, which allegedly constitute the enterprise;**

(b)     **Describe the structure, purpose, function and course of conduct of the enterprise;**

(c)     **State whether any defendants are employees, officers or directors of the alleged enterprise;**

(d)     **State whether any defendants are associated with the alleged enterprise;**

---

[6]     *See H.J. Inc. v. N.W. Bell Tele. Co.,* 492 U.S. 229, 239-40 (1989); *Tabas v. Tabas,* 47 F.3d 1280, 1293-94 (3d Cir.) (*en banc*), *cert. denied,* 515 U.S. 1118 (1995); *Hughes v. Consol-Pa. Coal Co.,* 945 F.2d 594, 611 (3d Cir. 1991), *cert. denied,* 504 U.S. 955 (1992); *Darrick Enters.,* 2007 WL 2893366, at **6-9 *Emcore Corp. v. PricewaterhouseCoopers LLP,* 102 F. Supp. 2d 237, 250-55 (D.N.J. 2000); *Concern Sojuzvneshtrans v. Buyanovski,* 80 F. Supp. 2d 273, 278-79 (D.N.J. 1999); *Farmers & Merchts. Nat'l Bank v. San Clemente Fin. Group Sec., Inc.,* 174 F.R.D. 572, 583-84 (D.N.J. 1997); *Barr Labs., Inc. v. Bolar Pharm. Corp.,* Civil Action No. 91-4374, 1992 U.S. Dist. LEXIS 22883, at *23 (D.N.J. July 14, 1992).

18

(e)     State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and

(f)     If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.

**RESPONSE TO QUESTION NO. 6:**

a-b.    <u>Constituency, Structure, Function and Course of Conduct of Aetna-Ingenix Enterprise</u>

Consistent with the pleading burden imposed by Rule 8(a) of the Federal Rules of Civil Procedure,[7] the constituency, structure, function and course of conduct of the Aetna-Ingenix Enterprise is described in the SAC as follows:

> As described herein of this Amended Complaint, the Aetna-Ingenix Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which Aetna has engaged. In addition, the members of the Aetna-Ingenix Enterprise function as a structured and continuous unit, and performed roles consistent with this structure. The members of the Aetna-Ingenix Enterprise performed certain legitimate and lawful activities that are not being challenged in this Amended Complaint, including the provision of health insurance and plan and claims administration services by Aetna,

---

[7]     For purposes of this RICO Case Statement (and Defendant Aetna's pending motion to dismiss the SAC), under controlling Third Circuit precedent "it is enough that a plaintiff state what entities it believes constitute an enterprise – a plaintiff does not have to allege the elements to prove that an enterprise actually exists." *Darrick Enters.,* 2007 WL 2893366, at *7 (footnote omitted) (citing *Seville Indus. Mach. Corp.,* 742 F.2d at 789-90 (reversing district court's dismissal of plaintiff's civil RICO claim because it failed to allege three elements to prove existence of "enterprise" because "the district court confused what must be pleaded with what must be proved," and holding that the plaintiff sufficiently pleaded the entities it believed constituted a RICO "enterprise")); *accord Hollis-Arrington v. PHH Mortgage Corp.,* 205 App'x 48, 53-54 (3d Cir. 2006). *See also Emcore Corp.,* 102 F. Supp. 2d at 263-64 (clarifying civil RICO plaintiff's burden to *identify* the "enterprise[s]" in his, her, or its complaint).

which was done for many claims lawfully and without resort to unlawful practices. However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations. Aside from legitimate activities carried out by the members of the Aetna-Ingenix Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Amended Complaint including, but not limited to, intentional underpayment of Aetna Members resulting from the use of flawed and invalid data for its UCR determinations.

