# PART
# I

**WILENTZ, GOLDMAN & SPITZER, P.A.**
900 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, New Jersey 07095-0958
(732) 636-8000

**POMERANTZ HAUDEK BLOCK GROSSMAN**
**& GROSS LLP**
100 Park Avenue
New York, New York 10017
(212) 661-1100

Counsel for Plaintiffs and the Class
(Additional Counsel Listed on Signature Page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MICHELE COOPER, MICHELE WERNER, DARLERY FRANCO and DOREEN RIZOPOULOS, individually and on behalf of all others similarly situated, | : : : : : | Case No.: 07cv3541(FSH)(PS) |
| Plaintiffs, | : : | **THIRD AMENDED** |
| -against- | : : | **CLASS ACTION COMPLAINT** |
| AETNA HEALTH INC. PA, CORP., AETNA HEALTH MANAGEMENT, LLC, AETNA LIFE INSURANCE  COMPANY, AETNA HEALTH and LIFE INSURANCE COMPANY, AETNA HEALTH INC., and AETNA INSURANCE COMPANY OF CONNECTICUT, | : : : : : : : : : | **JURY TRIAL FOR ALL** **CLAIMS SO TRIABLE** |
| Defendants. | : : | |

Plaintiffs Michele Cooper ("Cooper"), residing in Short Hills, New Jersey, Michele

Werner ("Werner"), residing in Arlington, Virginia, Darlery Franco ("Franco"), residing in

Newark, New Jersey, and Doreen Rizopoulos ("Rizopoulos"), residing in Chappaqua, New York,

#3839345.02 (149859.002)

to the best of their knowledge, information and belief, formed after an inquiry reasonable under the circumstances, for their Third Amended Class Action Complaint (hereinafter "TAC"") assert the following against Defendants Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc. and Aetna Insurance Company of Connecticut (collectively "Aetna" or "Defendants").

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

1.     Throughout the Class Periods, as defined below, Plaintiffs were insured by Aetna and Plaintiffs sought benefits for treatments for a variety of medical conditions.  Aetna engaged in an adversarial battle with Plaintiffs, denying coverage for substantial portions of the bills they received from the treating providers, thereby transferring crushing medical costs to Plaintiffs that should have been covered by Aetna.

2.     Each of the named Plaintiffs was a member of a health insurance plan offered through employers during the Class Period.  Aetna exercised all discretionary authority and control over the administration of the plan of each Plaintiff, including the management and disposition of benefits under the terms of the plan.  Plaintiffs Cooper, Werner and Franco are not currently insured by Aetna, although they were when the coverage disputes described herein arose.  Plaintiff Rizopoulos continues to be insured by Aetna.

3.     As the company that issues, insures and administers these employee benefit plans through which Plaintiffs received their insurance, Aetna is subject to the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") and its governing regulations.  Further, due to the role Aetna played in administering the plans of each of the Plaintiffs, including by

making coverage and benefit decisions and deciding appeals, Aetna has assumed the role as a fiduciary under ERISA toward each of the Plaintiffs.

4. ERISA uses the term "participant" to refer to a subscriber in an employee benefit health plan, while the term "beneficiary" refers to a subscriber's dependents who also are entitled to receive benefits under the plan. In this TAC, Plaintiffs will refer to beneficiaries and participants as "Members."

5. Aetna issues an Evidence of Coverage ("EOC" or "Certificate") to its participants and beneficiaries ("Aetna Members") that sets forth the benefits that Aetna promises to provide. According to Aetna's publicly available website designed for use by Aetna Members, Aetna defines a member as "a subscriber or dependent who is enrolled in and covered by a healthcare plan." *See* www.aetnanavigator.com (Glossary).

6. According to its website, Aetna's Certificate represents a "legal agreement between an individual subscriber or an employer group ('Contract holder') and a health plan that describes the benefits and limitations of the coverage." *Id.*

7. Aetna's website further defines "Health Benefit Plan" as "[t]he health insurance or HMO product offered by a licensed health benefits company that is defined by the benefit contract and represents a set of covered services or expenses accessible through a provider network, if applicable, or direct access to licensed providers and facilities." *Id.*

8. Under their Aetna healthcare plans, Plaintiffs have an express right to receive services from providers who have **not** entered into contracts with Aetna to accept reduced fees in exchange for greater access to Aetna's Members. These providers are known as nonparticipating ("Non-Par") providers. For other plans, including certain Health Maintenance Organization

("HMO") plans, Aetna Members may use Non-Par providers in emergencies, when they are out

of the home area, or when no participating provider is qualified or available to perform the

medically necessary service.   When Aetna Members receive Non-Par services, Aetna's payment

is based on the lesser of the billed charge or the usual, customary and reasonable ("UCR")

amount for that service in the geographic area in which it was performed.   Aetna uses the terms

"UCR," "customary and reasonable," and "reasonable charge" interchangeably.

  9. Aetna's website represents that Aetna determines reimbursement for Out-of-

Network or Non-Par providers by calculating UCR:

> **Out-of-Network**.  The use of health care providers who have not contracted with
> the health plan to provide services.   Members enrolled in preferred provider
> organizations (PPO) and point-of-service (POS) coverages can go out-of-network
> for covered services, but will pay additional costs in the form of deductibles and
> coinsurance and will be subject to benefit and lifetime maximums.   Because
> reduced fees are not negotiated with out-of-network providers, Aetna will
> calculate reimbursement based on the usual, customary and reasonable ["UCR"]
> charge (see *definition*).   Members are responsible for all charges above UCR in
> addition to any deductible and coinsurance provisions.

  10. Aetna calculates benefits for Non-Par services based on its determination of the

UCR for the services at issue.   Aetna's website defines the Customary and Reasonable charge as

follows:

> The amount customarily charged for the service by other providers in the same
> Geographic area (often defined as a specific percentile of all charges in the
> Community), and the reasonable cost of services for a given patient.  **Also called
> "Usual, Customary, and Reasonable" (UCR).**

  11. Aetna's   website   also   includes   on   its   website   its   standard   definition   for

"Reasonable Charge," as follows:

> The charge for a covered benefit, which is determined by Aetna to be the
> prevailing charge level, for the service or supply in the geographic area where it is
> furnished.   Aetna may take into account factors such as the complexity, degree of
> skill needed, type or specialty of the Provider, range of services provided by a

facility, and the prevailing charge in other areas in determining the Reasonable Charge for a service or supply that is unusual or is not often provided in the area or is provided by only a small number of providers in the area.

12.     Aetna treats all of its definitions of UCR in its plans as having identical meanings and applies uniform policies for calculating UCR.

