# PART

# II

systematic policy to apply UCR regardless of the flaws in the Ingenix Databases, and regardless of Aetna's failure to comply with its plan language.

## Plaintiff Franco's ERISA Plan

124.    During the Class Period, Plaintiff Franco was an Aetna member in a New Jersey large employer health plan through her employer.   The plan, which was fully insured and administered by Aetna, is known as the ACSA Trust.  Franco's health plan authorized her to use Non-Par providers, which Aetna promised to reimburse at UCR rates.

125.    Franco required complex facial surgery during the period she was fully insured by Aetna. The facial surgery was intended to remedy injuries she suffered from the use of forceps at birth.

126.    Franco sought preauthorization for her surgery (originally scheduled for January 2004) with Aetna.  Her surgeon, Dr. Elliott H. Rose, submitted a very detailed preauthorization letter to Aetna on November 14, 2003, setting forth in meticulous detail the CPT codes he and Dr. Frederick A. Valauri, his co-surgeon, would be performing, along with the price they charge per code.  "CPT" stands for Current Procedural Terminology, a procedure coding system created by the American Medical Association ("AMA") to allow for different medical procedures to be identified. At the end of the preauthorization letter, Dr. Rose stated:

> On behalf of this patient, we request predetermination of benefits for the above CPT codes and delineation of unsatisfied deductible, co-insurance, etc., to allow her to understand her financial obligation.  If your established fees differ from the above UCRs, please notify the patient and my office administrator, Linda Ossias.

127.    On December 11, 2003, Franco received an approval from Aetna, notifying her that Aetna's "Decision" was "Authorized" as to each of the surgical services she was due to

receive. On December 19, 2003, Franco received another approval letter from Aetna, reiterating that as to each proposed item, "coverage for this service has been approved."

128. On January 9, 2004, Aetna again authorized the facial surgery, and referred to its previous authorization of three days hospitalization. Again, Aetna reiterated that its authorization process had been satisfied.

129. Franco had complex facial surgery on February 2, 2004, performed by Dr. Rose and Dr. Valauri precisely as indicated in Dr. Rose's November 14, 2003 preauthorization letter.

130. On March 18, 2004, Aetna issued an EOB stating that of the $4,500 billed for her eyelid procedure by Dr. Rose, Aetna was allowing $1,990, with $2,510 being considered as above UCR: "This portion of this expense which is greater than the reasonable and customary charge is not covered under your plan." Aetna informed Franco that her "total responsibility" for the $4,500 charge was $3,107.

131. On March 22, 2004, Aetna issued another EOB, stating that, of the $49,100 billed by Dr. Rose, Aetna was paying $6,141.98, and Franco's "total responsibility" was $42,958.02. Of the unpaid amount, $35,325.75 was considered by Aetna to be "greater than the reasonable and customary charge."

132. Franco has made payments to Dr. Rose, her Non-Par provider, totaling at least $11,400. Of that total, $10,000 was paid as part of a deposit for an initial, related surgery that was performed by Dr. Rose prior to Franco being insured by Aetna. She paid out-of-pocket an additional $1,400 after she received her surgery from Dr. Rose while she was a member of an Aetna plan. Franco paid out-of-pocket at least $3,170.73 that was attributable to the unpaid difference between UCR and the provider's billed charge.

**Franco's Exhaustion of Administrative Remedies**

133.    On April 1, 2004, Dr. Rose filed an appeal with Aetna on behalf of Franco.  He explained the complicated nature of the facial reanimation surgery he performed on Franco, along with his special expertise.  He noted that its UCR determinations contradicted Aetna's preauthorization, and left the patient financially responsible for over $46,000.

134.    On August 19, 2004, Aetna issued an EOB allowing an additional $466.02 for the free muscle flap procedure performed by Dr. Rose, stating that the remaining $23,533.58 was excluded as "greater than the reasonable and customary charge" for the procedure.  Aetna did not explain why it was allowing the additional amount, or why that procedure was underpaid in its original determination.   Aetna did not allow any additional reimbursement for the other procedures, and simply stated "based on the review our original decision has not changed." Aetna did not explain why it was adhering to its original determination regarding the other six procedures performed by Dr. Rose, or why additional reimbursement was not warranted.  Its EOB violated established appeal procedures which should have resulted from Dr. Rose's appeal, including a written decision and acknowledgement of the appeal.

135.    While Aetna issued the August 19, 2004 EOB, it did not provide any further response to the appeal Dr. Rose had submitted on Franco's behalf, nor did it offer or describe any further opportunity to pursue an additional appeal. In particular, Aetna did not state that Dr. Rose or Franco could seek a second level appeal.  As a result, Aetna's new EOB paying an additional $466.02 represented a final denial of the appeal for any further benefits and thereby fully exhausted Franco's internal appellate remedies.

136. On August 27, 2004, Aetna issued an EOB regarding the six procedures performed by the co-surgeon, Dr. Valauri. Of the $30,275.00 billed by Dr. Valauri, Aetna allowed $8,960. Aetna stated that more than $17,000 was "greater than the reasonable and customary charge." Aetna further stated that Franco's "total responsibility" was $23,290.50.

137. Aetna determined UCR for Franco using the dollar amount in the Ingenix database despite Aetna's approval and preauthorization of the billed charges. Aetna's UCR determinations were not compliant with, and were contrary to Aetna's definition of UCR, were invalid for the reasons alleged herein, and violated ERISA.

### Plaintiff Rizopoulos' ERISA Plan

138. Rizopoulos' former husband, Kevin G. O'Brien, is an employee for Bank of America Corporation. As an employee benefit, O'Brien receives health insurance for himself and his family, including Rizopoulos, from Aetna. Pursuant to the terms of the plan, Rizopoulos is currently covered for healthcare services as an Aetna Member. As a result, when Rizopoulos submits a valid claim for benefits, Aetna is responsible for making the coverage determinations, issuing proper benefits and resolving any appeals of benefit denials or reductions.

