**WILENTZ, GOLDMAN & SPITZER, P.A.**
900 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, New Jersey 07095-0958
(732) 636-8000

Counsel for Plaintiffs and the Class
(Additional Counsel Listed on Signature Page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------X

MICHELE COOPER, MICHELE
WERNER, DARLERY FRANCO, PAUL
and SHARON SMITH, CAROLYN
SAMIT, and CAROLYN
WHITTINGTON, individually and on
behalf of all others similarly situated,

           Plaintiffs,

    v.

AETNA HEALTH INC. PA, CORP.,
AETNA HEALTH MANAGEMENT,
LLC, AETNA LIFE INSURANCE
COMPANY, AETNA HEALTH and
LIFE INSURANCE COMPANY,
AETNA HEALTH INC., and AETNA
INSURANCE COMPANY OF
CONNECTICUT,

           Defendants.

-------------------------------------------------------X

CASE No.:  07cv3541 (FSH) (PS)

**FOURTH AMENDED
CLASS ACTION COMPLAINT**

**JURY TRIAL FOR ALL
CLAIMS SO TRIABLE**

Plaintiffs Michele Cooper ("Cooper"), residing in Short Hills, New Jersey; Michele

Werner ("Werner"), residing in Arlington, Virginia; Darlery Franco ("Franco"), residing in

Newark, New Jersey; Paul and Sharon Smith residing in Townsend, Delaware; Carolyn Samit

residing in East Hanover, New Jersey, and Carolyn Whittington residing in Moorpark,

California, to the best of their knowledge, information and belief, formed after an inquiry

reasonable under the circumstances, for their Fourth Amended Class Action Complaint

1

(hereinafter "FAC") assert the following against Defendants Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc. and Aetna Insurance Company of Connecticut (collectively "Aetna" or "Defendants").

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

1.      Throughout the Class Periods, as defined below, Plaintiffs were insured by Aetna and Plaintiffs sought benefits for treatments for a variety of medical conditions.  Aetna engaged in an adversarial battle with Plaintiffs, denying coverage for substantial portions of the bills they received from their treating non-participating providers, thereby transferring crushing medical costs to Plaintiffs that should have been covered by Aetna.

2.      Each of the named Plaintiffs was a member of a health insurance plan offered through employers during the Class Period.  Aetna exercised all discretionary authority and control over the administration of the plan of each Plaintiff, including the management and disposition of benefits under the terms of the plan.  Plaintiffs Cooper, Werner and Franco are not currently insured by Aetna, although they were when the coverage disputes described herein arose.  Plaintiffs Smith, Samit and Whittington continue to be insured by Aetna.

3.      As the company that issues, insures and administers these employee benefit plans through which Plaintiffs received their insurance, Aetna is subject to the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") and its governing regulations.  Further, due to the role Aetna played in administering the plans of each of the Plaintiffs, including by making coverage and benefit decisions and deciding appeals, Aetna has assumed the role as a fiduciary under ERISA toward each of the Plaintiffs.

4.      ERISA uses the term "participant" to refer to a subscriber in an employee benefit health plan, while the term "beneficiary" refers to a subscriber's dependents who also are entitled to receive benefits under the plan.   In this FAC, Plaintiffs will refer to beneficiaries and participants as "Members."

5.      Aetna issues an Evidence of Coverage ("EOC" or "Certificate") to its participants and beneficiaries ("Aetna Members") that sets forth the benefits that Aetna promises to provide. According to Aetna's publicly available website designed for use by Aetna Members, Aetna defines a member as "a subscriber or dependent who is enrolled in and covered by a healthcare plan."  See www.aetnanavigator.com (Glossary).

6.      According to its website, Aetna's Certificate represents a "legal agreement between an individual subscriber or an employer group ('Contract holder') and a health plan that describes the benefits and limitations of the coverage." *Id.*

7.      Aetna's website further defines "Health Benefit Plan" as "[t]he health insurance or HMO product offered by a licensed health benefits company that is defined by the benefit contract and represents a set of covered services or expenses accessible through a provider network, if applicable, or direct access to licensed providers and facilities." *Id.*

8.      Under their Aetna healthcare plans, Plaintiffs have an express right to receive services from providers who have not entered into contracts with Aetna to accept reduced fees in exchange for greater access to Aetna's Members.  These providers are known as nonparticipating ("Non-Par") providers.   For other plans, including certain Health Maintenance Organization ("HMO") plans, Aetna Members may use Non-Par providers in emergencies, when they are out of the home area, or when no participating provider is qualified or available to perform the medically necessary service.  When Aetna Members receive Non-Par services, Aetna's payment

is based on the lesser of the billed charge or the usual, customary and reasonable ("UCR") amount for that service in the geographic area in which it was performed.  Aetna uses the terms "UCR," "customary and reasonable," and "reasonable charge" interchangeably.

9.     Aetna's website represents that Aetna determines reimbursement for Out-of-Network or Non-Par providers by calculating UCR:

> **Out-of-Network**.  The use of health care providers who have not contracted with the health plan to provide services.  Members enrolled in preferred provider organizations (PPO) and point-of-service (POS) coverages can go out-of-network for covered services, but will pay additional costs in the form of deductibles and coinsurance and will be subject to benefit and lifetime maximums.  Because reduced fees are not negotiated with out-of-network providers, Aetna will calculate reimbursement based on the usual, customary and reasonable ["UCR"] charge (see *definition*).  Members are responsible for all charges above UCR in addition to any deductible and coinsurance provisions.

10.    Aetna calculates benefits for Non-Par services based on its determination of the UCR for the services at issue.  Aetna's website defines the Customary and Reasonable charge as follows:

> The amount customarily charged for the service by other providers in the same Geographic area (often defined as a specific percentile of all charges in the Community), and the reasonable cost of services for a given patient.  **Also called "Usual, Customary, and Reasonable" (UCR).**

11.    Aetna's website also includes on its website its standard definition for "Reasonable Charge," as follows:

> The charge for a covered benefit, which is determined by Aetna to be the prevailing charge level, for the service or supply in the geographic area where it is furnished.  Aetna may take into account factors such as the complexity, degree of skill needed, type or specialty of the Provider, range of services provided by a facility, and the prevailing charge in other areas in determining the Reasonable Charge for a service or supply that is unusual or is not often provided in the area or is provided by only a small number of providers in the area.

12.     Aetna treats all of its definitions of UCR in its plans as having identical meanings and applies uniform policies for calculating UCR.

13.     Aetna often refers to UCR as the "amount allowed."  Aetna makes clear in its EOCs and Explanation of Benefits ("EOBs"), that the Member is financially responsible for the difference between UCR (amount allowed) and the provider's billed charge for Non-Par services.  For example, Aetna's website states that "Members are responsible for all charges above UCR in addition to any deductible and coinsurance provisions." *Id.*  The difference between UCR and the billed charge is often referred to in Aetna's Explanation of Benefits ("EOB") sent to its Members as "excluded expenses."  Excluded expenses are not credited toward its Members' annual deductible for Non-Par services, nor the annual out-of-pocket maximum.

14.     In-network or contracted or participating ("Par") providers contract with Aetna to accept reduced or discounted fees for their services.  When a Member uses a Par provider, his or her financial responsibility is limited to a specified co-payment, typically in the range of $10 to $30 per service.

15.     Aetna's website defines "Non-Participating Provider" as follows:  "This term is generally used to mean providers who have not contracted with a health plan to provide services at reduced fees.  Also called Non-Preferred Care Provider."  When an Aetna Member uses a Non-Par provider, Aetna imposes additional costs on the Member in the form of higher deductibles and coinsurance, and benefit and lifetime maximums.  Aetna does not begin to pay for Non-Par services until the Aetna Member has satisfied his or her calendar year deductible. Once a Member satisfies the deductible, then Aetna will pay a share (typically 80%) of the allowed amount for Non-Par Services.  If and when a Member reaches a maximum amount of

out-of-pocket expenses for Non-Par services, typically in the range of $1,500 - $3,000, the Member has no further coinsurance obligation (*e.g.*, 20% of the allowed amount) for any additional Non-Par services for that calendar year.  Aetna does not credit amounts above UCR to the Member's deductible or out-of-pocket maximum.

16.    In certain instances, such as when a referral from a primary care physician is not obtained, Aetna considers a Par provider to be Non-Par.  Aetna pays UCR for the service that was rendered by the Par provider in such circumstances and the Member is responsible for any unpaid amounts above UCR.

17.    During the Class Period, Aetna failed to properly calculate deductibles, coinsurance and out-of-pocket maximums in violation of Plaintiffs' healthcare plans, as described in the EOCs.  By failing to properly calculate these amounts, Aetna subsequently underpaid Plaintiffs and other Aetna Members for Non-Par services.  Despite complaints regarding Aetna's underpayments, Aetna did not correct its underpayments.

18.    At times during the Class Period, Aetna paid Non-Par hospital and medical services by using repricing vendors.  In the event a Non-Par provider had a contracted agreed-to fee with a repricer accessed by Aetna, Aetna would pay the agreed-to fee.  Despite Aetna's payment to the provider of the contracted agreed-to fee, Aetna would nevertheless calculate the Member's coinsurance at the higher amount applicable to services from Non-Par providers. Aetna should have applied the lower fee's reduced coinsurance applicable to contracted services. Aetna's improper calculation of coinsurance violated the plans and federal and state laws.

19.    Aetna is obligated to pay accurate UCR to its Members for Non-Par services consistent with the UCR definition.

20.     Aetna fails to comply with its own UCR definition by failing to pay benefits based on accurate UCR rates to its Members for Non-Par services (whether by Non-Par providers or by Par providers considered Non-Par by Aetna).

21.     To determine UCR, Aetna primarily relies on a database it acquired from Ingenix, Inc. ("Ingenix"), which is a wholly-owned subsidiary of United Healthcare Corporation, another major insurer.  Ingenix's databases are also known as the Prevailing Healthcare Charges System ("PHCS") and Medical Data Research ("MDR") (collectively, "Ingenix Databases").

22.     In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products, including MDR.  In October 1998, Ingenix purchased the PHCS database from the Health Insurance Association of America ("HIAA"), a trade group for the insurance industry.

23.     Aetna is a contributor of provider charge data to the Ingenix Databases.  Prior to contributing its data to Ingenix, Aetna deleted valid high charges.  Following receipt of the data from Aetna, Ingenix then removed additional valid high charges from all contributors' data. Ingenix then published the corrupted database.  Aetna and Ingenix "cooked the books."  The corruption of the data invalidates its use by Aetna as the basis for determining UCR for Non-Par providers' services.  These actions (among others referenced herein) violated both ERISA, a federal law designed to protect group plan participants and beneficiaries, and the Racketeer Influenced and Corrupt Organization Act ("RICO").

24.     In addition to UCR determinations based on the Ingenix Databases, Plaintiffs and class members challenge other Non-Par benefit reductions, including those imposed by use of the following methods:  use of discounted amounts or Par provider fee schedules; use of Medicare data; use of the average wholesale price ("AWP") to determine UCR for pharmaceutical drugs;

failing to pay appropriately for emergency room ("ER") services; failing to properly credit deductible amounts and out-of-pocket maximums; failing to provide an appropriate appeals process mechanism; approving requests for preauthorization without disclosing its nonpayment of a large percentage of the billed charges; threatening to refer members and Non-Par providers to collection agencies based on baseless allegations of overpayment by Aetna; and other improper practices.

25.     Aetna's improper  reductions in benefits for Non-Par services ("Non-Par Benefit Reductions") leave Aetna Members financially responsible for unpaid amounts that Aetna is obligated to pay under the terms of its healthcare plans.   Because the Non-Par Benefit Reductions are "exclusions" of coverage under the ERISA plans, Aetna has the burden to demonstrate that its exclusions comply with its plan and legal obligations.  Plaintiffs allege that Aetna cannot sustain its burden regarding its Non-Par Benefit Reductions, and seek unpaid benefits and other relief for themselves and on behalf of ERISA Class members.

26.     Aetna made numerous UCR and other Non-Par Benefit Reductions for Plaintiffs based on practices challenged herein as violative of federal and New Jersey law, including UCR based on manipulated and invalid data from the Ingenix Databases or based on Medicare rates.

27.     Aetna is legally obligated to adhere to the specific provisions of its Members' group health plans.

28.     Aetna cannot make Non-Par Benefit Reductions if they are not authorized or accurately disclosed in Aetna Members' Certificates and SPDs.  During the Class Period, Aetna breached Members' Certificates and SPDs when it made Non-Par Benefit Reductions.

29.     Plaintiffs and Class Members challenge Aetna's systemic application of rules and policies in making Non-Par Benefit Reductions that are not authorized by Aetna Members'

Certificates and SPDs; its routine violation of its fiduciary duties; and its failure to comply with ERISA, federal claims procedure regulations, federal common law and other applicable law.

30.     Aetna's EOBs reflecting Non-Par Benefit Reductions did not comply with legal requirements, including federal claims procedure regulations.  The EOBs failed to advise Aetna Members of the specific reasons for the denial, the specific plan provisions, and their appeal rights.  Aetna's EOBs reflecting UCR determinations failed to advise Plaintiffs of the data that Aetna used to calculate UCR.

31.     Various procedural rules that covered Plaintiffs' appeals were also violated. Aetna's substantive and procedural violations prevent Aetna from relying on defenses to Plaintiffs' claims, such as exhaustion or statutes of limitations.

32.     Aetna discouraged appeals by vouching for its Non-Par Benefit Reductions. Aetna's conduct toward Plaintiffs and Class Members clearly demonstrates that appeals of Aetna's Non-Par Benefit Reductions are futile.  As shown above, when a provider appealed, Aetna did not provide necessary and critical information, and did not provide the member with a copy of the appeals decision.

33.     Aetna's failure to reveal critical information during the appeals process, made a "full and fair review" unavailable to Aetna Members.  In certain cases, Aetna circumvented the appeals process, by handling complaints outside of the formal appeals process and not issuing written decisions.

34.     Plaintiffs, on behalf of themselves and all similarly situated Aetna Members, allege that Aetna's Non-Par Benefit Reductions violate ERISA and RICO.  In addition, Plaintiffs Cooper and Samit are members of health plans subject to particular New Jersey regulations governing small employer and individual plan members ("New Jersey Regulations").   Plaintiffs

allege that Aetna's Non-Par Benefit Reductions are contrary to the requirements of New Jersey Regulations.  In violating the regulations specific to New Jersey SEHP members, Aetna also violated ERISA and RICO.  In violating the regulations specific to New Jersey individual plan members, Aetna violated RICO.

35.     The protections imposed by the New Jersey Regulations require health insurance companies, including Aetna, to reimburse Non-Par hospital services provided to SEHP and individual plan members based on the hospital's billed charge.  New Jersey Regulations prohibit Aetna and other insurers from using fee schedules or other databases to reduce payment to their SEHP and individual plan members who receive hospital services.  Instead, Aetna was obligated by law to pay the Non-Par hospital's billed charge less any applicable coinsurance.  Aetna failed to comply with New Jersey Regulations for SEHP and individual plan members.

36.     New Jersey Regulations also require that Aetna reimburse Non-Par medical (non-hospital) services provided to SEHP and individual plan members at the 80th percentile of the most updated Ingenix fee schedule.  Such payment must be made without other reductions, such as for multiple or bilateral procedures.

37.     Aetna failed to comply with New Jersey Regulations applicable to Non-Par hospital and medical services to the detriment of Cooper and other SEHP members, and to Samit and other individual plan members.

38.     Although the New Jersey Regulations require insurers to pay UCR based on the updated PHCS database, Aetna misrepresents in its EOB that the database "is the amount which is most often charged for a given service by a Provider within the same geographic area."  For the reasons detailed herein, this statement is false and Aetna cannot comply with this provision of the New Jersey Regulations by using the Ingenix Databases.

39.     As described herein, Aetna and Ingenix individually and together manipulated and submitted charge data used by the Ingenix database to understate the 80th percentile amounts.  As a result of their joint and intentional manipulation of the Ingenix database, Aetna also violated the New Jersey Regulations and their stated purpose – to protect New Jersey consumers of Non-Par services – was thereby thwarted.  Aetna and Ingenix concealed its manipulation from the New Jersey regulators who enforce the New Jersey Regulations, and from employers and its members.  In fact, Aetna and Ingenix's manipulations ensured that the 80th percentile of the Ingenix Databases was inaccurate and that all SEHP and Individual Plan members as well as members in its other plans nationwide were underpaid.

40.     Aetna's UCR determinations, based on the manipulated Ingenix Databases, violated Aetna's legal obligations, and preclude it from relying on the New Jersey Regulations as a defense to its wrongful use of the invalid Ingenix Databases to determine UCR rates during the Class Period.  Aetna should be compelled to pay billed charges to all SEHP and Individual Plan members whose benefits Aetna determined in violation of the New Jersey Regulations, ERISA and RICO.

