## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————x
:
IN RE:  AETNA UCR LITIGATION,    :     **MDL NO. 2020**
:
This Document Relates To:  ALL CASES    :     **MASTER FILE NO. 2:07-CV-3541**
:     **(FSH) (PS)**
:
:
:
:
:
:
:
:
———————————————————x

## JOINT CONSOLIDATED AMENDED CLASS ACTION
## COMPLAINT AND DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

I.  SUMMARY OF PLAINTIFFS' ALLEGATIONS ............................................................ 2

    A.  Overview of Relevant Facts Concerning Defendant Aetna's Wrongdoing ........... 2

    B.  Subscriber Plaintiffs' Summary of Allegations ..................................................... 6

    C.  Provider/Association Plaintiffs' Summary of Allegations ................................... 16

II.  PARTIES ............................................................................................................... 20

    A.  Subscriber Plaintiffs .......................................................................................... 20

    B.  Provider Plaintiffs ............................................................................................. 21

    C.  Association Plaintiffs ......................................................................................... 23

    D.  Defendants ......................................................................................................... 33

    E.  Defendants Exclusive To Plaintiff Weintraub's Claims ...................................... 33

    F.  Non-Defendant Co-Conspirators ....................................................................... 34

III.  JURISDICTION AND VENUE ................................................................................. 38

IV.  AETNA PLANS PROVIDE COVERAGE FOR OUT-OF-NETWORK SERVICES ..... 38

V.  THE INGENIX DATABASE AND AETNA'S DETERMINATION OF UCR .............. 39

    A.  The Development of the Ingenix Database ......................................................... 39

    B.  Aetna Used The Ingenix Data Despite The Disclaimer ...................................... 43

    C.  Ingenix Contributors, including Aetna, Manipulate Data Before They Provide It to Ingenix ......................................................................................... 43

    D.  Ingenix Uses Inadequate Data Points ................................................................ 44

    E.  Ingenix Manipulates Modifiers ......................................................................... 46

    F.  Ingenix's Flawed Use Of Geozips ..................................................................... 47

    G.  Ingenix Further "Scrubs" Data Contributed By Data Contributions Like Aetna .. 47

    H.  The Derived Data Is Flawed ............................................................................. 48

VI.     THE CONSPIRACY TO CREATE AND FIX UCR RATES FOR THE PURPOSE OF UNDER-REIMBURSING FOR ONET .......................................................52

VII.    THE NEW YORK ATTORNEY GENERAL'S INVESTIGATION OF INGENIX........56

VIII.   AETNA'S ADDITIONAL PATTERN OF WRONGDOING ...........................................60

     A.     Aetna's ER Reimbursements....................................................................60

     B.     Aetna's Unauthorized Multiple Procedure Reductions ...........................61

     C.     Deductible And Out-Of-Pocket Limits.....................................................62

     D.     Failure to Pay Interest..............................................................................62

IX.     PLAINTIFFS WERE SYSTEMATICALLY UNDERPAID BY AETNA.......................63

     A.     Subscriber Plaintiffs Were Systematically Underpaid By Aetna .........................63

           1.     The Cooper Plaintiffs' Group Health Plans.................................63

           2.     Subscriber Plaintiff Cooper's ERISA Plan for New Jersey Small Employer Members ......................................................................64

           3.     Cooper's Exhaustion of Administrative Remedies ....................67

           4.     Cooper's Other Nonpar Benefit Reductions...............................68

           5.     Plaintiff Werner's ERISA Plan...................................................70

           6.     Werner's Exhaustion of Administrative Remedies ....................73

           7.     Plaintiff Franco's ERISA Plan ...................................................82

           8.     Franco's Exhaustion of Administrative Remedies .....................83

           9.     Plaintiff Smith's ERISA Plan and Exhaustion ..........................85

           10.    Plaintiff Whittington's ERISA Plan and Exhaustion ................86

           11.    Plaintiff Samit's Individual Plan ................................................88

           12.    Plaintiff Seney ...........................................................................91

           13.    Plaintiff Weintraub .....................................................................93

           14.    Plaintiff Hull...............................................................................94

     B.     The Provider/Association Plaintiffs Were Systemically Underpaid By Aetna .....95

|  |  | 1. | Plaintiff Dr. Frederick A. Valauri ................................................. 95 |
|  |  | 2. | Dr. Darrick Antell ..................................................................... 103 |
|  |  | 3. | Dr. Alan B. Schorr .................................................................... 109 |
|  |  | 4. | Dr. Frank G. Tonrey .................................................................. 114 |
|  |  | 5. | Dr. Carmen Kavali ..................................................................... 118 |
|  |  | 6. | Brian Mullins, M.S., P.T. ......................................................... 120 |
|  |  | 7. | Abraham I. Kozma, P.A. ........................................................... 122 |
|  |  | 8. | Maldonado Medical LLC ........................................................... 124 |
|  | C. | The Association Plaintiffs Have Been Directly Injured By Aetna's Conduct .... 127 |
| X. | ANTITRUST ALLEGATIONS ........................................................................ 128 |
|  | A. | Interstate Commerce ............................................................................ 128 |
|  | B. | Aetna's Agreement To Fix Prices And Engage In Other Anticompetitive Conduct .............................................................................................. 128 |
|  | C. | Antitrust Injury ................................................................................... 136 |
| XI. | DEFENDANTS' MISREPRESENTATIONS AND FRAUDULENT CONCEALMENT OF THE TRUTH .......................................................... 138 |
| XII. | CLASS ACTION ALLEGATIONS ................................................................... 142 |
|  | A. | Subscriber Plaintiff Class Actions ........................................................ 142 |
|  |  | 1. | Class Definitions ....................................................................... 142 |
|  |  | 2. | Common Class Claims, Issues And Defenses For The Subscriber Classes .................................................................... 143 |
|  |  | 3. | Additional Subscriber Class Action Allegations ..................... 146 |
|  | B. | Provider Plaintiffs' Class Allegations ................................................... 147 |
|  |  | 1. | Provider Class Definitions ....................................................... 147 |
| XIII. | CAUSES OF ACTION ................................................................................... 151 |
| JURY TRIAL DEMAND ................................................................................................ 207 |

By way of this Joint Consolidated Amended Class Action Complaint (the "Amended Complaint"), and to the best of their knowledge, information and belief, formed upon a reasonable inquiry under the circumstances, and pursuant to this Court's Case Management Order No. 1, entered on June 15, 2009, (a) Plaintiffs Michele Cooper ("Cooper"), residing in Short Hills, New Jersey; Michele Werner ("Werner"), residing in Arlington, Virginia; Darlery Franco ("Franco"), residing in Newark, New Jersey; Paul and Sharon Smith ("Smith") residing in Townsend, Delaware; Carolyn Samit ("Samit") residing in East Hanover, New Jersey, John Seney ("Seney") residing in Urichsville, Ohio, Carolyn Whittington ("Whittington") residing in Moorpark, California, Jeffrey M. Weintraub ("Weintraub") residing in New York, and Angela Hull ("Hull"), residing in Wisconsin (collectively, the "Subscriber Plaintiffs"), bring this action on behalf of themselves and all others similarly situated; (b) Drs. Darrick E. Antell, M.D. ("Antell"), residing in Connecticut, Frederick A. Valauri, M.D. ("Valauri"), residing in New York, Alan B. Schorr, M.D. ("Schorr"), residing in Pennsylvania, Frank G. Tonrey, M.D. ("Tonrey"), residing in Texas, Dr. Carmen M. Kavali, M.D. ("Kavali"), residing in Georgia, Brian Mullins, M.S., P.T. ("Mullins"), residing in New Jersey, Abraham I. Kozma, P.A. d/b/a the Chiropractic and Acupuncture Center of Sarasota ("Kozma"), residing in Florida, and Maldonado Medical, LLC ("Maldonado"), located in Arizona (collectively, the "Provider Plaintiffs") bring this action on behalf of themselves and all others similarly situated; and (c) Plaintiffs the American Medical Association ("AMA"), Medical Society of New Jersey ("MSNJ"), Medical Society of the State of New York ("MSSNY"), Connecticut State Medical Society ("CSMS"), Texas Medical Association ("TMA"), the North Carolina Medical Society ("NCMS"), the Tennessee Medical Association ("TNMA"), Medical Association of Georgia ("MAG"), California Medical Association ("CMA") Florida Medical Association ("FMA") the

Washington State Medical Association ("WSMA"), the American Podiatric Medical Association ("APMA"), and the New Jersey Psychological Association ("NJPA") (collectively, the "Association Plaintiffs") bring this action on behalf of themselves and/or their membership, against Defendants, Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc. and Aetna Insurance Company of Connecticut (collectively "Aetna"). Subscriber Plaintiff Weintraub further brings this action against additional Defendants UnitedHealth Group, Inc. ("UHG") and Ingenix, Inc. ("Ingenix") (collectively with Aetna, the "Weintraub Defendants").

## I.  SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A.  Overview of Relevant Facts Concerning Defendant Aetna's Wrongdoing

1.     This Amended Complaint combines and reasserts all claims previously asserted by the Plaintiffs in their pending actions related to Aetna's payments for "out-of-network" healthcare services ("ONET").[1] Plaintiffs include the Subscribers who purchased the healthcare services, the Providers (physicians and non-physician providers) of the healthcare services, and the Association Plaintiffs who represent the Providers. Through the wrongful and unlawful actions alleged herein, Aetna paid less than it was contractually obligated to pay for the ONET, and both the Subscribers and Providers were thereby injured. In this Amended Complaint, Plaintiffs allege all claims that have previously been alleged by any of the Plaintiffs against Aetna, and Plaintiffs indicate herein where claims are made only by certain Plaintiffs. The filing

---

[1] By this Court's Case Management Order No. 1, entered on June 15, 2009, the following actions, which were originally filed in this District, were consolidated: *Cooper v. Aetna Health Inc. PA*, Civil Action No. 2:07-cv-3541; *Seney v. Aetna Health Inc. PA*, Civil Action No. 2:09-cv-468; *Am. Med. Ass'n v. Aetna Health Inc. PA*, Civil Action No. 2:09-cv-579; *Tisko v. Aetna Health Inc. PA*, Case No. 2:09-cv-1577; and *Abraham I. Kozma, P.A. v. Aetna Health Inc. PA*, Civil Action No. 2:09-cv-1972. The above-referenced actions were consolidated by this Court with *Weintraub v. Ingenix, Inc.*, Case No. 2:09-cv-2027, which was transferred to this District by the Judicial Panel on Multidistrict Litigation pursuant to its Transfer Order dated April 8, 2009, *In re Aetna UCR Litigation*, MDL No. 2020.

of this Amended Complaint is not intended to constitute a waiver of any party's rights under *Lexecon v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

2.     The selection and purchase of health insurance is of vital importance to consumers. According to a recent survey conducted by the Office of New York's Attorney General, obtaining affordable healthcare is the number one concern of consumers. *Health Care Report: The Consumer Reimbursement System is Code Blue*, State of New York, Office of the Attorney General, January 13, 2009. This class action is about a secret and intentionally concealed agreement among health insurers to depress reimbursements for ONET, thereby raising the cost of unreimbursed healthcare services for consumers and providers.

3.     Many health insurers, including Aetna, offer health insurance plans that differentiate between coverage for medical treatment from (a) in-network providers who have negotiated discounted rates with the insurer, and (b) out-of-network providers who charge insured consumers their usual, non-discounted rates. Health insurance plans that permit insured individuals ("Members") to seek medical care from out-of-network providers are more expensive than plans that limit Members to care provided by in-network providers – *i.e.*, they require higher premium payments.

4.     For Members who have contracted for the right to obtain ONET benefits, and agreed to pay higher premiums in exchange for that flexibility, health insurers including Aetna, promise to reimburse Members for ONET at a percentage of the lesser of either (a) the actual amount of their medical bills, or (b) the usual, and customary and reasonable rate ("UCR") charged by providers providing such services in the same or similar geographic area for substantially the same service. However, as set forth in this Amended Complaint, during the

Subscriber and Provider Class Periods Aetna actually reimbursed its Members at a much ***lower*** rate.

5.     Plaintiffs' legal claims in this case are directed at a secret and illegal agreement by Aetna, UHG, Ingenix, and most of the country's largest health insurers to systemically under-reimburse consumers for ONET. Aetna and other health insurance companies agreed to manipulate the rates used to reimburse Members for ONET. Pursuant to this unlawful agreement, Aetna and its Co-Conspirators knowingly created, manipulated and used flawed data to set artificially low reimbursement rates for ONET.

6.     Aetna's wrongful conduct affects hundreds of thousands of consumers nationwide who have had to pay more for ONET services as a result of Aetna's illegal agreement, and it affects hundreds of thousands of Providers who have been paid less for ONET. The instrument to accomplish this conspiracy is a data services platform known as the Ingenix Database, maintained by Ingenix, which is wholly-owned and operated by UHG, the second largest insurer in the country. During the Subscriber and Provider Class Periods, Aetna contracted with Ingenix to provide ONET data claims and receive uniform pricing schedules which are used to calculate reimbursements for ONET services at artificially low rates (herein "False UCRs") that are presented as UCRs but are, in fact, substantially below the actual UCR.

7.     Ingenix serves as the conduit of the conspiracy and is the hidden profit engine of the health insurance business. Ingenix contracts with most of the country's largest health insurers, including Aetna, to collect ONET claims data. After Ingenix collects the data, it aggregates, manipulates, and "scrubs" the data to create False UCR schedules that it sells to most of the country's largest health insurers, including Aetna. Using the False UCR schedules, Aetna was able to under-reimburse the Subscriber and Provider Plaintiffs for ONET.

8.     During the Class Periods, Aetna hid this scheme or artifice to defraud, including the existence and purpose of the Ingenix Database, through a series of material omissions and misrepresentations.  There is an inherent and irreconcilable conflict of interest in using a price-setting mechanism, the Ingenix Database, which is controlled by UHG, Aetna and other health insurers, to create uniform pricing schedules.  Because these health insurers have an incentive to artificially deflate the amounts of money they have to reimburse Subscribers and Providers for ONET, it is not surprising that their use of the Ingenix Database results in the systematic under-reimbursement of Subscribers and Providers for ONET services.

9.     Until recent news reports detailed the New York Attorney General's investigation, the process of setting UCRs used to determine reimbursement for ONET services was effectively hidden from consumers who purchase and/or participate in health insurance programs, including providers.  This lack of transparency was facilitated by the following practices:

- In their healthcare plans that cover ONET services, Aetna and other insurers affirmatively represented that they will reimburse according to the UCR rate, which the reasonable consumer would understand to literally mean the "usual and customary rate" charged for such services;

- Aetna did not disclose a conflict of interest, *i.e.*, that the Ingenix Database, which is owned and controlled by health insurance companies in agreement with Aetna and other insurers, are used to determine False UCRs;

- Aetna concealed the fact that the health insurers regularly and intentionally exclude important data points to depress UCRs and under-reimburse for ONET services; and

- Aetna concealed that Ingenix "scrubs" the data it receives from Aetna and other insurers to remove information that would result in higher reimbursement rates.

10.     Plaintiffs allege the existence of (a) direct agreements in the form of contracts between Ingenix and many of the country's largest healthcare insurers, including Aetna, to

obtain and/or provide UCR pricing information; and (b) a lengthy chronology of facts that demonstrates a conspiracy between and among Aetna, UHG and Ingenix to use Ingenix to develop False UCRs that are, in turn, used to determine the amount to reimburse Members for ONET.

### B.    Subscriber Plaintiffs' Summary of Allegations

11.    Throughout the Subscriber Class Periods, the Subscriber Plaintiffs were insured by Aetna and sought benefits for treatments for a variety of medical conditions. As alleged herein, Aetna engaged in an adversarial battle with the Subscriber Plaintiffs, denying coverage for substantial portions of the bills they received from non-participating healthcare providers ("Nonpars"), thereby transferring crushing medical costs to Subscriber Plaintiffs that should have been covered by Aetna's healthcare insurance policies.

12.    Each of the named Subscriber Plaintiffs, as described this Amended Complaint, was a Member of a healthcare insurance plan offered through employers during the Subscriber Class Periods. Aetna exercised all discretionary authority and control over the administration of the healthcare insurance plan of each Subscriber Plaintiff, including the management and disposition of benefits under the terms of the plan. Subscriber Plaintiffs Cooper, Werner, Franco, Seney, and Weintraub are not currently insured by Aetna, although they were when the coverage disputes described herein arose. Subscriber Plaintiffs Smith, Samit, Hull, and Whittington continue to be insured by Aetna.

13.    As the company that issues, insures and administers these employee benefit plans through which Subscriber Plaintiffs received their healthcare insurance, Aetna is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and its governing regulations. Further, due to the role Aetna played in administering the plans of each of the

Subscriber Plaintiffs,[2] including by making coverage and benefit decisions and deciding appeals, Aetna has assumed the role as a "fiduciary" under ERISA toward each of the Subscriber Plaintiffs.

14.    ERISA uses the term "participant" to refer to a subscriber in an employee benefit health plan, while the term "beneficiary" refers to a subscriber's dependents who also are entitled to receive benefits under the plan.

15.    Aetna issues an Evidence of Coverage ("EOC" or the "Certificate") to its participants and beneficiaries that sets forth the benefits that Aetna promises to provide. According to Aetna's publicly available Internet website designed for use by Aetna Members, Aetna defines a Member as "a subscriber or dependent who is enrolled in and covered by a healthcare plan." *See* www.aetnanavigator.com (Glossary).

16.    According to its website, Aetna's Certificate represents a "legal agreement between an individual subscriber or an employer group ('Contract holder') and a health plan that describes the benefits and limitations of the coverage." *Id.*

17.    Aetna's website further defines "Health Benefit Plan" as "[t]he health insurance or HMO product offered by a licensed health benefits company that is defined by the benefit contract and represents a set of covered services or expenses accessible through a provider network, if applicable, or direct access to licensed providers and facilities." *Id.*

18.    Under their Aetna healthcare plans, Subscriber Plaintiffs have an express right to receive services from providers who have not entered into contracts with Aetna to accept reduced fees in exchange for greater access to Aetna's Members; these healthcare providers are known as Nonpars. For other plans, including certain Health Maintenance Organization ("HMO") plans,

---

[2] As described further below, Plaintiff Weintraub's plan with Aetna is not subject to nor governed by ERISA

Aetna Members may use Nonpars in emergencies, when they are out of their home area, or when no participating provider is qualified or available to perform the medically necessary service. When Aetna Members receive ONET, Aetna's payment is based on the lesser of the billed charge or UCR amount for that service in the geographic area in which it was performed. Aetna uses the terms "UCR," "customary and reasonable," and "reasonable charge" interchangeably. Aetna's website represents that Aetna determines reimbursement for ONET as follows by calculating UCR:

> Out-of-Network. The use of health care providers who have not contracted with the health plan to provide services. Members enrolled in preferred provider organizations (PPO) and point-of-service (POS) coverages can go out-of-network for covered services, but will pay additional costs in the form of deductibles and coinsurance and will be subject to benefit and lifetime maximums. Because reduced fees are not negotiated with out-of-network providers, Aetna will calculate reimbursement based on the usual, customary and reasonable ["UCR"] charge (see definition). Members are responsible for all charges above UCR in addition to any deductible and coinsurance provisions.

19. Aetna calculates benefits for ONET based on its determination of the UCR for the services at issue. Aetna's website defines the "Customary and Reasonable" charge as follows:

> The amount customarily charged for the service by other providers in the same Geographic area (often defined as a specific percentile of all charges in the Community), and the reasonable cost of services for a given patient. Also called "Usual, Customary, and Reasonable" (UCR).

