393.    Aetna's denial letter stated that, at the Member's request, it would provide "free of charge access to copies of all documents, records, and other information about [her] claim for benefits, including the specific rule, guideline, protocol, or other similar criterion that was used in making the decision, and the names of any clinical reviewers if applicable." However, this offer was meaningless, since Aetna also stated that its denial was a "final decision," such that the only other option was litigation.

394.    Based on Aetna's appeal decision, which was "final," and its accompanying Aetna Appeal Process and Member Rights form, the Member was given an express right to bring an immediate lawsuit under ERISA to pursue her claim for benefits. As an assignee of that Member's benefits, Dr. Valauri is exercising that right through this Amended Complaint.

395.    While Aetna's appeal decision was final, Aetna failed to respond or explain its UCR determination whereby it excluded charges of Dr. Valauri as being in excess of "the prevailing charge level." Its only explanation in its appeal denial letter related to its decision to reduce benefits based on multiple procedures having been performed on the same day. However, according to the EOB, the multiple surgical reduction was only relevant to two of the three CPT Codes. The primary procedure, CPT Code 30450, was unaffected by that policy. For that procedure, Dr. Valauri charged $11,214.00 as his usual and customary charge, based on the Ingenix Customized Fee Analyzer. Aetna excluded $4,435.00 of that amount as in excess of the "prevailing charge level," but provided no explanation for such a reduction in its denial of the member's appeal.

396.    As for the multiple surgical reductions, Aetna relies on a provision in the relevant SPD which states that, "[w]hen multiple procedures are performed during the same operative session, benefits for the secondary procedure(s) will be determined based on the medical policy

of the medical plan claims administrator." This was inadequate disclosure because it failed to explain what that policy was or how it would impact benefits.

397.    Moreover, the SPD refers solely to "secondary procedures." Yet, Aetna's policy, as explained in its denial letter, states that it pays 50% of eligible charges for the "second procedure" and 25% for "the third and all subsequent procedures." Because the SPD refers solely to the "secondary" procedures, Aetna was obligated to treat all such procedures similarly. Assuming any reduction for multiple surgeries was proper, Aetna should therefore have been limited to reducing benefits to 50% of eligible expenses, and not to 25%. This conclusion is further supported by the fact that the federal government limits its multiple surgical reductions to 50% of eligible charges for all secondary and subsequent procedures. Moreover, the AMA has adopted a policy whereby it opposes any effort to reduce benefits based on multiple procedures below 50% of the billed charges. Aetna's policy of paying only 25% of the allowed amount is therefore contrary to generally accepted practices.

398.    Aetna's representation in its EOB that its basis for reducing the benefits to be paid on behalf of the Member was due to the fact that Dr. Valauri's charges exceeded "the prevailing charge level" was false and misleading. As explained further herein, Aetna relied on the Ingenix Database to determine UCR, yet those databases do not reflect "the prevailing charge level" for health care services and provide an improper basis upon which to make UCR determinations.

399.    Aetna's appeal denials withheld material information, as detailed herein, that Aetna was obligated to disclose as a fiduciary. First, Aetna did not disclose that it had used the Ingenix Database to determine UCR. Second, Aetna did not disclose that it had contributed pre-edited data to Ingenix and that Ingenix further corrupted the data reducing amounts in the

Ingenix Database. Third, Aetna did not disclose that the Ingenix data came with a disclaimer that the data does not represent UCR.

400. Thus, any appeal to Aetna was likely to be futile as Aetna did not fully disclose all the relevant information. Aetna's appeal denials withheld material information, as detailed herein, that Aetna was obligated to disclose as a fiduciary. Because Nonpars are unaware of the scheme that results in payors like Aetna failing to pay appropriate UCR rates, they are either powerless to appeal any such improper determinations or their efforts to appeal these determinations are futile.

401. Aetna's treatment of the appeals was contrary to ERISA and applicable regulations. It did not provide a "full and fair review." Because Aetna's appeal process violated procedural safeguards adopted in the ERISA regulations, any appeals are "deemed exhausted" by operation of law.

402. Dr. Valauri seeks unpaid benefits for himself pursuant to assignments from Aetna beneficiaries and on behalf of other providers who received assignments from Aetna beneficiaries. As an assignee, he stands in the shoes of the beneficiary, and is entitled to enforce the terms of Aetna's health plan contract with the beneficiary. He also seeks injunctive and declaratory relief preventing further use of the Ingenix data and enjoining Aetna's continued ERISA violations.

### 2. Dr. Darrick Antell

403. Dr. Antell is a board-certified plastic surgeon and a Fellow of the American College of Surgeons who treats patients in health plans where Aetna pays claims for ONET services to beneficiaries and their assignees. Dr. Antell is an ONET provider vis-à-vis Aetna.

404. At all relevant times, Dr. Antell was not a member of Aetna's provider networks. Rather, when he provides health care services to Aetna subscribers, he does so as a Nonpar.

- 103 -

405. To provide proper care and treatment for his patients, at both lower risks and lower prices, Dr. Antell has created a certified on-site, state-of-the-art Office Based Surgical ("OBS") facility. Dr. Antell's OBS facility – which was originally incorporated as "850 Park Surgical," and is now incorporated as "Lenox Hill Ambulatory Surgery" – has received accreditation from the American Association for Accreditation of Ambulatory Surgical Facilities ("AAAASF") and the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). The AAAASF Certification sates that Dr. Antell's OBS facility was providing a certificate "for having met the standards of a CLASS C ambulatory surgical facility in which major surgical procedures are performed under intravenous Propofol or general anesthesia with external support of vital body functions." The JCAHO certificate states that Dr. Antell's OBS facility "has been accredited" by the JCAHO, "which has surveyed this organization and found it to meet the requirements for accreditation."

406. Dr. Antell has assumed substantial costs in establishing and maintaining his OBS facility, through which he provides the highest quality of care to his patients. As a result, as part of his customary and reasonable practice, Dr. Antell charges a "facility fee" for services he performs there to compensate him for the additional costs and effort of maintaining the facility. Dr. Antell bills facility fees separately from surgical fees. Facility fees are billed on a UB-92 form whereas surgical fees are billed on HCFA 1500 forms.

407. Dr. Antell's OBS facility satisfies the requirements of the Public Health Law ("PHL") of the State of New York. Section 230-d of the Public Health Law defines Office-Based Surgery as follows:

> "Office-based surgery" means any surgical or other invasive procedure, requiring general anesthesia, moderate sedation, or deep sedation, and any liposuction procedure where such surgical or other invasive procedure or liposuction performed by a licensee in

a location other than a hospital, as such term is defined in article twenty-eight of this chapter, excluding minor procedures and procedures requiring minimal sedation.

408.     Subdivision 2 of the PHL provides that physician practices in which office-based surgery is performed must obtain and maintain full accredited status.   The accreditation requirements take effect 18 months from January 14, 2008, or on or before July 14, 2009.  Both AAASF and JCAHO, which have accredited Dr. Antell's OBS facility, have been designated by New York State as accepted accrediting agencies under the PHL, along with the Accreditation Association for Ambulatory Health Care.  As a result, Dr. Antell has satisfied all requirements under New York law for maintaining, operating and performing surgical proceedings in his OBS facility.

409.     Dr. Antell receives assignments from Aetna Members.    These assignments indicate that Aetna should pay Dr. Antell directly.  Even in instances where Dr. Antell does not accept an assignment of benefits from Aetna beneficiaries, he has received their permission to pursue Aetna on their behalf for unpaid or underpaid claims.  Furthermore, Department of Labor regulations permit beneficiaries of ERISA-governed health care plans to have providers pursue such claims.   Those rules state that "[t]he [ERISA] claims procedures do not preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination."  29 CFR 2560.503-1(b)(4).

410.     While providing services to Aetna patients, Dr. Antell has repeatedly been subjected to reductions in reimbursements based on Aetna's representations that his bills are in excess of UCR.  In doing so, Aetna has relied improperly on the flawed and inadequate Ingenix Database, which fails to identify proper UCR rates.  As a result, Dr. Antell was systematically underpaid by Aetna.

411.     With respect to the UCR reductions Aetna imposed on Dr. Antell, any exhaustion of administrative remedies with respect the UCR determination would be futile, because Aetna, as a matter of policy, refuses to alter or reprocess claims that have been processed pursuant to the Ingenix Database. Alternatively, Dr. Antell should be deemed to have exhausted any claims that otherwise were not exhausted, due to Aetna's inadequate disclosure concerning grievance procedures and its violation of ERISA and the applicable ERISA regulations.

412.     Among the procedures Dr. Antell performs is breast reconstruction. Most of these procedures are performed on breast cancer patients after mastectomy. One of Dr. Antell's patients is a member of Aetna's Managed Choice POS plan which allows its members to use any out-of-network provider they choose. This member is a 48-year old woman who needed breast reconstruction surgery following a mastectomy. Dr. Antell performed the reconstruction in his OBS on October 28, 2008.

413.     On November 26, 2008, Dr. Antell submitted to Aetna on behalf of this patient appropriate HCFA 1500 and UB-92 forms along with operative reports. The HCFA form contained charges for two CPT codes: 19366RT ($14,000) and 19318LT ($12,000).

414.     By EOB dated December 30, 2008, Aetna informed Dr. Antell that "the[] expenses require further review. After we have completed our review, we will process this claim." Dr. Antell received no further communication from Aetna. On February 11, 2009, the patient contacted Aetna to inquire as to the status of the claim. She was told that the procedure was not medically necessary.

415.     On February 20, 2009, Dr. Antell's staff contacted Aetna to dispute the assertion that the breast reconstruction was not medically necessary. A customer service representative of Aetna told Dr. Antell's staff member that she would check into it and call back.

416. On February 26, 2009, an Aetna representative contacted Dr. Antell to inform him that Aetna agreed that the surgery was not cosmetic and told the staff that she was not sure why the claim had been denied. Aetna asked for copies of surgical notes to be faxed to the Aetna office. Although the notes had already been submitted, Dr. Antell's staff faxed them again.

417. On March 2, 2009, an Aetna representative informed Dr. Antell that one of the codes he had used on the HCFA form was invalid. Dr. Antell's staff member asked to appeal this finding to a Medical Director. After doing so, the Medical Director agreed the code was valid, apologized and said the claim would be processed within 30 days.

418. By letter dated April 8, 2009, Aetna overturned its previous determination and stated that the two services described in the HCFA form "are eligible for payment" adding that "Aetna covers reconstructive surgery after the surgical treatment of breast cancer." Aetna stated that the claim was being reprocessed. Despite this letter, by EOB dated April 14, Aetna informed Dr. Antell that one of the two surgical claims had been reprocessed and that both were denied because "[b]ased on the information received, these services were not provided."

419. By EOB dated April 20, 2009, Aetna remitted payment to Dr. Antell in the amount of $9,658.90. On the CPT 19366 RT code, Aetna allowed $9,500 out of the $14,000 billed. On the 19318 LT code, Aetna allowed $4,500 out of the $12,000 billed.

420. A remark next to the first CPT code stated: "The covered medical expense is based on an Aetna determination of a reasonable charge in the area or negotiated rate in the network for the services performed, as well as adjustment of procedure codes or application of multiple procedure percentage allowances. You may bill the member for the difference between the submitted and paid charges."

421.    Remark codes next to the second CPT code stated that the claim had been reprocessed and that "The member's plan provides coverage for charges that are reasonable and appropriate as determined by Aetna.  This procedure has been paid at the reasonable and customary rate which is 50% of the single procedure rate due to multiple surgical procedures performed on the same date of service."  Thus, payments for the services provided to this Aetna member by Dr. Antell were reduced based on Aetna's determination of "reasonable charges."

422.    In addition to the UCR reduction, Aetna has also refused to reimburse Dr. Antell for his facility fees relating to surgeries performed in his OBS facility, claiming that he does not have a properly authorized facility.

423.    This determination not to pay fees is contrary to Aetna's own prior determinations, in which it had recognized Dr. Antell's OBS facility and agreed that he could provide services in that facility for Aetna patients.

424.    The American Society of Plastic and Reconstructive Surgeons, Inc. ("ASPRS") has similarly taken the position that facility fees for OBS facilities are proper and should be reimbursed.  As stated in a Position Paper of the ASPRS:

> It is the position of the American Society of Plastic and Reconstructive Surgeons that reimbursement of reasonable charges for facilities accredited by AAAAPSF, or other recognized and approved accrediting agencies, for reconstructive plastic surgery procedures can play a significant role in reducing the cost of health care in general.  This is supported by the fact that on an average, 60 percent of the procedures performed by plastic surgeons are reconstructive, as opposed to cosmetic.  It is recognized that over 50 percent of those reconstructive procedures can be safely performed in office-based facilities.
>
> * * * *
>
> A growing number of large and respected third-party payors have amended their existing policies or liberalized their policy interpretation and are now providing reimbursement for in-office facility charges.

425. Based on information and belief, the patients' Aetna plans have no provision that health care services provided through an OBS facility, or that a facility fee charged for such services, would not be covered or reimbursed.

426. Given that charging and being reimbursed for facility fees for services provided at an accredited OBS facility is generally recognized in the medical and insurance community, there is no basis for Aetna to deny coverage for Dr. Antell's facility fees. Dr. Antell was entitled to charge his patient for the facility fee for his OBS facility and, under the terms and conditions of its health care plans, Aetna was obligated to pay such a fee as with UCR fees for Nonpar services.

427. Dr. Antell has appealed Aetna's denial of coverage for his OBS facility, and has exhausted all available appeal procedures. Moreover, any further appeals would be futile due to Aetna's firm practice of refusing to pay for OBS facilities used by Nonpars.

428. Based on the foregoing, Dr. Antell seeks unpaid benefits pursuant to assignments from Aetna beneficiaries, on behalf of himself and all other similarly situated physicians who have been subjected to improper UCR reductions based on Aetna's reliance on the Ingenix Database or other undisclosed policies to set UCR rates. Dr. Antell also seeks relief on behalf of himself and all other similarly situated physicians who have been denied coverage for facility fees for OBS facilities accredited by the accepted accreditation entities, including but not limited to the AAAASF and JCAHO. As an assignee, he stands in the shoes of the beneficiary, and is entitled to enforce the terms of Aetna's health plan contract with the beneficiary. He also seeks injunctive and declaratory relief preventing further use of the Ingenix data and enjoining Aetna's continued ERISA violations.

### 3.  Dr. Alan B. Schorr

429. Plaintiff Dr. Schorr is an endocrinologist with a private practice in Langhorne, PA. He is licensed to practice medicine in Pennsylvania and New Jersey, and is board-certified in Internal Medicine and Endocrinology, Diabetes and Metabolic Diseases.

430. At all relevant times, Dr. Schorr was a Nonpar in Aetna's physicians' networks. Throughout the Provider Class Period, Dr. Schorr provided out-of-network healthcare services to Aetna plan enrollees, which account for approximately 10% of Dr. Schorr's inpatients annually. Dr. Schorr's experience with Aetna's unlawful business practices is typical of what has happened to the Provider Class as a whole.

431. As an endocrinologist, Dr. Schorr specializes in treating disorders of the endocrine system, such as diabetes mellitus, hyperthyroidism and metabolic syndrome. In addition to routine patient care, Dr. Schorr regularly treats patients who are in a diabetic coma and require immediate medical attention. These patients, for obvious reasons, are unable to choose their physicians as routine patients do. At all relevant times, Dr. Schorr obtained a valid assignment of benefits from his inpatients through the hospital intake process.

432. Throughout the relevant Class Periods, Dr. Schorr utilized a CMS 1500 form (or its equivalent), to submit claims for payment to Aetna. Dr. Schorr's claims are routinely submitted electronically. Once an electronic claim is submitted it passes through a clearinghouse before reaching Aetna. All of Dr. Schorr's claims are submitted to Aetna using CPT codes, HCPCS, and modifiers, as necessary. Dr. Schorr does not find out his compensation from Aetna for services rendered until after a procedure is performed and a claim for payment is submitted.

433. At all relevant times, Dr. Schorr expected to be reimbursed by Aetna at the lesser of his billed charges or the current UCR rate. While providing services to Aetna patients, Dr. Schorr was repeatedly subjected to reductions in reimbursements based on Aetna's

representations that his bills are in excess of UCR amounts. In making these improper determinations, Aetna relied on the flawed and inadequate Ingenix database as well as other improper methods for calculating what it considered to be "fair" rates, which fail to identify proper UCR rates.

434. Rather than simply pay Dr. Schorr the lesser of his billed charges or UCR rates, Aetna instead routinely and deliberately reimbursed his claims at below UCR levels, requiring him to exhaust significant amounts of time and energy first identifying and then appealing improperly reimbursed claims.

435. Aetna unlawfully diminished Dr. Schorr's compensation by improperly calculating UCR rates and then misapplying these rates to his claims. Dr. Schorr's EOBs and Remittance Advices state that "[t]he member's plan provides benefits for covered expenses at the reasonable charge as determined by Aetna, for the service in the geographical area where it is provided. In certain circumstances, especially where the service is unusual or not often provided in the geographical area, the reasonable charge may be determined by considering other factors, including the prevailing charge in other areas." Nowhere on the EOBs, Remittance Advices or elsewhere in any other correspondence sent to Dr. Schorr does Aetna discuss or identify how it actually calculates UCR. The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations. By concealing its methods for calculating UCR rates, Aetna has been able to derive improper rates using faulty data, and apply them to Nonpar claims in order to diminish lawful reimbursement.

436. During the relevant Class Periods, Aetna also diminished reimbursement to Dr. Schorr by improperly paying for his services at a rate of "125% of Medicare," by misapplying a "Fee Schedule" to his claims, and by mistreating his claims as in-network despite the absence of

a contract between Aetna and Dr. Schorr. Nonpars like Dr. Schorr should not be reimbursed for their services based on an arbitrary percentage of Medicare rates. Nonpars are entitled to the lesser of their billed charges or UCR rates, and thus are under no obligation to accept anything less as payment, even if Aetna represents that it is "fair." Nevertheless, Aetna's EOBs to Dr. Schorr routinely stated that "SVC PD AT 125% MDCR" and that Aetna "BELIEVE[S] THIS IS A FAIR PYMT." Moreover, according to Aetna's letter correspondence to Dr. Schorr, "[t]o determine the payment amount when a provider does not participate with Aetna and the plan does not define the applicable allowable amount, our responsibility is to pay a fair amount for your services. For your services, we set this payment at 125% of the Medicare allowable amount." Other than Aetna's conclusory assertion that this configuration constitutes "fair payment" there is no basis or explanation for why 125% of Medicare is appropriate remuneration for Nonpar services or how this configuration of Medicare was derived in the first place. The application of a percentage of Medicare rates to Nonpar claims is unlawful and has harmed Dr. Schorr and the other members of the Provider Class who have been subjected to this practice.

437. Aetna has already been reprimanded by state regulators for its improper practice of determining UCR rates based on a percentage of Medicare rates. On July 23, 2007, the State of New Jersey Department of Banking and Insurance ("NJDOBI") ordered Aetna to pay nearly $10 million for systematic unfair business practices related to Aetna's determination of UCR rates for Nonpar services rendered to New Jersey Aetna Members. Specifically, the NJDOBI found that Aetna improperly calculated UCR rates by using a percentage of Medicare rates. Aetna's undisclosed and unauthorized use of Medicare rates to determine UCR left plan Members with large unpaid balances for which they were financially responsible. Nonpars, as a result, were often unable to recoup their lawful reimbursement for services rendered. Aetna's

improper application of Medicare rates, resulting in the aforementioned fine, was not limited to New Jersey, but was employed by Aetna nationwide to the detriment of Nonpars like Dr. Schorr in the State of Pennsylvania.

438.    In addition to under-reimbursing Dr. Schorr at 125% of Medicare, Aetna routinely misapplied its own discounted fee schedules to Dr. Schorr's claims during the relevant Class Period.  Despite the absence of a contractual relationship between Dr. Schorr and Aetna, Aetna's EOBs regularly state that "THIS PAYMENT WAS MADE ACCORDING TO OUR FEE SCHEDULE."  By placing this language on its EOBs, which are sent to plan Members, Aetna gives the false impression that Dr. Schorr has agreed to accept payment in accord with Aetna's discounted fee schedules.   Aetna further confuses its plan Members by maintaining a zero balance in the "Member Responsibility" column of these EOBs.  Making reference to Aetna fee schedules and indicating a zero member balance on EOBs results in significant hardship to Nonpars like Dr. Schorr when they seek to bill their patients for the amounts in excess of Aetna's payment, as the patients have been led to believe that their physicians have already been paid in full by Aetna.  This confusion makes collecting billed charges increasingly difficult for Nonpars like Dr. Schorr.

