**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

IN RE:  AETNA UCR LITIGATION,

This Document Relates To:  ALL CASES

*FILED ELECTRONICALLY*

MDL NO. 2020

MASTER FILE NO. 2:07-CV-3541
(FSH)

**MEMORANDUM OF LAW IN SUPPORT OF AETNA'S MOTION TO DISMISS
PLAINTIFFS' JOINT CONSOLIDATED AMENDED COMPLAINT**

Liza M. Walsh
Tricia B. O'Reilly
Patricia A. Lee
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey  07068-1765
(973) 535-0500

Richard J. Doren
Gareth T. Evans
Heather M. Richardson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

Joshua Lipton (*pro hac vice pending*)
Geoffrey M. Sigler
Melanie L. Katsur
Brian D. Boone (*pro hac vice pending*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*Counsel for Aetna*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 6

I.   UNDER *TWOMBLY* AND *IQBAL*, PLAINTIFFS ARE REQUIRED TO PLEAD FACTUAL ALLEGATIONS THAT SHOW AN ENTITLEMENT TO RELIEF ............................................................................... 6

II.   PLAINTIFFS HAVE NOT STATED A SHERMAN ACT CLAIM ..................... 6

    A.   Plaintiffs' Allegations Of Ordinary Commercial Contracts Do Not Establish The Purported Agreement To Use Flawed Data. ........................ 7

    B.   Plaintiffs' Remaining Factual Allegations Do Not Show An Agreement To Create Flawed Data Or Depress UCRs. ............................. 9

III.   PLAINTIFFS HAVE FAILED TO STATE A RICO CLAIM ............................ 13

    A.   Plaintiffs Have Not Properly Alleged Fraud, Causation, Or RICO Injury. ....................................................................................... 14

        1.   Rule 9(b) applies to Plaintiffs' RICO claims ................................. 15

        2.   Plaintiffs' allegations of "misrepresentations" and "omissions" do not satisfy Rule 9(b). ........................................... 16

        3.   A number of Plaintiffs have failed to allege facts demonstrating the out-of-pocket loss required under RICO. ........ 17

        4.   None of the Plaintiffs have pled facts showing that any out-of-pocket injuries were proximately caused by Aetna's alleged fraud. ............................................................................... 22

        5.   Plaintiffs' allegations of ERISA conversion also fail under Rule 9(b). ..................................................................................... 25

    B.   Plaintiffs Have Failed To Plead The Existence Of An "Enterprise." ........ 27

    C.   Plaintiffs Have Failed To Plead Any Facts Suggesting That Aetna Directed The Conduct Of Any Enterprise. ............................................... 29

i

D.   Plaintiffs Have Not Pled Any Facts Demonstrating The Existence Of A RICO Conspiracy. .................................................. 31

IV.   PLAINTIFFS HAVE NOT STATED A CLAIM WITH RESPECT TO NON-INGENIX-BASED FEE DETERMINATIONS ........................... 32

V.   MANY OF PLAINTIFFS' CLAIMS SEEKING ERISA BENEFITS SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO SATISFY THE PLEADING REQUIREMENTS FOR THESE CLAIMS .......... 35

A.   Seven Plaintiffs Fail To Allege Exhaustion Of Their Administrative Appeals Before Filing Suit Under Section 502(a)(1)(B). ................................................................ 36

B.   Aetna Is Not The Proper Defendant In The Claims For Benefits Brought By Two Plaintiffs. .................................. 41

C.   Benefits Claims By Franco And Dr. Valauri Are Barred By Contractual Limitations Periods Contained In The Relevant ERISA Plans .......................................................... 45

D.   The Plan That Dr. Antell Sues To Enforce As An Assignee Contains An Anti-Assignment Clause .......................... 47

VI.   PLAINTIFFS' NON-BENEFITS CLAIMS UNDER ERISA SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM .................... 48

A.   ERISA Sections 102 And 104 Do Not Support A Claim For Relief (Counts II(A) & (B)). ......................................... 48

B.   Plaintiffs' Claims For Breach Of Fiduciary Duty Under Section 502(a)(3) Fail, Because They Seek Monetary Benefits Rather Than Equitable Relief (Counts III(A) & (B)). ..................... 50

C.   Plaintiffs Cannot State A Claim Under Section 503 Or Related Claims Procedure Regulations (Counts IV(A) & (B)). ........... 51

VII.   THE ASSOCIATION PLAINTIFFS LACK ARTICLE III STANDING .......... 52

VIII.   SEVERAL SUBSCRIBER PLAINTIFFS LACK ARTICLE III STANDING ........................................................................ 53

IX.   PLAINTIFF WEINTRAUB ONLY ALLEGES A BREACH OF CONTRACT ................................................................... 54

A.   At Most, Plaintiff Weintraub Has Asserted A Claim For Breach Of Contract, Not A Violation Of GBL § 349. ................. 54

ii

B.      Plaintiff Weintraub Has Failed To Allege that Aetna's Conduct
        Was Materially Deceptive. ........................................................ 56

CONCLUSION ........................................................................................................ 57

# TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page(s)**

*Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004) ............................................................... 35

*Alderney Dairy Co. v. Hawthorn Mellody, Inc.*, 643 F.2d 113 (3d Cir. 1981)........................ 46, 47

*Alexander v. United States*, 509 U.S. 544 (1993)................................................................ 13

*AMA v. United Healthcare Corp.*, 2001 WL 863561 (S.D.N.Y. July 31, 2001)........................... 53

*AMA v. United Healthcare Corp.*, 2002 WL 31413668 (S.D.N.Y. Oct. 23, 2002)....................... 53

*AMA v. United Healthcare Corp.*, 2007 WL 1771498 (S.D.N.Y. June 18, 2007) .................. 44, 54

*AMA v. United Healthcare Corp.*, 588 F. Supp. 2d 432 (S.D.N.Y. 2008) .............................. 20, 39

*AMA v. United Healthcare Corp.*, No. 00-cv-2800, 2007 WL 1771498 (S.D.N.Y. June 18, 2007)........................................................................................... 20

*Ames v. Am. Nat'l Can Co.*, 170 F.3d 751 (7th Cir. 1999)........................................................ 50

*Anderson v. Ayling*, 396 F.3d 265 (3d Cir. 2005)........................................................ 14, 24

*Anderson v. Kutak, Rock & Campbell*, 51 F.3d 518 (5th Cir. 1995)................................... 18

*Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338 (3d Cir. 2004) ................................... 38, 43

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)............................................... 14, 22

*Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987).................................................. 9, 12

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).............................................................. *passim*

*Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139 (2d Cir. 1997) ...................................................................................... 50

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....................................................... *passim*

*Bennett v. Prudential Ins. Co.*, 192 F. App'x 153 (3d Cir. 2006) ................................. 36, 39

*Bickley v. Caremark RX, Inc.*, 461 F.3d 1325 (11th Cir. 2006) ................................... 36, 39

*Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410 (S.D.N.Y. 2004)................................. 57

*Bollig v. Christian Cmty. Home & Servs., Inc.*, No. 02-c-532-c, 2003 WL 23200362 (W.D. Wis. July 10, 2003)............................................................................... 21

*Boyle v. United States*, 129 S. Ct. 2237 (2009) ................................................................27, 29

*Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131 (2008).........................................22, 24

*Briglia v. Horizon Healthcare Servs., Inc.*, No. 03-6033, 2005 WL 1140687 (D.N.J. May 13, 2005)................................................................................................................48

*Burke v. PricewaterhouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76 (2d Cir. 2009)..................................................................................................................47

*Chaney v. Comcast Cable Comms., Inc.*, 2003 WL 21973325 (E.D. Pa. June 10, 2003)........................................................................................................................50

*Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506 (2d Cir. 2002)........................................................................................................................42

*Clark v. Robert W. Baird Co.*, 142 F. Supp. 2d 1065 (N.D. Ill. 2001) .........................................17

*Crichton v. Golden Rule Ins. Co.*, No. 07-3333, 2009 WL 2382698 (7th Cir. Aug. 5, 2009)..................................................................................................................28, 30

*Crocco v. Xerox Corp.*, 137 F.3d 105 (2d Cir. 1998) ................................................................44

*Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226 (3d Cir. 1994) ....................................46

*Curley v. Cumberland Farms Dairy, Inc.*, 728 F. Supp. 1123 (D.N.J. 1989) ..............................22

*D'Amico v. CBS Corp.*, 297 F.3d 287 (3d Cir. 2002)................................................................39

*DeBartolo v. Blue Cross/Blue Shield of Ill.*, No. 01 C 5940, 2001 WL 1403012 (N.D. Ill. Nov. 9, 2001) ................................................................................................50

*Deer Park Enter., LLC v. Ali Sys., Inc.*, 57 A.D.3d 711 (N.Y. App. Div. 2008) ........................56

*DeLaurentis v. Job Shop Tech. Servs. Inc.*, 912 F. Supp. 57 (E.D.N.Y. 1996)............................25

*DePasquale v. Allstate Ins. Co.*, 179 F. Supp. 2d 51 (E.D.N.Y. 2002) ......................................55

*Devito v. Aetna*, 536 F. Supp. 2d 523 (D.N.J. 2008) ................................................................41

*Dist. 1199P Health & Welfare Plan v. Janssen*, 2008 WL 5413105 (D.N.J. Dec. 23, 2008)........................................................................................................................32

*Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12 (1st Cir. 2000)..................................16

*Evans v. Employee Benefit Plan*, 311 Fed. App'x. 556 (3d Cir. 2009) ........................................44

*Everson v. Blue Cross & Blue Shield of Ohio*, 898 F. Supp. 532 (N.D. Ohio 1994) ...................26

*Faircloth v. Lundy Packing Co.*, 91 F.3d 648 (4th Cir. 1996) ....................................................50

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) ...................................................45

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) .............................20

*Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180 (10th Cir. 2007), *abrogated in part on other grounds by Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008) ....................................................................................52

*Fontana v. Diversified Group Adm'rs, Inc.*, 2003 WL 21224040 (3d Cir. May 28, 2003) ...................................................................................................................46

*Fowler v. UPMC Shadyside*, --- F.3d ---, 2009 WL 2501662 (3d Cir. Aug. 18, 2009) ...............6

*Goldman v. Metro Life Ins. Co.*, 841 N.E.2d 742 (N.Y. 2005) .................................................56

*Gonzales v. Al & John Inc.*, No. 06-6245, 2007 WL 1490407 (D.N.J. May 18, 2007) ...............39

*Goren v. New Vision Int'l, Inc.*, 156 F.3d 721 (7th Cir. 1998).............................................31, 32

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625 (S.D.N.Y. 2008) ..........................................................................................................55, 56

*Graden v. Conexant Sys. Inc.*, 496 F.3d 291 (3d Cir. 2007) ..............................................42, 45

*Greifenberger v. Hartford Life Ins. Co.*, 131 F. App'x 756 (2d Cir. 2005) ...........................36, 39

*Guilbert v. Gardner*, 480 F.3d 140 (2d Cir. 2007) ..................................................................46

*Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300 (3d Cir. 2008).......................42, 44, 46

*Harrow v. Prudential Ins. Co.*, 279 F.3d 244 (3d Cir. 2002) .............................................36, 37

*Hicks v. Fleming Cos.*, 961 F.2d 537 (5th Cir. 1992).............................................................49

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) .........................................13, 14, 22, 24

*Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450 (3d Cir. 2003) ...................................51

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ............................................54

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999).................................................15

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) .............................................9, 12

*In re Ins. Brokerage Antitrust Litig.*, 2007 WL 1062980 (D.N.J. Apr. 5, 2007)..............13, 30, 31

*In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2006 WL 2850607 (D.N.J. Oct. 3, 2006) ............................................................................................. 25, 28

*In re Schering-Plough Corp.*, No. 2:06-cv-5774, 2009 WL 2043604 (D.N.J. July 10, 2009) ................................................................................................. *passim*

*Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250 (11th Cir. 2004) .............................. 32

*James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439 (6th Cir. 2002) ........................... 49

*Koert v. GE Group Life Assurance Co.*, 231 F. App'x 117 (3d Cir. 2007) .................... 47

*Krauss v. Oxford Health Plans, Inc.*, 418 F. Supp. 2d 416 (S.D.N.Y. 2005) ................ 49

*LaFleur v. La. Health Serv. & Indem. Co.*, 563 F. 3d 148 (5th Cir. 2009) .................... 52

*Lichtenstein v. Reassure Am. Life Ins. Co.*, No. 07-cv-1653, 2009 WL 792080 (E.D.N.Y. Mar. 23, 2009) ........................................................................... 16

*Limestone Dev. Corp. v. Lemont*, 520 F.3d 797 (7th Cir. 2008) ................................. 27

*Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594 (D.N.J. 2000) ..................... 17

*Longmont United Hosp. v. Saint Barnabas Corp.*, 305 F. App'x 892 (3d Cir. 2009) ... 24

*Lujan v. Defenders of Wildlife*, 504 U.S. 5551 (1992) ......................................... 53, 54

*Lum v. Bank of Am.*, 361 F.3d 217 (3d Cir. 2004) ............................................... 15, 32

*Maio v. Aetna, Inc.*, 221 F.3d 472 (3d Cir. 2000) .......................................... 14, 18, 21

*Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563 (1925) ............................... 9

*McKinsey v. Sentry Ins.*, 986 F.2d 401 (10th Cir. 1993) ........................................... 44

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ................... 18, 21, 23, 25

*Metro. Life Ins. Co. v. Price*, 501 F.3d 271 (3d Cir. 2007) ........................................ 41

*Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516 (3d Cir. 2007) .................................. 46

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) ..................................... 7

*Morley v. Avaya, Inc.*, Civ. A. No. 04-409, 2006 WL 2226336 (D.N.J. Aug. 3, 2006) .... 50

*Mornay v. Travelers Ins.*, 2008 WL 2439941 (E.D. La. June 13, 2008) ....................... 11

*Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96 (2d Cir. 2005) ............................... 50

*Nichols v. Verizon Comms., Inc.*, 2002 WL 31477114 (D.N.J. Aug. 16, 2002)............................50

*O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674 (2d Cir. 1991)............................25

*Owen v. Regence BlueCross BlueShield of Utah*, 388 F. Supp. 2d 1318 (D. Utah 2005)............................20

*Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278 (3d Cir. 2002)...............53

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) ............................35

*Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004) ............................23

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ............................18

*Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986) ............................22

*Renfrew Ctr. v. Blue Cross & Blue Shield of Cent. New York, Inc.*, No. 94-cv-1527, 1997 WL 204309 (N.D.N.Y. Apr. 10, 1997)............................48

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ............................30

*Rolo v. City Investing co. Liquidating Trust*, 155 F.3d 644 (3d Cir. 1988)............................15

*Russello v. United States*, 464 U.S. 16 (1983)............................29

*Sanchez v. Triple-S Mgmt. Corp.*, 492 F.3d 1 (1st Cir. 2007) ............................16

*Schafer v. State Farm Fire & Casualty Co.*, 507 F. Supp. 2d 587 (E.D. La. 2007)............11

*Sedima S.P.L.R. v. Imrex Co.*, 473 U.S. 479 (1985)............................14

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ............................53

*Small v. Lorillard Tobacco Co., Inc.*, 720 N.E.2d 892 (N.Y. 1999) ............................57

*Smith v. Jones, Gregg, Creehan & Gerace, LLP*, 2008 WL 5129916 (W.D. Pa. Dec. 5, 2008)............................32

*Smith v. Sydnor*, 184 F.3d 356 (4th Cir. 1999)............................52

*Spagnola v. Chubb Corp.*, 574 F.3d 64 (2d Cir. 2009) ............................56

*Steele v. Hosp. Corp. of Am.*, 36 F.3d 69 (9th Cir. 1994)............................18

*Stutman v. Chem. Bank*, 731 N.E.2d 608 (N.Y. 2000) ............................55

*Syed v. Hercules Inc.*, 214 F.3d 155 (3d Cir. 2000) ............................52

*United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006) ....................................................................................................15, 25

*United States v. Aimone*, 715 F.2d 822 (3d Cir. 1983) ...............................................29

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) .............................................16

*United States v. Korando*, 29 F.3d 1114 (7th Cir. 1994) ............................................27

