**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

———————————————————————x
                                                    :
IN RE:  AETNA UCR LITIGATION,          :        **MDL NO. 2020**
                                                    :
This Document Relates To:  ALL CASES   :        **MASTER FILE NO. 2:07-CV-3541**
                                                    :        **(FSH) (PS)**
                                                    :
                                                    :
                                                    :
                                                    :
                                                    :
                                                    :
                                                    :
———————————————————————x

**SECOND JOINT CONSOLIDATED AMENDED CLASS ACTION**
**COMPLAINT AND DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

I.     SUMMARY OF PLAINTIFFS' ALLEGATIONS ..............................................................2

    **A.**     Overview of Relevant Facts Concerning Defendant Aetna's Wrongdoing.............2

    **B.**     Subscriber Plaintiffs' Summary of Allegations ......................................................6

    **C.**     Provider/Association Plaintiffs' Summary of Allegations ....................................16

II.    PARTIES ..........................................................................................................................20

    **A.**     Subscriber Plaintiffs............................................................................................20

    **B.**     Provider Plaintiffs ...............................................................................................21

    **C.**     Association Plaintiffs ...........................................................................................23

    **D.**     Aetna Defendants.................................................................................................33

    **E.**     UHG Defendants...................................................................................................33

    **F.**     Non-Defendant Co-Conspirators .........................................................................34

III.   JURISDICTION AND VENUE .......................................................................................37

IV.    AETNA PLANS PROVIDE COVERAGE FOR OUT-OF-NETWORK SERVICES......38

V.     THE INGENIX DATABASE AND AETNA'S DETERMINATION OF UCR...............39

    **A.**     The Development of the Ingenix Database............................................................39

    **B.**     Aetna Used The Ingenix Data Despite The Disclaimer........................................42

    **C.**     Ingenix Contributors, including Aetna, Manipulate Data Before
           They Provide It to Ingenix ...................................................................................43

    **D.**     Ingenix Uses Inadequate Data Points ..................................................................44

    **E.**     Ingenix Manipulates Modifiers............................................................................46

    **F.**     Ingenix's Flawed Use Of Geozips .......................................................................46

    **G.**     Ingenix Further "Scrubs" Data Contributed By Data Contributions
           Like Aetna............................................................................................................47

    **H.**     The Derived Data Is Flawed ................................................................................48

VI.   THE CONSPIRACY TO CREATE AND FIX UCR RATES FOR
      THE PURPOSE OF UNDER-REIMBURSING FOR ONET ...........................................51

VII.  THE NEW YORK ATTORNEY GENERAL'S INVESTIGATION
      OF INGENIX ...............................................................................................................55

VIII. AETNA'S ADDITIONAL PATTERN OF WRONGDOING ........................................60

      A.    Aetna's ER Reimbursements ...............................................................................60

      B.    Aetna's Unauthorized Multiple Procedure Reductions ........................................60

      C.    Deductible And Out-Of-Pocket Limits ................................................................61

      D.    Failure to Pay Interest .........................................................................................62

IX.   PLAINTIFFS WERE SYSTEMATICALLY UNDERPAID BY AETNA ......................62

      A.    Subscriber Plaintiffs Were Systematically Underpaid By Aetna .........................62

            1.    The Cooper Plaintiffs' Group Health Plans ................................................62

            2.    Subscriber Plaintiff Cooper's ERISA Plan for New Jersey
                  Small Employer Members ...........................................................................64

            3.    Cooper's Exhaustion of Administrative Remedies....................................67

            4.    Cooper's Other Nonpar Benefit Reductions ...............................................68

            5.    Plaintiff Werner's ERISA Plan....................................................................70

            6.    Werner's Exhaustion of Administrative Remedies....................................72

            7.    Plaintiff Franco's ERISA Plan......................................................................82

            8.    Franco's Exhaustion of Administrative Remedies .....................................83

            9.    Plaintiff Smith's ERISA Plan and Exhaustion...........................................85

            10.   Plaintiff Whittington's ERISA Plan and Exhaustion...................................86

            11.   Plaintiff Samit's Individual Plan..................................................................88

            12.   Plaintiff Seney.............................................................................................91

            13.   Plaintiff Weintraub......................................................................................93

            14.   Plaintiff Hull ...............................................................................................94

**B.**    The Provider/Association Plaintiffs Were Systemically Underpaid
By Aetna ................................................................................................95

    **1.**    Dr. Darrick Antell ....................................................................95

    **2.**    Dr. Alan B. Schorr ..................................................................101

    **3.**    Dr. Frank G. Tonrey................................................................106

    **4.**    Dr. Carmen Kavali ..................................................................110

    **5.**    Brian Mullins, M.S., P.T. ........................................................112

    **6.**    Abraham I. Kozma, P.A. .........................................................114

    **7.**    Maldonado Medical LLC.........................................................116

**C.**    The Association Plaintiffs Have Been Directly Injured By
Aetna's Conduct...................................................................................119

**X.**    ANTITRUST ALLEGATIONS........................................................................120

**A.**    Interstate Commerce ...........................................................................120

**B.**    Defendants Agreement To Fix Prices And Engage In Other
Anticompetitive Conduct ....................................................................120

**C.**    Antitrust Injury....................................................................................128

**XI.**    DEFENDANTS' MISREPRESENTATIONS AND FRAUDULENT
CONCEALMENT OF THE TRUTH ............................................................129

**XII.**    CLASS ACTION ALLEGATIONS ...............................................................134

**A.**    Subscriber Plaintiff Class Actions .....................................................134

    **1.**    Class Definitions.....................................................................134

    **2.**    Common Class Claims, Issues And Defenses For The
Subscriber Classes .................................................................135

    **3.**    Additional Subscriber Class Action Allegations ....................138

**B.**    Provider Plaintiffs' Class Allegations.................................................140

    **1.**    Provider Class Definitions ......................................................140

XIII.   CAUSES OF ACTION ...................................................................................144

COUNT I (A) - CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS
        GOVERNED BY ERISA AND REQUEST FOR DECLARATORY AND
        INJUNCTIVE RELIEF  (On Behalf Of The Subscriber ERISA And New Jersey
        SEHP Classes) ...........................................................................................144

COUNT I (B) - BREACH OF PLAN PROVISIONs FOR  BENEFITS IN VIOLATION
        OF ERISA § 502(A)(1)(B)  (On Behalf Of The Provider/Association Plaintiffs
        And The Provider ERISA Subclass)..............................................................146

COUNT II - FAILURE TO PROVIDE AN ACCURATE EOC AND SPD AND
        REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF  (On Behalf Of
        The Subscriber ERISA And The Subscriber New Jersey SEHP Classes).......147

COUNT III (A) - VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE
        CARE  AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
        (On Behalf Of The Subscriber ERISA And New Jersey SEHP Classes).........148

COUNT III(B) - FOR VIOLATION OF FIDUCIARY DUTIES OF LOYALTY  AND
        DUE CARE IN VIOLATION OF § 404 OF ERISA (On Behalf Of
        Provider/Association Plaintiffs And The Provider ERISA Subclass) .............150

COUNT IV(A) - FAILURE TO PROVIDE FULL & FAIR REVIEW AS REQUIRED by
        ERISA AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
        (On Behalf Of The Subscriber ERISA And Subscriber New Jersey SEHP Classes)......152

COUNT IV(B) - FOR DECLARATORY RELIEF RELATING TO AETNA'S
        VIOLATION OF ERISA (On Behalf Of All Provider/Association Plaintiffs And
        The Provider ERISA Subclass).....................................................................153

COUNT V(A) - FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)  BASED ON
        PREDICATE ACTS OF MAIL AND WIRE FRAUD (On Behalf Of All
        Subscriber Plaintiffs And The Subscriber RICO Antitrust Class)..................155

COUNT V(B) - FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)  BASED ON
        PREDICATE ACTS OF MAIL AND WIRE FRAUD (On Behalf Of
        Provider/Association Plaintiffs And The Provider Class Against All Defendants
        (except that Drs. Antell and Tonrey, Maldonado, the AMA and MSSNY do not
        bring claims against the UHG Defendants) ...................................................163

COUNT VI(A) - FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(c) BASED ON
        PREDICATE ACTS UNDER 18 U.S.C. § 664 AS WELL AS MAIL AND WIRE
        FRAUD  (On Behalf Of The Subscriber RICO Section 664 Subclass)...........172

COUNT VI(B) - FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(c) BASED ON
        PREDICATE ACTS UNDER 18 U.S.C. § 664 AS WELL AS MAIL AND WIRE
        FRAUD  (On Behalf Of All Provider/Association Plaintiffs And The Provider
        ERISA Subclass and Against All Defendants (except that Drs. Antell and Tonrey,
        Maldonado, the AMA and MSSNY do not bring claims against the UHG
        Defendants))..................................................................................................................177

COUNT VII - FOR VIOLATIONs OF RICO, 18 U.S.C. § 1962(D)  (On Behalf Of All
        Plaintiffs (except that Subscriber Plaintiffs Cooper, Werner, Franco, Smith,
        Whittington, and Samit, Drs. Antell and Tonrey, Maldonado, the AMA and
        MSSNY do not bring claims against the UHG Defendants)) And The RICO
        Classes) ..........................................................................................................................181

COUNT VIII(A) - FOR VIOLATION OF SECTION ONE OF THE SHERMAN ACT
        (On Behalf Of The Subscriber RICO Antitrust Class) ....................................................181

COUNT VIII(B) - FOR VIOLATION OF SECTION ONE OF THE SHERMAN ACT
        (On Behalf Of All Provider/Association Plaintiffs And The Provider Class
        Against All Defendants (except that Drs. Antell and Tonrey, Maldonado, the
        AMA and MSSNY do not bring claims against the UHG Defendants)))........................183

COUNT IX - VIOLATION OF GBL §349 (By Plaintiff Weintraub And On Behalf Of
        Subscriber New York Damages Class Against Aetna, UHG and Ingenix) ...................185

COUNT X - BREACH OF CONTRACT (By Plaintiff Weintraub Against Aetna And On
        Behalf Of A Non-ERISA Class Against Aetna)............................................................188

COUNT XI - BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR
        DEALING (By Plaintiff Weintraub Against Aetna, UHG and Ingenix And On
        Behalf Of Non-ERISA Class) .......................................................................................191

COUNT XII - UNJUST ENRICHMENT (By Plaintiff Weintraub Against Aetna, UHG
        and Ingenix On Behalf Of A Non-ERISA Class) ...........................................................193

JURY TRIAL DEMAND ..........................................................................................................200

By way of this Second Joint Consolidated Amended Class Action Complaint (the "Amended Complaint"), and to the best of their knowledge, information and belief, formed upon a reasonable inquiry under the circumstances, and pursuant to this Court's Case Management Order No. 1, entered on June 15, 2009, (a) Plaintiffs Michele Cooper ("Cooper"), residing in Short Hills, New Jersey; Michele Werner ("Werner"), residing in Arlington, Virginia; Darlery Franco ("Franco"), residing in Newark, New Jersey; Paul and Sharon Smith ("Smith") residing in Townsend, Delaware; Carolyn Samit ("Samit") residing in East Hanover, New Jersey, John Seney ("Seney") residing in Urichsville, Ohio,  Carolyn Whittington ("Whittington") residing in Moorpark, California, Jeffrey M. Weintraub ("Weintraub") residing in New York, and Angela Hull ("Hull"), residing in Wisconsin (collectively, the "Subscriber Plaintiffs"), bring this action on behalf of themselves and all others similarly situated; (b) Drs. Darrick E. Antell, M.D. ("Antell"), residing in Connecticut, Alan B. Schorr, M.D. ("Schorr"), residing in Pennsylvania, Frank G. Tonrey, M.D. ("Tonrey"), residing in Texas, Dr. Carmen M. Kavali, M.D. ("Kavali"), residing in Georgia, Brian Mullins, M.S., P.T. ("Mullins"), residing in New Jersey, Abraham I. Kozma, P.A. d/b/a the Chiropractic and Acupuncture Center of Sarasota ("Kozma"), residing in Florida, and Maldonado Medical, LLC ("Maldonado"), located in Arizona (collectively, the "Provider Plaintiffs") bring this action on behalf of themselves and all others similarly situated; and (c) Plaintiffs the American Medical Association ("AMA"), Medical Society of New Jersey ("MSNJ"), Medical Society of the State of New York ("MSSNY"), Connecticut State Medical Society ("CSMS"), Texas Medical Association ("TMA"), the North Carolina Medical Society ("NCMS"), the Tennessee Medical Association ("TNMA"), Medical Association of Georgia ("MAG"), California Medical Association ("CMA") Florida Medical Association ("FMA") the Washington State Medical Association ("WSMA"), the American Podiatric Medical Association

("APMA"), and the New Jersey Psychological Association ("NJPA") (collectively, the "Association Plaintiffs") bring this action on behalf of themselves and/or their membership, against Defendants, Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc. and Aetna Insurance Company of Connecticut (collectively "Aetna").   Subscriber Plaintiffs, and the Provider Plaintiffs and Association Plaintiffs (with the exception of Drs. Antell and Tonrey, Maldonado, the AMA, and MSSNY) further bring this action against additional Defendants UnitedHealth Group, Inc. ("UHG") and Ingenix, Inc. ("Ingenix")(the "UHG Defendants") (collectively with Aetna, the "Defendants").

## I.   SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A.   Overview of Relevant Facts Concerning Defendant Aetna's Wrongdoing

1.   This Amended Complaint combines and reasserts all claims previously asserted by the Plaintiffs in their pending actions related to Aetna's payments for "out-of-network" healthcare services ("ONET").[1]   Plaintiffs include the Subscribers who purchased the healthcare services, the Providers (physicians and non-physician providers) of the healthcare services, and the Association Plaintiffs who represent the Providers.   Through the wrongful and unlawful actions alleged herein, Aetna paid less than it was contractually obligated to pay for the ONET, and both the Subscribers and Providers were thereby injured.   In this Amended Complaint, Plaintiffs allege all claims that have previously been alleged by any of the Plaintiffs against

---

[1] By this Court's Case Management Order No. 1, entered on June 15, 2009, the following actions, which were originally filed in this District, were consolidated:  *Cooper v. Aetna Health Inc. PA,* Civil Action No. 2:07-cv-3541; *Seney v. Aetna Health Inc. PA,* Civil Action No. 2:09-cv-468; *Am. Med. Ass'n v. Aetna Health Inc. PA,* Civil Action No. 2:09-cv-579; *Tisko v. Aetna Health Inc. PA,* Case No. 2:09-cv-1577; and *Abraham I. Kozma, P.A. v. Aetna Health Inc. PA,* Civil Action No. 2:09-cv-1972.  The above-referenced actions were consolidated by this Court with *Weintraub v. Ingenix, Inc.,* Case No. 2:09-cv-2027, which was transferred to this District by the Judicial Panel on Multidistrict Litigation pursuant to its Transfer Order dated April 8, 2009, *In re Aetna UCR Litigation,* MDL No. 2020.

Aetna, and Plaintiffs indicate herein where claims are made only by certain Plaintiffs.  The filing of this Amended Complaint is not intended to constitute a waiver of any party's rights under *Lexecon v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

2.      The selection and purchase of health insurance is of vital importance to consumers.  According to a recent survey conducted by the Office of New York's Attorney General, obtaining affordable healthcare is the number one concern of consumers.  *Health Care Report: The Consumer Reimbursement System is Code Blue*, State of New York, Office of the Attorney General, January 13, 2009.  This class action is about a secret and intentionally concealed agreement among health insurers to depress reimbursements for ONET, thereby raising the cost of unreimbursed healthcare services for consumers and providers.

3.      Many health insurers, including Aetna, offer health insurance plans that differentiate between coverage for medical treatment from (a) in-network providers who have negotiated discounted rates with the insurer, and (b) out-of-network providers who charge insured consumers their usual, non-discounted rates.  Health insurance plans that permit insured individuals ("Members") to seek medical care from out-of-network providers are more expensive than plans that limit Members to care provided by in-network providers – *i.e.*, they require higher premium payments.

4.      For Members who have contracted for the right to obtain ONET benefits, and agreed to pay higher premiums in exchange for that flexibility, health insurers including Aetna, promise to reimburse Members for ONET at a percentage of the lesser of either (a) the actual amount of their medical bills, or (b) the usual, and customary and reasonable rate ("UCR") charged by providers providing such services in the same or similar geographic area for substantially the same service.  However, as set forth in this Amended Complaint, during the

Subscriber and Provider Class Periods Aetna actually reimbursed its Members at a much *lower* rate.

5.      Plaintiffs' legal claims in this case are directed at a secret and illegal agreement by Aetna, UHG, Ingenix, and most of the country's largest health insurers to systemically under-reimburse consumers for ONET.   Aetna and other health insurance companies agreed to manipulate the rates used to reimburse Members for ONET.   Pursuant to this unlawful agreement, Aetna and its Co-Conspirators knowingly created, manipulated and used flawed data to set artificially low reimbursement rates for ONET.

6.      Aetna's wrongful conduct affects hundreds of thousands of consumers nationwide who have had to pay more for ONET services as a result of Aetna's illegal agreement, and it affects hundreds of thousands of Providers who have been paid less for ONET.   The instrument to accomplish this conspiracy is a data services platform known as the Ingenix Database, maintained by Ingenix, which is wholly-owned and operated by UHG, the second largest insurer in the country.   During the Subscriber and Provider Class Periods, Aetna contracted with Ingenix to provide ONET data claims and receive uniform pricing schedules which are used to calculate reimbursements for ONET services at artificially low rates (herein "False UCRs") that are presented as UCRs but are, in fact, substantially below the actual UCR.

7.      Ingenix serves as the conduit of the conspiracy and is the hidden profit engine of the health insurance business.   Ingenix contracts with most of the country's largest health insurers, including Aetna, to collect ONET claims data.   After Ingenix collects the data, it aggregates, manipulates, and "scrubs" the data to create False UCR schedules that it sells to most of the country's largest health insurers, including Aetna.   Using the False UCR schedules, Aetna was able to under-reimburse the Subscriber and Provider Plaintiffs for ONET.

8.      During the Class Periods, Aetna hid this scheme or artifice to defraud, including the existence and purpose of the Ingenix Database, through a series of material omissions and misrepresentations.  There is an inherent and irreconcilable conflict of interest in using a price-setting mechanism, the Ingenix Database, which is controlled by UHG, Aetna and other health insurers, to create uniform pricing schedules.  Because these health insurers have an incentive to artificially deflate the amounts of money they have to reimburse Subscribers and Providers for ONET, it is not surprising that their use of the Ingenix Database results in the systematic under-reimbursement of Subscribers and Providers for ONET services.

9.      Until recent news reports detailed the New York Attorney General's investigation, the process of setting UCRs used to determine reimbursement for ONET services was effectively hidden from consumers who purchase and/or participate in health insurance programs, including providers.  This lack of transparency was facilitated by the following practices:

- In their healthcare plans that cover ONET services, Aetna and other insurers affirmatively represented that they will reimburse according to the UCR rate, which the reasonable consumer would understand to literally mean the "usual and customary rate" charged for such services;

- Aetna did not disclose a conflict of interest, *i.e.*, that the Ingenix Database, which is owned and controlled by health insurance companies in agreement with Aetna and other insurers, are used to determine False UCRs;

- Aetna concealed the fact that the health insurers regularly and intentionally exclude important data points to depress UCRs and under-reimburse for ONET services; and

- Aetna concealed that Ingenix "scrubs" the data it receives from Aetna and other insurers to remove information that would result in higher reimbursement rates.

10.     Plaintiffs allege the existence of (a) direct agreements in the form of contracts between Ingenix and many of the country's largest healthcare insurers, including Aetna, to

5

obtain and/or provide UCR pricing information; and (b) a lengthy chronology of facts that demonstrates a conspiracy between and among Aetna, UHG and Ingenix to use Ingenix to develop False UCRs that are, in turn, used to determine the amount to reimburse Members for ONET.

**B.      Subscriber Plaintiffs' Summary of Allegations**

11.      Throughout the Subscriber Class Periods, the Subscriber Plaintiffs were insured by Aetna and sought benefits for treatments for a variety of medical conditions.  As alleged herein, Aetna engaged in an adversarial battle with the Subscriber Plaintiffs, denying coverage for substantial portions of the bills they received from non-participating healthcare providers ("Nonpars"), thereby transferring crushing medical costs to Subscriber Plaintiffs that should have been covered by Aetna's healthcare insurance policies.

12.      Each of the named Subscriber Plaintiffs, as described this Amended Complaint, was a Member of a healthcare insurance plan offered through employers during the Subscriber Class Periods.  Aetna exercised all discretionary authority and control over the administration of the healthcare insurance plan of each Subscriber Plaintiff, including the management and disposition of benefits under the terms of the plan.  Subscriber Plaintiffs Cooper, Werner, Franco, and Weintraub are not currently insured by Aetna, although they were when the coverage disputes described herein arose.  Subscriber Plaintiffs Smith, Samit, Hull, and Whittington continue to be insured by Aetna.

13.      As the company that issues, insures and administers these employee benefit plans through which Subscriber Plaintiffs received their healthcare insurance, Aetna is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and its governing regulations.  Further, due to the role Aetna played in administering the plans of each of the

Subscriber Plaintiffs,[2] including by making coverage and benefit decisions and deciding appeals, Aetna has assumed the role as a "fiduciary" under ERISA toward each of the Subscriber Plaintiffs.

14.     ERISA uses the term "participant" to refer to a subscriber in an employee benefit health plan, while the term "beneficiary" refers to a subscriber's dependents who also are entitled to receive benefits under the plan.

15.     Aetna issues an Evidence of Coverage ("EOC" or the "Certificate") to its participants and beneficiaries that sets forth the benefits that Aetna promises to provide. According to Aetna's publicly available Internet website designed for use by Aetna Members, Aetna defines a Member as "a subscriber or dependent who is enrolled in and covered by a healthcare plan." *See* www.aetnanavigator.com (Glossary).

16.     According to its website, Aetna's Certificate represents a "legal agreement between an individual subscriber or an employer group ('Contract holder') and a health plan that describes the benefits and limitations of the coverage." *Id.*

17.     Aetna's website further defines "Health Benefit Plan" as "[t]he health insurance or HMO product offered by a licensed health benefits company that is defined by the benefit contract and represents a set of covered services or expenses accessible through a provider network, if applicable, or direct access to licensed providers and facilities." *Id.*

18.     Under their Aetna healthcare plans, Subscriber Plaintiffs have an express right to receive services from providers who have not entered into contracts with Aetna to accept reduced fees in exchange for greater access to Aetna's Members; these healthcare providers are known as Nonpars.  For other plans, including certain Health Maintenance Organization ("HMO") plans,

---

[2] As described further below, Plaintiff Weintraub's plan with Aetna is not subject to nor governed by ERISA

Aetna Members may use Nonpars in emergencies, when they are out of their home area, or when no participating provider is qualified or available to perform the medically necessary service. When Aetna Members receive ONET, Aetna's payment is based on the lesser of the billed charge or UCR amount for that service in the geographic area in which it was performed.  Aetna uses the terms "UCR," "customary and reasonable," and "reasonable charge" interchangeably. Aetna's website represents that Aetna determines reimbursement for ONET as follows by calculating UCR:

> Out-of-Network.  The use of health care providers who have not contracted with the health plan to provide services.  Members enrolled in preferred provider organizations (PPO) and point-of-service (POS) coverages can go out-of-network for covered services, but will pay additional costs in the form of deductibles and coinsurance and will be subject to benefit and lifetime maximums.  Because reduced fees are not negotiated with out-of-network providers, Aetna will calculate reimbursement based on the usual, customary and reasonable ["UCR"] charge (see definition).  Members are responsible for all charges above UCR in addition to any deductible and coinsurance provisions.

19.     Aetna calculates benefits for ONET based on its determination of the UCR for the services at issue.  Aetna's website defines the "Customary and Reasonable" charge as follows:

> The amount customarily charged for the service by other providers in the same Geographic area (often defined as a specific percentile of all charges in the Community), and the reasonable cost of services for a given patient.  Also called "Usual, Customary, and Reasonable" (UCR).

20.     Aetna also includes on its website its standard definition for "Reasonable Charge," as follows:

> The charge for a covered benefit, which is determined by Aetna to be the prevailing charge level, for the service or supply in the geographic area where it is furnished.  Aetna may take into account factors such as the complexity, degree of skill needed, type or specialty of the Provider, range of services provided by a facility, and the prevailing charge in other areas in determining the Reasonable Charge for a service or supply that is unusual or is not

8

often provided in the area or is provided by only a small number of providers in the area.

21.     Aetna treats all of its definitions of UCR in its plans as having identical meanings and applies uniform policies for calculating UCR.

22.     Aetna often refers to UCR as the "amount allowed." Aetna makes clear in its EOCs and EOBs that the Member is financially responsible for the difference between UCR (amount allowed) and the provider's billed charge for Nonpar services.  For example, Aetna's website states:  "Members are responsible for all charges above UCR in addition to any deductible and coinsurance provisions." *Id.*  The difference between UCR and the billed charge is often referred to in Aetna's EOBs sent to its Members as "excluded expenses." Excluded expenses are not credited toward its Members' annual deductible for Nonpar services, nor the annual out-of-pocket maximum.

23.     In-network or contracted or participating providers ("Pars") contract with Aetna to accept reduced or discounted fees for their services.  When a Member uses a Par, his or her financial responsibility is limited to a specified co-payment, typically in the range of $10 to $30 per service.

24.     Aetna's website defines "Nonparticipating Provider" as follows: "This term is generally used to mean providers who have not contracted with a health plan to provide services at reduced fees.  Also called Non-Preferred Care Provider."  When an Aetna Member uses a Nonpar, Aetna imposes additional costs on the Member in the form of higher deductibles and coinsurance, as well as benefit and lifetime maximums.  Aetna does not begin to pay for Nonpar services until the Aetna Member has satisfied his or her calendar year deductible.  Once a Member satisfies the deductible, then Aetna will pay a share (typically 80%) of the allowed amount for Nonpar services.  If and when a Member reaches a maximum amount of out-of-

9

pocket expenses for Nonpar services, typically in the range of $1,500 to $3,000, the Member has no further coinsurance obligation (e.g., 20% of the allowed amount) for any additional Nonpar services for that calendar year.  Aetna does not credit amounts above UCR to the Member's deductible or out-of-pocket maximum.

25.     In certain instances, such as when a referral from a primary care physician is not obtained, Aetna considers a Par to be Nonpar.  Aetna pays UCR for the service that was rendered by the Par in such circumstances and the Member is responsible for any unpaid amounts above UCR.

26.     During the Subscriber Class Periods, Aetna failed to properly calculate deductibles, coinsurance and out-of-pocket maximums, in violation of Subscriber Plaintiffs' healthcare plans and as described in the EOCs.  By failing to properly calculate these amounts, Aetna subsequently underpaid Subscriber Plaintiffs and other Aetna Members for ONET. Despite complaints regarding Aetna's underpayments received from Subscribers, Aetna did not correct its underpayments.

27.     At times during the Subscriber Class Periods, Aetna paid Nonpar hospital and medical services by using repricing vendors.  In the event a Nonpar had a contracted agreed-to fee with a repricer accessed by Aetna, Aetna would pay the agreed-to fee.  Despite Aetna's payment to the provider of the contracted agreed-to fee, Aetna would nevertheless calculate the Member's coinsurance at the higher amount applicable to services from Nonpars.  Aetna should have applied the lower fee's reduced coinsurance applicable to contracted services.  Aetna's improper calculation of coinsurance violated its healthcare insurance plans and applicable federal and state laws.

28.     Aetna is obligated to pay accurate UCR to its Members for Nonpar services consistent with the above-referenced UCR definition.

29.     Aetna fails to comply with its own UCR definition by failing to pay benefits based on accurate UCR rates to its Members for Nonpar services (whether by Nonpars or by Pars considered Nonpar by Aetna).

30.     To determine UCR, Aetna primarily relies on the Ingenix Database.  The Ingenix Database is comprised of the Prevailing Healthcare Charges System ("PHCS") and Medical Data Research ("MDR") databases.

31.     In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City, Utah-based provider of healthcare products, including MDR.  In October 1998, Ingenix purchased the PHCS database from the Health Insurance Association of America ("HIAA"), a trade group for the insurance industry.

32.     Aetna is a contributor of provider charge data to the Ingenix Database.  Prior to contributing its data to Ingenix, Aetna deleted valid high charges.  Following receipt of the data from Aetna, Ingenix then removed additional valid high charges from all contributors' data.  Ingenix then published the corrupted database.  Simply stated, Aetna and Ingenix "cooked the books," and the corruption of the data invalidates its use by Aetna as the basis for determining UCR for ONET.  These actions (among others referenced herein) violated both ERISA, a federal law designed to protect group plan participants and beneficiaries, and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

33.     In addition to UCR determinations based on the Ingenix Database, Subscriber Plaintiffs and Subscriber Class members challenge other improper reductions in benefits for ONET ("Nonpar Benefit Reductions"), including those imposed by use of the following

methods: Use of discounted amounts or Par provider fee schedules; use of Medicare data; use of the average wholesale price ("AWP") to determine UCR for pharmaceutical drugs; failing to pay appropriately for emergency room ("ER") services; failing to properly credit deductible amounts and out-of-pocket maximums; failing to provide an appropriate appeals process mechanism; approving requests for pre authorization without disclosing its nonpayment of a large percentage of the billed charges; threatening to refer Members and Nonpars to collection agencies based on baseless allegations of overpayment by Aetna; and other improper practices.

34.     Aetna's Nonpar Benefit Reductions leave Aetna Members financially responsible for unpaid amounts that Aetna is obligated to pay under the terms of its healthcare plans. Because the Nonpar Benefit Reductions are "exclusions" of coverage under the ERISA plans, Aetna has the burden to demonstrate that its exclusions comply with its plan(s) and its legal obligations.   Subscriber Plaintiffs allege that Aetna cannot sustain its burden regarding its Nonpar Benefit Reductions, and seek unpaid benefits and other relief for themselves and on behalf of ERISA Subscriber Class members.

35.     Aetna made numerous UCR and other Nonpar Benefit Reductions for Subscriber Plaintiffs based on practices challenged herein as violations of federal and New Jersey law, including UCR based on manipulated and invalid data from the Ingenix Databases or based on Medicare rates.

36.     Aetna is legally obligated to adhere to the specific provisions of its Members' group health plans.  Aetna cannot make Nonpar Benefit Reductions if they are not authorized or accurately disclosed in Aetna Members' Certificates and Summary Plan Descriptions ("SPDs"), a document designed to describe in layperson's language the material terms, conditions and limitations of the healthcare plan.   During the Subscriber Class Period, Aetna breached the

express terms and conditions of Members' Certificates and SPDs when it made Nonpar Benefit Reductions.

37.     Subscriber Plaintiffs and Subscriber Class Members challenge Aetna's systemic application of rules and policies in making Nonpar Benefit Reductions that are not authorized by Aetna Members' Certificates and SPDs; its routine violation of its fiduciary duties; and its failure to comply with ERISA, federal claims procedure regulations, federal common law and other applicable law.

38.     Aetna's EOBs reflecting Nonpar Benefit Reductions did not comply with legal requirements, including federal claims procedure regulations.  The EOBs failed to advise Aetna Members of the specific reasons for the denial(s), the specific plan provisions, and their appeal rights.  Aetna's EOBs reflecting UCR determinations failed to advise the Subscriber Plaintiffs of the data that Aetna used to calculate UCR.

39.     Various procedural rules that covered Subscriber Plaintiffs' appeals were also violated.  Aetna's substantive and procedural violations prevent Aetna from relying on defenses to Subscriber Plaintiffs' claims, such as exhaustion or statutes of limitations.

40.     Aetna discouraged appeals by vouching for its Nonpar Benefit Reductions. Aetna's conduct toward Subscriber Plaintiffs and Subscriber Class Members clearly demonstrates that appeals of Aetna's Nonpar Benefit Reductions are futile.  As shown below, when a provider appealed, Aetna did not provide necessary and critical information and it did not provide the Member with a copy of the appeals decision.

41.     Aetna's failure to reveal critical information during the appeals process made a "full and fair review" unavailable to Aetna Members.  In certain cases, Aetna circumvented the

appeals process by handling complaints outside of the formal appeals process and not issuing written decisions.

42.     Subscriber Plaintiffs, on behalf of themselves and all similarly situated Aetna Members, allege that Aetna's Nonpar Benefit Reductions violate ERISA, RICO, the Sherman Act, and New York's General Business Law, as described herein.

43.     In addition, Subscriber Plaintiffs Cooper and Samit are Members of health plans subject to particular New Jersey regulations governing small employer and individual health plan ("SEHP") Members ("New Jersey Regulations").   Aetna's Nonpar Benefit Reductions are contrary to the requirements of New Jersey Regulations.   In violating the regulations specific to New Jersey SEHP Members, Aetna also violated ERISA and RICO.   In violating the regulations specific to New Jersey individual plan Members, Aetna violated RICO.

44.     The protections imposed by the New Jersey Regulations require health insurance companies, including Aetna, to reimburse Nonpar hospital services provided to SEHP and individual plan Members based on the hospital's billed charge.   New Jersey Regulations prohibit Aetna and other insurers from using fee schedules or other databases to reduce payment to their SEHP and individual plan Members who receive hospital services.   Instead, Aetna was obligated by law to pay the Nonpar hospital's billed charge less any applicable coinsurance.   Aetna failed to comply with New Jersey Regulations for SEHP and individual plan Members.

45.     New Jersey Regulations also require that Aetna reimburse Nonpar medical (non-hospital) services provided to SEHP and individual plan Members at the 80th percentile of the most updated Ingenix fee schedule.   Such payment must be made without other reductions, such as for multiple or bilateral procedures.

46.     Aetna failed to comply with New Jersey Regulations applicable to Nonpar hospital and medical services to the detriment of Subscriber Plaintiff Cooper and other SEHP Members, and to Subscriber Plaintiff Samit and other individual plan Members.

47.     Although the New Jersey Regulations require insurers to pay UCR based on the updated PHCS database, Aetna misrepresents in its EOB that the database "is the amount which is most often charged for a given service by a Provider within the same geographic area."  For the reasons detailed herein, this statement is false and misleading and Aetna cannot comply with this provision of the New Jersey Regulations by using the Ingenix Database.

48.     As described herein, Aetna, UHG and Ingenix, acting individually and in concert, manipulated and submitted charge data used by the Ingenix Database to understate the 80th percentile amounts.  As a result of their joint and intentional manipulation of the Ingenix Database, Aetna also violated the New Jersey Regulations and their stated purpose - to protect New Jersey consumers of ONET - was thereby thwarted.  Aetna and Ingenix concealed the manipulation from the New Jersey regulators who enforce the New Jersey Regulations, and from employers and its Members.  In fact, Aetna and Ingenix's manipulations ensured that the 80th percentile of the Ingenix Database was inaccurate and that all SEHP and Individual Plan Members as well as Members in its other plans nationwide were underpaid.

49.     Aetna's UCR determinations, based on the manipulated Ingenix Database, violated Aetna's legal obligations, and preclude it from relying on the New Jersey Regulations as a defense to its wrongful use of the invalid Ingenix Database to determine UCR rates during the Subscriber Class Period.  Aetna should be compelled to pay billed charges to all SEHP and Individual Plan Members whose benefits Aetna determined in violation of the New Jersey Regulations, ERISA, RICO, the Sherman Act, and/or New York's General Business Law.

C.    **Provider/Association Plaintiffs' Summary of Allegations**

50.    The Provider Plaintiffs bring this case as a class action on behalf of themselves and all those similarly situated physicians, physician groups and ancillary providers (the "Provider Class") who are, or have been nonparticipating, or "out-of-network," providers ("Nonpars" or "Nonparticipating" physicians or providers), in that they did not participate in Aetna's providers' networks during the period from June 3, 2003, through the present (the "Provider Class Period"), alleging violations of ERISA, RICO and the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, as described herein.  As Nonpars in Aetna's providers' networks, the Provider Plaintiffs and the Provider Class have been harmed by underpayments made by Aetna for ONET that they provided to plan enrollees.   These underpayments are pervasive and result from systematic operating procedures employed by Aetna, which affect thousands of Nonpars every year.

51.    The Association Plaintiffs bring this case on their own behalf and/or on behalf of their membership of providers.  The Association Plaintiffs are dedicated to advocating for the rights of providers and patients alike for the delivery of the highest quality of medical care.  All of the Association Plaintiffs bring this action on behalf of their members who have been injured as a result of the egregious acts and practices of Aetna as set forth in this Amended Complaint. Some of the Association Plaintiffs have also been directly injured by the challenged conduct set forth herein.  As a result of Aetna's unlawful practices, the Association Plaintiffs have been required to devote substantial time and resources counseling their members on how to deal with the practices at issue, monitoring the payment practices of Aetna, corresponding with Aetna, advocating on their members' behalf, and communicating with regulators concerning Aetna's misconduct, among other things.  Accordingly, the Association Plaintiffs allege violations of

ERISA on behalf of their membership, and violations of RICO and the Sherman Act, on behalf of themselves and/or their membership, against Aetna as set forth below.

52.     The Provider Plaintiffs and the Association Plaintiffs are at times collectively referred to herein as the "Provider/Association Plaintiffs."

53.     As alleged herein, Pars are providers who have signed a contract with a particular managed care entity and receive reimbursement of eligible charges directly from that entity. Pars agree to provide healthcare services to plan enrollees at reduced rates in exchange for access to the plan's patient base, among other things.  When visiting a Par, plan Members are only responsible for co-payments, co-insurance, and payment for non-covered items (if any) at the time of service.

54.     Nonpars, by contrast, do not have a signed contract with a particular managed care entity.  Nonpars, therefore, may collect their full charges directly from patients at the time of service and are not required to accept reduced rates for procedures performed.  Rather than require plan Members to pay out of pocket and up front in full for medical services, Nonpars routinely accept an assignment of benefits, which occurs when a plan member authorizes his health benefits plan to remit payment directly to the provider for covered services.

55.     Managed care entities may refuse to recognize a patient's assignment and still remit payment to the patient.  Whether or not the health plan honors the assignment and pays the out-of-network benefit amount to the provider, Nonpars are entitled to bill the patient for the amount of the provider's charge which exceeds the amount the health plan covers.

56.     Aetna contractually promises its Members that it will pay for services performed by Nonpars at the lesser of the billed charge or the usual, customary and reasonable ("UCR," also known as "U&C" and "R&C") amount for the service rendered.  Aetna also contractually

promises Members that the UCR rate for a service is the "prevailing charge" charged by most providers of comparable services in the specific area where the Member received the service, with consideration given to the nature and severity of the Member's condition, as well as any complications or unusual circumstances that would require additional time, skill, or experience on the part of the Nonpar.

