# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------------X

IN RE:  AETNA UCR LITIGATION

_____

This Document Relates to:    ALL CASES

-------------------------------------------------------------X

MDL NO. 2020

MASTER DOCKET NO.
07-3541 (FSH) (PS)

<br>

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

<br>

D. Brian Hufford
Robert J. Axelrod
Daniel L. Berger
Susan J. Weiswasser
Jay Douglas Dean
POMERANTZ HAUDEK
 GROSSMAN & GROSS LLP
100 Park Avenue
New York, New York 10017
(212) 661-1100

*Chair of the Aetna Plaintiffs' Executive Committee*

[Additional Counsel on Signature Page]

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. iii

Preliminary Statement ........................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 2

A.    Background .............................................................................................................. 2

B.    The Ingenix Database ............................................................................................. 3

1.    Dr. Bernard Siskin .................................................................................................. 4

2.    Dr. Stephen Foreman .............................................................................................. 5

C.    United Healthcare, Ingenix and Aetna's Experts Do Not Defend Ingenix Determination of R&C ............................................................................................ 7

1.    Dr. Slottje .............................................................................................................. 7

2.    Dr. Joskow ............................................................................................................. 7

3.    Dr. Cantor .............................................................................................................. 7

D.    The Ingenix Database's Pervasive and Systemic Flaws ...................................... 8

E.    Aetna's Other Undisclosed Methodologies Were Invalid for Determining R&C ........... 10

1.    Aetna's "Back Room" Fee Profile Data Pricing R&C Benefit Determinations ............... 11

F.    Aetna's Failure to Disclose Material Information and Misrepresentations Concerning R&C Determinations in Violation of ERISA ................................................... 14

G.    Aetna's Claims and Appeals Procedures Denied Members Full and Fair Review, Rendering Member Appeals Futile, and Were in Violation of ERISA ............................ 16

H.    Aetna's Withholding of Information Relevant to Second-Level Appeals ...................... 16

I.    Aetna's Discretion in ASC Plans and the Use of Stop Loss Insurance in ASC Plans ...... 17

J.    Use of the Wire and Mail to Facilitate or Commit Fraud .................................... 18

K.    The Conspiracy to Fix Rates Paid for Benefits for Use of Non-Participating Providers . 19

1.    Dr. Rausser's Opinion ......................................................................................... 19

2.    Dr. Foreman's Opinion ........................................................................................ 20

ARGUMENT ..................................................................................................... 21

I.      THE COURT SHOULD CERTIFY THE CLASSES ...................................... 21

A.      THE CLASSES SATISFY EACH OF THE RULE 23(a) PREREQUISITES ................ 22

1.      Rule 23(a)(1): Numerosity ............................................................... 22

2.      Rule 23(a)(2): Commonality ............................................................ 22

3.      Rule 23(a)(3): Typicality ................................................................. 26

4.      Rule 23(a)(4): Adequacy of Representation .................................... 30

B.      COMMON QUESTIONS PREDOMINATE OVER ANY INDIVIDUALIZED ISSUES, SATISFYING RULE 23(b)(3) ...................................................................... 34

1.      Subscriber and Provider Plaintiffs' ERISA Claims ........................ 36

a.      Claims for Unpaid Benefits .............................................................. 36
c.      Failure to Provide Full & Fair Review ............................................. 40
2.      Subscriber Plaintiffs Non-ERISA Claims ........................................ 42

a.      NJ SEHP and Individual Plan Regulations ....................................... 42
b.      Breach of Contract ............................................................................ 42
c.      NY GBL § 349 ................................................................................... 44
3.      Provider and Subscriber Plaintiffs' RICO Claims .......................... 45

4.      Plaintiffs' Antitrust Claims .............................................................. 50

a.      Antitrust Conspiracy ......................................................................... 50
b.      Antitrust Injury (Common Impact) ................................................... 53
c.      Common Proof of Economic Damages ............................................. 55
d.      Rule of Reason Antitrust Liability .................................................... 57
C.      CLASS ADJUDICATION IS SUPERIOR TO ALL OTHER MEANS OF  RESOLVING THIS LITIGATION, SATISFYING RULE 23(b)(3) .................................................... 57

D.      THE ERISA CLAIMS SATISFY THE PREREQUISITES FOR  CERTIFICATION UNDER RULE 23(b)(2) .................................................................................. 59

CONCLUSION ................................................................................................. 60

# TABLE OF AUTHORITIES

**Cases**

*Ace Chrome Corp. v. Ibex Constr. LLC*,
    08 Civ. 10401 (TPG), 2009 U.S. Dist. LEXIS 71547 (S.D.N.Y. Aug. 13, 2009)................... 47

*Am. Seed Co. v. Monsanto Co.*,
    271 Fed. App'x. 138 (3d Cir. 2008) ................................................................. 59, 60

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997)................................................................................................ 56

*American Medical Ass'n v. United HealthCare Corp.*,
    No. 00 Civ. 2800 (LMM), 2009 U.S. Dist. LEXIS 112634 (S.D.N.Y. Dec. 1, 2009) ........... 36

*Baby Neal for and by Kanter v. Casey*,
    43 F.3d 48 (3d Cir. 1994) ........................................................................................ 28

*Barrowclough v. Kidder, Peabody & Co.*,
    752 F.2d 923 (3d Cir. 1985) ..................................................................................... 40

*Beck v. Maximus, Inc.*,
    457 F.3d 291 (3d Cir. 2006) ............................................................................ 28, 33, 36

*Bogosian v. Gulf Oil Corp.*,
    561 F.2d 434 (3d Cir. 1977) ............................................................................ 59, 60, 62

*Brooks v. Educators Mut. Life Ins. Co.*,
    206 F.R.D. 96 (E.D. Pa. 2002)......................................................................... 27, 29

*Buczek v. Continental Cas. Ins. Co.*,
    378 F.3d 284 (3d Cir. 2004) ..................................................................................... 41

*Bunnion v. Consol. Rail Corp.*,
    No. 97-4877, 1998 U.S. Dist. LEXIS 7727 (E.D. Pa. May 14, 1998).................................... 65

*Cannon v. Cherry Hill Toyota, Inc.*,
    184 F.R.D. 540, 545 (D.N.J. 1999)......................................................................... 38

*Cates v. Cooper Tire and Rubber Co.*,
    253 F.R.D. 422 (N.D. Ohio 2008) ............................................................................ 66

*Chiang v. Veneman*,
    385 F.3d 256 (3d Cir. 2004) ..................................................................................... 24

*Cincinnati Ins. Co. v. Cham's Jewelry Art, Inc.*,
    31 F. App'x 793 (3d Cir. 2002) ................................................................................ 40

*County of Monroe, Fla. v. Priceline.com, Inc.*,
   No. 09-10004-CIV-MOORE/SIMONTON,
   2010 U.S. Dist. LEXIS 25066 (S.D. Fla. Mar. 15, 2010) ....................................... 37

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269
   (W.D. Tex. 2007) ...................................................................................................... 37

*Dewitt v. Penn-Del Directory Corp.*,
   106 F.3d 514 (3d Cir. 1997) ..................................................................................... 40

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) .................................................................................................. 23

*Evans v. Employee Benefit Plan*,
   311 Fed. App'x 556 (3d Cir. 2009) .......................................................................... 43

*Fallick v. Nationwide Mut. Ins. Co.*,
   162 F.3d 410 (6th Cir. 1998) .................................................................................... 27

*First State Orthopaedics v. Concentra, Inc.*,
   534 F. Supp. 2d 500 (E.D. Pa. 2007) ....................................................................... 31

*Grider v. Keystone Health Plan Central, Inc.*,
   No. 2001-CV-05641, 2006 U.S. Dist. LEXIS 93085 (E.D. Pa. Dec. 20, 2006) ...... 50

*Grossmuller v. Int'l Union*,
   715 F.2d 853 (3d Cir. 1983 ...................................................................................... 42

*Hahnemann Univ. Hosp. v. All Shore, Inc.*,
   514 F.3d 300 (3d Cir. 2008) ..................................................................................... 44

*Hassine v. Jeffes*,
   846 F.2d 169 (3d Cir. 1988) ..................................................................................... 28

*Hodges v. Akeena Solar, Inc.*,
    263 F.R.D. 528 (N.D. Cal. 2009) ............................................................................ 37

*Hohider v. UPS*,
   574 F.3d 169 (3d Cir. 2009) ..................................................................................... 23

*Hunt v. Hawthorne Assocs.*,
   119 F.3d 888 (11th Cir. 1997) .................................................................................. 66

*In re Abbott Laboratories Norvir Anti-trust Litig.*,
   No. C 04-1511 CW, 2007 U.S. Dist. LEXIS 44459 (N.D. Cal. June 11, 2007) ...... 48

*In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*,
   2006 U.S. Dist. LEXIS 16619, (D.N.J. Aug. 4, 2006) ..................................... 36, 58

*In re Cmty. Bank of N. Va.*,
   418 F.3d 277 (3d Cir. 2005) ............................................................. 32

*In re Constar Int'l Inc. Sec. Litig.*,
   585 F.3d 774 (3d Cir. 2009) ............................................................. 38

*In re Ethylene Propylene Diene Monomer ("EDPM") Antitrust Litig.*,
   256 F.R.D. 82 (D. Conn. 2009) .................................................. 61, 62

*In re Flat Glass Antitrust Litig.*,
   191 F.R.D. 472 (W.D. Pa. 1999) ...................................................... 39

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) ............................................................. 57

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ............................................................... 32

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2009) ...................................................... passim

*In re IGI Secs. Litig.*,
   122 F.R.D. 451 (D.N.J. 1988) .......................................................... 29

*In re Ins. Brokerage Antitrust Litig.*,
   2009 U.S. Dist. LEXIS 17754, (D.N.J. Feb. 17, 2009), *aff'd*, 579 F.3d 241 (3d Cir. 2009)... 35

*In re Ins. Brokerage Antitrust Litig.*,
   579 F.3d 241 (3d Cir. 2009) ...................................................... passim

*In re Ins. Brokerage Antitrust Litig.*,
   No. 04-5184 (FSH), 2007 U.S. Dist. LEXIS 11163 (D.N.J. Feb. 16, 2007) ......................... 36

*In re K-Dur Antitrust Litig.*,
   No. 01-1652 (JAG), 2008 U.S. Dist. LEXIS 71771 (D.N.J. Mar. 27, 2008) ................... 37, 56

*In re Linerboard Antitrust Litig.*,
   305 F.3d 145 (3d Cir. 2002) .................................................. 58, 59, 60

*In re Mercedes Benz Tele Aid Contract Litig.*,
   257 F.R.D. 46 (D.N.J. 2009) ............................................................ 23

*In re Mercedes-Benz Antitrust Litig.*,
   213 F.R.D. 180 (D.N.J. 2003) .................................................. 31, 38, 39

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cr. 1998) .................................................. 36, 38

*In re Schering Plough Corp. ERISA Litig.*,
    589 F.3d 585 (3d Cir. 2009) ........................................................ 24, 28, 29

*In re Sugar Indus. Antitrust Litig.*,
    73 F.R.D. 322 (.D. Pa. 1976) ............................................................... 65

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002) ............................................................ 56

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ............................................................... 56

*Jansen v. Greyhound Corp.*,
    692 F. Supp. 1022 (N.D. Iowa 1986); .................................................. 66

*Jermyn v. Best Buy Stores*,
    *LP*, 256 F.R.D. 418 (S.D.N.Y. 2009) ............................................. 48, 49

*Johnston v. HBO Film Mgmt.*,
    265 F.3d 178 (3d Cir. 2001) .......................................................... 24, 27

*Kemmerer v. ICI Americas Inc.*,
    70 F.3d 281 (3d Cir. 1995) ................................................................ 40

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ........................................................ 54

*Kleiner v. First Nat'l Bank of Atlanta*,
    97 F.R.D. 683 (N.D. Ga. 1983) .......................................................... 47

*Kohen v. Pacific Inv't Mgmt. Co., LLC*,
    571 F.3d 672 (7th Cir. 2009) ........................................................... 32

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) .......................................................................... 55

*Lester v. Percudani*,
    217 F.R.D. 345 (M.D. Pa. 2003) ........................................................ 37

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004) ............................................................... 50

*Lyon v. Caterpillar, Inc.*,
    194 F.R.D. 206 (E.D. Pa. 2000) ......................................................... 39

*M.A. v. Newark Public Schools*,
    Civil Action No. 01-3389 (SRC),
    2009 U.S. Dist. LEXIS 114660 (D.N.J. Dec. 7, 2009) ......................... 33

*Markocki v. Old Republic Nat'l Title Ins. Co.*,
  254 F.R.D. 242 (E.D. Pa. 2008)................................................................ 37

*McCoy v. Health Net*,
  569 F. Supp. 2d 448 (D.N.J. 2008) ..................................................... passim

*McDonough v. Toys "R" Us, Inc.*,
  638 F.Supp.2d 461 (E.D. Pa. 2009) .................................................... passim

*McGee v. Equicor-Equitable HCA Corp.*,
  953 F.2d 1192 (10th Cir. 1992) ............................................................. 41

*Mulder v. PCS Health Sys., Inc.*,
  216 F.R.D. 307 (D.N.J. 2003)........................................................... 65, 66

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001) ...................................................... 24, 29, 32

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
  85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995 ................................ 48, 49

*Petruzzi's IGA Supermkts., Inc. v. Darling-Delaware Co.*,
  998 F.2d 1224 (3d Cir. 1993) ............................................................. 57

*Rossi v. Standard Roofing, Inc.*,
  156 F.3d 452 (3d Cir. 1998) ........................................................... 55, 61

*Schoenbaum v. E.I. Dupont De Nemours and Co.*,  No. 4:05-CV-01108-ERW,
  2009 U.S. Dist. LEXIS 114080 (E.D. Mo. Dec. 8, 2009) .................................. 64

*Shady Grove Orthopedic Associates v. Allstate Ins. Co.*,
  130 S. Ct. 1431 (2010).................................................................... 22

*Sloan v. BorgWarner, Inc.*,
  263 F.R.D. 470 (E.D. Mich. 2009) ......................................................... 66

*Spencer v. Hartford Fin. Servs. Group, Inc.*,
  256 F.R.D. 284 (D. Conn. 2009) ....................................................... 50, 52

*Summerfield v. Equifax Info. Servs.*, 264 F.R.D. 133 (D.N.J. 2009) .......................... 24

*Sutton v. Med. Serv. Ass'n of Pa.*, No. 92-4787,
  1993 U.S. Dist. LEXIS 3049 (E.D. Pa. Mar. 5, 1993)....................................... 65

*Szczubelek v. Cendant Mortgage, Inc.*,
  215 F.R.D. 107 (D.N.J. 2002)............................................................. 39

*Thomas v. SmithKline Beecham Corp.*,
  201 F.R.D. 386 (E.D. Pa. 2001).......................................................... 65

*United States v. Irizarry*,
    341 F.3d 273 (3d Cir. 2003) ............................................................. 53

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)......................................................................... 55

*Varacallo v. Mass. Mut. Life Ins. Co.*,
    226 F.R.D. 207 (D.N.J. 2005)........................................................... 38

Wachtel v. Health Net,
    2006 U.S. Dist. LEXIS 98168 (D.N.J. Sept. 28, 2006) ...................... 1

Wachtel v. Health Net,
    453 F.3d 179, 189-90 (3d Cir. 2006) ................................................. 1

*Wachtel v. Health Net, Inc.*,
    223 F.R.D. 196 (D.N.J. 2004)................................................... passim

*Weber v. Govt. Employees Ins. Co.*,
    262 F.R.D. 431 (D.N.J. 2009)........................................................... 28

*Weikel v. Tower Semiconductor, Ltd.*,
    183 F.R.D. 377 (D.N.J. 1998)........................................................... 33

*Weiss v. York Hosp.*,
    745 F.2d 786 (3d Cir. 1984) ............................................................. 23

*Williams v. Mohawk Indus., Inc.*,
    568 F.3d 1350 (11th Cir. 2009) ........................................................ 64

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)......................................................................... 58

## Statutes

18 U.S.C. § 1962(c) .................................................................. 46, 50

29 U.S.C. § 1104 ........................................................................... 40

29 U.S.C. § 1132(a)(1)(B) ............................................................. 37

29 U.S.C. § 1133 ...................................................................... 41, 42

GBL §349....................................................................................... 46

New York Gen. Bus. L. § 349 ....................................................... 45

**Rules**

Fed. R. Civ. P. 23(b)(2) .................................................................................................. 60

Fed. R. Civ. P. 23(b)(3)(A)-(D .................................................................................... 59

Federal Rule of Civil Procedure 23 ..................................................................... passim

Rule 23(b)(2) .................................................................................................................. 60

Rule 23(b)(3) .................................................................................................................. 58

**Treatises**

7 P. AREEDA, ANTITRUST LAW ¶ 1503, at 376 (1986) ................................................ 58

**Regulations**

N.J.A.C. § 11:21-7. 13(a) ............................................................................................. 43

N.J.A.C. § 11:21-7.13 ................................................................................................... 43

N.J.A.C. 11:20-24.5 ...................................................................................................... 43

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this memorandum in support of their motion,[1] pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), to certify (1) a Subscriber ERISA Class; (2) a Subscriber New Jersey Small Employer Health Plan ("NJ SEHP") and Individual Plan Class; (3) a Subscriber RICO Class; (4) a Subscriber RICO Section 664 Subclass; (5) a Subscriber New York Damages Sub-Class; (6) a Subscriber Non-ERISA Sub-Class; (7) a Provider Class; and (8) a Provider ERISA Sub-Class.[2]

The issues raised in this litigation are not new to this Court. The Court's decision in *Wachtel v. Health Net, Inc.*, 223 F.R.D. 196 (D.N.J. 2004), the remand by the Third Circuit "for a definition of the claims, issues and defenses to be treated on a class basis," 453 F.3d 179, 189-90 (3d Cir. 2006), and the amended order addressing the class definition issues specified and adopting the prior opinion by reference, Nos. 01-4183, 03-1801, 2006 U.S. Dist. LEXIS 98168, at *6-7 (D.N.J. Sept. 28, 2006), inform this motion.

