UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AETNA UCR LIGITATION | MDL. No. 2020 |
| | Master Case No.: 2:07-3541 (FSH) (PS) |
| This Document Relates to: ALL CASES |  **REDACTED** |

## DECLARATION OF JAMES CROSS, M.D.

I, Dr. James Cross, hereby certify and state:

1.      I make this declaration in connection with the above-captioned litigation. If called as a witness I could and would testify competently to the following.

2.      I am Head of National Medical Policy and Operations for Aetna, and have been employed by Aetna in that position since 1999. I am also a licensed physician, having graduated from the University of Minnesota Medical School in 1974. I practiced medicine from 1974 to 1989. I have held positions at a number of health insurers, including Prudential, which was acquired by Aetna in 1999.

3.      While at Aetna, I have been responsible for Aetna's reimbursement and clinical policies. My group's responsibility is to review and approve reimbursement and clinical policies and to ensure that those policies are properly applied. I have been a member of a number of cross-functional committees with policy-level responsibility at Aetna, in particular the Reimbursement Policy Council and the Health Operations Policy and Process Committee. In addition, I work extensively with provider groups, medical associations, and other external groups in developing Aetna's reimbursement policies and practices.

4.      I have personal knowledge of Aetna's policies regarding payment to non-participating providers, Aetna's reimbursement policies relating to use of modifiers, and Aetna's use of the Ingenix PHCS data to pay certain out-of-network claims.  I am also familiar with Aetna's profiling guidelines.

**A.      Databases or Fee Schedules Used to Pay Non-Participating Providers**

5.      Aetna uses a number of different fee schedules and data sources to pay providers who do not have a network participation agreement with Aetna—*i.e.*, non-participating providers.  The amount paid by Aetna on an individual claim depends on a variety of factors, including the terms of the member's plan, the type of service and claim, and the time period.

6.      In each instance, Aetna's decision to use a particular fee schedule or data source to pay non-participating providers has been the result of extensive deliberation and a number of considerations relevant to Aetna's business, including the benefits that employers want to provide, the benefits that plan members want to receive or purchase, and the costs of providing those benefits and the related effects on premiums or self-funded plan expenses.  Aetna also relies extensively on its own experience as one of the largest healthcare payers throughout the United States during the past fifteen years.  Other considerations include Aetna's experience in particular markets or networks using a particular fee schedule or data source to pay claims, including feedback from network personnel; Aetna's experience with member or provider complaints and appeals; and state and federal regulatory requirements.

7.      Since 2001, Aetna has used a wide range of fee schedules and data sources to pay non-participating providers for the services and supplies for which they seek reimbursement.  Some of these sources are described in greater detail below.  Aetna's judgment has always been that use of these databases and fee schedules is fair, reasonable, and consistent with the terms of

Aetna's health plans regarding payment to non-participating providers. There has never been any agreement with UnitedHealth, CIGNA, or any competitor to use a particular fee schedule or data source to pay non-participating providers or to set reimbursement rates at a certain level, and I am not aware of any communications to this effect.

8.      In setting its reimbursement rates for non-participating providers, Aetna's primary goal is to balance members' competing interests in low premiums and avoiding balance bills. Paying non-participating providers at higher rates increases the medical costs of the members' plan, and therefore increases the member's premium and/or employer's plan expense. Paying non-participating providers lower rates may increase members' exposure to balance bills. In determining the rates it pays non-participating providers, Aetna attempts to strike a balance between maintaining low premiums and protecting members from balance billing.

9.      In the competitive health insurance marketplace, if Aetna does not adequately balance these competing interests—maintaining low premiums and minimizing balance bills— and if Aetna does not pay non-participating providers at appropriate levels that are consistent with the terms of its health plans, Aetna will lose business.

**1.  The Ingenix PHCS Database**

10.     Aetna has used the PHCS Database as its primary data source underlying "reasonable and customary" payments to non-participating providers rendering services on an out-of-network basis since 1996. [1]

---

[1] I am aware that several companies acquired by Aetna—Chickering Claims Administrators, Inc. (also known as Aetna Student Health), Strategic Resource Company, and Schaller Anderson, Inc.—have used Ingenix's MDR database to pay non-par claims. This

[Footnote continued on next page]

11. The PHCS data provides percentiles of billed charges by CPT code for specific geographic areas. CPT codes were invented by the American Medical Association to provide a common language for describing procedures and services rendered by health care providers, and are used by all government and commercial payers in the reimbursement of providers. These codes reflect different medical procedures and can reflect varying degrees of complexity the same categories of services. By way of example, there are different CPT codes for office visits of varying intensity. Additionally, CPT codes take into account the skill required to perform a procedure, and providers of certain specialties typically bill to certain sets of CPT codes.

12. In Aetna's experience, the PHCS database has been a fair and reasonable source of provider charge percentiles, which Aetna interprets as satisfying its contractual obligation to allow reimbursement at the "reasonable and customary" or "prevailing" rate under many of Aetna's health benefits plans. The PHCS database is the largest commercially-available source of providers' billed charges. Because the PHCS database gathers claim data from many of the nation's largest health plans, it always has been the most robust and up-to-date commercially-available data set for determining the "prevailing" rates throughout the United States for a wide range of services. My understanding is that Aetna began using PHCS in 1996 because it was a broader source of provider charge data than Aetna's own claim systems. In addition, many of Aetna's largest customers are familiar with PHCS and are comfortable with using PHCS to pay out-of-network claims.

13. Based on Aetna's claims and appeals experience, most non-participating providers accept reimbursement at amounts equal to or less than the 80th percentile of the PHCS

[Footnote continued from previous page]
Declaration does not discuss the practices of these Aetna subsidiaries, which continued to use their own claims processing platforms after the acquisitions.

database.  Many providers' billed charges are lower than the rates from the PHCS database used to determine the "prevailing" rates for those services.  Non-participating providers' willingness to accept amounts equal to or less than the PHCS-based rates provide further support for the use of this data source to determine prevailing rates.

14.     Aetna recognizes that, among the thousands of medical procedures and hundreds of geographic areas covered by the PHCS database, the PHCS percentiles values are not always perfect.  When Aetna learns that the reimbursement rates based on the data from the PHCS database for a particular CPT code in a particular area are too low, such as through the appeals process, Aetna adjusts payment rates to what it views as a fair and reasonable rate.  This process may include a detailed clinical review of the procedure and reimbursement level by physicians employed by Aetna.

### 2.   Aetna Fee Profile Data

15.     Aetna has also used Aetna Fee Profile data to pay non-participating providers in some circumstances.  Aetna Fee Profile data were comprised of charge data from Aetna's own claims systems.

16.     Aetna Fee Profile data provided percentile values based on actual claim data for each CPT code.  The Aetna Fee Profile data were compiled at a local area level based on the first three digits of an area's zip code, as well as at state, region, territory and national levels.  In circumstances in which the Aetna Fee Profile Data were used, local data were used first; and if local data were not available, then state-level data were used; if state-level data as not available, then region-level data ere used; if region-level data were not available, then territory-level data were used; and if territory-level data were not available, then national data were used.

5

17.     My understanding is that many years ago, Aetna used Aetna Fee Profile data as its primary source for making "reasonable and customary" determinations.  As described above, Aetna began purchasing PHCS data in 1996 because the PHCS data were more robust.

18.     During my time at Aetna, Aetna has used Aetna Fee Profile data for certain claims for which the PHCS database did not provide a charge.  Examples include claims made using Aetna's "homegrown" codes—*e.g.*, non-CPT codes—and HCPC codes for which Ingenix did not provide data early in the 2000s.

19.     Aetna also used Aetna Fee Profile data to pay for anesthesia claims until 2004 because its systems were incompatible with the format of the Ingenix PHCS anesthesia data.  In 2004, Aetna implemented system logic to allow it to use the PHCS anesthesia data, and from that point forward, discontinued use of Aetna Fee Profile data for payment of anesthesia claims.

20.     Over the years, Aetna has gradually phased out the Aetna Fee Profile data as a basis for paying claims.  By 2005, Aetna discontinued use of "homegrown" codes, and, as discussed above, had begun to use Ingenix data to pay anesthesia claims.

21.     On December 31, 2009, Aetna completely discontinued the use of the Aetna Fee Profile data.

### 3.  Percentages Of The Medicare Fee Schedule

22.     Aetna has used different percentages of the Medicare fee schedule (also known as the "RBRVS" fee schedule) to pay certain claims made for services rendered by non-participating providers.  By way of background, Medicare rates are set by the federal government for thousands of services for each geographic area in the United States, based on formulas that take into account the time it takes to perform the service, the technical skill and physical effort, the effort and judgment, stress due to the potential risk to the patient, malpractice rates in the

area, and other geographic adjustments to reflect cost variation.  The Medicare fee schedule is updated regularly by the federal government, in consultation with panels of medical doctors through the American Medical Association, and adjustments are subject to public comment.  The Medicare fee schedule is publicly-available and it has been used by the federal government for many years to pay claims under the Medicare program.  In my experience, providers are familiar with Medicare rates as a baseline payment amount for the services they provide, and some providers set their fees based on a percentage of the Medicare fee schedule.

        **a.**       **Payment of "Non-Par Preferred" Claims**

23.     Aetna primarily has used a percentage of the Medicare fee schedule to pay "non-par preferred" claims on HMO plans in certain geographic areas.  Non-par preferred (also called "non-par in-network") claims are a distinct category of non-par claims that are not considered out-of-network under a member's plan.  By way of explanation, HMO plans typically do not have out-of-network benefits, but Aetna recognizes that it has an obligation to its members to cover care rendered by non-participating providers in certain circumstances—including emergencies, approved referrals to specialists by participating providers, and network deficiencies.

24.     These "non-par preferred" claims are not paid pursuant to any obligation of Aetna to pay "reasonable and customary" rates under a member's out-of-network benefit.  Unlike out-of-network benefits, which arise under the contract provisions in which Aetna may agree to pay "reasonable and customary" rates, "prevailing rates," or a "recognized charge," these "non-par preferred" claims are viewed as being covered under a member's in-network benefits.  In processing the claim, Aetna pays the claim at a fair and equitable amount for the services rendered and the member's co-insurance or co-pay obligations are set by Aetna at the in-network

level, the same as if they were seeing a participating provider.  Aetna tells the member in the

Explanation of Benefits that the member is not liable for any balance bills above the amount paid

by Aetna (*i.e.*, a percentage of Medicare).  If Aetna learns that the member has received a

balance bill from the provider, such as through a phone call, a complaint, or appeal, Aetna's

policy is to take responsibility to ensure that the provider receives fair compensation for its

services and to ensure that the plan member is held harmless.

     25.    Aetna began to use a percentage of Medicare fee schedule in specific geographic

areas, and after a period of testing and evaluation this methodology was rolled out to the entire

United States.  Aetna began to pay non-par preferred claims at 115% of the Medicare fee

schedule in Texas in 2001.  It then implemented a policy in the Southeast Region in August 2002

and in the Mid-Atlantic region in October 2002 to pay non-par preferred claims at 125% of the

Medicare fee schedule.

     26.    There are multiple reasons why Aetna explored paying non-par preferred claims

at a percentage above the Medicare fee schedule.  First, as noted above, Medicare rates provide a

readily available, cost-efficient means of determining reimbursement rates for thousands of CPT

codes in hundreds of geographic areas, which take into account a variety of relevant factors and

which are updated regularly.  Second, Aetna observed through its experience negotiating with

and paying providers for services that many providers view compensation at 100% of Medicare

rates or lower as fair compensation for their services.  Thus, Aetna determined that paying a

significant percentage *above* those rates that, in Aetna's experience, providers generally viewed

to be a fair retail rate for their services was fair and equitable reimbursement.  In other words,

Aetna did not use Medicare rates as a basis for paying out-of-network claims because those were

the rates paid by the government.  Rather, Aetna did so because it was *Aetna's* experience that

paying a rate 15 to 25 percent above Medicare rates represented fair compensation to providers based on what Aetna has consistently observed in the marketplace.

27.    Based on its experience in these regions, Aetna determined that 125% of the Medicare fee schedule was a fair and equitable payment for non-par preferred benefits.  A majority of providers were willing to accept these payment rates and did not balance bill the member or seek additional payment from Aetna.  For members who received balance bills following Aetna's initial payment, Aetna's experience was that these members were satisfied when Aetna took steps to hold them harmless.

28.    In February 2005, Aetna implemented a policy to pay all non-par preferred claims in HMO plans at 125% of the Medicare fee schedule.  Attached hereto as Exhibit A is a true and correct copy of a minutes from Aetna's Health Operations Policy and Process Policy Committee (AET-01302613-01302616), which shows an implementation date of February 15, 2005.

29.    Certain states and plans were exempt from this policy.  Attached hereto as Exhibit B is a true and correct copy of Aetna's policy regarding "Non-Participating Practitioners Authorized as In-Network" (AET-00296876-00296878).  On page AET-00296876, the policy lists certain exceptions, including "HMO and Health Network Products Only- Maryland (subject to state mandated rate)", and "New Jersey Small Group and Individual business."  New Jersey and Maryland have state regulations that require payment of non-par preferred claims at specific rates.  In New Jersey, all non-par preferred claims had to be paid at the 80th percentile of the PHCS data, and in Maryland, legislation required trauma claims to be paid at 140% of Medicare.

30.    Because of a Florida statute, claims for emergency services in Florida are paid at 239% of the Medicare Fee schedule.

31.     Aetna has continued to evaluate its percentage of Medicare fee schedules.  In 2006, after an analysis of non-par preferred claims for durable medical equipment and laboratory services, Aetna implemented a policy to pay non-par preferred claims made pursuant to HMO products for Durable Medical Equipment ("DME") and Laboratory services at 75% of the Medicare fee schedule.  Attached hereto as Exhibit C is a true and correct copy of a chart from Aetna's Health Operations Policy and Process Committee (AET-01056767-01056777), which shows that these policies were implemented on April 4, 2006.

32.     As with its use of the Medicare fee schedule as a basis for paying medical claims, Aetna determined based on its experience that 75% of the Medicare fee schedule was a fair and equitable rate to pay for DME and Laboratory services.  In Aetna's claim experience, it found that most DME and laboratory providers were willing to accept approximately 50% of the Medicare fee schedule, and it made the determination that payment at a significant percentage above that commonly-accepted rate was fair and equitable reimbursement for these types of services.

### b.     When No PHCS Data Or Aetna Fee Profile Data Are Available

33.     Since 2005, Aetna has had a policy to use 125% of the Medicare fee schedule to pay out-of-network claims for which there is neither Ingenix PHCS data nor Aetna Fee Profile data.  Attached hereto as Exhibit D is a true and correct copy of a document generated by Aetna's Health Operations Policy and Process Council (AET-00675037-00675039), which shows Aetna's process for implementing the decision to pay medical and surgical claims at 125% of the Medicare fee schedule when no PHCS or Aetna Fee Profile data were available.

34.     Because the Ingenix PHCS database provides data on most CPT codes and geographic areas, my understanding is that there are very few instances in which the Medicare fee schedule is used for this purpose.

**4. Average Wholesale Price ("AWP")**

35.     Average Wholesale Price is a misnomer, as it is not the price that wholesalers pay for pharmaceuticals.  The AWP builds in a significant margin above the wholesale price and is intended to reflect prices paid by consumers at retail pharmacies.  Attached hereto as Exhibit E is a true and correct copy of a report from the Office of the Inspector General, entitled "Medicaid Drug Price Comparison: Average sales Price to Average Wholesale Price," that compares Average Sales Price to Average Wholesale Price.  The report defines AWP as "a price derived from manufacturer-reported data for both brand and generic drugs," and notes that AWP "fails to account for the discounts available to various payers."  Exh. E at 3.  The report further notes that AWP is "significantly higher than the prices that drug manufacturers, wholesalers and other similar entities actually charge to physicians and suppliers who purchase these drugs." *Id.*

36.     AWP is based on NDC codes, which are more specific to the type of drug being purchased or provided than J-codes, which are more generic in that they include both brand name and generic versions of drugs, and do not differentiate between different brands.  The Ingenix HCPCS data is based on J-codes.

37.     The payment rates for the vast majority of Aetna's pharmacy claims are determined pursuant to contracts with pharmacies (including where pharmaceutical products are prescribed by in-network and out-of-network providers), contracts with providers, and, if the provider is non-participating and administers the pharmaceutical product directly to the patient

(*e.g.*, injectable medication, as opposed to a prescription that is filled at a pharmacy), using data from the Ingenix HCPCS data.

38.     There are two circumstances in which reimbursement for pharmaceuticals provided by a non-participating provider on an out-of-network basis under a medical benefit plan may have been based on AWP.  These situations include:

- First, Aetna had a policy to use AWP to pay claims made pursuant to insured plans for pharmaceuticals billed by a non-participating provider if those claims were sent Clinical Claim Review ("CCR") and amounted to more than $600. Attached hereto as Exhibit F is a copy of the excerpt of the Clinical Claim Review policy that sets out this policy (AET-01080602-01080606).

- Second, if a non-participating provider billed for injectables or infusions using an NDC code, AWP rates may have been used to reimburse the claim.  Based on my experience providers very rarely billed for pharmaceuticals using NDC codes; the vast majority of the time, providers bill for injectables or infusions using J-codes, for which Aetna bases reimbursement on PHCS HCPCS data.

39.     Reimbursement for pharmaceuticals provided by a non-participating pharmacy on an out-of-network under a pharmaceutical benefit plan may be based on AWP, because pharmacies typically bill with NDC codes.  However, Aetna has contracted rates for the vast majority of retail pharmacies, and the situation in which Aetna would need to use a fee schedule to determine reimbursement for a purchase at a non-participating pharmacy would be extremely rare.

**5.  Other Data Sources or Fee Schedules**

40.     Aetna has also used other databases and sources to pay for out-of-network claims since 2001.  For example, some self-funded plan sponsors require Aetna to use custom fee schedules.

41.     Aetna has also insured plans pursuant to which it pays non-participating providers rendering services on an out-of-network basis according to the Aetna Market Fee Schedule, which is Aetna's default participating provider reimbursement schedule based on geographic area.  For plans that use Aetna Market Fee Schedule, Aetna explicitly sets out in the plan documents that out-of-network claims will be paid according to this fee schedule and does not state that the fee schedule represents the "reasonable and customary" charge or "prevailing" charge.

**B.     Additional Reimbursement Policies Affect The Allowed Amount For Out-Of-Network Claims.**

42.     I understand that Plaintiffs have stated that "the *only* information used by Aetna to determine R&C for any given claim using Ingenix is the CPT code, date of service, provider zip code, and billed charge."  This statement is incorrect.  There are a wide range of factors that can affect the allowed amount for an out-of-network claim separate and apart from application of a "reasonable and customary" fee schedule.  The following is a description of some of these rules.

**1.  Modifiers**

43.     A CPT code provides a standardized description for a specific scope of services rendered by a provider.  Modifiers are two-digit codes that providers may append to a CPT code to show that the services the provider rendered were different from the normal scope of services described by the CPT code.  Both CPT codes and modifiers are developed by the American

Medical Association as part of a standardized terminology for providers to bill for their services. Given that the presence of a modifier indicates that a particular claim had unusual circumstances, Aetna will frequently change its reimbursement rates for those services.

44.     The Centers for Medicare and Medicaid Services endorse the use of modifiers, and has adopted reimbursement policies for modifiers, which are very similar to Aetna's policies set out below.  There are numerous modifiers that can increase or decrease the allowed amount, and some of them are described below.

###     a.     Unusual Procedural Services (Modifier 22)

45.     When Modifier 22 is properly applied to a claim and the claim relates to a covered service, following a review of patient-specific clinical documentation and established medical necessity payment is calculated based on 120% of either the Reasonable and Customary fee allowance (100% of R&C plus an additional 20%) or the contracted fee for the service or procedure performed.

46.     Additional payment is justified when a provider properly bills with a Modifier 22 to a claim because the provider has expended additional resources, time, and energy into providing the service.

###     b.     Bilateral Surgery and Multiple Surgery (Modifier 50 and 51)

47.     When Modifiers 50 and/or 51 are properly applied to a claim and the claim relates to a covered service, payment is calculated based on 100% of either the Reasonable & Customary amount or the contracted fee for the primary service or procedure, 50% for the secondary procedure, and 25% for any additional procedures.

48.     This reduction in payment is justified when a provider bills with a Modifier 50 and/or Modifier 51 because there are various efficiencies in performing surgeries on the same

day on the same patient, and the additional procedures require incrementally less effort by the surgeon.

  **c. Reduced Services (Modifier 52)**

  49. When Modifier 52 is properly applied to a claim and the claim relates to a covered service, payment is calculated based on 80% of either the Reasonable & Customary amount or the contracted fee for the service or procedure performed when a service or procedure has been partially reduced or eliminated at the physician's discretion.

  50. This reduction in payment is justified when a provider bills with a Modifier 52 because the provider has, admittedly, performed less than the full procedure described by the CPT code, and should therefore not be reimbursed as if he or she had performed the entire procedure.

  **d. Discontinued Procedures (Modifier 53)**

  51. When Modifier 53 is properly applied to a claim and the claim relates to a covered service, payment is calculated based on 20% of either the Reasonable & Customary amount or the contracted fee for the service or procedure performed when a procedure was started but discontinued prior to completion.

  52. This reduction in payment is justified when a provider bills with a Modifier 53 because the provider has only started a procedure, and has not expended the time or resources to complete the entire scope of the procedure defined by the CPT code.

  **e. Surgical Care Only (Modifier 54)**

  53. When Modifier 54 is properly applied to a claim and the claim relates to a covered service, payment is calculated based on 75% of either the Reasonable & Customary

amount or the contracted fee for the service or procedure performed when one physician performs a surgical procedure and another provides pre-operative and/or post-operative management.

54.     This reduction in payment is justified when a provider bills with a Modifier 54 because the provider has not provided the post-operative care that is included in the scope of services described by the CPT code and therefore included in the reimbursement rate set for that CPT code.

### f.     Post-Operative Management Only (Modifier 55)

55.     When Modifier 55 is properly applied to a claim and the claim relates to a covered service, payment is calculated based on 15% of either the Reasonable & Customary amount or the contracted fee for the service or procedure performed when one physician performs the post-operative management and another physician has performed the surgical procedure.

56.     This reduction in payment is justified when a provider bills with a Modifier 55 because the provider has not performed the surgical procedure that is the largest part of the scope of services described by the CPT code.

### g.     Pre-Operative Management Only (Modifier 56)

57.     When Modifier 56 is properly applied to a claim and the claim relates to a covered service, payment is calculated based on 10% of either the Reasonable & Customary amount or the contracted fee for the service or procedure performed when one physician performs the pre-operative care and evaluation and another physician has performed the surgical procedure.

58.     This reduction in payment is justified when a provider bills with a Modifier 56 because the provider has not performed the surgical procedure that is the largest part of the scope of services described by the CPT code.

### h.     Co-Surgeons (Modifier 62)

59.     When Modifier 62 is properly applied to a claim and the claim relates to a covered service and for surgical procedures for which a co-surgeon is eligible, payment is calculated based on 125% of either the total Reasonable & Customary fee allowance (100% of R&C plus an additional 25%) or the contracted fee for the combined procedure(s) performed. This fee allowance is divided equally between the two surgeons, so that each provider is paid at 62.5% of the surgical allowance.

60.     This reduction in payment is justified when providers bill with a Modifier 62 because each surgeon has performed a more limited scope of service, expending fewer resources, than had one surgeon, operating alone.

### i.     Procedure Performed on Infants less than 4KG (Modifier 63)

61.     When Modifier 63 is properly applied to a claim and the claim relates to a covered service and upon review of medical records, payment is calculated based on 120% of either the Reasonable & Customary fee allowance (100% of R&C plus an additional 20%) or the contracted fee for the service or procedure performed.

62.     Additional payment is justified when a provider properly bills with a Modifier 63 because procedures performed on infants weighing less than 4kg are significantly more difficult, and require greater expenditure of resources, than the same procedures performed on larger patients.

**j.      Minimum Assistant Surgeon (Modifier 81)**

63.      When Modifier 81 is properly applied to a claim and the claim relates to a covered service and for surgical procedures for which an assistant surgeon is eligible, payment is calculated based on 16% of either the Reasonable & Customary amount or the contracted fee for the surgical procedure.

