## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

----------------------------------------------------------X

IN RE:  AETNA UCR LITIGATION

Master Docket No. 07-3541(FSH)(PS)

MDL NO. 2020

_____

This Document Relates to:    ALL CASES

----------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' JOINT CONSOLIDATED AMENDED COMPLAINT AND PLAINTIFFS' SECOND JOINT CONSOLIDATED AMENDED COMPLAINT

D. Brian Hufford
Robert J. Axelrod
Susan J. Weiswasser
Jay D. Dean
POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP
100 Park Avenue
New York, New York 10017
(212) 661-1100

*Chair of the Aetna Plaintiffs' Executive Committee*

[Additional Counsel on Signature Page]

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

I.  THE INGENIX DATABASE ................................................................................ 1

II.  PLAINTIFFS' CLAIMS ....................................................................................... 2

III.  THE SAC IS THE OPERATIVE COMPLAINT ................................................. 3

IV.  PLAINTIFFS SATISFY THE PLEADING REQUIREMENTS OF
    *TWOMBLY* AND *IQBAL* (MTD SEC. I) ........................................................... 3

V.  PLAINTIFFS ALLEGE VALID CLAIMS FOR BENEFITS UNDER ERISA
    § 502(a)(1)(B) (MTD SEC. VI) ............................................................................. 5

    A.  Plaintiff Hull's Claims are Properly Brought against Defendants ................................. 5

    B.  Plaintiff Franco's Claims are Not Time-Barred ............................................................. 6

VI.  PLAINTIFFS ADEQUATELY ALLEGE "NON-INGENIX-BASED ERISA
    BENEFITS CLAIMS (MTD SEC. V) .................................................................. 8

VII.  PLAINTIFFS ALLEGE VALID CLAIMS FOR VIOLATION OF
    ERISA §§ 502(a)(3) AND 503 (MTD SEC. VII) ............................................... 11

VIII.  PLAINTIFFS ALLEGE VALID RICO CLAIMS (MTD SEC. III) ........................... 15

    A.  Plaintiffs Properly Allege Fraud, Causation, and RICO Injury ................................... 15

        1.  Plaintiffs' RICO Claims Satisfy Rule 9(b) .............................................. 15
        2.  Plaintiffs Properly Plead Mail Fraud Predicate ....................................... 16
        3.  Plaintiffs Properly Plead Causation and RICO Injury ............................ 20

    B.  Plaintiffs Sufficiently Allege the Existence of an Enterprise ....................................... 23

    C. Plaintiffs Allege Aetna's Participation in the Operation or Management of the Aetna-
        Ingenix Enterprise ......................................................................................................... 25

    D.  Plaintiffs Allege a Valid RICO Conspiracy Claim ....................................................... 27

IX.  PLAINTIFFS STATE A CLAIM UNDER
    THE SHERMAN ACT (MTD SEC. II) .............................................................. 29

    A.  Plaintiffs Plausibly Allege Actionable Antitrust Violations .......................................... 30

    B. Plaintiffs Sufficiently Allege Both Parallel Conduct and "Plus Factors"
        Required to Plead an Antitrust Conspiracy ................................................................... 32

    C. Defendants' Exchange of Information Supports Plaintiffs' Allegations
        of an Unlawful Conspiracy ........................................................................................... 34

    D.  Plaintiffs Adequately Plead a Restraint of Trade under the Rule of Reason ............... 35

    E. Defendants' Use of Tainted UCRs was Contrary to their Independent
        Economic Interests ........................................................................................................ 38

X.   PLAINTIFFS ADEQUATELY ALLEGE STANDING
     (MTD SECS. IV & VIII) ................................................................................ 40

     A.   Subscriber Plaintiffs Samit and Hull Have Standing to Assert their Claims ............... 40

     B.   The Association Plaintiffs Have Standing to Assert their Claims ............................... 43

          1.   The Association Plaintiffs Have Standing to Assert Direct Claims ........................ 43
          2.   The Association Plaintiffs Have Representative Standing  to Assert Claims
               on Behalf of their Members ...................................................................... 45

XI.  PLAINTIFF WEINTRAUB ALLEGES ACTIONABLE CLAIMS UNDER
     NEW YORK LAW (MTD SEC. IX) .............................................................. 47

     A.   Plaintiff Weintraub Alleges an Actionable GBL § 349 Claim .................................. 47

     B.   Plaintiff Weintraub Alleges Actionable Common Law Claims .................................. 49

CONCLUSION .................................................................................................. 50

# TABLE OF AUTHORITIES

## CASES

*ADA v. Cigna Corp.,*
605 F.3d 1283  MTD at 18......................................................................................18

*AMA v. United Healthcare Corp.,*
588 F. Supp. 2d 432 (S.D.N.Y. 2008)...........................................................30, 33, 37, 38

*AMA v. United Healthcare Corp.,*
2001 U.S. Dist. LEXIS 10818 (S.D.N.Y. July 31, 2001) .................................................44, 48

*AMA v. United Healthcare Corp.,*
2002 U.S. Dist. LEXIS 20309 .................................................................................45, 46

*AMA v. United Healthcare Corp.,*
2007 U.S. Dist. LEXIS 44196 (S.D.N.Y. June 18, 2007) ................................................41, 46

*In re ATM Fee Antitrust Litig.,*
2006 U.S. Dist. LEXIS 89836 (N.D. Cal., Nov. 30, 2006).....................................................40

*Ace Chrome Corp. v. IBEX Constr.,*
2009 U.S. Dist. LEXIS 71547 (S.D.N.Y. Aug. 13, 2009).....................................................47

*In re Advanta Corp. Sec. Litig.,*
180 F.3d 525 (3d Cir. 1999)...................................................................................17

*Am. Column & Lumber Co. v. United States,*
257 U.S. 377 (1921)...........................................................................................30

*In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.,*
2007 U.S. Dist. LEXIS 35980 (E.D. Pa. Aug. 29, 2007).....................................................21

*Am. Pipe & Constr. Co. v. Utah,*
414 U.S. 538 (1974)............................................................................................7

*Am. Tel. & Tel. Co. v. Empire Blue Cross & Blue Shield,*
1994 U.S. Dist. LEXIS 21091 (D.N.J. July 19, 1994)...........................................................16

*American Needle, Inc. v. NFL*,
130 S. Ct. 2201 (2010) ........................................................................38

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987) ...............................................................39

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ................................................................3, 4, 8

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) .........................................................34, 39

*Batas v. Prudential Ins. Co.*,
281 A.D.2d 260 (1st Dep't 2001) .......................................................48

*Bd. of Trs. of Ironworkers Local No. 498 Pension Fund v. Nationwide Life Ins. Co.*,
2005 U.S. Dist. LEXIS 6159 (N.D. Ill. Mar. 28, 2005) .......................16

*Behrend v. Comcast Corp.*,
532 F. Supp. 2d 735 (E.D. Pa. 2007) .................................................28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................3, 32, 33

*Beth Isr. Med. Ctr. v. Horizon Blue Cross and Blue Shield of NJ*,
448 F.3d 573 (2d Cir. 2006) ...............................................................47

*Black v. Long Term Disability Ins.*,
373 F. Supp. 2d 897 (E.D. Wis. 2005) ...............................................11

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982) ....................................................................21, 37

*Bollig v. Christian Cmty. Homes & Serv., Inc.*,
2003 U.S. Dist. LEXIS 27138 (W.D. Wis. July 20, 2003) ...................41

*Borrero v. United Healthcare of N.Y. Inc.*,
610 F.3d 1296 (11th Cir. July 6, 2010) ........................................45, 46

*Boyle v. United States,*
  129 S. Ct. 2237 (2009)..................................................................................................23

*Bridge v. Phoenix Bond & Indem. Co.,*
  553 U.S. 639, 128 S. Ct. 2131 (2008)....................................................................17, 18, 22

*Brokerage Concepts, Inc. v. U.S. Healthcare,*
  140 F.3d 494 (3d Cir. 1999)..........................................................................................22

*Brown v. Ret. Comm. of Briggs & Stratton Ret. Plan,*
  797 F.2d 521 (7th Cir. 1986) .........................................................................................7

*Brunswick v. Pueblo Bowl-O-Mat,*
  429 U.S. 477 (1977)........................................................................................................37

*Burke v. Kodak Retirement Income Plan,*
  336 F.3d 103 (2d Cir. 2003)............................................................................................8

*Burke v. PricewaterhouseCoopers LLP LongTerm Disability Plan,*
  572 F.3d 76 (2d Cir. 2009)..............................................................................................7

*Burstein v. Ret. Account Plan for Employees of Allegheny*
  *Health Educ. & Research Found.,* 334 F.3d 365 (3d Cir. 2003).......................................12, 42

*In re Chocolate Confectionary Antitrust Litig.,*
  602 F. Supp. 2d 538 (E.D. Pa. 2009) .............................................................................33

*Christidis v. First Penn. Mortgage Trust,*
  717 F.2d 96 (3d Cir. 1983)..........................................................................................11, 15

*Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.,*
  591 F.3d 1337 (11th Cir. 2009) ..................................................................................45, 46

*Cont'l Airlines, Inc. v. United Air Lines, Inc.,*
  120 F. Supp. 2d 556 (E.D. Va. 2000) ...........................................................................32

*Contractual Obligation Productions, LLC v. AMC Networks, Inc.*,
2006 U.S. Dist. LEXIS 16402 ........................................................................50

*Cook v. N.Y. Times Co. Group Long Term Disability Plan, No.*,
2004 U.S. Dist. LEXIS 1259 (S.D.N.Y. Jan. 27, 2004) ..........................................8

*Cowell v. Palmer Township*,
263 F.3d 286 (3d Cir. 2001).......................................................................4

*Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392 (7th Cir. 2009) .....................................................................26

*Crimpers Promotions Inc. v. HBO, Inc.*,
724 F.2d 290 (2d Cir. 1983).......................................................................37

*Curcio v. John Hancock Mut. Life Ins. Co.*,
33 F.3d 226 (3d Cir. 1994)...................................................................13, 14

*Cyr v. Reliance Standard Life Ins. Co.*,
525 F. Supp. 2d 1165 (C.D. Cal. 2007) .............................................................13

*Darrick Enter. v. Mitsubishi Motors*,
2007 U.S. Dist. LEXIS 72956 (D.N.J. Sept. 28, 2007) .............................................15

*Deer Park Enter., LLC v. Ali Sys., Inc.*,
57 A.D.3d 711, 870 N.Y.S.2d 89 (N.Y. 2008) ......................................................49

*Depenbrock v. CIGNA Corp.*,
389 F.3d 78 (3d Cir. 2004).......................................................................42

*Devlin v. Empire Blue Cross & Blue Shield*,
274 F.3d 76 (2d Cir. 2001).......................................................................11

*Devlin v. Scardelletti*,
536 U.S. 1 (2002)...............................................................................7

*Dewitt v. Penn-Del Directory Corp.*,
106 F.3d 514 (3d Cir. 1997)......................................................................42

*Elacqua v. Physicians' Reciprocal Insurers,*
52 A.D.3d 886, 889 (3d Dep't 2008) .......................................................48

*Evans v. Employee Benefit Plan,*
311 Fed. Appx 556 (3d Cir. 2009) ...........................................................5

*Fed. Savs. & Loan Ins. Corp. v. Shearson-Am. Express, Inc.,*
658 F. Supp. 1331 (D.P.R. 1987) .............................................................19

*In re Flat Glass Antitrust Litig.,*
385 F.3d 350 (3d Cir. 2004) ...............................................................33, 34

*Ford Motor Credit Co. v. Chiorazzo,*
529 F. Supp. 2d 535 (D.N.J. 2008) .........................................................15

*Fowler v. UPMC Shadyside,*
578 F.3d 203 (3d Cir. 2009) .....................................................................4

*Franco v. CIGNA,*
2008 U.S. Dist. LEXIS 110566 (D.N.J. Aug. 6, 2008) ...........................41

*Gaidon v. Mut. Life Ins. Co. of N.Y.,*
94 N.Y.2d 330 (N.Y. 1999) .....................................................................48

*Goldman v. Metro. Life Ins. Co.,*
5 N.Y. 3d 561, 841 N.E.2d 742 (N.Y. 2005) ..........................................49

*Gonzales v. Lloyds TSB Bank, PLC,*
532 F. Supp. 2d 1200 (C.D. Cal. 2006) ...................................................19

*Goren v. New Vision Int'l, Inc.,*
156 F.3d 721 (7th Cir. 1998) ...................................................................25

*Graden v. Conexant Sys. Inc.,*
496 F.3d 291 (3d Cir. 2007) .....................................................................5

*Grider v. Keystone Health Plan Cent., Inc.,*
2003 U.S. Dist. LEXIS 16551 (E.D. Pa. Sept. 18, 2003) ...................20, 21

*Grossmuller v. Int'l Union, UAW Local 813,*
   715 F.2d 853 (3d Cir. 1983)............................................................................7

*Hackett v. Xerox Corp. Long-Term Disability Income Plan,*
   315 F.3d 771 (7th Cir. 2003) .......................................................................14

*Hahnemann Univ. Hosp. v. All Shore, Inc.,*
   514 F.3d 300 (3d Cir. 2008)..........................................................................5

*Hall v. Aetna Life Ins. Co.,*
   No. 09-222 (N.D. Fla. Sept. 29, 2010)....................................................10, 41

*Hansen v. Cont'l Ins. Co.,*
   940 F.2d 971 (5th Cir. 1991) .......................................................................13

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982)................................................................................43, 44

*Heartland Payment Sys., Inc. v Micros Sys.,*
   2008 U.S. Dist. LEXIS 74972 (D.N.J. Sept. 29, 2008) ..........................32, 38

*Hooven v. Exxon Mobil Corp.,*
   465 F.3d 566 (3d Cir. 2006)......................................................................12, 41

*Hunt v. Wash. State Apple Adver. Comm'n,*
   432 U.S. 333 (1977)................................................................................45, 46

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.,*
   253 F. Supp. 2d 262 (D. Conn. 2003) .........................................................38

*In re Ins. Brokerage Antitrust Litig.,*
   618 F.3d 300 (3d Cir. 2010)................................................................ passim

*Jones v. Cito,*
   2010 U.S. Dist. LEXIS 71507 (D.N.J. July 16, 2010) ...............................4

*Juliano v. HMO of N.J.,*
   221 F.3d 279 (2d Cir. 2000).........................................................................8

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
   926 F.2d 1406 (3d Cir. 1991) ...........................................................................16

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ...........................................................................37

*Laurenzano v. Blue Cross and Blue Shield of Mass. Inc. Ret. Income Trust*,
   134 F. Supp. 2d 189 (D. Mass. 2001) ...............................................................11

*Livingston v. Shore Slurry Seal, Inc.*,
   98 F. Supp. 2d 594 (D.N.J. 2000) .....................................................................17

*Maalouf v. Salomon Smith Barney, Inc.*,
   2003 U.S. Dist. LEXIS 5913 (S.D.N.Y. April 10, 2003) ...................................50

*Maio v. Aetna Inc.*,
   221 F.3d 472 (3d Cir. 2000).....................................................................4, 20, 21

*In re Managed Care Litig.*,
   298 F. Supp. 2d 1259 (S.D. Fla. 2003) ..................................................43, 44, 45

*In re Managed Care Litig.*,
   595 F. Supp. 2d 1349 (S.D. Fla. 2009) .......................................................44, 45

*Maple Flooring Mfrs. Ass'n v. United States*,
   268 U.S. 563 (1925).........................................................................................34

*Masters v. Wilhelmina Model Agency*,
   2003 U.S. Dist. LEXIS 698 (S.D.N.Y. Jan. 17, 2003) .......................................34

*McCall v. Metro. Life Ins. Co.*,
   956 F. Supp. 1172 (D.N.J. 1996) ......................................................................40

*McCoy v. Health Net, Inc.*,
   569 F. Supp. 2d 448 (D.N.J. 2008) .................................................................1, 2

*In re Mercedes-Benz Antitrust Litig.*,
   157 F. Supp. 2d 355 (D.N.J. 2001) ...................................................................34

*Michael Davekos, P.C. v. Liberty Mut. Ins. Co.*,
   2008 Mass. App. Div. 32 (Mass. App. Div. Jan. 24, 2008)...................................................2

*Miller v. Fortis Benefits Ins. Co.*,
   475 F.3d 516 (3d Cir. 2007).........................................................................................6

*Mitchell v. Eastman Kodak Co.*,
   113 F.3d 433 (3d Cir. 1997)........................................................................................42

*Mitel Corp. v. A&A Connections Inc.*,
   1998 U.S. Dist. LEXIS 3576 (E.D. Pa. Mar. 20, 1998).........................................................39

*Moench v. Robertson*,
   62 F.3d 553 (3d Cir. 1995)........................................................................................42

*Mornay v. Travelers Inc., CIV. A.*,
   2008 U.S. Dist. LEXIS 46305 (E.D. La. June 13, 2008)...................................................33, 47

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984)...............................................................................................32

*NOW v. Scheidler*,
   510 U.S. 249 (1994)...........................................................................................21, 22

*N. Pac. Ry. Co. v. United States*,
   356 U.S. 1 (1958)................................................................................................31

