UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE:  AETNA UCR LITIGATION | MDL No. 2020 |
| This Document Relates to:  ALL CASES | Master Case No. 07-3541 (FSH) (PS) |

PLAINTIFFS' EXPERT REPORT DATED APRIL 6, 2010

**Bernard R. Siskin, Ph.D.**

**Director and Head of the Labor Practice Unit of LECG
Philadelphia, PA**

INTRODUCTION

I am submitting this Expert Report relating to Aetna's use of the Ingenix database to determine Usual, Customary and Reasonable ("UCR" aka "R&C") amounts. I have opined about the flaws in the UCR databases in the expert reports dated March 31, 2004 (HIAA) and June 15, 2006 (Ingenix) submitted in the *McCoy v. Health Net* case before this Court. On April 10, 2008, I appeared before the Court in the McCoy matter to explain the basis for my conclusions that Ingenix data is flawed and produces skewed R&C. The principles and requirements for a valid UCR database discussed in my prior reports and testimony are incorporated here.

I have been retained as an expert witness on behalf of plaintiffs ("Plaintiffs") to provide an analysis of the Ingenix databases, including the Prevailing Healthcare Charge System data and databases (hereinafter "PHCS Database") and the Medical Data Research ("MDR") database

(collectively, "Ingenix Databases") used by Aetna to determine R&C amounts for its subscriber members who have received services from non-participating medical providers (i.e., those whose charges have not been negotiated in advance with Aetna). Using a methodology that is considered reliable and generally accepted for statistical analysis, it is my opinion that the Ingenix Databases suffer from fundamental flaws that make them invalid for calculating R&C amounts.

[Rule 23(b)(3): Predominance]

### EDUCATION AND PROFESSIONAL QUALIFICATIONS

I am a Director of LECG and work in the Philadelphia, Pennsylvania office. I received my Ph.D. in Statistics with a minor in Econometrics from the Wharton School of the University of Pennsylvania in 1970. Upon graduation, I became an assistant professor at Temple University in Philadelphia, Pennsylvania. I served as Chairman of Temple University's Department of Statistics for five years. I remained at Temple until 1984, when I resigned my tenured professorship position.

Since receiving my Ph.D., I have specialized in the application of statistics in a forensic setting. Much of my professional experience over the past thirty years has involved analyzing data and evaluating whether data are appropriate and sufficient for inferential analysis. I have written on the proper use, reliability and validity of databases (also known as data sets) for particular applications and have lectured widely on these topics. I have been retained by several courts, governmental agencies, states and private organizations to evaluate and/assess a wide variety of databases. These institutions include: the Third Circuit Task Force on Equal Treatment in the Courts, the National Aeronautics and Space Agency (NASA), the United States Justice Department, the Central Intelligence Agency, the Federal Bureau of Investigation, the Environmental Protection Agency, various states such as New Jersey, California, Connecticut, and Alaska, and numerous municipalities such as New York, Chicago, Philadelphia and Akron, along with numerous private

corporations such as: Automatic Data Processing, Amerihealth, McKesson, Lafarge, Merck, Rohm & Haas and Washington Mutual.

## III. FEDERAL COURT CERTIFICATION AS AN EXPERT

I have testified in more than 100 cases on the issue of the application and use of statistical evidence. The analyses I have conducted have involved allegations regarding the presence or absence of statistical reliability in data sets. I have also been appointed by courts as a neutral, jointly-agreed-upon expert to undertake specific statistical analyses. My curriculum vita is annexed as Attachment 1.

## IV. EXPERTISE

I am an expert in statistics: the science of collecting, classifying, presenting and interpreting numerical data; the analysis of data and the limitations of what can and cannot be properly inferred from data.

## V. CLASS ISSUES

I understand that the Court will need to assess class issues. My expert report touches upon several class issues, including typicality, commonality and predominance.

VI.  **INFORMATION CONSIDERED IN FORMING MY OPINIONS**

In forming my opinions, I have reviewed the materials referred to in my prior reports (dated March 31, 2004 and June 15, 2006) as well as the following documents:

Aetna-specific policies and procedures relating to R&C including discussions among claims personnel; R&C training materials; materials related to use of Aetna's internal data or outdated data or a percentage of Medicare; Documents relating to profiling, including profiling guidelines and internal discussions about their use; Deposition testimony excerpts including from Ingenix personnel (Carla Gee) and Aetna personnel (Deb Justo) and certain interrogatory answers.

