January 26, 2012

<u>Via ECF and Overnight Mail</u>

Honorable Patty Shwartz, U.S. M.J.
United States District Court
District of New Jersey—Newark
U.S.P.O. & Courthouse Bldg., Room 477
50 Walnut Street
Newark, New Jersey  07101

   Re: *In re Aetna UCR Litigation*
     MDL 2020, Master File No. 2:07-cv-3541 (FSH) (PS)

Dear Magistrate Judge Shwartz:

  The parties respectfully submit the following discovery dispute, pursuant to the Court's Joint Letter Protocol.

## I. PLAINTIFFS' POSITION:

### A. Overview of Proceedings and Issues

  This dispute is a continuation of the Parties' ongoing disagreement concerning the United Defendants' improper privilege assertions.  As a result of Special Master Professor Paul Rice's findings, and the agreement of the parties, Plaintiffs were able to take the continued deposition of Dr. Melvin Ott, a former Ingenix employee.  During that deposition, Plaintiffs confirmed through Dr. Ott that potentially thousands of documents were never properly maintained, searched or produced.  Despite attempts to resolve this dispute, the United Defendants refused to search for or produce these documents.  Their main argument is based on the fact that Plaintiffs supposedly did not specifically request certain search terms by which these documents could potentially have been identified.  Not only does this argument ignore the obligations of a producing party to make a good faith search, but it disregards the procedural history whereby the United Defendants intentionally prevented the discovery of such information. Indeed, previously Plaintiffs challenged approximately 1000 pages of privilege log entries. Declaration of Amanda Lawrence ("Lawrence Decl."), ¶ 2.

  On May 13, 2011, Special Master Rice issued his Final Rulings on the disputed documents, in which he found that over 50% of the documents challenged by Plaintiffs were not, in fact, privileged and ordered the United Defendants to produce the previously-withheld

documents to Plaintiffs.[1]  Lawrence Decl., Exh. 1 (Final Opinion from Special Master Rice dated May 13, 2011).

In connection with the Special Master's findings, the United Defendants agreed to the continued deposition of Dr. Melvin Ott, a statistician hired by Ingenix in 2004 who worked on the Ingenix Databases. *Id,* ¶ 4.  Dr. Ott is a key witness who was intimately involved and familiar with DataSpan which involved a detailed evaluation and analysis into the Ingenix Databases.  He was initially deposed by Plaintiffs on August 25, 2010, but was instructed not to answer numerous questions on the grounds of privilege, and was prevented from testifying as to the full extent and scope of the work performed.  Dr. Ott's continued deposition occurred on July 19, 2011.  Lawrence Decl., Exh. 6 (Deposition of Melvin Ott ("Ott Depo.") dated July 19, 2011).  During that deposition, Dr. Ott identified a number of highly relevant documents that have not, to date, been produced by the United Defendants in any action nor have they appeared on a valid privilege log.

In response to the production of the previously withheld documents and Dr. Ott's deposition, on August 4, 2011, Plaintiffs wrote to the United Defendants requesting that they produce documents relating to the Ingenix Databases that have not been produced to date and/or identify those documents, if any, that the United Defendants claim are protected under a claim of privilege. Lawrence Decl., Exh. 2 (Letter from Amanda Lawrence to Christopher Pace dated August 4, 2011 ("8/4/11 Letter")).  In response to Plaintiffs' request, the United Defendants have steadfastly refused to produce any additional documents or information relating to these unproduced documents.  Lawrence Decl., Exh. 3 (Letter from Christopher Pace dated September 9, 2011 ("9/9/11 Letter")).

Thereafter, the parties met and conferred on the production of documents relating to Dr. Ott's testimony.  Although the United Defendants initially stated that they may be willing to search for relevant documents and information, on or about November 10, 2011, the United Defendants then stated that they were not willing to search for any documents which were not previously produced to Plaintiffs, and that the parties should present this dispute for judicial resolution.

On or about December 19, 2011, Plaintiffs presented the United Defendants with their portion of a joint dispute motion to be filed in the Central District of California.[2]  On or about

---

[1] In addition, prior to the issuance of Special Master Rice's final rulings, the United Defendants opted to voluntarily produce a number of previously-privileged documents based upon the preliminary rulings issued by Special Master Rice.  Lawrence Decl., ¶ 4.

[2] The continued deposition of Dr. Ott was noticed for the *In re Wellpoint UCR Rates Litigation,* pending in the Central District of California, along with the instant actions - *In re Aetna Out of Network Rates Litigation* and *Franco v. CIGNA.*  Plaintiffs believe that this dispute is ripe for adjudication in all three actions, notwithstanding Judge Chesler's dismissal on January 24, 2012 of the United Defendants in *Franco v. CIGNA.* (Far from being "inexplicable" as Defendants state, the UCR cases all hinge on the alleged invalidity of the Ingenix Databases.  It is therefore highly relevant in the CIGNA case that Ingenix admits its data is severely flawed and

January 4, 2012, the United Defendants provided their portion of the joint response in which they stated that they believed that this dispute was properly before this Court. Counsel for Plaintiffs caused the joint letter to be filed with the Court in the Central District of California in the *In re WellPoint* case.

Thus, given that the United Defendants have stated that this dispute is properly before <u>*this*</u> Court, they cannot now argue that this Court is not the proper forum to adjudicate the dispute. Indeed, the court in *In re WellPoint* recently denied Plaintiffs' motion based, in part, on a decision that the dispute is properly before the courts in the *Aetna* and *CIGNA* matters.

The documents Plaintiffs seek by this motion relate directly to the Ingenix Databases, their flaws, and Defendants' knowledge thereof. In addition, the newly produced documents show that certain depositions previously taken of representatives of the United Defendants need to be re-opened as their testimony is inconsistent with such documents, as well as incomplete. Plaintiffs thus seek the Court's intervention to compel the production of documents detailed below and to re-open the depositions of certain witnesses.

### B.   The United Defendants are Improperly Refusing to Produce Relevant Documents

Based on the production of documents ordered by Special Master Rice and the subsequent deposition of Dr. Ott, Plaintiffs seek the Court to compel production of the following documents:

- Documents previously stored in the "Escalante Room" at Ingenix: a room entirely devoted to analysis of the Ingenix Databases;[3]

- Documents stored in the "DataSpan" folder at Ingenix; and

- Documents related to, constituting, referring to, or supporting the (a) 2004 Dr. Ott memoranda; (b) the 2004 "SWOT" Analysis; and (c) Derek Esses' memoranda.

Lawrence Decl., Exh. 4 (Plaintiff's First Set of Requests for Production of Documents to Defendant Ingenix, Inc. dated March 9, 2009 – Requests nos. 14, 16, 17, 29, 30, 31, 34, 35, 36). The documents at issue here go to the very heart of this litigation and the other actions pending against the United Defendants.

---

inappropriate for determining UCR, as it does in the SWOT analysis. Lawrence Decl. Exh. 7.) Judge Chesler's 1/24/2012 decision in CIGNA has no bearing on the *Aetna* litigation in any event.

[3] Plaintiffs' state "previously stored" as counsel for the United Defendants has informed Plaintiffs that the contents of the Escalante Room were removed from that location.

1.    **Recently Produced Documents Reveal a Category of Relevant Information Otherwise "Hidden"**

A central theme of the documents subsequently produced as a result of the proceedings before Special Master Rice is an Ingenix program termed "DataSpan." DataSpan was an initiative at Ingenix that sought to both combine and enhance the MDR and PHCS Databases into one database that would address the flaws in those databases and provide, quite simply, a better product. Lawrence Decl., Exh. 7 (INGENIXMDL001183969-95). Dr. Ott was hired in order to work on DataSpan. DataSpan is critically relevant to the case at hand. Many of the flaws in the Ingenix Databases that DataSpan sought to correct are those highlighted in the Complaint. In fact, its very purpose was to create a statistically valid and defensible methodology to generate UCRs. *Id.,* Exh. 7 (INGENIXMDL001183969-95). Despite Ingenix's allocation of resources to the project and its presentation to the public, DataSpan never launched. It thus appears that at least the United Defendants were aware of the very same flaws complained of herein, and explored taking steps to rectify those same flaws, but never did.

2.    **The United Defendants Attempt to Shield DataSpan Behind Privilege**

Throughout any and all discovery in the pending "UCR cases," the United Defendants have gone to tremendous lengths to keep DataSpan hidden from Plaintiffs. The United Defendants did timely produce some documents that referenced DataSpan, but those references were innocuous and in no way previewed the critical importance of DataSpan nor the documents being withheld that show Ingenix's understanding of fundamental flaws in its MDR and PHCS databases. Lawrence Decl., ¶ 5. Defendants attempt to minimize the critical significance of the withheld documents, particularly the SWOT analysis that was produced only in 2011 due to Special Master Rice's privilege rulings. Defendants suggest that a document they did produce in the normal course of discovery, called the Business Case Form, was similar to the SWOT analysis. We contend that even a quick comparison of the two documents - - the withheld SWOT analysis and the produced Business Case Form - - will expose the bankruptcy of Defendants' argument. *Compare* Lawrence Decl. Exh 7 (SWOT analysis, produced only in 2011 due to Special Master) and Pace Decl. Exh 11 (Business Case Form, produced in normal course of discovery). A detailed analysis of the SWOT document appears in section 6 *infra.*

Indeed, the parties' dealings setting forth the parameters of discovery reflect an intention to keep documents about DataSpan hidden from view. Prior to United Defendants' production of any documents, The parties met and conferred on search terms and custodians, and at no point did counsel for United Defendants offer or suggest "DataSpan" as a relevant term—leaving Plaintiffs in the dark about its potential significance *Id,* ¶ 7. Additionally, when Plaintiffs did review documents produced that referenced DataSpan and sought to inquire further into it, the United Defendants objected. *Id.* At the depositions of Dr. Ott, Brett Stringham (IT, Ingenix), Susan Seare (VP, Ingenix), and Thomas Darr (MD, Ingenix), Plaintiffs asked about DataSpan. *Id,* ¶ 6. Each and every time, they were told that DataSpan was ordered by attorneys, or counsel for the deponent instructed the witness not to answer. *See*, *e.g.*, Lawrence Decl., Exh. 6 (Ott Depo. at 28:4-12; 42-43). Thus, it was only after a sucessful challenge to the privilege logs before the Special Master, and re-deposing Dr. Ott that Plaintiffs were at last able to garner any substantive information about DataSpan. And as shown in section 6, that withheld information is

explosive, confirming that in 2004, Ingenix recognized and confirmed the very database flaws that are at issue in this litigation.  Even though that limited production of privileged documents shows the potential critical nature of DataSpan documents, it appears that there is a slew of further information and documents related to DataSpan which Plaintiffs have been denied because they were not searched for, were not preserved, and/or were not logged on privilege logs.