The purpose of the Aetna-Ingenix Enterprise was to create a mechanism by which Aetna could reduce benefit payments for Nonpar services through use of flawed and invalid data, but to do so through a means that subscribers would be unable to challenge effectively. In particular, as described herein, the Aetna-Ingenix Enterprise created what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix Databases were designed to appear valid as a basis for UCR when, in fact, they were invalid. Through their roles in the Aetna-Ingenix Enterprise, Ingenix benefited indirectly through the monies saved by United Healthcare, its parent corporation, and by enhancing its ability to earn licensing fees through the sale of the Ingenix databases, while Aetna benefited by reducing the amount of benefits it paid for Nonpar services through the use of the Ingenix Databases to price UCR. Ingenix also used data submitted by Data Contributors to create other products, the licensing and sale of which directly benefited Ingenix.

As alleged herein, although Ingenix issues a disclaimer to the users of the Ingenix Databases, including Aetna, Aetna continued to use the Ingenix Databases in a manner directly at odds with the disclaimer, while Ingenix knew that its users were using the Ingenix Databases improperly to make UCR determinations. At the same time it was issuing a disclaimer in an effort to provide itself with legal protection, Ingenix was also promoting Ingenix Databases as a cost-savings mechanism that could save substantial sums to those who used them in making UCR determinations. Thus, Aetna and Ingenix expressly observed the disclaimer in the breach despite the fact that the disclaimer was correct in reporting that the Ingenix Databases could not be used as a basis for making UCR determinations.

Similarly, as alleged herein, while Ingenix required certifications from the Data Contributors, including Aetna, that purportedly verified that they were submitting all available data and were not pre-editing or otherwise manipulating the data prior to its contribution, Ingenix knew full well that these certifications were invalid because users of the Ingenix Databases, including Aetna, were not submitting all of their data and were pre-editing and manipulating the data prior to its submissions in furtherance of

20

Ingenix's effort to understate UCR amounts. The pre-editing and incomplete submission of data to Ingenix benefited Ingenix, and users of the Ingenix Databases, including United Health Care, Ingenix's parent company, and Aetna. Ingenix also failed to conduct any audits or reviews of its data to ensure that the data were valid and appropriate.

Ingenix and Aetna knew that the Ingenix Databases were being used without Aetna Members, or other health plan members, ever being informed of the disclaimer or the inherent flaws in the Ingenix Databases. For example, Aetna falsely reported to Class members that its reductions were based on UCR when, in fact, the reductions were based on flawed and invalid Ingenix Databases that substantially underreported UCR. Aetna referred overpayment recovery actions to collection agencies based on the flawed Ingenix data. At the same time, Aetna ensured that lawfully required information concerning Nonpar Benefit Reductions was not disseminated to Aetna Members, in violation of Aetna members' EOCs and federal law.

Aetna participated in the Aetna-Ingenix Enterprise in order to shift the costs of medical treatment provided by Nonpar providers from Aetna to its Members, to reduce Aetna's UCR payments and to create an appearance of legitimacy for its Nonpar Benefit Reductions. Aetna provided false and incomplete information to Aetna members to convert those withheld funds for the Aetna-Ingenix Enterprise's own direct and indirect financial gain, and to discourage its Members from using Nonpar providers. Because Aetna saves money when Par providers render services, the Aetna-Ingenix Enterprise saved Aetna money at the expense of Aetna Members. In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by Aetna and other users of the Ingenix Databases, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of Aetna alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

Aetna further used the Enterprise to facilitate its goal of reducing Nonpar benefits by submitting pre-edited and manipulated data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix Databases and which Aetna relied upon to make UCR determinations. As part of this fraudulent scheme, as alleged herein, Aetna submitted false certifications to Ingenix which attested that it was submitting all of its data, when it was not. Neither Ingenix nor its parent company, United Healthcare, took steps to audit or otherwise validate the data that Ingenix was receiving from Aetna and other data contributors. Ingenix was aware of the manipulation of data by Data Contributors such as Aetna, but allowed it to occur, since it was consistent with Ingenix's goal to underreport UCR.