13.     Aetna often refers to UCR as the "amount allowed." Aetna makes clear in its EOCs and Explanation of Benefits ("EOBs"), that the Member is financially responsible for the difference between UCR (amount allowed) and the provider's billed charge for Non-Par services. For example, Aetna's website states that "Members are responsible for all charges above UCR in addition to any deductible and coinsurance provisions." *Id.* The difference between UCR and the billed charge is often referred to in Aetna's Explanation of Benefits ("EOB") sent to its Members as "excluded expenses." Excluded expenses are not credited toward its Members' annual deductible for Non-Par services, nor the annual out-of-pocket maximum.

14.     In-network or contracted or participating ("Par") providers contract with Aetna to accept reduced or discounted fees for their services. When a Member uses a Par provider, his or her financial responsibility is limited to a specified co-payment, typically in the range of $10 to $30 per service.

15.     Aetna's website defines "Non-Participating Provider" as follows: "This term is generally used to mean providers who have not contracted with a health plan to provide services at reduced fees. Also called Non-Preferred Care Provider." When an Aetna Member uses a Non-Par provider, Aetna imposes additional costs on the Member in the form of higher deductibles and coinsurance, and benefit and lifetime maximums. Aetna does not begin to pay for Non-Par services until the Aetna Member has satisfied his or her calendar year deductible.

Once a Member satisfies the deductible, then Aetna will pay a share (typically 80%) of the allowed amount for Non-Par Services.  If and when a Member reaches a maximum amount of out-of-pocket expenses for Non-Par services, typically in the range of $1,500 - $3,000, the Member has no further coinsurance obligation (*e.g.*, 20% of the allowed amount) for any additional Non-Par services for that calendar year.  Aetna does not credit amounts above UCR to the Member's deductible or out-of-pocket maximum.

16.     In certain instances, such as when a referral from a primary care physician is not obtained, Aetna considers a Par provider to be Non-Par.  Aetna pays UCR for the service that was rendered by the Par provider in such circumstances and the Member is responsible for any unpaid amounts above UCR.

17.     During the Class Period, Aetna failed to properly calculate deductibles, coinsurance and out-of-pocket maximums in violation of Plaintiffs' healthcare plans, as described in the EOCs.  By failing to properly calculate these amounts, Aetna subsequently underpaid Plaintiffs and other Aetna Members for Non-Par services.  Despite complaints regarding Aetna's underpayments, Aetna did not correct its underpayments.

18.     At times during the Class Period, Aetna paid Non-Par hospital and medical services by using repricing vendors.  In the event a Non-Par provider had a contracted agreed-to fee with a repricer accessed by Aetna, Aetna would pay the agreed-to fee.  Despite Aetna's payment to the provider of the contracted agreed-to fee, Aetna would nevertheless calculate the Member's coinsurance at the higher amount applicable to services from Non-Par providers. Aetna should have applied the lower fee's reduced coinsurance applicable to contracted services. Aetna's improper calculation of coinsurance violated the plans and federal and state laws .

19.     Aetna is obligated to pay accurate UCR to its Members for Non-Par services consistent with the UCR definition.

20.     Aetna fails to comply with its own UCR definition by failing to pay benefits based on accurate UCR rates to its Members for Non-Par services (whether by Non-Par providers or by Par providers considered Non-Par by Aetna).

21.     To determine UCR, Aetna primarily relies on a database it acquired from Ingenix, Inc. ("Ingenix"), which is a wholly-owned subsidiary of United Healthcare Corporation, another major insurer.  Ingenix's databases are also known as the Prevailing Healthcare Charges System ("PHCS") and Medical Data Research ("MDR")  (collectively, "Ingenix Databases").

22.     In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products, including MDR. In October 1998, Ingenix purchased the PHCS database from the Health Insurance Association of America ("HIAA"), a trade group for the insurance industry.

23.     Aetna is a contributor of provider charge data to the Ingenix Databases.  Prior to contributing its data to Ingenix, Aetna deleted valid high charges.  Following receipt of the data from Aetna, Ingenix then removed additional valid high charges from all contributors' data. Ingenix then published the corrupted database.  Aetna and Ingenix "cooked the books."  The corruption of the data invalidates its use by Aetna as the basis for determining UCR for Non-Par providers' services.  These actions (among others referenced herein) violated both ERISA, a federal law designed to protect group plan participants and beneficiaries, and the Racketeer Influenced and Corrupt Organization Act ("RICO").

24.     In addition to UCR determinations based on the Ingenix Databases, Plaintiffs and class members challenge other Non-Par benefit reductions, including those imposed by use of the following methods:  use of discounted amounts or Par provider fee schedules; use of Medicare data; use of the average wholesale price ("AWP") to determine UCR for pharmaceutical drugs; failing to pay appropriately for emergency room ("ER") services; failing to properly credit deductible amounts and out-of-pocket maximums; failing to provide an appropriate appeals process mechanism; approving requests for preauthorization without disclosing its nonpayment of a large percentage of the billed charges; threatening to refer members and Non-Par providers to collection agencies based on baseless allegations of overpayment by Aetna; and other improper practices.

25.     Aetna's improper  reductions in benefits for Non-Par services ("Non-Par Benefit Reductions") leave Aetna Members financially responsible for unpaid amounts that Aetna is obligated to pay under the terms of its healthcare plans.     Because the Non-Par Benefit Reductions are "exclusions" of coverage under the ERISA plans, Aetna has the burden to demonstrate that its exclusions comply with its plan and legal obligations.  Plaintiffs allege that Aetna cannot sustain its burden regarding its Non-Par Benefit Reductions, and seek unpaid benefits and other relief for themselves and on behalf of ERISA Class members.

26.     Aetna made numerous UCR and other Non-Par Benefit Reductions for Plaintiffs based on practices challenged herein as violative of federal and New Jersey law, including UCR based on manipulated and invalid data from the Ingenix Databases or based on Medicare rates.

27.     Aetna is legally obligated to adhere to the specific provisions of its Members' group health plans.

28.     Aetna cannot make Non-Par Benefit Reductions if they are not authorized or accurately disclosed in Aetna Members' Certificates and SPDs.  During the Class Period, Aetna breached Members' Certificates and SPDs when it made Non-Par Benefit Reductions.

29.     Plaintiffs and Class Members challenge Aetna's systemic application of rules and policies in making Non-Par Benefit Reductions that are not authorized by Aetna Members' Certificates and SPDs; its routine violation of its fiduciary duties; and its failure to comply with ERISA, federal claims procedure regulations, federal common law and other applicable law.