139. On May 25, 2007, Rizopoulos received healthcare services that had been preauthorized by Aetna from a Non-Par provider, Dr. Fredrick A. Valauri. On behalf of Rizopoulos, Dr. Valauri submitted a HCFA 1500 Form to Aetna seeking benefits for the services rendered. He billed a total of $20,964.50, broken down by three services, each designated by a separate CPT Code.

140.    On August 16, 2007, Aetna sent an Explanation of Benefits ("EOB") to Dr.

Valauri reporting on its coverage determination for the services Dr. Valauri provided to

Rizopoulos. Its coverage determinations were summarized as follows:

| Service Code | Submitted Charge | Not Payable | Patient Resp. | Payable Amount |
|---|---|---|---|---|
| 57105 | 742.50 | 492.50 (1) | 592.50 | 150 |
| 3040 | 11,214.00 | 4,435.00 (2) | 2,711.50 | 4,057.40 |
| 21235 | 9,008.00 | 6,408.00 (3) | 7,414.78 | 1,593.22 |

Remarks:

1 – The member's plan provides coverage for charges that are reasonable and appropriate
as determined by Aetna. This procedure has been paid 25% of the reasonable and
customary rate due to multiple surgical procedures performed on the same date of service.

2 – The member's plan provides benefits for covered expenses at the prevailing charge
level, as determined by Aetna, made for the service in the geographical area where it is
provided. In determining the amount of a charge that is covered we may consider other
factors including the prevailing charge in other areas. Aetna's determination of the
prevailing charge does not suggest that your fee is not responsible and proper. If there is
additional information that should be brought to our attention or questions on this
reduction, please contact us at the telephone number shown on this statement.

3 – The member's plan provides coverage for charges that are reasonable and appropriate
as determined by Aetna. This procedure has been paid at 50% of the reasonable and
customary rate due to multiple surgical procedures performed on the same date of service.

141.    The EOB also specified that Rizopoulos owed a total of $3,818.28 in coinsurance

for the services, with "Total Patient Responsibility" being $15,153.88 and the total "Payable

Amount" of $5,810.62. The EOB further stated that Aetna was paying an additional amount of

$10.19 in interest, explained as follows: "Delayed claim interest was applied due to Aetna's

agreement with Physicians." The "Claim Payment," including the Payable Amount plus interest,

therefore totaled $5,820.81. A check of that amount was sent to Dr. Valauri, along with the

EOB. Aetna therefore paid less than 28% of the billed charges in purported satisfaction of

Rizopoulos' claim for benefits.

**Rizopoulous' Exhaustion of Administrative Remedies**

142.   By letter dated September 27, 2007, Rizopoulos submitted a written appeal to Aetna.  In her letter, she stated:

> I am writing in response [to] the reimbursement given to Dr. Valauri for my procedures on 5-25-07.  Upon careful review of your EOB, it is clear that you did not reimburse[] at reasonable and customary rates based on the data provided by Ingenix (attached).  As you can see, Dr. Valauri's fees are commensurate with the Ingenix's fee schedule.  Additionally, while reduction of fees for multiple surgeries may be applicable to Workers Comp and Medicare claims, this rule is not applicable to private insurance claims.  I am not aware of any such clause in my policy regarding multiple surgical reduction.  This was never disclosed to me and I object to your low reimbursement on that basis as well.  Kindly re-review my claims and forward to Dr. Valauri full payment for services provided.

143.   Dr. Valauri set his fees for his services based on a Customized Fee Analyzer sold to him by Ingenix, Inc., which purported to reflect prevailing rates for services in the geographic area in which Dr. Valauri worked.   Rizopoulos attached to her appeal excerpts from the Customized Fee Analyzer purporting to reflect prevailing rates for the CPT Codes that Dr. Valauri charged for the services he provided to Rizopoulos.

144.   By letter dated November 21, 2007, Aetna, through its Customer Resolution Team based in Lexington, Kentucky, informed Rizopoulos that it had denied her appeal.  Based on "the appeal request, the initial determination [and] the procedure report," Aetna stated that "we are upholding the previous benefit decision."  It then added:

> **How we made our decision:**
> Under the plan, when multiple procedures are performed on the same day or during the same operative session, the primary or major procedure is identified and reimbursed as if it were performed alone.  The secondary and all subsequent procedures are reimbursed at a reduced rate.  The primary procedure is reimbursed at 100% of eligible charges, the second procedure [at] 50% and the third and all subsequent procedures at 25%.  This is based on there being some overlap of time and services during not only the intraoperative period, but also during the pre and post operative care.  All charges are subject to eligibility, and all other plan provisions and limits at the time services are rendered.

Please refer to the Bank of America SPD under *surgical benefits*, which states: "The following services are covered under the medical plan . . . When multiple procedures are performed during the same operative session, benefits for the secondary procedure(s) will be determined based on the medical policy of the medical plan claims administrator. No separate payment will be provided for procedures that are incidental to or an integral part of the primary procedure.

145.    The letter further specified that Aetna's decision was final, stating:

**Next Steps:**
With this <u>final decision</u>, the appeal process within Aetna has been completed. Please refer to the enclosed document entitled "Aetna Appeal Process and Member Rights" for additional rights available and for an overview of the entire appeal process.

146.    The enclosed document explained that Rizopoulos had a right to submit an appeal to Aetna if she was "not satisfied with the original coverage decision," and that Aetna agreed to notify her of the appeal decision within 60 days of receiving such an appeal. Further, Aetna stated: "<u>Final Decision</u>: If you do not agree with the final decision, you have the right to bring a civil action under Section 502(a) of ERISA, if applicable."

147.    Aetna's denial letter stated that, at Rizopoulos' request, it would provide "free of charge access to copies of all documents, records, and other information about [her] claim for benefits, including the specific rule, guideline, protocol, or other similar criterion that was used in making the decision, and the names of any clinical reviewers if applicable." However, this offer was meaningless, since Aetna also stated that its denial was a "final decision," such that the only other option was litigation.

148.    Based on Aetna's appeal decision, which was "final," and its accompanying Aetna Appeal Process and Member Rights form, Rizopoulos was given the express right to bring an

immediate lawsuit under ERISA to pursue her claim for benefits. She is exercising that right through this TAC.