## THE DEFENDANTS

41.     Defendants Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc., and Aetna Insurance Company of Connecticut, offer, insure, underwrite and administer commercial healthcare plans benefits, including those of Plaintiffs.  For all its plans, Aetna has discretionary authority and/or control of the administration of the plans, and as well controls plan assets.

42.     Several of the Defendants, including Aetna Health, Inc. and Aetna Life Insurance Company, have offices located in Cranbury, New Jersey, and are licensed to do business in New Jersey.

43.     "Aetna" is a brand name used for products and services provided by one or more of the Aetna group of subsidiaries that offer, underwrite, or administer benefits.  When used in this FAC, "Aetna" refers to all Aetna predecessors, successors and subsidiaries owned and controlled by any of the named Defendants whose activities are interrelated and intertwined with them.  Due to the manner in which they function, all of the Aetna Defendants are functional fiduciaries as defined under ERISA and, as such, they must comply with fiduciary standards.

## JURISDICTION AND VENUE

44.     The rights and duties of insurance companies and Aetna Members with employer sponsored healthcare plans are governed by ERISA.  Plaintiffs assert subject matter jurisdiction for their ERISA claims under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e).  For Plaintiffs' RICO claims, jurisdiction arises under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

45.     Venue is appropriately laid in this District under 28 U.S.C. § 1391, 18 U.S.C. § 1965, and 29 U.S.C. § 1132(e)(2) because (i) Aetna resides, is found, has an agent, and transacts business in this District and (ii) Aetna conducts a substantial amount of business in this district and insures and administers group health plans both inside and outside this District, including from offices located in New Jersey.

46.     This FAC is filed as related to existing litigation pending in this District, namely, *Franco v. Connecticut General Life Insurance Co.*, Case No. 04cv1318 (FSH)(PS); and *Malchow v. Oxford Health Plans, Inc.*, 08 cv 935 (FSH) (PS).  This Court continues to exercise

jurisdiction to enforce the settlements finalized in *Wachtel v. Health Net, Inc.*, Case No. 01cv4183 (FSH)(PS); *McCoy v. Health Net*, Case No. 03cv1801 (FSH)(PS); *Scharfman v. Health Net*, Case No. 05cv301 (FSH)(PS).

## OVERVIEW OF PLAINTIFFS' LEGAL CLAIMS

47.     Aetna is an ERISA fiduciary of the ERISA health plans at issue, and owes the Plaintiffs and the Classes, as defined below, fiduciary duties of care and loyalty, and it must apply its plan provisions in good faith.

48.     Under ERISA, Aetna is required, among other things, to comply with the terms and conditions of its healthcare plans; to accord its Members an opportunity to obtain a "full and fair review" of any denied or reduced reimbursements; and to make various disclosures to Members.  Such disclosures include accurately setting forth plan terms; explaining the specific reasons why a claim is denied and the internal rules and evidence that underlie such determinations; disclosing the basis for their interpretation of plan terms; and providing appropriate data and documentation concerning its coverage decisions.

49.     The federal common law of trusts, applicable to ERISA fiduciaries, further requires that fiduciaries deal honestly with Members and adhere to certain specific fiduciary standards in their dealings.  As Justice Cardozo said, "Not honesty alone, but the punctilio of an honor the most sensitive, is the standard of behavior."

50.     In offering and administering its healthcare plans, Aetna assumes the role of "Plan Administrator," as that term is defined under ERISA, in that it interprets and applies the plan terms, makes all coverage decisions, and provides for payment to Members and/or their providers.  As the Plan Administrator, Aetna also assumes various obligations specified under ERISA.  These obligations include providing its Members with a "summary plan description"

("SPD"), a document designed to describe in layperson's language the material terms, conditions and limitations of the healthcare plan.  The full details of the plan, which are summarized in the SPD, are contained in the EOCs.

51.     Aetna is obligated under ERISA to make its coverage determinations in a manner consistent with the disclosures contained in the SPD.  To the extent there is a disparity or conflict between the SPD and the EOC, the SPD governs, so long as the Member benefits from the application of the SPD.   If the employer, rather than Aetna, is deemed to be the Plan Administrator, Aetna remains responsible for ensuring that the SPD complies with the law under its duties as a co-fiduciary as provided in ERISA, 29 U.S.C. § 1105, even if the employer prepares or disseminates the SPD.

52.     Aetna breached its fiduciary duties by failing to disclose the reimbursement rules it uses to reduce Members' benefits, and by failing to fulfill its obligations of good faith, due care and loyalty.  Moreover, it breached its duties by manipulating the data it contributed to Ingenix so as to achieve a reduced reported number that it could then use for setting UCR.

53.     Aetna's manipulation of its contribution of data submitted to Ingenix, and its knowing use of the inadequate and flawed Ingenix database to set UCR, further violates RICO, whereby Aetna knowingly paid inadequate benefits to its Members in order to maximize its own profits.

54.     With respect to all its healthcare plans, Aetna is obligated to its Members to provide specific healthcare benefits and reimbursements.   As detailed herein, Aetna has breached, and continues to breach, its obligations to Plaintiffs and the Classes, and in so doing has violated ERISA and RICO.

## PLAINTIFFS' GROUP HEALTH PLANS

55.     Plaintiffs Werner, Franco, Smith and Whittington's benefits were determined under standard Aetna healthcare plans governed by ERISA.  Plaintiff Cooper's benefits were determined under Aetna small employer plans ("SEHP") in New Jersey. Plaintiff Samit's individual plan was determined under an identical regulation applied to SEHP plans in New Jersey.  SEHP plans are governed by ERISA and are also subject to a New Jersey SEHP regulation, N.J.A.C. § 11:21-7.13(a) (the "SEHP Regulation").  Individual plans are governed by the New Jersey Regulations but are not subject to ERISA.

56.     Plaintiffs allege, as detailed herein, that Aetna relied on flawed and inappropriate data for making UCR determinations for Non-Par benefits as a result of its use of the Ingenix database.  By relying on such improper data for making UCR determinations, Aetna breached its duties as set forth in its ERISA-governed plans and, as a result, it should be required to reimburse its Members who received reduced Non-Par benefits up to billed charges.

57.     With respect to Cooper and Samit, the New Jersey Regulations impose additional requirements beyond those required under ERISA.  New Jersey adopted the SEHP and individual plan Regulations in an effort to ensure that all Members of such plans, who were not in a position to negotiate the best benefit packages from insurers, would receive a minimum level of benefits.  The New Jersey Regulations specified, among other things, that Aetna's UCR determinations be equal to or greater than the 80th percentile of the most updated version of the Ingenix database.  It also requires Aetna to pay out-of-network hospital services based on billed charges.  In incorporating the Ingenix database into the New Jersey Regulations applicable to small employer plan and individual plan members, the New Jersey Regulators were not told of the inherent flaws and inadequacies of the Ingenix database.

58.    For members of the New Jersey small employer plans, Aetna breached ERISA by violating its obligations under the SEHP Regulation, including, as detailed below, by imposing other reductions that went beyond the reported numbers from the 80th percentile of the Ingenix database (such as reductions for performing multiple procedures on the same day), and failing to pay 100% of billed charges for hospital services.  Moreover, Aetna intentionally manipulated its contributions to Ingenix for use in the Ingenix databases to achieve reported numbers that were lower than what should have been reported and used for setting UCR under the New Jersey Regulation, thereby violating both ERISA and RICO.  As to individual plan members (such as Carolyn Samit), who are not governed by ERISA, Aetna violated RICO.

**Plaintiff Cooper's ERISA Plan for New Jersey Small Employer Members**

59.    From November 2003 through September 30, 2005, Cooper was a beneficiary in her husband Justin Cooper's group plan through his employer, Rosenberg & Associates, which was fully insured and administered by Aetna.  Pursuant to the terms of the plan, both she and her husband were covered as Aetna Members.

60.    Because Cooper's health insurance was provided as an employee benefit by a private employer, Cooper's claims are brought under ERISA.  In addition, because Cooper was insured by a small employer plan under New Jersey law, Aetna is also required to comply with a New Jersey SEHP regulation, N.J.A.C. § 11:21-7.13(a) (the "SEHP Regulation"), in providing her benefits.

61.    Cooper was entitled to seek medical care from Non-Par providers pursuant to her SEHP EOC.  In her EOC, Aetna defined the use of UCR to establish reimbursement levels for Non-Par providers as follows:

> With respect to Network services and supplies, the negotiated agreement.  With respect to non-network benefits, an amount that

is not more than the usual and customary charge for the service or supply as We Determine, based on a standard approved by the Board.  The Board will decide a standard for what is Reasonable and Customary for the Non-Network benefits under the contract. The chosen standard is the amount which is most often charged for a given service by a Provider within the same geographic area.

62.     The term "standard approved by the Board" in the preceding paragraph refers to the Non-Par regulation promulgated by the New Jersey Small Employer Health Board ("SEH Board"), codified in the New Jersey Regulation.  The New Jersey Regulation requires insurers to pay Non-Par hospital services based on the billed charge and Non-Par medical services at the 80th percentile of the most updated Ingenix PHCS fee profile.  The SEH Board imposes other requirements, including requiring coverage of certain services.   The New Jersey Regulation suspends preauthorization requirements for Non-Par services rendered to New Jersey small plan members.

63.     Throughout the Class Period, Cooper and her husband received UCR benefit reductions from Aetna.  For example, on January 3, 2005, Justin Cooper received healthcare services from a Non-Par provider, for which the provider billed $4,000.  In addition, Justin Cooper received two treatments of pharmaceutical drugs, for which the Non-Par provider billed, respectively, $315 and $740.   Thereafter, a claim was submitted to Aetna on behalf of the Coopers, in compliance with the terms of their healthcare plan, seeking payment of benefits as required under the Aetna contract.

64.     The Coopers subsequently received by mail an EOB from Aetna dated May 13, 2005 to report on its payment of benefits concerning these healthcare services.  In the EOB, Aetna reported that it had excluded $499 from the billed amount for the first service, thereby leaving an amount allowed of $3,501.  Aetna further excluded $280 from the first drug, allowing only $35, and excluded $490 from the second drug, allowing only $250.  The Coopers remained

liable for the unpaid portion of the bill.  After reducing the benefit further to take into account the Coopers' deductible and coinsurance for using Non-Par services, including $450 for a cardiovascular stress test that was allocated to the deducible, Aetna paid only $2,265.20 of the total bill of $5,505.00.  The EOB specified that the "total expenses submitted" by the Coopers was $5,505.00, Aetna's "total payment" was $2,265.20, and "your total responsibility" (referring to the Coopers) was $3,239.80.

65.    To explain the excluded expenses totaling $1,269, Aetna used Code 0120, which was defined in the EOB as follows:  "This portion of the expense which is greater than the reasonable and customary charge is not covered under your plan."

66.    On the front page of the EOB, Aetna stated that if the Coopers had any questions about the claims they should contact Aetna at www.aetnanavigator.com.  That is a secure website provided to Aetna's Members, including the Coopers, for obtaining additional information about the benefits and services provided by Aetna.  Aetna's "Glossary" of terms on the website defined "UCR" and "Customary and Reasonable" costs for Non-Par providers.  All Members were told that Aetna's UCR determination was purportedly based on "the amount customarily charged for the service by other providers in the same geographic area," and that, in determining a "reasonable charge" for services, Aetna would determine "the prevailing charge level, made for the service or supply in the geographic area where it is furnished," after taking into account "factors such as the complexity, degree of skill needed, type or specialty of the Provider, range of services provided by a facility, and the prevailing charge in other areas in determining the Reasonable Charge for a service or supply that is unusual or is not often provided in the area or is provided by only a small number of providers in the area."

67.     On the back of the EOB, Aetna stated that the Coopers "are entitled to a review (appeal) of this benefit determination if you have questions or do not agree."  Aetna stated this could be done either by telephone or in writing, and the member should include "any comments, documents, records and other information you would like to have considered, whether or not submitted in connection with the initial claim."  Aetna, however, did not disclose what type of information, if any, would be considered as part of a review of a UCR determination.  The EOB further stated that "you may also review documents relevant to your claim."  Yet, Aetna did not have access to material aspects of the claim determination, including the underlying methodology and data used by Ingenix to derive the numbers that Aetna used as UCR.

## Cooper's Exhaustion of Administrative Remedies

68.     Following Aetna's nonpayment, Justin Cooper's provider, Manhattan Nuclear Cardiology, appealed this determination to Aetna by letter dated September 14, 2005.  In its letter, the provider stated:  "Our charges are not over and above usual and customary for this area."  It further pointed out that "[t]he patient will be responsible for any amounts you do not allow."

69.     By letter dated September 26, 2005, Aetna denied the provider's appeal on behalf of Justin Cooper.  Aetna's appeal denial stated:

> Based on our review of available information, including the member's policy, the company is not modifying its previous determination.  The above listed claim was previously processed correctly according to the member's QPOS plan.  According to Aetna's guidelines, the usual and customary rate for A4641 is $125.00; for J1245 is $35.00, for 78492 is $3501.00 and for 93015 is $450.00.  A total of $1970.80 was applied to the member's out-of-network deductible and co-insurance. Therefore, no additional payment will be made with respect to the above listed claim(s).

70.     Contrary to ERISA and federal regulations, Aetna did not treat the provider's appeal as required and did not provide a "full and fair review."   Aetna did not disclose the fee schedule used, nor did it address the basis for the appeal the provider had provided.  Aetna did not send a copy of the denial to the member.  Finally, Aetna failed to apply, disclose, or even refer to the SEHP Regulations.

71.     Pursuant to ERISA regulations, an appeal decided by a process that violates procedural safeguards is deemed exhausted.

72.     On November 8, 2005, the Non-Par provider billed the Coopers for the total unpaid portion of the bill, or $3,239.80.  In a comment printed on the bill the Coopers were told: "We have submitted the claim to your insurance company and per your insurance company the balance is your responsibility."

73.     For undisclosed reasons, Aetna sent Manhattan Nuclear Cardiology a new EOB dated April 2, 2007, some 18 months after its denial of the appeal.  The new EOB stated:  "This is an adjustment of a previously processed claim as a result of a claim project request.  This amount represents payment of a balance bill in full."

74.     There was no stated connection between the April 2007 payment due to a "claim project request" and the denial of the appeal in September 2005.  As a result, this subsequent payment does not alter the fact that Aetna had issued a final denial of the appeal that had been filed with respect to Cooper's claim and that this appeal had been exhausted.

**Cooper's Other Non-Par Benefit Reductions**

75.     During the first half of 2005, Cooper also received medical care from Non-Par providers, and subsequently submitted claims for benefits to Aetna.  Aetna responded by mailing her EOBs, including an EOB dated June 1, 2005, which reflected a billed amount of $285 for a

particular service, for which Aetna excluded $106.04, citing Code 0120 to explain that the provider's bill was "greater than the reasonable and customary charge." In another EOB dated August 17, 2005, Aetna responded to an additional claim for benefits for services received by the same Non-Par provider, reporting that it was excluding $10 from the bill of $285, again explaining by reference to Code 0120 that the bill was "greater than the reasonable and customary charge."

76.     Cooper received further services from other Non-Par providers during 2005, for which she submitted claims for benefits to Aetna. Aetna sent additional EOBs to the Coopers dated, respectively, July 6, 2005, August 17, 2005, and August 25, 2005. Each of these EOBs reported that certain expenses had been excluded, again using Code 0120 to report that the billed charges were "greater than the reasonable and customary charge." In these EOBs, Aetna excluded $42.76 from a $150 bill; $4.15 from a $49.99 bill; and $1.03 from a $72.45 bill.

77.     Each of the EOBs contained the total amount that remained the Coopers' "responsibility," which included the amount that had been excluded by Aetna as in excess of UCR. Further, each EOB referred the Coopers to Aetna's website, www.aetnanavigator.com, for answers to their questions and provided the same summary for potential reviews or appeals of benefit determinations.

78.     Under her SEHP Plan, Cooper had an individual $1,000 annual deductible for Non-Par services. Her individual annual out-of-pocket limit was $3,000 for Non-Par services. Under the plan, the Coopers' annual family deductible for Non-Par Services was $2,000, while their family out-of-pocket limit was $6,000. The Coopers' coinsurance for Non-Par services (once the deductible was met) was 30% of the UCR. If and when the Coopers satisfied the individual or family out-of-pocket limit, Aetna was required to pay 100% of UCR. During the

Class Period, Cooper and her husband were financially responsible for unpaid amounts in excess of the UCR determined by Aetna.

79.     Cooper has made numerous out-of-pocket payments to Non-Par providers that were in excess of the applicable deductible and coinsurance under her Aetna plan.  Cooper paid these sums as a result of Aetna's improper Non-Par Benefit Reductions as detailed herein.