20. Aetna also includes on its website its standard definition for "Reasonable Charge," as follows:

> The charge for a covered benefit, which is determined by Aetna to be the prevailing charge level, for the service or supply in the geographic area where it is furnished. Aetna may take into account factors such as the complexity, degree of skill needed, type or specialty of the Provider, range of services provided by a facility, and the prevailing charge in other areas in determining the Reasonable Charge for a service or supply that is unusual or is not

- 8 -

often provided in the area or is provided by only a small number of providers in the area.

21.     Aetna treats all of its definitions of UCR in its plans as having identical meanings and applies uniform policies for calculating UCR.

22.     Aetna often refers to UCR as the "amount allowed." Aetna makes clear in its EOCs and EOBs that the Member is financially responsible for the difference between UCR (amount allowed) and the provider's billed charge for Nonpar services. For example, Aetna's website states: "Members are responsible for all charges above UCR in addition to any deductible and coinsurance provisions." *Id.* The difference between UCR and the billed charge is often referred to in Aetna's EOBs sent to its Members as "excluded expenses." Excluded expenses are not credited toward its Members' annual deductible for Nonpar services, nor the annual out-of-pocket maximum.

23.     In-network or contracted or participating providers ("Pars") contract with Aetna to accept reduced or discounted fees for their services. When a Member uses a Par, his or her financial responsibility is limited to a specified co-payment, typically in the range of $10 to $30 per service.

24.     Aetna's website defines "Nonparticipating Provider" as follows: "This term is generally used to mean providers who have not contracted with a health plan to provide services at reduced fees. Also called Non-Preferred Care Provider." When an Aetna Member uses a Nonpar, Aetna imposes additional costs on the Member in the form of higher deductibles and coinsurance, as well as benefit and lifetime maximums. Aetna does not begin to pay for Nonpar services until the Aetna Member has satisfied his or her calendar year deductible. Once a Member satisfies the deductible, then Aetna will pay a share (typically 80%) of the allowed amount for Nonpar services. If and when a Member reaches a maximum amount of out-of-

pocket expenses for Nonpar services, typically in the range of $1,500 to $3,000, the Member has no further coinsurance obligation (e.g., 20% of the allowed amount) for any additional Nonpar services for that calendar year. Aetna does not credit amounts above UCR to the Member's deductible or out-of-pocket maximum.

25.     In certain instances, such as when a referral from a primary care physician is not obtained, Aetna considers a Par to be Nonpar. Aetna pays UCR for the service that was rendered by the Par in such circumstances and the Member is responsible for any unpaid amounts above UCR.

26.     During the Subscriber Class Periods, Aetna failed to properly calculate deductibles, coinsurance and out-of-pocket maximums, in violation of Subscriber Plaintiffs' healthcare plans and as described in the EOCs. By failing to properly calculate these amounts, Aetna subsequently underpaid Subscriber Plaintiffs and other Aetna Members for ONET. Despite complaints regarding Aetna's underpayments received from Subscribers, Aetna did not correct its underpayments.

27.     At times during the Subscriber Class Periods, Aetna paid Nonpar hospital and medical services by using repricing vendors. In the event a Nonpar had a contracted agreed-to fee with a repricer accessed by Aetna, Aetna would pay the agreed-to fee. Despite Aetna's payment to the provider of the contracted agreed-to fee, Aetna would nevertheless calculate the Member's coinsurance at the higher amount applicable to services from Nonpars. Aetna should have applied the lower fee's reduced coinsurance applicable to contracted services. Aetna's improper calculation of coinsurance violated its healthcare insurance plans and applicable federal and state laws.

28.     Aetna is obligated to pay accurate UCR to its Members for Nonpar services consistent with the above-referenced UCR definition.

29.     Aetna fails to comply with its own UCR definition by failing to pay benefits based on accurate UCR rates to its Members for Nonpar services (whether by Nonpars or by Pars considered Nonpar by Aetna).

30.     To determine UCR, Aetna primarily relies on the Ingenix Database. The Ingenix Database is comprised of the Prevailing Healthcare Charges System ("PHCS") and Medical Data Research ("MDR") databases.

31.     In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City, Utah-based provider of healthcare products, including MDR. In October 1998, Ingenix purchased the PHCS database from the Health Insurance Association of America ("HIAA"), a trade group for the insurance industry.

32.     Aetna is a contributor of provider charge data to the Ingenix Database. Prior to contributing its data to Ingenix, Aetna deleted valid high charges. Following receipt of the data from Aetna, Ingenix then removed additional valid high charges from all contributors' data. Ingenix then published the corrupted database. Simply stated, Aetna and Ingenix "cooked the books," and the corruption of the data invalidates its use by Aetna as the basis for determining UCR for ONET. These actions (among others referenced herein) violated both ERISA, a federal law designed to protect group plan participants and beneficiaries, and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

33.     In addition to UCR determinations based on the Ingenix Database, Subscriber Plaintiffs and Subscriber Class members challenge other improper reductions in benefits for ONET ("Nonpar Benefit Reductions"), including those imposed by use of the following

methods: Use of discounted amounts or Par provider fee schedules; use of Medicare data; use of the average wholesale price ("AWP") to determine UCR for pharmaceutical drugs; failing to pay appropriately for emergency room ("ER") services; failing to properly credit deductible amounts and out-of-pocket maximums; failing to provide an appropriate appeals process mechanism; approving requests for pre authorization without disclosing its nonpayment of a large percentage of the billed charges; threatening to refer Members and Nonpars to collection agencies based on baseless allegations of overpayment by Aetna; and other improper practices.

34.    Aetna's Nonpar Benefit Reductions leave Aetna Members financially responsible for unpaid amounts that Aetna is obligated to pay under the terms of its healthcare plans. Because the Nonpar Benefit Reductions are "exclusions" of coverage under the ERISA plans, Aetna has the burden to demonstrate that its exclusions comply with its plan(s) and its legal obligations.  Subscriber Plaintiffs allege that Aetna cannot sustain its burden regarding its Nonpar Benefit Reductions, and seek unpaid benefits and other relief for themselves and on behalf of ERISA Subscriber Class members.

35.    Aetna made numerous UCR and other Nonpar Benefit Reductions for Subscriber Plaintiffs based on practices challenged herein as violations of federal and New Jersey law, including UCR based on manipulated and invalid data from the Ingenix Databases or based on Medicare rates.

36.    Aetna is legally obligated to adhere to the specific provisions of its Members' group health plans.  Aetna cannot make Nonpar Benefit Reductions if they are not authorized or accurately disclosed in Aetna Members' Certificates and Summary Plan Descriptions ("SPDs"), a document designed to describe in layperson's language the material terms, conditions and limitations of the healthcare plan.  During the Subscriber Class Period, Aetna breached the

express terms and conditions of Members' Certificates and SPDs when it made Nonpar Benefit Reductions.

37.    Subscriber Plaintiffs and Subscriber Class Members challenge Aetna's systemic application of rules and policies in making Nonpar Benefit Reductions that are not authorized by Aetna Members' Certificates and SPDs; its routine violation of its fiduciary duties; and its failure to comply with ERISA, federal claims procedure regulations, federal common law and other applicable law.

38.    Aetna's EOBs reflecting Nonpar Benefit Reductions did not comply with legal requirements, including federal claims procedure regulations. The EOBs failed to advise Aetna Members of the specific reasons for the denial(s), the specific plan provisions, and their appeal rights. Aetna's EOBs reflecting UCR determinations failed to advise the Subscriber Plaintiffs of the data that Aetna used to calculate UCR.

39.    Various procedural rules that covered Subscriber Plaintiffs' appeals were also violated. Aetna's substantive and procedural violations prevent Aetna from relying on defenses to Subscriber Plaintiffs' claims, such as exhaustion or statutes of limitations.

40.    Aetna discouraged appeals by vouching for its Nonpar Benefit Reductions. Aetna's conduct toward Subscriber Plaintiffs and Subscriber Class Members clearly demonstrates that appeals of Aetna's Nonpar Benefit Reductions are futile. As shown below, when a provider appealed, Aetna did not provide necessary and critical information and it did not provide the Member with a copy of the appeals decision.

41.    Aetna's failure to reveal critical information during the appeals process made a "full and fair review" unavailable to Aetna Members. In certain cases, Aetna circumvented the

appeals process by handling complaints outside of the formal appeals process and not issuing written decisions.

42.     Subscriber Plaintiffs, on behalf of themselves and all similarly situated Aetna Members, allege that Aetna's Nonpar Benefit Reductions violate ERISA, RICO, the Sherman Act, and New York's General Business Law, as described herein.

43.     In addition, Subscriber Plaintiffs Cooper and Samit are Members of health plans subject to particular New Jersey regulations governing small employer and individual health plan ("SEHP") Members ("New Jersey Regulations"). Aetna's Nonpar Benefit Reductions are contrary to the requirements of New Jersey Regulations. In violating the regulations specific to New Jersey SEHP Members, Aetna also violated ERISA and RICO. In violating the regulations specific to New Jersey individual plan Members, Aetna violated RICO.

44.     The protections imposed by the New Jersey Regulations require health insurance companies, including Aetna, to reimburse Nonpar hospital services provided to SEHP and individual plan Members based on the hospital's billed charge. New Jersey Regulations prohibit Aetna and other insurers from using fee schedules or other databases to reduce payment to their SEHP and individual plan Members who receive hospital services. Instead, Aetna was obligated by law to pay the Nonpar hospital's billed charge less any applicable coinsurance. Aetna failed to comply with New Jersey Regulations for SEHP and individual plan Members.

45.     New Jersey Regulations also require that Aetna reimburse Nonpar medical (non-hospital) services provided to SEHP and individual plan Members at the 80th percentile of the most updated Ingenix fee schedule. Such payment must be made without other reductions, such as for multiple or bilateral procedures.

46.     Aetna failed to comply with New Jersey Regulations applicable to Nonpar hospital and medical services to the detriment of Subscriber Plaintiff Cooper and other SEHP Members, and to Subscriber Plaintiff Samit and other individual plan Members.

47.     Although the New Jersey Regulations require insurers to pay UCR based on the updated PHCS database, Aetna misrepresents in its EOB that the database "is the amount which is most often charged for a given service by a Provider within the same geographic area." For the reasons detailed herein, this statement is false and misleading and Aetna cannot comply with this provision of the New Jersey Regulations by using the Ingenix Database.

48.     As described herein, Aetna and Ingenix, acting individually and in concert, manipulated and submitted charge data used by the Ingenix Database to understate the 80th percentile amounts. As a result of their joint and intentional manipulation of the Ingenix Database, Aetna also violated the New Jersey Regulations and their stated purpose - to protect New Jersey consumers of ONET - was thereby thwarted. Aetna and Ingenix concealed the manipulation from the New Jersey regulators who enforce the New Jersey Regulations, and from employers and its Members. In fact, Aetna and Ingenix's manipulations ensured that the 80th percentile of the Ingenix Database was inaccurate and that all SEHP and Individual Plan Members as well as Members in its other plans nationwide were underpaid.

49.     Aetna's UCR determinations, based on the manipulated Ingenix Database, violated Aetna's legal obligations, and preclude it from relying on the New Jersey Regulations as a defense to its wrongful use of the invalid Ingenix Database to determine UCR rates during the Subscriber Class Period. Aetna should be compelled to pay billed charges to all SEHP and Individual Plan Members whose benefits Aetna determined in violation of the New Jersey Regulations, ERISA, RICO, the Sherman Act, and/or New York's General Business Law.

### C. Provider/Association Plaintiffs' Summary of Allegations

50.     The Provider Plaintiffs bring this case as a class action on behalf of themselves and all those similarly situated physicians, physician groups and ancillary providers (the "Provider Class") who are, or have been nonparticipating, or "out-of-network," providers ("Nonpars" or "Nonparticipating" physicians or providers), in that they did not participate in Aetna's providers' networks during the period from June 3, 2003, through the present (the "Provider Class Period"), alleging violations of ERISA, RICO and the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, as described herein. As Nonpars in Aetna's providers' networks, the Provider Plaintiffs and the Provider Class have been harmed by underpayments made by Aetna for ONET that they provided to plan enrollees. These underpayments are pervasive and result from systematic operating procedures employed by Aetna, which affect thousands of Nonpars every year.

51.     The Association Plaintiffs bring this case on their own behalf and/or on behalf of their membership of providers. The Association Plaintiffs are dedicated to advocating for the rights of providers and patients alike for the delivery of the highest quality of medical care. All of the Association Plaintiffs bring this action on behalf of their members who have been injured as a result of the egregious acts and practices of Aetna as set forth in this Amended Complaint. Some of the Association Plaintiffs have also been directly injured by the challenged conduct set forth herein. As a result of Aetna's unlawful practices, the Association Plaintiffs have been required to devote substantial time and resources counseling their members on how to deal with the practices at issue, monitoring the payment practices of Aetna, corresponding with Aetna, advocating on their members' behalf, and communicating with regulators concerning Aetna's misconduct, among other things. Accordingly, the Association Plaintiffs allege violations of

ERISA on behalf of their membership, and violations of RICO and the Sherman Act, on behalf of themselves and/or their membership, against Aetna as set forth below.

52. The Provider Plaintiffs and the Association Plaintiffs are at times collectively referred to herein as the "Provider/Association Plaintiffs."

53. As alleged herein, Pars are providers who have signed a contract with a particular managed care entity and receive reimbursement of eligible charges directly from that entity. Pars agree to provide healthcare services to plan enrollees at reduced rates in exchange for access to the plan's patient base, among other things. When visiting a Par, plan Members are only responsible for co-payments, co-insurance, and payment for non-covered items (if any) at the time of service.

54. Nonpars, by contrast, do not have a signed contract with a particular managed care entity. Nonpars, therefore, may collect their full charges directly from patients at the time of service and are not required to accept reduced rates for procedures performed. Rather than require plan Members to pay out of pocket and up front in full for medical services, Nonpars routinely accept an assignment of benefits, which occurs when a plan member authorizes his health benefits plan to remit payment directly to the provider for covered services.

55. Managed care entities may refuse to recognize a patient's assignment and still remit payment to the patient. Whether or not the health plan honors the assignment and pays the out-of-network benefit amount to the provider, Nonpars are entitled to bill the patient for the amount of the provider's charge which exceeds the amount the health plan covers.

56. Aetna contractually promises its Members that it will pay for services performed by Nonpars at the lesser of the billed charge or the usual, customary and reasonable ("UCR," also known as "U&C" and "R&C") amount for the service rendered. Aetna also contractually

promises Members that the UCR rate for a service is the "prevailing charge" charged by most providers of comparable services in the specific area where the Member received the service, with consideration given to the nature and severity of the Member's condition, as well as any complications or unusual circumstances that would require additional time, skill, or experience on the part of the Nonpar.

57.     During the Provider Class Periods, Aetna contributed its own manipulated provider charge data to and typically used the Ingenix Database to price claims for reimbursement submitted by Nonpars. However, the defective and conflict-ridden Ingenix Database fails to comply with the definition of UCR contained in Aetna's insurance contracts, and instead has been used by Aetna as a tool to deny, delay, and impede lawful reimbursement to Nonpars.

58.     On January 25, 2009, Aetna settled claims by the New York Attorney General concerning its unlawful use of the Ingenix to determine UCR rates. In a press release issued by Aetna concerning its $20 million settlement with the Attorney General, Donald Liss, Aetna's Senior Regional Medical Director, said: "Aetna …recognize[s] the Attorney General's concern about the *conflicts of interest inherent in the Ingenix databases*. We welcome a new database to be developed and maintained by a trusted and independent entity," (emphasis added). Notwithstanding this acknowledgment, Aetna still uses the Ingenix Database to calculate UCR rates. In fact, according to the New York Attorney General, UHG and Aetna contributed 70% of the billing information for the Ingenix system.

59.     In addition to its use of the Ingenix Database, Aetna further failed to disclose critical and material facts about Ingenix data that Aetna used to make out-of-network reimbursement decisions. Although Aetna was aware of serious, systemic flaws in the Ingenix

Database, Aetna concealed these flaws in its communications to Nonpars. The Ingenix Database, for example, averages charges from all providers regardless of specialty or specific provider type. It also fails to consider provider, patient, and procedure specific factors affecting charges. These known flaws, among others, were deliberately used by Aetna to diminish reimbursement to Nonpars. The non-disclosure of these material facts prevented the Provider Plaintiffs and the Provider Class from effectively challenging or appealing Aetna's improper UCR determinations.

60. During the relevant period, Aetna also used other faulty methods for determining UCR when Ingenix data was unavailable. Provider Plaintiffs and the Provider Class challenge the following Nonpar Benefit Reductions, along with the use of the Ingenix Database to price UCR, implemented by Aetna during the Provider Class Period: Use of discounted amounts or Par provider fee schedules; use of Medicare data; use of AWP to determine UCR for pharmaceutical drugs; failing to pay appropriately ER services; failing to properly credit deductible amounts and out-of-pocket maximums; failing to provide an appropriate appeals process mechanism; approving requests for preauthorization without disclosing its nonpayment of a large percentage of the billed charges; threatening to refer Members and Nonpar providers to collection agencies based on baseless allegations of overpayment by Aetna; refusing to pay for facility fees for the proper use of accredited office-based surgical ("OBS") facilities, and other improper practices.

61. Whether it used the Ingenix Database or another flawed methodology to price UCR, Aetna routinely and systematically underpaid Nonpars who submitted claims for reimbursement for ONET.

62. Aetna's pattern or practice of providing inadequate benefits for ONET also was intended to increase the costs to its Members of going out-of-network, thereby pressuring them to use in-network providers, subject to discounted rates. In doing so, Aetna breached the terms and conditions of its health care plans, which govern the benefits available for its Members and their treating health care providers.

63. Aetna's deceitful and pervasive business practices forced Provider Plaintiffs, the Provider Class, and many members of the Association Plaintiffs to expend significant time and resources towards identifying, disputing and then appealing Aetna's improper reimbursement determinations, oftentimes still resulting in underpayment. Aetna's conduct violated its legal obligations to the Provider Plaintiffs and the Provider Class, as assignees and beneficiaries of their patients' benefits, and violated federal and state law as described herein, causing Provider Plaintiffs and the Provider Class significant financial harm. Aetna's wrongful conduct also frustrated the purpose of the Association Plaintiffs as set forth below, causing them to exhaust significant time and resources advocating on behalf of their members' rights.

## II. PARTIES

### A. Subscriber Plaintiffs

64. Subscriber Plaintiffs Cooper, residing in Short Hills, New Jersey; Werner, residing in Arlington, Virginia; Franco, residing in Newark, New Jersey; Smith residing in Townsend, Delaware; Samit residing in East Hanover, New Jersey, Seney residing in Urichsville, Ohio, Whittington residing in Moorpark, California, Weintraub residing in New York, and Hull, residing in Wisconsin, bring this action on behalf of themselves and all others similarly situated. As detailed below, the Subscriber Plaintiffs have standing to pursue their claims and jurisdiction and venue are appropriate with regard to each Subscriber Plaintiff in this judicial district.

## B. Provider Plaintiffs

65.     Plaintiff Dr. Antell is a board-certified plastic and reconstructive surgeon who has been in practice for over 20 years. He is an official spokesperson for the American Society of Plastic Surgeons and is a Fellow of the American College of Surgeons. He received his general surgery training at Stanford University Medical Center and his specialty training in plastic/reconstructive surgery at the New York Hospital/Cornell Medical Center and the Memorial Sloan-Kettering Cancer Center in New York City. He also has a Doctor of Medical Dentistry degree from Case Western Reserve University. Dr. Antell is a citizen of the state of Connecticut and is licensed to practice medicine in New York, and he is a Nonpar in Aetna's physician networks.