439.    In correspondence sent to Nonpars and plan Members, Aetna routinely justifies its methods of under-reimbursement stating that "we believe we have ensured that this is a fair payment for your service(s)."  By peppering its correspondence with language suggesting that Aetna has already remitted a "fair amount" or "fair payment" to the doctor, Aetna leads patients to believe that any bill received from the doctor above and beyond what Aetna has already paid is improper, unjustified, and unwarranted. Aetna, at times, further instructs its plan Members not to pay "any amount above any applicable copayment, coinsurance, or deductible" for their

- 113 -

treatment despite the fact that Nonpars like Dr. Schorr are not obligated to accept Aetna's payment as payment in full.

440. All of Aetna's wrongful conduct described above has forced Dr. Schorr and members of the Provider Class to exhaust significant time and resources identifying and then appealing unlawfully reimbursed claims. Upon identifying an improper payment for a claim, Dr. Schorr promptly appeals Aetna's determination by sending a formal letter asking Aetna to reprocess the claim for additional payment. In addition to sending these appeals letters, Dr. Schorr makes telephone calls to Aetna to appeal the insurer's wrongful determinations. Dr. Schorr has frequently exhausted any administrative appeals available through Aetna without succeeding in obtaining full and proper reimbursement for his services, leaving a lawsuit as the only alternative.

441. Moreover, when an appeal is left unsettled, Dr. Schorr often cannot collect for his services due to Aetna's failure to comply with its contractual obligations.

### 4. Dr. Frank G. Tonrey

442. Plaintiff Dr. Tonrey is an anesthesiologist with a private practice in Dallas, TX. He is licensed to practice medicine in Texas and Arizona, and is board-certified in Anesthesiology and Emergency Medicine.

443. At all relevant times, Dr. Tonrey was a Nonpar in Aetna's physicians' networks. Throughout the Provider Class Period, Dr. Tonrey provided out-of-network healthcare services to Aetna plan enrollees. Dr. Tonrey's experience with Aetna's unlawful business practices is typical of what has happened to the Provider Class as a whole.

444. As an anesthesiologist, Dr. Tonrey administers anesthesia and manages the medical care of patients before, during, and after surgery. Dr. Tonrey is called upon by surgeons, not patients, to assist in surgical procedures. Thus in or out-of-network considerations

generally do not apply. At all relevant times, Dr. Tonrey obtained a valid assignment of benefits from his patients through the facility intake process.

445. Throughout the relevant Class Periods, Dr. Tonrey utilized a CMS 1500 form (or its equivalent), to submit claims for payment to Aetna. Dr. Tonrey's claims are routinely submitted electronically. Once an electronic claim is submitted it passes through a clearinghouse before reaching Aetna. All of Dr. Tonrey's claims are submitted to Aetna using CPT codes, ICD-9 codes, and modifiers, as necessary. Dr. Tonrey does not find out his compensation from Aetna for services rendered until after a procedure is performed and a claim for payment is submitted.

446. At all relevant times, Dr. Tonrey expected to be reimbursed by Aetna at the current UCR rate. While providing services to Aetna patients, Dr. Tonrey was repeatedly subjected to reductions in reimbursements based on Aetna's representations that his bills are in excess of UCR amounts. In making these improper determinations, Aetna relied on the flawed and inadequate Ingenix Database as well as other improper methods for calculating what it considered to be "fair" rates, which fail to identify proper UCR rates.

447. Rather than simply pay Dr. Tonrey the lesser of his billed charges or UCR rates, Aetna instead routinely and deliberately reimbursed his claims at below UCR levels, requiring him to exhaust significant amounts of time and energy first identifying and then appealing improperly reimbursed claims.

448. Aetna unlawfully diminished Dr. Tonrey's compensation by improperly calculating UCR rates and then misapplying these rates to his claims. Dr. Tonrey's EOBs and Remittance Advices state that "[t]he member's plan provides benefits for covered expenses at the reasonable charge as determined by Aetna, for the service in the geographic area where it is

provided." Nowhere on the EOBs or Remittance Advices does Aetna discuss or identify how it actually calculates UCR. The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations. However, in appeals correspondence sent to Dr. Tonrey, Aetna revealed that "[t]o determine the recognized charge, we refer to statistical profiles of physicians' charges for the same or similar services in a geographic area. We use Ingenix Prevailing Healthcare Charges System (PHCS), formerly HIAA, an outside data sources for these profiles. Ingenix PHCS is a nationally recognized source for data used to establish prevailing reasonable and customary fees. Aetna sets the recognized charge fee at the 80th percentile of Ingenix PHCS data unless otherwise specified by the plan sponsor." Through the use of Ingenix, among other improper pricing methods, Aetna has been able to derive improper rates using faulty data, and apply them to Nonpar claims in order to diminish lawful reimbursement.

449. During the Provider Class Periods, Aetna also diminished reimbursement to Dr. Tonrey by improperly paying for his services at a rate of "125% of Medicare" and by misapplying a "Fee Schedule" to his claims. Nonpars like Dr. Tonrey should not be reimbursed for their services based on an arbitrary percentage of Medicare rates. Nonpars are entitled to the lesser of their billed charges or UCR rates, and thus are under no obligation to accept anything less as payment, even if Aetna represents that it is "fair." Nevertheless, Aetna's EOBs to Dr. Tonrey routinely stated that "SERVICES PAID AS REFERRED AND 125% OF MEDICARE ALLOWABLE OR AETNA MARKET FEE SCHEDULE," which Aetna calls "fair." Moreover, according to Aetna's letter correspondence to Dr. Tonrey, "[t]o determine the payment amount when a provider does not participate with Aetna and the plan does not define the applicable allowable amount, our responsibility is to pay a fair amount for your services. We

set this payment at 125% of the Medicare allowable amount." Other than Aetna's conclusory assertion that this configuration constitutes fair payment there is no basis or explanation for why 125% of Medicare is appropriate remuneration for ONET or how this configuration of Medicare was derived in the first place. The application of a percentage of Medicare rates to Nonpar claims is unlawful and has harmed Dr. Tonrey and the other members of the Provider Class who have been subjected to this practice. As detailed above, Aetna has already been reprimanded by state regulators for its improper practice of determining UCR rates based on a percentage of Medicare rates.

450. In addition to under-reimbursing Dr. Tonrey at 125% of Medicare, Aetna routinely misapplied its own discounted fee schedules to Dr. Tonrey's claims during the Provider Class Period. Despite the absence of a contractual relationship between Dr. Tonrey and Aetna, Aetna's EOBs regularly state that payment was made according to Aetna's market fee schedule. By placing this language on its EOBs, which are sent to plan Members, Aetna gives the false impression that Dr. Tonrey has agreed to accept payment in accord with Aetna's discounted fee schedules.

451. In correspondence sent to Nonpars and plan Members, Aetna routinely justifies its methods of under-reimbursement stating, in a conclusory fashion, that the methods result in "fair payment." By peppering its correspondence with language suggesting that Aetna has already remitted a fair amount to the doctor, Aetna leads patients to believe that any bill received from the doctor above and beyond what Aetna has already paid is improper, unjustified, and unwarranted.

452. All of Aetna's wrongful conduct described above has forced Dr. Tonrey and members of the Class to exhaust significant time and resources identifying and then appealing

unlawfully reimbursed claims. Upon identifying an improper payment for a claim, Dr. Tonrey promptly appeals Aetna's determination by sending a formal letter asking Aetna to reprocess the claim for additional payment. In addition to sending these appeals letters, Dr. Tonrey makes telephone calls to Aetna to appeal the insurer's wrongful determinations. Dr. Tonrey has frequently exhausted any administrative appeals available through Aetna without succeeding in obtaining full and proper reimbursement for his services, leaving a lawsuit as the only alternative.

453. Moreover, when an appeal is left unsettled, Dr. Tonrey often cannot collect for his services due to Aetna's failure to comply with its contractual obligations.

### 5. Dr. Carmen Kavali

454. Effective July 15, 2005, Dr. Kavali entered into a Specialist Physician Agreement with Aetna and, as a result, became a member of the Aetna provider network. On July 10, 2007, Dr. Kavali sent a certified letter notifying Aetna that she was terminating the contract and that she understood the termination would become effective ninety days after Aetna's receipt of the letter. As a result, on or about October 11, 2007, Dr. Kavali was no longer a participant in the Aetna network and thus, with respect to Aetna, had the status of a non-participating physician thereafter.

455. After October 11, 2007, Dr. Kavali has treated patients with coverage under plans covered or administered by Aetna on an out-of-network basis. Dr. Kavali routinely obtains from her patients an assignment of benefits. Customarily, before Dr. Kavali performs a procedure for these patients, her office staff will contact Aetna to confirm coverage, inquire about the basis upon which payment to her will be made, and ask for the amount of the payment so that the patient's share of the cost can be calculated. Aetna, however, customarily refuses to explain the basis upon which payment will be made and will not disclose the amount that Dr. Kavali will

receive. Indeed, Aetna will not even confirm whether or not the payment will be based upon the usual and customary rate. The only information that Aetna typically will disclose is the amount of the patient's co-insurance, the out of network deductible, and how much of the deductible has already been met.

456. Once Dr. Kavali has provided medical services to an Aetna patient, she customarily sends to Aetna a bill using a CMS 1500 form or its equivalent describing the services with the appropriate CPT coding and informing Aetna of her charge for each service. In each instance, Dr. Kavali expects to be compensated for her services at the lesser of her billed charges or the amount provided under the patient's plan, which she understands is based upon a percentage of the applicable UCR rate.

457. Customarily, after receipt of Dr. Kavali's bill, Aetna will send to her or to her patient an EOB that specifies the amount being paid for each of the services that were provided. The amount paid by Aetna with rare exception has been less than the billed charge. Aetna has given various explanations for its decision not to pay the full amount, such as that the "member's plan provides benefits for covered services at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided" or that "payment [is] made according to allowable expenses for member's plan, less deductible and co-insurance."

458. When Dr. Kavali or her staff has asked Aetna for a better or more complete explanation for why she has been paid less than her billed charges, no such explanation has been provided. To the contrary, Aetna has been evasive or attempted to keep secret the basis upon which her bills have been discounted and, as a result, has prevented Dr. Kavali from learning the methodology it uses in calculating the amounts she is paid for rendering out of network services. However, based upon the reasons appearing on the EOBs and her knowledge of the relevant

facts, Dr. Kavali believes that Aetna has reduced her bills based the applicable UCR rate as reflected in the Ingenix Database.

459. By using the Ingenix data base to calculate the amount she receives for her services, Aetna improperly and unlawfully diminished the compensation to which Dr. Kavali is entitled. Because she typically is unable to collect from her patients the full amount of her billed charges, Dr. Kavali was been injured monetarily as a direct and proximate result of Aetna's improper conduct.

460. The EOBs issued by Aetna relating to the out of network patients treated by Dr. Kavali do not provide any procedures or process by which to appeal the amount of compensation. The EOBs simply contain an address and provide a telephone number to call "for questions about this claim." In addition, Aetna has told Dr. Kavali that it is not necessary to file a written appeal. Dr. Kavali or her staff has telephoned Aetna to complain about the amount of compensation paid for a particular service without any success in obtaining additional payment.

461. Any further appeal to Aetna regarding the amount of her compensation would have been futile as Aetna did not disclose and, indeed, concealed its use of the Ingenix Database to diminish payments based upon UCR rates and routinely asserted that it was paying the proper amount due under the patient's plan. Further, it would have been inconsistent with Aetna's scheme to disclose to physicians such as Dr. Kavali as part of any appeal process that it was manipulating the calculation of UCR rates or to provide additional compensation to physicians as such additional payments would have constituted an admission of its improper conduct.

### 6. Brian Mullins, M.S., P.T.

462. Plaintiff, Mullins, is a licensed physical therapist who resides in Ocean Township, New Jersey and works in Neptune, New Jersey. At all relevant times, Mr. Mullins was a Nonpar in Aetna's providers' networks. Throughout the relevant Class Period, Mr. Mullins has been an

out-of-network provider of physical therapy services to Aetna's Members. Mr. Mullins's experience with Aetna's unlawful business practices is typical of what has happened to the Provider Class as a whole.

463. Because he is not in Aetna's network of preferred providers, Mr. Mullins, as with other Class Members, typically obtains a claim assignment from his patients during the initial patient intake process, through which he is paid directly by Aetna for providing health care to its Members. These claim assignments do not alter the legal relationship between Aetna and its Members, but rather provides the convenience of allowing its Members to obtain needed health care on the implicit promise of later payment by Aetna.

464. The assignment of benefit forms that Mr. Mullins and Provider Class Members obtain from their Aetna patients are security for future payment by Aetna and direct Aetna, as the patient's insurer, to pay the benefit claim direct to the Nonpar. Mr. Mullins can and does check claim coverage and obtains pre-authorization from Aetna before performing services for Aetna's Members, but as with other Class Members, Mr. Mullins is not told Aetna's intended UCR reimbursement amount. The only payment information that Aetna typically will disclose is the amount of the patient's co-insurance, the out of network deductible, and how much of the deductible has already been met. Otherwise, payment is not known and is frequently not automatic – unlike the services Aetna has obtained for its Members.

465. Mr. Mullins, like other Provider Class Members, submits his claims to Aetna using standardized procedural codes such as CPT Codes, HCPCS Codes, and modifiers, as needed, on a HCFA form 1500 (n/k/a, CMS 1500). These claims are submitted to Aetna either in paper form or electronically and may or may not be immediately processed by an electronic clearinghouse before reaching Aetna.

466. Customarily, after receipt of Mr. Mullins' bill, Aetna will send to him or to his patient an EOB that specifies the amount being paid for each of the services that were provided. In each instance, the amount paid by Aetna has been less than the billed charge. Aetna gives generic explanations for its decision not to pay the full amount, such as that the "payment [is] made according to allowable expenses for member's plan, less deductible and co-insurance."

467. The EOBs issued by Aetna relating to the out of network patients treated by Mr. Mullins do not provide any procedures or process by which to appeal the amount of compensation. The EOBs simply contain an address and provide a telephone number to call "for questions about this claim." Because Aetna has been evasive and secretive regarding the basis upon which his bills have been discounted, Aetna has prevented Mr. Mullins from learning the methodology it uses in calculating the amounts he is paid for rendering ONET. However, based upon the reasons appearing on the EOBs and his knowledge of the relevant facts, Mr. Mullins believes that Aetna has reduced his bills based upon application of the Ingenix Database or some other faulty methodology.

468. At all relevant times, Mr. Mullins expected to be reimbursed by Aetna at the current UCR rate. While providing services to Aetna patients, Mr. Mullins was subjected to reductions in reimbursements based on Aetna's representations that his bills are in excess of UCR amounts. In making these improper determinations, Aetna relied on the flawed and inadequate Ingenix Database as well as other improper methods for calculating the proper UCR rates.

### 7.     Abraham I. Kozma, P.A.

469. Chiropractic and Acupuncture Center of Sarasota provided Nonpar healthcare services to an Aetna subscriber that had been preauthorized by Aetna. Chiropractic and Acupuncture Center of Sarasota is a Nonpar with regard to Aetna.

470.   On behalf of its Aetna covered patients, Chiropractic and Acupuncture Center of Sarasota submitted a HCFA 1500 Form to Aetna seeking benefits for the services that were provided. Each service billed was designated by a separate CPT Code.

471.   After Chiropractic and Acupuncture Center of Sarasota submitted the appropriate forms for reimbursement, Aetna sent an EOB to Chiropractic and Acupuncture Center of Sarasota, thereby acknowledging the validity of its assignment, in which it reported on its coverage determination for the services Chiropractic and Acupuncture Center of Sarasota provided to the patient.

472.   The EOB disclosed only that the Nonpar reimbursements were being paid at "prevailing" local rates or that at the reasonable and customary rates for its geographic area, or some other notation of UCR.

473.   At all relevant times, Chiropractic and Acupuncture Center of Sarasota expected to be reimbursed by Aetna at the lesser of its billed charges or the current UCR rate.

474.   However, Chiropractic and Acupuncture Center of Sarasota did not receive full payment for its billed charges from the Aetna subscribers.   Aetna unlawfully diminished Chiropractic and Acupuncture Center of Sarasota's compensation by improperly calculating UCR rates and then misapplying these rates to its claims.   Chiropractic and Acupuncture Center of Sarasota's EOBs often state that its billed charges purportedly exceed the UCR rate for the geographic area where the services were performed, Nowhere on the EOBs, however, or elsewhere in any other correspondence sent to Chiropractic and Acupuncture Center of Sarasota and its patients from Aetna discuss or identify how it actually calculates UCR.  The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations. With its methods for calculating UCR shrouded in a veil of secrecy, Aetna has been able to

derive improper rates using faulty Ingenix data, and apply them to Nonpar claims in order to diminish lawful reimbursement.

475.    Further, any appeal to Aetna was likely futile as Aetna did not fully disclose all the relevant information, Aetna's appeal denials withheld material information, as detailed herein, that Aetna was obligated to disclose as a fiduciary. Because Nonpars are unaware of the scheme that results in payors like Aetna failing to pay appropriate UCR rates, they are either powerless to appeal any such improper determinations or their efforts to appeal these determinations are futile.

476.    Finally, Aetna's treatment of the appeals was contrary to ERISA and applicable regulations. It did not provide a "full and fair review." Because Aetna's appeal process violated procedural safeguards adopted in the ERISA regulations, any appeals are "deemed exhausted" by operation of law.

477.    Plaintiff Kozma seeks unpaid benefit amounts, treble damages and declaratory and injunctive relief for Aetna's conduct described herein, on its own behalf and on behalf of the members of the Class as defined herein.

### 8.    Maldonado Medical LLC

478.    Plaintiff Maldonado is a referred provider of DME and related services with its principal office located in Phoenix, Arizona. Maldonado provides DME and related services to Aetna Members that have had such services prescribed by a physician as medically necessary. Maldonado does not participate in any of Aetna's health plans and at all relevant times has been a Nonpar of DME and related services with regard to all Aetna health plans.

479.    Maldonado obtains a valid assignment of benefits from Aetna Members, which allows Maldonado to bill Aetna directly and receive payment for physician prescribed DME and related services. Maldonado also has Aetna Members execute a special power of attorney

appointing the Center for Health Insurance Claims Advocacy ("CHICA") as its legal representative to facilitate the submittal of appeals related to Aetna's denial of claims or the reduction in benefit claims. CHICA is a non-profit organization that assists Aetna Members and Maldonado in the appellate process.

480.    On behalf of Aetna Members, Maldonado submits claims to Aetna on a HCFA 1500 Form for prescribed DME and related services designating each specific DME and service provided by HCPCS Code. When Maldonado submits claims to Aetna, it specifically requests copies of all documentation Aetna relied on in denying and/or reducing benefit claims. Aetna also inappropriately refers to Medicare rates, or a percentage thereof, as justification for its allowed rates. At all relevant times, Maldonado expected to be reimbursed by Aetna at the lesser of its billed charges or a legitimate UCR rate.

481.    Aetna oftentimes completely fails to respond to Maldonado's submitted claims. When Aetna does respond, it does so by sending Maldonado an EOB that typically reflects reductions in benefit claims based on what Aetna represents to be charges Aetna has received for the same service, the local prevailing rates, its fee schedule, the recognized charge, UCR rates, or some other similar notation. These EOBs do not provide the information that Maldonado requests with its submitted claims and provides insufficient information as to the methodology or source of data used in calculating the values Aetna represents as UCR rates.

482.    Upon receipt of these improper and/or insufficient EOBs, Maldonado seeks informal reconsideration of any denied and/or reduced benefit claims specifically requesting that Aetna provide copies of any information Aetna relied on in evaluating the claims and how UCR rates were calculated.

483. Aetna provides misleading responses to Maldonado's requests for informal reconsideration. For example, Aetna often fails to address all of the specific issues that reconsideration had been sought for, and fails to provide copies of the documents requested by Maldonado to justify its reimbursement determinations. In its responses to Maldonado, Aetna also mischaracterizes Maldonado's request for reconsideration as a "final appeal" and titles its own response as a "Final Appeal Resolution."

484. To the extent Maldonado is not satisfied with Aetna's resolution of disputed claims after informal reconsideration, Maldonado transfers patient files to CHICA and pays for all costs associated with CHICA's work conducting appeals on behalf of Maldonado and Aetna Members. Aetna Members execute an Authorization of Representation designating CHICA as their legal representative to appeal Aetna's denial and/or reduction of benefits.