*United States v. Kreimer*, 609 F.2d 126 (5th Cir. 1980) .............................................16

*United States v. Turkette*, 452 U.S. 576 (1981) ....................................................27, 29

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978) ..............................................9

*Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534 (3d Cir. 1993) ..............30, 31

*USAlliance Fed. Credit Union v. CUMIS Ins. Soc., Inc.*, 346 F. Supp. 2d 468 (S.D.N.Y. 2004) ....................................................................................................55

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ...............................................................51

Wachtel v. Guardian Life Ins. Co., 223 F.R.D. 196 (D.N.J. 2004), *vacated and remanded on other grounds*, 453 F.3d 179 (3d Cir. 2006) ........................................41

*Warth v. Seldin*, 422 U.S. 490 (1975) .........................................................................21

*Wayne Surgical Ctr., LLC v. Concentra Preferred Sys., Inc.*, No. 06-928, 2009 WL 961389 (D.N.J. Apr. 7, 2009) ..............................................................................40

*Weiner v. Klais & Co.*, 108 F.3d 86 (6th Cir. 1997) ...................................................36

*Weldon v. Kraft, Inc.*, 896 F.2d 793 (3d Cir. 1990) ...................................................36

*Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295 (D.N.J. 2005) ........................32

*Zipf v. AT&T*, 799 F.2d 889 (3d Cir. 1986) ...............................................................41

## Statutes

15 U.S.C. § 1 ...............................................................................................................6

18 U.S.C. § 664 ..........................................................................................................15

18 U.S.C. § 1341 ........................................................................................................15

18 U.S.C. § 1343 ........................................................................................................15

18 U.S.C. § 1961(4) ...................................................................................................29

18 U.S.C. § 1962(c) ...................................................................................13, 30

18 U.S.C. § 1964(a) ..........................................................................................21

18 U.S.C. § 1964(c) ..........................................................................................14

29 U.S.C. § 1002(16)(A) ...................................................................................44

29 U.S.C. § 1002(21)(A)(i) ...............................................................................45

29 U.S.C. § 1021(a)(1) ......................................................................................50

29 U.S.C. § 1022(a) ..........................................................................................49

29 U.S.C. § 1024(b)(4) ................................................................................49, 50

29 U.S.C. § 1101(b)(2) ......................................................................................26

29 U.S.C. § 1132(d)(2) ......................................................................................42

**Rules**

Fed. R. Civ. P. 8(a)(2) .........................................................................................6

**Regulations**

29 C.F.R. § 2560.503-1 ................................................................................38, 52

29 C.F.R. § 2560.503-1(g)(1) ............................................................................38

**Other Authorities**

*The Value of Provider Networks and the Role of Out-of-Network Charges in Rising
Health Care Costs: A Survey of Charges Billed by Out-of-Network Physicians*
(Aug. 2009), *avail. at*
http://www.ahipresearch.org/PDFs/ValueSurvey/AllStatesReport.pdf ...................................19

Title IX of the Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922 ...................13

## INTRODUCTION

Plaintiffs' Joint Consolidated Amended Complaint ("Complaint") is a classic example of over-reaching.  Plaintiffs' factual allegations center on their critiques of the Ingenix databases and Aetna's use of those databases to determine UCR rates for reimbursing plan members for visits to out-of-network ("ONET") providers.  In particular, Plaintiffs allege that members of many Aetna health plans have "contracted for the right to obtain ONET benefits," and in exchange for higher premiums Aetna "promise[d] to reimburse Members for ONET at a percentage of the lesser of either (a) the actual amount of their medical bills, or (b) the usual, and customary and reasonable rate ('UCR') charged by providers" for a similar service in a similar geographic area.  Compl. ¶ 4.  Plaintiffs contend that by using allegedly flawed data from Ingenix to determine UCR rates, "Aetna actually reimbursed its Members at a much *lower* rate" (*id.*) and it thereby "paid less than it was contractually obligated to pay for the ONET [services]" (*id.* ¶ 1).

But while Plaintiffs' factual allegations focus on Aetna's alleged breach of its contractual obligations by using purportedly depressed UCR rates derived from Ingenix data, Plaintiffs' legal claims and the relief they seek extend far beyond the factual allegations of the Complaint. For example, Plaintiffs apparently seek relief for *every* instance in which Aetna allowed less than billed charges for an out-of-network visit, even if the reduction had nothing to do with Ingenix or any practice actually challenged in the Complaint's factual allegations.  *See, e.g., id.* ¶ 549 (defining subscriber class to include all Aetna plan members who received ONET services "for which Aetna . . . allowed less than the provider's billed charge in determining benefits").

Similarly, with respect to Aetna's UCR determinations, Plaintiffs over-reach by attempting to parlay their criticisms of the Ingenix databases into a claim for relief with respect to *every* UCR determination made by Aetna—even where such determinations were not based on the supposedly flawed Ingenix data.  Thus, while Plaintiffs assert that Ingenix "is the hidden profit

1

engine of the health insurance business" and that Aetna used Ingenix data to generate "False UCRs" (*id.* ¶¶ 6, 7), Plaintiffs are seeking relief not only for Aetna's use of Ingenix data, but also where Aetna used *other* data sources that had nothing to do with Ingenix. *See id.* ¶ 61. Plaintiffs' factual allegations, however, do not support such claims. Plaintiffs do not contend that there was any conspiracy relating to any non-Ingenix data source. Nor do Plaintiffs even attempt to identify any "flaws" or "manipulation" in any other data source used by Aetna.

Moreover, apparently not satisfied with their contract-based claims where Aetna "paid less than it was contractually obligated to pay for the ONET [services]" (*id.* ¶ 1), Plaintiffs attempt to concoct treble-damage RICO and antitrust claims. The factual allegations in the Complaint, however, do not support such claims. Among other pleading failures, Plaintiffs have not offered factual allegations sufficient to show the existence of an antitrust conspiracy, a RICO enterprise, that Aetna directed a criminal enterprise, or predicate fraud claims. The treble damage remedy and *in terrorem* effects of antitrust and RICO claims were simply not intended to apply to breach-of-contract cases, which is all Plaintiffs have alleged here.

Solely for purposes of this motion, Aetna does not dispute that Plaintiffs have adequately alleged that there were flaws in the Ingenix data and that in some instances those flaws resulted in lower UCR rates when Aetna based its UCR determinations on Ingenix data.[1] Nor does Aetna dispute, for purposes of this motion, that some of the Plaintiffs have stated a contract-based claim for benefits due where, *but only where*, (i) Aetna was obligated by the terms of the member's plan to reimburse ONET services at the lesser of billed charges or the UCR rate, (ii) the

---

[1] Aetna denies any wrongdoing and it disputes Plaintiffs' factual allegations for all purposes beyond this motion, including Plaintiffs' assertions that Aetna engaged in any wrongful conduct with respect to the Ingenix data or Aetna's data contributions to Ingenix, that Aetna's use of Ingenix data resulted in depressed UCRs, and that Aetna breached any contractual obligation.

claim at issue was allowed at less than the full billed amount, based on Aetna's determination that the billed amount was greater than UCR,[2] (iii) Aetna's determination of the UCR rate was based on Ingenix data, and (iv) the remaining elements of an ERISA claim for benefits are satisfied, including exhaustion of administrative appeals and suing the proper party.  But, as discussed above, Plaintiffs' sprawling claims extend far beyond these limitations.

Even with respect to Plaintiffs' contract-based ERISA claims, Plaintiffs over-reach by seeking relief that is clearly foreclosed by the statutory scheme.  For example, Aetna is not a proper defendant in a suit for benefits under two Plaintiffs' plans, because those plans are self-insured and controlled by Plaintiffs' employers, and Aetna merely provides administrative services to the plans as a claims processor.  In addition, several Plaintiffs have not alleged that they have exhausted their administrative remedies, including several Plaintiffs who have not even *attempted* to appeal through the administrative framework provided in their plans.

In essence, Plaintiffs have taken a core set of criticisms of the Ingenix databases and they have tried to convert them into massive and wide-ranging claims, regardless of whether those claims have legal merit, support in the factual allegations of the Complaint, or, indeed, anything to do with Ingenix data.  Rule 12(b)(6) was designed for precisely this situation.

As the Supreme Court explained in *Twombly*, "something beyond the mere possibility of loss causation must be alleged" to survive a motion to dismiss, "lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557-58 (2007) (internal quotations omitted).  Accordingly, "when the allegations

---

[2]   A majority of ONET claims are paid by Aetna at the full billed amount, and are not subject to a UCR-based reduction.  Those claims are not at issue in this litigation.

in a complaint, however true, could not raise a claim of entitlement to relief, *this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court.*" *Id.* at 558 (emphasis added; internal quotations omitted). The Court emphasized that discovery proceedings should not be permitted where a plaintiff has failed to pass the pleading threshold: "it is only by taking care to require allegations" sufficient to state a claim "that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence." *Id.* at 559 (internal quotations omitted). *See also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions").

Plaintiffs seek to use their wide-ranging claims to exert unjustified pressure on Aetna and to embark on a fishing expedition in the hope that they might turn up some evidence of the grand conspiracy on which their conclusory and unsupported claims are based. Under the standards articulated in *Twombly* and *Iqbal*, the Court should reject these efforts. Moreover, if there is to be any hope of litigating this already-imposing case within the framework established by this Court, Plaintiffs' effort to expand the scope of the litigation far beyond the well-pled factual allegations in the Complaint should be rejected at the threshold. Accordingly, Aetna respectfully requests that the Court limit Plaintiffs' claims as follows:

- Plaintiffs' Sherman Act claims should be dismissed in their entirety because Plaintiffs have not asserted factual allegations sufficient to show that there was an agreement involving Aetna, United, or anyone else to use flawed data to depress UCRs. *See* Section II, *infra*.

- Plaintiffs' RICO claims should be dismissed in their entirety because Plaintiffs have not (a) asserted factual allegations sufficient to show the existence of a RICO enterprise or that Aetna directed such an Enterprise; (b) pled their fraud claims with the particularity required by Rule 9(b); (c) alleged any injuries that were proximately caused by any racketeering activity; or (d) alleged any facts sufficient to show that Aetna conspired to violate RICO. *See* Section III, *infra*.

- Plaintiffs' requests for relief where Aetna based UCR determinations on fee sched-

4

ules that have nothing to do with Ingenix should be struck from the Complaint be-cause Plaintiffs have not stated a claim with respect to such fee determinations. *See* Section IV, *infra*.

- Plaintiffs' ERISA claims for benefits due should be limited to claims as to which (a) Aetna is the proper defendant under ERISA; (b) Plaintiffs have exhausted their administrative remedies; and (c) Plaintiffs have satisfied other plan-related require-ments, such as contractual limitations periods. *See* Section V, *infra*.

- Plaintiffs' claims under ERISA Sections 502(a)(3), 503, 102, and 104 should be dis-missed because the ERISA provisions under which they bring those claims do not provide Plaintiffs with the relief they seek. *See* Section VI, *infra*.

- The Association Plaintiffs' claims should be dismissed because they lack Article III standing. *See* Section VII, *infra*.

- The claims of several Subscriber Plaintiffs should be dismissed because they lack Ar-ticle III standing. *See* Section VIII, *infra*.

- Plaintiff Weintraub's claim under New York General Business Law § 349 should be dismissed because he has not stated a claim under that statute. His claims for breach of the covenant of good faith and fair dealing and unjust enrichment also fail. *See* Section IX, *infra*.

Attached as Exhibit A to the Oatley Declaration is a chart that summarizes which claims should be dismissed and the grounds for dismissal, as well as which contract-based claims should survive. The contract claims for Plaintiffs Werner, Weintraub, Kavali, Schorr, Tonrey, and Maldonaldo are the only claims as to which Plaintiffs have offered factual allegations suffi-cient to state a claim and a viable legal basis for such a claim.[3]

---

3   Aetna's motion to dismiss does not respond to Plaintiff Seney's claims because Seney has stated that he will not continue to participate as a plaintiff in this litigation. Seney has agreed to stipulate to that fact. The motion also does not separately address the claims pressed in two tag-along actions to MDL-2020—*American Surgical Assistants, Inc. v. Aetna Health Inc.*, No. 2:09-4042 (D.N.J.) and *North Peninsula Surgical Center, L.P. v. Aetna Life Ins. Co.*, No. 2:09-3972 (D.N.J.). Case Management Order No. 1 provides that cases transferred pursuant to an order of the MDL Panel are automatically consolidated with the MDL proceedings for pretrial purposes and also provides that there will be a single consolidated complaint. To the extent that those ac-tions raise claims, issues, and arguments not currently raised in the Complaint, Aetna reserves it

[Footnote continued on next page]

**ARGUMENT**

**I.     UNDER *TWOMBLY* AND *IQBAL*, PLAINTIFFS ARE REQUIRED TO PLEAD FACTUAL ALLEGATIONS THAT SHOW AN ENTITLEMENT TO RELIEF**

As the Supreme Court has explained, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim under Rule 8. *Iqbal*, S. Ct. at 1949. "To survive a motion to dismiss, a complaint must contain sufficient ***factual matter***, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570) (emphasis added).

The plausibility requirement set forth in *Twombly* and *Iqbal* "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not '*show[n]*'—'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)) (emphasis added; alteration in original). As the Third Circuit has explained, under this standard "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, --- F.3d ---, 2009 WL 2501662, at *5 (3d Cir. Aug. 18, 2009).

**II.     PLAINTIFFS HAVE NOT STATED A SHERMAN ACT CLAIM**

Section 1 of the Sherman Act is implicated only where there is a "contract, combination . . . or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1. "Independent action is not

---

[Footnote continued from previous page]
right to address those claims, issues, and arguments separately at a later time, as this Court directs.

proscribed" by Section 1 of the Sherman Act. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Accordingly, to state a claim under Section 1 of the Sherman Act, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Plaintiffs' antitrust claim fails at the threshold because they have not asserted factual allegations sufficient to show the existence of an unlawful agreement.

Plaintiffs base their Sherman Act claim on a purported agreement between Aetna, Ingenix, United, and other managed care companies "to manipulate the rates used to reimburse Members for ONET" and to "use[] flawed data to set artificially low reimbursement rates for ONET." Compl. ¶ 5; *id.* ¶ 735 (the "substantial terms" of the purported agreement "were to create, maintain and use the Ingenix Database to produce artificially low UCRs for reimbursement of Out of Network Services"). Again and again, Plaintiffs assert in conclusory fashion that there was an agreement to use "flawed data" and "to produce artificially low UCRs." But the Complaint is devoid of *factual allegations* that, if proven, would support Plaintiffs' conclusion that such an agreement actually existed.

### A. Plaintiffs' Allegations Of Ordinary Commercial Contracts Do Not Establish The Purported Agreement To Use Flawed Data.

The bulk of Plaintiffs' factual allegations relating to their supposed "conspiracy" are, in reality, just descriptions of ordinary commercial arrangements relating to the Ingenix databases. *See* Compl. ¶¶ 182-200. Notwithstanding Plaintiffs' effort to attach sinister-sounding labels and buzzwords to their descriptions, Plaintiffs offer no factual allegations suggesting that these commercial contracts show the existence of a purported conspiracy to depress UCR rates.

For example, Plaintiffs allege that there are bilateral contracts between Ingenix and Aetna pursuant to which Aetna "provide[s] the raw data necessary for the Ingenix Database" and through which Aetna acquires the output from Ingenix (Compl. ¶ 519); that Ingenix enters into

"licensing agreements" with Aetna "that govern the use of the Ingenix Database" (*id.* at ¶ 524); and that there are agreements that specify what "data points" the data contributors should "include in the data provided to Ingenix" (*id.* ¶ 499).

But Plaintiffs do not allege that the creation, licensing, and use of a database of fee information is itself unlawful. That is, in fact, what the New York Attorney General has set out to do by transferring responsibility for the Ingenix database to a nonprofit entity that will continue to provide fee information based on contributions of charge data from managed care companies and others. *See* Compl. ¶ 214. Nor do Plaintiffs claim that it is unlawful for Ingenix and Aetna to enter into contracts concerning the provision of raw data to Ingenix, specifying the data that Aetna should provide, or defining the rights Aetna obtains when it licenses the output from Ingenix. These are ordinary commercial arrangements that one would expect to find in the creation of any database of cost information in any industry. Plaintiffs do not contend otherwise.