57.     During the Provider Class Periods, Aetna contributed its own manipulated provider charge data to and typically used the Ingenix Database to price claims for reimbursement submitted by Nonpars.  However, the defective and conflict-ridden Ingenix Database fails to comply with the definition of UCR contained in Aetna's insurance contracts, and instead has been used by Aetna as a tool to deny, delay, and impede lawful reimbursement to Nonpars.

58.     On January 25, 2009, Aetna settled claims by the New York Attorney General concerning its unlawful use of the Ingenix to determine UCR rates.  In a press release issued by Aetna concerning its $20 million settlement with the Attorney General, Donald Liss, Aetna's Senior Regional Medical Director, said: "Aetna …recognize[s] the Attorney General's concern about the *conflicts of interest inherent in the Ingenix databases*.  We welcome a new database to be developed and maintained by a trusted and independent entity," (emphasis added). Notwithstanding this acknowledgment, Aetna still uses the Ingenix Database to calculate UCR rates.  In fact, according to the New York Attorney General, UHG and Aetna contributed 70% of the billing information for the Ingenix system.

59.     In addition to its use of the Ingenix Database, Aetna further failed to disclose critical and material facts about Ingenix data that Aetna used to make out-of-network reimbursement decisions.  Although Aetna was aware of serious, systemic flaws in the Ingenix

Database, Aetna concealed these flaws in its communications to Nonpars. The Ingenix Database, for example, averages charges from all providers regardless of specialty or specific provider type. It also fails to consider provider, patient, and procedure specific factors affecting charges. These known flaws, among others, were deliberately used by Aetna to diminish reimbursement to Nonpars. The non-disclosure of these material facts prevented the Provider Plaintiffs and the Provider Class from effectively challenging or appealing Aetna's improper UCR determinations.

60.     During the relevant period, Aetna also used other faulty methods for determining UCR when Ingenix data was unavailable. Provider Plaintiffs and the Provider Class challenge the following Nonpar Benefit Reductions, along with the use of the Ingenix Database to price UCR, implemented by Aetna during the Provider Class Period: Use of discounted amounts or Par provider fee schedules; use of Medicare data; use of AWP to determine UCR for pharmaceutical drugs; failing to pay appropriately ER services; failing to properly credit deductible amounts and out-of-pocket maximums; failing to provide an appropriate appeals process mechanism; approving requests for preauthorization without disclosing its nonpayment of a large percentage of the billed charges; threatening to refer Members and Nonpar providers to collection agencies based on baseless allegations of overpayment by Aetna; refusing to pay for facility fees for the proper use of accredited office-based surgical ("OBS") facilities, and other improper practices.

61.     Whether it used the Ingenix Database or another flawed methodology to price UCR, Aetna routinely and systematically underpaid Nonpars who submitted claims for reimbursement for ONET.

62. Aetna's pattern or practice of providing inadequate benefits for ONET also was intended to increase the costs to its Members of going out-of-network, thereby pressuring them to use in-network providers, subject to discounted rates.  In doing so, Aetna breached the terms and conditions of its health care plans, which govern the benefits available for its Members and their treating health care providers.

63. Aetna's deceitful and pervasive business practices forced Provider Plaintiffs, the Provider Class, and many members of the Association Plaintiffs to expend significant time and resources towards identifying, disputing and then appealing Aetna's improper reimbursement determinations, oftentimes still resulting in underpayment.  Aetna's conduct violated its legal obligations to the Provider Plaintiffs and the Provider Class, as assignees and beneficiaries of their patients' benefits, and violated federal and state law as described herein, causing Provider Plaintiffs and the Provider Class significant financial harm.  Aetna's wrongful conduct also frustrated the purpose of the Association Plaintiffs as set forth below, causing them to exhaust significant time and resources advocating on behalf of their members' rights.

## II.  PARTIES

### A.  Subscriber Plaintiffs

64. Subscriber Plaintiffs Cooper, residing in Short Hills, New Jersey; Werner, residing in Arlington, Virginia; Franco, residing in Newark, New Jersey; Smith residing in Townsend, Delaware; Samit residing in East Hanover, New Jersey, Seney residing in Urichsville, Ohio, Whittington residing in Moorpark, California, Weintraub residing in New York, and Hull, residing in Wisconsin, bring this action on behalf of themselves and all others similarly situated.  As detailed below, the Subscriber Plaintiffs have standing to pursue their claims and jurisdiction and venue are appropriate with regard to each Subscriber Plaintiff in this judicial district.

20

### B.      Provider Plaintiffs

65.      Plaintiff Dr. Antell is a board-certified plastic and reconstructive surgeon who has been in practice for over 20 years.  He is an official spokesperson for the American Society of Plastic Surgeons and is a Fellow of the American College of Surgeons.  He received his general surgery training at Stanford University Medical Center and his specialty training in plastic/reconstructive surgery at the New York Hospital/Cornell Medical Center and the Memorial Sloan-Kettering Cancer Center in New York City.  He also has a Doctor of Medical Dentistry degree from Case Western Reserve University.  Dr. Antell is a citizen of the state of Connecticut and is licensed to practice medicine in New York, and he is a Nonpar in Aetna's physician networks.  Dr. Antell does not bring claims against UHG or Ingenix in this litigation.

66.      Plaintiff, Dr. Schorr, is an endocrinologist with a private practice in Langhorne, PA.  Dr. Schorr is also on staff at two hospitals: Saint Mary Medical Center and Lower Bucks Hospital.  Dr. Schorr is board-certified in both Internal Medicine and in Endocrinology, Diabetes and Metabolic Diseases.  Dr. Schorr is a citizen of the state of Pennsylvania, and is licensed to practice medicine in Pennsylvania and New Jersey.  At all relevant times, Dr. Schorr was a Nonpar in Aetna's physicians' networks.

67.      Plaintiff, Dr. Tonrey, is an anesthesiologist with a private practice in Dallas, Texas.  Dr. Tonrey is board-certified in Anesthesiology and Emergency Medicine.  He graduated from the Georgetown University School of Medicine, and was a resident in anesthesiology at the University of Vermont Medical Center.  Dr. Tonrey is a citizen of the state of Texas, and is licensed to practice medicine in both Arizona and Texas.  At all relevant times, Dr. Tonrey was a Nonpar in Aetna's physicians' networks. Dr. Tonrey does not bring claims against UHG or Ingenix in this litigation.

68.     Plaintiff, Dr. Kavali, is a plastic surgeon with a private practice in Atlanta, Georgia.  Dr. Kavali is board-certified by the American Board of Plastic Surgery and serves on the staff of Northside Hospital and the Center for Plastic Surgery.  She graduated from Mercer University School of Medicine, was a resident in general surgery at the University of Illinois in Chicago, and completed a plastic surgery fellowship at Wayne State University.  She is a citizen of the state of Georgia and is licensed to practice medicine in Georgia.  Dr. Kavali does not currently participate in the Aetna physician network and sees Aetna patients only on a non-participating basis.

69.     Plaintiff, Mullins, is a licensed physical therapist with a private practice in Neptune, New Jersey.  Mr. Mullins graduated from Duke University with a Master's degree in Physical Therapy.  Mr. Mullins has been a practicing physical therapist for 10 years.  Mr. Mullins is a citizen of the state of New Jersey, and is licensed to practice physical therapy in New Jersey.  At all relevant times, Mr. Mullins was a Nonpar in Aetna's providers' networks.

70.     Plaintiff Kozma is the principal of Chiropractic and Acupuncture Center of Sarasota and is licensed to practice chiropractic care in Florida. Chiropractic and Acupuncture Center of Sarasota is a Nonpar physician network.  Chiropractic and Acupuncture Center of Sarasota maintains a chiropractic and acupuncture practice, and provides related services such as physical therapy. Chiropractic and Acupuncture Center of Sarasota is a Florida professional association.

71.     Plaintiff, Maldonado, is a referred provider of Durable Medical Equipment ("DME") services with its principal office located in Phoenix, Arizona.  Maldonado provides DME and related services to Aetna Members that have had such services prescribed by a physician as medically necessary.  Maldonado does not participate in any of Aetna's health plans

and is therefore deemed an out-of-network provider with regards to all Aetna health plans. Maldonado does not bring claims against UHG or Ingenix in this litigation.

### C.    Association Plaintiffs

72.    Plaintiff, American Medical Association, is headquartered in Chicago, Illinois. The AMA is a national tax-exempt membership organization that represents the interests of approximately 240,000 physicians, residents and medical students, as well as their patients located in New Jersey and throughout the United States.  As the largest medical association in the United States and as the owner of Current Procedural Terminology ("CPT" or "CPT Codes"), the AMA works to represent its members with respect to payment practices by payors, such as Aetna, to healthcare providers, particularly physicians.  Both AMA physicians and AMA in its own capacity have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

73.    AMA appears herein on behalf of itself and its members, and also as a representative of the Litigation Center of the AMA and State Medical Societies.  The Litigation Center was formed in 1995 as a coalition of the AMA and private, voluntary, nonprofit state medical societies to represent the views of organized medicine in the courts.

74.    AMA has individual standing as it has been injured by Aetna's wrongful conduct as alleged herein.  AMA has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

75.    AMA also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint.  In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit AMA seeks declaratory and injunctive relief.  The AMA does not bring claims against UHG or Ingenix in this litigation.

76.     Plaintiff, Medical Society of New Jersey, is a New Jersey not-for-profit corporation organized and existing under the laws of New Jersey.  MSNJ was founded in 1766, and is the oldest professional society in the United States.  MSNJ represents approximately 8,000 physicians in the state of New Jersey.  The organization and its dues-paying members are dedicated to a healthy New Jersey, working to ensure the sanctity of the physician–patient relationship.  In representing all medical disciplines, MSNJ advocates for the rights of patients and physicians alike, for the delivery of the highest quality medical care.  This allows response to the patients' individual, varied needs, in an ethical and compassionate environment, in order to create a healthy New Jersey and healthy citizens.  MSNJ's stated mission is "[t]o promote the betterment of the public health and the science and the art of medicine, to enlighten public opinion in regard to the problems of medicine, and to safeguard the rights of the practitioners of medicine."

77.     MSNJ has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein.  MSNJ has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

78.     MSNJ also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint.  In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, MSNJ seeks declaratory and injunctive relief.

79.     Plaintiff, Medical Society of the State of New York, is a New York not-for-profit corporation organized and existing under the laws of the state of New York since 1807.  MSSNY represents approximately 30,000 licensed physicians, medical residents, and medical students in New York State.  MSSNY is committed to representing the medical profession as a whole and

advocating health related rights, responsibilities and issues. MSSNY is further committed to serving as a resource for its members and assisting them in addressing the many issues and needs which they face in providing health care to their patients. MSSNY strives to enhance the delivery of medical care of high quality to all people in the most economical manner, and to act to promote and maintain high standards in medical education and in the practice of medicine in an effort to ensure that quality medical care is available to the public. Both MSSNY physicians and MSSNY in its own capacity have been injured by the egregious acts and practices of defendants as set forth in this Amended Complaint.

80.     MSSNY has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein. MSSNY has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

81.     MSSNY also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, MSSNY seeks declaratory and injunctive relief. MSSNY does not assert claims against UHG or Ingenix in this litigation.

82.     Plaintiff, Connecticut State Medical Society, is a federation of eight component county medical associations, with a total membership of approximately 7,000 physicians. CSMS itself is a constituent state entity of the American Medical Association. Founded by the physician-patriots of the American Revolution, the Society operates from a heritage of democratic principles embodied in its Charter and Bylaws. The philosophy and purpose of the CSMS is to promote the highest standards of medical care in the State of Connecticut, to work to preserve the integrity and independence of physicians, and to support the sanctity of the

physician-patient relationship for the benefit of the public by, among other things, facilitating and assisting its physicians in providing top quality care to their patients, providing them with a unified voice and enabling them to take concerted action on behalf of their profession and of their patients, and acting and advocating on their behalf to preserve the ability, independence and freedom of physicians to render the best possible care to every patient. Both CSMS physicians and CSMS in its own capacity have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

83.   CSMS has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein. CSMS has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

84.   CSMS also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, CSMS seeks declaratory and injunctive relief.

85.   Plaintiff, Texas Medical Association, was organized by 35 physicians in 1853 to serve the people of Texas in matters of medical care, prevention and cure of disease, and the improvement of public health. Today, with more than 43,000 physician and medical student members, TMA's vision is still to "improve the health of all Texans." TMA supports Texas physicians by providing distinctive solutions to the challenges they encounter in the care of patients. TMA has four main goals: to protect, improve, and strengthen the viability of medical practices in Texas; to ensure continued success in legislative, regulatory, and legal interventions to enhance the statewide environment in which Texas physicians practice medicine; to strengthen physicians' trusted leadership role within their communities; and to enhance the powerful,

effective, and unified voice of Texas medicine.  Both TMA physicians and TMA in its own capacity have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

86.     TMA has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein.  TMA has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

87.     TMA also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint.  In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, TMA seeks declaratory and injunctive relief.

88.     Plaintiff, North Carolina Medical Society, is a North Carolina not-for-profit corporation organized and existing under the laws of North Carolina since 1849, with its headquarters located in Raleigh, North Carolina.  NCMS represents over 11,000 members in North Carolina, including licensed physicians, physician assistants, medical interns and residents, medical students and retired physicians.

89.     The philosophy and purpose of NCMS is to promote medical science, medical knowledge, and the highest standards of medical care in North Carolina.  NCMS strives to enhance access to medical care of high quality to all people in North Carolina and to promote high standards in the practice of medicine in an effort to ensure that quality medical care is available to the public by *inter alia*, promoting competence in the art of medical practice, making the medical profession more useful to the public in the prevention and care of disease and improving the quality of life.  NCMS is the largest physician organization in North Carolina. NCMS unifies doctors across North Carolina in all specialties and work settings on issues related

to, *inter alia*: the physician-patient relationship, health and insurance regulation, and patient safety. NCMS devotes significant resources to advocating physician viewpoints in the public policy arena. Specifically, NCMS and its member physicians take an active role in issues raised by private companies, institutions, administrative agencies and the North Carolina General Assembly and work to assure that the views of the medical community are presented in an organized and effective fashion.

90.     NCMS has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein. NCMS has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

91.     NCMS also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint. In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit NCSMS seeks declaratory and injunctive relief.

92.     Plaintiff, Tennessee Medical Association, is a professional organization for medical doctors dedicated to protecting the health interests of patients and enhancing the effectiveness of physicians throughout the state by defining and promoting: quality, safe and effective medical care; public policy to protect the sanctity of the physician-patient relationship, improve access to and the affordability of quality medical services; ethics and competence in medical education and practice; and open communication between the medical profession and the public, fostering a better understanding of the capacities of medical practice. TNMA physicians have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

93.     TNMA has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint and seeks declaratory and injunctive relief.

94.     Plaintiff, California Medical Association, is a non-profit, incorporated professional association of California physicians established in 1856, with its principal place of business in Sacramento, California.   CMA is comprised of more than 35,000 physicians practicing medicine in all specialties and serving patients in all demographics throughout the State of California.   CMA's mission is to promote the art and science of medicine, the care and well being of patients, the protection of the public health and the betterment of the medical profession.   CMA actively engages in the legislative, judicial, political and regulatory processes to carry out its mission.   Additionally, CMA regularly engages government and private health plans to advocate for the interests of its members.   CMA physicians have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

95.     CMA has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this complaint and seeks declaratory and injunctive relief.

96.     Plaintiff, Medical Association of Georgia, is a non-profit, voluntary professional association of Georgia physicians.   MAG was founded in 1849, is an affiliate of the American Medical Association, and is the largest physician association in Georgia.   Presently, MAG has over 6,600 physician members – nearly 5,000 of whom are physicians actively practicing medicine in the State of Georgia.   MAG was founded to promote the art and science of medicine and the improvement of public health.   With these ends in mind, MAG actively works to advocate physician and patient positions in the United States Congress, the Georgia General

Assembly, before state and federal courts, and in the private sector with large health plans, hospitals and other entities that significantly affect patient care.

97.    MAG has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein.  MAG has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

98.    MAG also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this complaint.  In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, MAG seeks declaratory and injunctive relief.

99.    Plaintiff, Florida Medical Association, is a not for profit corporation, which is organized and maintained for the benefit of the approximately 16,000 licensed Florida physicians who comprise its membership.  The FMA was created and exists for the purposes of securing and maintaining the highest standards of practice in medicine and furthering the interests of its members.  One of the primary purposes of the FMA is to act on behalf of its members by representing their common interests before various governmental entities and before state and federal courts

100.    FMA has individual standing because it has been injured by Aetna's wrongful conduct as alleged herein.  FMA has expended considerable time and resources helping its members deal with issues concerning Aetna's improper UCR reimbursements.

101.    FMA also has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this complaint.  In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, FMA seeks declaratory and injunctive relief.

102.    Plaintiff, Washington State Medical Association, is a private, non-profit membership organization for physicians.  WSMA is funded by physician membership dues, not by the state.  The WSMA works on behalf of its members and their patients to provide educational seminars, physician advocacy efforts, lobbying and other services.  The WSMA works to represent the professional interests of all members physicians in Washington state, on behalf of its patients, and to promote effective physician leadership in the evolving health care delivery system.  WSMA physicians have been injured by the egregious acts and practices of Defendants as set forth in this Amended Complaint.

103.    WSMA has associational standing on behalf of its members who have claims against Aetna for the violations alleged in this Amended Complaint and seeks declaratory and injunctive relief.

104.    Plaintiff, American Podiatric Medical Association, is a non-profit, tax-exempt, incorporated professional association of the nation's podiatrists, with its principal place of business in Bethesda, Maryland.  APMA serves as the leading voice and unifying force in advocating and representing the interests of over 15,000 podiatrists, their patients located throughout the United States, and the 53 non-profit, state podiatric medical associations.

105.    APMA is dedicated to promoting foot and ankle health, member services and professional excellence.  As part of its mission, APMA represents and advocates the interests of podiatrists before governmental authorities, in the private sector, and through formal litigation.

106.    APMA brings this action against Aetna on its own behalf and as the authorized representative of its members.  APMA has individual standing as it has been injured by Aetna's wrongful conduct as alleged herein.  APMA has expended its own time and resources monitoring

Aetna's payment practices, counseling its members on how to deal with the wrongful payment practices at issue, and advocating on its members' behalf.

107.     APMA also has associational standing on behalf of its members who have claims against Aetna for the violations alleged herein.  In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, APMA seeks declaratory and injunctive relief.  APMA will continue to be required to expend its own resources to protect its members if Aetna's conduct is not enjoined.

108.     Plaintiff, New Jersey Psychological Association, is a private, non-profit, professional association organized and existing under the laws of the State of New Jersey since 1950, with its principal place of business in West Orange, New Jersey.  NJPA represents over 2100 active and retired psychologists located throughout New Jersey.

109.     NJPA is dedicated to promoting the advancement of psychology and providing information and resources regarding various facets of the mental health field to its members, their patients, and the public.  As part of its mission, NJPA provides information, education direction, strategies, and support to assist all members in providing relevant and meaningful professional services to the public; supports its members in both the scientific and business aspects of their practices; and represents and advocates the interests of its members before governmental authorities, in the private sector, and through formal litigation.

110.     NJPA brings this action against Aetna on its own behalf and as the authorized representative of its members.  NJPA has individual standing as it has been injured by Aetna's wrongful conduct as alleged herein.  NJPA has expended its own time and resources monitoring Aetna's payment practices, counseling its members on how to deal with the wrongful payment practices at issue, and advocating on its members' behalf.

111.    NJPA also has associational standing on behalf of its members who have claims against Aetna for the violations alleged herein.  In addition to the redress it seeks for its own injury, and where its members are entitled to do so and the claims for relief otherwise permit, NJPA seeks declaratory and injunctive relief.  NJPA will continue to be required to expend its own resources to protect its members if Aetna's conduct is not enjoined.

### D.    Aetna Defendants

112.    Defendants Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc., and Aetna Insurance Company of Connecticut, offer, insure, underwrite and administer commercial health benefits, including those of Subscriber Plaintiffs referenced above.  Several of the Defendants, including Aetna Health, Inc. and Aetna Life Insurance Company, have offices located in Cranbury, New Jersey, and are licensed to do business in New Jersey.

113.    "Aetna" is a brand name used for products and services provided by one or more of the Aetna group of subsidiaries that offer, underwrite, or administer benefits.  When used in this Amended Complaint, "Aetna" includes all Aetna subsidiaries owned and controlled by any of the named Defendants whose activities are interrelated and intertwined with them.  Due to the manner in which they function, all of the Defendants are functional ERISA fiduciaries and, as such, they must comply with fiduciary standards.  "Aetna" refers to all predecessors, successors and subsidiaries of the named Aetna Defendants to which these allegations pertain.

### E.    UHG Defendants

114.    Defendant UnitedHealth Group, Inc. offers, among other things, health insurance products and services and network-based health and well-being services to beneficiaries and other government-sponsored health care programs.  A Minnesota corporation, UHG's principal place of business is at 9900 Bren Road East, Minnetonka, Minnesota 55343.

115.    Defendant Ingenix, Inc. is a wholly-owned subsidiary of UHG and offers a comprehensive line of clinical and cost management solutions for health care payers, providers, employers, pharmaceutical manufacturers, government agencies and other requiring quality health care information.  The company's products and services are represented by four business groups including:  (i) software and data services; (ii) publishing; (iii) pharmaceutical services; and (iv) consulting.  Ingenix licenses the use of its proprietary Ingenix Database to insurers who use it to set reimbursement schedules for out-of-network, non-negotiated medical services.  A Minnesota corporation, Ingenix's principal place of business is at 12125 Technology Drive, Eden Prairie, Minnesota 55344.

116.    Collectively, UHG and Ingenix are sometimes referred to herein as the "UHG Defendants."  The UHG Defendants joined the conspiratorial activity alleged herein and are legally responsible for the unlawful conduct because their directors, members, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition.  Alternatively, the UHG Defendants are legally responsible because they acted through, facilitated, dominated, or controlled the actions of another one of the UHG Defendants in furtherance of the unlawful conspiratorial activity alleged herein.

### F.    Non-Defendant Co-Conspirators

117.    Other natural persons, corporations and entities participated as Co-Conspirators, including:

(a)    Cigna Corporation ("Cigna") provides health care and related benefits offered through the workplace.  Key product lines include health care products and services (medical, pharmacy, behavioral health, clinical information management, dental and vision benefits, and case and disease management); and group disability, life and accident insurance.  In

34

addition, Cigna also provides life, accident, health and expatriate employee benefits insurance coverage in selected international markets, primarily in Asia and Europe.  Cigna is a Delaware corporation but has its corporate headquarters Philadelphia, Pennsylvania and its corporate offices in Bloomfield, Connecticut.  Cigna is licensed to conduct business in all fifty states. Cigna participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans.

(b)     WellPoint, Inc. ("WellPoint"), through its subsidiaries, provides healthcare and related benefits in the United States and internationally.  WellPoint is the nation's largest health insurer and provides health insurance to millions of persons across the United States.  An Indiana corporation, WellPoint has its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana 46204, and is licensed to conduct business in all fifty states. WellPoint participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans.

(c)     Oxford Health Plans' ("Oxford"), a subsidiary of UHG, products include its Freedom Network and Liberty Network HMOs, as well as the Freedom Plan and Liberty Plan point-of-service plans.  Oxford participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans.  Oxford is headquartered at 48 Monroe Turnpike, Trumbull, Connecticut 06611;

(d)     Health Net, Inc. ("Health Net") is among the United States' largest publicly-traded managed healthcare companies.  Health Net offers, among other things, HMOs,

POSs, and insured PPOs.  Health Net participates in the Ingenix Database by providing claims

data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care

services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its

health plans.  The Company's headquarters is located at 21650 Oxnard St., Woodland Hills,

California 91367; and

          (e)     Health Insurance Association of America ("HIAA"), now known as

America's Health Insurance Plans ("AHIP") is a trade group for the health insurance industry.  It

is a national association comprised of a variety of medical entities, but notably major insurance

companies, including many of its fellow Co-Conspirators.  It proclaims to provide "a unified

voice for the community of health insurance plans" by representing the interests of its members

on legislative and regulatory issues at the federal and state levels, and by providing conferences

and publications.  In 1973, HIAA created a database known as the Prevailing Health Charges

System ("PHCS") by obtaining historical charge data for surgical and anesthesia procedures

from numerous data contributors, including health insurance companies, third-party payors, and

self-insured companies.  HIAA later expanded PHCS to include data regarding dental (1977),

medical (1988), and drugs/medical equipment (1998).  HIAA had committees and advisory

groups comprised of various insurance company members that were responsible for PHCS's

development and management and which caused the PHCS database to become populated with

flawed data.  In October 1998, HIAA sold PHCS to Ingenix, and PHCS is now part of the

Ingenix Database.

          118.    In addition to WellPoint, Cigna, Oxford and Health Net, and other health

insurance companies, not named as Defendants, have participated in the alleged unlawful

conspiratorial activity in violation of federal and state law.  Such violations include, *inter alia*,

knowingly providing flawed and misleading data to Ingenix for use in determining UCRs; knowingly acquiescing to flawed and improper manipulation of data provided by Ingenix; and knowingly using artificially low UCRs produced by Ingenix in determining reimbursements for ONET.

119.     Whenever reference is made to an act, statement, or transaction of any corporation or entity in this Amended Complaint, including each of the Defendants and Co-Conspirators, the allegation means that the corporation or entity acted, stated or transacted by or though its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

120.     At all times mentioned in the allegations herein, each and every Defendant and Co-Conspirator was an agent or representative of and aided and abetted in the unlawful conduct of each of the other Defendants and Co-Conspirators.  In doing the things alleged herein, each and every Defendant and Co-Conspirator was acting within the course of such agency or representation and was acting with the consent, permission and authorization of the other Defendants and Co-Conspirators.  All actions of each Defendant and Co-Conspirators as alleged herein were ratified and approved by the other Defendants and Co-Conspirators.

## III.     JURISDICTION AND VENUE

121.     The Subscriber Plaintiffs and the Provider/Association Plaintiffs assert subject matter jurisdiction for their ERISA claims under 28 U.S.C. § 1331, and 28 U.S.C. § 1332(d). For their RICO claims, subject matter jurisdiction arises under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331, and for their Sherman Act claims, subject matter jurisdiction arises under 28 U.S.C. § 1331 and 28 U.S.C. § 1337.  These claims are all brought under federal statutes and necessarily involve adjudication of one or more federal questions.

122.     Pursuant to 28 U.S.C. § 1332(d)(2), this Court also has subject matter jurisdiction over all claims alleging a violation of State Law, including New York General Business Law ("GBL").  This Court can also exercise supplemental jurisdiction over those state law claims pursuant to 28 U.S.C. § 1367.

123.     Venue is appropriately laid in this District under 28 U.S.C. § 1391, 18 U.S.C. § 1965, and 29 U.S.C. § 1132(e)(2) because (a) Aetna resides, is found, has an agent, and transacts business in this District and (b) Aetna conducts a substantial amount of business in this district and insures and administers group healthcare insurance plans both inside and outside this District, including from offices located in New Jersey.

124.     This Amended Complaint is being filed pursuant to the CMO issued by this Court on June 16, 2009.

## IV.    AETNA PLANS PROVIDE COVERAGE FOR OUT-OF-NETWORK SERVICES

125.     Aetna issues documents to all of its participants and beneficiaries that set forth the benefits that Aetna promises to pay its Members.

126.     Like most insurance plans, Aetna's plans typically differentiate between: (a) coverage for medical treatment from "in-network" providers who have negotiated discount rates with the insurer, and (b) coverage for treatment from "out-of-network" providers who charge insureds their usual, non-discounted rates.  Health insurance plans, as part of their contracts with in-network providers, preclude in-network providers from billing insured patients in excess of the contracted for in-network services.  Conversely, out-of network providers have no service contracts with the insurance company and thus are not precluded from billing at their usual rates. In cases where the out-of-network provider bills in excess of what the insurance company is willing to pay, the balance not paid by the insurance company is the responsibility of the Aetna Member.

38

127.   When Aetna Members receive ONET, Aetna's payment is based on a percentage of the lesser of the billed charge or what Aetna describes as the "usual and customary" rate for that service.   Aetna uses the terms "UCR," "usual and customary" and "reasonable charge" interchangeably.

128.   The portions of ONET charges not paid by Aetna are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan Member has to pay for medical services over a given time period.   As detailed below, Aetna utilized the faulty Ingenix Database to price UCR.

## V.   THE INGENIX DATABASE AND AETNA'S DETERMINATION OF UCR

### A.   The Development of the Ingenix Database

129.   Ingenix, a wholly owned subsidiary of UHG, is a self-styled nationwide "health care information company" that sells "customized fee analyzers" to medical providers, healthcare insurers and automobile liability insurance companies.   Essentially, Ingenix creates "modules" or uniform pricing schedules, which provide whole dollar payment amounts for each percentile (for instance, the 80th percentile) for given medical procedures in various locations. All users of the database, *i.e.*, Aetna and its Co-Conspirators, are given precisely the same dollar amounts by percentile for each particular procedure and area.

130.   In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products, which, among other things, sold a provider charge database known as MDR.   In October 1998, Ingenix also purchased the PHCS database from HIAA, a trade group for the insurance industry.

131.   HIAA developed the PHCS database in 1973.   It obtained historical charge data for surgical and anesthesia procedures from numerous data contributors, including health insurance companies, third-party payors, and self-insured companies.   The PHCS databases were

later expanded to include data regarding dental (1977), medical (1988), and drugs/medical equipment (1998).

132.    The PHCS database, as described above, was initially created by HIAA, the health insurance industry's main trade association.

133.    HIAA, now known as AHIP, markets itself as a national association representing providers of health benefits in order to advocate on behalf of health insurance plans and to represent the interests of its members so as to "provide a unified voice for the healthcare financing industry . . . ."

134.    Those members included, and continue to include, virtually every major health insurer.  In fact, at the time of drafting this Amended Complaint, the Board of Directors of AHIP includes executives of Defendants and their Co-Conspirators including, but not limited to, the Chairman, President and CEO of Aetna and at least two executive vice presidents at UHG.

135.    More specifically, various committees within HIAA initially developed and managed the PHCS database – those members made decisions concerning the operation and very design of the database.

136.    HIAA initially created the PHCS as a way to aggregate and compile physician charge data as a service to its members.

137.    HIAA compiled information from its vast pool of member/insurers to create the PHCS which initially pertained to surgical and anesthesia procedures, but within five years of its inception in 1973, began to also include dental, medical, and drugs/medical equipment rates.

138.    Once created, the PHCS became the largest pool of charges for medical services in the country and was considered to be the nation's most comprehensive database of provider charges for private health care services – *i.e.*, the rates charged by physicians and other private

healthcare providers.  It contained data from more than 150 contributors from 50 states, the District of Columbia, Puerto Rico and the Virgin Islands.

139.    The information HIAA compiled (collected from the members/insurers), however, consisted only of four data points:  the date of service, the CPT Code, the billed charge, and the geozip.  This was the only information that HIAA sought from its members to create the PHCS.

140.    In fact, HIAA (via its committees and Board of Directors) consciously decided to limit the amount of information it received from contributors to create the PHCS.  In its own documents, HIAA stated that the data was limited and that even the quality of the data was "questionable."

141.    Once HIAA obtained the "questionable" data, it compiled the various submissions and created the PHCS which it then submitted to its members as a service.  However, HIAA expressly informed insurers that the PHCS was not intended to be used to establish UCR rates.

142.    The PHCS, thus, was built on submissions from health insurance companies but was not designed to determine precise reimbursement amounts – only to provide a general idea about prevailing charges in a given area based upon the admittedly limited data that HIAA collected in order to initially create the PHCS.

143.    HIAA submitted a disclaimer with the data it provided via the PHCS:

> The DATA, whether actual charge data, derived charge data conversion factor data or length of stay data, are provided to the LICENSEE for information purposes only.  The HIAA disclaims any endorsement, approval or recommendation of the DATA. There is neither a stated nor an implied "reasonable and customary" charge, either actual or derived; neither is there a stated nor an implied "reasonable and customary" conversion factor or length of stay.  Any interpretation and/or use of the DATA by the LICENSEE is solely and exclusively at the discretion of the LICENSEE.  THE LICENSEE MUST NOT represent the DATA in any way other than as expressed in this paragraph.

144.    PHCS was designed to provide limited information about provider charges, and not to determine precise reimbursement amounts.

145.    When Ingenix acquired both MDR and PHCS, it kept them as separate databases, but merged the underlying data.  MDR and PHCS used different methodologies to produce the ultimate output for the respective databases.  As a result, the dollar amounts differed for individual procedure codes at the reported percentiles.

146.    The Ingenix Database is marketed by UHG as the "industry standard."  UHG and Aetna, as well as their Co-Conspirators, all use the same Ingenix-established UCR rates to reimburse for ONET.

147.    To create the database, Ingenix first enters into contracts/licensing agreements with health insurers, including Aetna and UHG, as well as the Co-Conspirators, to (i) obtain data surrounding billing rates and information from those health insurers; and/or to (ii) provide UCR uniform pricing schedules to those same health insurers, including UHG and Aetna, for their use in billing ONET.  Ingenix actually offers the Ingenix Database to health insurers at a discounted rate if those insurers agree to provide data to Ingenix to create that very database.  Aetna both provides to and receives from Ingenix pricing data used to set UCR rates and reimbursement for ONET.

## B.    Aetna Used The Ingenix Data Despite The Disclaimer

148.    Aetna uses the information received from Ingenix to determine UCR rates for ONET even though Ingenix broadcasts that it is not endorsing, approving or recommending the use of the Ingenix data for UCR rates.  With each production, Ingenix includes the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to subscribers for informational purposes only. Ingenix, Inc. disclaims any endorsements, approval, or

recommendation or particular uses of the data.  There is neither a stated nor an implied "reasonable and customary charge" (either actual or derived).

149.    Throughout the relevant period, Aetna has been aware of the disclaimer but did not disclose its existence or substance to its Members or Nonpars seeking reimbursement for ONET.  Moreover, Aetna has repeatedly "represented" the Ingenix data other than as described in the disclaimer.  Among other things, Aetna uses both actual and derived data as a "reasonable and customary charge," in direct contravention of the disclaimer and federal and state law.

150.    Despite its own disclaimer, Ingenix also continues to enter into agreements with Aetna and its Co-Conspirators whereby the Ingenix Database is used to calculate UCR rates for ONET, which turn out to be artificially low.  Indeed, UHG and Ingenix promise that Ingenix Database users, including Aetna and their Co-Conspirators, will achieve substantial savings, including a 16:1 return on investment.

**C.    Ingenix Contributors, including Aetna, Manipulate Data Before They Provide It to Ingenix**

151.    Aetna is a significant Data Contributor because it contributed more charges to Ingenix than any other single data contributor.  During the relevant period, UHG and Aetna's data accounted for approximately 70% of the total submissions to the Ingenix Databases.  For certain modules, Aetna's data accounted for one-half of the total submissions.

152.    For the creation and continued updating of its database, Ingenix relies entirely on accumulating data from its various information providers (including Defendants and their Co-Conspirators) via its "data contribution program" in which those health insurers that are Ingenix clients submit information about the amounts they happen to have been billed by an undisclosed number of unidentified health care providers for specific "CPT" or "HCPCS" code services. Current Procedure Terminology ("CPT") codes are a system by which the American Medical

43

Association categorizes all medical services by five-digit codes.  Healthcare Common Procedure Coding System ("HCPCS") codes are monitored by CMS, the Centers for Medicare and Medicaid Services, and are based on the CPT system.  The data Ingenix receives has been termed a "convenience sample."

> **D.** **Ingenix Uses Inadequate Data Points**

153.    Following treatment by Nonpar, that provider submits a standardized claims procedure form to Aetna; Aetna then extracts information from that form to submit to Ingenix. However, the only information provided from the claims form to Ingenix are the following four data points:  (a) the date of service; (b) the CPT code; (c) the zip code where the service was provided; and (d) the actual amount billed.

154.    In or around 2005, members of HIAA, including Aetna, discussed submitting more than these four data points to Ingenix because they recognized expressly that the four data points were limited and inadequate as a basis for calculating accurate UCR rates.  Potential data points included provider identification, licensure, specialty, patient age and gender, and type of facility where the service was provided.

155.    Despite this express acknowledgement that the four data points were limited and inadequate, Defendants and their Co-Conspirators opted to continue to only submit the four above-listed elements to Ingenix.   Furthermore, Aetna never advised its Members of the inadequacy of the four data points or of the failure to expand those data points.

156.    Health insurers thus continue to enter these four simple data points onto a standard claims submission form provided to Ingenix.  However, prior to submission to Ingenix, health insurers first "scrub" these claims submissions forms in order to remove the highest charges, thereby submitting only the lowest claims amounts which results in a lower average cost.

44

157.    Therefore, Aetna, UHG, and their Co-Conspirators all affirmatively manipulate the data they contribute to Ingenix so as to further ensure that the Ingenix Database reports invalid and artificially low UCR rates.

158.    Beginning in at least 1980, Aetna collected charge data from its claim systems for the purpose of calculating UCR for ONET.

159.    From 1980 through the present, without substantial change, Aetna applied certain profiling rules (the "Profiling Rules") to determine whether or not it would collect and send the charge data for a particular claim to Ingenix.  If a claim "profiles," it is collected by Aetna as UCR data.  If a claim does not "profile," it is not collected or sent to Ingenix by Aetna for use in the Ingenix Database.

160.    During all or part of the relevant period, Aetna used its profiling rules to pre-edit its charge data to remove valid high charges prior to sending the remaining charges to Ingenix for inclusion in the Ingenix Database.

161.    Further, in 2005 Ingenix changed its data contribution forms to require data contributors to certify with each submission that the contributed data was complete and was not pre-edited or otherwise manipulated.  At this point, Aetna began to provide those required certifications to Ingenix attesting to the fact that its data submission was complete and not pre-edited.  Aetna knew and continues to know that the certifications are false and misleading.

162.    Once Ingenix receives the data contribution forms (containing only the four data points), it is then able to combine information from all the contributors (including Defendants and their Co-Conspirators) to create the Ingenix Database used to calculate UCR rates for ONET.