The central issue here, as in *Health Net*, is the validity of the Ingenix database and other reimbursement protocols Aetna used to make reasonable and customary ("R&C") reimbursement determinations for healthcare services rendered by non-participating ("non-par") providers. Expert opinion, deposition testimony and documentary evidence, appended to the accompanying Axelrod Declaration and summarized in this memorandum of law, overwhelmingly demonstrate

---

[1] The moving Plaintiffs are Michele Cooper, Michele Werner, Darlery Franco, Paul and Sharon Smith, Carolyn Samit, and Jeffrey M. Weintraub (collectively, "Subscriber Plaintiffs"); Alan B. Schorr, M.D., Frank G. Tonrey, M.D., Carmen M. Kavali, M.D., and Brian Mullins, M.S., P.T., (collectively, "Provider Plaintiffs). In addition, Plaintiff North Surgical Center LP, on behalf of facility providers, joins in the arguments advanced by Plaintiffs.

[2] The definitions of the classes are set forth in the Notice of Motion and the Declaration of Robert J. Axelrod in Support of Plaintiffs' Motion for Class Certification at ¶¶ 109, 111, 113, 115, 117, 119, 121.

that issues common to the Classes predominate and are fully capable of being resolved through generalized proof.

This case is exceedingly well-situated for class treatment, for the following additional reasons:

■   *This case involves, at bottom, only a single overarching issue – whether Aetna's R&C determinations breached its definition of R&C in its insurance contracts.* This issue is susceptible to common proof, which will demonstrate that Aetna's determination of R&C fails to comply with its R&C definition, establishing its liability on a class-wide basis. There are no individual issues that would preclude class treatment.

■   *This case involves uniform and substantively identical plan provisions.* Aetna interprets the R&C definition in its insurance contracts in exactly the same way and determines R&C reimbursement in a uniform manner – any linguistic variations are minor and immaterial.

■   *The measure of damages is formulaic and easily can be calculated for all Class members.* Plaintiffs' expert sets out economic methodologies that may be used to calculate class-wide damages. Thus, measurable damages are "capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2009).

## STATEMENT OF FACTS

### A.   Background

Aetna insures, underwrites and administers commercial healthcare benefits, including those of the moving Plaintiffs. Aetna explicitly permits its members to choose providers who do not contract with Aetna ("non-par providers"). Even as to its HMO members (whose premiums are generally lower), Aetna subscribers are legally permitted to use non-par providers in the event of an emergency or if a participating provider is not available to perform the service.

Aetna determines the amount of benefits due moving Plaintiffs and members of the Classes for services rendered by non-par providers by determining R&C amounts. Its subscribers and provider assignees are contractually entitled to billed charges in the absence of valid R&C.

*See* Axelrod Decl., Exh. 65-67

Aetna healthcare plans consistently define and apply R&C as the lesser of billed charges or "the charge Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished." Axelrod Decl., Exh. 1, at 4).[3]   The uniformity and consistency of Aetna's plan definitions of R&C are clearly demonstrated by the R&C Definitions Chart, Axelrod Decl., Exh. 3. The plan language is the same for plans Aetna insures (fully insured plans) and administers (self-funded plans). *See* Axelrod Decl., Exh. 67. There is no substantial difference in the meaning of R&C across plans.

Common proof demonstrates that Aetna's R&C determinations breached the terms of its plans by determining claims for services by non-par providers using the Ingenix database and other methods incapable of meeting the requirements of the plans. During the class periods, Aetna was required to comply with its definition of R&C. None of the methods used by Aetna to determine R&C benefit amounts complied with its plan definition. Examples of Aetna's invalid pricing methodologies include:  (1) invalid Ingenix data;  (2) Aetna's use of its own "Back Room" Aetna Fee Profile Data;  (3) improper use of Medicare Data;  (4) arbitrary "tiering" based on either Ingenix or Medicare data in behavioral health claims;  (5) outdated data;  and (6) use of average wholesale pricing for pharmaceuticals.

B.     **The Ingenix Database**

Aetna used invalid methods to determine R&C reimbursement amounts, including the Ingenix database or the Prevailing Healthcare Charge System ("PHCS"), during the applicable class periods, and that the flawed R&C methodologies were skewed against its subscribers and

---

[3] Aetna's plans definition incorporates several requirements for the determination of R&C under the plan. *See* Axelrod Decl. ¶ 2 and Exh. 1 (Expert Report by Bernard R. Siskin, Ph.D., dated April 6, 2010, at 4).

3

their provider assignees. The Ingenix database was created by the combined data contributions of health insurers, including Aetna, to determine reimbursement amounts for services rendered by non-par providers.

Throughout the Class Periods, Aetna used the Ingenix database as its primary method to determine R&C reimbursement, which Aetna then pays if the R&C is less than the provider's billed charge. Axelrod Decl., Exh. 4. Deborah Justo, an Aetna Provider Data Services unit analyst stated: "The Ingenix data is the primary source for R&C / RCL [R&C] based benefit determinations." Axelrod Decl., Exh. 6. Aetna's own documents and internal policies demonstrate that Aetna uses Ingenix to determine R&C, s*ee* Axelrod Decl. at ¶¶ 4, 5, 7, 8 which do not satisfy the terms of the plans.

1.    **Dr. Bernard Siskin**

The Siskin Report describes how the Ingenix database is fundamentally flawed and its use incompatible with Aetna's definition of R&C. Axelrod Decl., Exh. 1. After extensively reviewing the Ingenix database and Ingenix's methodology (including data contribution editing and deriving percentile calculations), he concluded that the Ingenix databases are invalid for use by Aetna to determine R&C. *Id.* at 2. Dr. Siskin defined the "core concepts" required for a valid R&C determination, and explained why Ingenix is not valid:

> To assess a reasonable charge for a particular medical service, one must rely on actual charges billed by similar providers for reasonably similar services performed for similar patients (age, etc.) in a relevant geographic area. In order to determine the set of reasonably similar services, the database would need to contain information on those factors which one would expect to affect the cost of the services, such as: (i) significant differences in provider qualifications, (ii) significant differences in type of medical service provided, and (iii) significant differences in medical market area. Given this information, one could then determine which charges are reasonable and which are "too high." A review of the Ingenix databases shows that they do not (and cannot) satisfy the core concepts of reasonably similar provider qualifications, medical services rendered and medical market area in which the service is performed. In sum, the Ingenix Databases do not allow one to compute a distribution of charges which are

> sufficiently similar that one can reasonably assess which charges are reasonable
> and which charges are "too high."

Axelrod Decl., Exh. 1 at 5.

The four data points reported by Ingenix fail to consider critical information and are incapable of representing a valid R&C.[4] *McCoy v. Health Net*, 569 F. Supp. 2d 448, 465-66 (D.N.J. 2008) ("[T]he database relies upon too few data points for each procedure. . . . These four data points exclude several factors that are critical to the 'core concepts' of UCR. . . . Ingenix relies upon these four data points to facilitate comparison among similar procedures and geographical zones. In other words, these data points represent the sum total of the information that purportedly allows an insurer to compare similarly situated procedures."). The Ingenix database does not collect or contain a provider's identity and therefore cannot consider a provider's qualifications, specialty, training or experience. *Id.* at 466 ("These excluded data points may be the most important factors in determining 'reasonable' and 'customary' costs. . . . Any accurate database would control for these additional factors. Ingenix's failure to control for these factors means that the database is not actually comparing similarly situated procedures when it purportedly yields a 'usual' and 'customary' rate for that procedure."); Axelrod Decl., Exh. 80 at 237:3-9, 3/17/10; 364:14-22; 372:1-4.

## 2.   Dr. Stephen Foreman

Plaintiffs' expert Dr. Stephen Foreman, "independently considered the flaws in the data collection and processing methodologies described by Dr. Siskin." Axelrod Decl., Exh. 77 at 343:9-16. As part of his overall analysis of the Ingenix database, Dr. Foreman agreed with Dr. Siskin that there was "a range of problems" with the data including:   (1) "lack of

---

[4] The *only* information used by Aetna to determine R&C for any given claim using Ingenix is the CPT code, date of service, provider zip code, and billed charge. Axelrod Decl., Exh. 1 at 11.

representativeness of contributed data";  (2) inappropriate use of "high/low" for data screening;
(3) use of outdated data; (4) failure to audit data; and (5) prescreening or selective contribution of
data. Axelrod Decl., Exh. 18 (Report of Dr. Stephen Foreman, Apr. 6, 2010 (Foreman Rep.) at p.
9). At his deposition, Dr. Foreman was asked "[d]id you do anything to validate the conclusions"
of Dr. Siskin. His response was:

> I've reviewed deposition testimony by officials of Ingenix. I've reviewed
> deposition testimony by officials of Aetna. I've reviewed other expert reports, and
> some of these are discussed in public documents such as the Rockefeller report
> and the New York Attorney General Report.
>
> In addition, having considered all this and worked with all of this, to my
> knowledge no one has denied that these processes exist. I know of no information
> that's been submitted in connection with this case that claimed the data was
> representative. I know of no one who's claiming that high low screen does not
> apply to this data. I know of no one who's contending that all data used by health
> insurers are current and up-to-date. And I believe that Aetna officials have
> acknowledged profiling or prescreening or prescrubbing.

Axelrod Decl. Exh. 77 at 174:5-175:24.

Dr. Foreman maintains that regularly accepted econometric models demonstrate that a
percentile rate product that does not improperly eliminate data, impute values where imputation
is unnecessary, and factor in provider type and specialty would have reimbursed subscribers and
providers in greater amounts than the Ingenix database. Axelrod Decl., Exh. 18 ¶ 137). Based
upon his review of the Ingenix database and his findings, he concluded:

- ■ Invalid percentile data were applied in the same way to all members of the
  Subscriber and Provider Classes to determine claims for services by non-par
  providers and required them to accept lesser reimbursement amounts than they
  would have received but for Aetna's R&C benefit payments practice. *Id.*

- ■ Damages can be calculated with reasonable certainty through Aetna's own data
  by establishing the "difference between the billed charge and the allowed amount
  calculated using the flawed data base." Damages can also be calculated with
  "reasonable certainty by developing accurate reimbursement percentile data to
  calculate what Aetna would have allowed and paid had it not utilized the Ingenix
  database." *Id.*

■   The method for computing damages will be the same for all class members. While the dollar amounts of such a computation may differ among class members, and some class members' calculated damages may be zero, the same common method may be used to assess the amount of damages for all class members. *Id.*

**C.   United Healthcare, Ingenix and Aetna's Experts Do Not Defend Ingenix Determination of R&C**

**1.   Dr. Slottje**

Significantly, United Healthcare Corporation, Ingenix and Aetna do not defend the Ingenix database as setting valid amounts for R&C. UHC and Ingenix's expert, Dr. Daniel J. Slottje, testified in deposition that he had "no opinion" as to whether "Ingenix, PHCS, MDR databases set forth a reasonable and customary charge either actual or derived." Axelrod Decl., Exh. 14.

**2.   Dr. Joskow**

Aetna's expert Dr. Joskow also did not endorse or offer an opinion of Aetna's use of Ingenix for determining R&C:   "I am not providing any opinion regarding whether – as a theoretical or legal matter – it is 'right' or 'wrong' for Aetna to have used data compiled in this way." Axelrod Decl., Exh. 16 at 26, 32.

**3.   Dr. Cantor**

Similarly, Aetna's expert Dr. Robin Cantor stated:   "My analysis does not address in any way how Aetna used the unmodified output of the Ingenix Database to pay ONET claims during the class period." Axelrod Decl., Exh. 17 at 5. Thus, United, Ingenix and Aetna did not offer any expert opinion that Ingenix is valid for determining R&C.

Thus, United, Ingenix and Aetna do not refute the conclusions by Plaintiffs' class experts, Dr. Siskin and Dr. Foreman, that the Ingenix database is invalid for determining valid R&C. Axelrod Decl., Exh. 1, 18

**D.**      <u>**The Ingenix Database's Pervasive and Systemic Flaws**</u>

Numerous pervasive and systemic flaws in the Ingenix database combine to make it indefensible for R&C. Ingenix gathers its data by using a statistically unreliable, convenience sample obtained from the purchasers of its final product. However, because Ingenix did not audit the data contributions and never audited the data submitted by Aetna, Axelrod Decl., Exh. 80 and 82., many contributors, such as Aetna, submit inadequate data that is either pre-scrubbed, incomplete, or inaccurate. Axelrod Decl., Exh. 1 at 10-11.

Dr. Siskin explained that Aetna submitted data that "significantly and adversely impact[ed] the integrity of the Ingenix database." Axelrod Decl., Exh. 1 at 15-16; *see also* Axelrod Decl., Exh. 83. Aetna submitted pre-scrubbed and "profiled" data. *Id.*, Exh. 33. As Aetna's own expert, Dr. Joskow, admitted, Aetna scrubbed out valid high charge data from its contributions to Ingenix. Dr. Joskow's limited analysis was for just 2 of 10,000 CPT codes limited to a six-month sample from February 15, 2004 to August 15, 2004, and revealed that 4-5% of such charges were removed by "profile." Axelrod Decl., Exh. 75.

Aetna was responsible for accurately and truthfully complying with its data contribution attestations that represented that it submitted the "full universe" of data, but instead it submitted data that was pre-scrubbed, profiled and incomplete. Axelrod Decl., Exhs. 33, 80 and 83. Although Aetna consistently denied the existence of profiling to exclude valid high charge data, the evidence confirms that it did, after all, profile data that excluded high charges from its data contribution to Ingenix. Axelrod Decl., Exhs. 45 and 83.

Significantly, Aetna explicitly told Ingenix in 2005 in writing that Aetna had violated and was continuing to violate Ingenix's alleged data quality standards, including by using profiling rules to decide to contribute ("profile") or not contribute ("not profile") its claims data. Ingenix responded that it would **accept** Aetna's non-compliant submission, but would also change

8

Aetna's attestations to make it appear -- falsely -- that Aetna was contributing compliant data. (AET 01350384-87; AET 03703851-52.) Aetna's profiling system excluded higher charges that exceeded R&C at least up until mid-2005 when the profiling rules were changed. Exh. 83 at 131:19-133:2.

Aetna also did not provide all non-discounted claims data in its submissions to Ingenix. Axelrod Decl., Exh. 83 at :6-80:2, 85:22-86:7; 86:21-87:5; 88:11-90:10; 101:23-1-2:15; 104:24-105:10,. Ingenix acknowledged the adverse impact that Aetna's profiling rules had on its database. Axelrod Decl., Exh. 80 at 106:15-108:15.