64.      This reduction in payment is justified when a provider bills with a Modifier 62 because the assistant surgeon has performed a significantly more limited scope of service, expending fewer resources, than the primary surgeon.

**k.      Assistant Surgeon (Modifiers 80 and 82)**

65.      When Modifier 80 or Modifier 82 is properly applied to a claim and the claim relates to a covered service and for surgical procedures for which an assistant surgeon is eligible, payment is calculated based on 20% of either the Reasonable & Customary amount or the contracted fee for the surgical procedure.  Attached hereto as Exhibit G is a true and correct copy of Aetna's policy entitled "Surgery (Specialist) – Policy/Overview" (AET-00297023-00297037).

66.      This reduction in payment is justified when a provider bills with a Modifier 80 or Modifier 82 because the assistant surgeon has performed a significantly more limited scope of service, expending fewer resources, than the primary surgeon.

**l.      Non-Surgeon Assistant (Modifier AS)**

67.      When Modifier AS is properly applied to a claim and the claim relates to a covered service and for surgical procedures for which a non-physician surgical assistant is eligible, payment is calculated based on 12% of either the Reasonable & Customary amount or the contracted fee for the surgical procedure.  *See* Exh. G, AET-00297025.

68.     This reduction in payment is justified when a provider bills with a Modifier AS because the non-surgeon assistant performed a significantly more limited scope of service, expending fewer resources, than the surgeon and is also not a licensed physician.

## 2.  Multiple Surgery Rules (Without Modifiers)

69.     As described above, there are certain modifiers by which providers can seek payment for multiple surgeries performed on the same date of service, even though some reimbursement guidelines would require the surgeries to be billed as part of a single global procedure.  When these modifiers are used, Aetna pays the second surgery at a reduced percentage, as described above.  Based on the same rationale, these same reimbursement rules are applied to claims involving certain types of surgeries performed on the same day even when the provider does not attach a modifier.

## 3.  Behavioral Health Tiering

70.     In 2006, Aetna implemented a policy to "tier" the payments it would make to non-participating behavioral health providers.  Attached hereto as Exhibit H is a true and correct copy of Aetna's policy entitled "Behavioral Health – Policy/Overview" (AET-00296748-00296764), which sets out on page AET-00296751 this tiering structure.  Pursuant to this policy, Aetna pays Psychiatrists 100% of the Reasonable & Customary amount or Recognized Charge, Psychologists (with PhDs) 80% of the Reasonable & Customary amount or Recognized Charge, and Licensed Social Workers and other mental health professionals 60% of the Reasonable & Customary amount or Recognized Charge.

71.     Aetna's judgment following analysis by Aetna's behavioral health unit was that tiered reimbursement for mental health professionals was reasonable and appropriate, because of

the way the market differentiates between levels of service provided by each category of mental health provider.

**D.      Aetna's Profiling Guidelines**

72.      Separate from the foregoing methods of paying non-par providers, I am also knowledgeable about Aetna's profiling guidelines, which are used to determine which types of claims are included in the claim data Aetna contributes to Ingenix for inclusion in the PHCS data.

73.      In Plaintiffs' Brief in support of their Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, they include a partial quote from an e-mail in which I referred to the profiling guidelines as "back room manipulation of data."  *See* Axelrod Decl., Exh. 38.  Although Plaintiffs deposed me, they never asked me about this e-mail.  If Plaintiffs had asked me about this email, I would have explained that I did not intend this e-mail to suggest that Aetna was improperly manipulating its contributions in a way that could skew the Ingenix PHCS data.  Rather, the e-mail discussed the question of whether sunsetting profiling guidelines would be an issue that needed to be raised before Aetna's Health Operations Policy and Process Committee.  I did not believe sunsetting profiling guidelines needed to be raised with HOPP, and I referred to profiling guidelines as "backroom manipulation" to convey that they were merely a technical "backroom" aspect of claim processing, and their termination did not raise significant policy issues.  I was not using the term "manipulation" with a negative connotation, as Plaintiffs suggest.

74.      Profiling guidelines are a reasonable way for Aetna to ensure that Aetna's contributions to Ingenix represent providers' true billed charges from a specific time-period for a specific geographic area, given the large volume of claims that Aetna processes and contributes

to Ingenix.  Aetna's goal in using the profiling guidelines was never to skew the data contributed to Ingenix or to eliminate "valid" high charges, as Plaintiffs' suggest, but rather to exclude charges that Aetna viewed as invalid or unreliable to avoid skewing the data.  My understanding is that the profiling guidelines were originally developed as a way to ensure that valid charges were used in Aetna's Fee Profile, which as described above was Aetna's primary method of determining "reasonable and customary" rates before it began purchasing PHCS in 1996.

75.     During my time at Aetna, the number of profiling guidelines has decreased for a variety of reasons.  Among other things, the Aetna Fee Profile was used less and less to reimburse of out-of-network claims, as described above, and Aetna relied on Ingenix to compile accurate charge percentiles with a broader pool of data; the way in which providers billed for their services became more standardized following the passage of HIPAA and through increased sophistication in the provider community; and the administrative costs of applying the profiling rules generally began to outweigh the benefits over time.  A copy of the profiling guidelines from 2003, when there were many more rules than there are today, is attached hereto as Exhibit I (AET-01339033-01339039).  The following is my understanding of the reasons for these guidelines.

### 1.  Duplicative Claims

76.     Many claims are submitted and processed more than once.  Inclusion of duplicate claims in the profile would improperly double-count these claims.  Several of Aetna's profiling guidelines were intended to prevent double-counting:

- "Intra-office COB (Aetna is both primary and secondary payer)."  The profiling guideline further instructs that a processor should "follow profile guidelines for the primary claim consideration" and "[d]o not profile the secondary claim consideration (including when the primary claim consideration was processed on MCS)"; and

- "Reconsidered expenses when the original expense was partially or totally covered."

## 2. Claims With Certain Modifiers

77.     As described above, claims billed with modifiers involve unique aspects of a particular service, and some providers bill different amounts for claims with modifiers than they do claims without modifiers.  For example, some providers may bill a surgery CPT code at 20% of the usual charge when using an "assistant surgeon" modifier, consistent with the rules described above.  Because the profile was supposed to capture those claims that represented providers "true" billed charges for a CPT code, and because Aetna increases or decreases the reimbursement rate due to modifiers after determining the baseline reasonable and customary rate for the CPT code, including charges with modifiers in the profile could have the effect of a double reduction (or double increase) in the rate.  Certain profiling guidelines excluded certain claims with modifiers:

- "Any valid secondary procedures on surgical multiple procedure code submissions; code may or may not have modifier 51 attached";

- "Bilaterals-if provider bills with one CPT4 code and modifier 50"; and

- "Codes listed with modifiers: 22, 51, 50 (as described above), 20, 21, 23, 52, 54, 66, 76, 77, 78, 99, AB, AC, AD, QK, or QY."

## 3. Unlisted Codes

78.     Claims billed under "unlisted" or "generic" codes, because those codes do not represent a service that can be included in a charge profile for a particular CPT code: unlisted or generic codes are used for procedures and services for which the provider does not believe a CPT code exists.  The services actually rendered by the provider under these codes may vary from a simple medical exam to a complex brain surgery and there is no way to categorize them given

the way in which they are billed.  For these reasons, certain of Aetna's profiling guidelines excluded "unlisted" and "generic" codes from the profile.

### 4.   Claims Subject To Bundling Or Modifications

79.     Aetna did not profile claims for which it had modified the grouping of CPT codes used by the provider in some way, such as when the provider did not bill using the correct CPT code or when other coding rules require the CPT codes to be "bundled" or modified in some other way to allow for proper payment of a claim.  Because there are coding errors in these claims, Aetna cannot be certain as to what constitutes the provider's actual charge for the particular service rendered.  The profiling guidelines intended to exclude these claims were:

- "Claims that pass through ClaimCheck";

- "Codes re-bundled into one CPT 4 code";

- "Code submitted is incorrect and changed or altered by processor, analyst or designated reviewer"; and

- "Arbitrary breakdown of fees by processor or reviewer";

### 5.   Medicare Direct Claims

80.     Aetna also did not profile "Medicare direct" claims.  The billed charges on these claims are inherently unreliable: the provider receives reimbursement first from Medicare, then bills Aetna for the remaining portion of the bill that was not covered by Medicare, and it is unclear on these claims whether the provider is submitted his or her full billed charge, or whether the provider is submitting the billed charge minus the portion that was covered by Medicare.

### 6.   Claims From Incorrect Geographic Areas and Time Periods

81.     Because the profile is intended to capture billed charges for a specific geographic area for a specific time period, certain profiling guidelines excluded claims that could not be tied

to a specific geographic area and were outside the time period the profile was intended to capture.  These profiling guidelines included:

- "Providers in EPDB with a No Profile indicator"

- "Claims that involve submissions where the provider API does not have a zip code that matches the first 3 digits of the Servicing Provider Zip";

- claims with only a billing address, and not a service address; and

- "Procedures performed one year prior to the date that they are being processed."

**7.  Claims less than 50% of the prevailing fee and over 150% of the prevailing fee**

82.     A number of years ago, Aetna had profiling guidelines for claims that were processed manually instructing processors to exclude from the profile charges that were less than 50% of the prevailing rate—*e.g.* the rate set at the 80th percentile of the PHCS database for that service—or over 150% of the prevailing rate.  Although I was not at Aetna when these rules originally were developed, my understanding is that these guidelines were intended to exclude charges that were unreliable and that could therefore improperly skew the data.  As with Aetna's other profiling guidelines, this guideline was not intended to skew the data, but rather to ensure that the data were *not* skewed by invalid or unreliable data points.

83.     Since 2001, the vast majority of Aetna's claims have been auto-adjudicated, without involvement of a manual claim processor, so these rules would not have applied to a majority of claims.  In any event, these rules were removed from Aetna's processor guidelines by late 2005.

**7.  Claims Where "Charge Exceed Prevailing"**

84.     I understand that Plaintiffs have claimed that Aetna had in place a profiling guideline that resulted in all claims above the prevailing rate not being profiled.  This is a

mischaracterization of Aetna's profiling guidelines as they were actually applied.  Although in some of Aetna's documents, there are statements that "Charges that exceed prevailing will be reduced and not profiled with action code 617 or 657" and that "Charges that exceed prevailing but are within plan prevailing fee liberalization will be accepted but not profiled with action code 605," these statements do not reflect Aetna's actual practice and Aetna has never automatically excluded all charges in excess of prevailing rates.

85.     It is my understanding that Aetna has never not profiled a claim merely because the billed charge exceeded the prevailing rate.


I declare under penalty of perjury that the following is true and correct.  Executed on June 30, 2010.

James D. Cross, MD

# EXHIBIT A

# HOPP POLICY COMMITTEE
## **FINAL**
### Minutes of Meeting: February 15, 2005
### 10:00 a.m. – 11:45 a.m.

**Members Present:** Andrea Anderson, Mary Bird, Joe Burns, Chris Caufield, Janona Davis, Penny Goins, Phil Haas, Joe Hrinda, Darren Ketchale, Deb Marchese, Sue Meier, Lynne Mureddu, Christina Nicastro, Merry Noss, Annemarie Rakes, Paula Roberts, Amy Schmid, Barbara Skomitz, and Barbara Uricheck

**Members Absent:** Jen Bjerke, Phyllis Brooks, Amy Medina, Larry Orkins, Rob Rioux, Michael Vert and Stacie Watson

**Supporting Members Present:** Carolyn Camp, Laura Croce, Donna Dojan, Eleanor Hunt, Susan Johnson, Marcia Levin, Edith Stein and Laurie Whelan

**Guests:** Tammy Gaul, Richard Gentleman, and Kathleen O'Callaghan

**Opening Remarks:** Andrea Anderson took roll call and reviewed the agenda.

| DISCUSSION ISSUE | | |
|---|---|---|
| TOPIC OVERVIEW | PRESENTER | RECOMMENDATION and DISCUSSION | NEXT STEPS: |
| | | REDACTED | |

CONFIDENTIAL

AET-01302613

**HOPP POLICY COMMITTEE**
**\*\*FINAL\*\***
Minutes of Meeting:  February 15, 2005
10:00 a.m. – 11:45 a.m.

| TOPIC OVERVIEW | PRESENTER | RECOMMENDATION and DISCUSSION | NEXT STEPS: |
|---|---|---|---|
| | | REDACTED | |

**FEBRUARY 3 REVIEW COUNCIL ISSUES**

| TOPIC OVERVIEW | PRESENTER | DISCUSSION/NEXT STEPS |
|---|---|---|
| | | REDACTED |

AET-01302614

CONFIDENTIAL

# HOPP POLICY COMMITTEE
## **FINAL**
### Minutes of Meeting:  February 15, 2005
### 10:00 a.m. – 11:45 a.m.

| TOPIC OVERVIEW | PRESENTER | DISCUSSION/NEXT STEPS |
|---|---|---|
| | | REDACTED |

**D&A UPDATES**

| TOPIC OVERVIEW | PRESENTER | DISCUSSION/NEXT STEPS |
|---|---|---|
| | | REDACTED |

CONFIDENTIAL

AET-01302615

# HOPP POLICY COMMITTEE
## **FINAL**
### Minutes of Meeting: February 15, 2005
### 10:00 a.m. – 11:45 a.m.

**IMPLEMENTATION UPDATES**

| TOPIC OVERVIEW | PRESENTER | DISCUSSION/NEXT STEPS |
|---|---|---|
| | | REDACTED |
| **Issue #117** Reimbursing Non-par Authorized @ 125% of Medicare Allowable | Darren Ketchale | • This issue was implemented over this weekend.  HMO piece went through successfully.  We would like to keep the issue open for various reasons, i.e., making changes to language reference in reimbursement policy, and also use of this policy on the Traditional side.  Andrea asked if we will give Council an update regarding the reimbursement policy.  Darren believes he will.  He is working with Dave Medich about applying to Medicare.  It should be ready for an April update.  Andrea asked Darren to keep her posted on this issue. |
| | | REDACTED |
| **Issue #94** Consistent Reimbursement of Codes with Ingenix data | Susan Johnson | • This was manually implemented January 25.  We are using Medicare rate if there is no Ingenix data.  We are looking at automating. |
| | | REDACTED |

**Our next meeting is Tuesday, March 1 at 10:00 a.m.**

CONFIDENTIAL

AET-01302616

# EXHIBIT B

Case 2:07-cv-03541-KSH-CLW   Document 565   Filed 08/30/10   Page 32 of 111 PageID: 15484
Nonparticipating Practitioners Authorized as In-network - Policy/Overview
Page 1 of 5

# NONPARTICIPATING PRACTITIONERS AUTHORIZED AS IN-NETWORK - POLICY/OVERVIEW

- Policy/Overview
  - Overview
  - Policy Statement
  - Exceptions
  - Effective Date by State and Region
    - HMO Rates/Effective Dates
    - Health Network Products Rates/Effective Dates
- **Definitions/Glossary**
- **Product Applicability**
- **Training Resources/Powertools/JobAids**
- **Related Information**

## NONPARTICIPATING PRACTITIONERS AUTHORIZED AS IN-NETWORK - POLICY/OVERVIEW

Back To Top ⬆

## POLICY/OVERVIEW

### OVERVIEW

**Modified: Effective 04/01/08**

We are implementing a change as part of our overall strategy to help contain the costs incurred from non-par utilization, and encourage non-par providers to consider the advantages of participating in Aetna's network.

These changes affect claims from non-participating providers for services that are approved at the in-network level of benefits.

### POLICY STATEMENT

**Modified: Effective 05/13/08**

Effective 12/01/2007, for all products, except Open Choice (OC) and Traditional Choice (TC), Aetna compensates non-participating practitioners who are either authorized for coverage on an in-network basis or utilized by members in an emergency situation as follows on the first submission:
- the applicable rate negotiated with the practitioner; (e.g. including the negotiated rate by the SCCU (Single Case Contracting Unit)), or
- if no negotiated rate is available, 100% of the practitioner 's charge up to the:
  Reasonable and Customary amount, **Note**: For self-funded plans, reasonable and customary is the plan's reasonable and customary or recognized charge. OR
  - State mandated rate (based on the servicing practitioner's state), OR
  - For HMO based plans and Health Network Products, 125% of CMS published fee schedules- except Anesthesia, DME and LAB, which are reimbursed as follows:
    - DME and LAB - 75% of CMS Fee Schedule
      Anesthesia reimbursement is a per unit rate established by the regions for each market.

**Note:** If there is no CMS published fee rate for a service, the default is HIAA50

### EXCEPTIONS

**Modified: Effective 05/13/08**

Certain exceptions exist, as follows:
- Medicare/Medicaid members nonparticipating practitioners
- Medicare primary **Exception**: Illinois fully insured. Refer to <u>Administration Types</u> and <u>Illinois COB</u>.
- HMO and Health Network Products Only - Maryland (subject to state mandated rate)
- HMO and Health Network Products Only - Providers who are designated to be paid as billed on first submission
- HMO Only - Agreement (A) practitioners
- Initial submissions requiring MCM referrals
- Plan Sponsor exceptions
- New Jersey Small Group and Individual business subject to state mandated rates; business policy decision to apply state mandated rate to all other segments and funding arrangements

CONFIDENTIAL
AET-00296876

- NAP contracted or negotiated rates (SCCU, GCS, Ad HOC)
- Provider exceptions

Note: Non-par practitioners approved by Patient Management are paid based on the rate negotiated.  If no rate is negotiated, apply rates as per policy. Exceptions above apply.

Policy applies to both Insured and Self Insured Plan Sponsors.


## EFFECTIVE DATE BY STATE AND REGION

**Modified: Effective 05/13/08**

Note: Reasonable and Customary or Recognized Charge amounts are accommodated via HIAA rating system; the Authorized Non-participating Fee Schedules are accommodated via the market designated non-par fee schedules indicated below.

In certain markets, for certain CPT or HCPCS, the reimbursement may be higher than 125% of RBRVS. Member/Provider Services should refer to these rates as "Medicare plus Premium" when discussing these rates. When discussing these rates with a Florida member or practitioner DO NOT use the terminology "125% RBRVS"; use the terminology "Medicare plus Premium" rate.

**Exception:** Do not use the term "Medicare plus Premium when discussion DME or LAB rates.


## HMO RATES/EFFECTIVE DATES

**Modified – Effective 04/21/09**

**(Applies to HMO Products Only)**

Click here to view the effective date by state, region and appropriate remit code to be used.


## HEALTH NETWORK PRODUCTS RATES/EFFECTIVE DATES

**Added - Effective 05/13/08**

Refer to the Network Boundary Screen (NB) in ACAS to determine the rating system and effective date for the servicing provider.  Refer to State Mandates and Pricing in the Claim Processing section.

Back To Top ⬆

---

## DEFINITIONS/GLOSSARY
There are no Definitions/Glossary terms specific to this topic.

Back To Top ⬆

---

## PRODUCT APPLICABILITY

| Traditional Products | HMO Products | Applies to |
|---|---|---|
| **ALL** Medical Products Processed on ACAS **EXCEPT** Open Choice and Traditional Choice | **ALL HMO Products EXCEPT** Medicare and Medicaid | **Fully Insured** <br><br> **Self Insured** |

Back To Top ⬆

CONFIDENTIAL                                                                                                    AET-00296877

## TRAINING RESOURCES/POWERTOOLS/JOBAIDS

| | |
|---|---|
| Aetna Learning Center Course # | 12712 |
| Powertools | There are no Powertools for this topic. |
| JobAids | There are no JobAids for this topic. |

Back To Top ⬆

## RELATED INFORMATION

For resubmitted/balance bills refer to Nonparticipating Practitioners Authorized In-Network Balance Bill Policy

| Policy Document Number | Original Effective Date |
|---|---|
| EPOLI.2002.016 | 03/27/02 |

**HMO**
Policy/Overview
Customer Service
Claim Processing
Product Applicability
Training Resources/Powertools/JobAids
Archives

**Traditional**
Policy/Overview
Customer Service
Claim Processing
Product Applicability
Training Resources/Powertools/JobAids
Archives

CONFIDENTIAL

AET-00296878

# EXHIBIT C

# REDACTED

# EXHIBIT D

HOPP #94: Consistent Reimbursement of Codes without Ingenix Data Billed by Non Participating Providers
09/30/2004

HOPP #94: Consistent Reimbursement of Codes without Ingenix Data Billed by Non Participating Providers
09/30/2004

**HOPP #94: Consistent Reimbursement of Codes without Ingenix Data Billed by Non Participating Providers**
**09/30/2004**

| TOPIC | DISCUSSION | RESOLUTION/ACTION | NEXT STEP | OWNER | EFFECTIVE DATE |
|-------|------------|-------------------|-----------|-------|----------------|
|       |            |                   |           |       |                |
|       |            |                   |           |       |                |

# EXHIBIT E

Department of Health and Human Services

**OFFICE OF
INSPECTOR GENERAL**

# MEDICAID DRUG PRICE COMPARISON: AVERAGE SALES PRICE TO AVERAGE WHOLESALE PRICE



Daniel R. Levinson
Inspector General

June 2005
OEI-03-05-00200

# *Office of Inspector General*

### http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The OIG's Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations in order to reduce waste, abuse, and mismanagement and to promote economy and efficiency throughout the department.

## *Office of Evaluation and Inspections*

The OIG's Office of Evaluation and Inspections (OEI) conducts management and program evaluations (called inspections) that focus on issues of concern to the department, the Congress, and the public. The findings and recommendations contained in the inspections reports generate rapid, accurate, and up-to-date information on the efficiency, vulnerability, and effectiveness of departmental programs. The OEI also oversees State Medicaid fraud control units, which investigate and prosecute fraud and patient abuse in the Medicaid program.

## *Office of Investigations*

The OIG's Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. The OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within the department. The OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops compliance program guidances, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

 E X E C U T I V E   S U M M A R Y

## OBJECTIVE

To compare average sales price (a statutorily defined price based on actual sales transactions) to average wholesale price (the published price most States use to set Medicaid reimbursement rates) for Medicare-covered drugs.

## BACKGROUND

Increases in Medicaid's prescription drug costs have generated considerable attention from the Administration, Congress, and the States. Federal regulations require that each State's reimbursement for Medicaid prescription drugs not exceed the lower of (1) its estimated acquisition cost plus a dispensing fee, or (2) the provider's usual and customary charge to the public for the drug.

Currently, most States estimate acquisition cost by discounting the average wholesale price (AWP) by a certain percentage. A small number of States use wholesale acquisition cost (WAC) plus a percentage markup when determining estimated acquisition cost. The AWP is a published price reported in commercial publications. Similarly, the WAC is a price reported in commercial publications. Prior to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Public Law 108-173), WAC was not a term defined in statute or regulation. The MMA defined WAC as the manufacturer's list price for the drug to wholesalers or direct purchasers, not including prompt pay or other discounts, rebates, or reductions in price, for the most recent month for which information is available.

Previous Office of Inspector General work demonstrated that the AWPs States use to establish their Medicaid drug reimbursement rates are higher than the prices retail pharmacies pay to purchase drugs. The AWP is not defined in law or regulation, and fails to account for the discounts available to various payers.

Prior to 2005, Medicare also used the AWP as the basis for Part B drug reimbursement. As of January 1, 2005, the MMA changed the basis of reimbursement for prescription drugs from AWP to average sales price (ASP).

Unlike AWP and WAC, there is a specific method to calculate ASP defined in the MMA and the Social Security Act (the Act). Pursuant to

section 1847A(c) of the Act, as amended by the MMA, the ASP is a manufacturer's unit sales of a drug to all purchasers in the United States in a calendar quarter divided by the total number of units of the drug sold by the manufacturer in that same quarter.  The ASP is net of any price concessions such as volume, prompt pay, and cash discounts.  Certain sales are exempt from the calculation of ASP, including sales at a nominal charge.  Similar to ASP, average manufacturer price (AMP) is defined in the Act and based on actual sales.  Section 1927(k)(1) of the Act defines AMP as the average price paid to the manufacturer by wholesalers in the United States for drugs distributed to the retail pharmacy class of trade, minus customary prompt pay discounts.  Medicaid uses AMP data reported quarterly by manufacturers to determine the rebate amount for a drug.