*Nat'l Congress for Puerto Rican Rights v. City of N.Y.*,
   75 F. Supp. 2d 154 (S.D.N.Y. 1999)...............................................................................44

*Newcal Indus. v. Ikon Office Solutions*,
   513 F.3d 1038 (9th Cir. 2008) ...................................................................................35

*In re OSB Antitrust Litig.*,
   2007 U.S. Dist. LEXIS 56573 (E.D. Pa. Aug. 3,  2007).........................................................33

*Owen v. Regence BlueCross BlueShield of Utah*,
   388 F. Supp. 2d 1318 (D. Utah 2005)...........................................................................21, 41

*Pa. Psychiatric Soc'y v. Green Spring Health Servs.*,
280 F.3d 278 (3d Cir. 2002)................................................................................46

*Pell v. E. I. DuPont de Nemours & Co.*,
539 F.3d 292 (3d Cir. 2008)................................................................................14

*Pereira v. United States*,
347 U.S. 1 (1954)................................................................................................20

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir.2008)............................................................................4, 50

*Precopio v. Bankers Life & Cas. Co.*,
2004 U.S. Dist. LEXIS 30425 (D.N.J. Aug. 10, 2004)................................14, 42

*Priority Solutions, Inc. v. CIGNA & Air France Medical Plan*,
2000 U.S. Dist. LEXIS 705 (S.D.N.Y. Jan. 12, 2000) ..........................................9

*Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*,
614 F.3d 57 (3d Cir. 2010)....................................................................................4

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)............................................................................................25

*Riordan v. Nationwide Mutual Fire Ins. Co.*,
756 F. Supp. 732 (S.D.N.Y. 1990)......................................................................48

*Rolo v. City Investing Co. Liquidating Trust*,
155 F.3d 644 (3d Cir. 1998)................................................................................15

*Rumpf v. Metro. Life Ins. Co.*,
2010 U.S. Dist. LEXIS 74388 (E.D. Pa. July 23, 2010)........................................7

*S. Broward Hosp. Dist v. MedQuist, Inc.*,
516 F. Supp. 2d 370 (D.N.J. 2007) .....................................................................15

*Sadowski v. Unum Life Ins. Co. of Am.*,
2008 U.S. Dist. LEXIS 61446 (E.D. Pa. Aug. 11, 2008)........................................6

*Salinas v. United States*,
   522 U.S. 52 (1997)................................................................................................27

*Salisbury v. Hartford Life & Accident Ins. Co.*,
   583 F.3d 1245 (10th Cir. 2009) ..............................................................................7

*Sanchez v. Triple-S Mgmt. Corp.*,
   492 F.3d 1 (1st Cir. 2007)......................................................................................16

*Schafer v. State Farm Fire and Cas. Co.*,
   507 F. Supp. 2d 587 (E.D. La. 2007) ..............................................................33, 39

*Scharfman v. Health Net, Inc.*,
   No. 05-301 (D.N.J. July 25, 2007).........................................................................14

*In re Schering-Plough Corp. Erisa Litig.*,
   2007 U.S. Dist. LEXIS 59708 (D.N.J. August 15, 2007)........................................13

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
   2009 U.S. Dist. LEXIS 58900 (D.N.J. July 10, 2009).......................................17, 20

*Schmuck v. United States*,
   489 U.S. 705 (1989).........................................................................................17, 18

*Schoonejongen v. Curtiss-Wright Corp.*,
   143 F.3d 120 (3d Cir. 1998)...................................................................................42

*Schwartz v. Oxford Health Plans*,
   175 F. Supp. 2d 581 (S.D.N.Y. 2001).......................................................................9

*Sebastian Int'l, Inc. v. Russolillo*,
   128 F. Supp. 2d 630 (C.D. Cal. 2001) ....................................................................18

*Sedima, S.P.R.L. v. Imrex Co. Inc.*,
   473 U.S. 479 (1985).........................................................................................21, 22

*See EP Medsystems, Inc. v. EchoCath, Inc.*,
   235 F.3d 865 (3d Cir. 2000)...................................................................................16

*Seville Indus. Mach. v. Southmost Mach.*,
   742 F.2d 786 (3d Cir. 1984)...........................................................................15

*Soule v. Norton*,
   750 N.Y.S.2d 692 (4th Dep't 2002) ..............................................................48

*Spagnola v. Chubb Corp.*,
   574 F.3d 64 (2d Cir. 2009).............................................................................48

*Standard Iron Works v. ArcelorMittal*,
   639 F. Supp. 2d 877 (N.D. Ill. 2009) ............................................................34

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)......................................................................32, 38

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
   171 F.3d 912 (3d Cir. 1999).....................................................................15, 37

*Steffy v. Liberty Life Assurance Co.*,
   2009 U.S. Dist. LEXIS 93515 (W.D. Pa. Oct. 7, 2009) .................................11

*Sugar Inst., Inc. v. United States*,
   297 U.S. 553 (1936)........................................................................................30

*Tackett v. M&G Polymers, USA, LLC*,
   561 F.3d 478 (6th Cir. 2009) .........................................................................11

*Texaco, Inc. v. Dagher*,
   547 U.S. 1 (2006)............................................................................................31

*In re U.S. Foodservice Inc. Pricing Litig.*,
   2009 U.S. Dist. LEXIS 117403 (D. Conn. Dec. 21, 2009)..............................19

*United States v. Aimone*,
   715 F.2d 822 (3d Cir. 1983)...........................................................................24

*United States v. Am. Linseed Oil Co.*,
   262 U.S. 371 (1923)........................................................................................30

*United States v. Brown Univ.*,
   5 F.3d 658 (3d Cir. 1993) ............................................................................36, 38

*United States v. Console*,
   13 F.3d 641 (3d Cir. 1993)..................................................................................28

*United States v. Container Corp. of Am.*,
   393 U.S. 333 (1969)..............................................................................................30

*United States v. D'Amato*,
   39 F.3d 1249 (2d Cir. 1994)................................................................................16

*United States v. Fernandez*,
   388 F.3d 1199 (9th Cir. 2004) ...........................................................................27

*United States v. Green*,
   592 F.3d 1057 (9th Cir. 2010) ...........................................................................16

*United States v. Kapp*,
   781 F.2d 1008 (3d Cir. 1986)..............................................................................28

*United States v. Kreimer*,
   609 F.2d 126 (5th Cir. 1980) ..............................................................................16

*United States v. Parise*,
   159 F.3d 790 (3d Cir. 1998).................................................................................25

*United States v. Philip Morris USA, Inc.*,
   449 F. Supp. 2d 1 (D.D.C. 2006), *aff'd in relevant part*,
   566 F.3d 1095 (D.C. Cir. 2009) .........................................................................29

*United States v. Shifman*,
   124 F.3d 31 (1st Cir. 1997)..................................................................................25

*United States v. Tiller*,
   302 F.3d 98 (3d  Cir. 2002)..........................................................................19, 20

*United v. Frega*,
   179 F.3d 793 (9th Cir. 1999) .......................................................................28, 29

*Vaughn v. Metropolitan Life Ins. Co.*,
  87 F. Supp. 2d 421 (E.D. Pa. 2000) ...................................................................13

*Wachtel v. Guardian Life Ins. Co.*,
  223 F.R.D. 196 (D.N.J. 2004) .............................................................................13

*Walling v. Brady*,
  125 F.3d 114 (3d Cir. 1997) ................................................................................14

*Walter v. Drayson*,
  538 F.3d 1244 (9th Cir. 2008) ............................................................................26

*Weaver v. Phoenix Home Life Mut. Ins. Co.*,
  990 F.2d 154 (4th Cir. 1993) ..............................................................................14

*White v. Sun Life Assurance Co.*,
  488 F.3d 240 (4th Cir. 2007) ...............................................................................7

*Yang v. Odom*,
  392 F.3d 97 (3d Cir. 2004)...................................................................................7

## FEDERAL STATUTES

18 U.S.C. § 664 ............................................................................................................16

18 U.S.C. § 1961 et seq. ("RICO")................................................................... *passim*

29 U.S.C. 1001 et seq. ("ERISA") ................................................................... *passim*

## FEDERAL RULES AND REGULATIONS

Fed. R. Civ. P. 8(a) .....................................................................................................16

Fed. R. Civ. P. 9(b) ..........................................................................................15, 16, 18,
                                                                                                                    19
29 C.F.R. 2520.102-2..................................................................................................12

29 C.F.R. §§ 2520.102-3.............................................................................................12

29 C.F.R. §§ 2560.503-1(g)(1)(v)...............................................................................7, 8

29 C.F.R. 2560.503-1(h) .............................................................................................7

**STATE STATUTES**

NY GBL § 349...........................................................................................47, 48, 49

**MISCELLANEOUS**

Healthcare Industry Task Force, State of New York, NYAG, Health Care Report: The
  Consumer Reimbursement System is Code Blue (Jan. 13, 2009) ...........................................2

Report & Recommendation, *Scharfman v. Health Net, Inc.*,
  No. 05-301 (D.N.J. July 25, 2007) .........................................................................14

Plaintiffs, consisting of Subscribers, Providers and Medical Associations, hereby respectfully oppose the motion to dismiss ("MTD") filed by Defendants Aetna Health Inc. PA, Corp. Aetna Health Mgmt, LLC, Aetna Life Insurance Company, Aetna Health Inc., Aetna Insurance Company of Connecticut (collectively, "Aetna"), Ingenix, Inc. ("Ingenix") and UnitedHealth Group, Inc. ("UHG") (collectively, "Defendants").

<u>**INTRODUCTION**</u>

I.   <u>**THE INGENIX DATABASE**</u>

The Joint Consolidated Second Amended Class Action Complaint ("SAC") alleges that Aetna relied on a database developed and promulgated by Ingenix, a wholly owned subsidiary of UHG (the "Ingenix database"), to determine the usual, customary and reasonable ("UCR") rates for reimbursing out-of-network ("ONET") health care services. While still in use by Aetna and others, the Ingenix database is a discredited method for setting benefit levels.

In *McCoy v. Health Net, Inc*., 569 F. Supp. 2d 448 (D.N.J. 2008), this Court approved a settlement arising primarily from a challenge to the use of the Ingenix database. In doing so, the Court highlighted many of the inherent flaws in the system, including, *inter alia*, its failure to "test the voluntarily submitted data to see if the data constitutes an accurate representative sample of charges for a particular procedure in a particular geographical area"; its reliance "upon too few data points for each procedure," which exclude points that "may be the most important factors in determining 'reasonable' and 'customary' costs"; its "undermin[ing] [of] the 'core concepts of UCR' by 'scrubbing' the data it does receive in a way that further skews UCR rates downward"; and its "fail[ure] to account for the fact that some CPT codes have a wider distribution of charges (*i.e.*, standard deviation) than others," which means that "the derived percentiles understate the true upper percentile values for these CPT codes." *Id.* at 464–68. The "end result" was that Health Net "reimburses insureds based on an artificially low rate used to

reflect UCR." *Id.* at 468. *See also Michael Davekos, P.C. v. Liberty Mut. Ins. Co.,* 2008 Mass. App. Div. 32 (Mass. App. Div. Jan. 24, 2008) ("[T]he Ingenix statistical analyses are derivative only, and the record indicates that the Ingenix raw data itself . . . lacks the requisite indicia of reliability to be admissible.").

In addition, the New York Attorney General ("NYAG") recent investigation of Ingenix concluded that "the conflict of interest problems . . . are not hypothetical; they are real because the Ingenix databases in fact under-reimburse consumers." Healthcare Industry Task Force, State of New York, NYAG, Health Care Report: The Consumer Reimbursement System is Code Blue at 19 (Jan. 13, 2009). The NYAG subsequently entered into settlement agreements whereby Aetna and UHG, among others, agreed to stop using the Ingenix database to set UCR and contributed financially to establish a new, independent database to replace Ingenix.

## II.   PLAINTIFFS' CLAIMS

The vast majority of health care plans in this country are issued by private employers, which are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). With the exception of Plaintiffs Samit and Weintraub, who are insured through ERISA-exempt plans (which include government, church or individual plans) and have asserted state law claims, Plaintiffs seek relief under ERISA, including § 502(a)(1)(B) for health care benefits, based on Aetna's use of the Ingenix database to make improper UCR determinations. They further seek relief under RICO and the antitrust laws for Defendants' conspiracy to manipulate ONET reimbursement levels by intentionally using a flawed UCR database to reduce benefits.

Defendants do not move to dismiss the ERISA § 502(a)(1)(B) benefits claim for at least ten of the plaintiffs: Subscriber Plaintiffs Werner, Cooper, Whittington and Smiths, and Provider Plaintiffs Antell, Kavali, Mullins, Schorr, Tonrey and Kozma. MTD, Ex. A. Nor do Defendants move to dismiss the state law breach of contract claims of Subscriber Plaintiff Weintraub. *Id.* As

a result, Plaintiffs' ERISA § 502(a)(1)(B) and state law breach of contract claims will proceed notwithstanding Defendants' (mistaken) contention that more fulsome factual pleading is needed for Plaintiffs' remaining ERISA, RICO, Sherman Act and common law claims. SAC ¶¶ 1-63 (summarizing all claims). As shown below, the SAC supplies ***ample*** facts to show each of these remaining claims is facially plausible under *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

<u>**ARGUMENT**</u>

**III.   <u>THE SAC IS THE OPERATIVE COMPLAINT</u>**

Defendants contend the SAC filed on December 24, 2009 [Dkt. # 319] is not the operative pleading in this MDL proceeding. MTD at 3-4. During a December 2009 conference before the Court, Plaintiffs indicated that certain provider plaintiffs wished to join in certain claims (RICO, antitrust) against UHG and Ingenix that were already set forth in the First Amended Complaint. The Court directed Plaintiffs to advise the Court if they wished to proceed with such an amendment, and Plaintiffs did so by way of letter dated December 19, 2009 [Dkt. # 312 & 313].[1] Until now, Defendants have not expressed any uncertainty regarding the operative effect of the SAC filed almost a year ago. Given this procedural history, Defendants waived their right to object to the SAC, which should be deemed to be the operative pleading.

**IV.   PLAINTIFFS SATISFY THE PLEADING REQUIREMENTS
      OF *TWOMBLY*[2] AND *IQBAL* (MTD SEC. I)**

The Supreme Court in *Iqbal* clarified the pleading standard on a motion to dismiss, noting that "a complaint must contain sufficient factual matter, accepted as true, to state a claim

---

[1]  At that time Plaintiffs also advised the Court that in addition to joining the provider plaintiff to the existing antitrust and RICO claims, Subscriber Plaintiff John Seney was added to all counts, and certain minor substantive changes were made to Subscriber Plaintiff Weintraub's unjust enrichment claim. Defendants therefore suffered no prejudice by Plaintiffs' filing of the amended complaint, even if it were found that they first should have sought leave from the Court to do so.

[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

to relief that is plausible on its face," adding that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inferences that the defendant is liable for the misconduct alleged." 129 S. Ct. at 1949 (internal citations and quotation marks omitted); *accord Jones v. Cito*, 2010 U.S. Dist. LEXIS 71507, at *6-7 (D.N.J. July 16, 2010) (FSH) ("civil complaints must now allege 'sufficient factual matter' to show that a claim is facially plausible") (quoting *Iqbal*, 129 S. Ct. at 1948); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("conclusory or 'bare bones' allegations" insufficient).