Weil Gotshal letter dated December 17, 2009 to Aetna subscriber counsel listing the number of records and the percentage of Aetna's data contribution to Ingenix.

Documents identified in this report or in my prior report.

VII.  **DISCUSSION**

A. **Overview**

> Aetna defines R&C in relevant part as:
>
> Only that part of a charge which is reasonable is covered. The reasonable charge for a service or supply is the lowest of:
> - the provider's usual charge for furnishing it; and
> - the charge Aetna determines to be appropriate, based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and
> - the charge Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished.
>
> In determining the reasonable charge for service or supply that is:
> - unusual; or
> - not often provided in the areas; or
> - provided by only a small number of providers in the area;
>
> Aetna may take into account factors, such as:

*[Margin annotation: Rule 23(b)(3): Predominance Superiority; Rule 23(a): Typicality]*

- the complexity;
- the degree of skill needed;
- the type of specialty of the provider
- the range of services or supplies provided by a facility; and
- the prevailing charge in other areas.

The definition above identifies certain of the core concepts necessary for developing an R&C standard.

If Aetna is to determine R&C consistent with this definition, it must have a database that allows it to assess the core factors. Aetna uses other data to determine R&C that does not address or consider these factors including outdated data, internal Aetna data and a percentage of Medicare..

To assess a reasonable charge for a particular medical service, one must rely on actual charges billed by similar providers for reasonably similar services performed for a similar patients (age, etc.) in a relevant geographic area. In order to determine the set of reasonably similar services, the database would need to contain information on those factors which one would expect to affect the cost of the services, such as: (i) significant differences in provider qualifications, (ii) significant differences in type of medical service provided, and (iii) significant differences in medical market area. Given this information, one could then determine which charges are reasonable and which are "too high." A review of the Ingenix databases shows that they do not (and cannot) satisfy the core concepts of reasonably similar provider qualifications, medical services rendered and medical market area in which the service is performed. In sum, the Ingenix Databases do not allow one to compute a distribution of charges which are sufficiently similar that one can reasonably assess which charges are reasonable and which charges are "too high."

B. Methodology Review

#3901219.08                                    5

In evaluating the Ingenix Databases, I considered the following general principles:

1. the stated purpose for the data (*e.g.* any relevant or other definition);

2. the data collected and the manner of its collection;

3. the data not collected and the reasons therefore;

4. the steps taken to ensure the accuracy, comprehensiveness and completeness of the data collected;

5. the editing of the data, if any, and whether such editing impacted the resulting distribution of the data and its validity;

6. the end use for the data, and whether the data necessary for such end use have been collected; and

7. whether any biases (distortions) were introduced at any point in the methodology.

## OVERVIEW

**Ingenix Uses Flawed Methodology (Data Contribution and Processing) to Create the MDR and PHCS Databases**

In 2000-01, Ingenix consolidated the MDR and PHCS databases and the data contribution and screening (editing) process (*i.e.*, "scrubbing") used to create them. I explain in this report how these databases share a flawed underlying methodology (including both data contribution and editing), which skews downward the amounts reported by the Ingenix databases for the percentiles at and above the 70th percentile ("Upper Percentiles"). As I note, these methodological flaws affect all CPT codes in all geographic areas. The methodology does not consider: any differentiation of services provided within a CPT code; patient age or health and conditions; patient's prior medical history; the provider's qualifications, credentials, specialty, training or experience; and the place of service (hospital, clinic or doctor's office).

[margin annotations: Rule 23(b)(3): Predominance; Rule 23(a): Commonality]