### 3.     The Deposition of Dr. Ott Revealed Scores of Unproduced Documents

During the July 19, 2011 continued deposition of Dr. Ott and through the review of the documents produced as a result of the proceedings before Special Master Rice, it has become clear that at least the below described categories of documents exist:

- A room at Ingenix, termed the "Escalante Room," was entirely devoted to DataSpan.  That room housed a wealth of documents on the project. Lawrence Decl., Exh. 6 (Ott Depo. at 182-183.  Such documents include, but certainly are not limited to: Studies of Current Procedural Terminology ("CPT") codes in three states which were printed off and stored in the Escalante Room (*Id.* (Ott Depo. at 198, 23-25)); results of testing the effect of removing outliers on the estimation of percentiles for UCR  (*Id.* (Ott Depo. at 240, 21-22)); "SAS" output for tests undertaken for the N=? issue pertaining to actual versus derived charges (*Id.* (Ott Depo. at 243, 15-17)).  These are simply the documents that Plaintiffs are aware were housed in the Escalante Room and have not been produced. Dr. Ott testified that "probably pretty much everything that we did regarding that [DataSpan] project would have been in that [Escalante] room" Ott Depo. at 183.

- There was an electronic directory devoted entirely to DataSpan. (*Id.* (Ott Depo. at 202)).  Documents contained on that directory included, but were again certainly not limited to: documents produced by two University of Utah employees hired by Ingenix to perform research on MDR, PHCS, and DataSpan (*Id.* (Ott Depo. at 209, 12-15)); a large volume of documents pertaining to a literature review undertaken by a hiree of Dr. Ott and pertaining to DataSpan (*Id.* (Ott Depo. at 222-23)).

- An intern hired by Ingenix, Derek Esses, looked at CPT codes by states as well as at the total number of charges per year in relation to DataSpan. He generated a report on this research.  (*Id.* (Ott Depo. at 263, 3-5)).

In addition to the documents discussed by Dr. Ott at his deposition, it is also clear from the documents produced by United Defendants during the privilege dispute, that further relevant documents exists.  Lawrence Decl., ¶ 9.  The United Defendants produced a "SWOT" analysis of the MDR and PHCS Databases during the time of the DataSpan Project. Lawrence Decl., Exh. 7 (IngenixMDL001183969-95).  That document lists a number of serious flaws and shortcomings with the Ingenix Databases.  However, Plaintiffs received this "SWOT Analysis" in isolation—

5

without any supporting documentation or communications concerning it. Lawrence Decl., ¶ 10. Similarly, following the proceedings before Special Master Rice, Plaintiffs received a series of memoranda generated by Dr. Ott in 2004 in conjunction with DataSpan.  Lawrence Decl., Exh. 8 (IngenixMDL 001183239-53).  The memoranda address core issues with the Ingenix Databases including their representativeness and validity.  *Id.*  However, Plaintiffs likewise did not receive any drafts, communications, supporting documentation, or follow up on those memoranda. Lawrence Decl., ¶ 11.

### 4.    The United Defendants Have Thwarted the Discovery Process by Refusing to Produce Further Documents

To date, United Defendants have claimed that the documents sought were not produced or placed on a valid privilege log because they were not captured by agreed-upon search terms or custodians.  Lawrence Decl., Exh. 3 (9/9/2011 Letter).  However, this is simply gamesmanship on behalf of the United Defendants.  To begin with, Plaintiffs are confident that the search terms provided would have captured the requested documents as they contained such broad and applicable terms as "PHCS" and "MDR." Lawrence Decl., Exh. 9 (October 19, 2011 Letter from A. Lawrence ("10/19/11 Letter")).  In addition, even if somehow the agreed-upon search terms did not capture the relevant documents, the United Defendants had an obligation to disclose relevant terms.  For example, in November 2009, Plaintiffs were completely unaware of the existence or relevance of "DataSpan" so were unable to propose it as a search term.  Lawrence Decl., ¶ 7.  The United Defendants, however, have possessed such knowledge from the inception of these lawsuits. The United Defendants are not allowed to subvert critically relevant documents by using their superior knowledge to winnow out relevant search terms.  *See, e.g. In re Seroquel Prods. Liab. Litig.,* 244 F.R.D. 650, 662 (M.D. Fla)("while key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process").

Instead of answering Plaintiffs' questions about the documents in the Escalante Room (and in the Ingenix DataSpan directory specifically referred to by Dr. Ott), Ingenix counsel have tried to shift the blame for their deliberate failure to produce these documents by suggesting that the search terms requested by Plaintiffs were somehow lacking.  This contention is nonsensical, since  the United Defendants have refused to disclose whether they have in fact ever reviewed these documents, much less made a specific determination as to whether an absence of search terms is the reason they were not produced.  It seems improbable, if not impossible, that these documents did not contain at least one search term that should have caused them to be produced. In any event, Plaintiffs' Requests clearly called for studies and analyses of the Ingenix Databases.  The real problem seems to be that these documents (and servers) were spoliated (at a time when Ingenix was already a defendant in UCR litigation and was aware of its preservations obligations), and that the real reason they were not searched and produced has nothing whatsoever to do with Plaintiffs.

As to custodians, the listed custodians included Susan Seare and Carla Gee — the employees at Ingenix who had primary responsibility over the MDR and PHCS Databases. Lawrence Decl., Exh. 7 (INGENIXMDL001183969-95).  Dr. Ott, again unknown to Plaintiffs in 2009, was not a custodian.  Lawrence Decl., ¶ 8.  However, Dr. Ott left Ingenix prior to

commencement of this suit and presumably his documents would now be in the custody of Ms. Seare or Ms. Gee.[4]  To the extent the United Defendants continue to maintain that the documents are not in the possession of any of the named custodians, Plaintiffs request that they be compelled to identify where the documents are located.  *See, e.g., In re Seroquel Prods. Liab. Litig.,* 244 F.R.D. at 663 (counsel has a responsibility to "take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched"); *Rhea v. Washington Dept. of Corr.,* No. 10-0254, 2010 WL 5395009, at *7 (W.D.Wash. Dec. 27, 2010) (failure to locate all responsible documents warranted granting of motion to compel and certification that all employees with responsive documents had searched for documents); Transcript of Recorded Opinion on Production Custodians by the Hon. Patty Schwartz in *Franco v. Conn. Gen. Life Ins. Co.,* No. Civ-07-6039, 2008 WL 3399644 (D.N.J. 2008), ECF No. 110 ("the rules still require that sources of information that are likely to have possession, custody or control of responsive discovery should be produced").

Therefore, Defendants have used the attempts at cooperation and streamlining of document collection (search terms and custodians) as a shield for production.  This is an impermissible manipulation of the discovery process and perverts its very purpose.

### 5.   Plaintiffs Have Attempted in Good Faith to Obtain the Requested Documents Prior to Seeking the Court's Intervention

Plaintiffs have attempted in good faith to obtain the above listed documents through independent means and without court intervention.  The continued deposition of Dr. Ott occurred on July 19, 2011.  Shortly thereafter, and after the revelation that a room full of documents had not been searched or produced, counsel for Plaintiffs sent a letter to counsel for Defendants asking for the documents to be produced, for them to be identified, or for an inspection of the premises. Lawrence Decl., Exh. 2 (8/4/11 Letter).  Counsel for United Defendants responded by letter of September 9, 2011 informing Plaintiffs that they did not intend to produce any documents or descriptions or to permit inspection based on a number of spurious arguments including that Plaintiffs' requests were somehow untimely and/or that the documents were not relevant.  Lawrence Decl., Exh. 3 (9/9/2011 Letter).  Counsel for Plaintiffs responded to this letter with an additional letter on October 19, 2011. Lawrence Decl., Exh. 9 (10/19/11 Letter).

A meet and confer call followed.  During that call, counsel for the United Defendants continued to maintain that they would not produce further documents although they might be willing to add the search term "DataSpan" and conduct an additional search. Lawrence Decl., ¶

---

[4] Plaintiffs do have some concerns, as well, that Dr. Ott's documents were destroyed inappropriately.  In fact, Dr. Ott testified that when he left Ingenix (in 2005), he was not instructed to preserve documents, and so he did not.  Instead, he testified that he deleted all of his electronic files when he left Ingenix.  Ott. Depo. 213-24.  He testified that rather than turning documents over, he "just got rid of them."  Nobody informed him that his documents were subject to a litigation hold.  *Id.*  He testified that Ingenix's outside lawyer did not tell him to preserve his documents due to ongoing litigation, and that he destroyed documents as he believed he was required to do under his severance agreement with Ingenix. Ott Depo. 287:8-15.

12. However, counsel for the United Defendants informed counsel for Plaintiffs informally on November 10, 2011 that they would not, in fact, even do that.[5] Therefore, judicial intervention has become the only manner by which Plaintiffs can obtain highly relevant documents and testimony.

This unilateral refusal to produce - or even to search for - documents is simply improper and not within the proper confines of the Federal Rules of Civil Procedure.

### 6.    There Can Be No Doubt that Relevant Documents Have Not Been Searched for or Produced

As a foundational matter, the documents sought by Plaintiffs from the United Defendants in regards to DataSpan are patently relevant.  Parties are entitled to discovery regarding any non-privileged matter that is relevant to a claim or defense in the action.  Federal Rule of Civil Procedure 26(b)(1); *id.* 37(a)(2)(A)(B).  Under the Federal Rules, the scope of discovery is to be construed liberally, and relevance for purposes of discovery is defined very broadly.  *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999) ("It is well recognized that the federal rules allow broad and liberal discovery."); *Tele-Radio Systems Ltd. v. De Forest Electronics, Inc.,* 92 F.R.D. 371, 375 (D.N.J. 1981); 7 Moore's Fed. Practice & Proc. §34.12[1] (3d ed. 2006).  Discovery is appropriate "'where there is any possibility that the information sought may be relevant to the subject matter of the action.'"  *Renshaw v. Ravert,* 82 F.R.D. 361, 363 (E.D. Pa. 1979) (quoting *U.S. v. Internal Business Machines, Corp.,* 66 F.R.D. 215, 218 (S.D.N.Y. 1974); *see also Pacitti,* 193 F.3d at 778.