21

If Aetna had not entered into the Aetna-Ingenix Enterprise by submitting pre-edited and manipulated data to Ingenix, it would not have been able to obtain the benefits it did from the Enterprise. Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix Databases were the largest available and had sufficient numbers to remove any doubt as to their validity. Ingenix also needed data that reported sufficiently low charges so that it could represent to its users that the Ingenix Databases would save users money used to make UCR determinations. Without data from Aetna and United Healthcare, the Ingenix Databases could not have been successfully marketed for UCR pricing. Similarly, Aetna could not have saved the millions of dollars it did if it had not used the Ingenix Databases for making UCR determinations even though it knew that they were flawed and invalid. By using the Ingenix Databases for making its UCR determinations, misrepresenting them as providing a valid and unassailable basis for such decisions, and deterring its subscribers from challenging or otherwise raising questions over how it set UCR, Aetna was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and United Health Care.

SAC ¶¶ 258-265. (These allegations are also incorporated by reference into Count VIII of the SAC, *see* ¶ 279.)

### c.    Defendant as Employee, Officer, or Director of Enterprise

Defendant Aetna is neither an employee, nor an officer, nor a director of the Aetna-Ingenix Enterprise; rather, Aetna is a member of that association-in-fact enterprise. SAC ¶¶ 256, 279.

### d.    Defendant as Associated with the Enterprise

As alleged in the SAC, Defendant Aetna is associated with the Aetna-Ingenix Enterprise. SAC ¶¶ 256, 258-265, 279.

### e.    Relationship Between Defendant and Enterprise

As alleged in the SAC, Defendant Aetna is a member of the Aetna-Ingenix Enterprise. SAC ¶¶ 256, 258-265, 279.

**f.     Perpetrators, Passive Instruments, or Victims of Racketeering Activity**

As alleged in the SAC, Defendant Aetna is a member of the Aetna-Ingenix Enterprise and is alleged to be a perpetrator of racketeering activity.  SAC ¶¶ 256, 258-265, 279.

The above-referenced allegations of the SAC are sufficient to satisfy Plaintiffs' pleading burden to identify the "enterprise" element of their civil RICO claims, as well as the necessary distinctions between the "person" and the "enterprise" and between the "enterprise" and the "pattern of racketeering activity."[8]

**QUESTION NO. 7:**

**State and describe in detail whether you are alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

**RESPONSE TO QUESTION NO. 7:**

As alleged in the SAC, and in accordance with *United States v. Turketter,* 452 U.S. 576, 583 (1981), Plaintiffs allege that the "pattern of racketeering activity" and the Aetna-Ingenix Enterprise are separate and distinct.[9]

---

[8]     *See, e.g., Darrick Enters.,* 2007 WL 2893366, at *7; *South Broward Hosp. Dist.,* 516 F. Supp. 2d at 390 & n.12, 391-92, 394; *In re Ins. Brokerage Antitrust Litig.,* MDL No. 1663, Civ. A. 04-5184 (FSH), Civ. A. 05-1079 (FSH), 2006 WL 2850607, at *15 (D.N.J. Oct. 3, 2006); *Emcore Corp.,* 102 F. Supp. 2d at 260-61; *Kievit v. Rokeach,* Civ. Action No. 86-2592  1987 U.S. Dist. LEXIS 16131, at *61 (D.N.J. Oct. 29, 1987).

[9]     Plaintiffs note, however, that under RICO, evidence that serves to establish the "enterprise" element of a civil racketeering claim need not be distinct or different from the proof that establishes the "pattern of racketeering activity" element of that claim. *See United States v. Turkette,* 452 U.S. 576, 583 (1981) (proof used to establish separate elements of RICO offense or claim may "coalesce"); *United States v. Irizarry,* 341 F.3d 273, 286 (3d Cir. 2003) ("enterprise" can be inferred from proof of "pattern of racketeering activity"), *cert. denied,* 540 U.S. 1140 (2004); see also Amer. Med. Ass'n. 2006 WL 3833440, *13-16 & n.15.

**QUESTION NO. 8:**

Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity. Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.