30.     Aetna's EOBs reflecting Non-Par Benefit Reductions did not comply with legal requirements, including federal claims procedure regulations.  The EOBs failed to advise Aetna Members of the specific reasons for the denial, the specific plan provisions, and their appeal rights.  Aetna's EOBs reflecting UCR determinations failed to advise Plaintiffs of the data that Aetna used to calculate UCR.

31.     Various procedural rules that covered Plaintiffs' appeals were also violated. Aetna's substantive and procedural violations prevent Aetna from relying on defenses to Plaintiffs' claims, such as exhaustion or statutes of limitations.

32.     Aetna discouraged appeals by vouching for its Non-Par Benefit Reductions Aetna's conduct toward Plaintiffs and Class Members clearly demonstrate  that appeals of Aetna's Non-Par Benefit Reductions are futile.  As shown above, when a provider appealed, Aetna did not provide necessary and critical information, and did not provide the member with a copy of the appeals decision.

33.     Aetna's failure to reveal critical information during the appeals process, made a "full and fair review" unavailable to Aetna Members.  In certain cases, Aetna circumvented the

appeals process, by handling complaints outside of the formal appeals process and not issuing written decisions.

34.     Plaintiffs, on behalf of themselves and all similarly situated Aetna Members, allege that Aetna's Non-Par Benefit Reductions violate ERISA and RICO.  In addition, Plaintiff Cooper, was a member of a small employer health plan ("SEHP") under New Jersey law.  She alleges that Aetna's Non-Par Benefit Reductions are also contrary to the requirements of New Jersey law specific to New Jersey SEHP members, which similarly violated ERISA and RICO.

35.     The protections imposed by the New Jersey SEHP Regulation required health insurance companies, including Aetna, to reimburse Non-Par hospital services provided to SEHP members based on the hospital's billed charge.  New Jersey law prohibits Aetna and other insurers from using fee schedules or other databases to reduce payment to its SEHP members who receive hospital services.  Instead, Aetna was obligated by law to pay the Non-Par hospital's billed charge less any applicable coinsurance.  Aetna failed to comply with New Jersey law.

36.     New Jersey law also requires that Aetna reimburse Non-Par medical (non-hospital) services provided to SEHP members at the 80th percentile of the most updated Ingenix fee schedule.  Such payment must be made without other reductions, such as for multiple or bilateral procedures.

37.     Aetna failed to comply with New Jersey law applicable to Non-Par hospital and medical services to the detriment of Cooper and other SEHP members.

38.     Although the New Jersey Regulation requires insurers to pay UCR based on the updated PHCS database, Aetna misrepresents in its EOB that the database "is the amount which is most often charged for a given service by a Provider within the same geographic area."  For the

reasons detailed herein, this statement is false and Aetna cannot comply with this provision of the New Jersey Regulation by using the Ingenix Databases.

39.     As described herein, Aetna and Ingenix individually and together manipulated and submitted charge data used by the Ingenix database to understate the 80th percentile amounts. As a result of their joint and intentional manipulation of the Ingenix database, Aetna also violated the New Jersey Regulation and its stated purpose – to protect New Jersey consumers of Non-Par services – was thereby thwarted.  Aetna and Ingenix concealed its manipulation from the New Jersey regulators who enforce the New Jersey Regulation, and from employers and its members. In fact, Aetna and Ingenix's manipulations ensured that the 80th percentile of the Ingenix Databases was inaccurate and that all SEHP members as well as members in its other plans nationwide were underpaid.

40.     Aetna's UCR determinations, based on the manipulated Ingenix Databases, violated Aetna's legal obligations, and preclude it from relying on the New Jersey Regulation as a defense to its wrongful use of the invalid Ingenix Databases to determine UCR rates during the Class Period.  Aetna should be compelled to pay billed charges to all SEHP members whose benefits Aetna determined using UCR in violation of the New Jersey Regulation, ERISA and RICO.

### THE DEFENDANTS

41.     Defendants Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc., and Aetna Insurance Company of Connecticut, offer, insure, underwrite and administer commercial

healthcare plans benefits, including those of Plaintiffs. For all its plans, Aetna has discretionary authority and/or control of the administration of the plans, and as well controls plan assets.

42.     Several of the Defendants, including Aetna Health, Inc. and Aetna Life Insurance Company, have offices located in Cranbury, New Jersey, and are licensed to do business in New Jersey.

43.     "Aetna" is a brand name used for products and services provided by one or more of the Aetna group of subsidiaries that offer, underwrite, or administer benefits. When used in this TAC, "Aetna" refers to all Aetna predecessors, successors and subsidiaries owned and controlled by any of the named Defendants whose activities are interrelated and intertwined with them. Due to the manner in which they function, all of the Aetna Defendants are functional fiduciaries as defined under ERISA and, as such, they must comply with fiduciary standards.

### JURISDICTION AND VENUE

44.     The rights and duties of insurance companies and Aetna Members with employer sponsored healthcare plans are governed by ERISA. Plaintiffs assert subject matter jurisdiction for their ERISA claims under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e). For Plaintiffs' RICO claims, jurisdiction arises under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

45.     Venue is appropriately laid in this District under 28 U.S.C. § 1391, 18 U.S.C. § 1965, and 29 U.S.C. § 1132(e)(2) because (i) Aetna resides, is found, has an agent, and transacts business in this District and (ii) Aetna conducts a substantial amount of business in this district and insures and administers group health plans both inside and outside this District, including from offices located in New Jersey.

46.     This TAC is filed as related to existing litigation pending in this District, namely, *Wachtel v. Health Net, Inc.,* Case No. 01cv4183 (FSH)(PS); *McCoy v. Health Net,* Case No. 03cv1801 (FSH)(PS); *Scharfman v. Health Net,* Case No. 05cv301 (FSH)(PS); *Franco v. Connecticut General Life Insurance Co.,* Case No. 04cv1318 (FSH)(PS); and *Malchow v. Oxford Health Plans, Inc.,* (case number is not yet available).

## OVERVIEW OF PLAINTIFFS' LEGAL CLAIMS

47.     Aetna is an ERISA fiduciary of the ERISA health plans at issue, and owes the Plaintiffs and the Classes, as defined below, fiduciary duties of care and loyalty, and it must apply its plan provisions in good faith.

48.     Under ERISA, Aetna is required, among other things, to comply with the terms and conditions of its healthcare plans; to accord its Members an opportunity to obtain a "full and fair review" of any denied or reduced reimbursements; and to make various disclosures to Members. Such disclosures include accurately setting forth plan terms; explaining the specific reasons why a claim is denied and the internal rules and evidence that underlie such determinations; disclosing the basis for their interpretation of plan terms; and providing appropriate data and documentation concerning its coverage decisions.