149. While Aetna's appeal decision was final, such that Rizopoulos is entitled to bring this action, Aetna failed to respond or explain its UCR determination whereby it excluded charges of Dr. Valauri as being in excess of "the prevailing charge level." Its only explanation in its appeal denial letter related to its decision to reduce benefits based on multiple procedures having been performed on the same day. However, according to the EOB, the multiple surgical reduction was only relevant to two of the three CPT Codes. The primary procedure, CPT Code 30450, was unaffected by that policy. For that procedure, Dr. Valauri charged $11,214.00 as his usual and customary charge, based on the Ingenix Customized Fee Analyzer. Aetna excluded $4,435.00 of that amount as in excess of the "prevailing charge level," but provided no explanation for such a reduction in its denial of Rizopoulos' appeal.

150. As for the multiple surgical reductions, Aetna relies on a provision in the Bank of America SPD, which states: "[w]hen multiple procedures are performed during the same operative session, benefits for the secondary procedure(s) will be determined based on the medical policy of the medical plan claims administrator." However, this provision then proceeds to define the "medical policy" which governs, by stating: "No separate payment will be provided for procedures that are incidental to or an integral part of the primary procedure." Thus, the plan only allowed Aetna to elect not to pay additional benefits for "incidental" procedures; it did *not* authorize Aetna to impose unilaterally a reduction of benefits based solely on the fact that separate medical procedures were performed on the same day. Rizopoulos correctly pointed out in her appeal that Aetna's multiple surgery policy had never been disclosed to her, and Aetna's

reduction of benefits based on that policy is therefore invalid and contrary to its obligations under ERISA.

151.   Aetna's representation in its EOB that its basis for reducing the benefits to be paid on behalf of Rizopoulos was due to the fact that Dr. Valauri's charges exceeded "the prevailing charge level" was false and misleading.  As explained further herein, Aetna relied on the Ingenix Databases to determine UCR, yet those databases do not reflect "the prevailing charge level" for healthcare services and provide an improper basis upon which to make UCR determinations.

152.   Aetna's appeal denials withheld material information, as detailed herein, that Aetna was obligated to disclose as a fiduciary. *First*, Aetna did not disclose to Rizopoulos that it had used the Ingenix Databases to determine UCR. *Second*, Aetna did not disclose that it had contributed pre-edited data to Ingenix and that Ingenix further corrupted the data reducing amounts in the Ingenix Databases. *Third*, Aetna did not disclose that the Ingenix data came with a disclaimer that the data does **not** represent UCR.

153.   Aetna's treatment of Rizopoulos' appeal was contrary to ERISA and applicable regulations.  It did not provide a "full and fair review."  Because Aetna's appeal process violated procedural safeguards adopted in the ERISA regulations, any appeals are "deemed exhausted" by operation of law.

154.   Rizopoulos is entitled to additional benefits for her Nonpar services, up to billed charges.  Because Aetna currently administers the plan through which Rizopoulos obtains her insurance, including making all benefit determinations, Aetna is the proper party to which an order for payment of additional benefits should be directed.

155.

## THE INGENIX DATABASES AND AETNA'S DETERMINATION OF UCR

156.    Ingenix, the owner of the Ingenix Databases which Aetna primarily relies upon for making its UCR determinations, is a wholly-owned subsidiary of United Health Group.  In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products, which, among other things, sold a provider charge database known as "MDR."  In October 1998, Ingenix also purchased the PHCS database from the Health Insurance Association of America ("HIAA"), a trade group for the insurance industry.

157.    HIAA developed the PHCS database in 1973.  It obtained historical charge data for surgical and anesthesia procedures from numerous data contributors, including health insurance companies, third-party payors, and self-insured companies.  The PHCS databases were later expanded to include data regarding dental (1977), medical (1988), and drugs/medical equipment (1998).

158.    PHCS was designed to provide limited information about provider charges, and **not** to determine precise reimbursement amounts.

159.    When Ingenix acquired both MDR and PHCS, it kept them as separate databases, but merged the underlying data.  MDR and PHCS used different methodologies to produce the ultimate output for the respective databases.  As a result, the dollar amounts differed for individual procedure codes at the reported percentiles.

160.    Ingenix produces two cycles of Ingenix data per year that include medical, surgical, anesthesia and HCFA's common procedure coding system services ("HCPCS").  HCPCS includes pharmaceuticals, injections, blood, medical equipment, ambulance transport,

medical screenings and similar services. Ingenix then sends the final fee schedule data to Aetna, among other users of the product, which then loads it into its computerized claim platform.

161.    Following treatment of Aetna's members by Non-Par providers, the provider completes a standardized form, noting the relevant CPT codes and the provider's billed charges. The bill is then sent to Aetna for payment by the Member or the provider.

162.    Aetna claims processors enter certain information from the claim (described below) and automatically access the Ingenix Databases. The claims processor's computer screen provides the dollar amount that Ingenix reports for an individual CPT code at the applicable percentile and Aetna uses this dollar amount or less (as in the case of tiering) as the UCR Non-Par Benefit Reduction.

163.    The CPT procedure codes can be used by any provider regardless of licensure, specialty, training or experience.

164.    The computerized process of using the Ingenix Databases at a particular percentile for the UCR dollar amount is sometimes referred to as "auto-adjudication."

165.    To create the database that serves as the basis for both PHCS and MDR, Ingenix collects and compiles billed charge data contributed by "Data Contributors," consisting of health insurers and others.

166.    Aetna is a significant Data Contributor because it contributed more charges to Ingenix than any other single data contributor. During the Class Period, Aetna's data accounted for over 14% of the total submissions to the Ingenix Databases. For certain modules, Aetna's data accounted for one-half of the total submissions.

167.    The PHCS database is comprised of both actual charge data and derived charge data. The MDR database reports only derived charge data. Billed charge data is often referred to as "actual" data. For any medical or surgical service for which the Ingenix PHCS Database ended up with fewer than nine charges, Ingenix used derived charge to determine a corresponding UCR amount for a particular CPT code.