80.     Cooper seeks to represent a class of SEHP members subject to the New Jersey Regulation on whose behalf Aetna underpaid for all hospital and medical services (including surgery, ER, hospital, physician, laboratory, anesthesia, chiropractic, mental health, dental, pharmaceutical, or other medical services and supplies) rendered by Non-Par providers (or other providers considered Non-Par by Aetna) through the Class Period.  She seeks unpaid benefits and other relief for herself and the "New Jersey SEHP Class."

**Plaintiff Werner's ERISA Plan**

81.     During the Class Period, Werner was a member of a group plan governed by ERISA.  Her group plan was sponsored by her employer, the American Psychiatric Association, and was fully insured and administered by Aetna.  Werner was in a family plan along with her daughter Hannah and her husband Geoffrey.

82.     During 2006 and 2007, Werner received medical services from Non-Par providers for which Aetna determined UCR below her provider's billed charges, amounts for which Werner is financially responsible.  With respect to these services, Werner has made payments to her Non-Par providers totaling at least $6,233.50.  Of that total, Werner paid out-of-pocket at least $2,973.60 that was attributable to the unpaid difference between UCR and the provider's billed charge.

83.     Werner received services on, respectively, February 1, 8, 15 and 22, 2006.  The Non-Par provider billed $135 for each service.  Aetna mailed Werner EOBs dated April 4, 2006 relating to each service.  The EOBs reflected that Aetna excluded $15 for each service as being in excess of UCR, leaving an allowed amount representing UCR of $120.  Then in each case Aetna paid only 60% of the UCR amount, or $72.  The EOB further identified "Total Plaintiff Responsibility" as $252, which represented, for each of the four services, the $48 coinsurance (40% of the UCR amount of $120), plus the $15 difference between the billed charge ($135) and UCR ($120).  In each instance,  Aetna's EOB used the following remark to explain its payment:

> Your plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided.  In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas.  Aetna's determination of the prevailing charge does not suggest your provider's fee is not reasonable and proper.   Your provider may bill you for this amount.  If there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number, or by writing to the address, shown on this statement.

84.     Aetna's EOB informed Werner that she had already satisfied her individual annual deductible of $300.  On each EOB, the provider's entire charges were identified as the amount the Non-Par Provider "May Bill You," without subtracting the amount of Aetna's payment from such field.  Pursuant to its uniform policy, all of the billed amounts in excess of UCR (*e.g.*, $60 total for the four February 2006 visits described in the preceding paragraph) should have been, but were not, attributed towards Werner's out-of-pocket maximum.

85.     Aetna's EOB also referred Werner to its website, saying:  "Questions?  Contact us at **aetnanavigator.com**."

86.     Werner received similar medical treatments with the same Non-Par billing and the same UCR reductions reflected in EOBs from Aetna on numerous occasions, including EOBs

with the following dates:  April 1 and 25, 2006, May 13, 2006, June 9, 2006, July 25, 2006, August 19, 2006 and September 14, 2006.  For those dates, Aetna collectively excluded coverage for $540 for Non-Par services, leaving Werner financially responsible for that amount in addition to her co-insurance.

87.     Werner received further treatments from the Non-Par provider in September 2006.  In an EOB from Aetna dated October 17, 2006, Aetna began to identify the UCR for this treatment as $72 (instead of as $120, as formerly was the UCR).  Aetna then calculated its share of UCR as 60% of $72, or $43.20.  The reduced UCR of $72 left Werner financially responsible for the unpaid $63 per treatment, along with 40% of the UCR ($72) or $28.80.  As to each $135 charge, therefore, Aetna considered itself responsible for $43.20, and Werner responsible for $91.80.  The "Total Patient Responsibility" for the four services at issue was reported in the EOB as $367.20, which remained Werner's financial responsibility.

88.     Werner continued to receive ongoing treatment from the Non-Par provider, who in October 2006 increased the billed charge to $140 per treatment.  According to various EOBs, Aetna mailed to Werner in the fall of 2006, Aetna again determined UCR of $72, disallowing $68 of each $140 charge as being in excess of UCR, using the same explanatory code which represented that the billed charges exceeded "prevailing" rates.  Some examples of EOBs reporting such UCR reductions are dated, respectively, October 17, 2006, January 20, 2007, February 14, 2007, April 24, 2007, May 8, 2007, June 20, 2007, and July 19, 2007.  Each such EOB contained the identical explanation for Aetna's UCR reduction.

89.     Werner also received UCR determinations from Aetna for other services.  On March 21, 2006, for example, Werner and her minor child both received dental services from a Non-Par dentist.  In an EOB dated April 1, 2006, Aetna determined UCR regarding three of the

dental services provided for Werner, leaving $32 unpaid as allegedly in excess of a reasonable charge.  In the same EOB, Aetna determined UCR for three services rendered to Werner's minor child, leaving $20 unpaid as allegedly in excess of a reasonable charge.   The total amount of $96 was identified by the EOB as "Total Patient Responsibility."   To describe its UCR determinations, Aetna used the following remark:

> You are covered for expenses at a level set by your plan sponsor. The charge for services exceeds that amount.  You are responsible for the amount indicated.  If you have additional information we should consider, please let us know.

**Werner's Exhaustion of Administrative Remedies**

90.     Werner unsuccessfully appealed Aetna's UCR reductions.  These internal appeals were fully exhausted, with Aetna refusing to change any of its prior Non-Par payments.

91.     On January 29, 2007, Werner appealed Aetna's UCR determinations for services she received from Non-Par providers from November 1, 2006 through December 27, 2006 referred to in her EOB dated January 20, 2007.  Her appeal letter referred to Aetna's "Plan Design and Benefits" which states that the Member must pay 40% for Non-Par office visits, with Aetna paying 60% of such visits.  Werner complained that Aetna's payments were inconsistent with the provisions of her plan limiting her financial responsibility to 40% coinsurance for the office visit.  Werner separately complained of Aetna's policy reducing payment to Non-Par licensed social workers ("LCSWs") and psychologists.  Werner attached to her appeal a copy of Aetna's new payment policy titled "Change in Reimbursement Policy for Non Par Behavioral Health Providers for PPO-based and HMO/QPOS plans," which she had obtained from perusing the internet and which states:

> Beginning with dates of service on or after September 1, 2006, in PPO-based and HMO/QPOS plans, Aetna is changing our reimbursement policy for Nonparticipating behavioral health providers.  This change ties reimbursement to the level of the

licensure of the clinician and will result in a change in Aetna's reimbursement for Nonparticipating psychologists and social workers.  This change will not affect psychiatrists and does not apply to the Medicare Advantage product.

Effective September 1, 2006, this change will reduce the allowable amount to:

\*      80% of Usual and Customary Rate (UCR) for psychologists

\*      60% of UCR for social worker

Reimbursement will be further subject to applicable plan deductible, coinsurance and/or co-payment.

This new policy makes our approach to reimbursement for Nonparticipating behavioral health providers consistent with our approach for Aetna participating behavioral health providers.

92.      In a letter dated May 9, 2007, Aetna denied Werner's first appeal.  Aetna stated that it was "upholding the previous benefit decision to deny the portion of your claim that exceeds what we have determined to be the reasonable charge."  Aetna claimed that the rate paid to Werner's Non-Par provider "was based on Reasonable Charges taking into consideration her type of specialty and her licensure."  It stated:  "In order to determine the reasonable charge, we refer to statistical profiles of physicians' charges for the same or similar services in a geographic area."

93.      In explaining its decision denying her appeal, Aetna stated that "[t]he benefit payment" for the Non-Par service "will be determined according . . . to the reasonable charge defined in the Glossary of the Booklet-Certificate," adding that the Glossary defines "Reasonable Charge" as follows:

Reasonable Charge:

Only that part of a charge which is reasonable is covered.  The reasonable charge for a service or supply is the lowest of:

- the provider's usual charge for furnishing it; and

- the charge Aetna determines to be appropriate, based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and
- the charge Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished.

In determining the reasonable charge for a service or supply that is:

- unusual; or
- not often provided in the areas; or
- provided by only a small number of providers in the area;

Aetna may take into account factors, such as:

- the complexity;
- the degree of skill needed;
- the type of specialty of the provider;
- the range of services or supplies provided by a facility; and
- the prevailing charge in other areas.

94.    Aetna attempted to justify its first level denial of Werner's appeal regarding the reduction in UCR for psychologists and social workers by stating:

> Effective with dates of service September 1, 2006 and after, a three tiered approach has been implemented for determining the allowed amount for out-of-network behavioral health services rendered by non-participating providers.   This approach takes into consideration the licensure and/or education of the rendering provider.   As your Attachment A shows, Aetna changed its non-participating behavioral health provider reimbursement policy, which is not directly tied to any particular member plan design. This change in policy is not a change to your plan.   The amount of $434 that you seek does not take into consideration the above information.

95.    Aetna's first level appeal denial further stated:   "We are sorry our determination could not be more favorable; however, we are bound by the terms of the contract."

96.    Aetna's first level appeal denial also stated that "[a]t your request, we will give you free of charge access to copies of all documents, records, and other information about your claim for benefits, including the specific rule, guideline, protocol, or other similar criterion that

was used in making the decision, and the names of any clinical reviewers if applicable." Werner's EOC contains the same representation (which is required by ERISA).

97.     On May 17, 2007, Werner requested a second level appeal, contesting Aetna's determination of UCR.  Werner contested how Aetna computed UCR, stating: "Aetna had failed to provide evidence that the reimbursement that they are allowing ($72) is in fact a reasonable reimbursement for the service provided in the Washington, DC metro area."

98.     Werner also disputed Aetna's reduction of UCR for LCSW services by 40%, stating:  "Aetna has failed to demonstrate that this new reimbursement policy for non network behavioral health providers is a reasonable reimbursement rate.  The fact that it has been implemented for in-network providers is not a demonstration that the methodology is reasonable."

99.     The second level appeal challenged Aetna's failure to notify Members of the mental health policy change, calling it "a material change to my healthcare policy and one that neither my plan nor its participants received notification of," and adding that "I only found your notice after extensive web research."  Werner's second level appeal further challenged Aetna's "sharp reduction in reimbursement for non network behavioral health services."

100.     Werner's second level appeal specifically requested copies of the following documents:

- Disclosure of all documents related to how Aetna calculates the reasonable charge for the type of service provided and licensure of the provider (LCSW) in the Washington, DC area, including market analysis, comparative data, and methodology in determining what is a reasonable charge;

- all relevant documents that Aetna sent to plan members notifying plan members of the change in the UCR determination for non network behavioral health providers including letters; distribution methods, dates, etc.;

- documentation from the master plan of the American Psychiatric Foundation (both 2006 and 2007) that demonstrates disclosure of your new reimbursement policy for non-network behavioral health providers; and

- data on Aetna's behavioral health network in the Washington, DC metro area, the number of providers that participate in the network by licensure, including the percentage of providers in the area that participate in Aetna's network.

101.   In violation of ERISA, Aetna did not provide Werner with the information she requested in her second level appeal.

102.   On June 6, 2007, Aetna denied Werner's second level appeal, stating as follows:

Aetna determines the extent of the plan's liability through use of the Ingenix Prevailing Health Care Charges System (PHCS). The PHCS is a statistical profile of provider's charges that has been developed for this purpose. The Ingenix PHCS collects provider charge data from more than 150 major contributors including commercial insurance companies and third party administrators. Data is collected for all 50 states, the District of Columbia, Puerto Rico and the Virgin Islands. Since physicians' fees reflect differing costs of doing business in various parts of the country, the PHCS recognizes these regional differences and uses the first three digits of the United States Postal Service zip codes to divide the charges into population areas based on cost-similar and geographically adjacent areas. There are 281 zip code areas for surgery and anesthesia and 334 for medicine, pathology and laboratory.

Fee information for the most recent twelve (12) month period is used as the basis for the profile which is the basic tool for reasonable and customary (R&C) determinations. The profile is updated semi-annually. At the time of the update, the latest information is released to all claim-paying personnel.

Aetna determines reimbursement for non-participating behavioral health providers as follows:

- Psychologist (allowed at 80% of the Reasonable and Customary/recognized charges)
- Social Workers, Licensed Profession Counselors, Marriage and Family Counselors, Psychiatric Nurse (allowed at 60% of the Reasonable and Customary/recognized charges)."

103.    Aetna's second level appeal denial stated that "[a]t your request, we will give you free of charge access to copies of all documents, records, and other information about your claim for benefits, including the specific rule, guideline, protocol, or other similar criterion that was used in making the decision" without acknowledging that Werner had, in fact, previously and specifically requested such documents.   Aetna's second level appeal denial also failed to acknowledge that Aetna had, in fact, not provided documents that were specifically requested by Werner during the appeal process.

104.    Aetna's second level appeal denial stated that this was Aetna's "final decision."

105.    On July 2, 2007, Werner again requested documents from Aetna, including the "documents, records, and other information about my claim, specific rules, guidelines, protocols, and other similar criteria that were used in making the decision."   Plaintiff's July 2, 2007 letter referred to Aetna's second level appeal denial and asked for the "data from your PHCS system as you reference in your [second level appeal denial] letter."

106.    Once again, Aetna failed to provide Werner with the requested documents that it twice claimed it would furnish "free of charge" upon request.

107.    Aetna's appeal denials withheld material information, as detailed herein, that Aetna was obligated to disclose as a fiduciary.   *First*, Aetna did not disclose to Werner, until its final denial, that it had used Ingenix PHCS data to determine UCR.   *Second*, Aetna did not disclose that it had contributed pre-edited data to Ingenix and that Ingenix further corrupted the data reducing amounts in the Ingenix Databases.   *Third*, Aetna did not disclose that the Ingenix data came with a disclaimer that the data does not represent UCR, which disclaimer Aetna violated in representing to Werner that the Ingenix data was a "basic tool" reflecting UCR. *Fourth*, Aetna did not provide the relevant evidence specifically requested by Werner during her

appeals in violation of ERISA.  *Fifth*, Aetna falsely asserted that its tiering policy was consistent with Aetna's definition of UCR.  *Sixth*, Aetna falsely asserted that its tiering policy was not a material change to Werner's plan.  *Seventh*, Aetna falsely asserted that it was not required to provide advance notification to employers and Members, or make changes to plan documents, before adopting the UCR tiering reductions for behavioral health.

108.    Following her unsuccessful appeals to Aetna, Werner contacted the Bureau of Insurance for the Commonwealth of Virginia ("VA DOI") to complain about Aetna, and attached copies of her appeals.

109.    On July 6, 2007, the Managed Care Ombudsman for the Commonwealth of Virginia, Thomas Bridenstine ("Bridenstine"), sent Werner a letter stating that he had reviewed information supplied by Aetna and "there was no consistent explanation that clearly explained how your claims were paid."

110.    In his July 6th letter, Managed Care Ombudsman Bridenstine also stated: "Although you were not successful in your appeal efforts, you provided a significant amount of information and I regret that Aetna was unable to provide a reasonable explanation for the methodology it used to determine the amount of money it would pay for your claims."

111.    On July 31, 2007, Aetna's Overpayment Recovery Unit in New Albany, Ohio sent letters to both Werner and to her Non-Par provider.  Aetna's letter to Werner (from Cindy Cook) informed her that Aetna's original UCR of $120 for four dates of service in October 2006 was too high, and the UCR should have been $72, and paid at 60%, or $43.20.  The letter found that Aetna should have paid a total of $172.80, rather than the $395.30 it paid.  It informed her that her coinsurance obligation for the four services was $115.20.  It advised her that if she did

not refund the overpayment of $222.50 to Aetna by August 21, 2007, "we will refer the overpayment to a recovery service."

112.    Aetna's Overpayment Recovery Unit disregarded the fact that Werner had already satisfied her out-of-pocket maximum as of October 11, 2006, such that she did not owe any further coinsurance on Non-Par services rendered after October 11, 2006.

113.    Aetna sent Werner's Non-Par provider a similar letter dated July 31, 2007, which claimed an overpayment for a date of service in February 2007, for which reduction to 60% of the initial UCR had not been made.

114.    On September 11, 2007, Werner wrote to Cook and informed her that because Aetna's claims payment practices were being considered by the VA DOI, she would not consider refunding money until VA DOI's investigation was concluded.

115.    On September 14, 2007, Werner sent a letter with similar information to Aetna's Overpayment Recovery Service in Nashville, Tennessee.

116.    After a "cease and desist" letter from the Virginia DOI to Aetna, Aetna suspended its overpayment recovery actions, which included a referral to a collection agency.

117.    In a letter dated September 27, 2007, Aetna admitted to the Virginia DOI that the provider charges in the Ingenix database cannot be distinguished by the provider's type of license.  In fact, all of the Ingenix data for a procedure code could potentially reflect the charges of LCSWs alone.