66.     Plaintiff Dr. Valauri is a board-certified plastic and reconstruction surgeon who has been in practice for over 30 years. He is past president of the New York Regional Society of Plastic and Reconstructive Surgery, is a member of some 20 professional societies, is Attending Surgeon at several New York hospitals and teaches cosmetic surgery to plastic surgery residents at those hospitals. Dr. Valauri received his M.D. from SUNY-Downstate in Brooklyn. He is a citizen of the state of New York and is licensed to practice medicine in New York, and he is a Nonpar in Aetna's physicians' networks.

67.     Plaintiff, Dr. Schorr, is an endocrinologist with a private practice in Langhorne, PA. Dr. Schorr is also on staff at two hospitals: Saint Mary Medical Center and Lower Bucks Hospital. Dr. Schorr is board-certified in both Internal Medicine and in Endocrinology, Diabetes and Metabolic Diseases. Dr. Schorr is a citizen of the state of Pennsylvania, and is licensed to practice medicine in Pennsylvania and New Jersey. At all relevant times, Dr. Schorr was a Nonpar in Aetna's physicians' networks.

68.     Plaintiff, Dr. Tonrey, is an anesthesiologist with a private practice in Dallas, Texas. Dr. Tonrey is board-certified in Anesthesiology and Emergency Medicine. He graduated from the Georgetown University School of Medicine, and was a resident in anesthesiology at the University of Vermont Medical Center. Dr. Tonrey is a citizen of the state of Texas, and is licensed to practice medicine in both Arizona and Texas. At all relevant times, Dr. Tonrey was a Nonpar in Aetna's physicians' networks.

69.     Plaintiff, Dr. Kavali, is a plastic surgeon with a private practice in Atlanta, Georgia. Dr. Kavali is board-certified by the American Board of Plastic Surgery and serves on the staff of Northside Hospital and the Center for Plastic Surgery. She graduated from Mercer University School of Medicine, was a resident in general surgery at the University of Illinois in Chicago, and completed a plastic surgery fellowship at Wayne State University. She is a citizen of the state of Georgia and is licensed to practice medicine in Georgia. Dr. Kavali does not currently participate in the Aetna physician network and sees Aetna patients only on a non-participating basis.

70.     Plaintiff, Mullins, is a licensed physical therapist with a private practice in Neptune, New Jersey. Mr. Mullins graduated from Duke University with a Master's degree in Physical Therapy. Mr. Mullins has been a practicing physical therapist for 10 years. Mr. Mullins is a citizen of the state of New Jersey, and is licensed to practice physical therapy in New Jersey. At all relevant times, Mr. Mullins was a Nonpar in Aetna's providers' networks.

71.     Plaintiff Kozma is the principal of Chiropractic and Acupuncture Center of Sarasota and is licensed to practice chiropractic care in Florida. Chiropractic and Acupuncture Center of Sarasota is a Nonpar physician network. Chiropractic and Acupuncture Center of Sarasota maintains a chiropractic and acupuncture practice, and provides related services such as

physical therapy. Chiropractic and Acupuncture Center of Sarasota is a Florida professional association.

72.    Plaintiff, Maldonado, is a referred provider of Durable Medical Equipment ("DME") services with its principal office located in Phoenix, Arizona. Maldonado provides DME and related services to Aetna Members that have had such services prescribed by a physician as medically necessary. Maldonado does not participate in any of Aetna's health plans and is therefore deemed an out-of-network provider with regards to all Aetna health plans.

### C.    Association Plaintiffs

73.    Plaintiff, American Medical Association, is headquartered in Chicago, Illinois. The AMA is a national tax-exempt membership organization that represents the interests of approximately 240,000 physicians, residents and medical students, as well as their patients located in New Jersey and throughout the United States. As the largest medical association in the United States and as the owner of Current Procedural Terminology ("CPT" or "CPT Codes"), the AMA works to represent its members with respect to payment practices by payors, such as Aetna, to healthcare providers, particularly physicians. Both AMA physicians and AMA in its own capacity have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

74.    AMA appears herein on behalf of itself and its members, and also as a representative of the Litigation Center of the AMA and State Medical Societies. The Litigation Center was formed in 1995 as a coalition of the AMA and private, voluntary, nonprofit state medical societies to represent the views of organized medicine in the courts.

75.    AMA has individual standing as it has been injured by Aetna's wrongful conduct as alleged herein. AMA has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

76. AMA also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit AMA seeks declaratory and injunctive relief.

77. Plaintiff, Medical Society of New Jersey, is a New Jersey not-for-profit corporation organized and existing under the laws of New Jersey. MSNJ was founded in 1766, and is the oldest professional society in the United States. MSNJ represents approximately 8,000 physicians in the state of New Jersey. The organization and its dues-paying members are dedicated to a healthy New Jersey, working to ensure the sanctity of the physician–patient relationship. In representing all medical disciplines, MSNJ advocates for the rights of patients and physicians alike, for the delivery of the highest quality medical care. This allows response to the patients' individual, varied needs, in an ethical and compassionate environment, in order to create a healthy New Jersey and healthy citizens. MSNJ's stated mission is "[t]o promote the betterment of the public health and the science and the art of medicine, to enlighten public opinion in regard to the problems of medicine, and to safeguard the rights of the practitioners of medicine."

78. MSNJ has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein. MSNJ has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

79. MSNJ also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, MSNJ seeks declaratory and injunctive relief.

80. Plaintiff, Medical Society of the State of New York, is a New York not-for-profit corporation organized and existing under the laws of the state of New York since 1807. MSSNY represents approximately 30,000 licensed physicians, medical residents, and medical students in New York State. MSSNY is committed to representing the medical profession as a whole and advocating health related rights, responsibilities and issues. MSSNY is further committed to serving as a resource for its members and assisting them in addressing the many issues and needs which they face in providing health care to their patients. MSSNY strives to enhance the delivery of medical care of high quality to all people in the most economical manner, and to act to promote and maintain high standards in medical education and in the practice of medicine in an effort to ensure that quality medical care is available to the public. Both MSSNY physicians and MSSNY in its own capacity have been injured by the egregious acts and practices of defendants as set forth in this Amended Complaint.

81. MSSNY has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein. MSSNY has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

82. MSSNY also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, MSSNY seeks declaratory and injunctive relief.

83. Plaintiff, Connecticut State Medical Society, is a federation of eight component county medical associations, with a total membership of approximately 7,000 physicians. CSMS itself is a constituent state entity of the American Medical Association. Founded by the physician-patriots of the American Revolution, the Society operates from a heritage of

democratic principles embodied in its Charter and Bylaws. The philosophy and purpose of the CSMS is to promote the highest standards of medical care in the State of Connecticut, to work to preserve the integrity and independence of physicians, and to support the sanctity of the physician-patient relationship for the benefit of the public by, among other things, facilitating and assisting its physicians in providing top quality care to their patients, providing them with a unified voice and enabling them to take concerted action on behalf of their profession and of their patients, and acting and advocating on their behalf to preserve the ability, independence and freedom of physicians to render the best possible care to every patient. Both CSMS physicians and CSMS in its own capacity have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

84. CSMS has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein. CSMS has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

85. CSMS also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, CSMS seeks declaratory and injunctive relief.

86. Plaintiff, Texas Medical Association, was organized by 35 physicians in 1853 to serve the people of Texas in matters of medical care, prevention and cure of disease, and the improvement of public health. Today, with more than 43,000 physician and medical student members, TMA's vision is still to "improve the health of all Texans." TMA supports Texas physicians by providing distinctive solutions to the challenges they encounter in the care of patients. TMA has four main goals: to protect, improve, and strengthen the viability of medical

practices in Texas; to ensure continued success in legislative, regulatory, and legal interventions to enhance the statewide environment in which Texas physicians practice medicine; to strengthen physicians' trusted leadership role within their communities; and to enhance the powerful, effective, and unified voice of Texas medicine. Both TMA physicians and TMA in its own capacity have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

87.     TMA has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein. TMA has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

88.     TMA also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, TMA seeks declaratory and injunctive relief.

89.     Plaintiff, North Carolina Medical Society, is a North Carolina not-for-profit corporation organized and existing under the laws of North Carolina since 1849, with its headquarters located in Raleigh, North Carolina. NCMS represents over 11,000 members in North Carolina, including licensed physicians, physician assistants, medical interns and residents, medical students and retired physicians.

90.     The philosophy and purpose of NCMS is to promote medical science, medical knowledge, and the highest standards of medical care in North Carolina. NCMS strives to enhance access to medical care of high quality to all people in North Carolina and to promote high standards in the practice of medicine in an effort to ensure that quality medical care is available to the public by *inter alia*, promoting competence in the art of medical practice, making

the medical profession more useful to the public in the prevention and care of disease and improving the quality of life. NCMS is the largest physician organization in North Carolina. NCMS unifies doctors across North Carolina in all specialties and work settings on issues related to, *inter alia*: the physician-patient relationship, health and insurance regulation, and patient safety. NCMS devotes significant resources to advocating physician viewpoints in the public policy arena. Specifically, NCMS and its member physicians take an active role in issues raised by private companies, institutions, administrative agencies and the North Carolina General Assembly and work to assure that the views of the medical community are presented in an organized and effective fashion.

91.     NCMS has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein. NCMS has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

92.     NCMS also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit NCSMS seeks declaratory and injunctive relief.

93.     Plaintiff, Tennessee Medical Association, is a professional organization for medical doctors dedicated to protecting the health interests of patients and enhancing the effectiveness of physicians throughout the state by defining and promoting: quality, safe and effective medical care; public policy to protect the sanctity of the physician-patient relationship, improve access to and the affordability of quality medical services; ethics and competence in medical education and practice; and open communication between the medical profession and the public, fostering a better understanding of the capacities of medical practice. TNMA

physicians have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

94.     TNMA has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint and seeks declaratory and injunctive relief.

95.     Plaintiff, California Medical Association, is a non-profit, incorporated professional association of California physicians established in 1856, with its principal place of business in Sacramento, California. CMA is comprised of more than 35,000 physicians practicing medicine in all specialties and serving patients in all demographics throughout the State of California. CMA's mission is to promote the art and science of medicine, the care and well being of patients, the protection of the public health and the betterment of the medical profession. CMA actively engages in the legislative, judicial, political and regulatory processes to carry out its mission. Additionally, CMA regularly engages government and private health plans to advocate for the interests of its members. CMA physicians have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

96.     CMA has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this complaint and seeks declaratory and injunctive relief.

97.     Plaintiff, Medical Association of Georgia, is a non-profit, voluntary professional association of Georgia physicians. MAG was founded in 1849, is an affiliate of the American Medical Association, and is the largest physician association in Georgia. Presently, MAG has over 6,600 physician members – nearly 5,000 of whom are physicians actively practicing medicine in the State of Georgia. MAG was founded to promote the art and science of medicine

and the improvement of public health. With these ends in mind, MAG actively works to advocate physician and patient positions in the United States Congress, the Georgia General Assembly, before state and federal courts, and in the private sector with large health plans, hospitals and other entities that significantly affect patient care.

98.    MAG has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein. MAG has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

99.    MAG also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this complaint. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, MAG seeks declaratory and injunctive relief.

100.    Plaintiff, Florida Medical Association, is a not for profit corporation, which is organized and maintained for the benefit of the approximately 16,000 licensed Florida physicians who comprise its membership. The FMA was created and exists for the purposes of securing and maintaining the highest standards of practice in medicine and furthering the interests of its members. One of the primary purposes of the FMA is to act on behalf of its members by representing their common interests before various governmental entities and before state and federal courts

101.    FMA has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein. FMA has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

102.    FMA also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this complaint. In addition to the redress it seeks for

its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, FMA seeks declaratory and injunctive relief.

103.    Plaintiff, Washington State Medical Association, is a private, non-profit membership organization for physicians.  WSMA is funded by physician membership dues, not by the state.  The WSMA works on behalf of its members and their patients to provide educational seminars, physician advocacy efforts, lobbying and other services.  The WSMA works to represent the professional interests of all members physicians in Washington state, on behalf of its patients, and to promote effective physician leadership in the evolving health care delivery system.  WSMA physicians have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

104.    WSMA has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint and seeks declaratory and injunctive relief.

105.    Plaintiff, American Podiatric Medical Association, is a non-profit, tax-exempt, incorporated professional association of the nation's podiatrists, with its principal place of business in Bethesda, Maryland.  APMA serves as the leading voice and unifying force in advocating and representing the interests of over 15,000 podiatrists, their patients located throughout the United States, and the 53 non-profit, state podiatric medical associations.

106.    APMA is dedicated to promoting foot and ankle health, member services and professional excellence.  As part of its mission, APMA represents and advocates the interests of podiatrists before governmental authorities, in the private sector, and through formal litigation.

107.    APMA brings this action against Aetna on its own behalf and as the authorized representative of its members.  APMA has individual standing as it has been injured by Aetna's

wrongful conduct as alleged herein. APMA has expended its own time and resources monitoring Aetna's payment practices, counseling its members on how to deal with the wrongful payment practices at issue, and advocating on its members' behalf.

108. APMA also has associational standing on behalf of its members who have claims against Aetna for the violations alleged herein. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, APMA seeks declaratory and injunctive relief. APMA will continue to be required to expend its own resources to protect its members if Aetna's conduct is not enjoined.

109. Plaintiff, New Jersey Psychological Association, is a private, non-profit, professional association organized and existing under the laws of the State of New Jersey since 1950, with its principal place of business in West Orange, New Jersey. NJPA represents over 2100 active and retired psychologists located throughout New Jersey.

110. NJPA is dedicated to promoting the advancement of psychology and providing information and resources regarding various facets of the mental health field to its members, their patients, and the public. As part of its mission, NJPA provides information, education direction, strategies, and support to assist all members in providing relevant and meaningful professional services to the public; supports its members in both the scientific and business aspects of their practices; and represents and advocates the interests of its members before governmental authorities, in the private sector, and through formal litigation.

111. NJPA brings this action against Aetna on its own behalf and as the authorized representative of its members. NJPA has individual standing as it has been injured by Aetna's wrongful conduct as alleged herein. NJPA has expended its own time and resources monitoring

Aetna's payment practices, counseling its members on how to deal with the wrongful payment practices at issue, and advocating on its members' behalf.

112. NJPA also has associational standing on behalf of its members who have claims against Aetna for the violations alleged herein. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, NJPA seeks declaratory and injunctive relief. NJPA will continue to be required to expend its own resources to protect its members if Aetna's conduct is not enjoined.

**D.    Defendants**

113. Defendants Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc., and Aetna Insurance Company of Connecticut, offer, insure, underwrite and administer commercial health benefits, including those of Subscriber Plaintiffs referenced above. Several of the Defendants, including Aetna Health, Inc. and Aetna Life Insurance Company, have offices located in Cranbury, New Jersey, and are licensed to do business in New Jersey.

114. "Aetna" is a brand name used for products and services provided by one or more of the Aetna group of subsidiaries that offer, underwrite, or administer benefits. When used in this Amended Complaint, "Aetna" includes all Aetna subsidiaries owned and controlled by any of the named Defendants whose activities are interrelated and intertwined with them. Due to the manner in which they function, all of the Defendants are functional ERISA fiduciaries and, as such, they must comply with fiduciary standards. "Aetna" refers to all predecessors, successors and subsidiaries of the named Aetna Defendants to which these allegations pertain.

**E.    Defendants Exclusive To Plaintiff Weintraub's Claims**

115. Defendant UnitedHealth Group, Inc. offers, among other things, health insurance products and services and network-based health and well-being services to beneficiaries and

other government-sponsored health care programs. A Minnesota corporation, UHG's principal place of business is at 9900 Bren Road East, Minnetonka, Minnesota 55343.

116. Defendant Ingenix, Inc. is a wholly-owned subsidiary of UHG and offers a comprehensive line of clinical and cost management solutions for health care payers, providers, employers, pharmaceutical manufacturers, government agencies and other requiring quality health care information. The company's products and services are represented by four business groups including: (i) software and data services; (ii) publishing; (iii) pharmaceutical services; and (iv) consulting. Ingenix licenses the use of its proprietary Ingenix Database to insurers who use it to set reimbursement schedules for out-of-network, non-negotiated medical services. A Minnesota corporation, Ingenix's principal place of business is at 12125 Technology Drive, Eden Prairie, Minnesota 55344.

117. Collectively, UHG and Ingenix are sometimes referred to herein as the "UHG Defendants." The UHG Defendants joined the conspiratorial activity alleged herein and are legally responsible for the unlawful conduct because their directors, members, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, the UHG Defendants are legally responsible because they acted through, facilitated, dominated, or controlled the actions of another one of the UHG Defendants in furtherance of the unlawful conspiratorial activity alleged herein.

118. For all cases other than Weintraub, Ingenix and UHG shall be considered non-Defendant Co-Conspirators, for the purposes of this Amended Complaint.

**F.    Non-Defendant Co-Conspirators**

119. Other natural persons, corporations and entities participated as Co-Conspirators, including:

(a)     Cigna Corporation ("Cigna") provides health care and related benefits offered through the workplace. Key product lines include health care products and services (medical, pharmacy, behavioral health, clinical information management, dental and vision benefits, and case and disease management); and group disability, life and accident insurance. In addition, Cigna also provides life, accident, health and expatriate employee benefits insurance coverage in selected international markets, primarily in Asia and Europe. Cigna is a Delaware corporation but has its corporate headquarters Philadelphia, Pennsylvania and its corporate offices in Bloomfield, Connecticut. Cigna is licensed to conduct business in all fifty states. Cigna participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans.

(b)     WellPoint, Inc. ("WellPoint"), through its subsidiaries, provides healthcare and related benefits in the United States and internationally. WellPoint is the nation's largest health insurer and provides health insurance to millions of persons across the United States. An Indiana corporation, WellPoint has its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana 46204, and is licensed to conduct business in all fifty states. WellPoint participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans.

(c)     Oxford Health Plans' ("Oxford"), a subsidiary of UHG, products include its Freedom Network and Liberty Network HMOs, as well as the Freedom Plan and Liberty Plan point-of-service plans. Oxford participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care services

and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans. Oxford is headquartered at 48 Monroe Turnpike, Trumbull, Connecticut 06611;

(d)     Health Net, Inc. ("Health Net") is among the United States' largest publicly-traded managed healthcare companies. Health Net offers, among other things, HMOs, POSs, and insured PPOs. Health Net participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans. The Company's headquarters is located at 21650 Oxnard St., Woodland Hills, California 91367; and

(e)     Health Insurance Association of America ("HIAA"), now known as America's Health Insurance Plans ("AHIP") is a trade group for the health insurance industry. It is a national association comprised of a variety of medical entities, but notably major insurance companies, including many of its fellow Co-Conspirators. It proclaims to provide "a unified voice for the community of health insurance plans" by representing the interests of its members on legislative and regulatory issues at the federal and state levels, and by providing conferences and publications. In 1973, HIAA created a database known as the Prevailing Health Charges System ("PHCS") by obtaining historical charge data for surgical and anesthesia procedures from numerous data contributors, including health insurance companies, third-party payors, and self-insured companies. HIAA later expanded PHCS to include data regarding dental (1977), medical (1988), and drugs/medical equipment (1998). HIAA had committees and advisory groups comprised of various insurance company members that were responsible for PHCS's development and management and which caused the PHCS database to become populated with

flawed data. In October 1998, HIAA sold PHCS to Ingenix, and PHCS is now part of the Ingenix Database.