485. CHICA submits first and second level appeals, as is necessary, and specifically requests all documentation relied on by Aetna in denying or reducing the benefit claims. Aetna oftentimes fails to respond to CHICA's appeal of denied or reduced claims. When Aetna does acknowledge appeals, it provides no documentation or meaningful explanation as to how the "recognized charge" is derived. CHICA continues the appellate process until claims are settled or it receives a Final Appeal Decision which exhausts administrative remedies.

486. In addition, any appeal was likely futile because Aetna failed to disclose all requested relevant information that it was obligated to disclose as a fiduciary. Because Nonpars are unaware of the scheme that results in payors like Aetna failing to pay appropriate UCR rates, they are either powerless to appeal any such improper determinations or their efforts to appeal these determinations are futile.

487.     Aetna's treatment of appeals was contrary to ERISA and applicable regulations. It did not provide a "full and fair review."   Because Aetna's appeal process violated procedural safeguards adopted in the ERISA regulations, all such appeals are "deemed exhausted" by operation of law.

488.     Maldonado's experiences with Aetna are typical of the class of Nonpars. Maldonado has been forced to expend a considerable amount of time and resources responding to Aetna's unjustifiable denial and/or reduction of benefit claims.   Maldonado seeks benefit amounts, its costs in pursuing inappropriately denied or reduced claims, treble damages and declaratory and injunctive relief for Aetna's conduct described herein, on its own behalf and on behalf of the members of the Class defined herein.

### C.     The Association Plaintiffs Have Been Directly Injured By Aetna's Conduct

489.     The Association Plaintiffs have also been injured by Aetna's wrongful conduct. Aetna's wrongful conduct causes direct injury to members of the Association Plaintiffs by delaying, denying, impeding and reducing lawful compensation for ONET provided to Aetna's enrollees.

490.     Aetna's wrongful conduct also causes direct injury to the Association Plaintiffs because they have been, and continue to expend time and resources in dealing with Defendants' practices.  This frustrates the Association Plaintiffs' purpose which is to uphold the provider patient relationship and ensure the delivery of quality medical care to patients.

491.     As a result of Aetna's conduct, the Association Plaintiffs have been required to devote substantial time and resources to dealing with the issues concerning Aetna's wrongful out-of-network reimbursement practices.  Specifically, the Association Plaintiffs devote significant time from several of its employees to deal with the practices at issue herein.  The Association Plaintiffs' efforts to counteract Aetna's unfair and deceptive practices include, *inter*

*alia*, counseling their respective members on how to counteract the practices at issue, monitoring Aetna's practices, and advocating on their members' behalf.

492.    Provider Association Plaintiffs seek unpaid benefit amounts, trebled damages and declaratory and injunctive relief for Aetna's conduct described herein, on their own behalf and on behalf of the members of the Association Plaintiffs, and of the Provider Class as defined herein.

## X.    ANTITRUST ALLEGATIONS

493.    Aetna has committed, and conspired to commit, with its direct competitors including, *inter alia*, UHG and CIGNA, and/or with other third parties numerous violations of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* Aetna has combined, conspired and/or agreed with other parties to unreasonably restrain trade in *per se* violation of Section 1 of the Sherman Act by price fixing with regard to paying reasonable and customary rate for non-party transactions.

### A.    Interstate Commerce

494.    Aetna participates in, and affects, interstate commerce.

495.    Aetna's activities, including the administration and operation of health plans and managed care plans, in every state in the United States, are in the regular, continuous and substantial flow of interstate commerce, and have a substantial effect upon interstate commerce.

496.    Aetna's unlawful activities, concerted actions, conspiracy to restrain trade, and agreement to fix prices substantially affect and restrain the operation of interstate commerce.

### B.    Aetna's Agreement To Fix Prices And Engage In Other Anticompetitive Conduct

497.    Aetna reached an agreement with its direct competitors, including UHG via its alter ego Ingenix and/or a number of other non-parties to determine UCR rates using primarily

the Ingenix Database, as described above, even while knowing that use of the database would result in artificially low reimbursements to Subscriber and Provider Class members. The above concerted action among these "competitors" and Co-Conspirators has resulted in unlawful and anticompetitive price fixing agreements, and other horizontal restraints of trade and anticompetitive behavior. This unreasonable restraint on trade is a *per se* violation of Section 1 of the Sherman Act.

498.    UHG, via its alter ego Ingenix, facilitates the direct horizontal agreements through the compiling and sharing of competitive information and UCR rate data among all the Co-Conspirators.

499.    Aetna and its co-conspirators are horizontal competitors in the sale of health insurance with the out of network benefit. These horizontal competitors have reached agreements, contractual or otherwise, in restraint of trade including agreements as to (i) to share data with Ingenix, and through Ingenix, each other (ii) what data points to include in the data provided to Ingenix, (iii) what geographic method of comparison to use in evaluating the data, (iv) agreeing to use the data as part of the claims adjustment process for out of network claims, and (v) other agreements related to implementing the goals and objectives of the conspiracy.

500.    As stated above, Aetna and other contributors to Ingenix are entitled to discounted use of the Ingenix Database simply for continuing to submit data at the level at which they submitted data when the database was owned by HIAA.

501.    UHG's ownership of the Ingenix Database and sharing of the database's compiled pricing data with each of its competitors is a textbook situation of adopting a benchmark for determining the price to be paid to Nonpars for out-of-network medical services.

502. Aetna engaged in price fixing when it agreed with its Co-Conspirators, including UHG to utilize precisely the same flawed database to determine the UCR amounts for out-of-network medical services, which lead to them paying substantially the same reduced amounts for services rendered to their subscribers.

503. Aetna's agreement also gives it, collectively with its competitors, tremendous power to set UCR rates well below those which would exist in a competitive marketplace. In fact, no competitive pressure to raise UCR rates exists while all the conspirators act collectively to reduce prices. Without agreement and collective action between them, including the exchange and compilation of relevant pricing data, Aetna would be unable to systematically and across the board reduce their UCR rates paid. This agreement to fix prices is an unreasonable restraint on trade and a *per se* violation of Section 1 of the Sherman Act.

504. The Department of Justice Antitrust Division notes in its Price Fixing "Primer" that price fixing agreement can take many forms. "[A]ny agreement that restricts price competitions violates the law." It adds that "examples of price fixing agreements include those to:

    (a)    Establish or adhere to price discounts

    (b)    Hold prices firm

    (c)    Adopt a standard formula for computing prices

    (d)    Adhere to a minimum fee or price schedule

http://www.usdoj.gov/atr/public/guidelines/211578.htm

505. Aetna, along with its Co-Conspirators, adopted a standard formula for making UCR determinations, based on a database that is designed and intended to reduce reported charges artificially, and each has agreed to a method of determining the maximum price or fee,

via database schedule, that it will pay for out-of-network charges. This alone amounts to an agreement to fix prices.

506. In addition to agreeing to price their UCR rates using the exact same database, which is inadequate for the purpose for which it is used, the insurers engage in behavior which facilitated the objections of the Company. The insurers have substantially similar contracts with their customers in which all material provisions are the same; they all submit UCR rate data to the databases to be compiled; they are all aware that the data submitted leads to skewing the relevant UCR determinations downward; and they all utilize the Ingenix Database to determine UCR rates. These actions allow their price fixing agreement to effectively depress the UCR rates paid to Nonpars for services rendered to plan subscribers, and otherwise reduce competition among would-be competitors.

507. Collusion, conspiracy and agreement are facilitated with an essentially homogenous product and with numerous opportunities for Aetna and its Co-Conspirators to agree and collude, including involvement and participation in the same trade associations and widespread availability of the Ingenix database. Additionally, where pricing information is shared among the parties, defection from the agreement is easy to detect as it is there for all to see in the data contributed to Ingenix.

508. The agreement between Aetna and its Co-Conspirators to fix and suppress prices also has the perverse effect of strong-arming doctors into becoming Pars of the various "networks" where further cost reducing measures and other methods of control can be imposed on healthcare providers.

509. As noted above, it was only after investigation by the NYAG, in conjunction with a pending class action lawsuit, that UHG agreed that the database used to determine UCR must

be independently maintained and that the agreement to fix prices using the database must be abandoned.

510. The market for data used to calculate UCRs for reimbursement of subscriber claims for out-of-network, non-negotiated medical services in the United States ("Data Market") is directly linked to the market for the purchase of insured medical services acquired on an out-of-network basis ("Linked Market"). The Data Market constitutes a primary input to the Linked Market, which Aetna uses to effectively control reimbursement amounts. The Linked Market is not subject to previously negotiated prices. Once adopted, the UCR constitutes the critical element in the reimbursement formula applied under each insurance plan and operates to cap the amount that will be reimbursed. By agreeing to joint control and administration of the Data Market through their use and manipulation of Ingenix and its data products, Aetna and its Co-Conspirators are able to assure that prices paid in the Linked Market will be artificially depressed, leading to collective cost savings for Aetna and its Co-Conspirators, increased costs borne by its Subscribers who purchase out-of-network services, and increased losses borne by Nonpars who are unable to collect the standard charge for their services rendered to Aetna subscribers.

511. Aetna and its Co-Conspirators conspired in the Data Market in order to create below-market UCRs ("False UCRs") and to artificially depress reimbursement rates for ONET. Ingenix functions as the conduit and switch that Aetna and its Co-Conspirators use to share prices and ultimately to fix UCRs. The design and effect of the conspiracy is to artificially deflate reimbursement amounts for ONET. As a result of the conspiracy, Aetna and its Co-Conspirators have shifted the costs of providing health insurance to the subscriber and provider plaintiffs.

512. Aetna and its Co-Conspirators agreed through contracts, licenses and oral understandings to provide flawed pricing information to Ingenix and to obtain and use the resulting flawed Ingenix uniform pricing schedules to set ONET reimbursement, thereby depriving subscribers and providers of a competitive market for obtaining ONET.

513. Further, Defendants and their Co-Conspirators agreed not to produce data to any other entity that would seek to provide data services used to calculate UCRs for determining ONET reimbursements.

514. Given Ingenix's 80% market share, the sale of the PCHS database by HIAA, as well as agreements by and among Aetna and the Co-Conspirators that tie them to Ingenix, there is no viable competitor in the market for data services used to calculate UCRs. Additionally, Ingenix's 80% share is indicia of the efficacy of conspiracy because it establishes the extent to which the Co-Conspirators have bought into the flawed database.

515. Due to the agreement by Defendants and their Co-Conspirators to manipulate and use a limited number of data points which are used to set the uniform pricing schedules (False UCRs) which Ingenix disseminates and Aetna and others deploy, competition in the market for the provision of data services used to calculate UCRs is harmed. In turn, competition in the Linked Market is harmed because of the agreement by Aetna and its Co-Conspirators to use False UCRs in order to reimburse for ONET.

516. Were it not for the existence of the conspiracy to manipulate the Data Market, Aetna and its Co-Conspirators would each have an incentive to set UCR rates competitively or alternatively to use a fair system to determine UCR rates that accurate reflect standard charges by Providers. Their failure to do so is a reflection of their collective self-interest and is an action taken directly contrary to their individual self-interests.

517.     Given the existence of the conspiracy, it is in Aetna's and its Co-Conspirators' collective interest to conspire to provide inaccurate, artificially low health care provider charge information to Ingenix for use in its database.     As cartel members, it is contrary to their collective interests to provide accurate reimbursement rates to subscribers because each of the Co-Conspirators uses the Ingenix Database (*i.e.*, the uniform price schedules of False UCRs) for the calculation of reimbursement of ONET.  If any Co-Conspirator were to cheat on the cartel and provide transparent pricing information that accurately reported healthcare provider charges, that accurate information would precipitate competition for ONET reimbursement, resulting in a loss of market share, revenue, and customers by cartel members.

518.     The Data Market is conducive to the collusion alleged herein.

519.     Aetna, Ingenix, UHG, and their Co-Conspirators jointly produce the data service used to calculate UCRs for reimbursement of claims by subscribers for out-of-network non-negotiated medical services.     Ingenix compiles and administers the Ingenix Database while UHG, Aetna, and their Co-Conspirators provide the raw data necessary for the Ingenix Database to compute and disseminate the uniform price schedules that UHG, Aetna, and their Co-Conspirators use to calculate ONET reimbursement.

520.     Today, the vast majority of health insurers have agreed to use the Ingenix Database to determine UCRs for reimbursing ONET claims.     Indeed, the UHG Defendants promote the Ingenix Database as the "industry standard" for determining UCRs, which insurance companies use to imbue their artificially low reimbursements for ONET with the appearance of legitimacy and accuracy.

521.     The Data Market has high barriers to entry.  The high barriers to entry include: the costs of obtaining historical and current insurers' data; the costs of constructing, developing,

and maintaining hardware and software platforms necessary to aggregate, manipulate, and disseminate the data; and the costs of successfully convincing insurers to adopt the services.

522.     The cost and difficulty of obtaining historical data poses an exceedingly high barrier to entry, as it requires any new entrant to obtain such data from Ingenix, who controls the spectrum of relevant historical insurer data.

523.     The Data Market is a mature market, having been in existence and in the effective control of Defendants and their Co-Conspirators for decades.  There are few competitors and, as described herein, the market has been marked by consolidation among those few competitors, such that Ingenix now provides the vast majority of data in this market.

524.     Defendants and their Co-Conspirators had, and continue to have, ample opportunities to communicate among themselves about the conspiracy and combination alleged herein, including the collection and dissemination of data used to establish the UCRs for calculating reimbursement for ONET, as well as at HIAA and now AHIP board meetings where Aetna was, and is, a board member and participated in meetings about the Data Market and the use of Ingenix by its Co-Conspirators.  Indeed, under the terms of the licensing agreements that govern the use of the Ingenix Database, UHG, Aenta, and their Co-Conspirators are in almost constant communication with Ingenix.

525.     Due to the lack of transparency in the determination of UCRs and ONET reimbursement as alleged herein, as well as a non-disclosure agreement by Aetna and its Co-Conspirators not to provide data to potential competitors of Ingenix, there is no competition among Aetna or its Co-Conspirators with respect to the determination of UCRs or the reimbursement of ONET.

526.  Every artificially suppressed UCR reported by Ingenix and adopted by Aetna has resulted in actual economic loss to one or both of the subscriber and provider classes. The minimum amount of such loss is equal to the difference between the artificially suppressed rate and a correctly computed UCR for the same procedure in the same locale, multiplied by the number of times that the procedure code has been used by Aetna to pay out-of-network claims in that locale during the class periods. These losses have been shared between Subscribers and Providers, and such damages may be allocated among them.

### C.    Antitrust Injury

527.  Aetna's market power results from the combined power of its competitors, who also reached agreement to utilize the same database to determine UCR rates and whose role as primary payors or administrators gives them the power to impose artificially low UCR rates and other anti-competitive restrictions on doctors that could not exist in a competitive market.

528.  Competition among the payors has also been reduced by the agreement to improperly reduce UCR amounts.

529.  Without the agreement to fix UCR rates and reduce competition among payors, the Subscriber and Provider Plaintiffs and Classes would have been, and would have continued to be paid more for ONET.

530.  Aetna and its Co-Conspirators conspired in the market for the provision of data services used to calculate UCRs in order to create and fix UCRs to artificially depress reimbursement for ONET. Ingenix functions as the conduit and switch Aetna and its Co-Conspirators use to share prices and ultimately to fix UCRs. The design and effect of the conspiracy is to artificially restrain reimbursement amounts for ONET. As a result of the conspiracy, Aetna and its Co-Conspirators have shifted the costs of providing health insurance to Plaintiff and the Classes.

531.    Aetna and its Co-Conspirators agreed through contracts, licenses and oral understandings to provide pricing information to Ingenix and to obtain and use the resulting flawed Ingenix uniform pricing schedules to set ONET reimbursement, thereby depriving Plaintiff and the Class of a competitive market for obtaining ONET.

532.    Further, Defendants and their Co-Conspirators agreed not to produce data to any other entity that would seek to provide data services used to calculate UCRs used to determine ONET reimbursement.

533.    Given Ingenix's 80% market share, the sale of the PHCS database by HIAA, as well as agreements by Aetna and the Co-Conspirators that tie them to Ingenix, there is no viable competitor in the market for data services used to calculate UCRs.

534.    Due to the agreement by Defendants and their Co-Conspirators to manipulate and use a limited number of data points which are used to set the uniform pricing schedules (UCRs) which Ingenix disseminates and Aetna and others deploy, competition in the market for the provision of data services used to calculate UCRs is harmed by this systematic manipulation of data. In turn, competition in the inextricably linked market for the provision of ONET is harmed because of the agreement by Aetna and its Co-Conspirators to use the flawed UCRs in order to reimburse for ONET.

535.    As a result of the anticompetitive and deceptive conduct of Aetna and its Co-Conspirators alleged herein, resulting in artificially low UCRs and depressed ONET reimbursements, Defendants deprived the Subscriber and Provider Plaintiffs and Classes of a competitive market where they could obtain full reimbursement for ONET.

536.    Moreover, one effect of the Defendants' conduct is to reduce the choice that the subscriber consumers have in obtaining medical services, thereby reducing consumer welfare.

## XI.  DEFENDANTS' MISREPRESENTATIONS AND FRAUDULENT CONCEALMENT OF THE TRUTH

537.  To calculate their reimbursement amounts for ONET, Aetna and its Co-Conspirators use the Ingenix Database to determine their UCR rates.  The Ingenix Database functions as a data-laundering mechanism:  Ingenix utilizes billing information provided by its parent company (UHG) and other health insurance companies, including Aetna, to calculate UCR rates that health insurers, including the entities which provided the data, then rely on and use to reimburse their Members' out-of-network claims.

538.  As described herein, Defendants and their Co-Conspirators combined to exert control over UCR rates used for reimbursing ONET by providing knowingly flawed data to Ingenix, which is then further manipulated or "scrubbed" by Ingenix.  Further, Defendants and their Co-Conspirators agreed through various contract and licensing agreements to use the flawed data, thereby depriving insureds, including Subscriber and Provider Class members, of a competitive market where they could obtain reimbursement for ONET.   Defendants' conspiratorial manipulations yield artificially low UCR rates, resulting in artificially low ONET reimbursements and higher out-of-pocket expenses for Members.

539.  UHG, Aetna and their Co-Conspirators jointly produce the False UCRs.  Ingenix compiles and administers the Ingenix Database while UHG, Aetna and the Co-Conspirators provide the raw data necessary for the Ingenix Database, as the benchmark for the false UCRs, which in turn are used by Aetna for determining reimbursement for ONET.

540.  The effect of Defendants' unlawful conduct and misrepresentations on consumers, including Subscriber and Provider Plaintiffs, is profound.   Overall out-of-pocket costs of healthcare insurance and choice of provider are the two most important aspects of healthcare to consumers.  Defendants' conspiracy and misrepresentations affect both of these aspects of

healthcare since Defendants represent through their advertising and plan contracts that they will permit their Members to choose between in-network and out-of-network providers and that Members will be reimbursed based on the UCR for ONET. Nevertheless, Defendants do not reimburse for ONET based on the UCR, instead utilizing reimbursement rates that they know are artificially deflated, thereby increasing the costs to consumers of using ONET and deterring consumers from freely choosing between in-network and out-of-network providers. By affirmatively misrepresenting the extent to which they will reimburse for ONET and the extent to which consumers can choose between in-network and out-of-network providers, and by failing to disclose that reimbursement for ONET is calculated based on False UCRs, Defendants have deceived Subscriber and Provider Plaintiffs and the other members of the Classes.