Plaintiffs do, however, contend that it is unlawful to enter into an agreement to manipulate data in order to generate artificially low UCR rates. But Plaintiffs cannot point to any provision in any of the commercial contracts relating to the Ingenix databases that establishes—or even suggests the existence of—such an agreement.

Similarly, Plaintiffs offer over a dozen paragraphs describing the creation of the PHCS database in the 1970s by HIAA, a trade association. Compl. ¶¶ 133-146. But Plaintiffs do not suggest that the creation of PHCS was part of any purported conspiracy to "fabricate UCR rates," or that HIAA was doing anything unlawful in creating this database. To the contrary, Plaintiffs allege that PHCS was created "as a way to aggregate and compile physician charge data as a service to its members" (*id.* ¶ 138) and that the database "was not designed to determine precise reimbursement amounts" (*id.* ¶ 144). Plaintiffs also describe the sale of PHCS to Ingenix, as well

as the various commercial agreements that were part of that transaction. *Id.* ¶¶ 182-187. But again, Plaintiffs do not allege that there was anything unlawful about that commercial transaction, or that it was part of any conspiracy to use flawed data to depress UCR rates.

There is a good reason why Plaintiffs do not contend that the creation, operation, and use of a database of physician charge information constitutes an antitrust violation. The Supreme Court has long held that the creation of such data sources is perfectly lawful, and in fact that such data sources can have substantial *pro*competitive effects. *See, e.g., Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 583 (1925) (holding that creation of a database of cost information by a trade association does not violate the antitrust laws: "Competition does not become less free merely because the conduct of commercial operations becomes more intelligent through the free distribution of knowledge of all the essential factors entering into the commercial transaction."); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) (exchanges of information can "increase economic efficiency and render markets more, rather than less, competitive" (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978))); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257-58 (2d Cir. 1987) ("evidence of the mere exchange of information by competitors cannot establish a conspiracy").

Accordingly, Plaintiffs are left to argue that there was an agreement to "manipulate the rates used to reimburse Members for ONET" and to "use[] flawed data to set artificially low reimbursement rates for ONET." Compl. ¶ 5. But Plaintiffs' allegations of ordinary commercial agreements relating to Ingenix simply do not establish such a conspiracy.

**B.   Plaintiffs' Remaining Factual Allegations Do Not Show An Agreement To Create Flawed Data Or Depress UCRs.**

Plaintiffs do offer factual allegations describing alleged flaws in the Ingenix data and the use of that data by Aetna to create UCR rates. But even assuming such allegations were true,

9

they do not plausibly show that Aetna, Ingenix, or anyone else entered into any *agreement* to create flawed data or depress UCRs.  To the contrary, Plaintiffs' own factual allegations suggest that the conduct alleged in the Complaint is perfectly consistent with Aetna's and Ingenix's independent, rational decision-making.  Just as in *Twombly*, the existence of these independent incentives for engaging in the alleged conduct requires dismissal of Plaintiffs' antitrust claim.

Plaintiffs allege, for example, that "Aetna deleted valid high charges" before submitting its data to Ingenix, and that Ingenix "removed additional valid high charges from all contributors' data."  Compl. ¶ 32.   But Plaintiffs themselves allege that Aetna and other health insurers have an *independent* incentive to "artificially deflate the amounts of money they have to reimburse Subscribers and Providers for ONET."  *Id.* ¶ 8.  Plaintiffs further allege that Aetna is "incentivized to provide flawed claims data which will result in lower UCR rates in order to pay lower reimbursements for ONET."  *Id.* ¶ 541.  And Plaintiffs likewise allege that Ingenix has an *independent* incentive to "turn[] a blind eye to the quality and reliability of the data submitted to it" and to "manipulat[e] the data to support artificially low UCR rates" in order to "assist[] UHG to perpetuate low reimbursement rates for out-of-network claims."  *Id.*  Plaintiffs' allegations of data manipulation are therefore perfectly consistent with these independent incentives, and they do not suggest the existence of any *agreement* to manipulate data.

The Supreme Court's opinion in *Twombly* is directly on point, and it requires dismissal here.  In *Twombly*, the Court explained that "nothing in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy" because the actions alleged in the complaint were consistent with the "natural, unilateral reaction" of each defendant to the market conditions alleged in the complaint.  550 U.S. at 566.  In other words, "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway."  *Id.*  Just

as in this case, the complaint in *Twombly* "itself g[ave] reasons to believe that the [defendants] would see their best interests" in engaging in the conduct alleged by the plaintiff. *Id.* at 568. Because the allegations demonstrated that there was an "obvious alternative explanation" to a conspiracy—independent reactions to similar market conditions—the Court found that "plaintiffs' claim of conspiracy in restraint of trade comes up short." *Id.* at 564.

Another recent case involving an insurer's independent incentives is also directly on point. In *Schafer v. State Farm Fire & Casualty Co.*, 507 F. Supp. 2d 587 (E.D. La. 2007), plaintiffs alleged that State Farm and other insurers must have been involved in a conspiracy because they were all using a software program that "allegedly prices repair costs below market value." *Id.* at 597. The court held that such allegations were insufficient under *Twombly* because the insurers "had a strong economic incentive to keep payouts for damages low" regardless of whether a conspiracy existed, and therefore "State Farm's behavior [in using the software program] was natural considering the strong economic incentive to keep payouts low." *Id. See also Mornay v. Travelers Ins.*, 2008 WL 2439941, at *4 (E.D. La. June 13, 2008) (featuring same operative facts as *Schafer*). Here, as in *Schafer*, Plaintiffs have alleged that Aetna, Ingenix, United, and other insurers each had an independent incentive to keep payouts for ONET services low. That independent incentive, which was allegedly held by each of the supposed conspirators, requires dismissal of Plaintiffs' conspiracy claim.

Plaintiffs' remaining allegations fare no better. For example, Plaintiffs contend that it is evidence of a conspiracy that Aetna and other alleged co-conspirators "all utilize the Ingenix Database to determine UCR rates." Compl. ¶ 506. But Plaintiffs allege just a few paragraphs later that "there is no viable competitor [to Ingenix] in the market for data services used to calculate UCRs." *Id.* ¶ 514; *see also id.* ¶ 522 (there are "exceedingly high barrier[s] to entry" in In-

11

genix's data market).  In a market in which there is just one "viable" supplier of data, it is hardly

evidence of a grand conspiracy that Aetna and others purchased data from that supplier.  More-

over, it is well-established that parallel conduct—even when taken with knowledge of other

companies' actions—is perfectly consistent with independent, non-conspiratorial decision-

making.  *See, e.g., Twombly*, 550 U.S. at 561 n.7 (the Supreme Court's decisions "have made it

clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary im-

plication of conspiracy"); *Baby Food*, 166 F.3d at 122 ("In an oligopolistic market, meaning a

market where there are few sellers, interdependent parallelism can be a necessary fact of life but

be the result of independent pricing decisions."); *Apex Oil*, 822 F.2d at 253 ("[P]arallel conduct

alone will not suffice as evidence of [an antitrust] conspiracy, even if the defendants knew the

other defendant companies were doing likewise.") (internal quotation marks omitted).

Indeed, notwithstanding Plaintiffs' conclusory claim that there was a vast, multi-year

conspiracy between Aetna and numerous other companies to use flawed data to artificially de-

press UCR rates, the only *factual allegations* identifying any communications between Aetna

and anyone else relating to the use of Ingenix data describe statements from HIAA and Ingenix

that the output from the PHCS database should *not* be used to establish UCR rates.  *See* Compl. ¶

143 ("HIAA expressly informed insurers that the PHCS was not intended to be used to establish

UCR rates."); ¶ 177 (alleging that Aetna "automatically relie[s] upon" Ingenix data for determin-

ing UCR rates "despite the fact that Ingenix actually informs insurance companies that it is not

endorsing, approving or recommending use of it to determine UCR rates").  If anything, these

allegations demonstrate an *absence* of agreement between Aetna and Ingenix (or anyone else)

that PHCS data will be used to establish UCR rates.

Throughout nearly 800 paragraphs of factual allegations, Plaintiffs offer not a single fac-

tual allegation that (if proven) would show that Aetna or Ingenix entered into any agreement with anyone about generating flawed data for the purpose of depressing UCRs. That is fatal to Plaintiffs' Sherman Act claim.[4]

## III.   PLAINTIFFS HAVE FAILED TO STATE A RICO CLAIM

Congress enacted RICO as Title IX of the Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922, for the purpose of "seek[ing] the eradication of organized crime in the United States." *Id.* at 923; *Alexander v. United States*, 509 U.S. 544, 561 (1993) ("The federal RICO statute was passed to eradicate the infiltration of legitimate businesses by organized crime."). Although RICO has been stretched somewhat beyond its original purpose, the statute's pleading requirements continue to repel garden-variety contract claims disguised in racketeering clothes. So it should here. Moreover, because the RICO statute is often invoked for the benefit of the *in terrorem* effect of its treble-damage remedy, this Court and others have held that baseless RICO claims should be dismissed as early as possible in litigation. *See In re Ins. Brokerage Antitrust Litig.*, 2007 WL 1062980, at *4 (D.N.J. Apr. 5, 2007) ("*Ins. Brokerage II*").

Plaintiffs have attempted to shoehorn run-of-the-mill contract claims into a racketeering framework, but the great distance between their claims and RICO's requirements is evident on the face of the Complaint. To state a claim under 18 U.S.C. § 1962(c), a plaintiff must allege (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity. 18 U.S.C. § 1962(c); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267-72 (1992). In addition, to have standing under the statute, the plaintiff must have suffered injury in "his business or prop-

---

[4]   Dismissal of Plaintiffs' Sherman Act claim is required for the additional reason that Plaintiffs allege neither a per se violation of the Act nor a violation of the rule of reason, as explained in the United Defendants' brief. *See* United Defs.' Br. at 6-7. To avoid burdening the Court with repetition, Aetna incorporates those arguments by reference.

erty" "by reason" of the pattern of racketeering activity.  18 U.S.C. § 1964(c); *Anderson v. Ayling*, 396 F.3d 265, 269 (3d Cir. 2005).  In other words, the racketeering activity must have been both the "but for" and proximate cause of the plaintiff's injury.  *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461-62 (2006); *Holmes*, 503 U.S. at 267-72.

Plaintiffs' Complaint fails to satisfy these requirements because they have not pled facts sufficient to show (1) that there were any fraudulent acts, as opposed to breaches of contract; (2) that they suffered out-of-pocket financial losses by reason of any purported fraud; (3) that Aetna directed the affairs of any "enterprise"; or (4) that Aetna conspired with United, Ingenix, or anyone else to do anything.  Dismissal is required for any one of these pleading failures.

### A.  Plaintiffs Have Not Properly Alleged Fraud, Causation, Or RICO Injury.

Plaintiffs' allegations fall well short of demonstrating their standing under RICO.  In particular, they have pled no facts sufficient to show that any fraudulent conduct by Aetna proximately *caused* them to suffer any injury to their business or property.

A RICO plaintiff only has standing if he has been "injured in his business or property by reason" of conduct that violates the statute.  18 U.S.C. § 1964(c); *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation") (quoting *Sedima S.P.L.R. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  A plaintiff must therefore show that the defendant's criminal conduct was both the "but for" and proximate cause of his injury.

Plaintiffs' allegations fail at every point in this analysis.  The Complaint offers only conclusory allegations of fraud; fails to make factual allegations sufficient to show that Plaintiffs suffered any cognizable injury under RICO; and does not connect the dots between even one of Aetna's alleged misrepresentations and any claimed injury.  Instead, Plaintiffs offer conclusory

14

claims of reliance and causation and attempt to paint a picture of a generalized "scheme," in the hope that such assertions will substitute for the requisite factual allegations showing a causal connection between the alleged fraud and their own injuries. But Third Circuit precedent is clear: "[A] plaintiff seeking to assert a RICO claim based on mail or wire fraud *'must allege what happened to them.'*" *In re Schering-Plough Corp.*, No. 2:06-cv-5774, 2009 WL 2043604, at *15 (D.N.J. July 10, 2009) (emphasis added) (quoting *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 659 (3d Cir. 1988)).

### 1.    Rule 9(b) applies to Plaintiffs' RICO claims.

Plaintiffs assert that the Defendants engaged in a pattern of racketeering activity by committing numerous acts of mail and wire fraud (18 U.S.C. § 1341 and § 1343) and "[t]heft or embezzlement from [an] employee benefit plan" (18 U.S.C. § 664). Because Plaintiffs' RICO claims sound in fraud, they must satisfy the pleading requirements of Rule 9(b). To satisfy Rule 9(b), Plaintiffs must plead (1) "the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud,'" (2) "who made a misrepresentation to whom," and (3) "the general content of the misrepresentation." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004); *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999). They must also plead causation with 9(b) particularity. *See United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 728 n.34 (10th Cir. 2006) (dismissing RICO claims because plaintiff's "generalized daisy chain of causation does not meet the requirements of Rule 9(b)"); *In re Schering-Plough*, 2009 WL 2043604, at *25 (applying Rule 9(b) and dismissing RICO claims, in part because plaintiffs failed to plead causation with particularity).

Rule 9(b) protects defendants "against spurious charges of immoral and fraudulent behavior." *Lum*, 361 F.3d at 224 (internal quotations omitted). Courts apply the rule strictly in the

RICO context. *See, e.g.*, *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000) ("RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."); *Lichtenstein v. Reassure Am. Life Ins. Co.*, No. 07-cv-1653, 2009 WL 792080, at *7 (E.D.N.Y. Mar. 23, 2009) ("Rule 9(b) . . . is strictly applied to pleadings of fraud as predicate acts in support of a civil RICO claim.").

### 2.   Plaintiffs' allegations of "misrepresentations" and "omissions" do not satisfy Rule 9(b).

Plaintiffs' allegations of mail and wire fraud rest on the same contentions regarding Aetna's purported use of "flawed" data that underpin their Sherman Act and ERISA claims, except that they add labels such as "fraudulent," "misleading," and "omissions." *See, e.g.*, Compl. ¶¶ 644–56, 678-691.  Even if Plaintiffs were correct that Aetna's use of Ingenix data violated the terms of Plaintiffs' plans, a "breach of contract itself [does not] constitute a scheme to defraud." *Sanchez v. Triple-S Mgmt. Corp.*, 492 F.3d 1, 12 (1st Cir. 2007) (alteration in original and quotations omitted); *see also United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994) ("A breach of contract does not amount to mail fraud."); *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract.").

As the Complaint itself makes clear, the meaning of the phrase "usual, customary, and reasonable" is defined by the plan language and, in some States (such as New Jersey), by regulations that are incorporated into the plan language. *See, e.g.*, Compl. ¶ 17 (rights defined under health plans are "defined by the benefit contract"); ¶ 21 (referring to Aetna's "definitions of UCR in its plans"); ¶ 28 ("Aetna is obligated to pay accurate UCR to its Members for Nonpar services consistent with the . . . UCR definition."); ¶ 45 ("New Jersey Regulations also require

that Aetna reimburse Nonpar medical (non-hospital) services . . . at the 80th percentile of the most updated Ingenix fee schedule."). Thus, for all of the Complaint's use of the "fraud" label, the gravamen of Plaintiffs' contentions is that Aetna misapplied plan benefit language by using Ingenix data in the way it did. *See, e.g., id.* ¶ 1 ("Through the wrongful and unlawful actions alleged herein, Aetna paid less than it was contractually obligated to pay for the ONET [services] . . . ."); ¶ 29 ("Aetna fails to comply with its own UCR definition by failing to pay benefits based on accurate UCR rates . . . ."); ¶ 57 ("[T]he defective and conflict-ridden Ingenix Database fails to comply with the definition of UCR contained in Aetna's insurance contracts.").