163.   Because it only receives the four data points on the data contribution forms, Ingenix necessarily uses only those four elements (date of service, CPT code, address, and amount billed) to create the Ingenix Database.  These four data points do not identify the provider, the patient (including age and condition), the type of facility where the services was performed, any adjustment factors for cost of living, the specific provider-type performing the services, the provider's usual charge and licensure, the type of facility where the service was performed (*i.e.*, hospital, clinic, doctor's office, nursing home, intensive care unit), or the prevailing fee or charge level for any provider or service in a particular geographic region.

### E.   Ingenix Manipulates Modifiers

164.   In fact, Ingenix actually further decreases the amount of specificity provided on the data contribution forms by removing any "modifiers" contained on those forms.  Modifiers consist of a two-digit number that providers add to a five-digit CPT code to signify an alteration of the stated service or otherwise identify the circumstances in which the service was provided.

### F.   Ingenix's Flawed Use Of Geozips

165.   The Ingenix Database also does not tabulate data according to the specific geographic area where a UCR actually would apply.  Instead, Ingenix divides all states into "geozips" composed of cities and towns sharing three-digits of postal zip codes, which are then grouped together by not only geographical proximity, but also by what Ingenix arbitrarily decides are "data similarities."  These geozips are not medical service areas amendable to cost comparison.

166.   The distortions created by the use of the geo-zips are recognized by Ingenix itself. In one of its Customized Fee Analyzers provided to health insurers, Ingenix states that:

> Because the fee ranges in the Analyzer are based on the first three
> digits of your geo-zip, you need to assess where your locale stands
> in relation to others in this three-digit area.  For example, many

>different three digit areas contain both urban and rural locales with
>different charging patterns.  Use your judgment to determine how
>to interpret the fee range for your particular community.

167.    Aetna, UHG and their Co-Conspirators fail to exercise reasonable judgment in determining whether the specific geo-zip applicable to a particular UCR determination is valid, including whether it may contain "urban and rural locales with different charging patterns." Instead, Aetna relies strictly on the geographic groupings provided by the Ingenix Database without taking into account possible different charging patterns within each geo-zip.  By doing so, Aetna's UCR rates have no valid basis, do not comply with its plan documents, are unreasonable, and violate applicable law.

**G.    Ingenix Further "Scrubs" Data Contributed By Data Contributions Like Aetna**

168.    Once Ingenix receives data contribution forms from individual insurers (which those insurers themselves have already scrubbed), it further "scrubs" the pooled data to remove high end values but not low end outliers so as to lower the average price of ONET.  Ingenix does so by using formulaic edits to identify purported statistical outliers and automatically removes them without factual basis or further investigation to determine if they are truly incorrect data points (and should be removed) or are simply valid high charges.  Ingenix actually rejects data from data contributors if the claims are too high.  The incorrect removal of valid high charges biases the upper percentile values downward.

169.    Based upon these procedures, Ingenix then produces two cycles of uniform pricing schedules a year that include medical, surgical, anesthesia, and coding system service rates for a given geographic area and CPT code.  Once Aetna receives these uniform pricing schedules, they are uploaded onto a computerized claims platform and automatically accessed to determine UCR rates for ONET.

170.    Aetna's computer system automatically adjudicates claims for the vast majority of ONET claims.  In other words, the Ingenix Database is automatically applied and no human intervention is necessary to evaluate the individual claims or the accuracy of the UCR provided by Ingenix.

**H.    The Derived Data Is Flawed**

171.    The "conversion factor data," which is used to develop the "derived" data, as referred to in the disclaimer are not the same as the actual charge data contributed to Ingenix.

172.    Throughout the relevant time period, derived data has been used as the basis for UCR reimbursement for the majority of medical and surgical services nationwide.  Derived data is not specific to a provider, patient or procedure (CPT code).  Rather than setting out rates for healthcare services based on what providers actually charge in the marketplace, derived data uses relative values assigned to each separate medical procedure multiplied by a conversion factor.  As a result, there is no relationship between the derived data and what providers actually charge in the marketplace.  Moreover, there is no scientific or other support for Aetna using derived data, through its reliance on the Ingenix Database, to set UCR rates for ONET.

173.    Derived charges do not reflect usual, customary and prevailing charges by actual providers; rather, they are artificial prices that Aetna uses through its reliance on the Ingenix database to understate UCR.

174.    The CPT Codes combined for derived data may represent very diverse procedures ranging from the most simple, including most of the charges, to the complex.  Among other things, for derived charges to provide a valid basis for determining reasonable compensation levels, an adjustment must be made to account for distribution and spread of the common and less common procedures.  This adjustment requires computation of standard deviations.  This computation is not performed by Ingenix.  Because Ingenix fails to consider that some CPT

codes have a wider distribution of charges (i.e., standard deviation) than others, the derived percentiles understate the true upper percentile values for these CPT codes. This is a particularly significant problem because those CPT codes with a large number of observations tend to be the most common and are being grouped with less common procedures with fewer observations. Thus, the use of the derived data, which is improperly calculated, does not comply with Aetna's UCR definitions.

175.    There is no review procedure in place at Aetna to verify the accuracy of the twice-yearly uniform pricing schedules generated by the Ingenix Database. Instead, the uniform pricing schedules created by the Ingenix Database are automatically relied upon to determine UCR rates despite the fact that Ingenix actually informs insurance companies that it is not endorsing, approving or recommending use of it to determine UCR rates.

176.    Likewise, Ingenix cannot guarantee that all claims received for a particular CPT code service at any given time have been reported, much less accurately reported, by its contributing insurers. Nor can Ingenix ascertain if the bills that are listed constitute the unnamed providers' usual and customary charges for the service, or, instead, a discounted rate required by the agreements one or more of the providers may have had with health care insurers. While Ingenix requests that the CPT code billing data be accurate and complete, Ingenix remains "at the mercy" of its data contributors with respect to that result because there is no Ingenix mechanism to enforce or validate the client certificates.

177.    Ingenix has never tested its results to determine if its statistical conclusions bear any relationship to the actual high, low, median or 80th percentile of actual marketplace CPT code service rates charged;

49

178.   The end result of this cycle of collusion is a database that produces flawed uniform pricing schedules (effectively UCR rates) that systematically result in the under-reimbursement for ONET by Aetna and its Co-Conspirators.   The flaws in the database are pervasive and include:

(a)   questionable accuracy of underlying data;

(b)   no inquiry into whether all of the contributors are using the same criteria and coding (as well as aggregating) accurately and consistently;

(c)   a procedure whereby when there is not enough charge data to provide a statistically valid sample for a CPT code, Ingenix aggregates data from similar codes to create a large enough sample;

(d)   Ingenix itself combines geo-zips to determine what it considers to be a "sociodemographic region" and there is no verification for such regions;

(e)   Ingenix scrubs data but only removes outliers in a subjective manner, i.e., removes high-end values but not low-end outliers;

(f)   no appropriate statistical methodology (including sampling, data editing or data estimation) and as a result, data is inappropriate and biased downward;

(g)   the cumulated data that Ingenix has received has already been scrubbed by the individual contributors;

(h)   includes charges for procedures in non-comparable geographic area;

(i)   does not segregate procedures performed by providers of same or similar skill, but combines all CPT codes together;

(j)   combines ONET charges with "in-network" providers who have already agreed to a contracted rate – thus skews it downward;

50

(k)      fails to distinguish between the number of medical providers whose charges are reflected; and

(l)      does not edit any data that reflects negotiated or discounted charges by health providers in any given area.

179.    As the staff report of the Senate Committee on Commerce, Science, and Transportation, "*Underpayments to Consumers by the Health Insurance Industry*" (June 24, 2009) ("Senate Report"), concluded:

> Although the insurance industry represented the Ingenix data as accurate and objective, subsequent investigations have revealed that the reliability of the Ingenix data was fatally undermined by faulty statistical methods and a fundamental conflict of interest. . . . In testimony before the Senate Commerce Committee in March 2009, UnitedHealth Company's CEO publicly expressed his regret that there was a conflict of interest inherent in his company's relationship with Ingenix. . . .
>
> Evidence collected during private litigation and the New York Attorney General's investigation demonstrated how the less-than-arms-length relationship between Ingenix and the insurance industry led to reimbursement practices that cost American consumers billions of dollars.  Insurers that contributed charge data to Ingenix often "scrubbed" their data to remove high charges. Ingenix then used its own statistical "scrubbing" methods to remove valid high charges from their calculations.

## VI.    THE CONSPIRACY TO CREATE AND FIX UCR RATES FOR THE PURPOSE OF UNDER-REIMBURSING FOR ONET

180.    In October 1998, the members of HIAA (including Aetna) agreed to sell the PHCS to Ingenix for an undisclosed amount.  This was part of a plan by Ingenix to acquire a dominant position in the market for the provision of date services used to calculate UCR that included over 50 acquisitions.  Prior to the PHCS purchase, in December 1997, as described above, Ingenix purchased the MDR database for derived data from Medicode, Inc.  Ingenix

would later merge those two databases to form what has herein been referred to as the Ingenix Database.

181.    Under the terms of the 1998 sale, HIAA and Ingenix agreed to have member companies participate on an ongoing Ingenix PHCS Advisory Committee, which would have input into what and how data were used by Ingenix, of which Aetna is a member.  Additionally, all HIAA staffers who then worked on the PHCS were offered positions with Ingenix.

182.    Furthermore, accompanying the sale to Ingenix, HIAA and Ingenix agreed to a 10-year Cooperation Agreement which provided HIAA with continued input in the development and operation of the PHCS and provided for lasting co-mingling of the two entities in the form of a "Liaison Committee" to advise and evaluate Ingenix.

183.    The Cooperation Agreement further provided that Ingenix would charge HIAA members 50% less than non-HIAA members for use of the database and that Ingenix would waive all fees for HIAA members that contributed data.

184.    Ingenix, upon purchasing the PHCS, also entered into a Confidentiality Agreement mandating that it shield from disclosure the identity of entities (i.e., the Defendants and Co-Conspirators in this action) that had or would submit information for use in the database.

185.    At the time of the sale of the PHCS to Ingenix, and as a condition thereto, UHG agreed to become a member of HIAA.

186.    This chain of events serves to demonstrate how Defendants, through HIAA, conspired and agreed to create, expand, continue, promote and use the Ingenix Database to control and set UCR rates among and between Aetna and its purported horizontal competitors with the ultimate aim of setting ONET reimbursements at below market levels.

187.    The agreement by Aetna and its Co-Conspirators with Ingenix to create and control the data used to establish UCR rates persists to the present.

188.    Based on its agreement with HIAA in 1998 and continuing today, Ingenix gives discounts to Aetna and its Co-Conspirators for supplying it with the pricing data it scrubs to fabricate UCR rates.

189.    UHG, Aetna and their Co-Conspirators each contract with Ingenix to ensure the creation and provision of UCR rates that they use to under-reimburse for ONET.

190.    Under the agreements, UHG, Aetna and the Co-Conspirators provide pricing data to Ingenix.   Ingenix in turn combines the pricing data it receives from Aetna and its Co-Conspirators.

191.    As a condition of obtaining uniform pricing schedules from Ingenix, Ingenix and the Defendants as well as their Co-Conspirators also enter into confidentiality and non-disclosure agreements whereby Aetna and its Co-Conspirator insurers agree not to re-produce any of the data submitted to Ingenix to any other group that seeks to develop a competing database for use in determining UCR rates for ONET.   These confidentiality and non-disclosure agreements restrain potential competition in the relevant market, and help conceal the agreement to fix prices as well as the role each Defendant and Co-Conspirator has in that agreement.

192.    The Ingenix Database is promoted as the "industry standard," and Defendants UHG and Aetna, as well as their Co-Conspirators, all use the same Ingenix-established UCR rates to reimburse for ONET.

193.    Aetna and its Co-Conspirators have ample opportunity to, and do, communicate through HIAA (now AHIP where Aetna is a board member) and regularly share UCR pricing information using Ingenix as a conduit and switch.

194.    In return, Ingenix gives each of the Defendants and Co-Conspirators a database of UCR rates based on their combined pricing data.

195.    Aetna and its Co-Conspirators know the data being provided to Ingenix is flawed and have communicated this fact to one another and Ingenix.

196.    Aetna and its Co-Conspirators likewise understand the UCR rates received from Ingenix are flawed and cause them to under-reimburse for ONET.

197.    Aetna and its Co-Conspirators continue to have input in type of data used by Ingenix and to jointly produce UCR data and UCR rates with and through Ingenix.

198.    Aetna and each of the Co-Conspirators continue to use Ingenix-created UCR rates, essentially a centrally set pricing schedule, as the basis for calculating ONET reimbursement.

199.    In or around 2005, HIAA considered adding data elements to data submitted and used by Ingenix to create UCR rates.  Ultimately, Aetna and its Co-Conspirators understood and agreed that Ingenix would continue to base UCR rates on the same insufficient data points it had always been using.

200.    Ingenix informs Aetna and its Co-Conspirators that it does not endorse, approve or recommend the use of its data for setting UCR rates to calculate ONET.  Nonetheless, Ingenix provides Aetna and its Co-Conspirators a uniform pricing schedule (i.e., UCR rates) twice a year and promises them a 16:1 return on investment when using Ingenix.  The only purpose of the uniform pricing schedule is to set and fix artificially low rates for ONET reimbursement.

201.    Neither Aetna nor any of its Co-Conspirators attempted to set up a rival database despite Ingenix's profitability and the fact it is owned by a competitor.  Ingenix's profit margins are 20%, compared to 10% for UHG as a whole.  None of the Co-Conspirators attempted to

disclose what the basis of their UCR rates were nor did they reveal that they, along with other horizontal competitors were supplying and using faulty data.

202.    In order to prevent transparency and inhibit price competition, neither Aetna nor any of its Co-Conspirators disclose that they contract with Ingenix, provide Ingenix with data, and use UCR rates provided by Ingenix.  They do not disclose how they and Ingenix arrive at UCR rates, or that Ingenix disseminates the UCR rates they all use for calculating ONET reimbursement.   They do not disclose they have agreed not to provide data to potential competitors of Ingenix.

203.    Aetna and its Co-Conspirators' scheme to manipulate UCR rates for the purpose of under-reimbursing for ONET is predicated, in part, on keeping the Ingenix Database, and its inherent flaws, a complete secret from the plaintiffs and their respective classes.  As a result, Aetna and its Co-Conspirators actively conceal the true UCR rates from Provider and Subscriber Plaintiffs and their respective Classes, knowing the success of the scheme will be jeopardized if any one of them discloses the true UCR rates.

204.    Rather than disclose the defective nature of the Ingenix Database and the participation by Aetna and its Co-Conspirators in creating flawed UCR rates, Aetna and its Co-Conspirators shield these facts from Provider and Subscriber Plaintiffs and their respective Classes and through misrepresentations and material omissions lead them to believe they are using fair and accurate UCR schedules to reimburse for ONET.

## VII.    THE NEW YORK ATTORNEY GENERAL'S INVESTIGATION OF INGENIX

205.    In a separate investigation into the flawed Ingenix Database conducted by the Attorney General of the State of New York, Andrew M. Cuomo, Mr. Cuomo concluded that "the Ingenix databases in fact under-reimburse consumers."  State of N.Y. Office of the Att'y Gen., *Health Care Report: The Consumer Reimbursement System is Code Blue* (January 13, 2009).

206.   According to the Attorney General's report, an analysis of the New York market showed that insurers that used Ingenix and other similar methods to determine UCR "systematically under-reimburse New Yorkers for doctor's office visits." *Id*.

207.   "When extrapolated across the State and the country, it is fair to say that the Ingenix databases have caused Americans to be under-reimbursed to the tune of at least hundreds of millions of dollars over the past ten years." *Id*.   Subscriber and Provider Plaintiffs, the Classes, and members of the Association Plaintiffs, of course, are primary victims of this under reimbursement scheme.

208.   Moreover, Subscriber and Provider Plaintiffs and the Classes have been harmed by the pervasive under-reimbursement scheme in that their physician–patient relationships have been disrupted.  According to the Attorney General:

> The responsible consumer reads the plan documents and sees a thicket of words.  One term seems intelligible: the "usual and customary rate" of a similar physician for a similar service in a similar area.  That sounds reasonable.  The consumer makes the leap out-of-network and submits the bill to the insurer, only to be told the consumer will not be fully reimbursed because the doctor's charge exceeded the usual and customary rate.  The fog of ignorance continues, thanks to the insurer.  The physician-patient relationship is undermined, as the physician has been branded a charlatan whose bills are inflated.  No one's interests here are advanced, except perhaps when next time, the consumer decides to stay in network for fear of what bills may accrue for out-of-network care.  The interests advanced in that event are those of the insurer, whether by accident or design.

*Id*.

209.   In addition to the negative impact that this disparagement has had on Subscriber and Provider Plaintiffs and the Classes, the disruption of the patient-doctor relationship has significantly harmed the Association Plaintiffs, which seek to safeguard this relationship.

210.     In discussing where the blame for this under-reimbursement scheme should lie, the Attorney General explained: "[T]he fault cannot be laid on Ingenix alone.  All industry members have benefited unfairly at the expense of consumers over the past ten years, and they continue to benefit unfairly from a rigged system day after day."  *Id*.  Aetna, as a significant beneficiary of the Ingenix Database, should therefore be held accountable for its use of the database to under-reimburse the Subscriber and Provider Plaintiffs and the Classes.

211.     Simultaneous with the release of the NYAG's findings, UHG, the owner of the Ingenix Database, settled claims centering on the Ingenix Database and UCR reimbursements with the NYAG and the AMA, among others.  As part of the NYAG settlement, UHG agreed to pay the NYAG approximately $50 million.  These funds are earmarked for the creation of an independent non-profit organization, which will own and operate a new database to be used for UCR determinations.  This new database will be designed to take the place of the Ingenix Database.

212.     Although the first, UHG was not the only insurer to settle claims with the NYAG concerning the use of Ingenix data.  Indeed, the use of Ingenix is so widespread that many insurers, including Aetna, settled similar claims with the Attorney General in what has become an historic effort to overhaul the nation's out-of-network healthcare reimbursement system. Namely, on January 15, 2009, the NYAG announced a settlement with Aetna for $20 million; on February 4, 2009, the NYAG announced a settlement with MVP Health Care, Inc. for $535,000; on February 10, 2009, the NYAG announced a settlement with Independent Health for $475,000 and HealthNow New York, Inc. for $212,500; on February 17, 2009, the NYAG announced a settlement with CIGNA for $10 million; on February 18, 2009, the NYAG announced a settlement with WellPoint, Inc. for $10 million; on March 3, 2009, the NYAG announced a

settlement with Guardian Life Insurance Company of America for $500,000; and on March 5, 2009, the NYAG announced a settlement with Excellus Health Plan for $775,000 and Capital District's Physician Health Plan for $300,000.   The funds from each of these settlements will also be paid to the qualified, non-profit organization charged with establishing the new, independent database to determine fair out-of-network reimbursement rates.

213.    In a press release issued by Aetna concerning its $20 million settlement with the NYAG, Donald Liss, Aetna's Senior Regional Medical Director, said: "Aetna shares and welcomes Attorney General Cuomo's interest in transparency, and we commend the Attorney General and his staff for establishing an independent process that is transparent and helps consumers make more informed health care purchasing decisions.   We also recognize the Attorney General's concern about the conflicts of interest inherent in the Ingenix databases.   We welcome a new database to be developed and maintained by a trusted and independent entity." Notwithstanding this acknowledgment, Aetna still uses the Ingenix Database to calculate UCR rates.   In fact, according to the NYAG, UHG and Aetna together contributed 70% of the billing information for the Ingenix system.

214.    Congress also is actively investigating the use of the Ingenix Database in setting UCR amounts.   Recently, the Senate Committee on Commerce, Science, and Transportation held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?"   The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers for ONET; specifically, how the industry calculates the UCR rates for Nonpars.

215.    At the March 31, 2009 hearing, Senator and Committee Chairman John D. Rockefeller, IV, speaking for the majority of the Senate Committee, explained why they believed

the insurance industry's practices were "deceptive."  Mr. Rockefeller noted that more than 100 million Americans paid for health insurance that would give "them the option of going outside of their provider networks for care," but that the insurance companies were not living up to their end of the bargain:

> Let's be very clear about this.  The insurers aren't letting their policyholders see non-network doctors out of the goodness of their hearts.  Consumers are paying for this option - through higher premiums and higher cost sharing.  There are many reasons American consumers decide to pay the extra money for health insurance with an out-of-network option.  One New York consumer we heard from last week, Dr. Mary Jerome, said she paid extra for the "peace of mind" that she could get the best care available when she really needed it.
>
> What we learned at our first hearing was that while consumers held up their side of the bargain, the insurers did not.  The insurance industry promised to base their out-of-network payments on what they call the "usual, customary, and reasonable" cost of medical care in a particular area.  Thanks to the New York investigation and other lawsuits, we now know that the insurance companies were not delivering what they promised.

216.    Senator Rockefeller specifically addressed the New York Attorney General's findings as to the insurance industry's use of the Ingenix's Database to pay far less than the UCR amounts:

> In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates.  A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates.  Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers.  For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying.  The source of the skewed data was Dr. Slavitt's company, Ingenix.

217.    In light of the insurance industry's fraudulent use of the Ingenix Database in setting UCR rates, the Senate Committee is currently evaluating whether more federal oversight

and regulation of the insurance industry is necessary.  For now, however, the only avenue of redress for insureds and their health care providers, such as Subscriber and Provider Plaintiffs and the Classes, is through the courts.

## VIII.   AETNA'S ADDITIONAL PATTERN OF WRONGDOING

### A.      Aetna's ER Reimbursements

218.    In all of the states in which Aetna operates, it is obligated to fully reimburse Aetna Members for use of out-of-network emergency services that satisfy a prudent layperson standard regardless of the type of insurance plan they have (e.g., POS, PPO, HMO).

219.    Under the prudent layperson standard, Aetna must fully pay for ER services, even if they subsequently are determined not to constitute an emergency, so long as the Aetna Member reasonably believed the condition to be emergent at the time the Member sought ER care.  The standard precludes reliance on a medical professional's diagnostic conclusion at the time of discharge because the medical professional is not a prudent layperson and has information unavailable to the prudent layperson at the time ER care was sought.

220.    For many Aetna Members, Aetna denied reimbursement for ER services that were properly considered emergent under the prudent layperson standard.

221.    Aetna EOBs failed to disclose material information to Aetna Members when Aetna denied or reduce payment for ER services.

### B.      Aetna's Unauthorized Multiple Procedure Reductions

222.    As a further method of reducing reimbursement for ONET, Aetna automatically reduces coverage for multiple procedures performed on the same day or during the same operative session, even if the additional procedures are unrelated to what Aetna considers to be the initial procedure or involve separate surgical incisions.  By so doing, Aetna makes

reimbursement determinations that dramatically reduce amounts for those so-called secondary procedures in violation of the terms of their contracts of insurance.

223.    Aetna plans do not disclose or authorize payment reductions based on Aetna's multiple surgical reduction policy ("MSR"), pursuant to which it reduces benefits when there are multiple surgical procedures performed on the same day.  ERISA does not permit exclusions or limitations to be applied to reduce benefits that have not been properly disclosed to members. Subscriber and Provider Plaintiffs were improperly harmed by Aetna's use of these undisclosed multiple surgical rules to reduce their reimbursements in violation of its obligations under ERISA and common law.

### C.    Deductible And Out-Of-Pocket Limits

224.    Aetna's obligation to pay health benefits arises once a beneficiary has satisfied his or her annual deductible amount, which is specified in the plan documents.  In addition, once a Member reaches the plan's specified out-of-pocket limit for the year, Aetna's obligation to pay benefits increases.  The out-of-pocket limit is referred to in a member's plan as the "coinsured charge limit" and will be so referred to here.  The coinsured charge limit means that once a Member's allowed amounts for services, in total, reaches the coinsured charge limit, as specified in the plan, the Member has no further obligation to pay any share of coinsurance.  So, for example, when the total of allowed amounts is below $1,000, Aetna is obligated to pay 80% of UCR, and a Member is obligated to pay coinsurance of 20%.  When a Member's allowed amounts for a calendar year total at least $1,000 or more, Aetna must pay 100% of UCR, and a Member's coinsurance obligation concludes for that calendar year.

225.    By the terms of the EOC, the allowed amount is the lesser of the provider's actual charge and the UCR.  Any amount of the billed charge above UCR does not count toward either the deductible or the coinsurance charge limit.  If the UCR is determined improperly, then the

amounts counted toward the deductible and/or the coinsurance charge limit based on such UCR are also too low.

226.    Aetna calculated the deductible and the coinsurance charge limits using inappropriately reduced UCR amounts, and failed to credit the difference between the actual charge and the allowed charge to the deductible or to the coinsured charge limit.  Aetna is therefore paying too little of the claim (80% of the improperly reduced UCR), while the Members remain financially responsible for too large a portion of the claim (20% of UCR, plus the difference between the billed amount and the allowed charge).

### D.    Failure to Pay Interest

227.    Aetna has improperly reduced its reimbursements as a result of the violation of the terms and conditions of its healthcare plans, and it owes restitution of the improperly denied amounts and interest on such amounts.

## IX.    PLAINTIFFS WERE SYSTEMATICALLY UNDERPAID BY AETNA

### A.    Subscriber Plaintiffs Were Systematically Underpaid By Aetna

#### 1.    The Cooper Plaintiffs' Group Health Plans

228.    Subscriber Plaintiffs Werner, Franco, Smith and Whittington's benefits were determined under standard Aetna healthcare plans governed by ERISA.  Subscriber Plaintiff Cooper's benefits were determined under Aetna SEHP in New Jersey.  Plaintiff Samit's individual plan was determined under an identical regulation applied to SEHP plans in New Jersey.  SEHP plans are governed by ERISA and are also subject to a New Jersey SEHP regulation, N.J.A.C. § 1l:21-7.13(a) (the "SEHP Regulation").  Individual plans are governed by the New Jersey Regulations but are not subject to ERISA.

229.    Subscriber Plaintiffs allege, as detailed herein, that Aetna relied on flawed and inappropriate data for making UCR determinations for Nonpar benefits as a result of its use of

the Ingenix Database.  By relying on such improper data for making UCR determinations, Aetna breached its duties as set forth in its ERISA-governed plans and, as a result, it should be required to reimburse its Members who received reduced Nonpar benefits up to billed charges.

230.    With respect to Cooper and Samit, the New Jersey Regulations impose additional requirements beyond those required under ERISA.  New Jersey adopted the SEHP and individual plan Regulations in an effort to ensure that all Members of such plans, who were not in a position to negotiate the best benefit packages from insurers, would receive a minimum level of benefits.   The New Jersey Regulations specified, among other things, that Aetna's UCR determinations be equal to or greater than the 80th percentile of the most updated version of the Ingenix database.  It also requires Aetna to pay out-of-network hospital services based on billed charges.  In incorporating the Ingenix database into the New Jersey Regulations applicable to small employer plan and individual plan Members, the New Jersey Regulators were not told of the inherent flaws and inadequacies of the Ingenix database.

231.    For Members of the New Jersey small employer plans, Aetna breached ERISA by violating its obligations under the SEHP Regulation, including, as detailed below, by imposing other reductions that went beyond the reported numbers from the 80th percentile of the Ingenix Database (such as reductions for performing multiple procedures on the same day), and failing to pay 100% of billed charges for hospital services.  Moreover, Aetna intentionally manipulated its contributions to Ingenix for use in the Ingenix Database to achieve reported numbers that were lower than what should have been reported and used for setting UCR under the New Jersey Regulation, thereby violating both ERISA and RICO.  As to individual plan Members (such as Carolyn Samit), who are not governed by ERISA, Aetna violated RICO.

**2.      Subscriber Plaintiff Cooper's ERISA Plan for New Jersey Small Employer Members**

232.    From November 2003 through September 30, 2005, Cooper was a beneficiary in her husband Justin Cooper's group plan through his employer, Rosenberg & Associates, which was fully insured and administered by Aetna.  Pursuant to the terms of the plan, both she and her husband were covered as Aetna Members.

233.    Because Cooper's health insurance was provided as an employee benefit by a private employer, Cooper's claims are brought under ERISA.  In addition, because Cooper was insured by a small employer plan under New Jersey law, Aetna is also required to comply with the SEHP Regulation in providing her benefits.  Cooper was entitled to seek medical care from Nonpar providers pursuant to her SEHP EOC.  In her EOC, Aetna defined the use of UCR to establish reimbursement levels for Nonpar as follows:

> With respect to Network services and supplies, the negotiated agreement.  With respect to non-network benefits, an amount that is not more than the usual and customary charge for the service or supply as We Determine, based on a standard approved by the Board.  The Board will decide a standard for what is Reasonable and Customary for the N on-Network benefits under the contract. The chosen standard is the amount which is most often charged for a given service by a Provider within the same geographic area.

234.    The term "standard approved by the Board" in the preceding paragraph refers to the Nonpar regulation promulgated by the New Jersey Small Employer Health Board ("SEH Board"), codified in the New Jersey Regulation.  The New Jersey Regulation requires insurers to pay Nonpar hospital services based on the billed charge and Nonpar medical services at the 80th percentile of the most updated Ingenix PHCS fee profile.   The SEH Board imposes other requirements, including requiring coverage of certain services.   The New Jersey Regulation

suspends preauthorization requirements for Nonpar services rendered to New Jersey small plan Members.

235.    Throughout the Class Periods, Cooper and her husband received UCR benefit reductions from Aetna.  For example, on January 3, 2005, Justin Cooper received healthcare services from a Nonpar, for which the provider billed $4,000.  In addition, Justin Cooper received two treatments of pharmaceutical drugs, for which the Nonpar provider billed, respectively, $315 and $740.  Thereafter, a claim was submitted to Aetna on behalf of the Coopers, in compliance with the terms of their healthcare plan, seeking payment of benefits as required under the Aetna contract.

236.    The Coopers subsequently received by mail an EOB from Aetna dated May 13, 2005, to report on its payment of benefits concerning these healthcare services.  In the EOB, Aetna reported that it had excluded $499 from the billed amount for the first service, thereby leaving an amount allowed of $3,501.  Aetna further excluded $280 from the first drug, allowing only $35, and excluded $490 from the second drug, allowing only $250.  The Coopers remained liable for the unpaid portion of the bill.  After reducing the benefit further to take into account the Coopers' deductible and coinsurance for using Nonpar services, including $450 for a cardiovascular stress test that was allocated to the deducible, Aetna paid only $2,265.20 of the total bill of $5,505.00.  The EOB specified that the "total expenses submitted" by the Coopers was $5,505.00, Aetna's "total payment" was $2,265.20 and "your total responsibility" (referring to the Coopers) was $3,239.80.

237.    To explain the excluded expenses totaling $1,269, Aetna used Code 0120, which was defined in the EOB as follows: "This portion of the expense which is greater than the reasonable and customary charge is not covered under your plan."

238.    On the front page of the EOB, Aetna stated that if the Coopers had any questions about the claims they should contact Aetna at www.aetnanavigator.com.   That is a secure website provided to Aetna's Members, including the Coopers, for obtaining additional information about the benefits and services provided by Aetna.   Aetna's "Glossary" of terms on the website defined "UCR" and "Customary and Reasonable" costs for Nonpar providers.   All Members were told that Aetna's UCR determination was purportedly based on "the amount customarily charged for the service by other providers in the same geographic area," and that, in determining a "reasonable charge" for services, Aetna would determine "the prevailing charge level, made for the service or supply in the geographic area where it is furnished," after taking into account "factors such as the complexity, degree of skill needed, type or specialty of the Provider, range of services provided by a facility, and the prevailing charge in other areas in determining the Reasonable Charge for a service or supply that is unusual or is not often provided in the area or is provided by only a small number of providers in the area."

239.    On the back of the EOB, Aetna stated that the Coopers "are entitled to a review (appeal) of this benefit determination if you have questions or do not agree." Aetna stated this could be done either by telephone or in writing, and the member should include "any comments, documents, records and other information you would like to have considered, whether or not submitted in connection with the initial claim." Aetna, however, did not disclose what type of information, if any, would be considered as part of a review of a UCR determination.  The EOB further stated that "you may also review documents relevant to your claim." Yet, Aetna did not have access to material aspects of the claim determination, including the underlying methodology and data used by Ingenix to derive the numbers that Aetna used as UCR.

3.      **Cooper's Exhaustion of Administrative Remedies**

240.    Following Aetna's nonpayment, Justin Cooper's provider, Manhattan Nuclear Cardiology, appealed this determination to Aetna by letter dated September 14, 2005.  In its letter, the provider stated: "Our charges are not over and above usual and customary for this area." It further pointed out that "[t]he patient will be responsible for any amounts you do not allow."

241.    By letter dated September 26, 2005, Aetna denied the provider's appeal on behalf of Justin Cooper.  Aetna's appeal denial stated:

> Based on our review of available information, including the member's policy, the company is not modifying its previous determination.  The above listed claim was previously processed correctly according to the member's QPOS plan.  According to Aetna's guidelines, the usual and customary rate for A4641 is $125.00; for Jl245 is $35.00, for 78492 is $3501.00 and for 93015 is $450.00.  A total of $1970.80 was applied to the member's out-of-network deductible and co-insurance.  Therefore, no additional payment will be made with respect to the above listed claim(s).

242.    Contrary to ERISA and federal regulations, Aetna did not treat the provider's appeal as required and did not provide a "full and fair review." Aetna did not disclose the fee schedule used, nor did it address the basis for the appeal the provider had provided.  Aetna did not send a copy of the denial to the member.  Finally, Aetna failed to apply, disclose, or even refer to the SEHP Regulations.

243.    Pursuant to ERISA regulations, an appeal decided by a process that violates procedural safeguards is deemed exhausted.

244.    On November 8, 2005, the Nonpar billed the Coopers for the total unpaid portion of the bill, or $3,239.80.  In a comment printed on the bill the Coopers were told: "We have submitted the claim to your insurance company and per your insurance company the balance is your responsibility."

245.    For undisclosed reasons, Aetna sent Manhattan Nuclear Cardiology a new EOB dated April 2, 2007, some 18 months after its denial of the appeal.  The new EOB stated: "This is an adjustment of a previously processed claim as a result of a claim project request.  This amount represents payment of a balance bill in full."

246.    There was no stated connection between the April 2007 payment due to a "claim project request" and the denial of the appeal in September 2005.  As a result, this subsequent payment does not alter the fact that Aetna had issued a final denial of the appeal that had been filed with respect to Cooper's claim and that this appeal had been exhausted.

### 4.    Cooper's Other Nonpar Benefit Reductions

247.    During the first half of 2005, Cooper also received medical care from Nonpar providers, and subsequently submitted claims for benefits to Aetna.  Aetna responded by mailing her EOBs, including an EOB dated June 1, 2005, which reflected a billed amount of $285 for a particular service, for which Aetna excluded $106.04, citing Code 0120 to explain that the provider's bill was "greater than the reasonable and customary charge." In another EOB dated August 17, 2005, Aetna responded to an additional claim for benefits for services received by the same Nonpar, reporting that it was excluding $10 from the bill of $285, again explaining by reference to Code 0120 that the bill was "greater than the reasonable and customary charge."

248.    Cooper received further services from other Nonpars during 2005, for which she submitted claims for benefits to Aetna.  Aetna sent additional EOBs to the Coopers dated, respectively, July 6, 2005, August 17, 2005, and August 25, 2005.  Each of these EOBs reported that certain expenses had been excluded, again using Code 0120 to report that the billed charges were "greater than the reasonable and customary charge." In these EOBs, Aetna excluded $42.76 from a $150 bill; $4.15 from a $49.99 bill; and $1.03 from a $72.45 bill.

249.    Each of the EOBs contained the total amount that remained the Coopers' "responsibility," which included the amount that had been excluded by Aetna as in excess of UCR.  Further, each EOB referred the Coopers to Aetna's website, www.aetnanavigator.com for answers to their questions and provided the same summary for potential reviews or appeals of benefit determinations.

250.    Under her SEHP Plan, Cooper had an individual $1,000 annual deductible for Nonpar services.  Her individual annual out-of-pocket limit was $3,000 for ONET.  Under the plan, the Coopers' annual family deductible for Nonpar Services was $2,000, while their family out-of-pocket limit was $6,000.  The Coopers' coinsurance for Nonpar services (once the deductible was met) was 30% of the UCR.  If and when the Coopers satisfied the individual or family out-of-pocket limit, Aetna was required to pay 100% of UCR.  During the Class Periods, Cooper and her husband were financially responsible for unpaid amounts in excess of the UCR determined by Aetna.

251.    Cooper has made numerous out-of-pocket payments to Nonpars that were in excess of the applicable deductible and coinsurance under her Aetna plan.  Cooper paid these sums as a result of Aetna's improper Nonpar Benefit Reductions as detailed herein.

252.    Cooper seeks to represent a class of SEHP Members subject to the New Jersey Regulation on whose behalf Aetna underpaid for all hospital and medical services (including surgery, ER, hospital, physician, laboratory, anesthesia, chiropractic, mental health, dental, pharmaceutical, or other medical services and supplies) rendered by Nonpars (or other providers considered Nonpar by Aetna) through the Class Periods.  She seeks unpaid benefits and other relief for herself and the New Jersey SEHP Class," as defined below.

### 5.      Plaintiff Werner's ERISA Plan

253.      During the Class Period, Werner was a member of a group plan governed by ERISA.  Her group plan was sponsored by her employer, the American Psychiatric Association, and was fully insured and administered by Aetna.  Werner was in a family plan along with her daughter Hannah and her husband Geoffrey.

254.      During 2006 and 2007, Werner received medical services from Nonpars for which Aetna determined UCR below her provider's billed charges, amounts for which Werner is financially responsible.  With respect to these services, Werner has made payments to her Nonpar providers totaling at least $6,233.50.  Of that total, Werner paid out-of-pocket at least $2,973.60 that was attributable to the unpaid difference between UCR and the provider's billed charge.

255.      Werner received services on, respectively, February 1, 8, 15 and 22, 2006.  The Nonpar provider billed $135 for each service.  Aetna mailed Werner EOBs dated April 4, 2006 relating to each service.  The EOBs reflected that Aetna excluded $15 for each service as being in excess of UCR, leaving an allowed amount representing UCR of $120.  Then in each case Aetna paid only 60% of the UCR amount, or $72.  The EOB further identified "Total Plaintiff Responsibility" as $252, which represented, for each of the four services, the $48 coinsurance (40% of the UCR amount of $120), plus the $15 difference between the billed charge ($135) and UCR ($120).  In each instance, Aetna's EOB used the following remark to explain its payment:

> Your plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided.  In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas.  Aetna's determination of the prevailing charge does not suggest your provider's fee is not reasonable and proper.  Your provider may bill you for this

amount.  If there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number, or by writing to the address, shown on this statement.