Once Ingenix receives invalid data from Aetna and its other data contributors, Ingenix employs its own invalid methodology to "scrub" or remove certain charges, including valid charges. Axelrod Decl., Exh. 1 at 7. It eliminates data that is outside a range of fees that it selects based on its geozips and its own MDR data.[5] *Id.*, Exh. 80 at 84:24-87:9.

The Ingenix database also does not collect or contain a provider's identity and therefore cannot factor in or consider a provider's qualifications, specialty, training or experience. Axelrod Decl., Exhs. 1 at 6; 79 at 155:20-156:8; 160:6-163:12; 165:4-10; 80 at 237:3-9; 364:14-22; 372:1-4. Although Ingenix requested non-par providers' specialty and credentials data from data submitting carriers, it did not require the production of that data, and the Ingenix data final product did not account for non-par providers' credentials and specialties. Axelrod Decl., Exh. 80 at 74:11-75:21. Board certification is also not considered a factor in determining R&C with non-par providers. Axelrod Decl., Exh. 79 at 112:4-18; 141:19-25; 155:20-156:8. Additionally,

---

[5] "MDR" refers Medical Data Resource, an Ingenix database that was once a competitive substitute for the PHCS database. Ingenix already owned MDR, which it had purchased from Medicode, Inc., in 1997, when it purchased the PHCS database from HIAA in 1998, making it the owner of the only two national UCR databases.

non-M.D. providers' charges for the same CPT service codes are treated identically to charges submitted by M.D.s. As a result, the Ingenix data cannot identify how many different providers' data has been included and results in a suppression of R&C benefits for the payment of physician services. Axelrod Decl., Exh.. 1 at 23; Exh. 79 at 209:19-211:7; Exh. 80 at 365:4-10; 367:14-368:3.

The Ingenix database also combines geographic areas based on the first three digits of a postal zip code, resulting in combined locations with disparate economic characteristics and different charging patterns. Zip codes do not constitute medical service areas. The Ingenix database fails to account for unusual circumstances or complexity and does not consider the specific services rendered. Axelrod Decl., Exh. 1 at 9-10). The cumulative effect of all of these flaws is that the Ingenix database is fundamentally flawed and its use is incompatible with Aetna's contractual definition of R&C. Axelrod Decl., Exh. 1 .at 34.

Ingenix disclaims use of the data for determining R&C. The disclaimer confirms that the data does not "represent," "state" or "imply" "reasonable and customary conversion factor[s]." Ingenix maintains that the data should be used for "informational purposes" only. Axelrod Decl., Exhs. 81 at 61. While disclaiming that Ingenix is UCR in communications with customers, Ingenix employees represented to customers that Ingenix could "help" the customer out with Ingenix "UCR data." Axelrod Decl., Exh. 81 at 71:9-73:6.

**E.      Aetna's Other Undisclosed Methodologies Were Invalid for Determining R&C**

Aetna used several other invalid R&C methodologies, which it failed to disclose to members and non-par providers in benefit determinations and in denying appeals. Axelrod Decl., Exh. 1 at 33-34; Exh. 84 at 265:3-267:8. Although Aetna purchased derived data from Ingenix, it failed to load the derived data into most of its claims systems. Therefore, when there is insufficient Ingenix data available, Aetna used a hierarchy of other undisclosed methodologies to

determine R&C payments to its members for services by non-par providers. *See* Axelrod Decl., Exh. 1 at 34.

1.    **Aetna's "Back Room" Fee Profile Data Pricing R&C Benefit Determinations**

Where Ingenix reported fewer than nine occurrences for a given CPT code in a given geographic area, Aetna used Fee Profile Data, expanding the geographic area to obtain R&C rates. Axelrod Decl., Exhs.79 at 67:25-69:16; AET-00910799; AET-00831025; Exh. 1 at 33. As Dr. Siskin stated:  "Clearly an unadjusted national number cannot satisfy the geography-specific definition of R&C.". James Cross, Head of Aetna's Health Operation Policy Process Committee ("HOPP"), stated that the Aetna Fee Profile Data produced through the 617 and 657 high charge claims data exclusion action codes was a "back room manipulation of data." Axelrod Decl., Exh. 38. Aetna's "back room" data was not credible and should not have been used to price R&C. Aetna further acknowledged that it uses its own "internal" and "outside vendor" data to determine R&C for out-of-network facility claims. Axelrod Decl., Exh. 79 at 151:15-152:21. 2.

2.    **Aetna's Use of Medicare Data to Price R&C Benefit Determinations**

If Ingenix and Aetna Fee Profile Data were not available, Aetna would price R&C at a percentage of Medicare's fee schedule, which also cannot represent valid R&C. Axelrod Decl., Exhs. 39. Such non-Ingenix pricing was a "significant potential savings" to Aetna on benefit payments. *Id.*, Exhs. 41; 1 at 34. As Dr. Siskin found: "Medicare is a budget-driven number and does not, and cannot, satisfy Aetna's definition of R&C. Thus, using Medicare data to define R&C is statistically invalid." Aetna primarily priced R&C for services by non-par providers at in-network facilities at 125% of Medicare, but it varied by market. *Id.*, Exh. 79 at 82:7-183:17; 192:9-12; Exh. 42.

The New Jersey Department of Banking & Insurance ("NJDOBI") conducted an investigation and discovered that Aetna paid only 75% of Medicare for lab and durable medical

equipment ("DME") and paid 125% of Medicare for other services. Axelrod Decl., Exhs. Exh. 79 at 265:4-266:12 (acknowledging that before the change to 75% of Medicare, Aetna used 89% of Ingenix)). In violation of N.J.A.C. 11:22-5.6(b), N.J.A.C. 11:24-5.1(a)1, N.J.A.C. 11:24-5.3(b) and N.J.A.C. 11:24-9.1(d)(9), Aetna routinely sent letters to non-par providers that it would not pay more than 125% of Medicare when a member received services by non-par providers at an in-network facility. Axelrod Decl., Exh. 43. Consequently, by Order dated July 23, 2007, NJDOBI fined Aetna $9.5 million, then the largest fine levied on a health care carrier, for using 125% of Medicare for New Jersey members, finding that this practice was contrary to New Jersey state law and unfairly saddled members with their non-par providers' balance bills. *Id.* NJDOBI ordered Aetna to cease using the 125% of Medicare pricing for payment of services by non-par providers and to reprocess all claims and pay billed charges. *Id.* at 4-5.

Aetna's improper use of Medicare fee schedules was not limited to the State of New Jersey. In 2004, Aetna's Health Operations Policy Process Committee ("HOPP") approved the use of Medicare-based benefit payment methodology for R&C. In September of 2007, Aetna discontinued its use of Medicare for R&C under instruction from NJDOBI as to New Jersey. However, Aetna continued using a percentage of Medicare for R&C for subscribers outside the state of New Jersey. Axelrod Decl., Exh. 45.

3.   **Aetna's Use of "Tiering" and Medicare Data to Price R&C Benefit Determinations For Behavioral Health Claims**

Aetna averages the charges of psychiatrists, psychologists, and medical social workers and paid them a reduced percentage of the average price depending on licensure. Axelrod Decl., Exhs. 45; 85 at 85:11-86:9, 51:21-54:13, 132:15-135:6. Aetna also used Medicare fee schedules, instead of valid R&C, to price behavioral health claims. *Id.* Aetna paid psychiatrists at 125% of Medicare or 80th percentile of HIAA (Ingenix), which had been reduced through tiering; Ph.D.s

12

at 80% of Medicare; and social workers at 60% of Medicare. Axelrod Decl., Exhs. 85 at 85:11-86:9, 51:21-54:13, 132:15-135:6; Exh. 79 at 207:21-209:6, Mar. 23, 2010).

**4.      Aetna's Use of Outdated Data to Price R&C Benefit Determinations**

Aetna also used outdated data to calculate invalid R&C. Although Aetna's plans were required to update R&C fee schedules on either a semi-annual or annual basis, Aetna knowingly used outdated data because it was profitable. Axelrod Decl., Exhs. 45, 47, 57.

Specifically, Aetna used outdated data to determine benefits for services by non-par providers in acquired companies, including Schaller Anderson, Chickering and SRC. Axelrod Decl., Exh. 79 at 201:18-202:7; Exh. 49. Aetna acquired Schaller Anderson in July 2007, which used 2004 MDR data to adjudicate claims for three self-funded plans, Scripps Health Inc., Catholic Healthcare West and Sun Health Corp. through October of 2008 before it updated the data. Axelrod Decl., Exh. 49. Aetna acquired Chickering with the Genelco Claims Administration system, which also used outdated data from August 2002 through September 2007.[6] *Id.* Plaintiff Jeffrey Weintraub's plan was administered by Chickering.

---

[6] It took an investigation by the NYDOI for Aetna to review and compensate members of the Chickering Plan for the use of outdated data.

5.    **Aetna's Use of Average Wholesale Price for R&C Benefit Determinations on Pharmaceuticals**

In determining benefit payments for the purchase of drugs administered by providers, Aetna also denies benefits to its members and provider assignees. Rather than paying retail prices, Aetna determines its benefit payments based on the average wholesale price ("AWP"), a national fee schedule that Aetna claims is "retail" cost. Axelrod Decl., Exh. 79 at 215:25-216:10; 217:4-220:7.

F.    **Aetna's Failure to Disclose Material Information and Misrepresentations Concerning R&C Determinations in Violation of ERISA**

In direct contravention of ERISA and federal claims regulations, Aetna failed to make legally required disclosures about its benefit reductions for services by non-par providers and failed to disclose all supporting evidence relied upon to reduce benefits. Aetna did not provide the underlying Ingenix claims data information to members because Aetna considered the Ingenix claims data to be proprietary. Axelrod Decl., Exh. 84 at 132:8-135:24; 136:23-137:3; 138:18-21; 212:21-213:11; Exh. 51. In responding to appeals, Aetna only provided generic information to members and non-par providers as to the methodology for determining the benefit payments and it acknowledged that "a normal lay person is not going to understand what that means." *Id.*, Exh. 84 at 66:3-20. Aetna's limited disclosures included the percentile rate provided by Ingenix and failed to provide sufficient information regarding the methodology to understand and meaningfully appeal benefit reductions. *Id.*, Exh. 84 at 287:1-288:17.

1.    **Aetna Made Material Misrepresentations Regarding R&C Determinations**

In addition, Aetna made material misrepresentations regarding Ingenix data and represented that it provided reasonable and customary fees in violation of ERISA and federal claims regulations. For example, Aetna misrepresented all of the following facts with regard to Ingenix to the class of subscribers and providers, which it acknowledges are untrue: (1) that

R&C was based on similar services in a similar geographic area, Axelrod Decl., Exh. 84 at 138:22-139:1; 119:19-25; 120:9-19; 136:23-137:20; 138:22-139:5; 265:3-267:8; (2) that it does not internally scrub the claims data prior to submitting to Ingenix, *Id.*, Exh. 53; (3) that Ingenix data was valid and reliable and that it performed internal tests to ensure the validity of the Ingenix data, *Id.*, Exhs. 83 at 233:6-236:17; Exh. 79 at 149:18-151:5; (4) that Ingenix "has in place a stringent editing system" that ensures accuracy; *Id.*, Exh. 56; (5) information in appeal letters as to the frequency of updating R&C data, *Id.*, Exh. 57 (AET-00845343); (6) that members could not be balance billed, *Id.*, Exh. 84 at 303:10-304:14; and (7) that Ingenix represents an independent data provider, when Ingenix is actually a private for profit company, wholly owned by health insurer United Healthcare Corporation ("UHC") and is not an independent agency. These misrepresented "facts" implicate "core" issues underlying the invalidity of the Ingenix database.

2.      **Aetna Omitted Material Facts Relating to R&C Benefit Determinations**

Aetna omitted material facts to subscribers and non-par providers regarding Ingenix data, its profiling rules, and its use of other invalid methodologies for pricing R&C. For example, Aetna did not disclose: (1) that it contributed incomplete and flawed data to Ingenix, Axelrod Decl., Exh. 53; (2) that it knew that use of its automated do-not-profile rules for charges that exceeded prevailing charges would suppress R&C, *Id.*, Exh. 60 ("We absolutely cannot continue to do this – this artificially holds down prevailing fees."); (3) that it used data that it knew was invalid for determining R&C, *Id.*, Exh. 53; (4) that Ingenix used outdated data for facility charges, *Id.*, Exh. 80 at 40:1-21;  (5) its improper use of its own Aetna Fee Profile Schedule, which it claimed was "confidential," and its use of Medicare rates to determine invalid R&C benefit payments, *Id.*, Exh. 37, 39; and (6) that it used Aetna Fee Profile Data for all anesthesia, claims with modifiers (*e.g.,* assistant surgery and bilateral surgery), and claims where there was

no Ingenix data available, *Id.*, Exh. 62.

**G.    Aetna's Claims and Appeals Procedures Denied Members Full and Fair Review, Rendering Member Appeals Futile, and Were in Violation of ERISA**

Aetna appeal process and denials do not provide subscribers and provider assignees with sufficient or specific information upon which they can determine if they have received the benefits to which they are entitled under the subscriber's contract. Axelrod Decl. Exh. 84 at 222:2-225:11; 232:1-232:20; Ex. 85 at 36:6-18; 216:1-217:2; Exh. 86 at 59:13-61:16; 128:18-129:5; 247:13-248:1; 294:20-295:3. Aetna's appeal personnel did not even understand the "boiler plate" language describing how the "percentile" benefit payment was calculated. Axelrod Decl., Exh. 84 at 157:10-16. Aetna service representatives were specifically trained not to encourage members to file appeals, but rather to "explain" the R&C benefit to "satisfy" callers. Axelrod Decl., Exh. 84 at 160:16-161:25, 164:4-20.

**H.    Aetna's Withholding of Information Relevant to Second-Level Appeals**

In both fully funded plans and in many administrative service contract ("ASC") plans, Aetna specifically acknowledges and undertakes the role of fiduciary. Where Aetna has a fully funded plan, Aetna is the fiduciary. Axelrod Decl., Exh. 84 at 180:18-20. Aetna has self-funded plans where Aetna is specifically designated as the fiduciary. *Id.*, at 180:21-181:7.

In all plans, whether fully funded or self-funded, Aetna exercises plenary discretion in benefit determinations, claims administration, and the processing of appeals in violation of its fiduciary obligations to members of ASC plans. There is no difference in how Aetna processes appeals and reveals benefit determination methodology when a self-funded plan retains discretion to determine second-level appeals. Axelrod Decl., Exh. 84 at 143:1-24. The process used by Aetna appeal analysts is the same whether the plan is fully funded or self funded. *Id.*, at 183:10-18.

In those self-funded plans where the sponsor retains the responsibility for second-level appeals, Aetna provides the appeal information upon which the sponsor must rely. Axelrod Decl., Exh. 84 at 181:16-182:16. The same infirmities that exist in the way Aetna processes appeals in its fully-funded plans exist in self-funded plans. *Id.*, Exh. 85; 86 at 292:22-295:3.

Denying ASC plan sponsors who handle the second level of appeals information about Aetna's UCR benefit determinations and the invalid R&C methodologies used, Aetna violated its fiduciary obligations and ERISA in two ways:  (1) it prevented the ASCs from providing plan members with a full and fair review of benefit determinations and denials; and (2) it rendered appeals of R&C determinations futile. The use of invalid R&C methodologies in determining plan benefits and processing appeals without disclosure of methodological flaws and inability of the database to determine R&C deprived ASC plans the ability to provide full and fair reviews of such decisions at the second level of appeals.

I.      **Aetna's Discretion in ASC Plans and the Use of Stop Loss Insurance in ASC Plans**

Aetna's exercise of discretion and role as a fiduciary under ERISA in all of its ASC plans is demonstrated by:  (1) the specific delegation of discretionary authority in the plan documents Axelrod Decl., Exh. 84 at 180:21-181:7;  (2) exercise of judgment, plan interpretation, *id.*; (3) exercise of discretion in administration and/or management; (4) application of complex procedures or less than defined rules; (5) computing a price based on "proprietary methodologies" and "derived data," *Id.*, Exh. 79;  and (6) failing to disclose "proprietary" and R&C methodologies to employers and members and the underlying futility of R&C appeals because of Aetna's non-disclosures as previously detailed. The manner in which Aetna determines benefit claims processing, claims adjudications and appeals, remains the same whether the plan is fully funded or an ASC plan with or without stop loss. *Id.*, Exh. 84 at 183:10-18.