The President's 2006 Budget proposes to require State Medicaid programs to reimburse pharmacies the ASP of a drug.  This proposal intends to align pharmacy reimbursement with pharmacy acquisition cost and would be consistent with Medicare reimbursement for Part B-covered drugs as established by the MMA.

This analysis compares ASP to AWP for 2,077 national drug codes where both ASP and AWP data were available for the third quarter of 2004.  We will refer to national drug codes with ASP data as Medicare-covered drugs.  Medicare-covered drugs may also be covered under the Medicaid program.  We analyzed a subset of these national drug codes (1,481) to compare AMP to AWP by drug type.  In addition, we compared WAC to AWP for 1,898 national drug codes.

A companion report, "Medicaid Drug Price Comparisons:  Average Manufacturer Price to Published Prices" (OEI-05-05-00240), compares AMP to AWP and WAC for Medicaid-reimbursed prescription drugs.  That analysis includes 24,101 national drug codes.

## FINDING

**Average sales price is substantially lower than average wholesale price for drug codes in this review.**  For 2,077 national drug codes, the median percentage difference between ASP and AWP is 49 percent.  Even when factoring in the discounted AWP most States use to calculate the estimated acquisition cost for Medicaid drugs, ASP is still substantially lower.

The difference between ASP and AWP was greatest for generic drugs.  For 704 single source brand codes, ASP is 26 percent below AWP at the

median, and for 216 multisource brand codes, ASP is 30 percent below AWP at the median.  For 1,152 generic national drug codes, ASP is 68 percent less than AWP at the median.  For five drug codes, there was no drug type information in the drug compendium.

To determine if the difference between the analyzed prices were similar for Medicare and Medicaid drugs, we compared the results of our analysis for Medicare-covered drugs to the analysis for Medicaid-reimbursed drugs in our companion report.  The companion report "Medicaid Drug Price Comparisons:  Average Manufacturer Price to Published Prices"  (OEI-05-05-00240) examined the differences between AMP and AWP for all drugs reimbursed by Medicaid (24,101 national drug codes).

We found that the differences between AWP and other prices analyzed are similar for both Medicare and Medicaid drugs.  For the 1,481 codes that had AMP and AWP in our review, we found that the difference between AMP and AWP for generic drugs is 72 percent at the median; correspondingly, the companion report found that the difference between AMP and AWP for generic drugs is 70 percent at the median.  For single source and multisource brand drugs, this report found that the differences between AMP and AWP are 22 and 25 percent at the median, respectively.  Similarly, the companion report found that the differences between AWP and AMP for single source and multisource brand drugs are 23 and 28 percent at the median, respectively.

## CONCLUSION

There is significant interest in changing Medicaid reimbursement for prescription drugs by aligning pharmacy reimbursement more closely with pharmacy acquisition cost.  The changes proposed in the President's 2006 budget would make Medicaid reimbursement consistent with Medicare by basing reimbursement on actual sales transactions.  This analysis demonstrates that ASP, which is a statutorily defined price based on actual sales transactions including discounts, was lower than published prices AWP and WAC.

We believe this inspection will provide useful information to those considering the implications of changing Medicaid's drug reimbursement methodology.  The substantial disparities between prices based on actual sales and the published prices currently being used indicate that changing the basis of Medicaid reimbursement could have a significant impact on Medicaid expenditures.

## AGENCY COMMENTS

CMS commented that these companion reports make clear that current Medicaid payment rules result in overpayments for drugs and emphasizes the need for reform. Similar problems with overpayments for Medicare drugs led to passage of the MMA provisions that changed the basis of reimbursement for drugs from AWP to ASP. CMS reiterated that the President's 2006 budget proposes to solve this problem by the use of ASP so Medicaid drug prices will reflect actual costs. CMS stated that Congress should enact legislation to ensure that Medicaid payment for drugs is related to actual prices paid by pharmacies. The full text of CMS's comments are provided in Appendix A.

# ► T A B L E   O F   C O N T E N T S

E X E C U T I V E   S U M M A R Y ........................................... i

I N T R O D U C T I O N ................................................ 1

F I N D I N G ....................................................... 8

    Average sales price is substantially lower than average
    wholesale price ........................................ 8

C O N C L U S I O N ................................................ 10

A P P E N D I X ..................................................... 11

    Appendix A:  Centers for Medicare & Medicaid Services'
    Comments ........................................... 11

E N D N O T E S ..................................................... 14

A C K N O W L E D G M E N T S ....................................... 15

 **I N T R O D U C T I O N**

## OBJECTIVE

To compare average sales price (a statutorily defined price based on actual sales transactions) to average wholesale price (the published price most States use to set Medicaid reimbursement rates) for Medicare-covered drugs.

## BACKGROUND

Increases in Medicaid's prescription drug costs have generated considerable attention from the Administration, Congress, and the States.  The House Energy and Commerce Subcommittee on Oversight and Investigations held a hearing in December 2004 on "Medicaid Prescription Drug Reimbursement:  Why the Government Pays Too Much" and explored potential reforms.[1]  Congress has established a Medicaid commission to provide recommendations to achieve $10 billion in overall Medicaid savings over the next 5 years and to consider longer-term performance goals and recommendations.[2]  The National Governors Association is also working on proposals to reduce Medicaid spending, including spending on prescription drugs.[3]

The Office of Inspector General (OIG) and others have found evidence that because States lack accurate drug pricing data, Medicaid drug reimbursements overestimate pharmacies' actual acquisition costs.  OIG has also found that Medicaid drug reimbursements exceed the prices paid by other Federal programs.  OIG has recommended that Medicaid should base reimbursement on pricing data that more accurately reflects actual acquisition costs.[4]

The Administration has expressed interest in adopting a reimbursement system for Medicaid that is similar to the Medicare Part B drug reform enacted under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Public Law 108-173).  The MMA amended the Social Security Act (the Act) to change the method of reimbursement for prescription drugs from average wholesale price (AWP) to average sales price (ASP).

The President's 2006 budget proposes restructuring Medicaid pharmacy reimbursement to save an estimated $542 million in fiscal year (FY) 2006 and $15.1 billion over 10 years.[5]  This budget also proposes to require State Medicaid programs to reimburse pharmacies the ASP of a drug plus a 6 percent fee for storage, dispensing, and counseling.  According to the President's budget, this reimbursement methodology

aligns pharmacy reimbursement with pharmacy acquisition cost and is consistent with Medicare reimbursement for Part B-covered drugs as established by the MMA.

**Medicaid Reimbursement for Prescription Drugs**

The Medicaid program, established under Title XIX of the Act, is administered by States and financed with State and Federal funds. Medicaid pays for medical and health-related assistance for certain vulnerable and needy individuals and families. All 50 States and the District of Columbia provide coverage for prescription drugs under the Medicaid program.

Federal regulations require, with certain exceptions, that State Medicaid reimbursements for prescription drugs not exceed the lower of (1) its estimated acquisition cost plus a dispensing fee, or (2) the provider's usual and customary charge to the public for the drug. CMS allows each State to define estimated acquisition cost.

*Average wholesale price and wholesale acquisition cost.* Currently, most States estimate acquisition cost by discounting AWP by a certain percentage. A small number of States use wholesale acquisition cost (WAC) plus a percentage markup when calculating estimated acquisition costs. According to information obtained from CMS's Web site, the discount from AWP in the State methodologies ranged from 5 to 50 percent, and the percentage markup to WAC ranged from 5 to 12 percent as of March 2005. The median discount for drugs for States that use AWP to calculate estimated acquisition cost was AWP minus 12 percent. The median percentage markup to WAC for the small number of States that use this price to calculate estimated acquisition cost was 8.5 percent.

The AWP is a price published in commercial publications. It is an important prescription drug pricing benchmark for payers throughout the health care industry. Similarly, the WAC is a price reported in commercial publications. Prior to the MMA, WAC was not a term defined in statute or regulation. The MMA defined WAC as the manufacturer's list price for the drug to wholesalers or direct purchasers, not including prompt pay or other discounts, rebates, or reductions in price, for the most recent month for which information is available.

Previous OIG work demonstrated that the AWPs States use to calculate estimated acquisition cost that determine Medicaid drug reimbursement rates are higher than the prices retail pharmacies pay

to purchase drugs.[6]  The AWP is not defined in law or regulation, and fails to account for the discounts available to various payers, including certain Federal agencies, providers, and large purchasers.  It is a price derived from manufacturer-reported data for both brand and generic drugs.

According to the President's 2006 Budget, the current Medicaid reimbursement method has created an incentive for manufacturers to artificially raise the AWP to make their products more attractive to pharmacies because the profit will be larger with the higher price.  According to Congressional testimony, States continue to rely on AWP, despite its widely recognized deficiencies, because they lack access to more accurate pricing information.

Prior to 2005, Medicare also used AWP as the basis for Part B drug reimbursement.  However, numerous reports by OIG and the Government Accountability Office, as well as data collected by the Department of Justice and Congressional investigations, indicated that Medicare's reimbursement rate was significantly higher than the prices that drug manufacturers, wholesalers, and other similar entities actually charge to physicians and suppliers who purchase these drugs.  Consequently, the MMA changed the basis of reimbursement for prescription drugs from AWP to ASP.

**Medicare Drug Reimbursement Methodologies**

*Average sales price.*  In 2005, Medicare began to pay for most drugs using an entirely new methodology based on ASP rather than AWP.  Unlike AWP and WAC, there is a specific method to calculate ASP set forth in the MMA and the Act.  Section 1847A(c) of the Act, as amended by the MMA, defines ASP as a manufacturer's unit sales of a drug to all purchasers in the United States in a calendar quarter divided by the total number of drug units sold by the manufacturer in that same quarter.  The ASP is net of any price concessions such as volume, prompt pay, and cash discounts; free goods contingent on purchase requirements; chargebacks; and rebates other than those obtained through the Medicaid drug rebate program.  Certain sales are exempt from the calculation of ASP, including sales at a nominal charge.

Manufacturers report ASPs to the Centers for Medicare & Medicaid Services (CMS) on a quarterly basis by national drug code, which is an 11-digit identifier that indicates the manufacturer of the drug, the product dosage form, and the package size.  Third quarter 2004 ASP submissions to CMS from manufacturers served as the basis for first

quarter 2005 Medicare allowances for most covered drug codes.  As of January 1, 2005, Medicare's allowance for most covered outpatient drug codes is equal to 106 percent of the volume-weighted ASPs for those drugs.

**The Medicaid Drug Rebate Program**

*Average manufacturer price.*  Similar to ASP, average manufacturer price (AMP) is defined by law and based on actual sales transactions.  In order for a manufacturer's drug to be eligible for Federal Medicaid matching funds, section 1927(a)(1) of the Act mandates that drug manufacturers enter into rebate agreements with the Secretary and pay quarterly rebates to State Medicaid agencies.  Under these rebate agreements and the law, manufacturers must provide CMS with the AMP for each of their national drug codes on a quarterly basis. Medicaid calculates drug rebates based on AMP.  Section 1927(k)(1) of the Act defines AMP to be the average price paid to the manufacturer by wholesalers in the United States for drugs distributed to the retail pharmacy class of trade minus customary prompt pay discounts.  The AMP is calculated as a weighted average of prices for all of a manufacturer's package sizes of a drug sold during a given quarter and is reported for the lowest identifiable quantity of the drug (e.g., one milligram, one milliliter, one tablet, one capsule).

**Companion Report**

A companion report:  "Medicaid Drug Price Comparisons:  Average Manufacturer Price to Published Prices" (OEI-05-05-00240), examines the differences between AWP, WAC, and AMP for all Medicaid-reimbursed drug codes (24,101 national drug codes).  For comparability, we also examined the differences between AMP, WAC, and AWP for national drug codes with ASP values.  This comparison would determine if there were substantial price differences for Medicaid-reimbursed drugs and our smaller subset of Medicare-covered drugs.

## METHODOLOGY

This analysis compares ASP to AWP for 2,077 national drug codes where both ASP and AWP data were available for the third quarter of 2004.  We will refer to national drug codes with ASP data as Medicare-covered drugs.  Medicare-covered drugs may also be covered under the Medicaid program.  We also analyzed a subset of these national drug codes (1,481) where both AMP and AWP were available.  In addition, we analyzed 1,898 codes where both WAC and AWP were available.  We

analyzed these subsets of codes to determine how the differences between the price points for Medicare-covered drugs would compare to the differences for Medicaid-reimbursed drugs found in our companion report.

**Centers for Medicare & Medicaid Services Data**

We obtained ASP and AMP data for third quarter 2004 from CMS.

*Average sales price data.* We obtained ASPs for 2,113 national drug codes that CMS used in its calculation of volume-weighted ASP for Medicare reimbursement. When calculating the ASPs, CMS only includes national drug codes with ASP submissions that are deemed acceptable. We did not examine the national drug codes that CMS opted to exclude from its calculation. These ASPs were based on data submitted by manufacturers for the third quarter of 2004.

We did not verify the accuracy of the billing units information contained in CMS's ASP data; however, OIG may review this information as part of a future study.

*Average manufacturer price data.* For the 2,113 national drug codes that had ASP data, we also obtained AMP data from CMS for the third quarter of 2004. We determined that 1,500 of these national drug codes had usable AMPs. We used a national drug code's AMP when (1) CMS used the code in its calculation of volume-weighted ASP, and (2) we could successfully identify the amount of drug that the code's AMP represented.

An AMP is reported for the lowest identifiable quantity of the drug contained in the national drug code (e.g., one milligram, one milliliter, one tablet, one capsule). In contrast, we obtained ASP, AWP, and WAC data for the entire amount of the drug contained in the national drug code (e.g., for 50 milliliters, for 100 tablets). To ensure that all prices were for comparable units, we converted each AMP so that it represented the total amount of the drug contained in that code. To accomplish this, we multiplied the AMPs for these 1,500 national drug codes by the total amount of the drug contained in each code, as identified by sources such as the CMS crosswalk file, "Red Book," manufacturer Web sites, and the Food and Drug Administration's national drug code directory.

INTRODUCTION

**Drug Compendium Data**

We obtained AWP and WAC package prices for third quarter 2004 from a national drug compendium.  This compendium's drug databases contain national drug codes, drug names, product description, and pricing information, including AWP and WAC.

Since we obtained monthly data for AWP and WAC, we selected a price from 1 month of third quarter 2004 for both price types.  To be conservative, we selected the minimum quarterly AWP per national drug code and maximum quarterly WAC per national drug code for this analysis.

*Third quarter 2004 average wholesale price and wholesale acquisition cost.*
We obtained AWP and WAC prices per national drug code for third quarter 2004 because the ASP and AMP prices we collected are based on manufacturer submissions for the third quarter of 2004.  From the 2,113 national drug codes for which we had ASP data, we found 2,079 codes with AWP data and 1,899 with WAC data.

**Average Sales Price Comparison**

We created one data set that contained ASP and AWP data for all drugs under review.  We excluded from our analysis codes that did not have information for both ASP and AWP.  We also excluded two codes where the ASP was zero.  As a result of this, there were 2,077 unique national drug codes included in our comparison of ASP to AWP.

We used AWP as our point of comparison because most States calculate estimated acquisition cost based on AWP minus some percentage.  For each of the 2,077 national drug codes, we calculated the percentage difference between ASP and AWP.  We calculated the median percentage difference for these 2,077 codes under review.

We also calculated the median percentage differences for single source, innovator multiple source, and non-innovator multiple source drugs.  Hereafter, we will refer to single source as single source brand; innovator multiple source as multisource brand; and non-innovator multiple source as generic.  We identified each drug type for these categories based on information in the drug compendium.  For five codes, there was no drug type information in the drug compendium.  We excluded these five codes from our analysis of drug type.  We did not verify the data from the compendium.

I N T R O D U C T I O N

**Comparisons of Other Price Points**

We analyzed a subset of codes to determine how the differences between the price points for Medicare-covered drugs would compare to the differences for Medicaid-reimbursed drugs found in our companion report. Out of the 2,077 drug codes we reviewed, we compared AMP to AWP for the 1,483 codes where both prices were available. For two of these codes, there was no drug type information in the drug compendium. We excluded these codes from our analysis of drug type. For each of the 1,481 codes in this subset, we calculated the median percentage difference between AMP and AWP for each drug type. For this analysis of Medicare-covered drugs, we did not use the same drug compendium for AWP and WAC data as the companion report.

Out of the 2,077 drug codes we reviewed, we compared WAC to AWP for the 1,898 codes where both prices were available. For each code in this subset, we calculated the median percentage difference between WAC and AWP for each drug type.

**Limitations**

We intend this inspection to provide information that is useful to those who are considering changing the basis of Medicaid reimbursement from a published price to a price based on actual sales. However, our analysis compares price points and not actual reimbursements. It is a theoretical analysis that is useful to estimate the impact of such a reimbursement change, but it does not measure the actual impact of such a change for two main reasons. First, States do not always reimburse at the amount that their estimated acquisition cost formulas would predict. Our analysis does not capture the full complexity of Medicaid reimbursement, which can include tiered estimated acquisition cost formulas as well as other price points (i.e., usual and customary charge, Federal upper limits, and State maximum allowable costs). Second, we are comparing published prices to ASP. However, if the basis of Medicaid reimbursement were changed to ASP, it would likely be ASP plus a markup percentage. For example, Medicare Part B now reimburses prescription drugs at ASP plus 6 percent.

**Standards**

This study was conducted in accordance with the "Quality Standards for Inspections" issued by the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency.

 **F I N D I N G**

**Average sales price is substantially lower than average wholesale price for drug codes in this review**

The ASP, a statutorily defined price based on actual sales transactions including discounts, is substantially lower than AWP. For 2,077 national drug codes with ASP and AWP data, ASP is 49 percent lower than AWP at the median.

For the purposes of Medicaid reimbursement, most States estimate acquisition cost by discounting AWP by a percentage ranging from 5 to 50 percent. The median discount for States that use AWP to calculate estimated acquisition cost drugs was 12 percent below AWP. Even when taking into account the discounted AWP most States use to calculate estimated acquisition cost, ASP is still substantially lower than AWP.

**The ASP for generic drugs was substantially less than AWP when compared to single source and multisource brand drugs.**
We analyzed the median percentage differences between ASP and AWP by type of drug: single source brand, multisource brand, and generic. For 704 single source brand codes, ASP is 26 percent below AWP at the median, and for 216 multisource brand codes, ASP is 30 percent below AWP at the median. The difference between ASP and AWP was greatest for generic drugs. For 1,152 generic national drug codes, ASP is 68 percent less than AWP at the median. For five drug codes, there was no drug type information in the drug compendium.

**The differences between AWP and other prices are similar for both Medicaid-reimbursed drugs and the smaller subset of Medicare-covered drugs we reviewed.**
To determine if the differences between the price points were similar for Medicare and Medicaid drugs, we compared the results of our analysis for Medicare-covered drugs to the analysis for Medicaid-reimbursed drugs in our companion report. Medicare-covered drugs may also be covered under the Medicaid program.

The companion report "Medicaid Drug Price Comparisons: Average Manufacturer Price to Published Prices" (OEI-05-05-00240) examined the differences between AMP and AWP for drugs reimbursed by Medicaid (24,101 national drug codes). The companion report's findings for Medicaid-reimbursed drugs were similar to this report's finding for the subset of Medicare drugs we reviewed. It found that the difference between AMP and AWP was greatest for generic drugs.

F I N D I N G

For the 1,481 codes that had AMP and AWP in our review, we found that the difference between AMP and AWP for generic drugs is 72 percent at the median; correspondingly, the companion report found that the difference between AMP and AWP for generic drugs is 70 percent at the median.  For single source and multisource brand drugs, this report found that the differences between AMP and AWP at the median are 22 and 25 percent, respectively.  Similarly, the companion report found that the differences between AWP and AMP for single source and multisource brand drugs at the median are 23 and 28 percent, respectively.

The companion report also found similar differences between WAC and AWP.  For the 1,898 codes that had AWP and WAC in our review, we found WAC is 20 percent lower than AWP for Medicare drugs at the median and the companion report found that WAC is 22 percent lower than AWP for Medicaid-reimbursed drugs at the median.

 C O N C L U S I O N

There is significant interest in changing Medicaid reimbursement for prescription drugs by aligning pharmacy reimbursement more closely with pharmacy acquisition cost. The changes proposed in the President's 2006 budget would make Medicaid reimbursement consistent with Medicare by basing reimbursement on actual sales transactions. This analysis demonstrates that ASP, which is a statutorily defined price based on actual sales transactions including discounts, was lower than published prices AWP and WAC.

We believe this inspection will provide useful information to those considering the implications of changing Medicaid's drug reimbursement methodology. The substantial disparities between prices based on actual sales and the published prices currently being used indicate that changing the basis of Medicaid reimbursement could have a significant impact on Medicaid expenditures.

## AGENCY COMMENTS

CMS commented that these companion reports make clear that current Medicaid payment rules result in overpayments for drugs and emphasizes the need for reform. Similar problems with overpayments for Medicare drugs led to passage of the MMA provisions that changed the basis of reimbursement for drugs from AWP to ASP. CMS reiterated that the President's 2006 budget proposes to solve this problem by the use of ASP so Medicaid drug prices will reflect actual costs. CMS stated that Congress should enact legislation to ensure that Medicaid payment for drugs is related to actual prices paid by pharmacies. The full text of CMS's comments are provided in Appendix A.

# APPENDIX ~ A

## Centers for Medicare & Medicaid Services' Comments

DEPARTMENT OF HEALTH & HUMAN SERVICES — Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC 20201

**DATE:** JUN 21 2005

**TO:** Daniel R. Levinson
Acting Inspector General

**FROM:** Mark B. McClellan, M.D., Ph.D. MM
Administrator
Centers for Medicare & Medicaid Services

**SUBJECT:** OIG Draft Reports: "*Comparison of Medicaid Federal Upper Limit Amounts to Average Manufacturer Prices*," (OEI-03-05-00110);

"*Medicaid Drug Price Comparison: Average Sales Price to Average Wholesale Price,*" (OEI 03-05-00200); and

"*Medicaid Drug Price Comparison: Average Manufacturer Price to Average Wholesale Price*," (OEI-05-05-00240)

Thank you for the opportunity to review and comment on the Office of Inspector General's (OIG) draft reports entitled "*Comparison of Medicaid Federal Upper Limit Amounts to Average Manufacturer Prices,*" "*Medicaid Drug Price Comparison: Average Sales Price to Average Wholesale Price,*" and "*Medicaid Drug Price Comparison: Average Manufacturer Price to Average Wholesale Price.*" The first OIG report addresses how prices for drugs set under the Medicaid Federal Upper Limit (FUL) program compare to reported average manufacturer prices (AMP), and estimates potential savings if FUL amounts were based on reported AMPs. The latter two reports compare how prices that most states currently use to set Medicaid reimbursement, average wholesale price (AWP), and wholesale acquisition cost (WAC), compare to statutorily defined prices based on actual sales transactions, i.e., average sales price (ASP) and AMP.

The OIG reports make clear that the current payment rules result in overpayments for drugs and emphasize the need for reform. The President's 2006 budget proposes to solve this problem by the use of average sales prices (ASP) so Medicaid drug prices will reflect actual costs.

**OIG Recommendation**
CMS should work with Congress to set Medicaid drug reimbursement amounts that more closely approximate pharmacy acquisition cost.

A P P E N D I X ~ A

Page 2 – Daniel R. Levinson

**CMS Response**
We concur with the OIG that the Congress needs to address drug prices paid by Medicaid to more closely relate Medicaid reimbursement to actual transaction prices.

Federal regulation (42 CFR 447.332) requires the FUL amount to be 150 percent of the published price for the least costly therapeutic equivalent using data from all available national compendia. The FUL system selects the lowest price of AWP, WAC, or direct price (DP), as reported by the national compendia to arrive at the FUL price.

States reimburse pharmacies for single source drugs at the lower of Estimated Acquisition Cost (EAC), or the pharmacy's usual and customary charge (UCC) to the general public. EAC is based on the state's reimbursement formula, generally AWP minus a percentage or WAC plus a percentage.