Contrary to Defendants' assertions, MTD at 4-5, the SAC offers far more than mere conclusory allegations of misconduct. Beyond the ERISA claims (which Aetna barely challenges), the SAC offers a thorough explication of Defendants' alleged conspiracy to systematically under-reimburse consumers for ONET services. Plaintiffs' exhaustive description of Defendants' motives, opportunities and means of engaging in the unlawful conduct provides ample factual detail to demonstrate the "facial plausibility" of Plaintiffs' claims, and raises an actionable inference of Defendants' liability. *Fowler*, 578 F.3d at 210.[3]

---

[3] Defendants argue for the first time in their renewed motion that any dismissal must be with prejudice, even though not a single one of Plaintiffs' claims has previously been dismissed. In this Circuit, leave to amend is liberally granted, particularly to cure a perceived pleading deficiency. *Phillips v. County of Allegheny,* 515 F.3d 224, 245 (3d Cir.2008) ("if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile"); *Jones*, 2010 U.S. Dist. LEXIS 71507, at*9 ("a court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility"). This is not, as Defendants suggest, a case in which a plaintiff has been given multiple attempts to amend what the Court has determined to be a "*failed*" complaint. MTD at 5 (emphasis added). In fact, there has never been an amendment after a ruling. Therefore, any dismissal here should be without prejudice and with leave to amend. *Phillips*, 515 F.3d at 245; *see, e.g., In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 311 (3d Cir. 2010) (district court dismissed claims with prejudice only after affording plaintiffs several opportunities to amend following earlier rulings). The cases cited by Defendants are readily distinguishable. *See Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 84 (3d Cir. 2010) (leave to amend for the fourth time properly denied after summary judgment and expiration of the deadline specified in the district court's

## V.   PLAINTIFFS ALLEGE VALID CLAIMS FOR BENEFITS UNDER ERISA § 502(a)(1)(B) (MTD SEC. VI)

### A.   **Plaintiff Hull's Claims are Properly Brought against Defendants**

Plaintiff Hull is a subscriber in a self-funded group health plan, where Aetna administers the plan, but the benefits are paid by the employer. According to Aetna, Hull has no recourse against Aetna in these circumstances, even though Aetna is functioning as the fiduciary that decides whether and how to use Ingenix or the challenged non-Ingenix methods to determine UCR. MTD at 36-39. Relying on *Graden v. Conexant Sys. Inc.,* 496 F.3d 291, 301 (3d Cir. 2007), *Hahnemann Univ. Hosp. v. All Shore, Inc.,* 514 F.3d 300, 308 (3d Cir. 2008) and *Evans v. Employee Benefit Plan,* 311 Fed. Appx. 556 (3d Cir. 2009), Aetna argues that Aetna, cannot be sued in the Third Circuit for breach of fiduciary duty or for breach of contract because it is not the plan itself. Yet, *Graden* and *Hahnemann* actually stand for the opposite proposition. In this Circuit – unlike the Second Circuit – a fiduciary may be sued for unpaid benefits or fiduciary breaches, even if the plan is self-funded, because the focus is on the fiduciary which is controlling benefits and making decisions. *See Graden*, 496 F.3d at 295, 301 (ERISA "accords various parties the right to sue ERISA plan fiduciaries for breaches of their fiduciary duties" and to seek money "from a solvent party liable to make good on the loss, not from the plan itself"); *Hahnemann*, 514 F.3d at 309 (upholding claim against plan administrator, not the plan, because it "owed a fiduciary duty which it breached by refusing to pay the claim without any justification"). Because Plaintiffs allege that Aetna, and not the employer, is the fiduciary in

---

scheduling order, which triggered higher "good cause" standard); *Cowell v. Palmer Township*, 263 F.3d 286, 296 (3d Cir. 2001) (leave to amend properly denied where amendment would "clearly be futile"); *Maio v. Aetna Inc.*, 221 F.3d 472, 500 (3d Cir. 2000) (same, where "it would not be possible … to amend … to cure the fundamental problem with the complaint").

charge of making UCR determinations and communicating with Aetna subscribers about Ingenix and UCR, they assert a valid ERISA claim.

In any event, while Defendants contest Hull's standing to sue for benefits, they misstate her claim. Hull is suing exclusively for declaratory and injunctive relief, which Defendants ignore.

B.    **Plaintiff Franco's Claims are Not Time-Barred**

Franco's claims did not accrue (and the limitation period did not begin to run) until Aetna denied her claim for benefits. *See Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 520 (3d Cir. 2007) ("In the ERISA context, the discovery rule has been 'developed' into the more specific 'clear repudiation' rule whereby a non-fiduciary cause of action accrues *when a claim for benefits has been denied*.") (emphasis added); *Sadowski v. Unum Life Ins. Co. of Am.*, 2008 U.S. Dist. LEXIS 61446, at *6 (E.D. Pa. Aug. 11, 2008) ("an ERISA action does not accrue until benefits are formally denied"). This is consistent with Aetna's own EOBs, which reported to Ms. Franco that she could pursue legal action upon "the final determination on review," or, in other words, after a final denial of benefits. In this case, Ms. Franco's claims were not actually denied until August 2004, which is when her claims accrued.[4] As a result, her time to file her complaint

---

[4]   On February 2, 2004, Ms. Franco received facial reconstruction surgery from two ONET provides, Dr. Elliot Rose and his co-surgeon, Dr. Frederick Valauri. Aetna issued two EOBs for the services provided by Dr. Rose on, respectively March 18 and 22, 2004, reporting Aetna's determination that $37,835.75 was above UCR out of a total bill of $53,600. On April 1, 2004, Dr. Rose appealed to Aetna on Franco's behalf, but Aetna never even responded. Rather, Aetna simply issued its third EOB (dated Aug. 19, 2004), allowing a mere $462 more, without any explanation of why it was allowing an additional amount or continuing to disallow over $37,000 that remained Franco's financial responsibility. Thereafter, on August 27, 2004, Aetna issued its first (and only) EOB addressing the services performed for Franco by co-surgeon Frederick Valauri. That EOB reported that Aetna only allowed $8960, less than 30% of the $30,275 in billed charges, finding that $17,000 was above UCR. SAC ¶¶ 305-312.

would have run on August 2007. It did not, however, because the statute for Ms. Franco's claims was tolled by the filing of the class action on July 30, 2007.[5]

Aetna also had an obligation to provide a "full and fair review" of denied claims when Franco filed an appeal but Aetna refused to respond to Dr. Rose's requests for information concerning the basis for its UCR reductions, in violation of 29 C.F.R. §§ 2560.503-1(g)(1)(v), 2560.503-1(h) (requiring an insurer to provide any policy relied on if requested), but merely issued a new EOB with a minimal additional payment, and did not rule on the appeal. SAC ¶¶ 305-312. A "full and fair review" under ERISA requires "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Brown v. Ret. Comm. of Briggs & Stratton Ret. Plan*, 797 F.2d 521, 534 (7th Cir. 1986); *see also Grossmuller v. Int'l Union, UAW Local 813,* 715 F.2d 853, 857 (3d Cir. 1983). None of this was offered to Ms. Franco or her ONET provider.[6]

---

[5] Franco is clearly a member of the class seeking relief. SAC ¶ 514 (class definition). It is well-settled that "the filing of an action on behalf of the class tolls a statute of limitations against them." *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002) (*citing Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)); *Yang v. Odom*, 392 F.3d 97, 103 (3d Cir. 2004). Accordingly, Franco's claims against Aetna, which relate back to July 30, 2007, were timely and should not be barred.

[6] Courts have refused to permit a statute of limitations defense where the insurer has provided information that conflicts with its litigation position, as Aetna did here. *See Rumpf v. Metro. Life Ins. Co.,* 2010 U.S. Dist. LEXIS 74388, at *24-25 (E.D. Pa. July 23, 2010) (holding that it would be "unfair and inequitable to hold Plaintiff to any disadvantage" and a "miscarriage of justice" because she followed the instructions in the denial letter, which provided that she could appeal and would then have the right to bring a lawsuit). *See White v. Sun Life Assurance Co.,* 488 F.3d 240, 247 (4th Cir. 2007) ("Th[e] interlocking remedial structure [of administrative review and the courts] does not permit an ERISA plan to start the clock ticking on civil claims while the plan is still considering internal appeals."). *See also Salisbury v. Hartford Life & Accident Ins. Co.*, 583 F.3d 1245 (10th Cir. 2009). Aetna's citation to *Burke v. PricewaterhouseCoopers LLP LongTerm Disability Plan,* 572 F.3d 76, 78 (2d Cir. 2009) is distinguishable and unavailing because it conflicts with holdings in this Circuit.

Aetna's failure to comply with ERISA's minimal procedural requirements tolls the statute of limitations, as it does not begin to accrue until the insurer complies with ERISA. *See Burke v. Kodak Retirement Income Plan,* 336 F.3d 103, 107-09 (2d Cir. 2003) (Where notice of denial failed to meet substantial compliance with ERISA and its regulations, time-bar provision for appeals was not triggered.); *see also Cook v. N.Y. Times Co. Group Long Term Disability Plan,* No., 2004 U.S. Dist. LEXIS 1259 (S.D.N.Y. Jan. 27, 2004).[7]

## VI.   PLAINTIFFS ADEQUATELY ALLEGE "NON-INGENIX-BASED" ERISA BENEFITS CLAIMS (MTD SEC. V)

In Section V of their brief, Defendants complain that Plaintiffs have not limited their challenges to the alleged flaws in the Ingenix database. According to Defendants, the SAC's allegations concerning certain "non-Ingenix-based" methodologies "exponentially" expands their burden in responding on the merits. MTD at 32-34. Aetna's solution, for efficiency, is to have the Court simply "excise" those claims from the SAC without regard to the underlying validity of the claims. *Id.* at 33. The Court, of course, cannot simply "excise" claims to which Defendants would rather not respond. Consistent with *Iqbal*, Plaintiffs have alleged plausible claims challenging Aetna's flawed means of determining UCR beyond just its use of the invalid Ingenix database. While Defendants disingenuously profess not to understand the basis for Plaintiffs'

---

[7] Aetna's EOBs did not provide any concrete information about why over $23,500 was being excluded as exceeding UCR, nor did they disclose what, if any, data was used to determine UCR amounts. In fact, Aetna's claims chart establishes Aetna used Ingenix data, but this information was not provided to Franco except as a byproduct of litigation. Aetna thereby violated its obligation to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1); *see also* 29 C.F.R. § 2560.503-1(g)(1). Moreover, the notice was required to provide reference to the specific plan provisions, and to describe "any additional material or information necessary for the claimant to perfect the claim," so as to enable the member "effectively to protest that decision." *Juliano v. HMO of N.J.*, 221 F.3d 279, 286 (2d Cir. 2000). Aetna's EOBs so substantially violate ERISA that Aetna cannot maintain a statute of limitations defense as to any of its claim denials.

claims, there is no uncertainty here: Plaintiffs allege that Aetna cannot reduce ONET benefits without complying with the specific provisions in its plans that require payment based on UCR. Whether through Ingenix or other non-Ingenix based methodologies, Aetna is required to determine ONET benefit levels based on what most providers charge for those services on the open market (or UCR). It has not done so, and therefore has violated ERISA. SAC ¶ 541.[8]

This is particularly true for Plaintiffs' challenge to the validity of Aetna using Medicare data or average wholesale price ("AWP") to determine UCR for medical services and pharmaceutical drugs, respectively. MTD at 33-34 (citing SAC ¶¶ 60, 401). Both practices are improper. On July 23, 2007, the State of New Jersey Department of Banking and Insurance found Aetna's practice of keying UCR to Medicare rates to be unfair to subscribers and contrary to state law, ordering Aetna to pay "nearly $10 million for systematic unfair business practices related to Aetna's determination of UCR rates for Nonpar services rendered to New Jersey Aetna Members," SAC ¶ 402, a conclusion equally applicable to Aetna's use of Medicare as a replacement for UCR. Likewise, many courts have expressly found that AWP – which is based on the wholesale prices *paid* by providers rather than the retail prices *charged* to insureds – is an inappropriate basis upon which to set UCR. *See, e.g., Schwartz v. Oxford Health Plans,* 175 F. Supp. 2d 581, 591–92 (S.D.N.Y. 2001); *Priority Solutions, Inc. v. CIGNA & Air France Medical Plan*, 2000 U.S. Dist. LEXIS 705, at *7–*8 (S.D.N.Y. Jan. 12, 2000).

---

[8]  *See, e.g.,* SAC ¶¶ 283, 294-98 (Aetna without advance warning or disclosure started reducing mental health reimbursements to 80% of Ingenix for psychologists and 60% for social workers, dramatically impacting the rates paid to mental health professionals and adversely affected Subscriber Plaintiff Werner (among millions of other Aetna subscribers)); SAC ¶ 403 (When Ingenix was not available, Aetna used its own internal fee schedule (the same fee schedule used to pay par providers) to determine UCR for Nonpar); SAC ¶ 371 (Aetna underpaid facility fees relating to office based surgical ("OBS") facilities).

Rather than making any attempt to demonstrate that its practices actually comply with its plan terms, which is the heart of the ERISA claim, Defendants argue instead that the non-Ingenix-based practice of charging 125% of Medicare rates cannot be challenged by ERISA plan members because, according to Aetna, Plaintiffs have supposedly affirmatively alleged that under such circumstances plan members "have 'zero' payment obligations." MTD at 34 (citing SAC ¶ 403). This is a gross mischaracterization of SAC ¶ 403, wherein Plaintiffs in fact allege that it is **Aetna** which confuses plan members by reporting a zero member balance in the "Member Responsibility" statements sent to plan members when, in fact, ONET providers have a right to bill their patients. SAC ¶ 403 (When paying 125% of Medicare, "Aetna routinely misapplied its own discounted fee schedules to Dr. Schorr's claims during the relevant Class Period," and "indicat[ed] a zero member balance on EOBs," with such "confusion mak[ing] collecting billed charges increasingly difficult for Nonpars").[9]

The point here is that, despite being required to pay ONET providers based on UCR, Aetna has on many occasions used Medicare without any valid basis for suggesting that this in any way satisfies the contractual requirement under its plans for ONET services. Indeed, there is simply **no** rational basis upon which to suggest that Medicare – reflecting rates established by a budget-conscious government – represents what most providers actually charge in the open market for health care services. Moreover, Aetna then pressures ONET providers into accepting lower rates by misrepresenting to the subscribers that they don't owe the unpaid portion of the bill to the their providers, when, in fact, it is undisputed that ONET providers have every legal right to expect payment in full from their patients regardless of how little Aetna may pay.

---

[9]  Defendants' passing attack on federal subject matter jurisdiction over the non-Ingenix-based ERISA claims fares no better. MTD at 34. The jurisdictional basis for resolution of the Ingenix-based ERISA claims and the "non-Ingenix-based" ERISA claims is precisely the same.

## VII.  PLAINTIFFS ALLEGE VALID CLAIMS FOR VIOLATION OF ERISA §§ 502(a)(3) AND 503 (MTD SEC. VII)

In addition to their ERISA benefits claims, Plaintiffs allege valid claims involving "non-benefits" violations under ERISA §§ 502(a)(3) and 503. MTD at 41-45. Defendants' bid for summary dismissal of these "non-benefits" ERISA claims in Section VII of their brief fails.

*First*, Defendants argue that the non-benefits claims are purely duplicative of Plaintiffs' claims for benefits under ERISA § 502(a)(1)(B). MTD at 41-42. They are not. Not only do Plaintiffs seek a return of benefits, but they also seek plan-wide relief by imposing requirements on Aetna for how it handles its ONET claims. This relief can properly be provided under Section 502(a)(3). *See Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 491-92 (6th Cir. 2009) ("[T]he plaintiff in *Hill* [*v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 718 (6th Cir. 2005)] also brought a claim for injunctive relief under § 502(a)(3) to require the defendant 'to alter the manner in which it administers all of the . . . claims.' *Id*. The Court noted that this § 502(a)(3) claim was for 'plan-wide injunctive relief, not [for] individual-benefit payments.' *Id*. Although the plaintiff had the ability to seek damages for improperly denied benefits, the Court allowed the plaintiff to proceed on both claims because '[o]nly injunctive relief of the type available under § [502(a)(3)] will provide the complete relief sought.' *Id*."). Here, too, Plaintiffs properly seek injunctive relief under 502(a)(3) to ensure that Aetna complies with its plan terms in paying UCR-based benefits, thereby establishing a valid ERISA claim. In any event, Plaintiffs may plead in the alternative.[10]

---

[10]  *See Steffy v. Liberty Life Assurance Co.*, 2009 U.S. Dist. LEXIS 93515, at *15-16 (W.D. Pa. Oct. 7, 2009) (denying dismissal of §502(a)(3) claim as "duplicative" of claim for benefits under § 502(a)(1) as "misplaced" at the motion to dismiss stage, noting plaintiff's argument that "the Third Circuit in *In re Unisys Corp. Retiree Med Benefit 'ERISA' Litig*., 57 F.3d 1255, 1264 (3d Cir. 1995), allowed the class of ERISA plaintiffs to raise a claim for ERISA benefits and an alternative breach of fiduciary claim"); *Laurenzano v. Blue Cross and Blue Shield of Mass. Inc.*

*Second*, Plaintiffs allege in Count II of the SAC that Aetna failed to provide the accurate and proper summary plan description ("SPD") required by ERISA. While Defendants argue that Sections 102 and 104 do not require disclosure of such information, MTD at 42-44, this is incorrect, as ERISA regulations specify that ONET benefits must be disclosed in the SPD. *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.*, 334 F.3d 365 (3d Cir. 2003).[11] Plaintiffs allege that the SPDs and other critical documents given by Aetna to the Subscriber Plaintiffs (including EOBs) reflect misleading statements and omissions that are relevant to the Plaintiffs' claims for unpaid benefits pursuant to ERISA. SAC ¶ 351. Plaintiffs' SAC further alleges that Aetna has inadequate claim procedures; fails to provide material information; fails to properly disclose information about ONET claims determinations, and suffers other deficiencies in disclosure. SAC ¶¶ 579-581.

These failings are not minor or technical, but materially undermine the plan participants' rights under the plan, particularly as they relate to UCR claims determinations. Misleading or omissive plan documents violate ERISA and its regulations. *Hooven v. Exxon Mobil Corp.,* 465 F.3d 566, 578 (3d Cir. 2006) ("any plaintiff who has relied on an inaccurate or misleading term of an SPD to his or her detriment can recover on a claim for breach of fiduciary duty, . . . or, in

_____

*Ret. Income Trust*, 134 F. Supp. 2d 189, 194 (D. Mass. 2001) (though plaintiffs may not receive relief under 502(a)(3) ***in addition to*** some other form of relief; they are not forced "to elect [their] remedy ***before*** filing a complaint") (emphasis added); *Black v. Long Term Disability Ins.*, 373 F. Supp. 2d 897, 901-02 (E.D. Wis. 2005) ("[A] district court should generally not dismiss a § [502](a)(3) claim as duplicative of a claim for benefits at the motion to dismiss stage of a case[.]"). Plaintiffs do not have to choose between pleading a breach of fiduciary duty claim for equitable relief and a claim for unpaid benefits. *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76 (2d Cir. 2001).