The first step in Ingenix's methodology is the collection of data from voluntary Data Contributors ("Step 1"). The data it receives is a convenience sample. Ingenix fails to ensure that the convenience sample is representative of the population of charges. It fails to ensure the Contributed Data contains the fields it requested, is not pre-edited to remove high charges, does not contain non-market charges, and reflects each Data Contributor's complete population of relevant charges. It then edits or "scrubs" (*i.e.*, deletes) the data using a "scrubber" prior to analytical processing ("Step 2"). Ingenix's scrubbing is inappropriate for two reasons. First, it uses formulaic edits to identify purported statistical outliers and automatically removes them without factual basis or further investigation to determine if they are truly incorrect data points (and should be removed) or are simply high (or low) charges that should not be removed. The incorrect removal of valid charges, even if removed from both the high and low ends, biases the Upper Percentile values downward. If an equal number of valid charges are deleted from the high and low ends, the Upper Percentiles will be biased downward. Even if more valid low charges than valid high charges are removed, the Upper Percentiles will most likely be biased downward. For example, if Ingenix removes just 5 percent of total valid charges from the high end, it would have to remove 4 times that number, or 20 percent, of total charges from the low end before the 80th percentile in the "scrubbed" data is the actual 80th percentile of all the valid charges. Secondly, Ingenix's scrubbing combines the charges for a broad range of CPT codes without adjusting for differences in the spread of charges between CPT codes (*i.e.*, the "standard deviation"). This flaw tends to systematically remove valid high data points, particularly in CPT codes having a wide variation in charges (*e.g.*, because different types of providers are billing the same CPT code). This biases the Upper Percentile values downward.

The third and final step is the analysis and publication of the scrubbed data ("Step 3"). Ingenix produces MDR and PHCS data for each three-digit zip code area in the nation. The PHCS database calculates and reports the percentile distribution of reported charges for individual CPT codes having at least nine occurrences in the final database. For CPT codes for which fewer than nine charges are reported, the PHCS database reports a "derived" percentile distribution of charges. PHCS derives charge data for approximately 90 percent of all CPT codes because the vast majority of data reported is for the most common 10 percent of CPT codes. The MDR Database derives charge data for all CPT codes. Derived percentile amounts are estimated for both PHCS and MDR by: (i) grouping together various CPT charges after the different CPT charges have purportedly been adjusted so that they are comparable; (ii) computing the percentiles of the combined CPT charges; and (iii) readjusting the percentiles of the combined data to represent the percentiles of the different CPT charges. However, Ingenix fails to adjust for the differences in the spread of charges (i.e., standard deviation) within each CPT code among the combined CPT charges and, as a result, the derived percentiles are all biased (other than the mean). This flaw results in understatatement of the Upper Percentiles of the derived PHCS and MDR data. Because R&C seeks to determine what "most" providers charge for a similar service in a geographical area, the relevant data points are the Upper Percentile values. This means that the relevant data points are disproportionately affected (biased) by Ingenix's improper methodology for deriving data.

The end result of Ingenix's methodology is that the Ingenix data:

- Does not use appropriate statistical methodology (including sampling, data editing or data estimation) and as a result, creates data that is inappropriate and biased downward for use in computing R&C[1];

---

[1] The bias occurs at the Upper Percentile values. Cognizant of this bias, Ingenix disclaims the use of its data to compute R&C. Ingenix publishes both the MDR and PHCS data with the following disclaimer:

#3901219.08      8

- Does not ensure that the data it collects does not pre-screen out valid high charges, does not contain non-market charges, and is complete in that it contains all the requested information on all the Data Contributors' relevant charges;  *[Rule 23(b)(3): Predominance]*

- Does not ensure that the data it reports is representative of the total population of relevant charges in the geographic area;  *[Rule 23(b)(3): Predominance]*

- Does not report[2] the qualifications of the providers billing the charge data (whether medical doctor, nurse practitioner, physician assistant, etc.);  *[Rule 23(b)(3): Predominance]*

- Does not report the training, experience or expertise of the providers billing the charge data;  *[Rule 23(b)(3): Predominance]*

- Does not report modifiers billed by the providers;  *[Rule 23(b)(3): Predominance]*

- Does not report the place of service (*i.e.*, clinic, hospital, medical office) for the charge data;  *[Rule 23(b)(3): Predominance]*

---

"Client is responsible for decisions made and actions taken based on the database. The database is designed and intended for use by professionals experienced in the uses and limitations of claims processing, and it is client's responsibility to ascertain the suitability of the database for client's purposes. The database is provided for informational purposes only and Ingenix disclaims any endorsement, approval, or recommendation of data in the database." Gee Ex. 12 (PHCS); Ex. 39 (MDR).

Ingenix's Product Schedule agreement prior to 2005 stated:

"The Data is provided to Customer for informational purposes only. Ingenix disclaims any endorsement, approval or recommendation of particular uses of the Data. There is neither a stated nor an implied 'reasonable and customary' charge, either actual or derived; neither is there a stated nor an implied 'reasonable and customary' conversion factor. Any interpretation and/or use of the Data by Customer is solely and exclusively at the discretion of Customer. Customer shall not represent the Data in any way other than as expressed in this paragraph." PHS 7009738.