The information and documents sought from the United Defendants go to the heart of Plaintiffs' claims concerning the pervasive flaws in the Ingenix Databases.   To show that relevance, it is necessary simply to look at the "SWOT Analysis" document.  Lawrence Decl., Exh. 7 (INGENIXMDL001183969-95).  That document, under the "MDR, PHCS and DataSpan Methodology," lists the strengths and weaknesses of the MDR/PHCS Methodology presumably in an attempt to rectify those areas in DataSpan.  *Id.*  Among the weaknesses are, *inter alia*:

- "No control of data and how contributors gather it";
- "Data is not representative of any denominator such as the total number of doctors, payers, dollars billed/paid, etc.";
- "Data is biased because no random sampling occurred";
- "Lack of data contributor audits";
- "Juxtaposition of actual and blended methodology resulting in illogical charging patterns"; and
- "Geozips at Ingenix derived and not based on any identifiable industry or demographic standards."

---

[5] Plaintiffs met and conferred with the United Defendants and thereafter diligently filed the joint letter with the Central District of California following final confirmation from counsel for the United Defendants that they were, despite earlier insinuations, unwilling to do anything at all to locate further disputed documents.

*Id.* These correspond substantially with the flaws outlined in the Complaint. Therefore, further documents on DataSpan, an initiative aimed at rectifying those flaws, are clearly relevant. Furthermore, those documents would show the United Defendants' knowledge of the exact flaws and the fact that they ultimately took no steps to fix them and to save the Class from the loss of substantial amounts of money in under-reimbursement. Despite Defendants' lame attempt to minimize this document, a review by the Court will show that Plaintiffs' description of this document as "explosive" is indeed accurate. Lawrence Decl. Exh 7. No document produced by Defendants without an order by the Special Master (much less the vanilla Business Case Form cited by Defendants) is in the same ballpark as the SWOT analysis (or the other deprivileged documents).

The United Defendants have steadfastly hidden this information—only producing it when pressed through proceedings before the Special Master. Now, they have refused to produce further documents exposed in that process, even when asked repeatedly. These relevant documents go to the heart of Plaintiffs' case and must be produced.

For the reasons set forth herein, Plaintiffs respectfully request that the United Defendants be compelled to produce: (1) all documents previously contained in the Escalante Room; (2) all documents on the DataSpan directory; and (3) all documents related to, constituting, referring to, or supporting the (a) 2004 Dr. Ott memoranda; (b) the 2004 "SWOT" Analysis"; and (c) Derek Esses' memoranda. To the extent it appears that Ingenix cannot now find potentially relevant documents, Plaintiffs respectfully request a finding of spoliation and adverse inferences relating to it.

## C.      Reopening Certain Depositions

Depending on the production of documents and data that the United Defendants are ordered to make, Plaintiffs may seek a Court order reopening the depositions of Ingenix employees Carla Gee and Susan Seare in order to have them testify as to documents now produced, clarify statements previously made concerning their work on the Ingenix Databases and the DataSpan project, and provide further details on information now garnered. Plaintiffs noticed and took those depositions on March 18, 2010 and July 13, 2010 respectively. At Ms. Seare's deposition, counsel for the United Defendants would not permit her to answer as to Dataspan. Lawrence Decl., Exh. 10 (Deposition of Susan Seare dated July 13, 2010 "Seare Depo." at 118:19-22). Even if Plaintiffs' counsel had been permitted to ask Ms. Seare about DataSpan, they were not yet in possession of the recently produced documents, including the SWOT analysis authored by Ms. Gee and Ms. Seare. Similarly, at the deposition of Ms. Gee, she testified incredulously that she was not aware of a "systematic-wide comparison between MDR and PHCS." Lawrence Decl., Exh. 11 (Deposition of Carla Gee dated March 18, 2010 "Gee Depo." at 261-262). This evasive testimony is now directly contradicted by documents produced by the United Defendants in conjunction with the privilege disputes. There is a serious question as to the whether Ms. Gee and Ms. Seare testified truthfully and fully, as Plaintiffs did not have the benefit of these detailed documents relating to the extensive work done on DataSpan and thus were prejudiced by the absence of this information. Thus, once Plaintiffs have the ability to obtain and review these relevant, responsive documents, they reserve their

rights to ask that they be afforded the opportunity to re-depose Ms. Seare and Ms. Gee on the topics and documents now available.  *See, e.g. Dongguk University v. Yale University,* Civ. No. 3:08CV441, 2010 WL 5475812 at *3 (D. Conn. Dec. 30, 2010) (permitting re-opening of two depositions where defendant belatedly produced document, which effectively denied plaintiff opportunity to cover ground with deponents in prior deposition regarding document); *U.S. ex rel Parikh v. Premera Blue Cross,* 2006 WL 3733783, at *8 (W.D.Wash. Dec. 15, 2006) (permitting two depositions to be re-opened after claims of privilege overruled).

> **D.    Plaintiffs' Request to Compel Discovery is Timely**

Plaintiffs' request for an order compelling production of the documents at issue is timely. It is true that discovery in this case ended in late July, 2010.  However, Plaintiffs timely submitted their discovery disputes to this Court on August 3, 2010 and October 7, 2010.  This Court's November 3, 2010 Order referred them to Special Master Rice and stated that the Special Master would address those issues as well as "reasonably anticipated future disputes."  The disagreement over the privilege logs, and issues reasonably stemming from them, were thus left open by the Court.  In fact, following a conference with Judge Chesler, Plaintiffs submitted a letter to the Court noting the fact that, while discovery was technically closed, it remained open as to this particular dispute.  *See* 10/24/11 Letter from Christopher M. Burke to the Honorable Stanley R. Chesler, Lawrence Decl., Exh. 13.

Furthermore, there is simply no way Plaintiffs could have discovered the hidden and highly relevant documents prior to the discovery cut-off.  Plaintiffs are not to blame for documents that Defendants listed on spurious privilege logs or failed to search and produce prior to the discovery cut-off.  It was only through the proceedings with Special Master Rice (conducted after the close of discovery) that Plaintiffs realized the exact extent of DataSpan and Ingenix's evaluation and critique of the Ingenix Databases.  The United Defendants may argue that Plaintiffs had access to documents referencing DataSpan prior to the close of discovery. However, as set forth in the 10/19/11 Letter, Plaintiffs had minimal information surrounding the project and any attempts to find out more were met with objection and difficulty.  Lawrence Decl., Exh. 9 (10/19/11 Letter).  For example, at the deposition of Brett Stringham at Ingenix, Plaintiffs asked about DataSpan, and Mr. Stringham could not recall anything about it or even working on it.  Even after counsel for Plaintiffs showed Mr. Stringham his time card on which he logged over 30 hours in one week on DataSpan, he still refused to answer about the project. Lawrence Decl., Exh. 12 (Deposition of Brett Stringham dated June 30, 2010 "Stringham Depo." at 188, 189:14).

This example serves to show that any attempts by Plaintiffs to unearth information about DataSpan and the associated evaluation of the existing Ingenix Databases were stymied by the United Defendants.  Therefore, it was only through extensive proceedings before Special Master Rice that Plaintiffs were able to begin to understand DataSpan and the breadth of the United Defendants' knowledge of the weaknesses of the existing Ingenix Databases.  Professor Rice issued his Final Rulings on May 13, 2011 and the continued deposition of Dr. Ott occurred on July 19, 2011.  It was only at the deposition of Dr. Ott that Plaintiffs first understood the extent and amount of unproduced (and undisclosed) documents that existed.  Thus, there was simply no way Plaintiffs could have sought those documents earlier.  *See generally Intex Recreation Corp.*

*v. Team Worldwide Corp.*, 471 F.Supp.2d 11, 15 (D.D.C. 2007) ("TWW does not provide any authority for its contention that Intex's motion [to compel allegedly privileged information after the close of discovery] is untimely. While Intex's motion was filed following the close of discovery, as Intex argues in its reply, '[i]t was only after the privilege logs were produced, the CI Agreement provided and the ARP deposition concluded that a motion could be brought[.]' . . . . Accordingly, the [court] finds that Intex's motion to compel was timely.").  For the United Defendants to first bar attempts at discovery made by Plaintiffs during the discovery period and then to claim that it's "too late" is utterly disingenuous.

### E.    A Spoliation Inference Can Be Imposed

"Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Mosaid Technologies. Inc. v. Samsung Electronics. Co., Ltd.* 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (quoting *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430  (S.D.N.Y. 2004)).  The United States Court of Appeals for the Third Circuit has further recognized that: "[*A*] *party's failure to produce a document can have the same practical effect as destroying it and we reaffirm that, under certain circumstances, nonproduction of evidence is rightfully characterized as spoliation*."  *Bull v. UPS,* No. 10-4339,  __ F.3d ___, 2012 WL 10932, at *4 (3d Cir. Jan. 4, 2012).  Here, Dr. Ott's testimony on the destruction of relevant documents coupled with the United Defendants' intentional failure to produce critical information amounts to spoliation.

Spoliation occurs in cases where (1) the evidence was in the party's control; (2) the evidence is relevant to the claims or defenses in the case; (3) there has been actual suppression or withholding of evidence and (4) the duty to preserve the evidence was reasonably foreseeable to the party.  *Id.* at 11.  Here, the United Defendants' are in control of the withheld documents.  The documents sought are clearly relevant because they concern the pervasive flaws in the Ingenix Databases.  Further, Dr. Ott's testimony on the destruction of relevant documents, and Plaintiffs' numerous requests for the production of further documents satisfies that the United Defendants are actually withholding evidence.  Finally, it is irrefutable that the United Defendants had a duty to preserve the evidence.

Accordingly, to the extent the United Defendants destroyed documents or continue to fail to produce documents that have been exposed through Plaintiffs' diligent efforts, Plaintiffs respectfully request that this Court impose a spoliation adverse inference instruction to permit the jury to infer that "destroyed evidence might or would have been unfavorable to the position of the offending party." *See Mosaid Techs., Inc.*, 348 F. Supp. 2d at 336 (imposing spoliation inference); *N.V.E., Inc., v. Palmeroni,* No. 06-5455, 2011 WL 4407428, at *6-8 (D.N.J. Sept. 21, 2011) (allowing spoliation adverse inference.)

### F.    Sanctions Are Appropriate

Plaintiffs respectfully request that the Court impose sanctions under Federal Rule of Civil Procedure 37 (c)(1) and under its inherent powers.  Rule 37(c)(1) provides:

*Failure to Disclose or Supplement.*   If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use

that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

A district court may also award sanctions under its "inherent powers" against a party who acts  "in bad faith, vexatiously, wantonly, or for oppressive reasons." *In re Gioioso,* 979 F.2d 956, 959 n.2 (3d Cir. 1992); *Chambers v. Nasco, Inc.,* 501 U.S. 32, 46 (1991) (upholding exercise of equitable power to sanction a party which has delayed or disrupted the litigation or has hampered enforcement of a court order); *see also Republic of the Philippines v. Westinghouse Electric,* 43 F.3d 65 (3d Cir. 1994).