**RESPONSE TO QUESTION NO. 8:**

Plaintiffs' allegations as to how Defendant Aetna's "pattern of racketeering activity" is distinct from the usual and daily activities of the Aetna-Ingenix Enterprise and its members are contained in Paragraphs 258-265 of the SAC, which are quoted in the Response to Question No. 6(a)-(b) and footnotes threto.

**QUESTION NO. 9:**

Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering activity.

**RESPONSE TO QUESTION NO. 9:**

The financial benefits received by Defendant Aetna and Ingenix – the members of the Aetna-Ingenix Enterprise – are described in Paragraph 259 of the SAC:

> The purpose of the Aetna-Ingenix Enterprise was to create a mechanism by which Aetna could reduce benefit payments for Nonpar services through use of flawed and invalid data, but to do so through a means that subscribers would be unable to challenge effectively. In particular, as described herein, the Aetna-Ingenix Enterprise created what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix Databases were designed to appear valid as a basis for UCR when, in fact, they were invalid. Through their roles in the Aetna-Ingenix Enterprise, Ingenix benefited indirectly through the monies saved by United Healthcare, its parent corporation, and by enhancing its ability to earn licensing fees through the sale of the Ingenix databases, while Aetna benefited by reducing the amount of benefits it paid for Nonpar services through the use of the Ingenix Databases to price UCR. Ingenix also used data submitted by Data Contributors to create other products, the licensing and sale of which directly benefited Ingenix.

SAC ¶ 259.

**QUESTION NO. 10:**

Describe the effect of the activities of the enterprise on interstate or foreign commerce.

**RESPONSE TO QUESTION NO. 10:**

Paragraph 257 of the SAC alleges that at all relevant times, "the Aetna-Ingenix Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO...." SAC ¶ 257. Paragraphs 187-202 of the SAC, which detail "Aetna's RICO Predicate Acts," allege that the affairs of the Aetna-Ingenix Enterprise were carried out through a "pattern of racketeering activity" consisting of unlawful uses of the U.S. mail and interstate wire facilities.

**QUESTION NO. 11:**

If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:

a. State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and

b. Describe the use or investment of such income.

**RESPONSE TO QUESTION NO. 11:**

The SAC does not allege a violation of 18 U.S.C. § 1962(a); however, Plaintiffs reserve the right to amend the SAC to assert such a claim following discovery.

**QUESTION NO. 12:**

If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.

**RESPONSE TO QUESTION NO. 12:**

The SAC does not allege a violation of 18 U.S.C. § 1962(b).

**QUESTION NO. 13:**

If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:

    **a.**    State who is employed by or associated with the enterprise; and

    **b.**    State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).

    **c.**    Describe specifically how the defendant(s) participated in the operation or management of the enterprise.

**RESPONSE TO QUESTION NO. 13:**

    **a.**    <u>Employed by or Associated with Enterprises</u>:

Plaintiffs allege that Defendant Aetna is associated with the Aetna-Ingenix Enterprise.

    **b.**    <u>"Person"/"Enterprise" Distinction</u>

Defendant Aetna, which is identified as the liable RICO "person" in Counts VII and VIII of the SAC, is not the same as the Aetna-Ingenix Enterprise; rather, Aetna is a member of the Aetna-Ingenix Enterprise.

    **c.**    <u>Operation or Management of Enterprise(s)</u>

In Counts VII and VIII of the SAC, Plaintiffs allege that Defendant Aetna participated in the operation or management of the Aetna-Ingenix Enterprise by controlling and manipulating the Ingenix Databases. <u>See also</u> Responses to Question Nos. 2, 3, 5 and 6, <u>Amer. Med. Ass'n</u>, 206 WL 3833440, *13-14.

**QUESTION NO. 14:**

If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.

**RESPONSE TO QUESTION NO. 14:**

The SAC does not allege a violation of 18 U.S.C. § 1962(d); however, Plaintiffs reserve the right to assert a civil RICO conspiracy claim following discovery.

**QUESTION NO. 15:**

**Describe the alleged injury to business or property.**

**RESPONSE TO QUESTION NO. 15:**

*See* Response to Question Nos. 1, 2 and 4.