49.     The federal common law of trusts, applicable to ERISA fiduciaries, further requires that fiduciaries deal honestly with Members and adhere to certain specific fiduciary standards in their dealings. As Justice Cardozo said, "Not honesty alone, but the punctilio of an honor the most sensitive, is the standard of behavior."

50.     In offering and administering its healthcare plans, Aetna assumes the role of "Plan Administrator," as that term is defined under ERISA, in that it interprets and applies the plan

terms, makes all coverage decisions, and provides for payment to Members and/or their providers. As the Plan Administrator, Aetna also assumes various obligations specified under ERISA. These obligations include providing its Members with a "summary plan description" ("SPD"), a document designed to describe in layperson's language the material terms, conditions and limitations of the healthcare plan. The full details of the plan, which are summarized in the SPD, are contained in the EOCs.

51.     Aetna is obligated under ERISA to make its coverage determinations in a manner consistent with the disclosures contained in the SPD. To the extent there is a disparity or conflict between the SPD and the EOC, the SPD governs, so long as the Member benefits from the application of the SPD. If the employer, rather than Aetna, is deemed to be the Plan Administrator, Aetna remains responsible for ensuring that the SPD complies with the law under its duties as a co-fiduciary as provided in ERISA, 29 U.S.C. § 1105, even if the employer prepares or disseminates the SPD.

52.     Aetna breached its fiduciary duties by failing to disclose the reimbursement rules it uses to reduce Members' benefits, and by failing to fulfill its obligations of good faith, due care and loyalty. Moreover, it breached its duties by manipulating the data it contributed to Ingenix so as to achieve a reduced reported number that it could then use for setting UCR.

53.     Aetna's manipulation of its contribution of data submitted to Ingenix, and its knowing use of the inadequate and flawed Ingenix database to set UCR, further violates RICO, whereby Aetna knowingly paid inadequate benefits to its Members in order to maximize its own profits.

54.    With respect to all its healthcare plans, Aetna is obligated to its Members to provide specific healthcare benefits and reimbursements.   As detailed herein, Aetna has breached, and continues to breach, its obligations to Plaintiffs and the Classes, and in so doing has violated ERISA and RICO.

## PLAINTIFFS' GROUP HEALTH PLANS

55.    Plaintiffs Werner, Franco and Rizopoulus's benefits were determined under standard Aetna healthcare plans governed by ERISA.    Plaintiff Cooper's benefits were determined under Aetna small employer plans ("SEHP") in New Jersey. SEHP plans are governed by ERISA and are also subject to a New Jersey SEHP regulation, N.J.A.C. § 11:21-7.13(a) (the "SEHP Regulation").

56.    Plaintiffs allege, as detailed herein, that Aetna relied on flawed and inappropriate data for making UCR determinations for Non-Par benefits as a result of its use of the Ingenix database.  By relying on such improper data for making UCR determinations, Aetna breached its duties as set forth in its ERISA-governed plans and, as a result, it should be required to reimburse its Members who received reduced Non-Par benefits up to billed charges.

57.    With respect to Cooper, the New Jersey SEHP Regulation imposes additional requirements beyond those required under ERISA.  New Jersey adopted the SEHP Regulation in an effort to ensure that all Members of small employer plans, who were not in a position to negotiate the best benefit packages from insurers, would receive a minimum level of benefits. The SEHP Regulation specified, among other things, that Aetna's UCR determinations be equal to or greater than the 80th percentile of the most updated version of the Ingenix database.  It also requires Aetna to pay out-of-network hospital services based on billed charges.  In incorporating

the Ingenix database into the New Jersey SEHP Regulation, the New Jersey Regulators were not told of the inherent flaws and inadequacies of the Ingenix database.

58.     For members of the New Jersey small employer plans, Aetna breached ERISA by violating its obligations under the SEHP Regulation, including, as detailed below, by imposing other reductions that went beyond the reported numbers from the 80th percentile of the Ingenix database (such as reductions for performing multiple procedures on the same day), and failing to pay 100% of billed charges for hospital services.  Moreover, Aetna intentionally manipulated its contributions to Ingenix for use in the Ingenix databases to achieve reported numbers that were lower than what should have been reported and used for setting UCR under the New Jersey Regulation, thereby violating both ERISA and RICO.

### Plaintiff Cooper's ERISA Plan for New Jersey Small Employer Members

59.     From November 2003 through September 30, 2005, Cooper was a beneficiary in her husband Justin Cooper's group plan through his employer, Rosenberg & Associates, which was fully insured and administered by Aetna.  Pursuant to the terms of the plan, both she and her husband were covered as Aetna Members.

60.     Because Cooper's health insurance was provided as an employee benefit by a private employer, Cooper's claims are brought under ERISA.  In addition, because Cooper was insured by a small employer plan under New Jersey law, Aetna is also required to comply with a New Jersey SEHP regulation, N.J.A.C. § 11:21-7.13(a) (the "SEHP Regulation"), in providing her benefits.

61.    Cooper was entitled to seek medical care from Non-Par providers pursuant to her

SEHP EOC.  In her EOC, Aetna defined the use of UCR to establish reimbursement levels for

Non-Par providers as follows:

> With respect to Network services and supplies, the negotiated agreement.  With respect to non-network benefits, an amount that is not more than the usual and customary charge for the service or supply as We Determine, based on a standard approved by the Board.  The Board will decide a standard for what is Reasonable and Customary for the Non-Network benefits under the contract.  The chosen standard is the amount which is most often charged for a given service by a Provider within the same geographic area.

62.    The term "standard approved by the Board" in the preceding paragraph refers to

the Non-Par regulation promulgated by the New Jersey Small Employer Health Board ("SEH

Board"), codified in the New Jersey Regulation.  The New Jersey Regulation requires insurers to

pay Non-Par hospital services based on the billed charge and Non-Par medical services at the

80th percentile of the most updated Ingenix PHCS fee profile.  The SEH Board imposes other

requirements, including requiring coverage of certain services.   The New Jersey Regulation

suspends preauthorization requirements for Non-Par services rendered to New Jersey small plan

members.

63.    Throughout the Class Period, Cooper and her husband received UCR benefit

reductions from Aetna.  For example, on January 3, 2005, Justin Cooper received healthcare

services from a Non-Par provider, for which the provider billed $4,000.  In addition, Justin

Cooper received two treatments of pharmaceutical drugs, for which the Non-Par provider billed,

respectively, $315 and $740.  Thereafter, a claim was submitted to Aetna on behalf of the

Coopers, in compliance with the terms of their healthcare plan, seeking payment of benefits as

required under the Aetna contract.