168.    Ingenix uses only four elements (or data points) from the charge data to create the Ingenix Databases. The four data points are:  date of service; CPT Code; the address where the service was performed; and the amount of the provider's billed charge.

169.    These four data points do not identify the provider, the patient (including age or general health status), or the type of facility where the service was performed.  Ingenix does not survey or engage in sampling to determine number and types of providers in a given geographical area. The addresses it collects are not correlated with the place of service to describe or identify the facility where the service was performed.  No patient or provider specific information is collected or analyzed.

170.    Because it only collects these four data points, the Ingenix Databases (both AC and DC) do not -- and cannot -- determine from its pooled data (i) the number of physicians or other providers in a given geographic area; (ii) whether the data reflects physician or non-physicians billed charges;  (iii) the number or percentage of providers furnishing billed charge data; (iv) the provider's usual charge;  (v) the provider's licensure, specialty training, or experience; (vi) degree of skill needed for the service; (vii) a patient's age or health status; (viii) the complexity of a patient's specific treatment; (ix) the place of service ("POS") (*i.e.*, the facility including hospital, clinic, physician office, nursing home, patient's home) as distinguished from

the address; (x) the range of services or supplies provided by a facility; (xi) rates based on cost factors or the cost of providing the same or similar service or supply; (xii) the prevailing fees or charge level for any provider or service in a particular geographic region; or (xiii) the amount commonly charged for a particular medical service by physicians in a particular geographic region.

171.     The Ingenix data is also inadequate for making UCR determinations because it fails to distinguish between charges that are made with and without modifiers.  Modifiers consist of a two-digit number that providers add to a five-digit CPT Code to signify an alteration of the stated service or otherwise identify the circumstances in which the service was provided. Modifiers may be  used to indicate, for example, that a non-physician has provided the service (i.e. a nurse practitioner) or that an assistant surgeon was involved.  In such a situation, the charge would be well less than what a physician would normally charge for such a service.  Yet, without the modifier being taken into account, the number is given equal weight as the physician's charge for determining the number that Aetna uses for setting UCR for all physician services.

172.     Ingenix also fails to audit its data or otherwise confirm which charges had modifiers and which ones did not.  Given that Aetna uses the numbers reported by Ingenix without further analysis to ensure that it is valid and appropriate for setting UCR, including with regard to modifiers, such UCR determinations are presumptively invalid.

173.     The use in the Ingenix Databases of only four data points, the combining of charges from various types of providers, the use of edits that eliminate valid high charges, and

other data manipulations and procedures, invalidate the Ingenix Databases for use in determining UCR and make them non-compliant with Aetna's contractual EOC and SPD definitions.

174.   Aetna recognized the insurmountable structural defects caused by using only the four data points that should have prevented the Ingenix Databases from being used to determine UCR.

175.   Aetna and Ingenix (as did HIAA) discussed expanding the Ingenix data to include additional data points.

176.   Ingenix and HIAA sought expanded data from Aetna and other Data Contributors. The required expanded data included several additional data points, such as provider identification, licensure, specialty; patient age and gender; two-digit modifier; and place of service (hospital or doctor's office, etc.). Certain Data Contributors did not contribute expanded data to Ingenix and Ingenix continued to accept those Data Contributors' data that did not contain the required expanded data points.

177.   Ingenix did not incorporate the expanded data points that were contributed into its Ingenix Databases.

178.   Expanded data was deemed necessary by HIAA, Ingenix and Aetna because the four data points are limited and inadequate as a basis for UCR.

179.   Despite knowledge of their inadequacy, Ingenix continued to produce the Ingenix Databases with only the four data points and supplied them to Aetna for use during the Class Period.

180.   Aetna knew the expanded data was not incorporated into the Ingenix Databases but it continued to purchase and use them for UCR determinations.

181.   Aetna did not advise its members of the inadequacy of the four data points or Ingenix's failure to incorporate expanded data points into its Ingenix Databases.

182.   In addition to using the Ingenix Databases for making UCR determinations despite knowing that they are invalid for that purpose, Aetna also affirmatively manipulates the data it contributes to Ingenix so as to further ensure that the Ingenix Databases reported invalid and unreasonably low charges.

183.   Beginning in at least 1980, Aetna collected charge data from its claim systems for the purpose of calculating UCR for Non-Par services.

184.   From 1980 through the present, without substantial change, Aetna applied certain profiling rules ("Profiling Rules") to determine whether or not it would collect and send the charge data for a particular claim to Ingenix. If a claim "profiles," it is collected by Aetna as UCR data. If a claim does **not** "profile," it is **not** collected or sent to Ingenix by Aetna for use in the Ingenix Databases.

185.   During all or part of the Class Period, Aetna used its profiling rules to pre-edit its charge data to remove valid high charges prior to sending the remaining charges to Ingenix for inclusion in the Ingenix Databases.

186.   In 2005, Ingenix changed its data contribution forms to require Data Contributors to certify with each data submission that the contributed data was complete and was not pre-edited or otherwise manipulated.

187.   Commencing in 2005, Aetna provided the required certifications to Ingenix attesting to the fact that its data submission was complete and not pre-edited. Aetna knew the

certification was false and misleading. Ingenix intentionally did not take the necessary steps to determine whether Aetna's certification was accurate or not.

188.     Upon receipt of Aetna's charge data (and that of other Data Contributors) Ingenix also edited ("scrubbed") all charge data to remove certain valid high charges. As part of this process Ingenix "scrubbed" the Aetna charge data that Aetna had already pre-edited ("pre-scrubbed").

189.     Ingenix informs insurance companies that use the data (including Aetna) that it is not endorsing, approving, or recommending the use of Ingenix data for UCR. With each production, Ingenix included the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to subscribers for informational purposes only.   Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data. There is neither a stated nor an implied "reasonable and customary charge" (either actual or derived).

190.     Ingenix also informs data users (including Aetna) that they cannot "represent" the Ingenix data **other than** as described in the disclaimer.

191.     Throughout the Class Period, Aetna has been aware of this disclaimer but did not disclose its existence or substance to its Members.