118.    Although Aetna's first level appeal denial on May 9, 2007 asserted that the "three tiered approach" reducing payment to Non-Par psychologists and social workers (and other licensed behavioral health professionals)  was "effective with dates of service September 1, 2006 and after," Aetna, in fact, could not legally apply these tiering reductions as of September 1,

2006 (or through the current date) without making explicit, approved changes to its EOCs, SPDs, and other plan documents. Without the required regulatory and employer approval, Aetna's unilateral UCR tiering reductions are null and void, and without effect.  Aetna's tiering policy also violates mental health parity laws.

119.     Aetna's 40% reduction in the UCR for LCSWs starting in the fall of 2006 resulted in significant unpaid benefits to Werner.  In addition, Aetna credited only the reduced amounts to her out-of-pocket maximum, delaying her ability to reach this maximum and shifting costs to her in contravention of her plan language.

120.     As of the fall of 2006, Werner's EOC and SPD did not change.  During this period, Aetna failed to notify Werner or her employer, the American Psychiatric Association, that Non-Par behavioral health benefits were being reduced and that a tiering approach would reduce the base UCR by 20% for psychologists and by 40% for other behavioral health professionals such as LCSWs. Thus, Werner's ultimate responsibility for LCSW services was increased because Aetna was paying 60% of the 40% lower UCR rate of $72 rather than 60% of the prior UCR rate of $120.  During this time, Aetna's EOBs did not disclose the new tiering policy or its basis.

121.     Werner had to extensively research Aetna's claims payment policies on the Internet in order to locate Aetna's statement that it would reduce Non-Par behavioral health providers' UCR by 40% as of September 1, 2006.

122.     Under ERISA, Aetna could not reduce UCR to Non-Par behavioral health professionals without advance notification to Members and employer groups, along with corresponding changes to plan documents and required approvals.

123.    Werner's appeals experience amply reflects both fiduciary violations and the futility of appeals to Aetna challenging UCR determinations.  Aetna failed to provide documents it is legally obligated to provide under ERISA, and refused to disclose to her any information that would have permitted a successful appeal.  Aetna's appeal denials to Werner reflect a fixed, systematic policy to apply UCR regardless of the flaws in the Ingenix Databases, and regardless of Aetna's failure to comply with its plan language.

**Plaintiff Franco's ERISA Plan**

124.    During the Class Period, Plaintiff Franco was an Aetna member in a New Jersey large employer health plan through her employer.  The plan, which was fully insured and administered by Aetna, is known as the ACSA Trust.  Franco's health plan authorized her to use Non-Par providers, which Aetna promised to reimburse at UCR rates.

125.    Franco required complex facial surgery during the period she was fully insured by Aetna.  The facial surgery was intended to remedy injuries she suffered from the use of forceps at birth.

126.    Franco sought preauthorization for her surgery (originally scheduled for January 2004) with Aetna.  Her surgeon, Dr. Elliott H. Rose, submitted a very detailed preauthorization letter to Aetna on November 14, 2003, setting forth in meticulous detail the CPT codes he and Dr. Frederick A. Valauri, his co-surgeon, would be performing, along with the price they charge per code.  "CPT" stands for Current Procedural Terminology, a procedure coding system created by the American Medical Association ("AMA") to allow for different medical procedures to be identified. At the end of the preauthorization letter, Dr. Rose stated:

> On behalf of this patient, we request predetermination of benefits for the above CPT codes and delineation of unsatisfied deductible, co-insurance, etc., to allow her to understand her financial

obligation.  If your established fees differ from the above UCRs,
please notify the patient and my office administrator, Linda Ossias.

127.     On December 11, 2003, Franco received an approval from Aetna, notifying her

that Aetna's "Decision" was "Authorized" as to each of the surgical services she was due to

receive.  On December 19, 2003, Franco received another approval letter from Aetna, reiterating

that as to each proposed item, "coverage for this service has been approved."

128.     On January 9, 2004, Aetna again authorized the facial surgery, and referred to its

previous authorization of three days hospitalization. Again, Aetna reiterated that its authorization

process had been satisfied.

129.     Franco had complex facial surgery on February 2, 2004, performed by Dr. Rose

and Dr. Valauri precisely as indicated in Dr. Rose's November 14, 2003 preauthorization letter.

130.     On March 18, 2004, Aetna issued an EOB stating that of the $4,500 billed for her

eyelid procedure by Dr. Rose, Aetna was allowing $1,990, with $2,510 being considered as

above UCR:  "This portion of this expense which is greater than the reasonable and customary

charge is not covered under your plan."  Aetna informed Franco that her "total responsibility" for

the $4,500 charge was $3,107.

131.     On March 22, 2004, Aetna issued another EOB, stating that, of the $49,100 billed

by Dr. Rose, Aetna was paying $6,141.98, and Franco's "total responsibility" was $42,958.02.

Of the unpaid amount, $35,325.75 was considered by Aetna to be "greater than the reasonable

and customary charge."

132.     Franco has made payments to Dr. Rose, her Non-Par provider, totaling at least

$11,400.  Of that total, $10,000 was paid as part of a deposit for an initial, related surgery that

was performed by Dr. Rose prior to Franco being insured by Aetna.  She paid out-of-pocket an

additional $1,400 after she received her surgery from Dr. Rose while she was a member of an

Aetna plan.  Franco paid out-of-pocket at least $3,170.73 that was attributable to the unpaid difference between UCR and the provider's billed charge.

**Franco's Exhaustion of Administrative Remedies**

133.    On April 1, 2004, Dr. Rose filed an appeal with Aetna on behalf of Franco.  He explained the complicated nature of the facial reanimation surgery he performed on Franco, along with his special expertise.  He noted that its UCR determinations contradicted Aetna's preauthorization, and left the patient financially responsible for over $46,000.

134.    On August 19, 2004, Aetna issued an EOB allowing an additional $466.02 for the free muscle flap procedure performed by Dr. Rose, stating that the remaining $23,533.58 was excluded as "greater than the reasonable and customary charge" for the procedure.  Aetna did not explain why it was allowing the additional amount, or why that procedure was underpaid in its original determination.   Aetna did not allow any additional reimbursement for the other procedures, and simply stated "based on the review our original decision has not changed." Aetna did not explain why it was adhering to its original determination regarding the other six procedures performed by Dr. Rose, or why additional reimbursement was not warranted.   Its EOB violated established appeal procedures which should have resulted from Dr. Rose's appeal, including a written decision and acknowledgement of the appeal.

135.    While Aetna issued the August 19, 2004 EOB, it did not provide any further response to the appeal Dr. Rose had submitted on Franco's behalf, nor did it offer or describe any further opportunity to pursue an additional appeal. In particular, Aetna did not state that Dr. Rose or Franco could seek a second level appeal.  As a result, Aetna's new EOB paying an additional $466.02 represented a final denial of the appeal for any further benefits and thereby fully exhausted Franco's internal appellate remedies.

136.    On August 27, 2004, Aetna issued an EOB regarding the six procedures performed by the co-surgeon, Dr. Valauri.  Of the $30,275.00 billed by Dr. Valauri, Aetna allowed $8,960.  Aetna stated that more than $17,000 was "greater than the reasonable and customary charge."  Aetna further stated that Franco's "total responsibility" was $23,290.50.

137.    Aetna determined UCR for Franco using the dollar amount in the Ingenix database despite Aetna's approval and preauthorization of the billed charges.  Aetna's UCR determinations were not compliant with, and were contrary to Aetna's definition of UCR, were invalid for the reasons alleged herein, and violated ERISA.

**Plaintiff Smith's ERISA Plan and Exhaustion**

138.    Paul and Sharon Smith are in a fully insured plan with Aetna through Mr. Smith's employer Croda, Inc.

139.    As an employee benefit, Paul Smith receives health insurance from Aetna for himself and his family, including his wife Sharon Smith.  When Sharon Smith submits a claim for benefits, Aetna is responsible for making the coverage determinations, issuing proper benefits and resolving any appeals of benefit denials or reductions.

140.    The Smiths' health plan with Aetna defines Reasonable Charge as:

> "an amount that is not more than the usual or customary charge for the service or supply a as determined by This Plan, based on a standard which is most often charged for a given service by a Provider within the same geographic area."

Aetna paid the Smiths reduced payment alleging R&C.

141.    In EOBs Aetna sent to Sharon Smith's provider, Aetna stated about its UCR determinations:

> "The member's plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided.   In

determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas.  Aetna's determination of the prevailing charge does not suggest your fee is not responsible and proper or there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number shown on this statement."

Mrs. Smith appealed and Aetna denied the appeals.

142.   Aetna also refused to consider certain appeals where litigation had been commenced.  For example, in a letter to her provider dated November 6, 2006, Aetna stated: "Dr. Grundy's letter specifically told you that in light of that litigation, we would engage in no further discussion with you about the Sharon Smith claims."

143.   Paul Smith commenced a pro-se small claims court action against Aetna regarding the adverse R&C determinations. Aetna removed the action to federal court in New York.  Sharon Smith is not a party to that action.  Mr. and Mrs. Smith have elected to proceed with their claims in this class action, and will discontinue the New York action without prejudice to their participation as Class representatives.

**Plaintiff Carolyn Whittington's ERISA Plan and Exhaustion**

144.   Ms. Whittington resides in Moorpar, California.  She is a beneficiary of a self-insured plan provided to her husband by his employer, Amgen, Inc., that is administered by Aetna.

145.   Ms. Whittington's health plan defines R&C as:

"….the lowest of:

*	the provider's usual charge for furnishing it; and

*	the charge Aetna determines to be appropriate, based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and

> \*      the charge Aetna determines to be the Recognized Charge Percentage made for that service or supply."
>
> The 'Recognized Charge Percentage' is the charge determined by Aetna on a semiannual basis to be in the 90th percentile of the charges made for a service or supply by providers in the geographic area where it is furnished.

146.    In some circumstances, Aetna may have an agreement, either directly or indirectly through a third party, with a provider which sets the rate that Aetna will pay for a service or supply.  In these instances, in spite of the methodology described above, the Recognized Charge is the rate established in such agreement.

147.    In determining the Recognized Charge for a service or supply that is:

> \*      unusual; or
> \*      not often provided in the area; or
> \*      provided by only a small number of providers in the area;

Aetna may take into account factors, such as:

> \*      the complexity;
> \*      the degree of skill needed;
> \*      the type of specialty of the provider;
> \*      the range of services or supplies provided by a facility;  and
> \*      the Recognized Charge in other areas."

148.    Aetna determines her claims and decides all appeals.  Thus, Aetna is a fiduciary and is responsible for the payment of additional benefits occasioned by a breach of fiduciary duty.

149.    Ms. Whittington's 7-year old son requires out-of-network services on an ongoing basis for various special needs, including vision therapy.  Aetna has chronically and routinely denied and delayed payment for his out-of-network services.

150.    Ms. Whittington formally complained to Aetna regarding its "targeted, discriminatory and illegal tactics" to avoid paying the out-of-network benefits owed for her son's medically necessary treatments, including on several dates in 2008 and 2009.

151.    Ms. Whittington appealed R&C reductions after Aetna had advised her that the R&C amount was $125 (which was her provider's billed charge).  Instead of allowing $125, Aetna allowed $107, claiming that $107 was the R&C for 1 hour of vision therapy.

152.    In an appeal on December 26, 2008,  Ms. Whittington complained of R&C reductions.  Aetna denied her appeal, and stated that no additional benefits were due.

153.    In a second appeal dated January 13, 2009, Ms. Whittington appealed various R&C reductions for vision therapy for her son.  Ms. Whittington challenged the R&C amount, stating there are no board certified vision therapists within 25 miles of her home who charge less than the $125 charged by her son's therapist.  She stated:

> "Based on this, it is clear to us that the abrupt reduction in Aetna's allowed amount represents an example of Aetna improperly calculating the usual, customary and reasonable fees of out-of-network providers with the intention of reducing the benefits reimbursed to the subscriber.  Please note that we are aware that Aetna is currently being investigated and charged in legal cases for similar types of illegal practices which violate ERISA, federal common law and federal claims procedures.  We urge you to reverse your first level appeal decision."

154.    Ms. Whittington also appealed to Aetna Member Services on January 5, 2009.

155.    In communications to Mrs. Whittington, Aetna denied her appeals but Aetna did not provide accurate explanations or relief to Ms. Whittington in response to her appeals.  Because she and her son are likely to need out-of-network treatments in the future, Ms. Whittington seeks not only payment for past services, but a declaration as to her future rights, which she is entitled to obtain under federal law.

**Plaintiff Carolyn Samit's Individual Plan**

156.    Carolyn Samit resides in East Hanover, New Jersey.  She is a member of a fully insured individual plan with Aetna.  She has experienced many Nonpar Benefit Reductions determined by Aetna, including for the infusion of drugs needed to keep her alive.

157.    Ms. Samit is a Medicare beneficiary in addition to being an Aetna beneficiary. Under her individual plan policy, Aetna defines R&C for individuals with two health plans as:

> "An amount that is not more than the usual or customary charge for the service or supply as determined by Us, based on a standard which is most often charged for a given service by a Provider within the same geographic area."

158.    On EOBs sent by Aetna to Ms. Samit, R&C reductions were explained with the following uniform explanation:

> "Your plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided.  In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas.  Aetna's determination of the prevailing charge does not suggest your provider's fee is not reasonable and proper.  Your provider may bill you for this amount.  If there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number, or by writing to the address, shown on this statement."

159.    On December 29, 2008, Ms. Samit appealed to Aetna for R&C reductions for drugs and drug supplies determined by Aetna between September 1, 2007 and August 29, 2008. These included appeals for CPT codes A4222, A4223, A4221, J1642 and J1644.

160.    On January 13, 2009, Aetna denied her appeal, stating:

> "Based on our review, the claims listed above were processed in accordance with the plan provisions and no additional payment is due."

161.    In response to specific questions about the data used to determine UCR, Aetna stated:

> "It is our determination that the data available at the time of each date of service was correct."

162.    Aetna explained its UCR amounts for various drugs and supplies, and upheld its determinations that the following amounts were not eligible for reimbursement based on its R&C allowances:  $3,806 for code J1644; $1782.72 for A4223; $450 for J1642.   Based on R&C reductions,  Aetna refused to pay over $6,000 for Ms. Samit's drugs and supplies for the period for the year between September 1, 2007 and August 29, 2008.

163.    Aetna admitted that it used Ingenix Prevailing HealthCare Charges System (PHCS) to determine R&C.   It acknowledged that when its R&C is less than the provider's charge, the "Covered Person may be held liable for the full amount of the billed charge."

164.    Aetna represented to Ms. Samit that it uses the Ingenix "profile" as the "basic tool for reasonable and customary (R&C) determinations" and that the "profile" reflects "for each procedure within each of the population areas, the dollar value of the charge representing the 80th percentile.   This charge is the one, which is at least as great as 80% of all charges recorded in that area for a given procedure."

165.    Aetna further represented to Ms. Samit:

> "PHCS (comprised of members from accident and health insurance firms) holds insurance forums, promotes insurance industry issues, and publishes statistical studies, law digests and information on insurance regulations.   PHCS also compiled and distributes profile information submitted from its member insurance carriers."

Aetna vouched for the Ingenix database information, stating:

> "PHCS profiles are collected from multiple insurance carriers. There are 150 data contributors, which include commercial insurance companies, third party administrators, Blue Cross and

Blue Shield, and some self-insured groups.  As a result, PHCs profiles are based on a larger number of charges.  This larger information base provides a more accurate representation of the prevailing fee for a procedure within a specific expense area."

166.    The information Aetna provided to Ms. Samit in her appeal is false and misleading.  It also omits material information which Aetna should have provided as a fiduciary.

167.    Aetna knew when it sent this letter that the Ingenix data does not reflect "reasonable and customary determinations".  It does not collect "all charges recorded" in an area for a given procedure.  PHCS does not have member firms.  It is, instead, a for-profit database of Ingenix which is a for-profit unit of United Healthcare.

168.    At the time it made these misleading statements, Aetna had already agreed with Attorney General Andrew Cuomo to stop using the Ingenix database.  *See* Assurance of Discontinuance entered into by Aetna with Attorney General Cuomo dated January 15, 2009.

169.    However, the assurance contained an escape clause inserted under the heading "Consumer Website" which provided that Aetna did not have to use the new database.  The provision stated:

In the Matter of

AETNA INC.