120. In addition to WellPoint, Cigna, Oxford and Health Net, and other health insurance companies, not named as Defendants, have participated in the alleged unlawful conspiratorial activity in violation of federal and state law. Such violations include, *inter alia*, knowingly providing flawed and misleading data to Ingenix for use in determining UCRs; knowingly acquiescing to flawed and improper manipulation of data provided by Ingenix; and knowingly using artificially low UCRs produced by Ingenix in determining reimbursements for ONET.

121. Whenever reference is made to an act, statement, or transaction of any corporation or entity in this Amended Complaint, including each of the Defendants and Co-Conspirators, the allegation means that the corporation or entity acted, stated or transacted by or though its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

122. At all times mentioned in the allegations herein, each and every Defendant and Co-Conspirator was an agent or representative of and aided and abetted in the unlawful conduct of each of the other Defendants and Co-Conspirators. In doing the things alleged herein, each and every Defendant and Co-Conspirator was acting within the course of such agency or representation and was acting with the consent, permission and authorization of the other Defendants and Co-Conspirators. All actions of each Defendant and Co-Conspirators as alleged herein were ratified and approved by the other Defendants and Co-Conspirators.

## III. JURISDICTION AND VENUE

123. The Subscriber Plaintiffs and the Provider/Association Plaintiffs assert subject matter jurisdiction for their ERISA claims under 28 U.S.C. § 1331, and 28 U.S.C. § 1332(d). For their RICO claims, subject matter jurisdiction arises under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331, and for their Sherman Act claims, subject matter jurisdiction arises under 28 U.S.C. § 1331 and 28 U.S.C. § 1337. These claims are all brought under federal statutes and necessarily involve adjudication of one or more federal questions.

124. Pursuant to 28 U.S.C. § 1332(d)(2), this Court also has subject matter jurisdiction over all claims alleging a violation of State Law, including New York General Business Law ("GBL"). This Court can also exercise supplemental jurisdiction over those state law claims pursuant to 28 U.S.C. § 1367.

125. Venue is appropriately laid in this District under 28 U.S.C. § 1391, 18 U.S.C. § 1965, and 29 U.S.C. § 1132(e)(2) because (a) Aetna resides, is found, has an agent, and transacts business in this District and (b) Aetna conducts a substantial amount of business in this district and insures and administers group healthcare insurance plans both inside and outside this District, including from offices located in New Jersey.

126. This Amended Complaint is being filed pursuant to the CMO issued by this Court on June 16, 2009.

## IV. AETNA PLANS PROVIDE COVERAGE FOR OUT-OF-NETWORK SERVICES

127. Aetna issues documents to all of its participants and beneficiaries that set forth the benefits that Aetna promises to pay its Members.

128. Like most insurance plans, Aetna's plans typically differentiate between: (a) coverage for medical treatment from "in-network" providers who have negotiated discount rates with the insurer, and (b) coverage for treatment from "out-of-network" providers who charge

insureds their usual, non-discounted rates. Health insurance plans, as part of their contracts with in-network providers, preclude in-network providers from billing insured patients in excess of the contracted for in-network services. Conversely, out-of network providers have no service contracts with the insurance company and thus are not precluded from billing at their usual rates. In cases where the out-of-network provider bills in excess of what the insurance company is willing to pay, the balance not paid by the insurance company is the responsibility of the Aetna Member.

129. When Aetna Members receive ONET, Aetna's payment is based on a percentage of the lesser of the billed charge or what Aetna describes as the "usual and customary" rate for that service. Aetna uses the terms "UCR," "usual and customary" and "reasonable charge" interchangeably.

130. The portions of ONET charges not paid by Aetna are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan Member has to pay for medical services over a given time period. As detailed below, Aetna utilized the faulty Ingenix Database to price UCR.

## V. THE INGENIX DATABASE AND AETNA'S DETERMINATION OF UCR

### A. The Development of the Ingenix Database

131. Ingenix, a wholly owned subsidiary of UHG, is a self-styled nationwide "health care information company" that sells "customized fee analyzers" to medical providers, healthcare insurers and automobile liability insurance companies. Essentially, Ingenix creates "modules" or uniform pricing schedules, which provide whole dollar payment amounts for each percentile (for instance, the 80th percentile) for given medical procedures in various locations. All users of the database, i.e., Aetna and its Co-Conspirators, are given precisely the same dollar amounts by percentile for each particular procedure and area.

132. In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products, which, among other things, sold a provider charge database known as MDR. In October 1998, Ingenix also purchased the PHCS database from HIAA, a trade group for the insurance industry.

133. HIAA developed the PHCS database in 1973. It obtained historical charge data for surgical and anesthesia procedures from numerous data contributors, including health insurance companies, third-party payors, and self-insured companies. The PHCS databases were later expanded to include data regarding dental (1977), medical (1988), and drugs/medical equipment (1998).

134. The PHCS database, as described above, was initially created by HIAA, the health insurance industry's main trade association.

135. HIAA, now known as AHIP, markets itself as a national association representing providers of health benefits in order to advocate on behalf of health insurance plans and to represent the interests of its members so as to "provide a unified voice for the healthcare financing industry . . . ."

136. Those members included, and continue to include, virtually every major health insurer. In fact, at the time of drafting this Amended Complaint, the Board of Directors of AHIP includes executives of Defendants and their Co-Conspirators including, but not limited to, the Chairman, President and CEO of Aetna and at least two executive vice presidents at UHG.

137. More specifically, various committees within HIAA initially developed and managed the PHCS database – those members made decisions concerning the operation and very design of the database.

138. HIAA initially created the PHCS as a way to aggregate and compile physician charge data as a service to its members.

139. HIAA compiled information from its vast pool of member/insurers to create the PHCS which initially pertained to surgical and anesthesia procedures, but within five years of its inception in 1973, began to also include dental, medical, and drugs/medical equipment rates.

140. Once created, the PHCS became the largest pool of charges for medical services in the country and was considered to be the nation's most comprehensive database of provider charges for private health care services – *i.e.*, the rates charged by physicians and other private healthcare providers. It contained data from more than 150 contributors from 50 states, the District of Columbia, Puerto Rico and the Virgin Islands.

141. The information HIAA compiled (collected from the members/insurers), however, consisted only of four data points: the date of service, the CPT Code, the billed charge, and the geozip. This was the only information that HIAA sought from its members to create the PHCS.

142. In fact, HIAA (via its committees and Board of Directors) consciously decided to limit the amount of information it received from contributors to create the PHCS. In its own documents, HIAA stated that the data was limited and that even the quality of the data was "questionable."

143. Once HIAA obtained the "questionable" data, it compiled the various submissions and created the PHCS which it then submitted to its members as a service. However, HIAA expressly informed insurers that the PHCS was not intended to be used to establish UCR rates.

144. The PHCS, thus, was built on submissions from health insurance companies but was not designed to determine precise reimbursement amounts – only to provide a general idea

about prevailing charges in a given area based upon the admittedly limited data that HIAA collected in order to initially create the PHCS.

145.     HIAA submitted a disclaimer with the data it provided via the PHCS:

> The DATA, whether actual charge data, derived charge data conversion factor data or length of stay data, are provided to the LICENSEE for information purposes only. The HIAA disclaims any endorsement, approval or recommendation of the DATA. There is neither a stated nor an implied "reasonable and customary" charge, either actual or derived; neither is there a stated nor an implied "reasonable and customary" conversion factor or length of stay. Any interpretation and/or use of the DATA by the LICENSEE is solely and exclusively at the discretion of the LICENSEE. THE LICENSEE MUST NOT represent the DATA in any way other than as expressed in this paragraph.

146.     PHCS was designed to provide limited information about provider charges, and not to determine precise reimbursement amounts.

147.     When Ingenix acquired both MDR and PHCS, it kept them as separate databases, but merged the underlying data. MDR and PHCS used different methodologies to produce the ultimate output for the respective databases. As a result, the dollar amounts differed for individual procedure codes at the reported percentiles.

148.     The Ingenix Database is marketed by UHG as the "industry standard." UHG and Aetna, as well as their Co-Conspirators, all use the same Ingenix-established UCR rates to reimburse for ONET.

149.     To create the database, Ingenix first enters into contracts/licensing agreements with health insurers, including Aetna and UHG, as well as the Co-Conspirators, to (i) obtain data surrounding billing rates and information from those health insurers; and/or to (ii) provide UCR uniform pricing schedules to those same health insurers, including UHG and Aetna, for their use in billing ONET. Ingenix actually offers the Ingenix Database to health insurers at a discounted

rate if those insurers agree to provide data to Ingenix to create that very database. Aetna both provides to and receives from Ingenix pricing data used to set UCR rates and reimbursement for ONET.

## B. Aetna Used The Ingenix Data Despite The Disclaimer

150. Aetna uses the information received from Ingenix to determine UCR rates for ONET even though Ingenix broadcasts that it is not endorsing, approving or recommending the use of the Ingenix data for UCR rates. With each production, Ingenix includes the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to subscribers for informational purposes only. Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data. There is neither a stated nor an implied "reasonable and customary charge" (either actual or derived).

151. Throughout the relevant period, Aetna has been aware of the disclaimer but did not disclose its existence or substance to its Members or Nonpars seeking reimbursement for ONET. Moreover, Aetna has repeatedly "represented" the Ingenix data other than as described in the disclaimer. Among other things, Aetna uses both actual and derived data as a "reasonable and customary charge," in direct contravention of the disclaimer and federal and state law.

152. Despite its own disclaimer, Ingenix also continues to enter into agreements with Aetna and its Co-Conspirators whereby the Ingenix Database is used to calculate UCR rates for ONET, which turn out to be artificially low. Indeed, UHG and Ingenix promise that Ingenix Database users, including Aetna and their Co-Conspirators, will achieve substantial savings, including a 16:1 return on investment.

## C. Ingenix Contributors, including Aetna, Manipulate Data Before They Provide It to Ingenix

153. Aetna is a significant Data Contributor because it contributed more charges to Ingenix than any other single data contributor. During the relevant period, UHG and Aetna's data accounted for approximately 70% of the total submissions to the Ingenix Databases. For certain modules, Aetna's data accounted for one-half of the total submissions.

154. For the creation and continued updating of its database, Ingenix relies entirely on accumulating data from its various information providers (including Defendants and their Co-Conspirators) via its "data contribution program" in which those health insurers that are Ingenix clients submit information about the amounts they happen to have been billed by an undisclosed number of unidentified health care providers for specific "CPT" or "HCPCS" code services. Current Procedure Terminology ("CPT") codes are a system by which the American Medical Association categorizes all medical services by five-digit codes. Healthcare Common Procedure Coding System ("HCPCS") codes are monitored by CMS, the Centers for Medicare and Medicaid Services, and are based on the CPT system. The data Ingenix receives has been termed a "convenience sample."

**D.     Ingenix Uses Inadequate Data Points**

155. Following treatment by Nonpar, that provider submits a standardized claims procedure form to Aetna; Aetna then extracts information from that form to submit to Ingenix. However, the only information provided from the claims form to Ingenix are the following four data points: (a) the date of service; (b) the CPT code; (c) the zip code where the service was provided; and (d) the actual amount billed.

156. In or around 2005, members of HIAA, including Aetna, discussed submitting more than these four data points to Ingenix because they recognized expressly that the four data points were limited and inadequate as a basis for calculating accurate UCR rates. Potential data

points included provider identification, licensure, specialty, patient age and gender, and type of facility where the service was provided.

157. Despite this express acknowledgement that the four data points were limited and inadequate, Defendants and their Co-Conspirators opted to continue to only submit the four above-listed elements to Ingenix. Furthermore, Aetna never advised its Members of the inadequacy of the four data points or of the failure to expand those data points.

158. Health insurers thus continue to enter these four simple data points onto a standard claims submission form provided to Ingenix. However, prior to submission to Ingenix, health insurers first "scrub" these claims submissions forms in order to remove the highest charges, thereby submitting only the lowest claims amounts which results in a lower average cost.

159. Therefore, Aetna, UHG, and their Co-Conspirators all affirmatively manipulate the data they contribute to Ingenix so as to further ensure that the Ingenix Database reports invalid and artificially low UCR rates.

160. Beginning in at least 1980, Aetna collected charge data from its claim systems for the purpose of calculating UCR for ONET.

161. From 1980 through the present, without substantial change, Aetna applied certain profiling rules (the "Profiling Rules") to determine whether or not it would collect and send the charge data for a particular claim to Ingenix. If a claim "profiles," it is collected by Aetna as UCR data. If a claim does not "profile," it is not collected or sent to Ingenix by Aetna for use in the Ingenix Database.

162. During all or part of the relevant period, Aetna used its profiling rules to pre-edit its charge data to remove valid high charges prior to sending the remaining charges to Ingenix for inclusion in the Ingenix Database.

163. Further, in 2005 Ingenix changed its data contribution forms to require data contributors to certify with each submission that the contributed data was complete and was not pre-edited or otherwise manipulated. At this point, Aetna began to provide those required certifications to Ingenix attesting to the fact that its data submission was complete and not pre-edited. Aetna knew and continues to know that the certifications are false and misleading.

164. Once Ingenix receives the data contribution forms (containing only the four data points), it is then able to combine information from all the contributors (including Defendants and their Co-Conspirators) to create the Ingenix Database used to calculate UCR rates for ONET.

165. Because it only receives the four data points on the data contribution forms, Ingenix necessarily uses only those four elements (date of service, CPT code, address, and amount billed) to create the Ingenix Database. These four data points do not identify the provider, the patient (including age and condition), the type of facility where the services was performed, any adjustment factors for cost of living, the specific provider-type performing the services, the provider's usual charge and licensure, the type of facility where the service was performed (*i.e.*, hospital, clinic, doctor's office, nursing home, intensive care unit), or the prevailing fee or charge level for any provider or service in a particular geographic region.

E. **Ingenix Manipulates Modifiers**

166. In fact, Ingenix actually further decreases the amount of specificity provided on the data contribution forms by removing any "modifiers" contained on those forms. Modifiers

consist of a two-digit number that providers add to a five-digit CPT code to signify an alteration

of the stated service or otherwise identify the circumstances in which the service was provided.

**F.      Ingenix's Flawed Use Of Geozips**

167.    The Ingenix Database also does not tabulate data according to the specific

geographic area where a UCR actually would apply. Instead, Ingenix divides all states into

"geozips" composed of cities and towns sharing three-digits of postal zip codes, which are then

grouped together by not only geographical proximity, but also by what Ingenix arbitrarily

decides are "data similarities." These geozips are not medical service areas amendable to cost

comparison.

168.    The distortions created by the use of the geo-zips are recognized by Ingenix itself.

In one of its Customized Fee Analyzers provided to health insurers, Ingenix states that:

> Because the fee ranges in the Analyzer are based on the first three
> digits of your geo-zip, you need to assess where your locale stands
> in relation to others in this three-digit area. For example, many
> different three digit areas contain both urban and rural locales with
> different charging patterns. Use your judgment to determine how
> to interpret the fee range for your particular community.

169.    Aetna, UHG and their Co-Conspirators fail to exercise reasonable judgment in

determining whether the specific geo-zip applicable to a particular UCR determination is valid,

including whether it may contain "urban and rural locales with different charging patterns."

Instead, Aetna relies strictly on the geographic groupings provided by the Ingenix Database

without taking into account possible different charging patterns within each geo-zip. By doing

so, Aetna's UCR rates have no valid basis, do not comply with its plan documents, are

unreasonable, and violate applicable law.

**G.      Ingenix Further "Scrubs" Data Contributed By Data Contributions Like
        Aetna**

170. Once Ingenix receives data contribution forms from individual insurers (which those insurers themselves have already scrubbed), it further "scrubs" the pooled data to remove high end values but not low end outliers so as to lower the average price of ONET. Ingenix does so by using formulaic edits to identify purported statistical outliers and automatically removes them without factual basis or further investigation to determine if they are truly incorrect data points (and should be removed) or are simply valid high charges. Ingenix actually rejects data from data contributors if the claims are too high. The incorrect removal of valid high charges biases the upper percentile values downward.

171. Based upon these procedures, Ingenix then produces two cycles of uniform pricing schedules a year that include medical, surgical, anesthesia, and coding system service rates for a given geographic area and CPT code. Once Aetna receives these uniform pricing schedules, they are uploaded onto a computerized claims platform and automatically accessed to determine UCR rates for ONET.

172. Aetna's computer system automatically adjudicates claims for the vast majority of ONET claims. In other words, the Ingenix Database is automatically applied and no human intervention is necessary to evaluate the individual claims or the accuracy of the UCR provided by Ingenix.

**H. The Derived Data Is Flawed**

173. The "conversion factor data," which is used to develop the "derived" data, as referred to in the disclaimer are not the same as the actual charge data contributed to Ingenix.

174. Throughout the relevant time period, derived data has been used as the basis for UCR reimbursement for the majority of medical and surgical services nationwide. Derived data is not specific to a provider, patient or procedure (CPT code). Rather than setting out rates for healthcare services based on what providers actually charge in the marketplace, derived data uses

relative values assigned to each separate medical procedure multiplied by a conversion factor. As a result, there is no relationship between the derived data and what providers actually charge in the marketplace. Moreover, there is no scientific or other support for Aetna using derived data, through its reliance on the Ingenix Database, to set UCR rates for ONET.

175. Derived charges do not reflect usual, customary and prevailing charges by actual providers; rather, they are artificial prices that Aetna uses through its reliance on the Ingenix database to understate UCR.

176. The CPT Codes combined for derived data may represent very diverse procedures ranging from the most simple, including most of the charges, to the complex. Among other things, for derived charges to provide a valid basis for determining reasonable compensation levels, an adjustment must be made to account for distribution and spread of the common and less common procedures. This adjustment requires computation of standard deviations. This computation is not performed by Ingenix. Because Ingenix fails to consider that some CPT codes have a wider distribution of charges (i.e., standard deviation) than others, the derived percentiles understate the true upper percentile values for these CPT codes. This is a particularly significant problem because those CPT codes with a large number of observations tend to be the most common and are being grouped with less common procedures with fewer observations. Thus, the use of the derived data, which is improperly calculated, does not comply with Aetna's UCR definitions.

177. There is no review procedure in place at Aetna to verify the accuracy of the twice-yearly uniform pricing schedules generated by the Ingenix Database. Instead, the uniform pricing schedules created by the Ingenix Database are automatically relied upon to determine

UCR rates despite the fact that Ingenix actually informs insurance companies that it is not endorsing, approving or recommending use of it to determine UCR rates.

178.    Likewise, Ingenix cannot guarantee that all claims received for a particular CPT code service at any given time have been reported, much less accurately reported, by its contributing insurers.  Nor can Ingenix ascertain if the bills that are listed constitute the unnamed providers' usual and customary charges for the service, or, instead, a discounted rate required by the agreements one or more of the providers may have had with health care insurers.  While Ingenix requests that the CPT code billing data be accurate and complete, Ingenix remains "at the mercy" of its data contributors with respect to that result because there is no Ingenix mechanism to enforce or validate the client certificates.