541. The relationships between Aetna, UHG, their Co-Conspirators and Ingenix are rife with inherent conflicts of interests against insureds, including Class members, that inhibit the construction of a rigorously defined and audited database necessary to determine fair and accurate UCR rates. Insurers, such as Aetna, who have a contract with Ingenix, are incentivized to provide flawed claims data which will result in lower UCR rates in order to pay lower reimbursements for ONET. Furthermore, Ingenix offers insurance companies that provide data to Ingenix, such as Aetna, a discounted rate for use of the database, thereby creating further incentive to provide flawed data, and highlighting the collusive and unfair nature of this unlawful scheme. Given the conspiracy to construct and use flawed data and employ inaccurate UCR rates, neither Aetna, UHG, its other Co-Conspirators, nor Ingenix, have any incentive to prevent or investigate the risk of biased, inaccurate data. In fact, Ingenix has an incentive to do the opposite because, by turning a blind eye to the quality and reliability of the data submitted to it, and then manipulating the data to support artificially low UCR rates, Ingenix can both support its

parent company by assisting UHG to perpetuate low reimbursement rates for out-of-network claims (up to 10% of total claims submitted to UHG) and maintain its dominant market position as the data provider for its health insurance company clients/participants

542.    Defendants and their Co-Conspirators actively conceal, and caused others to conceal, information about the true UCR rates for ONET, including the fact that UCR rates used by Defendants and their Co-Conspirators are deliberately understated, knowing the success of the high-profit scheme will be jeopardized if anyone discloses the significantly higher true average costs. Defendants and their Co-Conspirators not only operate Ingenix as a "black box" such that Members of Defendants' and their Co-Conspirators' health plans, including Plaintiff, have almost no ability to determine precisely how Ingenix calculates UCR rates, but Defendants and their Co-Conspirators also typically do not disclose that they either use Ingenix to calculate the UCR rate or that Ingenix is wholly-owned by an insurance company.

543.    Each Defendant and Co-Conspirator concealed its fraudulent conduct from Subscriber and Provider Plaintiffs and the members of the Classes (as set forth below) by conspiring to manipulate the process by which reimbursement rates were set. Defendants and their Co-Conspirators also prevented Subscriber and Provider Plaintiffs and the members of the Classes from knowing or discovering the actual methodology used by Ingenix to determine the UCR rate. As the Senate Report summarized President of the AMA Dr. Nancy Nielson's testimony, "when doctors asked insurers how they had calculated their 'usual and customary' rates, they were told that information was 'proprietary.'" Moreover, the fraudulent conduct alleged herein was of such a nature as to be self-concealing.

544.    Among consumer decisions, the selection and purchase of health insurance is of vital importance. When considering health insurance policies, consumers are entitled to accurate

information. In addition, and especially considering the skyrocketing cost of insuring oneself and one's family, consumers are entitled to the full value of their premiums.

545. Defendants and their Co-Conspirators have inflicted significant financial harm on their Members. Overall healthcare costs in the United States comprise over fifteen percent of the country's Gross Domestic Product. A significant percentage of claims submitted to Defendants and their Co-Conspirators are for ONET. Subscriber Plaintiffs and members of the Subscriber Classes paid for out-of-network coverage, obtained services from providers outside of the Aetna network, and had the right to reimbursement under the terms of their policies, including a fair and accurate calculation.

546. As a result of the conspiracy, Subscriber Plaintiffs and the members of the Classes paid Aetna higher premiums for out-of-network coverage and then received lower reimbursement for ONET than they would have received in a competitive market place.

547. Any applicable statutes of limitations have been tolled by Defendants' and their Co-Conspirators' knowing and active concealment and denial of the facts alleged herein. Aetna and Co-Conspirators went to great lengths to conceal the existence of the conspiracy and its material terms.

548. Defendants and their Co-Conspirators were, and continue to be, under a continuing duty to disclose to Subscriber and Provider Plaintiffs and the Classes the fact that their reimbursement rates for out-of-network medical expenses were based on UCR rates that bore, and continue to bear, no relationship to the actual charges for those medical expenses. Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the UCR rates, Defendants and their Co-Conspirators are estopped from relying on any statutes of limitations.

## XII.   CLASS ACTION ALLEGATIONS

### A.   Subscriber Plaintiff Class Actions

#### 1.   Class Definitions

549.   Subscriber Plaintiffs Werner, Franco, Smith, Seney, and Whittington bring this action on their own behalf and on behalf of an "Subscriber ERISA Class," defined as:

> All persons who are, or were, from July 30, 2001 through the present ("ERISA Class Period"), Members in any group healthcare plan insured or administered by Aetna, subject to ERISA (other than New Jersey small employer plan Members), who received hospital or medical services or supplies from a Nonpar provider (or any provider Aetna considered Nonpar for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed less than the provider's billed charge in determining benefits.

550.   Subscriber Plaintiffs Cooper and Samit bring this action on their own behalf and on behalf of a "Subscriber New Jersey SEHP and Individual Plan Class," defined as:

> All persons who are, or were, from July 30, 2001 through the present ("New Jersey SEHP and Individual Plan Class Period") Members in any New Jersey small group healthcare plan insured or administered by Aetna, subject to ERISA, and Members of Individual Plans insured or administered by Aetna not subject to ERISA who received hospital or medical services or supplies from a Non-Par provider (or any provider Aetna considered Nonpar for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed an amount less than the provider's billed charge in determining benefits.

551.   All of the Subscriber Plaintiffs bring this action on their own behalf and on behalf of a "Subscriber RICO Antitrust Class," defined as:

> All persons who are, or were, from March 1, 2001 through the present ("RICO Class Period"), Members in any healthcare plan (ERISA or non-ERISA) insured or administered by Aetna who received hospital or medical services or supplies from a Nonpar provider (or any provider Aetna considered Non- Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed an amount less than the provider's billed

charge in determining benefits, based on the use of the Ingenix Databases.

552. All of the Subscriber Plaintiffs, except for Plaintiff Weintraub, further bring this action on their own behalf and on behalf of a "Subscriber RICO Section 664 Subclass," defined as:

> All persons who are, or were, from March 1, 2001 through the present ("RICO Section 664 Subclass Period"), Members in any healthcare ERISA plan insured or administered by Aetna who received hospital or medical services or supplies from a Nonpar provider (or any provider Aetna considered N on- Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed an amount less than the provider's billed charge in determining benefits, based on the use of the Ingenix Databases.

553. Additionally Plaintiff Weintraub further bring this action on his own behalf and on behalf of a "Subscriber New York Damages Class," defined as:

> All persons or entities residing in New York who paid premiums for out-of-network health insurance coverage from Aetna and received reimbursement for ONETs between April 29, 2004 and the present.

554. Plaintiff Weintraub brings this action on his own behalf and on behalf of a "Non-ERISA Class" defined as follows:

> All persons who, are or were, from April 29, 2004 through the present ("Non-ERISA Class Period") Members in any plan insured or administered by Aetna, which was not subject to nor governed by ERISA, who received hospital or medical services or supplies from a Non-par provider for which Aetna (or any third party acting on behalf of Aetna) allowed less than the provider's billed charges in determining benefits.

**2. Common Class Claims, Issues And Defenses For The Subscriber Classes**

555. The following common class claims, issues and defenses for Subscriber Plaintiffs and the Subscriber Classes arise for the defined Class Periods:

(a)     Whether Aetna's use of the Ingenix Databases to calculate UCR in determining Nonpar reimbursement breached Aetna's legal obligations to its Members' group health plans;

(b)     Whether Aetna's Nonpar Benefit Reductions described in this Amended Complaint violated ERISA, or other applicable law;

(c)     Whether ERISA requires each Class Member to prove exhaustion or otherwise provide a basis for excusing exhaustion; or other relief;

(d)     Whether Aetna's alleged fiduciary violations, if proved, justify injunctive relief;

(e)     Whether Class Members (including those who assigned claims) may recover unpaid benefits;

(f)     Whether Aetna's failure to provide accurate plan documents upon request, including EOCs and SPDs and other information, entitles Class members to any relief;

(g)     Whether, in addition to unpaid benefits, interest should be added to the payment of unpaid benefits under ERISA;

(h)     Whether Aetna's claims review procedures comply with ERISA;

(i)     The standard of review applicable to review Aetna's Nonpar Benefit Reductions;

(j)     The identity and scope of the ERISA and non-ERISA plans subject to this Amended Complaint;

(k)     Whether Aetna violated its fiduciary or other legal duties owed to its Members when it made its Nonpar Benefit Reductions or otherwise engaged in the conduct alleged in this Amended Complaint;

(l)     Whether Aetna's EOBs and other communications with its Members violated ERISA or other applicable law;

(m)     Whether the Court's interpretation of the ERISA plans at issue must be guided by the state regulators' interpretation of such plans;

(n)     What are the applicable statute of limitations periods for the claims of Class members and whether Aetna's concealment of material facts bars Aetna from asserting any statute of limitations defense;

(o)     Whether Aetna's calculation of Members' deductibles and out-of-pocket maximums violate plan language and applicable law;

(p)     Whether Aetna violated the SEHP and individual plan Regulations for all New Jersey Members, including by underpaying hospital, medical, dental and other claims;

(q)     Whether Aetna and Ingenix' s manipulation of, and the structural deficiencies in, the Ingenix Databases prevent Aetna from relying on the New Jersey Regulation as a defense;

(r)     Whether Aetna violates the prudent layperson standard or other law by its Nonpar ER payment reductions or otherwise;

(s)     Whether Aetna engaged in a pattern of racketeering activity, as defined by RICO, by and through the conduct of the Aetna-Ingenix Enterprise described in this Amended Complaint;

(t)     Whether Aetna Members can enjoin the UCR tiering reductions for behavioral health services provided by psychologists, LCSWs and other mental health professionals and enjoin the dunning letters and collection referral threats made in conjunction with its unauthorized UCR tiering policy;

(u)     Whether Aetna Members in New Jersey SEHP and individual plans are entitled to receive unpaid amounts for all Nonpar hospital or medical services or supplies for which Aetna underpaid in violation of the SEHP and individual plan Regulations;

(v)     Whether Defendants and their Co-Conspirators engaged in a pattern of deceptive conduct as to Plaintiff and the members of the Classes;

(w)     Whether Defendants and their Co-Conspirators engaged in a contract, combination or conspiracy to fix UCRs;

(x)     The duration and extent of the combination or conspiracy alleged herein;

(y)     Whether the alleged combination and conspiracy violated Section 1 of the Sherman Act; and

(z)     Whether the alleged actions violated GBL § 349.

### 3.     Additional Subscriber Class Action Allegations

556.    The members of the Classes are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of hundreds of thousands of Aetna Members in commercial group health plans insured, offered, or administered by Aetna. The precise number of members in the Class are within Aetna's custody and control. Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied for the Class. For example, there are over 500,000 Aetna Members in New Jersey alone. Nationwide, there are hundreds of thousands of Aetna Members in ERISA and non-ERISA group health plans subject to the allegations of this Amended Complaint.

557.    Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class, including the class action claims, issues and defenses listed above.

558.    The named Subscriber Plaintiffs' claims are typical of the claims of the Class members because, as a result of the conduct alleged herein, Aetna has breached its statutory and contractual obligations to the Subscriber Plaintiffs and the Subscriber Class through and by uniform patterns or practices as described above.

559.    Subscriber Plaintiffs Cooper, Werner, Franco, Smith, Weintraub, Seney and Whittington, will fairly and adequately protect the interests of the members of the Subscriber Classes, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class action litigation and in the prosecution of ERISA and RICO claims and have no interests antagonistic to or in conflict with those of the Class. For these reasons, the Subscriber Plaintiffs are adequate class representatives.

560.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Aetna.

561.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, because the unpaid benefits denied Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them. Aetna maintains computerized claims information that enables it to calculate unpaid amounts resulting from Nonpar Benefit Reductions for Class Members. Given the uniform policy and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

### B.    Provider Plaintiffs' Class Allegations

#### 1.    Provider Class Definitions

562. The Provider Plaintiffs bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure. The requirements of subparts 23(a) and (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure are met. The Individual Provider Plaintiffs bring this class action on behalf of a Class, defined as:

> All Nonparticipating healthcare providers within the boundaries of the United States of America, who provided services to any member of any Aetna insured or administered health plan, at any time during the period June 3, 2003 through the date of certification and were paid less than their billed charge for such "out-of-network" medical services.

563. The Provider Plaintiffs also bring this action on their own behalf and on behalf of a Provider ERISA Subclass defined as follows:

> All non-participating healthcare providers, within the boundaries of the United States of America, who provided services to any member of any Aetna insured or administered group health plan subject to ERISA, at any time during the period June 3, 2003 through the date of certification and were paid less than their billed charge for such "out-of-network" medical services.

564. Excluded from the Provider Class and the Provider ERISA Subclass are any judge(s) or justice(s) to whom this action is assigned, as well as any relative of such judge(s) or justice(s) within the third degree of relationship, and the spouse of any such person.

## RULE 23(a)

### Numerosity

565. The Provider Class includes thousands of Nonpar healthcare providers throughout the United States and is therefore so large to make joinder of all members impracticable within the meaning of Fed. R. Civ. P. 23(a)(1).

### Commonality

566. Pursuant to Fed. R. Civ. P. 23(a)(2), there are questions of law or fact common to all Provider Class members, including, but not limited to, the following:

(a)     Whether the amounts paid to the Provider Classes, have been fixed, artificially maintained, and/or stabilized by Aetna and others;

(b)     Whether Aetna's use of the Ingenix database or its other Nonpar pricing methods to calculate UCR rates violated ERISA, RICO, or the Sherman Act;

(c)     Whether Aetna's Nonpar benefit reductions violated ERISA, RICO or the Sherman Act;

(d)     Whether Aetna's use of the Ingenix database itself resulted in lower UCR determinations than were otherwise available based on appropriate information;

(e)     Whether Aetna's failure to properly disclose the specific reason for UCR and Nonpar pricing methods in its EOBs as well as failure to disclose material information (including the offer to disclose the relevant evidence) violated ERISA or RICO;

(f)     Whether ERISA requires each Provider ERISA Subclass member to prove exhaustion or futility;

(g)     Whether Aetna violated RICO and, if so, the appropriate relief to be awarded;

(h)     Whether Aetna combined, conspired and/or agreed with its Co-Conspirators in a price fixing conspiracy that sought, and was able, to artificially lower, fix or maintain the price paid to Provider Plaintiffs and the Provider Class by Aetna as UCR rates in violation of the Sherman Act; and

(i)     Whether interest should be added to the payment of unpaid benefits.

## Typicality

567.     The claims of the Provider Plaintiffs are typical of the claims of the defined Provider Classes, within the meaning of Fed. R. Civ. P. 23(a)(3), and are based on and arise out of the same uniform and standard illegal practices of the Defendant alleged by the Provider

Plaintiffs. The proposed Provider Class representatives state claims for which relief can be granted that are typical of the claims of absent Provider Class members. If litigated individually, the claims of each Provider Class member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

## Adequacy

568. The Provider Plaintiffs are committed to pursuing this action and are prepared to serve the proposed Class in a representative capacity with all of the obligations and duties material thereto. The Individual Provider Plaintiffs will fairly and adequately represent the interests of the members of the class within the meaning of Fed. R. Civ. P. 23(a)(4) and have no interests adverse to, or which directly and irrevocably conflict with, the interests of the other Provider Class members.

569. The Provider Plaintiffs have retained competent counsel experienced in class action litigation. Said counsel will adequately prosecute this action, and will assert, protect and otherwise well represent the named Provider Class representatives and absent Provider Class members.

## RULE 23(b)(1)(A) AND (B)

570. The prosecution of separate actions by individual Provider Class members would create a risk of adjudication with respect to individual Provider Class members which would, as a practical matter, be dispositive of the interests of other members of the Provider Class who are not parties to this action, or could substantially impair or impede their ability to protect their interests.

571. The prosecution of separate actions by individual members of the Provider Class would create a risk of inconsistent of varying adjudications with respect to individual members of the Provider Class which would establish incompatible rights within the Provider Class.

572. Aetna's actions are generally applicable to the Provider Class as a whole, and the Individual Plaintiffs seek equitable remedies with respect to the Provider Class as a whole, within the meaning of Fed. R. Civ. P. 23(b)(2).

**RULE 23(b)(3)**

573. The common questions of law and fact enumerated above predominate over individual questions, and a class action is a superior method for the fair and efficient adjudication of this controversy, within the meaning of Fed. R. Civ. P. 23(b)(3). Common or general proof will be used for each Provider Class member to establish each element of their ERISA, RICO and antitrust claims. Additionally, proceeding as a class action is superior to other available methods of adjudication. The likelihood that individual members of the Provider Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation since the cost of litigation far exceeds what any one Provider Class member has at stake.

## XIII. CAUSES OF ACTION

### COUNT I (A)

**CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS GOVERNED BY ERISA AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(On Behalf Of The Subscriber ERISA And New Jersey SEHP Classes)**

574. The allegations contained in this Amended Complaint are realleged and incorporated by reference as if fully set forth therein.

575. Aetna must pay benefits to Aetna Members that are insured by, funded by or administered by Aetna pursuant to the terms of their ERISA plans and in compliance with applicable federal and state laws.

576. Aetna violated its legal obligations under ERISA-governed plans and federal common law each time it made the Nonpar Benefit Reductions described in this Amended Complaint, including violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

577. In certain self insured plans which are sometimes designated Administrative Services Only or "ASO," Aetna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

578. Where Aetna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Aetna is liable for underpaid benefits to Subscriber Plaintiffs and members of the class in both fully insured and ASO ERISA health plans.

579. Aetna further violated its obligations under ERISA when it failed to comply with applicable state law, such as by making Nonpar Benefit Reductions that were inconsistent with New Jersey SEHP regulations. These regulations require Aetna to pay provider charges using the most updated Ingenix data at the 80th percentile for the geographic area where the service occurred and further require Aetna to pay hospital services based on the billed charge, without using a database. Aetna systemically violated these regulations, including by using Outdated Data from inapplicable geographic areas, reducing payment for multiple procedures or assistant surgeons, and using Ingenix data to price hospital UCR. Aetna's violations resulted in systematic underpayment to New Jersey SEHP Members for hospital and medical services.

580. Aetna's omissions and lack of disclosure to its Members violated its legal obligations. Aetna violated obligations each time it engaged in conduct that discouraged or penalized its Members' use of Nonpar providers, such as by making Nonpar Benefit Reductions. Aetna, as the party which exercised all discretionary authority and control over the

administration of the plan of each Subscriber Plaintiffs, including the management and disposition of benefits under the terms of the plan, owed a fiduciary duty to Subscriber Plaintiffs and each putative class member.

581.    Aetna breached its fiduciary duties to Subscriber Plaintiffs and each member of the Subscriber Class by failing to pay proper Nonpar benefits without justification. Aetna therefore owes - and should be ordered to pay - the benefits that were improperly denied based on the policies detailed herein. Subscriber Plaintiffs, on their own behalf and on behalf of the members of the ERISA and New Jersey SEHP Classes, seek unpaid benefits, recalculated deductible and coinsurance amounts and interest back to the date their claims were originally submitted to Aetna. Plaintiff Sharon Smith also sues for declaratory and injunctive relief related to enforcement of the plan terms, and to clarify rights to future benefits. Subscriber Plaintiffs request attorneys' fees, costs, prejudgment interest and other appropriate relief against Aetna.

## COUNT I (B)

### BREACH OF PLAN PROVISIONS FOR
### BENEFITS IN VIOLATION OF ERISA § 502(A)(1)(B)
### (On Behalf Of The Provider/Association Plaintiffs And The Provider Erisa Subclass)

582.    Provider/Association Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.

583.    The Individual Provider Plaintiffs and the ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits claims.

584.    The Association Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

585.    During the Class Period, Aetna breached its plan provisions for benefits by underpaying UCR and other out-of-network reimbursement amounts covered by ERISA

healthcare plans to Provider Plaintiffs and the Provider ERISA Subclass in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

586. Aetna's breaches included, among other things, the misuse of the Ingenix database and other improper methods to both calculate UCR and reduce other benefits paid to Nonpars for out-of-network medical services.

587. Under the terms of its health plans, Aetna administers benefits and is a fiduciary.

588. In certain self insured plans which are sometimes designated ASO, Aetna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

589. Where Aetna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Aetna is liable for underpaid benefits to the Provider Plaintiffs and the Provider ERISA Subclass in both fully insured and ASO ERISA health plans.

590. Pursuant to 29 U.S.C. § 1132(a)(l)(B), Provider Plaintiffs and the Provider ERISA Subclass are entitled to recovery for unpaid benefits and declaratory relief relating to Aetna's violation of the terms of its health care plans. Association Plaintiffs are entitled to injunctive and declaratory relief.

## COUNT II

### FAILURE TO PROVIDE AN ACCURATE EOC AND SPD AND
### REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
**(On Behalf Of The Subscriber ERISA And The Subscriber New Jersey SEHP Classes)**

591. The allegations contained in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

592. Aetna's disclosure obligations under ERISA include furnishing accurate materials summarizing its group health plans, known as SPD materials, under 29 U.S.C. § 1022 and

supplying accurate EOCS, SPDs and other required information is actionable under 29 U.S.C. § 1132(c).

593. Aetna's failure to disclose material information about its Nonpar Benefit Reductions its contribution of flawed data to Ingenix and its use of such data, and its material changes in benefit policy without disclosure, including by UCR tiering and use of Medicare rates, violated ERISA, federal regulations and federal common law.