It is no wonder, then, that the Complaint eschews providing specific details about Aetna's purported fraudulent statements in favor of page upon page of allegations about EOBs and other disclosures that do not reveal any fraud. *See, e.g.*, Compl. ¶¶ 238-241, 308-09, 314-319. Likewise, the Complaint's allegations of wire fraud contain no facts at all describing with particularity when the alleged representations were made or any other facts sufficient to meet the Rule 9(b) standard. *Clark v. Robert W. Baird Co.*, 142 F. Supp. 2d 1065, 1072 (N.D. Ill. 2001) ("For the 'when,' it is not enough to merely allege a period of months or years, or the duration of the activity."). When Plaintiffs' labels are brushed aside, their allegations are about contract interpretation and the application of plan language, not fraud. *See Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594, 601 (D.N.J. 2000) (dismissing RICO case and holding that the complaint's lack of "specific allegations of fraud or deceit" prevented the plaintiffs from "transform[ing] their claims" that "defendants paid plaintiffs less than the prevailing wage" "into a federal RICO claim through the creative invocation of the wire and mail fraud statutes").

**3.   A number of Plaintiffs have failed to allege facts demonstrating the out-of-pocket loss required under RICO.**

The RICO claims should be dismissed as to a number of Plaintiffs for the independent

reason that they have not alleged facts sufficient to show the out-of-pocket loss that RICO demands.  *See Maio*, 221 F.3d at 483 (a RICO plaintiff must prove that he suffered a "concrete financial loss," such as "actual monetary loss, i.e., an out-of-pocket loss"); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008) (the "acceptable measure of injury" for RICO cases predicated on fraud is "out-of-pocket damages"); *Anderson v. Kutak, Rock & Campbell*, 51 F.3d 518, 523 (5th Cir. 1995) (same); *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994) (same).  This requirement of concrete financial injury has a "restrictive significance" (*Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)):  It ensures "that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff."  *Maio*, 221 F.3d at 483 (internal quotation marks omitted).

*Maio* is illustrative.  There, health plan subscribers alleged that Aetna's nondisclosure of cost-saving practices had induced them to pay more for "inferior" insurance coverage than the coverage was actually worth.  *Maio*, 222 F.3d at 484.  Because the plaintiffs did not allege that they had suffered any out-of-pocket losses, the Third Circuit held that the plaintiffs failed to satisfy RICO's "financial loss" requirement.  *Id.*; *see also id.* at 487-88.

A number of Plaintiffs' claims here suffer from the same failure to allege concrete financial loss, and therefore must be dismissed for lack of RICO standing.  Indeed, Plaintiffs concede that only "three of the named Subscriber Plaintiffs paid out-of-pocket to their non-par providers for amounts underpaid by Aetna."  RICO Case Statement at 9.  Plaintiffs Hull, Samit, Paul and Sharon Smith, and Whittington make no allegations whatsoever that they paid out of pocket with respect to any of their claims.  *See* Compl. ¶¶ 364-369 (Hull), ¶¶ 337-354 (Samit),  ¶¶ 316-322 (Smiths), ¶¶ 323-336 (Whittington).  These Plaintiffs do allege in conclusory fashion that they have been "injured" in their "business or property" (*see, e.g.*, Compl. ¶ 654; RICO Case State-

ment at 8), but "simply alleging an injury to business or property resulting from an alleged RICO violation is not enough to defeat a motion to dismiss." *In re Schering-Plough,*, 2009 WL 2043604, at *11.  While some Plaintiffs suggest they will contribute to their providers any sums they receive from Aetna where they have not actually paid out of pocket (*see, e.g.*, Cooper Aff. ¶ 4, Franco Aff. ¶ 4), such a pledge is not a substitute for the requisite injury to business or property.  If anything, that these Plaintiffs are forced to pledge to transfer any recoveries to someone else merely confirms that they have suffered no injury to their own business or property.

Moreover, even a specific allegation of out-of-pocket payments following a determination by Aetna that the allowed amount is less than the provider's billed charge is insufficient to allege injury.  Under Plaintiffs' theory of the case, they must establish that reimbursement under the "flawed" UCR rate is lower than what would have prevailed under a "correct" UCR rate.  In either situation—that is, under a "correct" UCR or a "flawed" UCR—a billed charge at a higher amount would leave the plan member with a payment obligation.[5]  If the member's obligation results from a provider charge in excess of a "correct" UCR rate, any out-of-pocket payment is not the result of any wrongdoing by Aetna, but rather is the appropriate result under the terms of the plan.

Perhaps recognizing that they cannot properly allege out-of-pocket loss, Plaintiffs appear to contend that the mere *receipt* of a bill from a provider for the "unpaid difference" between a UCR amount and the provider's billed charges confers standing under RICO—even if the member did not actually *pay* the bill.  But in no sense does the receipt of a balance bill injure one's

---

[5]   *See, e.g., The Value of Provider Networks and the Role of Out-of-Network Charges in Rising Health Care Costs: A Survey of Charges Billed by Out-of-Network Physicians* (Aug. 2009), *avail. at* http://www.ahipresearch.org/PDFs/ValueSurvey/AllStatesReport.pdf (compiling data demonstrating that some out-of-network providers charge "exorbitant" prices).

"business or property."  At that point, the plan member has paid no money to satisfy the bill, nor

is it certain that the member will ever do so.  There is nothing in the Complaint to suggest that

medical providers always pursue or collect on balance bills.  To the contrary, Dr. Kavali, one of

the Provider Plaintiffs, acknowledges that she often does not balance bill her patients and, when

she does, she routinely is unable to collect the full amount of her charges.  RICO Case Statement

at 25 (alleging that Dr. Kavali "did not balance-bill patient [S.M.B.]."); *id.* at 23 (alleging that she

"typically is unable to collect from patients the full amount of her billed charges").  Mere receipt

of a balance bill without any out-of-pocket payment or other loss thus hardly amounts to the

"concrete financial loss" that is required for RICO standing.  Indeed, courts have held that, in

many instances, it is not even enough for *constitutional* standing.  *See AMA v. United Healthcare*

*Corp.*, No. 00-cv-2800, 2007 WL 1771498, at *17-19 (S.D.N.Y. June 18, 2007) (holding that

two named plaintiffs lacked *constitutional* standing to sue for benefits under ERISA because one

plaintiff had failed to pay a balance bill and the other plaintiff's provider wrote off a balance bill

after submitting it to the plaintiff)[6]; *Owen v. Regence BlueCross BlueShield of Utah*, 388 F.

Supp. 2d 1318, 1326 (D. Utah 2005) (holding that health plan subscriber lacked *constitutional*

standing to sue her insurer for un-reimbursed medical expenses because there was no evidence

---

[6]    At a later point in *AMA v. United Healthcare Corp.*, 588 F. Supp. 2d 432 (S.D.N.Y. 2008),
Judge McKenna dismissed the plaintiffs' RICO claims based on his conclusion that they repre-
sented unexhausted requests for reimbursement that had already been denied remedy under ER-
ISA.  *Id.* at 439.  Relying on the Second Circuit's decision in *First Nationwide Bank v. Gelt
Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994)—which requires a plaintiff to exhaust contrac-
tual remedies before pursuing a RICO claim so that the amount of damages at issue can become
"clear and definite" (*id.*)—Judge McKenna held that the plaintiffs were foreclosed from pressing
treble-damage RICO claims to the extent that they had not exhausted remedies under their plans.
*AMA*, 588 F. Supp. 2d at 441.  Similarly, to the extent Plaintiffs here press RICO claims in place
of unexhausted ERISA claims, their claims should be dismissed.

that the plaintiff's providers had ever attempted to collect on the alleged debts); *Bollig v. Christian Cmty. Home & Servs., Inc.*, 2003 WL 23200362, at *3 (W.D. Wis. July 10, 2003) (same).

The Association Plaintiffs also lack standing to sue for damages under RICO because they have not alleged a concrete financial loss. The Association Plaintiffs allege that, "as a result of Aetna's unlawful practices," they have been required "to devote substantial time and resources" "dealing with" Aetna's purported fraudulent reimbursement practices, "counseling their members on how to deal with the practices at issue," "monitoring" and "corresponding" with Aetna, "advocating on their members' behalf," and "communicating with regulators concerning Aetna's misconduct," among other things. *See, e.g.*, Compl. ¶¶ 91, 490-92, RICO Case Statement at 11. These allegations fall well short of pleading the quantifiable financial injury necessary to sustain a RICO claim. *See Maio*, 222 F.3d at 487-88; *McLaughlin*, 522 F.3d at 227. As explained below (*see infra* Section VII), the "devotion" of "time and resources" to combating Aetna's alleged fraud is not even enough to demonstrate the Association Plaintiffs' Article III standing. Because RICO's requirement of out-of-pocket injury is more stringent than the requirement for constitutional standing, it is clear that the Associations' claims of abstract injuries to "time" and "resources" are insufficient to support a RICO claim.[7]

---

[7]    In their capacity as representatives of medical providers, the Association Plaintiffs may only sue for injunctive or declaratory relief. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 515 (1975) (an association lacked Article III standing where it sought damages rather than "a declaration, injunction, or some other form of prospective relief"). Private injunctive relief is not available under RICO. *See generally* 18 U.S.C. § 1964(a)-(c); *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1077 (9th Cir. 1986); *Curley v. Cumberland Farms Dairy, Inc.*, 728 F. Supp. 1123, 1137-38 (D.N.J. 1989) (dismissing claim for injunctive relief under RICO and noting that "[c]ourts that have addressed the availability of injunctive relief under RICO have almost uniformly concluded that RICO does not afford a private injunctive remedy"). Accordingly, the Association Plaintiffs may not sue under RICO in their representative capacity.

### 4. None of the Plaintiffs have pled facts showing that any out-of-pocket injuries were proximately caused by Aetna's alleged fraud.

Despite setting forth nearly 800 paragraphs of allegations, Plaintiffs utterly fail to offer any specific factual allegations showing that any purported racketeering caused any financial injury to any of the Plaintiffs. To be sure, Plaintiffs allege in conclusory fashion that they "relied" on Aetna's misrepresentations to their "detriment" (*see, e.g.,* Compl. ¶¶ 651, 688), and they assert the legal conclusion that their injuries were "proximately caused" by Aetna's conduct (*see, e.g., id.* ¶ 655). But Plaintiffs provide no details about their purported "reliance."[8] And, critically, they do not trace even a single out-of-pocket payment to any allegedly fraudulent statement by Aetna, as is required under Rule 9(b)'s stringent pleading standard.

A plaintiff must do more than show out-of-pocket loss to have standing under RICO. He must also show that the defendant's conduct was both the "but for" and proximate cause of his injury. *See Anza,* 547 U.S. at 457 (citing *Holmes,* 503 U.S. at 268). Plaintiffs plainly have not carried their pleading burden here. They offer scant details about Aetna's fraudulent statements. They fail to offer any specific factual allegations showing reasonable reliance on such statements. They fail to offer specific factual allegations showing their out-of-pocket payments. And, finally, they offer no factual allegations *connecting* any such payment to any fraudulent

---

[8]   In *Bridge v. Phoenix Bond & Indemnity Co.,* 128 S. Ct. 2131 (2008), the Supreme Court held that a plaintiff asserting a RICO claim predicated on mail fraud need not prove that he or she personally relied on the defendant's misrepresentations. *Id.* at 2134. The Court noted, however, that a plaintiff likely cannot demonstrate injury "by reason of" a pattern of racketeering activity without proving that *someone* relied on the misrepresentation. *Id.* at 2144 ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation."); *see also id.* ("[I]t may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation."). Here, Plaintiffs have alleged *first-party* reliance on Aetna's alleged misrepresentations. *See, e.g.,* Compl. ¶¶ 651, 688.

statement by Aetna.  Plaintiffs allege, for example, that "Aetna knew that its Members would reasonably rely on the accuracy, completeness, and integrity of disclosures by the Enterprise" and that "Aetna Members did rely to their detriment on misrepresentations and omissions from the Enterprise."  Compl. ¶ 651.  But Plaintiffs fail to offer factual allegations pointing to pur-ported misrepresentations that *they* relied upon.  And they fail to offer any factual allegations tracing *their* alleged losses to any such reliance.  Of course, Plaintiffs assert the conclusion that their injuries were "proximately caused" by Aetna's RICO violations.  Compl. ¶ 708.  But such a conclusory assertion does not replace the specific factual allegations required by Rule 9(b).

This pleading failure, standing alone, requires dismissal of Plaintiffs' RICO claims.  Moreover, a closer examination of Plaintiffs' claims reinforces the propriety of this result.  It is far from self-evident, for example, that a plan member would necessarily do anything differently if he or she knew in advance the exact level of Aetna's reimbursement in comparison to billed charges.  A subscriber may choose to visit an out-of-network provider based on personal prefer-ence, without regard to Aetna's reimbursement methodology or the amount of reimbursement.  *Cf. McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 (2d Cir. 2008) (denying class certifica-tion in part because "each plaintiff in this case could have elected to purchase light cigarettes for any number of reasons, including a preference for the taste and a feeling that smoking Lights was 'cool'"); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665 (9th Cir. 2004) ("Even . . . assuming that all plaintiffs in the proposed classes suffered financial loss or other concrete injury as a con-sequence of playing the machines, it does not necessarily follow that plaintiffs' injuries are caus-ally linked to the Casinos' alleged misrepresentations . . . [P]laintiffs' knowledge, motivations, and expectations bear heavily on the causation analysis.").  Plaintiffs' threadbare allegations of reliance and causation are therefore not enough to meet their burden of providing specific allega-

tions that tie their claimed injuries directly to Aetna's alleged conduct. *See In re Schering-Plough*, 2009 WL 2043604, at *21 (general allegations of injury and reliance were not enough to support a RICO claim because there were many "external variables" that could have contributed to the alleged injury, including "the preference of patients").

Further, to the extent that some Plaintiffs here allege out-of-pocket payments, reasons *independent* of Aetna's purported fraud may have caused those payments. To establish that Aetna's purported RICO violation proximately caused harm to them, Plaintiffs must show that their injuries were "'attributable to the violation, as distinct from other, independent, factors.'" *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2142 (2008) (quoting *Holmes*, 503 U.S. at 269). The Complaint itself gives reason to believe that factors independent of Aetna's purported fraud could have caused any injuries to Plaintiffs. Plaintiffs acknowledge, for example, that some *plan sponsors* set the methodology and rate for out-of-network reimbursement. *See, e.g.*, Compl. ¶ 263 ("You are covered for expenses at a level set by your *plan sponsor*." (emphasis added)); *see also Ayling*, 396 F.3d at 270 (3d Cir. 2005) (affirming dismissal of RICO complaint in part because intervening factors broke chain of causation); *Longmont United Hosp. v. Saint Barnabas Corp.*, 305 F. App'x 892, 894 (3d Cir. 2009) (affirming dismissal of RICO claim where intervening decision-maker broke chain of causation between plaintiff hospital's alleged financial injuries and defendant's purported scheme to reduce hospital's reimbursements). Because the Complaint casts doubt on Plaintiffs' allegations that Aetna's purported fraud directly led to their harm, it will not do for Plaintiffs merely to repeat the words "proximate cause." *See Sikkenga*, 472 F.3d at 728 (dismissing RICO claim because plaintiff "provide[d] no detail on the temporal proximity of the misrepresentation" to her harm and did not "tie any specific claim thereafter to this series of events"); *In re Schering-Plough*, 2009 WL 2043604, at *25.

24

Finally, it is not enough for Plaintiffs to point to a "fraudulent scheme" and allege generically that they "reasonably relied on [Aetna's] fraudulent scheme." Compl. ¶ 688. This assertion does not provide the specificity required by Rule 9(b). At the very most, it might be viewed as an invocation of classic fraud-on-the-market theory. Fraud-on-the-market, however, is not available under RICO. *See In re Schering-Plough*, 2009 WL 2043604, at \*20 (fraud-on-the-market theory "has been resoundingly rejected outside the context of federal securities fraud litigation"); *McLaughlin*, 522 F.3d at 230 (refusing to apply fraud-on-the-market presumption to RICO claims). Plaintiff pressing fraud-based RICO claims "***must allege what happened to them***." *In re Schering-Plough*, 2009 WL 2043604, at \*15 (emphasis added). Plaintiffs' allegations lack the "what happened to them" details required under Rule 9(b).