256.    Aetna's EOB informed Werner that she had already satisfied her individual annual deductible of $300.  On each EOB, the provider's entire charges were identified as the amount the Nonpar Provider "May Bill You," without subtracting the amount of Aetna's payment from such field.   Pursuant to its uniform policy, all of the billed amounts in excess of UCR (e.g., $60 total for the four February 2006 visits described in the preceding paragraph) should have been, but were not, attributed towards Werner's out-of-pocket maximum.

257.    Aetna's EOB also referred Werner to its website, saying: "Questions? Contact us at aetnanavigator.com."

258.    Werner received similar medical treatments with the same Nonpar billing and the same UCR reductions reflected in EOBs from Aetna on numerous occasions, including EOBs with the following dates: April 1 and 25, 2006, May 13, 2006, June 9, 2006, July 25, 2006, August 19, 2006 and September 14, 2006.  For those dates, Aetna collectively excluded coverage for $540 for Nonpar services, leaving Werner financially responsible for that amount in addition to her co-insurance.

259.    Werner received further treatments from the Nonpar provider in September 2006. In an EOB from Aetna dated October 17, 2006, Aetna began to identify the UCR for this treatment as $72 (instead of as $120, as formerly was the UCR).  Aetna then calculated its share of UCR as 60% of $72, or $43.20.  The reduced UCR of $72 left Werner financially responsible for the unpaid $63 per treatment, along with 40% of the UCR ($72) or $28.80.  As to each $135 charge, therefore, Aetna considered itself responsible for $43.20, and Werner responsible for

$91.80.  The "Total Patient Responsibility" for the four services at issue was reported in the EOB as $367.20, which remained Werner's financial responsibility.

260.    Werner continued to receive ongoing treatment from the Nonpar provider, who in October 2006 increased the billed charge to $140 per treatment.  According to various EOBs, Aetna mailed to Werner in the fall of 2006, Aetna again determined UCR of $72, disallowing $68 of each $140 charge as being in excess of UCR, using the same explanatory code which represented that the billed charges exceeded "prevailing" rates.  Some examples of EOBs reporting such UCR reductions are dated, respectively, October 17, 2006, January 20, 2007, February 14, 2007, April 24, 2007, May 8, 2007, June 20, 2007, and July 19, 2007.  Each such EOB contained the identical explanation for Aetna's UCR reduction.

261.    Werner also received UCR determinations from Aetna for other services.  On March 21, 2006, for example, Werner and her minor child both received dental services from a Nonpar dentist.  In an EOB dated April I, 2006, Aetna determined UCR regarding three of the dental services provided for Werner, leaving $32 unpaid as allegedly in excess of a reasonable charge.  In the same EOB, Aetna determined UCR for three services rendered to Werner's minor child, leaving $20 unpaid as allegedly in excess of a reasonable charge.  The total amount of $96 was identified by the EOB as "Total Patient Responsibility."   To describe its UCR determinations, Aetna used the following remark:

> You are covered for expenses at a level set by your plan sponsor.
> The charge for services exceeds that amount.  You are responsible
> for the amount indicated.  If you have additional information we
> should consider, please let us know.

### 6.    Werner's Exhaustion of Administrative Remedies

262.    Werner unsuccessfully appealed Aetna's UCR reductions.  These internal appeals were fully exhausted, with Aetna refusing to change any of its prior Non-Par payments.

263.    On January 29, 2007, Werner appealed Aetna's UCR determinations for services she received from Nonpar providers from November 1, 2006 through December 27, 2006 referred to in her EOB dated January 20, 2007.  Her appeal letter referred to Aetna's "Plan Design and Benefits" which states that the Member must pay 40% for Nonpar office visits, with Aetna paying 60% of such visits.  Werner complained that Aetna's payments were inconsistent with the provisions of her plan limiting her financial responsibility to 40% coinsurance for the office visit.  Werner separately complained of Aetna's policy reducing payment to Nonpar licensed social workers ("LCSWs") and psychologists.  Werner attached to her appeal a copy of Aetna's new payment policy titled "Change in Reimbursement Policy for Nonpar Behavioral Health Providers for PPO-based and HMO/QPOS plans," which she had obtained from perusing the internet and which states:

264.    Beginning with dates of service on or after September 1, 2006, in PPO-based and HMO/QPOS plans, Aetna is changing our reimbursement policy for Nonparticipating behavioral health providers.  This change ties reimbursement to the level of the licensure of the clinician and will result in a change in Aetna's reimbursement for Nonparticipating psychologists and social workers.  This change will not affect psychiatrists and does not apply to the Medicare Advantage product.

265.    Effective September 1, 2006, this change will reduce the allowable amount to: 80% of Usual and Customary Rate (UCR) for psychologists 60% of UCR for social worker Reimbursement will be further subject to applicable plan deductible, coinsurance and/or co-payment.

266.    This new policy makes our approach to reimbursement for Nonparticipating behavioral health providers consistent with our approach for Aetna participating behavioral health providers.

267.    In a letter dated May 9, 2007, Aetna denied Werner's first appeal.  Aetna stated that it was "upholding the previous benefit decision to deny the portion of your claim that exceeds what we have determined to be the reasonable charge."  Aetna claimed that the rate paid to Werner's Nonpar "was based on Reasonable Charges taking into consideration her type of specialty and her licensure."  It stated: "In order to determine the reasonable charge, we refer to statistical profiles of physicians' charges for the same or similar services in a geographic area."

268.    In explaining its decision denying her appeal, Aetna stated that "[t]he benefit payment" for the Nonpar service "will be determined according ... to the reasonable charge defined in the Glossary of the Booklet-Certificate," adding that the Glossary defines "Reasonable Charge" as follows:

> Reasonable Charge:
>
> Only that part of a charge which is reasonable is covered.   The reasonable charge for a service or supply is the lowest of:
>
> - the provider's usual charge for furnishing it; and
> - the charge Aetna determines to be appropriate, based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and
> - the charge Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished.
>
> In determining the reasonable charge for a service or supply that is:
>
> - unusual; or
> - not often provided in the areas; or
> - provided by only a small number of providers in the area;
>
> Aetna may take into account factors, such as:

- the complexity;
- the degree of skill needed;
- the type of specialty of the provider;
- the range of services or supplies provided by a facility; and
- he prevailing charge in other areas.

269.   Aetna attempted to justify its first level denial of Werner's appeal regarding the reduction in UCR for psychologists and social workers by stating:

> Effective with dates of service September 1, 2006 and after, a three tiered approach has been implemented for determining the allowed amount for out-of-network behavioral health services rendered by Nonparticipating providers.  This approach takes into consideration the licensure and/or education of the rendering provider.  As your Attachment A shows, Aetna changed its non-participating behavioral health provider reimbursement policy, which is not directly tied to any particular member plan design.  This change in policy is not a change to your plan.  The amount of $434 that you seek does not take into consideration the above information.

270.   Aetna's first level appeal denial further stated: "We are sorry our determination could not be more favorable; however, we are bound by the terms of the contract."

271.   Aetna's first level appeal denial also stated that "[a]t your request, we will give you free of charge access to copies of all documents, records, and other information about your claim for benefits, including the specific rule, guideline, protocol, or other similar criterion that was used in making the decision, and the names of any clinical reviewers if applicable." Werner's EOC contains the same representation (which is required by ERISA).

272.   On May 17, 2007, Werner requested a second level appeal, contesting Aetna's determination of UCR.  Werner contested how Aetna computed UCR, stating: "Aetna had failed to provide evidence that the reimbursement that they are allowing ($72) is in fact a reasonable reimbursement for the service provided in the Washington, DC metro area."

273.   Werner also disputed Aetna's reduction of UCR for LCSW services by 40%, stating: "Aetna has failed to demonstrate that this new reimbursement policy for non network

behavioral health providers is a reasonable reimbursement rate.   The fact that it has been implemented for in-network providers is not a demonstration that the methodology is reasonable."

274.   The second level appeal challenged Aetna's failure to notify Members of the mental health policy change, calling it "a material change to my healthcare policy and one that neither my plan nor its participants received notification of," and adding that "I only found your notice after extensive web research."   Werner's second level appeal further challenged Aetna's "sharp reduction in reimbursement for non network behavioral health services."

275.   Werner's second level appeal specifically requested copies of the following documents:

- Disclosure of all documents related to how Aetna calculates the reasonable charge for the type of service provided and licensure of the provider (LCSW) in the Washington, DC area, including market analysis, comparative data, and methodology in determining what is a reasonable charge;

- all relevant documents that Aetna sent to plan Members notifying plan Members of the change in the UCR determination for non network behavioral health providers including letters; distribution methods, dates, etc.;

- documentation from the master plan of the American Psychiatric Foundation (both 2006 and 2007) that demonstrates disclosure of your new reimbursement policy for non-network behavioral health providers; and

- data on Aetna's behavioral health network in the Washington, DC metro area, the number of providers that participate in the network by licensure, including the percentage of providers in the area that participate in Aetna's network.

276.   In violation of ERISA, Aetna did not provide Werner with the information she requested in her second level appeal.

277.   On June 6, 2007, Aetna denied Werner's second level appeal, stating as follows:

Aetna determines the extent of the plan's liability through use of the Ingenix Prevailing Health Care Charges System (PHCS). The PHCS is a statistical profile of provider's charges that has been developed for this purpose. The Ingenix PHCS collects provider charge data from more than 150 major contributors including commercial insurance companies and third party administrators. Data is collected for all 50 states, the District of Columbia, Puerto Rico and the Virgin Islands. Since physicians' fees reflect differing costs of doing business in various parts of the country, the PHCS recognizes these regional differences and uses the first three digits of the United States Postal Service zip codes to divide the charges into population areas based on cost-similar and geographically adjacent areas. There are 281 zip code areas for surgery and anesthesia and 334 for medicine, pathology and laboratory.

Fee information for the most recent twelve (12) month period is used as the basis for the profile which is the basic tool for reasonable and customary (R&C) determinations. The profile is updated semi-annually. At the time of the update, the latest information is released to all claim-paying personnel.

278.    Aetna determines reimbursement for Nonparticipating behavioral health providers as follows:

- Psychologist (allowed at 80% of the Reasonable and Customary/recognized charges)

- Social Workers, Licensed Profession Counselors, Marriage and Family Counselors, Psychiatric Nurse (allowed at 60% of the Reasonable and Customary/recognized charges)."

279.    Aetna's second level appeal denial stated that "[a]t your request, we will give you free of charge access to copies of all documents, records, and other information about your claim for benefits, including the specific rule, guideline, protocol, or other similar criterion that was used in making the decision" without acknowledging that Werner had, in fact, previously and specifically requested such documents. Aetna's second level appeal denial also failed to acknowledge that Aetna had, in fact, not provided documents that were specifically requested by Werner during the appeal process.

280.     Aetna's second level appeal denial stated that this was Aetna's "final decision."

281.     On July 2, 2007, Werner again requested documents from Aetna, including the "documents, records, and other information about my claim, specific rules, guidelines, protocols, and other similar criteria that were used in making the decision."  Plaintiff's July 2, 2007 letter referred to Aetna's second level appeal denial and asked for the "data from your PHCS system as you reference in your [second level appeal denial] letter."

282.     Once again, Aetna failed to provide Werner with the requested documents that it twice claimed it would furnish "free of charge" upon request.

283.     Aetna's appeal denials withheld material information, as detailed herein, that Aetna was obligated to disclose as a fiduciary.  First, Aetna did not disclose to Werner, until its final denial, that it had used Ingenix PHCS data to determine UCR.  Second, Aetna did not disclose that it had contributed pre-edited data to Ingenix and that Ingenix further corrupted the data reducing amounts in the Ingenix Database.  Third, Aetna did not disclose that the Ingenix data carne with a disclaimer that the data does not represent UCR, which disclaimer Aetna violated in representing to Werner that the Ingenix data was a "basic tool" reflecting UCR.  Fourth, Aetna did not provide the relevant evidence specifically requested by Werner during her appeals in violation of ERISA.  Fifth, Aetna falsely asserted that its tiering policy was consistent with Aetna's definition of UCR.  Sixth, Aetna falsely asserted that its tiering policy was not a material change to Werner's plan.  Seventh, Aetna falsely asserted that it was not required to provide advance notification to employers and Members, or make changes to plan documents, before adopting the UCR tiering reductions for behavioral health.

284.    Following her unsuccessful appeals to Aetna, Werner contacted the Bureau of Insurance for the Commonwealth of Virginia ("VA DOI") to complain about Aetna, and attached copies of her appeals.

285.    On July 6, 2007, the Managed Care Ombudsman for the Commonwealth of Virginia, Thomas Bridenstine ("Bridenstine"), sent Werner a letter stating that he had reviewed information supplied by Aetna and "there was no consistent explanation that clearly explained how your claims were paid."

286.    In his July 6th letter, Managed Care Ombudsman Bridenstine also stated:

> Although you were not successful in your appeal efforts, you provided a significant amount of information and I regret that Aetna was unable to provide a reasonable explanation for the methodology it used to determine the amount of money it would pay for your claims.

287.    On July 31, 2007, Aetna's Overpayment Recovery Unit in New Albany, Ohio sent letters to both Werner and to her Nonpar.  Aetna's letter to Werner (from Cindy Cook) informed her that Aetna's original UCR of $120 for four dates of service in October 2006 was too high, and the UCR should have been $72, and paid at 60%, or $43.20.  The letter found that Aetna should have paid a total of $172.80, rather than the $395.30 it paid.  It informed her that her coinsurance obligation for the four services was $115.20.  It advised her that if she did not refund the overpayment of $222.50 to Aetna by August 21, 2007, "we will refer the overpayment to a recovery service."

288.    Aetna's Overpayment Recovery Unit disregarded the fact that Werner had already satisfied her out-of-pocket maximum as of October 11, 2006, such that she did not owe any further coinsurance on Nonpar services rendered after October 11, 2006.

289.    Aetna sent Werner's Nonpar a similar letter dated July 31, 2007, which claimed an overpayment for a date of service in February 2007, for which reduction to 60% of the initial UCR had not been made.

290.    On September 11, 2007, Werner wrote to Cook and informed her that because Aetna's claims payment practices were being considered by the VA DOI, she would not consider refunding money until VA DOI's investigation was concluded.

291.    On September 14, 2007, Werner sent a letter with similar information to Aetna's Overpayment Recovery Service in Nashville, Tennessee.

292.    After a "cease and desist" letter from the Virginia DOI to Aetna, Aetna suspended its overpayment recovery actions, which included a referral to a collection agency.

293.    In a letter dated September 27, 2007, Aetna admitted to the Virginia DOI that the provider charges in the Ingenix Database cannot be distinguished by the provider's type of license.  In fact, all of the Ingenix data for a procedure code could potentially reflect the charges of LCSWs alone.

294.    Although Aetna's first level appeal denial on May 9, 2007 asserted that the "three tiered approach" reducing payment to Nonpar psychologists and social workers (and other licensed behavioral health professionals) was "effective with dates of service September 1, 2006 and after," Aetna, in fact, could not legally apply these tiering reductions as of September 1, 2006 (or through the current date) without making explicit, approved changes to its EOCs, SPDs, and other plan documents.  Without the required regulatory and employer approval, Aetna's unilateral UCR tiering reductions are null and void, and without effect.  Aetna's tiering policy also violates mental health parity laws.

295.    Aetna's 40% reduction in the UCR for LCSWs starting in the fall of 2006 resulted in significant unpaid benefits to Werner.  In addition, Aetna credited only the reduced amounts to her out-of-pocket maximum, delaying her ability to reach this maximum and shifting costs to her in contravention of her plan language.

296.    As of the fall of 2006, Werner's EOC and SPD did not change.  During this period, Aetna failed to notify Werner or her employer, the American Psychiatric Association, that N on- Par behavioral health benefits were being reduced and that a tiering approach would reduce the base UCR by 20% for psychologists and by 40% for other behavioral health professionals such as LCSWs.  Thus, Werner's ultimate responsibility for LCSW services was increased because Aetna was paying 60% of the 40% lower UCR rate of $72 rather than 60% of the prior UCR rate of $120.  During this time, Aetna's EOBs did not disclose the new tiering policy or its basis.

297.    Werner had to extensively research Aetna's claims payment policies on the Internet in order to locate Aetna's statement that it would reduce Nonpar behavioral health providers' UCR by 40% as of September 1, 2006.

298.    Under ERISA, Aetna could not reduce UCR to Nonpar behavioral health professionals without advance notification to Members and employer groups, along with corresponding changes to plan documents and required approvals.

299.    Werner's experience with appeals amply reflects both fiduciary violations and the futility of appeals to Aetna challenging UCR determinations, Aetna failed to provide documents it is legally obligated to provide under ERISA, and refused to disclose to her any information that would have permitted a successful appeal.  Aetna's appeal denials to Werner reflect a fixed,

systematic policy to apply UCR regardless of the flaws in the Ingenix Database, and regardless of Aetna's failure to comply with its plan language.

### 7.    Plaintiff Franco's ERISA Plan

300.    During the relevant Class Periods, Plaintiff Franco was an Aetna Member in a New Jersey large employer health plan through her employer.  The plan, which was fully insured and administered by Aetna, is known as the ACSA Trust.  Franco's health plan authorized her to use Nonpar providers, which Aetna promised to reimburse at UCR rates.

301.    Franco required complex facial surgery during the period she was fully insured by Aetna.  The facial surgery was intended to remedy injuries she suffered from the use of forceps at birth.

302.    Franco sought preauthorization for her surgery (originally scheduled for January 2004) with Aetna.  Her surgeon, Dr. Elliott H. Rose, submitted a very detailed preauthorization letter to Aetna on November 14, 2003, setting forth in meticulous detail the CPT codes he and Dr. Frederick A. Valauri, his co-surgeon, would be performing, along with the price they charge per code.  At the end of the pre authorization letter, Dr. Rose stated:

> On behalf of this patient, we request predetermination of benefits for the above CPT codes and delineation of unsatisfied deductible, co-insurance, etc., to allow her to understand her financial obligation.  If your established fees differ from the above UCRs, please notify the patient and my office administrator, Linda Ossias.

303.    On December 11, 2003, Franco received an approval from Aetna, notifying her that Aetna's "Decision" was "Authorized" as to each of the surgical services she was due to receive.  On December 19, 2003, Franco received another approval letter from Aetna, reiterating that as to each proposed item, "coverage for this service has been approved."

304.     On January 9, 2004, Aetna again authorized the facial surgery, and referred to its previous authorization of three days hospitalization.   Again, Aetna reiterated that its authorization process had been satisfied.

305.     Franco had complex facial surgery on February 2, 2004, performed by Dr. Rose and Dr. Valauri precisely as indicated in Dr. Rose's November 14, 2003 preauthorization letter.

306.     On March 18, 2004, Aetna issued an EOB stating that of the $4,500 billed for her eyelid procedure by Dr. Rose, Aetna was allowing $1,990, with $2,510 being considered as above UCR: "This portion of this expense which is greater than the reasonable and customary charge is not covered under your plan."  Aetna informed Franco that her "total responsibility" for the $4,500 charge was $3,107.

307.     On March 22, 2004, Aetna issued another EOB, stating that, of the $49,100 billed by Dr. Rose, Aetna was paying $6,141.98, and Franco's "total responsibility" was $42,958.02. Of the unpaid amount, $35,325.75 was considered by Aetna to be "greater than the reasonable and customary charge."

308.     Franco has made payments to Dr. Rose, her Nonpar, totaling at least $11,400.  Of that total, $10,000 was paid as part of a deposit for an initial, related surgery that was performed by Dr. Rose prior to Franco being insured by Aetna.  She paid out-of-pocket an additional $1,400 after she received her surgery from Dr. Rose while she was a member of an Aetna plan.  Franco paid out-of-pocket at least $3,170.73 that was attributable to the unpaid difference between UCR and the provider's billed charge.

### 8.     Franco's Exhaustion of Administrative Remedies

309.     On April 1, 2004, Dr. Rose filed an appeal with Aetna on behalf of Franco.  He explained the complicated nature of the facial reanimation surgery he performed on Franco,

along with his special expertise.  He noted that its UCR determinations contradicted Aetna's pre authorization, and left the patient financially responsible for over $46,000.

310.    On August 19, 2004, Aetna issued an EOB allowing an additional $466.02 for the free muscle flap procedure performed by Dr. Rose, stating that the remaining $23,533.58 was excluded as "greater than the reasonable and customary charge" for the procedure.  Aetna did not explain why it was allowing the additional amount, or why that procedure was underpaid in its original determination.    Aetna did not allow any additional reimbursement for the other procedures, and simply stated "based on the review our original decision has not changed." Aetna did not explain why it was adhering to its original determination regarding the other six procedures performed by Dr. Rose, or why additional reimbursement was not warranted.   Its EOB violated established appeal procedures which should have resulted from Dr. Rose's appeal, including a written decision and acknowledgement of the appeal.

311.    While Aetna issued the August 19, 2004 EOB, it did not provide any further response to the appeal Dr. Rose had submitted on Franco's behalf, nor did it offer or describe any further opportunity to pursue an additional appeal.  In particular, Aetna did not state that Dr. Rose or Franco could seek a second level appeal.  As a result, Aetna's new EOB paying an additional $466.02 represented a final denial of the appeal for any further benefits and thereby fully exhausted Franco's internal appellate remedies.

312.    On August 27, 2004, Aetna issued an EOB regarding the six procedures performed by the co-surgeon, Dr. Valauri.  Of the $30,275.00 billed by Dr. Valauri, Aetna allowed $8,960.  Aetna stated that more than $17,000 was "greater than the reasonable and customary charge."  Aetna further stated that Franco's "total responsibility" was $23,290.50.

313.    Aetna determined UCR for Franco using the dollar amount in the Ingenix database despite Aetna's approval and pre authorization of the billed charges.  Aetna's UCR determinations were not compliant with, and were contrary to Aetna's definition of UCR, were invalid for the reasons alleged herein, and violated ERISA.

### 9.    Plaintiff Smith's ERISA Plan and Exhaustion

314.    Paul and Sharon Smith are in a fully insured plan with Aetna through Mr. Smith's employer Croda, Inc.

315.    As an employee benefit, Paul Smith receives health insurance from Aetna for himself and his family, including his wife Sharon Smith.  When Sharon Smith submits a claim for benefits, Aetna is responsible for making the coverage determinations, issuing proper benefits and resolving any appeals of benefit denials or reductions.

316.    The Smiths' health plan with Aetna defines Reasonable Charge as: "an amount that is not more than the usual or customary charge for the service or supply a as determined by This Plan, based on a standard which is most often charged for a given service by a Provider within the same geographic area."  Aetna paid the Smiths reduced payment alleging R&C.

317.    In EOBs Aetna sent to Sharon Smith's provider, Aetna stated about its UCR determinations:

> The member's plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided.  In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas.  Aetna's determination of the prevailing charge does not suggest your fee is not responsible and proper or there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number shown on this statement.

318.    Mrs. Smith appealed and Aetna denied the appeal.

319.   Aetna also refused to consider certain appeals where litigation had been commenced.  For example, in a letter to her provider dated November 6, 2006, Aetna stated: "Dr. Grundy's letter specifically told you that in light of that litigation, we would engage in no further discussion with you about the Sharon Smith claims."

320.   Paul Smith commenced a pro-se small claims court action against Aetna regarding the adverse R&C determinations.  Aetna removed the action to federal court in New York.  Sharon Smith is not a party to that action.  Mr. and Mrs. Smith have elected to proceed with their claims in this class action, and will discontinue the New York action without prejudice to their participation as Class representatives.

**10.     Plaintiff Whittington's ERISA Plan and Exhaustion**

321.   Ms. Whittington resides in Moorpark, California.  She is a beneficiary of a self-insured plan provided to her husband by his employer, Amgen, Inc., that is administered by Aetna.

322.   Ms. Whittington's health plan defines R&C as:

"…. the lowest of:

- the provider's usual charge for furnishing it; and
- the charge Aetna determines to be appropriate, based on factors such as
- the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and
- the charge Aetna determines to be the Recognized Charge Percentage made for that service or supply."

323.   The 'Recognized Charge Percentage' is the charge determined by Aetna on a semiannual basis to be in the 90th percentile of the charges made for a service or supply by providers in the geographic area where it is furnished.

324.   In some circumstances, Aetna may have an agreement, either directly or indirectly through a third party, with a provider which sets the rate that Aetna will pay for a service or

supply.  In these instances, in spite of the methodology described above, the Recognized Charge

is the rate established in such agreement.

325.    In determining the Recognized Charge for a service or supply that is:

. . .

- unusual; or
- not often provided in the area; or
- provided by only a small number of providers in the area;

Aetna may take into account factors, such as:

. . .

- the complexity;
- the degree of skill needed;
- the type of specialty of the provider;
- the range of services or supplies provided by a facility; and
- the Recognized Charge in other areas."

326.    Aetna determines her claims and decided all her appeals.  Thus, Aetna is a

fiduciary and is responsible for the payment of additional benefits occasioned by a breach of

fiduciary duty.

327.    Ms. Whittington's 7-year old son requires ONET on an ongoing basis for various

special needs, including vision therapy.  Aetna has chronically and routinely denied and delayed

payment for his ONET.

328.    Ms. Whittington formally complained to Aetna regarding its "targeted,

discriminatory and illegal tactics" to avoid paying the out-of-network benefits owed for her son's

medically necessary treatments, including on several dates in 2008 and 2009.

329.    Ms. Whittington appealed R&C reductions after Aetna had advised her that the

R&C amount was $125 (which was her provider's billed charge).  Instead of allowing $125,

Aetna allowed $107, claiming that $107 was the R&C for 1 hour of vision therapy.

330.    In an appeal on December 26, 2008, Ms. Whittington complained of R&C reductions.  Aetna denied her appeal, and stated that no additional benefits were due.

331.    In a second appeal dated January 13, 2009, Ms. Whittington appealed various R&C reductions for vision therapy for her son.  Ms. Whittington challenged the R&C amount, stating there are no board-certified vision therapists within 25 miles of her home who charge less than the $125 charged by her son's therapist.  She stated:

> Based on this, it is clear to us that the abrupt reduction in Aetna's allowed amount represents an example of Aetna improperly calculating the usual, customary and reasonable fees of out-of-network providers with the intention of reducing the benefits reimbursed to the subscriber.  Please note that we are aware that Aetna is currently being investigated and charged in legal cases for similar types of illegal practices which violate ERISA, federal common law and federal claims procedures.  We urge you to reverse your first level appeal decision.

332.    Ms. Whittington also appealed to Aetna Member Services on January 5, 2009.

333.    In communications to Mrs. Whittington, Aetna denied her appeals but Aetna did not provide accurate explanations or relief to Ms. Whittington in response to her appeals.

334.    Because she and her son are likely to need ONET in the future, Ms. Whittington seeks not only payment for past services, but a declaration as to her future rights, which she is entitled to obtain under federal law.

### 11.    Plaintiff Samit's Individual Plan

335.    Carolyn Samit resides in East Hanover, New Jersey.  She is a member of a fully insured individual plan with Aetna.  She has experienced many Nonpar Benefit Reductions determined by Aetna, including for the infusion of drugs needed to keep her alive.

336.    Ms. Samit is a Medicare beneficiary in addition to being an Aetna beneficiary.

337.    Under her individual plan policy, Aetna defines R&C for individuals with two health plans as:

> An amount that is not more than the usual or customary charge for the service or supply as determined by Us, based on a standard which is most often charged for a given service by a Provider within the same geographic area.

338. On EOBs sent by Aetna to Ms. Samit, R&C reductions were explained with the following uniform explanation:

> Your plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided.  In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas.  Aetna's determination of the prevailing charge does not suggest your provider's fee is not reasonable and proper.  Your provider may bill you for this amount.  If there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number, or by writing to the address, shown on this statement.

339. On December 29, 2008, Ms. Samit appealed to Aetna for R&C reductions for drugs and drug supplies determined by Aetna between September 1, 2007 and August 29, 2008. These included appeals for CPT codes A4222, A4223, A4221, Jl642 and Jl644.

340. On January 13, 2009, Aetna denied her appeal, stating:  "Based on our review, the claims listed above were processed in accordance with the plan provisions and no additional payment is due."

341. In response to specific questions about the data used to determine UCR, Aetna stated: "It is our determination that the data available at the time of each date of service was correct."

342. Aetna explained its UCR amounts for various drugs and supplies, and upheld its determinations that the following amounts were not eligible for reimbursement based on its R&C allowances: $3,806 for code 11644; $1782.72 for A4223; $450 for 11642.  Based on R&C

reductions, Aetna refused to pay over $6,000 for Ms. Samit's drugs and supplies for the period

for the year between September 1, 2007 and August 29, 2008.

343.    Aetna admitted that it used Ingenix "PHCS to determine R&C.  It acknowledged

that when its R&C is less than the provider's charge, the "Covered Person may be held liable for

the full amount of the billed charge."

344.    Aetna represented to Ms. Samit that it uses the Ingenix "profile" as the "basic tool

for reasonable and customary (R&C) determinations" and that the "profile" reflects "for each

procedure within each of the population areas, the dollar value of the charge representing the

80th percentile.  This charge is the one, which is at least as great as 80% of all charges recorded

in that area for a given procedure."

345.    Aetna further represented to Ms. Samit:

>    PHCS (comprised of members from accident and health insurance
>    firms) holds insurance forums, promotes insurance industry issues,
>    and publishes statistical studies, law digests and information on
>    insurance regulations.  PHCS also compiled and distributes profile
>    information submitted from its member insurance carriers.

346.    Aetna vouched for the Ingenix Database information, stating:

>    PHCS profiles are collected from multiple insurance carriers.
>    There are 150 data contributors, which include commercial
>    insurance companies, third party administrators, Blue Cross and
>    Blue Shield, and some self-insured groups.  As a result, PHCS
>    profiles are based on a larger number of charges.  This larger
>    information base provides a more accurate representation of the
>    prevailing fee for a procedure within a specific expense area.

347.    The information Aetna provided to Ms. Samit in her appeal is false and

misleading.  It also omits material information which Aetna should have provided as a fiduciary.

348.    Aetna knew when it sent this letter that the Ingenix data does not reflect

"reasonable and customary determinations".  It does not collect "all charges recorded" in an area

for a given procedure.  PHCS does not have member firms.  It is, instead, a for-profit database of Ingenix which is a for-profit unit of UHG.

349.    At the time it made these misleading statements, Aetna had already agreed with Attorney General Andrew Cuomo to stop using the Ingenix Database.  See Assurance of Discontinuance entered into by Aetna with Attorney General Cuomo dated January 15, 2009.

350.    Aetna's appeal letter to Ms. Samit referred to the Ingenix data as a "profile." Aetna did not tell Ms. Samit that Aetna is the single largest data contributor to the Ingenix database, and that it failed to submit millions of valid high charges to Ingenix which it did not "profile" for inclusion in the Ingenix database.

351.    Although Ms. Samit had specifically requested "a copy of all data that was used in the above UCR determinations", Aetna provided no data to her.  Ms. Samit's appeal asked

352.    Aetna to "supply me with any known analyses that Aetna has performed about its cost savings from use of the data/method."  Aetna refused this request, stating that it had not used any cost savings information in making her claims determinations.

### 12.    Plaintiff Seney

353.    Subscriber Plaintiff Seney received ONET in 2005 when he was settled in a group health plan through his employer, Owens Coming, which was fully insured and administered by Aetna.  Pursuant to the terms of the Aetna plan, he was covered as an Aetna Member.

354.    Aetna relied on flawed and inappropriate data for making UCR determinations for Nonpar benefits as a result of its use of the Ingenix Database.  By relying on such improper data for making UCR determinations, Aetna breached its duties as set forth in its ERISA-governed plans and, as a result, it should be required to reimburse its Members who received reduced Nonpar benefits up to billed charges.

355.     Seney received UCR benefit reductions from Aetna in 2005 when he received health care services from a Nonpar.   A claim was submitted to Aetna on Seney's behalf in compliance with the terms of his health care plan, seeking payment of benefits as required under the Aetna contract.

356.     Seney subsequently received an EOB from Aetna concerning these health care services.   In the EOB, Aetna reported that it had excluded certain billed amounts.   Seney remained liable for the unpaid portion of the bill.

357.     Seney has made out-of-pocket payments to Nonpars that were in excess of the applicable deductible and coinsurance under his Aetna plan.   These sums were paid by Seney due to Aetna's improper Nonpar Benefit Reductions as detailed herein.

358.     The EOBs sent by Aetna regarding its Nonpar Benefit Reductions during the Subscriber Class Period did not comply with legal requirements, including federal claims procedure regulations.   The EOBs failed to advise Aetna Members of the specific reasons for the denial, the specific plan provisions, and their appeal rights.   Aetna's EOBs reflecting UCR determinations failed to advise Seney of the data Aetna used to calculate UCR.   Examples of Aetna's omissions of required disclosure on EOBs include the following:

- Absent or inadequate "Notes" describing Aetna's benefit reductions and failure to provide the required "specific" reasons for the disallowed amounts above UCR;

- The particular fee schedule or data or methodology used to determine UCR;

- Incomplete information about the appeal process and appeal rights;

- The characteristics (resulting in the invalidity) of the Ingenix Databases used to determine UCR;

- The disclaimer that accompanies Ingenix data;

- Aetna's manipulations of the data contributed to the Ingenix Database, and Ingenix's manipulations of the data from all contributors;

Aetna's use of certain Medicare rates that reduced benefits and left its Members financially exposed.

### 13.    Plaintiff Weintraub

359.    Plaintiff Jeffrey M. Weintraub is a resident of the State of New York.  During the Class Period, Plaintiff Weintraub participated in a "Student Health Insurance Program" sponsored by his University and defined as an "Aetna Open Choice PPO", underwritten by Aetna Life Insurance Company which is not subject to nor governed by ERISA.  As discussed further herein, Plaintiff Weintraub is not an ERISA class member.

360.    As a member of this Aetna health plan, Plaintiff Weintraub was provided a "Guide to Student Health Insurance and Healthcare at New York University" that sets forth the basics of Plaintiff Weintraub's Plan.   That document contains a Glossary where "Reasonable Charge" is defined as "[o]nly that part of a charge which is reasonable is covered.   The reasonable charge for a service or supply is the lowest of: the provider's usual charge for furnishing it; and the charge Aetna determines to be appropriate; based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and the care Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished."

361.    Plaintiff Weintraub was further provided with a "Student Health Insurance Handbook" that contains a "Summary of Benefits" section.   In that section, it is set forth that Plaintiff Weintraub was to be reimbursed 50% of the Reasonable Charge for certain ONS. In December, 2007, Plaintiff Weintraub visited Nonpar physician in New York, New York and submitted the claim through his health care plan.  Plaintiff Weintraub was reimbursed 50% of an

amount *less than* the actual charge because Aetna determined the "Reasonable Charge" to be a lesser amount.  Plaintiff Weintraub was forced to pay the remainder.

### 14.      Plaintiff Hull

362.     Plaintiff Hull is a resident of the State of Wisconsin.  At all times relevant to this Amended Complaint, Plaintiff Hull maintained health insurance through her spouse's employer, Citigroup, Inc. ("Citigroup").  Citigroup offered a variety of health insurance plans to its employees and their families, including the "ChoicePlan 500", of which his was a Member. The "ChoicePlan 500" offered by Citigroup was, at all times relevant to the Amended Complaint, administered by Aetna

363.     In conjunction with its health plans, Citigroup provided its employees with health plan documents, including a SPD.  That document contains a particular section entitled "ChoicePlan out of network features" which states that members of the plan are "covered at 70% of reasonable and customary charges" for ONET.

364.     The SPD specifically states that as a participant in the ChoicePlan 500, "you are entitled to certain rights and protections" under ERISA.

365.     The SPD further contains a definition of "Reasonable and Customary charge" as "Any charge that, for services rendered by or on behalf of a non-network physician, does not exceed the amount determined by the Claims Administrator in accordance with the applicable fee schedule.  As to all other charges, an amount measured and determined by the Claims Administrator by comparing the actual charge for the service or supply where the prevailing charges made for it.  The Claims Administrator determines the prevailing charge by taking into account all pertinent factors including the complexity of the service; the range of services provided; and the prevailing charge level in the geographic area where the provider is located and other geographic areas having similar medical cost experience."

366.    For all Choice Plans, including Plaintiff Hull's applicable Plan, Aetna is listed as the "Claims Administrator."

367.    On August 5, 2008, Plaintiff Hull underwent a series of medical tests by a Nonpar.   Plaintiff Hull used the mails to submit to Aetna her bills for such ONET for reimbursement.   Aetna submitted an evidence of coverage through the mails whereby it reimbursed Plaintiff Hull 70% of the costs of the "reasonable and customary" charge provided in the fee schedules of the Ingenix Database.  That amount was less than the actual charge incurred by Plaintiff Hull for the medical testing.  Plaintiff Hull was under-reimbursed by Aetna based upon the flawed fee schedules provided by Ingenix.

### B.    The Provider/Association Plaintiffs Were Systemically Underpaid By Aetna

### 1.    Dr. Darrick Antell

368.    Dr. Antell is a board-certified plastic surgeon and a Fellow of the American College of Surgeons who treats patients in health plans where Aetna pays claims for ONET services to beneficiaries and their assignees.  Dr. Antell is an ONET provider vis-à-vis Aetna.

369.    At all relevant times, Dr. Antell was not a member of Aetna's provider networks. Rather, when he provides health care services to Aetna subscribers, he does so as a Nonpar.

370.    To provide proper care and treatment for his patients, at both lower risks and lower prices, Dr. Antell has created a certified on-site, state-of-the-art Office Based Surgical ("OBS") facility.  Dr. Antell's OBS facility – which was originally incorporated as "850 Park Surgical," and is now incorporated as "Lenox Hill Ambulatory Surgery" – has received accreditation from the American Association for Accreditation of Ambulatory Surgical Facilities ("AAAASF") and the Joint Commission on Accreditation of Healthcare  Organizations ("JCAHO").  The AAAASF Certification sates that Dr. Antell's OBS facility was providing a certificate "for having met the standards of a CLASS C ambulatory surgical facility in which

major surgical procedures are performed under intravenous Propofol or general anesthesia with external support of vital body functions." The JCAHO certificate states that Dr. Antell's OBS facility "has been accredited" by the JCAHO, "which has surveyed this organization and found it to meet the requirements for accreditation."