17

Where ASC plans (self-funded plans) purchase stop loss insurance, the coverage becomes fully funded and transfers the risk and costs associated with large individual and/or aggregate claims above a preset threshold. Hatzikostas 30(b)(6) Dep. Tr. 39:11-23;  42:13-18;  44:4-16;  45:2-8;  45:10-46:1;  46:4-16;  51:16-24;  52:15-21;  57:5-15;  59:16-61:4;  63:5-11;  64:13-65:4;  68:20-69:17;  Mar. 26, 2010). Most ASC plans designate Aetna as a full claims fiduciary, but where an ASC plan (self-funded plans) is the designated fiduciary, if the pre-set coverage is reached, Aetna reserves the discretion to determine the final payment of any benefit. Hatzikostas 30(b)(6) Dep. Tr. 73:2-20,  77:1-25; 78:22-79:20; Mar. 26, 2010.

**J.      Use of the Wire and Mail to Facilitate or Commit Fraud**

To further the conspiracy and enterprise Ingenix, Aetna and other carriers used the wire and mail communications to further the unlawful activity. Invalid and suppressed data, and data submissions forms containing false certifications, were sent by file transfer protocol, email, fax, carriers or the United States Mail. Axelrod Decl., Exhs. 80, 82, 83 (Aetna used carriers, Fed Ex, United States Mail or United Parcel Service, to forward the data submission forms and actual data contributions and within the past two years began using file transfer protocol ("FTP") for the submission of data contributions); *Id.*, Exh. 33; Exh. 80 at 53:3-22; 69:6-22;  106:15-108:15; Exh. 79 at 293:10-294:9;  Ex. 83 at 88:11-90:10, 101:23-105:10; 126:14-127:20; 127:22-129:13; 130:22-131:6;  133:16-134:12. In furtherance of the unlawful activity Ingenix communicated directly with representatives of Aetna by use of telephone, email and facsimile in the exchange of these data submissions. *Id.*, Exh. 82. All of these communications were instrumental in the knowing creation of invalid data that would be employed to violate the terms of members health plans and to deny benefits to which members were entitled. The use of wire and mail communications to facilitate the exchange of invalid charge data and deny members R&C benefits that they were entitled to, was common to and injured the entire class.

**K.**     **The Conspiracy to Fix Rates Paid for Benefits for Use of Non-Participating Providers**

Aetna, Ingenix and their co-conspirators conspired to fix ONET reimbursement rates in a manner that was common to and injured the entire class. Common proof supporting an inference of a conspiracy includes evidence that most major health insurance carriers rely on the Ingenix databases to "establish prevailing R&C fees," Axelrod Decl., Exh. 8; that Ingenix's fee data is "developed from a common database repository," and "compiled from claims submitted to all insurance carriers for the same codes," *id.*; that Ingenix has effectively no competitors  Exh. 25; and that Ingenix imposes uniform or standard procedures on health insurance companies that submit data to it for purposes of determining R&C rates, Justo Exh. 20. A conspiracy can also be inferred from Ingenix's tolerance of what it knew to be flawed data contributions from Aetna. Notwithstanding Ingenix' assertion that it would exclude data that was not compliant with its purported data submission requirements, the evidence reflects that Ingenix was aware of, and facilitated, Aetna's submission of manipulated data.

1.     **Dr. Rausser's Opinion**

Plaintiffs' expert Dr. Gordon Rausser performed a detailed economic analysis of the health insurance industry, and, in particular, the data market in which the Aetna was an active participant and in which Aetna and its co-conspirators agreed to fix prices for R&C. Based upon his analysis, Dr. Rausser reached the following conclusions:

- ■  Aetna stood to benefit enormously by reducing the amount of reimbursement for services by non-par providers. Axelrod Decl., Exh. 21 ¶¶ 26-30).

- ■  Usage of the Ingenix database was ideally suited to the suppression of R&C and, thus, reduction of reimbursement for services by non-par providers. *Id.* at ¶¶ 31-37.

- ■  Ingenix's monopoly over price data, and the information asymmetries created by this monopoly, gave Defendants the market power necessary to fix, suppress, and maintain the reduced reimbursements. *Id.* at ¶¶ 38-46.

- "Plus" factors and characteristics recognized by courts and economists suggest that collusive price-fixing are evident in this data market. *Id.* at ¶¶ 47-54.

- Aetna's actions are against its unilateral self-interest and further evidence a conspiracy to fix the prices of benefits for services by non-par providers. *Id.* at ¶¶ 55-58.

- Determination of impact and damages can be proved using common proof. *Id.* at ¶¶ 59-62.

Dr. Rausser concluded in particular that the usage of common Ingenix schedules by multiple insurers "is effectively an express horizontal arrangement, in which putative competitors share and use a single set of prices through an entity that one or more of them controls." Axelrod Decl., Exh. 21 ¶ 47):

> In this case, the defendants and other participating insurers were not merely engaging in parallel pricing, but specifically intended that each of them would set their reimbursement rates based upon the common Ingenix schedules. PHCS and MDR were specifically designed, marketed, and used for this purpose. As a result, this is effectively an express horizontal arrangement, in which putative competitors share and use a single set of prices supplied through an entity that one or more of them controls.

*Id.* In Dr. Rausser's opinion, the issue of whether Defendants unlawfully conspired to set benefit payment levels for services by non-par providers below genuine R&C rates will be resolved by focusing on the conduct of Defendants rather than Plaintiffs. *Id.* at ¶¶ 26-47, ¶¶ 47-54.

**2.    Dr. Foreman's Opinion**

Applying well-established industrial organization economics methodology, Dr. Foreman concluded that All Class members are impacted by Aetna's past and continued use of inaccurate reimbursement percentile data for payment of claims for services by non-par providers based upon R&C charges. This class-wide adverse impact injures all subscribers and provider assignees who hold health insurance policies that provide for the payment of healthcare benefits for services by non-par providers based on Aetna's use of the Ingenix database and other reimbursement protocols, by reducing the level of reimbursement received for healthcare

services for services by non-par providers. Axelrod Decl., Exhs. 18 ¶¶ 10, 21-135, 139-42, 148-64; 19 ¶¶ 92-102).

## ARGUMENT

## I.   THE COURT SHOULD CERTIFY THE CLASSES

Fed. R. Civ. P. 23 states that one or more members of a class may maintain a class action if the suit satisfies the criteria of numerosity, typicality, commonality and adequacy under subsection (a) and fits within one of the three categories of proceeding prescribed in subsection (b). *See Shady Grove Orthopedic Associates v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437 (2010). Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Id.* The Supreme Court flatly rejected arguments that Rule 23 sets "eligibility criteria" under which the court may or may not allow a class action to proceed, even if all the rule's criteria are met. *Id.* at 1438 ("The discretion suggested by Rule 23's 'may' is discretion residing in the plaintiff. He may bring his claim in a class action if he wishes.").

Class certification must be granted if "the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 320 (3d Cir. 2009). In this Circuit, "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *Id.* The preponderance standard applies only to the procedural elements required by Rule 23, and not to the substantive elements that ultimately will be proved at trial. *Id.*; *In re Mercedes Benz Tele Aid Contract Litig*., 257 F.R.D. 46, 55 (D.N.J. 2009).

In deciding whether to grant class certification, the court "must consider all relevant evidence and arguments presented by the parties" in order to resolve only those factual and legal disputes that are relevant to Rule 23's class certification requirements. *Hydrogen Peroxide*, 552 F.3d at 307   The question is not whether the class proponents will prevail on the merits but

whether they satisfy the prerequisites of Rule 23. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). Class certification must be granted if the Court is "satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *Hydrogen Peroxide*, 552 F.3d at 309. The substantive elements of the plaintiffs' case come into focus only "in order to envision the form that a trial on those issues would take." *Hohider v. UPS*, 574 F.3d 169, 176 (3d Cir. 2009) (citations and internal quotation marks omitted).

## A.   THE CLASSES SATISFY EACH OF THE RULE 23(a) PREREQUISITES

### 1.   Rule 23(a)(1): Numerosity

Numerosity requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). In general, courts in this Circuit have set a low threshold for finding that the numerosity requirement has been satisfied. "'Numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement.'" *Weiss v. York Hosp.*, 745 F.2d 786, 808 n.35 (3d Cir. 1984). Here, Aetna insures millions of participants and beneficiaries. Axelrod Decl., Exh. 22 at 28. In addition, Aetna admits that the number of members in each of the above-defined Classes exceeds 40. Axelrod Decl., Exh. 70. Accordingly, numerosity is satisfied.

### 2.   Rule 23(a)(2): Commonality

Rule 23(a)(2) requires that there be "common questions of law or fact among members of the class." "It is well established that only one question of law or fact in common is necessary to satisfy the commonality requirement, despite the use of the plural 'questions' in the language of Rule 23(a)(2)." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 n.10 (3d Cir. 2009). Commonality "will be satisfied if the named plaintiffs share at least one question of law or fact with the grievances of the prospective class." *Chiang v. Veneman*, 385 F.3d 256, 265 (3d Cir. 2004) (quoting *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 184 (3d Cir. 2001)); *Newton v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001). In fact, "an allegation that the defendants' overall policy injured the plaintiffs satisfies the commonality requirement." *Summerfield v. Equifax Info. Servs.*, 264 F.R.D. 133, 139 (D.N.J. 2009).

In this case, there is one overarching issue that is common to all the Classes: the invalidity of the methods relied upon by Aetna to calculate R&C. Related questions also include:

(a) Whether Aetna's use of the Ingenix Databases to calculate R&C in determining benefit payments for services rendered by non-par providers violated ERISA, or other applicable law;

(b) Whether Aetna's use of the Ingenix Databases to calculate R&C in determining benefit payments for services rendered by non-par providers violated plan terms;

(c) Whether Aetna's use of outdated or otherwise improper data to calculate R&C benefit payments for services rendered by Non-par providers violated ERISA, or other applicable law;

(d) Whether Aetna's use of outdated or otherwise improper data to calculate R&C benefit payments for services rendered by Non-par providers violated plan terms;

(e) Whether Aetna's use of undisclosed data and methodologies to calculate R&C benefit payments for services rendered by Non-par providers violated ERISA;

(f) Whether Aetna violated its fiduciary or other legal duties owed to its Members when it made its benefit reductions for non-participating providers' services or otherwise engaged in the conduct alleged in the Complaint;

(g) Whether Aetna's EOBs and other communications with its members violated ERISA or other applicable law;

(h) Whether Aetna's claims review and appeals procedures comply with ERISA;

(i) Whether Aetna's exercise of discretion in benefit and appeal determinations in self-funded plans makes it a fiduciary under ERISA;

(j) Whether the Court's interpretation of the ERISA plans at issue must be guided by state regulators' interpretation of such plans;

(k) Whether Aetna's failure to provide accurate plan documents upon request, including EOCs and SPDs and other information, entitles Subscriber Class

members to any relief;

(l) Whether Aetna's alleged fiduciary violations, if proved, justify appointment of a monitor under ERISA § 502(a)(3) or other injunctive relief;

(m) Whether Subscriber Class Members who did not assign claims and Provider Class Members who are assignees may recover unpaid benefits;

(n) Whether the plans or ERISA require subscribers to pay non-par providers or to be balance billed to recover benefits;

(o) Whether interest should be assessed on a monetary recovery under ERISA;

(p) The standard of review applicable to review Aetna's benefit determinations;

(q) Whether unpaid benefits to class members can be determined on a class-wide basis if liability is assumed;

(r) Whether Ingenix and non-Ingenix R&C benefit determinations were arbitrary and denied subscribers and providers of benefits to which they were entitled and in violation of both Aetna's fiduciary obligations under ERISA and the federal claims regulation;

(s) Whether Aetna's concealment of material facts bars Aetna from asserting any statute of limitations defense;

(t) Whether Defendants engaged in a pattern of racketeering activity, as defined by RICO, by and through the conduct of the Aetna-Ingenix Enterprise described in the Complaint;

(u) Whether Aetna and its co-conspirators engaged in a pattern of deceptive conduct as the members of the Subscriber and Provider Classes;

(v) Whether Aetna violated RICO and, if so, the appropriate relief to be awarded; and

(w) Whether Aetna, UHG and Ingenix combined, conspired and/or agreed with each other and their other co-conspirators in a price-fixing conspiracy that sought, and was able, to artificially lower, fix or maintain the price paid to the members of the Subscriber and Provider Classes by Aetna as R&C rates, in violation of Section 1 of the Sherman Act.

*See* Compl. ¶¶ 520, 531.

In the analogous *Health Net* litigation, this Court held that the ERISA classes had "easily

24

met" the Rule 23(a) commonality test because they were "based on common operative facts and questions of law" – namely, the allegation of "a systematic course of conduct in interpreting contracts of insurance in an improper, undisclosed, and self-serving way in contravention of the plans and of [the defendant's] fiduciary duty to beneficiaries who chose to use out-of-network providers." *McCoy*, 569 F. Supp. 2d at 455-56 (after remand). The Court noted that if each member of the proposed classes were to have brought an individual action, "each would [have] be[en] required to prove that Health Net's R&C and other policies violated ERISA," and that, therefore, "[t]he issues of law and fact relating to whether Health Net fully disclosed and properly applied its reimbursement mechanisms for out-of-network provider services [we]re common to the class members and predominate[d] over individual questions." *Id.*

Another court in this Circuit likewise found the commonality element satisfied in an analogous ERISA action challenging the defendant's method of determining "reasonable and customary charges" for anesthesia services. *See Brooks v. Educators Mut. Life Ins. Co.*, 206 F.R.D. 96, 101 (E.D. Pa. 2002). Plaintiff alleged that neither of the two databases defendant used complied with the "same geographical area" requirement of participants' and beneficiaries' health plans. As the *Brooks* court explained:

> To certify, I need only find *one* common question of law or fact. Whether [the insurance company] engaged in a course of conduct or practice of paying for the anesthesia services of class members at some flat fee (20% of the surgeon's fee), or a fee that ignored the contractually- specified criteria for calculating reimbursements (through the use of the Medicode and Medicare programs) in violation of their contractual obligations, as the Amended Complaint alleges, constitutes a 'factual and legal claim common to the entire class."

206 F.R.D. at 101 (citing *Johnston*, 265 F.3d at 182). As the Court also noted, the fact that ERISA provides "uniform federal law" also supports class certification. *See also Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998) (reversing the denial of class certification

to a class of participants and beneficiaries challenging the same PHCS database that the Plaintiff and the Class challenge herein).

Similarly, this Court in *McCoy* held that the RICO class also satisfied the commonality requirement because it "alleged an association-in-fact between Health Net and Ingenix in which Health Net and Ingenix carried out a scheme to underpay benefits to Health Net subscribers." *McCoy*, 569 F. Supp. 2d at 456.  Thus, the commonality element is also easily satisfied here, where the ERISA, antitrust, RICO and state law claims sounding in contract and quasi contract all involve resolution of issues concerning Aetna's methodologies for determination of R&C.

**3.     Rule 23(a)(3): Typicality**

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "To evaluate typicality, [a court] ask[s] 'whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class.'" *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006) (quoting *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994)). Specifically, the typicality inquiry "focuses on the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 597-98

Put another way, "'[t]ypicality entails an inquiry whether the named plaintiff[s'] individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *Weber v. Govt. Employees Ins. Co.*, 262 F.R.D. 431, 442 (D.N.J. 2009) (quoting *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988)).

The Third Circuit has "set a low threshold" for satisfying the typicality test. *Newton*, 259 F.3d at 183. Importantly, the typicality analysis focuses on the conduct of the defendant, not that of the proposed class representative. *See In re IGI Secs. Litig.*, 122 F.R.D. 451, 456 (D.N.J. 1988) ("[I]t is defendants' course of conduct . . . upon which the court must focus in determining typicality.").

Therefore, factual differences between plaintiffs and absent class members are immaterial if either (a) the plaintiff's claims arise out of the same course of conduct or (b) the claims are based on the same legal theory. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 265 (3d Cir. 2009) ("[I]if the claims of the named plaintiffs and class members involve the same conduct by the defendant, typicality is established.") (citations and internal quotation marks omitted). As the Third Circuit recently reiterated:

> The similarity between claims or defenses of the representative and those of the class does not have to be perfect. . . . [F]actual differences between the proposed representative and other members of the class do not render the representative atypical if the claim arises from the same event or practice or *course of conduct* that gives rise to the claims of the class members.