Neither AWP nor WAC is related to the market price of drugs. Rather, they are prices based on reports by manufacturers. Manufacturers often report inflated prices in order to increase the profit for pharmacies and, thereby, encourage pharmacies to dispense their product. State Medicaid Agencies need information on market prices in order to set appropriate payment rates. The President has proposed in the fiscal year 2006 budget to require drug manufacturers to report ASP for drugs and to cap Federal matching for drug expenditures, in the aggregate, to ASP plus 6 percent.

**OIG Findings**
Overall, FUL prices were five times higher than the average AMPs for generic drug products in the third quarter of 2004. If Medicaid based FUL amounts on 150 percent of the average AMP instead of the compendia prices, the program could have saved an estimated $161 million in the third quarter of 2004.

For the comparison of AMP to compendia price, AMP is substantially lower than both AWP and WAC for all National Drug Codes (NDCs) reviewed. The median price comparison for all evaluated drugs was that AMP is equal to AWP – 59 percent and AMP is equal to WAC - 25 Percent. Generic drugs exhibited the largest differences between AMP and the list prices – The median price comparison for generic drugs was AMP is equal to AWP - 70 percent and AMP is equal to WAC – 40 percent. States' median AWP based estimated acquisition cost is AWP – 12 Percent. States' median WAC based estimated acquisition cost is WAC plus 8.5 percent.

For the comparison of ASP to compendia price, ASP is substantially lower than AWP and WAC for all NDCs reviewed. For 2,077 NDCs with ASP and AWP data, ASP is equal to AWP – 49 percent. The difference between ASP and AWP was greatest for generic drugs. For 1,152 generic NDCs, ASP is equal to AWP – 68 Percent.

A P P E N D I X ~ A

Page 3 – Daniel R. Levinson

**CMS Response/Conclusion**
These reports provide additional supportive evidence that when published compendia prices are used as a basis for Medicaid drug reimbursement, Medicaid payment greatly exceeds actual acquisition cost.  Legislation would be needed to define a price that manufacturers must report that can be used as a basis for state Medicaid agencies to set pharmacy payment.

In the fiscal year 2006 budget, the President proposed to require drug manufacturers to report the ASP for each drug and to cap Federal payment at an aggregate level to ASP plus 6 percent.  As long as states must rely on prices that are not based on true prices paid to manufacturers, states have no means to set appropriate payment amounts.  Current WACs and AWPs are greatly inflated and this inflation is encouraged by setting Medicaid payment in relation to these inflated prices.  Requiring manufacturers to report true prices and to limit Medicaid payment to a reasonable amount above these prices will eliminate the opportunity for manufacturers and pharmacies to gain through the reporting of inflated prices, yield substantial state and Federal government savings, and retain flexibility for states to set prices for individual drugs as they find appropriate within the overall cap.

Prior to 2005, Medicare also used AWP as the basis for Part B drug reimbursement.  However, numerous studies by the OIG and the Government Accountability Office, (GAO), indicated that Medicare's reimbursement rate was significantly higher than the prices that drug manufacturers and wholesalers actually charged physicians and suppliers who purchased these drugs.  Consequently, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) changed the basis of reimbursement for prescription drugs from AWP to ASP.  Congress should now enact similar legislation to ensure that Medicaid payment for drugs is related to actual prices paid by pharmacies.

➤  E N D N O T E S

[1] Testimony transcript available at:
http://www.oig.hhs.gov/testimony/docs/2004/reeb120704.pdf.

[2] Federal Register Notice.  Medicaid Program; Establishment of the Medicaid Commission and Request for Nominations for Members. CMS-2214-N.

[3] Available online at www.nga.org.

[4] "Variations in State Medicaid Drug Prices" (OEI-05-02-00681); "Cost Containment of Medicaid HIV/AIDS Drug Expenditures"(OEI-05-99-00611); "Medicaid Pharmacy—Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products" (A-06-02-00041).

[5] United States House of Representatives Committee on the Budget. "Analysis of the President's Budget for FY 2006." Available at: http://www.house.gov/budget/analysisprez021105.pdf.

[6] "Medicaid Pharmacy – Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs" (A-06-96-00030); "Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products" (A-06-97-00011); "Actual Acquisition Cost of Brand Name Prescription Drug Products" (A-06-00-00023); "Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products" (A-06-01-00053); "Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products" (A-06-02-00041); "Medicaid's Use of Revised Average Wholesale Prices" (OEI-03-01-00010); "Containment of Medicaid HIV/AIDS Drug Expenditures" (OEI-05-99-00611).

# ◤ A C K N O W L E D G M E N T S

This report was prepared under the direction of Robert A. Vito, Regional Inspector General for Evaluation and Inspections in the Philadelphia regional office, and Linda M. Ragone, Deputy Regional Inspector General.  Other principal Office of Evaluation and Inspections staff who contributed include:

Edward K. Burley, *Project Leader*

Linda B. Abbott, *Program Specialist*

# EXHIBIT F

**From:**  Yorgey, Brian
**Sent:**  Mon, 15 Jul 2002 16:00:47 GMT
**To:**  Caynor, Julie A; Andrews, Wendy J
**Subject:** RE: AWP questions

---

From the CCR website http://aetnet.aetna.com/mpnt/cmm/index_updates.htm

**<u>CCR INITIAL REVIEW LEVEL</u> (prior to any EOB/EPP correspondence):**

- When the clinical decision results in either an:
  - **Approval of services** by the Nurse Consultant, **OR**
  - **A reimbursement logic approval or denial** by the CCR Nurse Consultant/Analyst:
    - If a Par provider (growth hormone or IVIG reviews only):
      - With a contracted rate, allow at the specified contracted rate
      - If no contracted rate, allow at the lesser of billed charges or re-calculate claim at AWP-10% and document re-calculated price on the claim
    - **For Non Par providers (all single drugs > $600, except those approved by the FDA and used in the treatment of cancer or HIV):**
      - **Re-calculate claim at AWP** and document re-calculated price on the claim
      - **\*\*NOTE: AWP/R&C should not be applied to non-par claims on Aetna ASC business**
    - **Document re-calculated price, what clinical information was reviewed and the rationale for the determination on the referral form and MSW/EWM/Target/PT/PMDS**
      - Completed MSW/EWM/Target/PT/PMD

AET-01080602

> S must be closed on the same
> date the issue is resolved
> - **For PHC products:** set up
>   Pre-Approval/Utilization
>   Segment on the Patient File
>   for Payment of recurring
>   charges
>
> - Send the claim for finalization with the decision and
>   payment instructions and request backend
>   microfilm/imaging

Brian Yorgey, NCO Policy and Procedures
**Confidential: The above information is confidential and should be read only by the addressee or the addressee's specific designees in accordance with the Aetna Code of Conduct and applicable law.**

-----Original Message-----
**From:**   Caynor, Julie A
**Sent:**   Monday, July 15, 2002 9:57 AM
**To:**   Yorgey, Brian; Andrews, Wendy J
**Subject:**   RE: AWP questions

My unit is the CCR unit.

We were allowing 40%. We don't have it in writting anywhere.
The 40% rule is what we have used for years, however, from
what our Training dept is we shouldn't be allowing the add'l 40%.

I just want to make sure that is correct.

Thanks

-----Original Message-----
**From:**   Yorgey, Brian
**Sent:**   Monday, July 15, 2002 9:49 AM
**To:**   Caynor, Julie A; Andrews, Wendy J
**Subject:**   RE: AWP questions

For injectable claims going to CCR, follow the CCR response.  For injectable
claims handled at the processor level, the normal R&C guides are followed when
there is no prevailing fee.  Are you finding some type of documentation regarding
this 40%?

Brian Yorgey, NCO Policy and Procedures
**Confidential: The above information is confidential and should be read only by the addressee or the addressee's specific designees in accordance with the Aetna Code of Conduct and applicable law.**

-----Original Message-----
**From:**   Caynor, Julie A
**Sent:**   Thursday, July 11, 2002 8:40 PM
**To:**   Yorgey, Brian; Andrews, Wendy J
**Subject:**   RE: AWP questions

 **AET-01080603**

We should not allow an add'l 40% if there is no R&C correct?
Thanks

-----Original Message-----
**From:**   Yorgey, Brian
**Sent:**   Tuesday, July 02, 2002 9:04 AM
**To:**     Andrews, Wendy J
**Cc:**     Caynor, Julie A
**Subject:**       RE: AWP questions

This policy is for contracted providers.  TC is included because
of NAP.  Non-contracted providers are allowed at R&C and
normal guides for services with no R&C is followed.  CCR guides
also indicate that some drugs are referred to CCR for an AWP
based R&C price for non-pars ($600 per claim line).

Brian Yorgey, NCO Policy and Procedures
**Confidential: The above information is confidential and should be
read only by the addressee or the addressee's specific designees in
accordance with the Aetna Code of Conduct and applicable law.**

-----Original Message-----
**From:**   Andrews, Wendy J
**Sent:**   Wednesday, June 26, 2002 12:32 PM
**To:**     Yorgey, Brian
**Cc:**     Caynor, Julie A
**Subject:**       FW: AWP questions

Brian, can you answer these questions?

Julie, I believe that Brian is out of the office until Monday.

Thanks!

-----Original Message-----
**From:**   Caynor, Julie A
**Sent:**   Wednesday, June 26, 2002 12:28 PM
**To:**     Andrews, Wendy J
**Subject:**       FW: AWP questions

Hi Wendy.

Can you please clarify the following:

Is there a workflow established for non-contracted
provider's.
The policy states it applies to TC, but it appears it only
applies to contract provider's.

For non-contracted provider's if there is no R&C, are we
to allow 40% mark-up off the AWP?

Thanks
*Julie A. Caynor*
*CCR/MCM/OPR/Pins/Tins Teamlead*
*Dover Claim Office*
*Aetna Inc.*
*302-857-4001*
*Fax# 302-857-4803*

CONFIDENTIAL                                                              AET-01080604

-----Original Message-----
From:   Emeigh-Alessandro, Mary K
Sent:   Wednesday, June 26, 2002 10:11 AM
To:     Caynor, Julie A
Subject:        FW: AWP Q&A Update


-----Original Message-----
From:   Andrews, Wendy J
Sent:   Friday, June 14, 2002 2:55 PM
To:     Benson, Cindy A; Unruh, Tangula L; Schmidt, Patricia A; Robertson,
Margaret T; Gunn, Annette M; Little, Amie B; Ringkor, Susanna L; Lemos,
Alicia L; Buoni, Theresa I; Thomas, Shannon L; Corbin, Susan; Scratch,
Kristine M; Roberts, Paula; Wright, Tiphinie; Haynes, Robin L; Ahner,
Jamie; Ritter-Buecker, Ellen J; Bastian, Christine L; Dorshimer, Lynne L;
Cohen, Joan E; Quinter, Sherry; McCurdy, Kathleen P; Mcardle, Elizabeth;
Horan, Helen; McNamara, Heather A; Suhovy, Kelly A; Lopez, Teresa M;
Johnson, Maisha M; Engels, Arnold L; Schmidt, Greg; McLaughlin, Diana F;
Jones, Monica M; McConnell, Cynthia L; Sebastian, Denise A; Baker, Dodi;
Bobo, Kim R; West, Marion P; Hogan, Nora A; Mercer, Joyce; Santosuosso,
Sheila M; LeBlanc, Karen; Emeigh-Alessandro, Mary K; Macdonald,
Charlene; Cromer, Denise M; Campbell-Mason, Michelle; Sovine, Kathy J;
Bonewitz, Timothy N; Starcher, Timothy T; Washington, Cynthia M; Dalton,
Carla; Johnson, Phillis B; Simmons, Terry E; MacLaughlin, Vickie;
Alexander, Valsa; Mathew, Saley M; Boone, Timothy; Hummel, Deborah R;
Hawk, Robert D; Schmid, Amy L; Rex, Allen Jr; Bryant, Craig P; Hoffman,
Andrea K; Tretter, Tamara; Tetro, Suzanne M; Anderson, Tracey; Jones,
Philip J; Brems, Annmarie; Lucier, Christopher; Joyal, Paula M; Johnson,
Andrea L; Davis-Mosley, Faye E; Curran, Patrick J; Vigneau, Mildred R;
Hesse, Kristopher; Brown, Sonya; Sielski, Brenda L; Wright, Dorsey M;
Leon, Lisa A; Mckinzie, Cheryl L; Hough, Sonya; Munroe, Karen; Glass,
Jennifer; DeJesus, Alicia; Striefsky, Barbara M

Cc:     Golub, Thomas J; Blair, David J; Mureddu, Lynne A; Yorgey, Brian
Subject:        AWP Q&A Update

Below is a list of a couple of items that were
requested during the AWP Q&A session on
Tuesday.

1.  The most current draft copy is attached
below.  Any information listed in Red has been
added or changed since the last draft that was
sent out.

 << File: awp0311021.doc >>

2.  Due to an unexpected problem, the
calculator and instructions will not be on the K
Drive until Wednesday at the earliest.   Since
some of you are having trouble accessing the
tool from the web, I have attached the excel
document and instructions below.  You may
use this until it is available on the K Drive.
***Keep in mind, that if any changes are made***

AET-01080605

***to the calculator after it is moved to the K Drive, you will not have the most recent version as the only place it will be updated is on the K drive.***

  << File: AWP_Calc_052302.xls >>  << File: awppopup4.doc >>
Thank you!

Wendy Andrews
Learning and Performance
National Customer Operations
614-933-8214  Phone
614-933-7517  Fax

CONFIDENTIAL

AET-01080606

# EXHIBIT G

# SURGERY (SPECIALIST) – POLICY/OVERVIEW

- **Policy/Overview**
- **Definitions/Glossary**
- **Product Applicability**
- **Coverage Details**
  - Covered
  - Not Covered
  - Assistants  at Surgery
    - ✱ Covered
    - ✱ Reimbursement  - HMO Only
    - ✱ Reimbursement - Traditional Only
    - ✱ Not covered
    - ✱ Non-Physician Assistants Billing for Assisting at Surgery
    - ✱ Registered Nurse, Physician Assistant and Other Non-Physician Billing for Assisting at Surgery
    - ✱ Plan Sponsor Exceptions – Traditional Only
    - ✱ Provider Exceptions – Traditional Only
    - ✱ State Mandates and Network Exceptions – All Products
    - ✱ Team Surgery
  - Bariatric Surgery
  - Bilateral/Multiple Procedures
  - Breast Surgery
    - ✱ Covered
    - ✱ Not covered
    - ✱ Breast Needle Biopsy
    - ✱ Nipple Tattooing
  - Circumcision
    - ✱ Covered
    - ✱ Circumcision by a rabbi
  - Concurrent Procedures
  - Dermatology - HMO Only
  - Modifiers
  - Office-Based Surgical Facilities
  - Orthopedic Surgery – HMO Only
  - Prompt Repair – Traditional Only
  - Scar Revision – Traditional Only
  - Second Surgical Opinion
    - ✱ HMO Only
    - ✱ Traditional Only
      - Covered
      - SSO Penalty Waiver (By Administration)
      - Incentive Second Surgical Opinion Benefit
      - Second Surgical Opinion in Practice with the Operating Physician
      - Payment
      - Third Surgical Opinion
      - Standard Incentive Second Opinion Benefit CCI Wording
      - Standard List of Procedures Requiring a Second Opinion
  - Standby Surgical/Physician Teams – Traditional Only
  - Sterilization
- **Determining Plan Coverage Details**
- **Product Options/Benefit Enhancements**
- **Training Resources/Powertools/JobAids**
- **Related Information**

## SURGERY (SPECIALIST) – POLICY/OVERVIEW

Back To Top ⬆

## POLICY/OVERVIEW

This policy provides information and coverage determinations related to surgical procedures, rules for benefiting assistant surgeons, and other surgical related procedures or entities.

Back To Top ⬆

CONFIDENTIAL

AET-00297023

## DEFINITIONS/GLOSSARY

| Term | Definition |
|------|------------|
| Assistant Surgeon | An assistant surgeon is a medical professional trained to assist in surgery and in the pre-operative and post-operative periods under the supervision of a licensed physician.  An assistant surgeon's charge is identified by the inclusion of modifier-80, -81, -82, or –AS, after the surgical CPT code. |
| Bariatric Surgery | Bariatric surgery is the treatment for morbid obesity. |
| Co-surgeon | A co-surgeon is a medical professional who performs a specialized part of the surgery working in conjunction with the primary surgeon.  Co-surgeons are identified by modifier 62. |
| Second Surgical Opinion (SSO) | A second surgical opinion is a consultation by a physician other than the first physician who recommended and proposed to perform surgery.  It usually consists of:<br>☒ A physical examination of the insured family member.<br>☒ X-ray, lab tests and other diagnostic procedures.<br>A written report by the physician rendering the opinion. |
| Surgical Team | Team surgery is when highly complex procedures (requiring the concomitant services of several physicians, often of different specialties, plus other highly skilled, specially trained personnel, various types of complex equipment) are carried out under the 'surgical team' concept. Team surgeries are indicated by modifier 66. |

Back To Top ⏎

## PRODUCT APPLICABILITY

| Traditional Products | HMO Products | Applies to |
|----------------------|--------------|------------|
| ALL Traditional Products | ALL HMO Products | Fully Insured<br>Self Insured |

Back To Top ⏎

## COVERAGE DETAILS

### COVERED

**Modified – Effective 04/22/08**
☒ Surgical benefits provide coverage for surgical services and supplies.
☒ Consider charges for the following services and supplies (except when denied by ClaimCheck, ClaimsXten or via the AST) as part of the operating physician's charge for performing surgery:
☒ Administration of an anesthetic
☒ Charges made by a hospital on behalf of a salaried staff physician as though the salaried staff physician made the charges himself, unless excluded by the plan sponsor
☒ Necessary and related preoperative care (usually one visit immediately before surgery
☒ Necessary medical and surgical supplies such as ace bandages, casts, etc. Note: Refer to ClaimsXten (CXT) Policy/Overview for reimbursement guidelines associated with HCPCS supply codes that begin with "A".
☒ Post-operative care
☒ Post-operative care provided by a physician other than the operating surgeon (when circumstances make it impossible for the operating surgeon to provide post-op care,), and
☒ Special surgical equipment used in an office operating room such as instrument trays, disposable blades and needles, etc.
☒ Facility fees billed by a physician for use of an office operating room."

*Note: until standard coding and guidelines are established for facility fees in the office, charges should be combined with the surgical procedure and allowed up to the R & C or negotiated rate for the surgery.

CONFIDENTIAL

AET-00297024

Cover charges for improvement in function of a body part if the surgery:
- Eliminates or substantially reduces an impairment causing pain or discomfort to a body part or a body area resulting from a disease, injury or previous surgery
- Partly or fully restores or improves the physiological function, passive function or normal action of an organ, a tissue or a body part, or
- Restores a congenital physical impairment, such as harelip or club foot. In the case of harelip surgery (cheiloplasty) benefits can be paid for the initial repair of the harelip and subsequent revisions in cases where any or all of the procedures are performed on children who are covered as dependents. These operations constitute a multiple stage procedure that is necessary to correct this particular abnormality.

Surgical benefits are payable for surgical procedures performed to insert radium or radioactive isotopes into body tissue or orifice for treatment of certain malignant and/or non-malignant conditions.


## NOT COVERED

Charges for improvement in function of a body part are not covered if the surgery:
- Is cosmetic in nature
- Repairs body changes associated with the aging process, or
- Repairs congenital deformities of a generalized nature not causing a restorable loss of function.

**Notes:**
- Send cases in which there is a question as to whether surgery is "cosmetic" or for the correction of impairment of bodily function to the Medical Director. Include the appropriate documentation (history of accidental injury, copy of hospital admission, history and physical and the operative report. For outpatient surgery, submit a copy of the preoperative history notes.)
- **Traditional Only** - Cosmetic surgery denials should be based on the cosmetic surgery provision, limitation or exclusion in the policy. If applicable, use Action Code 083 for Non-CCP plans or Action Code 768 for CCP plans. Exception: Use Action code 451 for NY plans with CCP language.
- An autopsy performed for clinical research, provider protection, public health, criminal or other investigations, family comfort or for any other reason is not covered.


## ASSISTANTS AT SURGERY


## COVERED

**Modified – Effective 09/12/08**
Aetna extends coverage for surgical assistance provided by physicians based on the following eligibility criteria:
- Aetna covers only one physician surgical assistant, even if more than one assistant participates in a procedure. **Traditional Exception:** Effective with date of service 02/01/08, Aetna allows coverage for more than one assistant for California providers billing for cardiovascular operative procedures which require extracorporeal bypass. Refer to the embedded spreadsheet in deviation 1240 at http://aetnet.aetna.com/medOps/contentMgtAssets/documents/Policy_Support/Deviations/1240%20-%20CA2nd%20Asst%20CardiacSx.doc (Aetna Affiliate Access) for a list of procedures for which Aetna allows more than one assistant surgeon in California.
- 

Aetna bases the eligibility determination for an assistant surgeon primarily on the rules of the American College of Surgeons, the American Medical Association, and the Centers for Medicare and Medicaid.. The Clinical Claim Review considers requests for exceptions on a case-by-case basis.

The following URL provides a complete list of Aetna's determinations for covering/not covering assistant surgeons : http://aetnet.aetna.com/medOps/PP/Policy_Support/coding_references/assistant_surgeon_list.html   (Aetna Affiliate Access)

Refer to ClaimsXten (CXT) Policy/Overview: Assistant Surgeon Eligibility Rule B044 (and Rule B019 for non-participating Medicare Advantage claims) for additional coverage guidelines for surgical procedures billed by an Assistant Surgeon.


## REIMBURSEMENT - HMO ONLY
**Modified – Effective 10/06/09**

| Modifier | Reimbursement Percentage |
|---|---|
| AS | 12% of the base fee (negotiated or R&C) for the surgical CPT code.<br><br>Refer to Non-Physician Assistants Billing for Assisting at Surgery for coverage. |
| 80 (assistant surgeon) | 20% of the base fee (negotiated or R&C) for the surgical CPT code.<br><br>**Note:** For non-physician assistant surgeons billing with modifier 80, apply the percentage for modifier AS. |
| 81 (minimum surgical assistant services) | 16% of the base fee (negotiated or R&C) for the surgical CPT code.<br><br>For additional information, refer to Modifiers - Medical Coding - Claim Processing - Codes |

CONFIDENTIAL

AET-00297025

| | Note: For non-physician assistant surgeons billing with modifier 81, apply the percentage for modifier AS. |
|---|---|
| 82 (assistant surgeon when a qualified resident surgeon is not available) | 20% of the base fee (negotiated or R&C) for the surgical CPT code.<br><br>Note: For non-physician assistant surgeons billing with modifier 82, apply the percentage for modifier AS. |

This concludes the section that applies to HMO Only.

## REIMBURSEMENT - TRADITIONAL ONLY
Modified – Effective 07/28/09

| Modifier | Reimbursement Percentage |
|---|---|
| AS | ☒ Effective with dates of service 01/01/07 and after, allow 12% of the base fee (negotiated or R&C) for the surgical CPT code.<br>☒ For dates of service prior to 01/01/07, allow 20% of the base fee (negotiated or R&C) for the surgical CPT code.<br>☒ For a list of other state mandates and reimbursement instructions for modifier AS, refer to State and Network Exceptions - all Products. |
| 80 (assistant surgeon) | 20% of the base fee (negotiated or R&C) for the surgical CPT code.<br><br>Note: For non-physician assistant surgeons billing with modifier 80, apply the percentage for modifier AS. |
| 81 (minimum surgical assistant services) | 16% of the base fee (negotiated or R&C) for the surgical CPT code.<br><br>Note: For non-physician assistant surgeons billing with modifier 81, apply the percentage for modifier AS. |
| 82 (assistant surgeon when a qualified resident surgeon is not available) | 20% of the base fee (negotiated or R&C) for the surgical CPT code.<br><br>Note: For non-physician assistant surgeons billing with modifier 82, apply the percentage for modifier AS. |

Refer to ClaimsXten (CXT) Policy/Overview for reimbursement guidelines associated with multiple surgical procedures billed by assistant surgeons.

This concludes the section that applies to Traditional Only

## NOT COVERED

Modified - Effective 09/15/08

ClaimsXten determines if the assistant surgeon is medically necessary for the service(s) performed.