[11]  29 C.F.R. §§ 2520.102-3, 2520.102-2 specify that the SPD must be "written in a manner calculated to be understood by the average plan participant and shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan." SPDs must further specify "whether and under what circumstances, coverage is provided for out-of-network services." 29 C.F.R. § 2520.102-3(j)(3).

'extraordinary circumstances,' an equitable estoppel claim . . . under ERISA section 502(a)(3)(B)"); *In re Schering-Plough Corp. Erisa Litig.*, 2007 U.S. Dist. LEXIS 59708, at *16 (D.N.J. August 15, 2007) (citations omitted) ("courts in this district and elsewhere have regularly found that a material misstatement contained in, or incorporated by reference in, an SPD is actionable pursuant to ERISA").[12]

**Third**, although Aetna contends that it is not the "plan" administrator for Plaintiff Hull and is therefore not obligated to comply with ERISA's disclosure requirements, MTD at 44, Plaintiffs allege that Aetna both exercised *de facto* control over the administration of benefits and interpreted plan terms. SAC ¶¶ 323-26, 363-66. Supreme Court and Circuit Court precedent have clearly "left room" for ERISA suits against entities functioning as plan administrator, even if they do not formally hold that title. *Cyr v. Reliance Standard Life Ins. Co.*, 525 F. Supp. 2d 1165, 1172 (C.D. Cal. 2007) (discussing cases).

In *Vaughn v. Metropolitan Life Ins. Co.*, 87 F. Supp. 2d 421 (E.D. Pa. 2000), for example, the court expressly allowed ERISA claims to proceed against a health insurance company acting as a *de facto* plan administrator. There, the court held that "MetLife's fate as a defendant under ERISA turns on whether it exercised sufficient 'discretionary authority or discretionary responsibility in the administration of the plan.'" *Id.* at 426 (quoting *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 234 (3d Cir. 1994)). Finding that MetLife was "the *de facto* plan administrator,*" due to the fact that it "possesse[d] broad discretion in the interpretation of the plan, sole responsibility for the evaluation of claims, and final decision-making authority

---

[12]  Because ambiguities in the SPD will be construed in the beneficiary's favor, the content of the SPDs are highly relevant not only *to* Count II, but also to Plaintiffs' ERISA benefits claims under Count I. *See Wachtel v. Guardian Life Ins. Co.*, 223 F.R.D. 196, 213 n.31 (D.N.J. 2004) ("Where there are ambiguities in the SPD which could mislead a beneficiary, that too, requires a decision to be reached in the beneficiary's favor"); *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 981–82 (5th Cir. 1991).

over the payment of benefits," it held that it "was a fiduciary of the Plan under the terms of ERISA" and therefore was "'a proper party under ERISA.'" *Id.* at 426-27 & n.6 (quoting *Curcio*, 33 F.3d at 235). The same analysis clearly applies here, given the explicit allegations that Aetna controlled the UCR benefit determinations at issue in this action.[13]

**Fourth**, Defendants assert that Plaintiffs' only remedy for Aetna's violation of their right to a "full and fair review" of claims under ERISA § 503 is a remand to the plan administrator. MTD, at 44-45. However, as Judge Shwartz has ruled, "where courts determine that an administrator abused its discretion in depriving the claimant of full and fair review, remand is inappropriate and courts reinstate the claimant's benefits instead." Report & Recommendation, *Scharfman v. Health Net, Inc.*, 05CV301 (D.N.J. July 25, 2007) (citing *Precopio v. Bankers Life & Cas. Co.*, 2004 U.S. Dist. LEXIS 30425, 101 (D.N.J. Aug. 10, 2004); *see also Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776–77 (7th Cir. 2003). A dispute over the nature of the remedy for adequately alleged ERISA non-benefits claims is certainly no grounds upon which to dismiss those claims.

---

[13]   "Fiduciary" is a defined term in the ERISA statute to include those who have "any discretionary authority or discretionary responsibility in the administration" of the ERISA plan. 29 U.S.C. § 1002(21)(A). The definition of a fiduciary is a functional one, and the issue of whether one is considered a fiduciary does not turn upon formal designations. *Walling v. Brady,* 125 F.3d 114, 119 (3d Cir. 1997). Rather, one is a fiduciary if upon the exercise of either any discretionary authority or control over plan management *or **authority or control*** over plan assets. Plaintiffs' claim for breach of fiduciary duty, which seeks appropriate equitable relief, should therefore be allowed to proceed. *See Pell v. E. I. DuPont de Nemours & Co.,* 539 F.3d 292, 306–10 (3d Cir. 2008) (rejecting view that ERISA precludes injunctive or restitutionary relief under §1132(a)(3)).

## VIII.   PLAINTIFFS ALLEGE VALID RICO CLAIMS (MTD SEC. III)

### A.   Plaintiffs Properly Allege Fraud, Causation, and RICO Injury

#### 1.   Plaintiffs' RICO Claims Satisfy Rule 9(b)

Contrary to Aetna's contentions, the SAC identifies the predicate acts constituting the "pattern of racketeering activity" with requisite particularity. Plaintiffs need not itemize the date, hour and place of each fraudulent occurrence as long as they flesh out their allegations by some means. *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (*citing Seville Indus. Mach. v. Southmost Mach.*, 742 F.2d 786, 791 (3d Cir. 1984) (upholding civil RICO claims based on allegations of the nature and subject of misrepresentations, but omitting the precise words used)); *accord Darrick Enter. v. Mitsubishi Motors*, 2007 U.S. Dist. LEXIS 72956 (D.N.J. Sept. 28, 2007).

When applying Rule 9(b), courts should not focus exclusively on the "particularity" language, because doing so fails to take into account the general simplicity and flexibility contemplated by the rules. *Ford Motor Credit Co. v. Chiorazzo*, 529 F. Supp. 2d 535, 538 (D.N.J. 2008) (*quoting Christidis v. First Penn. Mortgage Trust*, 717 F.2d 96, 100 (3d Cir. 1983)). Courts "should apply [Rule 9(b)] with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants, as is alleged to have happened here." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 934 n.17 (3d Cir. 1999) (internal punctuation and citation omitted). Courts in this circuit have relaxed the heightened standards for pleadings under Rule 9(b) where, as here, corporate fraud is alleged in order to "prevent sophisticated defrauders from successfully concealing the details of their fraud." *S. Broward Hosp. Dist v. MedQuist, Inc.,* 516 F. Supp. 2d 370, 384 (D.N.J. 2007).

Although the precise information as to the scheme to defraud is within Defendants' knowledge, SAC ¶¶ 8-9, 475, 488, 503, Plaintiffs adequately allege the underlying factual basis

for their claims in the SAC and in Plaintiffs' Consolidated Second Amended RICO Case Statement ("RCS"), thus fulfilling the purpose of Rule 9(b). *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 882 (3d Cir. 2000). Plaintiffs have supplied a detailed description of (1) the date, time, place, or other details of the alleged fraud (*see* RCS at 11-97, 100-01); (2) who made a representation to whom (*see* RCS at 11-97, 100-01; SAC ¶¶ 64-71, 606, 608, 637, 639-41, 644-47, 667); and (3) the general content of the misrepresentation (*see* RCS at 11-97, 100-01; SAC ¶¶ 7-9, 119-20, 175, 193, 200-204, 608-13, 637-41, 644-47, 667).[14]

## 2. Plaintiffs Properly Plead Mail Fraud Predicate

Aetna contends that its fraudulent scheme is just a "labeling" problem, a mere breach of business contract.[15] But even ordinary business practices can violate the mail fraud statute. *United States v. Green*, 592 F.3d 1057, 1070 (9th Cir. 2010) ("'Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to

---

[14]   Aetna's contention that Plaintiffs' RICO claim premised on violations of 18 U.S.C. § 664 must be pled with specificity under Rule 9(b) ignores precedents holding that a § 664 predicate acts need only satisfy Rule 8(a), not Rule 9(b). *Am. Tel. & Tel. Co. v. Empire Blue Cross & Blue Shield*, 1994 U.S. Dist. Lexis 21091, at *67–68 (D.N.J. July 19, 1994); *see also Bd. of Trs. of Ironworkers Local No. 498 Pension Fund v. Nationwide Life Ins. Co.*, 2005 U.S. Dist. LEXIS 6159 (N.D. Ill. Mar. 28, 2005).

[15]   Aetna cites three out-of-circuit cases purporting to show a distinction between breach of contract and fraud. In *Sanchez v. Triple-S Mgmt. Corp.*, 492 F.3d 1, 12 (1st Cir. 2007) , the First Circuit held, in the very next sentence from the one Aetna chose to quote and which it omitted, that "the scheme must be intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct." The court then noted that in *Sanchez* plaintiffs themselves admitted that no such scheme existed. Similarly, in *United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994), the court held that there was no breach of any contractual obligation. Aetna's quote from *Kehr Packages, Inc. v. Fidelcor, Inc.* 926 F.2d 1406, 1417 (3d Cir. 1991), is actually a quote from the parenthetical to *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980), where the Fifth Circuit upheld the jury's conclusion that the defendants **had** engaged in mail fraud because they had used the mails at least once in a scheme to defraud. In *Kehr*, the court found that mail fraud was not triggered because the transaction at issue contained "no deception that would bring it within the purview of the mail fraud statute." 926 F.2d at 1417.

be used.'") (*quoting Pereira v. United States*, 347 U.S. 1, 8-9 (1954)). Indeed, in arguing that there is nothing fraudulent about determining UCR using a third-party database, Aetna ignores that the SAC does not allege that Aetna simply used a database or breached its contracts. Instead, the SAC alleges, *inter alia*, that Defendants manipulated the data in that database while touting it as the industry standard, and that these material facts were concealed from its healthcare plan participants and their ONET providers – all as part of an orchestrated scheme to underpay them. SAC ¶¶ 145-52. The SAC also specifies the communications Aetna used in furtherance of the fraudulent scheme. *Id.* ¶¶ 236, 241, 247, 255, 260, 267, 287-89, 319, 344, 367, 383, 414, 613-14.

Equally unavailing is Aetna's argument that it did not commit wire fraud because its communications failed to involve any fraud or misrepresentations. MTD at 16-18, 20-21. When used in the course of a fraudulent scheme, however, mail or wire fraud acts need not ***themselves*** be fraudulent or untrue. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 2138 (2008); *Schmuck v. United States*, 489 U.S. 705, 715 (1989). Instead, mail or wire fraud predicate acts need only be in furtherance of a scheme to defraud (or incidental to an essential part of the scheme). *Bridge*, 128 S. Ct. at 2138; *Schmuck*, 489 U.S. at 715.[16]

The predicate acts here were not simply Aetna's communications to Plaintiffs. Rather, the gravamen of Plaintiffs' RICO claim is Defendants' fraudulent underpayment scheme, including the creation, manipulation and knowing use of flawed data to set artificially-low ONET reimbursement rates, for which it used the mails and wires to facilitate. SAC ¶¶ 6-63, 142-204,

_____

[16] Defendants' citations are inapposite. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 530 (3d Cir. 1999), was decided under the Private Sec. Litig. Reform Act, which requires that allegations of knowledge be supported by facts stated with particularity giving rise to a "strong inference that the defendant acted with the required state of mind." *Id.* at 530. The same standard does not apply here. Unlike *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 U.S. Dist. Lexis 58900 (D.N.J. July 10, 2009), Plaintiffs here "*have* alleged what happened to them." In *Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594 (D.N.J. 2000), the plaintiffs failed, unlike here, to identify a single fraudulent misrepresentation.

597-697; RCS at 3-7, 12-15, 101-19. Plaintiffs plausibly allege ample facts from which it may be inferred that Aetna used the mails and wires to facilitate that creation, manipulation and use of the Ingenix Database to carry out their scheme to defraud. SAC ¶¶ 608, 610(a)-(b), 612-13, 641, 652-56; RCS at 11-97, 101-03.

Plaintiffs also sufficiently allege mail fraud with respect to UHG and Ingenix. SAC ¶¶ 652, 654-55. For RICO purposes, it is sufficient that Defendants used the mails and wires among themselves to transmit information in order to perpetrate their scheme and create the product of their conspiracy: the Ingenix Database. SAC ¶¶ 610-13, 647-48, 652, 657-697; RCS at 12-15. Because the predicate acts involving communications to Plaintiffs were incidental to an essential part of the scheme (SAC ¶ 613) – which Defendants do not dispute – whether those mailings or wirings themselves were fraudulent is, again, irrelevant.[17]

Aetna's suggestion that Plaintiffs must better identify the communications containing the alleged misrepresentations upon which they relied is equally baseless. MTD at 17-18 & 20-21. Because it is irrelevant whether the use of the wires or mails involved misrepresentations that were relied upon, whether Plaintiffs' allegations about Aetna's representations satisfy Rule 9(b) (*e.g.*, as to dates or which Aetna made them) is, in turn, irrelevant. At any rate, even were Rule 9(b) not relaxed here, Plaintiffs allege sufficient information as to the use of the wires and mails, including dates and other information (including which Defendant made them) to satisfy the

---

[17]  Aetna's reliance on *ADA v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010), MTD at 18, is misplaced. There, unlike here, the plaintiffs failed to adequately allege a scheme to defraud, *see* 605 F.3d at 1292, and as a result the court could not "infer a scheme driven deception from a complaint that provides no details of fraud or conspiracy." *Id.* at 1293. To the extent that Aetna suggests that its communications to Plaintiffs must involve specific misrepresentations or fraudulent statements that Plaintiffs relied upon, MTD at 20-23, RICO has no reliance requirement, and communications themselves need not be fraudulent where, as here, they are alleged to be in furtherance of a larger scheme to defraud. *Bridge*, 128 S. Ct. at 2138-39; *Schmuck*, 489 U.S. at 715; *Sebastian Int'l, Inc. v. Russolillo*, 128 F. Supp. 2d 630, 635-36 (C.D. Cal. 2001).

Rule. SAC ¶¶ 6-63, 142-204, 600-697; RCS at 11-97; 100-01; *compare Fed. Savs. & Loan Ins. Corp. v. Shearson-Am. Express, Inc.*, 658 F. Supp. 1331, 1337-38 (D.P.R. 1987) ("All that is required to fulfill the particularity requirement of Rule 9(b) is that a complaint set forth the substance of plaintiff's claim with sufficient detail to evoke the defendant's answer since 'Rule 9' is not to be applied with draconian strictness.") (quoting *Kimmel v. Peterson*, 565 F. Supp. 476, 481 (E.D. Pa. 1983)).

Finally, "[b]ased on the on-going nature of the fraud alleged by Plaintiffs, [any omission of specific information] is not a fatal flaw." *Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1211-12 (C.D. Cal. 2006) (omission of specific dates not fatal where fraud occurred over extended period); *accord Shearson-Am. Express*, 658 F. Supp. at 1337 ("To the extent that any specific dates pertaining to specific misrepresentations may be lacking, they are not required ... because they occurred over an extended period of time . . . To the extent possible, discovery will provide those details."); *In re U.S. Foodservice Inc. Pricing Litig.*, 2009 U.S. Dist. LEXIS 117403, at *61 (D. Conn. Dec. 21, 2009) (Rule 9(b) requirements relaxed in cases involving complex fraudulent schemes occurring over lengthy period of time and involving thousands of billing documents).

Defendants' argument that Plaintiffs' have failed to sufficiently allege mail or wire fraud against UHG and Ingenix or a pattern or racketeering acts, MTD at 18-19, is likewise meritless. The allegations plainly set forth their involvement in multiple instances of use of the mails and wires as part of Defendants' scheme to defraud. SAC ¶¶ 151-52, 157, 168-69, 503-04, 643, 666; RCS at 3-7. The argument that they did not personally commit any predicate acts, MTD at 18, betrays a fundamental misunderstanding of RICO mail and wire fraud principles, which do not require the personal use of the mails or wires. *See United States v. Tiller*, 302 F.3d 98, 101 (3d

19

Cir. 2002). Rather, a defendant is liable where, as here, it "'causes' the mails to be used'" by "'do[ing] an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'" *Id.* (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)). The allegations here plainly meet this standard, SAC ¶¶ 152, 643—a point not disputed by Defendants. The argument that UHG and Ingenix had no involvement in any communications to Plaintiffs, MTD at 18-19 & 20-21, is thus beside the point, since, as noted above, the allegations do not involve simply Aetna's communications but also the fraudulent underpayment scheme involving the manipulated database (of which UHG and Ingenix were part).