In April 2005, Ingenix's Product Schedule agreement reflected the additional italicized language:

"The Data is provided to Customer for informational purposes only. *Customer acknowledges that the Data is a tool that Customer may use in various ways in its internal business.* Ingenix disclaims any endorsement, approval or recommendation of particular uses of the Data *either in general or with respect to Customer's operations. The Data does not provide to Customer* a stated or an implied 'reasonable and customary' charge, either actual or derived. *The Data does not contain* a stated nor an implied 'reasonable and customary' conversion factor. Any *reliance upon,* interpretation *of* and/or use of the Data by Customer is solely and exclusively at the discretion of Customer. *Customer's determination or establishment of an appropriate reimbursement level or fee is solely within Customer's discretion, regardless of whether Customer uses the Data. Ingenix does not determine, on Customer's behalf, the appropriate fee or reimbursement levels for Customer and its business. Customer acknowledges that Ingenix sells both the MDR and the PHCS relative and actual charge databases, and that Customer has decided to license the PHCS database.* Customer shall not represent the Data in any way other than as expressed in this paragraph." PHS 7108744.

2   I will use the word "report" to mean "collect", "determine", "include" "identify," and "use as a basis for R&C calculations."

#3901219.08                                                9

- Does not report the type of service (*i.e.*, inpatient, emergency, ambulatory surgery) for the charge data;

- Improperly edits out valid charges, which biases the Upper Percentiles of reported data downward; and

- Statistically incorrectly estimates derived percentile data which understates the Upper Percentile values.

I explain in detail below my critique of Ingenix's methodology and my conclusion that the MDR and PHCS databases are unreliable and invalid for determining usual, customary and reasonable ("R&C") amounts for services rendered to Aetna members by out-of-network providers. I also provide an overview of how Aetna's claims system uses the Ingenix data to make R&C determinations.

## I. DETAILED DISCUSSION REGARDING INGENIX'S METHODOLOGY INGENIX'S DATA CONTRIBUTION FLAWS (STEP 1)

Proper statistical procedures require that Ingenix assess the completeness and accuracy of the data it receives from its Data Contributors, and ensure that its rules are being followed. A Data Contributor database cannot be considered valid when there is inadequate data quality control in place. Ingenix's[3] methodology for selecting a convenience sample without testing or validation results in two fundamental flaws: *first,* one cannot assume that the Contributed Data was representative of the population of charges; and *second*, there were no controls in place to ensure that Data Contributors were contributing appropriate data (e.g., market charge data, complete data reflecting all of their relevant charges, etc.) and were not pre-editing or pre-scrubbing their

---

[3] A convenience sampling and the reward system in which reimbursement is based only on the amount of data passing screening; entices Data Contributors to eliminate high values when submitting data regardless of whether the charge was valid or not. I explain Aetna's prescrubbing of its data contribution *infra*. Another flaw is that the data contributed by each Data Contributor was not established as representative of all its charge data.

#3901219.08                                                          10

Contributed Data. The mere existence of large quantities of data would not remedy the fundamental flaws caused by incomplete, unrepresentative and pre-scrubbed Contributed Data.

Recent testimony provided by Aetna, CIGNA and Ingenix witnesses have confirmed the numerous deficiencies in Ingenix's data collection process which I discussed in prior reports. These deficiencies render the data unusable for the stated purpose of assisting Ingenix customers (such as Aetna) in determining R&C. [Rule 23(b)(3): Predominance]

### A. Ingenix Does Not Receive Useful Data on Provider, Place of Service, Difference in Level of Service or Type of Service within CPT Codes Necessary for Properly Estimating R&C

Ingenix has never consistently received expanded information from its Data Contributors. As a result, Ingenix only uses limited information consisting of the date of service, CPT code (5 digits only rather than 7 digits which would include modifiers), billed charge and provider's zip code. When Ingenix started to collect provider information (*e.g.*, the identity of the provider, the provider's professional degree specialty, etc.), its Data Contributors provided it partially or not at all. As a result, Ingenix continued doing its analysis and created the final PHCS and MDR data without considering provider-specific information. Data Contributors also do not consistently contribute other data fields that Ingenix purports to require, such as patient information, place of service and type of service. Thus, Ingenix does not consider these additional factors in the Ingenix databases. [Rule 23(b)(3): Predominance]