Under this inherent power, the Court retains authority "to sanction errant attorneys" in order "to preserve the integrity of the judicial process*." In re Cendant Corp.,* 260 F.3d 180, 199 (3d Cir. 2001); *see also Deville v. Givaudan Fragrances Corp.*, 419 Fed. App'x 201 (3d Cir. 2011) (explaining that "decision to impose sanctions for discovery violations and any determination as to what sanctions are appropriate are matters generally entrusted to the discretion of the district court") (citation and internal quotation marks omitted); *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 84 (D.N.J. 2006) (stating that courts may "impose sanctions on those who abuse the judicial process" and that sanctions assist courts in the "truth-seeking process").  In determining the appropriate sanction, this Court should consider that the defendants' "pattern of wrongdoing may require a stiffer sanction than an isolated incident." *Wachtel*, 239 F.R.D. at 100 (citation and internal quotation marks omitted).

The United Defendants' failure to identify and produce highly relevant documents violates Rule (37) and is sanctionable.  This Court must consider the following factors in deciding whether to impose sanctions under Rule 37(c)(1):  (1) prejudice or surprise to the Plaintiffs; (2) the ability of Plaintiffs to cure the prejudice; (3) the likelihood of disruption; and (4) the Defendants' bad faith or unwillingness to comply.  *Id.* at 105. The United Defendants' behavior during the course of discovery in failing to identify relevant search terms or custodians, withholding documents and topics, and then refusing to produce documents once identified is in bad faith and has severely prejudiced the Plaintiffs to the extent that sanctions are merited.  *See, e.g., Id.* at 99 (monetary sanctions awarded where party improperly withheld documents in violation of Rule 37(c)(1); *Patel v. Havana Bar, Rest. & Catering,* No. 10-1383, 2011 WL 6029983, at *10 (E.D. Pa. Dec. 5, 2011) (sanctions awarded for failure to produce initial disclosures and omission of evidence in the production of documents).

Plaintiffs clearly suffered undue obstacles by the United Defendants' production of the previously-withheld critical documents that were only produced after discovery had closed and after a Special Master found that over 50% of the documents were not privileged, as well as by Dr. Ott's testimony, which confirmed that they were still refusing to produce relevant

documents.  The failure to timely produce documents has also prejudiced Plaintiffs who were unable to question witnesses on their knowledge of these documents and who now have filed a Motion for Class Certification (including expert reports) without these key documents.  The United Defendants' obstinate refusal to comply with their discovery obligations has also disrupted and delayed the Court's ability to efficiently manage this case to trial.  Finally, United Defendants' strategic tactics of hiding documents behind the cloak of privilege and their continued discovery violations are in bad faith.

As shown herein, the information and documents sought from the United Defendants goes to the heart of Plaintiffs' claims concerning the pervasive flaws in the Ingenix Databases. Plaintiffs have thus been prejudiced by the United Defendants' belated production of the critical documents that were only produced after discovery had closed and after a Special Master found that they were not appropriately designated as privileged.  Plaintiffs had no ability to predict ahead of time that Dr. Ott's continued testimony would confirm the existence of a room full of documents that were not searched for or produced.  The failure to timely produce documents prejudiced Plaintiffs from taking complete depositions.  *See Curtis T. Bedwell & Sons v. Int'l Fidelity Ins. Co.,* 843 F.2d 693-94 (3d Cir. 1988) (prejudice from documents being produced after close of discovery); *Ware v. Rodale Press,* 322 F.3d 218 (3d Cir. 2003) (prejudice from having limited time to use delayed information).  The factors which go to an evaluation of sanctions under Rule 37 are satisfied here.  Furthermore, deterrence of other litigants from flouting discovery is an appropriate consideration for sanctions.  *National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639 (1976); *Barnett v. Outboard Marine Construction,* 611 F.2d 32, 26 (3d Cir. 1979) (decrying "deliberate tactical intransigence" by litigants).

## II.   UNITED DEFENDANTS' POSITION

On October 31, 2011, this Court entered an Order definitively and unequivocally stating that "no further discovery may be conducted."  That Order was issued on the heels of Plaintiffs asking to keep discovery open – so that they could pursue the *very* "outstanding discovery" that is the subject of their instant motion.

Yet here the United Defendants[6] are three months later – 26 months after the deadline to serve written discovery requests passed, 21 months after the deadline to bring a discovery dispute passed, and 18 months after the deadline for fact discovery passed  – forced to respond to Plaintiffs' patently untimely and ill-advised attempt to seek additional documents and depositions because they are unsatisfied with the poor job they did in discovery during the appropriate discovery time period.[7]

To date, the United Defendants have produced more than 1.4 million pages of documents, more than 1.5 terabytes of uncompressed electronic data, and over a dozen witnesses for

---

[6] The "United Defendants" are UnitedHealth Group Incorporated ("UHG") and Ingenix, Inc.

[7] Plaintiffs inexplicably claim that this instant dispute would also be ripe in *Franco v. CIGNA,* notwithstanding that they acknowledge that the United Defendants have been dismissed from *Franco.*  In any event, the instant dispute is only being raised in this action.

depositions.  Nevertheless, Plaintiffs now claim this discovery is somehow deficient and seek to reopen discovery to conduct a fishing expedition over a matter – the DataSpan project involving Ingenix, Inc. and its counsel – which they have known about for nearly two-and-a-half years. Plaintiffs' requests are so blatantly untimely that they should be soundly rejected on this basis alone.

Plaintiffs' counsel is also engaging in blatant forum shopping.  The dispute they seek to raise here is identical to one they raised just weeks ago in *In re WellPoint Out-Of-Network UCR Rates Litigation*, Case No. 02:09-ml-02074, pending in the Central District of California ("*In re WellPoint*").  The Central District promptly denied Plaintiffs' counsel's motion, so Plaintiffs are re-filing the motion here – where it is even more untimely – in the hope of escaping their *In re WellPoint* defeat.  And in their haste to refile their *In re WellPoint* motion here, Plaintiffs simply ignore the evidence the United Defendants presented in *In re WellPoint* and mislead the Court as to their own dilatory and improper conduct.

Plaintiffs contend that the discovery issues they now raise are timely because they are somehow part of the matter that was before Special Master Rice.  Even were this accurate, which it is not, Plaintiffs fail to disclose that they agreed to the Court issuing an Order in June 2011 releasing Special Master Rice from his duties because he had resolved all the disputes referred to him.  Plaintiffs also state that they raised this discovery dispute in a letter to the Court in mid-October 2011, but fail to acknowledge that the Court responded to (and resolved) the letter days later by issuing an Order categorically stating that "no further discovery may be conducted." Plaintiffs further seek to re-open various depositions in light of documents they obtained following Special Master Rice's Final Privilege Ruling, but simply ignore the agreement they voluntarily entered, after reviewing those documents, that they would not seek to re-open any such depositions (in exchange for the United Defendants agreeing to an additional deposition of Dr. Mel Ott in *In re WellPoint*, which took place in July 2011).

Discovery has long since been over in this case as to the United Defendants.  Plaintiffs should not be rewarded for their abuse of the discovery process as represented by this Submission, which (among other things), Plaintiffs unreasonably delayed in bringing and violates agreements they themselves accepted.  Plaintiffs' motion to compel must be denied (and the United Defendants reserve their right to seek sanctions for Plaintiffs' discovery process abuse).

### A.   Plaintiffs' Demand Is Untimely and Should be Denied on That Ground Alone.

Plaintiffs' opportunity to seek additional documents and depositions passed long ago:

- The deadline for Plaintiffs to serve discovery requests passed <u>over two years ago</u>, on November 30, 2009.[8]

---

[8] *See* Pace Decl. ¶ 4, Ex. 3 (Case Mgmt. Order No. 1, D.E. 210 (June 17, 2009) ("<u>CMO No. 1</u>") ¶ 10(a)).

- The deadline for parties to bring discovery disputes before this Court expired <u>over 21 months ago</u>, on April 30, 2010.[9]

- Fact discovery closed <u>over 18 months ago</u>, on July 19, 2010.[10]

Plaintiffs are fully aware of this reality.  Back on October 24, 2011, Plaintiffs submitted a letter to Judge Chesler referencing the very same discovery dispute and request for additional "outstanding discovery" that is the subject of their current motion, and contending this was "an open discovery dispute."  (*See* Lawrence Decl., Ex. 13.)  One week later, Judge Chesler issued an Order making clear, in no uncertain terms, that Plaintiffs were not entitled to any further discovery:

---

**ORDERED** that no further discovery may be conducted.


　　s/Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

---

(*See* Order, D.E. 801 (Oct. 31, 2011).)

With full knowledge that they could not pursue the instant discovery dispute in this Court, Plaintiffs' counsel directed their efforts towards another tribunal – the Central District of California where *In re WellPoint* is pending.

### B.  Plaintiffs' Counsel Attempt to Re-Litigate a Dispute They Already Lost in *In re WellPoint*.

#### 1.  Magistrate Judge Mumm Denied Plaintiffs' Motion to Compel Less Than Two Weeks Ago.

Plaintiffs' counsel already raised – <u>and lost</u> – this identical discovery dispute earlier this month before a Magistrate Judge of the Central District of California in *In re WellPoint*.  There,

---

[9] *See* Pace Decl. ¶ 4, Ex. 4 (Case Mgmt. Order No. 5, D.E. 351 (Mar. 1, 2010) ¶ 2(a)).  The parties subsequently agreed to extend the deadline to bring specific discovery disputes, none of which related to the United Defendants or the issues raised by Plaintiffs herein.  (*See* Pace Decl. ¶ 4 n.1.)

[10] *See* Pace Decl. ¶ 4, Ex. 3 (CMO No. 1 ¶ 10(b)).

the parties submitted a 44-page joint discovery dispute stipulation on January 6, 2012 setting forth their respective positions, along with multiple declarations and exhibits (the "*WellPoint* Discovery Dispute Submission").  (*See* Pace Decl., Ex. 2.)  Among other things, Plaintiffs' counsel decided they would seek in the Central District to enforce document requests served in a case (*Weintraub*) that would eventually be consolidated into *In re Aetna*, even though the United Defendants told them they could not do so.  Plaintiffs' counsel also decided to press their discovery dispute even though the United Defendants explained to them in detail why it was untimely.

Seven days after the *WellPoint* Discovery Dispute Submission was filed, Magistrate Judge Mumm quickly and decisively rejected the frivolous positions of Plaintiffs' counsel, stating:

> (1) plaintiffs seek to enforce discovery requests that were propounded in a separate action in the United States District for the District of New Jersey; and

> (2) in any event, plaintiffs' motion is untimely, the last day for completing discovery as to the United Defendants expired over one year ago.