**QUESTION NO. 16:**

**Describe the direct causal relationship between the alleged injury and the violation of the RICO statutes.**

**RESPONSE TO QUESTION NO. 16:**

*See* Responses to Question Nos. 1, 2, 4 and 15.

**QUESTION NO. 17:**

**List the damages sustained by reason of the violation of § 1962, including the amount for which each defendant is allegedly liable.**

**RESPONSE TO QUESTION NO. 17:**

*See* Responses to Question Nos. 1, 2, 4, 15 and 16.

**QUESTION NO. 18:**

**List all other Federal causes of action, if any, and provide the relevant statute numbers.**

**RESPONSE TO QUESTION NO. 18:**

Counts I through VII of the SAC assert claims arising out of Defendant Aetna's violations of ERISA.

**QUESTION NO. 19:**

    **List all pendent state claims if any.**

**RESPONSE TO QUESTION NO. 19:**

    The SAC does not assert any pendent state law claims against Defendant Aetna.

**QUESTION NO. 20:**

    **Provide any additional information that you feel would be helpful to the Court in processing your RICO claim.**

**RESPONSE TO QUESTION NO. 20:**

    The SAC is based upon facts and information available to Plaintiffs and their counsel at this time. Two of Aetna's Rule 30(b)(6) designees (Sharon Chilcott and Deborah Justo) testified under oath, pursuant to subpoena, in the *Wachtel/McCoy v. HealthNet* matter. These deponents produced documents that clearly reflected Aetna's use of a fixed formula which deleted numerous high charges from its data before the remainder was transmitted to Ingenix. Plaintiffs' UCR expert, Dr. Bernard Siskin, has referenced Aetna's pre-edited data as one of the compelling factors resulting in the invalidity of the Ingenix Databases. More precise factual details regarding the misconduct and predicate acts of Defendant Aetna remain hidden and exclusively in its possession, custody and control. Because the misconduct and many RICO predicate acts relate to the internal affairs of Defendant Aetna (namely, its underpayment scheme), Plaintiffs cannot be expected to provide additional factual details at this stage in the litigation.[10]

---

[10]   *See In re Craftmatic Sec. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989) ("Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Thus, courts have relaxed [Rule 9(b)] when factual information is peculiarly within the defendant's knowledge or control.") (internal citations

DATED:  January 15, 2008

Respectfully submitted,

**WILENTZ, GOLDMAN & SPITZER, P.A.**

By _____

Barry M. Epstein, Esq.
Barbara Gail Quackenbos, Esq.
Lynne M. Kizis, Esq.
Kevin P. Roddy, Esq.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000

**POMERANTZ      HAUDEK      BLOCK
GROSSMAN & GROSS LLP**
Stanley M. Grossman, Esq.
D. Brian Hufford, Esq.
Robert J. Axelrod, Esq.
Susan J. Weiswasser, Esq.
100 Park Avenue
New York, NY  10017
Telephone:  (212) 661-1100

---

omitted); *accord South Broward Hosp. Dist.,* 516 F. Supp. 2d at 383-85 (same); *Zavala v. Wal-Mart Stores, Inc.,* 393 F. Supp. 2d 295, 313 (D.N.J. 2005) (same); *In re Midlantic Corp. S'holders Litig.,* 758 F. Supp. 226, 231-32 (D.N.J. 1990) (same); *Kronfeld v. First Jersey Nat'l Bank,* 638 F. Supp. 1454, 1465 (D.N.J. 1986) (same); *see also Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674, 680 (6th Cir. 1988) (relied upon by Third Circuit in *Craftmatic* and applying these principles in civil RICO setting).

29

**SIEGEL BRILL GREUPNER DUFFY & FOSTER, P.A.**
Wood R. Foster, Jr., Esq.
Jordan Lewis, Esq.
1300 Washington Avenue South
Minneapolis, MN  55401
Telephone:  (612) 337-6100

**Counsel for Plaintiffs and the Members of the Proposed Class**