64.     The Coopers subsequently received by mail an EOB from Aetna dated May 13, 2005 to report on its payment of benefits concerning these healthcare services.  In the EOB, Aetna reported that it had excluded $499 from the billed amount for the first service, thereby leaving an amount allowed of $3,501.  Aetna further excluded $280 from the first drug, allowing only $35, and excluded $490 from the second drug, allowing only $250.  The Coopers remained liable for the unpaid portion of the bill.  After reducing the benefit further to take into account the Coopers' deductible and coinsurance for using Non-Par services, including $450 for a cardiovascular stress test that was allocated to the deducible, Aetna paid only $2,265.20 of the total bill of $5,505.00.  The EOB specified that the "total expenses submitted" by the Coopers was $5,505.00, Aetna's "total payment" was $2,265.20, and "your total responsibility" (referring to the Coopers) was $3,239.80.

65.     To explain the excluded expenses totaling $1,269, Aetna used Code 0120, which was defined in the EOB as follows:  "This portion of the expense which is greater than the reasonable and customary charge is not covered under your plan."

66.     On the front page of the EOB, Aetna stated that if the Coopers had any questions about the claims they should contact Aetna at www.aetnanavigator.com.  That is a secure website provided to Aetna's Members, including the Coopers, for obtaining additional information about the benefits and services provided by Aetna.  Aetna's "Glossary" of terms on the website defined "UCR" and "Customary and Reasonable" costs for Non-Par providers.  All Members were told that Aetna's UCR determination was purportedly based on "the amount customarily charged for the service by other providers in the same geographic area," and that, in determining a "reasonable charge" for services, Aetna would determine "the prevailing charge level, made for

the service or supply in the geographic area where it is furnished," after taking into account "factors such as the complexity, degree of skill needed, type or specialty of the Provider, range of services provided by a facility, and the prevailing charge in other areas in determining the Reasonable Charge for a service or supply that is unusual or is not often provided in the area or is provided by only a small number of providers in the area."

67.     On the back of the EOB, Aetna stated that the Coopers "are entitled to a review (appeal) of this benefit determination if you have questions or do not agree." Aetna stated this could be done either by telephone or in writing, and the member should include "any comments, documents, records and other information you would like to have considered, whether or not submitted in connection with the initial claim." Aetna, however, did not disclose what type of information, if any, would be considered as part of a review of a UCR determination. The EOB further stated that "you may also review documents relevant to your claim." Yet, Aetna did not have access to material aspects of the claim determination, including the underlying methodology and data used by Ingenix to derive the numbers that Aetna used as UCR.

### Cooper's Exhaustion of Administrative Remedies

68.     Following Aetna's nonpayment, Justin Cooper's provider, Manhattan Nuclear Cardiology, appealed this determination to Aetna by letter dated September 14, 2005. In its letter, the provider stated:  "Our charges are not over and above usual and customary for this area." It further pointed out that "[t]he patient will be responsible for any amounts you do not allow."

69.     By letter dated September 26, 2005, Aetna denied the provider's appeal on behalf of Justin Cooper. Aetna's appeal denial stated:

Based on our review of available information, including the member's policy, the company is not modifying its previous determination. The above listed claim was previously processed correctly according to the member's QPOS plan. According to Aetna's guidelines, the usual and customary rate for A4641 is $125.00; for J1245 is $35.00, for 78492 is $3501.00 and for 93015 is $450.00. A total of $1970.80 was applied to the member's out-of-network deductible and co-insurance. Therefore, no additional payment will be made with respect to the above listed claim(s).

70.     Contrary to ERISA and federal regulations, Aetna did not treat the provider's appeal as required and did not provide a "full and fair review." Aetna did not disclose the fee schedule used, nor did it address the basis for the appeal the provider had provided. Aetna did not send a copy of the denial to the member. Finally, Aetna failed to apply, disclose, or even refer to the SEHP Regulations.

71.     Pursuant to ERISA regulations, an appeal decided by a process that violates procedural safeguards is deemed exhausted.

72.     On November 8, 2005, the Non-Par provider billed the Coopers for the total unpaid portion of the bill, or $3,239.80. In a comment printed on the bill the Coopers were told: "We have submitted the claim to your insurance company and per your insurance company the balance is your responsibility."

73.     For undisclosed reasons, Aetna sent Manhattan Nuclear Cardiology a new EOB dated April 2, 2007, some 18 months after its denial of the appeal. The new EOB stated: "This is an adjustment of a previously processed claim as a result of a claim project request. This amount represents payment of a balance bill in full."

74.     There was no stated connection between the April 2007 payment due to a "claim project request" and the denial of the appeal in September 2005. As a result, this subsequent

payment does not alter the fact that Aetna had issued a final denial of the appeal that had been filed with respect to Cooper's claim and that this appeal had been exhausted.

### Cooper's Other Non-Par Benefit Reductions

75.     During the first half of 2005, Cooper also received medical care from Non-Par providers, and subsequently submitted claims for benefits to Aetna.  Aetna responded by mailing her EOBs, including an EOB dated June 1, 2005, which reflected a billed amount of $285 for a particular service, for which Aetna excluded $106.04, citing Code 0120 to explain that the provider's bill was "greater than the reasonable and customary charge."  In another EOB dated August 17, 2005, Aetna responded to an additional claim for benefits for services received by the same Non-Par provider, reporting that it was excluding $10 from the bill of $285, again explaining by reference to Code 0120 that the bill was "greater than the reasonable and customary charge."

76.     Cooper received further services from other Non-Par providers during 2005, for which she submitted claims for benefits to Aetna.  Aetna sent additional EOBs to the Coopers dated, respectively, July 6, 2005, August 17, 2005, and August 25, 2005.  Each of these EOBs reported that certain expenses had been excluded, again using Code 0120 to report that the billed charges were "greater than the reasonable and customary charge."  In these EOBs, Aetna excluded $42.76 from a $150 bill; $4.15 from a $49.99 bill; and $1.03 from a $72.45 bill.

77.     Each of the EOBs contained the total amount that remained the Coopers' "responsibility," which included the amount that had been excluded by Aetna as in excess of UCR.  Further, each EOB referred the Coopers to Aetna's website, www.aetnanavigator.com, for

answers to their questions and provided the same summary for potential reviews or appeals of benefit determinations.