192.     Throughout the Class Period, Aetna has been aware of the disclaimer but it repeatedly has "represented" the Ingenix data **other than** as described in the disclaimer. Among other things, Aetna uses both actual and derived data as a "reasonable and customary charge," in direct contravention of the disclaimer, and federal and state law.

193.     The "conversion factor data," which is used to develop the "derived" data, as referred to in the disclaimer are not the same as the actual charge data contributed to Ingenix.

194.    Throughout the Class Period, derived data has been used as the basis for UCR reimbursement for the majority of medical and surgical services nationwide. Derived data is not specific to a provider, patient or procedure (CPT code). Rather than setting out rates for healthcare services based on what providers actually charge in the marketplace, derived data uses relative values assigned to each separate medical procedure multiplied by a conversion factor. As a result, there is no relationship between the derived data and what providers actually charge in the marketplace. Moreover, there is no scientific or other support for Aetna using derived data, through its reliance on the Ingenix database, to set UCR rates for Non-Par services.

195.    Derived charges do not reflect usual, customary and prevailing charges by actual providers; rather, they are artificial prices that Aetna uses through its reliance on the Ingenix database to understate UCR.

196.    The CPT Codes combined for derived data may represent very diverse procedures ranging from the most simple, including most of the charges, to the complex. Among other things, for derived charges to provide a valid basis for determining reasonable compensation levels, an adjustment must be made to account for distribution and spread of the common and less common procedures. This adjustment requires computation of standard deviations. This computation is not performed by Ingenix. Because Ingenix fails to consider that some CPT codes have a wider distribution of charges (*i.e.*, standard deviation) than others, the derived percentiles understate the true upper percentile values for these CPT codes. This is a particularly significant problem because those CPT codes with a large number of observations tend to be the most common and are being grouped with less common procedures with fewer observations.

Thus, the use of the derived data, which is improperly calculated, does not comply with Aetna's UCR definitions.

197.    Relative values for Ingenix are also based on national data rather than geographic-specific charge data, and are used to establish conversion factors. Derived data is, therefore, not specific to a geographic area, as UCR must be.

198.    In addition to the structural limitations outlined in this TAC, the database computations that use either actual charge data or derived data do not tabulate data according to the specific geographic area. For example, Ingenix combines numerous three-digit zip codes used for postal purposes which are not medical service areas amenable to cost comparison. These areas, known as "Geozips," do not properly compare charges from similar geographic areas, leading to improper comparisons and invalid data.

199.    The distortions created by the use of Geozips are recognized by Ingenix itself. In its MDR Customized Fee Analyzer, which Ingenix sells to providers to use in setting their rates, Ingenix states:

> Because the fee ranges in the Analyzer are based on the first three digits of your
> geozip, you need to assess where your locale stands in relation to others in this
> three-digit area. For example, many different three digit areas contain both urban
> and rural locales with different charging patterns. Use your judgment to
> determine how to interpret the fee range for your particular community.

200.    Aetna fails to exercise any judgment in determining whether the specific Geozip applicable to particular UCR determinations is valid, including whether they may contain disparate "urban and rural locales with different charging patterns." Instead, Aetna relies strictly on the geographic groupings provided by the Ingenix Databases, without taking into account possible "different charging patterns" in each Geozip. By so doing, Aetna's UCR determinations

have no valid basis, do not comply with the EOC, SPDs and other plan documents, are unreasonable, and in violation of ERISA and other applicable law.

201.    Aetna relies on the Ingenix Databases for making UCR determinations without auditing the underlying data or otherwise taking any steps to verify that data it acquires from Ingenix provide a reasonable basis upon which to set UCR.

202.    Ingenix does not audit the Data Contributors, nor verify the accuracy or completeness of their data submissions.  Thus, the validity and reliability of the Ingenix Databases are entirely at the mercy of its voluntary data contributors, all of whom have an incentive to have Ingenix report reduced rates for use in setting UCR.

203.    In instances where Ingenix knew Aetna's data submission violated its stated data requirements, Ingenix did not audit Aetna because it needed Aetna's data to allow the Ingenix Databases to be sold.

204.    The information as to the Ingenix Databases' deficiencies was not disclosed to Aetna Members, healthcare providers, or state regulators.

205.    Although Aetna professed the ability to take account of factors such as "complexity; degree of skill needed; the type of specialty of the provider; the range of services or supplies provided by a facility," and others, it did not change its methodology to compensate for the known deficiencies of the data it used to make Non-Par Benefit Reductions.

206.    By systemically making Non-Par Benefit Reductions using flawed and invalid data and data that was not compliant with the plan definition of UCR and other Non-Par Benefits, Aetna violated its EOC and SPDs during the Class Period.

## AETNA'S EMERGENCY ROOM REIMBURSEMENTS

207.    In all of the states in which Aetna operates, it is obligated to fully reimburse Aetna Members for use of out-of-network emergency room services ("ER") that satisfy a prudent layperson standard regardless of the type of the insurance plan they have (*e.g.*, POS, PPO, HMO).

208.    Under the prudent layperson standard, Aetna must fully pay for ER services, even if they subsequently are determined not to constitute an emergency, so long as the Aetna Member reasonably believed the condition to be emergent at the time the Member sought ER care.  The standard precludes reliance on a medical professional's diagnostic conclusion at the time of discharge because the medical professional is not a prudent layperson and has information unavailable to the prudent layperson at the time ER care was sought.

209.    For many Aetna Members, Aetna denied reimbursement for ER services that were properly considered emergent under the prudent layperson standard.

210.    Aetna EOBs failed to disclose material information to Aetna Members when Aetna denied or reduced payment for ER services.

## AETNA'S UNAUTHORIZED MULTIPLE PROCEDURE REDUCTIONS

211.    As a further method for making reductions in reimbursements to subscribers for healthcare provided by Non-Par providers, Aetna automatically reduces coverage for multiple procedures performed on the same day or during the same operative session, even if the additional procedures are unrelated to what Aetna considers to be the initial procedure or involve separate surgical incisions.  By so doing, Aetna makes reimbursement determinations that dramatically reduce amounts for those so-called secondary procedures in violation of the terms of their contracts of insurance.