## ASSURANCE OF DISCONTINUANCE
## UNDER EXECUTIVE LAW §63(15)
* * *
## CONSUMER WEBSITE

32.    The Not-for-Profit Company will create a website (**the "Healthcare Information Transparency Website" or "HIT Website"**) accessible to the public.  The HIT Website will include a search function that permits users to select medical services and the zip codes for the areas where the services are sought.  The search result will indicate clearly the prevailing charge amount at a stated percentile in a given geographic area, or a range of charges, from the New Database.  With the search result, the HIT Website **will remind consumers** who access the site **that their insurers or**

**third-party administrators** determine reimbursement amounts by reference to the applicable benefit plan document, and that the plan's sponsor or claims fiduciary may administer such benefit plan by applying a predetermined percentile of the New Database, various reimbursement policies, co-insurance, and deductibles in determining the actual reimbursement amount, or **may determine reimbursement amounts using a mechanism other than the New Database or other databases of provider charges**. The HIT Website will advise consumers to refer to applicable benefit plan documents or the consumer's plan administrator or insurer for further information regarding the consumer's individual plan. With the search result, the HIT Website also will remind consumers that they may be financially responsible for the balance of their providers' charges that exceed the amounts paid by their insurance or health care benefit plans.

170.   Aetna's appeal letter to Ms. Samit referred to the Ingenix data as a "profile." Aetna did not tell Ms. Samit that Aetna is the single largest data contributor to the Ingenix database, and that it failed to submit millions of valid high charges to Ingenix which it did not "profile" for inclusion in the Ingenix database.

171.   Although Ms. Samit had specifically requested "a copy of all data that was used in the above UCR determinations", Aetna provided no data to her.  Ms. Samit's appeal asked Aetna to "supply me with any known analyses that Aetna has performed about its cost savings from use of the data/method."  Aetna refused this request, stating that it had not used any cost savings information in making her claims determinations.

## THE INGENIX DATABASES AND AETNA'S DETERMINATION OF UCR

172.   Ingenix, the owner of the Ingenix Databases which Aetna primarily relies upon for making its UCR determinations, is a wholly-owned subsidiary of United Health Group.  In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products, which, among other things, sold a provider charge database known as

"MDR."  In October 1998, Ingenix also purchased the PHCS database from the Health Insurance Association of America ("HIAA"), a trade group for the insurance industry.

173.    HIAA developed the PHCS database in 1973.  It obtained historical charge data for surgical and anesthesia procedures from numerous data contributors, including health insurance companies, third-party payors, and self-insured companies.  The PHCS databases were later expanded to include data regarding dental (1977), medical (1988), and drugs/medical equipment (1998).

174.    PHCS was designed to provide limited information about provider charges, and **not** to determine precise reimbursement amounts.

175.    When Ingenix acquired both MDR and PHCS, it kept them as separate databases, but merged the underlying data.  MDR and PHCS used different methodologies to produce the ultimate output for the respective databases.  As a result, the dollar amounts differed for individual procedure codes at the reported percentiles.

176.    Ingenix produces two cycles of Ingenix data per year that include medical, surgical, anesthesia and HCFA's common procedure coding system services ("HCPCS").  HCPCS includes pharmaceuticals, injections, blood, medical equipment, ambulance transport, medical screenings and similar services.  Ingenix then sends the final fee schedule data to Aetna, among other users of the product, which then loads it into its computerized claim platform.

177.    Following treatment of Aetna's members by Non-Par providers, the provider completes a standardized form, noting the relevant CPT codes and the provider's billed charges.  The bill is then sent to Aetna for payment by the Member or the provider.

178.    Aetna claims processors enter certain information from the claim (described below) and automatically access the Ingenix Databases.  The claims processor's computer screen

provides the dollar amount that Ingenix reports for an individual CPT code at the applicable percentile and Aetna uses this dollar amount or less (as in the case of tiering) as the UCR Non-Par Benefit Reduction.

179.    The CPT procedure codes can be used by any provider regardless of licensure, specialty, training or experience.

180.    The computerized process of using the Ingenix Databases at a particular percentile for the UCR dollar amount is sometimes referred to as "auto-adjudication."

181.    To create the database that serves as the basis for both PHCS and MDR, Ingenix collects and compiles billed charge data contributed by "Data Contributors," consisting of health insurers and others.

182.    Aetna is a significant Data Contributor because it contributed more charges to Ingenix than any other single data contributor. During the Class Period, Aetna's data accounted for over 14% of the total submissions to the Ingenix Databases.  For certain modules, Aetna's data accounted for one-half of the total submissions.

183.    The PHCS database is comprised of both actual charge data and derived charge data.  The MDR database reports only derived charge data. Billed charge data is often referred to as "actual" data.  For any medical or surgical service for which the Ingenix PHCS Database ended up with fewer than nine charges, Ingenix used derived charge to determine a corresponding UCR amount for a particular CPT code.

184.    Ingenix uses only four elements (or data points) from the charge data to create the Ingenix Databases. The four data points are:  date of service; CPT Code; the address where the service was performed; and the amount of the provider's billed charge.

185.    These four data points do not identify the provider, the patient (including age or general health status), or the type of facility where the service was performed.  Ingenix does not survey or engage in sampling to determine number and types of providers in a given geographical area. The addresses it collects are not correlated with the place of service to describe or identify the facility where the service was performed.  No patient or provider specific information is collected or analyzed.

186.    Because it only collects these four data points, the Ingenix Databases (both AC and DC) do not -- and cannot -- determine from its pooled data (i) the number of physicians or other providers in a given geographic area; (ii) whether the data reflects physician or non-physicians billed charges; (iii) the number or percentage of providers furnishing billed charge data; (iv) the provider's usual charge; (v) the provider's licensure, specialty training, or experience; (vi) degree of skill needed for the service; (vii) a patient's age or health status; (viii) the complexity of a patient's specific treatment; (ix) the place of service ("POS") (*i.e.*, the facility including hospital, clinic, physician office, nursing home, patient's home) as distinguished from the address; (x) the range of services or supplies provided by a facility; (xi) rates based on cost factors or the cost of providing the same or similar service or supply; (xii) the prevailing fees or charge level for any provider or service in a particular geographic region; or (xiii) the amount commonly charged for a particular medical service by physicians in a particular geographic region.

187.    The Ingenix data is also inadequate for making UCR determinations because it fails to distinguish between charges that are made with and without modifiers.  Modifiers consist of a two-digit number that providers add to a five-digit CPT Code to signify an alteration of the stated service or otherwise identify the circumstances in which the service was provided.

Modifiers may be  used to indicate, for example, that a non-physician has provided the service (*i.e.* a nurse practitioner) or that an assistant surgeon was involved.  In such a situation, the charge could well be less than what a physician would normally charge for such a service.  Yet, without the modifier being taken into account, the number is given equal weight as the physician's charge for determining the number that Aetna uses for setting UCR for all physician services.

188.    Ingenix also fails to audit its data or otherwise confirm which charges had modifiers and which ones did not.  Given that Aetna uses the numbers reported by Ingenix without further analysis to ensure that it is valid and appropriate for setting UCR, including with regard to modifiers, such UCR determinations are presumptively invalid.

189.    The use in the Ingenix Databases of only four data points, the combining of charges from various types of providers, the use of edits that eliminate valid high charges, and other data manipulations and procedures, invalidate the Ingenix Databases for use in determining UCR and make them non-compliant with Aetna's contractual EOC and SPD definitions.

190.    Aetna recognized the insurmountable structural defects caused by using only the four data points that should have prevented the Ingenix Databases from being used to determine UCR.

191.    Aetna and Ingenix (as did HIAA) discussed expanding the Ingenix data to include additional data points.

192.    Ingenix and HIAA sought expanded data from Aetna and other Data Contributors. The required expanded data included several additional data points, such as provider identification, licensure, specialty; patient age and gender; two-digit modifier; and place of service (hospital or doctor's office, etc.).  Certain Data Contributors did not contribute expanded

data to Ingenix and Ingenix continued to accept those Data Contributors' data that did not contain the required expanded data points.

193.    Ingenix did not incorporate the expanded data points that were contributed into its Ingenix Databases.

194.    Expanded data was deemed necessary by HIAA, Ingenix and Aetna because the four data points are limited and inadequate as a basis for UCR.

195.    Despite knowledge of their inadequacy, Ingenix continued to produce the Ingenix Databases with only the four data points and supplied them to Aetna for use during the Class Period.

196.    Aetna knew the expanded data was not incorporated into the Ingenix Databases but it continued to purchase and use them for UCR determinations.

197.    Aetna did not advise its members of the inadequacy of the four data points or Ingenix's failure to incorporate expanded data points into its Ingenix Databases.

198.    In addition to using the Ingenix Databases for making UCR determinations despite knowing that they are invalid for that purpose, Aetna also affirmatively manipulates the data it contributes to Ingenix so as to further ensure that the Ingenix Databases reported invalid and unreasonably low charges.

199.    Beginning in at least 1980, Aetna collected charge data from its claim systems for the purpose of calculating UCR for Non-Par services.

200.    From 1980 through the present, without substantial change, Aetna applied certain profiling rules ("Profiling Rules") to determine whether or not it would collect and send the charge data for a particular claim to Ingenix.  If a claim "profiles," it is collected by Aetna as

UCR data.  If a claim does **not** "profile," it is not collected or sent to Ingenix by Aetna for use in the Ingenix Databases.

201.    During all or part of the Class Period, Aetna used its profiling rules to pre-edit its charge data to remove valid high charges prior to sending the remaining charges to Ingenix for inclusion in the Ingenix Databases.

202.    In 2005, Ingenix changed its data contribution forms to require Data Contributors to certify with each data submission that the contributed data was complete and was not pre-edited or otherwise manipulated.

203.    Commencing in 2005, Aetna provided the required certifications to Ingenix attesting to the fact that its data submission was complete and not pre-edited. Aetna knew the certification was false and misleading.  Ingenix intentionally did not take the necessary steps to determine whether Aetna's certification was accurate or not.

204.    Upon receipt of Aetna's charge data (and that of other Data Contributors) Ingenix also edited ("scrubbed") all charge data to remove certain valid high charges.  As part of this process Ingenix "scrubbed" the Aetna charge data that Aetna had already pre-edited ("pre-scrubbed").

205.    Ingenix informs insurance companies that use the data (including Aetna) that it is not endorsing, approving, or recommending the use of Ingenix data for UCR.  With each production, Ingenix included the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to subscribers for informational purposes only. Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data.  There is neither a stated nor an implied "reasonable and customary charge" (either actual or derived).

206.     Ingenix also informs data users (including Aetna) that they cannot "represent" the Ingenix data **other than** as described in the disclaimer.

207.     Throughout the Class Period, Aetna has been aware of this disclaimer but did not disclose its existence or substance to its Members.

208.     Throughout the Class Period, Aetna has been aware of the disclaimer but it repeatedly has "represented" the Ingenix data **other than** as described in the disclaimer.  Among other things, Aetna uses both actual and derived data as a "reasonable and customary charge," in direct contravention of the disclaimer, and federal and state law.

209.     The "conversion factor data," which is used to develop the "derived" data, as referred to in the disclaimer are not the same as the actual charge data contributed to Ingenix.

210.     Throughout the Class Period, derived data has been used as the basis for UCR reimbursement for the majority of medical and surgical services nationwide.  Derived data is not specific to a provider, patient or procedure (CPT code).  Rather than setting out rates for healthcare services based on what providers actually charge in the marketplace, derived data uses relative values assigned to each separate medical procedure multiplied by a conversion factor. As a result, there is no relationship between the derived data and what providers actually charge in the marketplace.  Moreover, there is no scientific or other support for Aetna using derived data, through its reliance on the Ingenix database, to set UCR rates for Non-Par services.

211.     Derived charges do not reflect usual, customary and prevailing charges by actual providers; rather, they are artificial prices that Aetna uses through its reliance on the Ingenix database to understate UCR.

212.     The CPT Codes combined for derived data may represent very diverse procedures ranging from the most simple, including most of the charges, to the complex.  Among other

things, for derived charges to provide a valid basis for determining reasonable compensation levels, an adjustment must be made to account for distribution and spread of the common and less common procedures.  This adjustment requires computation of standard deviations.  This computation is not performed by Ingenix.  Because Ingenix fails to consider that some CPT codes have a wider distribution of charges (*i.e.*, standard deviation) than others, the derived percentiles understate the true upper percentile values for these CPT codes.  This is a particularly significant problem because those CPT codes with a large number of observations tend to be the most common and are being grouped with less common procedures with fewer observations. Thus, the use of the derived data, which is improperly calculated, does not comply with Aetna's UCR definitions.

213.    Relative values for Ingenix are also based on national data rather than geographic-specific charge data, and are used to establish conversion factors.  Derived data is, therefore, not specific to a geographic area, as UCR must be.

214.    In addition to the structural limitations outlined in this FAC, the database computations that use either actual charge data or derived data do not tabulate data according to the specific geographic area.  For example, Ingenix combines numerous three-digit zip codes used for postal purposes which are not medical service areas amenable to cost comparison. These areas, known as "Geozips," do not properly compare charges from similar geographic areas, leading to improper comparisons and invalid data.

215.    The distortions created by the use of Geozips are recognized by Ingenix itself.  In its MDR Customized Fee Analyzer, which Ingenix sells to providers to use in setting their rates, Ingenix states:

> Because the fee ranges in the Analyzer are based on the first three digits of your geozip, you need to assess where your locale stands

in relation to others in this three-digit area.  For example, many different three digit areas contain both urban and rural locales with different charging patterns.  Use your judgment to determine how to interpret the fee range for your particular community.

216.    Aetna fails to exercise any judgment in determining whether the specific Geozip applicable to particular UCR determinations is valid, including whether they may contain disparate "urban and rural locales with different charging patterns."  Instead, Aetna relies strictly on the geographic groupings provided by the Ingenix Databases, without taking into account possible "different charging patterns" in each Geozip.  By so doing, Aetna's UCR determinations have no valid basis, do not comply with the EOC, SPDs and other plan documents, are unreasonable, and in violation of ERISA and other applicable law.

217.    Aetna relies on the Ingenix Databases for making UCR determinations without auditing the underlying data or otherwise taking any steps to verify that data it acquires from Ingenix provide a reasonable basis upon which to set UCR.

218.    Ingenix does not audit the Data Contributors, nor verify the accuracy or completeness of their data submissions.  Thus, the validity and reliability of the Ingenix Databases are entirely at the mercy of its voluntary data contributors, all of whom have an incentive to have Ingenix report reduced rates for use in setting UCR.

219.    In instances where Ingenix knew Aetna's data submission violated its stated data requirements, Ingenix did not audit Aetna because it needed Aetna's data to allow the Ingenix Databases to be sold.

220.    The information as to the Ingenix Databases' deficiencies was not disclosed to Aetna Members, healthcare providers, or state regulators.

221.    Although Aetna professed the ability to take account of factors such as "complexity; degree of skill needed; the type of specialty of the provider; the range of services or

supplies provided by a facility," and others, it did not change its methodology to compensate for the known deficiencies of the data it used to make Non-Par Benefit Reductions.

222.    By systemically making Non-Par Benefit Reductions using flawed and invalid data and data that was not compliant with the plan definition of UCR and other Non-Par Benefits, Aetna violated its EOC and SPDs during the Class Period.

## AETNA'S EMERGENCY ROOM REIMBURSEMENTS

223.    In all of the states in which Aetna operates, it is obligated to fully reimburse Aetna Members for use of out-of-network emergency room services ("ER") that satisfy a prudent layperson standard regardless of the type of the insurance plan they have (*e.g.*, POS, PPO, HMO).

224.    Under the prudent layperson standard, Aetna must fully pay for ER services, even if they subsequently are determined not to constitute an emergency, so long as the Aetna Member reasonably believed the condition to be emergent at the time the Member sought ER care.  The standard precludes reliance on a medical professional's diagnostic conclusion at the time of discharge because the medical professional is not a prudent layperson and has information unavailable to the prudent layperson at the time ER care was sought.

225.    For many Aetna Members, Aetna denied reimbursement for ER services that were properly considered emergent under the prudent layperson standard.

226.    210.    Aetna EOBs failed to disclose material information to Aetna Members when Aetna denied or reduced payment for ER services.

## AETNA'S UNAUTHORIZED MULTIPLE PROCEDURE REDUCTIONS

227.    As a further method for making reductions in reimbursements to subscribers for healthcare provided by Non-Par providers, Aetna automatically reduces coverage for multiple

procedures performed on the same day or during the same operative session, even if the additional procedures are unrelated to what Aetna considers to be the initial procedure or involve separate surgical incisions.  By so doing, Aetna makes reimbursement determinations that dramatically reduce amounts for those so-called secondary procedures in violation of the terms of their contracts of insurance.

228.    Aetna's Plans do not disclose or authorize payment reductions based on Aetna's multiple surgical reduction policy ("MSR"), pursuant to which it reduces benefits when there are multiple surgical procedures performed on the same day.  ERISA does not permit exclusions or limitations to be applied to reduce benefits that have not been properly disclosed to Members. Plaintiffs were improperly harmed by Aetna's use of these undisclosed multiple surgical rules to reduce their reimbursements in violation of its obligations under ERISA and common law.