179.    Ingenix has never tested its results to determine if its statistical conclusions bear any relationship to the actual high, low, median or 80th percentile of actual marketplace CPT code service rates charged;

180.    The end result of this cycle of collusion is a database that produces flawed uniform pricing schedules (effectively UCR rates) that systematically result in the under-reimbursement for ONET by Aetna and its Co-Conspirators.  The flaws in the database are pervasive and include:

(a)    questionable accuracy of underlying data;

(b)    no inquiry into whether all of the contributors are using the same criteria and coding (as well as aggregating) accurately and consistently;

(c)    a procedure whereby when there is not enough charge data to provide a statistically valid sample for a CPT code, Ingenix aggregates data from similar codes to create a large enough sample;

(d)     Ingenix itself combines geo-zips to determine what it considers to be a "sociodemographic region" and there is no verification for such regions;

(e)     Ingenix scrubs data but only removes outliers in a subjective manner, i.e., removes high-end values but not low-end outliers;

(f)     no appropriate statistical methodology (including sampling, data editing or data estimation) and as a result, data is inappropriate and biased downward;

(g)     the cumulated data that Ingenix has received has already been scrubbed by the individual contributors;

(h)     includes charges for procedures in non-comparable geographic area;

(i)     does not segregate procedures performed by providers of same or similar skill, but combines all CPT codes together;

(j)     combines ONET charges with "in-network" providers who have already agreed to a contracted rate – thus skews it downward;

(k)     fails to distinguish between the number of medical providers whose charges are reflected; and

(l)     does not edit any data that reflects negotiated or discounted charges by health providers in any given area.

181.    As the staff report of the Senate Committee on Commerce, Science, and Transportation, *"Underpayments to Consumers by the Health Insurance Industry"* (June 24, 2009) ("Senate Report"), concluded:

> Although the insurance industry represented the Ingenix data as accurate and objective, subsequent investigations have revealed that the reliability of the Ingenix data was fatally undermined by faulty statistical methods and a fundamental conflict of interest. . . .
> In testimony before the Senate Commerce Committee in March 2009, UnitedHealth Company's CEO publicly expressed his regret

that there was a conflict of interest inherent in his company's relationship with Ingenix. . . .

Evidence collected during private litigation and the New York Attorney General's investigation demonstrated how the less-than-arms-length relationship between Ingenix and the insurance industry led to reimbursement practices that cost American consumers billions of dollars. Insurers that contributed charge data to Ingenix often "scrubbed" their data to remove high charges. Ingenix then used its own statistical "scrubbing" methods to remove valid high charges from their calculations.

## VI.    THE CONSPIRACY TO CREATE AND FIX UCR RATES FOR THE PURPOSE OF UNDER-REIMBURSING FOR ONET

182.    In October 1998, the members of HIAA (including Aetna) agreed to sell the PHCS to Ingenix for an undisclosed amount. This was part of a plan by Ingenix to acquire a dominant position in the market for the provision of date services used to calculate UCR that included over 50 acquisitions. Prior to the PHCS purchase, in December 1997, as described above, Ingenix purchased the MDR database for derived data from Medicode, Inc. Ingenix would later merge those two databases to form what has herein been referred to as the Ingenix Database.

183.    Under the terms of the 1998 sale, HIAA and Ingenix agreed to have member companies participate on an ongoing Ingenix PHCS Advisory Committee, which would have input into what and how data were used by Ingenix, of which Aetna is a member. Additionally, all HIAA staffers who then worked on the PHCS were offered positions with Ingenix.

184.    Furthermore, accompanying the sale to Ingenix, HIAA and Ingenix agreed to a 10-year Cooperation Agreement which provided HIAA with continued input in the development and operation of the PHCS and provided for lasting co-mingling of the two entities in the form of a "Liaison Committee" to advise and evaluate Ingenix.

185. The Cooperation Agreement further provided that Ingenix would charge HIAA members 50% less than non-HIAA members for use of the database and that Ingenix would waive all fees for HIAA members that contributed data.

186. Ingenix, upon purchasing the PHCS, also entered into a Confidentiality Agreement mandating that it shield from disclosure the identity of entities (i.e., the Defendants and Co-Conspirators in this action) that had or would submit information for use in the database.

187. At the time of the sale of the PHCS to Ingenix, and as a condition thereto, UHG agreed to become a member of HIAA.

188. This chain of events serves to demonstrate how Defendants, through HIAA, conspired and agreed to create, expand, continue, promote and use the Ingenix Database to control and set UCR rates among and between Aetna and its purported horizontal competitors with the ultimate aim of setting ONET reimbursements at below market levels.

189. The agreement by Aetna and its Co-Conspirators with Ingenix to create and control the data used to establish UCR rates persists to the present.

190. Based on its agreement with HIAA in 1998 and continuing today, Ingenix gives discounts to Aetna and its Co-Conspirators for supplying it with the pricing data it scrubs to fabricate UCR rates.

191. UHG, Aetna and their Co-Conspirators each contract with Ingenix to ensure the creation and provision of UCR rates that they use to under-reimburse for ONET.

192. Under the agreements, UHG, Aetna and the Co-Conspirators provide pricing data to Ingenix. Ingenix in turn combines the pricing data it receives from Aetna and its Co-Conspirators.

193.     As a condition of obtaining uniform pricing schedules from Ingenix, Ingenix and the Defendants as well as their Co-Conspirators also enter into confidentiality and non-disclosure agreements whereby Aetna and its Co-Conspirator insurers agree not to re-produce any of the data submitted to Ingenix to any other group that seeks to develop a competing database for use in determining UCR rates for ONET.   These confidentiality and non-disclosure agreements restrain potential competition in the relevant market, and help conceal the agreement to fix prices as well as the role each Defendant and Co-Conspirator has in that agreement.

194.     The Ingenix Database is promoted as the "industry standard," and Defendants UHG and Aetna, as well as their Co-Conspirators, all use the same Ingenix-established UCR rates to reimburse for ONET.

195.     Aetna and its Co-Conspirators have ample opportunity to, and do, communicate through HIAA (now AHIP where Aetna is a board member) and regularly share UCR pricing information using Ingenix as a conduit and switch.

196.     In return, Ingenix gives each of the Defendants and Co-Conspirators a database of UCR rates based on their combined pricing data.

197.     Aetna and its Co-Conspirators know the data being provided to Ingenix is flawed and have communicated this fact to one another and Ingenix.

198.     Aetna and its Co-Conspirators likewise understand the UCR rates received from Ingenix are flawed and cause them to under-reimburse for ONET.

199.     Aetna and its Co-Conspirators continue to have input in type of data used by Ingenix and to jointly produce UCR data and UCR rates with and through Ingenix.

200. Aetna and each of the Co-Conspirators continue to use Ingenix-created UCR rates, essentially a centrally set pricing schedule, as the basis for calculating ONET reimbursement.

201. In or around 2005, HIAA considered adding data elements to data submitted and used by Ingenix to create UCR rates. Ultimately, Aetna and its Co-Conspirators understood and agreed that Ingenix would continue to base UCR rates on the same insufficient data points it had always been using.

202. Ingenix informs Aetna and its Co-Conspirators that it does not endorse, approve or recommend the use of its data for setting UCR rates to calculate ONET. Nonetheless, Ingenix provides Aetna and its Co-Conspirators a uniform pricing schedule (i.e., UCR rates) twice a year and promises them a 16:1 return on investment when using Ingenix. The only purpose of the uniform pricing schedule is to set and fix artificially low rates for ONET reimbursement.

203. Neither Aetna nor any of its Co-Conspirators attempted to set up a rival database despite Ingenix's profitability and the fact it is owned by a competitor. Ingenix's profit margins are 20%, compared to 10% for UHG as a whole. None of the Co-Conspirators attempted to disclose what the basis of their UCR rates were nor did they reveal that they, along with other horizontal competitors were supplying and using faulty data.

204. In order to prevent transparency and inhibit price competition, neither Aetna nor any of its Co-Conspirators disclose that they contract with Ingenix, provide Ingenix with data, and use UCR rates provided by Ingenix. They do not disclose how they and Ingenix arrive at UCR rates, or that Ingenix disseminates the UCR rates they all use for calculating ONET reimbursement. They do not disclose they have agreed not to provide data to potential competitors of Ingenix.

205. Aetna and its Co-Conspirators' scheme to manipulate UCR rates for the purpose of under-reimbursing for ONET is predicated, in part, on keeping the Ingenix Database, and its inherent flaws, a complete secret from the plaintiffs and their respective classes. As a result, Aetna and its Co-Conspirators actively conceal the true UCR rates from Provider and Subscriber Plaintiffs and their respective Classes, knowing the success of the scheme will be jeopardized if any one of them discloses the true UCR rates.

206. Rather than disclose the defective nature of the Ingenix Database and the participation by Aetna and its Co-Conspirators in creating flawed UCR rates, Aetna and its Co-Conspirators shield these facts from Provider and Subscriber Plaintiffs and their respective Classes and through misrepresentations and material omissions lead them to believe they are using fair and accurate UCR schedules to reimburse for ONET.

## VII. THE NEW YORK ATTORNEY GENERAL'S INVESTIGATION OF INGENIX

207. In a separate investigation into the flawed Ingenix Database conducted by the Attorney General of the State of New York, Andrew M. Cuomo, Mr. Cuomo concluded that "the Ingenix databases in fact under-reimburse consumers." State of N.Y. Office of the Att'y Gen., *Health Care Report: The Consumer Reimbursement System is Code Blue* (January 13, 2009).

208. According to the Attorney General's report, an analysis of the New York market showed that insurers that used Ingenix and other similar methods to determine UCR "systematically under-reimburse New Yorkers for doctor's office visits." *Id.*

209. "When extrapolated across the State and the country, it is fair to say that the Ingenix databases have caused Americans to be under-reimbursed to the tune of at least hundreds of millions of dollars over the past ten years." *Id.* Subscriber and Provider Plaintiffs, the Classes, and members of the Association Plaintiffs, of course, are primary victims of this under reimbursement scheme.

210. Moreover, Subscriber and Provider Plaintiffs and the Classes have been harmed by the pervasive under-reimbursement scheme in that their physician–patient relationships have been disrupted. According to the Attorney General:

> The responsible consumer reads the plan documents and sees a thicket of words. One term seems intelligible: the "usual and customary rate" of a similar physician for a similar service in a similar area. That sounds reasonable. The consumer makes the leap out-of-network and submits the bill to the insurer, only to be told the consumer will not be fully reimbursed because the doctor's charge exceeded the usual and customary rate. The fog of ignorance continues, thanks to the insurer. The physician-patient relationship is undermined, as the physician has been branded a charlatan whose bills are inflated. No one's interests here are advanced, except perhaps when next time, the consumer decides to stay in network for fear of what bills may accrue for out-of-network care. The interests advanced in that event are those of the insurer, whether by accident or design.

*Id.*

211. In addition to the negative impact that this disparagement has had on Subscriber and Provider Plaintiffs and the Classes, the disruption of the patient-doctor relationship has significantly harmed the Association Plaintiffs, which seek to safeguard this relationship.

212. In discussing where the blame for this under-reimbursement scheme should lie, the Attorney General explained: "[T]he fault cannot be laid on Ingenix alone. All industry members have benefited unfairly at the expense of consumers over the past ten years, and they continue to benefit unfairly from a rigged system day after day." *Id.* Aetna, as a significant beneficiary of the Ingenix Database, should therefore be held accountable for its use of the database to under-reimburse the Subscriber and Provider Plaintiffs and the Classes.

213. Simultaneous with the release of the NYAG's findings, UHG, the owner of the Ingenix Database, settled claims centering on the Ingenix Database and UCR reimbursements with the NYAG and the AMA, among others. As part of the NYAG settlement, UHG agreed to

pay the NYAG approximately $50 million. These funds are earmarked for the creation of an independent non-profit organization, which will own and operate a new database to be used for UCR determinations. This new database will be designed to take the place of the Ingenix Database.

214. Although the first, UHG was not the only insurer to settle claims with the NYAG concerning the use of Ingenix data. Indeed, the use of Ingenix is so widespread that many insurers, including Aetna, settled similar claims with the Attorney General in what has become an historic effort to overhaul the nation's out-of-network healthcare reimbursement system. Namely, on January 15, 2009, the NYAG announced a settlement with Aetna for $20 million; on February 4, 2009, the NYAG announced a settlement with MVP Health Care, Inc. for $535,000; on February 10, 2009, the NYAG announced a settlement with Independent Health for $475,000 and HealthNow New York, Inc. for $212,500; on February 17, 2009, the NYAG announced a settlement with CIGNA for $10 million; on February 18, 2009, the NYAG announced a settlement with WellPoint, Inc. for $10 million; on March 3, 2009, the NYAG announced a settlement with Guardian Life Insurance Company of America for $500,000; and on March 5, 2009, the NYAG announced a settlement with Excellus Health Plan for $775,000 and Capital District's Physician Health Plan for $300,000. The funds from each of these settlements will also be paid to the qualified, non-profit organization charged with establishing the new, independent database to determine fair out-of-network reimbursement rates.

215. In a press release issued by Aetna concerning its $20 million settlement with the NYAG, Donald Liss, Aetna's Senior Regional Medical Director, said: "Aetna shares and welcomes Attorney General Cuomo's interest in transparency, and we commend the Attorney General and his staff for establishing an independent process that is transparent and helps

consumers make more informed health care purchasing decisions. We also recognize the Attorney General's concern about the conflicts of interest inherent in the Ingenix databases. We welcome a new database to be developed and maintained by a trusted and independent entity." Notwithstanding this acknowledgment, Aetna still uses the Ingenix Database to calculate UCR rates. In fact, according to the NYAG, UHG and Aetna together contributed 70% of the billing information for the Ingenix system.

216. Congress also is actively investigating the use of the Ingenix Database in setting UCR amounts. Recently, the Senate Committee on Commerce, Science, and Transportation held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?" The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers for ONET; specifically, how the industry calculates the UCR rates for Nonpars.

217. At the March 31, 2009 hearing, Senator and Committee Chairman John D. Rockefeller, IV, speaking for the majority of the Senate Committee, explained why they believed the insurance industry's practices were "deceptive." Mr. Rockefeller noted that more than 100 million Americans paid for health insurance that would give "them the option of going outside of their provider networks for care," but that the insurance companies were not living up to their end of the bargain:

> Let's be very clear about this. The insurers aren't letting their policyholders see non-network doctors out of the goodness of their hearts. Consumers are paying for this option - through higher premiums and higher cost sharing. There are many reasons American consumers decide to pay the extra money for health insurance with an out-of-network option. One New York consumer we heard from last week, Dr. Mary Jerome, said she paid extra for the "peace of mind" that she could get the best care available when she really needed it.

What we learned at our first hearing was that while consumers held up their side of the bargain, the insurers did not. The insurance industry promised to base their out-of-network payments on what they call the "usual, customary, and reasonable" cost of medical care in a particular area. Thanks to the New York investigation and other lawsuits, we now know that the insurance companies were not delivering what they promised.

218. Senator Rockefeller specifically addressed the New York Attorney General's findings as to the insurance industry's use of the Ingenix's Database to pay far less than the UCR amounts:

In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates. A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates. Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers. For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying. The source of the skewed data was Dr. Slavitt's company, Ingenix.

219. In light of the insurance industry's fraudulent use of the Ingenix Database in setting UCR rates, the Senate Committee is currently evaluating whether more federal oversight and regulation of the insurance industry is necessary. For now, however, the only avenue of redress for insureds and their health care providers, such as Subscriber and Provider Plaintiffs and the Classes, is through the courts.

## VIII. AETNA'S ADDITIONAL PATTERN OF WRONGDOING

### A. Aetna's ER Reimbursements

220. In all of the states in which Aetna operates, it is obligated to fully reimburse Aetna Members for use of out-of-network emergency services that satisfy a prudent layperson standard regardless of the type of insurance plan they have (e.g., POS, PPO, HMO).

221. Under the prudent layperson standard, Aetna must fully pay for ER services, even if they subsequently are determined not to constitute an emergency, so long as the Aetna Member reasonably believed the condition to be emergent at the time the Member sought ER care. The standard precludes reliance on a medical professional's diagnostic conclusion at the time of discharge because the medical professional is not a prudent layperson and has information unavailable to the prudent layperson at the time ER care was sought.

222. For many Aetna Members, Aetna denied reimbursement for ER services that were properly considered emergent under the prudent layperson standard.

223. Aetna EOBs failed to disclose material information to Aetna Members when Aetna denied or reduce payment for ER services.

### B. Aetna's Unauthorized Multiple Procedure Reductions

224. As a further method of reducing reimbursement for ONET, Aetna automatically reduces coverage for multiple procedures performed on the same day or during the same operative session, even if the additional procedures are unrelated to what Aetna considers to be the initial procedure or involve separate surgical incisions. By so doing, Aetna makes reimbursement determinations that dramatically reduce amounts for those so-called secondary procedures in violation of the terms of their contracts of insurance.

225. Aetna plans do not disclose or authorize payment reductions based on Aetna's multiple surgical reduction policy ("MSR"), pursuant to which it reduces benefits when there are multiple surgical procedures performed on the same day. ERISA does not permit exclusions or limitations to be applied to reduce benefits that have not been properly disclosed to members. Subscriber and Provider Plaintiffs were improperly harmed by Aetna's use of these undisclosed multiple surgical rules to reduce their reimbursements in violation of its obligations under ERISA and common law.

## C.     Deductible And Out-Of-Pocket Limits

226.     Aetna's obligation to pay health benefits arises once a beneficiary has satisfied his or her annual deductible amount, which is specified in the plan documents.  In addition, once a Member reaches the plan's specified out-of-pocket limit for the year, Aetna's obligation to pay benefits increases.  The out-of-pocket limit is referred to in a member's plan as the "coinsured charge limit" and will be so referred to here.  The coinsured charge limit means that once a Member's allowed amounts for services, in total, reaches the coinsured charge limit, as specified in the plan, the Member has no further obligation to pay any share of coinsurance.  So, for example, when the total of allowed amounts is below $1,000, Aetna is obligated to pay 80% of UCR, and a Member is obligated to pay coinsurance of 20%.  When a Member's allowed amounts for a calendar year total at least $1,000 or more, Aetna must pay 100% of UCR, and a Member's coinsurance obligation concludes for that calendar year.

227.     By the terms of the EOC, the allowed amount is the lesser of the provider's actual charge and the UCR.  Any amount of the billed charge above UCR does not count toward either the deductible or the coinsurance charge limit.  If the UCR is determined improperly, then the amounts counted toward the deductible and/or the coinsurance charge limit based on such UCR are also too low.

228.     Aetna calculated the deductible and the coinsurance charge limits using inappropriately reduced UCR amounts, and failed to credit the difference between the actual charge and the allowed charge to the deductible or to the coinsured charge limit.  Aetna is therefore paying too little of the claim (80% of the improperly reduced UCR), while the Members remain financially responsible for too large a portion of the claim (20% of UCR, plus the difference between the billed amount and the allowed charge).

## D.     Failure to Pay Interest

229.    Aetna has improperly reduced its reimbursements as a result of the violation of the terms and conditions of its healthcare plans, and it owes restitution of the improperly denied amounts and interest on such amounts.

## IX.    PLAINTIFFS WERE SYSTEMATICALLY UNDERPAID BY AETNA

### A.    Subscriber Plaintiffs Were Systematically Underpaid By Aetna

#### 1.    The Cooper Plaintiffs' Group Health Plans

230.    Subscriber Plaintiffs Werner, Franco, Smith and Whittington's benefits were determined under standard Aetna healthcare plans governed by ERISA.  Subscriber Plaintiff Cooper's benefits were determined under Aetna SEHP in New Jersey.  Plaintiff Samit's individual plan was determined under an identical regulation applied to SEHP plans in New Jersey.  SEHP plans are governed by ERISA and are also subject to a New Jersey SEHP regulation, N.J.A.C. § 11:21-7.13(a) (the "SEHP Regulation").  Individual plans are governed by the New Jersey Regulations but are not subject to ERISA.