594. Throughout the Class Period, Subscriber Plaintiffs and members of the Subscriber ERISA and New Jersey SEHP Classes have been proximately harmed by Aetna's failure to comply with 29 U.S.C. § 1022 and 29 U.S.C. § 1024(b)(4), federal regulations, and federal common law, and are entitled to appropriate relief under ERISA, including injunctive and declaratory relief to remedy Aetna's continuing violation of these provisions.

## COUNT III (A)

### VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE CARE AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
**(On Behalf Of The Subscriber ERISA And New Jersey SEHP Classes)**

595. The allegations contained in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

596. Throughout the Class Period, Aetna acted as a "fiduciary" to Subscriber Plaintiffs and to members of the ERISA and New Jersey SEHP Classes, as such term is understood under 29 U.S.C. § 1002(21)(A).

597. As an ERISA fiduciary, Aetna owed, and owes, its Members in ERISA plans a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent administrator would use in the conduct of a like enterprise. Further, ERISA fiduciaries must act in accordance with the documents and instruments governing the group plan. 29 U.S.C. § 1104(a)(1)(B) and (D). In failing to act prudently, and in failing to act in

accordance with the documents and instruments governing the plan, Aetna violated its fiduciary duty of care.

598.    As an ERISA fiduciary, Aetna owed and owes its Members a duty of loyalty, defined as an obligation to make decisions in the interest of its Members, and to avoid self-dealing or financial arrangements that benefit it at the expense of its Members under 29 U.S.C. § 1106. Aetna cannot, for example, make benefit determinations for the purpose of saving money at the expense of its Members.

599.    Aetna violated its fiduciary duties of loyalty and due care by, *inter alia*, making Nonpar Benefit Reductions that were unauthorized by EOCs and SPDs; failing to inform Aetna Members of flaws in the Ingenix Databases that make their use in calculating UCR reimbursement inappropriate; making false representations regarding its Nonpar Benefit Reductions; failing to credit deductibles and out-of-pocket maximums properly; changing its benefit practices without advance disclosure to Members; failing to properly credit deductible and out of pocket maximums; violating ER laws; misrepresenting facts to regulators; sending baseless overpayment actions to collection; failing to disclose in preauthorizing services that Aetna's Nonpar reimbursement practices would leave the Member financially responsible for the bulk of the "approved" service; and violating federal and state law, including the SEHP Regulation.

600.    In certain self insured plans, which are sometimes designated ASO, Aetna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

601.    Where Aetna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Aetna is liable for

underpaid benefits to Subscriber Plaintiffs and members of the class in both fully insured and ASO ERISA health plans.

602.    Aetna also violated its fiduciary duties by using SPDs that did not comply with federal law.

603.    Aetna breached its fiduciary duties by sending noncompliant EOBs and other communications to Subscriber Plaintiffs and the members of the ERISA and New Jersey SEHP Classes.

604.    Subscriber Plaintiffs and the members of the ERISA and New Jersey SEHP Classes are entitled to assert a claim for relief for Aetna's violation of its fiduciary duties under 29 U.S.C. § 1132(a)(3), including injunctive and declaratory relief, and its removal as a breaching fiduciary.

## COUNT III(B)

### FOR VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE CARE IN VIOLATION OF § 404 OF ERISA
#### (On Behalf Of Provider/Association Plaintiffs And The Provider ERISA Subclass)

605.    Provider/Association Plaintiffs hereby repeat the allegations of the prior paragraphs of the Amended Complaint as if fully set forth herein.

606.    The Individual Provider Plaintiffs and the Provider ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits claims.

607.    The Association Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

608.    During the Class Period, Aetna acted and continues to act as a fiduciary of its Members' health plans, as the term fiduciary is interpreted under § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). At such times, Aetna also acted and acts as a fiduciary for self-insured plans, including by deciding final appeals.

609.   As a functional fiduciary under ERISA and as a claims fiduciary making final appeal decisions for self-insured plan Members, Aetna owes Provider Plaintiffs and the Provider ERISA Subclass a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character. Further, fiduciaries must ensure that they are acting in accordance with the documents and instruments governing the plan, in accordance with § 404(a)(l)(B) and (D) of ERISA, 29 U.S.C. § 1104(a)(l)(B) and (D).  In failing to act prudently, and in failing to act in accordance with the documents governing the plan, Aetna violated its fiduciary duty of care.

610.   As a fiduciary of health plans under ERISA, Aetna owed Provider Plaintiffs and the Provider ERISA Subclass a duty of loyalty, defined as an obligation to make decisions in the interest of Members, and to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of members, in accordance with § 406 of ERISA, 29 U.S.C. § 1106. Thus, Aetna cannot make benefit determinations for the purpose of saving money at the expense of its Members.

611.   During the Class Period, Aetna violated its fiduciary duty of loyalty, *inter alia*, by using the Ingenix database and other methods for pricing Nonpar claims (including default formulas and rounding rules) that benefited itself at the expense of Members as well as Provider Plaintiffs and the Provider ERISA Subclass.  In addition, Aetna violated (and continues to violate) its fiduciary duty of loyalty by failing to inform Members as well as Provider Plaintiffs and members of the Provider ERISA Subclass of material information, including but not limited to flaws in the data and methodology used to determine UCR reimbursement. In fact, during the Class Period, by using the U.S. mails and interstate wire facilities, Aetna made representations *inter alia* about the Ingenix database that it knew were untrue. As the largest data contributor to

the Ingenix database, Aetna knew many of the flaws that make the Ingenix data an inappropriate basis for UCR.

612. In relying on the Ingenix database or other improper pricing methods, which were noncompliant with its contractual obligations and invalid to make UCR determinations, and in applying, *inter alia*, a reduction for multiple procedures that was not authorized and nowhere disclosed to Members in their plan documents, Aetna violated its fiduciary obligations to Provider Plaintiffs and the Provider ERISA Subclass. Provider Plaintiffs and the Provider ERISA Subclass are entitled to assert a claim for relief for Aetna's violation of its fiduciary duties under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), including declaratory relief, and may seek removal of any fiduciary that breached its duties. Association Plaintiffs are entitled to injunctive and declaratory relief.

## COUNT IV(A)

### FAILURE TO PROVIDE FULL & FAIR REVIEW AS REQUIRED BY ERISA AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
### (On Behalf Of The Subscriber ERISA And Subscriber New Jersey SEHP Classes)

613. The allegations contained in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

614. Aetna functioned and continues to function as the "plan administrator" - within the meaning of such term under ERISA - for Plaintiffs. During the Class Period, Subscriber Plaintiffs and the ERISA Class and the New Jersey SEHP Class were entitled to receive a "full and fair review" of all claims denied by Aetna, and entitled to assert a claim under 29 U.S.C. § 1132(a)(3) for failure to comply with these requirements.

615. Although Aetna was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Subscriber Plaintiffs and members of the ERISA and New Jersey SEHP Classes

by making Non- Par Benefit Reductions that are inconsistent with or unauthorized by the terms of Members' EOCs and SPDs, as well as by failing to disclose data, its methodology and other critical information relating to its Nonpar Benefit Reductions.

616.    ERISA and its implementing regulations set forth minimum standards for claim procedures, appeals, notice to Members and the like. In engaging in the conduct described herein, including use of an invalid database for determining UCR, use of Medicare rates, use of AWP, tiering of behavioral health reimbursements, incorrect calculation of deductibles and out﹁ of-pocket maximums, baseless threats regarding overpayments and referrals to collection agencies, false pre authorization letters, and making other systematic benefit reductions without disclosure or authority under the plans, Aetna failed to comply with ERISA, its regulations and federal common law that require a "full and fair review, failed to provide reasonable claims procedures, and failed to make necessary disclosures to its Members.

617.    Appeals of Subscriber Plaintiffs and the members of the Subscriber ERISA and New Jersey SEHP Classes should be excused by virtue, *inter alia*, of Aetna's numerous procedural and substantive violations.

618.    Subscriber Plaintiffs' failed appeals, as alleged in this Amended Complaint, show the futility of exhausting appeals to Aetna. The requirement to exhaust internal appeals under ERISA should, therefore, be deemed to be futile for all Class Members. Throughout the Class Period, Subscriber Plaintiffs and members of the Subscriber ERISA and New Jersey SEHP Classes have been harmed by Aetna's failure to provide a "full and fair review" of appeals under 29 U.S.C. § 1133, and by Aetna's failure to disclose relevant information in violation of ERISA and the federal common law. Subscriber Plaintiffs Smith, Samit, Hull, and Whittington, who are currently insured by Aetna, the Subscriber ERISA Class and the New Jersey SEHP Class are also

entitled to injunctive and declaratory relief to remedy Aetna's continuing violations of these provisions.

**COUNT IV(B)**

**FOR DECLARATORY RELIEF RELATING TO AETNA'S VIOLATION OF ERISA**
**(On Behalf Of All Provider/Association Plaintiffs And The Provider ERISA Subclass)**

619.    Provider/Association Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.

620.    The Individual Provider Plaintiffs and the Provider ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits claims.

621.    The Association Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

622.    Under federal law, the Provider Plaintiffs and the Provider ERISA Subclass are entitled to receive protections under ERISA including (a) a "full and fair review" of all claims denied by Aetna; (b) compliance by Aetna with ERISA claims procedure regulations; and (c) receipt of accurate materials summarizing such group health plans, known as Summary Plan Descriptions ("SPD") materials under § 102 of ERISA, 29 U.S.C. § 1022.

623.    Any time Aetna deprived its Members of "full and fair review" or proper compliance with ERISA claims procedure regulations, it violated § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), and thus violated the rights of Provider Plaintiffs and the Provider ERISA Subclass.

624.    Although Aetna was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to § 503 of ERISA, 29 U.S.C. § 1133, and its implementing regulations, *inter alia*, by failing to disclose the "specific reasons" for benefit denials, failing to

disclose data and/or the methodology used to determine UCR or Nonpar reimbursement, and failing to comply with appeal procedures imposed by ERISA and the federal common law.

625.    Applicable federal claims procedure regulations set forth minimum standards for claim procedures, appeals, notice to Members and the like. By engaging in the conduct described herein including, but not limited to, making benefit determinations for Nonpar claims that are inconsistent with the terms of group health plans, and failing to disclose information concerning the data and/or methodology it used to determine UCR or other Nonpar reimbursements, Aetna failed to comply with such regulations

626.    The consequences of Aetna's failure to comply with the regulations (as well as federal common law), are that Aetna failed to provide reasonable claims procedures and failed to make required disclosures to Provider Plaintiffs and the Provider ERISA Subclass.

627.    Administrative remedies are deemed exhausted, *inter alia*, by virtue of the invalid Ingenix database, other invalid Nonpar pricing methods discussed supra, and Aetna's failure to provide reasonable claims procedures.   By virtue of the conduct alleged in this Amended Complaint, any appeal would have been futile.

628.    Aetna's failure to supply accurate SPDs and accurate information is redressable under § 502(c) of ERISA, 29 U.S.C. § 1132(c).

629.    Aetna's failure to disclose material information about its UCR and other methods for pricing Nonpar claims constitute violation of federal common law, which obligates fiduciaries such as Aetna to provide this material information.

630.    Provider Plaintiffs and the Provider ERISA Subclass have been harmed by Aetna's failure to provide a "full and fair review" of appeals submitted under § 503 of ERISA, 29 U.S.C. § 1133, by Aetna's failure to disclose information relevant to appeals or to comply

with ERISA claims procedure regulations, in violation of ERISA and the federal common law, and by Aetna's failure to provide accurate information, in violation of federal common law and § 102 of ERISA, 29 U.S.C. § 1022.

631. Provider Plaintiffs and the Provider ERISA Subclass are entitled to a declaration by this Court that Aetna's actions as alleged herein are in violation of its duties and obligations of ERISA. Association Plaintiffs are entitled to injunctive and declaratory relief.

**COUNT V(A)**

**FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)**
**BASED ON PREDICATE ACTS OF MAIL AND WIRE FRAUD**
**(On Behalf Of All Subscriber Plaintiffs And The Subscriber Rico Class)**

632. The allegations contained in this Amended Complaint are realleged and incorporated as if fully set forth herein. This claim is asserted by Subscriber Plaintiffs on behalf of themselves and the members of the RICO Class.

633. At all relevant times, Aetna was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

634. At all relevant times, and as described in this Amended Complaint, Aetna carried out its underpayment scheme to Aetna Members in connection with the conduct of an association-in- fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of Aetna and Ingenix (the "Aetna-Ingenix Enterprise" or the "Enterprise").

635. At all relevant times, the Aetna-Ingenix Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

636. As described herein of this Amended Complaint, the Aetna-Ingenix Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which Aetna has engaged. In addition, the members of the Aetna-Ingenix Enterprise function as a structured and continuous unit, and performed roles

consistent with this structure. The members of the Aetna-Ingenix Enterprise performed certain legitimate and lawful activities that are not being challenged in this complaint, including the provision of health insurance and plan and claims administration services by Aetna, which was done for many claims lawfully and without resort to unlawful practices. However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations. Aside from legitimate activities carried out by the members of the Aetna-Ingenix Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Amended Complaint including, but not limited to, intentional underpayment of Aetna Members resulting from the use of flawed and invalid data for its UCR determinations.

637.    The purpose of the Aetna-Ingenix Enterprise was to create a mechanism by which Aetna could reduce benefit payments for Nonpar services through use of flawed and invalid data, but to do so through a means that subscribers would be unable to challenge effectively. In particular, as described herein, the Aetna-Ingenix Enterprise created what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix Databases were designed to appear valid as a basis for UCR when, in fact, they were invalid. Through their roles in the Aetna-Ingenix Enterprise, Ingenix benefited indirectly through the monies saved by United Healthcare, its parent corporation, and by enhancing its ability to earn licensing fees through the sale of the Ingenix databases, while Aetna benefited by reducing the amount of benefits it paid for Nonpar services through the use of the Ingenix Databases to price UCR. Ingenix also used data submitted by Data Contributors to create other products, the licensing and sale of which directly benefited Ingenix.

638. As alleged herein, although Ingenix issues a disclaimer to the users of the Ingenix Databases, including Aetna, Aetna continued to use the Ingenix Databases in a manner directly at odds with the disclaimer, while Ingenix knew that its users were using the Ingenix Databases improperly to make UCR determinations. At the same time it was issuing a disclaimer in an effort to provide itself with legal protection, Ingenix was also promoting Ingenix Databases as a cost-savings mechanism that could save substantial sums to those who used them in making UCR determinations. Thus, Aetna and Ingenix expressly observed the disclaimer in the breach despite the fact that the disclaimer was correct in reporting that the Ingenix Databases could not be used as a basis for making UCR determinations.

639. Similarly, as alleged herein, while Ingenix required certifications from the Data Contributors, including Aetna, that purportedly verified that they were submitting all available data and were not pre-editing or otherwise manipulating the data prior to its contribution, Ingenix knew full well that these certifications were invalid because users of the Ingenix Databases, including Aetna, were not submitting all of their data and were pre-editing and manipulating the data prior to its submissions in furtherance of Ingenix's effort to understate UCR amounts. The pre-editing and incomplete submission of data to Ingenix benefited Ingenix, and users of the Ingenix Databases, including UHG, Ingenix's parent company, and Aetna. Ingenix also failed to conduct any audits or reviews of its data to ensure that the data were valid and appropriate.

640. Ingenix and Aetna knew that the Ingenix Databases were being used without Aetna Members, or other health plan Members, ever being informed of the disclaimer or the inherent flaws in the Ingenix Databases. For example, Aetna falsely reported to Class members that its reductions were based on UCR when, in fact, the reductions were based on flawed and invalid Ingenix Databases that substantially underreported UCR. Aetna referred overpayment

recovery actions to collection agencies based on the flawed Ingenix data. At the same time, Aetna ensured that lawfully required information concerning Nonpar Benefit Reductions was not disseminated to Aetna Members, in violation of Aetna Members' EOCs and federal law.

641.    Aetna participated in the Aetna-Ingenix Enterprise in order to shift the costs of medical treatment provided by Nonpar providers from Aetna to its Members, to reduce Aetna's UCR payments and to create an appearance of legitimacy for its Nonpar Benefit Reductions. Aetna provided false and incomplete information to Aetna Members to convert those withheld funds for the Aetna-Ingenix Enterprise's own direct and indirect financial gain, and to discourage its Members from using Nonpar providers. Because Aetna saves money when Par providers render services, the Aetna Ingenix Enterprise saved Aetna money at the expense of Aetna Members. In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by Aetna and other users of the Ingenix Databases, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of Aetna alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

642.    Aetna further used the Enterprise to facilitate its goal of reducing Nonpar benefits by submitting pre-edited and manipulated data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix Databases and which Aetna relied upon to make UCR determinations. As part of this fraudulent scheme, as alleged herein, Aetna submitted false certifications to Ingenix which attested that it was submitting all of its data, when it was not. Neither Ingenix nor its parent company, UHG, took steps to audit or otherwise validate the data that Ingenix was receiving from Aetna and other data contributors. Ingenix was aware of the

manipulation of data by Data Contributors such as Aetna, but allowed it to occur, since it was consistent with Ingenix's goal to underreport UCR.

643.    If Aetna had not entered into the Aetna-Ingenix Enterprise by submitting pre-edited and manipulated data to Ingenix, it would not have been able to obtain the benefits it did from the Enterprise. Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix Databases were the largest available and had sufficient numbers to remove any doubt as to their validity. Ingenix also needed data that reported sufficiently low charges so that it could represent to its users that the Ingenix Databases would save users money used to make UCR determinations. Without data from Aetna and UHG, the Ingenix Databases could not have been successfully marketed for UCR pricing. Similarly, Aetna could not have saved the millions of dollars it did if it had not used the Ingenix Databases for making UCR determinations even though it knew that they were flawed and invalid. By using the Ingenix Databases for making its UCR determinations, misrepresenting them as providing a valid and unassailable basis for such decisions, and deterring its subscribers from challenging or otherwise raising questions over how it set UCR, Aetna was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and UHG.

644.    Through its wrongful conduct as alleged herein, Aetna, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

645.    Aetna, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the RICO Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for Nonpar services, including (a) mail fraud, in violation of 18

U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Such predicate acts include the following:

> ( a)    by mailing or causing to be mailed and otherwise knowingly agreeing to the mailing of various materials and information including, but not limited to, materially false and invalid UCR determinations and EOBs, for the purpose of saving Aetna money at its Members' expense, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

> (b)    by transmitting or causing to be transmitted and otherwise knowingly agreeing to the transmittal of various materials and information including, but not limited to, materially false UCR determinations and related explanation of such determinations, by means of telephone, facsimile, and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

646.    As set forth above, Aetna instructed its claims personnel to make Nonpar Benefit Reductions which were contrary to law and its Members' EOCs and SPDs. Aetna knew that the data contributed to Ingenix was flawed and incomplete, but Aetna continued to use the Ingenix Databases anyway.

647.    In furtherance of its underpayment scheme for Nonpar services, Aetna, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to further all aspects of the intentional underpayment to its member by delivering and/or receiving materials, including EOCs and SPDs, EOBs, appeal determinations, and other materials necessary to carry out the scheme to defraud Plaintiffs and other Members.

648.    The foregoing communications via U.S. mail and interstate wire facilities contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of Aetna's scheme to defraud

described in this Amended Complaint. Further, they were used to provide the under-payment scheme for ONET with an appearance of legitimacy and regularity, and/or postpone ultimate discovery and complaint of the under-payment scheme for Nonpar services, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

649.     The misrepresentations and omissions in these materials have included and include those set forth previously in this Amended Complaint.

650.     As named fiduciaries and claims administrators of various of the Aetna plans, Aetna occupied and occupies a position of trust and it had, and has, a special relationship with its Members that requires it to accurately represent the terms and conditions of the Aetna plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

651.     Aetna knew that its Members would reasonably rely on the accuracy, completeness and integrity of disclosures by the Enterprise. Aetna Members did rely to their detriment on misrepresentations and omissions from the Enterprise.

652.     Each such use of the U.S. Mail and interstate wire facilities alleged in this Amended Complaint constitutes a separate and distinct predicate act.

653.     The above-described acts of mail and wire fraud are related because they each involve common members, common Nonpar claim practices, common results impacting upon common victims, and are continuous because they occurred over several years, and constitutes the usual practice of Aetna such that they amount to and pose a threat of continued racketeering activity. Aetna's scheme to defraud is open-ended and not inherently terminable.