### 5. Plaintiffs' allegations of ERISA conversion also fail under Rule 9(b).

Plaintiffs' allegations that Aetna converted ERISA plan assets also fall short of Rule 9(b)'s pleading standards.[9] Plaintiffs' allegations of criminal conversion are bereft of *any* facts, let alone specific facts, that could demonstrate Aetna's conversion of ERISA plan assets. Plaintiffs allege in conclusory fashion that a grab bag of disclosures from Aetna—including "plan documents, insurance policies, summary plan descriptions, certificates of coverage, claim forms, reimbursement checks, and EOBs"—all "contained false and fraudulent misrepresentations and

---

[9]   Because Plaintiffs' allegations of conversion sound in fraud—Counts VI(A) and B repeatedly allege that Aetna converted funds by a false payment scheme (*see* Compl. ¶¶ 705, 721)—they too are subject to Rule 9(b)'s pleading standards. *See O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) ("Because plaintiffs premise these claims, in large part, on defendants' alleged fraudulent conduct, plaintiffs must comply with Rule 9(b)."); *see also In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2006 WL 2850607, at \*11 (D.N.J. Oct. 3, 2006) ("*Ins. Brokerage I*") ("Plaintiffs' conspiracy claims are predicated on fraud, and thus, are subject to [Rule 9(b)]."); *DeLaurentis v. Job Shop Tech. Servs. Inc.*, 912 F. Supp. 57, 64-65 (E.D.N.Y. 1996) (applying Rule 9(b) where plaintiff alleged violation of § 664 as a RICO predicate act).

omissions of material facts" and supported numerous "false payment[s]" on out-of-network claims. Compl. ¶¶ 699-702.  But Plaintiffs never provide any specific facts explaining the circumstances and content of Aetna's alleged ERISA fraud.

The scraps of allegations that Plaintiffs do offer up fail as a matter of both law and logic. Plaintiffs allege that Aetna converted assets from fully-insured plans, but in such plans Aetna pays benefits *out of its own pocket*, not out of plan assets.  *See* Compl. ¶ 697; *see also* 29 U.S.C. § 1101(b)(2) ("In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, *but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer*." (emphasis added)). Obviously, Aetna cannot "convert" its own assets.  Once the "conversion" label is laid to the side, it is clear that Plaintiffs are merely complaining that Aetna has "failed to pay enough money to health care providers." *Everson v. Blue Cross & Blue Shield of Ohio*, 898 F. Supp. 532, 542 (N.D. Ohio 1994); *see also* Compl. ¶ 1 ("Aetna paid less than it was contractually obligated to pay for the ONET [services]").  But that is simply "not a violation of § 664 upon which a RICO claim can be based." *Everson*, 898 F. Supp. at 542 (rejecting plaintiffs' allegations of predicate fraud under § 664 where plaintiffs asserted that insurer "failed to pay enough money to health care providers and that, as a result, plaintiffs were required to pay higher copayments than they otherwise should have paid").

Plaintiffs' own allegations belie their suggestion that Aetna converted plan funds from self-funded plans—plans in which the sponsor, *not Aetna*, pays claims.  Plaintiffs allege that "[f]or self-funded healthcare plans, Aetna improperly prevented payment of benefits to the plan participants and beneficiaries in order to justify its receipt of administrative fees." Compl. ¶ 697. Even if taken as true, however, this allegation would only demonstrate that Aetna received fees

for its services, while *plan sponsors* paid less out of their own funds on out-of-network claims. (And, of course, Plaintiffs do not even attempt to allege a conspiracy between Aetna and plan sponsors to reduce payments out of the plan sponsors' funds.) Clearly, this is not conversion.

**B.      Plaintiffs Have Failed To Plead The Existence Of An "Enterprise."**

Plaintiffs allege that Aetna "carried out its underpayment scheme to Aetna Members in connection with the conduct of an association-in-fact 'enterprise[]' . . . comprised of Aetna and Ingenix." Compl. ¶ 634.  At most, however, Plaintiffs' allegations show that Aetna and Ingenix did business together.  That is not enough to state a RICO claim.

A RICO enterprise requires proof of "an ongoing organization" whose "various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981).  In *Boyle v. United States*, 129 S. Ct. 2237 (2009), the Supreme Court clarified that an enterprise must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 2244.  The "hallmark of an enterprise is 'structure'" (*United States v. Korando*, 29 F.3d 1114, 1117 (7th Cir. 1994)), because without structure  "'enterprise' collapses to 'conspiracy.'" *Limestone Dev. Corp. v. Lemont*, 520 F.3d 797, 805 (7th Cir. 2008).

Attempting to make their case for an "enterprise," Plaintiffs point to the same bilateral commercial agreements between Ingenix and Aetna that underpin their Sherman Act claims, apparently contending that those contracts themselves establish a RICO enterprise.  *See, e.g.*, Compl. ¶¶ 499, 519, 524.  They do not.  As discussed above, those are just ordinary commercial contracts.  In analogous circumstances, courts have held that ordinary business interactions are insufficient to show the existence of an enterprise. *See, e.g., Crichton v. Golden Rule Ins. Co.*, --- F.3d ----, 2009 WL 2382698, at *6 (7th Cir. Aug. 5, 2009) (plaintiff failed to allege a RICO enterprise because he had "done no more than describe the ordinary operation of a garden-variety

marketing arrangement"); *In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2006 WL 2850607, at *16 (D.N.J. Oct. 3, 2006) ("*Ins. Brokerage I*") ("[M]ere allegations that the Defendants did business with one another or contracted together does not suffice to establish the existence of an enterprise.").  If the law were otherwise, then nearly every company in America could be dragged into federal court to defend RICO suits based on their day-to-day commercial dealings.  Evolved as it has, RICO does not criminalize ordinary commercial relationships.

Instead of providing *factual allegations* describing the structure of the supposed "Aetna-Ingenix Enterprise," Plaintiffs simply crib the buzz words and phrases used in RICO cases—such as "ascertainable structure" and "continuous unit"—and mix in allegations describing *unilateral* actions by Aetna or Ingenix. *See, e.g.*, Compl. ¶ 162 (allegation that Aetna "pre-edit[ed]" charge data "to remove valid high charges" before submitting that data to Ingenix); ¶ 170 (allegation that Ingenix "scrub[bed]" its data "to remove high end values but not low end outliers so as to lower the average price of [out-of-network reimbursements]").  But Plaintiffs' efforts to affix a label of "enterprise" to allegations of unilateral conduct are insufficient to state a claim under RICO.  Rather, Plaintiffs must offer *factual allegations* that (if proven) would plausibly show the existence of an enterprise. *See, e.g, Iqbal*, 129 S. Ct. at 1949; *In re Schering-Plough*, 2009 WL 2043604, at *11 (a RICO claim cannot "withstand a motion to dismiss simply through a plaintiff's formulaic recitation of the statutory RICO elements").

As the *Boyle* Court recently made clear, allegations that "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates . . . would not be enough to show that the individuals were members of an enterprise." 129 S. Ct. at 2245 n.4.  When their allegations are stripped of conclusory RICO labels, Plaintiffs have alleged nothing more than that here:  The Complaint describes actions taken independently by Aetna and

28

Ingenix, along with allegations of ordinary commercial interactions, but there are simply no fac-
tual allegations suggesting that any of Aetna's purported fraudulent acts were consciously under-
taken as part of an agreed-upon scheme or that they were undertaken at the behest of a criminal
"enterprise." *Id.* at 2245 (re-affirming that a RICO plaintiff must establish both the existence of
an enterprise *and* the conduct of the enterprise through a pattern of racketeering activity: "'proof
of one does not necessarily establish the other.'") (quoting *Turkette*, 452 U.S. at 583).  Indeed,
there are no allegations that the so-called enterprise ever directed anyone to do anything.

In short, Plaintiffs allege a handful of ordinary business dealings unadorned by any enter-
prise structure, and ask this Court to cobble together an enterprise from that lawful commercial
relationship.  More is required under *Twombly* and *Iqbal*.[10]

**C.    Plaintiffs Have Failed To Plead Any Facts Suggesting That Aetna Directed
The Conduct Of Any Enterprise.**

Plaintiffs' claims also fail because they have not alleged facts showing that Aetna con-
ducted the affairs of an enterprise.  18 U.S.C. § 1962(c).  In *Reves v. Ernst & Young*, 507 U.S.
170 (1993), the Supreme Court set forth the kind of factual allegations needed to support RICO's

---

[10]  Plaintiffs' allegations of enterprise also fail because, under the plain language of the statute,
corporations cannot form an association-in-fact enterprise.  Under RICO, an "'Enterprise' in-
cludes [1] any *individual*, partnership, *corporation*, association, or other legal entity, and [2] any
union or *group of individuals* associated in fact although not a legal entity." 18 U.S.C. § 1961(4)
(emphases added).  The statute distinguishes between individuals and corporations and limits
"association-in-fact" enterprises to "group[s] of *individuals*." "[W]here Congress includes par-
ticular language in one section of a statute but omits it in another section of the same Act, it is
generally presumed that Congress acts intentionally and purposely in the disparate inclusion or
exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).  Interpreting § 1961(4) to permit
associations-in-fact comprised of corporations greatly expands RICO beyond its statutory pur-
pose of *protecting* businesses.

Aetna acknowledges that there is contrary precedent in the Third Circuit (*see United States v.
Aimone*, 715 F.2d 822, 828 (3d Cir. 1983)), but wishes to preserve the argument for appellate
review in the event of an intervening change in law.

"conduct" element:  The plaintiff must allege that (i) the defendant "participated in the *operation* and *management* of the enterprise itself," and (ii) the defendant played "some part in *directing* the enterprise's affairs."  *Id.* at 179, 183 (emphasis added).  During congressional debates over the bill that ultimately became the RICO statute, critics raised concerns that the bill would reach many crimes not typical of organized crime.  *Id.* at 183.  Congress included the "conduct" requirement to allay those concerns and limit the statute's reach:  It is not enough for a defendant merely to participate in an enterprise's affairs through a pattern of racketeering activity; instead, evidence that he *operated, managed, or directed* those affairs is required.  *Id.* at 177-79; *see also Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993).  This requires a "showing that the defendant[] conducted or participated in the conduct of the '*enterprise's* affairs,' not just [his] *own* affairs."  *Reves*, 507 U.S. at 185 (emphasis in original).

In applying *Reves*, courts in this Circuit and others have squarely held that "[a]llegations that a defendant had a business relationship with the putative RICO enterprise . . . do not suffice" to show operation or management of the enterprise's affairs.  *Crichton*, 2009 WL 2382698, at *6; *see also Ins. Brokerage II*, 2007 WL 2892700, at *13 (the operation or management requirement "ha[s] been rigorously enforced to prevent an explosion of RICO civil strike suits targeting business disputes in which the plaintiff simply pleads the existence of a business relationship between the alleged wrongdoer and some third party").  Nor is supplying goods or services to the enterprise sufficient, even if they are "indispensable" to the enterprise's function.  *Peat, Marwick*, 996 F.2d at 1539 ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO.").  Even knowledge of the enterprise's criminal purpose is not enough.  *See, e.g., Goren v. New Vision Int'l, Inc.*, 156 F.3d

721, 728 (7th Cir. 1998) (performing services for an enterprise, "even with knowledge of the enterprise's illicit nature," is not operation or management of the enterprise).

Measured against these standards, Plaintiffs' conclusory assertion that Aetna directed the affairs of the "Aetna-Ingenix Enterprise" rings hollow.  Although the Complaint parrots the statutory language from Section 1962(c) (*see* Compl. ¶ 644), it offers no *factual allegations* suggesting that Aetna participated in the operation or management of any enterprise.  *See Iqbal*, 129 S. Ct. at 1949; *Ins. Brokerage II*, 2007 WL 1062980, at *29 ("Rule 8(a) does not allow a RICO plaintiff to plead conjecture instead of actual facts.").  Indeed, Plaintiffs never allege that Aetna directed Ingenix or the "Aetna-Ingenix Enterprise" to do *anything*.  Rather, they merely allege a series of acts independently undertaken by Aetna and Ingenix in pursuit of their own, independent interests, along with a charge that Aetna's and Ingenix's dealing with each other were vital to carrying out the "enterprise's" purposes.  *See, e.g.*, Compl. ¶ 643 (allegation that Aetna "pre-edited and manipulated" data).

Plaintiffs' allegations are plainly insufficient to demonstrate that Aetna directed the affairs of the alleged enterprise, rather than Aetna's own affairs.  Plaintiffs try to spin a tale of racketeering by pointing to Aetna's business interactions with Ingenix and trumping up the indispensable nature of Aetna's data contributions to Ingenix.  But neither business dealings (*Crichton*) nor the provision of even "indispensable" services (*Peat, Marwick*) amount to operation and management of a criminal enterprise.  This is so even if, as Plaintiffs have alleged, Aetna *knew* that the Ingenix data was fraudulent.  *See Goren*, 156 F.3d at 728.  Plaintiffs simply have failed to plead factual allegations in support of this necessary element of their RICO claim.

### D.    Plaintiffs Have Not Pled Any Facts Demonstrating The Existence Of A RICO Conspiracy.

Plaintiffs make a last-ditch effort to keep RICO's treble-damage remedy in play by alleg-

ing that Aetna conspired to violate RICO.  In light of the failure of Plaintiffs' substantive RICO claim, however, their naked allegations of RICO conspiracy add nothing.  "Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims themselves are deficient." *Lum*, 361 F.3d at 227 n.5; *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004) (same); *Dist. 1199P Health & Welfare Plan v. Janssen*, 2008 WL 5413105, at *16 (D.N.J. Dec. 23, 2008) (same).

Plaintiffs' claim of RICO conspiracy also fails for the same reason that their claim of antitrust conspiracy fails:  the Complaint fails to allege facts plausibly showing an illicit ***agreement*** between Aetna and its alleged co-conspirators—the touchstone of any conspiracy.  *See, e.g., Janssen*, 2008 WL 5413105, at *15 (stating that a violation of § 1962(d) requires proof of an agreement to violate one of § 1962's substantive provisions); *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 303 (D.N.J. 2005) (same); *Smith v. Jones, Gregg, Creehan & Gerace, LLP*, 2008 WL 5129916, at *7 (W.D. Pa. Dec. 5, 2008) (applying *Twombly* and dismissing RICO conspiracy claim because complaint consisted of "sweeping generalizations as to an alleged conspiracy involving all Defendants").  Moreover, because Plaintiffs allege that Aetna and its purported co-conspirators "accomplished the goal of their conspiracy through fraud, the . . . Complaint is subject to Rule 9(b)." *Lum*, 361 F.3d at 228.  As explained above, however, Plaintiffs' threadbare allegations that Aetna, Ingenix, and other managed care companies "conspired" to manipulate Ingenix data are not even enough to satisfy the Rule 8 pleading standard articulated in *Twombly* and *Iqbal*.

## IV.   PLAINTIFFS HAVE NOT STATED A CLAIM WITH RESPECT TO NON-INGENIX-BASED FEE DETERMINATIONS

As alleged in the Complaint, Aetna bases many of its UCR determinations on the output from the Ingenix databases.  Compl. ¶ 30.  But there are also instances in which Aetna bases its

UCR determinations on fee schedules that have nothing to do with Ingenix. Plaintiffs are seek-

ing to recover for many of these non-Ingenix fee determinations as well. *Id.* ¶¶ 60-61. Plaintiffs,

however, have come nowhere close to stating a claim based on Aetna's non-Ingenix-based fee

determinations. Accordingly, Plaintiffs' requests for compensation for such fee determinations

should be struck from the Complaint.

Plaintiffs' factual allegations are unmistakably targeted at the alleged flaws in the Ingenix

databases. In Plaintiffs' own words:

> Plaintiffs' legal claims in this case are directed at a secret and illegal agree-
> ment by Aetna, UHG, Ingenix, and most of the country's largest health insur-
> ers to systematically under-reimburse consumers for ONET. Aetna and other
> health insurance companies agreed to manipulate the rates used to reimburse
> Members for ONET.

*Id.* ¶ 5. According to Plaintiffs, "[t]he instrument used to accomplish this conspiracy is a data

services platform known as the Ingenix Database." *Id.* ¶ 6. "Ingenix serves as the conduit of the

conspiracy and is the hidden profit engine of the health insurance business." *Id.* ¶ 7.