371.    Dr. Antell has assumed substantial costs in establishing and maintaining his OBS facility, through which he provides the highest quality of care to his patients. As a result, as part of his customary and reasonable practice, Dr. Antell charges a "facility fee" for services he performs there to compensate him for the additional costs and effort of maintaining the facility. Dr. Antell bills facility fees separately from surgical fees. Facility fees are billed on a UB-92 form whereas surgical fees are billed on HCFA 1500 forms.

372.    Dr. Antell's OBS facility satisfies the requirements of the Public Health Law ("PHL") of the State of New York. Section 230-d of the Public Health Law defines Office-Based Surgery as follows:

> "Office-based surgery" means any surgical or other invasive procedure, requiring general anesthesia, moderate sedation, or deep sedation, and any liposuction procedure where such surgical or other invasive procedure or liposuction performed by a licensee in a location other than a hospital, as such term is defined in article twenty-eight of this chapter, excluding minor procedures and procedures requiring minimal sedation.

373.    Subdivision 2 of the PHL provides that physician practices in which office-based surgery is performed must obtain and maintain full accredited status. The accreditation requirements take effect 18 months from January 14, 2008, or on or before July 14, 2009. Both AAASF and JCAHO, which have accredited Dr. Antell's OBS facility, have been designated by New York State as accepted accrediting agencies under the PHL, along with the Accreditation Association for Ambulatory Health Care. As a result, Dr. Antell has satisfied all requirements

under New York law for maintaining, operating and performing surgical proceedings in his OBS facility.

374.     Dr. Antell receives assignments from Aetna Members.   These assignments indicate that Aetna should pay Dr. Antell directly.  Even in instances where Dr. Antell does not accept an assignment of benefits from Aetna beneficiaries, he has received their permission to pursue Aetna on their behalf for unpaid or underpaid claims.  Furthermore, Department of Labor regulations permit beneficiaries of ERISA-governed health care plans to have providers pursue such claims.   Those rules state that "[t]he [ERISA] claims procedures do not preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination."  29 CFR 2560.503-1(b)(4).

375.     While providing services to Aetna patients, Dr. Antell has repeatedly been subjected to reductions in reimbursements based on Aetna's representations that his bills are in excess of UCR.  In doing so, Aetna has relied improperly on the flawed and inadequate Ingenix Database, which fails to identify proper UCR rates.  As a result, Dr. Antell was systematically underpaid by Aetna.

376.     With respect to the UCR reductions Aetna imposed on Dr. Antell, any exhaustion of administrative remedies with respect the UCR determination would be futile, because Aetna, as a matter of policy, refuses to alter or reprocess claims that have been processed pursuant to the Ingenix Database.  Alternatively, Dr. Antell should be deemed to have exhausted any claims that otherwise were not exhausted, due to Aetna's inadequate disclosure concerning grievance procedures and its violation of ERISA and the applicable ERISA regulations.

377.     Among the procedures Dr. Antell performs is breast reconstruction.  Most of these procedures are performed on breast cancer patients after mastectomy.  One of Dr. Antell's

patients is a member of Aetna's Managed Choice POS plan which allows its members to use any out-of-network provider they choose.  This member is a 48-year old woman who needed breast reconstruction surgery following a mastectomy.  Dr. Antell performed the reconstruction in his OBS on October 28, 2008.

378.    On November 26, 2008, Dr. Antell submitted to Aetna on behalf of this patient appropriate HCFA 1500 and UB-92 forms along with operative reports.  The HCFA form contained charges for two CPT codes: 19366RT ($14,000) and 19318LT ($12,000).

379.    By EOB dated December 30, 2008, Aetna informed Dr. Antell that "the[] expenses require further review.  After we have completed our review, we will process this claim."  Dr. Antell received no further communication from Aetna.  On February 11, 2009, the patient contacted Aetna to inquire as to the status of the claim.  She was told that the procedure was not medically necessary.

380.    On February 20, 2009, Dr. Antell's staff contacted Aetna to dispute the assertion that the breast reconstruction was not medically necessary.  A customer service representative of Aetna told Dr. Antell's staff member that she would check into it and call back.

381.    On February 26, 2009, an Aetna representative contacted Dr. Antell to inform him that Aetna agreed that the surgery was not cosmetic and told the staff that she was not sure why the claim had been denied.  Aetna asked for copies of surgical notes to be faxed to the Aetna office.  Although the notes had already been submitted, Dr. Antell's staff faxed them again.

382.    On March 2, 2009, an Aetna representative informed Dr. Antell that one of the codes he had used on the HCFA form was invalid.  Dr. Antell's staff member asked to appeal this finding to a Medical Director.  After doing so, the Medical Director agreed the code was valid, apologized and said the claim would be processed within 30 days.

383.     By letter dated April 8, 2009, Aetna overturned its previous determination and stated that the two services described in the HCFA form "are eligible for payment" adding that "Aetna covers reconstructive surgery after the surgical treatment of breast cancer." Aetna stated that the claim was being reprocessed.   Despite this letter, by EOB dated April 14, Aetna informed Dr. Antell that one of the two surgical claims had been reprocessed and that both were denied because "[b]ased on the information received, these services were not provided."

384.     By EOB dated April 20, 2009, Aetna remitted payment to Dr. Antell in the amount of $9,658.90.   On the CPT 19366 RT code, Aetna allowed $9,500 out of the $14,000 billed.   On the 19318 LT code, Aetna allowed $4,500 out of the $12,000 billed.

385.     A remark next to the first CPT code stated: "The covered medical expense is based on an Aetna determination of a reasonable charge in the area or negotiated rate in the network for the services performed, as well as adjustment of procedure codes or application of multiple procedure percentage allowances.   You may bill the member for the difference between the submitted and paid charges."

386.     Remark codes next to the second CPT code stated that the claim had been reprocessed and that "The member's plan provides coverage for charges that are reasonable and appropriate as determined by Aetna.   This procedure has been paid at the reasonable and customary rate which is 50% of the single procedure rate due to multiple surgical procedures performed on the same date of service."   Thus, payments for the services provided to this Aetna member by Dr. Antell were reduced based on Aetna's determination of "reasonable charges."

387.     In addition to the UCR reduction, Aetna has also refused to reimburse Dr. Antell for his facility fees relating to surgeries performed in his OBS facility, claiming that he does not have a properly authorized facility.

388.   This determination not to pay fees is contrary to Aetna's own prior determinations, in which it had recognized Dr. Antell's OBS facility and agreed that he could provide services in that facility for Aetna patients.

389.   The American Society of Plastic and Reconstructive Surgeons, Inc. ("ASPRS") has similarly taken the position that facility fees for OBS facilities are proper and should be reimbursed.  As stated in a Position Paper of the ASPRS:

> It is the position of the American Society of Plastic and Reconstructive Surgeons that reimbursement of reasonable charges for facilities accredited by AAAAPSF, or other recognized and approved accrediting agencies, for reconstructive plastic surgery procedures can play a significant role in reducing the cost of health care in general.  This is supported by the fact that on an average, 60 percent of the procedures performed by plastic surgeons are reconstructive, as opposed to cosmetic.  It is recognized that over 50 percent of those reconstructive procedures can be safely performed in office-based facilities.

> * * * *

> A growing number of large and respected third-party payors have amended their existing policies or liberalized their policy interpretation and are now providing reimbursement for in-office facility charges.

390.   Based on information and belief, the patients' Aetna plans have no provision that health care services provided through an OBS facility, or that a facility fee charged for such services, would not be covered or reimbursed.

391.   Given that charging and being reimbursed for facility fees for services provided at an accredited OBS facility is generally recognized in the medical and insurance community, there is no basis for Aetna to deny coverage for Dr. Antell's facility fees.  Dr. Antell was entitled to charge his patient for the facility fee for his OBS facility and, under the terms and conditions of its health care plans, Aetna was obligated to pay such a fee as with UCR fees for Nonpar services.

392.     Dr. Antell has appealed Aetna's denial of coverage for his OBS facility, and has exhausted all available appeal procedures.  Moreover, any further appeals would be futile due to Aetna's firm practice of refusing to pay for OBS facilities used by Nonpars.

393.     Based on the foregoing, Dr. Antell seeks unpaid benefits pursuant to assignments from Aetna beneficiaries, on behalf of himself and all other similarly situated physicians who have been subjected to improper UCR reductions based on Aetna's reliance on the Ingenix Database or other undisclosed policies to set UCR rates.  Dr. Antell also seeks relief on behalf of himself and all other similarly situated physicians who have been denied coverage for facility fees for OBS facilities accredited by the accepted accreditation entities, including but not limited to the AAAASF and JCAHO.  As an assignee, he stands in the shoes of the beneficiary, and is entitled to enforce the terms of Aetna's health plan contract with the beneficiary.  He also seeks injunctive and declaratory relief preventing further use of the Ingenix data and enjoining Aetna's continued ERISA violations.

## 2.     Dr. Alan B. Schorr

394.     Plaintiff Dr. Schorr is an endocrinologist with a private practice in Langhorne, PA.  He is licensed to practice medicine in Pennsylvania and New Jersey, and is board-certified in Internal Medicine and Endocrinology, Diabetes and Metabolic Diseases.

395.     At all relevant times, Dr. Schorr was a Nonpar in Aetna's physicians' networks. Throughout the Provider Class Period, Dr. Schorr provided out-of-network healthcare services to Aetna plan enrollees, which account for approximately 10% of Dr. Schorr's inpatients annually. Dr. Schorr's experience with Aetna's unlawful business practices is typical of what has happened to the Provider Class as a whole.

396.     As an endocrinologist, Dr. Schorr specializes in treating disorders of the endocrine system, such as diabetes mellitus, hyperthyroidism and metabolic syndrome.  In

addition to routine patient care, Dr. Schorr regularly treats patients who are in a diabetic coma and require immediate medical attention.  These patients, for obvious reasons, are unable to choose their physicians as routine patients do.  At all relevant times, Dr. Schorr obtained a valid assignment of benefits from his inpatients through the hospital intake process.

397.    Throughout the relevant Class Periods, Dr. Schorr utilized a CMS 1500 form (or its equivalent), to submit claims for payment to Aetna.  Dr. Schorr's claims are routinely submitted electronically.  Once an electronic claim is submitted it passes through a clearinghouse before reaching Aetna.  All of Dr. Schorr's claims are submitted to Aetna using CPT codes, HCPCS, and modifiers, as necessary.  Dr. Schorr does not find out his compensation from Aetna for services rendered until after a procedure is performed and a claim for payment is submitted.

398.    At all relevant times, Dr. Schorr expected to be reimbursed by Aetna at the lesser of his billed charges or the current UCR rate.  While providing services to Aetna patients, Dr. Schorr was repeatedly subjected to reductions in reimbursements based on Aetna's representations that his bills are in excess of UCR amounts.  In making these improper determinations, Aetna relied on the flawed and inadequate Ingenix database as well as other improper methods for calculating what it considered to be "fair" rates, which fail to identify proper UCR rates.

399.    Rather than simply pay Dr. Schorr the lesser of his billed charges or UCR rates, Aetna instead routinely and deliberately reimbursed his claims at below UCR levels, requiring him to exhaust significant amounts of time and energy first identifying and then appealing improperly reimbursed claims.

400.    Aetna unlawfully diminished Dr. Schorr's compensation by improperly calculating UCR rates and then misapplying these rates to his claims.  Dr. Schorr's EOBs and

Remittance Advices state that "[t]he member's plan provides benefits for covered expenses at the reasonable charge as determined by Aetna, for the service in the geographical area where it is provided. In certain circumstances, especially where the service is unusual or not often provided in the geographical area, the reasonable charge may be determined by considering other factors, including the prevailing charge in other areas." Nowhere on the EOBs, Remittance Advices or elsewhere in any other correspondence sent to Dr. Schorr does Aetna discuss or identify how it actually calculates UCR. The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations. By concealing its methods for calculating UCR rates, Aetna has been able to derive improper rates using faulty data, and apply them to Nonpar claims in order to diminish lawful reimbursement.

401.    During the relevant Class Periods, Aetna also diminished reimbursement to Dr. Schorr by improperly paying for his services at a rate of "125% of Medicare," by misapplying a "Fee Schedule" to his claims, and by mistreating his claims as in-network despite the absence of a contract between Aetna and Dr. Schorr. Nonpars like Dr. Schorr should not be reimbursed for their services based on an arbitrary percentage of Medicare rates. Nonpars are entitled to the lesser of their billed charges or UCR rates, and thus are under no obligation to accept anything less as payment, even if Aetna represents that it is "fair." Nevertheless, Aetna's EOBs to Dr. Schorr routinely stated that "SVC PD AT 125% MDCR" and that Aetna "BELIEVE[S] THIS IS A FAIR PYMT." Moreover, according to Aetna's letter correspondence to Dr. Schorr, "[t]o determine the payment amount when a provider does not participate with Aetna and the plan does not define the applicable allowable amount, our responsibility is to pay a fair amount for your services. For your services, we set this payment at 125% of the Medicare allowable amount." Other than Aetna's conclusory assertion that this configuration constitutes "fair

payment" there is no basis or explanation for why 125% of Medicare is appropriate remuneration for Nonpar services or how this configuration of Medicare was derived in the first place.  The application of a percentage of Medicare rates to Nonpar claims is unlawful and has harmed Dr. Schorr and the other members of the Provider Class who have been subjected to this practice.

402.    Aetna has already been reprimanded by state regulators for its improper practice of determining UCR rates based on a percentage of Medicare rates.  On July 23, 2007, the State of New Jersey Department of Banking and Insurance ("NJDOBI") ordered Aetna to pay nearly $10 million for systematic unfair business practices related to Aetna's determination of UCR rates for Nonpar services rendered to New Jersey Aetna Members.  Specifically, the NJDOBI found that Aetna improperly calculated UCR rates by using a percentage of Medicare rates. Aetna's undisclosed and unauthorized use of Medicare rates to determine UCR left plan Members with large unpaid balances for which they were financially responsible.  Nonpars, as a result, were often unable to recoup their lawful reimbursement for services rendered.  Aetna's improper application of Medicare rates, resulting in the aforementioned fine, was not limited to New Jersey, but was employed by Aetna nationwide to the detriment of Nonpars like Dr. Schorr in the State of Pennsylvania.

403.    In addition to under-reimbursing Dr. Schorr at 125% of Medicare, Aetna routinely misapplied its own discounted fee schedules to Dr. Schorr's claims during the relevant Class Period.  Despite the absence of a contractual relationship between Dr. Schorr and Aetna, Aetna's EOBs regularly state that "THIS PAYMENT WAS MADE ACCORDING TO OUR FEE SCHEDULE."  By placing this language on its EOBs, which are sent to plan Members, Aetna gives the false impression that Dr. Schorr has agreed to accept payment in accord with Aetna's discounted fee schedules.  Aetna further confuses its plan Members by maintaining a zero

balance in the "Member Responsibility" column of these EOBs.  Making reference to Aetna fee schedules and indicating a zero member balance on EOBs results in significant hardship to Nonpars like Dr. Schorr when they seek to bill their patients for the amounts in excess of Aetna's payment, as the patients have been led to believe that their physicians have already been paid in full by Aetna.  This confusion makes collecting billed charges increasingly difficult for Nonpars like Dr. Schorr.

404.    In correspondence sent to Nonpars and plan Members, Aetna routinely justifies its methods of under-reimbursement stating that "we believe we have ensured that this is a fair payment for your service(s)."  By peppering its correspondence with language suggesting that Aetna has already remitted a "fair amount" or "fair payment" to the doctor, Aetna leads patients to believe that any bill received from the doctor above and beyond what Aetna has already paid is improper, unjustified, and unwarranted.  Aetna, at times, further instructs its plan Members not to pay "any amount above any applicable copayment, coinsurance, or deductible" for their treatment despite the fact that Nonpars like Dr. Schorr are not obligated to accept Aetna's payment as payment in full.

405.    All of Aetna's wrongful conduct described above has forced Dr. Schorr and members of the Provider Class to exhaust significant time and resources identifying and then appealing unlawfully reimbursed claims.  Upon identifying an improper payment for a claim, Dr. Schorr promptly appeals Aetna's determination by sending a formal letter asking Aetna to reprocess the claim for additional payment.  In addition to sending these appeals letters, Dr. Schorr makes telephone calls to Aetna to appeal the insurer's wrongful determinations.  Dr. Schorr has frequently exhausted any administrative appeals available through Aetna without

succeeding in obtaining full and proper reimbursement for his services, leaving a lawsuit as the only alternative.

406.    Moreover, when an appeal is left unsettled, Dr. Schorr often cannot collect for his services due to Aetna's failure to comply with its contractual obligations.

### 3.    Dr. Frank G. Tonrey

407.    Plaintiff Dr. Tonrey is an anesthesiologist with a private practice in Dallas, TX. He is licensed to practice medicine in Texas and Arizona, and is board-certified in Anesthesiology and Emergency Medicine.

408.    At all relevant times, Dr. Tonrey was a Nonpar in Aetna's physicians' networks. Throughout the Provider Class Period, Dr. Tonrey provided out-of-network healthcare services to Aetna plan enrollees.  Dr. Tonrey's experience with Aetna's unlawful business practices is typical of what has happened to the Provider Class as a whole.

409.    As an anesthesiologist, Dr. Tonrey administers anesthesia and manages the medical care of patients before, during, and after surgery.  Dr. Tonrey is called upon by surgeons, not patients, to assist in surgical procedures.  Thus in or out-of-network considerations generally do not apply.  At all relevant times, Dr. Tonrey obtained a valid assignment of benefits from his patients through the facility intake process.

410.    Throughout the relevant Class Periods, Dr. Tonrey utilized a CMS 1500 form (or its equivalent), to submit claims for payment to Aetna.  Dr. Tonrey's claims are routinely submitted electronically.  Once an electronic claim is submitted it passes through a clearinghouse before reaching Aetna.  All of Dr. Tonrey's claims are submitted to Aetna using CPT codes, ICD-9 codes, and modifiers, as necessary.  Dr. Tonrey does not find out his compensation from Aetna for services rendered until after a procedure is performed and a claim for payment is submitted.

411.   At all relevant times, Dr. Tonrey expected to be reimbursed by Aetna at the current UCR rate.   While providing services to Aetna patients, Dr. Tonrey was repeatedly subjected to reductions in reimbursements based on Aetna's representations that his bills are in excess of UCR amounts.   In making these improper determinations, Aetna relied on the flawed and inadequate Ingenix Database as well as other improper methods for calculating what it considered to be "fair" rates, which fail to identify proper UCR rates.

412.   Rather than simply pay Dr. Tonrey the lesser of his billed charges or UCR rates, Aetna instead routinely and deliberately reimbursed his claims at below UCR levels, requiring him to exhaust significant amounts of time and energy first identifying and then appealing improperly reimbursed claims.

413.   Aetna unlawfully diminished Dr. Tonrey's compensation by improperly calculating UCR rates and then misapplying these rates to his claims.   Dr. Tonrey's  EOBs and Remittance Advices state that "[t]he member's plan provides benefits for covered expenses at the reasonable charge as determined by Aetna, for the service in the geographic area where it is provided."   Nowhere on the EOBs or Remittance Advices does Aetna discuss or identify how it actually calculates UCR.   The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations.   However, in appeals correspondence sent to Dr. Tonrey, Aetna revealed that "[t]o determine the recognized charge, we refer to statistical profiles of physicians' charges for the same or similar services in a geographic area.   We use Ingenix Prevailing Healthcare Charges System (PHCS), formerly HIAA, an outside data sources for these profiles.   Ingenix PHCS is a nationally recognized source for data used to establish prevailing reasonable and customary fees.   Aetna sets the recognized charge fee at the 80th percentile of Ingenix PHCS data unless otherwise specified by the plan sponsor."   Through the

use of Ingenix, among other improper pricing methods, Aetna has been able to derive improper rates using faulty data, and apply them to Nonpar claims in order to diminish lawful reimbursement.

414.    During the Provider Class Periods, Aetna also diminished reimbursement to Dr. Tonrey by improperly paying for his services at a rate of "125% of Medicare" and by misapplying a "Fee Schedule" to his claims.  Nonpars like Dr. Tonrey should not be reimbursed for their services based on an arbitrary percentage of Medicare rates.  Nonpars are entitled to the lesser of their billed charges or UCR rates, and thus are under no obligation to accept anything less as payment, even if Aetna represents that it is "fair."  Nevertheless, Aetna's EOBs to Dr. Tonrey routinely stated that "SERVICES PAID AS REFERRED AND 125% OF MEDICARE ALLOWABLE OR AETNA MARKET FEE SCHEDULE," which Aetna calls "fair." Moreover, according to Aetna's letter correspondence to Dr. Tonrey, "[t]o determine the payment amount when a provider does not participate with Aetna and the plan does not define the applicable allowable amount, our responsibility is to pay a fair amount for your services.  We set this payment at 125% of the Medicare allowable amount." Other than Aetna's conclusory assertion that this configuration constitutes fair payment there is no basis or explanation for why 125% of Medicare is appropriate remuneration for ONET or how this configuration of Medicare was derived in the first place.  The application of a percentage of Medicare rates to Nonpar claims is unlawful and has harmed Dr. Tonrey and the other members of the Provider Class who have been subjected to this practice.  As detailed above, Aetna has already been reprimanded by state regulators for its improper practice of determining UCR rates based on a percentage of Medicare rates.

415.   In addition to under-reimbursing Dr. Tonrey at 125% of Medicare, Aetna routinely misapplied its own discounted fee schedules to Dr. Tonrey's claims during the Provider Class Period.  Despite the absence of a contractual relationship between Dr. Tonrey and Aetna, Aetna's EOBs regularly state that payment was made according to Aetna's market fee schedule.  By placing this language on its EOBs, which are sent to plan Members, Aetna gives the false impression that Dr. Tonrey has agreed to accept payment in accord with Aetna's discounted fee schedules.

416.   In correspondence sent to Nonpars and plan Members, Aetna routinely justifies its methods of under-reimbursement stating, in a conclusory fashion, that the methods result in "fair payment."   By peppering its correspondence with language suggesting that Aetna has already remitted a fair amount to the doctor, Aetna leads patients to believe that any bill received from the doctor above and beyond what Aetna has already paid is improper, unjustified, and unwarranted.

417.   All of Aetna's wrongful conduct described above has forced Dr. Tonrey and members of the Class to exhaust significant time and resources identifying and then appealing unlawfully reimbursed claims.  Upon identifying an improper payment for a claim, Dr. Tonrey promptly appeals Aetna's determination by sending a formal letter asking Aetna to reprocess the claim for additional payment.  In addition to sending these appeals letters, Dr. Tonrey makes telephone calls to Aetna to appeal the insurer's wrongful determinations.  Dr. Tonrey has frequently exhausted any administrative appeals available through Aetna without succeeding in obtaining full and proper reimbursement for his services, leaving a lawsuit as the only alternative.

418.    Moreover, when an appeal is left unsettled, Dr. Tonrey often cannot collect for his services due to Aetna's failure to comply with its contractual obligations.

### 4.    Dr. Carmen Kavali

419.    Effective July 15, 2005, Dr. Kavali entered into a Specialist Physician Agreement with Aetna and, as a result, became a member of the Aetna provider network.  On July 10, 2007, Dr. Kavali sent a certified letter notifying Aetna that she was terminating the contract and that she understood the termination would become effective ninety days after Aetna's receipt of the letter.  As a result, on or about October 11, 2007, Dr. Kavali was no longer a participant in the Aetna network and thus, with respect to Aetna, had the status of a non-participating physician thereafter.

420.    After October 11, 2007, Dr. Kavali has treated patients with coverage under plans covered or administered by Aetna on an out-of-network basis.  Dr. Kavali routinely obtains from her patients an assignment of benefits.  Customarily, before Dr. Kavali performs a procedure for these patients, her office staff will contact Aetna to confirm coverage, inquire about the basis upon which payment to her will be made, and ask for the amount of the payment so that the patient's share of the cost can be calculated.  Aetna, however, customarily refuses to explain the basis upon which payment will be made and will not disclose the amount that Dr. Kavali will receive.  Indeed, Aetna will not even confirm whether or not the payment will be based upon the usual and customary rate.  The only information that Aetna typically will disclose is the amount of the patient's co-insurance, the out of network deductible, and how much of the deductible has already been met.

421.    Once Dr. Kavali has provided medical services to an Aetna patient, she customarily sends to Aetna a bill using a CMS 1500 form or its equivalent describing the services with the appropriate CPT coding and informing Aetna of her charge for each service.  In

each instance, Dr. Kavali expects to be compensated for her services at the lesser of her billed charges or the amount provided under the patient's plan, which she understands is based upon a percentage of the applicable UCR rate.

422.    Customarily, after receipt of Dr. Kavali's bill, Aetna will send to her or to her patient an EOB that specifies the amount being paid for each of the services that were provided. The amount paid by Aetna with rare exception has been less than the billed charge.  Aetna has given various explanations for its decision not to pay the full amount, such as that the "member's plan provides benefits for covered services at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided" or that "payment [is] made according to allowable expenses for member's plan, less deductible and co-insurance."

423.    When Dr. Kavali or her staff has asked Aetna for a better or more complete explanation for why she has been paid less than her billed charges, no such explanation has been provided.  To the contrary, Aetna has been evasive or attempted to keep secret the basis upon which her bills have been discounted and, as a result, has prevented Dr. Kavali from learning the methodology it uses in calculating the amounts she is paid for rendering out of network services. However, based upon the reasons appearing on the EOBs and her knowledge of the relevant facts, Dr. Kavali believes that Aetna has reduced her bills based the applicable UCR rate as reflected in the Ingenix Database.

424.    By using the Ingenix data base to calculate the amount she receives for her services, Aetna improperly and unlawfully diminished the compensation to which Dr. Kavali is entitled.  Because she typically is unable to collect from her patients the full amount of her billed charges, Dr. Kavali was been injured monetarily as a direct and proximate result of Aetna's improper conduct.

425.    The EOBs issued by Aetna relating to the out of network patients treated by Dr. Kavali do not provide any procedures or process by which to appeal the amount of compensation.  The EOBs simply contain an address and provide a telephone number to call "for questions about this claim."  In addition, Aetna has told Dr. Kavali that it is not necessary to file a written appeal.  Dr. Kavali or her staff has telephoned Aetna to complain about the amount of compensation paid for a particular service without any success in obtaining additional payment.

426.    Any further appeal to Aetna regarding the amount of her compensation would have been futile as Aetna did not disclose and, indeed, concealed its use of the Ingenix Database to diminish payments based upon UCR rates and routinely asserted that it was paying the proper amount due under the patient's plan.  Further, it would have been inconsistent with Aetna's scheme to disclose to physicians such as Dr. Kavali as part of any appeal process that it was manipulating the calculation of UCR rates or to provide additional compensation to physicians as such additional payments would have constituted an admission of its improper conduct.

### 5.    Brian Mullins, M.S., P.T.

427.    Plaintiff, Mullins, is a licensed physical therapist who resides in Ocean Township, New Jersey and works in Neptune, New Jersey.  At all relevant times, Mr. Mullins was a Nonpar in Aetna's providers' networks.  Throughout the relevant Class Period, Mr. Mullins has been an out-of-network provider of physical therapy services to Aetna's Members.  Mr. Mullins's experience with Aetna's unlawful business practices is typical of what has happened to the Provider Class as a whole.

428.    Because he is not in Aetna's network of preferred providers, Mr. Mullins, as with other Class Members, typically obtains a claim assignment from his patients during the initial patient intake process, through which he is paid directly by Aetna for providing health care to its Members.  These claim assignments do not alter the legal relationship between Aetna and its

Members, but rather provides the convenience of allowing its Members to obtain needed health care on the implicit promise of later payment by Aetna.

429.    The assignment of benefit forms that Mr. Mullins and Provider Class Members obtain from their Aetna patients are security for future payment by Aetna and direct Aetna, as the patient's insurer, to pay the benefit claim direct to the Nonpar.  Mr. Mullins can and does check claim coverage and obtains pre-authorization from Aetna before performing services for Aetna's Members, but as with other Class Members, Mr. Mullins is not told Aetna's intended UCR reimbursement amount.  The only payment information that Aetna typically will disclose is the amount of the patient's co-insurance, the out of network deductible, and how much of the deductible has already been met.  Otherwise, payment is not known and is frequently not automatic – unlike the services Aetna has obtained for its Members.

430.    Mr. Mullins, like other Provider Class Members, submits his claims to Aetna using standardized procedural codes such as CPT Codes, HCPCS  Codes, and modifiers, as needed, on a HCFA form 1500 (n/k/a, CMS 1500).  These claims are submitted to Aetna either in paper form or electronically and may or may not be immediately processed by an electronic clearinghouse before reaching Aetna.

431.    Customarily, after receipt of Mr. Mullins' bill, Aetna will send to him or to his patient an EOB that specifies the amount being paid for each of the services that were provided.  In each instance, the amount paid by Aetna has been less than the billed charge.  Aetna gives generic explanations for its decision not to pay the full amount, such as that the "payment [is] made according to allowable expenses for member's plan, less deductible and co-insurance."

432.    The EOBs issued by Aetna relating to the out of network patients treated by Mr. Mullins  do  not  provide  any  procedures  or  process  by  which  to  appeal  the  amount  of

113

compensation.  The EOBs simply contain an address and provide a telephone number to call "for questions about this claim."  Because Aetna has been evasive and secretive regarding the basis upon which his bills have been discounted, Aetna has prevented Mr. Mullins from learning the methodology it uses in calculating the amounts he is paid for rendering ONET.  However, based upon the reasons appearing on the EOBs and his knowledge of the relevant facts, Mr. Mullins believes that Aetna has reduced his bills based upon application of the Ingenix Database or some other faulty methodology.

433.    At all relevant times, Mr. Mullins expected to be reimbursed by Aetna at the current UCR rate.  While providing services to Aetna patients, Mr. Mullins was subjected to reductions in reimbursements based on Aetna's representations that his bills are in excess of UCR amounts.  In making these improper determinations, Aetna relied on the flawed and inadequate Ingenix Database as well as other improper methods for calculating the proper UCR rates.

### 6.    Abraham I. Kozma, P.A.

434.    Chiropractic and Acupuncture Center of Sarasota provided Nonpar healthcare services to an Aetna subscriber that had been preauthorized by Aetna.  Chiropractic and Acupuncture Center of Sarasota is a Nonpar with regard to Aetna.

435.    On behalf of its Aetna covered patients, Chiropractic and Acupuncture Center of Sarasota submitted a HCFA 1500 Form to Aetna seeking benefits for the services that were provided.  Each service billed was designated by a separate CPT Code.

436.    After Chiropractic and Acupuncture Center of Sarasota submitted the appropriate forms for reimbursement, Aetna sent an EOB to Chiropractic and Acupuncture Center of Sarasota, thereby acknowledging the validity of its assignment, in which it reported on its

coverage determination for the services Chiropractic and Acupuncture Center of Sarasota provided to the patient.

437.    The EOB disclosed only that the Nonpar reimbursements were being paid at "prevailing" local rates or that at the reasonable and customary rates for its geographic area, or some other notation of UCR.

438.    At all relevant times, Chiropractic and Acupuncture Center of Sarasota expected to be reimbursed by Aetna at the lesser of its billed charges or the current UCR rate.

439.    However, Chiropractic and Acupuncture Center of Sarasota did not receive full payment for its billed charges from the Aetna subscribers.   Aetna unlawfully diminished Chiropractic and Acupuncture Center of Sarasota's compensation by improperly calculating UCR rates and then misapplying these rates to its claims.  Chiropractic and Acupuncture Center of Sarasota's EOBs often state that its billed charges purportedly exceed the UCR rate for the geographic area where the services were performed, Nowhere on the EOBs, however, or elsewhere in any other correspondence sent to Chiropractic and Acupuncture Center of Sarasota and its patients from Aetna discuss or identify how it actually calculates UCR.  The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations. With its methods for calculating UCR shrouded in a veil of secrecy, Aetna has been able to derive improper rates using faulty Ingenix data, and apply them to Nonpar claims in order to diminish lawful reimbursement.

440.    Further, any appeal to Aetna was likely futile as Aetna did not fully disclose all the relevant information, Aetna's appeal denials withheld material information, as detailed herein, that Aetna was obligated to disclose as a fiduciary.  Because Nonpars are unaware of the scheme that results in payors like Aetna failing to pay appropriate UCR rates, they are either

powerless to appeal any such improper determinations or their efforts to appeal these determinations are futile.

441.    Finally, Aetna's treatment of the appeals was contrary to ERISA and applicable regulations. It did not provide a "full and fair review." Because Aetna's appeal process violated procedural safeguards adopted in the ERISA regulations, any appeals are "deemed exhausted" by operation of law.

442.    Plaintiff Kozma seeks unpaid benefit amounts, treble damages and declaratory and injunctive relief for Aetna's conduct described herein, on its own behalf and on behalf of the members of the Class as defined herein.

### 7.    Maldonado Medical LLC

443.    Plaintiff Maldonado is a referred provider of DME and related services with its principal office located in Phoenix, Arizona.  Maldonado provides DME and related services to Aetna Members that have had such services prescribed by a physician as medically necessary. Maldonado does not participate in any of Aetna's health plans and at all relevant times has been a Nonpar of DME and related services with regard to all Aetna health plans.

444.    Maldonado obtains a valid assignment of benefits from Aetna Members, which allows Maldonado to bill Aetna directly and receive payment for physician prescribed DME and related services.  Maldonado also has Aetna Members execute a special power of attorney appointing the Center for Health Insurance Claims Advocacy ("CHICA") as its legal representative to facilitate the submittal of appeals related to Aetna's denial of claims or the reduction in benefit claims.  CHICA is a non-profit organization that assists Aetna Members and Maldonado in the appellate process.

445.    On behalf of Aetna Members, Maldonado submits claims to Aetna on a HCFA 1500 Form for prescribed DME and related services designating each specific DME and service

provided by HCPCS Code.  When Maldonado submits claims to Aetna, it specifically requests copies of all documentation Aetna relied on in denying and/or reducing benefit claims.  Aetna also inappropriately refers to Medicare rates, or a percentage thereof, as justification for its allowed rates.  At all relevant times, Maldonado expected to be reimbursed by Aetna at the lesser of its billed charges or a legitimate UCR rate.

446.    Aetna oftentimes completely fails to respond to Maldonado's submitted claims. When Aetna does respond, it does so by sending Maldonado an EOB that typically reflects reductions in benefit claims based on what Aetna represents to be charges Aetna has received for the same service, the local prevailing rates, its fee schedule, the recognized charge, UCR rates, or some other similar notation.  These EOBs do not provide the information that Maldonado requests with its submitted claims and provides insufficient information as to the methodology or source of data used in calculating the values Aetna represents as UCR rates.

447.    Upon receipt of these improper and/or insufficient EOBs, Maldonado seeks informal reconsideration of any denied and/or reduced benefit claims specifically requesting that Aetna provide copies of any information Aetna relied on in evaluating the claims and how UCR rates were calculated.

448.    Aetna provides misleading responses to Maldonado's requests for informal reconsideration.  For example, Aetna often fails to address all of the specific issues that reconsideration had been sought for, and fails to provide copies of the documents requested by Maldonado to justify its reimbursement determinations.  In its responses to Maldonado, Aetna also mischaracterizes Maldonado's request for reconsideration as a "final appeal" and titles its own response as a "Final Appeal Resolution."

449.    To the extent Maldonado is not satisfied with Aetna's resolution of disputed claims after informal reconsideration, Maldonado transfers patient files to CHICA and pays for all costs associated with CHICA's work conducting appeals on behalf of Maldonado and Aetna Members.  Aetna Members execute an Authorization of Representation designating CHICA as their legal representative to appeal Aetna's denial and/or reduction of benefits.

450.    CHICA submits first and second level appeals, as is necessary, and specifically requests all documentation relied on by Aetna in denying or reducing the benefit claims.  Aetna oftentimes fails to respond to CHICA's appeal of denied or reduced claims.  When Aetna does acknowledge appeals, it provides no documentation or meaningful explanation as to how the "recognized charge" is derived.  CHICA continues the appellate process until claims are settled or it receives a Final Appeal Decision which exhausts administrative remedies.

451.    In addition, any appeal was likely futile because Aetna failed to disclose all requested relevant information that it was obligated to disclose as a fiduciary.  Because Nonpars are unaware of the scheme that results in payors like Aetna failing to pay appropriate UCR rates, they are either powerless to appeal any such improper determinations or their efforts to appeal these determinations are futile.

452.    Aetna's treatment of appeals was contrary to ERISA and applicable regulations. It did not provide a "full and fair review."   Because Aetna's appeal process violated procedural safeguards adopted in the ERISA regulations, all such appeals are "deemed exhausted" by operation of law.

453.    Maldonado's experiences with Aetna are typical of the class of Nonpars. Maldonado has been forced to expend a considerable amount of time and resources responding to Aetna's unjustifiable denial and/or reduction of benefit claims.  Maldonado seeks benefit

amounts, its costs in pursuing inappropriately denied or reduced claims, treble damages and declaratory and injunctive relief for Aetna's conduct described herein, on its own behalf and on behalf of the members of the Class defined herein.

**C.    The Association Plaintiffs Have Been Directly Injured By Aetna's Conduct**

454.    The Association Plaintiffs have also been injured by Aetna's wrongful conduct. Aetna's wrongful conduct causes direct injury to members of the Association Plaintiffs by delaying, denying, impeding and reducing lawful compensation for ONET provided to Aetna's enrollees.

455.    Aetna's wrongful conduct also causes direct injury to the Association Plaintiffs because they have been, and continue to expend time and resources in dealing with Defendants' practices.  This frustrates the Association Plaintiffs' purpose which is to uphold the provider patient relationship and ensure the delivery of quality medical care to patients.

456.    As a result of Aetna's conduct, the Association Plaintiffs have been required to devote substantial time and resources to dealing with the issues concerning Aetna's wrongful out-of-network reimbursement practices. Specifically, the Association Plaintiffs devote significant time from several of its employees to deal with the practices at issue herein.  The Association Plaintiffs' efforts to counteract Aetna's unfair and deceptive practices include, *inter alia*, counseling their respective members on how to counteract the practices at issue, monitoring Aetna's practices, and advocating on their members' behalf.

457.    Provider Association Plaintiffs seek unpaid benefit amounts, trebled damages and declaratory and injunctive relief for Aetna's conduct described herein, on their own behalf and on behalf of the members of the Association Plaintiffs, and of the Provider Class as defined herein.

## X.      ANTITRUST ALLEGATIONS

458.    Aetna has committed, and conspired to commit, with its direct competitors including, *inter alia*,  UHG and CIGNA, and/or with other third parties numerous violations of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*  Aetna has combined, conspired and/or agreed with other parties to unreasonably restrain trade in *per se* violation of Section 1 of the Sherman Act by price fixing with regard to paying reasonable and customary rate for non-party transactions.