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 598 (internal quotation marks omitted; emphasis added). In short, "[t]ypicality is *not* identicality." *Brooks*, 206 F.R.D. at 102 (emphasis in original).

During the relevant time period, Subscriber Plaintiffs received medical services from non-par providers and Aetna's benefits payments were determined by its use of the *same* invalid R&C methods that Aetna used to determine R&C for the *entirety* of the Subscriber Classes. *See* Axelrod Decl. Exh. 85 at 36:19-37:7, 40:25-41:11, 72:8-73:1, 110:16-111:23, 133:11-134:4; Exh. 86 at 36:11-38:8, 57:19-59:17; Exh. 87 at 89:1-90:11; 96:4-24, 112:12-21, 114:13-115:9; Exh. 91 at 21:11-18, 22:11-23:8, 168:4-19, 179:20-181:15; Exh. 92 at 126:2-128:24; Exh. 93 at 25:7-14, 26:4-27:23, 89:16-90:3, 117:14-118:2, 219:4-19; Exh. 94 at 31:6-8, 33:2-7, 43:15-20,

109:2-6).

Moreover, like absent class members, Subscriber Plaintiffs were denied full and fair review in claims determinations and appeals under a process that is futile. Axelrod Decl., *id.,* Exhs.85-87; 91-94.

Similarly, the deposition testimony of Provider Plaintiffs confirms that they were subjected to the same course of conduct challenged on behalf the proposed Provider Classes. Each was a non-par provider of health care services. Axelrod Decl., Exh. 88 at 61:25-62:3, 121:5-25; Exh. 89 at 124:15-21; Exh. 90 at 101:19-24, 106:19-21, 133:24-134:8; Exh. 95 at 35:6-36-8, 42:14:21, 43:24-44:10; 65:22-66:7. Each rendered services to one or more Aetna insureds. *Id.* (Schorr Dep. Tr. 109:12-22, 115:23-116:14, 150:9-19; Mullins Dep. Tr. 146:2-148:15; Tonrey Dep. Tr. 18:12-19:14, 68:11-17 & Ex. 301; Kavali Dep. Tr. 51:9-11, 42:16-21, 221:8-17; 243:7-10, 243:14-16, 265:12-16, 274:21-24). Each received payment for services by non-par providers from Aetna with reimbursements based on R&C set below billed charges and suffered losses as a result. *Id.* (Schorr Dep. Tr. 127:13-128:17, 152:12-21, 261:14-24; Mullins Dep. Tr. 146:2-150:25; Tonrey Dep. Tr. 72:8-73:9, 135:12-136:3, 151:19-152:17; Kavali Dep. Tr. 139:16-140:7, 221:8-17, 245:13-15).

Thus, the proposed representatives are similarly situated to the absent members of their respective classes, having been subjected to the same conduct and sharing the same legal claims. In the analogous *Health Net* litigation, this Court rejected the defendant's arguments that the typicality element was not satisfied because of differences in plan contracts and R&C definitions. The Court noted that "the predominant legal allegation [wa]s that the method of calculating allowed amounts was undisclosed, self-serving, and based on outdated and/or otherwise improper data," and that "[t]his central argument [wa]s not hinged on a specific R&C definition."

*Wachtel*, 223 F.R.D. at 215. [7]  Similarly, the Court was unpersuaded by the defendant's argument that certain R&C methodologies had been applied to some class members but not to others, concluding that such a distinction did not defeat a showing of typicality because, as in this litigation, "the Plaintiffs ha[d] alleged a common pattern of conduct in applying undisclosed and improper reimbursement methods." *Id.* at 216.

Another district court in this Circuit held that the typicality element was satisfied in an action brought by providers to challenge the defendant healthcare cost administrator's R&C methodology, noting that the proposed class representatives, like absent class members, were medical providers who had submitted bills to third-party payors for whom the defendant had determined the amount that the providers would be paid and that "[t]heir claims ar[o]se out of [the defendant's] system-wide business practices allegedly resulting in reduced payments to all class members." *First State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 511 (E.D. Pa. 2007).

In *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180 (D.N.J. 2003), this Court found the typicality element satisfied where "the central claim for the named plaintiffs [wa]s that they were harmed by an illegal price-fixing conspiracy," noting that this claim would "be the same for all of the class members." *Id.* at 185. So, too, here, all members of the classes asserting Sherman Act § 1 claims allege the existence of an illegal price-fixing conspiracy among Aetna, its co-Defendants, and others relating to reimbursement rates for services by non-par providers.

United's and Ingenix's expert, Dr. Daniel J. Slottje, maintains that the application of the Ingenix database varied between its effect on the benefits claims of four named Subscriber

---

[7] Dr. Tonrey does not assert claims under RICO and the Sherman Act against Defendants UHG and Ingenix.

Plaintiffs (Michele Werner, Paul Smith, Sharon Smith, and Jeffrey Weintraub) and its effect on class members' benefits claims. Axelrod Decl., Exh. 15 at 5, 29-33. However, as the Seventh Circuit in *Kohen v. Pacific Inv't Mgmt. Co., LLC*, 571 F.3d 672, 677-78 (7th Cir. 2009), held, the mere fact that some class members may ultimately be found to have benefited from the misconduct is not sufficient to defeat class certification. A*ccord Newton*, 259 F.3d at 184 ("typicality does not require similarity of individual questions concerning . . . damages on the part of the class representatives"). As noted above, the typicality test focuses on the defendant's conduct, and so long as Plaintiffs' claims arise out of the same course of conduct and their legal theories are the same as those of absent class members, the typicality requirement is satisfied. Such is the case here.

### 4.    Rule 23(a)(4): Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Adequacy "encompasses two distinct inquiries designed to protect the interests of absentee class members:  'it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees', and it tests the qualifications of the counsel to represent the class.'" *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 303 (3d Cir. 2005) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 800 (3d Cir. 1995)). Moreover, "[t]he burden falls on the party challenging class representation to prove inadequacy." *M.A. v. Newark Public Schools*, Civil Action No. 01-3389 (SRC), 2009 U.S. Dist. LEXIS 114660, at *26 (D.N.J. Dec. 7, 2009). "Doubts concerning the adequacy of a class representative are resolved in favor of certification." *Weikel v. Tower Semiconductor, Ltd.,* 183 F.R.D. 377, 394 (D.N.J. 1998). Plaintiffs clearly meet the requirements of adequacy of representation.

Adequacy and typicality overlap in that a class representative with typical claims has the genuine incentive to pursue claims on behalf of absent class members and to protect their

interests. *See Beck*, 457 F.3d at 296 ("[T]he typicality and adequacy inquiries often tend[ ] to merge because both look to potential conflicts and to whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."). Here, Plaintiffs have a strong incentive to protect the interests of absent class members because their claims and those of absent members arise from the same conduct by Defendants and their co-conspirators concerning the unlawful under-reimbursement of claims by non-par providers. Thus, all of the proposed class representatives have a substantial stake in this litigation and a strong incentive to vigorously pursue their claims.

Subscriber Plaintiffs understand that they are class representatives,  Axelrod Decl., Exh. 85 at 38:6-23, 210:19-211:2, 218:3-21; Exh. 86 at 33:18-34:15, 292:22-293:25; Exh. 87 at 96:4-24; 111:23-112:21, 115:21-117:3; Exh. 91 at 18:16-19:11; Exh. 92 at 19:4-20:18; Exh. 93 at 23:9-24:6, Exh. 94 at 36:16-25, 119:14-23);  testified to their commitment to and willingness to fully represent and protect the interests of the Classes, *id*; and  have gathered and produced ample information concerning their benefits claims, and submitted to depositions, relinquishing their privacy by exposing their private medical records and personal financial documents to Aetna's scrutiny,  *Id.* Exh. 74:9-17, 80:19-25).

Similarly, Provider Plaintiffs testified that they understand their role and duties as class representatives, Axelrod Decl., Exh. 90 at 12:12-15, 243:5-245-4; Exh. 95 at 51:4-14, 174:13-177:3; Exh. 89 at 206:10-21, 318:17-22; Exh. 88 at 57:24-58:6, 109:25-111:20; testified that they are committed to proceeding in the best interests of their respective Classes, *id.*; and  produced voluminous records concerning, among other things, their reimbursement claims, receipt of assignments of benefits, and documents concerning their professional practices. Axelrod Decl., Exh. 50.

Aetna's expert, Dr. Robin Cantor, suggests that there are "antagonistic interests" among class members, and that some class members would have no interest in challenging the unlawfulness of Aetna's R&C methodologies. Axelrod Decl., Exh. 17 ¶¶ 37-38, 93. That is unavailing. Dr. Foreman's Rebuttal Report addresses Dr. Cantor's conclusions. Axelrod Decl., Exh. 19 ¶¶ 47-78. In brief, Dr. Cantor compares the Ingenix databases to five other available data products, which she represents as benchmarks. She argues that, based upon this "benchmark" comparison, that Plaintiffs have failed to establish common proof of injury because sometimes the Ingenix database values are sometimes higher than the comparison database values. Thus, Dr. Cantor claims, there may be intra-class conflict because some class members may not have suffered damages. *Id.* at ¶¶ 47, 51, 67-76.

In rebuttal, Dr. Foreman notes that Dr. Cantor has failed to identify appropriate benchmarks for comparison, because:

- The databases used by Dr. Cantor for comparison purposes do not represent the "same unit of analysis and the same study populations." *Id.* ¶57.

- The data products proposed as benchmarks have not been tested for scientific reliability. *Id.* at ¶¶51-55, 59.

- The databases used by Dr. Cantor for comparison purposes do not represent the "same unit of analysis and the same study populations." *Id.* ¶57.[8]

- The comparative data has not been demonstrated to be reliable. *Id.* at ¶¶69-73.

- Dr. Cantor did not use un-manipulated data in her comparison. *Id.* at ¶¶69-73.

Moreover, Dr. Cantor's opinion improperly suggests a legal conclusion for the Court, relies on wrong standard, and ignores the fact that each class member was paid benefits that were less than billed charges. Additionally, Dr. Cantor's conclusion is based on conjecture and speculation concerning class members in upper and lower percentile distributions. Such

---

[8] Dr. Siskin made a similar point in his deposition. Siskin Dep. at 111:16-112:20.

speculative or theoretical conflicts do not render proposed representatives inadequate. *In re Ins.*
*Brokerage Antitrust Litig.*, No. 04-5184 (FSH), 2009 U.S. Dist. LEXIS 17754, at *69 (D.N.J.
Feb. 17, 2009) (antagonism between named plaintiffs and class must rise to the level of being "a
legally cognizable conflict of interest between the two groups") (citation and internal quotation
marks omitted), *aff'd*, 579 F.3d 241 (3d Cir. 2009). As this Court has explained:

> [C]ourts are generally skeptical of defenses to class certification based on
> conflicts between the proposed class members. The mere fact that a representative
> plaintiff stands in a different factual posture is not sufficient to refuse certification
> . . . . The atypicality or conflict must be clear and must be such that the interests
> of the class are placed in significant jeopardy. Courts have generally declined to
> consider conflicts, particularly as they regard damages, sufficient to defeat class
> action status at the outset unless the conflict is apparent, imminent, and on an
> issue at the very heart of the suit.

*In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, No. 02-6030 (WHW), 2006 U.S. Dist.
LEXIS 16619, *24 (D.N.J. Aug. 4, 2006) (citations and quotation marks omitted).

The adequacy inquiry also "factors in competency and conflicts of class counsel." *Beck*,
457 F.3d at 296 n.10. To this end, courts consider whether plaintiff's attorney is qualified,
experienced, and able to conduct the litigation. *In re Prudential Ins. Co. Am. Sales Practice*
*Litig. Agent Actions*, 148 F.3d 283, 312 (3d Cr. 1998). To this, there should be no legitimate
dispute. The firm resumes of the Plaintiffs' Executive Committee, Axelrod Decl., Exhs. 172,
demonstrate that proposed Class Counsel are well versed in complex and class action litigation.
Indeed, this Court and others have recognized the superior ability of these firms to handle
complex class action litigation, including the specific claims being asserted here.[9] *See Markocki*

---

[9]For example, in *Health Net*, the District Court appointed Pomerantz Haudek and counsel from
Wilentz, Goldman & Spitzer, P.A., as co-lead counsel on behalf of classes of subscribers.
*McCoy*, 569 F. Supp. 2d at 457. *See also In re Ins. Brokerage Antitrust Litig.*, No. 04-5184
(FSH), 2007 U.S. Dist. LEXIS 11163, *81-82 (D.N.J. Feb. 16, 2007) (noting that Whatley,
Drake & Kallas has "successfully prosecuted numerous antitrust class actions" and that Edith M.
Kallas "has been active in complex litigation" and "was also one of the principal representatives

*v. Old Republic Nat'l Title Ins. Co.*, 254 F.R.D. 242, 249 (E.D. Pa. 2008) (adequacy found where

plaintiff was represented by counsel "experienced in representing class actions involving similar

legal theories"); *In re K-Dur Antitrust Litig.*, No. 01-1652 (JAG), 2008 U.S. Dist. LEXIS 71771,

*28 (D.N.J. Mar. 27, 2008) (adequacy established where counsel were "experienced in antitrust

disputes and complex class action litigation"). In sum, adequacy is satisfied here.

## B.   COMMON QUESTIONS PREDOMINATE OVER ANY INDIVIDUALIZED ISSUES, SATISFYING RULE 23(b)(3)

Rule 23(b)(3) provides that an action may be maintained as a class action if the Court

finds that the four prerequisites of Rule 23(a) are satisfied and that "questions of law or fact

common to the members of the class predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for the fair and efficient

adjudication of the controversy." The predominance component of Rule 23(b)(3) requires that

"[i]ssues common to the class must predominate over individual issues." *Hydrogen Peroxide*,

552 F.3d at 311 (quoting *Prudential*, 148 F.3d at 313-14). Thus, the predominance analysis will

often require the Court to "examine the elements of plaintiffs' claim through the prism of Rule

23" to determine if the claim is "capable of proof at trial through evidence that is common to the

---

on behalf of nationwide classes of physicians and medical societies who negotiated recent settlements with Aetna, Cigna, Health Net, Prudential, Wellpoint, and Humana that resulted in billions of dollars of practice reforms and monetary relief"); *American Medical Ass'n v. United HealthCare Corp.*, No. 00 Civ. 2800 (LMM), 2009 U.S. Dist. LEXIS 112634, at *31 (S.D.N.Y. Dec. 1, 2009) (Pomerantz "plainly qualified, experienced and able to conduct this litigation"); *County of Monroe, Fla. v. Priceline.com, Inc.*, No. 09-10004-CIV-MOORE/SIMONTON, 2010 U.S. Dist. LEXIS 25066, *23 (S.D. Fla. Mar. 15, 2010) (Carella Byrne has "substantial experience in litigating class actions and other complex matters"); *Hodges v. Akeena Solar, Inc.*, 263 F.R.D. 528, 533 (N.D. Cal. 2009) ("Upon review of Scott+Scott's resume, the Court finds that, given the firm's experience . . . [the lead plaintiff's] choice of counsel is well-qualified to act as class counsel"); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 325 (W.D. Tex. 2007) ("Bonnett, Fairbourn, Friedman & Balint, P.C. has successfully handled more than 100 class action settlements over the last 20 years."); *Lester v. Percudani*, 217 F.R.D. 345, 351 (M.D. Pa. 2003) (Seeger Weiss a "preeminent" firm "with extensive experience in prosecuting class actions").

class rather than individual to its members." *Id.* at 311.

Predominance does not require that claims be identical. *See Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 545 (D.N.J. 1999) (stating that "class members need not be identically situated upon all issues, so long as their claims are not in conflict"). "Predominance exists where the efficiencies gained by the class resolution outweigh the individual issues." *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 231 (D.N.J. 2005); *Mercedes-Benz Antitrust Litig.*, 213 F.R.D. at 186 (predominance requires that "common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members"). The existence of individual questions does not preclude a finding of predominance. *Prudential*, 148 F.3d at 315; *Wachtel*, 223 F.R.D. at 213. Even a small number of common issues can satisfy predominance if the resolution of those issues will "significantly advance the litigation." *Mercedes-Benz Antitrust Litig.*, 213 F.R.D. at 186.