Do not provide benefits for an assistant surgeon when the surgical procedure:
☒ does not require a technical assistant
☒ does not qualify for reimbursement
☒ is performed when the patient is not confined as a hospital inpatient (applies to Basic plans only), and
☒ is performed in a hospital where surgical assistance is routinely available as a service provided by a hospital resident, intern or house officer.

Even though it may be a requirement at certain facilities to have a provider on standby, these providers do not render actual patient care during this timeframe; therefore, standby services are not considered to be services rendered to the patient and are not covered.

## NON-PHYSICIAN ASSISTANTS BILLING FOR ASSISTING AT SURGERY

Modified - Effective 09/15/08

A professional who is not a physician may have assisted at the surgery. Professionals who are not physicians, such as nurses and physician assistants are standardly non-covered, unless there is a deviation for
☒ Customer,
☒ state mandate, or network exception.
Denial is based on the fact that they are not recognized as legally qualified physicians or as assistant surgeons. A nurse or a physician assistant can assist at surgery, but they cannot be assistant surgeons because only physicians can be surgeons.

**Note:  HMO Only** - For Dates of service prior to 01/01/2007, non-physician assistants are not covered unless:
- there is a state that mandates coverage, or
- there is a market that is contracted for the non-physician type.
- Effective with dates of service 01/01/2007 and after, allow non-physician assistants when they meet the criteria listed below.

**This concludes the portion that applies to HMO Only**

**All Products**
Cover charges for the services of a health care provider who is not recognized as a legally qualified physician only when ALL of the following criteria are met:
- the non-recognized provider is employed by and working under the direct supervision of a recognized hospital, a health care facility or a legally qualified physician,
- the non-recognized provider is licensed and qualified by professional credentials or degree to provide the services,
- the services are prescribed or recommended by the Primary Care Physician, a participating specialist or, under non-network plans, a legally qualified physician,
- the services are covered under the contract, and
- the charges are billed by the employer.

Non-Physicians are covered to assist at surgery as long as:
- they meet the criteria above, or
- there is a state mandate, or
- there is a contract exception, or
- there is a plan sponsor exception listed in CCI/BENLVL.

Do not cover charges made for the services of a non-physician's assistant if they are billing on their own behalf, except if there is a state mandate, network, or customer exception.

Refer to ClaimsXten (CXT) Policy/Overview:  Assistant Surgeon Eligibility Rule B044 (and Rule B019 for non-participating Medicare Advantage claims) for additional coverage guidelines for surgical procedures billed by an Assistant Surgeon.

## REGISTERED NURSE, PHYSICIAN ASSISTANT AND OTHER NON-PHYSICIAN BILLING FOR ASSISTING AT SURGERY

A non-physician may have assisted at the surgery. Non-physicians include:

| Specialty | Specialty Code |
|---|---|
| Certified surgical assistant | CSA |
| Certified surgical registered nurse | CSRN |
| Certified surgical technicians | CST |
| Non-physician surgical assistant | NSA |
| Nurse practitioner | RNFA / NP |
| Physician assistant | PA / PAS |
| Registered nurse | RN |
| Registered nurse – first assistant | RFA |

## PLAN SPONSOR EXCEPTIONS – TRADITIONAL ONLY

When a plan excludes the use of ICHK for bundling purposes, it is still permissible to use ICHK to determine what procedures are primary, secondary, tertiary, etc.
- When a plan indicates to use a different percentage to allow for assistant surgeon charges, follow the plan sponsor rules outlined for reimbursing the assistant surgeon.
- When a plan has an exception to allow the use of a non-physician assistant surgeon, follow the plan sponsor exception.

## PROVIDER EXCEPTIONS – TRADITIONAL ONLY

Effective 11/09/04, a deviation to Aetna's assistant surgeon policy for Children's Urology Associates (TIN 880382275) was approved. Providers billing under TIN# 880382272 are permitted to bill assistant surgeon charges for the following codes:

| Codes | | |
|---|---|---|
| 14040 | 15240 | 15574 |
| 49320 | 49495 | 49496 |
| 49500 | 49505 | 49585 |
| 53424 | 54340 | 54520 |
| 54530 | 54640 | |

**Exceptions TIN# 880382272**

| Provider Name | PVN# | PIN# |
|---|---|---|
| Children's Urology Associates | 2111952 | 4620672 |

CONFIDENTIAL

AET-00297027

| Clare E. Close MD | 3362675 | 7279479 |
|---|---|---|
| Waldo C. Feng MD | 3362675 | 7279479 |
| | | |
| George S. Ganesan MD | 2111979 | 4297037 |
| | | |
| James C. Plaire MD | 2360630 | 7720087 |

## STATE MANDATES AND NETWORK EXCEPTIONS – ALL PRODUCTS
Modified – Effective 04/21/09

Refer to the chart below for state-specific mandates and network exceptions.

| State | HMO Impact | Traditional Impact | Details |
|---|---|---|---|
| Alaska | X | X | Effective January 1, 2003, the state of Alaska requires coverage for services rendered by a Physician Assistant (PA). The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply to Physician Assistants. Allow 12% of the surgical fee allowance based on the contracted fee or UCR. <br><br> Refer to State Legislation for additional information. |
| Arizona | X | X | The Arizona networks contracts and reimburses non-physician surgical assistants to assist at surgery. This includes CSRN, CST, RNFA, PA, RN, NSA and CSA. <br><br> The services must be in connection with a covered surgical procedure. <br><br> Reimbursement for participating providers is contracted at 10% of the surgical fee allowance based on contracted fee or UCR. Nonparticipating providers are reimbursed 12% of UCR. |
| California | X | | Effective 9/1/1999, the state of California enacted the Scope of Basic Health Services - Provider Recognition mandate that if the basic health plan covers the condition, the insurer may not exclude a category of provider who is licensed to provide services for that condition, and is acting within the scope of practice, unless the services would not meet the insurer's standards. This would include services rendered and billed by any of the provider types here. Allow the rate allowed for physicians assisting at surgery. |
| Colorado | X | X | The Colorado networks contracts and reimburses non-physician surgical assistants to assist at surgery. This includes CSRN, CST, RNFA, PA, RN, NSA and CSA. The services must be in connection with a covered surgical procedure. <br><br> Effective February 1, 2004 reimbursement for participating providers is contracted at 20% of the surgical fee allowance based on contracted fee or UCR. Non-participating providers are reimbursed at 12% of UCR. <br><br> Effective June 2, 2006, members are to be held harmless when out-of-network surgical assistants provide care at a network facility. Refer to State Legislation for additional information. |
| Connecticut | X | X | Effective July 1, 1995, the state of Connecticut requires coverage for services rendered and billed by a Physician Assistant (PA) or a Certified Nurse Practitioner, this includes CSRN, NP RNFA, RN and RFA. The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply. Allow 12% of the surgical fee allowance based on the contracted fee or UCR. <br><br> Refer to State legislation for further information. |
| Delaware | X | X | Effective January 1, 2000, the state of Delaware requires coverage for services of assistants at surgery in the same manner as Medicare Part B. Whether contracted or not, these providers are eligible for reimbursement at 16% of the surgical fee allowance based on the contracted fee or UCR. HMO Only - Allow the rate with remit code P07. <br><br> Refer to State Legislation for further information. |
| Florida | X | X | Effective October 1, 1997, the state of Florida requires coverage for services rendered by a Physician Assistant (PA) or a Registered Nurse First Assistant (RNFA). The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply to Physician Assistants and Registered Nurse First Assistants. Allow 12% of the surgical fee allowance based on the contracted fee or UCR. <br><br> Refer to State Legislation for further information. |
| Georgia | X | X | Effective July 1, 2001, the state of Georgia requires coverage for services rendered by a Registered Nurse First Assistant (RNFA). The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply to Registered Nurse First Assistants. Allow 12% of the surgical fee allowance based on the contracted fee <br><br> Refer to State legislation for further information. |
| Idaho | X | X | Effective 07/01/2004, Idaho law requires insurers to provide payment or reimbursement for professional services performed by Nurse Practitioners (NP). Refer to State Legislation for additional information. |
| Illinois | X | X | Illinois state law requires coverage for services rendered by non-physician surgical assistants. This includes CSRN, CST, RNFA, PA, RN, NSA and CSA. The services must be in connection with a covered surgical procedure. Services are billed under the individual provider's TIN. Allow |

CONFIDENTIAL

AET-00297028

Surgery (Specialist) – Policy/Overview

| | | | |
|---|---|---|---|
| | | | 12% of the surgical fee allowance based on the contracted fee or UCR.  The services are identified by a non-physician type specialty code. Example – PAST or NSA. |
| Iowa | | X | Effective October 28, 2005, Iowa rental networks contract and reimburse participating physician assistants (PA) to assist at surgery. The services must be in connection with a covered surgical procedure.  Normal processing guidelines for assistant surgeons apply. Allow 20% of the surgical fee allowance based on the contracted rate or UCR.  Concurrent rules (20/10/5) apply for multiple surgical procedures. |
| Kansas | X | X | Effective 07/05/2001, the state of Kansas requires recognition of Physician Assistants and Nurse Practitioners for services which are within the scope of their license and are covered by the plan.  Allow 12% of the surgical fee allowance based on the contracted fee or UCR for physicians assisting at surgery.  Concurrent rules (12/6/3) apply for multiple surgical procedures.<br><br>Refer to State Legislation for additional information. |
| Kentucky | X | X | ▪ Effective July 15, 2000, the state of Kentucky requires coverage for services rendered and billed by a Certified Surgical Assistant for surgical assistance of interoperative surgical care.<br><br>▪ Effective July 15, 2001 the state of Kentucky amended the existing law to also require coverage for services rendered and billed by a Physician Assistant for surgical assistance of interoperative surgical care.<br><br>▪ The services must be in connection with a covered surgical procedure.  Normal processing guidelines for assistant surgeons apply to surgical assistants licensed in Kentucky.  Allow 12% of the surgical fee allowance based on the contracted fee or UCR.<br><br>▪ HMO Only - Allow the rate with remit code P07.<br>Refer to State Legislation for further information. |
| Louisiana | X | X | Effective January 1, 2004, the state of Louisiana allows coverage for services rendered and billed by a Registered Nurse First Assistant.  The services must be in connection with a covered surgical procedure.  Normal processing guidelines for assistant surgeons apply to Registered Nurse First Assistants. Allow 12% of the surgical fee allowance based on the contracted fee or UCR.<br>Refer to State Legislation for further information. |
| Maine | X | X | Effective January 1, 2004, the state of Maine requires coverage for services rendered and billed by a Registered Nurse First Assistant (RNFA).  The services must be in connection with a covered surgical procedure.  Normal processing guidelines for assistant surgeons apply to Registered Nurse First Assistant.  Allow 12% of the surgical fee allowance based on the contracted fee or UCR.<br>Refer to State Legislation for further information. |
| Montana | | X | Effective August 1, 2005, the Montana rental networks (network ids – 2958 and 2959) contract and reimburse participating non-physician surgical assistants to assist at surgery. This includes CSRN, CST, RNFA, PA, NP, RN, NSA and CSA.  The services must be in connection with a covered surgical procedure.  Normal processing guidelines for assistant surgeons apply. Allow 12% of the surgical fee allowance based on contracted fee or UCR.  Non participating providers are reimbursed 12% of UCR. |
| Nebraska | | X | Effective 01/01/2007, a deviation has been put in place for the state of Nebraska to allow coverage for Physician Assistants.  Allow 20% of the surgical fee allowance based on contracted fee or UCR.  For concurrent procedures, allow 20/10/5. |
| Nevada | X | X | Effective October 1, 2005, the state of Nevada requires coverage for services rendered and billed by certain provider types. This includes CSRN, CST, PAS, NSA, RFA, NP and RN. The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply. Allow 12% of the surgical fee allowance based on the contracted fee or UCR.<br>Refer to State Legislation for further information. |
| New Jersey | X | X | Effective January 22, 1993, the state of New Jersey requires coverage for services rendered and billed by a Nurse Practitioner, this includes NP, RN, RNFA. The services must be in connection with a covered surgical procedure.  Normal processing guidelines for assistant surgeons apply.  Allow 12% of the surgical fee allowance based on the contracted fee or UCR.<br>Refer to State Legislation for further information. |
| New Mexico | | X | Effective 05/14/08, the state of New Mexico requires coverage for services rendered and billed by a Nurse Practitioner (PA, PAS) and Certified Nurse Practitioners (CSRN, NP RNFA, RN and RFA).  The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply. Allow 12% of the surgical fee allowance based on the contracted fee or UCR.<br>Refer to State Legislation for further information. |
| Oklahoma | | X | ▪ Effective November 11, 1999 the state of Oklahoma Freedom of Choice Act requires coverage for services rendered and bill by Physician Assistant (PA, PAS). The services must be in connection with a covered surgical procedure.  Normal processing guidelines for assistant surgeons apply. Allow 12% of the surgical fee allowance based on the contracted fee or UCR.<br><br>▪ Effective January 1, 2006, the Oklahoma networks contract and reimburse a non-physician assistant, Joni A. Javellas, RNFA – EPDB PIN 7419351, to assist at surgery. This provider bills with modifier AS. Services must be in connection with a covered surgical procedure. Allow 12% of the surgical fee allowance based on the contracted fee or UCR.<br>Refer to State Legislation for further information. |

CONFIDENTIAL                                                                                                      AET-00297029

| | | | |
|---|---|---|---|
| Oregon | X | X | ▪ Effective 01/01/06, the state of Oregon requires coverage for services rendered and billed by a Registered Nurse First Assistant (RNFA). The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply. Allow 20% of the surgical fee allowance based on the contracted fee or UCR. |
| | | | ▪ **Traditional Only** - Effective July 1, 2005, the Oregon rental networks contract and reimburse participating non-physician surgical assistants to assist at surgery. This includes CSRN, CST, RNFA, PA, RN, NP, NSA and CSA. The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply. Allow 20/10/5% of the surgical fee allowance based on contracted fee or UCR. |
| | | | Refer to State Legislation for further information. |
| South Dakota | X | X | ▪ Effective 07/01/80, the state of South Dakota requires coverage for services rendered and billed by a Nurse Practitioner or a Physician Assistant, this includes NP, PA, PAS. The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply. Allow 12% of the surgical fee allowance based on contracted fee or UCR |
| | | | ▪ **Traditional Only:** Effective 03/01/2005, a deviation to Aetna's assistant surgeon policy for rental networks 2953 and 2955 was approved to allow 100% of the negotiated fee with no further reduction. |
| | | | Refer to State Legislation for further information. |
| Texas | X | X | ▪ The state of Texas requires insurers to add surgical assistants to the existing list of covered recognized practitioners. |
| | | | ▪ The state of Texas requires coverage for services rendered by a Physician Assistant or an Advanced Practice Nurse. The term Advanced Practice Nurse includes a Nurse Practitioner. The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply. Allow 12% of the surgical fee allowance based on the contracted fee or UCR. |
| | | | ▪ Texas networks contract and reimburse non-physician surgical assistants to assist at surgery. The services must be in connection with a covered surgical procedure. This includes CSRN, CST, RNFA, PA, RN, NSA and CSA. Allow 12% of the surgical fee allowance based on the contracted fee or UCR. |
| | | | Refer to State Legislation for further information. |
| Utah | | X | **Traditional Only:** Effective retroactive to date of service 01/01/07, an approved deviation applies to the state of Utah. Allow 12% of the surgical fee allowance based on the contracted fee or UCR for all non-physician assistants. |
| Washington | X | X | Effective January 1, 1996, the state of Washington enacted the Every Category of Health Care Providers mandate. This mandate requires that if the basic health plan covers the condition, the insurer may not exclude a category of provider who is licensed to provide services for that condition, and is acting within the scope of practice, unless the services would not meet the insurer's standards. This would include services rendered and billed by any of the provider types listed under Registered Nurse, Physician Assistant and Other Non-Physician Billing for Assisting at Surgery. Allow the rate we would allow for physicians assisting at surgery. |
| Wyoming | | X | ▪ Effective 12/01/05, the Wyoming rental networks contract and reimburse participating non-physician surgical assistants to assist at surgery. This includes CSRN, CST, RNFA, PA, NP, RN, NSA and CSA. The services must be in connection with a covered surgical procedure. Normal processing guidelines for assistant surgeons apply. Allow 12% of the surgical fee allowance based on contracted fee or UCR. Non participating providers are reimbursed 12% of UCR. |
| | | | ▪ Effective 03/01/2005, a deviation to Aetna's assistant surgeon policy for rental networks 2757 and 2856 was approved to allow 100% of the negotiated fee with no further reduction. |

Reference: For additional information regarding specific legislation, refer to Legislation by Topic - Recognized Practitioner.


**TEAM SURGERY**

Modifier 66 is reported when highly complex procedures (requiring the simultaneous services of several physicians, often of different specialties, plus other highly skilled, specially trained personnel, various types of complex equipment) are carried out under the "surgical team" concept.

The Clinical Claim Review Unit reviews claims billed with modifier 66 (surgical team) to determine the appropriateness of the modifier and reimbursement of each team member.


**BARIATRIC SURGERY**

**Modified - Effective 11/17/08**
Effective 01/01/05 for new and renewing business, bariatric surgery is no longer a standard covered benefit, subject to state filing approvals.
▪ If this surgery is excluded from coverage under the plan, it must be listed in the CCI/BENLVL as such.
▪ For some market segments, and where approved, plan sponsors are offered a buy-up benefit.
▪ As groups renew, they are encouraged to move to either the not covered benefit or to purchase one of the buy-up options. In most states, the buy-up option is only available in-network.

CONFIDENTIAL

AET-00297030

- For states where there is a requirement or mandate, and for existing groups prior to their renewal, bariatric surgery continues to be covered as an "assumed" benefit. When the benefit is assumed, no bariatric benefit line will appear in BENLVL.
- Aetna considers medically necessary, surgery to correct complications from bariatric surgery. Claims for complications of bariatric surgery are handled the same as claims for any other service. There is no need to refer to CCR unless the codes billed hit a trigger for CCR review.

**Note:** Refer to the <u>Obesity and Weight Reduction Policy</u> for information on coverage of nutritional counseling and weight reduction programs.

## BILATERAL/MULTIPLE PROCEDURES

One of the following modifiers may be submitted with a surgery charge, indicating it is a bilateral or multiple procedure.

| Modifier | Claim Type |
|----------|--------------------|
| 50 | Bilateral Procedure |
| 51 | Multiple procedures |

Claims submitted with these modifiers are adjudicated per ClaimCheck guidelines.

## BREAST SURGERY

### COVERED
**Modified – Effective 02/03/09**
Aetna provides coverage for breast reconstructive surgery after mastectomy for breast cancer.
- Covered procedures include:
- Insertion of a breast prosthesis,
- Nipple and areolar reconstruction,
- Use of tissue expanders, or
- Reconstruction with a transverse rectus abdominis myocutaneous flap (TRAM) or similar procedure,
- Reduction (or some cases augmentation) mammoplasty and related reconstructive procedures on the unaffected side for symmetry, and
- Tattooing of the nipple area.

**Removal of Breast Implants**
Aetna provides coverage for the removal of breast implants not cancer related if the implants are being removed due to leaking or defective implants.

**Breast Reduction Surgery**
Aetna covers breast reduction surgery for non-cosmetic indications. Coverage may be provided when certain criteria are met. Coverage of breast reduction surgery requires medical review.

### NOT COVERED

The services listed below are cosmetic in nature and are not covered unless performed due to medical necessity and precertified by Aetna:
- Breast enlargement
- Breast reconstruction
- Breast reduction
- Mammoplasty
- Treatment of gynecomastia

### BREAST NEEDLE BIOPSY

Stereotactic localization for breast needle biopsy, code 77031, is covered when performed in the surgeon's or OB/GYN's office in conjunction with the needle biopsy.

### NIPPLE TATTOOING

CPT Codes 11920 and 11921 (correct skin color defects) are covered at the appropriate rates, when the services are related, or there is a history of breast reconstruction.

CONFIDENTIAL                                                                      AET-00297031

# CIRCUMCISION

## COVERED

Circumcision is covered regardless of the patient's age unless CCI/BENLVL says differently.

**HMO Only** - If circumcision is done prior to discharge from the hospital nursery, it is covered under the mother's hospital referral for delivery. If done after discharge from the hospital, a referral from the PCP to a participating physician is necessary.

## CIRCUMCISION BY A RABBI

- ¤ **HMO Only** - A person who performs religious circumcisions are not covered. A Mohel (pronounced Moyal) would be covered if they are a licensed physician.

- ¤ **Traditional Only** - When circumcision is covered under an Aetna health plan and the procedure is performed by a certified Mohel, cover the Mohel's charge for the circumcision up to negotiated or prevailing fee for the surgery. Do not cover the Mohel's charge for the ritual itself.

- ¤ **Traditional Note:** A circumcision by a Rabbi may be covered at the preferred benefit level under an MC plan without PCP referral, provided that the newborn confinement is/was payable at the preferred benefit level. This is because a circumcision is normally performed while the newborn is still confined in the hospital and there are no participating Rabbis in our networks. Although we normally cover billed charges when reimbursing non-participating providers at the preferred benefit level, we will still subject circumcisions by a Rabbi to a determination of Reasonable and Customary or Recognized Charge for the surgical procedure, as applicable, due to the fact that we are not requiring a referral and the possibility that a portion of the charge may be for the ritual.

# CONCURRENT PROCEDURES

Refer to ClaimsXten (CXT) Policy/Overview for coverage guidelines related to concurrent procedures.

# DERMATOLOGY - HMO ONLY

**Alopecia Evaluation**
An alopecia evaluation is a covered service, upon referral from the PCP.

**Covered Treatment**
Intralesional injections with steroids or other systemic therapy.

**Treatment Not Covered**
The topical use of Minoxidil (Rogaine) or Finasteride (Propecia) to treat alopecia are not covered. This is because both Rogaine and Propecia are hair growth stimulants without immunomodulating properties and are used mainly for the treatment of androgenetic alopecia (male pattern baldness).

**This concludes the HMO-only information.**

# MODIFIERS

Surgery charges can also be billed with modifiers to signify various levels of complexity. The Modifier policy contains a listing of all current modifiers and associated handling instructions.

# OFFICE-BASED SURGICAL FACILITIES

Surgery performed in the physician's office is handled as any other surgical procedure outlined in this document, including the application of AST and ClaimCheck. Click here for coverage of surgical services, supplies and facility fees.

# ORTHOPEDIC SURGERY – HMO ONLY

CONFIDENTIAL

AET-00297032

**Fracture Care**
Fracture care is covered using either the referral process or the consult and treat referral process.

**Non-Covered Services**
Non-covered supplies include:
- Arch Supports,
- Orthopedic Appliances, and
- Orthotic Shoe Inserts.

The number of follow-up days is determined by the CPT code indicating the type of fracture.

**This concludes the HMO-only information.**

## PROMPT REPAIR – TRADITIONAL ONLY

Benefits are not payable for plastic, reconstructive or cosmetic surgery or other services and supplies which improve, alter or enhance appearance whether or not for psychological or emotional reasons; except to the extent needed to:
- Improve the function of a part of the body, other than the teeth or structures that support the teeth that is malformed:
  - as the result of a severe birth defect, such as harelip or webbed fingers or toes; or
  - as a direct result of a disease or surgery performed to treat disease or injury.
- Repair an injury which occurs while the person is covered under an Aetna Health Plan of the same employer or plan sponsor; but only if the surgery is performed in the calendar year of the accident which causes the injury or in the next calendar year.

**Exception:** There are situations where it is appropriate to waive this requirement such as cases when repair of an injury must be postponed until maximum recovery from injury occurs.  Examples: severe burns, deep lacerations or staged scar revisions

**HIPAA Note**
When HIPAA applies to a specific group plan, the requirement that the injury must occur while the person is covered under the plan does not apply and benefits should not be denied on this basis.

Prompt repair does not include charges incurred to treat an injury after coverage terminates.

Medical reports documenting the patient's clinical course and previous treatment should be sent to the Regional Medical Director.