### 3.   Plaintiffs Properly Plead Causation and RICO Injury

Contrary to Aetna's assertions, MTD at 19, Plaintiffs do allege they have sustained "concrete financial loss" proximately caused by Aetna's RICO violations. RCS at 8-97, 119-120. Aetna concedes that Plaintiffs Werner, Franco and Cooper allege with particularity that they paid their ONET providers out-of-pocket for amounts underpaid by Aetna. And Aetna does not challenge the sufficiency of the detailed allegations of out-of-pocket losses asserted by the Provider Plaintiffs and the Medical Association Plaintiffs, as set forth in the SAC. These allegations are sufficient to establish that Plaintiffs suffered "a concrete financial loss and not mere injury to a valuable intangible property interest." *Schering-Plough Corp. Intron.,* 2009 U.S. Dist. LEXIS 58900, at *43 (citation omitted); *see also Maio v. Aetna,* 221 F.3d 472, 483–84 (collecting cases in which courts found that RICO plaintiffs had alleged "actual monetary loss, *i.e.*, an out-of-pocket loss"); *Grider v. Keystone Health Plan Cent., Inc.,* 2003 U.S. Dist. LEXIS 16551, at *5, *21–22 (E.D. Pa. Sept. 18, 2003) (provider plaintiffs alleged that insurer wrongfully delayed and denied compensation due under contracts to provide services to HMO

members);[18] *Blue Shield of Va. v. McCready*, 457 U.S. 465, 475 (1982) (holding that insurer's denial of healthcare benefits directly injured subscribers since "McCready has paid her psychologist's bills; her injury consists of Blue Shield's failure to pay her … [she is] out of pocket as a consequence of the plan's failure to pay benefits") (footnote omitted).

As for the remaining Subscriber Plaintiffs, Aetna's insistence on out-of-pocket losses is misguided. Indeed, in *Sedima, S.P.R.L. v. Imrex Co. Inc.*, 473 U.S. 479 (1985), the Supreme Court rejected such a cramped interpretation of RICO, stating: "If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional, amorphous 'racketeering injury' requirement." *Id.* at 495. The Supreme Court honored the crucial distinction between an injury proximately caused by "racketeering activity" – the commission of a predicate act – and racketeering activity causing "racketeering injury." Aetna's demand for out-of-pocket losses as evidence of RICO injury is the same as a "racketeering injury" rejected in *Sedima*.

The sufficiency of Plaintiffs' allegations is further demonstrated by *NOW v. Scheidler*, 510 U.S. 249, 255–56 (1994). There, the complaint alleged that conduct "injured the business

---

[18]   In *Grider,* 2003 U.S. Dist. LEXIS 16551, at *63, Judge Gardner distinguished the Third Circuit's decision in *Maio*, 221 F.3d at 484, 487–88, upon which Aetna relies, noting that in *Maio*, the plaintiffs merely alleged that the difference between what they paid and the actual worth of the services constituted a financial loss for RICO purposes. Plaintiffs' RICO claims in this case are identical to those upheld by Judge Gardner in *Grider,* rather than those dismissed by the Third Circuit in *Maio.* Similarly, in *In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, 2007 U.S. Dist. LEXIS 35980, at *74 (E.D. Pa. Aug. 29, 2007), the district court distinguished the Third Circuit's decision in *Maio* and held that annuity purchasers who "alleged that they actually received less [in benefits] than what they were promised" sufficiently alleged "actual monetary loss" and "have standing under RICO." In contrast, Aetna's authorities are inapposite. In *Owen v. Regence BlueCross BlueShield of Utah*, 388 F. Supp. 2d 1318 (D. Utah 2005), there was no allegation that a member's claim for benefits had been denied and the facts indicated that the charges were not, in fact, owed.

and/or property interests" of plaintiffs in violation of RICO, but did not allege out-of-pocket losses or any specific monetary injury stemming from the abortion clinics' shutdown. Like Aetna, the anti-abortion protestors in *Scheidler* contended that plaintiffs' alleged injury was not traceable to their unlawful conduct. The Supreme Court held to the contrary and upheld the plaintiffs' standing to maintain RICO claims. *Id.* at 256 ("'[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . .' ***Nothing more is needed to confer standing on [plaintiffs] at the pleading stage.***") (emphasis added; internal citations omitted); *see also Sedima*, 473 U.S. at 497 ("Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.").

Equally meritless is Aetna's contention that Provider Plaintiffs fail to explain how they "'relied' on Aetna's misrepresentations to their 'detriment.'" MTD at 20. Again, Plaintiffs are not required to show any "reliance" for RICO injury purposes (making any challenge to a "fraud-on-the-market" theory, MTD at 22-23, irrelevant).[19]

---

[19] At any rate, Plaintiffs have alleged facts from which it is reasonably inferable and plausible that Defendants' scheme was deceptive and that it involved a use of the mails and wires that proximately caused Plaintiffs' RICO injuries. *See, e.g.*, RCS at 3-9, 11-100, 104-110, 116-120; *see also* SAC ¶¶ 6-63, 362-367, 652, 677. Contrary to Aetna's argument that independent factors caused Plaintiffs' harm, MTD at 21, Plaintiffs' allegations show that their RICO injuries were a direct result of Defendants' scheme to defraud (by, *inter alia*, manipulating data via the mails and wires in order to lower the amount of Plaintiffs' ONET benefits) and were not contingent on any harm to, or losses suffered by, any third parties – nor were they attributable to an independent intervening cause that is not a predicate act under RICO. *See Bridge*, 128 S. Ct. at 2143 (RICO proximate causation satisfied where respondents' injury was "the direct result of petitioners' fraud" and "no independent factors account for respondents' injury . . . and no more immediate victim is better situated to sue"); *Brokerage Concepts, Inc. v. U.S. Healthcare*, 140 F.3d 494, 521 (3d Cir. 1999) (RICO proximate causation satisfied where plaintiffs' injury was "not derivative of any losses suffered by," or "contingent upon any injury to," a third party). Aetna's argument that it was plan sponsors who caused Plaintiffs' injuries, MTD at 21, is

B.     **Plaintiffs Sufficiently Allege the Existence of an Enterprise**

Plaintiffs allege that Aetna conducted the affairs of an association-in-fact enterprise comprised of Aetna and Ingenix (the "Aetna-Ingenix Enterprise") through a pattern of racketeering activity. SAC ¶¶ 599, 626. Defendants' only contention with regard to the sufficiency of these allegations is based on the fallacy that Plaintiffs have pled nothing more than a run-of-the-mill business association between Aetna and Ingenix. However, reading the allegations as a whole reveals that Plaintiffs' Enterprise pleading far exceeds the applicable standards under RICO. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 369-70 (3d Cir. 2010) (supporting association-in-fact enterprise comparable to that alleged here).

Each of the requisite elements of a plausible Aetna-Ingenix Enterprise to be proved at trial are pled. As the Supreme Court indicated in *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009), "an association-in-fact enterprise must have at least three structure features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." The Court further clarified that a RICO enterprise "need not have a hierarchical structure or a 'chain of command," members "need not have fixed rolls," and the group "need not have a name, regular meetings, dues" or similar indicia of formal structure, but "decisions may be made on an ad hoc basis and by any number of methods," with "different members . . . perform[ing] different roles at different times." *Id.* at 2245.

As Plaintiffs allege, the purpose of the Aetna-Ingenix Enterprise was to create a mechanism by which Aetna could reduce benefits payments for ONET services by using flawed and invalid data through a means that would appear to be a valid basis for UCR and would

---

unavailing because the allegations detail that Plaintiffs were improperly reimbursed at lower amounts than they were entitled to as a result of Defendants' scheme, including their wrongful use of the Ingenix Database. *See* RCS at 8-9, 15-97; SAC ¶¶ 50-63, 218-453.

therefore not be susceptible to challenge. SAC ¶¶ 602, 632. Significantly, Defendants do not argue that Plaintiffs insufficiently plead the purpose of the Enterprise. Defendants likewise concede that Plaintiffs sufficiently allege longevity. As set forth in the SAC, the Enterprise came into existence in 1997 when the Health Insurance Association of America ("HIAA") sold the PHCS database to Ingenix, an ample period of time for Aetna and Ingenix to pursue the Enterprise's purpose. SAC ¶¶ 31, 117(e), 131-32, 135-40, 180.[20]

Aetna's only argument is that the relationship Plaintiffs allege between Aetna and Ingenix is insufficient to support an enterprise because "[a]t most…Plaintiffs allegations show that Aetna and Ingenix did business together" and that such "ordinary business interactions are insufficient to show the existence of an enterprise." MTD at 24-25. Yet, Plaintiffs allege far more than simple, ordinary business interactions between Aetna and Ingenix and, in fact, the SAC is replete with factual allegations showing that Aetna's fraudulent acts were consciously undertaken as part of an agreed to scheme to depress payments for ONET services.[21] Plaintiffs therefore sufficiently allege the existence of the Aetna-Ingenix Enterprise.

---

[20]   Aetna argues that "Plaintiffs' allegations of enterprise also fail because, under the plain language of the statute, a corporation cannot form an association-in-fact enterprise." MTD at 26 n.4. Yet, as Aetna acknowledges, the Third Circuit considered and rejected this argument in *United States v. Aimone*, 715 F.2d 822, 828 (3d Cir. 1983).

[21]   *See e.g.,* SAC ¶ 627 ("Aetna through the Enterprise described above and in conspiracy with Ingenix and other healthcare companies undertook a fraudulent scheme to underpay Providers for the ONET provided to Aetna subscribers. . . . In furtherance of the scheme, Aetna engaged in thousands if not millions of acts of mail and wire fraud."); ¶ 601 ("[T]he members of the Aetna-Ingenix Enterprise . . . used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Amended Complaint including, but not limited to, intentional underpayment of Aetna Members resulting from the use of flawed and invalid data for its UCR determinations"); ¶ 631 ("[T]he members of the Aetna-Ingenix Enterprise . . . used the Enterprise's structure to carry out the fraudulent scheme and unlawful activities alleged in this Amended Complaint including, but not limited to, intentional underpayment of benefits to Provider Plaintiffs and the Provider Class resulting from Aetna's use of flawed and invalid data for its UCR determinations"); ¶ 5 ("Plaintiffs' legal claims in this case are directed at a secret and illegal agreement by Aetna, UHG, Ingenix, and most of the country's largest health insurers

C.  **Plaintiffs Allege Aetna's Participation in the Operation or Management of the Aetna-Ingenix Enterprise**

Aetna also argues that Plaintiffs have not sufficiently alleged that Aetna directed the affairs of the Aetna-Ingenix Enterprise. Aetna again misconstrues Plaintiffs' allegations. While a defendant must play "some part in directing the enterprise's affairs" to be liable under RICO, "*significant control* over or within an enterprise" is not required. *Reves v. Ernst & Young*, 507 U.S. 170, 179 & n.4 (1993) (emphasis in original). Here, Aetna was no mere unwitting or unwilling actor, but was instead substantially involved with and integral to the operation of the enterprise. *See United States v. Parise*, 159 F.3d 790, 797 (3d Cir. 1998). As a result, Defendants' contentions are irrelevant and their supporting citations inapposite.[22]

Indeed, contrary to Defendants' assertions, Plaintiffs allege a relationship between Aetna and Ingenix that differs from a simple or innocent business relationship. In particular, Plaintiffs allege that Defendants were not merely involved in their own affairs, but were knowing and necessary participants in a fraudulent scheme that furthered the common goals of the members of

---

to systematically under-reimburse consumers for ONET."). *See also* SAC ¶¶ 6, 7, 32, 48, 180-204, 462-501.

[22] "*Reves* focused on the RICO liability of those 'outside' an enterprise who may assist in furthering the illegal activities of the enterprise . . . . The Court did not reach the issue of the liability of those 'inside.'" *Parise*, 159 F.3d at 797. As the Third Circuit noted in *Parise*, "the Court [in *Reves*] made clear that RICO liability may extend to those who do not hold a managerial position within an enterprise, but who do nonetheless knowingly further the illegal aims of the enterprise by carrying out the directive of those in control." *Id.* at 796. The Third Circuit quoted with approval the First Circuit's conclusion that "RICO liability extends to those 'plainly integral to carrying out' the enterprise's activities.'" *Id.* (quoting *United States v. Shifman*, 124 F.3d 31, 36 (1st Cir. 1997)). The same is true of *In re Ins. Brokerage*, 618 F.3d at 379-80. Defendants' citation to *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721 (7th Cir. 1998), is likewise inapposite. There, the plaintiff had neither alleged an association-in-fact enterprise nor sufficiently alleged that the defendants conducted or participated in the conduct of the enterprise's affairs.

the Enterprise.[23] These allegations support the plausible inference that, because UHG and Ingenix exercised control over and managed the database (the centerpiece of the conspiracy), they exercised significant control over the enterprise. *See Walter v. Drayson*, 538 F.3d 1244, 1248 (9th Cir. 2008) (enterprise might be operated or managed by others associated with enterprise who exert control over it) (*citing Reves*, 507 U.S. at 184). As Plaintiffs allege, Defendants' participation was essential to the success of the enterprise and they controlled and were integrally involved in decision-making with regard to the Ingenix database.[24]

---

[23] Plaintiffs allege that Defendants participated in and controlled the Aetna-Ingenix Enterprise in a multitude of ways, including knowingly participating in the formation and maintenance of the Ingenix Database and in decision-making with respect to the inclusion of data within the Ingenix Database that would reduce ONET payments. SAC ¶¶ 602, 606, 607-08, 613, 633, 637, 640-41, 643-48; RCS at 104-110, 115. Aetna and UHG also allegedly agreed to purchase and use the Ingenix Database for the express purpose of depressing ONET payments, SAC ¶¶ 627, 640-41; RCS at 104-110, and intentionally submitted "scrubbed" and otherwise flawed and incomplete data to Ingenix for the purpose of lowering payments for ONET, knowing the data would be further manipulated by Ingenix. SAC ¶¶ 602, 606, 607-08, 613, 637, 640-41, 643-48; RCS at 104-110. Inclusion of Aetna's and UHG's data was critical to both the appearance of legitimacy of the Ingenix Database and to the usefulness of that data for depressing ONS payments. It was therefore essential to the Enterprise's success. SAC ¶¶ 607-08, 640-41; RCS at 112-14. Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix Database was the largest available and had sufficient numbers to remove any doubt as to their validity. SAC ¶¶ 607-08, 640-41; RCS at 112-14. Without data from Aetna and UHG, the Ingenix Database could not have been successfully marketed as the "industry standard" for UCR pricing. SAC ¶¶ 608, 641; RCS at 112-14. In addition, Defendants undertook countless and nearly constant acts of mail and wire fraud in furtherance of the Enterprise's common purpose of reducing the price paid for ONET. SAC ¶¶ 640-41, 643-647; RCS at 11-103, 105-110. Defendants agreed to conceal the flaws in the Ingenix data as well as the scheme to depress ONET payments achieved through use of the Ingenix Database for UCR determinations. SAC ¶¶ 627, 637; RCS at 107. They also provided false and misleading information and deterred Subscribers and Provider class members from challenging or otherwise questioning how they set UCR. SAC ¶¶ 59, 608, 641; RCS at 13, 107.

[24] As set forth in the SAC, then, the relationship between Aetna, Ingenix, and UHG was forged in furtherance of a common, fraudulent purpose. This is not a case like *Crichton* where the plaintiff did "little more than plead facts suggesting the existence of the marketing relationship between the Federation and Golden Rule." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009). Plaintiffs here have properly pled not only the existence of the Aetna-Ingenix Enterprise, but also each Defendant's direction of the conduct of the enterprise. *See Walter*, 538

D.    **Plaintiffs Allege a Valid RICO Conspiracy Claim**

Plaintiffs also sufficiently allege a conspiracy to violate 18 U.S.C. § 1962(c), which provides that "it shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To maintain a RICO conspiracy claim, Plaintiffs must allege that the defendant "knew about and agreed to facilitate the scheme." *Salinas v. United States*, 522 U.S. 52, 66 (1997); s*ee United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004).

In seeking dismissal, Aetna first suggests that Plaintiffs' RICO conspiracy claims must be dismissed because Plaintiffs' substantive RICO claims fail. MTD at 29. As discussed above, this is wrong, as plaintiffs' substantive RICO claims do not fail. Aetna also repeats its argument that Plaintiffs have not pled facts "plausibly showing an illicit *agreement* between Defendants and their alleged co-conspirators .... but merely an agreement among Defendants to use the Ingenix Database to set ONET reimbursement rates ...." *Id*. at 29-30 (emphasis added). But Plaintiffs have alleged far more than a simple business relationship between Aetna and Ingenix and have pled far more than "threadbare" allegations of the conspiracy to create false UCRs.

As to the conspiracy contention, Plaintiffs specifically allege that the Insurer Conspirators agreed to systematically under-reimburse for out-of-network services through, among other things, use of the Ingenix Database. The members of HIAA, including Aetna, agreed to sell the PHCS Database developed by HIAA to Ingenix, UHG's subsidiary, in 1998. SAC ¶¶ 115, 180. As part of the PHCS sale, HIAA and Ingenix agreed to have member companies, including Aetna, participate in an ongoing Ingenix PHCS Advisory Committee. SAC ¶ 181. The Insurer Conspirators knowingly created and maintained a flawed system that uses limited amounts of

F.3d at 1249 (distinguishing *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967 (7th Cir. 1995)).

manipulated data to artificially depress reimbursement rates for ONET. SAC ¶¶ 154-56, 163, 480, 482, 484, 503-04. Ingenix entered into contracts with Aetna and the Other Insurers to (i) obtain data regarding billing rates and information from those health insurers and (ii) provide UCR uniform price schedules to those same health insurers.[25] SAC ¶¶ 6, 7, 10, 147, 189, 202, 477, 485, 503. They supplied manipulated data to the Ingenix Database, which was then further manipulated for the purpose of creating false UCRs. SAC ¶¶ 7, 32, 154-56, 163, 480, 482, 484, 503-04. Aetna supplied approximately 70% of the total submissions to the Ingenix Database. SAC ¶ 151. The Other Insurers also agreed not to provide ONET charge data to any potential Ingenix competitor. SAC ¶ 478-79, 488, 490. Each of the Other Insurers further agreed to use – and, in fact, has use – the resulting False UCR schedules to determine reimbursement for ONS, thereby reducing its costs for such services. SAC ¶¶ 1, 5, 30, 59, 146, 148, 505. To protect the conspiracy from detection, the Other Insurers agreed to conceal the scheme, employing a series of material misrepresentations and omissions. SAC ¶¶ 191, 203, 400, 426, 502, 506-08.