Aetna, CIGNA and Guardian, all confirmed that they do not provide adequate expanded data to Ingenix. CIGNA, for example, provides fewer than half of the allegedly required data fields, and [Rule 23(b)(3): Predominance] provides *no* provider-specific information (*e.g.*, the name and address of the provider; his or her licensure, specialty, etc.). At least until March 2005, when it apparently stopped contributing data, Guardian continued to contribute only the same limited four data elements that it contributed since

the 1970s and it failed to provide provider-specific and patient-specific information. Ingenix has consistently acquiesced in receiving Contributed Data that does not include most of the requested information from Data Contributors and has continued to use only the same four data fields employed since the inception of the HIAA database: billed charge, date of charge, zip code of location where service provided; and CPT code.[4]

Rule 23(b)(3): Predominance

### B. CIGNA's Contributed Data Demonstrates That The PHCS Sample is Not Representative

Both currently and in the past, CIGNA has maintained multiple claims systems. When I filed my report, "Plaintiffs' Supplemental Expert Report," dated June 15, 2006, I noted that: "CIGNA contributes data to Ingenix from only four of its nine claims systems. The five claims systems from which CIGNA does not contribute data are nationwide in scope. CIGNA stated that it decided not to contribute all its data to Ingenix because contributing additional data would not increase the discount it receives from Ingenix (75 percent). CIGNA has only one claims system from which it contributes data to Ingenix that contains any HCPCS data."[1]

It is my understanding that CIGNA verified that it "has historically submitted claims data to Ingenix from four of its claims systems: Dentacom, Medicom, CIGNA Claims, and Proclaim. As of November 2007 and March 2008, CIGNA ceased submitting data from CIGNA Claims and Medicom, respectively, to Ingenix because these claims platforms processed very few claims. Beginning in November 2009, in addition to Proclaim and Dentacom, CIGNA began submitting claims data for claims processed on Power MHS." Power MHS is one of CIGNA's major claims processing systems.

---

4   HIAA, the operator of the predecessor database, stated that these four data fields were selected because they were relatively easy for Data Contributors to submit. HIAA acknowledged they do not provide provider-specific, patient-specific, service-specific information about the charge.

#3901219.08                                     12

With respect to its other claims process systems, CIGNA states that:

"CIGNA does not submit data from the rest of its claims engines: single-site MHS, Amisys, MHC, CBH, PowerStepp (CIGNA Voluntary), Worldcare (CIGNA International) or Diamond 950 (CIGNA International). There are several reasons that CIGNA does not submit data from the remainder of its claims systems. First, CIGNA is not required by its contract with Ingenix to submit data from any particular claims system CIGNA sends data on a voluntary basis. Second, sending data from the remaining claims systems to Ingenix is not technologically practical. The four claims platforms from which CIGNA has historically sent data to Ingenix have capabilities that allow CIGNA to extract the data that Ingenix needs. Sending data from the remaining claims platforms would require considerable modifications to the claims platforms, and would also require CIGNA to develop an IT solution for extracting the data from those claims platforms. Third, when Ingenix customers send Ingenix a certain volume of data, Ingenix in turn provides those customers with a discount on data from the Ingenix PHCS database. CIGNA receives the maximum discount as a result of the data that it sends to Ingenix. Sending additional amounts of data would not result in any additional discount. Fourth, the claims platforms that CIGNA does not submit data from are minor claims platforms that only comprise a small fraction of the claims processed by CIGNA. Finally, based on the data that goes into the claims platforms, CIGNA has no reason to believe that sending data from Proclaim, CIGNA Claims, Medicom, Dentacom, and Power MHS, but not the remaining platforms, materially impacts the data it send to Ingenix"

Without production of the underlying factual or statistical evidence, CIGNA's claim that "sending all its data would not materially impact the data sent to Ingenix" cannot be verified. It should be noted that this statement is not justified by the mere fact that these claims are only a small percent of CIGNA's total claims. If the deleted claims are disproportionately high priced, and for CPT codes with few observations per zip code, a few claims could drastically change the percentile distribution and UCR estimate. Moreover, CIGNA only started contributing claims data to Ingenix from Power MHS (one of its two major claims engines) in 2009.