(*See* Pace Decl., Ex. 3 ((In Chambers) Order on Mot. to Compel, D.E. 338, *In re WellPoint* (Jan. 12, 2012)).)

Plaintiffs' counsel strategically selected *In re WellPoint* as the case to resolve their discovery dispute, even though they were expressly advised by the United Defendants before the dispute was submitted to Judge Mumm that the dispute was meritless and their hand-selected forum was inappropriate.  Now Plaintiffs' counsel is engaging in blatant forum-shopping, ignoring their own strategic (and erroneous) decisions as well as numerous discovery-related Orders of this Court.  Far from being justifiable, their actions – which are fostering re-litigation, duplication of efforts and the wasting of judicial and party resources – are nothing short of sanctionable.

## 2. The United Defendants Have Never Conceded This Dispute Is Properly Raised Before This Court.

Plaintiffs' counsel explain away their second bite of the apple by disingenuously arguing that the United Defendants somehow conceded that their discovery dispute would be properly raised here.  (Pls.' Submission at 3.)  Nothing could be further from the truth.  The United Defendants stated in the *WellPoint* Discovery Dispute Submission that the *WellPoint* plaintiffs could not move to compel responses to discovery requests that were propounded in an entirely separate case, but never even remotely suggested that a motion to compel in *In re Aetna* against the United Defendants in 2012 would be timely or proper:

> The United Defendants agreed to re-produce in this matter the documents they produced in *In re Aetna*, but that does not permit Plaintiffs to try in this Court to litigate the underlying document requests that led to the production in *In re Aetna*; such litigation ***should have occurred, if at all,*** only in *In re Aetna*.
> . . . . .

16

The United Defendants' compliance with those requests **could have been challenged, if at all,** only in the New Jersey District Court presiding over *In re Aetna.*

(*See* Pace Decl., Ex. 1 at 4, 22 (emphasis added).)  As the United Defendants' use of the past-tense phrases – "should have occurred, if at all" and "could have been challenged, if at all" – makes clear, Plaintiffs' opportunity to litigate discovery disputes in *In re Aetna* already passed. Plaintiffs' representation to this Court that the United Defendants conceded that the instant discovery dispute is properly before this Court is thus patently false.

Plaintiffs' attempt to raise here the identical dispute that was rejected less than two weeks ago by the Central District of California is precisely the sort of forum shopping and re-litigation that is antithetical to the goals of both the multidistrict litigation process, *see* 28 U.S.C. §1407, and the federal rules, *see* Federal Rule of Civil Procedure 1.  Plaintiffs' improper discovery tactic should be soundly rejected.

### 3. Plaintiffs' Contention that the United Defendants Refuse to Give Them Information Is False.

Because they rehash the exact same arguments they presented to the Central District of California, Plaintiffs repeatedly accuse the United Defendants of refusing to provide information related to the documents they claim exist but were not produced while simply ignoring the evidence provided to Plaintiffs' counsel by the United Defendants in connection with *WellPoint* Discovery Dispute Submission.[11]  More specifically, Plaintiffs' counsel continue to maintain that there was a conference room (named Escalante) that housed a wealth of documents "hidden" from the discovery process, even though they have been provided declarations showing that this was a largely paperless conference room used for meetings and, in any event, documents once stored in that room were collected during the discovery process.  (*See* Pace Decl., Ex. 1 at 31-32.)  Plaintiffs' counsel continue to maintain that an electronic folder relating to DataSpan also was "hidden" in the discovery process even though the same declarations show that the electronic folder also was searched in the discovery process.  (*See* Pace Decl., Ex. 1 at 34.) Plaintiffs' counsel continue to maintain that drafts or variations of a "SWOT" analysis must exist even after presented with a declaration and deposition testimony showing that no such drafts or variations exist.  (*See* Pace Decl., Ex. 1 at 33-34.).  Plaintiffs' counsel continue to maintain that they do not have documents of work done by University of Utah professors for Ingenix, even after the United Defendants identified some such documents in Plaintiffs' possession.  (*See* Pace Decl., Ex. 1 at 23, 34.)

Plaintiffs also wildly speculate that the United Defendants must not have followed the discovery protocols in place for this case because they have not been able to locate documents that they believe should or might exist.  But as the United Defendants have explained to

---

[11] The accompanying declarations of Susan P. Seare and Matthew B. Baudler are nearly identical to the declarations previously submitted in connection with the *WellPoint* Discovery Dispute Submission.  The Christopher R.J. Pace declaration is identical with respect to statements about specific documents produced by the United Defendants during discovery.

Plaintiffs' counsel, they did follow the discovery protocols. The documents collected from the agreed-upon "Production Custodians" were screened using the keyword search terms also agreed to among the parties (125 terms for the Ingenix Production Custodians and 613 for the UHG Production Custodians), after which all of the documents that hit on one or more keyword search terms were reviewed for responsiveness. If determined to be responsive, the documents were either produced or placed on a privilege log. (*See* Pace Decl., Ex. 1, at 34.)

Plaintiffs' new discovery demands are premised on unsupported accusations and a refusal by them to review the discovery record or accept evidence that contradicts their accusations. These new discovery demands should be rejected.

### C.    Plaintiffs' Efforts to Explain the Untimeliness of Their Current Requests Are Without Merit.

As set forth in Pt.A *supra*, Plaintiffs' current demand is blatantly untimely because they raise it more than a year-and-a-half after the close of fact discovery in this case and nearly two years after the deadline to bring discovery disputes. Indeed, this Court entered an Order on October 31, 2011 prohibiting any further discovery, just days after Plaintiffs' counsel submitted a letter to the Court expressly arguing that the very discovery dispute at issue here was still "open" and they were seeking more discovery. (*See* Lawrence Decl., Ex. 13.)

In a weak effort to explain the untimeliness of their demand, Plaintiffs disingenuously assert that: (1) they actually timely submitted this dispute to the Court because it stems from earlier 2010 discovery disputes; and (2) they could not have made their current demand earlier because they were in the dark. Neither contention has merit.

### 1.    Plaintiffs Cannot Shoehorn This Dispute into Earlier 2010 Disputes.

Plaintiffs assert that the instant dispute is timely because they raised *other* discovery disputes before this Court in August and October 2010. They then attempt to shoehorn their present demand for documents and depositions into those disputes by arguing that this Court empowered Special Master Rice to adjudicate "reasonably anticipated future disputes" in November 2010. (*See* Pls.' Submission at 11.) Plaintiffs' attempt is meritless. Plaintiffs make no effort to demonstrate that their present discovery demands were "reasonably anticipated" in November 2010 or, even if they were, why Plaintiffs could delay for over a year in turning such "anticipated future disputes" into present disputes.

More to the point, the proceedings before Special Master Rice reached their final conclusion last spring and culminated in an order appropriately titled the "Final Privilege Ruling." Thereafter, on June 15, 2011, following a Joint Motion from Plaintiffs and the United Defendants, this Court issued an Order releasing Professor Paul Rice from his duties as Special Master because "he has resolved all of the privilege disputes referred to him." (*See* Pace Decl., Ex. 20 (Order Granting Joint Mot. to Release Professor Paul R. Rice from Duties as Special Master, D.E. 779 (June 15, 2011).) Critically, Plaintiffs agreed (and the Court ordered) that Special Master Rice had no further duties – which necessarily includes any duty to resolve the "reasonably anticipated future disputes" addressed in the Court's November 2010 Order, and did so after they had received the documents the Special Master directed be turned over to them.

(*See* Pace Decl., Ex. 19 (Memo. of Law In Support of Joint Mot. to Release Professor Paul R. Rice from Duties as Special Master, D.E. 778-1 (June 14, 2011).)  Accordingly, even if Plaintiffs could somehow establish (contrary to the facts) that their current discovery demands were before Special Master Rice, all that would mean is they are foreclosed by the Court's June 2011 Order that Plaintiffs themselves voluntarily requested over six months ago.

### 2.    Plaintiffs Knew About DataSpan Long Ago.

Plaintiffs also insist that that there was "simply no way [they] could have sought [DataSpan-related] documents earlier," but this excuse is baseless.  Plaintiffs were well aware of DataSpan, the Escalante Room, and the subject matters outlined in their specific requests well before the deadline for fact discovery, and years before bringing the instant dispute.

#### a.    *Plaintiffs possessed knowledge about DataSpan before the July 19, 2010 fact discovery deadline.*

The United Defendants produced documents to Plaintiffs expressly referencing DataSpan and the Escalante Room as early as August 13, *2009*, nearly one year before the fact discovery cutoff.  (*See, e.g.*, Pace Decl. ¶ 7, Ex. 9 (INGENIX00221501, "DataSpan Accomplishments 1.1.2004-7.28.2004" document indicating Ingenix work on a "DataSpan product" and that Ingenix set up the Escalante Room as a DataSpan "war room").)[12]  In March 2010, the United Defendants produced additional documents concerning the purpose and scope of the DataSpan initiative.  (*See, e.g.*, Pace Decl. ¶¶ 8-9, Exs. 10 & 11 (INGENIXMDL000527315, "DataSpan Charter" document describing the DataSpan project; INGENIXMDL000520268, "Business Case Form" document describing the DataSpan project.)   These documents contained detailed information about the DataSpan project.  For example, the Business Case Form discusses questions having been raised about the "representativeness" of contributor data, attestations and periodic auditing of contributor data, and researching a potential change to the geographical breakdown of data (using GeoStrata instead of Geozips).  (Pace Decl. Ex. 11 INGENIXMDL000520268, "Business Case Form".)  Also in March 2010, Plaintiffs received documents created by the University of Utah professors they reference in the Submission.  (*See* Pace Decl. ¶ 11, Ex. 12.)

Plaintiffs' knowledge about DataSpan and the existence of the Escalante Room before the July 19, 2010 fact discovery cutoff is further evidenced by the questions Plaintiffs' counsel themselves asked at the depositions of three Ingenix employees, Brett Stringham, Wendy Larsen, and Susan Seare.  Plaintiffs asked questions in those depositions about – and even *used as exhibits* – the very "DataSpan Accomplishments," "DataSpan Charter," and "Business Case Form" documents produced by the United Defendants in August 2009 and March 2010:

- *See, e.g.*, B. Stringham Dep. Tr. (June 30, 2010) at 174:24-175:3 ("Q: Okay.  Back to the document that we were looking at prior, the 11.  No. 5 says, 'Initiated the setup of a war room to focus on the project.  Resulted in setting aside of the Escalante Room.'