78.     Under her SEHP Plan, Cooper had an individual $1,000 annual deductible for Non-Par services. Her individual annual out-of-pocket limit was $3,000 for Non-Par services. Under the plan, the Coopers' annual family deductible for Non-Par Services was $2,000, while their family out-of-pocket limit was $6,000. The Coopers' coinsurance for Non-Par services (once the deductible was met) was 30% of the UCR. If and when the Coopers satisfied the individual or family out-of-pocket limit, Aetna was required to pay 100% of UCR. During the Class Period, Cooper and her husband were financially responsible for unpaid amounts in excess of the UCR determined by Aetna.

79.     Cooper has made numerous out-of-pocket payments to Non-Par providers that were in excess of the applicable deductible and coinsurance under her Aetna plan. Cooper paid these sums as a result of Aetna's improper Non-Par Benefit Reductions as detailed herein.

80.     Cooper seeks to represent a class of SEHP members subject to the New Jersey Regulation on whose behalf Aetna underpaid for all hospital and medical services (including surgery, ER, hospital, physician, laboratory, anesthesia, chiropractic, mental health, dental, pharmaceutical, or other medical services and supplies) rendered by Non-Par providers (or other providers considered Non-Par by Aetna) through the Class Period. She seeks unpaid benefits and other relief for herself and the "New Jersey SEHP Class."

### Plaintiff Werner's ERISA Plan

81.     During the Class Period, Werner was a member of a group plan governed by ERISA. Her group plan was sponsored by her employer, the American Psychiatric Association,

and was fully insured and administered by Aetna. Werner was in a family plan along with her daughter Hannah and her husband Geoffrey.

82.    During 2006 and 2007, Werner received medical services from Non-Par providers for which Aetna determined UCR below her provider's billed charges, amounts for which Werner is financially responsible. With respect to these services, Werner has made payments to her Non-Par providers totaling at least $6,233.50. Of that total, Werner paid out-of-pocket at least $2,973.60 that was attributable to the unpaid difference between UCR and the provider's billed charge.

83.    Werner received services on, respectively, February 1, 8, 15 and 22, 2006. The Non-Par provider billed $135 for each service. Aetna mailed Werner EOBs dated April 4, 2006 relating to each service. The EOBs reflected that Aetna excluded $15 for each service as being in excess of UCR, leaving an allowed amount representing UCR of $120. Then in each case Aetna paid only 60% of the UCR amount, or $72. The EOB further identified "Total Plaintiff Responsibility" as $252, which represented, for each of the four services, the $48 coinsurance (40% of the UCR amount of $120), plus the $15 difference between the billed charge ($135) and UCR ($120). In each instance, Aetna's EOB used the following remark to explain its payment:

> Your plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided. In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas. Aetna's determination of the prevailing charge does not suggest your provider's fee is not reasonable and proper. Your provider may bill you for this amount. If there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number, or by writing to the address, shown on this statement.

84.     Aetna's EOB informed Werner that she had already satisfied her individual annual deductible of $300.  On each EOB, the provider's <u>entire</u> charges were identified as the amount the Non-Par Provider "May Bill You," without subtracting the amount of Aetna's payment from such field.  Pursuant to its uniform policy, all of the billed amounts in excess of UCR (*e.g.*, $60 total for the four February 2006 visits described in the preceding paragraph) should have been, but were not, attributed towards Werner's out-of-pocket maximum.

85.     Aetna's EOB also referred Werner to its website, saying:  "Questions?  Contact us at **aetnanavigator.com**."

86.     Werner received similar medical treatments with the same Non-Par billing and the same UCR reductions reflected in EOBs from Aetna on numerous occasions, including EOBs with the following dates:  April 1 and 25, 2006, May 13, 2006, June 9, 2006, July 25, 2006, August 19, 2006 and September 14, 2006.  For those dates, Aetna collectively excluded coverage for $540 for Non-Par services, leaving Werner financially responsible for that amount in addition to her co-insurance.

87.     Werner received further treatments from the Non-Par provider in September 2006. In an EOB from Aetna dated October 17, 2006, Aetna began to identify the UCR for this treatment as $72 (instead of as $120, as formerly was the UCR).  Aetna then calculated its share of UCR as 60% of $72, or $43.20.  The reduced UCR of $72 left Werner financially responsible for the unpaid $63 per treatment, along with 40% of the UCR ($72) or $28.80.  As to each $135 charge, therefore, Aetna considered itself responsible for $43.20, and Werner responsible for $91.80.  The "Total Patient Responsibility" for the four services at issue was reported in the EOB as $367.20, which remained Werner's financial responsibility.

88.     Werner continued to receive ongoing treatment from the Non-Par provider, who in October 2006 increased the billed charge to $140 per treatment.  According to various EOBs, Aetna mailed to Werner in the fall of 2006, Aetna again determined UCR of $72, disallowing $68 of each $140 charge as being in excess of UCR, using the same explanatory code which represented that the billed charges exceeded "prevailing" rates.  Some examples of EOBs reporting such UCR reductions are dated, respectively, October 17, 2006, January 20, 2007, February 14, 2007, April 24, 2007, May 8, 2007, June 20, 2007, and July 19, 2007.  Each such EOB contained the identical explanation for Aetna's UCR reduction.

89.     Werner also received UCR determinations from Aetna for other services.  On March 21, 2006, for example, Werner and her minor child both received dental services from a Non-Par dentist.  In an EOB dated April 1, 2006, Aetna determined UCR regarding three of the dental services provided for Werner, leaving $32 unpaid as allegedly in excess of a reasonable charge.  In the same EOB, Aetna determined UCR for three services rendered to Werner's minor child, leaving $20 unpaid as allegedly in excess of a reasonable charge.  The total amount of $96 was identified by the EOB as "Total Patient Responsibility."   To describe its UCR determinations, Aetna used the following remark:

> You are covered for expenses at a level set by your plan sponsor.  The charge for services exceeds that amount.  You are responsible for the amount indicated.  If you have additional information we should consider, please let us know.

### Werner's Exhaustion of Administrative Remedies

90.     Werner unsuccessfully appealed Aetna's UCR reductions.  These internal appeals were fully exhausted, with Aetna refusing to change any of its prior Non-Par payments.