212.    Aetna's Plans do not disclose or authorize payment reductions based on Aetna's multiple surgical reduction policy ("MSR"), pursuant to which it reduces benefits when there are multiple surgical procedures performed on the same day.   ERISA does not permit exclusions or limitations to be applied to reduce benefits that have not been properly disclosed to Members. Plaintiffs were improperly harmed by Aetna's use of these undisclosed multiple surgical rules to reduce their reimbursements in violation of its obligations under ERISA and common law.

## DEDUCTIBLE AND OUT-OF-POCKET LIMITS

213.    Aetna's obligation to pay health benefits arises once a beneficiary has satisfied his or her annual deductible amount, which is specified in the plan documents.   In addition, once a Member reaches the plan's specified out-of-pocket limit for the year, Aetna's obligation to pay benefits increases.   The out-of-pocket limit is referred to in Plaintiffs' plan as the "coinsured charge limit" and will be so referred to here.   The coinsured charge limit means that once a Member's allowed amounts for services, in total, reaches the coinsured charge limit, as specified in the plan, the Member has no further obligation to pay any share of coinsurance.   So, for example, when the total of allowed amounts is below $1,000, Aetna is obligated to pay 80% of UCR, and a Member is obligated to pay coinsurance of 20%.   When a Member's allowed amounts for a calendar year total at least $1,000 or more, Aetna must pay 100% of UCR, and a Member's coinsurance obligation concludes for that calendar year.

214.    By the terms of the EOC, the allowed amount is the lesser of the provider's actual charge and the UCR. Any amount of the billed charge above UCR does not count toward either the deductible or the coinsurance charge limit. If the UCR is determined improperly, then the

amounts counted toward the deductible and/or the coinsurance charge limit based on such UCR are also too low.

215. Aetna calculated the deductible and the coinsurance charge limits using inappropriately reduced UCR amounts, and failed to credit the difference between the actual charge and the allowed charge to the deductible or to the coinsured charge limit. Aetna is therefore paying too little of the claim (80% of the improperly reduced UCR), while the Members remain financially responsible for too large a portion of the claim (20% of UCR, plus the difference between the billed amount and the allowed charge).

## INTEREST

216. Aetna has improperly reduced its reimbursements to Members as a result of the violation of the terms and conditions of its healthcare plans, and it owes Members restitution of the improperly denied amounts and interest on such amounts.

## AETNA'S RICO PREDICATE ACTS

217. During the RICO Class Period and RICO Section 664 Subclass Period, Aetna engaged in a series of predicate acts underlying its RICO violations. These predicate acts include the dissemination through the U.S. Mail of numerous fraudulent, misleading and deceptive EOBs and other communications to Class Members, and by transmitting through the internet fraudulent, misleading and deceptive representations on its public website, as detailed in this TAC.

218. Aetna disseminated through the U.S. Mail numerous EOBs to Cooper including, but not limited to, EOBs dated May 13, 2005, June 1, 2005, July 6, 2005, August 17, 2005 and August 25, 2005. Each of these EOBs misrepresented that Aetna's reduction of the allowed

amount below the billed charge was because the billed charge was "greater than the reasonable and customary charge."

219.   Aetna similarly disseminated false statements in numerous EOBs it sent through the U.S. Mail to Werner, including, but not limited to, EOBs dated April 1, 4 and 15, 2006, May 13, 2006, June 9, 2006, July 25, 2006, August 19, 2996, September 14, 2006, October 17, 2006, January 20, 2007, February 14, 2007, April 24, 2007, May 8, 2007, June 20, 2007 and July 19, 2007, in addition to the EOB it sent to Dr. Valauri on behalf Rizopoulos dated August 16, 2007. Each of these EOBs misrepresented that the UCR reduction was based on the "prevailing charge level" for services "in the geographic area where it is provided."

220.   Aetna further mailed Franco correspondence, including on December 11, 2003, December 19, 2003 and January 9, 2004, about her "authorized" and "approved" surgery. These statements were intentionally misleading.   Aetna knew that its Non-Par Benefits Reductions would leave Franco financially responsible for tens of thousands of dollars.

221.   Aetna sent EOBs to Franco dated March 18, 2004, March 22, 2004, August 19, 2004, and August 27, 2004 and September 1, 2004 that falsely advised her that her providers' surgery charges were "greater than the reasonable and customary charge" for the procedures.

222.   These representations to each of the named plaintiffs or their Non-Par providers were knowingly false and misleading.   Aetna knew and recklessly disregarded that its method for setting reimbursement levels for Non-Par providers was fatally flawed and did not properly determine valid UCR levels, and that it did not have a valid basis upon which to represent that the providers' bills were "greater than the reasonable and customary charge" or the "prevailing charge level" for the relevant services in a particular geographic area.

223. Aetna's overpayment recovery service also baselessly represented in dunning letters to its members that Aetna had overpaid UCR benefits and improperly referred the claimed underpaid bills to collection agencies when the alleged overpayments were not immediately refunded to Aetna.

224. In addition, all of Aetna's EOBs to Werner after date of service September 1, 2006 falsely stated that the UCR amount ($72) was the "prevailing charge level" for her Non-Par provider, without disclosing that Aetna was in fact unlawfully changing the base UCR from $120 to $72 by way of its undisclosed behavioral health tiering policy.

225. In making its UCR determinations, Aetna relied primarily on the Ingenix Databases and, from time to time, used Medicare rates. Neither methodology is a proper basis for UCR. With regard to the Ingenix Databases, Aetna, while serving as a major contributor of the data underlying the Ingenix Databases, knowingly submitted data to Ingenix that Aetna had improperly pre-edited to remove high charges, thereby artificially lowering the reported charges that were used to set UCR. The Ingenix Databases are flawed for numerous other reasons, as detailed in this TAC. Similarly, Medicare rates are not designed to and do not, establish UCR, and cannot legitimately be used for that purpose.