## DEDUCTIBLE AND OUT-OF-POCKET LIMITS

229.    Aetna's obligation to pay health benefits arises once a beneficiary has satisfied his or her annual deductible amount, which is specified in the plan documents.  In addition, once a Member reaches the plan's specified out-of-pocket limit for the year, Aetna's obligation to pay benefits increases.  The out-of-pocket limit is referred to in Plaintiffs' plan as the "coinsured charge limit" and will be so referred to here.  The coinsured charge limit means that once a Member's allowed amounts for services, in total, reaches the coinsured charge limit, as specified in the plan, the Member has no further obligation to pay any share of coinsurance.  So, for example, when the total of allowed amounts is below $1,000, Aetna is obligated to pay 80% of UCR, and a Member is obligated to pay coinsurance of 20%.  When a Member's allowed amounts for a calendar year total at least $1,000 or more, Aetna must pay 100% of UCR, and a Member's coinsurance obligation concludes for that calendar year.

230.    By the terms of the EOC, the allowed amount is the lesser of the provider's actual charge and the UCR.  Any amount of the billed charge above UCR does not count toward either the deductible or the coinsurance charge limit.  If the UCR is determined improperly, then the amounts counted toward the deductible and/or the coinsurance charge limit based on such UCR are also too low.

231.    Aetna calculated the deductible and the coinsurance charge limits using inappropriately reduced UCR amounts, and failed to credit the difference between the actual charge and the allowed charge to the deductible or to the coinsured charge limit.  Aetna is therefore paying too little of the claim (80% of the improperly reduced UCR), while the Members remain financially responsible for too large a portion of the claim (20% of UCR, plus the difference between the billed amount and the allowed charge).

## INTEREST

232.    Aetna has improperly reduced its reimbursements to Members as a result of the violation of the terms and conditions of its healthcare plans, and it owes Members restitution of the improperly denied amounts and interest on such amounts.

## AETNA'S RICO PREDICATE ACTS

233.    During the RICO Class Period and RICO Section 664 Subclass Period, Aetna engaged in a series of predicate acts underlying its RICO violations.  These predicate acts include the dissemination through the U.S. Mail of numerous fraudulent, misleading and deceptive EOBs and other communications to Class Members, and by transmitting through the internet fraudulent, misleading and deceptive representations on its public website, as detailed in this FAC.

234.    Aetna disseminated through the U.S. Mail numerous EOBs to Cooper including, but not limited to, EOBs dated May 13, 2005, June 1, 2005, July 6, 2005, August 17, 2005 and August 25, 2005.  Each of these EOBs misrepresented that Aetna's reduction of the allowed amount below the billed charge was because the billed charge was "greater than the reasonable and customary charge."

235.    Aetna similarly disseminated false statements in numerous EOBs it sent through the U.S. Mail to Werner, including, but not limited to, EOBs dated April 1, 4 and 15, 2006, May 13, 2006, June 9, 2006, July 25, 2006, August 19, 2996, September 14, 2006, October 17, 2006, January 20, 2007, February 14, 2007, April 24, 2007, May 8, 2007, June 20, 2007 and July 19, 2007, and others.  Each of these EOBs misrepresented that the UCR reduction was based on the "prevailing charge level" for services "in the geographic area where it is provided."

236.    Aetna further mailed Franco correspondence, including on December 11, 2003, December 19, 2003 and January 9, 2004, about her "authorized" and "approved" surgery. These statements were intentionally misleading.  Aetna knew that its Non-Par Benefits Reductions would leave Franco financially responsible for tens of thousands of dollars.

237.    Aetna sent EOBs to Franco dated March 18, 2004, March 22, 2004, August 19, 2004, and August 27, 2004 and September 1, 2004 that falsely advised her that her providers' surgery charges were "greater than the reasonable and customary charge" for the procedures.

238.    Aetna sent false and misleading correspondence and EOBs to Plaintiffs Smith, Whittington and Samit via the U.S. mails.

239.    These representations to each of the named plaintiffs or their Non-Par providers were knowingly false and misleading.  Aetna knew and recklessly disregarded that its method for setting reimbursement levels for Non-Par providers was fatally flawed and did not properly

determine valid UCR levels, and that it did not have a valid basis upon which to represent that the providers' bills were "greater than the reasonable and customary charge" or the "prevailing charge level" for the relevant services in a particular geographic area.

240. Aetna's overpayment recovery service also baselessly represented in dunning letters to its members that Aetna had overpaid UCR benefits and improperly referred the claimed underpaid bills to collection agencies when the alleged overpayments were not immediately refunded to Aetna.

241. In addition, all of Aetna's EOBs to Werner after date of service September 1, 2006 falsely stated that the UCR amount ($72) was the "prevailing charge level" for her Non-Par provider, without disclosing that Aetna was in fact unlawfully changing the base UCR from $120 to $72 by way of its undisclosed behavioral health tiering policy.

242. In making its UCR determinations, Aetna relied primarily on the Ingenix Databases and, from time to time, used Medicare rates. Neither methodology is a proper basis for UCR. With regard to the Ingenix Databases, Aetna, while serving as a major contributor of the data underlying the Ingenix Databases, knowingly submitted data to Ingenix that Aetna had improperly pre-edited to remove high charges, thereby artificially lowering the reported charges that were used to set UCR. The Ingenix Databases are flawed for numerous other reasons, as detailed in this FAC. Similarly, Medicare rates are not designed to and do not, establish UCR, and cannot legitimately be used for that purpose.

243. Regardless of whether the data Aetna relied upon from the Ingenix Databases were based upon actual or derived charges, they do not fall within the description provided by Aetna in its various EOBs. Because of the manipulation of the data by Aetna and Ingenix, as well as (among other reasons) the inclusion of data from all healthcare providers, regardless of

licensure or experience, and the omission of modifiers, the number based on actual data nevertheless failed to reflect the prevailing or customary charges.  For derived data, which represents the vast majority of CPT Codes in PHCS and all of the charges in MDR, the numbers reported by Ingenix have no relation to actual billed charges, whether prevailing or otherwise. Thus, during the Class Period, Aetna defrauded its members through its false and misleading EOBs.

244.    As a further aspect of its scheme to reduce Non-Par benefits below the level it was otherwise contractually required to pay, using the U.S. Mail and/or interstate wire facilities, Aetna submitted fraudulent certifications to Ingenix concerning its data.  In particular, Ingenix requires its Data Contributors (including Aetna) to attest that the data being submitted for inclusion in the Ingenix Databases reflected all of the available data from the contributor, without being pre-edited or otherwise manipulated.  Aetna falsely attested to this fact even though it had internal policies that precluded substantial data from being included in its submission to Ingenix.  The impact of Aetna's manipulation of the data it submitted to Ingenix for inclusion in the Ingenix Databases was to lower the amount of the reported charges so as to reduce the ultimate numbers that Ingenix would report and which Aetna would use for making its UCR determinations.  All of this material information was withheld from Plaintiffs and Class Members.

245.    The EOBs sent by Aetna to Plaintiffs via U.S. Mail and reflecting UCR benefit reductions did not adequately disclose the basis for, nor the reasons behind, the exclusion of expenses, and thereby precluded Plaintiffs from the information they needed to challenge Aetna's UCR determinations.  Aetna did not disclose whether it used a particular database, or Medicare rates, or some other methodology, and it did not disclose the required information

about how Plaintiffs and Class Members might successfully appeal the UCR benefit reductions. Aetna failed to provide the specific reasons regarding unpaid Non-Par benefits, failed to impart necessary information about the appeals process, and failed to provide other information required under ERISA.

246.    Aetna's correspondence by U.S. Mail to Franco misrepresented to her that various procedures specified by her surgeon (including the price for each specific code) were "authorized" and "approved." In fact, Aetna intended not to pay knowing that these procedures would leave tens of thousand of dollars unpaid by Aetna, for which Franco would be financially responsible.

247.    Further predicate acts of mail and/or wire fraud were committed by Aetna in its responses to Werner's internal appeals of the UCR reductions.  In its responses, disseminated by Aetna via U.S. Mail, Aetna made the following false and misleading statements:

- In its May 9, 2006 denial of Werner's first leave appeal, Aetna represented that it determined UCR rates "based on Reasonable Charges taking into consideration [the Non-Par provider's] type of specialty and her licensure." This was false because the Ingenix Databases do not permit any distinction to be drawn based on specialty and licensure.

- In the same letter, Aetna represented that, in determining UCR, it "refer[s] to statistical profiles of physicians' charges for the same or similar services in a geographic area." This was false because the Ingenix Databases do not provide a "statistical profile of physicians' charges" and do not report ". . . charges for the same or similar services . . . " at all, nor charges in a "geographic area" which is appropriately defined.

- In its June 26, 2007 denial of Werner's second level appeal, Aetna stated that it set UCR based on the PHCS database, representing it as "a statistical profile of provider's charges that has been developed for this purpose." This is false because not only do the Ingenix Databases not provide a "statistical profile of providers' charges," but the statement that PHCS "has been developed for this purpose" is directly

contrary to and in violation of Ingenix's disclaimer, which specifically warns Aetna and other users of the Ingenix Databases that it was not intended to serve as a basis for providing UCR determinations.

- In its July 31, 2007 letter to Werner, Aetna claimed Werner had been overpaid for dates of service in October 2006 because "the correct allowed amount per date should have been $72.00 and paid $43.20. We should have paid a total of $172.80. The patient's responsibility is $115.20 coinsurance." These statements are false, because the allowed amount for that date (according to the Ingenix database) was $120, and was payable at $120. Plaintiff's coinsurance obligation ended on October 11, 2006. Further, Aetna's threat to send the overpayment to collection if she did not repay it was improper and harassing. Aetna subsequently sent Werner for collection action, which it stopped only after the Virginia DOI sent Aetna a "cease and desist" letter.

- In its July 31, 2007 letter to Werner's Non-Par provider, Aetna claimed that the Non-Par provider had been overpaid $57.60 by stating: "Our payment should have been $172.80, because we would have paid 60% of the prevailing fees." This statement was false because $72 was not the prevailing fee for the services at issue in Washington, DC. Aetna's threat to send the overpayment to recovery (or offset it from future payments) was without a proper basis.

248.   Aetna also sent through the U.S. Mails to Sharon Smith an intentionally incomplete and misleading letter denying her appeal. Among other things, Aetna failed to disclose in this letter that its reliance on the invalid Ingenix Databases served as a basis for its UCR reductions, claiming the plan "covered expenses at the prevailing charge level".

249.   Aetna also sent through U.S. mails to Carolyn Whittington appeal denials with inaccurate explanations.

250.   Aetna also sent through the U.S. mails to Mrs. Carolyn Samit false and inaccurate explanations of UCR reductions.

251.   Aetna's Internet website, to which its EOBs directed its Members for answers to their questions, was also fraudulent and misleading.   The website represented to Aetna's Members, via the Internet (which utilizes interstate wire facilities), that Aetna made its UCR determinations based on the prevailing charges of what other providers charged for similar services.   Moreover, the website represented that Aetna would take into account various factors, including the specialty of the provider and, if there were few charges or a small number of providers submitting charge data in a particular geographic area, it stated and represented that Aetna would consider the prevailing charges in other areas.   These statements, as disseminated to Plaintiffs and Class members via Aetna's Internet website, were false.   In fact, the Ingenix Databases use derived data for the vast majority of CPT Codes, such that when there are less than nine charges reported in a particular geographic area prevailing charges from other areas are not used, as Aetna falsely represents.   Further, even if there are more than eight charges contained in the Ingenix PHCS Database, and they are used to provide a dollar amount for a CPT code at a given percentile, the eight or more charges could all come from one provider, or a few providers of different licensure, specialties, training and experience performed at different places of service for patients of different ages, gender and disparate health conditions.   All of these factors affect the reasonableness of the billed charge.   None of these factors are accounted for in the Ingenix Databases. Aetna has no way of knowing the number of providers who submitted data, or a way to differentiate between them, so that Aetna is unable to satisfy its representation on its website of checking the actual charges from other areas when there were only a small number of instances that a certain service was provided in an area.   In addition, even when actual charge data was reported by Ingenix in the Ingenix PHCS Database, Aetna had no basis for concluding that these data reflected actual prevailing charges for the reasons cited above and in

light of the manipulation of data by Ingenix as well as the improper pre-editing of submitted data by Aetna itself.

## CLASS DEFINITIONS

252.    Plaintiffs Werner, Franco, Smith and Whittington bring this action on their own behalf and on behalf of an "ERISA Class," defined as:

> All persons who are, or were, from July 30, 2001 through the present ("ERISA Class Period"), Members in any group healthcare plan insured or administered by Aetna, subject to ERISA (other than New Jersey small employer plan members), who received hospital or medical services or supplies from a Non-Par provider (or any provider Aetna considered Non-Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed   less than the provider's billed charge in determining benefits.

253.    Plaintiffs Cooper and Samit bring this action on their own behalf and on behalf of a "New Jersey SEHP and Individual Plan Class," defined as:

> All persons who are, or were, from July 30, 2001 through the present ("New Jersey SEHP and Individual Plan Class Period") Members in any New Jersey small group healthcare plan insured or administered by Aetna, subject to ERISA, and members of Individual Plans insured or administered by Aetna not subject to ERISA who received hospital or medical services or supplies from a Non-Par provider (or any provider Aetna considered Non-Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed  an amount less than the provider's billed charge in determining benefits.

254.    All named Plaintiffs bring this action on their own behalf and on behalf of a "RICO Class," defined as:

> All persons who are, or were, from March 1, 2001 through the present ("RICO Class Period"), Members in any healthcare plan (ERISA or non-ERISA) insured or administered by Aetna who received hospital or medical services or supplies from a Non-Par provider (or any provider Aetna considered Non-Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed  an amount less than the provider's billed

charge in determining benefits, based on the use of the Ingenix Databases.

255.    All named Plaintiffs further bring this action on their own behalf and on behalf of

a "RICO Section 664 Subclass," defined as:

> All persons who are, or were, from March 1, 2001 through the present ("RICO Section 664 Subclass Period"), Members in any healthcare ERISA plan insured or administered by Aetna who received hospital or medical services or supplies from a Non-Par provider (or any provider Aetna considered Non-Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed  an amount less than the provider's billed charge in determining benefits, based on the use of the Ingenix Databases.

256.    Plaintiffs Werner, Franco,  Smith and Whittington bring claims against Aetna on

their own behalf and on behalf of the ERISA Class to recover unpaid benefits due under their

plans, and to enforce and clarify their rights, under 29 U.S.C. § 1132(a)(1)(B) and to remedy

Aetna's failure to accurately disclose information in plan materials and otherwise, and its failure

to provide a "full and fair review" of the decisions denying claims under 29 U.S.C. § 1133.

Further, Plaintiffs allege that, as an ERISA fiduciary, Aetna has violated its fiduciary duties of

loyalty and care under 29 U.S.C. §§ 1104 and 1106, by relying on Ingenix Databases and

Medicare rates that are invalid for the purpose of making Non-Par Benefit Reductions without

disclosure or lawful authority and by violating ERISA and federal claims procedure regulations.

*See*, *e.g.*, 29 C.F.R. § 2560.503-1.

257.    In violation of its legal and fiduciary obligations, Aetna acted and continues to

place itself in an adversarial relationship with its Members.  For example, Aetna violated New

Jersey laws governing Non-Par reimbursement and liability for ER services, violated New York

law through its imposition of excessive reductions for multiple surgeries, and exposed its

Members to greater financial responsibility for Non-Par services than authorized by law and plan

language.  As another example, Aetna instituted UCR tiering reductions for behavioral health providers without plan authorization, without regulatory approval, and without disclosure to Aetna Members and their employers, or to regulators.  UCR tiering violates the rights of all Aetna members in ERISA, SEHP and non ERISA plans.

258.   In addition, Plaintiffs Smith, Samit and Whittington seek declaratory and injunctive relief against Aetna on her own behalf and on behalf of the ERISA Class to enforce the plan terms, to clarify rights to future benefits and to remedy Aetna's continuing violations of federal and state law.