231.    Subscriber Plaintiffs allege, as detailed herein, that Aetna relied on flawed and inappropriate data for making UCR determinations for Nonpar benefits as a result of its use of the Ingenix Database.  By relying on such improper data for making UCR determinations, Aetna breached its duties as set forth in its ERISA-governed plans and, as a result, it should be required to reimburse its Members who received reduced Nonpar benefits up to billed charges.

232.    With respect to Cooper and Samit, the New Jersey Regulations impose additional requirements beyond those required under ERISA.  New Jersey adopted the SEHP and individual plan Regulations in an effort to ensure that all Members of such plans, who were not in a position to negotiate the best benefit packages from insurers, would receive a minimum level of benefits.  The New Jersey Regulations specified, among other things, that Aetna's UCR determinations be equal to or greater than the 80th percentile of the most updated version of the

Ingenix database. It also requires Aetna to pay out-of-network hospital services based on billed charges. In incorporating the Ingenix database into the New Jersey Regulations applicable to small employer plan and individual plan Members, the New Jersey Regulators were not told of the inherent flaws and inadequacies of the Ingenix database.

233. For Members of the New Jersey small employer plans, Aetna breached ERISA by violating its obligations under the SEHP Regulation, including, as detailed below, by imposing other reductions that went beyond the reported numbers from the 80th percentile of the Ingenix Database (such as reductions for performing multiple procedures on the same day), and failing to pay 100% of billed charges for hospital services. Moreover, Aetna intentionally manipulated its contributions to Ingenix for use in the Ingenix Database to achieve reported numbers that were lower than what should have been reported and used for setting UCR under the New Jersey Regulation, thereby violating both ERISA and RICO. As to individual plan Members (such as Carolyn Samit), who are not governed by ERISA, Aetna violated RICO.

## 2. Subscriber Plaintiff Cooper's ERISA Plan for New Jersey Small Employer Members

234. From November 2003 through September 30, 2005, Cooper was a beneficiary in her husband Justin Cooper's group plan through his employer, Rosenberg & Associates, which was fully insured and administered by Aetna. Pursuant to the terms of the plan, both she and her husband were covered as Aetna Members.

235. Because Cooper's health insurance was provided as an employee benefit by a private employer, Cooper's claims are brought under ERISA. In addition, because Cooper was insured by a small employer plan under New Jersey law, Aetna is also required to comply with the SEHP Regulation in providing her benefits. Cooper was entitled to seek medical care from

Nonpar providers pursuant to her SEHP EOC. In her EOC, Aetna defined the use of UCR to establish reimbursement levels for Nonpar ps as follows:

> With respect to Network services and supplies, the negotiated agreement. With respect to non-network benefits, an amount that is not more than the usual and customary charge for the service or supply as We Determine, based on a standard approved by the Board. The Board will decide a standard for what is Reasonable and Customary for the N on-Network benefits under the contract. The chosen standard is the amount which is most often charged for a given service by a Provider within the same geographic area.

236.    The term "standard approved by the Board" in the preceding paragraph refers to the Nonpar regulation promulgated by the New Jersey Small Employer Health Board ("SEH Board"), codified in the New Jersey Regulation. The New Jersey Regulation requires insurers to pay Nonpar hospital services based on the billed charge and Nonpar medical services at the 80th percentile of the most updated Ingenix PHCS fee profile. The SEH Board imposes other requirements, including requiring coverage of certain services. The New Jersey Regulation suspends preauthorization requirements for Nonpar services rendered to New Jersey small plan Members.

237.    Throughout the Class Periods, Cooper and her husband received UCR benefit reductions from Aetna. For example, on January 3, 2005, Justin Cooper received healthcare services from a Nonpar, for which the provider billed $4,000. In addition, Justin Cooper received two treatments of pharmaceutical drugs, for which the Nonpar provider billed, respectively, $315 and $740. Thereafter, a claim was submitted to Aetna on behalf of the Coopers, in compliance with the terms of their healthcare plan, seeking payment of benefits as required under the Aetna contract.

238.    The Coopers subsequently received by mail an EOB from Aetna dated May 13, 2005, to report on its payment of benefits concerning these healthcare services. In the EOB,

Aetna reported that it had excluded $499 from the billed amount for the first service, thereby leaving an amount allowed of $3,501. Aetna further excluded $280 from the first drug, allowing only $35, and excluded $490 from the second drug, allowing only $250. The Coopers remained liable for the unpaid portion of the bill. After reducing the benefit further to take into account the Coopers' deductible and coinsurance for using Nonpar services, including $450 for a cardiovascular stress test that was allocated to the deducible, Aetna paid only $2,265.20 of the total bill of $5,505.00. The EOB specified that the "total expenses submitted" by the Coopers was $5,505.00, Aetna's "total payment" was $2,265.20 and "your total responsibility" (referring to the Coopers) was $3,239.80.

239. To explain the excluded expenses totaling $1,269, Aetna used Code 0120, which was defined in the EOB as follows: "This portion of the expense which is greater than the reasonable and customary charge is not covered under your plan."

240. On the front page of the EOB, Aetna stated that if the Coopers had any questions about the claims they should contact Aetna at www.aetnanavigator.com. That is a secure website provided to Aetna's Members, including the Coopers, for obtaining additional information about the benefits and services provided by Aetna. Aetna's "Glossary" of terms on the website defined "UCR" and "Customary and Reasonable" costs for Nonpar providers. All Members were told that Aetna's UCR determination was purportedly based on "the amount customarily charged for the service by other providers in the same geographic area," and that, in determining a "reasonable charge" for services, Aetna would determine "the prevailing charge level, made for the service or supply in the geographic area where it is furnished," after taking into account "factors such as the complexity, degree of skill needed, type or specialty of the Provider, range of services provided by a facility, and the prevailing charge in other areas in

determining the Reasonable Charge for a service or supply that is unusual or is not often

provided in the area or is provided by only a small number of providers in the area."

241.    On the back of the EOB, Aetna stated that the Coopers "are entitled to a review

(appeal) of this benefit determination if you have questions or do not agree." Aetna stated this

could be done either by telephone or in writing, and the member should include "any comments,

documents, records and other information you would like to have considered, whether or not

submitted in connection with the initial claim." Aetna, however, did not disclose what type of

information, if any, would be considered as part of a review of a UCR determination. The EOB

further stated that "you may also review documents relevant to your claim." Yet, Aetna did not

have access to material aspects of the claim determination, including the underlying

methodology and data used by Ingenix to derive the numbers that Aetna used as UCR.

### 3.    Cooper's Exhaustion of Administrative Remedies

242.    Following Aetna's nonpayment, Justin Cooper's provider, Manhattan Nuclear

Cardiology, appealed this determination to Aetna by letter dated September 14, 2005. In its

letter, the provider stated: "Our charges are not over and above usual and customary for this

area." It further pointed out that "[t]he patient will be responsible for any amounts you do not

allow."

243.    By letter dated September 26, 2005, Aetna denied the provider's appeal on behalf

of Justin Cooper. Aetna's appeal denial stated:

> Based on our review of available information, including the
> member's policy, the company is not modifying its previous
> determination. The above listed claim was previously processed
> correctly according to the member's QPOS plan. According to
> Aetna's guidelines, the usual and customary rate for A4641 is
> $125.00; for J1245 is $35.00, for 78492 is $3501.00 and for 93015
> is $450.00. A total of $1970.80 was applied to the member's out-
> of-network deductible and co-insurance. Therefore, no additional
> payment will be made with respect to the above listed claim(s).

244.    Contrary to ERISA and federal regulations, Aetna did not treat the provider's appeal as required and did not provide a "full and fair review." Aetna did not disclose the fee schedule used, nor did it address the basis for the appeal the provider had provided. Aetna did not send a copy of the denial to the member. Finally, Aetna failed to apply, disclose, or even refer to the SEHP Regulations.

245.    Pursuant to ERISA regulations, an appeal decided by a process that violates procedural safeguards is deemed exhausted.

246.    On November 8, 2005, the Nonpar billed the Coopers for the total unpaid portion of the bill, or $3,239.80. In a comment printed on the bill the Coopers were told: "We have submitted the claim to your insurance company and per your insurance company the balance is your responsibility."

247.    For undisclosed reasons, Aetna sent Manhattan Nuclear Cardiology a new EOB dated April 2, 2007, some 18 months after its denial of the appeal. The new EOB stated: "This is an adjustment of a previously processed claim as a result of a claim project request. This amount represents payment of a balance bill in full."

248.    There was no stated connection between the April 2007 payment due to a "claim project request" and the denial of the appeal in September 2005. As a result, this subsequent payment does not alter the fact that Aetna had issued a final denial of the appeal that had been filed with respect to Cooper's claim and that this appeal had been exhausted.

### 4.    Cooper's Other Nonpar Benefit Reductions

249.    During the first half of 2005, Cooper also received medical care from Nonpar providers, and subsequently submitted claims for benefits to Aetna. Aetna responded by mailing her EOBs, including an EOB dated June 1, 2005, which reflected a billed amount of $285 for a particular service, for which Aetna excluded $106.04, citing Code 0120 to explain that the

provider's bill was "greater than the reasonable and customary charge." In another EOB dated August 17, 2005, Aetna responded to an additional claim for benefits for services received by the same Nonpar, reporting that it was excluding $10 from the bill of $285, again explaining by reference to Code 0120 that the bill was "greater than the reasonable and customary charge."

250. Cooper received further services from other Nonpars during 2005, for which she submitted claims for benefits to Aetna. Aetna sent additional EOBs to the Coopers dated, respectively, July 6, 2005, August 17, 2005, and August 25, 2005. Each of these EOBs reported that certain expenses had been excluded, again using Code 0120 to report that the billed charges were "greater than the reasonable and customary charge." In these EOBs, Aetna excluded $42.76 from a $150 bill; $4.15 from a $49.99 bill; and $1.03 from a $72.45 bill.

251. Each of the EOBs contained the total amount that remained the Coopers' "responsibility," which included the amount that had been excluded by Aetna as in excess of UCR. Further, each EOB referred the Coopers to Aetna's website, www.aetnanavigator.com for answers to their questions and provided the same summary for potential reviews or appeals of benefit determinations.

252. Under her SEHP Plan, Cooper had an individual $1,000 annual deductible for Nonpar services. Her individual annual out-of-pocket limit was $3,000 for ONET. Under the plan, the Coopers' annual family deductible for Nonpar Services was $2,000, while their family out-of-pocket limit was $6,000. The Coopers' coinsurance for Nonpar services (once the deductible was met) was 30% of the UCR. If and when the Coopers satisfied the individual or family out-of-pocket limit, Aetna was required to pay 100% of UCR. During the Class Periods, Cooper and her husband were financially responsible for unpaid amounts in excess of the UCR determined by Aetna.

253. Cooper has made numerous out-of-pocket payments to Nonpars that were in excess of the applicable deductible and coinsurance under her Aetna plan. Cooper paid these sums as a result of Aetna's improper Nonpar Benefit Reductions as detailed herein.

254. Cooper seeks to represent a class of SEHP Members subject to the New Jersey Regulation on whose behalf Aetna underpaid for all hospital and medical services (including surgery, ER, hospital, physician, laboratory, anesthesia, chiropractic, mental health, dental, pharmaceutical, or other medical services and supplies) rendered by Nonpars (or other providers considered Nonpar by Aetna) through the Class Periods. She seeks unpaid benefits and other relief for herself and the New Jersey SEHP Class," as defined below.

### 5. Plaintiff Werner's ERISA Plan

255. During the Class Period, Werner was a member of a group plan governed by ERISA. Her group plan was sponsored by her employer, the American Psychiatric Association, and was fully insured and administered by Aetna. Werner was in a family plan along with her daughter Hannah and her husband Geoffrey.

256. During 2006 and 2007, Werner received medical services from Nonpars for which Aetna determined UCR below her provider's billed charges, amounts for which Werner is financially responsible. With respect to these services, Werner has made payments to her Nonpar providers totaling at least $6,233.50. Of that total, Werner paid out-of-pocket at least $2,973.60 that was attributable to the unpaid difference between UCR and the provider's billed charge.

257. Werner received services on, respectively, February 1, 8, 15 and 22, 2006. The Nonpar provider billed $135 for each service. Aetna mailed Werner EOBs dated April 4, 2006 relating to each service. The EOBs reflected that Aetna excluded $15 for each service as being in excess of UCR, leaving an allowed amount representing UCR of $120. Then in each case

Aetna paid only 60% of the UCR amount, or $72. The EOB further identified "Total Plaintiff Responsibility" as $252, which represented, for each of the four services, the $48 coinsurance (40% of the UCR amount of $120), plus the $15 difference between the billed charge ($135) and UCR ($120). In each instance, Aetna's EOB used the following remark to explain its payment:

> Your plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided. In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas. Aetna's determination of the prevailing charge does not suggest your provider's fee is not reasonable and proper. Your provider may bill you for this amount. If there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number, or by writing to the address, shown on this statement.

258. Aetna's EOB informed Werner that she had already satisfied her individual annual deductible of $300. On each EOB, the provider's entire charges were identified as the amount the Nonpar Provider "May Bill You," without subtracting the amount of Aetna's payment from such field. Pursuant to its uniform policy, all of the billed amounts in excess of UCR (e.g., $60 total for the four February 2006 visits described in the preceding paragraph) should have been, but were not, attributed towards Werner's out-of-pocket maximum.

259. Aetna's EOB also referred Werner to its website, saying: "Questions? Contact us at aetnanavigator.com."

260. Werner received similar medical treatments with the same Nonpar billing and the same UCR reductions reflected in EOBs from Aetna on numerous occasions, including EOBs with the following dates: April 1 and 25, 2006, May 13, 2006, June 9, 2006, July 25, 2006, August 19, 2006 and September 14, 2006. For those dates, Aetna collectively excluded coverage for $540 for Nonpar services, leaving Werner financially responsible for that amount in addition to her co-insurance.

261.     Werner received further treatments from the Nonpar provider in September 2006. In an EOB from Aetna dated October 17, 2006, Aetna began to identify the UCR for this treatment as $72 (instead of as $120, as formerly was the UCR). Aetna then calculated its share of UCR as 60% of $72, or $43.20. The reduced UCR of $72 left Werner financially responsible for the unpaid $63 per treatment, along with 40% of the UCR ($72) or $28.80. As to each $135 charge, therefore, Aetna considered itself responsible for $43.20, and Werner responsible for $91.80. The "Total Patient Responsibility" for the four services at issue was reported in the EOB as $367.20, which remained Werner's financial responsibility.

262.     Werner continued to receive ongoing treatment from the Nonpar provider, who in October 2006 increased the billed charge to $140 per treatment. According to various EOBs, Aetna mailed to Werner in the fall of 2006, Aetna again determined UCR of $72, disallowing $68 of each $140 charge as being in excess of UCR, using the same explanatory code which represented that the billed charges exceeded "prevailing" rates. Some examples of EOBs reporting such UCR reductions are dated, respectively, October 17, 2006, January 20, 2007, February 14, 2007, April 24, 2007, May 8, 2007, June 20, 2007, and July 19, 2007. Each such EOB contained the identical explanation for Aetna's UCR reduction.

263.     Werner also received UCR determinations from Aetna for other services. On March 21, 2006, for example, Werner and her minor child both received dental services from a Nonpar dentist. In an EOB dated April I, 2006, Aetna determined UCR regarding three of the dental services provided for Werner, leaving $32 unpaid as allegedly in excess of a reasonable charge. In the same EOB, Aetna determined UCR for three services rendered to Werner's minor child, leaving $20 unpaid as allegedly in excess of a reasonable charge. The total amount of $96

was identified by the EOB as "Total Patient Responsibility." To describe its UCR determinations, Aetna used the following remark:

> You are covered for expenses at a level set by your plan sponsor. The charge for services exceeds that amount. You are responsible for the amount indicated. If you have additional information we should consider, please let us know.

### 6. Werner's Exhaustion of Administrative Remedies

264. Werner unsuccessfully appealed Aetna's UCR reductions. These internal appeals were fully exhausted, with Aetna refusing to change any of its prior Non- Par payments.

265. On January 29, 2007, Werner appealed Aetna's UCR determinations for services she received from Nonpar providers from November 1, 2006 through December 27, 2006 referred to in her EOB dated January 20, 2007. Her appeal letter referred to Aetna's "Plan Design and Benefits" which states that the Member must pay 40% for Nonpar office visits, with Aetna paying 60% of such visits. Werner complained that Aetna's payments were inconsistent with the provisions of her plan limiting her financial responsibility to 40% coinsurance for the office visit. Werner separately complained of Aetna's policy reducing payment to Nonpar licensed social workers ("LCSWs") and psychologists. Werner attached to her appeal a copy of Aetna's new payment policy titled "Change in Reimbursement Policy for Nonpar Behavioral Health Providers for PPO-based and HMO/QPOS plans," which she had obtained from perusing the internet and which states:

266. Beginning with dates of service on or after September 1, 2006, in PPO-based and HMO/QPOS plans, Aetna is changing our reimbursement policy for Nonparticipating behavioral health providers. This change ties reimbursement to the level of the licensure of the clinician and will result in a change in Aetna's reimbursement for Nonparticipating psychologists and

social workers. This change will not affect psychiatrists and does not apply to the Medicare Advantage product.

267. Effective September 1, 2006, this change will reduce the allowable amount to: 80% of Usual and Customary Rate (UCR) for psychologists 60% of UCR for social worker Reimbursement will be further subject to applicable plan deductible, coinsurance and/or co-payment.

268. This new policy makes our approach to reimbursement for Nonparticipating behavioral health providers consistent with our approach for Aetna participating behavioral health providers.

269. In a letter dated May 9, 2007, Aetna denied Werner's first appeal. Aetna stated that it was "upholding the previous benefit decision to deny the portion of your claim that exceeds what we have determined to be the reasonable charge." Aetna claimed that the rate paid to Werner's Nonpar "was based on Reasonable Charges taking into consideration her type of specialty and her licensure." It stated: "In order to determine the reasonable charge, we refer to statistical profiles of physicians' charges for the same or similar services in a geographic area."

270. In explaining its decision denying her appeal, Aetna stated that "[t]he benefit payment" for the Nonpar service "will be determined according ... to the reasonable charge defined in the Glossary of the Booklet-Certificate," adding that the Glossary defines "Reasonable Charge" as follows:

> Reasonable Charge:
>
> Only that part of a charge which is reasonable is covered. The reasonable charge for a service or supply is the lowest of:
>
> - the provider's usual charge for furnishing it; and
> - the charge Aetna determines to be appropriate, based on factors such as the cost of providing the same or a similar

service or supply and the manner in which charges for the
service or supply are made; and

- the charge Aetna determines to be the prevailing charge
level made for it in the geographic area where it is
furnished.

In determining the reasonable charge for a service or supply that is:

- unusual; or
- not often provided in the areas; or
- provided by only a small number of providers in the area;

Aetna may take into account factors, such as:

- the complexity;
- the degree of skill needed;
- the type of specialty of the provider;
- the range of services or supplies provided by a facility; and
- he prevailing charge in other areas.

271.    Aetna attempted to justify its first level denial of Werner's appeal regarding the

reduction in UCR for psychologists and social workers by stating:

> Effective with dates of service September 1, 2006 and after, a three
> tiered approach has been implemented for determining the allowed
> amount for out-of-network behavioral health services rendered by
> Nonparticipating providers.  This approach takes into consideration
> the licensure and/or education of the rendering provider.  As your
> Attachment A shows, Aetna changed its non-participating
> behavioral health provider reimbursement policy, which is not
> directly tied to any particular member plan design.  This change in
> policy is not a change to your plan.  The amount of $434 that you
> seek does not take into consideration the above information.