654. The direct and intended victims of the pattern of racketeering activity described previously herein are beneficiaries and their assignees and the members of the RICO Class, whom Aetna has underpaid for ONET.

655. Subscriber Plaintiffs and Members of the Subscriber RICO Class were injured by reason of Aetna's RICO violations because they directly and immediately were underpaid benefits. Aetna further deprived them of the knowledge necessary to challenge its underpayments. Their injuries were proximately caused by Aetna's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Aetna's RICO violations (and commission of underlying predicate acts) and, but for Aetna's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

656. Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Subscriber Plaintiffs and the members of the RICO Class are entitled to recover threefold their damages, costs and attorneys' fees from Aetna and other appropriate relief.

## COUNT V(B)

### FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)
### BASED ON PREDICATE ACTS OF MAIL AND WIRE FRAUD
### (On Behalf Of Provider/Association Plaintiffs And The Provider Class)

657. Provider/Association Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein. This claim is asserted by Plaintiffs on their own behalf and on behalf of Class members.

658. The Individual Provider Plaintiffs and the Class have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

659. The Association Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

660. At all relevant times, Aetna was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

661. At all relevant times, and as described in this Amended Complaint, Aetna carried out its underpayment scheme to defraud Provider Plaintiffs and the Provider Class in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of Aetna, UHG and Ingenix among others (the "Aetna-Ingenix Enterprise" or the "Enterprise").

662. Aetna through the Enterprise described above and in conspiracy with Ingenix and other healthcare companies undertook a fraudulent scheme to underpay Providers for the ONET provided to Aetna subscribers. Through the fraudulent underpayment scheme, Aetna and others agreed to utilize the flawed Ingenix database for its UCR determinations in an effort to depress the prices paid for ONET by the conspiring healthcare companies. Aetna knowingly purchased and utilized the Ingenix database with the express purpose of depressing its ONET payments and in fact supplied "scrubbed" and otherwise flawed and incomplete data to Ingenix with the purpose of lowering payments for ONET. Aetna agreed to conceal the flaws in the Ingenix data as well as the scheme to depress ONET payments achieved by use of the Ingenix database for UCR determinations. In furtherance of the scheme, Aetna engaged in thousands if not millions of acts of mail and wire fraud.

663. Aetna, Ingenix and UHG were all participants in the Aetna-Ingenix Enterprise.

664. At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

665.    The Aetna-Ingenix Enterprise was at all relevant times a continuing unit involving Aetna and Ingenix functioning with a common purpose of reducing the price paid for ONET, and increasing the profits the Enterprise participants and their Co-Conspirators.  Throughout the class period, Aetna, Ingenix and UHG remained members of the Enterprise throughout the Class Period undertaking countless and nearly constant acts of mail and wire fraud for their common purpose described above.

666.    The Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which Aetna has engaged. In addition, the members of the Enterprise functioned continuous unit, and performed roles consistent with this structure. The members of the Enterprise performed certain legitimate and lawful activities that are not being challenged in this Amended Complaint, including the provision of health insurance and plan and claims administration services by Aetna, which was done for many claims lawfully and without resort to unlawful practices. However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations. Aside from legitimate activities carried out by the members of the Enterprise, its members used the Enterprise's structure to carry out the fraudulent scheme and unlawful activities alleged in this Amended Complaint including, but not limited to, intentional underpayment of benefits to Provider Plaintiffs and the Provider Class resulting from Aetna's use of flawed and invalid data for its UCR determinations.

667.    The Enterprise was used to create a mechanism or vehicle by which Aetna could reduce payments to Provider Plaintiffs and the Provider Class for ONET through the use of flawed and invalid data that could not be challenged effectively. In particular, as described

herein, the Enterprise created what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix database was designed to appear valid as a basis for UCR when, in fact, it is and was invalid.

668. Through their roles in the Enterprise and the scheme, Ingenix benefited directly by enhancing its ability to earn licensing fees through the sale of the Ingenix databases, including others which used Aetna data, and through the monies saved by UHG, its parent corporation. Aetna benefited by reducing the amount it paid to Provider Plaintiffs and the Provider Class for their ONET through the use of the Ingenix database to price UCR.

669. As alleged above, although Ingenix issues a disclaimer to the users of the Ingenix databases, Aetna continued to use the Ingenix databases in a manner directly at odds with the disclaimer, while Ingenix knew that its data users were using the Ingenix databases improperly to make UCR determinations and failed to stop it. At the same time it was issuing a disclaimer in a misguided effort to provide itself and UHG with legal protection, Ingenix was also promoting the Ingenix database as a cost-saving mechanism that could save substantial sums to those such as Aetna who improperly used and relied upon them in making UCR determinations.

670. In furtherance of the fraudulent scheme, Ingenix provided extensive "litigation support," including vouching for data used to price UCR by its data users. Ingenix employed staff to assist data users, including testifying in court, testifying in depositions, supplying documentation and otherwise bolstering the users' use of Ingenix data to price UCR. Thus, Aetna and Ingenix expressly observed the disclaimer in the breach, despite the fact that the disclaimer correctly stated that the Ingenix database could not be used as a basis for making UCR determinations. Aetna provided data to Ingenix which it knew would be edited by Ingenix in a manner which precluded its use for UCR.

671. Ingenix not only knowingly sought and accepted Aetna's incomplete data, but it continued to provide a significant discount to Aetna. Ingenix also failed to conduct any audits or reviews of the data it received from data contributors, including Aetna. These actions were taken in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the Aetna-Ingenix Enterprise.

672. During the Class Period, Aetna participated in the conduct of the Enterprise in order to shift the costs of medical treatment from Aetna to its Members and therefore to Plaintiffs and the Class, to reduce Aetna's UCR payments and to create an appearance of legitimacy for its out-of-network benefit reductions. Using U.S. mail and interstate wire facilities, Aetna provided false and misleading information to Provider Plaintiffs and the Provider Class to convert those withheld funds for the Enterprise's own direct and indirect financial gain, and to discourage its Members from using out-of-network healthcare providers.

673. Because Aetna saves money when participating providers render services, the operations of the Enterprise saved Aetna money at the expense of the Provider Plaintiffs and the Provider Class. In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by Aetna and other users of the Ingenix databases, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of Aetna alleged above, the shared goal of the Enterprise for which its Members functioned as a continuous unit.

674. Aetna further used the Enterprise to facilitate its goal of reducing out-of-network benefits paid to Plaintiffs and the Class by submitting incomplete and inadequate data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix databases and which Aetna relied upon to make UCR determinations. As part of this fraudulent scheme, as

alleged herein, Aetna intentionally submitted, via U.S. mail and interstate wire facilities, data which it knew would be used to create false databases used to price UCR for its Members and members of other healthcare plans. Ingenix was aware of the inadequacy of data contributed by data contributors such as Aetna, but allowed it to occur, since it was consistent with the enterprise's purpose of reducing the cost of out of network healthcare services.

675. Among other ways Aetna participated in the affairs of the Enterprise, Aetna was the single largest data contributor to the Ingenix PHCS database. Aetna's submission of data to Ingenix benefited Ingenix, and users of the Ingenix databases, including Aetna. The inclusion of Aetna's data was critical to both the appearance of legitimacy of the Ingenix PHCS database, and the usefulness of that data for depressing the price paid for ONET. Further, Aetna knew the data it contributed to Ingenix was flawed and incomplete and its use by the Enterprise and Ingenix would depress the price of ONET for all its Co-Conspirators.

676. If Aetna had not participated in the conduct of the Enterprise by submitting flawed data to Ingenix, and using the Ingenix database, it would not have been able to obtain the benefits it did from the Enterprise. Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix database was the largest available and had sufficient numbers to remove any doubt as to their validity. Aetna knew such representations were being made by Ingenix and used Ingenix's representations for the identical purpose of removing doubt as to their validity. Ingenix needed the data to provide databases to its users to save them money on Nonpar claims. Without data from Aetna and other large data contributors, the Ingenix database could not have been successfully marketed as the "industry standard" for UCR pricing. Similarly, Aetna could not have saved the millions of dollars it did if it had not used the Ingenix databases for making UCR determinations even though it knew that they were flawed and

invalid. By using the Ingenix database for making its UCR determinations, misrepresenting them, through use of the U.S. mail and interstate wire facilities, as providing a valid and unassailable basis for such decisions, and deterring its subscribers as well as members of the Provider Class from challenging or otherwise raising questions over how it set UCR, Aetna was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and UHG.

677. Through its wrongful conduct as alleged herein, Aetna, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5). These acts of racketeering activity have continued throughout the Class Period to the present.

678. Aetna, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the Provider Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for ONET, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Each use of the mail or wire in furtherance of the fraudulent scheme described above is an a predicate act of mail and wire fraud. Such predicate acts include the following:

> (a) mailing, causing to be mailed and/or knowingly agreeing to the mailing of various materials and information including, but not limited to, letters regarding preauthorization approval(s) and/or appeals, materially false or misleading data for use in the Ingenix databases, materially false and misleading UCR determinations, EOBs and remittance advices for the purpose of saving Aetna money at the expense of Provider Plaintiffs and the Provider Class, and mailing materially false data for use in the Ingenix database, for the purpose of effectuating the above-described fraudulent scheme, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

(b) transmitting, causing to be transmitted and/or knowingly agreeing to the transmittal of various materials and information including, but not limited to, preauthorization approvals; materially false UCR determinations and related explanation of such determinations, and materially false or misleading data for use in the Ingenix database, by means of telephone, facsimile and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

679. Aetna issued false and misleading letters to Providers regarding benefits, as well as false and misleading EOBs and Explanations of Payment. Aetna knew that the data it contributed to Ingenix was inadequate and lacked required data fields essential for Ingenix to evaluate the data and include (or exclude) it in final UCR fee schedules, but Aetna continued to use the Ingenix databases to make UCR determinations anyway.

680. Ingenix and Aetna knew that the Ingenix databases were being used without Plaintiffs and the Class ever being informed of the disclaimer or the inherent flaws in the Ingenix databases. For example, Aetna falsely reported to Plaintiffs and Class members, via U.S. mail and interstate wire communications, that its reductions in amounts paid for ONET were based on UCR when, in fact, the reductions were based on flawed and invalid numbers obtained from the Ingenix databases that substantially underreported UCR.

681. In furtherance of its underpayment scheme for ONET, Aetna, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment scheme to Provider Plaintiffs and the Provider Class by delivering and/or receiving materials necessary to carry out the scheme to defraud Provider Plaintiffs and the Provider Class. Each use of the mail or wire in furtherance of the scheme was a violation of the above statutes.

682. The foregoing communications, sent via U.S. mail and interstate wire facilities, contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of Aetna's scheme to defraud Provider Plaintiffs and the Provider Class described in this Amended Complaint. Further, such written communications were used by Aetna to provide the underpayment scheme for ONET with an appearance of legitimacy and regularity, to conceal the scheme and/or postpone ultimate discovery and complaint of the underpayment scheme for ONET, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

683. As named fiduciaries and claims administrators of various of the Aetna plans, Aetna occupied and occupies a position of trust and it had, and has, a special relationship with its Members, and therefore with Provider Plaintiffs and the Provider Class, that requires it to accurately represent the terms and conditions of the Aetna plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

684. Each such use of the U.S. mail and interstate wire facilities in furtherance of the scheme alleged in this Amended Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

685. The above-described pattern of racketeering activity is related because it involves the same fraudulent scheme, common persons, common out-of-network claim practices, common results impacting upon common victims, and is continuous because it occurred over several years, and constitutes the usual practice of Aetna and the Enterprise, such that it amounts

to and poses a threat of continued racketeering activity. Aetna's scheme to defraud Provider Plaintiffs and the Provider Class is open-ended and on-going.

686.    The direct and intended victims of the pattern of racketeering activity described previously herein are the Provider Plaintiffs and the Provider Class, whom Aetna has underpaid for ONET.

687.    As a result of Aetna's fraudulent scheme, Provider Plaintiffs and the Provider Class were injured in their business or property by reason of Aetna's RICO violations because they were underpaid for ONET rendered to Aetna's subscribers and were forced to exhaust significant time and resources addressing Aetna's wrongful practices.

688.    In addition, Provider Plaintiffs and the Provider Class reasonably relied on the fraudulent scheme by providing ONET to Aetna subscribers.

689.    Aetna further deprived them of the knowledge necessary to discover or challenge the underpayments.

690.    Their injuries were proximately caused by Aetna's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Aetna's RICO violations (and commission of underlying predicate acts) and, but for Aetna's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

691.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Provider Plaintiffs and the Provider Class are entitled to recover threefold their damages, costs and attorneys' fees from Aetna and other appropriate relief.

## COUNT VI(A)

**FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
BASED ON PREDICATE ACTS UNDER 18 U.S.C. § 664**

## AS WELL AS MAIL AND WIRE FRAUD
### (On Behalf Of The Subscriber Rico Section 664 Subclass)

692.     Subscriber Plaintiffs incorporate and reallege the allegations above as if fully set forth herein including, but not limited to, the allegations contained in Count VI and its description of the Aetna-Ingenix Enterprise. This claim is asserted by Plaintiffs on behalf of themselves and the members of the Subscriber RICO Class who are also members of the Subscriber ERISA Class, as those terms are defined in this Amended Complaint.

693.     Section 1961(l)(B) of RICO specifically identifies as a predicate act "any act which is indictable under . . . [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. § 1961(l)(B). Section 664 of Title 18 provides: Theft or embezzlement from employee benefit plan Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

694.     Each of the Aetna healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(l)(A), and otherwise is subject to "any provision of Title I of the Employee Retirement Income Security Act of 1974," 29 U.S.C. § 1001, *et seq.*, is included in this Count, including Plaintiffs' plans.

695.     Each of the Aetna healthcare plans that is subject to ERISA is funded by insurance coverage Aetna provides or administers. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

696.     Subscriber Plaintiffs' governing plan documents warrant that all benefits due under the plans will be paid. By improperly reducing payments on Nonpar claims, Aetna intentionally caused Subscriber Plaintiffs and the members of the Subscriber RICO Class who were also members of the Subscriber ERISA Class (the "ERISA Section 664 Subclass") to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

697.     For fully insured healthcare plans, in which Aetna both administered the plans and paid the benefits from its own assets, Aetna benefited from the conversion of assets from its ERISA plans. Whereas these assets should have been held by Aetna in its fiduciary capacity under ERISA, and paid to its Members, Aetna improperly withheld such funds and maintained them as part of its own assets for Aetna's own benefit. For self-funded healthcare plans, Aetna improperly prevented payment of benefits to the plan participants and beneficiaries in order to justify its receipt of administrative fees. Insurers such as Aetna benefited in the same way, while Ingenix benefited indirectly through the savings generated by its parent, UHG, and directly through the licensing fees it received from Aetna and other insurers who used the flawed Ingenix Databases to commit RICO violations.

698.     Aetna acted with specific intent to deprive Plaintiffs and RICO Section 664 Subclass members of guaranteed benefits, and was sufficiently aware of the facts to know that it was acting unlawfully and contrary to the trust placed in them by Plaintiffs and RICO Section 664 Subclass members and the insurers whose plans it was administering.

699.     Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked

within the applicable plan as a guaranteed benefit for the intended beneficiary, for Aetna's direct or indirect benefit.

700.    As set forth above, Aetna concocted multiple schemes to make improperly reduced payments for Nonpar services.

701.    In furtherance of its false payment schemes, Aetna, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to advance all aspects of the false payment schemes by delivering and/or receiving materials, including plan documents, insurance policies, summary plan descriptions, certificates of coverage, claim forms, reimbursement checks, EOBs describing UCR determinations, appeal determinations, overpayment actions, preauthorization decisions, referrals to collection agencies, representations to regulators, and other materials necessary to effectuate the false payment schemes, as well as to contribute, edit and manipulate the source data for the UCR Databases.

702.    The foregoing mail communications and wire communications contained false and fraudulent misrepresentations and omissions of material facts, and otherwise were incident to an essential part of the false payment schemes and were used to provide the false payment schemes with an appearance of legitimacy and regularity, and postpone ultimate discovery and complaint of the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if no such mailings or wire transmissions had taken place, and had the design and effect of preventing a meaningful evaluation and review of Aetna's Nonpar Benefit Reductions.

703.    As named fiduciaries and claims administrators of various of the Aetna healthcare plans, Aetna occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiffs and RICO Section 664 Subclass members that requires it to accurately represent

- 182 -

the terms and conditions of the Aetna healthcare plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

704. Each such use of the U.S. Mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

705. The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of Aetna such that they amount to and pose a threat of continued racketeering activity.

706. The purpose of Aetna's false payment schemes was to underpay the guaranteed benefits to which Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members are entitled to under health group plans, and convert those withheld funds for its own direct or indirect financial gain. It created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiffs and RICO Section 664 Subclass members, in order to increase revenue through its plan and claims administration business.

707. The direct and intended victims of the pattern of racketeering activity described previously herein are Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members, who Aetna deprived of the complete guaranteed benefits to which they are entitled for Nonpar services.

708. Aetna's RICO violations injured Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members by depriving them of hundreds of millions of dollars in

guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations, and their injuries were proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Aetna's RICO violations (and commission of underlying predicate acts), and but for Aetna's RICO violations (and commission of underlying predicate acts), Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members would not have suffered the injuries suffered by them.

709.   As a result of its misconduct, Aetna is liable to Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members in an amount to be determined at trial.

710.   Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members are entitled to recover threefold their damages, and costs and attorneys' fees from Aetna.

## COUNT VI(B)

### FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### BASED ON PREDICATE ACTS UNDER 18 U.S.C. § 664
### AS WELL AS MAIL AND WIRE FRAUD
### (On Behalf Of All Provider/Association Plaintiffs And The Provider ERISA Subclass)

711.   Provider Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein, including, but not limited to, the allegations of Count V(B) describing the Enterprise. This claim is asserted by the Provider Plaintiffs on behalf of themselves and on behalf the members of the Provider ERISA Subclass described above.

712.   The Provider Plaintiffs and the Provider ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

713. The Association Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

714. Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under ... [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. § 1961(l)(B). Section 664 of Title 18 provides:

> **Theft or embezzlement from employee benefit plan**
> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

715. Each of the Aetna healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision" of Title I of ERISA is included in this Count.

716. Each of the Aetna healthcare plans that are subject to ERISA are also subject to Section 664 of Title 18. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

717. The governing plan documents warrant that all benefits due under the plans will be paid. By improperly reducing payments on out-of-network claims, Aetna intentionally caused Plaintiffs and the members of the ERISA Subclass to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

718. For fully insured health care plans, in which Aetna both administered the plans and paid the benefits from its own assets, Aetna benefited from the conversion of assets from its ERISA plans. Whereas these assets should have been held by Aetna in its fiduciary capacity under ERISA plans and paid to its Members, Aetna improperly withheld such funds and

maintained them as part of its own assets for Aetna's own benefit. For self-funded health care plans, Aetna made final appeal decisions and intentionally caused underpayment of benefits to Plaintiffs and the ERISA Subclass in order to justify its receipt of administrative fees.

719. Aetna acted with specific intent to deprive Provider Plaintiffs and the Provider ERISA Subclass members of guaranteed benefits, and was sufficiently aware of the facts to know that it was acting unlawfully and contrary to the trust placed in them by the Provider Plaintiffs, the Provider ERISA Subclass members and the insurers whose plans it was administering.

720. Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended member, for Aetna's direct or indirect benefit.

721. As set forth above, Aetna concocted a fraudulent underpayment scheme, including use of the Ingenix database, to make improperly reduced payments for ONET.

722. As named fiduciaries and claims administrators of various of the Aetna healthcare plans, Aetna occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiffs and ERISA Subclass members that requires it to accurately represent the terms and conditions of the Aetna healthcare plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

723. Each such use of the U.S. mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

724. The above-described acts of conversion of employee benefit plan funds, in addition to the acts of mail and wire fraud described in Count V, are related because they each

involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of Aetna such that they amount to and pose a threat of continued racketeering activity.

725. The common purpose of Aetna's false payment scheme was to underpay the guaranteed benefits which were assigned to Provider Plaintiffs and the Provider ERISA Subclass members, reducing the costs of ONET, and convert those withheld funds for its own direct or indirect financial gain. Aetna created an appearance of regularity and legitimacy by providing false and incomplete information to Provider Plaintiffs and the Provider ERISA Subclass members, in order to increase revenue through its plan and claims administration business.