In contrast to these allegations relating to Ingenix, Plaintiffs do not even attempt to allege

the existence of any conspiracy targeted at any other fee schedule used by Aetna.

Similarly, Plaintiffs set forth dozens of paragraphs of factual allegations describing the

supposed flaws in the Ingenix databases. Plaintiffs go on at great length in their description of

such alleged flaws—including allegedly flawed data collection (Compl. ¶¶ 141-42), alleged data

manipulation or "scrubbing" (*id.* ¶¶ 153-54, 158-63, 170), allegedly inadequate data points (*id.*

¶¶ 155-58, 165), allegedly flawed use of geozips (*id.* ¶¶ 167-69), and allegedly improper creation

of derived data (*id.* ¶¶ 173-76). *See also id.* ¶ 180 (summarizing a dozen criticisms of the In-

genix databases). According to Plaintiffs, "Aetna relied on flawed and inappropriate data for

making UCR determinations for Nonpar benefits *as a result of its use of the Ingenix Database*.

By relying on such improper data for making UCR determinations, Aetna breached its duties as

33

set forth in its ERISA-governed plans . . . ." *Id.* ¶ 231 (emphasis added).

In stark contrast to these allegations relating to Ingenix, Plaintiffs offer no allegations whatsoever about any supposed manipulation or flaws in any other data source or fee schedule used by Aetna.  Nor can they.  The attempt to include these "other" fee schedules in the case is simply over-reaching.  Plaintiffs' claim that they are entitled to relief because Aetna relied on manipulated or flawed data simply cannot apply to any non-Ingenix-based fee schedule, because Plaintiffs have identified no such manipulation or flaws.  Indeed, with one exception, Plaintiffs do not even bother to identify the non-Ingenix-based fee schedules used by Aetna.

The only non-Ingenix-based fee schedule that Plaintiffs even identify is the federal government's Medicare rate schedule.  *See* Compl. ¶ 436 (Dr. Schorr's allegation that Aetna paid him 125% of Medicare rates for some claims).  Plaintiffs, however, do not allege that Aetna has manipulated the federal government's Medicare fee data or conspired with the federal government.  Nor do they allege that the federal government is subject to the conflict of interest that supposedly influences the Ingenix data.  There are simply no factual allegations that could support a claim that it is unlawful for Aetna to have paid certain claims at a rate 25 percent greater than the rates paid by the federal government.

Moreover, Plaintiffs have failed to identify the legal basis for any claim relating to non-Ingenix-based reimbursement.  The very most that Plaintiffs allege is a passing assertion that out-of-network providers "should not be reimbursed for their services" based on a percentage of Medicare rates and that "[t]he application of a percentage of Medicare rates to Nonpar claims is unlawful."  Compl. ¶ 436.  But Plaintiffs do not state what law is supposedly violated, they set forth no factual allegations to demonstrate that any such law is violated, and they identify no basis for federal subject matter jurisdiction over such a claim.  Plaintiffs clearly cannot meet their

pleading burden under Rule 8 or invoke the jurisdiction of this Court by merely identifying a practice and asserting that it is "unlawful." *See, e.g., Iqbal*, 129 S. Ct. at 1949 (Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").

## V.  MANY OF PLAINTIFFS' CLAIMS SEEKING ERISA BENEFITS SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO SATISFY THE PLEADING REQUIREMENTS FOR THESE CLAIMS

The centerpiece of Plaintiffs' Complaint is their claim for "benefits due" under Section 502(a)(1)(B) of ERISA.  Most of the plans under which Plaintiffs sue are ERISA plans, and the relief that Plaintiffs seek—an increase in the level of UCR benefits for out-of-network services under the terms of those plans—is precisely the type of relief that ERISA's civil enforcement provision was designed to address.   Within ERISA's comprehensive scheme, Section 502(a)(1)(B) is the *exclusive* avenue for Plaintiffs to seek the relief that they seek.  *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52 (1987); *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004).

To bring a Section 502(a)(1)(B) claim, however, Plaintiffs must satisfy the pleading requirements for such a claim.  As described below, nine out of the fourteen individual ERISA Plaintiffs fail to do so, and therefore their claims under Counts I(A) and (B) of the Complaint should be dismissed.[11]  As illustrated in the chart attached as Exhibit B to the Oatley Declaration, seven out of fourteen Plaintiffs fail to plead exhaustion; one Plaintiff's claim that was exhausted should be dismissed because it is barred by the plan's contractual limitations period; and a Provider Plaintiff's claim is barred by an anti-assignment provision in the relevant plan.

---

[11]  Subscriber Plaintiffs Weintraub and Samit are not seeking relief under ERISA, because they were not enrolled in ERISA plans.  To the extent the Association Plaintiffs have standing to sue on behalf of their members—and they do not, for the reasons set forth *infra* —then they are subject to all of the same pleading requirements and should be dismissed for the same reasons.

**A.      Seven Plaintiffs Fail To Allege Exhaustion Of Their Administrative Appeals Before Filing Suit Under Section 502(a)(1)(B).**

Plaintiffs' claims seeking benefits under Section 502(a)(1)(B) should be dismissed for failure to state a claim to the extent they do not adequately allege exhaustion of administrative remedies. *See, e.g., Harrow v. Prudential Ins. Co.*, 279 F.3d 244, 249 (3d Cir. 2002) ("Except in limited circumstances . . . a federal court will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan." (internal quotation marks omitted)); *Bennett v. Prudential Ins. Co.*, 192 F. App'x 153 (3d Cir. 2006) (dismissal appropriate where plaintiff failed to allege that he exhausted administrative appeals before filing suit under Section 502(a)(1)(B)); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990) (affirming dismissal of ERISA claims because plaintiff failed to exhaust administrative remedies).[12]

Seven out of the fourteen individual Plaintiffs who seek to recover benefits under Section 502(a)(1)(B) of ERISA do not allege that they exhausted their appeals on *any* claims at issue in this case: Plaintiffs Cooper, Franco, Hull, Smith, Whittington, Kozma, and Mullins. Accordingly, their claims should be dismissed so that they can exhaust their administrative appeals before filing suit.

Of the seven Plaintiffs who fail to plead exhaustion, three do not allege that they filed even a single appeal. *See* Compl. ¶¶ 364-69 (Hull), ¶¶ 469-77 (Kozma), ¶¶ 462-68 (Mullins).

---

[12]   *See also Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1330 (11th Cir. 2006) (affirming district court's dismissal of plaintiff's 502(a)(2) and 502(a)(3) claims for failure to exhaust administrative remedies); *Greifenberger v. Hartford Life Ins. Co.*, 131 F. App'x 756, 759 (2d Cir. 2005) (affirming district court's grant of defendant's motion to dismiss plaintiff's claim for unpaid benefits where plaintiff "made no attempt whatsoever to file an administrative claim or to notify the insurer that she disputes its denial of benefits"). The exhaustion requirement applies to providers as well, who are suing as assignees, and therefore are subject to the same requirements. *See Weiner v. Klais & Co.*, 108 F.3d 86, 91 (6th Cir. 1997) (affirming dismissal of provider's claims for failure to exhaust administrative remedies).

Two other Plaintiffs (Franco and Smith) allege that they contacted Aetna by phone or filed a first-level appeal, but they do not allege that they exhausted their appeals on any claims in this case. *See id.* ¶¶ 311-12 (allegation by Franco that her provider filed an appeal, that Aetna paid an additional $466.02, and no allegation that Franco or her provider pursued a second-level appeal); ¶ 320 ("Mrs. Smith appealed and Aetna denied the appeal."). These allegations plainly do not establish exhaustion. *Harrow*, 279 F.3d at 247 ("Making one step which could be construed as an initial complaint does not constitute exhaustion of all remedies" (internal citation omitted)); *id.* at 251 (plaintiff failed to exhaust administrative remedies where she "did not pursue any action beyond [an] initial telephonic inquiry to Prudential").

Claims by two additional Plaintiffs also should be dismissed. Although Plaintiffs Cooper and Whittington allege that appeals were exhausted on claims for which Ingenix was used to determine the UCR rate (*see* Compl. ¶¶ 242, 332-34), these claims were **allowed *in full*** before they filed the lawsuit. *See* Compl. ¶¶ 247-48 (Cooper allegation that "as a result of a claim project request" her husband's provider received "payment of a balance bill in full"); Ex. N to Stiles Declaration (Whittington's balance bill paid in full).[13] Thus, these Plaintiffs have not pled exhaustion as to any claims at issue in this case, because the only appeals they exhausted were allowed in full.

Several Plaintiffs allege in conclusory fashion that exhaustion "likely" would have been futile, evidently invoking the "futility" exception to the exhaustion requirement. *See* Compl. ¶¶ 461, 475, 486 (allegations that any appeal "likely was futile" or "would have been futile" by

---

[13] Because Whittington's appeals-related documents are specifically relied on in the Complaint (*see* Compl. ¶¶ 332-34), they are appropriately considered as part of this motion to dismiss. *See Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004).

Maldonado, Kavali, and Kozma). But Plaintiffs' Complaint is devoid of any *factual allegations* to support their bare allegation that any appeal "likely was futile." *See Twombly*, 550 U.S. at 570. Similarly, the handful of Provider Plaintiffs who claim that their appeals are "deemed exhausted" have failed to allege any facts that (if proven) would show that Aetna violated the ERISA claim procedures. *See* 29 C.F.R. § 2560.503-1. An allegation that Aetna failed to "provide copies of the documents" (*see, e.g.,* Compl. ¶ 483), without identifying which documents were not provided and whether they were requested in writing, plainly is insufficient to invoke these regulations. Nor can these Provider Plaintiffs claim that the ERISA disclosure requirements apply to them when they have not alleged facts showing that they qualified as "claimants" under these regulations. *See e.g.*, 29 C.F.R. § 2560.503-1(g)(1) (requiring plan administrators to notify *claimants* about the required appeals procedures).

In particular, Plaintiff Kozma alleges that exhausting any appeals "was likely futile," even though he does not allege that he ever attempted to exhaust *any* appeals on the claims at issue here. *See D'Amico v. CBS Corp.*, 297 F.3d 287 (3d Cir. 2002) (affirming ruling that CBS's "longstanding policy of denying" the type of claim at issue did not support a finding of futility, because plaintiffs had not even attempted to exhaust their appeals before filing suit). Moreover, Aetna's payments in full of the Cooper and Whittington claims conclusively undercut the assertion that "Aetna, as a matter of policy, refuses to alter or reprocess claims that have been processed pursuant to the Ingenix Database." Compl. ¶ 411.

In the Third Circuit and elsewhere, courts routinely dismiss claims for failure to plead exhaustion where the plaintiff asserts that exhaustion would be futile, but fails to allege *facts* that would support a "clear and positive showing of futility." *See Bennett*, 192 F. App'x at 156 (affirming trial court's dismissal of ERISA complaint for failure to state a claim where plan partici-

38

pant asserted futility, but he had not "availed himself of all of the Plan's available review proce-
dures" and therefore the futility claim was "merely speculative"); *Gonzales v. Al & John Inc.*,
No. 06-6245, 2007 WL 1490407 (D.N.J. May 18, 2007) (following *Harrow* and granting motion
to dismiss where plaintiff failed to allege facts supporting his assertion of futility in an adminis-
trative appeal under the LMRA); *see also Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1330
(11th Cir. 2006) (affirming dismissal where "claim of futility is merely speculative because
[plaintiff] did not even attempt to pursue the administrative procedure available"); *Greifenberger
v. Hartford Life Ins. Co.*, 131 F. App'x 756 (2d Cir. 2005) (affirming dismissal where plaintiffs'
allegation of futility was conclusory); *AMA v. United Healthcare Corp.*, 588 F. Supp. 2d 432,
450 (S.D.N.Y. 2008) ("a blanket assertion of exhaustion of administrative remedies in a com-
plaint is insufficient to withstand a motion to dismiss") (internal quotation marks omitted).

Nor can Plaintiffs point to the handful of appeals that were exhausted without being paid
in full as a basis for arguing that all other appeals by all other Plaintiffs would be futile. *See
Wayne Surgical Ctr., LLC v. Concentra Preferred Sys., Inc.*, No. 06-928, 2009 WL 961389
(D.N.J. Apr. 7, 2009) (holding that plaintiffs failed to allege futility where they alleged that they
were successful on appeal only a small percentage of the time, because the possibility of success,
even if the odds of success were low, undercut plaintiffs' assertion of futility). In addition, al-
though the five exhausted appeals identified in the Complaint involved UCR issues, they also
involved unique, claim-specific issues that foreclose any extrapolation to futility for other Plain-
tiffs:

(1) the appeal by Dr. Valauri's patient challenged Aetna's practice of reducing reim-
bursements for multiple surgeries performed on the same day, based on a member's
plan provision (*see* Compl. ¶ 388);

(2) Plaintiff Werner's appeal challenged Aetna's "new policy" in the Fall of 2006 of us-
ing different tiers of reimbursements for certain types of behavioral health providers
based on their licensure (*see* Compl. ¶¶ 267-279);

(3) Dr. Antell's appeal challenged Aetna's denial of coverage for a "facility fee" that he contends should be covered based on his establishment of an out-patient surgery center (*see* Compl. ¶ 427);

(4) Maldonado's appeals challenged Aetna's decision "to limit the number of days of coverage" for DME services (*see* RICO Case Statement at 94-97); and

(5) Dr. Tonrey's appeals challenged Aetna's determination that a particular anesthesia service should be categorized as "general anesthesia," which Tonrey characterized as an "IT problem" with Aetna's systems (*see* RICO Case Statement at 16-23).[14]

Plaintiffs' inability to plead futility therefore distinguishes this case from *Wachtel v. Guardian Life Ins. Co.*, 223 F.R.D. 196 (D.N.J. 2004), *vacated and remanded on other grounds*, 453 F.3d 179 (3d Cir. 2006), in which this Court found that Health Net employed a fixed policy of denying appeals and of discouraging plaintiffs from appealing UCR determinations based on Ingenix. Unlike in *Wachtel*, there are no ***factual allegations*** in this Complaint supporting Plaintiffs' conclusory assertion that Aetna actually maintained a "policy" that would require denial of appeals in all instances.[15]   In the absence of such factual allegations, Plaintiffs' conclusory claims of futility must be rejected. *See Iqbal*, 129 S. Ct. at 1949.

If Plaintiffs were able to satisfy the exhaustion requirement merely by referring to a handful of appeals that did not squarely present most of the issues in their two hundred-page Com-

---

[14]   These five Plaintiffs are the only ones who have adequately pled exhaustion in the Complaint. The allegations of exhaustion by two additional Plaintiffs, Kavali and Schorr, are conclusory and insufficient under *Twombly*; however, based on a preliminary review of appeals-related documents recently produced by these Plaintiffs pursuant to this Court's requirement in the Case Management Order that the parties produce all standing and exhaustion-related documents as part of their initial disclosures, Aetna does not seek dismissal in this motion based on failure to exhaust by these two additional Plaintiffs.

[15]   In *Devito v. Aetna*, 536 F. Supp. 2d 523, 533 n.8 (D.N.J. 2008), this Court found that the plaintiffs had adequately pled futility, where both named plaintiffs alleged that they repeatedly and consistently had been denied coverage for treatment of eating disorders and that Aetna had a "corporate policy" of limiting coverage of eating disorders as non-biologically-based conditions. As discussed above, notwithstanding Plaintiffs' conclusory assertion that that Aetna employs a fixed policy to deny UCR appeals, their factual allegations do not support this assertion.

plaint, the exhaustion requirement would be meaningless and the purpose of the requirement would be undermined. *See Zipf v. AT&T*, 799 F.2d 889, 892 (3d Cir. 1986) (one purpose of the exhaustion requirement is to "creat[e] a record of the plan's rationales for denial of the claim"); *Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 279 (3d Cir. 2007) (one purpose of the exhaustion requirement is "refining and defining the problem for final judicial resolution") (internal quotation marks and citation omitted). Accordingly, all claims asserted by the seven ERISA Plaintiffs who fail to adequately allege exhaustion should be dismissed.