### A.      Interstate Commerce

459.    Defendants participate in, and affects, interstate commerce.

460.    Defendants' activities, including the administration and operation of health plans and managed care plans, in every state in the United States, are in the regular, continuous and substantial flow of interstate commerce, and have a substantial effect upon interstate commerce.

461.    Defendants' unlawful activities, concerted actions, conspiracy to restrain trade, and agreement to fix prices substantially affect and restrain the operation of interstate commerce.

### B.      Defendants Agreement To Fix Prices And Engage In Other Anticompetitive Conduct

462.    Aetna reached an agreement with its direct competitors, including Defendant UHG via its alter ego Ingenix and/or a number of other non-parties to determine UCR rates using primarily the Ingenix Database, as described above, even while knowing that use of the database would result in artificially low reimbursements to Subscriber and Provider Class members.  The above concerted action among these "competitors" and Co-Conspirators has resulted in unlawful and anticompetitive price fixing agreements, and other horizontal restraints of trade and anticompetitive behavior.  This unreasonable restraint on trade is a *per se* violation of Section 1 of the Sherman Act.

463.   UHG, via its alter ego Ingenix, facilitates the direct horizontal agreements through the compiling and sharing of competitive information and UCR rate data among all the Co-Conspirators.

464.   Defendants and their co-conspirators are horizontal competitors in the sale of health insurance with the out of network benefit.  These horizontal competitors have reached agreements, contractual or otherwise, in restraint of trade including agreements as to (i) to share data with Ingenix, and through Ingenix, each other (ii) what data points to include in the data provided to Ingenix, (iii) what geographic method of comparison to use in evaluating the data, (iv) agreeing to use the data as part of the claims adjustment process for out of network claims, and (v) other agreements related to implementing the goals and objectives of the conspiracy.

465.   As stated above, Aetna and other contributors to Ingenix are entitled to discounted use of the Ingenix Database simply for continuing to submit data at the level at which they submitted data when the database was owned by HIAA.

466.   UHG's ownership of the Ingenix Database and sharing of the database's compiled pricing data with each of its competitors is a textbook situation of adopting a benchmark for determining the price to be paid to Nonpars for out-of-network medical services.

467.   Defendants engaged in price fixing when they agreed with their Co-Conspirators, to utilize precisely the same flawed database to determine the UCR amounts for out-of-network medical services, which lead to them paying substantially the same reduced amounts for services rendered to their subscribers.

468.   Aetna's agreement also gives it, collectively with its competitors, tremendous power to set UCR rates well below those which would exist in a competitive marketplace.  In fact, no competitive pressure to raise UCR rates exists while all the conspirators act collectively

to reduce prices. Without agreement and collective action between them, including the exchange and compilation of relevant pricing data, Aetna would be unable to systematically and across the board reduce their UCR rates paid.  This agreement to fix prices is an unreasonable restraint on trade and a *per se* violation of Section 1 of the Sherman Act.

469.    The Department of Justice Antitrust Division notes in its Price Fixing "Primer" that price fixing agreement can take many forms. "[A]ny agreement that restricts price competitions violates the law."  It adds that "examples of price fixing agreements include those to:

      (a)     Establish or adhere to price discounts

      (b)     Hold prices firm

      (c)     Adopt a standard formula for computing prices

      (d)     Adhere to a minimum fee or price schedule

http://www.usdoj.gov/atr/public/guidelines/211578.htm

470.    Aetna, along with its Co-Conspirators, adopted a standard formula for making UCR determinations, based on a database that is designed and intended to reduce reported charges artificially, and each has agreed to a method of determining the maximum price or fee, via database schedule, that it will pay for out-of-network charges. This alone amounts to an agreement to fix prices.

471.    In addition to agreeing to price their UCR rates using the exact same database, which is inadequate for the purpose for which it is used, the insurers engage in behavior which facilitated the objections of the Company.  The insurers have substantially similar contracts with their customers in which all material provisions are the same; they all submit UCR rate data to the databases to be compiled; they are all aware that the data submitted leads to skewing the relevant UCR determinations downward; and they all utilize the Ingenix Database to determine

UCR rates.  These actions allow their price fixing agreement to effectively depress the UCR rates paid to Nonpars for services rendered to plan subscribers, and otherwise reduce competition among would-be competitors.

472.   Collusion, conspiracy and agreement are facilitated with an essentially homogenous product and with numerous opportunities for Aetna and its Co-Conspirators to agree and collude, including involvement and participation in the same trade associations and widespread availability of the Ingenix database.   Additionally, where pricing information is shared among the parties, defection from the agreement is easy to detect as it is there for all to see in the data contributed to Ingenix.

473.   The agreement between Defendants and their Co-Conspirators to fix and suppress prices also has the perverse effect of strong-arming doctors into becoming Pars of the various "networks" where further cost reducing measures and other methods of control can be imposed on healthcare providers.

474.   As noted above, it was only after investigation by the NYAG, in conjunction with a pending class action lawsuit, that UHG agreed that the database used to determine UCR must be independently maintained and that the agreement to fix prices using the database must be abandoned.

475.   The market for data used to calculate UCRs for reimbursement of subscriber claims for out-of-network, non-negotiated medical services in the United States ("Data Market") is directly linked to the market for the purchase of insured medical services acquired on an out-of-network basis ("Linked Market").  The Data Market constitutes a primary input to the Linked Market, which Aetna uses to effectively control reimbursement amounts.  The Linked Market is not subject to previously negotiated prices.  Once adopted, the UCR constitutes the critical

element in the reimbursement formula applied under each insurance plan and operates to cap the amount that will be reimbursed.  By agreeing to joint control and administration of the Data Market through their use and manipulation of Ingenix and its data products, Aetna and its Co-Conspirators are able to assure that prices paid in the Linked Market will be artificially depressed, leading to collective cost savings for Aetna and its Co-Conspirators, increased costs borne by its Subscribers who purchase out-of-network services, and increased losses borne by Nonpars who are unable to collect the standard charge for their services rendered to Aetna subscribers.

476.    Aetna and its Co-Conspirators conspired in the Data Market in order to create below-market UCRs ("False UCRs") and to artificially depress reimbursement rates for ONET. Ingenix functions as the conduit and switch that Aetna and its Co-Conspirators use to share prices and ultimately to fix UCRs.  The design and effect of the conspiracy is to artificially deflate reimbursement amounts for ONET.  As a result of the conspiracy, Aetna and its Co-Conspirators have shifted the costs of providing health insurance to the subscriber and provider plaintiffs.

477.    Defendants and their Co-Conspirators agreed through contracts, licenses and oral understandings to provide flawed pricing information to Ingenix and to obtain and use the resulting flawed Ingenix uniform pricing schedules to set ONET reimbursement, thereby depriving subscribers and providers of a competitive market for obtaining ONET.

478.    Further, Defendants and their Co-Conspirators agreed not to produce data to any other entity that would seek to provide data services used to calculate UCRs for determining ONET reimbursements.

479.     Given Ingenix's 80% market share, the sale of the PCHS database by HIAA, as well as agreements by and among Aetna and the Co-Conspirators that tie them to Ingenix, there is no viable competitor in the market for data services used to calculate UCRs.  Additionally, Ingenix's 80% share is indicia of the efficacy of conspiracy because it establishes the extent to which the Co-Conspirators have bought into the flawed database.

480.     Due to the agreement by Defendants and their Co-Conspirators to manipulate and use a limited number of data points which are used to set the uniform pricing schedules (False UCRs) which Ingenix disseminates and Aetna and others deploy, competition in the market for the provision of data services used to calculate UCRs is harmed.  In turn, competition in the Linked Market is harmed because of the agreement by Aetna and its Co-Conspirators to use False UCRs in order to reimburse for ONET.

481.     Were it not for the existence of the conspiracy to manipulate the Data Market, Aetna and its Co-Conspirators would each have an incentive to set UCR rates competitively or alternatively to use a fair system to determine UCR rates that accurate reflect standard charges by Providers.  Their failure to do so is a reflection of their collective self-interest and is an action taken directly contrary to their individual self-interests.

482.     Given the existence of the conspiracy, it is in Defendants and their Co-Conspirators' collective interest to conspire to provide inaccurate, artificially low health care provider charge information to Ingenix for use in its database.  As cartel members, it is contrary to their collective interests to provide accurate reimbursement rates to subscribers because each of the Co-Conspirators uses the Ingenix Database (*i.e.*, the uniform price schedules of False UCRs) for the calculation of reimbursement of ONET.  If any Co-Conspirator were to cheat on the cartel and provide transparent pricing information that accurately reported healthcare

provider charges, that accurate information would precipitate competition for ONET reimbursement, resulting in a loss of market share, revenue, and customers by cartel members.

483.    The Data Market is conducive to the collusion alleged herein.

484.    Aetna, Ingenix, UHG, and their Co-Conspirators jointly produce the data service used to calculate UCRs for reimbursement of claims by subscribers for out-of-network non-negotiated medical services.   Ingenix compiles and administers the Ingenix Database while UHG, Aetna, and their Co-Conspirators provide the raw data necessary for the Ingenix Database to compute and disseminate the uniform price schedules that UHG, Aetna, and their Co-Conspirators use to calculate ONET reimbursement.

485.    Today, the vast majority of health insurers have agreed to use the Ingenix Database to determine UCRs for reimbursing ONET claims.   Indeed, the UHG Defendants promote the Ingenix Database as the "industry standard" for determining UCRs, which insurance companies use to imbue their artificially low reimbursements for ONET with the appearance of legitimacy and accuracy.

486.    The Data Market has high barriers to entry.   The high barriers to entry include: the costs of obtaining historical and current insurers' data; the costs of constructing, developing, and maintaining hardware and software platforms necessary to aggregate, manipulate, and disseminate the data; and the costs of successfully convincing insurers to adopt the services.

487.    The cost and difficulty of obtaining historical data poses an exceedingly high barrier to entry, as it requires any new entrant to obtain such data from Ingenix, who controls the spectrum of relevant historical insurer data.

488.    The Data Market is a mature market, having been in existence and in the effective control of Defendants and their Co-Conspirators for decades.   There are few competitors and, as

described herein, the market has been marked by consolidation among those few competitors, such that Ingenix now provides the vast majority of data in this market.

489.    Defendants and their Co-Conspirators had, and continue to have, ample opportunities to communicate among themselves about the conspiracy and combination alleged herein, including the collection and dissemination of data used to establish the UCRs for calculating reimbursement for ONET, as well as at HIAA and now AHIP board meetings where Aetna was, and is, a board member and participated in meetings about the Data Market and the use of Ingenix by its Co-Conspirators.  Indeed, under the terms of the licensing agreements that govern the use of the Ingenix Database, UHG, Aetna, and their Co-Conspirators are in almost constant communication with Ingenix.

490.    Due to the lack of transparency in the determination of UCRs and ONET reimbursement as alleged herein, as well as a non-disclosure agreement by Aetna and its Co-Conspirators not to provide data to potential competitors of Ingenix, there is no competition among Defendants or their Co-Conspirators with respect to the determination of UCRs or the reimbursement of ONET.

491.    Every artificially suppressed UCR reported by Ingenix and adopted by Aetna has resulted in actual economic loss to one or both of the subscriber and provider classes.  The minimum amount of such loss is equal to the difference between the artificially suppressed rate and a correctly computed UCR  for the same procedure in the same locale, multiplied by the number of times that the procedure code has been used by Aetna to pay out-of-network claims in that locale during the class periods.  These losses have been shared between Subscribers and Providers, and such damages may be allocated among them.

### C.      Antitrust Injury

492.     Aetna's market power results from the combined power of its competitors, who also reached agreement to utilize the same database to determine UCR rates and whose role as primary payors or administrators gives them the power to impose artificially low UCR rates and other anti-competitive restrictions on doctors that could not exist in a competitive market.

493.     Competition among the payors has also been reduced by the agreement to improperly reduce UCR amounts.

494.     Without the agreement to fix UCR rates and reduce competition among payors, the Subscriber and Provider Plaintiffs and Classes would have been, and would have continued to be paid more for ONET.

495.     Defendants and their Co-Conspirators conspired in the market for the provision of data services used to calculate UCRs in order to create and fix UCRs to artificially depress reimbursement for ONET.  Ingenix functions as the conduit and switch Aetna and its Co-Conspirators use to share prices and ultimately to fix UCRs.  The design and effect of the conspiracy is to artificially restrain reimbursement amounts for ONET.  As a result of the conspiracy, Aetna and its Co-Conspirators have shifted the costs of providing health insurance to Plaintiff and the Classes.

496.     Defendants and their Co-Conspirators agreed through contracts, licenses and oral understandings to provide pricing information to Ingenix and to obtain and use the resulting flawed Ingenix uniform pricing schedules to set ONET reimbursement, thereby depriving Plaintiff and the Class of a competitive market for obtaining ONET.

497.    Further, Defendants and their Co-Conspirators agreed not to produce data to any other entity that would seek to provide data services used to calculate UCRs used to determine ONET reimbursement.

498.    Given Ingenix's 80% market share, the sale of the PHCS database by HIAA, as well as agreements by Aetna and the Co-Conspirators that tie them to Ingenix, there is no viable competitor in the market for data services used to calculate UCRs.

499.    Due to the agreement by Defendants and their Co-Conspirators to manipulate and use a limited number of data points which are used to set the uniform pricing schedules (UCRs) which Ingenix disseminates and Aetna and others deploy, competition in the market for the provision of data services used to calculate UCRs is harmed by this systematic manipulation of data.  In turn, competition in the inextricably linked market for the provision of ONET is harmed because of the agreement by Aetna and its Co-Conspirators to use the flawed UCRs in order to reimburse for ONET.

500.    As a result of the anticompetitive and deceptive conduct of Defendants and their Co-Conspirators alleged herein, resulting in artificially low UCRs and depressed ONET reimbursements, Defendants deprived the Subscriber and Provider Plaintiffs and Classes of a competitive market where they could obtain full reimbursement for ONET.

501.    Moreover, one effect of the Defendants' conduct is to reduce the choice that the subscriber consumers have in obtaining medical services, thereby reducing consumer welfare.

## XI.    DEFENDANTS' MISREPRESENTATIONS AND FRAUDULENT CONCEALMENT OF THE TRUTH

502.    To calculate their reimbursement amounts for ONET, Defendants and their Co-Conspirators use the Ingenix Database to determine their UCR rates.  The Ingenix Database functions as a data-laundering mechanism:  Ingenix utilizes billing information provided by its

parent company (UHG) and other health insurance companies, including Aetna, to calculate UCR rates that health insurers, including the entities which provided the data, then rely on and use to reimburse their Members' out-of-network claims.

503.   As described herein, Defendants and their Co-Conspirators combined to exert control over UCR rates used for reimbursing ONET by providing knowingly flawed data to Ingenix, which is then further manipulated or "scrubbed" by Ingenix.  Further, Defendants and their Co-Conspirators agreed through various contract and licensing agreements to use the flawed data, thereby depriving insureds, including Subscriber and Provider Class members, of a competitive market where they could obtain reimbursement for ONET.   Defendants' conspiratorial manipulations yield artificially low UCR rates, resulting in artificially low ONET reimbursements and higher out-of-pocket expenses for Members.

504.   UHG, Aetna and their Co-Conspirators jointly produce the False UCRs.  Ingenix compiles and administers the Ingenix Database while UHG, Aetna and the Co-Conspirators provide the raw data necessary for the Ingenix Database, as the benchmark for the false UCRs, which in turn are used by Aetna for determining reimbursement for ONET.

505.   The effect of Defendants' unlawful conduct and misrepresentations on consumers, including Subscriber and Provider Plaintiffs, is profound.   Overall out-of-pocket costs of healthcare insurance and choice of provider are the two most important aspects of healthcare to consumers.   Defendants' conspiracy and misrepresentations affect both of these aspects of healthcare since Defendants represent through their advertising and plan contracts that they will permit their Members to choose between in-network and out-of-network providers and that Members will be reimbursed based on the UCR for ONET.   Nevertheless, Defendants do not reimburse for ONET based on the UCR, instead utilizing reimbursement rates that they know are

artificially deflated, thereby increasing the costs to consumers of using ONET and deterring consumers from freely choosing between in-network and out-of-network providers. By affirmatively misrepresenting the extent to which they will reimburse for ONET and the extent to which consumers can choose between in-network and out-of-network providers, and by failing to disclose that reimbursement for ONET is calculated based on False UCRs, Defendants have deceived Subscriber and Provider Plaintiffs and the other members of the Classes.

506.    The relationships between Aetna, UHG, their Co-Conspirators and Ingenix are rife with inherent conflicts of interests against insureds, including Class members, that inhibit the construction of a rigorously defined and audited database necessary to determine fair and accurate UCR rates.  Insurers, such as Aetna, who have a contract with Ingenix, are incentivized to provide flawed claims data which will result in lower UCR rates in order to pay lower reimbursements for ONET.  Furthermore, Ingenix offers insurance companies that provide data to Ingenix, such as Aetna, a discounted rate for use of the database, thereby creating further incentive to provide flawed data, and highlighting the collusive and unfair nature of this unlawful scheme.  Given the conspiracy to construct and use flawed data and employ inaccurate UCR rates, neither Aetna, UHG, its other Co-Conspirators, nor Ingenix, have any incentive to prevent or investigate the risk of biased, inaccurate data.  In fact, Ingenix has an incentive to do the opposite because, by turning a blind eye to the quality and reliability of the data submitted to it, and then manipulating the data to support artificially low UCR rates, Ingenix can both support its parent company by assisting UHG to perpetuate low reimbursement rates for out-of-network claims (up to 10% of total claims submitted to UHG) and maintain its dominant market position as the data provider for its health insurance company clients/participants

507.    Defendants and their Co-Conspirators actively conceal, and caused others to conceal, information about the true UCR rates for ONET, including the fact that UCR rates used by Defendants and their Co-Conspirators are deliberately understated, knowing the success of the high-profit scheme will be jeopardized if anyone discloses the significantly higher true average costs.  Defendants and their Co-Conspirators not only operate Ingenix as a "black box" such that Members of Defendants' and their Co-Conspirators' health plans, including Plaintiff, have almost no ability to determine precisely how Ingenix calculates UCR rates, but Defendants and their Co-Conspirators also typically do not disclose that they either use Ingenix to calculate the UCR rate or that Ingenix is wholly-owned by an insurance company.

508.    Each Defendant and Co-Conspirator concealed its fraudulent conduct from Subscriber and Provider Plaintiffs and the members of the Classes (as set forth below) by conspiring to manipulate the process by which reimbursement rates were set.  Defendants and their Co-Conspirators also prevented Subscriber and Provider Plaintiffs and the members of the Classes from knowing or discovering the actual methodology used by Ingenix to determine the UCR rate.  As the Senate Report summarized President of the AMA Dr. Nancy Nielson's testimony, "when doctors asked insurers how they had calculated their 'usual and customary' rates, they were told that information was 'proprietary.'"  Moreover, the fraudulent conduct alleged herein was of such a nature as to be self-concealing.

509.    Among consumer decisions, the selection and purchase of health insurance is of vital importance.  When considering health insurance policies, consumers are entitled to accurate information.  In addition, and especially considering the skyrocketing cost of insuring oneself and one's family, consumers are entitled to the full value of their premiums.

510.    Defendants and their Co-Conspirators have inflicted significant financial harm on their Members.  Overall healthcare costs in the United States comprise over fifteen percent of the country's Gross Domestic Product.  A significant percentage of claims submitted to Defendants and their Co-Conspirators are for ONET.  Subscriber Plaintiffs and members of the Subscriber Classes paid for out-of-network coverage, obtained services from providers outside of the Aetna network, and had the right to reimbursement under the terms of their policies, including a fair and accurate calculation.

511.    As a result of the conspiracy, Subscriber Plaintiffs and the members of the Classes paid Aetna higher premiums for out-of-network coverage and then received lower reimbursement for ONET than they would have received in a competitive market place.

512.    Any applicable statutes of limitations have been tolled by Defendants' and their Co-Conspirators' knowing and active concealment and denial of the facts alleged herein.  Aetna and Co-Conspirators went to great lengths to conceal the existence of the conspiracy and its material terms.

513.    Defendants and their Co-Conspirators were, and continue to be, under a continuing duty to disclose to Subscriber and Provider Plaintiffs and the Classes the fact that their reimbursement rates for out-of-network medical expenses were based on UCR rates that bore, and continue to bear, no relationship to the actual charges for those medical expenses. Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the UCR rates, Defendants and their Co-Conspirators are estopped from relying on any statutes of limitations.

XII.   **CLASS ACTION ALLEGATIONS**

A.     **Subscriber Plaintiff Class Actions**

1.     **Class Definitions**

514.   Subscriber Plaintiffs Werner, Franco, Hull, Smith, Seney, and Whittington bring

this action on their own behalf and on behalf of an "Subscriber ERISA Class," defined as:

> All persons who are, or were, from July 30, 2001 through the
> present ("ERISA Class Period"), Members in any group healthcare
> plan insured or administered by Aetna, subject to ERISA (other
> than New Jersey small employer plan Members), who received
> hospital or medical services or supplies from a Nonpar provider (or
> any provider Aetna considered Nonpar for purposes of paying
> benefits) for which Aetna (or any third party acting on behalf of
> Aetna) allowed less than the provider's billed charge in
> determining benefits.

515.   Subscriber Plaintiffs Cooper and Samit bring this action on their own behalf and

on behalf of a "Subscriber New Jersey SEHP and Individual Plan Class," defined as:

> All persons who are, or were, from July 30, 2001 through the
> present ("New Jersey SEHP and Individual Plan Class Period")
> Members in any New Jersey small group healthcare plan insured or
> administered by Aetna, subject to ERISA, and Members of
> Individual Plans insured or administered by Aetna not subject to
> ERISA who received hospital or medical services or supplies from
> a Non-Par provider (or any provider Aetna considered Nonpar for
> purposes of paying benefits) for which Aetna (or any third party
> acting on behalf of Aetna) allowed an amount less than the
> provider's billed charge in determining benefits.

516.   All of the Subscriber Plaintiffs bring this action on their own behalf and on behalf

of a "Subscriber RICO Antitrust Class," defined as:

> All persons who are, or were, from March 1, 2001 through the
> present ("RICO Class Period"), Members in any healthcare plan
> (ERISA or non-ERISA) insured or administered by Aetna who
> received hospital or medical services or supplies from a Nonpar
> provider (or any provider Aetna considered Non-Par for purposes
> of paying benefits) for which Aetna (or any third party acting on

behalf of Aetna) allowed an amount less than the provider's billed charge in determining benefits, based on the use of the Ingenix Databases.

517.　All of the Subscriber Plaintiffs, except for Plaintiff Weintraub, further bring this action on their own behalf and on behalf of a "Subscriber RICO Section 664 Subclass," defined as:

> All persons who are, or were, from March 1, 2001 through the present ("RICO Section 664 Subclass Period"), Members in any healthcare ERISA plan insured or administered by Aetna who received hospital or medical services or supplies from a Nonpar provider (or any provider Aetna considered Non-Par for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed an amount less than the provider's billed charge in determining benefits, based on the use of the Ingenix Databases.

518.　Additionally Plaintiff Weintraub further bring this action on his own behalf and on behalf of a "Subscriber New York Damages Class," defined as:

> All persons or entities residing in New York who paid premiums for out-of-network health insurance coverage from Aetna and received reimbursement for ONETs between April 29, 2004 and the present.

519.　Plaintiff Weintraub brings this action on his own behalf and on behalf of a "Non-ERISA Class" defined as follows:

> All persons who, are or were, from April 29, 2004 through the present ("Non-ERISA Class Period") Members in any plan insured or administered by Aetna, which was not subject to nor governed by ERISA, who received hospital or medical services or supplies from a Non-par provider for which Aetna (or any third party acting on behalf of Aetna) allowed less than the provider's billed charges in determining benefits.

**2.　Common Class Claims, Issues And Defenses For The Subscriber Classes**

520.　The following common class claims, issues and defenses for Subscriber Plaintiffs and the Subscriber Classes arise for the defined Class Periods:

135

(a)     Whether Aetna's use of the Ingenix Databases to calculate UCR in determining Nonpar reimbursement breached Aetna's legal obligations to its Members' group health plans;

(b)     Whether Aetna's Nonpar Benefit Reductions described in this Amended Complaint violated ERISA, or other applicable law;

(c)     Whether ERISA requires each Class Member to prove exhaustion or otherwise provide a basis for excusing exhaustion; or other relief;

(d)     Whether Aetna's alleged fiduciary violations, if proved, justify injunctive relief;

(e)     Whether Class Members (including those who assigned claims) may recover unpaid benefits;

(f)     Whether Aetna's failure to provide accurate plan documents upon request, including EOCs and SPDs and other information, entitles Class members to any relief;

(g)     Whether, in addition to unpaid benefits, interest should be added to the payment of unpaid benefits under ERISA;

(h)     Whether Aetna's claims review procedures comply with ERISA;

(i)     The standard of review applicable to review Aetna's Nonpar Benefit Reductions;

(j)     The identity and scope of the ERISA and non-ERISA plans subject to this Amended Complaint;

(k)     Whether Aetna violated its fiduciary or other legal duties owed to its Members when it made its Nonpar Benefit Reductions or otherwise engaged in the conduct alleged in this Amended Complaint;

(l)     Whether Aetna's EOBs and other communications with its Members violated ERISA or other applicable law;

(m)     Whether the Court's interpretation of the ERISA plans at issue must be guided by the state regulators' interpretation of such plans;

(n)     What are the applicable statute of limitations periods for the claims of Class members and whether Defendants' concealment of material facts bars Aetna from asserting any statute of limitations defense;

(o)     Whether Aetna's calculation of Members' deductibles and out-of-pocket maximums violate plan language and applicable law;

(p)     Whether Aetna violated the SEHP and individual plan Regulations for all New Jersey Members, including by underpaying hospital, medical, dental and other claims;

(q)     Whether Aetna's, UHG's and Ingenix's manipulation of, and the structural deficiencies in, the Ingenix Databases prevent Aetna from relying on the New Jersey Regulation as a defense;

(r)     Whether Aetna violates the prudent layperson standard or other law by its Nonpar ER payment reductions or otherwise;

(s)     Whether Defendants engaged in a pattern of racketeering activity, as defined by RICO, by and through the conduct of the Aetna-Ingenix Enterprise described in this Amended Complaint;

(t)     Whether Aetna Members can enjoin the UCR tiering reductions for behavioral health services provided by psychologists, LCSWs and other mental health professionals and enjoin the dunning letters and collection referral threats made in conjunction with its unauthorized UCR tiering policy;

(u)   Whether Aetna Members in New Jersey SEHP and individual plans are entitled to receive unpaid amounts for all Nonpar hospital or medical services or supplies for which Aetna underpaid in violation of the SEHP and individual plan Regulations;

(v)   Whether Defendants and their Co-Conspirators engaged in a pattern of deceptive conduct as to Plaintiff and the members of the Classes;

(w)   Whether Defendants and their Co-Conspirators engaged in a contract, combination or conspiracy to fix UCRs;

(x)   The duration and extent of the combination or conspiracy alleged herein;

(y)   Whether the alleged combination and conspiracy violated Section 1 of the Sherman Act; and

(z)   Whether the alleged actions violated GBL § 349.

### 3.   Additional Subscriber Class Action Allegations

521.   The members of the Classes are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of hundreds of thousands of Aetna Members in commercial group health plans insured, offered, or administered by Aetna. The precise number of members in the Class is within Aetna's custody and control. Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied for the Class. For example, there are over 500,000 Aetna Members in New Jersey alone. Nationwide, there are hundreds of thousands of Aetna Members in ERISA and non-ERISA group health plans subject to the allegations of this Amended Complaint.

522.   Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class, including the class action claims, issues and defenses listed above.

523.     The named Subscriber Plaintiffs' claims are typical of the claims of the Class members because, as a result of the conduct alleged herein, Aetna has breached its statutory and contractual obligations to the Subscriber Plaintiffs and the Subscriber Class through and by uniform patterns or practices as described above.

524.     Subscriber Plaintiffs Cooper, Werner, Franco, Smith, Weintraub, Hull, Seney and Whittington, will fairly and adequately protect the interests of the members of the Subscriber Classes, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class action litigation and in the prosecution of ERISA and RICO claims and have no interests antagonistic to or in conflict with those of the Class. For these reasons, the Subscriber Plaintiffs are adequate class representatives.

525.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Aetna.

526.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, because the unpaid benefits denied Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them. Aetna maintains computerized claims information that enables it to calculate unpaid amounts resulting from Nonpar Benefit Reductions for Class Members. Given the uniform policy and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

**B.     Provider Plaintiffs' Class Allegations**

**1.     Provider Class Definitions**

527.    The Provider Plaintiffs bring this action on behalf of themselves and all others

similarly situated under Rule 23 of the Federal Rules of Civil Procedure.  The requirements of

subparts 23(a) and (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure are met.  The

Individual Provider Plaintiffs bring this class action on behalf of a Class, defined as:

> All Nonparticipating healthcare providers within the boundaries of
> the United States of America, who provided services to any
> member of any Aetna insured or administered health plan, at any
> time during the period June 3, 2003 through the date of
> certification and were paid less than their billed charge for such
> "out-of-network" medical services.

528.    The Provider Plaintiffs also bring this action on their own behalf and on behalf of

a Provider ERISA Subclass defined as follows:

> All non-participating healthcare providers, within the boundaries
> of the United States of America, who provided services to any
> member of any Aetna insured or administered group health plan
> subject to ERISA, at any time during the period June 3, 2003
> through the date of certification and were paid less than their billed
> charge for such "out-of-network" medical services.

529.    Excluded from the Provider Class and the Provider ERISA Subclass are any

judge(s) or justice(s) to whom this action is assigned, as well as any relative of such judge(s) or

justice(s) within the third degree of relationship, and the spouse of any such person.

## RULE 23(A)

## Numerosity

530.    The Provider Class includes thousands of Nonpar healthcare providers throughout

the United States and is therefore so large to make joinder of all members impracticable within

the meaning of Fed. R. Civ. P. 23(a)(1).

## Commonality

531.     Pursuant to Fed. R. Civ. P. 23(a)(2), there are questions of law or fact common to all Provider Class members, including, but not limited to, the following:

(a)     Whether the amounts paid to the Provider Classes, have been fixed, artificially maintained, and/or stabilized by Defendants and others;

(b)     Whether Aetna's use of the Ingenix database or its other Nonpar pricing methods to calculate UCR rates violated ERISA, RICO, or the Sherman Act;

(c)     Whether Aetna's Nonpar benefit reductions violated ERISA, RICO or the Sherman Act;

(d)     Whether Aetna's use of the Ingenix database itself resulted in lower UCR determinations than were otherwise available based on appropriate information;

(e)     Whether Aetna's failure to properly disclose the specific reason for UCR and Nonpar pricing methods in its EOBs as well as failure to disclose material information (including the offer to disclose the relevant evidence) violated ERISA or RICO;

(f)     Whether ERISA requires each Provider ERISA Subclass member to prove exhaustion or futility;

(g)     Whether Aetna violated RICO and, if so, the appropriate relief to be awarded;

(h)     Whether Aetna, UHG and Ingenix combined, conspired and/or agreed with their Co-Conspirators in a price fixing conspiracy that sought, and was able, to artificially lower, fix or maintain the price paid to Subscriber Plaintiffs and the Subscriber Class and derivatively to the Provider Plaintiffs and the Provider Class by Aetna as UCR rates in violation of the Sherman Act; and

(i)     Whether interest should be added to the payment of unpaid benefits.

**Typicality**

532.    The claims of the Provider Plaintiffs are typical of the claims of the defined

Provider Classes, within the meaning of Fed. R. Civ. P. 23(a)(3), and are based on and arise out

of the same uniform and standard illegal practices of the Defendant alleged by the Provider

Plaintiffs.   The proposed Provider Class representatives state claims for which relief can be

granted that are typical of the claims of absent Provider Class members.   If litigated individually,

the claims of each Provider Class member would require proof of the same material and

substantive facts, rely upon the same remedial theories, and seek the same relief.

**Adequacy**

533.    The Provider Plaintiffs are committed to pursuing this action and are prepared to

serve the proposed Class in a representative capacity with all of the obligations and duties

material thereto.   The Individual Provider Plaintiffs will fairly and adequately represent the

interests of the members of the class within the meaning of Fed. R. Civ. P. 23(a)(4) and have no

interests adverse to, or which directly and irrevocably conflict with, the interests of the other

Provider Class members.

534.    The Provider Plaintiffs have retained competent counsel experienced in class

action litigation.   Said counsel will adequately prosecute this action, and will assert, protect and

otherwise well represent the named Provider Class representatives and absent Provider Class

members.

**RULE 23(B)(1)(A) and (B)**

535.    The prosecution of separate actions by individual Provider Class members would

create a risk of adjudication with respect to individual Provider Class members which would, as

a practical matter, be dispositive of the interests of other members of the Provider Class who are

not parties to this action, or could substantially impair or impede their ability to protect their interests.

536.     The prosecution of separate actions by individual members of the Provider Class would create a risk of inconsistent of varying adjudications with respect to individual members of the Provider Class which would establish incompatible rights within the Provider Class.

## RULE 23(b)(2)

537.     Aetna's actions are generally applicable to the Provider Class as a whole, and the Individual Plaintiffs seek equitable remedies with respect to the Provider Class as a whole, within the meaning of Fed. R. Civ. P. 23(b)(2).

## RULE 23(b)(3)

538.     The common questions of law and fact enumerated above predominate over individual questions, and a class action is a superior method for the fair and efficient adjudication of this controversy, within the meaning of Fed. R. Civ. P. 23(b)(3).  Common or general proof will be used for each Provider Class member to establish each element of their ERISA, RICO and antitrust claims.  Additionally, proceeding as a class action is superior to other available methods of adjudication.  The likelihood that individual members of the Provider Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation since the cost of litigation far exceeds what any one Provider Class member has at stake.

## XIII.   CAUSES OF ACTION

### <u>COUNT I (A)</u>

**CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS GOVERNED BY
<u>ERISA AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**
**(On Behalf Of The Subscriber ERISA And New Jersey SEHP Classes)**

539.   The allegations contained in this Amended Complaint are realleged and incorporated by reference as if fully set forth therein.

540.   Aetna must pay benefits to Aetna Members that are insured by, funded by or administered by Aetna pursuant to the terms of their ERISA plans and in compliance with applicable federal and state laws.

541.   Aetna violated its legal obligations under ERISA-governed plans and federal common law each time it made the Nonpar Benefit Reductions described in this Amended Complaint, including violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

542.   In certain self insured plans which are sometimes designated Administrative Services Only or "ASO," Aetna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

543.   Where Aetna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Aetna is liable for underpaid benefits to Subscriber Plaintiffs and members of the class in both fully insured and ASO ERISA health plans.

544.   Aetna further violated its obligations under ERISA when it failed to comply with applicable state law, such as by making Nonpar Benefit Reductions that were inconsistent with New Jersey SEHP regulations. These regulations require Aetna to pay provider charges using the most updated Ingenix data at the 80th percentile for the geographic area where the service

occurred and further require Aetna to pay hospital services based on the billed charge, without using a database. Aetna systemically violated these regulations, including by using Outdated Data from inapplicable geographic areas, reducing payment for multiple procedures or assistant surgeons, and using Ingenix data to price hospital UCR. Aetna's violations resulted in systematic underpayment to New Jersey SEHP Members for hospital and medical services.

545.    Aetna's omissions and lack of disclosure to its Members violated its legal obligations. Aetna violated obligations each time it engaged in conduct that discouraged or penalized its Members' use of Nonpar providers, such as by making Nonpar Benefit Reductions. Aetna, as the party which exercised all discretionary authority and control over the administration of the plan of each Subscriber Plaintiffs, including the management and disposition of benefits under the terms of the plan, owed a fiduciary duty to Subscriber Plaintiffs and each putative class member.

546.    Aetna breached its fiduciary duties to Subscriber Plaintiffs and each member of the Subscriber Class by failing to pay proper Nonpar benefits without justification. Aetna therefore owes - and should be ordered to pay - the benefits that were improperly denied based on the policies detailed herein. Subscriber Plaintiffs, on their own behalf and on behalf of the members of the ERISA and New Jersey SEHP Classes, seek unpaid benefits, recalculated deductible and coinsurance amounts and interest back to the date their claims were originally submitted to Aetna. Plaintiff Sharon Smith also sues for declaratory and injunctive relief related to enforcement of the plan terms, and to clarify rights to future benefits. Subscriber Plaintiffs request attorneys' fees, costs, prejudgment interest and other appropriate relief against Aetna.

## COUNT I (B)

## BREACH OF PLAN PROVISIONS FOR
## BENEFITS IN VIOLATION OF ERISA § 502(A)(1)(B)
### (On Behalf Of The Provider/Association Plaintiffs And The Provider ERISA Subclass)

547.    Provider/Association Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.

548.    The Individual Provider Plaintiffs and the ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits claims.

549.    The Association Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

550.    During the Class Period, Aetna breached its plan provisions for benefits by underpaying UCR and other out-of-network reimbursement amounts covered by ERISA healthcare plans to Provider Plaintiffs and the Provider ERISA Subclass in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

551.    Aetna's breaches included, among other things, the misuse of the Ingenix database and other improper methods to both calculate UCR and reduce other benefits paid to Nonpars for out-of-network medical services.

552.    Under the terms of its health plans, Aetna administers benefits and is a fiduciary.

553.    In certain self insured plans which are sometimes designated ASO, Aetna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

554.    Where Aetna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Aetna is liable for

underpaid benefits to the Provider Plaintiffs and the Provider ERISA Subclass in both fully insured and ASO ERISA health plans.

555.    Pursuant to 29 U.S.C. § 1132(a)(l)(B), Provider Plaintiffs and the Provider ERISA Subclass are entitled to recovery for unpaid benefits and declaratory relief relating to Aetna's violation of the terms of its health care plans.  Association Plaintiffs are entitled to injunctive and declaratory relief.

## COUNT II

### FAILURE TO PROVIDE AN ACCURATE EOC AND SPD AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
#### (On Behalf Of The Subscriber ERISA And The Subscriber New Jersey SEHP Classes)

556.    The allegations contained in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

557.    Aetna's disclosure obligations under ERISA include furnishing accurate materials summarizing its group health plans, known as SPD materials, under 29 U.S.C. § 1022 and supplying accurate EOCS, SPDs and other required information is actionable under 29 U.S.C. § 1132(c).