"The predominance inquiry is especially dependent upon the merits of a plaintiff's claim, since the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009); *see also Szczubelek v. Cendant Mortgage, Inc.,* 215 F.R.D. 107, 120-21 (D.N.J. 2002) (discussing factors for courts to consider in undertaking Rule 23(b)(3) analysis). Once this Court identifies the applicable law, it must determine whether proving the elements of Plaintiffs' claim(s) can be done through common questions. *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 210 (E.D. Pa. 2000).

"Common issues predominate when the focus is on the defendant's conduct and not on the conduct of the individual class members." *Mercedes-Benz Antitrust Litig.*, 213 F.R.D. at 187; *see also In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 484 (W.D. Pa. 1999). As outlined

below, an analysis of the applicable law demonstrates that Plaintiffs' claims can be proved by resolution of common questions that significantly advance this litigation, and class certification is justified.

The claims of the Subscriber and Provider Plaintiffs focus on a single overarching issue common to all members of the Classes: Aetna's methods for determining R&C for non-par providers' healthcare services. Other common issues, such as disclosure of these methods and appeals of Aetna's R&C determinations, are integrally related to this core issue. The same evidence, applicable to virtually all the Classes, will be employed in adjudicating the claims of *all the Classes* under Rule 23(b)(3).

The methodologies set forth in the Expert Reports of Dr. Foreman demonstrate both that common issues predominate and that adjudication including trial of these cases is manageable on a classwide basis.

### 1. Subscriber and Provider Plaintiffs' ERISA Claims

#### a. Claims for Unpaid Benefits

Under ERISA § 502(a)(1)(B), Plaintiffs may bring an action "to recover benefits due under the terms of the plan, to enforce rights under the terms of the plan, or to clarify rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Section 502(a)(1)(B) permits Plaintiffs to assert a breach of contract claim for failure to pay benefits as required under the terms and conditions of the plans. *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 287 (3d Cir. 1995) ("In holding that ICI breached the terms of the plan, the district court appropriately applied contract principles.") "[B]reach of contract principles, applied as a matter of federal common law, govern disputes arising out of plan documents." *Id.*; *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 936 (3d Cir. 1985) ("ERISA establishes federal jurisdiction for suits claiming

breach of contract of an employees benefit plan.").

Under ERISA, Aetna must comply with its plan terms. *See Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 520 (3d Cir. 1997). Insurance policies are considered policies of adhesion. *Cincinnati Ins. Co. v. Cham's Jewelry Art, Inc.*, 31 F. App'x 793, 795 (3d Cir. 2002). General contract principles apply to the Court's interpretation of the ERISA plan. "An insurance policy should be interpreted according to the plain meaning" and any ambiguity "is ordinarily resolved in favor of the insured." *Buczek v. Continental Cas. Ins. Co.*, 378 F.3d 284, 289 (3d Cir. 2004). ERISA contracts must be interpreted according to what a reasonable person "would have understood the words to mean." *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1202 (10th Cir. 1992).

In assessing Plaintiffs' breach of contract claims brought pursuant to ERISA § 502(a)(1)(B), the Court need consider only the contract language governing Aetna's obligations regarding R&C determinations and whether Aetna's actions breached those obligations. In practice, Aetna interpreted its contractual obligations to determine R&C to permit it to use Ingenix data and other improper and undisclosed methods including the use of outdated data and Medicare rates. Because Aetna interpreted its contractual obligations in administering all of its plans and did not differentiate its action based on the language of individual plans for determining R&C, adjudication of ERISA claims for unpaid benefits is a common issue that predominates in this action.

This Court noted that the Ingenix database is flawed and does not represent R&C. *McCoy v. Health Net*, 569 F. Supp. 2d at 464-68 (stating that "[t]he Ingenix database suffers from numerous errors"). Indeed, the documents show that neither Ingenix nor Aetna believed that the Ingenix database was appropriate for determining R&C. Axelrod Decl., Exh. 2. Aetna

nevertheless used Ingenix as its primary method for determining R&C.

Dr. Siskin reviewed the R&C definition of the contracts and testified that "the definition is the distribution of provider charges for a similar service in a particular medical market area." Axelrod Decl., Exh. 73 at 579:3-6. He continued, "that definition is not met – cannot be met from the Ingenix database unless you make very simplified assumptions. I'm saying if I wanted to calculate that number, there are a set of factors one would have to consider." *Id*. Dr. Siskin concludes that "the Ingenix Databases do not allow one to compute a distribution of charges which are sufficiently similar that one can reasonably assess which charges are reasonable and which are 'too high.'" Axelrod Decl., Exh. 1 at 5. As Dr. Siskin explains, the Ingenix database suffers from "methodological flaws [that] affect all CPT codes in all geographic areas." *Id* at 6. For example, the database's failure to consider "provider specialty, training, experience, expertise or qualifications, such as whether a provider is a physician or not, and regardless of the type or place of service" results in "high charges which are valid and usual are regarded [by Ingenix] as unreliable outliers, and are eliminated from the Common Data, thereby skewing downward the Upper Percentile values in the final Ingenix data." *Id.* at 23-24. These flaw combined with the many others he describes render the Ingenix database an invalid determiner of R&C. *Id.*

This Court considered the methodologies that Dr. Siskin used in assessing the "major flaws" in the Ingenix database and concluded that "the use of any database to calculate medical insurance coverage can be analyzed by inquiring into the same data collection and statistical manipulation issues addressed herein." *McCoy*, 569 F. Supp. 2d at 464.

Aetna's other undisclosed methodologies are similarly flawed and unsuitable for use in R&C determinations. Dr. Siskin's analysis led to his conclusion that Aetna's use of "its own

internal data or a percentage of Medicare are also invalid methods to determine R&C." Axelrod

Decl., Exh. 1 at 33-34. For these reasons, it was unknowable and thus unappealable. *Grossmuller*

*v. Int'l Union*, 715 F.2d 853 (3d Cir. 1983).

Aetna's use of invalid R&C constitutes a breach of the plan terms. This can be proved

entirely through evidence of Aetna's conduct and without resort to consideration of individual

issues. *See Wachtel*, 223 F.R.D. at 210 (noting that in an ERISA contract damages case,

"plaintiffs need not establish a class-wide impact to prevail on class certification"). Individual

damages can be assessed through Aetna's "computerized system to reprocess those claims as to

which a reduction method was applied that was held to be undisclosed or otherwise improper"

and "do not defeat predominance as to liability issues." *Id.* at 214. Aetna's breach of the plan

language is the core ERISA violation in this case; the remaining ERISA claims flow directly

from Aetna's 502(a)(1)(B) violations.

> **b.**     **Violation of Fiduciary Duties of Loyalty and Due Care**

ERISA § 504 outlines provides, in part, that a "fiduciary the obligations that fiduciaries

[such as Aetna] owe to its beneficiaries shall discharge his duties with respect to a plan solely in

the interest of the participants and beneficiaries" "for the exclusive purpose of providing benefits

to participants and their beneficiaries" "in accordance with the documents and instruments

governing the plan.". 29 U.S.C. § 1104 (formatting altered). Plaintiffs allege that Aetna's

improper R&C reductions that violate ERISA § 502(a)(1)(B) also violate § 504. Once again,

Aetna's conduct can be measured against the statute without resort to individual proof.

In its role as insurer and claims administrator, Aetna is a fiduciary as a matter of law to

the entire class. The Third Circuit in *Evans* defines the "proper defendant" under ERISA. *Evans*

*v. Employee Benefit Plan,* 311 Fed. App'x 556, 558 (3d Cir. 2009) ("In a claim for wrongful

denial of benefits under ERISA, the proper defendant is the plan itself or a person who controls

the administration of benefits under the plan. 29 U.S.C. § 1132(a)(1)(B).”). *See also Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 309 (3d Cir. 2008) (holding that “a plan administrator engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of plan documents”).

Aetna’s plan language across the class allocate to Aetna fiduciary authority and discretion to make benefits determinations, thus rendering it a fiduciary. By its own admission, where Aetna fully insured or self insured a plan, Aetna is a fiduciary. Axelrod Decl., Exh. 84 at 180:18-20. Aetna’s 30(b)(6) representative confirmed that there is no difference in how Aetna processed appeals and how it discloses benefit determination methodology information when a self-funded plan retains discretion to determine second-level appeals. *Id.* at 143:1-24. Aetna appeal analysts’ procedures are the same whether the plan is fully funded or self funded. *Id.* at 183:10-18. Further, in self-funded plans where the sponsor retains the responsibility for second-level appeals, Aetna provides the same invalid R&C information to the sponsor that it uses in its appeal determinations. *Id.* at 181:16-182:16. Indeed, without this authority, Aetna would not be able to make R&C determinations for the class, which it undisputedly did.

Once Aetna’s fiduciary status is established as a matter of law, the same class proofs used to support the ERISA § 502(a)(1)(B) violation above will also be sufficient to prove that this same conduct is a breach of the prudent man standard of care in § 404.

### c.    Failure to Provide Full & Fair Review

Section 503 of ERISA provides that “every benefit plan” must “afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.” 29 U.S.C. § 1133. By serving as fiduciary and claims administrator, Aetna assumed the obligation to comply with ERISA’s full and fair review requirements under the plans. 29 U.S.C. § 1133.

40

This claim flows directly from Aetna's violations of 502(a)(1)(B) and can be proved through common proofs. After making improper R&C determinations using invalid methods, Aetna denied members the ability to properly appeal these determinations.

Aetna did not permit members to prove that R&C was invalid. While denying members information necessary to challenge R&C or to learn of its R&C methodology, the R&C amount was assumed and accepted by Aetna as the proper benefit payment and would not be increased except in limited circumstances. Axelrod Decl., Exh. 84 at 159:13-167:20, 166:22-167:20. Such denial of basic information and limited consideration is not the full and fair review required by ERISA. Aetna simply did not consider challenges to the R&C methodology, which were kept secret, resulting in benefit denials across the classes.

Aetna also failed to inform members that: (1) R&C could be determined by another methodology other than Ingenix such as derived data, outdated data, Medicare fee schedules, or its own Aetna Fee Profile Schedule, Axelrod Decl., Exh. 84 at 138:22-139:1; 119:19-25; 120:9-19; 136:23-137:20; 138:22-139:5; 265:3-267:8; (2) R&C could be determined on less than 9 charges, *id.*, Exh. 79 at 67:25-69:16; Exh. 37; (3) Ingenix published a disclaimer that its data does not determine R&C, Exh. 64; (4) Ingenix data mixed physicians charges with other professionals' charges and that certain CPT codes produced the same R&C whether the service was performed by a medical doctor or a non-medical doctor, *id.*, Exh. 70 at 209:19-211:7; Exh. 80 at 365:4-19; 367:14-368:3; and (5) Ingenix data may have been altered or pre-edited, *id.*, Exh. 83 at 88:11-90:10; Exh. 33.

Aetna customer service representatives were also specifically trained not to encourage members to file appeals. Axelrod Decl., Exh. 84 at 151:14-152:9; 160:16-161:25; 164:4-20; Exh. 66. Accordingly, appeals of Aetna's R&C methodologies were futile pursuant to Aetna's

standard processes and procedures. These practices resulting in futility apply to all members of the classes.

2.    **Subscriber Plaintiffs Non-ERISA Claims**

a.    **NJ SEHP and Individual Plan Regulations**[10]

The same evidence to prove the ERISA violations will be sufficient to prove violation of the New Jersey Small Employer Health Plan and Individual Plan Regulations. N.J.A.C. § 11:21-7.13 requires "small employer carriers [to] pay covered charges for medical services, using either the allowed charges or actual charges." The SEHP defines "allowed charge" as "a standard based on the Prevailing Healthcare Charges System," which is based on the Ingenix database. Similarly, N.J.A.C. 11:20-24.5 mandates that individual health plan carriers "pay covered charges for services based on the allowed charges or actual charges." This regulation also defines "allowed charge" as "a standard based on the Prevailing Healthcare Charges System," which is based on the Ingenix database. Since Aetna fraudulently manipulated the Ingenix Database to deprive Subscribers and Providers of benefits, these facts can be proved entirely through evidence of Aetna's conduct and without resort to consideration of individual issues.

b.    **Breach of Contract**

Common issues predominate as to Subscriber Plaintiffs' breach of contract claim since it arises out of the same uniform contractual promises and the same course of conduct that breaches those promises with respect to all members of the Non-ERISA class. Because state contract laws are uniform as they concern this issue, and because of the predominance of

---

[10] SEHP plans are governed by ERISA and are also subject to a New Jersey SEHP regulation, N.J.A.C. § 11:21-7. 13(a). Individual plans are governed by the New Jersey Regulations but are not subject to ERISA.

common legal and factual issues, courts have recognized that breach of contract claims like those here that arise out of a widely used form contract are ideal for class treatment. *Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 692 (N.D. Ga. 1983) ("When viewed in light of Rule 23, claims arising from interpretation of a form contract appear to present the classic case for treatment as a class action . . . .").

Plaintiffs will prove that Aetna utilizes form contracts of adhesion that promise to reimburse for services by non-par providers based on the R&C. Similarly, common issues predominate as to Aetna's alleged breach of that promise since the breach arises out of the same central course of conduct: Aetna's systematic under-reimbursement for services by non-par providers at rates substantially below the R&C based on the use of the flawed Ingenix database. Because common questions regarding interpretation of Aetna's contracts and whether Aetna breached those contracts predominate over any individual issues regarding damage calculations, class certification of Plaintiff's breach of contract claim is warranted.[11]

---

[11] Common issues predominate as to the breach of implied covenant claim asserted in the Eleventh Cause of Action. The law reads into every contract a duty of good faith and fair dealing in its performance and in its enforcement. Restatement (2d) of Contracts, § 205 (1981). As an alternative to the breach of contract claim, Subscriber Plaintiffs are pursue an unjust enrichment claim on behalf of subscribers to Aetna's individual and family health plans. These subscriber plaintiffs must prove that Aetna received a benefit from Plaintiffs, and that Aetna's retention of that benefit is inequitable. *See Ace Chrome Corp. v. Ibex Constr. LLC*, 08 Civ. 10401 (TPG), 2009 U.S. Dist. LEXIS 71547 (S.D.N.Y. Aug. 13, 2009). Because the focus of an unjust enrichment claim is on the gains of the defendant instead of the losses of the plaintiffs, courts have recognized that common issues predominate. *See In re Abbott Laboratories Norvir Antitrust Litig.*, No. C 04-1511 CW, 2007 U.S. Dist. LEXIS 44459 (N.D. Cal. June 11, 2007). Here, proof of benefit will be straightforward since by definition all of the members of the class paid money to Aetna for health care coverage.

c.       **NY GBL § 349**

With respect to the New York Damages Class, common questions predominate as to Plaintiffs' GBL §349 claim, the elements of which are that: (1) Defendants' acts are directed to consumers, (2) they are deceptive or misleading in a material way, and (3) Plaintiffs have been injured thereby. *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 532, 647 N.E.2d 741, 744 (1995). Numerous courts have recognized that common questions of law and fact predominate in a consumer class action under GBL § 349 where, as here, the claims are based on a defendant's uniform misrepresentations and omissions to a large group of consumers. *See Jermyn v. Best Buy Stores, LP*, 256 F.R.D. 418, 435 (S.D.N.Y. 2009) ("Courts have repeatedly held that that section 349 claims based upon omissions, non-disclosures and deceptive corporate policy are well suited to class certification.").

In order to qualify as consumer-oriented conduct under GBL §349, a plaintiff need only "demonstrate that the acts or practices have a broader impact on consumers at large" than a traditional two-party dispute. *Oswego,* 85 N.Y.2d at 25, 623 N.YS.2d at 532, 647 N.E.2d at 744. This element is by definition a common question as proof of consumer impact will be the same for all class members and will focus on the overall impact of Defendants' market-wide misrepresentations, rather than on any particular Class Member's experience.

To prove that Aetna made material misrepresentations, Plaintiffs will rely upon uniform, widely disseminated statements in Aetna's contracts and advertising that they will reimburse for services by non-par providers based on the R&C. To prove material omissions under NY GBL § 349, Plaintiffs need only show that Defendants possessed and withheld material information that is relevant to a reasonable consumer. *Oswego*, 85 N.Y.2d at 26, 623 N.YS.2d at 533, 647 N.E.2d at 745. Plaintiffs will establish on a class-wide basis that Aetna did not disclose the material fact

that they were conspiring to deflate reimbursements for services by non-par providers through use of the Ingenix database, or that their use of the Ingenix database was rife with conflicts of interest. The injury requirement under GBL §349 requires Plaintiffs to prove that Aetna's acts caused them to suffer a loss. Because the misrepresentations and omissions at issue concerned the amount of money Plaintiffs and the other members of the New York Damages class would need to pay for services by non-par providers, this element is necessarily satisfied if Plaintiffs can prove the first two elements of their GBL §349 claim.