## SCAR REVISION – TRADITIONAL ONLY

Scar revision surgery is considered medically necessary and covered when the scar revision surgery:
- corrects a functional impairment resulting from an accidental injury;
- corrects a functional impairment resulting from previous surgery;
- does not correct a functional impairment but it is postponed:
  - for up to one year after single stage surgery or
  - for up to one year after the final stage of multiple stage surgery, and
  - then only when the previous surgery was required to treat disease or injury;
    OR
- does not correct a functional impairment but it is postponed after an accidental injury or surgery until maximum recovery occurs or, for a child, until growth has stopped.

These criteria apply to scar revision surgery performed after repair of an injury that occurs while the person is a covered family member. However, the scar revision surgery does not have to be performed in the calendar year of the accident causing the injury or the next calendar year. See Prompt Repair or a detailed description of the cosmetic surgery exclusion, including the time limitation for cosmetic repair of an accidental injury).

**HIPAA Note:**
When HIPAA applies to a specific group plan, the requirement that the injury must occur while the person is covered under the plan does not apply and benefits should not be denied on this basis.

**This concludes the Traditional-only information.**

## SECOND SURGICAL OPINION

### HMO ONLY

Information is located in the Second & Third Opinion topic.

**This concludes the HMO-only information.**

### TRADITIONAL ONLY

**COVERED**

CONFIDENTIAL

AET-00297033

Cover physician's exam and necessary x-ray, lab or other diagnostic procedures for a second opinion on the necessity or advisability of surgery (including oral surgery) that is:

- Recommended by the physician who performs the surgery as long as it is medically necessary and covered under the plan;
- Non-emergency in nature (the procedure can be postponed without undue risk to the patient).

The second (or third) surgical opinions must:

- Be performed by a physician who is a board certified specialist; and
- Take place before the date the proposed surgery is scheduled to be done.

Even when a plan does not include a separate second surgical opinion benefit, cover charges for necessary physicians' services as well as any x-ray and laboratory tests required for a second surgical opinion, but only if the proposed surgical procedure is covered under the plan (e.g., it is not cosmetic or considered investigational for treatment of the disease or injury diagnosed).

## SSO PENALTY WAIVER (BY ADMINISTRATION)

Waive the Second Surgical Opinion (fixed dollar or 50%) benefit penalty when:

- The patient would have to travel more than 50 miles one way to obtain a second opinion,
- The patient's physical condition limits his/her ability to travel,
- A procedure that requires a second opinion is performed following an emergency hospital admission and the surgery is directly related to the symptoms which caused the emergency situation and is performed within 48 hours of the emergency admission,
- A procedure that requires a second opinion is performed following an elective admission and the surgery is directly related to the sudden onset of acute symptoms severe enough to have warranted immediate hospital admission had the patient not already been confined,  or
- Medicare is primary.

## INCENTIVE SECOND SURGICAL OPINION BENEFIT

If a surgical procedure listed below is to be performed on a non-emergency basis and the plan covers a second opinion, the member should obtain a second opinion before the surgery. The second opinion must be from a physician who is not associated with or in practice with the physician who first recommended and proposed to perform the surgery.

**Note:** The list of surgical procedures for the Incentive Second Surgical Opinion Benefit can vary among policyholders. Refer to CCI any variation of the standard list.

If these requirements are not met, benefits otherwise payable for the surgery are paid at 50%, after the deductible.

- Adenoidectomy
- Back or Disc Surgery
- Bunionectomy
- Cholecystectomy
- Coronary artery bypass
- Dilation and curettage
- Excision of cataracts
- Excision and ligation of varicose veins
- Hemorrhoidectomy
- Hernia (inguinal) repair
- Hysterectomy
- Knee surgery
- Mastectomy
- Nasal reconstructive surgery
- Removal of prostate
- Tonsillectomy

When a major surgical procedure (not requiring a second surgical opinion) is performed in conjunction with another surgical procedure requiring a second surgical opinion:

- A second surgical opinion is not required, and
- The benefit penalty does not apply.

The above rule applies whether or not the surgery is performed on an emergency basis.

## SECOND SURGICAL OPINION IN PRACTICE WITH THE OPERATING PHYSICIAN

The second or third opinion specialist is considered to be in practice with the operating surgeon when they:

- Have the same Taxpayer Identification Number (TIN)
- Do not have the same TIN but share the same office space as indicated by either of the following:
    - Their names are listed together on office letterhead or stationery, or
    - Their addresses are exactly the same
- Do not have the same TIN and do not share the same address, but are part of the same major clinic/satellite association.

Exceptions:

- Mayo Clinic-the staff comprises the vast majority of physicians in the Rochester, MN area, therefore, second opinion elsewhere is not feasible.
- Independent physicians who alternate with one another to provide care for each other's patients when one of them is away on weekends, holidays, business or vacation should not be considered associated.

## PAYMENT

Provide the 100% (no deductible) second opinion benefit when the second opinion physician (and the plan includes a second surgical opinion benefit):

- Renders an opinion on the need or advisability of surgery, and
- Is not associated or in practice with the first physician who recommended and proposed to perform the surgery.

CONFIDENTIAL                                                                    AET-00297034

Cover charges as consultation fees or preoperative visits in the same manner as they would be covered under plans without a second surgical opinion benefit when the second surgical opinion:
- Is rendered on the day that proposed elective surgery was scheduled to be performed, and
- Physician is associated or in practice with the first physician who recommended and proposed to perform the surgery.

**THIRD SURGICAL OPINION**

Benefit a third surgical opinion (100% no deductible) when the plan includes a second surgical opinion benefit and the:
- Second opinion does not confirm the recommendation of the first physician who proposed to perform the surgery, or
- Patient has an updated surgical opinion based on the nurse consultant's suggestion.

Do not provide the SSO benefit when a second surgical opinion confirms the recommendation of the first physician.

**STANDARD INCENTIVE SECOND OPINION BENEFIT CCI WORDING**

SECOND SURGICAL OPINION - 100% OF REASONABLE AND CUSTOMARY EXPENSES NOT SUBJECT TO DEDUCTIBLE.

COINSURANCE_____%, However, 50% COINSURANCE SURGEON'S CHARGES WHEN NO SECOND OPINION IS SOUGHT.

When this benefit is included in a plan, and a second surgical opinion is not obtained for one of the following procedures, surgeon's charges are reduced to 50% of reasonable and customary.

**Fixed Dollar Amount CCI Wording**
COMPREHENSIVE          "FIRST $200 OF SURGEON'S CHARGES NOT
MAJOR MEDICAL           PAYABLE WHEN SECOND OPINION NOT
                        OBTAINED FOR PROTOTYPE SURGICAL LIST
                        OF PROCEDURES AND (OPTIONAL) CORONARY
                        ARTERY BYPASS."

When this benefit is included in a plan and a second opinion is not obtained for one of the mandatory surgical procedures, the first $200 of expenses for surgeon's fees is excluded from covered expenses.

**STANDARD LIST OF PROCEDURES REQUIRING A SECOND OPINION**

The following is the Aetna Standard list of procedures requiring a second opinion:
- Adenoidectomy
- Back or Disc Surgery
- Bunionectomy
- Cholecystectomy
- Coronary artery bypass
- Dilation and curettage
- Excision of cataracts
- Excision and ligation of varicose veins
- Hemorrhoidectomy
- Hernia (inguinal) repair
- Hysterectomy
- Knee surgery
- Mastectomy (partial or complete)
- Nasal reconstructive surgery
- Removal of prostate
- Tonsillectomy

**Note:** The list of surgical procedures (for the Incentive Second Surgical Opinion Benefit) can vary among policyholders. Refer to Remarks section of coverage cards to determine:
If plan provisions contain a non-standard procedure list
Whether the Coronary Artery Bypass procedure is subject to incentive benefit

**This concludes the Traditional-only information.**

**STANDBY SURGICAL/PHYSICIAN TEAMS – TRADITIONAL ONLY**

When surgery is performed by a standby surgeon, benefits are payable for the surgical procedure. Charges for the standby service, CPT code 99360, are allowed, denied or referred per the Aetna Standard Table.

**Note:** A perfusionist is not a legally qualified physician or a recognized health care provider in his/her own right. If a perfusionist bills directly on his/her own behalf, see Recognized Practitioners/Providers Policy/Overview. Non-Recognized Providers Employed by Recognized Providers.

**STERILIZATION**

**Modified – Effective 07/15/08**
Aetna provides coverage for sterilization procedure for plans that do not have an exception to our standard contract for these services.

**Sterilization Not Covered**
The following services are not covered:
- Reversal of a tubal ligation
- Reversal of a vasectomy
- Services related to the reversal of voluntary sterilization (tubal ligation or vasectomy)
- Infertility coverage for individuals or couples whose inability to conceive is related to a voluntary sterilization procedure (**HMO Only**)

Note: Following is list of voluntary sterilization codes for plans with an exception to exclude coverage for voluntary sterilization.

| Code | Description | Code | Description |
|------|-------------|------|-------------|
| 00851 | Anesthesia for intraperitoneal procedures in lower abdomen including laparoscopy; tubal ligation/transection | 58600 | Ligation or transection of fallopian tube(s), abdominal or vaginal approach, unilateral or bilateral |
| 00921 | Anesthesia for procedures on male genitalia (including open urethral procedures); vasectomy, unilateral or bilateral | 58605 | Ligation or transection of fallopian tube(s), abdominal or vaginal approach, postpartum, unilateral or bilateral, during same hospitalization (separate procedure) |
| 52402 | Cystourethroscopy with transurethral resection or incision of ejaculatory ducts | 58611 | Ligation or transection of fallopian tube(s) when done at the time of cesarean delivery or intra-abdominal surgery (not a separate procedure) (List separately in addition to code for primary procedure) |
| 55250 | Vasectomy, unilateral or bilateral (separate procedure), including postoperative semen examination(s) | 58615 | Occlusion of fallopian tube(s) by device (eg, band, clip, Falope ring) vaginal or suprapubic approach |
| 55450 | Ligation (percutaneous) of vas deferens, unilateral or bilateral (separate procedure) | 58670 | Laparoscopy, surgical; with fulguration of oviducts (with or without transection) |
| 58565 | Hysteroscopy, surgical; with bilateral fallopian tube cannulation to induce occlusion by placement of permanent implants | 58671 | Laparoscopy, surgical; with occlusion of oviducts by device (eg, band, clip, or Falope ring) |

Back To Top ⬆

---

## DETERMINING PLAN COVERAGE DETAILS

There is no BENLVL, CCI or ASD information specific to this topic.

Back To Top ⬆

---

## PRODUCT OPTIONS/BENEFIT ENHANCEMENTS

Product Options or Benefit enhancements for this topic may be located in BENLVL or CCI.

Back To Top ⬆

---

## TRAINING RESOURCES/POWERTOOLS/JOBAIDS

| | |
|---|---|
| Aetna Learning Center Course # | There are no Training Resources for this topic. |
| Powertools | There are no Powertools for this topic. |
| JobAids | ACAS Assistant Surgeon Reimbursement Performance Tool http://aetnet.aetna.com/cware/proc_nav/pn_ast_surg/index.html |

CONFIDENTIAL

AET-00297036

Back To Top ⬆

## RELATED INFORMATION

| Policy Document Number | Original Effective Date |
|---|---|
| EPOLI.0000.032 | |

**HMO**
Policy/Overview
Customer Service
Claim Processing
Product Applicability
Training Resources/Powertools/JobAids
Archives

**Traditional**
Policy/Overview
Customer Service
Claim Processing
Product Applicability
Training Resources/Powertools/JobAids
Archives
-
-
-

CONFIDENTIAL

AET-00297037

# EXHIBIT H

# BEHAVIORAL HEALTH – POLICY/OVERVIEW
- **Policy/Overview**
- **Definitions/Glossary**
  - Alcoholism/Drug Abuse Treatment
  - Detoxification
  - Effective Treatment
  - Medical/Surgical
  - Mental Disorder
  - Treatment Facility (Mental Disorder)
  - Standalone
  - Wholesale
- **Product Applicability**
- **Coverage Details**
  - Aetna Depression Management Program
    - Depression Screening
  - Allowable Amount for Non-Participating Behavioral Health
    - Overview
    - Policy Statement
    - Exceptions
  - Emergency Care
  - Inpatient Benefits
  - Intensive Outpatient Benefits
  - HMO Contract State
  - Hypnosis/Hypnotherapy
  - HMO Contract State
  - Legislated Benefits
  - Expanded Covered Services
  - Mixed Services
  - Outpatient Benefits
  - Partial Hospitalization
  - Prescription Medications
  - Precertification
  - Referrals
  - Residential Treatment Facilities
  - Non-Residential Treatment Facilities
  - Aetna Embedded, Stand Alone and Whole Case Behavioral Health
  - Aetna Employee Assistance Program (EAP)
  - Aetna Alcohol Disease Management Program
    - Overview
    - Eligibility
    - Goals
    - Criteria for the Alcohol Disease Management Program
    - Referrals
  - Depression Disease Management Program
    - The Reawakening Center
  - Medical Psychiatric Case Management Program
  - Intensive Case Management (ICM) Program
  - Anxiety Disease Management Program
  - Bipolar Disorders Disease Management Program
  - Healthy Nutrition Disease Management Program
  - Home Behavioral Health Services
  - Substance Abuse Screening for Depressed Adolescents Prevention Program
  - Episode of Care
  - Tiered Cost Sharing
  - Retroactive Waiver of Outpatient Copay
  - Criteria for Recognizing Non-Contracted Residential Treatment Facilities In States without Legislation
  - Aetna Pediatric Behavioral Health Management Program
  - Psychiatric Disability Services
- **Determining Plan Coverage Details**
  - Diagnosis/V Codes
    - Behavioral Health V Code Categories
    - V Codes that may be Submitted with Behavioral Health Claims
- **Product Options/Benefit Enhancements**
- **Training Resources/Powertools/JobAids**
- **Related Information**

# BEHAVIORAL HEALTH – POLICY/OVERVIEW

Back To Top ⤴

**CONFIDENTIAL**                                                                 **AET-00296748**

## POLICY/OVERVIEW

Behavioral Health (BH)  benefits include those inpatient and outpatient mental health and substance abuse services set forth in Aetna's health plan offerings (for HMO only, includes Medicare Advantage).  Coverage for mental health services may be stated separately than substance abuse services in plan documents.

In general, care delivered for disorders listed in the Diagnostic and Statistical Manual for Mental Disorders, Fourth edition (DSMIV), are considered mental disorders or alcohol/drug disorders. However, certain disorders may be treated as medical conditions or illnesses, (e.g. developmental disorders, Alzheimer's and dementia not otherwise specified).

Back To Top ⬆

## DEFINITIONS/GLOSSARY

### ALCOHOLISM/DRUG ABUSE TREATMENT

**States with Laws Mandating Inpatient Treatment**
A facility located in a state with inpatient treatment legislation is recognized when the facility is primarily established for treatment of alcoholism/drug abuse and it is licensed as such by the state or jurisdiction where it is located.

**States without Laws Mandating Inpatient Treatment**
A facility located in a state without inpatient treatment legislation is recognized under policies with inpatient alcoholism/drug abuse treatment facility coverage if it meets all of the requirements listed below:

Mainly provides a program for diagnosis, evaluation, and effective treatment of alcoholism or drug abuse.

- Makes charges.
- Meets licensing standards.
- Prepares and maintains a written plan of treatment for each patient.
- The plan must be based on medical, psychological and social needs. It must be supervised by a physician.
- Provides, on the premises, 24 hours a day.
  - Medical detoxification services (may involve the use of detoxification services needed with its effective treatment program).
  - Infirmary-level medical services.  Also, it provides, or arranges with a hospital in the area for, any other medical services that may be required.
  - Supervision by a staff of physicians.
  - Skilled nursing care by licensed nurses who are directed by a full-time R.N.

### DETOXIFICATION

This is care aimed mainly at treating the after effects of a specific alcohol or drug abuse episode. If a patient is admitted to a hospital in an intoxicated state with a diagnosis of alcoholism or drug abuse and the confinement is short-term (i.e., 5 days or less), assume that the confinement is for detoxification unless there is evidence to the contrary.

### EFFECTIVE TREATMENT

A program of therapy prescribed and supervised by a physician who certifies that the treatment program includes a comprehensive follow-up program consisting of either:
- individual therapy at least once a month with a physician or group therapy directed by a physician, or
- attendance at least twice per month, at meetings of organizations devoted to the therapeutic treatment of alcoholism or drug abuse.

### MEDICAL/SURGICAL

The term refers to those medical conditions and medical and/or surgical treatments covered under the medical portion of the insurance plan.

CONFIDENTIAL

AET-00296749

## MENTAL DISORDER

This is a disease commonly understood to be a mental disorder whether or not it has a physiological or organic basis and for which treatment is generally provided by or under the direction of a mental health professional such as a psychiatrist, a psychologist or a psychiatric social worker.  A mental disorder includes, but is not limited to:

- Alcoholism and drug abuse
- Schizophrenia
- Bipolar disorder
- Pervasive Mental Developmental Disorder (Autism)
- Panic disorder
- Major depressive disorder
- Psychotic depression
- Obsessive compulsive disorder

## TREATMENT FACILITY (MENTAL DISORDER)

This is an institution that:

Mainly provides a program for the diagnosis, evaluation, and effective treatment of mental disorders.

- Is not mainly a school or a custodial, recreational or training institution.
- Provides infirmary-level medical services.  Also, it provides, or arranges with a hospital in the area for, any other medical service that may be required.
- Is supervised full-time by a psychiatrist who is responsible for patient care and is there regularly.
- Is staffed by psychiatric physicians involved in care and treatment.
- Has a psychiatric physician present during the whole treatment day.
- Provides, at all times, psychiatric social work and nursing services.
- Provides, at all times, skilled nursing care by licensed nurses who are supervised by a full-time R.N.
- Prepares and maintains a written plan of treatment for each patient based on medical, psychological and social needs.  The plan must be supervised by a psychiatric physician.
- Makes charges.
- Meets licensing standards.

## STANDALONE

**Traditional Only**
Plan sponsors carve out their behavioral health benefits and awards only the behavioral health plan to the vendor (Aetna).

## WHOLECASE

**Traditional Only**
Plan sponsors carve out their behavioral health benefits and award the behavioral health plan to the vendor (Aetna), but also allows the opportunity for medical coverage where a portion of their membership subscribe. There can be plan summaries which include medical and behavioral health BICs, and plan summaries which contain only the behavioral health BIC.

**For example:** With Wholecase, the customer may offer their employees a choice of medical coverage through Aetna or Blue Cross, but the behavioral health benefits are only through Aetna.

It is important for Aetna to keep these customer contracts separate for downstream reporting purposes; therefore, on some plans the product may be indicated as "Wholecase" rather than "Standalone".

Back To Top ⤴

## PRODUCT APPLICABILITY

CONFIDENTIAL                                                                    AET-00296750

| Traditional Products | HMO Products | Applies to |
|---|---|---|
| ALL Traditional Products | ALL HMO Products | Full Insured |
| | | Self Insured |

Back To Top ⬆

# COVERAGE DETAILS

## AETNA DEPRESSION MANAGEMENT PROGRAM

### DEPRESSION SCREENING

The Aetna Depression Management program is the first national program to integrate medical and behavioral health care at the Primary Care Physician's office for depression screening and assessments for patients. The program provides clinical tools for PCPs, training for office staff, access to Aetna nurse case managers and support from Aetna's network of behavioral health specialists. The program provides a flat dollar reimbursement, without regard to the members' medical benefit design or cost sharing (deductible, copay, coinsurance), for PCPs who actively participate in screening and dialogue with patients to diagnose depression.

**Note:** This program does not apply to members of the Strategic Resource Company (SRC) or the Chickering Group.

## ALLOWABLE AMOUNT FOR NON-PARTICIPATING BEHAVIORAL HEALTH

### OVERVIEW

Effective with dates of service 9/1/06 and after, for products with an out-of-network benefit and indemnity and basic major medical plans, a three tiered approach has been implemented for determining the allowed charges for behavioral health services rendered by non-participating providers.

This approach takes into consideration the specialty of the rendering provider.

**Important Note:** This applies to both fully-insured and self-insured plans.

### POLICY STATEMENT
**Modified – Effective 09/08/09** ▨

The Reasonable and Customary (R&C) charge is the amount Aetna determines to be the prevailing charge for the service or supply in the geographic area where it is furnished. Refer to the <u>Reasonable and Customary Behavioral Health member communication</u> for additional information related to Reasonable and Customary charges.

Aetna applies R&C for behavioral health providers based on the provider type of the clinician.
- ☒ Psychiatrists (MD) – 100% of R&C/Recognized Charge (examples: HIAA80, HIAA90, HIAA75, and multiple others)
- ☒ Psychologists (PHD) – 80% of R&C/Recognized Charge (examples: BH8080, BH8090, BH8075, and multiple others)
- ☒ Applied Behavioral Analysts, Social Workers, Licensed Professional Counselors, Marriage and Family Counselors, Psychiatric Nurse, Drug and Alcohol Counselor, Psychological Examiner, Pastoral Counselors – 60% of R&C/Recognized Charge (examples: BH6080, BH6090, BH6075, and multiple others)

**Note:** The tiered approach of 100%/80%/60% applies to the amount allowed and not the reimbursement (benefit) rate. The member's plan indicates the reimbursement (benefit) rate.

### EXCEPTIONS
**Modified – Effective 08/25/09** ▨

CONFIDENTIAL                                                      AET-00296751

**This policy does not apply to claims when:**

- Member is enrolled in an Aetna Medicare Products (e.g. Medicare Advantage, Medicare Private Fee for Service, etc).
- Medicare primary members. Note: Providers that opt out of Medicare and the charges are eligible per the plan, or when we are estimating Medicare benefits.
- States with regulations that do not allow use of the process.
- NAP claims.
- SCCU claims.
- Facility claims, including professional services billed by facilities.
- Nonparticipating provider allowed at the in-network benefit level.
- Plan sponsors that opt out of the process. **Note:** Provision lines display in CCI for plan sponsors that have approved deviations. For HMO plans the 4041 Table is coded.
- HMO contract is fully insured, written in the state of Maryland, and the provider on the claim is located in Maryland.
- New Jersey Small Group or Individual Plans.
  - For Small Group, this means the policy does not apply to contracts written in the state of New Jersey, regardless of where the member lives.
  - For Individual, this means the policy does not apply to contracts written in the state of New Jersey.

## EMERGENCY CARE

Benefit reimbursement for emergency services is determined by the type of service rendered (e.g. psychiatric emergency is coded and paid as a mental disorder when the services billed are psychiatric in nature; psychiatric evaluations, psychotherapy).  Psychiatric emergencies requiring medical care, (e.g. suicide attempt, emergency room care) are coded and considered as medical/surgical.

Click here for additional information on State Legislation.

## INPATIENT BENEFITS

Benefits are provided for covered inpatient treatment of mental disorders or alcoholism and drug abuse at the rate specified by the plan when:
- Treatment is provided in a qualified hospital, psychiatric hospital, psychiatric treatment facility, or residential treatment facility.
- Expenses for the following are covered:
- room and Board (semi private, or up to the plan limit)
- other necessary services and supplies

Benefits for inpatient mental nervous or alcohol/drug related expenses are defined by the plan. Refer to CCI/BENLVL to verify the benefit levels of the plan. Benefits may be stated as:
- X% after a copay of $X, or
- X% after deductible, or deductible waived, or
- X% after deductible, and $X per visit copay/deductible, or
- X% up to a maximum allowable visit of $X per visit; after deductible

**Traditional products only:**  When a plan does not include separate benefits for alcohol/drug abuse related expenses, these expenses are considered mental disorders covered under the mental health benefit of the plan.

## INTENSIVE OUTPATIENT BENEFITS

Intensive outpatient programs are a concentrated, non-residential program of education, medication management, individual, group, and family therapy and activities for individuals experiencing a psychiatric disorder.  In absence of a separate benefit, services are reimbursed at the outpatient mental health or alcohol/substance abuse rate of the plan.

### HMO CONTRACT STATE
**Added – Effective 12/23/08**

To establish a member's contracted state, see HMO Eligiblity - Enrollment - HMO Contracted State.

### HYPNOSIS/HYPNOTHERAPY
**Added – Effective 04/07/09**

Hypnotherapy was added to the AST table to deny.  It was determined that Hypnosis was considered experimental and investigational.