These allegations plead a plausible RICO conspiracy. *See generally United v. Frega*, 179 F.3d 793, 819 (9th Cir. 1999) ("A formal agreement is not necessary, but agreement may be inferred from the defendants' acts pursuant to the scheme or other circumstantial evidence."); *United States v. Console*, 13 F.3d 641, 654 (3d Cir. 1993) ("'Proof of agreement in a RICO proceeding may be established by circumstantial evidence to the same extent permitted in traditional conspiracy cases.'"); *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986) ("[T]he existence of a conspiracy can be inferred 'from evidence of related facts and

---

[25] Actual contracts, such as those described in the SAC, among Ingenix and Aetna and the Other Insurers can constitute a plausible basis for characterizing those contracts as part of an anticompetitive scheme to fix UCR prices. *See Behrend v. Comcast Corp*., 532 F. Supp. 2d 735, 741 (E.D. Pa. 2007) (denying motion to dismiss relying in part on contracts in the context of an anticompetitive scheme).

circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.'") (citing case). And contrary to Defendants' assertion, MTD at 30, the conspiracy as alleged extends beyond just Aetna, to include UHG and Ingenix as well as co-conspirators. *See Frega*, 179 F.3d at 819 ("It does not matter that some conspirators may not have known, or agreed, with each other" or whether they participated in every aspect of scheme); *United States v. Philip Morris USA, Inc*., 449 F. Supp. 2d 1, 902 (D.D.C. 2006) ("[E]ven if one conspirator did not participate in, or was unaware of, acts undertaken by co-conspirators in furtherance of the conspiracy, it is nevertheless liable for such acts.") (citing cases), *aff'd in relevant part*, 566 F.3d 1095 (D.C. Cir. 2009).

Aetna's argument that Plaintiffs' RICO conspiracy allegations fail to meet Rule 9(b), MTD at 30, is unavailing because, as noted above, that Rule is relaxed where, as here, the information at issue is within the exclusive knowledge or control of the Defendants. In any event, even if that Rule applies, Plaintiffs' allegations, as discussed above, easily satisfy it.

## IX.   PLAINTIFFS STATE A CLAIM UNDER THE SHERMAN ACT (MTD SEC. II)

Plaintiffs allege Aetna, UHG and their co-conspirators used the Ingenix Database to create collusion-insulated profits through the systematic under-reimbursement of ONET. SAC ¶¶ 482, 495, 500, 507, 630. Defendants designed Ingenix and continue to manage its structure and operation, agreed not to compete with Ingenix in setting UCR, contribute data to and use data from Ingenix, and manipulate the Ingenix Database and ONET reimbursements in coordinated fashion. As long as each conspirator continues to provide Ingenix with manipulated data to be used in calculating UCRs, assists the other Insurer Conspirators in preventing the formation of any competing entities, and foregoes competing for subscribers on the basis of ONET reimbursements, the Insurer Conspirators can and do reap enormous profits and under-reimburse

29

for ONET without fear of losing customers. SAC ¶¶ 482, 495, 500, 507, 630. As shown below, the SAC is replete with factual allegations that supply the context from which it is plausible to infer such a conspiracy. Indeed, the court in *AMA v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 446 (S.D.N.Y. 2008) ("*AMA III*"), concluded that plaintiffs alleging antitrust violations for the same conduct – in fact, alleging many of the same but far fewer facts – had "easily satisf[ied] the pleading standard with respect to pleading allegations of a conspiracy." Yet Defendants nevertheless move to dismiss on three baseless grounds in Section II of their brief. MTD 6-14.

A.      **Plaintiffs Plausibly Allege Actionable Antitrust Violations**

Defendants argue that Plaintiffs allege only "ordinary commercial arrangements relating to the Ingenix databases." MTD at 7. This self-serving mischaracterization of the Plaintiffs' antitrust claim ignores both the controlling law and the Plaintiffs' well-pleaded allegations of *per se* and rule of reason unlawful horizontal price fixing. As the Supreme Court has long held, "a combination to gather and supply information as a part of a plan to impose unwarrantable restrictions . . . has been condemned" as a violation of Section 1 of the Sherman Act. *Sugar Inst., Inc. v. United States*, 297 U.S. 553, 599–600 (1936).[26] Here, Plaintiffs allege the Ingenix Database was established through a horizontal agreement, transferred from HIAA to UHG by a horizontal agreement, and maintained by horizontal conduct with competitors contributing data that they used to suppress prices paid to class members. The SAC details how Defendants, acting

---

[26]   *See also United States v. Container Corp. of Am.*, 393 U.S. 333, 336–37 (1969) ("The result of this reciprocal exchange of prices was to stabilize prices through at a downward level [with] an anticompetitive effect upon the industry . . . ."); *United States v. Am. Linseed Oil Co.*, 262 U.S. 371, 390 (1923) (concerted action by competitors who disseminated pricing data among themselves through a trade bureau was "forbidden when the necessary tendency is to destroy the kind of competition to which the public has long looked for protection"); *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 411–12 (1921) (lumber industry association members who collected and exchanged sales, pricing and stock information were guilty of restraining trade, despite argument that information exchange had benign purposes).

together, artificially depressed the ONET reimbursements to subscribers and medical providers. SAC ¶¶ 131-32, 135, 154-57, 181-82, 185, 193, 199-200, 464, 471-472, 478-479, 490. These collective actions were undertaken by horizontal competitors to exchange reimbursement data. Defendants "conspired and agreed to create, expand, continue, promote and use the Ingenix Database to control and set UCR rates among and between Aetna and its purported horizontal competitors with the ultimate aim of setting ONET reimbursements at below market levels." SAC ¶ 186. Defendants and their co-conspirators met and communicated continuously to discuss and implement their price-fixing scheme. SAC ¶ 489. Ingenix thus acted as the "conduit and switch" used by the Insurer Conspirators, including Aetna, to disseminate and fix the artificial UCRs. SAC ¶ 476. As a result of this scheme, Aetna and other insurers underpaid subscribers and providers by many millions if not billions of dollars, and Ingenix earned substantial profits from the sale of this flawed data. SAC ¶¶ 476, 491, 494-95, 500. Absent these unlawful agreements between the parties, subscribers and providers would have received higher ONET reimbursements. SAC ¶ 494.

The carefully designed and executed price fixing scheme alleged by Plaintiffs is hardly an "ordinary commercial arrangement." Instead, it is a *per se* illegal scheme undertaken by horizontal competitors. *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("Price-fixing agreements between two or more competitors, otherwise known as horizontal price fixing agreements, fall into the category of arrangements that are *per se* unlawful."). And even assuming *arguendo* Defendants' characterization of their scheme as "ordinary," that does not absolve them of liability, because **all** price fixing combinations, regardless of their form, violate Section 1. *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) ("price fixing" is "*per se* unreasonable[] because its "pernicious effect on competition and lack of any redeeming virtue [is] ***conclusively***

*presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use*") (emphasis added).[27]

Because price-fixing is a *per se* Section 1 violation, Defendants' concerted actions are deemed anticompetitive as a matter of law. Defendants' insinuation that their conspiracy benefitted the public interest is irrelevant under a *per se* analysis.

Defendants claim that the use of the Ingenix database has been legitimated by New York Attorney-General ("NYAG"). MTD at 7. The NYAG considered the previous use of Ingenix a fraudulent and "rigged system" and only assented to the continued use of the database upon the condition of increased transparency, including oversight by several universities undertaking peer review of the UCR schedules. SAC ¶212. The Ingenix database previously encountered no such transparency. Its only oversight was by a horizontal competitor of Defendants, which profited enormously from effecting the anticompetitive conspiracy that Plaintiffs allege. SAC ¶203.

B.    **Plaintiffs Sufficiently Allege Both Parallel Conduct and <u>"Plus Factors" Required to Plead an Antitrust Conspiracy</u>**

Defendants' contention that Plaintiffs' Sherman Act claims fail to allege the specifics of the unlawful agreement invokes an improper pleading standard. *See Heartland Payment Sys., Inc. v Micros Sys.*, 2008 U.S. Dist. LEXIS 74972, at *46 (D.N.J. Sept. 29, 2008) (even post-*Twombly*, a plaintiff need not allege "any specific communication or meeting" to state a Section 1 claim); *see generally Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) "to survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only allege 'enough factual matter (taken as true) to suggest that an agreement was made'"). *Twombly* requires only that

---

[27]   A determination as to whether a challenged restraint is governed by the *per se* rule or the rule of reason is typically fact-intensive and therefore inappropriate for adjudication on a motion directed at the pleadings. *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 563 (E.D. Va. 2000) (*citing NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.26 (1984)).

"when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." 550 U.S. at 557; *see also Ins. Brokerage Antitrust Litig.*, 618 F.3d at 321-23 (discussing post-*Twombly* plausibility test). To this end, the Third Circuit held that collusion claims based "on inferences from consciously parallel behavior must show that certain 'plus factors' also exist [such as] (1) evidence that the defendant had motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)).[28]

This is precisely what is alleged in the SAC. Taken together, these allegations establish that Defendants stood to profit from coordinated suppression of UCRs, had the opportunity to coordinate their approaches to UCR calculation (*i.e.*, adopted a common plan), and acted in a manner inconsistent with mere independent activity – in other words, they plausibly "'suggest[] . . . a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Ins. Brokerage*, 618 F.3d at 322. Substantively identical allegations regarding use of the PCHS database to make UCR determinations have already been held to "easily satisfy" the pleading standards established in *Twombly*. *AMA III*, 588 F. Supp. 2d at 446. Along the same lines in *In re OSB Antitrust Litig.*, 2007 U.S. Dist. LEXIS 56573, at *11–*12 (E.D. Pa. Aug. 3,

---

[28]  Although *Flat Glass* was decided prior to *Twombly* and in a summary judgment posture, its circumstantial analysis of anticompetitive conduct has been applied, post-*Twombly*, in the motion to dismiss context. *See In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576 n.43 (E.D. Pa. 2009). For this reason, Defendants' reliance on *Schafer v. State Farm Fire and Cas. Co.*, 507 F. Supp. 2d 587 (E.D. La. 2007) is misplaced. That decision was decided under the assumption that "the *Twombly* ruling supersedes any articulation of the 'plus factor' test." *Id.* at 596. The same holds true for *Mornay v. Travelers Inc.*, CIV. A. 2008 U.S. Dist. LEXIS 46305, at *2 (E.D. La. June 13, 2008), which expressly relied upon *Schafer*. Even after *Twombly*, courts within the Third Circuit continue to apply the "plus factor" test as articulated in *Flat Glass*.

2007), the court held that allegations of parallel conduct, taken in combination with explicit allegations that defendants agreed to fix prices through an industry periodical and discussions of pricing at industry events, satisfied pleading requirements. Plaintiffs here likewise adequately set forth allegations of both parallel conduct and context that plausibly suggest an unlawful prior agreement in violation of Section 1 of the Sherman Act.

C. **Defendants' Exchange of Information Supports Plaintiffs' Allegations of an Unlawful Conspiracy**

Where, as here, an exchange of information among competitors facilitates an agreement in restraint of trade, it is clearly unlawful. *Maple Flooring Mfrs. Ass'n v. United States,* 268 U.S. 563 (1925). The Supreme Court made this precise distinction in the *Maple Flooring*, stating: "[I]nformation, gathered and disseminated among the members of a trade or business, may be the basis of agreement or concerted action to lessen production arbitrarily or to raise prices. . . . Such concerted action constitutes a restraint of commerce and is illegal . . . ." 268 U.S. at 585. Many courts have recognized that trade associations can be used to facilitate cartel behavior. *See Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 897 (N.D. Ill. 2009); *Masters v. Wilhelmina Model Agency*, 2003 U.S. Dist. LEXIS 698, at *12 (S.D.N.Y. Jan. 17, 2003).

Similarly, the Third Circuit in *Flat Glass* distinguished the lawful price discussions in *In re Baby Food Antitrust Litig.,* 166 F.3d 112 (3d Cir. 1999), which occurred between low-level employees and were not supported by evidence of concerted price increase activities, with potentially unlawful pricing discussions that occurred at a higher level and that may have had an impact on pricing. *Flat Glass*, 385 F.3d at 368–69; *see also In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 360 (D.N.J. 2001).

D.      **Plaintiffs Adequately Plead a Restraint of Trade under the Rule of Reason**

Defendants contend Plaintiffs have not pleaded the existence of a relevant product market or harm to competition in the relevant market, that Plaintiffs are direct purchasers of Ingenix data, and that Ingenix engaged in concerted action. MTD at 13-14. The sufficiency of Plaintiffs' concerted action allegations have already been discussed above. As to their challenges concerning the relevant product market and antitrust standing, Defendants misconstrue the allegations of the SAC and the governing case law.

Plaintiffs allege the anticompetitive conduct in the upstream market – that is, the fixing of UCR rates by horizontal competitor through Ingenix – is undertaken for the sole purpose of systematically under-reimbursing subscribers and providers for ONET in the downstream market where patients purchase health insurance and providers perform services pursuant to those plans. This upstream market definition is plausible based on the factual allegations of the SAC. First, Plaintiffs identify the producers in the relevant market. *See Newcal Indus. v. Ikon Office Solutions*, 513 F.3d 1038, 1045 (9th Cir. 2008) (product markets are defined by products or producers). Ingenix dominates the Data Market, inasmuch as the largest health insurance carriers use the Ingenix Database to determine UCRs for reimbursing ONET claims. SAC ¶¶ 5, 7, 10, 485. It obtained its dominant position in the Data Market through its acquisition of over fifty competitors, including PHCS and MDR. SAC ¶¶ 180-81. Second, Plaintiffs allege that no other viable competitors exist in the Data Market, and no new market entrants have emerged due to the Insurer Conspirators' agreements not to provide data to would-be competitors of Ingenix. SAC ¶¶ 486-87. *Newcal Indus. Inc.*, 513 F.3d at 1045 (product market definition includes producers who have potential to compete in relevant market). Furthermore, in its marketing materials for Ingenix, UHG recognizes the existence of a data market for UCRs because it promotes the database as the "industry standard" for determining UCRs. SAC ¶ 485. As further support for the

geographic scope of the relevant market, Plaintiffs allege that Ingenix provides the same UCR schedules to all Insurer Conspirators, who provide services to members located across the entire United States. SAC ¶¶ 129, 147, 460.[29]

Moreover, Ingenix clearly exercise market power in the Data Market. Market power is a surrogate for demonstrating injury to competition because market power bears a strong relationship to a party's ability to injure competition. *United States v. Brown Univ*., 5 F.3d 658, 668–69 (3d Cir. 1993). Injury to competition may also be shown by "the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods or services." *Id*. at 668 (citations omitted). Plaintiffs have sufficiently alleged the Insurer Conspirators' anti-competitive exercise of market power in the upstream market, leading to (1) the systematic downward skewing of UCRs, and (2) foreclosing competitors to Ingenix.

Specifically, Plaintiffs allege that Ingenix holds an 80% market share and, recognizing its dominance, markets its database as the "industry standard." SAC ¶¶ 479, 485. Plaintiffs further alleged that Defendants eliminated competition in the data services market when HIAA allowed UHG to acquire the PHCS database after it had already acquired the only other competing databases in the market, including the MDR database. SAC ¶¶ 180-86. Along with Defendants' plan, through HIAA, to expand and promote the Ingenix Database, Defendants also agreed to not provide data to any potential Ingenix Database competitors. SAC ¶ 478. Accordingly, Plaintiffs

---

[29]   The SAC includes allegations that the Data Market "is directly linked to the market for the purchase of insured medical services acquired on an out-of-network basis ('Linked Market')." SAC ¶ 475. The data that Defendants and Ingenix manipulate in the Date Market provides an output in the form of an Ingenix UCR schedule as the principle means for controlling pricing in the downstream market, *i.e.*, the market for ONET. *Id.* Therefore, "[b]y agreeing to joint control and administration of the Data Market through their use and manipulation of Ingenix and its data products, Aetna and its Co-Conspirators are able to assure that prices paid in the Linked Market will be artificially depressed," thus causing injury to Plaintiffs. SAC ¶ 475.

have sufficiently alleged an adverse effect on competition. *See also AMA III*, 588 F. Supp. 2d at 447–48.