Similarly, in my supplemental expert report in Health Net dated June 15, 2006, I noted:

"proper statistical procedures require that Ingenix assess the completeness and accuracy of the data it receives from its Data Contributors and ensure that its rules are being followed. A Data Contributor database cannot be considered valid when there is inadequate data quality control in place."

#3901219.08                              13

I have subsequently learned that in response to Ingenix's revised Data Submission Information form, although CIGNA certified that it "attests that the service zip code provided in service zip field (example: field #20 on Ingenix's recommended Record Layout) is populated with the zip code where services were rendered which is not necessarily the provider billing address zip code," Ingenix was aware as early as in 2001 that CIGNA could not supply the zip code where the service was rendered, but only the provider billing address zip code. Despite this, Ingenix used CIGNA data until 2009, when it discontinued using CIGNA data because of this problem.

I have also learned that, at some time, rather than submitting individual charges CIGNA submitted total charges and total number of occurrences to Ingenix for one of its claim processing data sets. Rather than discarding the data as useless, Ingenix considered the data as multiple charges, incorporating them all at the average. This approach obviously biases the UCR estimate down. For example, if there are only 10 charges in a zip code, and the charges average $100, Ingenix would consider these to be 10 individual charges at $100 each, and any charge in excess of $100 would be considered to be above the 80th percentile. However, the $100 average could be composed of five charges at $110 and five charges at $90; therefore, one-half of the charges would incorrectly be considered "atypical" of the charge distribution. To the extent that other contributors supplied aggregated data and Ingenix used the average values as it did for CIGNA, the methodology could actually seriously bias the distribution profiles used to compute R&C downward.

Rule 23(b)(3): Predominance

### C. Guardian Violated Ingenix's Data Contribution Requirements

Guardian never contributed all of its available data. It produced no charge data relating to anesthesia procedures. Its Contributed Data was limited to certain CPT codes, and specifically excluded data relating to other CPT codes. Even as to the CPT codes it did contribute, Guardian failed to contribute provider-specific data fields (such as provider licensure, specialty, etc.) and patient-specific data fields (including the patient's age and gender). Except for three modifiers, Guardian's data excluded modifiers which were identified on the providers' billed charges.

### D. Aetna Pre-Scrubs Valid High Charges

It is appropriate for a Data Contributor to edit out data errors. However, it is important that a Data Contributor does not pre-edit or pre-scrub out data to remove high charges which it labels "outliers." There are two reasons for this requirement. First, such pre-editing removes valid high charges and biases downward the Upper Percentile values in the collected data. Second, Ingenix's scrubbing process presumes and requires that the Contributed Data is not pre-edited or pre-scrubbed.

Aetna is Ingenix's largest data contributor. Its contributions to Ingenix are now 25% of the total data Ingenix receives. *See* Weil Gotshal letter dated December 17, 2009 to Aetna subscriber counsel. For at least two decades, Aetna has pre-edited or pre-scrubbed, its claims data according to its so-called Profiling rules. Aetna considers its Profiling rules mandatory. Aetna uses different Profiling rules according to whether a claim was processed by Aetna's automated adjudication ("AA") system or from manual claims processing (*i.e.*, after review by the medical review unit). The vast majority of Aetna's R&C determinations are made by its "AA" system. Aetna's AA Profiling rules state (in pertinent part):

#3901219.08                                                15

> "Charges that exceed prevailing will be reduced and not profiled with action codes 617 or 657.
>
> Charges that exceed prevailing but are within plan prevailing fee liberalization will be accepted but not profiled with action code 605"

Aetna's manual Profiling Guideline states (in pertinent part):

> "Do not profile situations where Edit 410 displays – submitted charge is less than half the prevailing fee."
>
> "Do not profile situations where Edit 401 displays – submitted charge exceeds prevailing fee by 150%."