---

[12]  This document also discloses that Dr. Ott had hired (unnamed) researchers to conduct a literature review and address representativeness issues.

Do you recall that room being set aside for DataSpan?") (emphasis added) (Pace Decl., Ex. 13);

- *id*. at 167:22-168:3 ("Q:   Under Section 2, program project descriptions, it says, 'DataSpan will combine two of the industry's most requested and most recognized database projects – MDR and PHCS – with a highly scientific, market-centric methodology to create an authoritative new reference.'  Do you recall discussions of merging the MDR and PHCS?");

- W. Larsen Dep. Tr. (June 29, 2010) at 28:5-15 ("Q:   Who at Ingenix made the decision that PHCS and MDR would be combined into a single product line called DataSpan? . . .  Did you participate in any discussions during your employment at Ingenix regarding the development of DataSpan? . . .  Who wrote the project charter?") (Pace Decl., Ex. 14);

- *id*. at 70:12-21 ("Q:   Under product market overview under 2.0, executive summary, it states under the first bullet 'Ingenix owns two Legacy database-oriented lines offered under the brand names MDR and PHCS. Appeals and legal support of these products has increased prompting the development of DataSpan.' . . . . Do you know who wrote that paragraph?");

- S. Seare Dep. Tr. (July 13, 2010) at 117:13-16 ("Q:  Do you know if during that time frame, 2005 to approximately 2009, there was ever a consideration of combining the PHCS and MDR products into one product?") (Pace Decl., Ex. 15); and

- *id*. at 118:14-16 ("Q:   And with respect to the business reasons, was there any analysis of the underlying methodologies that were going to be used in the combined product?").

Thus, Plaintiffs were clearly aware of, and could have pursued additional discovery relating to, DataSpan, the Escalante Room, and the subject matters referenced in their Submission before the fact discovery deadline.  Plaintiffs failed to do so, and they cannot now seek such discovery over a year-and-a-half too late.

### b.  Plaintiffs knew about DataSpan before the Special Master Rice proceedings began.

In addition, after the July 19, 2010 deadline for fact discovery, but before the Special Master Rice proceedings began in November 2010, Plaintiffs continued to demonstrate that they were fully aware of the DataSpan project, the Escalante Room, and related subject matter through deposition testimony.  However, Plaintiffs still failed to seek additional discovery at that time.

Plaintiffs' arguments that there was no way they could have understood, realized the "extent" of, the DataSpan project prior to the fact discovery deadline or the proceedings before Special Master Rice are belied not only by the depositions noted above, but also by the depositions of Ingenix employees or former employees Katie Barrozo and Dr. Melvin Ott

conducted in July and August 2010.  The deposition transcripts reveal that Plaintiffs were well aware of the purpose underlying the DataSpan project and that DataSpan involved an analysis of the Ingenix Databases' methodologies:

- *See, e.g.*, K. Barrozo Dep. Tr. (July 21, 2010) at 91:3-11 ("Q:  The fourth bullet down says, 'DataSpan development methodology is based on sound scientific principles to better meet the increasingly sophisticated needs of our customers.  Additionally, it is anticipated DataSpan will diminish the volume of future legal challenges.'  *I've seen this statement many times when DataSpan is discussed*.  Do you know what this statement sort of refers to, or do you remember discussion of this statement?") (emphasis added) (Pace Decl., Ex. 16);

- Dr. M. Ott Dep. Tr. (Aug. 25, 2010) at 63:19-21 ("Q:  Is it your opinion that the DataSpan project was to address concerns that the MDR and PHCS databases might lack representativeness?") (Pace Decl., Ex. 17);

- *id*. at 95:6-8 ("Q:  Can you describe to me the 'statistical analysis of Ingenix charged data for in-depth study of new DataSpan product' that you undertook?").

Further, Dr. Ott's August 25, 2010 deposition testimony underscores that Plaintiffs had knowledge as of that date (at a minimum) – more than 16 months ago – that Ingenix conducted CPT code studies and a "SWOT Analysis" in conjunction with the DataSpan project:

Q:     S-W-O-T.  I'm sorry.  Do you recall what that was?
A:     The abbreviation stands for Strength, Weaknesses, Opportunities, and Threats. It's a common tool in business.
Q:     And did you undertake the SWOT analysis?
A:     Yes.
                              * * * * *
Q:     Do you know if someone took notes in this meeting?
A:     Of course.  It was put in writing.  But [attorney] Dave Arrington was in the room and it was all done in conjunction with him.
Q:     Do you know where the notes would be stored?
A:     No.  I would have no way of knowing.
                              * * * * *
Q:     And then it says, "For analyzing the Ingenix charge data to determine charge patterns by CPT and by state."  So would it  be Carla and Kerry who would then run the programs to analyze the data?
A:     And myself.
Q:     So you actually did run programs to analyze the Ingenix charge data?
A:     Yes.
Q:     And did you generate an analysis or a report from those?
A:     An analysis.  I don't know that I ever generated a report.  I don't recall.
Q:     And what would you have done with the analysis?
            Mr. Pappas: Objection. Form.
A:     That would have been part of the DataSpan project that would have been under work product.

21

> Q:    But there was a physical written analysis of the data?
>
> A:    I don't recall if there was a written analysis of it.  There were probably some printouts that we looked at but I don't recall any specific report.

(*See* Pace Decl., Ex. 17 (Dr. M. Ott Dep. Tr. (Aug. 25, 2010) at 98:1-7, 99:8-15, 102:20-103:18).)

Plaintiffs' insistence that they became aware of the SWOT Analysis and "Studies of Current Procedural Terminology ("CPT") codes" – two of the categories of documents they seek now – only as a result of Dr. Ott's *July 2011* deposition and the proceedings before Special Master Rice is plainly inaccurate and belied by the record.  As shown above, Plaintiffs had extensive knowledge of DataSpan, the Escalante Room, and the existence of the very categories of documents they seek in this Submission prior to the Special Master Rice proceedings, or nearly 15 months before seeking Court intervention here.  Ingenix also produced hundreds of documents in discovery that discuss DataSpan.  (*See* Decl. of Matthew B. Baudler ("Baudler Decl.") ¶ 11.)  Clearly, Plaintiffs' assertion that the United Defendants "have gone to tremendous lengths to keep DataSpan hidden from Plaintiffs" is simply not true.

Plaintiffs also repeatedly mischaracterize the DataSpan project as one that identified "flaws" in the existing Ingenix Databases.[13]  As reflected in the wealth of documents Plaintiffs cite, DataSpan was an effort to explore potential changes to the Databases to improve them and address legal challenges to them.  It was not an indictment of the Ingenix Databases at all, as Plaintiffs claim, but an effort at analyzing and potentially enhancing the Databases.

### 3.    Plaintiffs Further Delayed Bringing This Submission After the Final Privilege Rulings and Second Ott Deposition.

In any event, even if Plaintiffs' contention were true (which it is not) that they became aware for the first time of the existence of many new DataSpan-related documents as a result of the Special Master Rice proceedings and the July 2011 deposition of Mel Ott, Plaintiffs waited until the middle of January 2012 – more than eight months after Special Master Rice's Final Privilege Rulings, and over six months after the second Ott deposition – to seek this Court's assistance.

The proceedings before Special Master Rice were based primarily on Plaintiffs' challenges to documents listed on Ingenix's privilege log concerning analyses conducted in 2003-2008 of the methodology used to generate the Ingenix Databases, which were created in connection with litigation brought against the United Defendants before, during and after the DataSpan project.  *See, e.g., AMA, et al. v. United Healthcare Corp.*, et al., 00-civ-2800

---

[13]  Plaintiffs mischaracterize the 2004 SWOT analysis as "explosive" new evidence that "confirmed" flaws in the Ingenix Databases.  The reality is that the analysis is consistent with documents Plaintiffs had received earlier in discovery about DataSpan, including the Business Case Form, *see* page 26, *supra*, and simply describes criticisms of the Databases that had been raised in legal challenges (as well as "strengths" and "opportunities"), without purporting to "confirm" any "flaws."

(S.D.N.Y.) (suit brought in 2000, with final judgment entered in 2010); *see also* Pace Decl. ¶ 15. A subset of these documents, which involved methodology-related research conducted in 2003 and 2004, were part of the DataSpan project.

Plaintiffs tout that Special Master Rice concluded that over half of the documents they challenged were not privileged, in an effort to suggest that the Ingenix privilege assertions were wholly frivolous. But Plaintiffs' statistic is misleading: In his Final Privilege Ruling, Special Master Rice *upheld* Ingenix's privilege claims for the majority of documents he addressed therein, and in any event the contested documents as a whole amounted to only a tiny fraction of the total documents listed on the privilege logs at issue (which numbered in the thousands due to the breadth of discovery). (*See* Baudler Decl. ¶ 12.)[14] Moreover, the Special Master acknowledged that the contested DataSpan-related documents were undertaken at the behest of Ingenix's counsel in response to litigation involving the Ingenix Databases, but determined that there was also a business nature to these documents such that these "dual purpose" documents were not protected by the work product doctrine. (*See* Pace Decl. ¶ 17.)

In any event, Special Master Rice's final ruling was handed down in May 2011 and the Ott deposition took place in July 2011. There is simply no justification for Plaintiffs waiting until January 2012 to file a motion to compel allegedly based on information they learned through the ruling and deposition.

### D.   Plaintiffs Cannot Unilaterally Disregard Their Agreement to Limit Discovery After Special Master Rice's Final Ruling.

In addition, Plaintiffs' Submission flies in the face of the very agreement they made following the conclusion of Special Master Rice's final privilege ruling to limit further discovery. After the ruling, Plaintiffs and the United Defendants specifically agreed that there would be one three-hour deposition of Dr. Ott in *In re WellPoint*,[15] and that deposition would be the only discovery resulting from the proceedings before Special Master Rice. (*See* Pace Decl., Ex. 19 (May 29, 2011 Ltr. from M. Geagan to J. Guglielmo and R. Axelrod).) Critically, Plaintiffs specifically agreed that they would <u>not</u> seek additional depositions of Ingenix representatives relating to the subject matters at issue before Special Master Rice:

---

[14] Plaintiffs challenged 250 entries of the thousands listed on the privilege logs. Many of these included duplicates, so the net number of documents Plaintiffs challenged was 122. Moreover, of the 250 entries, the United Defendants voluntarily produced 93 after initial proceedings before the Special Master. In his Final Privilege Ruling, the Special Master addressed the remaining 82 and determined that 62 were privileged. (*See* Baudler Decl. ¶ 13.)