91.     On January 29, 2007, Werner appealed Aetna's UCR determinations for services she received from Non-Par providers from November 1, 2006 through December 27, 2006 referred to in her EOB dated January 20, 2007.  Her appeal letter referred to Aetna's "Plan Design and Benefits" which states that the Member must pay 40% for Non-Par office visits, with Aetna paying 60% of such visits.  Werner complained that Aetna's payments were inconsistent with the provisions of her plan limiting her financial responsibility to 40% coinsurance for the office visit.  Werner separately complained of Aetna's policy reducing payment to Non-Par licensed social workers ("LCSWs") and psychologists.  Werner attached to her appeal a copy of Aetna's new payment policy titled "Change in Reimbursement Policy for Non Par Behavioral Health Providers for PPO-based and HMO/QPOS plans," which she had obtained from perusing the internet and which states:

> Beginning with dates of service on or after September 1, 2006, in PPO-based and HMO/QPOS plans, Aetna is changing our reimbursement policy for Nonparticipating behavioral health providers.  This change ties reimbursement to the level of the licensure of the clinician and will result in a change in Aetna's reimbursement for Nonparticipating psychologists and social workers.  This change will not affect psychiatrists and does not apply to the Medicare Advantage product.
>
> Effective September 1, 2006, this change will reduce the allowable amount to:
> *       80% of Usual and Customary Rate (UCR) for psychologists
> *       60% of UCR for social worker
>
> Reimbursement will be further subject to applicable plan deductible, coinsurance and/or co-payment.
>
> This new policy makes our approach to reimbursement for Nonparticipating behavioral health providers consistent with our approach for Aetna participating behavioral health providers.

92.     In a letter dated May 9, 2007, Aetna denied Werner's first appeal. Aetna stated that it was "upholding the previous benefit decision to deny the portion of your claim that exceeds what we have determined to be the reasonable charge." Aetna claimed that the rate paid to Werner's Non-Par provider "was based on Reasonable Charges taking into consideration her type of specialty and her licensure." It stated: "In order to determine the reasonable charge, we refer to statistical profiles of physicians' charges for the same or similar services in a geographic area."

93.     In explaining its decision denying her appeal, Aetna stated that "[t]he benefit payment" for the Non-Par service "will be determined according . . . to the reasonable charge defined in the Glossary of the Booklet-Certificate," adding that the Glossary defines "Reasonable Charge" as follows:

Reasonable Charge:

Only that part of a charge which is reasonable is covered. The reasonable charge for a service or supply is the lowest of:

- the provider's usual charge for furnishing it; and
- the charge Aetna determines to be appropriate, based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and
- the charge Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished.

In determining the reasonable charge for a service or supply that is:

- unusual; or
- not often provided in the areas; or
- provided by only a small number of providers in the area;

Aetna may take into account factors, such as:

- the complexity;
- the degree of skill needed;

- the type of specialty of the provider;
- the range of services or supplies provided by a facility; and
- the prevailing charge in other areas.

94.    Aetna attempted to justify its first level denial of Werner's appeal regarding the reduction in UCR for psychologists and social workers by stating:

> Effective with dates of service September 1, 2006 and after, a three tiered approach has been implemented for determining the allowed amount for out-of-network behavioral health services rendered by non-participating providers. This approach takes into consideration the licensure and/or education of the rendering provider.  As your Attachment A shows, Aetna changed its non-participating behavioral health provider reimbursement policy, which is not directly tied to any particular member plan design. This change in policy is not a change to your plan. The amount of $434 that you seek does not take into consideration the above information.

95.    Aetna's first level appeal denial further stated:  "We are sorry our determination could not be more favorable; however, we are bound by the terms of the contract."

96.    Aetna's first level appeal denial also stated that "[a]t your request, we will give you free of charge access to copies of all documents, records, and other information about your claim for benefits, including the specific rule, guideline, protocol, or other similar criterion that was used in making the decision, and the names of any clinical reviewers if applicable." Werner's EOC contains the same representation (which is required by ERISA).

97.    On May 17, 2007, Werner requested a second level appeal, contesting Aetna's determination of UCR.  Werner contested how Aetna computed UCR, stating: "Aetna had failed to provide evidence that the reimbursement that they are allowing ($72) is in fact a reasonable reimbursement for the service provided in the Washington, DC metro area."

98.    Werner also disputed Aetna's reduction of UCR for LCSW services by 40%, stating: "Aetna has failed to demonstrate that this new reimbursement policy for non network

behavioral health providers is a reasonable reimbursement rate. The fact that it has been implemented for in-network providers is not a demonstration that the methodology is reasonable."

99.     The second level appeal challenged Aetna's failure to notify Members of the mental health policy change, calling it "a material change to my healthcare policy and one that neither my plan nor its participants received notification of," and adding that "I only found your notice after extensive web research." Werner's second level appeal further challenged Aetna's "sharp reduction in reimbursement for non network behavioral health services."

100.    Werner's second level appeal specifically requested copies of the following documents:

- Disclosure of all documents related to how Aetna calculates the reasonable charge for the type of service provided and licensure of the provider (LCSW) in the Washington, DC area, including market analysis, comparative data, and methodology in determining what is a reasonable charge;

- all relevant documents that Aetna sent to plan members notifying plan members of the change in the UCR determination for non network behavioral health providers including letters; distribution methods, dates, etc.;

- documentation from the master plan of the American Psychiatric Foundation (both 2006 and 2007) that demonstrates disclosure of your new reimbursement policy for non-network behavioral health providers; and

- data on Aetna's behavioral health network in the Washington, DC metro area, the number of providers that participate in the network by licensure, including the percentage of providers in the area that participate in Aetna's network.

101.    In violation of ERISA, Aetna did **not** provide Werner with the information she requested in her second level appeal.

102.    On June 26, 2007, Aetna denied Werner's second level appeal, stating as follows:

Aetna determines the extent of the plan's liability through use of the Ingenix Prevailing Health Care Charges System (PHCS). The PHCS is a statistical profile

of provider's charges that has been developed for this purpose.  The Ingenix
PHCS collects provider charge data from more than 150 major contributors
including commercial insurance companies and third party administrators.  Data is
collected for all 50 states, the District of Columbia, Puerto Rico and the Virgin
Islands.  Since physicians' fees reflect differing costs of doing business in various
parts of the country, the PHCS recognizes these regional differences and uses the
first three digits of the United States Postal Service zip codes to divide the charges
into population areas based on cost-similar and geographically adjacent areas.
There are 281 zip code areas for surgery and anesthesia and 334 for medicine,
pathology and laboratory.

Fee information for the most recent twelve (12) month period is used as the basis
for the profile which is the basic tool for reasonable and customary (R&C)
determinations.  The profile is updated semi-annually.  At the time of the update,
the latest information is released to all claim-paying personnel.

Aetna determines reimbursement for non-participating behavioral health providers
as follows:

- Psychologist (allowed at 80% of the Reasonable and
  Customary/recognized charges)
- Social Workers, Licensed Profession Counselors, Marriage and
  Family Counselors, Psychiatric Nurse (allowed at 60% of the
  Reasonable and Customary/recognized charges)."