226. Regardless of whether the data Aetna relied upon from the Ingenix Databases were based upon actual or derived charges, they do not fall within the description provided by Aetna in its various EOBs. Because of the manipulation of the data by Aetna and Ingenix, as well as (among other reasons) the inclusion of data from all healthcare providers, regardless of licensure or experience, and the omission of modifiers, the number based on actual data nevertheless failed to reflect the prevailing or customary charges. For derived data, which

represents the vast majority of CPT Codes in PHCS and all of the charges in MDR, the numbers reported by Ingenix have no relation to actual billed charges, whether prevailing or otherwise. Thus, during the Class Period, Aetna defrauded its members through its false and misleading EOBs.

227.    As a further aspect of its scheme to reduce Non-Par benefits below the level it was otherwise contractually required to pay, using the U.S. Mail and/or interstate wire facilities, Aetna submitted fraudulent certifications to Ingenix concerning its data. In particular, Ingenix requires its Data Contributors (including Aetna) to attest that the data being submitted for inclusion in the Ingenix Databases reflected all of the available data from the contributor, without being pre-edited or otherwise manipulated. Aetna falsely attested to this fact even though it had internal policies that precluded substantial data from being included in its submission to Ingenix. The impact of Aetna's manipulation of the data it submitted to Ingenix for inclusion in the Ingenix Databases was to lower the amount of the reported charges so as to reduce the ultimate numbers that Ingenix would report and which Aetna would use for making its UCR determinations. All of this material information was withheld from Plaintiffs and Class Members.

228.    The EOBs sent by Aetna to Plaintiffs via U.S. Mail and reflecting UCR benefit reductions did not adequately disclose the basis for, nor the reasons behind, the exclusion of expenses, and thereby precluded Plaintiffs from the information they needed to challenge Aetna's UCR determinations. Aetna did not disclose whether it used a particular database, or Medicare rates, or some other methodology, and it did not disclose the required information about how Plaintiffs and Class Members might successfully appeal the UCR benefit reductions. Aetna

failed to provide the specific reasons regarding unpaid Non-Par benefits, failed to impart necessary information about the appeals process, and failed to provide other information required under ERISA.

229.   Aetna's correspondence by U.S. Mail to Franco misrepresented to her that various procedures specified by her surgeon (including the price for each specific code) were "authorized" and "approved." In fact, Aetna intended not to pay knowing that these procedures would leave tens of thousand of dollars unpaid by Aetna, for which Franco would be financially responsible.

230.   Further predicate acts of mail and/or wire fraud were committed by Aetna in its responses to Werner's internal appeals of the UCR reductions.  In its responses, disseminated by Aetna via U.S. Mail, Aetna made the following false and misleading statements:

- In its May 9, 2006 denial of Werner's first leave appeal, Aetna represented that it determined UCR rates "based on Reasonable Charges taking into consideration [the Non-Par provider's] type of specialty and her licensure." This was false because the Ingenix Databases do not permit any distinction to be drawn based on specialty and licensure.

- In the same letter, Aetna represented that, in determining UCR, it "refer[s] to statistical profiles of physicians' charges for the same or similar services in a geographic area." This was false because the Ingenix Databases do not provide a "statistical profile of physicians' charges" and do not report ". . . charges for the same or similar services . . . " at all, nor charges in a "geographic area" which is appropriately defined.

- In its June 26, 2007 denial of Werner's second level appeal, Aetna stated that it set UCR based on the PHCS database, representing it as "a statistical profile of provider's charges that has been developed for this purpose." This is false because not only do the Ingenix Databases not provide a "statistical profile of providers' charges," but the statement that PHCS "has been developed for this purpose" is directly contrary to and in violation of Ingenix's disclaimer, which specifically warns Aetna and other users of the Ingenix Databases that it was not intended to serve as a basis for providing UCR determinations.

- In its July 31, 2007 letter to Werner, Aetna claimed Werner had been overpaid for dates of service in October 2006 because "the correct allowed amount per date should have been $72.00 and paid $43.20. We should have paid a total of $172.80. The patient's responsibility is $115.20 coinsurance." These statements are false, because the allowed amount for that date (according to the Ingenix database) was $120, and was payable at $120. Plaintiff's coinsurance obligation ended on October 11, 2006. Further, Aetna's threat to send the overpayment to collection if she did not repay it was improper and harassing.   Aetna subsequently sent Werner for collection action, which it stopped only after the Virginia DOI sent Aetna a "cease and desist" letter.

- In its July 31, 2007 letter to Werner's Non-Par provider, Aetna claimed that the Non-Par provider had been overpaid $57.60 by stating: "Our payment should have been $172.80, because we would have paid 60% of the prevailing fees." This statement was false because $72 was not the prevailing fee for the services at issue in Washington, DC. Aetna's threat to send the overpayment to recovery (or offset it from future payments) was without a proper basis.

231.    Aetna also sent through the U.S. Mails to Rizopoulos an intentionally incomplete and misleading letter denying her internal appeal dated November 21, 2007. Among other things, Aetna failed to disclose in this letter that its reliance on the invalid Ingenix Databases served as a basis for its UCR reductions, focusing solely on the multiple surgical reductions.  Its discussion of its multiple surgical policy was also misleading as it failed to disclose that its practice of reducing benefits down to 25% of eligible charges was contrary to the policy of the Federal government and the AMA, and was in violation of New York law.

232.    Aetna's Internet website, to which its EOBs directed its Members for answers to their questions, was also fraudulent and misleading.   The website represented to Aetna's Members, via the Internet (which utilizes interstate wire facilities), that Aetna made its UCR determinations based on the prevailing charges of what other providers charged for similar services. Moreover, the website represented that Aetna would take into account various factors, including the specialty of the provider and, if there were few charges or a small number of

providers submitting charge data in a particular geographic area, it stated and represented that Aetna would consider the prevailing charges in other areas. These statements, as disseminated to Plaintiffs and Class members via Aetna's Internet website, were false. In fact, the Ingenix Databases use derived data for the vast majority of CPT Codes, such that when there are less than nine charges reported in a particular geographic area prevailing charges from other areas are not used, as Aetna falsely represents. Further, even if there are more than eight charges contained in the Ingenix PHCS Database, and they are used to provide a dollar amount for a CPT code at a given percentile, the eight or more charges could all come from one provider, or a few providers of different licensure, specialties, training and experience performed at different places of service for patients of different ages, gender and disparate health conditions. All of these factors affect the reasonableness of the billed charge. None of these factors are accounted for in the Ingenix Databases. Aetna has no way of knowing the number of providers who submitted data, or a way to differentiate between them, so that Aetna is unable to satisfy its representation on its website of checking the actual charges from other areas when there were only a small number of instances that a certain service was provided in an area. In addition, even when actual charge data was reported by Ingenix in the Ingenix PHCS Database, Aetna had no basis for concluding that these data reflected actual prevailing charges for the reasons cited above and in light of the manipulation of data by Ingenix as well as the improper pre-editing of submitted data by Aetna itself.