## COMMON CLASS CLAIMS, ISSUES AND DEFENSES FOR THE CLASS

259.   The following common class claims, issues and defenses for Plaintiffs and the Class arise for the defined Class Periods:

(1)    Whether Aetna's use of the Ingenix Databases to calculate UCR in determining Non-Par reimbursement breached Aetna's legal obligations to its Members  in group health plans;

(2)    Whether Aetna's Non-Par Benefit Reductions described in this FAC violated ERISA, or other applicable law;

(3)    Whether ERISA requires each Class Member to prove exhaustion or otherwise provide a basis for excusing exhaustion;

(4)    Whether Aetna's alleged fiduciary violations, if proved, justify injunctive or other relief;

(5)    Whether Class Members (including those who assigned claims) may recover unpaid benefits;

(6)    Whether Aetna's failure to provide accurate plan documents upon request, including EOCs and SPDs and other information, entitles Class members to any relief;

(7)    Whether, in addition to unpaid benefits, interest should be added to the payment of unpaid benefits under ERISA;

(8)    Whether Aetna's claims review procedures comply with ERISA;

(9)     The standard of review applicable to review Aetna's Non-Par Benefit Reductions;

(10)     The identity and scope of the ERISA and non-ERISA plans subject to this Complaint;

(11)     Whether Aetna violated its fiduciary or other legal duties owed to its Members when it made its Non-Par Benefit Reductions or otherwise engaged in the conduct alleged in this FAC;

(12)     Whether Aetna's EOBs and other communications with its Members violated ERISA or other applicable law;

(13)     Whether the Court's interpretation of the ERISA plans at issue must be guided by the state regulators' interpretation of such plans;

(14)     What are the applicable statute of limitations periods for the claims of Class members and whether Aetna's concealment of material facts bars Aetna from asserting any statute of limitations defense;

(15)     Whether Aetna's calculation of Members' deductibles and out-of-pocket maximums violate plan language and applicable law;

(16)     Whether Aetna violated the SEHP and individual plan Regulations for all New Jersey Members, including by underpaying hospital, medical, dental and other claims;

(17)     Whether Aetna and Ingenix's manipulation of, and the structural deficiencies in, the Ingenix Databases prevent Aetna from relying on the New Jersey Regulation as a defense;

(18)     Whether Aetna violates the prudent layperson standard or other law by its Non-Par ER payment reductions or otherwise;

(19)     Whether Aetna engaged in a pattern of racketeering activity, as defined by RICO, by and through the conduct of the Aetna-Ingenix Enterprise described in this FAC;

(20)     Whether Aetna Members in ERISA and non-ERISA plans are entitled to treble damages or other relief for Aetna's violations of RICO;

(21)     Whether Aetna Members can enjoin the UCR tiering reductions for behavioral health services provided by psychologists, LCSWs and other mental health professionals and enjoin the dunning letters and collection referral threats made in conjunction with its unauthorized UCR tiering policy; and

(22)     Whether Aetna Members in New Jersey SEHP and individual plans are entitled to receive unpaid amounts for all Non-Par hospital or medical services or supplies for which Aetna underpaid in violation of the SEHP and individual plan Regulations.

## ADDITIONAL CLASS ACTION ALLEGATIONS

260.   The members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the Class consists of millions of Aetna Members in commercial group health plans insured, offered, or administered by Aetna.  The precise number of members in the Class are within Aetna's custody and control.  Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied for the Class.  For example, there are over 500,000 Aetna Members in New Jersey alone.  Nationwide, there are tens of millions of Aetna Members in ERISA and non-ERISA group health plans subject to the allegations of this FAC.

261.   Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class, including the class action claims, issues and defenses listed above.

262.   The named Plaintiffs' claims are typical of the claims of the Class members because, as a result of the conduct alleged herein, Aetna has breached its statutory and contractual obligations to the named Plaintiffs and the Class through and by uniform patterns or practices as described above.

263.   Plaintiffs Cooper, Werner, Franco, Smith and Whittington will fairly and adequately protect the interests of the members of the Class, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class action litigation and in the prosecution of ERISA and RICO claims and have no interests antagonistic to or in conflict with those of the Class.  For these reasons, the named Plaintiffs are adequate class representatives.

264.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Aetna.

265.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, because the unpaid benefits denied Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them.  Aetna maintains computerized claims information that enables it to calculate unpaid amounts resulting from Non-Par Benefit Reductions for Class Members. Given the uniform policy and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

## COUNT I

### CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS GOVERNED BY ERISA AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
(On behalf of the ERISA and New Jersey SEHP Classes)

266.    The allegations contained in this FAC are realleged and incorporated by reference as if fully set forth therein.

267.    Aetna must pay benefits to Aetna Members that are insured by, funded by or administered by Aetna pursuant to the terms of their ERISA plans and in compliance with applicable federal and state laws.

268.    Aetna violated its legal obligations under ERISA-governed plans and federal common law each time it made the Non-Par Benefit Reductions described in this FAC, including violation of ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B).

269.     In certain self insured plans which are sometimes designated Administrative Services Only or "ASO," Aetna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

270.     Where Aetna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, CIGNA is liable for underpaid benefits to Plaintiff and members of the class in both fully insured and ASO ERISA health plans.

271.     Aetna further violated its obligations under ERISA when it failed to comply with applicable state law, such as by making Non-Par Benefit Reductions that were inconsistent with New Jersey SEHP regulations.  These regulations require Aetna to pay provider charges using the most updated Ingenix data at the 80th percentile for the geographic area where the service occurred and further require Aetna to pay hospital services based on the billed charge, without using a database.  Aetna systemically violated these regulations, including by using Outdated Data from inapplicable geographic areas, reducing payment for multiple procedures or assistant surgeons, and using Ingenix data to price hospital UCR.  Aetna's violations resulted in systematic underpayment to New Jersey SEHP members for hospital and medical services.

272.     Aetna's omissions and lack of disclosure to its Members violated its legal obligations.

273.     Aetna violated obligations each time it engaged in conduct that discouraged or penalized its Members' use of Non-Par providers, such as by making Non-Par Benefit Reductions.

274.     Aetna, as the party which exercised all discretionary authority and control over the administration of the plan of each Plaintiff, including the management and disposition of

benefits under the terms of the plan, owed a fiduciary duty to Plaintiffs and each putative class member.

275.    Aetna breached its fiduciary duties to Plaintiff and each putative class member by failing to pay proper Nonpar benefits without justification.  Aetna therefore owes – and should be ordered to pay – the benefits that were improperly denied based on the policies detailed herein.

276.    Plaintiffs, on their own behalf and on behalf of the members of the ERISA and New Jersey SEHP Classes, seek unpaid benefits, recalculated deductible and coinsurance amounts and interest back to the date their claims were originally submitted to Aetna.  Plaintiff Sharon Smith also sues for declaratory and injunctive relief related to enforcement of the plan terms, and to clarify rights to future benefits.  Plaintiffs request attorneys' fees, costs, prejudgment interest and other appropriate relief against Aetna.

## COUNT II

### FAILURE TO PROVIDE FULL & FAIR REVIEW AS REQUIRED BY ERISA AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
(On behalf of the ERISA and New Jersey SEHP Classes)

277.    The allegations contained in this FAC are realleged and incorporated by reference as if fully set forth herein.

278.    Aetna functioned and continues to function as the "plan administrator" – within the meaning of such term under ERISA – for Plaintiffs.  During the Class Period, Plaintiffs and the ERISA Class and the New Jersey SEHP Class were entitled to receive a "full and fair review" of all claims denied by Aetna, and entitled to assert a claim under  29 U.S.C. § 1132(a)(3) for failure to comply with these requirements.

279.    Although Aetna was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. § 1133 (and the regulations promulgated

thereunder) for Plaintiffs and members of the ERISA and New Jersey SEHP Classes by making Non-Par Benefit Reductions that are inconsistent with or unauthorized by the terms of Members' EOCs and SPDs, as well as by failing to disclose data, its methodology and other critical information relating to its Non-Par Benefit Reductions.

280.    ERISA and its implementing regulations set forth minimum standards for claim procedures, appeals, notice to Members and the like.  In engaging in the conduct described herein, including use of an invalid database for determining UCR, use of Medicare rates, use of AWP, tiering of behavioral health reimbursements, incorrect calculation of deductibles and out-of-pocket maximums, baseless threats regarding overpayments and referrals to collection agencies, false preauthorization letters, and making other systematic benefit reductions without disclosure or authority under the plans, Aetna failed to comply with ERISA, its regulations and federal common law that require a "full and fair review, " failed to provide reasonable claims procedures, and failed to make necessary disclosures to its Members.

281.    Appeals of Plaintiffs and the members of the ERISA and New Jersey SEHP Classes should be excused by virtue, inter alia, of Aetna's numerous procedural and substantive violations.

282.    Plaintiffs' failed appeals, as alleged in this FAC, show the futility of exhausting appeals to Aetna.  The requirement to exhaust internal appeals under ERISA should, therefore, be deemed to be futile for all Class Members.

283.    Throughout the Class Period, Plaintiffs and members of the ERISA and New Jersey SEHP Classes have been harmed by Aetna's failure to provide a "full and fair review" of appeals under 29 U.S.C. § 1133, and by Aetna's failure to disclose relevant information in violation of ERISA and the federal common law.  Plaintiff Smith, who is currently insured by

Aetna, the ERISA Class and the New Jersey SEHP Class are also entitled to injunctive and declaratory relief to remedy Aetna's continuing violation of these provisions.

## COUNT III

### FAILURE TO PROVIDE AN ACCURATE EOC AND SPD
### AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
(On behalf of the ERISA and New Jersey SEHP Classes)

284.    The allegations contained in this FAC are realleged and incorporated by reference as if fully set forth herein.

285.    Aetna's disclosure obligations under ERISA include furnishing accurate materials summarizing its group health plans, known as SPD materials, under 29 U.S.C. § 1022 and supplying accurate EOCS, SPDs and other required information is actionable under 29 U.S.C. § 1132(c).

286.    Aetna's failure to disclose material information about its Non-Par Benefit Reductions its contribution of flawed data to Ingenix and its use of such data, and its material changes in benefit policy without disclosure, including by UCR tiering and use of Medicare rates, violated ERISA, federal regulations and federal common law.

287.    266.    Throughout the Class Period, Plaintiffs and members of the ERISA and New Jersey SEHP Classes have been proximately harmed by Aetna's failure to comply with 29 U.S.C. § 1022 and 29 U.S.C. § 1024(b)(4), federal regulations, and federal common law, , and are entitled to appropriate relief under ERISA, including injunctive and declaratory relief to remedy Aetna's continuing violation of these provisions.

**COUNT IV**

**VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE CARE**
**AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF**
(On behalf of the ERISA and New Jersey SEHP Classes)

288.    The allegations contained in this FAC are realleged and incorporated by reference as if fully set forth herein.

289.    Throughout the Class Period, Aetna acted as a "fiduciary" to Plaintiffs and to members of the ERISA and New Jersey SEHP Classes, as such term is understood under 29 U.S.C. § 1002(21)(A).

290.    As an ERISA fiduciary, Aetna owed, and owes, its Members in ERISA plans a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent administrator would use in the conduct of a like enterprise.  Further, ERISA fiduciaries must act in accordance with the documents and instruments governing the group plan.  29 U.S.C. § 1104(a)(1)(B) and (D).  In failing to act prudently, and in failing to act in accordance with the documents and instruments governing the plan, Aetna violated its fiduciary duty of care.

291.    As an ERISA fiduciary, Aetna owed and owes its Members a duty of loyalty, defined as an obligation to make decisions in the interest of its Members, and to avoid self-dealing or financial arrangements that benefit it at the expense of its Members under 29 U.S.C. § 1106.  Aetna cannot, for example, make benefit determinations for the purpose of saving money at the expense of its Members.

292.    Aetna violated its fiduciary duties of loyalty and due care by, inter alia, making Non-Par Benefit Reductions that were unauthorized by EOCs and SPDs; failing to inform Aetna Members of flaws in the Ingenix Databases that make their use in   calculating   UCR reimbursement inappropriate; making false representations regarding its Non-Par Benefit

Reductions; failing to credit deductibles and out-of-pocket maximums properly; changing its benefit practices without advance disclosure to Members; failing to properly credit deductible and out of pocket maximums; violating ER laws; misrepresenting facts to regulators; sending baseless overpayment actions to collection; failing to disclose in preauthorizing services that Aetna's non-par reimbursement practices would leave the Member financially responsible for the bulk of the "approved" service; and violating federal and state law, including the SEHP Regulation.

293.   In certain self insured plans which are sometimes designated Administrative Services Only or "ASO," Aetna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

294.   Where Aetna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, CIGNA is liable for underpaid benefits to Plaintiff and members of the class in both fully insured and ASO ERISA health plans.

295.   Aetna also violated its fiduciary duties by using SPDs the did not comply with federal law.

296.   Aetna breached its fiduciary duties by sending noncompliant EOBs and other communications to Plaintiffs and the members of the ERISA and New Jersey SEHP Classes.

297.   Plaintiffs and the members of the ERISA and New Jersey SEHP Classes are entitled to assert a claim for relief for Aetna's violation of its fiduciary duties under 29 U.S.C. § 1132(a)(3), including injunctive and declaratory relief, and its removal as a breaching fiduciary.

## COUNT V

### VIOLATION OF CLAIMS PROCEDURE PROVISIONS AND
### REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
(On behalf of the ERISA and New Jersey SEHP Classes)

298.    The allegations contained in this FAC are realleged and incorporated as if fully set forth herein.

299.    Aetna is an insurance company subject to regulation under the insurance laws of more than one state.  It must therefore comply with claims procedures defined by federal law (*e.g.*, 29 C.F.R. § 2560.503-1).

300.    Aetna failed to comply with federal regulations by, inter alia, making Non-Par Benefit Reductions that did not provide Aetna Members with necessary or required information, or providing misinformation to the Members.  Aetna further violated such regulations by using invalid UCR and Medicare data, without disclosure and inconsistent with plan language.  Aetna's tiering of UCR for behavioral health providers violated ERISA, mental health parity, the New Jersey Regulation and other applicable law.  Aetna also violated SEHP Regulation and other applicable law.

301.    As a proximate cause of its violation of such regulations, Plaintiffs and the members of ERISA and New Jersey SEHP Classes have been harmed by Aetna, and are entitled to appropriate relief under ERISA, including monetary, declaratory and injunctive relief, for Aetna's violation of federal regulations.

302.    As a consequence of violating such regulations and otherwise engaging in the conduct herein alleged, internal administrative remedies are unavailing as a matter of law, and exhaustion and/or statutes of limitations should be found satisfied for all Class Members.

**COUNT VI**

**VIOLATIONS OF RICO**
(On behalf of the RICO Class)

303.   The allegations contained in this FAC are realleged and incorporated as if fully set forth herein.  This claim is asserted by Plaintiffs on behalf of themselves and the members of the RICO Class.

304.   At all relevant times, Aetna was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

305.   At all relevant times, and as described in this FAC, Aetna carried out its underpayment scheme to Aetna Members in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of Aetna and Ingenix (the "Aetna-Ingenix Enterprise" or the "Enterprise").

306.   At all relevant times, the Aetna-Ingenix Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

307.   As described herein of this FAC, the Aetna-Ingenix Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which Aetna has engaged.  In addition, the members of the Aetna-Ingenix Enterprise function as a structured and continuous unit, and performed roles consistent with this structure.  The members of the Aetna-Ingenix Enterprise performed certain legitimate and lawful activities that are not being challenged in this FAC, including the provision of health insurance and plan and claims administration services by Aetna, which was done for many claims lawfully and without resort to unlawful practices.  However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations. Aside

from legitimate activities carried out by the members of the Aetna-Ingenix Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this FAC including, but not limited to, intentional underpayment of Aetna Members resulting from the use of flawed and invalid data for its UCR determinations.

308.     The purpose of the Aetna-Ingenix Enterprise was to create a mechanism by which Aetna could reduce benefit payments for Non-Par services through use of flawed and invalid data, but to do so through a means that subscribers would be unable to challenge effectively.  In particular, as described herein, the Aetna-Ingenix Enterprise created what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix Databases were designed to appear valid as a basis for UCR when, in fact, they were invalid.  Through their roles in the Aetna-Ingenix Enterprise, Ingenix benefited indirectly through the monies saved by United Healthcare, its parent corporation, and by enhancing its ability to earn licensing fees through the sale of the Ingenix databases, while Aetna benefited by reducing the amount of benefits it paid for Non-Par services through the use of the Ingenix Databases to price UCR. Ingenix also used data submitted by Data Contributors to create other products, the licensing and sale of which directly benefited Ingenix.

309.     As alleged herein, although Ingenix issues a disclaimer to the users of the Ingenix Databases, including Aetna, Aetna continued to use the Ingenix Databases in a manner directly at odds with the disclaimer, while Ingenix knew that its users were using the Ingenix Databases improperly to make UCR determinations.  At the same time it was issuing a disclaimer in an effort to provide itself with legal protection, Ingenix was also promoting Ingenix Databases as a cost-savings mechanism that could save substantial sums to those who used them in making UCR determinations.  Thus, Aetna and Ingenix expressly observed the disclaimer in the breach

despite the fact that the disclaimer was correct in reporting that the Ingenix Databases could not be used as a basis for making UCR determinations.