272.    Aetna's first level appeal denial further stated: "We are sorry our determination

could not be more favorable; however, we are bound by the terms of the contract."

273.    Aetna's first level appeal denial also stated that "[a]t your request, we will give

you free of charge access to copies of all documents, records, and other information about your

claim for benefits, including the specific rule, guideline, protocol, or other similar criterion that

was used in making the decision, and the names of any clinical reviewers if applicable."

Werner's EOC contains the same representation (which is required by ERISA).

274.    On May 17, 2007, Werner requested a second level appeal, contesting Aetna's determination of UCR.  Werner contested how Aetna computed UCR, stating: "Aetna had failed to provide evidence that the reimbursement that they are allowing ($72) is in fact a reasonable reimbursement for the service provided in the Washington, DC metro area."

275.    Werner also disputed Aetna's reduction of UCR for LCSW services by 40%, stating: "Aetna has failed to demonstrate that this new reimbursement policy for non network behavioral health providers is a reasonable reimbursement rate.   The fact that it has been implemented for in-network providers is not a demonstration that the methodology is reasonable."

276.    The second level appeal challenged Aetna's failure to notify Members of the mental health policy change, calling it "a material change to my healthcare policy and one that neither my plan nor its participants received notification of," and adding that "I only found your notice after extensive web research."  Werner's second level appeal further challenged Aetna's "sharp reduction in reimbursement for non network behavioral health services."

277.    Werner's second level appeal specifically requested copies of the following documents:

- Disclosure of all documents related to how Aetna calculates the reasonable charge for the type of service provided and licensure of the provider (LCSW) in the Washington, DC area, including market analysis, comparative data, and methodology in determining what is a reasonable charge;

- all relevant documents that Aetna sent to plan Members notifying plan Members of the change in the UCR determination for non network behavioral health providers including letters; distribution methods, dates, etc.;

- documentation from the master plan of the American Psychiatric Foundation (both 2006 and 2007) that demonstrates disclosure of your new reimbursement policy for non-network behavioral health providers; and

- data on Aetna's behavioral health network in the Washington, DC metro area, the number of providers that participate in the network by licensure, including the percentage of providers in the area that participate in Aetna's network.

278.    In violation of ERISA, Aetna did not provide Werner with the information she requested in her second level appeal.

279.    On June 6, 2007, Aetna denied Werner's second level appeal, stating as follows:

> Aetna determines the extent of the plan's liability through use of the Ingenix Prevailing Health Care Charges System (PHCS). The PHCS is a statistical profile of provider's charges that has been developed for this purpose. The Ingenix PHCS collects provider charge data from more than 150 major contributors including commercial insurance companies and third party administrators. Data is collected for all 50 states, the District of Columbia, Puerto Rico and the Virgin Islands. Since physicians' fees reflect differing costs of doing business in various parts of the country, the PHCS recognizes these regional differences and uses the first three digits of the United States Postal Service zip codes to divide the charges into population areas based on cost-similar and geographically adjacent areas. There are 281 zip code areas for surgery and anesthesia and 334 for medicine, pathology and laboratory.
>
> Fee information for the most recent twelve (12) month period is used as the basis for the profile which is the basic tool for reasonable and customary (R&C) determinations. The profile is updated semi-annually. At the time of the update, the latest information is released to all claim-paying personnel.

280.    Aetna determines reimbursement for Nonparticipating behavioral health providers as follows:

- Psychologist (allowed at 80% of the Reasonable and Customary/recognized charges)

- Social Workers, Licensed Profession Counselors, Marriage and Family Counselors, Psychiatric Nurse (allowed at 60% of the Reasonable and Customary/recognized charges)."

281.    Aetna's second level appeal denial stated that "[a]t your request, we will give you free of charge access to copies of all documents, records, and other information about your claim

for benefits, including the specific rule, guideline, protocol, or other similar criterion that was used in making the decision" without acknowledging that Werner had, in fact, previously and specifically requested such documents. Aetna's second level appeal denial also failed to acknowledge that Aetna had, in fact, not provided documents that were specifically requested by Werner during the appeal process.

282. Aetna's second level appeal denial stated that this was Aetna's "final decision."

283. On July 2, 2007, Werner again requested documents from Aetna, including the "documents, records, and other information about my claim, specific rules, guidelines, protocols, and other similar criteria that were used in making the decision." Plaintiff's July 2, 2007 letter referred to Aetna's second level appeal denial and asked for the "data from your PHCS system as you reference in your [second level appeal denial] letter."

284. Once again, Aetna failed to provide Werner with the requested documents that it twice claimed it would furnish "free of charge" upon request.

285. Aetna's appeal denials withheld material information, as detailed herein, that Aetna was obligated to disclose as a fiduciary. First, Aetna did not disclose to Werner, until its final denial, that it had used Ingenix PHCS data to determine UCR. Second, Aetna did not disclose that it had contributed pre-edited data to Ingenix and that Ingenix further corrupted the data reducing amounts in the Ingenix Database. Third, Aetna did not disclose that the Ingenix data came with a disclaimer that the data does not represent UCR, which disclaimer Aetna violated in representing to Werner that the Ingenix data was a "basic tool" reflecting UCR. Fourth, Aetna did not provide the relevant evidence specifically requested by Werner during her appeals in violation of ERISA. Fifth, Aetna falsely asserted that its tiering policy was consistent with Aetna's definition of UCR. Sixth, Aetna falsely asserted that its tiering policy was not a

material change to Werner's plan. Seventh, Aetna falsely asserted that it was not required to provide advance notification to employers and Members, or make changes to plan documents, before adopting the UCR tiering reductions for behavioral health.

286. Following her unsuccessful appeals to Aetna, Werner contacted the Bureau of Insurance for the Commonwealth of Virginia ("VA DOI") to complain about Aetna, and attached copies of her appeals.

287. On July 6, 2007, the Managed Care Ombudsman for the Commonwealth of Virginia, Thomas Bridenstine ("Bridenstine"), sent Werner a letter stating that he had reviewed information supplied by Aetna and "there was no consistent explanation that clearly explained how your claims were paid."

288. In his July 6th letter, Managed Care Ombudsman Bridenstine also stated:

> Although you were not successful in your appeal efforts, you provided a significant amount of information and I regret that Aetna was unable to provide a reasonable explanation for the methodology it used to determine the amount of money it would pay for your claims.

289. On July 31, 2007, Aetna's Overpayment Recovery Unit in New Albany, Ohio sent letters to both Werner and to her Nonpar. Aetna's letter to Werner (from Cindy Cook) informed her that Aetna's original UCR of $120 for four dates of service in October 2006 was too high, and the UCR should have been $72, and paid at 60%, or $43.20. The letter found that Aetna should have paid a total of $172.80, rather than the $395.30 it paid. It informed her that her coinsurance obligation for the four services was $115.20. It advised her that if she did not refund the overpayment of $222.50 to Aetna by August 21, 2007, "we will refer the overpayment to a recovery service."

290.    Aetna's Overpayment Recovery Unit disregarded the fact that Werner had already satisfied her out-of-pocket maximum as of October 11, 2006, such that she did not owe any further coinsurance on Nonpar services rendered after October 11, 2006.

291.    Aetna sent Werner's Nonpar a similar letter dated July 31, 2007, which claimed an overpayment for a date of service in February 2007, for which reduction to 60% of the initial UCR had not been made.

292.    On September 11, 2007, Werner wrote to Cook and informed her that because Aetna's claims payment practices were being considered by the VA DOI, she would not consider refunding money until VA DOI's investigation was concluded.

293.    On September 14, 2007, Werner sent a letter with similar information to Aetna's Overpayment Recovery Service in Nashville, Tennessee.

294.    After a "cease and desist" letter from the Virginia DOI to Aetna, Aetna suspended its overpayment recovery actions, which included a referral to a collection agency.

295.    In a letter dated September 27, 2007, Aetna admitted to the Virginia DOI that the provider charges in the Ingenix Database cannot be distinguished by the provider's type of license. In fact, all of the Ingenix data for a procedure code could potentially reflect the charges of LCSWs alone.

296.    Although Aetna's first level appeal denial on May 9, 2007 asserted that the "three tiered approach" reducing payment to Nonpar psychologists and social workers (and other licensed behavioral health professionals) was "effective with dates of service September 1, 2006 and after," Aetna, in fact, could not legally apply these tiering reductions as of September 1, 2006 (or through the current date) without making explicit, approved changes to its EOCs, SPDs, and other plan documents. Without the required regulatory and employer approval, Aetna's

unilateral UCR tiering reductions are null and void, and without effect. Aetna's tiering policy also violates mental health parity laws.

297. Aetna's 40% reduction in the UCR for LCSWs starting in the fall of 2006 resulted in significant unpaid benefits to Werner. In addition, Aetna credited only the reduced amounts to her out-of-pocket maximum, delaying her ability to reach this maximum and shifting costs to her in contravention of her plan language.

298. As of the fall of 2006, Werner's EOC and SPD did not change. During this period, Aetna failed to notify Werner or her employer, the American Psychiatric Association, that N on- Par behavioral health benefits were being reduced and that a tiering approach would reduce the base UCR by 20% for psychologists and by 40% for other behavioral health professionals such as LCSWs. Thus, Werner's ultimate responsibility for LCSW services was increased because Aetna was paying 60% of the 40% lower UCR rate of $72 rather than 60% of the prior UCR rate of $120. During this time, Aetna's EOBs did not disclose the new tiering policy or its basis.

299. Werner had to extensively research Aetna's claims payment policies on the Internet in order to locate Aetna's statement that it would reduce Nonpar behavioral health providers' UCR by 40% as of September 1, 2006.

300. Under ERISA, Aetna could not reduce UCR to Nonpar behavioral health professionals without advance notification to Members and employer groups, along with corresponding changes to plan documents and required approvals.

301. Werner's appeals expenence amply reflects both fiduciary violations and the futility of appeals to Aetna challenging UCR determinations, Aetna failed to provide documents it is legally obligated to provide under ERISA, and refused to disclose to her any information

that would have permitted a successful appeal. Aetna's appeal denials to Werner reflect a fixed, systematic policy to apply UCR regardless of the flaws in the Ingenix Database, and regardless of Aetna's failure to comply with its plan language.

### 7.   Plaintiff Franco's ERISA Plan

302.   During the relevant Class Periods, Plaintiff Franco was an Aetna Member in a New Jersey large employer health plan through her employer. The plan, which was fully insured and administered by Aetna, is known as the ACSA Trust. Franco's health plan authorized her to use Nonpar providers, which Aetna promised to reimburse at UCR rates.

303.   Franco required complex facial surgery during the period she was fully insured by Aetna. The facial surgery was intended to remedy injuries she suffered from the use of forceps at birth.

304.   Franco sought preauthorization for her surgery (originally scheduled for January 2004) with Aetna. Her surgeon, Dr. Elliott H. Rose, submitted a very detailed preauthorization letter to Aetna on November 14, 2003, setting forth in meticulous detail the CPT codes he and Dr. Frederick A. Valauri, his co-surgeon, would be performing, along with the price they charge per code. At the end of the pre authorization letter, Dr. Rose stated:

> On behalf of this patient, we request predetermination of benefits for the above CPT codes and delineation of unsatisfied deductible, co-insurance, etc., to allow her to understand her financial obligation. If your established fees differ from the above UCRs, please notify the patient and my office administrator, Linda Ossias.

305.   On December 11, 2003, Franco received an approval from Aetna, notifying her that Aetna's "Decision" was "Authorized" as to each of the surgical services she was due to receive. On December 19, 2003, Franco received another approval letter from Aetna, reiterating that as to each proposed item, "coverage for this service has been approved."

306. On January 9, 2004, Aetna again authorized the facial surgery, and referred to its previous authorization of three days hospitalization. Again, Aetna reiterated that its authorization process had been satisfied.

307. Franco had complex facial surgery on February 2, 2004, performed by Dr. Rose and Dr. Valauri precisely as indicated in Dr. Rose's November 14, 2003 preauthorization letter.

308. On March 18, 2004, Aetna issued an EOB stating that of the $4,500 billed for her eyelid procedure by Dr. Rose, Aetna was allowing $1,990, with $2,510 being considered as above UCR: "This portion of this expense which is greater than the reasonable and customary charge is not covered under your plan." Aetna informed Franco that her "total responsibility" for the $4,500 charge was $3,107.

309. On March 22, 2004, Aetna issued another EOB, stating that, of the $49,100 billed by Dr. Rose, Aetna was paying $6,141.98, and Franco's "total responsibility" was $42,958.02. Of the unpaid amount, $35,325.75 was considered by Aetna to be "greater than the reasonable and customary charge."

310. Franco has made payments to Dr. Rose, her Nonpar, totaling at least $11,400. Of that total, $10,000 was paid as part of a deposit for an initial, related surgery that was performed by Dr. Rose prior to Franco being insured by Aetna. She paid out-of-pocket an additional $1,400 after she received her surgery from Dr. Rose while she was a member of an Aetna plan. Franco paid out-of-pocket at least $3,170.73 that was attributable to the unpaid difference between UCR and the provider's billed charge.

### 8. Franco's Exhaustion of Administrative Remedies

311. On April 1, 2004, Dr. Rose filed an appeal with Aetna on behalf of Franco. He explained the complicated nature of the facial reanimation surgery he performed on Franco,

along with his special expertise. He noted that its UCR determinations contradicted Aetna's pre authorization, and left the patient financially responsible for over $46,000.

312. On August 19, 2004, Aetna issued an EOB allowing an additional $466.02 for the free muscle flap procedure performed by Dr. Rose, stating that the remaining $23,533.58 was excluded as "greater than the reasonable and customary charge" for the procedure. Aetna did not explain why it was allowing the additional amount, or why that procedure was underpaid in its original determination. Aetna did not allow any additional reimbursement for the other procedures, and simply stated "based on the review our original decision has not changed." Aetna did not explain why it was adhering to its original determination regarding the other six procedures performed by Dr. Rose, or why additional reimbursement was not warranted. Its EOB violated established appeal procedures which should have resulted from Dr. Rose's appeal, including a written decision and acknowledgement of the appeal.

313. While Aetna issued the August 19, 2004 EOB, it did not provide any further response to the appeal Dr. Rose had submitted on Franco's behalf, nor did it offer or describe any further opportunity to pursue an additional appeal. In particular, Aetna did not state that Dr. Rose or Franco could seek a second level appeal. As a result, Aetna's new EOB paying an additional $466.02 represented a final denial of the appeal for any further benefits and thereby fully exhausted Franco's internal appellate remedies.

314. On August 27, 2004, Aetna issued an EOB regarding the six procedures performed by the co-surgeon, Dr. Valauri. Of the $30,275.00 billed by Dr. Valauri, Aetna allowed $8,960. Aetna stated that more than $17,000 was "greater than the reasonable and customary charge." Aetna further stated that Franco's "total responsibility" was $23,290.50.

315. Aetna determined UCR for Franco using the dollar amount in the Ingenix database despite Aetna's approval and pre authorization of the billed charges. Aetna's UCR determinations were not compliant with, and were contrary to Aetna's definition of UCR, were invalid for the reasons alleged herein, and violated ERISA.

### 9.    Plaintiff Smith's ERISA Plan and Exhaustion

316. Paul and Sharon Smith are in a fully insured plan with Aetna through Mr. Smith's employer Croda, Inc.

317. As an employee benefit, Paul Smith receives health insurance from Aetna for himself and his family, including his wife Sharon Smith. When Sharon Smith submits a claim for benefits, Aetna is responsible for making the coverage determinations, issuing proper benefits and resolving any appeals of benefit denials or reductions.

318. The Smiths' health plan with Aetna defines Reasonable Charge as: "an amount that is not more than the usual or customary charge for the service or supply a as determined by This Plan, based on a standard which is most often charged for a given service by a Provider within the same geographic area." Aetna paid the Smiths reduced payment alleging R&C.

319. In EOBs Aetna sent to Sharon Smith's provider, Aetna stated about its UCR determinations:

> The member's plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided. In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas. Aetna's determination of the prevailing charge does not suggest your fee is not responsible and proper or there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number shown on this statement.

320. Mrs. Smith appealed and Aetna denied the appeal.

321. Aetna also refused to consider certain appeals where litigation had been commenced. For example, in a letter to her provider dated November 6, 2006, Aetna stated: "Dr. Grundy's letter specifically told you that in light of that litigation, we would engage in no further discussion with you about the Sharon Smith claims."

322. Paul Smith commenced a pro-se small claims court action against Aetna regarding the adverse R&C determinations. Aetna removed the action to federal court in New York. Sharon Smith is not a party to that action. Mr. and Mrs. Smith have elected to proceed with their claims in this class action, and will discontinue the New York action without prejudice to their participation as Class representatives.

### 10.    Plaintiff Whittington's ERISA Plan and Exhaustion

323. Ms. Whittington resides in Moorpark, California. She is a beneficiary of a self-insured plan provided to her husband by his employer, Amgen, Inc., that is administered by Aetna.

324. Ms. Whittington's health plan defines R&C as:

"…. the lowest of:

- the provider's usual charge for furnishing it; and
- the charge Aetna determines to be appropriate, based on factors such as
- the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and
- the charge Aetna determines to be the Recognized Charge Percentage made for that service or supply."

325. The 'Recognized Charge Percentage' is the charge determined by Aetna on a semiannual basis to be in the 90th percentile of the charges made for a service or supply by providers in the geographic area where it is furnished.

326. In some circumstances, Aetna may have an agreement, either directly or indirectly through a third party, with a provider which sets the rate that Aetna will pay for a service or

supply. In these instances, in spite of the methodology described above, the Recognized Charge is the rate established in such agreement.

327. In determining the Recognized Charge for a service or supply that is:

. . .

- unusual; or
- not often provided in the area; or
- provided by only a small number of providers in the area;

Aetna may take into account factors, such as:

. . .

- the complexity;
- the degree of skill needed;
- the type of specialty of the provider;
- the range of services or supplies provided by a facility; and
- the Recognized Charge in other areas."

328. Aetna determines her claims and decided all her appeals. Thus, Aetna is a fiduciary and is responsible for the payment of additional benefits occasioned by a breach of fiduciary duty.

329. Ms. Whittington's 7-year old son requires ONET on an ongoing basis for various special needs, including vision therapy. Aetna has chronically and routinely denied and delayed payment for his ONET.

330. Ms. Whittington formally complained to Aetna regarding its "targeted, discriminatory and illegal tactics" to avoid paying the out-of-network benefits owed for her son's medically necessary treatments, including on several dates in 2008 and 2009.

331. Ms. Whittington appealed R&C reductions after Aetna had advised her that the R&C amount was $125 (which was her provider's billed charge). Instead of allowing $125, Aetna allowed $107, claiming that $107 was the R&C for 1 hour of vision therapy.

332.   In an appeal on December 26, 2008, Ms. Whittington complained of R&C reductions. Aetna denied her appeal, and stated that no additional benefits were due.

333.   In a second appeal dated January 13, 2009, Ms. Whittington appealed various R&C reductions for vision therapy for her son. Ms. Whittington challenged the R&C amount, stating there are no board-certified vision therapists within 25 miles of her home who charge less than the $125 charged by her son's therapist. She stated:

> Based on this, it is clear to us that the abrupt reduction in Aetna's allowed amount represents an example of Aetna improperly calculating the usual, customary and reasonable fees of out-of-network providers with the intention of reducing the benefits reimbursed to the subscriber. Please note that we are aware that Aetna is currently being investigated and charged in legal cases for similar types of illegal practices which violate ERISA, federal common law and federal claims procedures. We urge you to reverse your first level appeal decision.