726. The direct and intended victims of the pattern of racketeering activity described previously herein are Provider Plaintiffs and the Provider ERISA Subclass members. The Enterprise's common purpose of reducing the cost of out of network healthcare reimbursement costs could not have been achieved without conversion of the Plan's assets, which rightfully should have been paid to the Providers. The injuries to the Provider Plaintiffs were a natural consequence of the false payment scheme.

727. Aetna's RICO violations injured Provider Plaintiffs and the Provider ERISA Subclass members in their business or property by depriving them of hundreds of millions of dollars in assigned benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations, and their injuries were proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Aetna's RICO violations (and commission of underlying predicate acts), and but for Aetna's RICO violations (and commission

of underlying predicate acts), Provider Plaintiffs and Provider ERISA Subclass members would not have suffered the injuries suffered by them.

728.   As a result of its misconduct, Aetna is liable to Provider Plaintiffs and the Provider ERISA Subclass in an amount to be determined at trial. Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Provider Plaintiffs and Provider ERISA Subclass members are entitled to recover threefold their damages, and costs and attorneys' fees from Aetna.

**COUNT VII**

**FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)**
**(On Behalf Of All Plaintiffs And The RICO Classes)**

729.   Plaintiffs hereby repeat the allegations of the Amended Complaint and specifically the allegations in Counts V(A) and Count V(B).

730.   From at least June 3, 2003, Aetna conspired with UHG, Ingenix and other Co-Conspirators to conduct or participate, directly or indirectly, in the conduct of the affairs of the Aetna-Ingenix Enterprise, described above, through a pattern of racketeering activity as described above in violation of 18 U.S.C. § 1962(d).  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

731.   In furtherance of this conspiracy, Aetna and its Co-conspirators, including Ingenix, and UHG committed numerous overt acts as alleged above in the pattern of racketeering described above, including also, the submission of data to Ingenix for use in the fraudulent Ingenix database.

732.   As a direct and proximate result of, and by reason of, the activities of Aetna and its conduct in violation of 18 U.S.C. § 1962(d), all Plaintiffs and the Subscriber and Provider Classes have been injured in their business and property within the meaning 18 U.S.C. § 1964(c),

and are entitled to recover treble damages together with the costs of this lawsuit, expenses and reasonable attorneys' fees.

**COUNT VIII(A)**

**FOR VIOLATION OF SECTION ONE OF THE SHERMAN ACT**
**(On Behalf Of The Subscriber RICO Antitrust Class)**

733.    Subscriber Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.  Subcriber Plaintiffs bring this claim on behalf of the Federal Damage and Injunctive Relief Classes.

734.    From a date unknown, but beginning at least as early as January 1, 1998, and continuing through the present, Defendants and their Co-Conspirators have combined, conspired and/or contracted to restrain interstate trade in violation of 15 U.S.C. §1.

735.    The combination or conspiracy alleged in this Complaint consisted of a continuing agreement, understanding or concert of action by the Defendants and their other Co-Conspirators, the substantial terms of which were to create, maintain and use the Ingenix Database to produce artificially low UCRs for reimbursement of Out of Network Services.

736.    The conspiracy was intended to directly affect the end payors of the medical services covered by out-of-network insurance plans.  The intent, purpose and effect of the conspiracy was to cause under-reimbursement for medical services, and thereby minimize reimbursement payments made on such claims among Defendants and their Co-Conspirators.

737.    Through the conspiracy, Defendants and their Co-Conspirators have in fact caused a decrease in reimbursement or payments for out-of-network medical services but for their anticompetitive conduct.

738.    As the result of the wrongful conduct alleged herein, Subscriber Plaintiffs and the Subscriber Antitrust Damages Class paid higher out-of-pocket payments for out-of-network

medical services than they would have paid but for Defendants' and their Co-Conspirators' anticompetitive conduct, have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

739. The conduct of Defendants and their Co-Conspirators constitutes a violation of §1 of the Sherman Act, 15 U.S.C. §1. Subscriber Plaintiffs and the Subscriber Antitrust Damages Class are entitled to recover all damages and treble damages allowed under §1 of the Sherman Act against Defendants, jointly and severally, together with their costs of suit, including reasonable attorneys' fees, as well as any necessary injunctions to bar or abate Defendants' anticompetitive acts.

## COUNT VIII(B)

### FOR VIOLATION OF SECTION ONE OF THE SHERMAN ACT
### (On Behalf Of All Provider/Association Plaintiffs And The Provider Class)

740. Provider Plaintiffs hereby repeat the allegations of the prior paragraphs of the Amended Complaint as if fully set forth herein.

741. The Individual Provider Plaintiffs and the Provider Class have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

742. The Associational Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

743. Aetna, along with Ingenix and its competitors, have combined, conspired and/or agreed with one another, and/or with unnamed Co-Conspirators, to unreasonably restrain trade in per se violation of Section One of the Sherman Act, 15 U.S.C. § 1. Aetna combined, conspired and/or agreed with its Co-Conspirators in a horizontal price fixing conspiracy that sought, and

was able, to artificially lower, fix or maintain the price paid to Provider Plaintiffs and the Provider Class by Aetna as UCR rates.

744.     The above agreement and/or conspiracy to fix prices is a *per se* violation of Section 1 of the Sherman Act, which operates at the expense of doctors (as well as subscribers) resulting in lower UCR rates of payment to healthcare providers.  The above agreement and conspiracy illegally restrains competition in a number of ways, including:

(a)     Fixing the price of UCR rates for Nonpar services at levels far below the level that would exist in a truly competitive market;

(b)     Accomplishing this price fixing by agreeing to peg the UCR rates to the same Ingenix database thereby using the same essential pricing formula;

(c)     Putting extreme additional competitive pressure on Nonpar healthcare providers to become part of particular networks by collusively refusing to even honor competitive market rates for those medical services in the UCR determinations.

745.     The above "price fixing" scheme has reduced the amount Provider Plaintiffs and the Provider Class are paid for their services below competitive levels.  However, because of the overwhelming market power that the users of Ingenix collectively maintain in the market, and because of the conspiracy and/or agreement among Aetna, its competitors and/or other parties to fix prices and not compete, there is no way to avoid interaction with the conspiracy.  Because of this conspiracy, Aetna and its Co-Conspirators, including UHG maintain their oligopsany by reducing costs all the while squeezing payments for ONET to unconscionably low levels.

746.     All of the aforementioned agreements and/or conspiracies affect interstate commerce and have resulted in antitrust injury to the Provider Plaintiffs and the Provider Class.

747. Provider Plaintiffs and the Provider Class are entitled to damages under 15 U.S.C. § 15, *et seq.*

748. As a result of the illegal agreements and/or conspiracies, Aetna has caused the Provider Plaintiffs and the Provider Class to suffer financial loss in that Aetna, with its agreements to fix prices and collective market strength, pays Provider Plaintiffs and the Provider Class at UCR rates that are set at unconscionably low and uncompetitive levels.

749. As a consequence of Aetna's illegal agreements and/or conspiracies, Provider Plaintiffs have suffered and will continue to suffer financial loss and have been injured and will continue to be injured in their business of providing and enhancing medical services. Among other things, Provider Plaintiffs and the Provider Class received less payment for their medical services than they would have in the absence of the agreement among Aetna the other users of Ingenix to fix the prices paid for Provider Plaintiffs' out-of-network medical treatment.

750. Provider Plaintiffs and the Provider Class are entitled to recover such actual damages as the jury may find, threefold, plus costs, expenses and attorneys fees.

751. Provider Plaintiffs and the Provider Class further seek injunctive relief in the form of order prohibiting Aetna from engaging in the anti-competitive, discriminatory and otherwise wrongful behavior described above.

## COUNT IX

### VIOLATION OF GBL §349
### (By Plaintiff Weintraub And On Behalf Of Subscriber New York Damages Class)

752. Plaintiff Weintraub incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

753. Plaintiff Weintraub seeks relief on behalf of himself and the New York Subscriber Damages Class under New York's General Business Law §349. GBL §349 prohibits deceptive

acts or practices in the conduct of any business or in the furnishing of any service in the state of New York.

754. Aetna represented that it reimbursed Members or caused Members to be reimbursed for Out of Network Services based on UCR rates, but intentionally failed to disclose the true basis on which it determined its Members' out-of-network reimbursements.

755. Aetna caused and causes harm to its Members including Plaintiff Weintraub and the Class members through its aforementioned schemes, including increasing Members' out-of-pocket payments, or forcing them to forego such ONET services entirely to avoid such expense.

756. Aetna knew full well that its reimbursements to Members derived from the Ingenix Database were understated. It engaged in extensive schemes to preclude subscribers from learning that they had been duped.

757. Among the acts contrary to GBL §349:

(a) Aetna repeatedly represented in plan documents, insurance policies, summary plan descriptions, certificates of coverage and other materials that it would cause claims for out-of-network medical services to be reimbursed on UCR amounts, but failed to disclose that it intended to reimburse these claims based on the Ingenix Database, which it knew or should have known unjustifiably understated UCR amounts; and

(b) never disclosed the underlying data and methodology upon which the Ingenix Database was designed and constructed and precluded all of the users of the Ingenix Database from disclosing any PHCS or MDR-related information through confidentiality and non-disclosure agreements in order to prevent discovery of and complaints about the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if the underlying data and methodology were disclosed.

758. Plaintiff Weintraub and members of the New York Subscriber Damages Class have paid premiums to Aetna for out-of-network coverage. Plaintiff Weintraub and members of the New York Damages Class used ONET and sought reimbursement from Aetna. Aetna provided reimbursement to Plaintiff and members of the New York Damages Class based upon the defective Ingenix Database, including its flawed UCR rates.

759. Aetna's provision and use of Ingenix's UCR rates to determine reimbursement to Plaintiff Weintraub and the members of the New York Subscriber Damages Class for ONET constitutes an unfair or deceptive act or practice in the conduct of trade or commerce in violation of GBL §349, because Aetna knew that the UCR rates provided by Ingenix were either defective, unreliable or collusively created.

760. Defendants' concealment of the true nature of the Ingenix Database from Plaintiff Weintraub and the members of the New York Subscriber Damages Class constitutes the concealment of a material fact, because this is precisely the type of information upon which Plaintiff Weintraub and members of the New York Subscriber Damages Class could reasonably be expected to rely upon when making the decision whether to purchase and/or use out-of-network coverage from Aetna, especially since Plaintiff Weintraub alleges that the UCR rates calculated by Ingenix and used by Aetna in many cases bear no relationship to the true, market UCR rates for ONET. Defendants' concealment from Plaintiff Weintraub and other members of the New York Damages Class of the true nature of the Ingenix Database, including its UCR rates, constitutes an unfair or deceptive act or practice in violation of GBL §349.

761. As a direct and proximate result of Aetna's deceptive and unfair conduct, Weintruab and members of the New York Subscriber Damages Class have suffered and continue

to suffer injury, including in particular, the overpayment of out-of-pocket expenses related to ONET.

762. Accordingly, Plaintiff Weintraub and members of the New York Subscriber Damages Class are entitled to actual damages, punitive damages and equitable relief pursuant to GBL §349.

**COUNT X**

**BREACH OF CONTRACT**
**(By Plaintiff Weintraub Against Aetna And On Behalf Of A Non-ERISA Class)**

763. Plaintiff Weintraub incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

764. During times relevant to the Complaint, Plaintiff Weintraub has been a member of an individual and family health plan issued and administered by Aetna. Specifically, during the Class Period, Plaintiff Weintraub participated in a "Student Health Insurance Program" sponsored by his University and defined as an "Aetna Open Choice PPO", underwritten by Aetna Life Insurance Company which was not subject to nor governed by ERISA.

765. Aetna issued standard form contract documents for its individual and family plans (the "Agreements") to Plaintiff Weintraub and its other non-ERISA Members setting forth the benefits Aetna agreed to provide members as well as the costs to the members of the plans.

766. The Agreements are uniform contracts that utilize the same definitions even across different health plans. The Agreements are one-sided adhesive contracts. Such contracts are presented on a take it or leave it basis and are not subject to negotiation or alteration by individual members.

767. The Agreements provide non-ERISA Members like Plaintiff Weintraub with an express right to receive treatment from out-of-network providers. Aetna refers to these providers

as "non-participating," "non-contracting," "non-network," "non-PPO" and/or "out-of-network" providers. Services by "in-network" providers are reimbursed at discounted rates negotiated between the healthcare provider and Aetna. Aetna promises in the Agreements to reimburse its members for services by out-of-network providers at a percentage of the lesser of: (i) the actual, billed charge, or (ii) the UCR for the services in the geographic area in which the services were performed.

768.    Plaintiff Weintraub was provided a "Guide to Student Health Insurance and Healthcare at New York University" that sets forth the terms of his Plan. That document contains a Glossary where "Reasonable Charge" is defined as "[o]nly that part of a charge which is reasonable is covered. The reasonable charge for a service or supply is the lowest of: the provider's usual charge for furnishing it; and the charge Aetna determines to be appropriate; based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and the care Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished."

769.    Plaintiff Weintraub was further provided with a "Student Health Insurance Handbook" that contains a "Summary of Benefits" section. In that section, Aetna promised to reimburse Plaintiff Weintraub 50% of the Reasonable Charge for ONET.

770.    Aetna's Agreements, and its other written communications with its non ERISA Members, state that the Member is financially responsible for the difference between the allowed expense and the provider's billed charge for ONET. For example, the Agreements explicitly state that "Covered Medical Expenses" only include charges that are not in excess of the "Reasonable Charge."

771.    Once a member receives ONET, Aetna provides an EOB that describes the division of payment for the service.  The EOBs state the amount the Non-par charged for the service, the amount allowed, and after stating the percentage and portion of the amount allowed that Aetna will pay, states the balance, which the EOBs describe as "Your Responsibility."

772.    Thus. the portions of ONET charges not paid by Aetna are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan member has to pay for medical services over a given time period.  Such costs are borne entirely by Members such as Plaintiff Weintraub.

773.    In December, 2007, Plaintiff Weintraub obtained ONET from a Non-par in New York City and submitted the claim for the services to Aetna.  Aetna reimbursed Plaintiff Weintraub less than the agreed-upon percentage of either the provider's actual charges or the Reasonable Charge.  This reimbursement determination resulted in Plaintiff being obligated to pay not only his deductible, but also that part of the provider's billed charge that exceeded the reimbursement amount determined by Aetna.

774.    Plaintiff Weintraub and the other members of the Non-ERISA Class complied with their obligations under their Agreements with Aetna.

775.    Nevertheless, Aetna failed to comply with the terms of the Agreements with Plaintiff Weintraub and the other Non-ERISA Class Members by making reimbursement determinations for ONET that had the effect of covering less than the stated percentage of either the providers' actual charges or the UCR without valid data to support such determinations, rather relying on the flawed and artificially deflated data provided by Ingenix.  Aetna's conduct thus contravenes the express terms of the Agreements and constitutes a breach of its contracts. Such conduct also prevents Aetna's members from obtaining the benefits of the reimbursements

they reasonably expect to receive pursuant to the terms of the Agreements in violation of the covenant of good faith and fair dealing.

776.     As a consequence of Aetna and its Co-Conspirators' actions, Plaintiff Weintraub and the other members of the proposed Non-ERISA Class were reimbursed for ONS in amounts less than what they should have been paid under their Agreements.

## COUNT X

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**(By Plaintiff Weintraub Against Aetna And On Behalf Of Non-Erisa Class)**

777.     Plaintiff Weintraub incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

778.     During the Class Period, Aetna has calculated reimbursement for ONET based on the flawed data obtained from Ingenix resulting in Aetna's failure to reimburse in accordance with the terms of its Agreements.

779.     Aetna utilized the flawed Ingenix data to calculate false UCRs, thereby under-reimbursing Plaintiff Weintraub and other Non-ERIS Members, in order to obtain additional revenues to unlawfully enrich Aetna to the detriment of Plaintiff Weintraub and the other members of the Non-ERISA Class.

780.     Plaintiff Weintraub and members of the Non-ERISA Class purchased their Aetna health service plans with the reasonable expectation that they would be reimbursed for ONET based upon the actual charge or the reasonable charge for the particular healthcare service in the region where that service is obtained.

781.     In addition, Plaintiff Weintraub and members of the Non-ERISA Class purchased the health services plans with the reasonable expectation that Aetna would deal with them honestly, fairly, equitably, in good faith and in full conformity with the fundamental and implied

terms of the Agreements. Aetna brought about and intended this expectation through the contractual language in the Agreements, enrollment materials, advertising, and through the express representations of its employees, agents and representatives.

782. In breach of the covenant of good faith and fair dealing, Aetna has failed to reimburse ONET based on actual UCRs and has not provided any additional benefits to Plaintiff Weintraub and the Non-ERISA Class for the increased charges resulting from their under-reimbursement for ONET. Therefore, Aetna has unreasonably denied Plaintiff Weintraub and the Non-ERISA Class the benefit of their bargain.

783. Aetna has materially and fundamentally breached the duty of good faith and fair dealing owed to Plaintiff Weintraub and the Non-ERISA Class in at least the following respects:

(a)    Unreasonably and in bad faith conspiring to utilize flawed data to calculate depressed UCRs and under-reimburse plan Members for ONET in order to unlawfully enrich itself;

(b)    Unreasonably and in bad faith failing to clearly and definitely notify Plaintiff and the Non-ERISA Class of the fact that Aetna utilizes flawed data, which results in higher payments for ONET by Plaintiff Weintraub and the Non-ERISA Class;

(c)    Unreasonably and in bad faith continuing to misrepresent to Plaintiff Weintraub and the Non-ERISA Class that they were being reimbursed for ONET based on the UCR when Aetna continues to utilize flawed Ingenix data to calculate false or reduced UCRs;

(d)    Unreasonably, secretly, and in bad faith providing intentionally flawed and manipulated data to Ingenix for use in the Ingenix Database with the knowledge that such data would produce artificially low false UCRs from Ingenix; and

(e)    Unreasonably and in bad faith putting the interests of Aetna ahead of those of Plaintiff Weintraub and the Non-ERISA Class.

784.    Aetna's conduct represents a failure or refusal to discharge its contractual responsibilities, prompted by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of Plaintiff Weintraub and the Non-ERISA Class and thereby deprives them of the benefits of the Agreement in accordance with the agreed-upon terms.

785.    Plaintiff Weintraub and the Non-ERISA Class performed their obligations under the Agreement by paying the dues, deductibles, and co-payments required by the Agreement.

786.    Plaintiff Weintraub and the Non-ERISA Class were damaged by Aetna's breach of the covenant of good faith and fair dealing in that they were under-reimbursed for ONET thereby resulting in increased out of pocket costs and/or they were unable to pay down their deductibles as quickly as they should have, and are therefore entitled to damages according to proof at trial.

## COUNT XII

### UNJUST ENRICHMENT
### (By Plaintiff Weintraub Against Aetna On Behalf Of A Non-ERISA Class)

787.    Plaintiff Weintraub incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

788.    During the Class Period, Aetna has benefited from its intentional under-reimbursement for ONET due to the unlawful and inequitable acts alleged in this Amended Complaint.

789.    Aetna's financial benefits resulting from its unlawful and inequitable conduct are traceable to payments by Plaintiff Weintraub and the other members of the Non-ERISA Class in

the form of higher premiums for the right to obtain ONS. Aetna has also financially benefitted by retaining money that should have been provided to Plaintiff Weintraub and the other members of the Non-ERISA Class for reimbursements for ONS.

790. Plaintiff Weintraub and the Non-ERISA Class have unknowingly conferred upon Aetna an economic benefit, in the nature of profits resulting from Defendants' unlawful conspiracy to under-reimburse for ONS, to the economic detriment of Plaintiff Weintraub and the Non-ERISA Class.

791. The economic benefit of overcharges for premiums, under-reimbursement for ONET, and unlawful antitrust profits derived by Defendants through their conspiracy is a direct result of Defendants' unlawful practices.

792. The financial benefits derived by Aetna rightfully belongs to Plaintiff Weintraub and the Non-ERISA Class, as they paid higher premiums for the right to obtain ONET at the UCR, only to be reimbursed by Aetna based on the UCRs, which inured to the benefit of Defendants.

793. It would be inequitable for the Defendants to be permitted to retain any of the monies they wrongfully retained due to their unfair and unconscionable methods, acts and practices alleged in this Amended Complaint.

794. Aetna should be compelled to disgorge in a common fund for the benefit of Plaintiff Weintraub and the Non-ERISA Class all unlawful or inequitable proceeds received by them.

795. A constructive trust should be imposed upon all unlawful or inequitable sums received by Aetna traceable to Plaintiff Weintraub and the Non-ERISA Class.