### B.   Aetna Is Not The Proper Defendant In The Claims For Benefits Brought By Two Plaintiffs.

Benefits claims by Plaintiffs Hull and Whittington (who are among the seven who also have failed to exhaust) also should be dismissed because they failed to sue the proper party. "In a § 1132(a)(1)(B) claim, the defendant is the plan itself (or plan administrators in their official capacities only)." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) (citing *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 509-10 (2d Cir. 2002)); *see also Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 308-10 (3d Cir. 2008) (affirming hospital's judgment in a claim for benefits under Section 502(a)(1)(B) against the "plan administrator" in its "individual capacity").

The reason for this limitation on proper defendants under Section 502(a)(1)(B) is straightforward: a claim seeking "benefits due" under Section 502(a)(1)(B) by definition arises under the "terms of the plan," and "if entitlement to benefits is established, the court can direct the plan administrator to pay them from the assets of the plan, much as a trustee may be compelled to satisfy a trust obligation from trust assets." *Hahnemann*, 514 F.3d at 308 (citation omitted); *see also* 29 U.S.C. § 1132(d)(2) ("Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable

against any other person unless liability against such person is established in his individual ca-
pacity under this subchapter"). The plan administrator, therefore, is analogous to a trustee—a
designated person or entity with authority to act for the plan in litigation brought under "the
terms of the plan" and, if there were a judgment against the plan, to direct payment of benefits
from the plan's assets. *See Hahnemann*, 514 F.3d at 308.

Plaintiffs' claims under Section 502(a)(1)(B) therefore should be dismissed to the extent
Aetna is neither the "plan itself" nor the "plan administrator" for their ERISA plans. *Graden*,
496 F.3d at 301. Plaintiffs Hull and Whittington are enrolled in ***self-funded*** plans established by
their employers, Citigroup and Amgen, that specifically designate entities other than Aetna as the
plan administrators for these plans.[16] Because Plaintiffs' summary plan descriptions ("SPDs")
are properly considered as part of this motion to dismiss (*see Angstadt*, 377 F.3d at 342), and be-
cause the SPDs for these plans make clear that Aetna is not the plan administrator, their claims
against Aetna under Section 502(a)(1)(B) should be dismissed.

Plaintiff Hull is enrolled in the "Citigroup Health Benefit Plan, Plan #508," which is
"self-insured" by Citigroup. (Citigroup SPD at 85 & 86); Ex. J to Stiles Decl. Plaintiff Hull's
SPD designates "[t]he Plans Administration Committee of Citigroup, Inc." as the "Plan Adminis-
trator." *Id.* at 89. In the section entitled "Plan Administration," the SPD states:

> The Plan Administrator, the Plans Administration Committee of Citigroup, Inc., is
> responsible for the general administration of the Plans and has the full discretion-
> ary authority and power to control and manage all the administrative aspects of
> the Plans, except to the extent such authority has been delegated to the Claims
> Administrator.

---

[16]  The remaining Subscriber Plaintiffs were enrolled in plans that were fully-insured by Aetna.
For purposes of this motion to dismiss, Aetna does not seek dismissal of claims brought by the
seven Subscriber Plaintiffs enrolled in fully-insured plans for failure to sue the proper defendant.

*Id.* at 89.  Thus, the SPD makes clear that Citigroup, not Aetna, controls "general administration of the Plans," and designates Citigroup's benefits committee as the Plan Administrator.

Plaintiff Whittington is enrolled in the "Amgen Group Health Plan," which is also self-insured.[17]  Plaintiff Whittington's SPD designates her employer, "Amgen," as the "Plan Administrator." (Amgen SPD at 91); Ex. H to Stiles Decl..  According to the SPD, "[t]he Plan Administrator has discretionary authority to interpret the Plan and the Plan's enrollment materials and to make factual determinations which are relevant to eligibility, coverage, and enrollment." *Id.* at 84.  Aetna therefore is not the plan administrator for Plaintiff Whittington's plan.

Where a plan "specifically so designate[s]" a person as the "plan administrator"—as both the Citigroup and Amgen plans do—that designated person is *the* plan administrator under ERISA. 29 U.S.C. § 1002(16)(A)(i) (defining the "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated").  *See also Hahnemann,* 514 F.3d at 308-10 (affirming a judgment against a plan member's employer, Allshore, Inc., as the proper defendant, where the employer designated itself as the plan administrator); *McKinsey v. Sentry Ins.,* 986 F.2d 401, 404 (10th Cir. 1993) ("[29 U.S.C. §] 1002(16)(A) provides that if a plan specifically designates a plan administrator, then that individual or entity is *the* plan administrator for purposes of ERISA" (emphasis in original)); *Crocco v. Xerox Corp.,* 137 F.3d 105, 107 (2d Cir. 1998) (affirming dismissal of claims seeking benefits from Xerox, the plan sponsor, because even though Xerox allegedly controlled the plan as a "de facto co-administrator," the

---

[17]  *See* Amgen SPD at 2 ("AMGEN is financially responsible for your Health Care Benefits (Medical Plan, Mental Health and Substance Abuse Plan, Prescription Drug Plan, and Vision Plan) described in the following pages of this Booklet."); *see also id.* at 91 ("The Medical, Dental, and Vision benefits under this Plan are funded by Amgen and are administered according with the Administrative Services Contract with Aetna Life Insurance Company").

plan documents designated someone else as the plan administrator); *AMA v. United Healthcare Corp.*, 2007 WL 1771498, at *25 (S.D.N.Y. June 18, 2007) (dismissing claims against United Health based on use of Ingenix to determine UCR under self-insured plans where employers designated themselves as plan administrators).[18]

Furthermore, Plaintiffs' allegation that Aetna is a "Claims Administrator" and therefore a "fiduciary"—simply because it has been delegated some "discretion" when processing claims under the terms of these plans—does not make Aetna a proper defendant in a claim for benefits under Section 502(a)(1)(B).[19] Under the statutory framework, being a fiduciary is not equivalent to being the plan administrator. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (holding that "one is a fiduciary to the extent he exercises *any* discretionary authority or control" (emphasis in original)); *accord* 29 U.S.C. § 1002(21)(A)(i)-(iii). Indeed, there are often multiple fiduciaries under an ERISA plan—*see* Citigroup SPD at 99-100, listing more than ten

---

[18] Because Citigroup and Amgen control and insure their own plans, and have designated themselves as plan administrators, there is no reason to second-guess these designations. This case therefore is distinguishable from *Evans v. Employee Benefit Plan*, 311 Fed. Appx. 556 (3d Cir. 2009), in which the court found that the insurer, and not the employer, was the plan administrator. In holding that the insurer, MetLife, was the plan administrator and therefore the proper defendant, the Third Circuit relied on statements in the plan documents that "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract." *Id.* at 559 (internal quotation marks omitted). MetLife also was financially responsible for paying benefits under the plan. *Id.* ("MetLife both evaluates and pays claims under the Plan"). Here, Amgen and Citigroup are not only Plaintiffs' employers and the designated plan administrators in the SPDs, but they also fulfill the roles that MetLife had in *Evans*, because they (a) control overall administration of their plans and (b) are financially responsible for paying benefits under those plans.

[19] The SPDs for these plans refer to Aetna as the "Claims Administrator," with delegated "discretion and authority to render benefit determinations in a manner consistent with the terms and conditions" of the plan. Citigroup SPD at 85; Amgen SPD at 90. *See also* Citigroup SPD at 44-46 ("Claims and appeals," describing Aetna's delegated functions as Claims Administrator); Citigroup SPD at 89 ("The Plans are administered by the Plans Administration Committee. However, the final decision on the payment of claims under certain Plans rests with the Claims Administrators").

"claims administrators"—but in a claim for benefits under Section 502(a)(1)(B), the only proper defendant is the plan administrator or the plan itself.

As the Third Circuit has recognized, there are avenues through which plan members may seek relief from fiduciaries who are not the plan administrator—namely, Sections 502(a)(2) and (a)(3)—but those avenues are distinct from Section 502(a)(1)(B). *See Graden*, 496 F.3d at 301 ("One of the key differences between § 1132(a)(1)(B) and (a)(2) is who is a proper defendant."). The Third Circuit has held that claims under Section 502(a)(2) may be brought against "a plan fiduciary in its individual capacity," but claims under Section 502(a)(1)(B) may only be brought against the "plan" or the "plan administrator (in its official capacity only)." *Id.*; *see also Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 232-35 (3d Cir. 1994) (holding that plaintiff's employer, Capital Health, was a fiduciary in addition to being the plan administrator, and therefore was a proper party in a breach of fiduciary duty claim under Section 502(a)(3)).

Accordingly, the SPDs demonstrate that Aetna is neither the "plan" nor the "plan administrator" for the Citigroup and Amgen plans, and thus Plaintiffs' claims seeking benefits under these plans should be dismissed for failure to sue the proper defendant.

## C.   Benefits Claims By Franco And Dr. Valauri Are Barred By Contractual Limitations Periods Contained In The Relevant ERISA Plans.

In a claim for benefits under Section 502(a)(1)(B) of ERISA, courts borrow the "most applicable state limitations statute," *Guilbert v. Gardner*, 480 F.3d 140, 148 (2d Cir. 2007), which the Third Circuit has held to be the statute of limitations for breach of contract actions. *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 520 (3d Cir. 2007). The period in which to bring a claim for benefits may be shortened, however, by contractual limitations periods contained in ERISA plans. These shorter limitations periods are valid, as "long as the contractual period is

not manifestly unreasonable." *Hahnemann*, 514 F.3d at 306.[20]

  Based on the allegations in the Complaint, the claims of Plaintiffs Franco and Dr. Valauri are barred by the contractual limitations periods contained in the applicable plans. Plaintiff Franco's plan establishes a limitations period of three years. *See* ACSA SPD at 34 ("No action shall be brought after the expiration of 3 years after the time written submission of claim is required to be furnished."). Because the plan requires that written proof of loss be furnished within 90 days after the member incurs a covered benefit, the proof of loss for Plaintiff Franco's surgery on February 2, 2004 was due by May 3, 2004. She therefore was required to file her lawsuit by May 2007, but she joined the *Cooper* action as a plaintiff on November 27, 2007. Notably, Plaintiff Franco was a lead plaintiff in *Franco v. CIGNA*, Civ. No. 04-1318—which involved many of the same challenges to Ingenix—throughout the entire limitations period.[21]

  Dr. Valauri's claim also is time-barred, because he seeks benefits under ERISA as an assignee under a plan that contains a one-year limitations period. Compl. ¶ 394. The relevant plan for services that Dr. Valauri rendered on May 25, 2007 (*see* Compl. ¶ 383) is the Bank of America plan, which states that a participant "must bring any civil action for benefits no later than one year following final decision on your claim under the procedures." Bank of America SPD at 16, Ex. L to Stiles Decl. Dr. Valauri alleges that the "final decision" on his appeal was provided by

---

[20] *See also Alderney Dairy Co. v. Hawthorn Mellody, Inc.*, 643 F.2d 113, 118 (3d Cir. 1981) (as a general contract law principle, parties may contract for a limitations period shorter than the statute of limitations); *Fontana v. Diversified Group Adm'rs, Inc.*, 2003 WL 21224040, at *2 (3d Cir. May 28, 2003) (upholding limitations period established in ERISA plan).

[21] Contractual limitations periods are not tolled by the internal appeals process. *See Burke v. PricewaterhouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 78 (2d Cir. 2009) (per curiam); *Koert v. GE Group Life Assurance Co.*, 231 F. App'x 117 (3d Cir. 2007). In any event, Plaintiff Franco's appeals ended in August 2004 and thus she would have been required to file her case by August 2007 even if the limitations period were tolled during the appeals.

Aetna on November 21, 2007.  Compl. ¶ 390.  Therefore, the deadline to seek relief as an as-

signee under the Bank of America plan was November 21, 2008, which was more than two

months before he joined this lawsuit as a plaintiff on February 9, 2009.

Both the ACSA and Bank of America contractual limitations periods are reasonable as a

matter of law, and thus these claims should be dismissed.  *See Alderney Dairy*, 643 F.2d at 118

(finding a one-year limitations period to be reasonable); *Koert v. GE Group Life Assurance Co.*,

231 F. App'x 117, 120 (3d Cir. 2007) (finding a three-year limitations period in an ERISA plan

to be reasonable).

### D.     The Plan That Dr. Antell Sues To Enforce As An Assignee Contains An Anti-Assignment Clause.

Like other Provider Plaintiffs, Dr. Antell alleges that he seeks relief under ERISA on the

basis of assignments he received from Aetna members, which he claims give him standing to

seek relief as if he were standing in the member's shoes.  *See* Compl. ¶ 409.  But based on the

allegations in the Complaint, Dr. Antell seeks relief under a plan that specifically ***prohibits*** as-

signments, and thus his claims should be dismissed.

Dr. Antell seeks to recover benefits due from Aetna under the ERISA plan for a member

whom he treated on October 28, 2008 under "Aetna's Managed Choice POS plan."  Compl.

¶ 412.  The terms of that plan include an anti-assignment clause stating that "[c]overage may be

assigned only with the written consent of Aetna."  Ex. K to Stiles Decl.  Dr. Antell does not al-

lege that Aetna gave him "written consent" to receive an assignment from the member whom he

treated, and the anti-assignment provision contained in that plan was valid and enforceable.  *See*

*Briglia v. Horizon Healthcare Servs., Inc.*, No. 03-6033, 2005 WL 1140687, at *4 (D.N.J. May

13, 2005) (collecting cases and holding that anti-assignment provisions in ERISA plans are

valid); *see also Renfrew Ctr. v. Blue Cross & Blue Shield of Cent. New York, Inc.*, No. 94-cv-

1527, 1997 WL 204309, at *2-3 (N.D.N.Y. Apr. 10, 1997) (holding that anti-assignment clauses are valid in ERISA plans and under New York law). Dr. Antell's claim based on an assignment therefore should be dismissed.

## VI. PLAINTIFFS' NON-BENEFITS CLAIMS UNDER ERISA SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

### A. ERISA Sections 102 And 104 Do Not Support A Claim For Relief (Counts II(A) & (B)).

Plaintiffs' claims that Aetna violated disclosure duties under ERISA Sections 102 and 104 must be dismissed. Plaintiffs purport to challenge Aetna's use of Ingenix data to make UCR determinations under the guise of a "disclosure" claim by alleging that Aetna "fail[ed] to disclose material information about its Nonpar Benefit Reductions[,] its contribution of flawed data to Ingenix and its use of such data, and its material changes in benefit policy without disclosure, including by UCR tiering and use of Medicare rates." Compl. ¶ 593.

Neither Section 102 nor Section 104 of ERISA requires disclosure of the information Plaintiffs seek. Section 102 requires that a "summary plan description . . . be furnished to participants and beneficiaries," "be sufficiently accurate and comprehensive to reasonably apprise such participants of their rights and obligations under the plan," and "include the information described in [Section 102(b)]." 29 U.S.C. § 1022(a). Section 102(b) "sets out with great specificity how the SPD must be written and what information it must contain." *Hicks v. Fleming Cos.*, 961 F.2d 537, 540 (5th Cir. 1992); *see also James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 451 (6th Cir. 2002) (Section 102(b) "contains detailed disclosure provisions regulating the contents of summary plan descriptions"). It lists 13 specific information requirements, none of which includes the disclosure of UCR data. *See Krauss v. Oxford Health Plans, Inc.*, 418 F. Supp. 2d 416, 429-30 (S.D.N.Y. 2005) (Section 102 "does not mandate" disclosure of how UCR limits were calculated).

48

Similarly, ERISA Section 104(b)(4) imposes a duty to provide only certain types of information: "The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary[] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). UCR data is not one of the categories of information covered.