558.    Aetna's failure to disclose material information about its Nonpar Benefit Reductions its contribution of flawed data to Ingenix and its use of such data, and its material changes in benefit policy without disclosure, including by UCR tiering and use of Medicare rates, violated ERISA, federal regulations and federal common law.

559.    Throughout the Class Period, Subscriber Plaintiffs and members of the Subscriber ERISA and New Jersey SEHP Classes have been proximately harmed by Aetna's failure to comply with 29 U.S.C. § 1022 and 29 U.S.C. § 1024(b)(4), federal regulations, and federal common law, and are entitled to appropriate relief under ERISA, including injunctive and declaratory relief to remedy Aetna's continuing violation of these provisions.

## COUNT III (A)

## VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE CARE
## AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
### (On Behalf Of The Subscriber ERISA And New Jersey SEHP Classes)

560.   The allegations contained in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

561.   Throughout the Class Period, Aetna acted as a "fiduciary" to Subscriber Plaintiffs and to members of the ERISA and New Jersey SEHP Classes, as such term is understood under 29 U.S.C. § 1002(21)(A).

562.   As an ERISA fiduciary, Aetna owed, and owes, its Members in ERISA plans a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent administrator would use in the conduct of a like enterprise. Further, ERISA fiduciaries must act in accordance with the documents and instruments governing the group plan. 29 U.S.C. § 1104(a)(l)(B) and (D). In failing to act prudently, and in failing to act in accordance with the documents and instruments governing the plan, Aetna violated its fiduciary duty of care.

563.   As an ERISA fiduciary, Aetna owed and owes its Members a duty of loyalty, defined as an obligation to make decisions in the interest of its Members, and to avoid self-dealing or financial arrangements that benefit it at the expense of its Members under 29 U.S.C. § 1106. Aetna cannot, for example, make benefit determinations for the purpose of saving money at the expense of its Members.

564.   Aetna violated its fiduciary duties of loyalty and due care by, *inter alia*, making Nonpar Benefit Reductions that were unauthorized by EOCs and SPDs; failing to inform Aetna Members of flaws in the Ingenix Databases that make their use in calculating UCR reimbursement inappropriate; making false representations regarding its Nonpar Benefit

148

Reductions; failing to credit deductibles and out-of-pocket maximums properly; changing its benefit practices without advance disclosure to Members; failing to properly credit deductible and out of pocket maximums; violating ER laws; misrepresenting facts to regulators; sending baseless overpayment actions to collection; failing to disclose in preauthorizing services that Aetna's Nonpar reimbursement practices would leave the Member financially responsible for the bulk of the "approved" service; and violating federal and state law, including the SEHP Regulation.

565.    In certain self insured plans, which are sometimes designated ASO, Aetna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

566.    Where Aetna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Aetna is liable for underpaid benefits to Subscriber Plaintiffs and members of the class in both fully insured and ASO ERISA health plans.

567.    Aetna also violated its fiduciary duties by using SPDs that did not comply with federal law.

568.    Aetna breached its fiduciary duties by sending noncompliant EOBs and other communications to Subscriber Plaintiffs and the members of the ERISA and New Jersey SEHP Classes.

569.    Subscriber Plaintiffs and the members of the ERISA and New Jersey SEHP Classes are entitled to assert a claim for relief for Aetna's violation of its fiduciary duties under 29 U.S.C. § l132(a)(3), including injunctive and declaratory relief, and its removal as a breaching fiduciary.

## COUNT III(B)

### FOR VIOLATION OF FIDUCIARY DUTIES OF LOYALTY
### AND DUE CARE IN VIOLATION OF § 404 OF ERISA
**(On Behalf Of Provider/Association Plaintiffs And The Provider ERISA Subclass)**

570.     Provider/Association Plaintiffs hereby repeat the allegations of the prior paragraphs of the Amended Complaint as if fully set forth herein.

571.     The Individual Provider Plaintiffs and the Provider ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits claims.

572.     The Association Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

573.     During the Class Period, Aetna acted and continues to act as a fiduciary of its Members' health plans, as the term fiduciary is interpreted under § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). At such times, Aetna also acted and acts as a fiduciary for self-insured plans, including by deciding final appeals.

574.     As a functional fiduciary under ERISA and as a claims fiduciary making final appeal decisions for self-insured plan Members, Aetna owes Provider Plaintiffs and the Provider ERISA Subclass a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character. Further, fiduciaries must ensure that they are acting in accordance with the documents and instruments governing the plan, in accordance with § 404(a)(l)(B) and (D) of ERISA, 29 U.S.C. § 1104(a)(l)(B) and (D).  In failing to act prudently, and in failing to act in accordance with the documents governing the plan, Aetna violated its fiduciary duty of care.

575.     As a fiduciary of health plans under ERISA, Aetna owed Provider Plaintiffs and the Provider ERISA Subclass a duty of loyalty, defined as an obligation to make decisions in the interest of Members, and to avoid self-dealing or financial arrangements that benefit the

fiduciary at the expense of members, in accordance with § 406 of ERISA, 29 U.S.C. § 1106. Thus, Aetna cannot make benefit determinations for the purpose of saving money at the expense of its Members.

576.    During the Class Period, Aetna violated its fiduciary duty of loyalty, *inter alia*, by using the Ingenix database and other methods for pricing Nonpar claims (including default formulas and rounding rules) that benefited itself at the expense of Members as well as Provider Plaintiffs and the Provider ERISA Subclass.   In addition, Aetna violated (and continues to violate) its fiduciary duty of loyalty by failing to inform Members as well as Provider Plaintiffs and members of the Provider ERISA Subclass of material information, including but not limited to flaws in the data and methodology used to determine UCR reimbursement. In fact, during the Class Period, by using the U.S. mails and interstate wire facilities, Aetna made representations *inter alia* about the Ingenix database that it knew were untrue. As the largest data contributor to the Ingenix database, Aetna knew many of the flaws that make the Ingenix data an inappropriate basis for UCR.

577.    In relying on the Ingenix database or other improper pricing methods, which were noncompliant with its contractual obligations and invalid to make UCR determinations, and in applying, *inter alia*, a reduction for multiple procedures that was not authorized and nowhere disclosed to Members in their plan documents, Aetna violated its fiduciary obligations to Provider Plaintiffs and the Provider ERISA Subclass. Provider Plaintiffs and the Provider ERISA Subclass are entitled to assert a claim for relief for Aetna's violation of its fiduciary duties under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), including declaratory relief, and may seek removal of any fiduciary that breached its duties.  Association Plaintiffs are entitled to injunctive and declaratory relief.

## COUNT IV(A)

## FAILURE TO PROVIDE FULL & FAIR REVIEW AS REQUIRED BY
## ERISA AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
### (On Behalf Of The Subscriber ERISA And Subscriber New Jersey SEHP Classes)

578.    The allegations contained in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

579.    Aetna functioned and continues to function as the "plan administrator" - within the meaning of such term under ERISA - for Plaintiffs. During the Class Period, Subscriber Plaintiffs and the ERISA Class and the New Jersey SEHP Class were entitled to receive a "full and fair review" of all claims denied by Aetna, and entitled to assert a claim under 29 U.S.C. § 1132(a)(3) for failure to comply with these requirements.

580.    Although Aetna was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Subscriber Plaintiffs and members of the ERISA and New Jersey SEHP Classes by making Non-Par Benefit Reductions that are inconsistent with or unauthorized by the terms of Members' EOCs and SPDs, as well as by failing to disclose data, its methodology and other critical information relating to its Nonpar Benefit Reductions.

581.    ERISA and its implementing regulations set forth minimum standards for claim procedures, appeals, notice to Members and the like. In engaging in the conduct described herein, including use of an invalid database for determining UCR, use of Medicare rates, use of AWP, tiering of behavioral health reimbursements, incorrect calculation of deductibles and out¬ of-pocket maximums, baseless threats regarding overpayments and referrals to collection agencies, false pre authorization letters, and making other systematic benefit reductions without disclosure or authority under the plans, Aetna failed to comply with ERISA, its regulations and

federal common law that require a "full and fair review, failed to provide reasonable claims procedures, and failed to make necessary disclosures to its Members.

582.    Appeals of Subscriber Plaintiffs and the members of the Subscriber ERISA and New Jersey SEHP Classes should be excused by virtue, *inter alia*, of Aetna's numerous procedural and substantive violations.

583.    Subscriber Plaintiffs' failed appeals, as alleged in this Amended Complaint, show the futility of exhausting appeals to Aetna. The requirement to exhaust internal appeals under ERISA should, therefore, be deemed to be futile for all Class Members. Throughout the Class Period, Subscriber Plaintiffs and members of the Subscriber ERISA and New Jersey SEHP Classes have been harmed by Aetna's failure to provide a "full and fair review" of appeals under 29 U.S.C. § 1133, and by Aetna's failure to disclose relevant information in violation of ERISA and the federal common law.  Subscriber Plaintiffs Smith, Samit and Whittington, who are currently insured by Aetna, the Subscriber ERISA Class and the New Jersey SEHP Class are also entitled to injunctive and declaratory relief to remedy Aetna's continuing violations of these provisions.

## COUNT IV(B)

### FOR DECLARATORY RELIEF RELATING TO AETNA'S VIOLATION OF ERISA
### (On Behalf Of All Provider/Association Plaintiffs And The Provider ERISA Subclass)

584.    Provider/Association Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.

585.    The Individual Provider Plaintiffs and the Provider ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits claims.

586.    The Association Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

587.    Under federal law, the Provider Plaintiffs and the Provider ERISA Subclass are entitled to receive protections under ERISA including (a) a "full and fair review" of all claims denied by Aetna; (b) compliance by Aetna with ERISA claims procedure regulations; and (c) receipt of accurate materials summarizing such group health plans, known as Summary Plan Descriptions ("SPD") materials under § 102 of ERISA, 29 U.S.C. § 1022.

588.    Any time Aetna deprived its Members of "full and fair review" or proper compliance with ERISA claims procedure regulations, it violated § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), and thus violated the rights of Provider Plaintiffs and the  Provider ERISA Subclass.

589.    Although Aetna was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to § 503 of ERISA, 29 U.S.C. § 1133, and its implementing regulations, *inter alia*, by failing to disclose the "specific reasons" for benefit denials, failing to disclose data and/or the methodology used to determine UCR or Nonpar reimbursement, and failing to comply with appeal procedures imposed by ERISA and the federal common law.

590.    Applicable federal claims procedure regulations set forth minimum standards for claim procedures, appeals, notice to Members and the like. By engaging in the conduct described herein including, but not limited to, making benefit determinations for Nonpar claims that are inconsistent with the terms of group health plans, and failing to disclose information concerning the data and/or methodology it used to determine UCR or other Nonpar reimbursements, Aetna failed to comply with such regulations

591.    The consequences of Aetna's failure to comply with the regulations (as well as federal common law), are that Aetna failed to provide reasonable claims procedures and failed to make required disclosures to Provider Plaintiffs and the Provider ERISA Subclass.

592.     Administrative remedies are deemed exhausted, *inter alia*, by virtue of the invalid Ingenix database, other invalid Nonpar pricing methods discussed supra, and Aetna's failure to provide reasonable claims procedures.   By virtue of the conduct alleged in this Amended Complaint, any appeal would have been futile.

593.     Aetna's failure to supply accurate SPDs and accurate information is redressable under § 502(c) of ERISA, 29 U.S.C. § 1132(c).

594.     Aetna's failure to disclose material information about its UCR and other methods for pricing Nonpar claims constitute violation of federal common law, which obligates fiduciaries such as Aetna to provide this material information.

595.     Provider Plaintiffs and the Provider ERISA Subclass have been harmed by Aetna's failure to provide a "full and fair review" of appeals submitted under § 503 of ERISA, 29 U.S.C. § 1133, by Aetna's failure to disclose information relevant to appeals or to comply with ERISA claims procedure regulations, in violation of ERISA and the federal common law, and by Aetna's failure to provide accurate information, in violation of federal common law and § 102 of ERISA, 29 U.S.C. § 1022.

596.     Provider Plaintiffs and the Provider ERISA Subclass are entitled to a declaration by this Court that Aetna's actions as alleged herein are in violation of its duties and obligations of ERISA.   Association Plaintiffs are entitled to injunctive and declaratory relief.

### COUNT V(A)

**FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)**
**BASED ON PREDICATE ACTS OF MAIL AND WIRE FRAUD**
**(On Behalf Of All Subscriber Plaintiffs And The Subscriber Rico Antitrust Class)**

597.     The allegations contained in this Amended Complaint are realleged and incorporated as if fully set forth herein. This claim is asserted by Subscriber Plaintiffs on behalf of themselves and the members of the RICO Class.

598.    At all relevant times, Aetna was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

599.    At all relevant times, and as described in this Amended Complaint, Aetna carried out its underpayment scheme to Aetna Members in connection with the conduct of an association-in- fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of Aetna, UHG and Ingenix (the "Aetna-Ingenix Enterprise" or the "Enterprise").

600.    At all relevant times, the Aetna-Ingenix Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

601.    As described herein of this Amended Complaint, the Aetna-Ingenix Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which Aetna has engaged.  In addition, the members of the Aetna-Ingenix Enterprise function as a structured and continuous unit, and performed roles consistent with this structure. The members of the Aetna-Ingenix Enterprise performed certain legitimate and lawful activities that are not being challenged in this complaint, including the provision of health insurance and plan and claims administration services by Aetna, which was done for many claims lawfully and without resort to unlawful practices. However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations. Aside from legitimate activities carried out by the members of the Aetna-Ingenix Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Amended Complaint including, but not limited to, intentional underpayment of Aetna Members resulting from the use of flawed and invalid data for its UCR determinations.

602.     The purpose of the Aetna-Ingenix Enterprise was to create a mechanism by which Aetna could reduce benefit payments for Nonpar services through use of flawed and invalid data, but to do so through a means that subscribers would be unable to challenge effectively. In particular, as described herein, the Aetna-Ingenix Enterprise created what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix Databases were designed to appear valid as a basis for UCR when, in fact, they were invalid. Through their roles in the Aetna-Ingenix Enterprise, Ingenix benefited indirectly through the monies saved by United Healthcare, its parent corporation, and by enhancing its ability to earn licensing fees through the sale of the Ingenix databases, while Aetna benefited by reducing the amount of benefits it paid for Nonpar services through the use of the Ingenix Databases to price UCR. Ingenix also used data submitted by Data Contributors to create other products, the licensing and sale of which directly benefited Ingenix.

603.     As alleged herein, although Ingenix issues a disclaimer to the users of the Ingenix Databases, including Aetna, Aetna continued to use the Ingenix Databases in a manner directly at odds with the disclaimer, while Ingenix knew that its users were using the Ingenix Databases improperly to make UCR determinations. At the same time it was issuing a disclaimer in an effort to provide itself with legal protection, Ingenix was also promoting Ingenix Databases as a cost-savings mechanism that could save substantial sums to those who used them in making UCR determinations. Thus, Aetna and Ingenix expressly observed the disclaimer in the breach despite the fact that the disclaimer was correct in reporting that the Ingenix Databases could not be used as a basis for making UCR determinations.

604.     Similarly, as alleged herein, while Ingenix required certifications from the Data Contributors, including Aetna, that purportedly verified that they were submitting all available

data and were not pre-editing or otherwise manipulating the data prior to its contribution, Ingenix knew full well that these certifications were invalid because users of the Ingenix Databases, including Aetna, were not submitting all of their data and were pre-editing and manipulating the data prior to its submissions in furtherance of Ingenix's effort to understate UCR amounts. The pre-editing and incomplete submission of data to Ingenix benefited Ingenix, and users of the Ingenix Databases, including UHG, Ingenix's parent company, and Aetna. Ingenix also failed to conduct any audits or reviews of its data to ensure that the data were valid and appropriate.

605.    Ingenix and Aetna knew that the Ingenix Databases were being used without Aetna Members, or other health plan Members, ever being informed of the disclaimer or the inherent flaws in the Ingenix Databases. For example, Aetna falsely reported to Class members that its reductions were based on UCR when, in fact, the reductions were based on flawed and invalid Ingenix Databases that substantially underreported UCR. Aetna referred overpayment recovery actions to collection agencies based on the flawed Ingenix data. At the same time, Aetna ensured that lawfully required information concerning Nonpar Benefit Reductions was not disseminated to Aetna Members, in violation of Aetna Members' EOCs and federal law.

606.    Aetna participated in the Aetna-Ingenix Enterprise in order to shift the costs of medical treatment provided by Nonpar providers from Aetna to its Members, to reduce Aetna's UCR payments and to create an appearance of legitimacy for its Nonpar Benefit Reductions. Aetna provided false and incomplete information to Aetna Members to convert those withheld funds for the Aetna-Ingenix Enterprise's own direct and indirect financial gain, and to discourage its Members from using Nonpar providers. Because Aetna saves money when Par providers render services, the Aetna Ingenix Enterprise saved Aetna money at the expense of Aetna Members. In turn, the Enterprise benefited from the pattern of racketeering activity through the

reduction of UCR costs by Aetna and other users of the Ingenix Databases, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of Aetna alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

607.    Aetna further used the Enterprise to facilitate its goal of reducing Nonpar benefits by submitting pre-edited and manipulated data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix Databases and which Aetna relied upon to make UCR determinations. As part of this fraudulent scheme, as alleged herein, Aetna submitted false certifications to Ingenix which attested that it was submitting all of its data, when it was not. Neither Ingenix nor its parent company, UHG, took steps to audit or otherwise validate the data that Ingenix was receiving from Aetna and other data contributors. Ingenix was aware of the manipulation of data by Data Contributors such as Aetna, but allowed it to occur, since it was consistent with Ingenix's goal to underreport UCR.

608.    If Aetna had not entered into the Aetna-Ingenix Enterprise by submitting pre-edited and manipulated data to Ingenix, it would not have been able to obtain the benefits it did from the Enterprise. Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix Databases were the largest available and had sufficient numbers to remove any doubt as to their validity. Ingenix also needed data that reported sufficiently low charges so that it could represent to its users that the Ingenix Databases would save users money used to make UCR determinations. Without data from Aetna and UHG, the Ingenix Databases could not have been successfully marketed for UCR pricing. Similarly, Aetna could not have saved the millions of dollars it did if it had not used the Ingenix Databases for making UCR determinations even though it knew that they were flawed and invalid. By using the Ingenix Databases for making its

UCR determinations, misrepresenting them as providing a valid and unassailable basis for such decisions, and deterring its subscribers from challenging or otherwise raising questions over how it set UCR, Aetna was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and UHG.

609.    Through its wrongful conduct as alleged herein, Defendants, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

610.    Defendants, acting through their officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the RICO Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for Nonpar services, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Such predicate acts include the following:

> ( a)    by mailing or causing to be mailed and otherwise knowingly agreeing to the mailing of various materials and information including, but not limited to, materially false and invalid UCR determinations and EOBs, for the purpose of saving Aetna money at its Members' expense, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

> (b)    by transmitting or causing to be transmitted and otherwise knowingly agreeing to the transmittal of various materials and information including, but not limited to, materially false UCR determinations and related explanation of such determinations, by means of telephone, facsimile, and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

611.    As set forth above, Aetna instructed its claims personnel to make Nonpar Benefit Reductions which were contrary to law and its Members' EOCs and SPDs. Aetna knew that the

data contributed to Ingenix was flawed and incomplete, but Aetna continued to use the Ingenix Databases anyway.

612.    In furtherance of its underpayment scheme for Nonpar services, Aetna, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to further all aspects of the intentional underpayment to its member by delivering and/or receiving materials, including EOCs and SPDs, EOBs, appeal determinations, and other materials necessary to carry out the scheme to defraud Plaintiffs and other Members.

613.    The foregoing communications via U.S. mail and interstate wire facilities contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of Aetna's scheme to defraud described in this Amended Complaint. Further, they were used to provide the under-payment scheme for ONET with an appearance of legitimacy and regularity, and/or postpone ultimate discovery and complaint of the under-payment scheme for Nonpar services, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

614.    The misrepresentations and omissions in these materials have included and include those set forth previously in this Amended Complaint.

615.    As named fiduciaries and claims administrators of various of the Aetna plans, Aetna occupied and occupies a position of trust and it had, and has, a special relationship with its Members that requires it to accurately represent the terms and conditions of the Aetna plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

616.     Aetna knew that its Members would reasonably rely on the accuracy, completeness and integrity of disclosures by the Enterprise. Aetna Members did rely to their detriment on misrepresentations and omissions from the Enterprise.

617.     Each such use of the U.S. Mail and interstate wire facilities alleged in this Amended Complaint constitutes a separate and distinct predicate act.

618.     The above-described acts of mail and wire fraud are related because they each involve common members, common Nonpar claim practices, common results impacting upon common victims, and are continuous because they occurred over several years, and constitutes the usual practice of Aetna such that they amount to and pose a threat of continued racketeering activity. Aetna's scheme to defraud is open-ended and not inherently terminable.

619.     The direct and intended victims of the pattern of racketeering activity described previously herein are beneficiaries and their assignees and the members of the RICO Class, whom Aetna has underpaid for ONET.

620.     Subscriber Plaintiffs and Members of the Subscriber RICO Antitrust Class were injured by reason of Defendants' RICO violations because they directly and immediately were underpaid benefits. Aetna further deprived them of the knowledge necessary to challenge its underpayments. Their injuries were proximately caused by Defendants' violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

162

621.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Subscriber Plaintiffs and the members of the Subscriber RICO Antitrust Class are entitled to recover threefold their damages, costs and attorneys' fees from Defendants and other appropriate relief.

## COUNT V(B)

**FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)**
**BASED ON PREDICATE ACTS OF MAIL AND WIRE FRAUD**
**(On Behalf Of Provider/Association Plaintiffs And The Provider Class Against All Defendants (except that Drs. Antell and Tonrey, Maldonado, the AMA and MSSNY do not bring claims against the UHG Defendants)**

622.    Provider/Association Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.  This claim is asserted by Plaintiffs on their own behalf and on behalf of Class members.

623.    The Individual Provider Plaintiffs and the Class have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

624.    The Association Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

625.    At all relevant times, Aetna, UHG and Ingenix were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

626.    At all relevant times, and as described in this Amended Complaint, Aetna, UHG and Ingenix carried out its underpayment scheme to defraud Provider Plaintiffs and the Provider Class in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of Aetna, UHG and Ingenix (the "Aetna-Ingenix Enterprise" or the "Enterprise").

627.    Aetna through the Enterprise described above and in conspiracy with Ingenix and other healthcare companies undertook a fraudulent scheme to underpay Providers for the ONET

provided to Aetna subscribers. Through the fraudulent underpayment scheme, Aetna and others agreed to utilize the flawed Ingenix database for its UCR determinations in an effort to depress the prices paid for ONET by the conspiring healthcare companies.   Aetna knowingly purchased and utilized the Ingenix database with the express purpose of depressing its ONET payments and in fact supplied "scrubbed" and otherwise flawed and incomplete data to Ingenix with the purpose of lowering payments for ONET.  Aetna agreed to conceal the flaws in the Ingenix data as well as the scheme to depress ONET payments achieved by use of the Ingenix database for UCR determinations.  In furtherance of the scheme, Aetna engaged in thousands if not millions of acts of mail and wire fraud.

628.     Aetna, Ingenix and UHG were all participants in the Aetna-Ingenix Enterprise.

629.     At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

630.     The Aetna-Ingenix Enterprise was at all relevant times a continuing unit involving Aetna and Ingenix functioning with a common purpose of reducing the price paid for ONET, and increasing the profits the Enterprise participants and their Co-Conspirators.  Throughout the class period, Aetna, Ingenix and UHG remained members of the Enterprise throughout the Class Period undertaking countless and nearly constant acts of mail and wire fraud for their common purpose described above.

631.     The Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which Aetna has engaged. In addition, the members of the Enterprise functioned continuous unit, and performed roles consistent with this structure. The members of the Enterprise performed certain legitimate and lawful activities that are not being challenged in this Amended Complaint, including the

provision of health insurance and plan and claims administration services by Aetna, which was done for many claims lawfully and without resort to unlawful practices. However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations. Aside from legitimate activities carried out by the members of the Enterprise, its members used the Enterprise's structure to carry out the fraudulent scheme and unlawful activities alleged in this Amended Complaint including, but not limited to, intentional underpayment of benefits to Provider Plaintiffs and the Provider Class resulting from Aetna's use of flawed and invalid data for its UCR determinations.

632.    The Enterprise was used to create a mechanism or vehicle by which Aetna could reduce payments to Provider Plaintiffs and the Provider Class for ONET through the use of flawed and invalid data that could not be challenged effectively. In particular, as described herein, the Enterprise created what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix database was designed to appear valid as a basis for UCR when, in fact, it is and was invalid.

633.    Through their roles in the Enterprise and the scheme, Ingenix benefited directly by enhancing its ability to earn licensing fees through the sale of the Ingenix databases, including others which used Aetna data, and through the monies saved by UHG, its parent corporation. Aetna benefited by reducing the amount it paid to Provider Plaintiffs and the Provider Class for their ONET through the use of the Ingenix database to price UCR.

634.    As alleged above, although Ingenix issues a disclaimer to the users of the Ingenix databases, Aetna continued to use the Ingenix databases in a manner directly at odds with the disclaimer, while Ingenix knew that its data users were using the Ingenix databases improperly to

make UCR determinations and failed to stop it.  At the same time it was issuing a disclaimer in a misguided effort to provide itself and UHG with legal protection, Ingenix was also promoting the Ingenix database as a cost-saving mechanism that could save substantial sums to those such as Aetna who improperly used and relied upon them in making UCR determinations.

635.    In furtherance of the fraudulent scheme, Ingenix provided extensive "litigation support," including vouching for data used to price UCR by its data users. Ingenix employed staff to assist data users, including testifying in court, testifying in depositions, supplying documentation and otherwise bolstering the users' use of Ingenix data to price UCR. Thus, Aetna and Ingenix expressly observed the disclaimer in the breach, despite the fact that the disclaimer correctly stated that the Ingenix database could not be used as a basis for making UCR determinations. Aetna provided data to Ingenix which it knew would be edited by Ingenix in a manner which precluded its use for UCR.

636.    Ingenix not only knowingly sought and accepted Aetna's incomplete data, but it continued to provide a significant discount to Aetna.  Ingenix also failed to conduct any audits or reviews of the data it received from data contributors, including Aetna.  These actions were taken in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the Aetna-Ingenix Enterprise.

637.    During the Class Period, Aetna participated in the conduct of the Enterprise in order to shift the costs of medical treatment from Aetna to its Members and therefore to Plaintiffs and the Class, to reduce Aetna's UCR payments and to create an appearance of legitimacy for its out-of-network benefit reductions. Using U.S. mail and interstate wire facilities, Aetna provided false and misleading information to Provider Plaintiffs and the Provider Class to convert those

withheld funds for the Enterprise's own direct and indirect financial gain, and to discourage its Members from using out-of-network healthcare providers.

638.     Because Aetna saves money when participating providers render services, the operations of the Enterprise saved Aetna money at the expense of the Provider Plaintiffs and the Provider Class. In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by Aetna and other users of the Ingenix databases, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of Aetna alleged above, the shared goal of the Enterprise for which its Members functioned as a continuous unit.

639.     Aetna further used the Enterprise to facilitate its goal of reducing out-of-network benefits paid to Plaintiffs and the Class by submitting incomplete and inadequate data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix databases and which Aetna relied upon to make UCR determinations. As part of this fraudulent scheme, as alleged herein, Aetna intentionally submitted, via U.S. mail and interstate wire facilities, data which it knew would be used to create false databases used to price UCR for its Members and members of other healthcare plans. Ingenix was aware of the inadequacy of data contributed by data contributors such as Aetna, but allowed it to occur, since it was consistent with the enterprise's purpose of reducing the cost of out of network healthcare services.

640.     Among other ways Aetna participated in the affairs of the Enterprise, Aetna was the single largest data contributor to the Ingenix PHCS database. Aetna's submission of data to Ingenix benefited Ingenix, and users of the Ingenix databases, including Aetna.  The inclusion of Aetna's data was critical to both the appearance of legitimacy of the Ingenix PHCS database, and the usefulness of that data for depressing the price paid for ONET.  Further, Aetna knew the data

it contributed to Ingenix was flawed and incomplete and its use by the Enterprise and Ingenix would depress the price of ONET for all its Co-Conspirators.

641.    If Aetna had not participated in the conduct of the Enterprise by submitting flawed data to Ingenix, and using the Ingenix database, it would not have been able to obtain the benefits it did from the Enterprise. Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix database was the largest available and had sufficient numbers to remove any doubt as to their validity. Aetna knew such representations were being made by Ingenix and used Ingenix's representations for the identical purpose of removing doubt as to their validity. Ingenix needed the data to provide databases to its users to save them money on Nonpar claims. Without data from Aetna and other large data contributors, the Ingenix database could not have been successfully marketed as the "industry standard" for UCR pricing. Similarly, Aetna could not have saved the millions of dollars it did if it had not used the Ingenix databases for making UCR determinations even though it knew that they were flawed and invalid. By using the Ingenix database for making its UCR determinations, misrepresenting them, through use of the U.S. mail and interstate wire facilities, as providing a valid and unassailable basis for such decisions, and deterring its subscribers as well as members of the Provider Class from challenging or otherwise raising questions over how it set UCR, Aetna was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and UHG.

642.    Through its wrongful conduct as alleged herein, Aetna, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).  These acts of racketeering activity have continued throughout the Class Period to the present.

643.    Aetna, UHG and/or Ingenix acting through their officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the Provider Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for ONET, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343.  Each use of the mail or wire in furtherance of the fraudulent scheme described above is an a predicate act of mail and wire fraud. Such predicate acts include the following:

> (a)    mailing, causing to be mailed and/or knowingly agreeing to the mailing of various materials and information including, but not limited to, letters regarding preauthorization approval(s) and/or appeals, materially false or misleading data for use in the Ingenix databases, materially false and misleading UCR determinations, EOBs and remittance advices for the purpose of saving Aetna money at the expense of Provider Plaintiffs and the Provider Class, and mailing materially false data for use in the Ingenix database, for the purpose of effectuating the above-described fraudulent scheme, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

> (b)    transmitting, causing to be transmitted and/or knowingly agreeing to the transmittal of various materials and information including, but not limited to, preauthorization approvals; materially false UCR determinations and related explanation of such determinations, and materially false or misleading data for use in the Ingenix database, by means of telephone, facsimile and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

644.    Aetna issued false and misleading letters to Providers regarding benefits, as well as false and misleading EOBs and Explanations of Payment. Aetna knew that the data it contributed to Ingenix was inadequate and lacked required data fields essential for Ingenix to evaluate the data and include (or exclude) it in final UCR fee schedules, but Aetna continued to use the Ingenix databases to make UCR determinations anyway.

645.     Ingenix and Aetna knew that the Ingenix databases were being used without Plaintiffs and the Class ever being informed of the disclaimer or the inherent flaws in the Ingenix databases. For example, Aetna falsely reported to Plaintiffs and Class members, via U.S. mail and interstate wire communications, that its reductions in amounts paid for ONET were based on UCR when, in fact, the reductions were based on flawed and invalid numbers obtained from the Ingenix databases that substantially underreported UCR.

646.     In furtherance of its underpayment scheme for ONET, Aetna, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment scheme to Provider Plaintiffs and the Provider Class by delivering and/or receiving materials necessary to carry out the scheme to defraud Provider Plaintiffs and the Provider Class.  Each use of the mail or wire in furtherance of the scheme was a violation of the above statutes.

647.     The foregoing communications, sent via U.S. mail and interstate wire facilities, contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of Aetna's scheme to defraud Provider Plaintiffs and the Provider Class described in this Amended Complaint. Further, such written communications were used by Aetna to provide the underpayment scheme for ONET with an appearance of legitimacy and regularity, to conceal the scheme and/or postpone ultimate discovery and complaint of the underpayment scheme for ONET, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

648.     As named fiduciaries and claims administrators of various of the Aetna plans, Aetna occupied and occupies a position of trust and it had, and has, a special relationship with its

Members, and therefore with Provider Plaintiffs and the Provider Class, that requires it to accurately represent the terms and conditions of the Aetna plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

649.    Each such use of the U.S. mail and interstate wire facilities in furtherance of the scheme alleged in this Amended Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

650.    The above-described pattern of racketeering activity is related because it involves the same fraudulent scheme,  common persons, common out-of-network claim practices, common results impacting upon common victims, and is continuous because it occurred over several years, and constitutes the usual practice of Aetna and the Enterprise, such that it amounts to and poses a threat of continued racketeering activity. Aetna's scheme to defraud Provider Plaintiffs and the Provider Class is open-ended and on-going.

651.    The direct and intended victims of the pattern of racketeering activity described previously herein are the Provider Plaintiffs and the Provider Class, whom Aetna has underpaid for ONET.

652.    As a result of Aetna's fraudulent scheme, Provider Plaintiffs and the Provider Class were injured in their business or property by reason of Aetna's RICO violations because they were underpaid for ONET rendered to Aetna's subscribers and were forced to exhaust significant time and resources addressing Aetna's wrongful practices.

653.    In addition, Provider Plaintiffs and the Provider Class reasonably relied on the fraudulent scheme by providing ONET to Aetna subscribers.

654. Aetna further deprived them of the knowledge necessary to discover or challenge the underpayments.

655. Their injuries were proximately caused by Aetna, UHG and Ingenix's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Aetna's RICO violations (and commission of underlying predicate acts) and, but for Aetna, UHG and Ingenix's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

656. Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Provider Plaintiffs and the Provider Class are entitled to recover threefold their damages, costs and attorneys' fees from Aetna and other appropriate relief.

## COUNT VI(A)

### FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### BASED ON PREDICATE ACTS UNDER 18 U.S.C. § 664
### AS WELL AS MAIL AND WIRE FRAUD
#### (On Behalf Of The Subscriber Rico Section 664 Subclass)

657. Subscriber Plaintiffs incorporate and reallege the allegations above as if fully set forth herein including, but not limited to, the allegations contained in Count V(A) and its description of the Aetna-Ingenix Enterprise. This claim is asserted by Plaintiffs on behalf of themselves and the members of the Subscriber RICO Antitrust Class who are also members of the Subscriber ERISA Class, as those terms are defined in this Amended Complaint.

658. Section 1961(l)(B) of RICO specifically identifies as a predicate act "any act which is indictable under . . . [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. § 1961(l)(B). Section 664 of Title 18 provides: Theft or embezzlement from employee benefit plan Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds,

172

securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

659.    Each of the Aetna healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(l)(A), and otherwise is subject to "any provision of Title I of the Employee Retirement Income Security Act of 1974," 29 U.S.C. § 1001, *et seq.*, is included in this Count, including Plaintiffs' plans.

660.    Each of the Aetna healthcare plans that is subject to ERISA is funded by insurance coverage Aetna provides or administers. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

661.    Subscriber Plaintiffs' governing plan documents warrant that all benefits due under the plans will be paid. By improperly reducing payments on Nonpar claims, Defendants intentionally caused Subscriber Plaintiffs and the members of the Subscriber RICO Antitrust Class who were also members of the Subscriber ERISA Class (the "ERISA Section 664 Subclass") to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

662.    For fully insured healthcare plans, in which Aetna both administered the plans and paid the benefits from its own assets, Aetna benefited from the conversion of assets from its ERISA plans. Whereas these assets should have been held by Aetna in its fiduciary capacity under ERISA, and paid to its Members, Aetna improperly withheld such funds and maintained them as part of its own assets for Aetna's own benefit. For self-funded healthcare plans, Aetna improperly prevented payment of benefits to the plan participants and beneficiaries in order to

justify its receipt of administrative fees. Insurers such as Aetna and UHG benefited in the same way, while Ingenix benefited indirectly through the savings generated by its parent, UHG, and directly through the licensing fees it received from Aetna and other insurers who used the flawed Ingenix Databases to commit RICO violations.

663. Defendants acted with specific intent to deprive Plaintiffs and RICO Section 664 Subclass members of guaranteed benefits, and was sufficiently aware of the facts to know that it was acting unlawfully and contrary to the trust placed in them by Plaintiffs and RICO Section 664 Subclass members and the insurers whose plans it was administering.

664. Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended beneficiary, for Aetna's direct or indirect benefit.

665. As set forth above, Defendants concocted multiple schemes to make improperly reduced payments for Nonpar services.

666. In furtherance of its false payment schemes, Defendants, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to advance all aspects of the false payment schemes by delivering and/or receiving materials, including plan documents, insurance policies, summary plan descriptions, certificates of coverage, claim forms, reimbursement checks, EOBs describing UCR determinations, appeal determinations, overpayment actions, preauthorization decisions, referrals to collection agencies, representations to regulators, and other materials necessary to effectuate the false payment schemes, as well as to contribute, edit and manipulate the source data for the UCR Databases.

667.     The foregoing mail communications and wire communications contained false and fraudulent misrepresentations and omissions of material facts, and otherwise were incident to an essential part of the false payment schemes and were used to provide the false payment schemes with an appearance of legitimacy and regularity, and postpone ultimate discovery and complaint of the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if no such mailings or wire transmissions had taken place, and had the design and effect of preventing a meaningful evaluation and review of Aetna's Nonpar Benefit Reductions.

668.     As named fiduciaries and claims administrators of various of the Aetna healthcare plans, Aetna occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiffs and RICO Section 664 Subclass members that requires it to accurately represent the terms and conditions of the Aetna healthcare plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

669.     Each such use of the U.S. Mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

670.     The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of Defendants such that they amount to and pose a threat of continued racketeering activity.

671.    The purpose of Aetna's false payment schemes was to underpay the guaranteed benefits to which Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members are entitled to under health group plans, and convert those withheld funds for its own direct or indirect financial gain. It created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiffs and RICO Section 664 Subclass members, in order to increase revenue through its plan and claims administration business.

672.    The direct and intended victims of the pattern of racketeering activity described previously herein are Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members, who Aetna deprived of the complete guaranteed benefits to which they are entitled for Nonpar services.

673.    Defendants' RICO violations injured Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members by depriving them of hundreds of millions of dollars in guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations, and their injuries were proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts), and but for Defendants' RICO violations (and commission of underlying predicate acts), Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members would not have suffered the injuries suffered by them.

674.    As a result of its misconduct, Defendants are liable to Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members in an amount to be determined at trial.

675.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Subscriber Plaintiffs and Subscriber RICO Section 664 Subclass members are entitled to recover threefold their damages, and costs and attorneys' fees from Defendants.