Differences in the amount of damages does not preclude certification of a GBL §349 class where, as here, the injuries are all caused by a common course of conduct that can be proven on a class-wide basis. *See Jermyn,* 256 F.R.D. at 436 ("The fact that the mechanical calculation of each member's damages will have individualized aspects does not preclude class certification."). The methodologies presented by Dr. Foreman for assessment of common impact and damages clearly are also applicable to the Class claims under NY GBL § 349.

### 3.    Provider and Subscriber Plaintiffs' RICO Claims

Plaintiffs' claims under substantive RICO and RICO conspiracy may all be tried on proof that is common to the Classes.

Establishing liability under 18 U.S.C. § 1962(c) requires proof of (1) conduct (2) of an enterprise (3) through a pattern of racketeering activity, (4) plus an injury to "business or property." *Insurance Brokerage*, 579 F.3d at 269; *Lum v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir. 2004)). Here, each of these four elements is readily provable by common evidence. *See id.*, 579 F.3d at 267-70; *McCoy*, 569 F. Supp. 2d at 456  (finding common issues to predominate in RICO claim arising out of alleged scheme to underpay health care benefits); *Grider v. Keystone Health Plan Central, Inc.*, No. 2001-CV-05641, 2006 U.S. Dist. LEXIS 93085, *81-82 (E.D. Pa. Dec. 20, 2006) (same).

Common evidence will prove the extent to which Aetna and the other RICO defendants participated in the operation, control and manipulation of the Ingenix databases so as to create and implement uniform pricing schedules that result in the systematic underpayment of benefits. Axelrod Decl., Exh. 21 ¶¶ 47-54); Exh. 1 at 10-11). Because evidence of the challenged conduct is common to all class members, predominance is readily satisfied as to the first RICO element. *See Insurance Brokerage*, 579 F.3d at 269 (finding predominance of common issues on conduct element of RICO claim, noting that proving this element would involve common questions about defendants' activities); *Spencer v. Hartford Fin. Servs. Group, Inc.*, 256 F.R.D. 284 (D. Conn. 2009) (finding predominance of common issues with respect to conduct where plaintiff alleged that insurer managed the enterprise while other defendants participated in the operation of the enterprise by carrying out insurer's uniform policies).

Throughout the class periods, Aetna consistently was the largest or second-largest data contributor to the Ingenix database. Accordingly, it played a highly significant role in the development of the corrupt Ingenix database and economically benefits from the use of the corrupt database. Axelrod Decl., Exh. 33. At the time United and Ingenix purchased the PHCS database from HIAA, a seventh of PHCS's data came from Aetna. *Id.* Aetna's data contribution continued to grow and dominate the Ingenix database. For example, Aetna contributed nearly 11% of the data received in 2004 – second only to UHG's contribution of nearly 24% of the data Axelrod Decl., Exh. 24 and Aetna has "[c]ontributed [d]ata has been between 17-25% of the charges Ingenix has received since 2005," Axelrod Decl., Exh. 1 at 16. Aetna was often the largest contributor of data in a submission period. Exh. 82 at 145:18-147:14. Aetna regularly contributed some of its claims data to Ingenix in exchange for deep discounts on the license fees for the Ingenix database. Axelrod Decl., Exh. 38, 79; 80; 98. Aetna thus economically benefited

from submitting invalid data by suppressing Ingenix data used to determine R&C and reduced its cost for the use of the Ingenix database.

Ingenix and United economically benefited from allowing its data contributors, particularly large contributors like Aetna and CIGNA, to circumvent Ingenix's data contribution rules. Ingenix was consistently one of United's most profitable businesses and at Ingenix's "financial core" were its database products. Axelrod Decl., Exh. 23. Ingenix dependence on Aetna to supply a significant portion of the data used in its products resulted in Ingenix's willingness to sacrifice the integrity of the Ingenix database in return for Aetna's compromised data. Indeed, Ingenix's relationship with Aetna and CIGNA was essential to the continued existence of the Ingenix Database. In 2004, five contributors accounted for 52% of the total data contributed to Ingenix. Axelrod Decl., Exh. 24. The top three contributors, United, Aetna and CIGNA, accounted for 43% of the total data contributed. Ingenix could not have continued to market and sell its profitable database without the participation of Aetna – resulting in its willingness to overlook and accept Aetna's tainted data.

Such evidence of an association-in-fact enterprise is plainly common to all members of the RICO Class. *See McCoy*, 569 F. Supp. 2d at 456 (finding that common issues predominate with respect to association-in-fact RICO enterprise arising out of alleged common plan or scheme to underpay health care benefits); *Spencer*, 256 F.R.D. at 295-96 (finding predominance on issue of RICO enterprise where plaintiffs alleged ongoing partnership between entities engaged in implementing a scheme to systematically underpay structured insurance settlements).

In implementing the alleged fraudulent scheme of the Aetna-Ingenix Enterprise to underpay health benefits, Aetna and the other RICO Defendants engaged in racketeering activity premised on numerous predicate acts of mail and wire fraud. Plaintiffs have already amassed

evidence that Aetna used mail and wire communications to:

■forward invalid and suppressed data via mail, file transfer protocol or email, with Ingenix's knowledge, that would be used to set suppressed benefit payments to Aetna members, as well as members of any health care plan that used Ingenix data to determine benefits. Axelrod Decl., Exhs. 33; 62; 80;

■forward false statements as to how benefits were calculated through EOBs and statements in appeal denial letters. Axelrod Decl., Exh. 60; Exh. 85 at 52:1-54:17; 216:1-217:2, 1/25/10; Exh. 86 at 60:24-61:16; Exh. 87 at 121:23-122:7; Exh. 88 at 221:8-225:6, 2/12/10; Exh. 89 at 215:22-218:18; Ex. 90 at 174:24-179:24, 3/12/10);

■falsely vouch for the accuracy of the Ingenix data system. Axelrod Decl., Exhs. 54, 55, 60, 79,83; and

■deny members the information they required to determine whether the benefits being paid were valid under the contract. Axelrod Decl., Exh. 85 at 52:1-54:17.
.To facilitate the fraud, Aetna knowingly sent false certifications as to the data it had

contributed to Ingenix. Axelrod Decl., Exhs. 33; Exh. 80 at 69:6-22, Mar. 17, 2010; Exh. 79 at

293:10-294:9; Exh. 83 at 88:11-90:10, 101:23-105:10; 126:14-127:20; 127:22-129:13; 130:22-

131:6; 133:16-134:12. With these false certifications in hand Ingenix incorporated Aetna data

that it should have excluded into the Ingenix database, resulting in suppressed benefit payments

for healthcare services by non-par providers. *Id.*[12]

The same sort of common evidence will establish the pattern of racketeering activity for

violations of 18 U.S.C. § 664 serving as the predicate acts. By improperly reducing payments on

claims for services by non-par providers, Aetna intentionally caused the Plaintiffs and the

members of the RICO Classes who were *also* members of the ERISA Classes to be underpaid

benefits to which they were otherwise entitled in accordance with the terms of Aetna's group

health plans.

---

[12]Such evidence also serves to reinforce the predominance of common issues relating to the "enterprise" element as well. *United States v. Irizarry*, 341 F.3d 273, 286 (3d Cir. 2003) ("enterprise" can be inferred from proof of pattern of racketeering activity").

For fully insured health care plans, in which Aetna both administered the plans and paid the benefits from its own assets, Aetna benefited from the conversion of assets from its ERISA plans. Whereas these assets should have been held by Aetna in its fiduciary capacity under ERISA plans and paid to its Members, Aetna improperly withheld such funds and maintained them as part of its own assets for Aetna's own benefit. Aetna acted with specific intent to deprive the Plaintiffs and applicable RICO Class members of benefits, and was sufficiently aware of the facts to know that it was acting unlawfully and contrary to the trust placed in them by Plaintiffs and RICO Class members and the insurers whose plans it was administering.

Because proof of the foregoing predicate acts by one class member will necessarily prove them on behalf of all class members, predominance is satisfied as to this element for both RICO claims. *See Insurance Brokerage*, 579 F.3d at 270 (predominance satisfied where common issues included "whether activities that constitute racketeering were taking place through the enterprise (such as mail or wire fraud) and whether these racketeering activities were recurring such that a pattern could be established"); *McCoy*, 569 F. Supp. 2d at 456 (finding common issues to predominate in RICO claim with respect to performance of predicate acts, including mail and wire fraud, arising out of alleged common plan or scheme).

Proof of Plaintiffs' RICO conspiracy claim turns on common evidence of a conspiracy among and acts in furtherance thereof by the alleged conspirators, making the RICO conspiracy claim no less certifiable than the Section 1962(c) claim. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1256 (11th Cir. 2004) (holding that where defendants operating nationwide allegedly conspired to underpay doctors, factual issues relating to the alleged conspiracy are common to all plaintiffs). As stated in *Klay*:

> [P]laintiffs' RICO claims are not simply individual allegations of underpayments lumped together, and the allegation of an official corporate policy or conspiracy is

not simply a piece of circumstantial evidence being used to support such individual underpayment claims. Instead, the very gravamen of the RICO claims is the "pattern of racketeering activities" and the existence of a national conspiracy to underpay doctors. These are not facts from which jurors will be asked to infer the commission of wrongful acts against individual plaintiffs; these very facts constitute essential elements of each plaintiff's RICO claims.

382 F.3d at 1257 (finding predominance of common issues on RICO conspiracy claim).

### 4.   Plaintiffs' Antitrust Claims

The elements of Plaintiffs' antitrust claims are (1) a violation of section 1 of the Sherman Act, (2) injury resulting from that violation, and (3) measurable damages. *See Hydrogen Peroxide*, 552 F.3d at 311.

### a.   Antitrust Conspiracy

As to the first element, a violation of section 1 of the Sherman Act, there should be no genuine controversy. Horizontal price-fixing agreements are *per se* violations of the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210-28 (1940). Plaintiffs allege that Defendants horizontally colluded with those that controlled the market for provider cost data to artificially fix, suppress and maintain the reimbursement rates in the downstream market for insured coverage of non-par healthcare services. Such a horizontal price-fixing conspiracy would, once proved, amount to a *per se* violation of the Sherman Act. *McDonough v. Toys "R" Us, Inc.*, 638 F.Supp.2d 461, 480 (E.D. Pa. 2009); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 462 (3d Cir. 1998).

As courts have recognized, "[s]ome restraints are considered per se unreasonable because they 'have manifestly anticompetitive effects' and 'lack any redeeming virtue.'" *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d at 480 (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)). "Examples include 'horizontal agreements among competitors to fix prices or to divide markets.'" *Id.* (same). Where, as here, the focus will be on

Aetna's Defendants' in fixing the rates of reimbursement paid for services by non-par providers, the predominance test is easily satisfied. *In re K-Dur Antitrust Litig.*, 2008 U.S. Dist. LEXIS 71771, *36-*37 ("Courts routinely find that proof of a violation of the antitrust law focuses on the defendants' conduct and not on the conduct of individual class members.").

Indeed, the Supreme Court recognized that Rule 23(b)(3)'s predominance element is "a test readily met in certain cases alleging . . . violations of antitrust laws." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997); *accord In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262-63 (D.D.C. 2002). In fact, this Court found the predominance test satisfied in a case involving similar facts, noting that "[t]he legal and factual issues regarding Health Net's alleged use of improper reimbursement practices [via the Ingenix database] [we]re central to the determination of Health Net's liability to each class member." *Wachtel*, 223 F.R.D. at 217; *see also id.* at 212 ("The issues of law and fact relating to whether Health Net fully disclosed and properly applied its reimbursement mechanisms for out-of-network provider services are common to the class members and predominate over individual questions.").

In several recent decisions, the Third Circuit upheld determinations that predominance was satisfied on the question of an antitrust violation. *See In re Ins. Brokerage Litig.*, 579 F.3d at 268; *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004).

Here, the issue of whether Defendants unlawfully conspired to set reimbursement levels for services by non-par providers below genuine R&C rates will be resolved at trial through common proof because the evidence will focus on the conduct of Defendants rather than Plaintiffs. Axelrod Decl., Exh. 21 ¶¶ 26-54. This includes substantial common proof showing that Defendants engaged in parallel behavior, that they were aware of each other's conduct, that this awareness was an element in their decision-making process, and that Defendants' actions

were contrary to their economic interests. *Id.* ¶¶ 13-14, 17, 26-37, 47-58. Moreover, Dr. Rausser's report provides detailed class-wide economic analysis of the various factors that made the health insurance industry conducive to collusive price-fixing, and the aspects of Defendants' conduct that, from an economic perspective, are consistent with collusion. *Id.* ¶¶ 13-16, 22-54; Exh. 18 ¶¶ 67-81, 137). In other words, there is common proof "that the structure of the market was such as to make secret [reimbursement rate for services by non-par providers] fixing feasible." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).

As to the remaining plus factor (evidence implying a traditional conspiracy), the Third Circuit has stated that evidence on this factor is not necessary as long as a plaintiff shows that defendants had a motive to conspire and acted contrary to their self-interest (common proof of which Plaintiffs present here, as noted above). *See Petruzzi's IGA Supermkts., Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1244 (3d Cir. 1993). Even if evidence implying a traditional conspiracy were required, however, courts accept "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *In re Flat Glass*, 385 F.3d at 361). Here, Plaintiffs have presented substantial common proof of that factor, too. Axelrod Decl., Exh. 21 ¶¶ 47-54).

Common questions of law will dominate as well. Whether Defendants violated the antitrust laws and entered into a conspiracy is a question common to all class members with antitrust claims. Compl. ¶¶ 698-716. Common issues of an antitrust violation predominate here because "the inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) (citation omitted and internal quotation marks omitted).

b.    **Antitrust Injury (Common Impact)**

"Antitrust impact requires proof not only of 'an injury causally linked to a violation of the antitrust laws' but also of 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *McDonough*, 638 F. Supp. 2d at 482. "At the class certification stage, the Court's concern is not whether Plaintiffs can or will establish class-wide impact, but whether class-wide impact may be proven by evidence common to all class members." *Graphite Prods.*, 2006 U.S. Dist. LEXIS 16619, at *30. In addition, meeting the impact element only requires that class members suffer *some* injury from the conspiracy:  "inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969). In connection with this element, Plaintiffs must show (1) that they suffered an injury; (2) that the injury was caused by an antitrust violation; and (3) that the injury qualifies as an antitrust injury. *McDonough*, 638 F. Supp. 2d at 482.

Here, Plaintiffs contend that class members were injured because they were reimbursed amounts less for services by non-par providers than they would have received but for the conspiracy, and that, for all subscribers, the value of their health insurance policies was reduced in the same manner. Plaintiffs contend that Defendants' collusive conduct effected a systematic downward bias in R&Cs calculated using the Ingenix database, thereby impacting class members through reduced reimbursement. Axelrod Decl., Exh. 1 at 8-10; Exh. 18 ¶¶ 6, 59-62; Exh. 21 ¶ 143.

The Third Circuit has held that "when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of . . . impact cannot be made on a common basis, so long as the common proof adequately demonstrates some damage to each individual." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir. 1977); *accord*

*Linerboard*, 305 F.3d at 151; *Am. Seed Co. v. Monsanto Co.*, 271 Fed. App'x. 138, 140 (3d Cir. 2008) (reaffirming *Bogosian* and *Linerboard*). As the Third Circuit explained in *Bogosian*:

> If . . . a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.

*Bogosian*, 561 F.2d at 454. "This presumption of class-wide injury through the use of common proof is now referred to as the '*Bogosian* short-cut.'" *Am. Seed*, 271 Fed. App'x at 140. The Third Circuit and other courts have affirmed the reliance on this short-cut where it is supported by additional evidence, such as an expert's analysis. *See id*. at 14 (citations omitted); *accord In re Hydrogen Peroxide*, 552 F.3d at 325-26; *Linerboard*, 305 F.3d at 153-55; *Am. Seed Co.*, 271 Fed. App'x at 140-41.