## LEGISLATED BENEFITS

Some states have legislation that requires insurers to provide coverage for biologically based or serious mental illnesses under the same terms and conditions as for other illnesses and diseases, under the medical benefit.

Click here for information on state legislated benefits.

CONFIDENTIAL                                                                 AET-00296752

Behavioral Health – Policy/Overview

## EXPANDED COVERED SERVICES

**This policy applies to Self-Funded Traditional Products Only**
Self-insured plan sponsors have the option to include Expanded Covered Services in their plan of benefits. Expanded Covered Services provides reimbursement for services that will aid in the treatment of a member with a behavioral health condition that would not be covered under a standard medical plan or Behavioral Health provision. Expanded Covered Services include:

» Family Support at Home Services - These services are for the purpose of clinical assessment of; and treatment in the home situation, to ensure that the member is progressing in the home environment to reduce the risk of relapse, or out-of home-placement. Services are provided to covered dependent children under 18 years of age with a diagnosed mental health condition and who are supported by their families at home. These services must be precertified through Aetna Behavioral Health.
• Transportation Services - Coverage for public transportation to and from a covered treatment is provided. Maximum payment will be $15.00 per one way trip, up to sixteen one way trips. These services must be precertified through Aetna Behavioral Health. A paid receipt must be submitted by the member as proof of a claim.

Expanded Covered Services must be precertified by a Behavioral Health clinician in order for the expense to qualify for reimbursement under the plan.

Cost sharing provisions may apply (e.g. deductible, coinsurance, copay, etc.).

## MIXED SERVICES

A mixed claim is defined as a multi line claim where all or some diagnosis codes are BH and procedure codes are a mix of BH and medical. However, the provider specialty must be BH in order for the claim to be tagged as a mixed BH claim.

**Example 1**
An adolescent is admitted to a psychiatric facility for violent and suicidal behavior. After evaluation, it is determined that the patient suffers from frontal lobe and brain cord damage due to a serious head trauma received at age 9. The treatment is covered under the medical/surgical portion of the plan.

**Example 2**
A patient is admitted to ICU after a suicide attempt. The patient is stabilized medically and the attending physician requests a transfer to a psychiatric unit. The care:

provided to stabilize the patient prior to transfer to a psychiatric unit is considered under the medical plan.

provided in the psychiatric unit is considered under the behavioral health benefits of the plan.

**Example 3:**
A patient with severe anorexia nervosa must be admitted to a medical bed for close medical monitoring due to the medical complications resulting from the illness. The cost of the bed and the medical services is coded and considered as medical/surgical, while the cost of psychiatric services is coded and considered as a mental disorder.

## OUTPATIENT BENEFITS

Benefits for outpatient mental nervous or alcohol/drug related expenses are defined by the plan. Refer to CCI/BENLVL to verify the benefit levels of the plan. Benefits may be stated as:

» X% after a copay of $X, or
» X% after deductible, or deductible waived, or
» X% after deductible, and $X per visit copay/deductible, or
» X% up to a maximum allowable visit of $X per visit; after deductible

**Traditional products only:** When a plan does not include separate benefits for alcohol/drug abuse related expenses, covered expenses are considered mental disorders covered under the mental health benefit of the plan.

Covered expenses include:

» Charges made by hospitals and facilities for outpatient treatment of mental disorders, alcoholism and substance abuse.
» Charges made by physicians for outpatient treatment of mental disorders, alcoholism and substance abuse.
» Charges for medical services and supplies (other than inpatient charges) used in connection with the treatment of mental disorders.
» Charges for day care or evening care sessions (partial hospitalization) made by facilities meeting the standard treatment facility recognition requirements.

**Note:** For benefit payment purposes, charges for partial hospitalization, day care or evening care in a recognized hospital or treatment facility are covered subject to the outpatient mental disorder benefits and limitations described by the plan. Charges for room accommodations for overnight stays in a recognized hospital or treatment facility are covered subject to any inpatient mental disorder benefits and limitations described by the plan. These rules do not apply to plans that provide separate benefits for partial hospitalization (day care, evening care and night care) in a recognized hospital or treatment facility. These separate partial hospitalization benefits will be noted on CCI/BENLVL. And benefits should be based on that coverage information.

Outpatient benefits for treatments of mental disorders, alcoholism and substance abuse may vary according to requirements of state laws.

When the outpatient mental health or alcohol/ substance abuse benefit is included in a plan, there is no additional coverage for outpatient treatment under any other benefit, unless expressly written in the plan.

CONFIDENTIAL

**Example:** The plan allows for 20 outpatient visits for treatment of mental disorders per calendar year.  The member has used all 20 visits for the current calendar year.  No other benefits are available for this member unless there is an alternate behavioral health benefit expressly written into the plan (e.g. swapped benefits).

## PARTIAL HOSPITALIZATION

A partial confinement treatment program, (day, evening or night care) for treatment of a recognized mental disorder is a planned program of psychiatric services provided on less than a full-time inpatient basis and that meets both the following requirements:

- It involves any generally accepted form of evaluation and treatment of a condition diagnosed as mental illness that does not require full time confinement in a hospital or treatment facility, and
- A physician, who reviews the program and evaluates its effectiveness, at least once a week, supervises it.

A treatment session begins when a covered member enters a treatment facility and ends when the individual leaves the facility upon completion of 1 day care or 1 night care treatment.

**Modified 01/08/08**

In the absence of a (separate) partial hospitalization benefit listed in the benefit detail, services are reimbursed at the outpatient mental health or alcohol/substance abuse rate. Limitations of the benefit are based according to the Outpatient Benefit structure (CCI/BENLVL).

Cover the facility charges for the following services and supplies furnished during a treatment session:

- Facility services, supplies and prescription drugs
- Physician services
- Psychiatric nurse or social worker services
- Psychological testing
- Collateral visits with the patient's immediate family

**Non-Covered Expenses**
- Missed appointments
- Telephone consultations, video consultations
- Personal comfort items
- Counseling or therapy primarily for marital, family or sexual problems
- Services and supplies not regularly part of the institutions' care or which are for education, vocational training, recreational therapy or used to assist with custodial care
- Charges for night care or day care in excess of the most common semi-private charge for such care

## PRESCRIPTION MEDICATIONS
**Modified- Effective 02/24/09**
**This section applies to Traditional Products Only**

Plans that cover prescription medications under the medical policy reimburse prescription medications same as any other medical expense.

Exception: The plan of benefits for prescription drug coverage specifically states that behavioral health medications are reimbursed at the behavioral health rate.

**End of section that applies to Traditional Products Only**

**Behavioral Health Medication Flyer**

Behavioral Health Medication Black and White Flyer

Behavioral Health Medication Colored Flyer

## PRECERTIFICATION
**Modified – Effective 07/28/09**
Behavioral Health Patient Management (BH PM) performs patient management activities, where applicable by product, for all Aetna products.
Specifically, the scope of their responsibility includes:
- Precertification and concurrent review of inpatient and residential care, partial hospital level of care and intensive outpatient are required.
- Precertification and concurrent review of outpatient care, when required by the plan

Note:  For additional information, refer to:
Precertification List - BH authorizations requiring pre-certification.

## REFERRALS
**Modified – Effective 04/07/09**

CONFIDENTIAL                                                                          AET-00296754

Referral from a member's PCP to a behavioral health provider is not required.
- All care rendered while in the Behavioral Health providers office does not require referral.  If the service is listed as a Behavioral Health service that requires precertification, authorization is required.

## RESIDENTIAL TREATMENT FACILITIES
**Modified - Effective 07/29/08**
See Criteria for Recognizing Non-Contracted Residential Treatment Facilities in States without Legislation below.
For more information, also see this same topic in:
BH CSR HMO
BH CSR TRAD
BH Proc HMO
BH Proc TRAD

## NON-RESIDENTIAL TREATMENT FACILITIES

Non-residential substance abuse treatment facilities (place of service 57) are locations which provide treatment for substance abuse (alcohol or drug) on an ambulatory basis (outpatient care only).

Cover medically necessary services for outpatient treatment up to the plan's limitation unless the provider is flagged in EPDB as either not covered or requires review.

## AETNA EMBEDDED, STAND ALONE AND WHOLE CASE BEHAVIORAL HEALTH

**This section applies to Traditional Products Only**

Beginning 01/01/05, Behavioral Health will market Stand-alone and Whole Case Behavioral Health plans to traditional based customers.  The following are the Behavioral Health plans:

- **Embedded:** BH benefits are embedded in the medical plan (e.g. OC, MC, MCOA, EC or ECOA)
- **Stand-alone:**  BH  benefits that are stated as a separate benefit in CCI (e.g. BIC MBH).  Plan sponsors that provide medical benefits through Aetna in addition to their behavioral health may or may not share accumulators with their medical plan.
- **Whole Case:** there will be plan summaries which include an Aetna Medical and/or Standalone BH benefits, along with plan summaries which contain only the BH product without an Aetna Medical product. For Wholecase, all members have BH benefits, but some not necessarily all, may have elected medical benefits.

Behavioral Health programs provide a comprehensive range of services to members for inpatient care, partial hospitalization, intensive outpatient programs, and outpatient care for both mental health and substance abuse problems.  Services include:
- access to a multi-specialty network
- crisis management
- precertification and concurrent review through utilization management, discharge planning and case management

**End of section that applies to Traditional Products Only**

## AETNA EMPLOYEE ASSISTANCE PROGRAM (EAP)

Aetna offers an Employee Assistance Program to plan sponsors.  An EAP is a work site-based program designed to assist organizations in helping employees and families balance the demands of work, life, and personal issues. This includes services to employers such as management consultation and support for traumatic workplace events, work site education and training. It also includes services to employees and families that identify and resolve personal concerns that impact performance and improve overall well being, such as individual and family counseling services, consultation for issues with children or adult relatives, and legal or financial services.

Aetna's EAP includes a full suite of EAP and work/life services including but not limited to:

- 24x7 telephonic access and authorization
- A plan sponsor determined number of counseling sessions
- A comprehensive provider network
- Management consultation
- Critical Incident Stress Debriefing support
- Interactive web resources
- On-site trainings and program promotion
- Many work/life offerings such as child and elder care resources and referrals, education searches and support, legal and financial services
Note:  EAP does not apply to Small Group.

## AETNA ALCOHOL DISEASE MANAGEMENT PROGRAM

CONFIDENTIAL                                                                                                                                        AET-00296755

## OVERVIEW

Aetna's research estimates that the medical costs for members diagnosed as alcoholics are about two or three-fold higher than those without alcoholism. It has also been shown that the health care costs of family member's are reduced, if the alcoholic is treated. Because of these findings and other research performed nationally that supports these conclusions, Aetna has began actively marketing the Alcohol Disease Management (ADM) program to aid in the treatment of this disease.

## ELIGIBILITY

This program is currently available to HMO members (fully insured and self insured), and to self-insured traditional products on a buy-up basis only.

## GOALS

The Alcohol Disease Management program is divided into two tracks to provide a customized approach, based on the individualized needs of the member. Each track includes interventions developed to address the specific needs of the member in different stages of disease.

**Track 1:** Targets those early in the course of the disease. These members generally are identified through case findings (for example from trauma admissions or ER visits), adolescent populations, and referrals through an Employee Assistance Program (EAP) or student assistance programs. Components of this track include:

» Physician notification: letter--customized based on referral source or trigger, and a screening tool.
» Screening performed by physician office, information provided to facilitate linkage to appropriate intervention or provider.

**Track 2:** Targets those with established disease, the severe relapsing alcoholic, or the alcoholic with psychiatric illness or medical consequences to the alcohol use. Because those in Track 2 are known to have the disease, a screening is unnecessary. Components of this track include:

» Customized services, treatment plan developed in coordination with the PCP
» Case management principles of outreach to individuals, facilitated linkages to providers, educational resources for member and family

Members can locate additional information on this and other Behavioral Health programs on the Behavioral Health intranet site http://aetnet.aetna.com/core_behavioral_health/index.html (Aetna Affiliate Access) under "Clinical."

## CRITERIA FOR THE ALCOHOL DISEASE MANAGEMENT PROGRAM

**Added - Effective 01/29/08**
» Primary diagnosis of Alcohol Dependence 303.90 or
» If the primary diagnosis is
  ■ 304.80 Polysubstance Dependence,
  ■ use of alcohol is present,
  ■ alcohol abuse 305.00,
  ■ alcohol dependence 303.90,
  ■ 291.x, e.g., alcohol withdrawal,
» Member must be 18 years of age or older.

## REFERRALS

**Added - Effective 01/29/08**
**Referrals by all staff may be made by:**
» Tasking in eTums to: Alcohol Disease Mgmt, BH Sandy (all ADM referrals go to this task bucket regardless of region).
» Program Contact: Pat Williams, RN, CSW, Supervisor, ADM Team UCMC (Sandy) 801-256-7061.

## DEPRESSION DISEASE MANAGEMENT PROGRAM

The Reawakening Center

The Depression Disease Management Program is currently available as:
» a standard offering for fully and self-insured HMO plans that include Aetna's medical and behavioral health benefits,
» a buy-up option for self-insured Traditional plans that include Aetna's medical and behavioral health benefits,

CONFIDENTIAL     AET-00296756

- » a buy-up option for Traditional Stand Alone Behavioral Health plans
- » a Stand-Alone program on the Traditional platform effective January 1, 2006

The Depression Disease Management Program consists of the following components:

- » Self-assessment for depression and co-morbid disorders.
- » Online services related to depression and its treatment.
- » Decision-support tools (see The Reawakening Center below) as well as case management telephone outreach, and integration with pharmacy, primary care physicians and behavioral health professionals.
- » Case management outreach for members and primary care physicians to coordinate care and access to services, as well as enhance compliance.

Employees may be referred to Aetna's Depression Disease Management Program through the following channels:

- » Inpatient psychiatric admission for a diagnosis of major depression, dysthymia, depression not otherwise specified or bipolar depression.
- » Outpatient treatment for one of the above diagnoses.
- » Pharmacy data indicating noncompliance with medications.
- » Referral by a primary care physician.

Aetna's Depression Disease Management Program facilitates the application of evidence-based treatment intervention and enhances the cost-effective use of pharmacy benefits to maximize responses to antidepressant medication.


## THE REAWAKENING CENTER

Depression is estimated to be the leading cause of disability worldwide. Nearly 19 million Americans experience depression annually, it's a subject that's rarely discussed openly. Seeking help for depression usually carries with it a stigma, which explains why only 23 percent of adults diagnosed with depression actually receive treatment. That's why Aetna developed the Reawakening Center http://www.reawake.com

The Reawakening Center provides information about depression in a way that is creative, entertaining, supportive and non-threatening. The program helps participants to learn more about themselves, discover ways of dealing with their feelings and emotions, and develop insight and understanding into when they should seek professional help. It also helps participants to understand their readiness for taking action so they can be more successful in addressing their feelings of depression, should they be at risk.


## MEDICAL PSYCHIATRIC CASE MANAGEMENT PROGRAM
**Modified - Effective 08/05/08**
Medical Psychiatric Case Management is:

- » a standard HMO offering to fully insured and self-insured plan sponsors when both Medical and Behavioral Heath products are with Aetna.
- » a standard offering on fully insured National Accounts and Middle Market Traditional medical products when both Medical and Behavioral Health products are with Aetna. Exception: This expanded offering is not available to the Individual/Small Group and Student Health (Chickering) segments.
- » a buy up for self-insured Traditional plan sponsors when both Medical and Behavioral Health products are with Aetna.
- » A buy-up option for self-insured Traditional Stand-Alone plan sponsors
- » A stand alone program on the traditional platform effective January 1, 2006

The Medical Psychiatric Case Management Program was developed to help members who have concurrent medical and behavioral health conditions. Since one condition may affect the successful treatment of the other, the need for care coordination between Medical Management Nurses and Behavioral Health Care Managers is great.

Approximately half of the members who enroll in Medical Psychiatric Case Management are referred from the following Aetna medical clinical units which have formal procedures for depression screening, education and triage:
- » Case Management (including Retiree and Medicare)
- » Beginning Right Maternity
- » Diabetes and Chronic Heart Failure (CHF), supported by LifeMasters
- » Asthma, Coronary Artery Disease, Low Back Pain and Diabetes
- » Optimal Renal Care
- » National Medical Excellence (Pre- and Post-Transplant)
- » Post Discharge Cardiac Calls
- » Disability

With permission, medical case managers in these programs refer members who screen positive to a Medical Psychiatric case manager who is co-located in Aetna case management units. The member then receives a call from the Medical Psychiatric case manager, a licensed mental health professional or a psychiatric nurse with at least three years experience.

The Medical Psychiatric Case Manager assesses the member's needs, arranges for any needed treatment services by health care professionals, and enrolls the member if he/she meets program criteria.

Once enrolled, a case management plan is developed aimed at determining a coordinated behavioral health and medical care approach that the member can fully engage in and manage. The plan and length of time in case management is individualized. Components of Medical Psychiatric case management include member telephonic case management and provider and case manager coordination.

The Aetna Medical Psychiatric Case Management Program offers:

- » A collaborative approach: Medical nurses and behavioral health clinicians work side-by-side in the same office (co-located) to coordinate care, develop a plan for treatment and help employees adhere to a recommended plan.

CONFIDENTIAL                                                                                          AET-00296757

» Coordination of services. Medical Psychiatric case managers work with patients' physicians, community services or agencies and family members to help develop a recovery plan best suited to the individual's needs.
» Predictive modeling: Helps case managers identify opportunities for intervention with members before conditions become more severe.
» Depression Screening: Aetna Patient Management and other specialty units screen members with medical conditions to determine if they also have any behavioral health issues.
» Voluntary referrals to Aetna medical programs.
» Available to members with behavioral health issues who show symptoms of a chronic medical condition.

## INTENSIVE CASE MANAGEMENT (ICM) PROGRAM

ICM is:
» a standard offering to fully insured and self-insured HMO plan sponsors
» a standard offering for all fully insured and self-insured Traditional POS & EPO plans when both Medical and Behavioral Heath products are with Aetna effective January 1, 2006.
» available as a  buy up (offered along with Inpatient and Outpatient Care Management services) for self-insured Traditional Open Choice and Traditional Choice medical products.
» not available for fully insured Open Choice and Traditional Choice medical products .
» available as a standard offering for self-insured Traditional Stand Alone Behavioral Health products.

Intensive Case Management serves those members with complex behavioral health conditions that require a specialized approach in order for care to be effective in relieving symptoms, improving quality of life, and maximizing efficient and appropriate use of behavioral health benefit.  The goal of ICM is to improve treatment outcomes for enrollees with complex behavioral health conditions who are at risk for poor treatment outcomes.

## ANXIETY DISEASE MANAGEMENT PROGRAM

Aetna's Anxiety Disease Management Program will help member's access providers to get the treatment they need when they need it, and will also help them to better understand their pharmacy benefits, allowing them to take medications in a cost-efficient and effective manner.

This program is being offered:
» as a standard part of HMO (both fully-insured and self-insured),
» as a "buy-up" option on the traditional platform for self-insured Middle Market and National Account customers.
» as a buy-up option for Traditional Stand Alone Behavioral Health plans.
» on a stand alone basis on the traditional platform effective January 1, 2006.

The major goals of the program are
» Identify Generalized Anxiety Disorder, Panic Disorder, Posttraumatic Stress Disorder in members.
» Match member with treatment modality based on evidence-based guidelines
» Provide resource materials to member and families that increase understanding of anxiety.
» Provide educational and assessment resources and evidence-based treatment guidelines to providers.

## BIPOLAR DISORDERS DISEASE MANAGEMENT PROGRAM

Effective 1/1/07 the Bipolar Disease Management Program is being offered:

» as a standard part of HMO (both fully-insured and self-insured)
» as a "buy-up" option on the traditional platform for self-insured Middle Market and National Account customers.

The major goals of the program are:
» Identify Bipolar Disorders in members.
» Enhance compliance with medication through educational/resources and active case management.
» Provide resource materials and their supports to increase the understanding of bipolar disorders.
» Provide educational and assessment resources and evidence based treatment guidelines to providers.

## HEALTHY NUTRITION DISEASE MANAGEMENT PROGRAM

Effective 1/1/07 the Behavioral Health Healthy Nutrition Disease Management Program is being offered:

» as a standard part of HMO (both fully-insured and self-insured)
» as a "buy-up" option on the traditional platform for self-insured Middle Market and National Account customers.

The major goals of the program are:
» Identify anorexia nervosa, bulimia nervosa, and morbid obesity in members.
» Match members with treatment modalities according to evidence based guidelines.
» Provide resource materials to members and their supports to increase the understanding of healthy nutrition.
» Provide educational and assessment resources and evidence based treatment guidelines to providers.

CONFIDENTIAL
AET-00296758

## HOME BEHAVIORAL HEALTH SERVICES

Skilled home behavioral health care is the provision of intermittent skilled services for treatment of behavioral disorders in the home. These services are rendered in lieu of hospitalization, confinement in an extended care facility, or going outside of the home for the service.

## SUBSTANCE ABUSE SCREENING FOR DEPRESSED ADOLESCENTS PREVENTION PROGRAM
**Modified – Effective 07/28/09**

Substance Abuse Screening for Depressed Adolescents Prevention Program encourage members who are interested in learning more about the Substance Abuse Screening for Depressed Adolescents Prevention Program to call the phone number on the back of their insurance card for mental health/substance abuse inquiries and request to speak with a Care Manager in their Care Management Center.

**Eligibility**
The Substance Abuse Screening for Depressed Adolescents Prevention Program is included as part of the coverage benefit for all HMO-based and Traditional plans.

**Program Features**
Aetna Behavioral health collaborates with treating providers and facilities to encourage substance use assessments for all adolescents between the ages of 12 to 18 who enter treatment with a depression, cyclothymic, or mood disorder due to medical condition. Due to the increased risk of suicide in depressed adolescents who are using substances, there is an increased need to conduct assessment for substance use. For those adolescents positive for substance use/abuse, Aetna Behavioral Health collaborates with the treating provider or facility to encourage treatment that targets the full scope and complexity of both the depressive symptoms and substance use/abuse.

**Program Includes**
- Collaboration with treating providers and facilities to ensure a thorough assessment for substance use is completed. The assessment may help treating providers understand how the adolescent's depression and substance use/abuse interrelate.
- Inclusion of both depression and substance abuse in treatment planning.
- Web-based educational materials about depression and substance use/abuse.
- Family inclusion in the treatment process, permission from the adolescent is necessary.
- Referrals to dual diagnosis step-down programs, outpatient treatment, and community based resources, educational resources, and available EAP services for both the adolescent and family.

## EPISODE OF CARE
**Modified – Effective 04/07/09**

To ensure compliance with Federal Parity, Episode of Care is no longer being offered or supported.

## TIERED COST SHARING
**Modified – Effective 04/07/09**
To ensure compliance with Federal Parity, Tiered Cost Sharing is no longer being offered or supported.

## RETROACTIVE WAIVER OF OUTPATIENT COPAY
**Modified – Effective 03/10/2009**

**This policy applies to Self-Funded Traditional Products Only**
A buy-up program is available allowing the retroactive refund of outpatient copay/coinsurance paid by members upon completion of Behavior Health Specialty Programs (Depression, Alcohol/Substance Abuse, Anxiety, Bi-Polar, ICM, MedPsych).

The Program requires WebCCI coding, coordination between the Behavior Health Clinician, Plan Sponsor Liaison, Customer Advocate or Broker

CONFIDENTIAL                                                                                AET-00296759

Liaison and Claim Processing.

Rework Reason Code 38 has recently been recycled for use with the program to reflect the revised name "Disease Management Reimbursement" with the description "For use only if instructed by Plan Sponsor Liaison. Refund of copay/coinsurances upon completion of agreed to treatment plan".

**Note: ASD will not include Rework Reason Code 38 as a drop-down selection until 05/09 this can be manually input in the interim.** See e.Policies Communication regarding Rework Reason Code 38

Reporting: ORS OP reports will still reflect missed referral to DC: for Rework Code 38. Enkata reporting will reflect "Disease Management Reimbursement".