The Supreme Court has rejected Defendants' argument that (1) the Data Market cannot be a relevant market simply because the adversely affected subscribers and providers do not participate in that market, and (2) Plaintiffs did not suffer antitrust injury because they do not participate as competitors or consumers in the Data Market. MTD at 14 (and authorities cited therein). In *McCready*, 457 U.S. at 479-81, the Court held that the plaintiff's injury was redressable under the antitrust laws even though she was not an economic actor in the market that had been restrained. The Third Circuit, analyzing *McCready* stated that the subscriber plaintiff, McCready, neither a competitor, consumer or business participating in the same relevant market as the defendants, suffered antitrust injury because the "reimbursement scheme was both the alleged conspiracy and the cause of McCready's harm." *Steamfitters,* 171 F.3d at 923. *See also Crimpers Promotions Inc. v. HBO, Inc.*, 724 F.2d 290, 294-95 (2d Cir. 1983) (although plaintiff did not participate in relevant market, its injury was "inextricably intertwined" with injury that defendants inflicted); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (reversing dismissal where plaintiffs and defendants participated in separate markets).

Here, Plaintiffs have been injured by the harm to competition Defendants inflicted in the Data Market. Their injury "flows from that which makes [D]efendants' acts unlawful": their agreement to manipulate the Data Market. *Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977). Defendants' UCR reimbursement rates were lower because they were not "set by free competition" but, rather, by Defendants' agreement to control and lower UCR rate data used to

calculate ONS reimbursements. *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 272 (D. Conn. 2003).

Moreover, Ingenix clearly exercise market power in the Data Market. Market power is a surrogate for demonstrating injury to competition because market power bears a strong relationship to a party's ability to injure competition. *Brown Univ.*, 5 F.3d at 668–69. Injury to competition may also be shown by "the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods or services." *Id.* at 668 (citations omitted). Plaintiffs have sufficiently alleged the Insurer Conspirators' anti-competitive exercise of market power in the upstream market, leading to (a) the systematic downward skewing of UCRs, and (b) foreclosing competitors to Ingenix.

E.    **Defendants' Use of Tainted UCRs was Contrary to their Independent Economic Interests**

Defendants argue that Plaintif0fs fail to allege they acted against their independent economic interests. MTD at 12. As an initial matter, to state a claim Plaintiffs are not required to allege that Defendants acted against their economic self-interest. *AMA III* at 447 (rejecting defendants' argument that plaintiffs "failure to provide evidence that Defendants were acting contrary to their 'independent business interests' is somehow tantamount to inadequate pleading"); *see also*, *Starr*, 592 F.3d at 323. In any event, Defendants' actions here are not unilateral, but rather were taken in the "common interests of the part[ies] to the restraint, at the expense of those who are not parties." *American Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2213 (2010). Absent any conspiracy, Defendants would each have an incentive to set UCRs accurately and competitively to compete for subscribers., SAC ¶¶ 516-517. In a competitive and open market the use of suppressed UCRs would inevitably lower an insurer's market share. *See Heartland*, 2008 U.S. Dist. LEXIS 74972, at *52–53 (ability to preserve market share despite

increases in prices suggests rational economic motivation for defendant to engage in alleged conspiracy). Only by secretly colluding with the Other Insurers and Ingenix can Aetna use suppressed UCR rates without suffering any competitive disadvantage.[30] Similarly in the absence of a conspiracy, Defendants would each have the incentive to enter the data market themselves because of the profitability of data collection and provision, or to encourage another competitor to enter the market in order to reduce the costs of the UCR schedules. SAC ¶203. Despite these advantages, Defendants have entered into agreements with Ingenix not to provide data to a competing database and have refused to enter the data market themselves. SAC ¶¶520, 525.

Finally, the determination of the anticompetitive or precompetitive effect of the alleged conspiracy is not properly resolved on a motion to dismiss, but rather by the finder of fact weighing all of the relevant evidence.[31] *Mitel Corp. v. A&A Connections Inc.*, 1998 U.S. Dist. LEXIS 3576, at *10–11 (E.D. Pa. Mar. 20, 1998) ("at this early stage, without the benefit of discovery, Mitel's mere allegations that its relationship with its Authorized Dealers is

---

[30] *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 327, is distinguishable. There, each insurer had the incentive to enter into the commission agreements at issue, regardless of the actions of its competitors, so as to enable the insurer to retain and maintain business. Thus, "sound, independent business reasons" existed for the defendants' common behavior. Here, by contrast, insurers would **lose** business by utilizing suppressed UCRs unless all competitors agreed to do the same. Therefore, unlike *Ins. Brokerage*, there is no sound, independent business reason for Defendants' common behavior. Defendants further rely on *Schafer*, 507 F. Supp. 2d 587. *Schafer* is distinguishable from the present case on multiple fronts: (1) the use of the Xactimate database was prescribed by Louisiana state law in the aftermath of Hurricane Katrina; (2) the database was not owned and controlled by an insurer-competitor; and (3) the database was not biased downwards by the data contributions from **the very same users of the database.**

[31] Defendants' cases, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124 (3d Cir. 1999), and *Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987), actually weigh **against** dismissal. Both cases, which involved parallel pricing and not a direct conspiratorial agreement as here, were decided on summary judgment, upon a weighing of all relevant evidence, not on a motion to dismiss.

'procompetitive' is insufficient to refute A & A's claim of antitrust injury"); *In re ATM Fee Antitrust Litig.*, 2006 U.S. Dist. LEXIS 89836, at *14–15 (N.D. Cal., Nov. 30, 2006).

## X.   **PLAINTIFFS ADEQUATELY ALLEGE STANDING (MTD SECS. IV & VIII)**

Contrary to Defendants' contentions, MTD at 30-32, 45-47, Plaintiffs have adequately alleged standing as to both Subscriber Plaintiffs Hull and Samit, and the Association Plaintiffs.

### A.   **Subscriber Plaintiffs Samit and Hull Have Standing to Assert their Claims**

Aetna asserts that Plaintiffs Samit and Hull "lack Article III standing . . . because they have not received a balance bill for any ONET services." MTD at 30. Ms. Samit testified, however, that she paid at least one of her providers in full before Aetna even made its initial UCR determination, thereby causing her the injury Aetna claims she must have. *See* Carolyn Samit Dep. Tr. at 101:15-16, Feb. 2, 2010. ("I don't owe Linda Kestenbaum any money. I paid her in full.").[32] Moreover, Aetna fails to demonstrate that a balance bill is required in order to bring an ERISA claim, particularly when nothing in the statute or the plan documents requires such a bill before pursuing ERISA remedies, and nothing prevents the provider from pursuing payment in the future. *See McCall v. Metro. Life Ins. Co.*, 956 F. Supp. 1172, 1181 & n.3 (D.N.J. 1996) (ERISA allows a beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits the terms of the plan. . ."); AET-00000319-20, 00000340 (no balance billing requirement in Samit's plan

---

[32] As for Ms. Hull, she made clear in her deposition that she was suing for declaratory and injunctive relief even though she did not suffer UCR determinations that resulted in any additional financial responsibility for her. Under ERISA, subscribers are entitled to sue to enjoin violations of plan terms, as well as for a declaration as to their rights to clarify their entitlement to future benefits. ERISA § 502(a)(1)(B). Ms. Hull is thus clearly entitled to declaratory and injunctive relief, even if she is not currently entitled to monetary past benefits.

documents).[33] The fact is, Aetna's UCR determinations made in violation of Aetna's plan terms are a concrete injury sufficient in and of themselves to confer standing. *See Franco v. CIGNA*, 2008 U.S. Dist. LEXIS 110566, at *26 (D.N.J. Aug. 6, 2008), where this Court held that "an allegedly improper reduction . . . in benefits constitutes an injury sufficient to confer Article III standing," adding that the plaintiff's "alleged injury existed at the time CIGNA improperly reduced Franco's benefits." *Id.* ,at *26 n.8. Thus, a balance bill is not a prerequisite to standing.[34]

In *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 577 (3d Cir. 2006), the Third Circuit held that "once a benefit accrues, 'the employer is contractually and statutorily obligated to provide that benefit and may not retrospectively amend the plan to divest the plan participant of a payment that he was already entitled to receive.'" Aetna therefore owed the benefit – a proper UCR payment – once the service was provided and the claim submitted. A balance bill is an

---

[33] In Subscribers' EOBs, Aetna sets forth the requisite for filing appeals and pursuing ERISA litigation, with no balance billing requirement. AET-00294136-38; AET-01597502-04 (Samit's EOBs); *see also* AET-01355194-205; AET-01355209-14 (Franco's EOBs, additional examples); AET-01354439-41; AET-01354453-54 (Werner's EOBs, additional examples). Thus, there is no justification for Aetna's position that its members must pay for their benefits out of their own pockets before they can sue Aetna. Such an unreasonable requirement discriminates against Subscribers on the basis of their economic status contrary to law and the ERISA contract. Members might forego medical care if they had to pay the provider in advance, which would defeat the purpose of having health care insurance in the first place.

[34] Aetna's citations, none from the Third Circuit, do not warrant a contrary conclusion. In *AMA v. United Healthcare Corp.*, 2007 U.S. Dist. LEXIS 44196 (S.D.N.Y. June 18, 2007) (*AMA IV*), at *60-63 , the decision was limited to where the provider has expressly excused the patient from paying the remainder of the bill. In *Owen v. Regence Bluecross Blueshield of Utah*, 388 F. Supp. 2d 1318, 1326 (D. Utah 2005), addressing summary judgment, the court noted that an affidavit from the provider in question showed that the plaintiff owed nothing, and there was no contrary evidence that the provider believed the bill remained viable. In *Hall v. Aetna Life Ins. Co.*, No. 09-222, at *5-6 (N.D. Fla. Sept. 29, 2010), which involved class certification not a motion to dismiss, the provider's Facility Agreement "precluded" the provider from billing the named plaintiffs for the services, and the plaintiffs testified that they did not "consider themselves financially responsible" for the services. In *Bollig v. Christian Cmty. Homes & Serv., Inc.*, 2003 U.S. Dist. LEXIS 27138, at *8-9 (W.D. Wis. July 20, 2003), the provider affirmatively expressed in sworn testimony that he would not seek payment from plaintiffs and the court held that the plaintiffs might not be liable under state regulations in any event.

extra-contractual requirement that Aetna cannot now impose.[35] Had Aetna tried to impose such a requirement when Plaintiffs appealed a UCR reduction, there is little doubt that a court would have rejected such a decision as arbitrary and capricious under ERISA. It is unreasonable to impose such an after-the-fact requirement when nothing in the plan or ERISA itself requires a balance bill before a subscriber may seek benefits. *Moench v. Robertson*, 62 F.3d 553, 566 (3d Cir. 1995) (a plan interpretation is not reasonable if it is not "consistent with the goals of the plan," "conflicts with the substantive or procedural requirements of the ERISA statute" or "is contrary to the clear language of the plan").[36]

Finally, a motion to dismiss is not the proper mechanism to address the balance billing argument. Rather, Aetna would have to assert and prove it as an affirmative defense.

---

[35] Where, as here, the plan documents do not require balance billing as a prerequisite to seeking benefits, Aetna is precluded from asserting such a requirement without amending the plan. *See Depenbrock v. CIGNA Corp.*, 389 F.3d 78, 83 (3d Cir. 2004) ("ERISA specifies that a valid amendment can only be made in the manner specified in the plan document."); *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 124-25 (3d Cir. 1998) (on remand) (rejecting *ex post* ratifications that defeat intervening rights). This is reinforced by the fact that the SPD had no such disclosure. *See Burstein,* 334 F.3d at 378 (SPDs must be "transparent, accurate, and comprehensive.").

[36] *See also Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442 (3d Cir. 1997) (Plan Administrator arbitrarily and capriciously denied long term disability benefits to the plaintiff claiming a lack of objective *medical* evidence, where the plan only required objective evidence); *Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 520 (3d Cir. 1997) (administrator's discretionary interpretation of plan "may not controvert the plain language of the [plan] document") (citation omitted); *Precopio v. Bankers Life & Cas. Co.*, 2004 U.S. Dist. LEXIS 30425, at *81-82 (D.N.J. Aug. 10, 2004) (Bankers Life's secret position that all drunk driving fatalities are excluded from accidental death coverage under ERISA-governed plans is inconsistent with these ERISA requirements regarding the "transparency, accuracy, and comprehensiveness" of SPDs.)

B.     **The Association Plaintiffs Have Standing to Assert their Claims**

    **1.   The Association Plaintiffs Have Standing to Assert Direct Claims**

The Association Plaintiffs adequately plead a direct, cognizable injury resulting from Defendants' wrongful conduct, pursuant to the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). There, where an organization alleged that (a) it had been frustrated in its efforts to satisfy its underlying organizational purpose, and (b) the defendant's wrongful practices had required it "to devote significant resources" to counteract the effects of those practices, the Court held that it had alleged a sufficient injury-in-fact to give it standing in its own right. Tellingly, Defendants completely ignore *Havens* in Section VIII of their brief even though the Court in that case, the seminal decision on this issue, made clear that a "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests." 455 U.S. at 380. The Association Plaintiffs here satisfy *Havens* by alleging facts showing that their organizational purposes have been frustrated by having been forced to divert significant resources from their core missions to combat Defendants' wrongful conduct. *See, e.g.,* SAC ¶¶ 72-74, 76-77, 79-80, 82-86, 88-90, 96-97, 99-100, 104-111, 454-457.

*In re Managed Care Litig.*, 298 F. Supp. 2d 1259 (S.D. Fla. 2003), a case Defendants relegate to a footnote, is squarely on point. There, the court applied *Havens* in finding that the medical associations' RICO allegations that "systemic practices . . . ha[d] caused them to lose membership and to expend their own time and resources fighting Defendants' tactics," were sufficient to give the associations standing in their own right, noting the "significant difference between associations that further certain abstract and philosophical interests, such as environment and taxation, with member-driven organizations such as the Associational Plaintiffs ostensibly dedicated to the holistic welfare of their physicians as well as the practice of

medicine." *Id.* at 1305-07.[37] Moreover, the Association Plaintiffs here have engaged in extensive discovery, including the production of approximately 1.4 million pages of documents, 14 depositions and the filing of expert reports – all of which demonstrates that these associations have been forced to expend considerable resources in frustration of their purpose that is directly attributable to combating Defendants' wrongful conduct and that this injury is calculable.[38]

---

[37] Defendants try to distinguish *Managed Care* from this case by pointing out that there is no allegation here that the Defendants' practices have caused the Association Plaintiffs to lose membership, as there was in *Managed Care.* MTD at 46 n.12. However, this was only one of a number of allegations the plaintiffs asserted in *Managed Care.* The main thrust of those allegations, as is true here, was that the association plaintiffs were forced to expend their own time and resources fighting the defendants' tactics. In reaching its finding that the medical associations had standing in their own right, the court did not focus on the loss of membership, but on the way in which "medical associations [] must deal with the fallout of [managed care companies' alleged] behavior." 298 F. Supp. 2d. at 1306l. Aetna also cites in a footnote to a different decision by the same court, *In re Managed Care Litig.*, 595 F. Supp. 2d at 1358, wherein the American Dental Association's ERISA claim was dismissed after the court determined that the ADA did not have standing on its own behalf under ERISA, the only remaining claim in that action, because it was neither a participant nor a beneficiary under an ERISA plan; here, the Association Plaintiffs do not bring claims on their own behalf under ERISA. Notably, however, the court *did* permit the associations to bring claims for injunctive relief on their members' behalf – a fact Defendants ignore here. 595 F. Supp. 2d at 1359. While the court also found under the facts presented there that the ADA's expenditures in combating the defendants' actions had been "purely voluntary" (*Id.*), here, the Association Plaintiffs' expenditures were not voluntary, but instead were necessary in order to pursue the fundamental purpose of the organizations – to promote and protect the business interests of their members, whose financial well-being is threatened by Defendants' conduct. *See, e.g.,* SAC ¶¶ 72-74, 76-77, 79-80, 82-83, 85-86, 88-90, 96-97, 99-100, 104-111, 454-457.

[38] Defendants' reliance on *AMA v. United Healthcare Corp.*, 2001 U.S. Dist. LEXIS 10818 (S.D.N.Y. July 31, 2001) ("*AMA I*") and *AMA II* (MTD at 45-56), is misplaced. The *AMA II* court, relying on its earlier decision in *AMA I*, held that the association plaintiff could not maintain a claim on its own behalf under ERISA. Unlike the *Managed Care* court, which allowed the medical association plaintiffs to proceed on their own behalf under RICO, the *AMA I* court was not presented with (and therefore did not address) an association's standing in its own right to bring the claims that the Association Plaintiffs assert here. Moreover, in *AMA I* the court failed to properly distinguish organizations with "abstract social interests" from organizations such as the Association Plaintiffs, which are member-driven and dedicated to the business interests of their physician-members. *See AMA I*, at *49 (relying on *Nat'l Congress for Puerto Rican Rights v. City of N.Y.*, 75 F. Supp. 2d 154, 165 (S.D.N.Y. 1999). As explained above, this is an essential distinction under *Havens* and *Managed Care.*

**2. The Association Plaintiffs Have Representative Standing
to Assert Claims on Behalf of their Members**

The Association Plaintiffs also bring claims on behalf of their members who have been injured by the conduct alleged in the complaint in the same manner as the Provider Plaintiffs. SAC ¶¶ 75, 78, 81, 84, 87, 91, 92-93, 94-95, 98, 101, 102-103, 106-107, 110-111, 457. Under *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977), an association may bring claims on behalf of its members if (a) its members would have standing to sue; (b) the association seeks to protect uncontested interests that are germane to its organizational purpose; and (c) the action does not require the participation of the association's members. *Id.* at 343. Notably, several courts addressing similar claims to those here have concluded that medical associations had standing to assert such claims on their members' behalf under *Hunt*. *See e.g.*, *Borrero v. United Healthcare of N.Y. Inc.*, 610 F.3d 1296 (11th Cir. July 6, 2010) (ERISA); *Managed Care*, 298 F. Supp. 2d at 1305-07 (RICO); *In re Managed Care Litig.*, 595 F. Supp. 2d 1349, 1358 (S.D. Fla. 2009) (ERISA); *AMA v. United Healthcare Corp.*, 2002 U.S. Dist. LEXIS 20309 (S.D.N.Y. Oct. 23, 2002) ("*AMA II*") (ERISA); *AMA III* at 449 (Clayton Act).