Aetna's use of Profiling rules such as those quoted above significantly and adversely impact the integrity of the Ingenix databases. Aetna is a major data contributor, contributing hundreds of millions of charge records each year to Ingenix. Ingenix claims to base its data on 450 million claim records per cycle. Aetna's Contributed Data has been between 17-25% of the charges Ingenix has received since 2005. While Aetna contends that its Profiling rules did not automatically remove all claims in which the billed charge exceeded R&C from the data set it used to contribute to Ingenix (as well as create its own AMFS data), Aetna has nevertheless confirmed that it did use Profiling rules and that some charges were excluded based on the R&C value. While Aetna has yet to come forward with an adequate explanation and corroboration of how its Profiling rules applied over time, it is apparent that before Ingenix received the data, Aetna had pre-scrubbed the data using its internal Profiling rules. Aetna's pre-scrubbing of data compromised the integrity and accuracy of the data contributed to Ingenix. The combination of pre-scrubbing by Aetna and scrubbing by Ingenix ensured that the data gathered and compiled would be incomplete.

E. **Ingenix's Fails to Insist on Compliance with Its Rules or to Audit its Data Contributors and Ignores Problems in Contributed Data Even When It is Aware of Them**

#3901219.08                                16

Proper statistical procedures require that Ingenix assess the completeness and accuracy of the data it receives from its Data Contributors, and ensure that its contribution rules are being followed. A Data Contributor database cannot be considered valid when there is inadequate data quality control in place.

Despite the importance of Ingenix receiving all available "un-scrubbed" and market rate data (*e.g.*, excluding governmental payor data) from its Data Contributors, Ingenix took no steps to ensure that this occurred. Ingenix did not inquire or overlooked information as to how CIGNA, Aetna or other Data Contributors selected data, or whether they scrubbed it, or included non-market rate data. Aetna took from its interactions with Ingenix that it was free to pre-edit its data to weed out charges in excess of R&C. Significantly, Aetna informed Ingenix that it was pre-scrubbing its data using numerous Profiling rules. Ingenix did not inquire about these Profiling rules, and did not audit Aenta, but simply agreed to pretend that Aetna was submitting complete data. In fact, Ingenix agreed to change Aetna's certifications (which admitted non-compliance) to read "yes" instead of "no." Ingenix acknowledges that it is improper for Data Contributors to pre-scrub Contributed Data, but still took no steps to stop it, even when Aetna expressly informed Ingenix it was doing so.[5] Despite Ingenix's understanding that pre-scrubbing biases the data, Ingenix used Aetna's Contributed Data even though it had been pre-scrubbed and incomplete.

Even though its Data Contribution rules require submission of the entire universe of charge data, and Ingenix requires its Data Contributors to certify that they have submitted the entire universe of charge data, Ingenix knew that its Data Contributors (including CIGNA, Guardian and Aetna) continued to contribute less than all of their available data, pre-scrubbed their Contributed Data, and

---

[5] It is both possible and likely that other Data Contributors are pre-scrubbing their Contributed Data prior to sending it to Ingenix. CIGNA, for example, could not state with certainty that it did not pre-scrub its Contributed Data.

#3901219.08              17

failed to submit information for all required data fields. Yet Ingenix ignored, and continues to ignore, these clear violations of its stated policy and its Data Contributors' admittedly false certifications Neither Aetna, Cigna or Ingenix alerted data users that the previously compiled data violated its Data Contribution guidelines. [Rule 23(b)(3): Predominance]

The following relevant chronology makes that clear:

1.  Ingenix's pre-November 2004 contribution forms did not request, and Ingenix did not receive, Contributed Data reflecting the entire universe of provider data from its Data Contributors.

2.  Commencing in November 2004, Ingenix changed its data contribution form to require each Data Contributor to certify that it was contributing the "entire universe of billed charges" and without alteration or pre-scrubbing.

3.  Aetna, CIGNA and Guardian all signed the post-November 2004 certifications (as did other Data Contributors) despite continuing their prior practice of contributing less than the entire universe of billed charges from their claim systems.

4.  Even when Aetna told Ingenix it was continuing to pre-scrub its data by using Profiling Rules, Ingenix accepted Aetna's pre-scrubbed data. Ingenix did not audit Aetna's contributions or assess the impact of Aetna's violation of Ingenix's stated rules. Ingenix did not take any steps to enforce its stated rules or inform data users that its Data Contribution rules were not being followed or enforced. [Rule 23(b)(3): Predominance]

5.  CIGNA also periodically advised Ingenix that its data did not differentiate between rendering provider (place of service) zip code and billing provider (place of billing) zip code. Despite CIGNA's demonstrated inability to report rendering provider zip codes, Ingenix did not