[15] Plaintiffs incorrectly state that this deposition was cross-noticed for other cases, including *In re Aetna*. The deposition was captioned only for *In re WellPoint* and it was made clear on the record that it was being taken only in *In re WellPoint*. (*See* Pace Decl. ¶ 21, Ex. 22 (Dr. M. Ott Dep. Tr. (July 19, 2010) at 172:7-20.)

> Plaintiffs will *not seek to conduct any additional depositions* of representatives of the United Defendants relating to any of the Disputed Ingenix Documents, or any subject matter covered by any of the Disputed Ingenix Documents, *in either MDL No. 2020 or MDL No. 2074.*

(*See id.* (emphasis added).)  The United Defendants held up their end of the bargain and this Court should not entertain Plaintiffs' current attempt to compel additional discovery in violation of their May 29, 2011 agreement.

### E.    Plaintiffs Should Not Be Allowed to Reopen Depositions.

Separate and apart from Plaintiffs' agreement "that they will *not seek to conduct any additional depositions* of representatives of the United Defendants" – which is sufficient to reject Plaintiffs' demand to reopen any depositions – Plaintiffs have not provided the Court with any basis whatsoever for to re-open the depositions of Ms. Gee and Ms. Seare.

Although Plaintiffs contend that Ms. Gee was "evasive" and "incredulous[]" because she testified that she was not aware of a "systematic-wide comparison between MDR and PHCS," they offer nothing to contradict this testimony.  All they reference is the DataSpan project, but that project was not a comparison of the percentiles reported in the PHCS database versus the MDR database; it was instead focused on potentially creating a new database to replace both the existing databases.  And as to Ms. Seare, Plaintiffs are flatly incorrect that they were not "permitted to ask Ms. Seare about DataSpan"; to the contrary, using the DataSpan "Business Case Form" document produced by the United Defendants in March 2010, Plaintiffs asked several DataSpan-related questions at Ms. Seare's deposition that Ms. Seare answered.  (*See* Pace Decl., Exs. 11 & 15 (INGENIXMDL000527453, "Business Case Form" document; S. Seare Dep. Tr. at 117:13, 118:14).)

### F.    Plaintiffs' Challenges to the Substance of the United Defendants' Document Production Are Unsupportable.

In any event, as the United Defendants already demonstrated for Plaintiffs' counsel in the *WellPoint* Discovery Dispute Submission, Plaintiffs' accusations that massive amounts of documents were hidden from them is unfounded.  The United Defendants collected all of the documents they said they would collect from the Production Custodians, screened those documents through keyword searches, and then reviewed them for responsiveness to document requests.  Those documents determined to be responsive (including to be within the relevant discovery time period) were either produced or listed on a privilege log.  The United Defendants were under no obligation to do anything more.  Indeed, the discovery effort they undertook was massive, lead to the production of huge quantities of documents, and dwarfs any discovery effort Plaintiffs undertook.

1.     **There Is No Roomful of "Hidden" Documents – the Escalante Room Was Largely a Paperless Conference Room, and in any Event, Documents from the Room Were Collected During the Discovery Process.**

Plaintiffs speculate that there was a room that "housed a wealth of documents" on DataSpan that the United Defendants hid during the discovery process. They are wrong. The room to which Plaintiffs refer – the Escalante Room – was an ordinary conference room on the third floor of Ingenix's Salt Lake City offices (named after a river in Southern Utah). (*See* Decl. of Susan Seare, ("Seare Decl.") ¶ 4.) From 2003 through early-2005, the Escalante Room was set aside for Ingenix employees working on the DataSpan project. (*See id.*) Contrary to Plaintiffs' accusations that the Escalante Room is an entire room filled with "a wealth of documents," the Escalante Room was largely a *paperless* environment that was used for meetings and that had network hubs that allowed employees to collaboratively view and share files on their laptop computers. (*See id.* ¶ 5.) The Escalante Room did contain some hard copy documents, but they were largely limited to maps of the United States showing geozips, and approximately 8 to 10 binders containing raw data runs for analyses of various portions of the charges data contributed to Ingenix for use in the Databases (what is often called the "Contributor Data"). (*See id.*)

The Escalante Room has not been used for any DataSpan-related work in more than six years. (*See id.* ¶ 8.) After the DataSpan project ended, Susan Seare notified Ingenix building services in 2005 to place the Escalante Room back into the normal conference room circulation for use by other employees. (*See id.* ¶ 6.) The data run binders were placed in boxes and moved to a storage closet. (*See id.* ¶ 7.) In connection with this case, those data run binders were collected and organized for potential production, scanned, and assigned to a "Production Custodian." Thereafter, all the documents assigned to such Production Custodians were culled using the search terms agreed upon by the parties, and then reviewed for responsiveness and privilege. (*See id.*; Baudler Decl. ¶¶ 2-8.)

In short, Plaintiffs' contention that a roomful of relevant documents exists that was never captured through the discovery process is inaccurate. And in any event, Plaintiffs have established no need for the Escalante Room documents – data runs of various portions of the Contributor Data – since the Contributor Data itself has already been produced to them. (*See* Baudler Decl. ¶ 10.) Finally, Plaintiffs have known of these data runs since at least the initial Mel Ott deposition in August 2010. (*See* Pace Decl., Ex. 17 (Dr. M. Ott Dep. Tr. (Aug. 25, 2010), at 100:24-103:3).) Plaintiffs' belated demand for production of such documents is groundless.

2.     **There Are No Additional Underlying Documents Relating to the SWOT Analysis.**

While Plaintiffs also say they need documents supporting a 2004 "SWOT Analysis," the United Defendants already told them there are no additional underlying documents relating to the 2004 SWOT analysis, as Dr. Ott made clear in his August 2010 deposition:

| | |
|---|---|
| Q: | And did you undertake the SWOT analysis? |
| A: | Yes. |
| Q: | And do you know to whom you delivered this analysis? |
| A: | It was in this office in one of these rooms.  May have been this room. |
| Q: | It was a presentation? |
| A: | No.  That's not what SWOT analysis. |
| Q: | What is a SWOT analysis? |
| A: | You put an S on the board, write out "strengths" and then you start talking.  What are the strengths of what we have here.      And   then you spend probably an hour on that and then you go to W, put "weaknesses" on the board and you talk about that for an hour and you list them all.  And keep going, "opportunities,"      and then "threats." And then you summarize it all, write it up. |

* * * * *

| | |
|---|---|
| Q: | Do you know if someone took notes in this meeting? |
| A: | Of course.  It was put in writing.  But Dave Arrington was in the room and it was all done in conjunction with him. |

(*See* Pace Decl, Ex. 17 (Dr. M. Ott Dep. Tr. (Aug. 25, 2010) at 98:6-22; 99:8-12).)  The 2004 SWOT analysis, in other words, was the product of a DataSpan team meeting and memorialized in a document.  (*See* Seare Decl. ¶ 9.)  It was not part of some elaborate, document-intensive process.  The document containing the SWOT analysis has been produced to Plaintiffs.

### 3.       The DataSpan Electronic Folder Was Collected and Documents Relating to the University of Utah Employees Were Already Produced.

Plaintiffs also seek "Documents stored in the [electronic] DataSpan folder at Ingenix." Plaintiffs contend this folder contains, among other items, "documents produced by two University of Utah employees," and a "large volume of documents pertaining to a literature review undertaken by a hiree of Dr. Ott."  In connection with this case, however, any DataSpan folder in the Ingenix electronic directory was collected and assigned to a Production Custodian, and all of the documents assigned to the Production Custodians were culled using the search terms agreed upon by the parties, and then reviewed for responsiveness and privilege.  (*See* Seare Decl. ¶ 10; Baudler Decl. ¶¶ 2-6.)  Documents determined to be responsive (including being within the relevant discovery time period) were either produced or placed on a privilege log. (*See* Baudler Decl. ¶¶ 6-8.)  And, as explained above, documents created by two University of Utah professors, and hundreds of documents referencing DataSpan, were produced in discovery. (*See* Pace Decl. ¶ 11, Ex. 12.)

Finally, it is important to repeat that Ingenix has already produced to Plaintiffs all of the underlying Contributor Data for the Ingenix Databases for the years 2004 to 2008, as well as the Databases themselves – over 1.5 terabytes of data.  (*See* Baudler Decl. ¶¶ 8, 10.)  To the extent Plaintiffs complain that Ingenix did not produce internal analyses of the Contributor Data or the Databases, Plaintiffs already possess all of the relevant data to conduct such analyses themselves. Plaintiffs should not be permitted to engage in further discovery, long after all relevant discovery deadlines have passed, to seek analyses or work product they can do themselves.

26

4.    **Plaintiffs' Objection to "DataSpan" Not Being a Keyword Search Term Is Without Merit.**

Discovery in this MDL was conducted pursuant to search terms and Production Custodian lists to which the parties agreed pursuant to an electronic discovery protocol ("EDP"). (*See* Pace Decl. ¶ 6.)   Over two years ago, Plaintiffs negotiated these search terms and custodians, and agreed to use them as parameters for the United Defendants' document review and production.   Yet now, Plaintiffs disparage United Defendants' compliance with the EDP as "gamesmanship."   It is, however, quite clearly Plaintiffs who are engaging in "gamesmanship" by trying to alter their agreements unilaterally and impose new, undue discovery burdens on the United Defendants – a year-and-a-half after discovery as to the United Defendants has ended, no less.

Plaintiffs accuse the United Defendants of hiding DataSpan documents because they "are confident that the search terms provided would have captured the requested documents." Plaintiffs offer no support for this accusation, which implies that the United Defendants did not in fact use the search terms to which the parties agreed to screen documents for review and potential production in discovery.   Any and all documents that hit on the 125 Ingenix keyword search terms and 613 UHG keyword search terms negotiated by the parties and that were within the relevant discovery time period were reviewed for responsiveness, and if determined to be responsive, either produced or placed on a privilege log.   (*See* Baudler Decl. ¶¶ 5-8.)   The sufficiency of the search terms applied by the United Defendants is evidenced by the substantial volume of documents they produced:  over 1.4 million pages.   (*See* Baudler Decl. ¶ 8.)   Indeed, those produced documents (which do not include unchallenged documents on privilege logs) contained over 600 that reference "DataSpan," comprising over 11,000 pages.   (*See* Baudler Decl. ¶ 11.)

Nevertheless, Plaintiffs complain that the United Defendants should have used "DataSpan" as a keyword search term pursuant to the EDP.   But as explained above, the United Defendants had a good-faith basis for their position that many of the documents relating to DataSpan were privileged, and furthermore would have been created outside the relevant discovery time period.   Given the breadth of the search terms to which the parties agreed, the United Defendants had no obligation to add another term that – to the extent it identified documents not triggered by the existing search terms – was most likely to identify privileged documents or documents outside the time period of discovery.   *See, e.g.*, *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 254-263 (D. Md. 2008) (discussing the importance of selecting "search terms . . . aimed at locating responsive ESI, rather than identifying privileged or work-product protected documents within the population of responsive ESI").