103.   Aetna's second level appeal denial stated that "[a]t your request, we will give you

free of charge access to copies of all documents, records, and other information about your claim

for benefits, including the specific rule, guideline, protocol, or other similar criterion that was

used in making the decision" without acknowledging that Werner had, in fact, previously and

specifically requested such documents.   Aetna's second level appeal denial also failed to

acknowledge that Aetna had, in fact, not provided documents that were specifically requested by

Werner during the appeal process.

104.   Aetna's second level appeal denial stated that this was Aetna's "final decision."

105.    On July 2, 2007, Werner again requested documents from Aetna, including the "documents, records, and other information about my claim, specific rules, guidelines, protocols, and other similar criteria that were used in making the decision." Plaintiff's July 2, 2007 letter referred to Aetna's second level appeal denial and asked for the "data from your PHCS system as you reference in your [second level appeal denial] letter."

106.    Once again, Aetna failed to provide Werner with the requested documents that it twice claimed it would furnish "free of charge" upon request.

107.    Aetna's appeal denials withheld material information, as detailed herein, that Aetna was obligated to disclose as a fiduciary. *First*, Aetna did not disclose to Werner, until its final denial, that it had used Ingenix PHCS data to determine UCR. *Second,* Aetna did not disclose that it had contributed pre-edited data to Ingenix and that Ingenix further corrupted the data reducing amounts in the Ingenix Databases. *Third,* Aetna did not disclose that the Ingenix data came with a disclaimer that the data does **not** represent UCR, which disclaimer Aetna violated in representing to Werner that the Ingenix data was a "basic tool" reflecting UCR. *Fourth,* Aetna did not provide the relevant evidence specifically requested by Werner during her appeals in violation of ERISA. *Fifth,* Aetna falsely asserted that its tiering policy was consistent with Aetna's definition of UCR. *Sixth,* Aetna falsely asserted that its tiering policy was not a material change to Werner's plan. *Seventh,* Aetna falsely asserted that it was not required to provide advance notification to employers and Members, or make changes to plan documents, before adopting the UCR tiering reductions for behavioral health.

108.    Following her unsuccessful appeals to Aetna, Werner contacted the Bureau of Insurance for the Commonwealth of Virginia ("VA DOI") to complain about Aetna, and attached copies of her appeals.

109.    On July 6, 2007, the Managed Care Ombudsman for the Commonwealth of Virginia, Thomas Bridenstine ("Bridenstine"), sent Werner a letter stating that he had reviewed information supplied by Aetna and "there was no consistent explanation that clearly explained how your claims were paid."

110.    In his July 6th letter, Managed Care Ombudsman Bridenstine also stated: "Although you were not successful in your appeal efforts, you provided a significant amount of information and I regret that Aetna was unable to provide a reasonable explanation for the methodology it used to determine the amount of money it would pay for your claims."

111.    On July 31, 2007, Aetna's Overpayment Recovery Unit in New Albany, Ohio sent letters to both Werner and to her Non-Par provider. Aetna's letter to Werner (from Cindy Cook) informed her that Aetna's original UCR of $120 for four dates of service in October 2006 was too high, and the UCR should have been $72, and paid at 60%, or $43.20. The letter found that Aetna should have paid a total of $172.80, rather than the $395.30 it paid. It informed her that her coinsurance obligation for the four services was $115.20. It advised her that if she did not refund the overpayment of $222.50 to Aetna by August 21, 2007, "we will refer the overpayment to a recovery service."

112.    Aetna's Overpayment Recovery Unit disregarded the fact that Werner had already satisfied her out-of-pocket maximum as of October 11, 2006, such that she did not owe any further coinsurance on Non-Par services rendered after October 11, 2006.

113.    Aetna sent Werner's Non-Par provider a similar letter dated July 31, 2007, which claimed an overpayment for a date of service in February 2007, for which reduction to 60% of the initial UCR had not been made.

114.    On September 11, 2007, Werner wrote to Cook and informed her that because Aetna's claims payment practices were being considered by the VA DOI, she would not consider refunding money until VA DOI's investigation was concluded.

115.    On September 14, 2007, Werner sent a letter with similar information to Aetna's Overpayment Recovery Service in Nashville, Tennessee.

116.    After a "cease and desist" letter from the Virginia DOI to Aetna, Aetna suspended its overpayment recovery actions, which included a referral to a collection agency.

117.    In a letter dated September 27, 2007, Aetna admitted to the Virginia DOI that the provider charges in the Ingenix database cannot be distinguished by the provider's type of license. In fact, all of the Ingenix data for a procedure code could potentially reflect the charges of LCSWs alone.

118.    Although Aetna's first level appeal denial on May 9, 2007 asserted that the "three tiered approach" reducing payment to Non-Par psychologists and social workers (and other licensed behavioral health professionals) was "effective with dates of service September 1, 2006 and after," Aetna, in fact, could not legally apply these tiering reductions as of September 1, 2006 (or through the current date) without making explicit, approved changes to its EOCs, SPDs, and other plan documents. Without the required regulatory and employer approval, Aetna's unilateral UCR tiering reductions are null and void, and without effect.  Aetna's tiering policy also violates mental health parity laws.

119.    Aetna's 40% reduction in the UCR for LCSWs starting in the fall of 2006 resulted in significant unpaid benefits to Werner. In addition, Aetna credited only the reduced amounts to her out-of-pocket maximum, delaying her ability to reach this maximum and shifting costs to her in contravention of her plan language.

120.    As of the fall of 2006, Werner's EOC and SPD did not change. During this period, Aetna failed to notify Werner or her employer, the American Psychiatric Association, that Non-Par behavioral health benefits were being reduced and that a tiering approach would reduce the base UCR by 20% for psychologists and by 40% for other behavioral health professionals such as LCSWs. Thus, Werner's ultimate responsibility for LCSW services was increased because Aetna was paying 60% of the 40% lower UCR rate of $72 rather than 60% of the prior UCR rate of $120. During this time, Aetna's EOBs did not disclose the new tiering policy or its basis.

121.    Werner had to extensively research Aetna's claims payment policies on the Internet in order to locate Aetna's statement that it would reduce Non-Par behavioral health providers' UCR by 40% as of September 1, 2006.

122.    Under ERISA, Aetna could not reduce UCR to Non-Par behavioral health professionals without advance notification to Members and employer groups, along with corresponding changes to plan documents and required approvals.

123.    Werner's appeals experience amply reflects both fiduciary violations and the futility of appeals to Aetna challenging UCR determinations. Aetna failed to provide documents it is legally obligated to provide under ERISA, and refused to disclose to her any information that would have permitted a successful appeal. Aetna's appeal denials to Werner reflect a fixed,