## **CLASS DEFINITIONS**

233.    Plaintiffs Werner, Franco and Rizopoulos bring this action on their own behalf and on behalf of an "ERISA Class," defined as:

All persons who are, or were, from July 30, 2001 through the present ("ERISA Class Period"), Members in any group healthcare plan insured or administered by Aetna, subject to ERISA (other than New Jersey small employer plan members), who received hospital or medical services or supplies from a Non-Par provider (or any provider Aetna considered Non-Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed less than the provider's billed charge in determining benefits.

234.    Cooper brings this action on her own behalf and on behalf of a "New Jersey SEHP Class," defined as:

All persons who are, or were, from July 30, 2001 through the present ("New Jersey SEHP Class Period") Members in any New Jersey small group healthcare plan insured or administered by Aetna, subject to ERISA, who received hospital or medical services or supplies from a Non-Par provider (or any provider Aetna considered Non-Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed an amount less than the provider's billed charge in determining benefits.

235.    All named Plaintiffs bring this action on their own behalf and on behalf of a "RICO Class," defined as:

All persons who are, or were, from March 1, 2001 through the present ("RICO Class Period"), Members in any healthcare plan (ERISA or non-ERISA) insured or administered by Aetna who received hospital or medical services or supplies from a Non-Par provider (or any provider Aetna considered Non-Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed an amount less than the provider's billed charge in determining benefits, based on the use of the Ingenix Databases.

236.    All named Plaintiffs further bring this action on their own behalf and on behalf of a "RICO Section 664 Subclass," defined as:

All persons who are, or were, from March 1, 2001 through the present ("RICO Section 664 Subclass Period"), Members in any healthcare ERISA plan insured or administered by Aetna who received hospital or medical services or supplies from a Non-Par provider (or any provider Aetna considered Non-Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed an amount less than the provider's billed charge in determining benefits, based on the use of the Ingenix Databases.

237.    Plaintiffs Werner, Franco and Rizopoulos bring claims against Aetna on their own behalf and on behalf of the ERISA Class to recover unpaid benefits due under their plans, and to enforce and clarify their rights, under 29 U.S.C. § 1132(a)(1)(B) and to remedy Aetna's failure to accurately disclose information in plan materials and otherwise, and its failure to provide a "full and fair review" of the decisions denying claims under 29 U.S.C. § 1133.  Further, Plaintiffs allege that, as an ERISA fiduciary, Aetna has violated its fiduciary duties of loyalty and care under 29 U.S.C. §§ 1104 and 1106, by relying on Ingenix Databases and Medicare rates that are invalid for the purpose of making Non-Par Benefit Reductions without disclosure or lawful authority and by violating ERISA and federal claims procedure regulations.  *See, e.g.,* 29 C.F.R. § 2560.503-1.

238.    In violation of its legal and fiduciary obligations, Aetna acted and continues to place itself in an adversarial relationship with its Members.  For example, Aetna violated New Jersey laws governing Non-Par reimbursement and liability for ER services, violated New York law through its imposition of excessive reductions for multiple surgeries, and exposed its Members to greater financial responsibility for Non-Par services than authorized by law and plan language.  As another example, Aetna instituted UCR tiering reductions for behavioral health providers without plan authorization, without regulatory approval, and without disclosure to Aetna Members and their employers, or to regulators.  UCR tiering violates the rights of all Aetna members in ERISA, SEHP and non ERISA plans.

239.    In addition, Plaintiff Rizopoulos seeks declaratory and injunctive relief against Aetna on her own behalf and on behalf of the ERISA Class to enforce the plan terms, to clarify rights to future benefits and to remedy Aetna's continuing violations of federal and state law.

## COMMON CLASS CLAIMS, ISSUES AND DEFENSES FOR THE CLASS

240.   The following common class claims, issues and defenses for Plaintiffs and the

Class arise for the defined Class Periods:

(1)     Whether Aetna's use of the Ingenix Databases to calculate UCR in determining Non-Par reimbursement breached Aetna's legal obligations to its Members  in group health plans;

(2)     Whether Aetna's Non-Par Benefit Reductions described in this TAC violated ERISA, or other applicable law;

(3)     Whether ERISA requires each Class Member to prove exhaustion or otherwise provide a basis for excusing exhaustion;

(4)     Whether Aetna's alleged fiduciary violations, if proved, justify injunctive or other relief;

(5)     Whether Class Members (including those who assigned claims) may recover unpaid benefits;

(6)     Whether Aetna's failure to provide accurate plan documents upon request, including EOCs and SPDs and other information, entitles Class members to any relief;

(7)     Whether, in addition to unpaid benefits, interest should be added to the payment of unpaid benefits under ERISA;

(8)     Whether Aetna's claims review procedures comply with ERISA;

(9)     The standard of review applicable to review Aetna's Non-Par Benefit Reductions;

(10)    The identity and scope of the ERISA and non-ERISA plans subject to this Complaint;

(11)    Whether Aetna violated its fiduciary or other legal duties owed to its Members when it made its Non-Par Benefit Reductions or otherwise engaged in the conduct alleged in this TAC;

(12)    Whether Aetna's EOBs and other communications with its Members violated ERISA or other applicable law;

(13)    Whether the Court's interpretation of the ERISA plans at issue must be guided by the state regulators' interpretation of such plans;