310.    Similarly, as alleged herein, while Ingenix required certifications from the Data Contributors, including Aetna, that purportedly verified that they were submitting all available data and were not pre-editing or otherwise manipulating the data prior to its contribution, Ingenix knew full well that these certifications were invalid because users of the Ingenix Databases, including Aetna, were not submitting all of their data and were pre-editing and manipulating the data prior to its submissions in furtherance of Ingenix's effort to understate UCR amounts.  The pre-editing and incomplete submission of data to Ingenix benefited Ingenix, and users of the Ingenix Databases, including United Health Care, Ingenix's parent company, and Aetna.  Ingenix also failed to conduct any audits or reviews of its data to ensure that the data were valid and appropriate.

311.    Ingenix and Aetna knew that the Ingenix Databases were being used without Aetna Members, or other health plan members, ever being informed of the disclaimer or the inherent flaws in the Ingenix Databases.  For example, Aetna falsely reported to Class members that its reductions were based on UCR when, in fact, the reductions were based on flawed and invalid Ingenix Databases that substantially underreported UCR.  Aetna referred overpayment recovery actions to collection agencies based on the flawed Ingenix data.  At the same time, Aetna ensured that lawfully required information concerning Non-Par Benefit Reductions was not disseminated to Aetna Members, in violation of Aetna members' EOCs and federal law.

312.    Aetna participated in the Aetna-Ingenix Enterprise in order to shift the costs of medical treatment provided by Non-Par providers from Aetna to its Members, to reduce Aetna's UCR payments and to create an appearance of legitimacy for its Non-Par Benefit Reductions.

Aetna provided false and incomplete information to Aetna members to convert those withheld funds for the Aetna-Ingenix Enterprise's own direct and indirect financial gain, and to discourage its Members from using Non-Par providers. Because Aetna saves money when Par providers render services, the Aetna-Ingenix Enterprise saved Aetna money at the expense of Aetna Members. In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by Aetna and other users of the Ingenix Databases, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of Aetna alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

313.    Aetna further used the Enterprise to facilitate its goal of reducing Non-Par benefits by submitting pre-edited and manipulated data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix Databases and which Aetna relied upon to make UCR determinations. As part of this fraudulent scheme, as alleged herein, Aetna submitted false certifications to Ingenix which attested that it was submitting all of its data, when it was not. Neither Ingenix nor its parent company, United Healthcare, took steps to audit or otherwise validate the data that Ingenix was receiving from Aetna and other data contributors. Ingenix was aware of the manipulation of data by Data Contributors such as Aetna, but allowed it to occur, since it was consistent with Ingenix's goal to underreport UCR.

314.    If Aetna had not entered into the Aetna-Ingenix Enterprise by submitting pre-edited and manipulated data to Ingenix, it would not have been able to obtain the benefits it did from the Enterprise. Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix Databases were the largest available and had sufficient numbers to remove any doubt as to their validity. Ingenix also needed data that reported sufficiently low charges so that it

could represent to its users that the Ingenix Databases would save users money used to make UCR determinations.  Without data from Aetna and United Healthcare, the Ingenix Databases could not have been successfully marketed for UCR pricing.  Similarly, Aetna could not have saved the millions of dollars it did if it had not used the Ingenix Databases for making UCR determinations even though it knew that they were flawed and invalid.  By using the Ingenix Databases for making its UCR determinations, misrepresenting them as providing a valid and unassailable basis for such decisions, and deterring its subscribers from challenging or otherwise raising questions over how it set UCR, Aetna was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and United Health Care.

315.    Through its wrongful conduct as alleged herein, Aetna, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

316.    Aetna, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the RICO Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for Non-Par services, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343.  Such predicate acts include the following:

(a)    by mailing or causing to be mailed and otherwise knowingly agreeing to the mailing of various materials and information including, but not limited to, materially false and invalid UCR determinations and EOBs, for the purpose of saving Aetna money at its Members' expense, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

(b)    by transmitting or causing to be transmitted and otherwise knowingly agreeing to the transmittal of various materials and information including, but not limited to, materially false UCR determinations and related explanation of such determinations, by means of telephone, facsimile, and

the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

317.     As set forth above, Aetna instructed its claims personnel to make Non-Par Benefit Reductions which were contrary to law and its members' EOCs and SPDs.  Aetna knew that the data contributed to Ingenix was flawed and incomplete, but Aetna continued to use the Ingenix Databases anyway.

318.     In furtherance of its underpayment scheme for Non-Par services, Aetna, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to further all aspects of the intentional underpayment to its member by delivering and/or receiving materials, including EOCs and SPDs, EOBs, appeal determinations, and other materials necessary to carry out the scheme to defraud Plaintiffs and other Members.

319.     The foregoing communications via U.S. mail and interstate wire facilities contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of Aetna's scheme to defraud described in this FAC.  Further, they were used to provide the under-payment scheme for Non-Par services with an appearance of legitimacy and regularity, and/or postpone ultimate discovery and complaint of the under-payment scheme for Non-Par services, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

320.     The misrepresentations and omissions in these materials have included and include those set forth previously in this FAC.

321.     As named fiduciaries and claims administrators of various of the Aetna plans, Aetna occupied and occupies a position of trust and it had, and has, a special relationship with its Members that requires it to accurately represent the terms and conditions of the Aetna plans, and

to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

322.    Aetna knew that its Members would reasonably rely on the accuracy, completeness and integrity of disclosures by the Enterprise.  Aetna Members did rely to their detriment on misrepresentations and omissions from the Enterprise.

323.    Each such use of the U.S. Mail and interstate wire facilities alleged in this FAC constitutes a separate and distinct predicate act.

324.    The above-described acts of mail and wire fraud are related because they each involve common members, common Non-Par claim practices, common results impacting upon common victims, and are continuous because they occurred over several years, and constitutes the usual practice of Aetna such that they amount to and pose a threat of continued racketeering activity.  Aetna's scheme to defraud is open-ended and not inherently terminable.

325.    The direct and intended victims of the pattern of racketeering activity described previously herein are beneficiaries and their assignees and the members of the RICO Class, whom Aetna has underpaid Non-Par services.

326.    Plaintiffs and Members of the RICO Class were injured by reason of Aetna's RICO violations because they directly and immediately were underpaid benefits. Aetna further deprived them of the knowledge necessary to challenge its underpayments.  Their injuries were proximately caused by Aetna's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Aetna's RICO violations (and commission of underlying predicate acts) and, but for Aetna's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

327.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs and the members of the RICO Class are entitled to recover threefold their damages, costs and attorneys' fees from Aetna and other appropriate relief.

## COUNT VII

### VIOLATIONS OF RICO IN ERISA PLANS
(on behalf of the RICO Section 664 Subclass)

328.    Plaintiffs incorporate and reallege the allegations above as if fully set forth herein including, but not limited to, the allegations contained in Count VI and its description of the Aetna-Ingenix Enterprise.  This claim is asserted by Plaintiffs on behalf of themselves and the members of the RICO Class who are also members of the ERISA Class, as those terms are defined in this FAC.

329.    Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under . . . [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act.  18 U.S.C. § 1961(1)(B).  Section 664 of Title 18 provides:

> **Theft or embezzlement from employee benefit plan**
> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

330.    Each of the Aetna healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision of title I of the Employee Retirement Income Security Act of 1974," 29 U.S.C. § 1001, et seq., is included in this Count, including Plaintiffs' plans.

331.    Each of the Aetna healthcare plans that is subject to ERISA is funded by insurance coverage Aetna provides or administers.  The applicable plan documents expressly

state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

332.    Plaintiffs' governing plan documents warrant that all benefits due under the plans will be paid.  By improperly reducing payments on Non-Par claims, Aetna intentionally caused Plaintiffs and the members of the RICO Class who were also members of the ERISA Class (the "ERISA Section 664 Subclass") to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

333.    For fully insured healthcare plans, in which Aetna both administered the plans and paid the benefits from its own assets, Aetna benefited from the conversion of assets from its ERISA plans.  Whereas these assets should have been held by Aetna in its fiduciary capacity under ERISA, and paid to its Members, Aetna improperly withheld such funds and maintained them as part of its own assets for Aetna's own benefit.  For self-funded healthcare plans, Aetna improperly prevented payment of benefits to the plan participants and beneficiaries in order to justify its receipt of administrative fees.  Insurers such as Aetna benefited in the same way, while Ingenix benefited indirectly through the savings generated by its parent, United Healthcare, and directly through the licensing fees it received from Aetna and other insurers who used the flawed Ingenix Databases to commit RICO violations.

334.    Aetna acted with specific intent to deprive Plaintiffs and RICO Section 664 Subclass members of guaranteed benefits, and was sufficiently aware of the facts to know that it was acting unlawfully and contrary to the trust placed in them by Plaintiffs and RICO Section 664 Subclass members and the insurers whose plans it was administering.

335.    Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked

within the applicable plan as a guaranteed benefit for the intended beneficiary, for Aetna's direct or indirect benefit.

336.   As set forth above, Aetna concocted multiple schemes to make improperly reduced payments for Non-Par services.

337.   In furtherance of its false payment schemes, Aetna, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to advance all aspects of the false payment schemes by delivering and/or receiving materials, including plan documents, insurance policies, summary plan descriptions, certificates of coverage, claim forms, reimbursement checks, EOBs describing UCR determinations, appeal determinations, overpayment actions, preauthorization decisions, referrals to collection agencies, representations to regulators, and other materials necessary to effectuate the false payment schemes, as well as to contribute, edit and manipulate the source data for the UCR Databases.

338.   The foregoing mail communications and wire communications contained false and fraudulent misrepresentations and omissions of material facts, and otherwise were incident to an essential part of the false payment schemes and were used to provide the false payment schemes with an appearance of legitimacy and regularity, and postpone ultimate discovery and complaint of the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if no such mailings or wire transmissions had taken place, and had the design and effect of preventing a meaningful evaluation and review of Aetna's Non-Par Benefit Reductions.

339.   As named fiduciaries and claims administrators of various of the Aetna healthcare plans, Aetna occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiffs and RICO Section 664 Subclass members that requires it to accurately represent

the terms and conditions of the Aetna healthcare plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

340.    Each such use of the U.S. Mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

341.    The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of Aetna such that they amount to and pose a threat of continued racketeering activity.

342.    The purpose of Aetna's false payment schemes was to underpay the guaranteed benefits to which Plaintiffs and RICO Section 664 Subclass members are entitled to under health group plans, and convert those withheld funds for its own direct or indirect financial gain.  It created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiffs and RICO Section 664 Subclass members, in order to increase revenue through its plan and claims administration business.

343.    The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiffs and RICO Section 664 Subclass members, who Aetna deprived of the complete guaranteed benefits to which they are entitled for Non-Par services.

344.    Aetna's RICO violations injured Plaintiffs and RICO Section 664 Subclass members by depriving them of hundreds of millions of dollars in guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to

challenge false and manipulative UCR determinations, and their injuries were proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Aetna's RICO violations (and commission of underlying predicate acts), and but for Aetna's RICO violations (and commission of underlying predicate acts), Plaintiffs and RICO Section 664 Subclass members would not have suffered the injuries suffered by them.

345.    As a result of its misconduct, Aetna is liable to Plaintiffs and RICO Section 664 Subclass members in an amount to be determined at trial.

346.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs and RICO Section 664 Subclass members are entitled to recover threefold their damages, and costs and attorneys' fees from Aetna.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

A.    Certifying the ERISA Class, the New Jersey SEHP and Individual Plan Class, the RICO Class, and the RICO Section 664 Subclass, as set forth in this FAC, and appointing named Plaintiffs as Class representatives for the RICO Class and the RICO Section 664 Subclass, appointing named Plaintiffs Werner, Franco, Smith and Whittington as Class representatives for the ERISA Class, and appointing Plaintiffs Cooper and Samit as Class representatives for the New Jersey SEHP and Individual Plan Class;

B.    Declaring that Aetna has breached the terms of its EOCs and SPDs and awarding unpaid benefits to Plaintiffs and the members of the ERISA and New Jersey SEHP and Individual Plan Classes, as well as awarding injunctive and declaratory relief to prevent Aetna's

continuing Non-Par Benefit Reductions that are undisclosed and unauthorized by EOCs and SPDs;

C.      Declaring that Aetna has violated its fiduciary duties by failing to pay proper Nonpar benefits without justification and by violating its duties of loyalty and care to Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes, and awarding appropriate relief, including unpaid benefits, restitution, interest, declaratory and injunctive relief to Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes, and removing the Aetna Defendants as fiduciaries;

D.      Enjoining Aetna from violating applicable law and ordering remedial relief for its past violations of applicable law, including regarding ER, tiering and use of Medicare rates for UCR;

E.      Enjoining Aetna's use of EOBs that violate applicable law;

F.      Declaring that Aetna has failed to provide a "full and fair review" to Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes under 29 U.S.C. § 1133, and awarding injunctive, declaratory and other equitable relief to Plaintiffs and the members of the ERISA Class to ensure compliance with ERISA and its regulations;

G.      Compelling Aetna to allow the provider's billed amount, and to pay additional benefits to Plaintiffs and the Classes based on the new allowed amount, in every instance in which Aetna reduced reimbursements due to its UCR determinations that were based on flawed or inadequate data, including through its reliance on the Ingenix database in violation of contractual terms of its plans and the SEHP and Individual Plan Regulation, plus interest;

H.      Compelling Aetna to recalculate deductibles and coinsured charge limits based on the provider's charge (rather than the UCR amount) in every instance in which it improperly reduced benefits;

I.      Declaring that Aetna has violated its disclosure and related obligations under ERISA and  federal common law, including under 29 U.S.C. § 1022, for which Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes are entitled to injunctive, declaratory and other equitable relief;

J.      Declaring that Aetna has violated Federal Claims Procedure Regulations issued under ERISA, and enjoining any continued violation ;

K.      Declaring that Aetna has breached its fiduciary obligations to its Members under ERISA, including 29 U.S.C., § 1104 and 29 U.S.C. § 1106, 29 U.S.C. § 1022, and 29 U.S.C. § 1024(b)(4), and the federal common law, and awarding declaratory and injunctive relief to remedy same, including but not limited to removal of a fiduciary or appointment of an independent monitor;

L.      Declaring that Aetna and the Ingenix-Aetna Enterprise engaged in a scheme to reduce the amount of Aetna's payments to its Members, in violation of 18 U.S.C. § 1962(c);

M.      Declaring that Aetna, through the Ingenix-Aetna Enterprise, made false payments on claims arising under ERISA plans, thereby converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended beneficiary, for Aetna's direct or indirect benefit, in violation of 18 U.S.C. § 664, justifying monetary and injunctive and other relief;

N.      Preliminarily and permanently enjoining Aetna from using the Ingenix Databases as well as Medicare fees to determine UCR, along with other Non-Par Benefit Reductions;

O.      Preliminarily and permanently enjoining Aetna from making Non-Par Benefit Reductions where Members' EOCs and SPDs do not disclose or authorize them;

P.      Preliminarily and permanently enjoining Aetna from making Non-Par Benefit Reductions in the New Jersey SEHP and Individual Plan Classes in violation of New Jersey law;

Q.      Preliminarily and permanently enjoining Aetna from discouraging Non-Par services or placing undisclosed obstacles in the path of Aetna members seeking to access Non-Par care, including in the ER;

R.      Preliminarily and permanently enjoining Ingenix from "approving" members' requests for preauthorization without disclosing the financial consequences that will occur despite Aetna's "approval";

S.      Ordering Aetna to recalculate and issue unpaid benefits to Plaintiffs and Class members that were underpaid as a result of Aetna's Non-Par Benefit Reductions;

T.      Awarding Plaintiffs and the Members of the RICO Class and the RICO 664 Subclass compensatory damages, trebled where required by law, and disbursements and expenses of this action, including reasonable counsel fees, costs and reimbursements of expenses, including expert fees, in amounts to be determined by the Court and other appropriate relief;

U.      Awarding prejudgment interest; and

V.      Granting such other and further relief as is just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Dated:  February 19, 2009

Respectfully submitted,

**WILENTZ, GOLDMAN & SPITZER, P.A.**

*/s/ Barry M. Epstein*

_____
Barry M. Epstein, Esq.
Barbara Gail Quackenbos, Esq.
Lynne M. Kizis, Esq.
Kevin P. Roddy, Esq.
90 Woodbridge Center Drive, Suite 900
Woodbridge, New Jersey  07095
(732) 636-8000

**SIEGEL BRILL GREUPNER DUFFY &
FOSTER P.A.**
Wood R. Foster, Jr., Esq.
Jordan Lewis, Esq.
1300 Washington Ave S
Minneapolis, MN 55401
(612) 337-6100

**JONATHAN ALPERT**
Alpert Law Firm
401 E. Jackson Street
Suite 1825
Tampa, FL  33602

**Counsel for Plaintiffs and the
Members of the Putative Class**

## INACTIVE
**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
100 Park Avenue
New York, NY 10017
(212) 661-1100