334.   Ms. Whittington also appealed to Aetna Member Services on January 5, 2009.

335.   In communications to Mrs. Whittington, Aetna denied her appeals but Aetna did not provide accurate explanations or relief to Ms. Whittington in response to her appeals.

336.   Because she and her son are likely to need ONET in the future, Ms. Whittington seeks not only payment for past services, but a declaration as to her future rights, which she is entitled to obtain under federal law.

### 11.   Plaintiff Samit's Individual Plan

337.   Carolyn Samit resides in East Hanover, New Jersey. She is a member of a fully insured individual plan with Aetna. She has experienced many Nonpar Benefit Reductions determined by Aetna, including for the infusion of drugs needed to keep her alive.

338.   Ms. Samit is a Medicare beneficiary in addition to being an Aetna beneficiary.

339.   Under her individual plan policy, Aetna defines R&C for individuals with two health plans as:

An amount that is not more than the usual or customary charge for the service or supply as determined by Us, based on a standard which is most often charged for a given service by a Provider within the same geographic area.

340.　On EOBs sent by Aetna to Ms. Samit, R&C reductions were explained with the following uniform explanation:

Your plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided. In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas. Aetna's determination of the prevailing charge does not suggest your provider's fee is not reasonable and proper. Your provider may bill you for this amount. If there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number, or by writing to the address, shown on this statement.

341.　On December 29, 2008, Ms. Samit appealed to Aetna for R&C reductions for drugs and drug supplies determined by Aetna between September 1, 2007 and August 29, 2008. These included appeals for CPT codes A4222, A4223, A4221, J1642 and J1644.

342.　On January 13, 2009, Aetna denied her appeal, stating: "Based on our review, the claims listed above were processed in accordance with the plan provisions and no additional payment is due."

343.　In response to specific questions about the data used to determine UCR, Aetna stated: "It is our determination that the data available at the time of each date of service was correct."

344.　Aetna explained its UCR amounts for various drugs and supplies, and upheld its determinations that the following amounts were not eligible for reimbursement based on its R&C allowances: $3,806 for code 11644; $1782.72 for A4223; $450 for 11642.  Based on R&C

reductions, Aetna refused to pay over $6,000 for Ms. Samit's drugs and supplies for the period

for the year between September 1, 2007 and August 29, 2008.

345.    Aetna admitted that it used Ingenix "PHCS to determine R&C. It acknowledged

that when its R&C is less than the provider's charge, the "Covered Person may be held liable for

the full amount of the billed charge."

346.    Aetna represented to Ms. Samit that it uses the Ingenix "profile" as the "basic tool

for reasonable and customary (R&C) determinations" and that the "profile" reflects "for each

procedure within each of the population areas, the dollar value of the charge representing the

80th percentile. This charge is the one, which is at least as great as 80% of all charges recorded

in that area for a given procedure."

347.    Aetna further represented to Ms. Samit:

> PHCS (comprised of members from accident and health insurance
> firms) holds insurance forums, promotes insurance industry issues,
> and publishes statistical studies, law digests and information on
> insurance regulations. PHCS also compiled and distributes profile
> information submitted from its member insurance carriers.

348.    Aetna vouched for the Ingenix Database information, stating:

> PHCS profiles are collected from multiple insurance carriers.
> There are 150 data contributors, which include commercial
> insurance companies, third party administrators, Blue Cross and
> Blue Shield, and some self-insured groups. As a result, PHCS
> profiles are based on a larger number of charges. This larger
> information base provides a more accurate representation of the
> prevailing fee for a procedure within a specific expense area.

349.    The information Aetna provided to Ms. Samit in her appeal is false and

misleading. It also omits material information which Aetna should have provided as a fiduciary.

350.    Aetna knew when it sent this letter that the Ingenix data does not reflect

"reasonable and customary determinations". It does not collect "all charges recorded" in an area

for a given procedure. PHCS does not have member firms. It is, instead, a for-profit database of Ingenix which is a for-profit unit of UHG.

351. At the time it made these misleading statements, Aetna had already agreed with Attorney General Andrew Cuomo to stop using the Ingenix Database. See Assurance of Discontinuance entered into by Aetna with Attorney General Cuomo dated January 15, 2009.

352. Aetna's appeal letter to Ms. Samit referred to the Ingenix data as a "profile." Aetna did not tell Ms. Samit that Aetna is the single largest data contributor to the Ingenix database, and that it failed to submit millions of valid high charges to Ingenix which it did not "profile" for inclusion in the Ingenix database.

353. Although Ms. Samit had specifically requested "a copy of all data that was used in the above UCR determinations", Aetna provided no data to her. Ms. Samits appeal asked

354. Aetna to "supply me with any known analyses that Aetna has performed about its cost savings from use of the data/method." Aetna refused this request, stating that it had not used any cost savings information in making her claims determinations.

### 12. Plaintiff Seney

355. Subscriber Plaintiff Seney received ONET in 2005 when he was settled in a group health plan through his employer, Owens Coming, which was fully insured and administered by Aetna. Pursuant to the terms of the Aetna plan, he was covered as an Aetna Member.

356. Aetna relied on flawed and inappropriate data for making UCR determinations for Nonpar benefits as a result of its use of the Ingenix Database. By relying on such improper data for making UCR determinations, Aetna breached its duties as set forth in its ERISA-governed plans and, as a result, it should be required to reimburse its Members who received reduced Nonpar benefits up to billed charges.

357.     Seney received UCR benefit reductions from Aetna in 2005 when he received health care services from a Nonpar.  A claim was submitted to Aetna on Seney's behalf in compliance with the terms of his health care plan, seeking payment of benefits as required under the Aetna contract.

358.     Seney subsequently received an EOB from Aetna concerning these health care services.   In the EOB, Aetna reported that it had excluded certain billed amounts.   Seney remained liable for the unpaid portion of the bill.

359.     Seney has made out-of-pocket payments to Nonpars that were in excess of the applicable deductible and coinsurance under his Aetna plan.  These sums were paid by Seney due to Aetna's improper Nonpar Benefit Reductions as detailed herein.

360.     The EOBs sent by Aetna regarding its Nonpar Benefit Reductions during the Subscriber Class Period did not comply with legal requirements, including federal claims procedure regulations.  The EOBs failed to advise Aetna Members of the specific reasons for the denial, the specific plan provisions, and their appeal rights.   Aetna's EOBs reflecting UCR determinations failed to advise Seney of the data Aetna used to calculate UCR.   Examples of Aetna's omissions of required disclosure on EOBs include the following:

- Absent or inadequate "Notes" describing Aetna's benefit reductions and failure to provide the required "specific" reasons for the disallowed amounts above UCR;

- The particular fee schedule or data or methodology used to determine UCR;

- Incomplete information about the appeal process and appeal rights;

- The characteristics (resulting in the invalidity) of the Ingenix Databases used to determine UCR;

- The disclaimer that accompanies Ingenix data;

- Aetna's manipulations of the data contributed to the Ingenix Database, and Ingenix's manipulations of the data from all contributors;

Aetna's use of certain Medicare rates that reduced benefits and left its Members financially exposed.

### 13. Plaintiff Weintraub

361. Plaintiff Jeffrey M. Weintraub is a resident of the State of New York. During the Class Period, Plaintiff Weintraub participated in a "Student Health Insurance Program" sponsored by his University and defined as an "Aetna Open Choice PPO", underwritten by Aetna Life Insurance Company which is not subject to nor governed by ERISA. As discussed further herein, Plaintiff Weintraub is not an ERISA class member.

362. As a member of this Aetna health plan, Plaintiff Weintraub was provided a "Guide to Student Health Insurance and Healthcare at New York University" that sets forth the basics of Plaintiff Weintraub's Plan. That document contains a Glossary where "Reasonable Charge" is defined as "[o]nly that part of a charge which is reasonable is covered. The reasonable charge for a service or supply is the lowest of: the provider's usual charge for furnishing it; and the charge Aetna determines to be appropriate; based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and the care Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished."

363. Plaintiff Weintraub was further provided with a "Student Health Insurance Handbook" that contains a "Summary of Benefits" section. In that section, it is set forth that Plaintiff Weintraub was to be reimbursed 50% of the Reasonable Charge for certain ONS. In December, 2007, Plaintiff Weintraub visited Nonpar physician in New York, New York and submitted the claim through his health care plan. Plaintiff Weintraub was reimbursed 50% of an

amount *less than* the actual charge because Aetna determined the "Reasonable Charge" to be a lesser amount. Plaintiff Weintraub was forced to pay the remainder.

### 14. Plaintiff Hull

364.    Plaintiff Hull is a resident of the State of Wisconsin. At all times relevant to this Amended Complaint, Plaintiff Hull maintained health insurance through her spouse's employer, Citigroup, Inc. ("Citigroup"). Citigroup offered a variety of health insurance plans to its employees and their families, including the "ChoicePlan 500", of which his was a Member.

365.    The "ChoicePlan 500" offered by Citigroup was, at all times relevant to the Amended Complaint, administered by Aetna.

366.    In conjunction with its health plans, Citigroup provided its employees with health plan documents, including a SPD. That document contains a particular section entitled "ChoicePlan out of network features" which states that members of the plan are "covered at 70% of reasonable and customary charges" for ONET.

367.    The SPD further contains a definition of "Reasonable and Customary charge" as "Any charge that, for services rendered by or on behalf of a non-network physician, does not exceed the amount determined by the Claims Administrator in accordance with the applicable fee schedule. As to all other charges, an amount measured and determined by the Claims Administrator by comparing the actual charge for the service or supply where the prevailing charges made for it. The Claims Administrator determines the prevailing charge by taking into account all pertinent factors including the complexity of the service; the range of services provided; and the prevailing charge level in the geographic area where the provider is located and other geographic areas having similar medical cost experience."

368.    For all Choice Plans, including Plaintiff Hull's applicable Plan, Aetna is listed as the "Claims Administrator."

369.	On August 5, 2008, Plaintiff Hull underwent a series of medical tests by a Nonpar.	Plaintiff Hull used the mails to submit to Aetna her bills for such ONET for reimbursement.	Aetna submitted an evidence of coverage through the mails whereby it reimbursed Plaintiff Hull 70% of the costs of the "reasonable and customary" charge provided in the fee schedules of the Ingenix Database.	That amount was less than the actual charge incurred by Plaintiff Hull for the medical testing.	Plaintiff Hull was under-reimbursed by Aetna based upon the flawed fee schedules provided by Ingenix.

**B.	The Provider/Association Plaintiffs Were Systemically Underpaid By Aetna**

**1.	Plaintiff Dr. Frederick A. Valauri**

370.	Dr. Valauri is a board-certified plastic surgeon who treats patients in health plans where Aetna pays claims for ONET to beneficiaries and their assignees.	At all times relevant, Dr. Valauri was a Nonpar in Aetna's physicians' networks.	During the relevant Class Period, Dr. Fredrick A. Valauri provided ONET to Aetna Members.

371.	On behalf of his Aetna covered patients, Dr. Valauri submitted a HCFA 1500 Form to Aetna seeking benefits for the services that were provided.	He billed for his services, each designated by a separate CPT Code.

372.	Dr. Valauri receives assignments from Aetna beneficiaries.	These assignments indicate that Aetna should pay Dr. Valauri directly.	Even in instances where Dr. Valauri does not accept an assignment of benefits from Aetna beneficiaries, he has received their permission to pursue Aetna on their behalf for unpaid or underpaid claims.	Furthermore, Department of Labor regulations permit beneficiaries of ERISA-governed health care plans to have providers pursue such claims.	Those rules state that "[t]he [ERISA] claims procedures do not preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination." 29 CFR 2560.503-1(b)(4).

373. Because there is no contractual arrangement between Aetna and Dr. Valauri, Aetna pays beneficiaries UCR when they receive medical services from Dr. Valauri.

374. At all relevant times, Dr. Valauri expected to be reimbursed by Aetna at the lesser of his billed charges or the current UCR rate. Dr. Valauri was systematically underpaid by Aetna due to Aetna's use of the Ingenix Database and other protocols.

375. After Dr. Valauri submitted the appropriate forms for reimbursement, Aetna sent an EOB to Dr. Valauri, thereby acknowledging the validity of his assignment, in which it reported on its coverage determination for the services Dr. Valauri provided to the patient.

376. The EOB disclosed only that the Nonpar reimbursements were being paid at "prevailing" local rates or that at the reasonable and customary rates for his geographic area, or some other notation of UCR.

377. However, Dr. Valauri set his fees for his services based on a Customized Fee Analyzer sold to him by Ingenix, which purported to reflect prevailing rates for services in the geographic area in which Dr. Valauri worked. Despite using this product, Aetna claims his rates were often many thousands of dollars over the prevailing or usual customary and reasonable rate for his geographic area.

378. Dr. Valauri did not receive full payment for his billed charges from the Aetna subscribers. Aetna unlawfully diminished Dr. Valauri's compensation by improperly calculating UCR rates and then misapplying these rates to his claims. Dr. Valauri's EOBs often state that his billed charges purportedly exceed the UCR rate for the geographic area where the services were performed. Nowhere on the EOBs, however, or elsewhere in any other correspondence sent to Dr. Valauri and his patients from Aetna discuss or identify how it actually calculates UCR. The EOBs do not even specify whether Ingenix data or some other methodology was used

in these calculations. With its methods for calculating UCR shrouded in a veil of secrecy, Aetna has been able to derive improper rates using faulty Ingenix data, and apply them to Nonpar claims in order to diminish lawful reimbursement.

379. Dr. Valauri also exhausted his remedies with respect to these claims, seeking appeals and final determinations, whether on his own, or though the patient, of the reimbursement amounts. The appeals were denied by Aetna, without paying Dr. Valauri based on his full non-discounted charges, and it provided him with no further opportunity to seek reconsideration of its decision.

380. One of Dr. Valauri's patients is a Member, through her former husband's employer, of Aetna's Choice POS II plan. This plan allows Members to use any out-of-network provider they choose.

381. The plan provides specifically that "[t]he plan will base payment [for out-of-network coverage] on reasonable and customary limits." The plan defines "reasonable and customary (R&C) as:

> [F]ees [that are] set each year by the medical plan claims administrators as the fees that most doctors in a geographic area charge for particular services or procedures. If your doctor charges more, the PPO plans will not pay for the amount in excess of the R&C level. You are responsible for paying this difference if you are not using a PPO participating physician.

382. The plan also states:

> When covered health services are received from out-of-network providers, the medical plan claims administrator calculates R&C based on available data resources of competitive fees in that geographic area.

383. On May 25, 2007, Dr. Valauri provided health care services that had been preauthorized by Aetna to this member. On her behalf, Dr. Valauri submitted a HCFA 1500

Form to Aetna seeking benefits for the services that were provided. He billed a total of $20,964.50, broken down by three services, each designated by a separate CPT Code.

384. On August 16, 2007, Aetna sent an EEOB to Dr. Valauri reporting on its coverage determination for the services Dr. Valauri provided to the member. Its coverage determinations were summarized as follows:

| Service Code | Submitted Charge | Not Payable | Patient Resp. | Payable Amount |
|---|---|---|---|---|
| 57105 | 742.50 | 492.50 (1) | 592.50 | 150 |
| 3040 | 11,214.00 | 4,435.00 (2) | 2,711.50 | 4,057.40 |
| 21235 | 9,008.00 | 6,408.00 (3) | 7,414.78 | 1,593.22 |

Remarks:

1 – The member's plan provides coverage for charges that are reasonable and appropriate as determined by Aetna. This procedure has been paid 25% of the reasonable and customary rate due to multiple surgical procedures performed on the same date of service.

2 – The member's plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided. In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas. Aetna's determination of the prevailing charge does not suggest that your fee is not responsible and proper. If there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number shown on this statement.

3 – The member's plan provides coverage for charges that are reasonable and appropriate as determined by Aetna. This procedure has been paid at 50% of the reasonable and customary rate due to multiple surgical procedures performed on the same date of service.

385. The declaration in Remark 2 that Aetna "may consider other factors including the prevailing charge in other areas" contradicts not only the language directly before it but also the language in the Member's plan that the relevant operative geographic area is the one where the services were performed.

386. The EOB also specified that the member owed a total of $3,818.28 in co-insurance for the services, with "Total Patient Responsibility" being $15,153.88 and the total "Payable Amount" of $5,810.62. The EOB further stated that Aetna was paying an additional amount of $10.19 in interest. The "Claim Payment," including the Payable Amount plus interest, therefore totaled $5,820.81. A check of that amount was sent to Dr. Valauri, along with the EOB. Aetna therefore paid less than 28% of the billed charges in purported satisfaction of the Member's claim for benefits.

387. By letter dated September 27, 2007, the Member submitted a written appeal to Aetna. In her letter, she stated:

388. I am writing in response [to] the reimbursement given to Dr. Valauri for my procedures on 5-25-07. Upon careful review of your EOB, it is clear that you did not reimburse[] at reasonable and customary rates based on the data provided by Ingenix (attached). As you can see, Dr. Valauri's fees are commensurate with the Ingenix's fee schedule. Additionally, while reduction of fees for multiple surgeries may be applicable to Workers Comp and Medicare claims, this rule is not applicable to private insurance claims. I am not aware of any such clause in my policy regarding multiple surgical reduction. This was never disclosed to me and I object to your low reimbursement on that basis as well. Kindly re-review my claims and forward to Dr. Valauri full payment for services provided.

389. As indicated above, Dr. Valauri set his fees for his services based on a Customized Fee Analyzer sold to him by Ingenix, which purported to reflect prevailing rates for services in the geographic area in which Dr. Valauri worked. The Member attached to her appeal excerpts from the Customized Fee Analyzer purporting to reflect prevailing rates for the CPT Codes Dr. Valauri charged for the services he provided to her.

390.    By letter dated November 21, 2007, Aetna, through its Customer Resolution

Team based in Lexington, Kentucky, informed the member that it had denied her appeal. Based

on "the appeal request, the initial determination [and] the procedure report," Aetna stated that

"we are upholding the previous benefit decision." It then added:

### How we made our decision:

Under the plan, when multiple procedures are performed on the same day or
during the same operative session, the primary or major procedure is identified
and reimbursed as if it were performed alone. The secondary and all subsequent
procedures are reimbursed at a reduced rate. The primary procedure is reimbursed
at 100% of eligible charges, the second procedure [at] 50% and the third and all
subsequent procedures at 25%. This is based on there being some overlap of time
and services during not only the intraoperative period, but also during the pre and
post operative care. All charges are subject to eligibility, and all other plan
provisions and limits at the time services are rendered.

Please refer to the [employer's] SPD under surgical benefits, which states: "The
following services are covered under the medical plan . . . When multiple
procedures are performed during the same operative session, benefits for the
secondary procedure(s) will be determined based on the medical policy of the
medical plan claims administrator. No separate payment will be provided for
procedures that are incidental to or an integral part of the primary procedure.

391.    The letter further specified that Aetna's decision was final, stating:

### Next Steps:

With this final decision, the appeal process within Aetna has been completed.
Please refer to the enclosed document entitled "Aetna Appeal Process and
Member Rights" for additional rights available and for an overview of the entire
appeal process.

392.    The enclosed document explained that the Member had a right to submit an

appeal to Aetna if she was "not satisfied with the original coverage decision," and that Aetna

agreed to notify her of the appeal decision within 60 days it received such an appeal. Further,

Aetna stated: "Final Decision: If you do not agree with the final decision, you have the right to

bring a civil action under Section 502(a) of ERISA, if applicable."