796. Plaintiff Weintraub and the Non-ERISA Class have no adequate remedy at law.

**WHEREFORE**, Provider Plaintiffs, the Provider Class, and the Provider ERISA Subclass demand judgment in their favor against Aetna as follows:

(f)     Certifying the Provider Class and Provider ERISA Subclass as set forth in this Complaint, and appointing the Individual Provider Plaintiffs as representatives for these classes;

(g)     Declaring that Aetna has breached the terms of its Members' plans with regard to out-of-network benefits in its Members' health plans, and thereby awarding damages to Provider Plaintiffs and the Provider ERISA Subclass for unpaid benefits in ERISA plans to Provider Plaintiffs and the Provider ERISA Subclass, as well as awarding declaratory relief with respect to Aetna's violations of ERISA;

(h)     Declaring that Aetna has failed to provide a "full and fair review" to Provider Plaintiffs and the Provider ERISA Subclass under § 503 of ERISA, 29 U.S.C. § 1133, and awarding declaratory relief with respect to Aetna's violation of ERISA;

(i)     Declaring that Aetna has violated its disclosure obligations under ERISA and the federal common law, including under § 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)( 4), and § 102 of ERISA, 29 U.S.C. § 1022, for which Plaintiffs and the ERISA Subclass are entitled to declaratory relief;

(j)     Declaring that Aetna violated federal claims procedures and SPD disclosure requirements under ERISA and that "deemed exhaustion" under the ERISA regulations is in effect as a result of Aetna's actions;

(k)     Declaring that Aetna is liable to Provider Plaintiffs and the Class pursuant to RICO, 18 U.S.C. §§, 1962(c), (d) and 1964(c) for threefold their damages, costs and attorney fees and awarding such relief;

(l)     Enjoining Aetna from committing the RICO violations described above in the future and/or declaring their invalidity;

(m)     Declaring that Aetna violated federal antitrust law and is liable to Provider Plaintiffs and the Provider Class pursuant to 15 U.S.C. § 15, *et seq.* for threefold their damages, costs and attorney fees and awarding such relief;

(n)     Enjoining Aetna from committing the antitrust violations described above in the future and/or declaring their invalidity;

(o)     Enjoining Aetna from using the Ingenix database as well as Medicare fees to determine UCR, along with other Nonpar benefit reductions;

(p)     Enjoining Aetna from committing any violation of law proven at trial;

(q)     Awarding Provider Plaintiffs and the Provider Class the costs and disbursements of this action, including reasonable attorneys' fees, costs and expenses in amounts to be determined by the Court;

(r)     Ordering Aetna to recalculate and issue unpaid benefits to Provider Plaintiffs and Provider Class members that were underpaid as a result of Aetna's improper UCR determinations;

(s)     Awarding prejudgment interest to the Provider Plaintiffs; and

(t)     Granting such other and further relief as is just and proper.

**WHEREFORE**, Subscriber Plaintiffs and the Subscriber Class demand judgment in their favor against Aetna as follows:

(a)     Certifying the ERISA Class, the New Jersey SEHP and Individual Plan Class, the RICO Class, and the RICO Section 664 Subclass, the Federal Damages and Federal Injunctive Relief Classes, and the New York Subscribers Classes as set forth in this Amended

Complaint, and appointing named Plaintiffs, except Plaintiff Weintraub, as Class representatives for the RICO Class and the RICO Section 664 Subclass, appointing named Subscriber Plaintiffs as Class representatives for the ERISA Class, appointing Plaintiffs Cooper and Samit as Class representatives for the New Jersey SEHP and Individual Plan Class, appointing Plaintiff Weintruab as Class representative for the New York Subscriber Damages Class, and appointing all named Plaintiffs as Class representative for the Federal Damages and Federal injunctive relief classes.

(b)     Declaring that Aetna has breached the terms of its EOCs and SPDs and awarding unpaid benefits to Subscriber Plaintiffs and the members of the ERISA and New Jersey SEHP and Individual Plan Classes, as well as awarding injunctive and declaratory relief to prevent Aetna's continuing Nonpar Benefit Reductions that are undisclosed and unauthorized by EOCs and SPDs;

(c)     Declaring that Aetna has violated its fiduciary duties by failing to pay proper Nonpar benefits without justification and by violating its duties of loyalty and care to Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes, and awarding appropriate relief, including unpaid benefits, restitution, interest, declaratory and injunctive relief to Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes, and removing the Aetna Defendants as fiduciaries;

(d)     Enjoining Aetna from violating applicable law and ordering remedial relief for its past violations of applicable law, including regarding ER, tiering and use of Medicare rates for UCR;

(e)     Enjoining Aetna's use of EOBs that violate applicable law;

(f)     Declaring that Aetna has failed to provide a "full and fair review" to Subscriber Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes under 29 U.S.C. § 1133, and awarding injunctive, declaratory and other equitable relief to Subscriber Plaintiffs and the members of the ERISA Class to ensure compliance with ERISA and its regulations;

(g)     Compelling Aetna to allow the provider's billed amount, and to pay additional benefits to Subscriber Plaintiffs and the Subscriber Classes based on the new allowed amount, in every instance in which Aetna reduced reimbursements due to its UCR determinations that were based on flawed or inadequate data, including through its reliance on the Ingenix database in violation of contractual terms of its plans and the SEHP and Individual Plan Regulation, plus interest;

(h)     Compelling Aetna to recalculate deductibles and coinsured charge limits based on the provider's charge (rather than the UCR amount) in every instance in which it improperly reduced benefits;

(i)     Declaring that Aetna has violated its disclosure and related obligations under ERISA and federal common law, including under 29 U.S.C. § 1022, for which Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes are entitled to injunctive, declaratory and other equitable relief;

(j)     Declaring that Aetna has violated Federal Claims Procedure Regulations issued under ERISA, and enjoining any continued violation;

(k)     Declaring that Aetna has breached its fiduciary obligations to its Members under ERISA, including 29 U.S.C., § 1104 and 29 U.S.C. § 1106, 29 U.S.C. § 1022, and 29 U.S.C. § 1024(b)( 4), and the federal common law, and awarding declaratory and injunctive

relief to remedy same, including but not limited to removal of a fiduciary or appointment of an independent monitor;

(l)    Declaring that Aetna and the Ingenix-Aetna Enterprise engaged in a scheme to reduce the amount of Aetna's payments to its Members, in violation of 18 U.S.C. § 1962(c);

(m)    Declaring that Aetna, through the Ingenix-Aetna Enterprise, made false payments on claims arising under ERISA plans, thereby converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended beneficiary, for Aetna's direct or indirect benefit, in violation of 18 U.S.C. § 664, justifying monetary and injunctive and other relief;

(n)    Preliminarily and permanently enjoining Aetna from using the Ingenix Databases as well as Medicare fees to determine UCR, along with other Nonpar Benefit Reductions;

(o)    Preliminarily and permanently enjoining Aetna from making Nonpar Benefit Reductions where Members' EOCs and SPDs do not disclose or authorize them; Preliminarily and permanently enjoining Aetna from making Nonpar Benefit Reductions in the New Jersey SEHP and Individual Plan Classes in violation of New Jersey law;

(p)    Preliminarily and permanently enjoining Aetna from discouraging Nonpar services or placing undisclosed obstacles in the path of Aetna Members seeking to access Non¬-Par care, including in the ER;

(q)    Preliminarily and permanently enjoining Ingenix from "approving" members' requests for preauthorization without disclosing the financial consequences that will occur despite Aetna's "approval";

(r)     Ordering Aetna to recalculate and issue unpaid benefits to Subscriber Plaintiffs and Class members that were underpaid as a result of Aetna's Nonpar Benefit Reductions;

(s)     Awarding Subscriber Plaintiffs and the Members of the Subscriber RICO Class and the RICO 664 Subclass compensatory damages, trebled where required by law, and disbursements and expenses of this action, including reasonable counsel fees, costs and reimbursements of expenses, including expert fees, in amounts to be determined by the Court and other appropriate relief;

(t)     Awarding Subscriber Plaintiffs and members of the New York Damages Class are entitled to actual damages, punitive damages and equitable relief pursuant to GBL §349;

(u)     Declaring that Aetna violated federal antitrust law and is liable to Subscriber Plaintiffs and the Provider Class pursuant to 15 U.S.C. § 15, *et seq.* for threefold their damages, costs and attorney fees and awarding such relief;

(v)     Awarding prejudgment interest; and

(w)     Granting such other and further relief as is just and proper.

## JURY TRIAL DEMAND

All Plaintiffs demand a jury trial for all claims so triable.


Each attorney set forth below is representing that the allegations with respect each of to his or her clients have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

| Provider Cases | Subscriber Cases (listed in the order in which they appear in CMO and alphabetical by plaintiff) |
|---|---|
| *Edith M. Kallas* (signature)<br>Edith M. Kallas, Esq.<br>Joe R. Whatley, Esq.<br>Mitchell M. Breit<br>W. Tucker Brown, Esq.<br>Laurence J. Hasson, Esq<br>**WHATLEY DRAKE & KALLAS, LLC**<br>1540 Broadway<br>37th Floor<br>New York, NY 10036<br>(212) 447-7070<br><br>D. Brian Hufford, Esq.<br>Robert J. Axelrod, Esq.<br>**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP**<br>100 Park Avenue<br>New York, NY 10017<br>(212) 661-1100<br><br>Archie Lamb, Jr. , Esq.<br>**LAW OFFICES OF ARCHIE LAMB, LLC**<br>2017 Second Avenue North, 2nd Floor<br>Birmingham, Alabama 35203<br>(205) 324-4644<br><br>Nicholas B. Roth, Esq.<br>**EYSTER KEY TUBBWEAVER & ROTH**<br>402 E. Moulton Street<br>Decatur, Alabama 35601<br>(256) 353-6761<br><br>Dennis G. Pantazis, Esq.<br>**WIGGINS, CHILDS, QUINN & PANTAZIS, LLC**<br>The Kress Building<br>301 Nineteenth Street North<br>Birmingham, Alabama 35203<br>(205) 314-0500 | *Kevin Roddy by permission* EMK (handwritten)<br>Barry M. Epstein, Esq.<br>Lynne Kizis, Esq.<br>Barbara Gail Quackenbos, Esq.<br>Kevin P. Roddy<br>**WILENTZ, GOLDMAN & SPITZER, P.A**<br>90 Woodbridge Center Drive<br>PO Box 10<br>Woodbridge , NJ 07095<br>(732) 636-8000<br><br>Jonathan Alpert, Esq.<br>**THE ALPERT LAW FIRM P.A.**<br>5920 River Terrace<br>Tampa, Florida 33604-6526<br>(813) 223-4131<br><br>Wood R. Foster, Jr., Esq.<br>Jordan Lewis, Esq.<br>**SIEGEL BRILL GREUPNER DUFFY & FOSTER P.A.**<br>1300 Washington Ave S<br>Minneapolis, MN 55401<br>(616) 337-6100<br><br>*Attorneys for Plaintiffs in Cooper v. Aetna Health Inc. P.A., Case No. 2:09-cv-3541*<br><br>*James Cecchi by permission* EMK (handwritten)<br>James E. Cecchi, Esq.<br>**CARELLA BYRNE BAIN GILFILLAN CECCHI STEWART & OLSTEIN, PC**<br>5 Becker Farm Road<br>Roseland , NJ 07068<br>(973) 994-1700 |

J. Mark White, Esq.
**WHITE ARNOLD ANDREWS & DOWD**
2025 3rd Avenue North, Suite 600
Birmingham, Alabama 35203
(205) 323-1888

Ralph Knowles, Esq.
Kenneth Canfield, Esq.
**DOFFERMYRE SHIELDS CANFIELD & KNOWLES, LLC**
1355 Peachtree Street, Suite 1600
Atlanta, GA 30309
(404) 881-8900

Gregory J. Pepe, Esq.
**NEUBERT, PEPE & MONTEITH P.C.**
195 Church Street, 13th Floor
New Haven, CT 06510-20026
(203) 821-2000

Klari Neuwelt, Esq.
**LAW OFFICE OF KLARI NEUWELT**
110 East 59th Street, 29th Floor
New York, NY 10022
(212) 593-8800

*Attorneys for Plaintiffs in:*
*American Medical Association v. Aetna*
*Health Inc. P.A., Case No. 2:09-cv-579, and*
*Plaintiffs Alan B. Schorr, Frank G. Tonrey,*
*Carmen M. Kavali, the Tennessee Medical*
*Association, Medical Association of Georgia,*
*California Medical Association, Florida*
*Medical Association, and the Washington State*
*Medical Association*

Stephen A. Weiss, Esq.
Christopher A. Seeger, Esq.
Jonathan Shub, Esq.
**SEEGER WEISS LLP**
One William Street
New York, New York 10004
(212) 584-0700

Paul M. Weiss, Esq.
Jeffrey A. Leon, Esq.
**FREED & WEISS LLC**
111 West Washington Street, Suite 1331
Chicago, Illinois 60602
(312) 220-0000

Richard J. Burke, Esq.
**RICHARD J. BURKE LLC**
1010 Market Street, Suite 650
St. Louis, Missouri 63101

Alberto R. Nestico, Esq.
**KISLING, NESTICO & REDICK LLC**
3200 W. Market Street, Suite 300
Akron, Ohio 44333

Austin Tighe, Esq.
**FEAZELL & TIGHE, L.L.P.**
6300 Bridgepoint Parkway
Bridgepoint 2, Suite 220
Austin, TX 78732

*Attorneys for Plaintiffs in:*
*Seney v. Aetna Health Inc. P.A.,*
*Case No. 2:09-cv-4268*

Joseph Guglielmo by permission
EMK

Joseph P. Guglielmo
**SCOTT + SCOTT LLP**
29 WEST 57TH STREET
14TH FLOOR
NEW YORK , NY 10019
(212) 223-6444

*Andrew Friedman by permission EMR*

Andrew S. Friedman, Esq.
Elaine A. Ryan, Esq.
Kathryn A. Jann, Esq.
**BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.**
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100

Bruce D. Greenberg, Esq.
Jennifer Sarnelli, Esq.
**LITE DePALMA GREENBERG
& RIVAS, LLC**
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000

Michael C. Dodge, Esq.
**GLAST, PHILLIPS & MURRAY, P.C.**
2200 One Galleria Tower
13355 Noel Road, L.B. 48
Dallas, Texas 86350
Telephone: (972) 419-8300

*Attorneys for Plaintiffs in:*
*Tisko v. Aetna Health Inc. P.A.,*
*Case No. 2:09-cv-1577, and Plaintiffs Brian*
*Mullins, the American Podiatric Medical*
*Association, and the New Jersey Psychological*
*Association*

*Lisa Rodriguez by permission EMR*

Lisa J. Rodriguez, Esq.
**TRUJILLO RODRIGUEZ RICHARDS,
LLC**
258 Kings Highway East
Haddonfield, NJ 08033
(856) 795-9002

Ira Neil Richards, Esq.
**TRUJILLO RODRIGUEZ RICHARDS,
LLC**
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
(215) 731-9004

David R. Scott, Esq.
Amanda F. Lawrence, Esq.
**SCOTT + SCOTT, LLP**
PO Box 192
108 Norwich Ave.
Colchester, CT 06415
(860) 537-5537

Christopher M. Burke
**Scott & Scott, LLP-CA**
600 B Street, Suite 1500
San Diego , CA 92101
619-233-4565

Mark N. Todzo
**Lexington Law Group, LLP**
**1627 IRVING ST.**
**SAN FRANCISCO, CA 94110**
Phone: (415) 759-4111

*Attorneys for Plaintiffs in:*
*Weintraub v. Ingenix Inc., Case No. 2:09-cv-*
*2027, and Plaintiff Angela Hull*

Marc H. Edelson, Esq.
**EDELSON & ASSOCIATES, LLC**
45 West Court Street
Doylestown, PA 18901
(215) 230-8043

Anthony Bolognese, Esq.
Joshua H. Grabar, Esq.
**BOLOGNESE & ASSOCIATES, LLC**
Two Penn Center,
1500 John F. Kennedy Blvd., Ste. 320
Philadelphia, PA 19102
(215) 814-6750

*Attorneys for Plaintiffs in:*
*Kozma v. Aetna Health Inc. P.A.,*
*Case No. 2:09-cv-1972*


Scott K. Ames
**FENNEMORE CRAIG, P.C.**
3003 North Central Avenue, Suite 2600
Phoenix, AZ 85012-2913
Tel: 602.916.5339

*Attorney for Plaintiff Maldonado Medical LLC*

# CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of July 2009 a true and correct copy of the foregoing was served on counsel of record through electronic notification via the CM/ECF system as well as on the following Counsel via US Mail.

D. Brian Hufford, Esq.
Robert J. Axelrod, Esq.
**POMERANTZ HAUDEK BLOCK**
**GROSSMAN & GROSS LLP**
100 Park Avenue
New York, NY 10017
(212) 661-1100

Archie Lamb, Jr. , Esq.
**LAW OFFICES OF ARCHIE LAMB, LLC**
2017 Second Avenue North, 2nd Floor
Birmingham, Alabama 35203
(205) 324-4644

Nicholas B. Roth, Esq.
**EYSTER KEY TUBBWEAVER & ROTH**
402 E. Moulton Street
Decatur, Alabama 35601
(256) 353-6761

Dennis G. Pantazis, Esq.
**WIGGINS, CHILDS, QUINN & PANTAZIS, LLC**
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
(205) 314-0500

J. Mark White, Esq.
**WHITE ARNOLD ANDREWS & DOWD**
2025 3rd Avenue North, Suite 600
Birmingham, Alabama 35203
(205) 323-1888

Ralph Knowles, Esq.
Kenneth Canfield, Esq.
**DOFFERMYRE SHIELDS CANFIELD & KNOWLES, LLC**
1355 Peachtree Street, Suite 1600
Atlanta, GA 30309
(404) 881-8900

Gregory J. Pepe, Esq.
**NEUBERT, PEPE & MONTEITH P.C.**
195 Church Street, 13th Floor
New Haven, CT 06510-20026
(203) 821-2000

Klari Neuwelt, Esq.
**LAW OFFICE OF KLARI NEUWELT**
110 East 59th Street, 29th Floor
New York, NY 10022
(212) 593-8800

Jonathan Alpert, Esq.
**THE ALPERT LAW FIRM P.A.**
5920 River Terrace
Tampa, Florida 33604-6526
(813) 223-4131

Wood R. Foster, Jr., Esq.
Jordan Lewis, Esq.
**SIEGEL BRILL GREUPNER DUFFY & FOSTER P.A.**
1300 Washington Ave S
Minneapolis, MN 55401
(616) 337-6100

Stephen A. Weiss, Esq.
Christopher A. Seeger, Esq.
Jonathan Shub, Esq.
**SEEGER WEISS LLP**
One William Street
New York, New York 10004
(212) 584-0700

Richard J. Burke, Esq.
**RICHARD J. BURKE LLC**
1010 Market Street, Suite 650
St. Louis, Missouri 63101

Alberto R. Nestico, Esq.
**KISLING, NESTICO & REDICK LLC**
3200 W. Market Street, Suite 300
Akron, Ohio 44333

Austin Tighe, Esq.
**FEAZELL & TIGHE, L.L.P.**
6300 Bridgepoint Parkway
Bridgepoint 2, Suite 220
Austin, TX 78732

David R. Scott, Esq.
Amanda F. Lawrence, Esq.
**SCOTT + SCOTT, LLP**
PO Box 192
108 Norwich Ave.
Colchester, CT 06415
(860) 537-5537

Christopher M. Burke
**SCOTT & SCOTT, LLP-CA**
600 B Street, Suite 1500
San Diego , CA 92101
619-233-4565

Mark N. Todzo
**LEXINGTON LAW GROUP, LLP**
1627 Irving St.
San Francisco, CA 94110
Phone: (415) 759-4111

Andrew S. Friedman, Esq.
Elaine A. Ryan, Esq.
Kathryn A. Jann, Esq.
**BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.**
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100

Bruce D. Greenberg, Esq.
Jennifer Sarnelli, Esq.
**LITE DePALMA GREENBERG**
& RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000

Michael C. Dodge, Esq.
**GLAST, PHILLIPS & MURRAY, P.C.**
2200 One Galleria Tower
13355 Noel Road, L.B. 48
Dallas, Texas 86350
Telephone: (972) 419-8300

Respectfully Submitted,

Edith M. Kallas
WHATLEY DRAKE & KALLAS, LLC
1540 Broadway
37th Floor
New York, NY 10036
(212) 447-7070