Moreover, many courts, including this Court, have concluded that the phrase "instruments under which the plan is established or operated" covers only certain legal documents governing a plan. *Morley v. Avaya, Inc.*, 2006 WL 2226336, at *17 (D.N.J. Aug. 3, 2006) ("A document under which the plan is established or operated is not just any document relating to a plan, but only formal documents that establish or govern the plan.") (internal quotation marks omitted). *See, e.g., Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 758 (7th Cir. 1999) ("[T]he use of the term 'instruments' implies that the statute reaches only formal legal documents governing a plan."); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 652–54 (4th Cir. 1996) (same); *Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142-45 (2d Cir. 1997) (same). The types of information Plaintiffs seek, such as data about UCR calculations, are simply not formal legal documents that fall within the obligations imposed by Section 104(b)(4). *See DeBartolo v. Blue Cross/Blue Shield of Ill.*, No. 01 C 5940, 2001 WL 1403012, at *1, *7 (N.D. Ill. Nov. 9, 2001) (rejecting claim for "information concerning how the defendants arrived at their determination of 'usual and customary' charges" because it was "not the type of information an ERISA plan administrator is required to disclose under 29 U.S.C. § 1024(b)(4)").

Finally, only the plan administrator is bound by the duties imposed by these provisions (*see* 29 U.S.C. §§ 1024(b)(4) & 1021(a)(1)), and as discussed above, two of Plaintiffs' plans spe-

49

cifically designate an entity other than Aetna as the "Plan Administrator." Thus, even if the information sought by Plaintiffs were addressed by these provisions, Aetna would not be a proper defendant to the extent it is not the plan administrator. *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 104 (2d Cir. 2005); *Chaney v. Comcast Cable Comms., Inc.*, 2003 WL 21973325, at *3 (E.D. Pa. June 10, 2003); *Nichols v. Verizon Comms., Inc.*, 2002 WL 31477114, at *14 (D.N.J. Aug. 16, 2002) (same).

### B. Plaintiffs' Claims For Breach Of Fiduciary Duty Under Section 502(a)(3) Fail, Because They Seek Monetary Benefits Rather Than Equitable Relief (Counts III(A) & (B)).

Plaintiffs' claims against Aetna for breach of fiduciary duty arising out of its use of the Ingenix database fail as well, because the ERISA provision through which they seek this relief—Section 502(a)(3)—does not provide Plaintiffs with the relief they seek. These claims are completely foreclosed by *Varity Corp. v. Howe*, because these claims merely duplicate Plaintiffs' claims for benefits under Section 502(a)(1)(B). 516 U.S. 489 (1996).

Through their breach of fiduciary duty claim, Plaintiffs state that they seek injunctive and declaratory relief (Compl. ¶¶ 604 & 612),[22] but they allege that "Aetna is liable for underpaid benefits to Subscriber Plaintiffs and members of the class." Compl. ¶ 601. Plaintiffs apparently seek the same relief under Section 502(a)(3)—a declaration or injunction clarifying how UCR payments should be calculated prospectively—as they do under Section 502(a)(1)(B) (*see*

---

[22] Any request for monetary damages or benefits would not be permitted under Section 502(a)(3), which is expressly limited to equitable relief. In addition, if Plaintiffs were to seek equitable restitution based on some specifically identifiable and traceable funds over which they would seek to impose a constructive trust—and they plainly cannot do so—their claims still would fail to the extent Plaintiffs fail to allege that they suffered out-of-pocket losses as a result of the challenged conduct. *See Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 456 (3d Cir. 2003) (rejecting plaintiff's claim for restitution and disgorgement where plaintiff suffered no personal loss as a result of HMO's cost-control measures).

pid

Compl. ¶¶ 581 & 590).

But *Varity* teaches that Section 502(a)(3) is a "catchall" provision that "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." 516 U.S. at 512. Where Congress has elsewhere provided relief for a plaintiff's injury, there is no need for further relief, and an action under Section 502(a)(3) "would not be 'appropriate'" equitable relief. *Id.* at 515. A claim for breach of fiduciary duty is actually a claim for benefits "where the basis of the claim is a plan administrator's denial of benefits or an action by the defendant closely related to the plaintiff's claim for benefits . . . ." *Smith v. Sydnor*, 184 F.3d 356, 362 (4th Cir. 1999). Plaintiffs' remedy is under Section 502(a)(1)(B), and their claims for breach of fiduciary duty are foreclosed by *Varity*.

## C. Plaintiffs Cannot State A Claim Under Section 503 Or Related Claims Procedure Regulations (Counts IV(A) & (B)).

Plaintiffs allege that Aetna violated their rights under Section 503 of ERISA by failing to provide them with a "full and fair review" of their denied claims (Compl. ¶ 624), and that Aetna failed to comply with procedural standards enacted under Section 503 governing "claim procedures, appeals, notice to Members and the like" (*id.* ¶ 625). As a result, Plaintiffs claim that they are entitled to injunctive and declaratory relief. *Id.* ¶ 631.

Where Plaintiffs' claim is premised on a failure to disclose information that prevented a "full and fair review" from occurring, the only remedy for a violation of Section 503 and related regulations (29 C.F.R. § 2560.503-1) is remand to the plan administrator—relief that Plaintiffs do not seek here. As then-Judge Alito explained in *Syed v. Hercules Inc.*, 214 F.3d 155 (3d Cir. 2000), "the remedy for a violation of § 503 is to remand to the plan administrator so the claimant gets the benefit of a full and fair review." *Id.* at 162. *See also LaFleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 157-58 (5th Cir. 2009) ("Remand to the plan administrator for full and

fair review is usually the appropriate remedy when the administrator fails to substantially comply

with the procedural requirements of ERISA"); *Flinders v. Workforce Stabilization Plan of Phil-*

*lips Petroleum Co.*, 491 F.3d 1180, 1194 (10th Cir. 2007) ("If the plan administrator . . . failed to

adequately explain the grounds for the decision, then the proper remedy is to remand the case for

further findings or additional explanation."), *abrogated in part on other grounds by Metro. Life*

*Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008).

## VII.   THE ASSOCIATION PLAINTIFFS LACK ARTICLE III STANDING

The Association Plaintiffs' claims must also be dismissed because they lack Article III

standing.  The Association Plaintiffs press claims for damages on their own behalf, but, fatally,

they have not adequately alleged a redressable "injury in fact."  *See Lujan v. Defenders of Wild-*

*life*, 504 U.S. 555, 560-561 (1992); *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280

F.3d 278, 283 (3d Cir. 2002) (stating that an association may only assert claims on its own behalf

for injuries it "directly" sustained).  As described above, the Association Plaintiffs allege that

Aetna's conduct has "frustrated [their] purpose" and caused them to "expend time and resources"

to deal with the "issues" surrounding Aetna's out-of-network reimbursement practices.  Compl.

¶¶ 490-91.  These types of abstract injuries fall well short of pleading the concrete, particularized

injury required for constitutional standing.  *See, e.g., Simon v. E. Ky. Welfare Rights Org.*, 426

U.S. 26, 40 (1976).  Of particular relevance here, in *AMA v. United Healthcare Corp.*, 2001 WL

863561, at *14 (S.D.N.Y. July 31, 2001), Judge McKenna held that the American Medical Asso-

ciation and Medical Society of the State of New York—both Plaintiffs in this case—lacked Arti-

cle III standing to sue on their own behalf, concluding that their allegations that they were "ad-

versely affected" by United Health's use of Ingenix because they had to "devote . . . resources to

countering such practices" and were "thereby distracted from pursuing other issues" did not add

up to a concrete injury.  *Id.*; *see also AMA v. United Healthcare Corp.*, 2002 WL 31413668, at

*4 (S.D.N.Y. Oct. 23, 2002) (reaffirming earlier decision and noting that "volunteering to assist one's own members" is "not a concrete injury").

Likewise, the Association Plaintiffs lack Article III standing to press claims on behalf of their provider members. To sue in their representative capacities, the Association Plaintiffs must demonstrate (1) that their members would otherwise have standing to sue in their own right; (2) the interests they seek to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Here, resolution of the claims at issue would require the providers in the respective Associations' memberships to show that they received a valid assignment and that they or their assignors exhausted administrative remedies. Because this would require the providers' participation, the Associations cannot bring suit on the providers' behalf. *See AMA v. United Healthcare Corp.*, 2007 WL 1771498, at *21 (S.D.N.Y. June 18, 2007) (holding that medical associations lacked standing to sue on their provider members' behalf because determining whether the providers had received valid assignments and exhausted administrative remedies would require a "detailed and fact-specific inquiry" with "individualized member participation").

## VIII.  SEVERAL SUBSCRIBER PLAINTIFFS LACK ARTICLE III STANDING

Subscriber Plaintiffs Hull, Samit, Whittington, and Paul and Sharon Smith also fail to plead facts demonstrating their Article III standing. These Plaintiffs allege generally that Aetna's out-of-network reimbursements were depressed for services they received (Compl. ¶¶ 322, 332, 344, 369), but they do not allege that they ever paid out of pocket for those services or even that they were ever billed by their provider. This is not surprising, for—as the RICO Case Statement demonstrates—providers often *do not* balance-bill their patients. *See* RICO Case Statement at 25 (recounting numerous instances in which the Provider Plaintiff Kavali "did not

53

balance-bill [the] patient"). Because Plaintiffs Hull, Samit, Whittington, and the Smiths have not alleged that they were charged for out-of-network medical services—much less paid for them—they have failed to allege the requisite concrete injury that Article III demands. *See Lujan*, 504 U.S. at 560. Accordingly, this Court lacks jurisdiction over their claims.

## IX.    PLAINTIFF WEINTRAUB ONLY ALLEGES A BREACH OF CONTRACT

For the reasons set out above, Plaintiff Weintraub has not stated a claim under the Sherman Act or RICO. He also fails in his attempt to allege the elements of a claim under New York General Bus. Law § 349 ("GBL § 349"). To establish a violation of GBL § 349, a plaintiff must allege and "prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000). Plaintiff Weintraub pays lip service to some of these elements by reciting trigger words like "material" and "concealment," but the Complaint is devoid of the ***factual allegations*** needed to support such a claim. *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 631 (S.D.N.Y. 2008) (holding that plaintiff's "[b]ald contentions, unsupported characterizations, and legal conclusions" were not enough to state a claim under GBL § 349).

### A.    At Most, Plaintiff Weintraub Has Asserted A Claim For Breach Of Contract, Not A Violation Of GBL § 349.

When one properly disregards Plaintiff Weintraub's unadorned allegations of "deception" and "consumer-oriented" conduct, his claim under GBL § 349 boils down to a contention that Aetna promised to reimburse him for out-of-network services at the "reasonable and customary" rate, but instead reimbursed him at a rate based on "flawed" Ingenix data. In other words, Plaintiff Weintraub claims that Aetna did not fulfill the terms of its contract.

Courts have repeatedly held, however, that GBL § 349 is not a surrogate for New York

contract law. *See, e.g., USAlliance Fed. Credit Union v. CUMIS Ins. Soc., Inc.*, 346 F. Supp. 2d 468, 472 (S.D.N.Y. 2004) (juxtaposing a claim under GBL § 349 with a "garden-variety breach of contract cause of action"); *DePasquale v. Allstate Ins. Co.*, 179 F. Supp. 2d 51, 62 (E.D.N.Y. 2002) (dismissing GBL § 349 claim against insurer because it was "no more than a private con-tractual dispute concerning the scope of coverage under the Policies"). The statute instead pro-tects consumers from deceptive trade practices in "essentially the same" manner that the Lanham Act extends federal protections to consumers from false or misleading advertising. *See Gottlieb Dev.*, 590 F. Supp. 2d at 636 ("The typical violation contemplated by [GBL § 349] involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false or misleading advertising.").

For this reason, GBL § 349 requires a plaintiff to allege loss that is "independent of the loss caused by the alleged breach of contract." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009). Plaintiff Weintraub has made no such allegation here. Instead, he has alleged the same injury for both his breach of contract claim (Count X) and his GBL § 349 claim (Count IX): that Aetna did not pay the contracted UCR rate for Plaintiff Weintraub's out-of-networks services. *Compare* Compl. ¶ 761 *with* ¶ 766. This pleading failure requires dismissal of Plaintiff Weintraub's GBL § 349 claim.

For similar reasons, Weintraub's claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment must also be dismissed. Neither type of claim may be maintained when, as here, the plaintiff and the defendant have entered into a contract and the al-leged injury is intrinsically tied to the claimed breach of the terms of that contract. *See Deer Park Enter., LLC v. Ali Sys., Inc.*, 57 A.D.3d 711, 712 (N.Y. App. Div. 2008) (dismissing claim for breach of the implied covenant of good faith and fair dealing where alleged breach was "in-

55

trinsically tied to the damages allegedly resulting from a breach of the contract" (internal quotation marks and citation omitted)); *Goldman v. Metro Life Ins. Co.*, 841 N.E.2d 742, 746-47 (N.Y. 2005) (dismissing unjust enrichment claim because "the matter [was] controlled by contract").

**B.    Plaintiff Weintraub Has Failed To Allege that Aetna's Conduct Was Materially Deceptive.**

Although Plaintiff Weintraub makes conclusory allegations that the Ingenix data is "flawed" or "manipulated," he has not alleged that (i) Aetna actually said anything false about its calculation of the "reasonable and customary" rate for medical services, (ii) Aetna made any representation to him about the data it uses, or (iii) Aetna made any false claims about his policy or coverage. Although he asserts that Aetna failed to disclose various information about its calculation of UCR rates, Plaintiff Weintraub has not asserted that any fact purportedly omitted by Aetna was *material* to any decision that he made. To be sure, Plaintiff Weintraub alleges that Aetna's supposed "concealment of the true nature of the Ingenix database" is the kind of material fact that he could reasonably be expected to rely on "when making the decision whether to purchase and/or use out-of-network coverage" (Compl ¶ 760), but, notably, he does not claim that *he* would have, or could have, obtained other health care coverage at a lower cost, whether from Aetna or another managed care company, if he knew of the purported flaws in the Ingenix database. *See Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 415 (S.D.N.Y. 2004) (dismissing GBL § 349 where plaintiff did not contend that existence of undisclosed conversion rate would have caused him to select a different credit card).

Nor has Weintraub alleged any *causal connection* between Aetna's purported omissions and any injury he allegedly incurred—an essential element of his GBL § 349 claim. *See Small v. Lorillard Tobacco Co., Inc.*, 720 N.E.2d 892, 898 (N.Y. 1999) (holding that mere allegation of deception was insufficient to show actual injury); *Bildstein*, 329 F. Supp. 2d at 415 (holding that

56

plaintiffs "must plead facts establishing actual injury by the alleged deceptive act" to establish a GBL § 349 claim).  Indeed, nowhere in the complaint does Plaintiff Weintraub identify the reimbursement he actually received from Aetna, or what reimbursement he believes he should have received.  Because Weintraub has failed to adequately explain his injury, much less tie that injury to any misrepresentation made by Aetna, his GBL § 349 claim fails.[23]

**CONCLUSION**

Based on the foregoing, Aetna respectfully requests that this Court (a) dismiss Plaintiffs' Sherman Act and RICO claims in their entirety; (b) dismiss Plaintiffs' requests for relief relating to fee schedules other than Ingenix; (c) dismiss the ERISA benefits claims for the nine Plaintiffs who failed to exhaust administrative appeals and failed to satisfy other elements of those claims; (d) dismiss all non-benefits ERISA claims; (e) dismiss all claims by Association Plaintiffs for lack of standing; and (f) dismiss all claims by Plaintiffs who lack Article III standing. and (g) dismiss all state-law claims by Plaintiff Weintraub for failure to state a claim under GBL § 349 or for breach of the covenant of good faith and fair dealing or unjust enrichment.

Respectfully submitted,

_s/Liza M. Walsh_____
Liza M. Walsh
Tricia B. O'Reilly
Patricia A. Lee
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey  07068-1765
(973) 535-0500

---

[23]  As Ingenix and UnitedHealth explain in their brief, to the extent Weintraub alleges that he has been injured by the payment of "premiums to Aetna for out-of-network coverage" (Compl. ¶ 758), he fails to allege an actual loss or injury compensable under GBL § 349. *See* United Defs.' Br. at 7-8.  Aetna incorporates those arguments by reference.

Richard J. Doren
Gareth T. Evans
Heather M. Richardson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

Joshua Lipton (*pro hac vice pending*)
Geoffrey M. Sigler
Melanie L. Katsur
Brian D. Boone (*pro hac vice pending*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*Counsel for Aetna*