**COUNT VI(B)**

**FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**BASED ON PREDICATE ACTS UNDER 18 U.S.C. § 664**
**AS WELL AS MAIL AND WIRE FRAUD**
**(On Behalf Of All Provider/Association Plaintiffs And The Provider ERISA Subclass and Against All Defendants (except that Drs. Antell and Tonrey, Maldonado, the AMA and MSSNY do not bring claims against the UHG Defendants))**

676.    Provider Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein, including, but not limited to, the allegations of Count V(B) describing the Enterprise. This claim is asserted by the Provider Plaintiffs on behalf of themselves and on behalf the members of the Provider ERISA Subclass described above.

677.    The Provider Plaintiffs and the Provider ERISA Subclass have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

678.    The Association Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

679.    Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under ... [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. § 1961(l)(B). Section 664 of Title 18 provides:

> **Theft or embezzlement from employee benefit plan**
> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

680.     Each of the Aetna healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision" of Title I of ERISA is included in this Count.

681.     Each of the Aetna healthcare plans that are subject to ERISA are also subject to Section 664 of Title 18. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

682.     The governing plan documents warrant that all benefits due under the plans will be paid. By improperly reducing payments on out-of-network claims, Aetna intentionally caused Plaintiffs and the members of the ERISA Subclass to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

683.     For fully insured health care plans, in which Aetna both administered the plans and paid the benefits from its own assets, Aetna benefited from the conversion of assets from its ERISA plans. Whereas these assets should have been held by Aetna in its fiduciary capacity under ERISA plans and paid to its Members, Aetna improperly withheld such funds and maintained them as part of its own assets for Aetna's own benefit. For self-funded health care plans, Aetna made final appeal decisions and intentionally caused underpayment of benefits to Plaintiffs and the ERISA Subclass in order to justify its receipt of administrative fees.

684.     Aetna, UHG and Ingenix acted with specific intent to deprive Provider Plaintiffs and the Provider ERISA Subclass members of guaranteed benefits, and was sufficiently aware of the facts to know that it was acting unlawfully and contrary to the trust placed in them by the Provider Plaintiffs, the Provider ERISA Subclass members and the insurers whose plans it was administering.

685.    Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended member, for Aetna's direct or indirect benefit.

686.    As set forth above, Aetna, UHG and Ingenix concocted a fraudulent underpayment scheme, including use of the Ingenix database, to make improperly reduced payments for ONET.

687.    As named fiduciaries and claims administrators of various of the Aetna healthcare plans, Aetna occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiffs and ERISA Subclass members that requires it to accurately represent the terms and conditions of the Aetna healthcare plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

688.    Each such use of the U.S. mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

689.    The above-described acts of conversion of employee benefit plan funds, in addition to the acts of mail and wire fraud described in Count V, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of Aetna such that they amount to and pose a threat of continued racketeering activity.

690.    The common purpose of the false payment scheme was to underpay the guaranteed benefits which were assigned to Provider Plaintiffs and the Provider ERISA Subclass members, reducing the costs of ONET, and convert those withheld funds for its own direct or

indirect financial gain. Aetna created an appearance of regularity and legitimacy by providing false and incomplete information to Provider Plaintiffs and the Provider ERISA Subclass members, in order to increase revenue through its plan and claims administration business.

691.     The direct and intended victims of the pattern of racketeering activity described previously herein are Provider Plaintiffs and the Provider ERISA Subclass members.   The Enterprise's common purpose of reducing the cost of out of network healthcare reimbursement costs could not have been achieved without conversion of the Plan's assets, which rightfully should have been paid to the Providers. The injuries to the Provider Plaintiffs were a natural consequence of the false payment scheme.

692.     Aetna, UHG and Ingenix's RICO violations injured Provider Plaintiffs and the Provider ERISA Subclass members in their business or property by depriving them of hundreds of millions of dollars in assigned benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations, and their injuries were proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Aetna's RICO violations (and commission of underlying predicate acts), and but for Aetna's RICO violations (and commission of underlying predicate acts), Provider Plaintiffs and Provider ERISA Subclass members would not have suffered the injuries suffered by them.

693.     As a result of its misconduct, Aetna, UHG and Ingenix is liable to Provider Plaintiffs and the Provider ERISA Subclass in an amount to be determined at trial. Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Provider Plaintiffs and Provider ERISA Subclass members are entitled to recover threefold their damages, and costs and attorneys' fees from Aetna.

## COUNT VII

## FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
**(On Behalf Of All Plaintiffs (except that Drs. Antell and Tonrey, Maldonado, the AMA and MSSNY do not bring claims against the UHG Defendants) and The RICO Classes)**

694.   Plaintiffs hereby repeat the allegations of the Amended Complaint and specifically the allegations in Counts V(A) and Count V(B).

695.   From at least June 3, 2003, Aetna conspired with UHG, and Ingenix  to conduct or participate, directly or indirectly, in the conduct of the affairs of the Aetna-Ingenix Enterprise, described above, through a pattern of racketeering activity as described above in violation of 18 U.S.C. § 1962(d).  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

696.   In furtherance of this conspiracy, Aetna, UHG and Ingenix committed numerous overt acts as alleged above in the pattern of racketeering described above, including also, the submission of data to Ingenix for use in the fraudulent Ingenix database.

697.   As a direct and proximate result of, and by reason of, the activities of Aetna and its conduct in violation of 18 U.S.C. § 1962(d), all Plaintiffs and the Subscriber and Provider Classes have been injured in their business and property within the meaning 18 U.S.C. § 1964(c), and are entitled to recover treble damages together with the costs of this lawsuit, expenses and reasonable attorneys' fees.

## COUNT VIII(A)

## FOR VIOLATION OF SECTION ONE OF THE SHERMAN ACT
**(On Behalf Of The Subscriber RICO Antitrust Class)**

698.   Subscriber Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.  Subscriber Plaintiffs bring this claim on behalf of the Federal Damage and Injunctive Relief Classes.

699.    From a date unknown, but beginning at least as early as January 1, 1998, and continuing through the present, Defendants and their Co-Conspirators have combined, conspired and/or contracted to restrain interstate trade in violation of 15 U.S.C. §1.

700.    The combination or conspiracy alleged in this Complaint consisted of a continuing agreement, understanding or concert of action by the Defendants and their other Co-Conspirators, the substantial terms of which were to create, maintain and use the Ingenix Database to produce artificially low UCRs for reimbursement of Out of Network Services.

701.    The conspiracy was intended to directly affect the end payors of the medical services covered by out-of-network insurance plans.   The intent, purpose and effect of the conspiracy was to cause under-reimbursement for medical services, and thereby minimize reimbursement payments made on such claims among Defendants and their Co-Conspirators.

702.    Through the conspiracy, Defendants and their Co-Conspirators have in fact caused a decrease in reimbursement or payments for out-of-network medical services but for their anticompetitive conduct.

703.    As the result of the wrongful conduct alleged herein, Subscriber Plaintiffs and the Subscriber Antitrust Damages Class paid higher out-of-pocket payments for out-of-network medical services than they would have paid but for Defendants' and their Co-Conspirators' anticompetitive conduct, have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

704.    The conduct of Defendants and their Co-Conspirators constitutes a violation of §1 of the Sherman Act, 15 U.S.C. §1.   Subscriber Plaintiffs and the Subscriber Antitrust Damages Class are entitled to recover all damages and treble damages allowed under §1 of the Sherman Act against Defendants, jointly and severally, together with their costs of suit, including

reasonable attorneys' fees, as well as any necessary injunctions to bar or abate Defendants' anticompetitive acts.

## COUNT VIII(B)

### FOR VIOLATION OF SECTION ONE OF THE SHERMAN ACT
**(On Behalf Of All Provider/Association Plaintiffs And The Provider Class Against All Defendants (except that Drs. Antell and Tonrey, Maldonado, the AMA and MSSNY do not bring claims against the UHG Defendants))**

705.    Provider Plaintiffs hereby repeat the allegations of the prior paragraphs of the Amended Complaint as if fully set forth herein.

706.    The Individual Provider Plaintiffs and the Provider Class have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

707.    The Associational Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

708.    Aetna, along with Ingenix and UHG and other competitors, have combined, conspired and/or agreed with one another, and/or with unnamed Co-Conspirators, to unreasonably restrain trade in per se violation of Section One of the Sherman Act, 15 U.S.C. § 1. Aetna, UHG and Ingenix combined, conspired and/or agreed with its Co-Conspirators in a horizontal price fixing conspiracy that sought, and was able, to artificially lower, fix or maintain the price paid to Provider Plaintiffs and the Provider Class by Aetna as UCR rates.

709.    The above agreement and/or conspiracy to fix prices is a *per se* violation of Section 1 of the Sherman Act, which operates at the expense of doctors (as well as subscribers) resulting in lower UCR rates of payment to healthcare providers.  The above agreement and conspiracy illegally restrains competition in a number of ways, including:

183

(a)     Fixing the price of UCR rates for Nonpar services at levels far below the level that would exist in a truly competitive market;

(b)     Accomplishing this price fixing by agreeing to peg the UCR rates to the same Ingenix database thereby using the same essential pricing formula;

(c)     Putting extreme additional competitive pressure on Nonpar healthcare providers to become part of particular networks by collusively refusing to even honor competitive market rates for those medical services in the UCR determinations.

710.    The above "price fixing" scheme has reduced the amount Provider Plaintiffs and the Provider Class are paid for their services below competitive levels.  However, because of the overwhelming market power that the users of Ingenix collectively maintain in the market, and because of the conspiracy and/or agreement among Aetna, its competitors and/or other parties to fix prices and not compete, there is no way to avoid interaction with the conspiracy.  Because of this conspiracy, Aetna and its Co-Conspirators, including UHG maintain their oligopsony by reducing costs all the while squeezing payments for ONET to unconscionably low levels.

711.    All of the aforementioned agreements and/or conspiracies affect interstate commerce and have resulted in antitrust injury to the Provider Plaintiffs and the Provider Class.

712.    Provider Plaintiffs and the Provider Class are entitled to damages under 15 U.S.C. § 15, *et seq.*

713.    As a result of the illegal agreements and/or conspiracies, Aetna has caused the Provider Plaintiffs and the Provider Class to suffer financial loss in that Aetna, along with UHG and Ingenix, with its agreements to fix prices and collective market strength, pays Provider Plaintiffs and the Provider Class at UCR rates that are set at unconscionably low and uncompetitive levels.

714.     As a consequence of Aetna, UHG and Ingenix's illegal agreements and/or conspiracies, Provider Plaintiffs have suffered and will continue to suffer financial loss and have been injured and will continue to be injured in their business of providing and enhancing medical services.  Among other things, Provider Plaintiffs and the Provider Class received less payment for their medical services than they would have in the absence of the agreement among Aetna, UHG and the other users of Ingenix to fix the prices paid for Provider Plaintiffs' out-of-network medical treatment.

715.     Provider Plaintiffs and the Provider Class are entitled to recover such actual damages as the jury may find, threefold, plus costs, expenses and attorneys fees.

716.     Provider Plaintiffs and the Provider Class further seek injunctive relief in the form of order prohibiting Aetna, UHG and Ingenix from engaging in the anti-competitive, discriminatory and otherwise wrongful behavior described above.

## **COUNT IX**

### **VIOLATION OF GBL §349**
**(By Plaintiff Weintraub And On Behalf Of Subscriber New York Damages Class Against Aetna, UHG and Ingenix)**

717.     Plaintiff Weintraub incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

718.     Plaintiff Weintraub seeks relief on behalf of himself and the New York Subscriber Damages Class under New York's General Business Law §349.  GBL §349 prohibits deceptive acts or practices in the conduct of any business or in the furnishing of any service in the state of New York.

719.     Aetna represented that it reimbursed Members or caused Members to be reimbursed for Out of Network Services based on UCR rates, but intentionally failed to disclose the true basis on which it determined its Members' out-of-network reimbursements.

720.    Aetna, UHG and Ingenix caused and causes harm to its Members including Plaintiff Weintraub and the Class members through its aforementioned schemes, including increasing Members' out-of-pocket payments, or forcing them to forego such ONET services entirely to avoid such expense.

721.    Aetna, UHG and Ingenix knew full well that Aetna's reimbursements to Members derived from the Ingenix Database were understated.  It engaged in extensive schemes to preclude subscribers from learning that they had been duped.

722.    Among the acts contrary to GBL §349:

(a)    Aetna repeatedly represented in plan documents, insurance policies, summary plan descriptions, certificates of coverage and other materials that it would cause claims for out-of-network medical services to be reimbursed on UCR amounts, but failed to disclose that it intended to reimburse these claims based on the Ingenix Database, which it knew or should have known unjustifiably understated UCR amounts; and

(b)    never disclosed the underlying data and methodology upon which the Ingenix Database was designed and constructed and precluded all of the users of the Ingenix Database from disclosing any PHCS or MDR-related information through confidentiality and non-disclosure agreements in order to prevent discovery of and complaints about the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if the underlying data and methodology were disclosed.

723.    Plaintiff Weintraub and members of the New York Subscriber Damages Class have paid premiums to Aetna for out-of-network coverage.  Plaintiff Weintraub and members of the New York Damages Class used ONET and sought reimbursement from Aetna.  Aetna

provided reimbursement to Plaintiff and members of the New York Damages Class based upon the defective Ingenix Database, including its flawed UCR rates.

724.    Aetna's provision and use of Ingenix's UCR rates to determine reimbursement to Plaintiff Weintraub and the members of the New York Subscriber Damages Class for ONET constitutes an unfair or deceptive act or practice in the conduct of trade or commerce in violation of GBL §349, because Aetna, UHG and Ingenix knew that the UCR rates provided by Ingenix were either defective, unreliable or collusively created.

725.    Defendants' concealment of the true nature of the Ingenix Database from Plaintiff Weintraub and the members of the New York Subscriber Damages Class constitutes the concealment of a material fact, because this is precisely the type of information upon which Plaintiff Weintraub and members of the New York Subscriber Damages Class could reasonably be expected to rely upon when making the decision whether to purchase and/or use out-of-network coverage from Aetna, especially since Plaintiff Weintraub alleges that the UCR rates calculated by Ingenix and used by Aetna in many cases bear no relationship to the true, market UCR rates for ONET.  Defendants' concealment from Plaintiff Weintraub and other members of the New York Damages Class of the true nature of the Ingenix Database, including its UCR rates, constitutes an unfair or deceptive act or practice in violation of GBL §349.

726.    As a direct and proximate result of Aetna's, UHG's and Ingenix's deceptive and unfair conduct, Weintraub and members of the New York Subscriber Damages Class have suffered and continue to suffer injury, including in particular, the overpayment of out-of-pocket expenses related to ONET.

727.     Accordingly, Plaintiff Weintraub and members of the New York Subscriber Damages Class are entitled to actual damages, punitive damages and equitable relief pursuant to GBL §349.

## COUNT X

### BREACH OF CONTRACT
**(By Plaintiff Weintraub Against Aetna And On Behalf Of A Non-ERISA Class Against Aetna)**

728.     Plaintiff Weintraub incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

729.     During times relevant to the Complaint, Plaintiff Weintraub has been a member of an individual and family health plan issued and administered by Aetna.  Specifically, during the Class Period, Plaintiff Weintraub participated in a "Student Health Insurance Program" sponsored by his University and defined as an "Aetna Open Choice PPO", underwritten by Aetna Life Insurance Company which was not subject to nor governed by ERISA.

730.     Aetna issued standard form contract documents for its individual and family plans (the "Agreements") to Plaintiff Weintraub and its other non-ERISA Members setting forth the benefits Aetna agreed to provide members as well as the costs to the members of the plans.

731.     The Agreements are uniform contracts that utilize the same definitions even across different health plans.  The Agreements are one-sided adhesive contracts.  Such contracts are presented on a take it or leave it basis and are not subject to negotiation or alteration by individual members.

732.     The Agreements provide non-ERISA Members like Plaintiff Weintraub with an express right to receive treatment from out-of-network providers.  Aetna refers to these providers as "non-participating," "non-contracting," "non-network," "non-PPO" and/or "out-of-network" providers.  Services by "in-network" providers are reimbursed at discounted rates negotiated

between the healthcare provider and Aetna.  Aetna promises in the Agreements to reimburse its members for services by out-of-network providers at a percentage of the lesser of: (i) the actual, billed charge, or (ii) the UCR for the services in the geographic area in which the services were performed.

733.    Plaintiff Weintraub was provided a "Guide to Student Health Insurance and Healthcare at New York University" that sets forth the terms of his Plan.  That document contains a Glossary where "Reasonable Charge" is defined as "[o]nly that part of a charge which is reasonable is covered.  The reasonable charge for a service or supply is the lowest of: the provider's usual charge for furnishing it; and the charge Aetna determines to be appropriate; based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and the care Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished."

734.    Plaintiff Weintraub was further provided with a "Student Health Insurance Handbook" that contains a "Summary of Benefits" section.  In that section, Aetna promised to reimburse Plaintiff Weintraub 50% of the Reasonable Charge for ONET.

735.    Aetna's Agreements, and its other written communications with its non ERISA Members, state that the Member is financially responsible for the difference between the allowed expense and the provider's billed charge for ONET.  For example, the Agreements explicitly state that "Covered Medical Expenses" only include charges that are not in excess of the "Reasonable Charge."

736.    Once a member receives ONET, Aetna provides an EOB that describes the division of payment for the service.  The EOBs state the amount the Non-par charged for the

service, the amount allowed, and after stating the percentage and portion of the amount allowed that Aetna will pay, states the balance, which the EOBs describe as "Your Responsibility."

737.    Thus. the portions of ONET charges not paid by Aetna are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan member has to pay for medical services over a given time period.  Such costs are borne entirely by Members such as Plaintiff Weintraub.

738.    In December, 2007, Plaintiff Weintraub obtained ONET from a Non-par in New York City and submitted the claim for the services to Aetna.  Aetna reimbursed Plaintiff Weintraub less than the agreed-upon percentage of either the provider's actual charges or the Reasonable Charge.  This reimbursement determination resulted in Plaintiff being obligated to pay not only his deductible, but also that part of the provider's billed charge that exceeded the reimbursement amount determined by Aetna.

739.    Plaintiff Weintraub and the other members of the Non-ERISA Class complied with their obligations under their Agreements with Aetna.

740.    Nevertheless, Aetna failed to comply with the terms of the Agreements with Plaintiff Weintraub and the other Non-ERISA Class Members by making reimbursement determinations for ONET that had the effect of covering less than the stated percentage of either the providers' actual charges or the UCR without valid data to support such determinations, rather relying on the flawed and artificially deflated data provided by Ingenix.  Aetna's conduct thus contravenes the express terms of the Agreements and constitutes a breach of its contracts. Such conduct also prevents Aetna's members from obtaining the benefits of the reimbursements they reasonably expect to receive pursuant to the terms of the Agreements in violation of the covenant of good faith and fair dealing.

741.    As a consequence of Aetna and its Co-Conspirators' actions, Plaintiff Weintraub and the other members of the proposed Non-ERISA Class were reimbursed for ONS in amounts less than what they should have been paid under their Agreements.

## COUNT XI

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**(By Plaintiff Weintraub Against Aetna, UHG and Ingenix And On Behalf Of Non-ERISA Class)**

742.    Plaintiff Weintraub incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

743.    During the Class Period, Aetna has calculated reimbursement for ONET based on the flawed data obtained from Ingenix resulting in Aetna's failure to reimburse in accordance with the terms of its Agreements.

744.    Aetna utilized the flawed Ingenix data to calculate false UCRs, thereby under-reimbursing Plaintiff Weintraub and other Non-ERIS Members, in order to obtain additional revenues to unlawfully enrich Aetna to the detriment of Plaintiff Weintraub and the other members of the Non-ERISA Class.

745.    Plaintiff Weintraub and members of the Non-ERISA Class purchased their Aetna health service plans with the reasonable expectation that they would be reimbursed for ONET based upon the actual charge or the reasonable charge for the particular healthcare service in the region where that service is obtained.

746.    In addition, Plaintiff Weintraub and members of the Non-ERISA Class purchased the health services plans with the reasonable expectation that Aetna would deal with them honestly, fairly, equitably, in good faith and in full conformity with the fundamental and implied terms of the Agreements.   Aetna brought about and intended this expectation through the

contractual language in the Agreements, enrollment materials, advertising, and through the express representations of its employees, agents and representatives.

747.    In breach of the covenant of good faith and fair dealing, Aetna has failed to reimburse ONET based on actual UCRs and has not provided any additional benefits to Plaintiff Weintraub and the Non-ERISA Class for the increased charges resulting from their under-reimbursement for ONET.   Therefore, Aetna and Ingenix have unreasonably denied Plaintiff Weintraub and the Non-ERISA Class the benefit of their bargain.

748.    Aetna and Ingenix have materially and fundamentally breached the duty of good faith and fair dealing owed to Plaintiff Weintraub and the Non-ERISA Class in at least the following respects:

(a)    Unreasonably and in bad faith conspiring to utilize flawed data to calculate depressed UCRs and under-reimburse plan Members for ONET in order to unlawfully enrich itself;

(b)    Unreasonably and in bad faith failing to clearly and definitely notify Plaintiff and the Non-ERISA Class of the fact that Aetna utilizes flawed data, which results in higher payments for ONET by Plaintiff Weintraub and the Non-ERISA Class;

(c)    Unreasonably and in bad faith continuing to misrepresent to Plaintiff Weintraub and the Non-ERISA Class that they were being reimbursed for ONET based on the UCR when Aetna continues to utilize flawed Ingenix data to calculate false or reduced UCRs;

(d)    Unreasonably, secretly, and in bad faith providing intentionally flawed and manipulated data to Ingenix for use in the Ingenix Database with the knowledge that such data would produce artificially low false UCRs from Ingenix; and

    (e)  Unreasonably and in bad faith putting the interests of Aetna ahead of those of Plaintiff Weintraub and the Non-ERISA Class.

   749.  Aetna's conduct represents a failure or refusal to discharge its contractual responsibilities, prompted by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of Plaintiff Weintraub and the Non-ERISA Class and thereby deprives them of the benefits of the Agreement in accordance with the agreed-upon terms.

   750.  Plaintiff Weintraub and the Non-ERISA Class performed their obligations under the Agreement by paying the dues, deductibles, and co-payments required by the Agreement.

   751.  Plaintiff Weintraub and the Non-ERISA Class were damaged by Aetna's and Ingenix's breach of the covenant of good faith and fair dealing in that they were under-reimbursed for ONET thereby resulting in increased out of pocket costs and/or they were unable to pay down their deductibles as quickly as they should have, and are therefore entitled to damages according to proof at trial.

### COUNT XII

### UNJUST ENRICHMENT
**(By Plaintiff Weintraub Against Aetna, UHG and Ingenix On Behalf Of A Non-ERISA Class)**

   752.  Plaintiff Weintraub incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

   753.  During the Class Period, Aetna, UHG and Ingenix have benefited from their intentional under-reimbursement for ONET due to the unlawful and inequitable acts alleged in this Amended Complaint.

   754.  Aetna's financial benefits resulting from its unlawful and inequitable conduct are traceable to payments by Plaintiff Weintraub and the other members of the Non-ERISA Class in

the form of higher premiums for the right to obtain ONS.  Aetna has also financially benefited by retaining money that should have been provided to Plaintiff Weintraub and the other members of the Non-ERISA Class for reimbursements for ONS.

755.    Plaintiff Weintraub and the Non-ERISA Class have unknowingly conferred upon Aetna UHG and Ingenix an economic benefit, in the nature of profits resulting from Defendants' unlawful conspiracy to under-reimburse for ONS, to the economic detriment of Plaintiff Weintraub and the Non-ERISA Class.

756.    The economic benefit of overcharges for premiums, under-reimbursement for ONET, and unlawful antitrust profits derived by Defendants through their conspiracy is a direct result of Defendants' unlawful practices.

757.    The financial benefits derived by Aetna, UHG and Ingenix rightfully belong to Plaintiff Weintraub and the Non-ERISA Class, as they paid higher premiums for the right to obtain ONET at the UCR, only to be reimbursed by Aetna based on the UCRs, which inured to the benefit of Defendants.

758.    It would be inequitable for the Defendants to be permitted to retain any of the monies they wrongfully retained due to their unfair and unconscionable methods, acts and practices alleged in this Amended Complaint.

759.    Aetna, UHG and Ingenix should be compelled to disgorge in a common fund for the benefit of Plaintiff Weintraub and the Non-ERISA Class all unlawful or inequitable proceeds received by them.

760.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Aetna traceable to Plaintiff Weintraub and the Non-ERISA Class.

761.    Plaintiff Weintraub and the Non-ERISA Class have no adequate remedy at law.

**WHEREFORE**, Provider Plaintiffs, the Provider Class, and the Provider ERISA Subclass demand judgment in their favor against Aetna as follows:

(a)     Certifying the Provider Class and Provider ERISA Subclass as set forth in this Complaint, and appointing the Individual Provider Plaintiffs as representatives for these classes;

(b)     Declaring that Aetna has breached the terms of its Members' plans with regard to out-of-network benefits in its Members' health plans, and thereby awarding damages to Provider Plaintiffs and the Provider ERISA Subclass for unpaid benefits in ERISA plans to Provider Plaintiffs and the Provider ERISA Subclass, as well as awarding declaratory relief with respect to Aetna's violations of ERISA;

(c)     Declaring that Aetna has failed to provide a "full and fair review" to Provider Plaintiffs and the Provider ERISA Subclass under § 503 of ERISA, 29 U.S.C. § 1133, and awarding declaratory relief with respect to Aetna's violation of ERISA;

(d)     Declaring that Aetna has violated its disclosure obligations under ERISA and the federal common law, including under § 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)( 4), and § 102 of ERISA, 29 U.S.C. § 1022, for which Plaintiffs and the ERISA Subclass are entitled to declaratory relief;

(e)     Declaring that Aetna violated federal claims procedures and SPD disclosure requirements under ERISA and that "deemed exhaustion" under the ERISA regulations is in effect as a result of Aetna's actions;

(f)     Declaring that Aetna, UHG and Ingenix are liable to the Provider Plaintiffs and the Class pursuant to RICO, 18 U.S.C. §§, 1962(c), (d) and 1964(c) for threefold their damages, costs and attorney fees and awarding such relief;

(g)     Enjoining Aetna, UHG and Ingenix from committing the RICO violations described above in the future and/or declaring their invalidity;

(h)     Declaring that Aetna, UHG and Ingenix violated federal antitrust law and is liable to Provider Plaintiffs and the Provider Class pursuant to 15 U.S.C. § 15, *et seq.* for threefold their damages, costs and attorney fees and awarding such relief;

(i)     Enjoining Aetna, UHG, and Ingenix from committing the antitrust violations described above in the future and/or declaring their invalidity;

(j)     Enjoining Aetna from using the Ingenix database as well as Medicare fees to determine UCR, along with other Nonpar benefit reductions;

(k)     Enjoining Aetna from committing any violation of law proven at trial;

(l)     Awarding Provider Plaintiffs and the Provider Class the costs and disbursements of this action, including reasonable attorneys' fees, costs and expenses in amounts to be determined by the Court;

(m)     Ordering Aetna to recalculate and issue unpaid benefits to Provider Plaintiffs and Provider Class members that were underpaid as a result of Aetna's improper UCR determinations;

(n)     Awarding prejudgment interest to the Provider Plaintiffs; and

(o)     Granting such other and further relief as is just and proper.

**WHEREFORE**, Subscriber Plaintiffs and the Subscriber Class demand judgment in their favor against Aetna as follows:

(a)     Certifying the ERISA Class, the New Jersey SEHP and Individual Plan Class, the RICO Class, and the RICO Section 664 Subclass, the Federal Damages and Federal Injunctive Relief Classes, and the New York Subscribers Classes as set forth in this Amended

Complaint, and appointing named Plaintiffs as Class representatives for the RICO Class and all named Plaintiffs except Plaintiff Weintraub as class representatives for the RICO Section 664 Subclass, appointing named Subscriber Plaintiffs as Class representatives for the ERISA Class, appointing Plaintiffs Cooper and Samit as Class representatives for the New Jersey SEHP and Individual Plan Class, appointing Plaintiff Weintraub as Class representative for the New York Subscriber Damages Class, and appointing all named Plaintiffs as Class representative for the Federal Damages and Federal injunctive relief classes.

(b)  Declaring that Aetna has breached the terms of its EOCs and SPDs and awarding unpaid benefits to Subscriber Plaintiffs and the members of the ERISA and New Jersey SEHP and Individual Plan Classes, as well as awarding injunctive and declaratory relief to prevent Aetna's continuing Nonpar Benefit Reductions that are undisclosed and unauthorized by EOCs and SPDs;

(c)  Declaring that Aetna has violated its fiduciary duties by failing to pay proper Nonpar benefits without justification and by violating its duties of loyalty and care to Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes, and awarding appropriate relief, including unpaid benefits, restitution, interest, declaratory and injunctive relief to Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes, and removing the Aetna Defendants as fiduciaries;

(d)  Enjoining Aetna, UHG and Ingenix from violating applicable law and ordering remedial relief for its past violations of applicable law, including regarding ER, tiering and use of Medicare rates for UCR;

(e)  Enjoining Aetna's use of EOBs that violate applicable law;

197

(f)     Declaring that Aetna has failed to provide a "full and fair review" to Subscriber Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes under 29 U.S.C. § 1133, and awarding injunctive, declaratory and other equitable relief to Subscriber Plaintiffs and the members of the ERISA Class to ensure compliance with ERISA and its regulations;

(g)     Compelling Aetna to allow the provider's billed amount, and to pay additional benefits to Subscriber Plaintiffs and the Subscriber Classes based on the new allowed amount, in every instance in which Aetna reduced reimbursements due to its UCR determinations that were based on flawed or inadequate data, including through its reliance on the Ingenix database in violation of contractual terms of its plans and the SEHP and Individual Plan Regulation, plus interest;

(h)     Compelling Aetna to recalculate deductibles and coinsured charge limits based on the provider's charge (rather than the UCR amount) in every instance in which it improperly reduced benefits;

(i)     Declaring that Aetna has violated its disclosure and related obligations under ERISA and federal common law, including under 29 U.S.C. § 1022, for which Plaintiffs and the ERISA and New Jersey SEHP and Individual Plan Classes are entitled to injunctive, declaratory and other equitable relief;

(j)     Declaring that Aetna has violated Federal Claims Procedure Regulations issued under ERISA, and enjoining any continued violation;

(k)     Declaring that Aetna has breached its fiduciary obligations to its Members under ERISA, including 29 U.S.C., § 1104 and 29 U.S.C. § 1106, 29 U.S.C. § 1022, and 29 U.S.C. § 1024(b)( 4), and the federal common law, and awarding declaratory and injunctive

relief to remedy same, including but not limited to removal of a fiduciary or appointment of an independent monitor;

(l)     Declaring that Aetna, United and Ingenix and the Ingenix-Aetna Enterprise engaged in a scheme to reduce the amount of Aetna's payments to its Members, in violation of 18 U.S.C. § 1962(c);

(m)     Declaring that Aetna, United and Ingenix, through the Ingenix-Aetna Enterprise, made false payments on claims arising under ERISA plans, thereby converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended beneficiary, for Aetna's direct or indirect benefit, in violation of 18 U.S.C. § 664, justifying monetary and injunctive and other relief;

(n)     Preliminarily and permanently enjoining Defendants from using the Ingenix Databases as well as Medicare fees to determine UCR, along with other Nonpar Benefit Reductions;

(o)     Preliminarily and permanently enjoining Aetna from making Nonpar Benefit Reductions where Members' EOCs and SPDs do not disclose or authorize them; Preliminarily and permanently enjoining Aetna from making Nonpar Benefit Reductions in the New Jersey SEHP and Individual Plan Classes in violation of New Jersey law;

(p)     Preliminarily and permanently enjoining Aetna from discouraging Nonpar services or placing undisclosed obstacles in the path of Aetna Members seeking to access Non-Par care, including in the ER;

(q)     Preliminarily and permanently enjoining Ingenix from "approving" members' requests for preauthorization without disclosing the financial consequences that will occur despite Aetna's "approval";

(r)     Ordering Aetna to recalculate and issue unpaid benefits to Subscriber Plaintiffs and Class members that were underpaid as a result of Aetna's Nonpar Benefit Reductions;

(s)     Awarding Subscriber Plaintiffs and the Members of the Subscriber RICO Antitrust Class and the RICO 664 Subclass compensatory damages, trebled where required by law, and disbursements and expenses of this action, including reasonable counsel fees, costs and reimbursements of expenses, including expert fees, in amounts to be determined by the Court and other appropriate relief;

(t)     Awarding Subscriber Plaintiffs and members of the New York Damages Class are entitled to actual damages, punitive damages and equitable relief pursuant to GBL §349;

(u)     Declaring that Aetna, United and Ingenix violated federal antitrust law and are liable to Subscriber Plaintiffs and the Subscriber Class pursuant to 15 U.S.C. § 15, *et seq.* for threefold their damages, costs and attorney fees and awarding such relief;

(v)     Awarding prejudgment interest; and

(w)     Granting such other and further relief as is just and proper.

## JURY TRIAL DEMAND

All Plaintiffs demand a jury trial for all claims so triable.

Each attorney set forth below is representing that the allegations with respect each of to his or her clients have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

s/ D. Brian Hufford
D. Brian Hufford
Robert J. Axelrod
Susan J. Weiswasser
POMERANTZ HAUDEK
GROSSMAN & GROSS LLP
100 Park Avenue
New York, NY 10017
212-661-1100

*Chair of the Aetna Plaintiffs' Executive Committee*

James E. Cecchi
Lindsay H. Taylor
CARELLA BYRNE BAIN GILFILLAN
CECCHI STEWART & OLSTEIN, PC
5 Becker Farm Road
Roseland, NJ 07068
973-994- 1700

Joe R. Whatley
Edith M. Kallas
W. Tucker Brown
Laurence J. Hasson
WHATLEY DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
New York, NY 10036
212-447-7070

Barry M. Epstein
Kevin Peter Roddy
Lynne Kizis
Barbara Gail Quackenbos
WILENTZ, GOLDMAN & SPITZER P.A.
90 Woodbridge Center Drive
PO Box 10
Woodbridge, NJ 07095
732-636-8000

Kevin M. Berry
WILENTZ, GOLDMAN & SPITZER P.A.
110 William Street, 26th Floor
New York, NY 10038
212-267-3091

Stephen A. Weiss
Christopher A. Seeger
Jonathan Shub
SEEGER WEISS LLP
One William Street
New York, New York 10004
212-584-0700

Joseph P. Guglielmo
SCOTT + SCOTT LLP
500 Fifth Avenue, 40th Floor
New York, NY 10110
212-223-6444

David R. Scott
Amanda F. Lawrence
SCOTT + SCOTT LLP
PO Box 192
108 Norwich Ave.
Colchester, CT 06415
860-537-5537

Christopher M. Burke
SCOTT + SCOTT LLP-CA
600 Street, Suite 1500
San Diego, CA 92101
619-233-4565

Andrew S. Friedman
Elaine A. Ryan
Kathryn A. Jann
BONNETT, FAIRBOURN, .FRIEDMAN &
BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
602-274-1100

*Members of the Aetna Plaintiffs' Executive
Committee*

Archie Lamb, Jr.
LAW OFFICES OF ARCHIE LAMB, LLC
2017 Second Avenue North, 2nd Floor
Birmingham, Alabama 35203
205-324-4644

Nicholas B. Roth
EYSTER KEY TUBBWEAVER & ROTH
402 E. Moulton Street
Decatur, Alabama 35601
256-353-6761

Dennis G. Pantazis
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
205-314~0500

Ralph Knowles
Kenneth Canfield
DOFFERMYRE SHIELDS CANFIELD &
KNOWLES, LLC
1355 Peachtree Street, Suite 1600
Atlanta, GA 30309
404-881-8900

Paul M. Weiss
Jeffrey A. Leon
George K. Lang
FREED & WEISS LLC
111 West Washington Street, Suite 1331
Chicago, Illinois 60602
312-220-0000

Gregory J. Pepe
NEUBERT, PEPE & MONTEITH P.C.
195 Church Street, 13th Floor
New Haven, CT 06510-20026
203-821-2000

Klari Neuwelt
LAW OFFICE OF KLARI NEUWEL T
110 East 59th Street, 29th Floor
New York, NY 10022
212-593-8800

203

Wood R. Foster, Jr.
Jordan Lewis
SIEGEL BRILL GREUPNER DUFFY &
FOSTER P.A.
1300 Washington Ave S
Minneapolis, MN 55401
616-337-6100

Jonathan Alpert
THE ALPERT LAW FIRM P.A.
5920 River Terrace
Tampa, Florida 33604-6526
813-223-4131

Donald E. Haviland, Jr.
THE HAVILAND LAW FIRM LLC
112 Haddontowne Court, Suite 202
Cherry Hill, NJ 08034
215-609-4661

Bruce Heller Nagel
Randee M. Matloff
NAGEL RICE, LLP
103 Eisenhower Parkway, Suite 201
Roseland, NJ 07068
973-618-0400

Richard J. Burke
RICHARD J. BURKE LLC
1010 Market Street, Suite 650
St. Louis, Missouri 63101
314-880-7000

Alberto Nestico
KISLING, NESTICO & REDICK LLC
3200 W. Market Street, Suite 300
Akron, Ohio 44333
330-869-9007

Austin Tighe
FEAZELL & TIGHE, L.L.P.
6300 Bridgepoint Parkway
Bridgepoint 2, Suite 220
Austin, TX 78732
512-372-8100

Bruce D. Greenberg
Jennifer Sarnelli
LITE DePALMA GREENBERG
& RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
973-623-3000

Michael C. Dodge
GLAST, PHILLIPS & MURRY, P.C.
2200 One Galleria Tower
13355 Noel Road, L.B. 48
Dallas, Texas 86350
972-419-8300

Mark N. Todzo
Lexington Law Group, LLP
1627 IRVING ST.
SAN FRANCISCO, CA 94110
415-759-4111

Lisa J. Rodriguez
TRUJILLO RODRIGUEZ RICHARDS, LLC
258 Kings Highway East
Haddonfield, NJ 08033
856-795-9002

Ira Neil Richards
TRUJILLO RODRIGUEZ RICHARDS, LLC
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
215-731-9004

Marc H. Edelson
EDELSON & ASSOCIATES, LLC
45 West Court Street
Doylestown, PA 18901
215-230-8043

Anthony Bolognese
Joshua H. Grabar
Jonathan M Stemerman
BOLOGNESE & ASSOCIATES, LLC
Two Penn Center
1500 John F. Kennedy Blvd., Ste. 320
Philadelphia, PA 19102
215-814-6750

*Counsel for Plaintiffs*