In the present case, there is common proof showing that "the price structure in the [health care] industry is such that nationwide the conspiratorially affected [reimbursement rates and insurance policy values] . . . fluctuated within a range which, though [possibly] different in different regions [or geozips], w[ere] [lower] in all regions than the range which would have existed in all regions under competitive conditions." *Bogosian*, 561 F.2d at 454. Axelrod Decl., Exh. 21 ¶¶ 13-16, 22, 26-46, 51, 59-61; Exh. 18 ¶¶ 10, 69; Exh. 1 at 7-10, 19-24). Plaintiffs' theory of antitrust impact is thus both plausible and capable of proof by common evidence, the only two showings required of Plaintiffs at this stage. *Hydrogen  Peroxide*, 552 F.3d at 325 ("the question at class certification stage is whether, if [antitrust] impact is plausible in theory, it is

also susceptible to proof at trial through available evidence common to the class"); *McDonough*, 638 F. Supp. 2d at 490.

Specifically, Dr. Foreman performed an extensive analysis showing that Plaintiffs (1) are reimbursed for services by non-par providers below contractually specified levels in the same manner, and that Subscriber Plaintiffs (2) suffer reductions in the value of their health insurance policy benefits in the same manner as a result of Aetna's reduction of reimbursement below contractually specified levels. Axelrod Decl., Exh. 18 ¶¶ 10, 21-135, 139-42). Dr. Foreman also discusses two viable methodologies by which he can show, based on common proof, class-wide impact and damages with a reasonable degree of certainty. One method establishes the difference between the billed charge and the allowed amount calculated using the flawed data base. *See id*. ¶ 145. Another methodology posits that "[d]amages to the subscriber and provider classes can be calculated based on the development of accurate and known billed charge percentile data and use of accurate billed charge percentile basis to calculate what Aetna would have reimbursed 'but for' the application of the flawed reimbursement limits." *Id*. ¶ 147. As Dr. Foreman further notes, "[t]his approach permits calculation of damages in an efficient way since the calculation is the same for all class members, and will produce accurate damage calculation with a reasonable degree of certainty." *Id*. ¶¶ 148-64, Exh. 19 ¶¶ 92-102). Dr. Foreman's analysis is also supported by empirically based simulations of the adverse impact resulting from Aetna's use of the Ingenix database to distort reimbursement rates. *Id.*, Exh. 18 ¶¶ 119-20 & Exh. C).

### c.       Common Proof of Economic Damages

"An antitrust plaintiff 'must make a showing regarding the amount of damages,' but 'the standard [of proof] is somewhat relaxed.'" *McDonough*, 638 F. Supp. 2d at 490 (quoting *Rossi v. Standard Roofing, Inc.*, 156 F.3d at 484 ). "It is not necessary to show with total certainty the amount of damages sustained." *Rossi*, 156 F.3d at 483. Once injury has been shown, "the jury is

permitted to calculate the actual damages suffered using a reasonable estimate, as long as the jury verdict is not the product of speculation or guess work." *Id.* at 484. A result of this reasonable estimate may be that some class members' calculated damages may be zero under one methodology. *In re Ethylene Propylene Diene Monomer ("EDPM") Antitrust Litig.*, 256 F.R.D. 82, 89 (D. Conn. 2009) ("The plaintiffs need not demonstrate to an absolute certainty that all EPDM purchasers ultimately suffered damages as a result of inflated list prices."). Thus, predominance requires only a viable method whereby, based on common proof, damages can be reasonably estimated for the class.

Dr. Foreman's expert report sets forth viable economic methodologies that can be used to calculate class-wide damages with a reasonable degree of certainty and to apportion the damages among class members, and Dr. Rausser's report recognizes that, in other instances, damages involving the same type of allegations have been accurately and fairly estimated. Axelrod Decl., Exh. 18 ¶¶ 137-69; Exh. 19 ¶¶ 92-102; Exh. 21 ¶¶ 59-62, 65). This evidence demonstrates that measurable damages are "capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide*, 552 F.3d at 311-12; *see also In re EDPM.*, 256 F.R.D. at 88; *Bogosian*, 561 F.2d at 456 ("the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate."). In further support, Dr. Rausser noted that "[u]sing a properly constructed set of UCRs as described in the report of Dr. Stephen Foreman, the detailed claims processing data can then be employed to calculate for all claims the dollar amount of the under-payment. Alternatively, amounts paid in claims reimbursement can be compared to amounts billed by providers to arrive at a precise outer boundary for damages." Rausser Rep. ¶ 18.

### d.    Rule of Reason Antitrust Liability

The additional factors considered under a rule of reason analysis reinforce the predominance of common issues. Proof of the relevant product and geographic markets raises common questions of economic analysis entirely unrelated to the actions of any individual consumer. *Insurance Brokerage*, 579 F.3d at 268, 278; *McDonough*, 638 F. Supp. 2d at 482 n.11.

Similarly susceptible of common proof of the adverse *effects* of Aetna's challenged conduct, such the alleged reduction in competition. *Insurance Brokerage*, 579 F.3d at 268, 278. Because proof of actual anti-competitive effects is often impossible to make, due to the difficulty of isolating the market effects of challenged conduct, courts allow a plaintiff to present proof of the defendant's market power to satisfy its initial burden. *Id.*; 7 P. AREEDA, ANTITRUST LAW ¶ 1503, at 376 (1986)).

Whether the alleged actions by Aetna and those with whom it acted in concert amounted to an illegal restraint of trade in violation of Section 1 presents yet another common question -- one of law -- that supports predominance. *Insurance Brokerage*, 579 F.3d at 268 & 277-78 (common question whether alleged horizontal agreements constituted illegal restraints of trade); *see also McDonough*, 638 F. Supp. 2d at 480-82 (alleged unlawfulness of vertical restraints do not require evidence that is individual to class members).

### C.    CLASS ADJUDICATION IS SUPERIOR TO ALL OTHER MEANS OF RESOLVING THIS LITIGATION, SATISFYING RULE 23(b)(3)

Rule 23(b)(3) also requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." The superiority inquiry requires a court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods. *Wachtel*, 223 F.R.D. at 209 ("To determine whether the Plaintiffs satisfy the superiority prong of 23(b)(3), the Court considers the alternatives to a class action.").

The factors that determine whether class treatment is superior to other methods of adjudication include (a) the interest of class members in individually controlling the prosecution of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by class members; (c) the desirability of concentrating the litigation of the claims in the particular forum; and (d) the difficulties likely to be encountered in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). Here, each of these factors favors certification.

The predominance of common questions makes a class action both superior and manageable. *See Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009) ("If a district court determines that issues common to all class members predominate over individual issues, then a class action will likely be more manageable than and superior to individual actions.") *Schoenbaum v. E.I. Dupont De Nemours and Co.*, No. 4:05-CV-01108-ERW, 2009 U.S. Dist. LEXIS 114080, at *30 (E.D. Mo. Dec. 8, 2009) (superiority analysis is "ultimately dependent on the predominance issue").

Where Aetna is found liable to the classes, it can readily "recalculate its reimbursements for each class member whose benefits were determined based on improper methods." *Wachtel*, 223 F.R.D. at 217. After all, the information necessary to calculate the amount of damages owed to class members (including the billed charges of each claim) is data that resides within Aetna's claims systems. Axelrod Decl., Exh. 1 at 34).

When certifying a nearly identical class, this Court noted:  "Class action is the superior form of litigation in this case because it ensures that potentially meritorious claims will be addressed efficiently and without waste of judicial resources." *Wachtel*, 223 F.R.D. at 217. While the amount of damages each Class member may recover from Aetna may not be insubstantial, neither is it sufficiently large to offset the costs of prosecuting a complex case on

an individual basis. Joinder or wholesale intervention would prove unmanageable and result in a great multiplicity of actions. *Id.* at 217. Further, this case was initiated and consolidated before this Court, and has been proceeding through discovery under the supervision of this Court and an able Magistrate Judge. The potential size of the class also does not bar a grant of class certification, "keeping in mind the purpose for which amended Rule 23 was designed." *In re Sugar Indus. Antitrust Litig.,* 73 F.R.D. 322, 357 (.D. Pa. 1976).

### D.      THE ERISA CLAIMS SATISFY THE PREREQUISITES FOR CERTIFICATION UNDER RULE 23(b)(2)

Plaintiffs' ERISA claims separately satisfy the prerequisites for certification under Rule 23(b)(2). Certification under that rule is appropriate where a defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

This and numerous others within this Circuit have routinely certified classes under Rule 23(b)(2) where the ERISA claims involve challenges to plan-wide policies or practices. *See Mulder v. PCS Health Sys., Inc.*, 216 F.R.D. 307, 311, 318-19 (D.N.J. 2003) (certifying ERISA claim under 23(b)(2)); *Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386, 397 (E.D. Pa. 2001); *Bunnion v. Consol. Rail Corp.*, No. 97-4877, 1998 U.S. Dist. LEXIS 7727, at *22 (E.D. Pa. May 14, 1998); *Sutton v. Med. Serv. Ass'n of Pa.*, No. 92-4787, 1993 U.S. Dist. LEXIS 3049, at *10-11 (E.D. Pa. Mar. 5, 1993). Plaintiffs seek injunctive and declaratory relief, including a declaration that Aetna's R&C methodologies violate ERISA, and an injunction against use of the Ingenix database in making R&C determinations. *See* Compl. at 195-200 (prayers for relief). That they also seek recovery or payment of wrongly withheld healthcare benefits in no way lessens the amenability of their claims to Rule 23(b)(2) certification. To the contrary, recovery of benefits in an ERISA action has long been considered to be equitable relief, not damages at law.

*See Hunt v. Hawthorne Assocs.*, 119 F.3d 888, 907 (11th Cir. 1997). Indeed, monetary relief here would "flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Mulder*, 216 F.R.D. at 319.

Thus, numerous courts have certified ERISA claims under Rule 23(b)(2) where the relief sought included payment of additional benefits. *See Jansen v. Greyhound Corp.*, 692 F. Supp. 1022, 1028 (N.D. Iowa 1986); *Sloan v. BorgWarner, Inc.*, 263 F.R.D. 470, 476 (E.D. Mich. 2009); *Cates v. Cooper Tire and Rubber Co.*, 253 F.R.D. 422, 431 (N.D. Ohio 2008).

## CONCLUSION

For the foregoing reasons, the Court should certify the Classes, appoint the moving Subscriber and Provider Plaintiffs as Class representatives, and appoint their counsel as Class Counsel pursuant to Fed. R. Civ. P. 23(g)(1).

Dated:  May 28, 2010

/s/ Robert J. Axelrod
D. Brian Hufford
Robert J. Axelrod
Daniel L. Berger
Susan J. Weiswasser
Jay Douglas Dean
POMERANTZ HAUDEK
GROSSMAN & GROSS LLP
100 Park Avenue
New York, NY 10017
212-661-1100

*Chair of the Aetna Plaintiffs' Executive Committee*

James E. Cecchi
Lindsay H. Taylor
CARELLA BYRNE BAIN GILFILLAN
CECCHI STEWART & OLSTEIN, PC
5 Becker Farm Road
Roseland, NJ 07068
973-994- 1700

Edith M. Kallas
Joe R. Whatley
W. Tucker Brown
WHATLEY DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
New York, NY 10036
212-447-7070

Barry M. Epstein
Barbara Gail Quackenbos
Lynne Kizis
Eric J. Marcy
Michele C. Lefkowitz
Julia A. López
WILENTZ, GOLDMAN & SPITZER P.A.
90 Woodbridge Center Drive
PO Box 10
Woodbridge, NJ 07095
732-636-8000

Stephen A. Weiss
Christopher A. Seeger
Diogenes P. Kekatos
James A. O'Brien III
SEEGER WEISS LLP
One William Street
New York, New York 10004
212-584-0700
Joseph P. Guglielmo
SCOTT + SCOTT LLP
500 Fifth Avenue, 40th Floor
New York, NY 10010
212-223-6444

David R. Scott
Amanda F. Lawrence
SCOTT + SCOTT LLP
156 S. Main Street
Colchester, CT 06415
860-537-5537

Christopher M. Burke
SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, CA 92101
619-233-4565

61

Andrew S. Friedman, Esq.
Elaine A. Ryan, Esq.
BONNETT, FAIRBOURN, .FRIEDMAN &
BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
602-274-1100

*Members of the Aetna Plaintiffs' Executive
Committee*

Jonathan W. Cuneo, Esq.
David W. Stanley, Esq.
CUNEO GILBERT & LADUCA, LLP
507 C Street NE
Washington, D.C. 20002
202-789-3960

Nicholas B. Roth, Esq.
EYSTER KEY TUBBWEAVER & ROTH
402 E. Moulton Street
Decatur, Alabama 35601
256-353-6761

Dennis G. Pantazis, Esq.
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
205-314~0500

Ralph Knowles, Esq.
Kenneth Canfield, Esq.
Martha Fessenden, Esq.
DOFFERMYRE SHIELDS CANFIELD &
KNOWLES, LLC
1355 Peachtree Street, Suite 1600
Atlanta, GA 30309
404-881-8900

Paul M. Weiss, Esq.
Jeffrey A. Leon, Esq.
George K. Lang, Esq.
FREED & WEISS LLC
111 West Washington Street, Suite 1331
Chicago, Illinois 60602
312-220-0000

Gregory J. Pepe, Esq.
NEUBERT, PEPE & MONTEITH P.C.
195 Church Street, 13th Floor
New Haven, CT 06510-20026
203-821-2000

Klari Neuwelt, Esq.
LAW OFFICE OF KLARI NEUWELT
110 East 59th Street, 29th Floor
New York, NY 10022
212-593-8800

Wood R. Foster, Jr., Esq.
Jordan Lewis, Esq.
SIEGEL BRILL GREUPNER DUFFY &
FOSTER P.A.
1300 Washington Ave S
Minneapolis, MN 55401
616-337-6100

Jonathan Alpert, Esq.
THE ALPERT LAW FIRM P.A.
5920 River Terrace
Tampa, Florida 33604-6526
813-223-4131

Donald E. Haviland, Jr., Esq.
THE HAVILAND LAW FIRM LLC
111 S. Independence Mall East
Philadelphia, PA 19106
215-609-4661

Bruce Heller Nagel, Esq.
Randee M. Matloff, Esq.
NAGEL RICE, LLP
103 Eisenhower Parkway, Suite 201
Roseland, NJ 07068
973-618-0400

63

Richard J. Burke, Esq.
RICHARD J. BURKE LLC
1010 Market Street, Suite 650
St. Louis, Missouri 63101
314-880-7000

Alberto Nestico, Esq.
KISLING, NESTICO & REDICK LLC
3200 W. Market Street, Suite 300
Akron, Ohio 44333
330-869-9007

Austin Tighe, Esq.
FEAZELL & TIGHE, L.L.P.
6300 Bridgepoint Parkway
Bridgepoint 2, Suite 220
Austin, TX 78732
512-372-8100

Bruce D. Greenberg, Esq.
LITE DePALMA GREENBERG LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
973-623-3000

Michael C. Dodge, Esq.
GLAST, PHILLIPS & MURRY, P.C.
2200 One Galleria Tower
13355 Noel Road, L.B. 48
Dallas, Texas 86350
972-419-8300

Mark N. Todzo, Esq.
LEXINGTON LAW GROUP, LLP
1627 IRVING ST.
SAN FRANCISCO, CA 94110
415-759-4111

Lisa J. Rodriguez, Esq.
TRUJILLO RODRIGUEZ RICHARDS, LLC
258 Kings Highway East
Haddonfield, NJ 08033
856-795-9002

Ira Neil Richards, Esq.
TRUJILLO RODRIGUEZ RICHARDS, LLC
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
215-731-9004

Marc H. Edelson, Esq.
EDELSON & ASSOCIATES, LLC
45 West Court Street
Doylestown, PA 18901
215-230-8043

Anthony Bolognese, Esq.
Joshua H. Grabar, Esq.
Jonathan M Stemerman, Esq.
BOLOGNESE & ASSOCIATES, LLC
Two Penn Center
1500 John F. Kennedy Blvd., Ste. 320
Philadelphia, PA 19102
215-814-6750

Paul M. Sod, Esq.
LAW OFFICES OF PAUL M. SOD
337R Central Avenue
Lawrence, New York 11559

*Counsel for Plaintiffs*