The following steps detail critical steps to complete a retroactive waiver of copay/coinsurance for completion of treatment for Behavioral Health.

| Step | Activities/Details | Responsible Party |
|---|---|---|
| 1. WebCCI Coding | Complete "BHDM Wer Copay" line value coding in WebCCI. | PCC |
| 2. PST/PSM Update | Update PST (Plan Sponsor Tool) with PSL (Plan Sponsor Liaison) or PSM (Plan Sponsor Module) with CA (Customer Advocate)/BL (Broker Liaison), information. | PSL, CA, BL |
| 3. Identify Members Eligible for Retro-Waiver | Identify members eligible for participation in program and upon completion of specialty programs, enter "BH Retroactive Reimbursement of Copay" into Clinical Notes in the BH DM/CM event in eTums. | Specialty Care Case Manager |
| 4. Identify Case Liaison | Review Mental Health Category in PST (Plan Sponsor Tool) to obtain the Plan Sponsor Liaison (PSL-National Accounts) or Plan Sponsor Module Claims Page for the Customer Advocate (Middle Market) or Broker Liaison (ASM) name, phone, fax information. | Specialty Care Case Manager |
| 5. Complete Retro Waiver of Copay Form | Complete "ABH Retro Waiver of Outpatient Copay/Coinsurance Reimbursement Request" form. Include the authorization date for reimbursement (use date the request is sent to the PSL/CA/BL) of expenses from (start) date to (end) date on the form and in Clinical Notes in eTums. | Specialty Care Case Manager |
| 6. Send Completed Request to PSL | Email or fax "ABH Retro Waiver of Outpatient Copay/Coinsurance Reimbursement Request" form to the PSL/CA/BL. | Specialty Care Case Manager |
| 7. Verify Plan Coding | Verify WebCCI has "BHDM Wer Copay" benefit line value coded.  If the coding is present, forward the form to the appropriate claim contact to facilitate the identification and rework of appropriate claims; include note "Rework Coding RAmmddyyW38". | PSL, CA, BL |
| 8. WebCCI is not Coded | If WebCCI is not coded, the PSL/CA/BL should engage the PCC (Plan Coordination Consultant) to verify if the benefit should be coded or is not applicable.  If the benefit is not applicable, the PSL should engage the BH Clinician to assure appropriate member communications | PSL, CA, BL |
| 9. Recall/Rework Claims | Recall each claim for rework individually; use Override code "RA", Rework Type "W" and Rework Reason Code 38 "Disease Management Reimbursement". | Claims |
| 10. Recall/Rework Claims | Recall each claim for rework individually; use Override code "RA", Rework Type "W" and Rework Reason Code 38 "Disease Management Reimbursement". | Claims |
| 11. Do Not Pay Interest | Interest is not payable on reimbursements (use the date of the Reimbursement Request Form, not the claim date). | Claims |
| 12. Denied Claims | Denied claims are not eligible (unless a claim was denied in error & is being corrected). | Claims |
| 13. If Claim is Not Final | If all related claims have not been received use a SPH flag (special handling code "A"), with a notice to refer appropriate BH claims to the designated contact. The Exp Dt field should be coded with 12/31/9999 and the expected end date should be coded on the Patient's Notes (NT) Maintenance screen; do not use the "W" trigger.  Once all claims have been received and processed the SPH flag should be removed to avoid pending future claims. | Claims |
| 14. Complete | Complete Rework Form information and Back-end image all documentation. | Claims |

## CRITERIA FOR RECOGNIZING NON-CONTRACTED RESIDENTIAL TREATMENT FACILITIES IN STATES WITHOUT LEGISLATION

**Policy**

Effective 01/01/06, all states, with the exception of:
» Illinois
» Maryland
» Nevada
» Virginia
» Pennsylvania
» Texas
» Washington
for non-contracted residential treatment facilities must meet the following criteria in order to be recognized under Aetna plans.  Note:  If a claim is received from a state noted above, this policy would not apply and the services would be reimbursed at the normal benefit level.

**Residential Facility - Behavioral Health**
A behavioral health residential treatment facility is recognized by Aetna if it meets the following criteria:
» On-site licensed Behavioral Health Provider 24 hours per day/7 days a week.
» Provides a comprehensive patient assessment (preferably before admission, but at least upon admission).

CONFIDENTIAL                                                                                      AET-00296760

- Is admitted by a Physician.
- Has access to necessary medical services 24 hours per day/7 days a week.
- Provides living arrangements that foster community living and peer interaction that are consistent with developmental needs.
- Offers group therapy sessions with at least an RN- or Masters-Level Health Professional.
- Has the ability to involve family/support systems in therapy (required for children and adolescents; encouraged for adults).
- Provides access to at least weekly sessions with a psychiatrist or psychologist for individual psychotherapy.
- Has peer-oriented activities.
- Services are managed by a licensed Behavioral Health Provider who, while not needing to be individually contracted, needs to (1) meet the Aetna credentialing criteria as an individual practitioner, and (2) function under the direction/supervision of a licensed psychiatrist (Medical Director).
- Has individualized active treatment plan directed toward the alleviation of the impairment that caused the admission.
- Provides a level of skilled intervention consistent with patient risk.
- Meets any and all applicable licensing standards established by the jurisdiction in which it is located.
- Is not a Wilderness Treatment Program or any such related or similar program, school and/or education service.

Additional recommended element (not a required criteria for eligibility):
- Active discharge planning initiated upon admission to program

**Residential Treatment Facility - Chemical Dependency**
All of the criteria listed above for behavioral health residential treatment facilities plus the following:
- Ability to assess and recognize withdrawal complications that threaten life or bodily functions and to obtain needed services either on-site or externally
- 24 hours per day/7 days a week supervision by a Physician with evidence of close and frequent observation
- On-site, licensed Behavioral Health Provider, medical, or substance abuse professionals 24 hours per day/7 days a week.

Additional recommended elements (not a required criteria for eligibility):
- Active discharge planning initiated upon admission to program
- Ability to make referrals/ connections to appropriate substance abuse programs during residential treatment as well as following discharge


## AETNA PEDIATRIC BEHAVIORAL HEALTH MANAGEMENT PROGRAM
**Modified - Effective 01/06/09**
Effective 12/30/07 through 12/30/09, the Aetna Pediatric Behavioral Health Management Program is designed to support the pediatrician's office in the diagnosis and treatment of mood and behavior problems.

This program will offer:
- Reimbursement of Pediatricians for screenings.
- Psychiatric consultations (with a child and adolescent psychiatrist) via telephone, with reimbursement for both the pediatrician and the psychiatrist.
- The opportunity for facilitated access to a child psychiatrist.

**Note:** The pilot includes a small group of providers in New Jersey and Ohio; it may expand to Texas, Pennsylvania and Maine.


## PSYCHIATRIC DISABILITY SERVICES

**Added - Effective 1/29/08**

Aetna Behavioral Health and Aetna Disability and Leave Management Services partnered together to offer the Psychiatric Disability Services program. The program is marketed and administered by Aetna Behavioral Health. The Behavioral Health Unit within Aetna Disability will provide the claim review for this program utilizing the Workability claim system.

The Psychiatric Disability Service program is offered as a buy up component for Plan Sponsors that purchase Aetna Behavioral Health. The program is currently offered only to new self insured (ASC advice only) National Account and Key Account Plan Sponsors billed on a PEPM basis, effective 01/01/2008 or later.

This program is not currently available to Small Market Plan Sponsors, Plan Sponsors who have Aetna Disability (Temporary Disability Income or Long Term Disability) or to Fully Insured (FI) Plan Sponsors in any market.

This program will be offered to active employees only through Aetna Behavioral Health.

Back To Top ⬆


## DETERMINING PLAN COVERAGE DETAILS

### DIAGNOSIS/V CODES

**Added – Effective 09/01/09**

In order for claims to adjudicate to the behavioral health benefit the provider must be a mental health professional. The provider type and location of service determines the benefit that is applied.

**Note:** For definition of V Codes see <u>Coding - DiagnosisCodes</u>.

**BEHAVIORAL HEALTH V CODE CATEGORIES**
**Added – Effective 09/01/09**

**Note:** The below contain codes specific to behavioral health, there are additional classifications not listed below that are not applicable to behavioral health.

| Classification | Example |
|---|---|
| Status | V40 Series |
| History | V11 Series |
| Screening | V79 Series |
| Observation | V71 Series |
| Follow Up | V67 Series |
| Counseling | V65 Series |
| Other classifications that may include behavioral health | Routine and Administrative, Aftercare, Miscellaneous, Nonspecific |

**V CODES THAT MAY BE SUBMITTED WITH BEHAVIORAL HEALTH CLAIMS**
**Added – Effective 09/01/09**

Behavioral health V Codes may be submitted by providers/facilities, but are not necessarily covered. Refer to Claim Processing Guidelines.

| Code | Description |
|---|---|
| V11 | Personal history of mental disorder |
| V11.0 | Personal history of schizophrenia |
| V11.1 | Personal history of affective disorders |
| V11.2 | Personal history of neurosis |
| V11.3 | Personal history of alcoholism |
| V11.8 | Personal history of other mental disorders |
| V11.9 | Personal history of unspecified mental disorder |
| V15 | Other personal history presenting hazards to health |
| V15.4 | Personal history of psychological trauma, presenting hazards to health |
| V17 | Family history of certain chronic disabling diseases |
| V17.0 | Family history of psychiatric condition |
| V18 | Family history of certain other specific conditions |
| V18.4 | Family history of mental retardation |
| V40 | Mental and behavioral problems |
| V40.0 | Mental & behavioral problems with learning |
| V40.1 | Mental & behavioral problems with communication (including speech) |
| V40.2 | Other mental problems |
| V40.3 | Other behavioral problems |
| V40.9 | Unspecified mental or behavioral problem |
| V58 | Other & unspecified aftercare |
| V58.6 | Long-term (current) drug use |
| V61 | Other family circumstances |
| V61.0 | Family disruption |
| V61.1 | Marital problems |
| V61.2 | Parent-child problems |
| V61.3 | Problems with aged parents or in-laws |
| V61.41 | Health Problems within family: Alcoholism in family |
| V62 | Other psychosocial circumstances |
| V62.1 | Adverse effects of work environment |
| V62.2 | Other occupational circumstances or maladjustment |

CONFIDENTIAL
AET-00296762

| V62.4 | Social maladjustment |
| V62.8 | Other psychological or physical stress, not elsewhere classified |
| V62.9 | Unspecified psychosocial circumstance |
| V65 | Other persons seeking consultation without complaint or sickness |
| V65.1 | Person consulting on behalf of another person |
| V65.3 | Dietary surveillance & counseling |
| V65.4 | Other counseling, not elsewhere classified |
| V65.42 | Counseling on substance use and abuse |
| V65.8 | Other reasons for seeking consultation |
| V65.9 | Unspecified reason for consultation |
| V66 | Convalescence |
| V66.3 | Convalescence following psychotherapy & other treatment for mental disorder |
| V67 | Follow-up examination |
| V67.3 | Follow-up examination following psychotherapy & other treatment for mental disorder |
| V68 | Encounters for administrative purposes |
| V68.1 | Issue of repeat prescriptions |
| V68.2 | Request for expert evidence |
| V68.8 | Encounters for other specified administrative purpose |
| V68.9 | Encounters for unspecified administrative purposes |
| V70 | General medical examination |
| V70.1 | General psychiatric exam requested by the authority. |
| V70.2 | General psychiatric examination, other & unspecified. |
| V71 | Observation & evaluation for suspected conditions |
| V71.0 | Observation for suspected mental condition |
| V71.8 | Observation for other specified suspected conditions |
| V71.9 | Observation for unspecified suspected conditions |
| V79 | Special screening for mental disorders & developmental handicaps |
| V79.0 | Screening for depression |
| V79.1 | Screening for alcoholism |
| V79.2 | Screening for mental retardation |
| V79.3 | Screening for developmental handicaps in early childhood |
| V79.8 | Screening for other specified mental disorders & developmental handicaps |
| V79.9 | Screening for unspecified mental disorders & developmental handicaps |
| V80 | Special screening for neurological, eye & ear diseases |
| V80.0 | Screening for neurological conditions |

Back To Top ⬆

## PRODUCT OPTIONS/BENEFIT ENHANCEMENTS

Back To Top ⬆

CONFIDENTIAL                                                                                                     AET-00296763

## TRAINING RESOURCES/POWERTOOLS/JOBAIDS

| | |
|---|---|
| Aetna Learning Center Course # | ⊠ Allowable Charge for Non Participating Behavioral Health Providers (course 12686)<br><br>⊠ Aetna Strategic Desktop (ASD) Aetna Behavioral Health (ABH) CSR full user Training (course 10671) |
| Powertools | There are no Powertools for this topic. |
| JobAids | There are no JobAids for this topic. |
| Bright Ideas | http://aetnet.aetna.com/nco/bi/user_guide/bh_non-par_fee_calc_hmo.html<br><br>http://aetnet.aetna.com/nco/bi/user_guide/bh_non-par_fee_calc_trad.html |
| Learning and Performance | http://aetnet.aetna.com/nco/bustran/modules/pk_tools/sbh/frontend.html |

Back To Top ⬆

## RELATED INFORMATION

| Policy Document Number | Original Effective Date |
|---|---|
| EPOLI.2006.025 | 2006 |

**HMO**
Policy/Overview
Customer Service
Claim Processing
Product Applicability
Training Resources/Powertools/JobAids
Archives

**Traditional**
Policy/Overview
Customer Service
Claim Processing
Product Applicability
Training Resources/Powertools/JobAids
Archives

CONFIDENTIAL                                                                                                      AET-00296764

# EXHIBIT I

# $ K @ **Reasonable and Customary - Claim Processing - Profiling Rules**

| | |
|---|---|
| Released Online: | Updated 04/04/03 |
| | |
| Applies to Traditional Choice (Indemnity), Elect Choice (EPO), ASC, Insured, National Account, Key/Select Accounts, Small Group Business, Open Choice (PPO), Managed Choice (POS), Open Access Elect Choice, Open Access Managed Choice (POS), Healthfund, Affordable HealthChoices | |
| | |
| Systems: Aecclaims, ACAS | |
| | |
| PolicyPolicy_Dept_Labor_Opinion_Reasonable_Customary_Disclosure | Contact Servicing Reasonable_and_Customary_Contact_Servicing_Administrative | Related InformationReasonable_and_Customary_Related_Information_Administrative | ClaimProcessingReasonable_and_Customary_Claim_Processing_Profiling_Rules |

{bmc Blttria2.bmp}ACASReasonable_Customary_Claim_Processing_ACAS
{bmc Blttria2.bmp}AecclaimsReasonable_Customary_Claim_Processing_Aecclaims
{bmc Blttria2.bmp}MCSReasonable_Customary_Claim_Processing_MCS
{bmc Blttria2.bmp}Profiling InstructionsReasonable_Customary_Claim_Processing_Profiling_Instructions

# **ACAS**
System Assigned Action Codes

---

# Reasonable_and_Customary_Claim_Processing_Profiling_Rules
$ Reasonable and Customary - Claim Processing - Profiling Rules
K Reasonable and Customary - Claim Processing - Profiling Rules;profile - profiling - Profiling Rules
@ Status|0|||0|||||
# Reasonable_Customary_Claim_Processing_ACAS

AET-01339033

Charges submitted on claims that are auto-adjudicated in ACAS are assigned no-profile action codes in the following situations:

Charges that exceed prevailing will be reduced with action code 617, 657.

Charges that exceed prevailing but are within plan prevailing fee liberalization will be accepted with 605.

Providers in EPDB with a No Profile indicator are processed with action code 607.

Claims that involve submissions where the provider API does not a have a zip code that matches the first 3 digits of the Servicing Provider Zip are processed with action code 607.

Claims that pass through ClaimCheck can be processed with action codes 616, 626, 676, 696.

Medicare Direct claims are processed with action code 607.

Processor Instructions
ACAS processors, handling claims that are not auto-adjudicated, are responsible for application of the profile and no-profile rules in this policy and other various policies in TOLR.

ACAS may automatically assign a profile or no-profile action code on claims handled by a processor, or auto-adjudicated, when R&C, ClaimCheck, or other logic is invoked.  It is not necessary to alter system generated action codes for the purpose of following profile and no-profile rules.  Altering these action codes based on documented ACAS procedures/workarounds, or based on CCR instruction, is still necessary.

Note that it is not necessary to enter no-profile action codes on Medicare primary submissions; however, doing so is not considered incorrect.

**#Aecclaims**
Follow the Profiling
InstructionsReasonable_Customary_Claim_Processing_Profiling_Instructions.

Always key the charges and hit enter to get the prevailing fee information.  Then go back up and add the appropriate action code.  Failure to do so will stop the prevailing fee editing.

The following are the more common edits you will encounter, please refer to the Coding Guide manual in CHPL for instructions on handling.

NO PREV FEE - REFER TO CCU

EXC PREV $999/999%-C/L

SUBM GREATER THAN 150% PREV FEE

SUBM LESS THAN HALF PREV FEE

**#MCS**
The MCS system does not send data to the profile system.  The profiling rules in this policy do not apply to claims processed in he MCS system.

**#Profiling Instructions**

---

# Reasonable_Customary_Claim_Processing_Aecclaims
# Reasonable_Customary_Claim_Processing_MCS

AET-01339034

{bmc Blttria2.bmp}OverviewProfiling_Instructions_Overview
{bmc Blttria2.bmp}Do Not ProfileProfiling_Instructions_DoNot_Profile
{bmc Blttria2.bmp}Modifier 26 Profiling
InstructionsProfiling_Instructions_Modifier_26_Profiling_Instructions

#**Overview**

Aetna primarily uses data from Igenex PHCS formerly HIAA to determine R&C. To increase the range of fees being captured, Aetna also captures data as well. The data captured by Aetna is contributed to PHCS (HIAA).

Aetna R&C is used for the following:

- PHCS (HIAA) has no profile for a procedure
- Anesthesia procedures
- Aetna Home grown codes (e.g., private duty nursing)

Profiling is the capturing of data based on the provider's service location (geographical area), the procedure performed, and the amount being charged.  Capturing this data determines future reimbursement amounts.  For this reason it is critical that expenses be profiled or not profiled appropriately.

All fees are automatically captured in the system each time a claim is processed. The system profiles each individual expense unless directed otherwise by the processor (6XX series action code); or if the entire submitted amount is being denied or externally pended.  The system will profile the submitted dollars, not the R&C amount or the negotiated fee amounts.

Refer to 500 and 600 Series Cost Containment Action Code Chart!JumpID(`Helpfile.hlp>second',`500_and_600_Series_Quick_Reference_Action_Code_Char t') in the Codes Online Reference for an explanation of the 500 and 600 series action codes.

The 5XX and 6XX series of action codes control profiling.
- Action codes beginning with a 5 allow profiling of the expense, even if part of the expense is being denied (over R&C).
- Action codes that begin with a 6 will withhold the expense from being profiled.

Profiling instructions apply to all codes, this includes:
- CPT 4 codes (medical, surgical, x-ray, and lab)
- HCPC codes (services and supplies)
- CDT codes (dental) and internally created codes (often referred to as "homegrown" or "dummy" codes).

There are many reasons why a provider may charge other than his or her normal fee for a service.  Do not profile any expenses containing these situations, as this would result in distorted data.

Example:

Claim Edit message  "SUBMITTED LESS THAN HALF THE PREVAILING FEE"
Billed amount        $ 40.00
R & C              $100.00

Do not profile the above scenario because this information negatively

---

# Reasonable_Customary_Claim_Processing_Profiling_Instructions
# Profiling_Instructions_Overview

| Deleted: ¶ |
| Deleted: |

affects the data already captured for the procedure.  Action code 600 is used.

**#Do Not Profile**
Do not profile the following (unless indicated), as the profile data obtained would not be meaningful.  Use a 6xx series action code.

- Intra-office COB (Aetna is both primary and secondary payer) – follow profile guidelines for the primary claim consideration.  Do not profile the secondary claim consideration (including when the primary claim consideration was processed on MCS).
- Do not profile billing address, only service address.
- Edit 410-less than half prevailing fee.
- Edit 407-150% over prevailing fee.
- Codes re-bundled into one CPT 4 code.
- Code submitted is incorrect and changed or altered by processor, analyst or designated reviewer.
- Any valid secondary procedures on surgical multiple procedure code submissions; code may or may not have modifier 51 attached.  **Note**: This does not include add on codes.  These should be profiled.
- Procedures performed one year prior to the date that they are being processed.
- Arbitrary breakdown of fees by processor or reviewer.
- Reconsidered expenses when the original expense was partially or totally covered (this includes payment made or monies applied toward deductible).  **Note**: Fully denied charges are not passed to the profile system.
- Unlisted service codes, e.g., 30999 unlisted procedure, nose.
- Generic codes, e.g., 99070.
- CCR instructs the use of a no-profile code due to unusual circumstances or complications.
- Bilaterals - if provider bills with one CPT4 code and modifier 50.  Bilaterals submitted on two lines should be profiled see Communication letter S 93-35 for instructions.
- Codes listed with modifiers: 22, 51, 50 (as described above), 20, 21, 23, 52, 54, 66, 76, 77, 78, 99 AB, AC, AD, QK or QY.
- Procedures that require referral to CCR for a scheduled benefit allowance.
- Prenatal visits benefited prior to the termination of pregnancy.
- Surgical procedures that include the cost of the facility/surgical suite (that has not been recognized as a Physician's Office-Based Surgical Facility) -i.e., facility charges are re-bundled into the surgery.
- Co-surgeon's (identified with modifier 62) fees, if acting in the capacity of an assistant surgeon rather than a true co-surgeon.
- Surgical procedures involving the use of an operating microscope when not described by a distinct CPT code. This is not the same as micro-dissection codes, e.g., 61712.

**#Modifier 26 Profiling Instructions**
- If bills are received with a modifier 26, and the system accepts the modifier, profile the charge.  Example - TOS 05, CPT code and modifier 26.  If the system accepts, profile if the bill has the PC, states professional fee, or modifier 26.

- If bills are received with a modifier 26, and the system does not accept the modifier, do not profile the charge.  The amount will go toward the global fee code.  There could be a negotiated fee for the Professional Component (modifier 26) even though the system doesn't take the modifier in the processing field. This amount displays to the processor when the code is entered without the modifier - the global fee/prof component fee displays. There shouldn't be any R&C data because the system can't profile under a modifier it doesn't accept.

---

# Profiling_Instructions_DoNot_Profile
# Profiling_Instructions_Modifier_26_Profiling_Instructions

- For independent labs that bill with a place of service of inpatient or outpatient, and do not identify on the bill as TC or global, treat as a PC (26) type of service.  Usually these bills have "professional fee" or "PC" typed on the bill itself.

This Document is for internal use only except as expressly authorized and is not for redistribution.

CONFIDENTIAL

AET-01339037

**# $ K @ Contact Does Not Have a CPT Code**
Released Online 08/05/03

Call the provider to request the CPT when the caller is a member and doesn't have the CPT code.

If the provider:

- Is not sure what procedure they are going to perform. Tell the provider we are unable to make a determination without the exact service code or description.
- Is not sure what the CPT code is but has an exact description of the service to be rendered.  Use autocoderAutocoder_PF_Key_Functions_Aecclaims_Topics to determine the code.   If you are unable to determine a code – follow the workflow outlined in Clinical Claim Review - Claim ProcessingClinical_Claim_Review_Claim_Processing coding services section.

See: PHCS (HIAA) Rates - Strategic Pricer - Systems for information on how to locate R&C in the system.HIAA_Rates_Strategic_Pricer

---

# Contact_does_not_have_a_CPT_code
$ Contact Does Not Have a CPT Code
K Contact Does Not Have a CPT Code
@ Status|0|||0|||||

AET-01339038

**# $ K @ Prevailing Fee Liberalization Example**
Released Online 08/05/03

Example:

| | |
|---|---|
| ALT FEE SURG | 90TH PERCENTILE |
| ALT FEE MED | 90TH PERCENTILE |
| ALT FEE DXL | 90TH PERCENTILE |

This CCI wording indicates that the plan has the 90th percentile for surgical, medical and diagnostic x-ray and lab.

---

[#] Prevailing_Fee_Liberalization_Example
[$] Prevailing Fee Liberalization Example
[K] Prevailing Fee Liberalization Example
[@] Status|0|||0||||||