Defendants argue that "the Associations cannot bring suit on the providers' behalf" because the providers must show valid assignments and exhaustion, which "will require the providers' participation." MTD at 47. Defendants completely ignore *Borrero*, submitted previously to the Court as supplemental authority, in which the Eleventh Circuit considered whether, under its earlier decision in *Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337 (11th Cir. 2009), the association plaintiffs lacked standing to bring claims under ERISA. After careful consideration, the Court of Appeals concluded that they did not.

First noting that "[o]ther circuits have expressly permitted representative entities to sue under ERISA through associational standing," *Borrero*, 610 F.3d at 1305 (collecting cases,

including *Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 284-87 (3d Cir. 2002)), the court distinguished *Connecticut State Dental*, where the medical association sought both equitable ***and legal*** relief, whereas the plaintiffs in *Borrero* sought only injunctive and declaratory relief. The equitable relief claims of the medical associations in *Borrero* were found to not run afoul of the third prong of *Hunt* test, given that their claims "can be litigated with limited individual participation" because "[t]he relief they seek is an alteration of United's methodology, not redress for any specific past decision." *Id.* at 1306. Notably, just as in this case, in *Borrero* the medical associations' individual members would only have standing under ERISA if they obtained valid assignments from ERISA plan enrollees. Nevertheless, the Eleventh Circuit ruled that "[b]ecause these claims can be proved with the limited participation of organization members, the organization has standing to assert them here." *Id.* As in *Borrero,* the Association Plaintiffs challenge Aetna's general practices, and seek an alteration of Aetna's methodologies for calculating UCR rates, "rather than redress for any specific past decision." *Id.* Accordingly, the Association Plaintiffs have standing to assert the ERISA claims they assert on their members' behalf here.[39]

---

[39] Defendants fail to note that their only cited authority, *AMA IV*, 2007 U.S. Dist. LEXIS 44196 , is a summary judgment decision, not a motion to dismiss, and that even then, the case was limited to the Association's ERISA claims, with the court specifically noting that "[t]he Medical Association Plaintiffs remain[ed] in th[e] litigation for their non-ERISA claims." *Id.*, at *71 n.23. In *AMA II,* which Defendants ignore in this regard, the court rejected the defendant's argument that the Association's claims should be dismissed for failure to satisfy the third prong of *Hunt* on a motion to dismiss. 2002 U.S. Dist. LEXIS 20309, at *11-12. For example, at the summary judgment stage, the Association Plaintiffs anticipate that they will be able to use Defendants' own data and documents to establish valid assignments to the extent that such proof is necessary to establish the Association Plaintiffs' claims. Such proof will not necessitate the involvement of their membership.

## XI.   PLAINTIFF WEINTRAUB ALLEGES ACTIONABLE CLAIMS UNDER NEW YORK LAW (MTD SEC. IX)

Conceding that Weintraub has sufficiently alleged a breach of contract claim, Defendants move in Section IX of their brief to dismiss as duplicative his NY GBL § 349 and other state law claims. Neither contention is well-taken.

### A.   Plaintiff Weintraub Alleges an Actionable GBL § 349 Claim

Defendants contend that Weintraub's GBL § 349 claim is an improper "surrogate" for his uncontested breach of contract claim. MTD at 48-49. But, even if true, Weintraub may assert GBL § 349 in the alternative.[40] Moreover, the two claims are not redundant. Weintraub's breach of contract claim is focused on Defendants' failure to provide reimbursement for ONET services as promised, SAC ¶¶ 728-41, while Weintraub's GBL § 349 claim more broadly challenges Defendants' deceptive conduct. SAC ¶¶ 717-27.[41] Likewise, the damages under a GBL § 349 claim – which allows recovery based on the premiums Plaintiffs would have paid if they had known about Defendants' unlawful scheme and selected less expensive in-network healthcare – are more comprehensive than for breach of contract, based on the difference between the promised reimbursements for ONET and what was actually paid (the contract damages).

Moreover, Weintraub clearly satisfies the requirements for a claim under GBL § 349, which extends to "all deceptive acts or practices declared to be unlawful, whether or not subject

---

[40] *See Beth Isr. Med. Ctr. v. Horizon Blue Cross and Blue Shield of NJ*, 448 F.3d 573, 586 (2d Cir. 2006) (a plaintiff's claims for relief "may include relief in the alternative or different types of relief"); *see, e.g., Ace Chrome Corp. v. IBEX Constr.*, 2009 U.S. Dist. LEXIS 71547, at *11 (S.D.N.Y. Aug. 13, 2009) (unjust enrichment may be pled as alternative to breach of contract).

[41] Here, Weintraub alleges that Aetna committed material misrepresentations and omissions in its advertising of the plans (including the failure to disclose the conflict of interest). SAC ¶¶ 719, 721, 722, 725. Thus, unlike the breach of contract claim, Defendants' marketing of the plans will be a central area of inquiry with respect to Weintraub's GBL § 349 claim. *See Watts v. Jackson Hewitt Tax Serv.*, 06-cv-6042, 2008 U.S. Dist. LEXIS 63433, at *20 (E.D.N.Y. 2008) (GBL § 349 "meant to empower consumers, especially the disadvantaged and to even the playing field of their disputes with better funded and superiorly situated fraudulent businesses").

to any other law of this state." GBL § 349(g). *See Riordan v. Nationwide Mutual Fire Ins. Co.*, 756 F. Supp. 732, 734, 739 (S.D.N.Y. 1990) (upholding GBL § 349 claim "arising from defendant's alleged failure to satisfy its obligations under the [insurance] policy"); *AMA I*, 2001 U.S. Dist. LEXIS 10818, at *58 (plaintiff in UCR under-reimbursement case adequately alleged damage under GBL § 349 even where such damage is duplicative of contract damages). Thus, an insurer's use of a far-reaching scheme to deprive policyholders of the benefits of their insurance policies – as alleged here – is actionable under GBL § 349.[42] Accordingly, a number of courts have upheld GBL § 349 claims against insurance companies based on similar pricing schemes.[43]

Defendants argue further that Plaintiffs' GBL § 349 claim cannot reach Ingenix and UGH as they are not alleged to have dealt directly with Weintraub. MTD at 49. However, GBL § 349 imposes secondary liability for co-conspirators, *Soule v. Norton*, 750 N.Y.S.2d 692, 695 (4th Dep't 2002), and material deception under GBL §349 has been broadly construed to include the secret use of an intentionally flawed insurance model to determine benefits. *See, e.g., Batas,* 281 A.D.2d at 262, 724 N.Y.S.2d at 5. Here, Weintraub alleges that the flawed database that forms the central basis for his GBL §349 claim was developed by Ingenix, which is a wholly-owned subsidiary of UHG, and that UHG provides flawed data that contributes to the inaccuracies in the

---

[42]   Defendants' citation to *Spagnola v. Chubb Corp.*, 574 F.3d 64 (2d Cir. 2009) is easily distinguishable. The plaintiff there did *not* claim "that he did not contract for the coverage he received." *Id.* at 74. Here, this is precisely what Weintraub claims: that he contracted for coverage for ONET at the UCR, but that he received something different (coverage for ONET at the false UCRs). SAC ¶¶ 4, 505, 719.

[43]   *See Batas v. Prudential Ins. Co.*, 281 A.D.2d 260, 262 (1st Dep't 2001) (plaintiff had adequately pled a violation of GBL § 349 by alleging that the defendant insurance company failed to disclose to its policyholders that it based   medical necessity determinations on guidelines which conflict with generally accepted medical standards); *Gaidon v. Mut. Life Ins. Co. of N.Y.,* 94 N.Y.2d 330, 343–44 (N.Y. 1999) (upholds GBL § 349 claim based on defendant's practice of using unrealistic insurance premium projections to sell life insurance); *Elacqua v. Physicians' Reciprocal Insurers*, 52 A.D.3d 886, 889 (3d Dep't 2008) (upholds GBL § 349 claim based on the defendant insurer's failure to disclose its conflicts of interest to its insured).

48

database. SAC ¶¶164-171, 182-206. In addition, the SAC provides detailed allegations regarding the manner in which UHG and Ingenix manipulate the Ingenix database to cause deflated reimbursements and significant resulting damages to the Class members. *See, e.g., id.,* ¶¶537-548. Because these allegations are sufficient to state a claim under GBL §349, UHG and Ingenix are directly liable for their role in the underlying conduct at issue as participants in the scheme to conceal the true nature of the Ingenix Database from Weintraub. SAC ¶¶ 721, 725.

### B.   Plaintiff Weintraub Alleges Actionable Common Law Claims

Defendants lastly argue that Plaintiff Weintraub's breach of contract claim necessarily precludes his implied contract and unjust enrichment claims. But the undisclosed conflicts of interest inherent in Defendants' use of the Ingenix Database present grounds for those claims that are not "intrinsically tied" to the breach of contract. SAC ¶¶ 9, 57-58, 179, 213, 506-09. This is not a case like *Deer Park Enter., LLC v. Ali Sys., Inc.*, 57 A.D.3d 711, 712, 870 N.Y.S. 2d 89, 89 (N.Y. 2008), in which "the conduct and resulting injury alleged in [the express and implied contract claims] are identical," or like *Goldman v. Metro. Life Ins. Co.*, 5 N.Y. 3d 561, 587-88, 841 N.E. 2d 742, 746-47 (N.Y. 2005), in which the alleged unjust enrichment was based on "disputed terms and conditions [that] fall entirely within the insurance contract." Instead, Weintraub explicitly asserts in the SAC that by under-reimbursing for ONET, Defendants precluded him and the class from obtaining the benefits of their contracts (regardless of what the contracts said). The argument Weintraub essentially makes under this claim is that he pays a higher premium for insurance in order to obtain the right to ONET, but is then dissuaded from using the ONET because it is made unaffordable by use of the flawed Ingenix data. As with the

GBL §349 claim, this damages argument made for Weintraub's claims for breach of the implied covenant of good faith and fair dealing is distinct from the breach of contract claim.[44]

### CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss the SAC should be denied.[45]

Dated  November 2, 2010.

<div style="margin-left:40%">

s/ D. Brian Hufford_____
D. Brian Hufford
Robert J. Axelrod
Susan J. Weiswasser
Jay D. Dean
POMERANTZ HAUDEK
GROSSMAN & GROSS LLP
100 Park Avenue
New York, NY 10017
212-661-1100

*Chair of the Aetna Plaintiffs' Executive Committee*

James E. Cecchi
Lindsay H. Taylor
CARELLA BYRNE BAIN GILFILLAN
CECCHI STEWART & OLSTEIN, PC
5 Becker Farm Road
Roseland, NJ 07068
973-994- 1700

</div>

---

[44]  In addition, both the implied contract and unjust enrichment claims are plead in the alternative to the breach of express contract claim; the fact that Weintraub may only ***recover*** on one claim (either contract or quasi-contract) certainly does not preclude him from ***pleading*** unjust enrichment and implied covenant claims in the alternative. *See, e.g., Maalouf v. Salomon Smith Barney, Inc.*, 2003 U.S. Dist. LEXIS 5913, at *20-21 (S.D.N.Y. April 10, 2003) (refusing to dismiss New York unjust enrichment and implied covenant of good faith and fair dealing claims, despite concurrent allegation of breach of contract claim); *see generally Contractual Obligation Productions, LLC v. AMC Networks, Inc.*, 2006 U.S. Dist. LEXIS 16402, at *22-23 (characterizing such an argument as "misguided at the pleading stage").

[45]  In the event the Court grants Defendants' motion, Plaintiffs request that they be granted leave to amend the SAC. *Phillips,* 515 F.3d at 245 ("if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile").

Joe R. Whatley
Edith M. Kallas
W. Tucker Brown
WHATLEY DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
New York, NY 10036
212-447-7070

Barry M. Epstein
Kevin Peter Roddy
Lynne Kizis
Barbara Gail Quackenbos
Eric Marcy
WILENTZ, GOLDMAN & SPITZER P.A.
90 Woodbridge Center Drive, PO Box 10
Woodbridge, NJ 07095
732-636-8000

Kevin M. Berry
WILENTZ, GOLDMAN & SPITZER P.A.
110 William Street, 26th Floor
New York, NY 10038
212-267-3091
Stephen A. Weiss
Christopher A. Seeger
Diogenes P. Kekatos
James A. O'Brien III
SEEGER WEISS LLP
One William Street
New York, New York 10004
212-584-0700

Joseph P. Guglielmo
SCOTT + SCOTT LLP
500 Fifth Avenue, 40th Floor
New York, NY 10110
212-223-6444

David R. Scott
Amanda F. Lawrence
SCOTT + SCOTT LLP
PO Box 192
108 Norwich Ave.
Colchester, CT 06415
860-537-5537

Christopher M. Burke
SCOTT + SCOTT LLP-CA
7070 Broadway, 10th floor
San Diego, CA 92101
619-233-4565

Andrew S. Friedman
Elaine A. Ryan
Kathryn A. Jann
BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
602-274-1100

*Members of the Aetna Plaintiffs' Executive
Committee*

Nicholas B. Roth
EYSTER KEY TUBBWEAVER & ROTH
402 E. Moulton Street
Decatur, Alabama 35601
256-353-6761
Dennis G. Pantazis
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
205-314~0500

Ralph Knowles
Kenneth Canfield
DOFFERMYRE SHIELDS CANFIELD &
KNOWLES, LLC
1355 Peachtree Street, Suite 1600
Atlanta, GA 30309
404-881-8900

Paul M. Weiss
Jeffrey A. Leon
George K. Lang
FREED & WEISS LLC
111 West Washington Street, Suite 1331
Chicago, Illinois 60602
312-220-0000

Gregory J. Pepe
NEUBERT, PEPE & MONTEITH P.C.
195 Church Street, 13th Floor
New Haven, CT 06510-20026
203-821-2000
Klari Neuwelt

LAW OFFICE OF KLARI NEUWEL T
110 East 59th Street, 29th Floor
New York, NY 10022
212-593-8800

Wood R. Foster, Jr.
Jordan Lewis
SIEGEL BRILL GREUPNER
  DUFFY & FOSTER P.A.
1300 Washington Ave S
Minneapolis, MN 55401
616-337-6100

Jonathan Alpert
THE ALPERT LAW FIRM P.A.
5920 River Terrace
Tampa, Florida 33604-6526
813-223-4131

Donald E. Haviland Jr., Esq.
HAVILAND HUGHES, L.L.C.
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, Pennsylvania 19106
215-609-4661

Bruce Heller Nagel
Randee M. Matloff
NAGEL RICE, LLP
103 Eisenhower Parkway, Suite 201
Roseland, NJ 07068
973-618-0400

Richard J. Burke
RICHARD J. BURKE LLC
1010 Market Street, Suite 650
St. Louis, Missouri 63101
314-880-7000

Alberto Nestico
KISLING, NESTICO & REDICK LLC
3200 W. Market Street, Suite 300
Akron, Ohio 44333
330-869-9007

Austin Tighe
FEAZELL & TIGHE, L.L.P.
6300 Bridgepoint Parkway
Bridgepoint 2, Suite 220
Austin, TX 78732
512-372-8100

Bruce D. Greenberg
LITE DePALMA GREENBERG LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
973-623-3000

Michael C. Dodge
GLAST, PHILLIPS & MURRY, P.C.
2200 One Galleria Tower
13355 Noel Road, L.B. 48
Dallas, Texas 86350
972-419-8300

Mark N. Todzo
LEXINGTON LAW GROUP, LLP
1627 Irving St.
San Francisco, Ca 94110
415-759-4111

Lisa J. Rodriguez
TRUJILLO RODRIGUEZ RICHARDS, LLC
258 Kings Highway East
Haddonfield, NJ 08033
856-795-9002

Ira Neil Richards
TRUJILLO RODRIGUEZ RICHARDS, LLC
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
215-731-9004

54

Marc H. Edelson
EDELSON & ASSOCIATES, LLC
45 West Court Street
Doylestown, PA 18901
215-230-8043

Anthony Bolognese
Joshua H. Grabar
Jonathan M Stemerman
BOLOGNESE & ASSOCIATES, LLC
Two Penn Center
1500 John F. Kennedy Blvd., Ste. 320
Philadelphia, PA 19102
215-814-6750

Paul M. Sod
LAW OFFICES OF PAUL M. SOD
337R Central Avenue
Lawrence, New York 11559
516-295-0707

*Counsel for Plaintiffs*