Plaintiffs also err in implying that any document that hit on a keyword search term had to be produced.   The keyword search terms were used to screen and narrow the set of documents that thereafter had to be reviewed for responsiveness to Plaintiffs' document requests (as narrowed through the meet-and-confer process) and for privilege.   Plaintiffs almost entirely ignore the document requests they actually served and entirely ignore the agreements reached though the meet-and-confer process that substantially narrowed those requests (and which were

memorialized in four letters back in November and December 2009).  (*See* Pace Decl. ¶ 5, Exs. 5, 6, 7, & 8.).

Furthermore, Plaintiffs easily could have timely requested that the United Defendants amend the keyword search term list to include the word "DataSpan" upon their discovery of that word's alleged significance.  Even if Plaintiffs had no knowledge of DataSpan in November 2009, as they claim but as contradicted by Ingenix's production of the "DataSpan Accomplishments" in August 2009, *see* Pt. C(2)(a), *supra*, they were clearly aware of the DataSpan project in plenty of time to have requested back in 2010 that "DataSpan" be used as a search term.  *See* Pt. C(2)(b), *supra*.[16]  Plaintiffs cannot now, so long after discovery has closed, complain about the keyword search terms to which the parties agreed and as to which Plaintiffs should have challenged, if at all, ages ago.[17]

### G.   Plaintiffs' Requests for a Spoliation Inference And Sanctions Are Unfounded.

"An adverse negative inference is an extreme remedy."  *McAdams v. U.S.*, 297 F. App'x 183, 187 (3d Cir. 2008).  For a spoliation inference even to be possible, four essential factors must be satisfied:  (1) the evidence was in the party's control; (2) "it must appear that there has been actual suppression or withholding of the evidence"; (3) the evidence was relevant to the claims or defenses; and (4) it was foreseeable that the evidence would later be discoverable.  *Mosaid Tech. Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332 336 (D.N.J. 2004).  Here, Plaintiffs' argument for a spoliation adverse inference instruction – based on Dr. Ott's testimony and the United Defendants' alleged intentional failure to produce documents – wholly fails to meet these four criteria and, more fundamentally, is entirely unfounded.

The bulk of Plaintiffs' argument for this inference hinges on their allegation that certain documents are unavailable to them because Dr. Ott destroyed them.  Yet Plaintiffs know they are wrong.  As Dr. Ott testified in his July 2011 deposition, he did *not* destroy any original hard-

---

[16] The same points apply to Plaintiffs' complaint that Dr. Ott was not designated as a Production Custodian.  In fact, Plaintiffs asked the United Defendants to add Production Custodians during the discovery process and they in fact did so.  (*See* Pace Decl. ¶ 21.)  Plaintiffs did not request to have Dr. Ott designated as a production custodian.

[17] The United Defendants have always maintained that Plaintiffs' new requests for additional documents and testimony were untimely and improper and that the discovery collection and review process the United Defendants followed was sound and consistent with the parties' agreements on discovery.  In the meet-and-confer process prior to the *WellPoint* Discovery Dispute Submission, counsel for the United Defendants told Plaintiffs – solely in an effort to avoid the costly and time-consuming discovery dispute process that Plaintiffs have now invoked – that Ingenix would consider adding "DataSpan" as a new keyword search term if that would resolve all of Plaintiffs' discovery grievances.  Plaintiffs, however, did not pursue this proposal further, presumably because it would not satisfy their objectives.  (*See* Pace Decl. ¶ 22.)  Incredibly, Plaintiffs now try to cast the United Defendants as somehow reversing course during the meet-and-confer process, but this accusation is unfounded.  (*See* Pace Decl. ¶ 22.)

copy or electronic Ingenix documents.  Instead, after his employment with Ingenix ended, Dr. Ott simply discarded his print-outs of electronic documents that were already saved on Ingenix's network or his copies of paper documents stored at Ingenix.  (*See* Pace Decl., Ex. 22 (Dr. M. Ott Dep. Tr. (July 19, 2011) at 291:13-292:9).)  Nothing in Dr. Ott's testimony suggests, as Plaintiffs posit, that relevant documents were destroyed.

Stripped of this argument, Plaintiffs are left only with the allegation that the United Defendants have not produced documents in response to "Plaintiffs' numerous requests for the production of further documents."  Plaintiffs conclusory argument, which equates the alleged failure to produce documents with actual suppression or withholding, "fails to get off the starting line."  *Felix v. GMS, Zallie Holdings, Inc.*, -- F. Supp. 2d --, 2011 WL 5837188, at *8 (E.D. Pa. Nov. 17, 2011).  They provide no proof that there "has been an actual suppression or withholding of evidence."  *Bull v. UPS*, -- F.3d --, 2012 WL 10932, at *8 (3d Cir. Jan. 4, 2012).  Indeed, for all of the reasons stated above, Plaintiffs have no basis to demand additional documents from the United Defendants, let alone request a spoliation inference because their untimely, procedurally improper and speculative demands have been rejected.

Plaintiffs' request for sanctions is also unfounded.  They unreasonably delayed in bringing this dispute and ignored numerous clearly-established court-imposed deadlines.  They have no basis to contend that Ingenix was under any obligation to produce documents not required to be produced pursuant to the applicable EDP in place, and their Submission blatantly attempts to repudiate discovery agreements they voluntarily entered.  It is no surprise, therefore, that none of Plaintiffs' authority supports their request for sanctions.  *See, e.g., Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 99-102 (D.N.J. 2006) (imposing sanctions for bad faith conduct, including ignoring court's order and failing to disclose defendants had deliberately failed to conduct proper discovery searches, and "[perpetrating] fraud on the court" through submission of false statements in court papers and false affidavits); *Patel v. Havana Bar, Rest. & Catering*, No. 10-1383,  2011 WL 6029983, at *10 (E.D. Pa. Dec. 5, 2011) (imposing sanctions for plaintiff's "suspect" failure to produce key witness statements).

If anything, the parties that should be sanctioned here are <u>Plaintiffs</u>, whose tactical and egregious forum shopping and belated fishing expedition for additional discovery are prime examples of the "bad faith," "vexatious," "wanton," and "oppressive" behavior punishable by sanction.  *See, e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 181 (3d Cir. 2002) (same).  Plaintiffs knowingly seek documents beyond the deadlines established in this Court's discovery-related Orders, and that fall outside the parameters that Plaintiffs themselves agreed would govern discovery (including agreed-upon search terms and Production Custodians).  And the record is clear that Plaintiffs possessed the knowledge to request these documents months, if not years, ago.  They knew about DataSpan long ago, well before the deadline for fact discovery ended.  Plaintiffs' excessive delay in seeking the court's intervention is entirely unjustifiable. *See Muniz v. Price*, 2010 WL 4537037, at *2 (M.D. Pa. Nov. 3, 2010).[18]

---

[18]  After the Court denies Plaintiffs' ill-conceived discovery motion, the United Defendants intend to seek sanctions against Plaintiffs.

Plaintiffs' tactic here is obvious:  They know their new discovery demands are untimely. They know they are forum-shopping and have lost on their discovery demands in another tribunal only weeks ago.   They know their demands are premised on speculation and contradicted by the record.  So to cover for all of this, they claim indignation and hope this Court will somehow "split the baby" by giving them some of their requests, rejecting others and denying any penalties.  But this Court should not and cannot fall for Plaintiffs' ploy.  Their discovery motion is meritless, and it is made all the more offensive by being coupled with meritless calls for sanctions and adverse inferences.

### H.    Conclusion.

Plaintiffs' discovery demand flies directly in the face of numerous Orders of this Court, including most recently its October 31, 2011 Order that discovery is closed, issued on the heels of Plaintiffs asking to keep discovery open to pursue the instant dispute.  It is also an offensive display of forum shopping, as Plaintiffs' counsel seek to re-litigate the same dispute they lost just weeks ago in *In re WellPoint*.   Plaintiffs cannot ignore Court orders, they cannot abrogate discovery agreements they entered voluntarily, and they cannot escape the consequences of their own intentional delay.  Plaintiffs' demand for additional discovery should be summarily, and unequivocally, denied.

*        *        *        *        *

The parties thank Your Honor for your consideration of this matter.

Respectfully submitted,

*/s/ Christopher R.J. Pace*
Christopher R.J. Pace, Esq.
Matthew B. Baudler, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153
(212) 310-8000

Michael B. Himmel, Esq.
Melissa T. Lozner, Esq.
Natalie J. Kraner, Esq.
LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500

*Counsel for UnitedHealth Group
Incorporated and Ingenix, Inc.*

*/s/ Barbara Gail Quackenbos*

Barry M. Epstein, Esq.
Barbara Gail Quackenbos, Esq.
Eric J. Marcy, Esq.
WILENTZ GOLDMAN & SPITZER, PA
90 Woodbridge Center Drive
Suite 900
Woodbridge, New Jersey 07095
(732) 636-8000

Joseph P. Guglielmo, Esq.
SCOTT + SCOTT LLP
29 West 57th Street
14th Floor
New York, NY 10019
(212) 223-6444

Christopher M. Burke, Esq.
SCOTT+SCOTT LLP
600 B Street, Suite 1500
San Diego, CA 92101
(619) 233-4565

D. Brian Hufford, Esq.
Robert J. Axelrod, Esq.
POMERANTZ HAUDEK BLOCK
  GROSSMAN & GROSS LLP
100 Park Avenue
New York, New York  10017
(212) 661-1100

James E. Cecchi, Esq.
CARELLA BYRNE BAIN GILFILLAN
  CECCHI STEWART & OLSTEIN, PC
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Edith M. Kallas, Esq.
Joe R. Whatley, Esq.
Mitchell M. Breit, Esq.
W. Tucker Brown, Esq.
Laurence J. Hasson, Esq.
WHATLEY DRAKE & KALLAS, LLC
1540 Broadway
37th Floor

31

New York, NY 10036
(212) 447-7070

Stephen A. Weiss, Esq.
Christopher A. Seeger, Esq.
Diogenes P. Kekatos
James A. O'Brien III
SEEGER WEISS LLP
One William Street
New York, NY 10004
(212) 584-0700

Andrew S. Friedman, Esq.
Elaine A. Ryan, Esq.
Kathryn A. Jann, Esq.
BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012
(602) 274-1100

*Members of Plaintiffs' Executive Committee*