# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

IN RE:  AETNA UCR LITIGATION,

This Document Relates To:  ALL CASES

*Document Filed Electronically*

MDL NO. 2020

MASTER FILE NO. 2:07-CV-3541 (SRC)

## UNITEDHEALTH GROUP INCORPORATED'S AND INGENIX INC.'S MEMORANDUM OF LAW IN OPPOSITION TO THE JOINT MOTION FOR PRELIMINARY CERTIFICATION OF A <u>SUBSCRIBER SETTLEMENT CLASS ON RICO AND ANTITRUST CLAIMS</u>

Michael B. Himmel, Esq.
Natalie J. Kraner, Esq.
LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500

Jeffrey S. Klein, Esq.*
Christopher R.J. Pace, Esq.*
Nicholas J. Pappas, Esq.*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
(admitted pro hac vice)

*Attorneys for Defendants Ingenix, Inc. and UnitedHealth Group Incorporated*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................1

RELEVANT BACKGROUND ................................................................................4

ARGUMENT ..............................................................................................................6

   I.  RULE 23(B)(3)'S REQUIREMENTS TO CERTIFY A CLASS ON THE
SUBSCRIBER PLAINTIFFS' RICO AND SHERMAN ACT CLAIMS, EVEN
FOR SETTLEMENT, ARE DEMANDING ..................................................................6

   II.  THE SETTLING PARTIES CANNOT PROVE COMMON ANSWERS TO
ESSENTIAL ELEMENTS OF THEIR RICO AND SHERMAN ACT CLAIMS .........8

      A.  CAUSATION AND INJURY CANNOT BE PROVEN THROUGH CLASS-WIDE
PROOF ....................................................................................................................8

         1.  There Is No Evidence That the Databases' Reported Provider Charges
Percentiles Were Skewed Downward Across the Board ..................................10

         2.  Dr. Foreman's Methodologies for Calculating Damages Do Not Cure
the Inability to Establish Class-Wide Causation or Injury................................21

         3.  Whether Members of the Subscriber Settlement Class Incurred Out-of-
Pocket Expenses Creates Individualized Issues................................................26

         4.  Self-Funded Plans Create Additional Individualized Issues........................28

      B.  THE SETTLING PARTIES CANNOT ESTABLISH OTHER ELEMENTS OF THE
SUBSCRIBER PLAINTIFFS' RICO CLAIMS THROUGH COMMON PROOF ......................30

         1.  There is No Common Proof That Any Purported Misrepresentations
Caused Injuries to the Class................................................................................30

         2.  Plaintiffs' Assertion of a RICO Conspiracy Does Not Lessen Their
Burden of Proving Common Answers to RICO Requirements........................36

   CONCLUSION...........................................................................................................38

## TABLE OF AUTHORITIES

Page(s)

CASES

*Agostino v. Quest Diagnostics, Inc.*,
  256 F.R.D. 437 (D.N.J. 2009)....................................................................................7, 37

*Am. Med. Ass'n v. United Healthcare Corp.*,
  No. 00-cv-2800, 2009 WL 4403185 (S.D.N.Y. Dec. 1, 2009).............................................26

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997).....................................................................................................8

*Anderson v. Ayling*,
  396 F.3d 265 (3d Cir. 2005)....................................................................................31, 35

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)....................................................................................................27

*Beck v. Prupis*,
  529 U.S. 494 (2000)....................................................................................................36

*Bell Atl. Corp. v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) .......................................................................................13

*Camiolo v. State Farm Fire & Cas. Co.*,
  334 F.3d 345 (3d Cir. 2003)..........................................................................................34

*Franco v. Conn. Gen. Life Ins. Co.*,
  818 F. Supp. 2d 792 (D.N.J. 2011) .........................................................................26, 27

*Gates v. Rohm & Hass Co.*,
  655 F.3d 255 (3rd Cir. 2011) ...........................................................................13, 14, 18

*Grider v. Keystone Health Plan Central, Inc.*,
  2006 WL 3825178 (E.D. Pa. Dec. 20, 2006) ..................................................................37

*Haynes v. Planet Automall, Inc.*,
  276 F.R.D. 65 (E.D.N.Y. 2011) ....................................................................................34

*Holmes v. Sec. Investor Prot. Corp.*,
  503 U.S. 258 (1992)....................................................................................................31

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008)............................................................................... passim

*In re Managed Care Litig.*,
    209 F.R.D. 678 (S.D. Fla. 2002) .................................................................33

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
    2009 WL 2043604 (D.N.J. July 10, 2009).................................................35

*In re WellPoint Out-of-Network "UCR" Rates Litig.*,
    --- F. Supp. 2d ----, 2012 WL 5193815 (C.D. Cal. Sept. 6, 2012)..............34, 35, 36

*Johnston v. HBO*,
    265 F.3d 178 (3d Cir. 2001)...............................................................32, 33

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ....................................................33, 36, 37

*Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*,
    149 F.R.D. 65 (D.N.J. 1993)..............................................................12

*Maio v. Aetna*,
    221 F.3d 472 (3d Cir. 2000)...............................................................8

*Marcus v. BMW of N. Am.*,
    687 F.3d 583 (3d Cir. 2012)...........................................................26, 27

*McDonough v. Toys R Us, Inc.*,
    834 F. Supp. 2d 329 (E.D. Pa. 2011) ...................................................6

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)....................................................31, 33, 35

*Opperman v. Allstate New Jersey Insurance Co.*,
    No. 07-1887, 2009 WL 3818063 (D.N.J. Nov. 13, 2009) ....................................14

*Poulos v. Caesars World, Inc.*,
    379 F.3d 654 (9th Cir. 2004) ........................................................31, 33

*Simon v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
    482 F.2d 880 (5th Cir. 1973) ........................................................32, 33

*Spencer v. Hartford Financial Services Group, Inc.*,
    256 F.R.D. 284 (D. Conn. 2009).........................................................37

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) (en banc)..............................................7, 28

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010)........................................................31, 33

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)..................................................................................................6, 7

**STATUTES**

15 U.S.C. § 15(a) ...........................................................................................8, 16, 26, 27

18 U.S.C. § 1964(c) ................................................................................................. passim

**RULES**

Federal Rule of Civil Procedure 23 ......................................................................... passim

## PRELIMINARY STATEMENT

Aetna, three members of Aetna health plans (the "Settling Subscribers") and four providers of out-of-network ("OON") services to Aetna health plan members (the "Settling Providers") ask this Court to preliminarily certify a Subscriber Settlement Class and a Provider Settlement Class as to not only the ERISA claims pled in this case only against Aetna, but also as to Plaintiffs' RICO and Sherman Act claims pled against Aetna, UnitedHealth Group Incorporated ("UHG") and Ingenix, Inc. ("Ingenix"). These settling parties, however, provide no substantive analysis to demonstrate that any class can be certified on the Subscriber Plaintiffs' RICO and Sherman Act claims pursuant to Federal Rule of Civil Procedure ("Rule") 23(b)(3). *See* Mem. of Law in Supp. of Joint Mot. for Prelim. Cert. (the "Settlement Brief") at 11-12 (D.E. 839-1). To the contrary, RICO and the Sherman Act share at least two common requirements that doom certification here of a class of Aetna health plan members (such as the proposed Subscriber Settlement Class) to pursue claims under either statute: A plaintiff has neither a RICO nor a Sherman Act claim unless the plaintiff can prove that he or she suffered an actual "injury to his [or her] business or property" and this injury was "by reason of" – *i.e.*, directly caused by – a violation of either RICO or the Sherman Act.

The purported injury here, according to the Settlement Brief and its accompanying proposed preliminary approval order, is that Aetna reimbursed the members of the Subscriber Settlement Class less for OON services than was required under the terms of its health plans when (among other things) it utilized an Ingenix Database to determine prevailing provider charge levels and then used that information to set its OON reimbursement amounts. Even assuming this is a viable theory of injury under RICO and the Sherman Act, there is no proof (common or otherwise) that Aetna's use of an Ingenix Database caused such an injury to all, or

even most, members of the proposed Subscriber Settlement Class.  The Databases report provider charge distribution percentiles for, quite literally, *millions* of combinations of medical procedures (classified by CPT codes) and geographic regions (classified by Geozips).  The evidence shows that no systematic downward bias can be identified across all, or even most, of these CPT code/Geozip combinations.  As a consequence, no class of Aetna plan members can establish, using common proof, that each member was under-reimbursed for OON services due to Aetna's use of an Ingenix Database.  Rather, to demonstrate under-reimbursement, each plan member would have to present *individualized* evidence as to the specific CPT code/Geozip combination and provider charge percentile from the iteration of an Ingenix Database that Aetna used for his or her OON claim and then compare that to what the plan member contends would be a more accurate corresponding benchmark to satisfy Aetna's health plan obligations.

Furthermore, an Aetna health plan member does not suffer an actual injury to his or her "business or property" caused "by reason of" a RICO or Sherman Act violation if that member never paid a provider for OON services because the provider accepted Aetna's reimbursement payment and did not collect anything further from the plan member.  The record is unwavering that this determination can be made only on a *member-by-member* basis:  Each member would have to submit evidence that he or she paid something out-of-pocket for the OON services the member received, and the evidence of what one member paid out-of-pocket (if anything) would not be proof at all as to whether any other member paid out-of-pocket for OON services.

For the foregoing reasons and the additional reasons stated below, this Court cannot, consistent with Rule 23(b)(3), certify a Subscriber Settlement Class on the RICO and Sherman Act claims as pled in the operative complaint in this case.

To be clear, the objection of UHG and Ingenix (collectively, the "United Defendants") here is only to certification (whether preliminary or final) of the Subscriber Settlement Class to adjudicate and resolve (by settlement) the RICO and Sherman Act claims pled in the Complaint.[1] No Provider Plaintiff is asserting claims against the United Defendants, so the United Defendants do not have a basis to oppose – and hence are not directly opposing – certification of the Provider Settlement Class.  Furthermore, no Subscriber Plaintiff is asserting claims against the United Defendants either for violation of ERISA or for breach of contract under State law (brought by Subscriber Plaintiffs who are not members of ERISA plans), so the United Defendants do not have a basis to oppose – and hence are not directly opposing – certification of the Subscriber Settlement Class to pursue settlement of their ERISA and breach-of-contract claims.  At least until their motion to dismiss is decided, however, the United Defendants are facing RICO and Sherman Act claims brought by at least one, if not more than one, Subscriber Plaintiff.  Accordingly, they have a direct interest in any decision by this Court to certify a Subscriber Settlement Class on those claims.  And this is true even if the Subscriber Settlement Class is certified only for the purposes of settlement, since the law is clear that the requirements of Rule 23(b)(3) are very similar as applied to a settlement class and a "merits" class.

Shortly after receiving the Settlement Brief, the United Defendants asked Aetna and the Settling Subscribers (the "Settling Parties") to modify their class certification position to eliminate any request that this Court certify the Subscriber Settlement Class on RICO and Sherman Act claims.  They declined, making this Opposition necessary.  The Opposition can be

---

[1]  "Complaint," as used herein, refers to both the First and the Second Consolidated Amended Complaint (the "FAC" and "SAC," respectively).  The parties disagree over which is the operative complaint, but the Court need not resolve that dispute now because no subscriber class can be certified on the RICO and Sherman Act claims as pled in either complaint.

resolved by either (1) the Settling Parties dropping their request to certify the Subscriber Settlement Class to adjudicate the RICO and Sherman Act claims on a class-wide basis, (2) the Subscriber Plaintiffs dismissing their RICO and Sherman Act claims against the United Defendants, (3) this Court denying certification of the Subscriber Settlement Class to adjudicate the RICO and Sherman Act claims,[2] or (4) this Court ruling upon, and granting, the pending motion to dismiss the RICO and Sherman Act claims pled against the United Defendants.

## RELEVANT BACKGROUND

### I.    THE AETNA SETTLEMENT AGREEMENT

On December 6, 2012, Aetna, the Settling Subscribers and the Settling Providers entered into a settlement agreement (the "Settlement Agreement") (D.E. 839-2), which proposes two settlement classes:   A Subscriber Settlement Class and a Provider Settlement Class.   The Subscriber Settlement Class is defined as "Persons who, at any time from March 1, 2001 through the Preliminary Approval Date, (i) were [Aetna] Plan Members; (ii) received a Covered Service or Supply from an [OON] Health Care Provider or [OON] Health Care Provider Group; and (iii) whose resulting claims for reimbursement included Partially Allowed Claims." *Id.* § 1.50.

The Settlement Agreement creates two funds applicable to the Subscriber Settlement Class: A General Settlement Fund and a Subscriber Prove-Up Fund. *Id.* §§ 9, 10.1. Subscriber Settlement Class members can seek a payment from the General Settlement Fund even if they have never been balance billed by a health care provider for OON services and even if they have never incurred any out-of-pocket expenses for OON services they received. *Id.* § 9.

---

[2]   Denying certification to *adjudicate* the RICO and Sherman Act claims on a class basis would not change the scope of the Settlement Agreement *release* since a party can release claims in a class settlement that he or she could not litigate on a class basis.

## II.     THE MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT

On December 7, 2012, the Settling Parties filed their Settlement Brief asking this Court, among other things, to certify (preliminarily) the Subscriber Settlement Class.  They assert that the "common questions" supporting class certification are "whether reimbursements paid to the Settlement Classes were fixed at levels below those that would prevail in a competitive market and whether Aetna's use of the Ingenix data or any other data to calculate usual, customary, or reasonable rates violated ERISA, RICO, or the Sherman Antitrust Act."  Settlement Br. at 11 (D.E. 839-1).  They further conclude, without any analysis, that those common questions predominate over individual questions.  *See id.* at 12 (entirety of argument on Rule 23(b)(3)'s predominance requirement is the statement that "the common questions discussed above predominate over individual questions" and the citation to a 1998 case).

## III.     PRIOR RELEVANT CLASS CERTIFICATION PROCEEDINGS

Although the Settlement Brief does not provide a substantive analysis supporting certification of the Subscriber Settlement Class, the parties previously briefed class certification issues for the Court.  On November 8, 2010, Plaintiffs filed a Motion in Support of Class Certification (D.E. 634) (the "Class Certification Brief"),[3] which relied upon various expert reports submitted by Drs. Stephen Foreman, Gordon Rausser, and Bernard R. Siskin. Defendants filed a joint opposition to Plaintiffs' Class Certification Brief (D.E 673) on November 15, 2010, relying upon expert reports submitted by Drs. Daniel J. Slottje, Andrew Joskow, Robin Cantor, and Thomas McCarthy.  The United Defendants address below the

---

[3]   This was actually Plaintiffs' second class certification motion.  After the first round of class certification briefing, the Court (Hochberg, J.) ordered the parties to re-file new class certification briefs.  *See* Order, dated October 28, 2012 (D.E. 626).

incurable flaws in the Class Certification Brief's arguments to demonstrate that no Subscriber Settlement Class can be certified on Plaintiffs' RICO and Sherman Act claims.[4]

## ARGUMENT

**I.     RULE 23(B)(3)'S REQUIREMENTS TO CERTIFY A CLASS ON THE SUBSCRIBER PLAINTIFFS' RICO AND SHERMAN ACT CLAIMS, EVEN FOR SETTLEMENT, ARE DEMANDING**

The Subscriber Settlement Class cannot be certified under Rule 23(b)(3) as to the RICO and Sherman Act claims pled in the Complaint unless the Settling Parties can prove, among other things, that there are "questions of law or fact common to the class" and that such questions "predominate over any questions affecting only individual members."  Rule 23(a)(2) & (b)(3). "A party seeking class certification must affirmatively demonstrate his [or her] compliance with the Rule – that is, he [or she] must be prepared to prove that there are ***in fact*** sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (emphasis in original).

Following the Supreme Court's watershed decision in *Dukes*, the standard for what qualifies as a "common question" under Rule 23(a)(2) and 23(b)(3) has been substantially raised. *See McDonough v. Toys R Us, Inc.*, 834 F. Supp. 2d 329, 338 (E.D. Pa. 2011) (*Dukes* "creat[ed] a higher 'commonality' threshold for class action certification under FRCP 23(a)(2))").  A question of law or fact is "common" only if it (1) is a "common contention" upon which the claims of all putative class members depend, *Dukes*, 131 S. Ct. at 2551; (2) is capable of class-wide resolution, "which means that determination of its truth or falsity will resolve an issue that

---

[4]   Plaintiffs filed a reply in support of class certification on November 24, 2010 (D.E. 688) (the "Class Certification Reply"), which they sought to support by untimely and unauthorized expert reports from Drs. Foreman and Rausser.  After Defendants moved to strike these reports, the parties stipulated that Defendants could submit new responsive expert reports.  *See* Order, dated September 12, 2011 (D.E. 796).

is central to the validity of each one of the claims [*i.e.*, each class member's claim] in one stroke;" *id*; and (3) is supported by "convincing proof." *Id.* at 2556; *see also id.* at 2551 ("What matters to class certification ... is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation" (emphasis in original) (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132 (2009)).

This Court "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).  In doing so, the Court "should make its own independent findings and need not afford plaintiff's claims any deference." *Agostino v. Quest Diagnostics, Inc.*, 256 F.R.D. 437, 449 (D.N.J. 2009).   "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Hydrogen Peroxide*, 552 F.3d at 311 (citation omitted); *accord Agostino*, 256 F.R.D. at 457 (D.N.J. 2009) (class certification inappropriate "where proof of an essential element of a cause of action requires individualized inquiry into the facts").  Moreover, at least in the present context where questions of state-law variability are not at issue,[5] the Court's Rule 23 analysis is largely the same whether it is deciding to certify a class for settlement purposes or for a trial on the merits:

---

[5]   In *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (en banc), the Third Circuit determined that variations in State law will rarely defeat certification of a multi-state settlement class where the settling parties can prove the commonality of "the defendant's conduct as to all class members and any ***resulting injuries common to all class members***" (emphasis added).  As demonstrated below, the Settling Parties fail to satisfy this basic *Sullivan* requirement because they cannot prove that all, or even most, Subscriber Settlement Class members suffered any injury to their "business or property" that was caused directly by the RICO and Sherman Act violations pled in the Complaint.  *See* pages 9-29, *infra*.

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* [Rule] 23(b)(3)(D), for the proposal is that there be no trial. But other specifications of the Rule – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened, attention in the settlement context.

*Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); *see also id*. at 622 ("Federal courts … lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper"); *id*. at 623 ("it is not the mission of Rule 23(e) [on class settlements] to assure the class cohesion that legitimizes representative action in the first place. If a common interest in a fair compromise could satisfy the predominance requirement of Rule 23(b)(3), that vital prescription would be stripped of any meaning in the settlement context.").

## II.     THE SETTLING PARTIES CANNOT PROVE COMMON ANSWERS TO ESSENTIAL ELEMENTS OF THEIR RICO AND SHERMAN ACT CLAIMS

### A.     CAUSATION AND INJURY CANNOT BE PROVEN THROUGH CLASS-WIDE PROOF.

RICO and the Sherman Act claims require a plaintiff to demonstrate an actual injury to "his [or her] business or property" that was "by reason of" – *i.e.*, directly caused by – a RICO or Sherman Act violation.  *See* 15 U.S.C. § 15(a); 18 U.S.C. § 1964(c); *Hydrogen Peroxide*, 552 F.3d at 311; *Maio v. Aetna*, 221 F.3d 472, 483 (3d Cir. 2000).   In this case, it is essential therefore for the Settling Parties to show, at a minimum, that there is a "common answer" across the Subscriber Settlement Class to the question of whether the OON reimbursement rates they contend Aetna should have employed under the terms of its health plans were higher than the reimbursement rates Aetna actually employed when it used an Ingenix Database to determine prevailing provider charge levels.  This could only be accomplished if, among other things, the Settling Parties could prove that the reported provider charges percentiles in the Ingenix Databases were systematically biased downward, which is a threshold they simply cannot meet.

The empirical evidence demonstrates that there is no downward bias at all in the Ingenix Databases.[6]  But even if the Settling Parties could somehow demonstrate, using common proof, that there is an "average" overall downward bias in the Ingenix Databases, they still could not obtain certification of their Subscriber Settlement Class on the RICO and Sherman Act claims pled in this case.  Even Plaintiffs' experts have admitted that they cannot establish that all – or anywhere close to all – class members were under-reimbursed because of the purported flaws in the Ingenix Databases.  Instead, ***Plaintiffs' experts have conceded that huge swaths of the classes were not under-reimbursed by Aetna when it used an Ingenix Database to determine prevailing or reasonable provider charge levels***, even accepting as true Plaintiffs' unfounded criticisms of the Databases.  Nor have the Settling Parties presented any methodology that they could use to prove causation or injury on a class-wide basis.  Just as in *Hydrogen Peroxide*, 552 F.3d at 321-22, the Settling Parties' inability to show either causation or injury across the Subscriber Settlement Class through class-wide proof means that they cannot satisfy the predominance element of Rule 23(b)(3) as to Plaintiffs' RICO and Sherman Act claims.[7]

---

[6]   The Settlement Agreement covers more than just OON claims for which Aetna used an Ingenix Database as a benchmark to determine reasonable or prevailing provider charges.  It also covers OON claims that Aetna reimbursed based on a percentage of Medicare rates as well as OON claims where Aetna adjusted reimbursement based on policies covering assistant surgeons, co-surgeons, multiple surgical procedures, and behavioral health tiering.  *See* Settlement Agreement § 1.42 (D.E. 839-2).  Plaintiffs have never claimed that the United Defendants had any involvement in these practices divorced from the Ingenix Database, and this Opposition does not address whether or not these non-Database practices may have resulted in a systematic under-reimbursement or bias that might justify class certification as to those practices only.

[7]   Given the current posture in which class certification is before the Court, the Court does not need to address barriers to class certification that would only apply to the United Defendants and not to Aetna as well.  Accordingly, those barriers (which include releases the United Defendants have from proposed Class members and differences in disclosures and reimbursement practices between Aetna and UHG affiliates) are not presented in this Opposition.

1.      **There Is No Evidence That the Databases' Reported Provider Charges Percentiles Were Skewed Downward Across the Board.**

Even accepting all of Plaintiffs' (flawed) criticisms of the Ingenix Databases and taking at face value the (flawed) analyses offered by Plaintiffs' experts, *it is uncontested that the proposed Subscriber Settlement Class would include millions of uninjured class members*.  To determine causation and injury across that Class would involve, at a minimum, separate analyses of many millions of different data distributions across all of the combinations of CPT codes and Geozips in any given Ingenix Database release, further multiplied by variations in those distributions across different Database releases covering different time periods.  Accordingly, sorting which Class members can potentially prove causation and injury from those who cannot present such proof would involve an incredibly complex inquiry that defeats any notion of predominance.  *See*, *e.g.*, Slottje Class Rep. at 22-29 (Boone Decl. Ex. 23) (D.E. 680) (demonstrating the heterogeneity across data distributions in the Ingenix PHCS Database).[8]

Indeed, Aetna's historical claims experience, among numerous other objective benchmarks, supports Aetna's use of an Ingenix Database as a fair and rational basis for determining prevailing or reasonable provider charge levels and then basing its OON reimbursement rates on those charge levels.  When Aetna used an Ingenix Database (most commonly, its reported 80th percentile charge) to evaluate provider charge levels for each year between 2001 and 2008, *it allowed at full billed charges over 80 percent of all OON claims*. *See* Laporta Decl. ¶¶ 4, 18 (D.E. 650).  As Plaintiffs' expert Dr. Foreman admitted at his deposition, this result is exactly what "[y]ou would expect to see" if the Ingenix Databases were

---

[8]   The PHCS Database reports provider charge percentiles for over 3 million data distributions in each six-month release – percentiles for each of the 8,000-plus CPT codes in each of 400-plus Geozips.  And there are roughly 20 releases of the PHCS Database implicated by the proposed class period.  *See* Cantor Class Rep. Table 9 (Boone Decl. Ex. 15) (D.E. 679).

"really truly representative of the 80th percentile."  Foreman Dep. at 71:1-10 (Boone Decl. Ex. 7 (D.E. 679).  Plaintiffs have never been able to reconcile this with their claim of downward bias.

> **(a)**      ***Plaintiffs' experts all agreed there is not an across-the-board downward bias in the Ingenix Database percentiles***.

To support the conclusion in their Class Certification Brief that "[a]ll class members suffered impact," Plaintiffs relied *exclusively* on the declarations of two expert witnesses, Drs. Siskin and Rausser.  Pls' Class Cert. Br. at 30 (D.E. 634).  But these experts, as well as Plaintiffs' other expert (Dr. Foreman), conceded at their depositions that they were ***not*** opining that reported Ingenix Database provider charge percentiles were understated across the board – or even that they were understated for most putative class members.

Dr. Siskin testified that he "cannot give the opinion that the Ingenix database systematically for every class member resulted in the payment of a UCR ['usual, customary and reasonable'] amount that was lower than a true UCR."  Siskin Dep. at 448:6-17 (Boone Decl. Ex. 3) (D.E. 679); *id.* at 445:15-18 ("If you are asking me whether or not if I did the true UCR in every case the true UCR would be higher?  I'm not saying that.").  Dr. Siskin explained that for any given CPT code/Geozip combination in any given time period, he does not know whether the "true UCR" would be higher, lower, or the same as a OON reimbursement rate based on the percentile values reported in an Ingenix Database.  *Id.* at 58:4-23.  Rather than testifying to an across-the-board downward bias, Dr. Siskin explained that his opinion is that "the ***tendency, on average***, is going to be" that the "appropriate" UCR "would tend to be higher," but "[w]hether or not it was in every single case, I don't know."  *Id.* at 54:5-25 (emphasis added).  To come up with anything but an "average" "probability estimate" that a particular claim was under-reimbursed, Dr. Siskin would need "information about the ***individual*** and the circumstances of the ***individual***."  *Id.* at 60:24-61:21 (emphasis added).

In their Class Certification Brief, Plaintiffs also cited Dr. Rausser's class certification report for the proposition that "understatement of UCRs in sample ranged from low of 7% to high of 28%." Pls' Class Cert. Br. at 30 (D.E. 634) (citing Rausser Class Rep. ¶ 60 (D.E. 679)). But the portion of Dr. Rausser's report to which Plaintiffs cited reflects neither any work by Dr. Rausser nor any meaningful sample of data. Instead, he simply copied the results reported by the New York Attorney General from its analysis of *six* CPT codes in *Erie County*, New York. *See* Rausser Class Rep. ¶ 60 (Boone Decl. Ex. 12) (D.E. 679). Plainly, that reference cannot support any conclusion that all Subscriber Settlement Class members can show that Aetna always under-reimbursed their OON claims, when those claims could involve *thousands* of different CPT codes and services rendered in *hundreds* of different geographic regions. *See Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65, 75 (D.N.J. 1993) (Rule 23(a)(2) not satisfied by putative class of car dealers challenging car maker's warranty reimbursements, which state law requires be made at dealers' "prevailing" and "not ... unreasonable" rates, because "[e]ach dealer has its own retail prices, its own relevant geographical test area and its own prevailing retail prices for that geographical area," so "neither the reasonableness of an individual Dealer's retail price for a particular part nor the validity of Ford's Reimbursement Formula can be determined on a class basis"). Moreover, Dr. Rausser conceded at his deposition that he did not examine the Ingenix Databases or any Aetna claims data. When asked about a reference in his report to a "systematic downward bias" in the reported Ingenix Databases provider charge percentiles, Dr. Rausser testified that he did *not* mean that the Database percentile values were depressed "across the board," or even "more often than not." Rausser Dep. at 244:21-246:25 (Boone Decl. Ex. 13) (D.E. 679). Similarly, Dr. Rausser testified that his opinions do *not* "lead to a conclusion that the percentile values in the Ingenix database were understated for all the

CPT codes in all geographic areas in all time periods relevant to this case." *Id.* at 248:9-17.

Furthermore, Plaintiffs' other expert, Dr. Foreman, testified that he is ***not*** "offering an opinion that the percentile values for Ingenix were lower than the accurate percentiles in each and every case." Foreman Dep. at 412:21-413:13 (Boone Decl. Ex. 7) (D.E. 679). When asked about the statement in his class certification report that "the classes suffered common impact from past use of inaccurate percentile data," Dr. Foreman conceded that he was "referring to the ***potential*** effect that it could have, ***not the actual effect that it did have***." *Id.* at 154:13-155:5 (emphasis added). Likewise, in his deposition following the submission of his merits report, Dr. Foreman explained that the reported Ingenix Database provider charge percentile values were not depressed across the board, but rather were equal to or greater than his supposedly "more accurate" benchmark values for approximately 35 to 40 percent of the data distributions that he analyzed. Foreman Dep. at 78:25-80:16 (Boone Decl. Ex. 10) (D.E. 679).

Even assuming *arguendo* that (1) Plaintiffs' experts were correct about the purported flaws in the Ingenix Databases, (2) those flaws led to a "tendency, on average" or a "potential" for a downward bias in the Databases, and (3) such a bias could form the basis for a RICO or antitrust violation, class certification still would be precluded as a matter of law on Plaintiffs' RICO and Sherman Act claims here because the Settling Parties lack any methodology to show through class-wide proof that this purported bias caused injury to all (or even nearly all) Subscriber Settlement Class members. "[W]here fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (*quoted with approval in Hydrogen Peroxide*, 552 F.3d at 311); *see also Gates v. Rohm & Hass Co.*, 655 F.3d 255, 270 (3rd Cir. 2011) ("Courts have

generally denied certification of medical monitoring classes when individual questions involving causation and damages predominate over (and are more complex than) common issues such as whether defendants released the offending chemical into the environment").

In a strikingly similar case from this District – *Opperman v. Allstate New Jersey Insurance Co.*, No. 07-1887, 2009 WL 3818063 (D.N.J. Nov. 13, 2009) – the plaintiffs alleged that Allstate "systematically undervalued and underpaid homeowners insurance claims by using software systems and cost databases that produced depressed estimates" of losses.  *Id.* at *1.  Echoing Plaintiffs' claims here, the plaintiffs alleged that Allstate "manipulated" its payments by "alter[ing] its cost databases so that estimates would be calculated based upon" pricing data that was not "accurate."  *Id.* at *2.  The court denied the motion for class certification because the plaintiffs could not establish through common proof that "all class members received estimates that undervalued their loss."  *Id.* at *5.  The court explained:

> Although Allstate may have adopted the Home Depot scheme to produce lower estimates in the aggregate, it does not follow that *every* Home Depot pricing estimate was necessarily lower than it would have been using the preexisting price database.  Furthermore, ... it is still likely that some estimates correctly approximated, or even overestimated, certain claimants' loss value.  In other words, even if most claimants received undervalued estimates, it is likely that some unknown portion of claimants—perhaps even a substantial number – received estimates that accurately approximated their actual loss value. ...  In short, to determine whether a claimant received payment based upon a low estimate requires an *individualized comparison* of what his or her loss was worth with the amount Allstate ultimately paid on the claim.

*Id.* at *5 (emphasis in original); *see also id*. at *7 (certification inappropriate because some class members "likely received payments that accurately approximated (or even overvalued) their loss").  The same analysis prevents certification of the Subscriber Settlement Class here.

### (b)   *Expert empirical analysis refutes any claim the Ingenix Database percentiles were suppressed across-the-board.*

Unlike Plaintiffs' experts, whose only analysis of the Ingenix data consists of flawed,

selective "studies" by Dr. Foreman, experts tendered by Aetna and the United Defendants examined the reported Ingenix Database provider charge percentiles and underlying provider charges data in detail using a variety of reliable statistical methodologies.  Those experts concluded that there is **no evidence** that the Ingenix Database percentiles were generally biased downward as a result of the practices challenged by Plaintiffs, let alone that there was any systematic, across-the-board downward bias.  Plaintiffs' unsupported assertions in their Class Certification Brief about a purported downward bias in reported Ingenix Database percentiles are refuted by multiple, independent data analyses that – unlike Dr. Foreman's flawed studies – withstand rigorous analytical scrutiny.

Defense expert Dr. Robin Cantor conducted an empirical analysis to assess whether there is evidence of a class-wide impact from Plaintiffs' allegation that the Ingenix values are depressed as a result of a conspiracy or a conflict of interest.  Cantor Class Rep. ¶ 39 (Boone Decl. Ex. 15) (D.E. 679).  She compared millions of Ingenix database values to the corresponding values in five independent sources of provider charge data that are free from the alleged conspiracy and conflict of interest.  *Id.* ¶¶ 39-41.[9]  If Plaintiffs were correct that a conflict of interest or conspiracy led to a common adverse impact across the entire Subscriber Settlement Class, the comparison of Ingenix Database percentiles to the independent benchmarks would show that the Database percentiles were persistently lower than the benchmark values across the board.  *Id.* ¶ 74.  But Dr. Cantor's analysis resoundingly **rejected** such a theory.  Across tens of millions of matched pairs, the Database percentile values were equal to or

---

[9]   Several Plaintiff Medical Associations have recommended these same data sources to their members for benchmarking their charges.  *See* Cantor Merits Rep. ¶¶ 98-103 (Boone Decl. Ex. 18) (D.E. 679).

exceeded the independent benchmark values roughly half the time.  *Id.* at Table 15.  Similarly, when Dr. Cantor calculated the average of the percent differences between the reported Ingenix Database percentiles and the other benchmarks, the results showed that the Database percentiles were ***on par with or higher than the benchmarks***.  *Id.* ¶¶ 74-82.  In short, Dr. Cantor's empirical analysis precludes a finding that anywhere close to all Subscriber Settlement Class members suffered a monetary injury (an "injury to ... business or property") caused by ("by reason of") any alleged conspiracy or conflict of interest.  15 U.S.C. §15(a); 18 U.S.C. §1964(c).[10]

Similarly, Dr. Slottje conducted an empirical analysis comparing the percentile values in the Ingenix PHCS Database to the percentile values in an independent source of physician charge data (the Wasserman PFR database).  *See* Slottje Class Rep. at 12-15 (Boone Decl. Ex. 23) (D.E. 680).  The results of his analysis empirically refuted Plaintiffs' theory of class-wide impact.  Dr. Slottje found that with respect to all combinations of procedure codes and geographic areas that were reflected in both databases during the 2004 to 2008 timeframe, it was actually more likely that the percentile value of the PHCS database would ***exceed*** the corresponding Wasserman PFR percentile value than that the Wasserman PFR value would exceed the PHCS value.  *Id.* at 15.[11]

> **(c)    The impact of Plaintiffs' criticisms of the "representativeness" of the Ingenix Database percentiles is purely speculative.**

Plaintiffs and their experts criticized Ingenix's methodology for gathering data as leading

---

[10]   The New York Attorney General's report is not to the contrary.  *See* Boone Decl. Exs. 15-16 (D.E. 679) (Cantor Class Rep. ¶¶ 87-91; Cantor Resp. Class Rep. ¶¶ 42-45).

[11]   While Dr. Foreman criticized Dr. Cantor's and Dr. Slottje's analysis of the Wasserman PFR database as an independent benchmark, in 2006 he endorsed the use of the Wasserman PFR in a report commissioned by the Medical Society of New Jersey that was submitted in a state court proceeding.  Dr. Foreman described the Wasserman PFR as "available to all, inexpensive to acquire, totally transparent, unbiased" and "recognized by coding experts as the nearest available (accessible) substitute for 'usual, customary and reasonable' fee comparisons."  *See* Cantor Class Resp. Rep. ¶ 29 (Boone Decl. Ex. 16) (D.E. 679).

to a "lack of representativeness of contributed data," and they criticized Ingenix for a "failure to audit data."  Pls' Class Cert. Br. at 5 (D.E. 634); *see also* Siskin Merits Rep. at 12 (Boone Decl. Ex. 4) (D.E. 679).  At the outset, Plaintiffs' criticisms of "representativeness" require one to set aside (a) the reality that the Ingenix data was based upon billions of provider charges and represented the most extensive collection of physician billed charge data in the industry, and (b) that the Ingenix Databases were intended to report on a census of contributed data, as opposed to being representative samples of all provider charges everywhere (*see* Slottje Merits Rep. at 9 (Boone Decl. Ex. 27) (D.E. 680)).[12]  Even setting those issues aside, there is no evidence or expert testimony that could support a conclusion that any lack of "representativeness" in the provider charges data used to create the Ingenix Database percentiles led to a downward bias in all (or even most) of the Databases' reported percentile values, or that the Settling Parties could answer through common proof the question of which Subscriber Settlement Class members suffered an out-of-pocket expense caused by this purported flaw.  As Dr. Siskin conceded, "the very fact that data is obtained by way of a convenience sample does not mean that the data is not representative of the underlying population of provider charges or is biased in any way."  Siskin Dep. at 572:21-573:12 (Boone Decl. Ex. 3) (D.E. 679).  Accordingly, Dr. Siskin conceded that he does not know "whether any particular CPT code, geozip, or release is representative or biased in any way because [he] didn't test it."  *Id.* at 575:15-22.

In his merits report, Dr. Foreman admitted that, "[b]ecause the entire population of billed charges is not known there is no way to scientifically prove or disprove whether the Ingenix

---

[12]  Based on the 2001 to 2008 reference manuals provided to Database licensees, Dr. Slottje concluded that Ingenix's "data collection effort is a census because the data collected is the entire population of data."  Because "no sampling is occurring, then no convenience sampling is occurring and no sample bias exists."  Slottje Merits Rep. at 9 (Boone Decl. Ex. 27) (D.E. 680).

billed charges are representative of all billed charges," and that "[t]he hypothesis that the Ingenix percentiles represent UCR can neither be proven nor disproven."  Foreman Merits Rep. ¶ 163 (Boone Decl. Ex. 9) (D.E. 679).   Notwithstanding this admission, Dr. Foreman nevertheless presented an assessment that purports to show an average downward bias from what he deemed to be a lack of representativeness in the provider charges data collection used to create the Ingenix Databases.  *Id.*  Dr. Foreman's work, however, does not withstand scrutiny.  As Dr. Cantor explained, Dr. Foreman's analysis of representativeness is "biased and improper," and a more sensible approach to the issue demonstrates that there is no downward bias in the Databases from any lack of representativeness.  Cantor Merits Rep. ¶¶ 131-135 (Boone Decl. Ex. 18) (D.E. 679).  And Dr. Foreman never even attempted to establish that there is a downward bias that would have caused injury to all (or nearly all) class members, as is required under *Hydrogen Peroxide*.  The Settling Parties have proposed no methodology that could be used to assess any such impact through class-wide proof.  *Cf. Gates*, 655 F.3d at 266 ("The evidence here is not 'common' because it is not shared by all (possibly even most) individuals in the class.  Averages or community-wide estimations would not be probative of any individual's claim because any one class member may have an exposure level well above or below the average.").

> (d)   **Plaintiffs' criticisms of Ingenix's "scrubbing" methodology do not support a finding of class-wide injury.**

Plaintiffs' experts also criticized a data processing methodology used by Ingenix, which they describe as a "high-low screen."  Foreman Class Rep. ¶¶ 98-110 (Boone Decl. Ex. 5) (D.E. 679); *see also* Pls' Class Br. at 5 (D.E. 634).  But Plaintiffs' experts conceded that this process did not result in any class-wide injury.  As Plaintiffs' experts admitted, the existence of any supposed injury would vary across the millions of different CPT code/Geozip combinations at issue in this case.  Specifically, Dr. Siskin conceded that the impact of applying the high-low

screen varies from one CPT code/Geozip distribution to another – in different cases it could increase the 80th percentile value, decrease it, or not change it at all.  Siskin Dep. at 331:19-334:13 (Boone Decl. Ex. 3) (D.E. 679).  Dr. Foreman made similar concessions, acknowledging that in some cases the high-low screen may "not screen out any data," and in other cases it may "only screen out low charges."  Foreman Dep. at 196:15-21 (Boone Decl. Ex. 7) (D.E. 679).

Dr. Slottje confirmed empirically, based an analysis of all contributed provider charges data for the Ingenix Databases (as opposed to a non-representative subset like Dr. Foreman), that the high-low screen does ***not*** lead to any class-wide impact.  Dr. Slottje directly examined the issue by adding back the records that the screen had removed from the contributor data underlying the PHCS Database percentile values, and he compared the resulting 80th percentile values to the associated 80th percentile values of the relevant PHCS Database Release.  For the 2007-2008 Releases, Dr. Slottje showed that the screen either ***raised*** or ***had no impact whatsoever*** on reported PHCS Database percentile values for ***89 to 94 percent*** of CPT code/Geozip combinations.  *See* Slottje Class Rep. at 8-10 (Boone Decl. Ex. 23) (D.E. 680).  This result directly refutes Plaintiffs' allegation that there is a systematic downward bias in PHCS percentile values resulting from the high-low screen.[13]

Moreover, for those limited CPT/Geozip combinations in which application of the high-low screen led to a reduction of the percentile values, there remains a question as to whether any charges removed were invalid data points (which Dr. Siskin acknowledged would be properly removed) or valid data points (which Dr. Siskin contended should have been left in the

---

[13]  Plaintiffs argued in their Class Certification Brief that an analysis by Dr. Foreman showed that a high-low screen could have a downward biasing effect, but Dr. Foreman's analysis is wholly irrelevant to this litigation.  He intentionally did not use the high-low screen actually used by Ingenix, but instead used a different screen (Tukey) that leads to different effects.  Cantor Merits Rep. ¶¶ 136-151 (Boone Decl. Ex. 18) (D.E. 679).

Database).  Plaintiffs identified no way to determine the impact of the high-low screen other than through an individual examination of millions of charges.  For example, Dr. Siskin proposed that, for each charge that was screened out, there could be "a panel of experts" that could "look at the charges that were high" and "call up the doctor and say is this what you really charged." Siskin Dep. at 310:21-311:20 (Boone Decl. Ex. 3) (D.E. 679).  Dr. Siskin also proposed that a "team of people" could review each charge that was screened out to determine whether it was fraudulent or valid.  *Id.* at 316:4-321:22.  This is the antithesis of class-wide proof of injury.

> **(e)**     ***Plaintiffs' criticisms of Ingenix Database derived charges do not support a finding of a class-wide causation or injury.***

Plaintiffs also criticized in their Class Certification Brief Aetna's use of "derived" provider charge percentiles from the Ingenix PHCS Database.  Putting aside the many flaws in these critiques, they do not prove class-wide causation or injury.  First, claims adjudicated using derived data account for only a tiny fraction of the claims in the case.  The PHCS database provided percentile values based on derived data (as opposed to actual data) only when there were less than nine charges for a CPT code in a Geozip.  Siskin Class Rep. at 28 (Boone Decl. Ex. 2) (D.E. 679).  Accordingly, by definition, Aetna only could have used derived provider charge percentiles from the PHCS Database as a benchmark for evaluating uncommon procedures, not for the most common OON services received by Subscriber Settlement Class members.  Cantor Class Rep. ¶ 62 (Boone Decl. Ex. 15) (D.E. 679).

In any event, Plaintiffs lack any common proof of causation or injury even for the small portion of claims that Aetna paid using PHCS Database derived provider charges percentiles as benchmarks.  None of Plaintiffs' experts offered a data analysis showing injury or downward bias resulting from use of derived charges percentiles.  That is not surprising, as Dr. Cantor has shown through empirical analysis that PHCS derived charges percentiles are frequently ***higher***

than the values from other benchmarks.  Cantor Class Resp. Rep. ¶ 49 (Boone Decl. Ex. 15) (D.E. 679).  Dr. Slottje's empirical analysis also showed that there can be no class-wide proof of causation or injury resulting from the use of PHCS derived charges percentiles.  Slottje Merits Rep. at 26 (Boone Decl. Ex. 26) (D.E. 680).  Moreover, Plaintiffs have never contended that all forms of derived percentiles are improper, and they have never explained how one would tell which derived percentiles are proper and which are not.  *See* Siskin Dep. at 364:21-25 (Boone Decl. Ex. 3) (D.E. 679).  The only aspect of derived percentiles that Dr. Siskin has criticized is that Ingenix "did not adjust for the variance" among the different data distributions that were grouped together to create the derived percentiles.  *Id.* at 364:5-9; *see also* Siskin Class Rep. at 37-38 (Boone Decl. Ex. 2) (D.E. 679).  According to Dr. Siskin, this supposed flaw means that "you are going to understate the one with greater standardized variance and ***overstate*** the one with the smaller variance."  Siskin Dep. at 365:20-24 (Boone Decl. Ex. 3) (D.E. 679) (emphasis added).  Thus, "the impact of how Ingenix creates derived data [will] depend on the spread of charges for each CPT code in each geographic area."  *Id.* at 366:22-367:4.  Clearly, there is no class-wide proof of causation or injury here.

### 2. Dr. Foreman's Methodologies for Calculating Damages Do Not Cure the Inability to Establish Class-Wide Causation or Injury.

#### (a) *Dr. Foreman's so-called "more accurate" percentile values are deeply flawed and, even taken at face value, contradict any notion of class-wide causation and injury.*

As noted above, Dr. Foreman's calculation of so-called "more accurate" percentile values in his class report does not support a finding of class-wide impact because, even taken at face value, his analysis fails to show a downward bias for approximately 35 to 40 percent of the Ingenix Database provider charge percentiles that he examined.  *See supra* at 14.  Moreover, Dr. Foreman studied less than 1 percent of the CPT/Geozip combinations in the PHCS Database.

21

*See* Cantor Merits Rep. ¶ 114 & Table 14 (Boone Decl. Ex. 18) (D.E. 679).   Nothing

demonstrates that Dr. Foreman's limited studies of 300 and 350 CPT codes are representative of

the millions of CPT code/Geozip data distributions that he has not studied.  *Cf.* Slottje Merits

Rep. at 38-39 (Boone Decl. Ex. 26) (D.E. 680) (explaining that Dr. Foreman's results cannot be

extrapolated to the remaining CPT/Geozip combinations in the Database).   Accordingly, his

analysis cannot provide support for a finding of class-wide causation or injury.

Moreover, it is clear that Dr. Foreman's analysis is deeply flawed and cannot be taken at

face value even for the subset of medical procedures and geographic areas that he studied.  Dr.

Foreman testified that his 300 Study, which forms the basis for his damage calculation, was

conducted by another analyst and was only provided to Dr. Foreman the day before he signed his

expert report.  Foreman Dep. at 237:22-238:17 (Boone Decl. Ex. 10) (D.E. 679).  No one double-

checked the calculations in either the 300 Study or Dr. Foreman's 350 Study before they were

included in Dr. Foreman's report.  *Id*. at 238:18-25.  And a number of the backup files, data

sources, and intermediate data runs that formed the basis for the 300 and 350 Studies and would

be required to replicate and test these studies were "lost" or were simply not saved by Dr.

Foreman.  *Id.* at 59:8-20; 251:24-253:23.

While Dr. Foreman did not examine or double-check the studies that form the basis for

his damage calculations, Defendants' experts have done so.  That examination revealed that Dr.

Foreman's studies are riddled with errors – everything from sloppy mistakes, to methodological

errors, to problems that are inexplicable and unprofessional.  For example:

- Dr. Foreman's 300 Study mistakenly used the same year of contributor data for 2007 and 2008 and then compared those results to two different years of Ingenix PHCS Database percentiles.  McCarthy Rep. ¶ 149 (Boone Decl. Ex. 28) (D.E. 680); Cantor Merits Rep. ¶¶ 44-45 (Boone Decl. Ex. 18) (D.E. 679).

- Dr. Foreman included data for technical or facility charges in addition to physicians' professional fees, which make his fees higher and not comparable to the professional fees in the relevant Ingenix PHCS Database modules. McCarthy Rep. ¶ 140 (Boone Decl. Ex. 28) (D.E. 680).

- Dr. Foreman conducted his comparisons by matching Ingenix PHCS Database percentiles from one period of contributor data with his percentile values that were based on contributor data from later time periods.  McCarthy Rep. ¶ 139 (Boone Decl. Ex. 28) (D.E. 680).

- Dr. Foreman misunderstood or misapplied the Geozips in the Ingenix Databases, which led him to drop data from hundreds of Geozips in his 350 Study.  McCarthy Rep. ¶ 141 (Boone Decl. Ex. 28) (D.E. 680); Cantor Merits Rep. ¶ 55 (Boone Decl. Ex. 18) (D.E. 679).

- Dr. Foreman did not properly count the units of each service when estimating his percentiles because he did not break charges into individual units when multiple units were contained in a single claim line in the contributor data. McCarthy Rep. ¶ 142 (Boone Decl. Ex. 28) (D.E. 680).

- Dr. Foreman sometimes recorded the wrong PHCS provider charges percentile in his studies and therefore compared his "more accurate" percentile values to a value that was not actually the relevant PHCS Database percentile. Cantor Merits Rep. ¶ 47 (Boone Decl. Ex. 18) (D.E. 679).

The list of errors goes on and on.  *See* McCarthy Rep. ¶¶ 139-152 (Boone Decl. Ex. 28) (D.E. 680); Cantor Merits Rep. ¶¶ 43-58 (Boone Decl. Ex. 18) (D.E. 679).  Reflecting these errors, Dr. Foreman's supposedly "more accurate" percentile values include results that are utterly implausible and render his work entirely unreliable.  For example, he generated hundreds of results for which his 80th percentile value was less than $1.  Cantor Merits Rep. ¶ 57 & Table 5 (Boone Decl. Ex. 18) (D.E. 679).  Dr. Foreman also frequently generated wildly divergent results in his 300 Study and 350 Study when he was studying the same CPT code, Geozip, and time period, even though he was using the same contributor data and, supposedly, the same "more accurate" method for compiling percentile values.  *Id.* ¶¶ 46-48.  For example, CPT 96413 in Geozip 776 has an 80th percentile value of $622 in the 300 Study but an 80th percentile value of $250 in the 350 Study.  *Id.* ¶ 46.

23

As described in his expert report, Dr. McCarthy corrected Dr. Foreman's obvious errors and re-ran Dr. Foreman's 300 Study and 350 Study.  McCarthy Rep. ¶¶ 138-154 (Boone Decl. Ex. 28) (D.E. 680).  When Dr. McCarthy corrected the errors in Dr. Foreman's 350 Study, he found that *the reported Ingenix PHCS Database provider charge percentile values equaled or exceeded the values in the corrected Foreman benchmark approximately 85 percent of the time*.  *Id.* ¶ 146.  When Dr. McCarthy corrected the errors in Dr. Foreman's 300 Study, he found that the PHCS Database values equaled or exceeded the values in the corrected benchmark *approximately 84 percent of the time*.  *Id.* ¶ 151.  Dr. McCarthy also re-ran Dr. Foreman's weighted average difference between the PHCS Database percentiles and the contributor data. After correcting Dr. Foreman's obvious errors, Dr. McCarthy found that the reported PHCS Database percentiles were on average within about 1 percent of the corresponding values for the contributor data.  *Id.* ¶ 154.  As Dr. McCarthy found, "[t]hese small percentages are *inconsistent* with there having been a systematic suppression of the percentiles in the Ingenix PHCS medical and surgical modules or dental modules."  *Id.* (emphasis added).

Further, Dr. Slottje performed a sensitivity analysis to test Dr. Foreman's use of a non-random selection of CPT/Geozip combinations in the 300 and 350 CPT studies.  *See* Slottje Merits Rep. at 37-40 (Boone Decl. 26) (D.E. 680).  Dr. Slottje analyzed all of the contributed provider charges data available in this case for those PHCS Database percentiles based on actual charges (comprising over half-a-million CPT/Geozip combinations), as opposed to Dr. Foreman's "study" of a much-smaller, non-randomly selected group of CPT/Geozip combinations.  Dr. Slottje's analysis not only refutes Dr. Foreman's findings as to average downward bias, but also reveals that Dr. Foreman's attempt to extrapolate the results of his "study" to the entirety of the PHCS Database is unreliable.  Reasons for this include (1) the

variability in the frequency and distribution of underlying charge data across the universe of CPT/Geozip combinations and (2) changes to CPT codes and Geozips over time (and thus across different PHCS Database Releases). *Id.* Clearly, Dr. Foreman's damage model – in either its corrected or error-riddled form – cannot support a finding of causation and/or injury to all (or nearly all) members of the Subscriber Settlement Class.[14]

> **(b)** **Dr. Foreman's "billed charges" damages methodology does not align with Plaintiffs' claims or the terms of Aetna's plans.**

Without citing any legal authority, Plaintiffs argued in their Class Certification Brief that "[t]he Court can award [the difference between the billed and allowed charges] ..., requiring payment based on billed charges." Pls' Class Cert. Br. at 36 (D.E. 634). There is no legal justification for this approach, and the difference between billed charges and a "usual, customary and reasonable" rate says nothing about whether Aetna's determination of what a "usual, customary and reasonable" rate was for a given OON claim was understated, overstated, or

---

[14] In connection with their Class Certification Reply, Plaintiffs submitted an additional and unauthorized expert report from Dr. Foreman in which he attempted, or at least claimed to attempt, to correct the numerous errors in his 300 and 350 studies via new "500" and "5000" studies. Analysis by defense experts of Dr. Foreman's new studies, however, revealed that they were as riddled with errors, as unreliable and as unhelpful to Plaintiffs' class certification efforts as Dr. Foreman's prior work. He continued to commit errors, for example, in failing to exclude facilities claims, misapplying Geozips and using claims data from the wrong time periods. His new studies also continued to be inconsistent with each other (and his prior studies), producing dramatically different values for the same CPT code/Geozip combinations. Even without correcting for Dr. Foreman's (numerous) errors, his new, largest study continued to show that between 40-57% of the time, the 80th percentile provider charge reported in the PHCS Database was equal to or greater than the corresponding 80th percentile estimated by Dr. Foreman, which only further confirmed that there can be no class-wide assessment of causation or injury. One report also demonstrated that the provider charge percentiles reported in the PHCS Database were incredibly consistent with the corresponding percentiles disclosed in the New York Attorney General-approved "Fair Health" database, which Plaintiffs have lauded as free from the effects of the alleged conspiracy that underlies their RICO and Sherman Act claims. The defense expert reports (submitted along with this Opposition) were provided to Plaintiffs in October 2011. *See* Decl. of Christopher R.J. Pace, filed concurrently herewith, ¶¶ 3-6 & Exs. A-C.

unaffected by the conduct Plaintiffs challenge in this case as violating RICO and/or the Sherman Act. *Cf. Marcus v. BMW of N. Am.*, 687 F.3d 583, 604 (3d Cir. 2012) (reversing certification of class of persons who owned vehicles with allegedly defective "run flat" tires that nevertheless suffered a flat because individual issues of causation and injury predominated over the issue of a claimed defect; "individual inquiries" would be required to determine whether a particular class member's vehicle tire went flat because of a defect or for an unrelated reason that would have caused any tire to go flat). Moreover, the required showing of class-wide causation and injury through common proof cannot be sidestepped through an assertion that all class members – whether injured or not – should be entitled to some form of windfall damages.

Plaintiffs' "billed-charge" theory does not even make sense as a damages model, let alone a method of showing class-wide causation and injury. It does nothing to show the harm potentially caused to a Subscriber Settlement Class member due to Aetna's use of an Ingenix Database as a benchmark to determine OON provider charge levels as opposed to some other type of benchmark. *See Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-cv-2800, 2009 WL 4403185, at *5 (S.D.N.Y. Dec. 1, 2009).

### 3. Whether Members of the Subscriber Settlement Class Incurred Out-of-Pocket Expenses Creates Individualized Issues.

Separate from the issue of whether a provider charges percentile reported in an Ingenix Database was lower than what Plaintiffs believe would be an "accurate UCR" rate for a particular OON service in a particular geographic region, a class member cannot demonstrate that he or she was "injured in" his or her "business or property by reason of" either a RICO or Sherman Act violation without providing evidence that he or she incurred an out-of-pocket expense for the OON service received. 15 U.S.C. §15(a); 18 U.S.C. §1964(c). As this Court has held, "the legal obligation to pay ... does not amount to a tangible loss of property redressable

26

under RICO" or, by extension, the Sherman Act (though such an obligation may suffice to maintain an ERISA claim).  *Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 824 (D.N.J. 2011).[15]  Accordingly, without evidence that the members of the Subscriber Settlement Class incurred out-of-pocket expenses, "the Court cannot conclude that [they] have established that they have sustained a concrete injury within the meaning of RICO" or the Sherman Act.  *Id.* at 824 (citing *Maio*, 221 F.3d at 483).

The definition of the Subscriber Settlement Class does not limit its membership to those Aetna health plan members that paid anything for the OON services they received, let alone anything above and beyond whatever co-payment or co-insurance amounts they were required to pay under the applicable Aetna health plan.  Moreover, the Settlement Agreement does not require members of the Subscriber Settlement Class to provide any proof of incurring out-of-pocket expenses to recover under the General Settlement Fund.  Settlement Agreement § 9 (D.E. 839-2).  Nor do the Settling Parties argue that they can show through class-wide evidence which putative class members paid bills for amounts over and above what Aetna has already covered (let alone over and above what Aetna covered and what the members were required to pay as co-insurance or a co-payment); this information is not available in any of Aetna's claims systems. *Cf. Marcus*, 687 F.3d at 592-94 (holding that class cannot be certified unless it is "currently and readily ascertainable," and discussing problems with determining membership in proposed class when potentially injured parties could not be determined from defendant's records).

The only conceivable way to establish who paid balance bills for each of the millions of

---

[15]  The elements of a RICO cause of action – contained in 18 U.S.C. §1964(c) – that a plaintiff have suffered an injury to "business or property" and that this injury be "by reason of" a RICO violation were drawn (verbatim) from 15 U.S.C. §15(a), which creates the private right of action to enforce the Sherman Act.  *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 463 (2006).

claims in the putative class would be to examine the billing and payment records of each putative class member.  *See* AMA (Hanson) Dep. at 341:15-25; 342:2, 20-23; 343:2-5 (Boone Decl. Ex. 29) (D.E. 680) (only way to determine whether a provider sent or waived a balance bill is to review individual physician accounting records).  This would involve countless individualized evidentiary issues.  *See* Cooper Dep. at 260-70 (Boone Decl. Ex. 71) (D.E. 680).[16]  This Court cannot certify the Subscriber Settlement Class on the basis of the Subscriber Plaintiffs' RICO and Sherman Act claims where there is no possible means of answering, via common proof, the basic question of whether Aetna's use of an Ingenix Database for benchmarking purposes caused any particular class member to pay out even a nominal amount more for OON services than he or she would have if Aetna employed an alternative benchmark more to Plaintiffs' liking.[17]

### 4.    Self-Funded Plans Create Additional Individualized Issues.

Plaintiffs' inability to satisfy Rule 23's requirements is magnified with respect to self-funded plans, which cover *2 out of 3* Aetna members.  Because these plans are controlled by

---

[16]  A number of Subscriber Plaintiffs, each of whom would be a member of the Subscriber Settlement Class, testified that their providers either never sent them a balance bill or did not attempt to collect on such a bill.  *See* S. Smith Dep. at 81:4-82:4 (Boone Decl. Ex. 98) (D.E. 680); Franco Dep. at 102:14-103:8 (Boone Decl. Ex. 88) (D.E. 680).

[17]  The inability of the Subscriber Plaintiffs to demonstrate that they suffered any injury at all to their "business or property" that was caused directly by a RICO or Sherman Act violation significantly distinguishes this case from *Sullivan v. DB Investments, Inc*.  There was no dispute in *Sullivan* that all of the settlement class members had suffered an actual, out-of-pocket cost as a result of paying inflated prices for diamonds.  The *Sullivan* Court "distill[ed] at least three guideposts that direct the predominance inquiry: first, that commonality is informed by *the defendant's conduct as to all class members and any resulting injuries common to all class members*; second, that variations in state law do not necessarily defeat predominance; and third, that concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class."  667 F.3d at 297 (emphasis added).  Thereafter, in upholding a settlement class before it notwithstanding variations in State law over the standing of indirect purchasers, the *Sullivan* Court relied *repeatedly* on the fact that the claimed misconduct in the case before it had caused a common injury to all class members.  *See, e.g., id.* at 285, 297, 300, 304, 307, 327, 328.  No such commonality of causation or injury exists here.

large, sophisticated employers that have a direct financial stake in how OON services are reimbursed, these plans raise a host of individualized issues directly relevant to certification of the Subscriber Settlement Class.   In many cases, employers make the decision to set the reimbursement amounts for OON services based on their own budgetary considerations.   To take one example, Aetna processed claims for a self-funded plan sponsored by Amgen, a large pharmaceutical company.    For the 25,000 members enrolled in this plan, Amgen paid approximately $63 million in claims in 2009, of which approximately $11 million was for OON services.   Barton Decl. ¶¶ 9-10 (D.E. 645).   Thereafter, Amgen directed Aetna to *lower* the PHCS Database percentile Aetna used as a benchmark for determining OON claim reimbursement.   *Id.* ¶¶ 17-20.  Amgen's decision to lower its OON reimbursements demonstrates why any simplistic attempt to sweep self-funded plans into the Subscriber Settlement Class does not come close to satisfying Rule 23(b)(3).

At bottom, Plaintiffs' RICO and Sherman Act claims rest on allegations and legal theories that do not apply to self-funded plans.   Variation in plan terms affecting OON reimbursement is particularly pronounced in self-funded plans, because the plan sponsors often draft their own plans.   In many cases, these plan sponsors choose the method by which Aetna will pay OON claims.   Owens Corning, for example, asked Aetna during the sales process in 2002 how OON claims would be reimbursed, and Aetna responded:

> We determine our reasonable and customary (R&C) profiles using primarily the Ingenix PHCS database (formerly owned by HIAA), although we may use other data as needed.  All fee data is based on postal zip codes.  We update our data twice annually.  The standard reasonable and customary (R&C) percentile is the 80th, with a $10 liberalization corridor.

Kehaly Decl. ¶ 40 (D.E. 664).   As further explained in the declaration from Owens Corning's Benefits Manager, he always understood that Aetna's "R&C" determinations were based on data

organized by CPT codes and the first three digits of zip codes, and he viewed Aetna's use of an Ingenix Database as "reasonable." Saulsberry Decl. ¶¶ 18, 23 (D.E. 670).

Thus, even if Plaintiffs were to establish that Aetna chose to use an Ingenix Database for benchmarking purposes data as part of a conspiracy to depress OON reimbursements for its fully-insured plans, decisions by individual self-funded plan sponsors in setting the terms of their own plans (as demonstrated by the Amgen and Owens Corning examples above), including through the use of an Ingenix Database for benchmarking, would necessitate separate inquiry into each self-funded plan. *See*, *e.g.*, Rausser Dep. at 352:16-354:1 (Boone Decl. Ex. 13) (D.E. 679) (an employer's decision regarding the level of benefits for OON services "depends on the competitive conditions in the labor market"); *id*. at 351:13-352:15 (the increasing financial burden of rising healthcare costs provides a "rational independent incentive for employers to look for ways to reduce the costs that they pay for healthcare"). Moreover, a health insurer's supposed profit motive in conspiring to suppress OON reimbursements does not exist for self-funded plans, which are themselves financially responsible for paying these claims.

**B.** **THE SETTLING PARTIES CANNOT ESTABLISH OTHER ELEMENTS OF THE SUBSCRIBER PLAINTIFFS' RICO CLAIMS THROUGH COMMON PROOF.**

**1.** **There is No Common Proof That Any Purported Misrepresentations Caused Injuries to the Class.**

The Subscriber Plaintiffs cannot allege that Aetna's use of an Ingenix Database for benchmarking in connection with OON claims is, standing alone, a RICO predicate act. Instead, the predicate acts upon which they base their RICO claims are supposed acts of fraud in connection with that use. But Subscriber Settlement Class members cannot demonstrate through class-wide proof that they all suffered an injury "by reason of" the supposed fraud pled by the Subscriber Plaintiffs – *i.e.*, that specific fraudulent misrepresentations were both the but-for and

proximate cause of their purported injuries.  *See*, *e.g.*, 18 U.S.C. § 1964(c); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267-72 (1992); *Anderson v. Ayling*, 396 F.3d 265, 270 (3d Cir. 2005); *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 133-35 (2d Cir. 2010) (reversing certification of RICO fraud class because individualized issues of causation predominated); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 226-27 (2d Cir. 2008) (same).  Causation "lies at the heart of a civil RICO claim," and "[l]umping claims together in a class action does not diminish or dilute this requirement."  *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004).  The Settling Parties' failure to show that class-wide proof of causation exists forecloses certification of the Subscriber Settlement Class on the basis of RICO as a matter of law.  *See Hydrogen Peroxide*, 552 F.3d at 316 n.14 ("The burden of proof rests on the movant.").

Plaintiffs have never demonstrated – and cannot demonstrate – that any purported misrepresentations they received (all from Aetna) were uniform across the Subscriber Settlement Class.  Even Plaintiffs' limited examples (Pls' Class Cert. Br. at 34 (D.E. 634)) – which include detailed appeals correspondence, EOBs, and phone calls with Aetna customer service representatives – underscore the widespread variation in Aetna's communications with members.  The declarations and exhibits supporting Defendants' Class Certification Opposition also demonstrated the varied information Aetna distributed about OON reimbursement levels and its use of an Ingenix Database to Aetna's members and employer plan sponsors (who communicate separately with plan members).  *See*, *e.g.*, Ferensic-Smith Decl. ¶¶ 55-73 (D.E. 657) (describing Aetna's phone calls with members, appeals correspondence, and other methods by which Aetna communicates detailed information about OON reimbursement to plan members); Kehaly Decl. ¶¶ 32-36 (D.E. 664) (describing Requests for Proposal, plan documents, the sales process, and other methods by which Aetna and large plan sponsors communicate with members about OON

reimbursement and Aetna's use of an Ingenix Database for benchmarking); Barton Decl. ¶¶ 17-20 (D.E. 645) (describing Aetna's detailed communications with Amgen about OON reimbursement costs); Saulsberry Decl. ¶¶ 18-21 (D.E. 670) (describing Aetna's detailed communications with Owens Corning about OON reimbursement).

By the same token, while Plaintiffs asserted in their Class Certification Brief that Aetna's plan language and policies are "materially uniform" across all of its plans (Pls' Class Cert. Br. at 12-14 (D.E. 634), the evidence of actual plan language does not support that assertion. Many of those plans vary substantially in how Aetna's obligation to pay OON claims is described. Some plans expressly state that Aetna will use a "zip code area (or groupings of zip codes)" to determine OON reimbursement rates, contrary to Plaintiffs' claim that Aetna should have used some type of "medical cost area" other than Geozips. *See* Kehaly Decl. Ex. 2 (D.E. 664) (areas defined "by zip code area (or groupings of zip codes)"); Noss Decl. Ex. 7 (D.E. 667) ("Expense areas are defined by the first three digits of the U.S. Postal Service Zip Codes."). Other plans fly in the face of Plaintiffs' claim that there should be different OON reimbursements for the same service depending on the type or specialty of the provider. Pls' Class Cert. Br. at 5 (D.E. 634). For example, many Aetna plans only permit "the type of specialty of the provider" to be considered in determining the reimbursement amount "for a service or supply that is ... unusual; or not often provided in the area; or provided by only a small number of providers in the area." *See* Kehaly Decl. Ex. 2 (D.E. 664).

Such varying plan language (in addition to other varying alleged representations) precludes certification of a RICO class. *See Johnston v. HBO*, 265 F.3d 178, 191 (3d Cir. 2001) (denying certification of RICO class because, *inter alia*, evidence showed that putative class members received different written and oral representations); *Simon v. Merrill, Lynch, Pierce,*

*Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973) (same); *In re Managed Care Litig.*, 209 F.R.D. 678, 691-92 (S.D. Fla. 2002) (same), *aff'd in part, rev'd in part sub nom. Klay v. Humana*, 382 F.3d 1241 (11th Cir. 2004). The Settling Parties have never described how, through class-wide proof, they would establish that any purported misrepresentation by Aetna – distinct from Aetna's alleged underpayment of an OON claim – ***caused*** their injuries. Nor have the Settling Parties described how such misrepresentations by Aetna are in any way connected to the United Defendants. The only "theory" of causation offered by Plaintiffs in their Complaint – that they personally relied on Aetna's purported misrepresentations, and their personal reliance led to their claimed injuries (FAC ¶¶ 651, 688; SAC ¶ 616) – clearly is not the type of theory that can be proven on a class-wide basis. *See, e.g.*, *Johnston*, 265 F.3d at 194-95; *Eli Lilly*, 620 F.3d at 132-137; *Poulos*, 379 F.3d at 665; *McLaughlin*, 522 F.3d at 234.

This case proves why: Absent individual trials, there is no way for this Court to probe the minds and motivations of millions of members of the Subscriber Settlement Class to determine whether they relied on Aetna's purported misrepresentations. Several of the named Plaintiffs have testified, for instance, that they never even read – or could not recall reading – the very communications that Plaintiffs contend were fraudulent.[18] Moreover, Plaintiffs have not explained how they could show what each individual class member who remembers seeing an allegedly fraudulent communication would have done differently but for the alleged fraud. In circumstances such as these, no class can be certified. *See, e.g.*, *Johnston*, 265 F.3d at 189-90;

_____

[18] *See, e.g.*, Weintraub Dep. at 44:9-45:15, 63:6-24, 124:2-16 (Boone Decl. Ex. 127) (D.E. 680) (does not recall reviewing the EOB for his only claim in the case until he began preparing for his deposition, and he does not "recall reviewing [his plan] documents"); P. Smith 1/20/10 Dep. at 54:15-19 (Boone Decl. Ex. 97) (D.E. 680) ("Q: Did you ever look up in the [plan] documents you were provided what the definition of 'usual and customary charges' was? A: No.").

*see also Haynes v. Planet Automall, Inc.*, 276 F.R.D. 65, 79-80 (E.D.N.Y. 2011) (Rule 23(a)(2) not satisfied by putative class of used car buyers suing dealers for charging a fee to credit buyers but not to cash buyers, as only 63.9% of credit buyers were charged the fee, which "demonstrates that the fee is not uniformly charged to all credit customers").

In their Class Certification Brief, Plaintiffs focused on the purportedly "false certifications" (Pls' Class Cert. Br. at 34 (D.E. 634)) that Aetna sent to Ingenix regarding its data contributions, as well as other communications between Aetna and Ingenix.  Plaintiffs suggested that Ingenix's transmission of the Ingenix Databases to licensees could be part of a common mail or wire fraud scheme supporting their RICO claims, but Plaintiffs offered no evidence (1) that Ingenix made false statements to licensees in transmitting the data, (2) that the Databases are anything but what Ingenix represented them to be in the Database reference manuals, (3) that in the transmission process Ingenix directed licensees to misrepresent the Databases to others, or (4) that Aetna did not know exactly what it was receiving when it got the Databases, regardless of how Ingenix described those Databases.   Furthermore, Plaintiffs have never even attempted to show that they were somehow misled by how Ingenix described the Databases to Aetna (or even that they knew at all about those descriptions).   In short, the communications between Ingenix and Aetna provide no basis for Plaintiffs' RICO claims.  *See Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345, 364 (3d Cir. 2003) (to prove mail fraud, "there must be some sort of *fraudulent misrepresentations* or omissions *reasonably calculated to deceive* persons of ordinary prudence and comprehension." (emphasis added) (internal quotation marks omitted)); *In re WellPoint Out-of-Network "UCR" Rates Litig.*, --- F. Supp. 2d ----, 2012 WL 5193815, at *23-24 (C.D. Cal. Sept. 6, 2012) ("That the [Complaint] now identifies data transmissions between Ingenix and the Insurer Conspirators as the predicate mailings does not ... change the fact that

34

this is a case where proof of reliance, and likely first-party reliance, is a mile post on the road to causation. ...  As regards the Subscribers, Plaintiffs do not direct the Court to any allegations of reliance whatsoever." (internal quotation marks omitted)).

Moreover, for many of Aetna's plans, the plan sponsor – not Aetna – decided how OON reimbursements would be determined (including deciding whether to use an Ingenix Database as a benchmark for gauging provider charge levels) and controlled the content of disclosures to plan members explaining how OON reimbursement levels would be calculated.  *See* Kehaly Decl. ¶¶ 21, 47, 59-63 (D.E. 664); *see also*, *e.g.*, FAC ¶ 263, SAC ¶ 261 ("You are covered for expenses at a level set by your plan sponsor").   Therefore, even if there had been a misrepresentation upon which a member relied, the plan sponsor's involvement is an intervening cause, cutting off any possible connection between Aetna's purported fraud and the plan member's "injury."   *See Anderson*, 396 F.3d at 270 (no proximate cause where injury was "filtered through [a] long chain of intervening causes").[19]

All told, there is absolutely no way that Plaintiffs can prove, using common proof that would lead to a common answer across all members of the Subscriber Settlement Class, that any purported fraud they have attempted to identify to support their ill-conceived RICO claims caused them the injury they assert: the under-reimbursement of their OON claims.  They have not shown uniformity in the statements Aetna made to the Class about OON reimbursement, and they have not even tried to offer proof that each Class member, or anyone else, relied to their

_____

[19]  *See also McLaughlin*, 522 F.3d at 226-27 (holding that individualized issues of causation predominated over common issues because "factors other than defendants' misrepresentation[s] may have intervened"); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, at *21 (D.N.J. July 10, 2009) (dismissing RICO claims in part because plaintiffs' theory of causation and injury did not properly account for "important external variables such as the medical judgment of physicians and the preference of patients").

detriment on any supposed "fraudulent scheme" associated with the Ingenix Databases.[20] Plaintiffs' inability to prove the essential elements of their claims through common evidence precludes certification of any RICO class.

> **2.      Plaintiffs' Assertion of a RICO Conspiracy Does Not Lessen Their Burden of Proving Common Answers to RICO's Requirements.**

To prevail on their conspiracy claim, the Subscriber Plaintiffs must prove the very same elements of injury, causation, and scienter that splinter into millions of individualized issues under their substantive RICO claim.  *See* 18 U.S.C. § 1964(c); *Beck v. Prupis*, 529 U.S. 494, 507 (2000).  Individualized issues do not become any less individualized simply because they are accompanied by a conspiracy allegation.  If it were otherwise, Rule 23 would be rendered a dead letter.  *See Hydrogen Peroxide*, 552 F.3d at 321.

Contrary to the Subscriber Plaintiffs' contention in their Class Certification Brief, *Klay v. Humana, Inc.*, 382 F.3d 1241, does not support certification of a class here on their RICO claims. Although the *Klay* Court found that common issues about the existence of a national conspiracy were "substantial" in that case, the Court's decision to uphold certification of a RICO class was predicated on the determination that the providers had received and relied on ***uniform*** misrepresentations in contracts with managed care companies that touched on physician pay and thus went "to the heart of" the contracts.  *Id*. at 1259.  Here, as shown above, Subscriber Settlement Class members received a wide array (and differing amounts) of communications regarding OON reimbursement standards and practices.  Such variability dooms certification of a class to pursue any RICO claims here, including any RICO conspiracy claim.  *See*, *e.g.*,

---

[20]  Plaintiffs essentially conceded that they cannot prove reliance based on any "fraudulent scheme" theory by arguing previously in their Class Certification Reply that they do not need to prove anyone relied on such a scheme to maintain their RICO claims.  That argument has been squarely rejected.  *See In re WellPoint*, 2012 WL 5193815, at *23-24.

*Agostino*, 256 F.R.D. at 458 n.9 (denying certification of a RICO class and distinguishing *Klay* on the ground that, in *Klay*, "proof of liability ... did not require an inquiry into the plaintiffs' individual circumstances").

The other cases cited by Plaintiffs in their Class Certification Brief similarly are wide of the mark. In *Grider v. Keystone Health Plan Central, Inc.*, 2006 WL 3825178, at *22-23 (E.D. Pa. Dec. 20, 2006), the District Court certified a RICO class because it concluded that liability – including causation and reliance – could be established through common proof. *Id.* Here, as explained, no such common proof of causation exists. *See Agostino*, 256 F.R.D. at 458 n.9 (distinguishing *Grider* on the ground that "proof of liability ... did not require an inquiry into the plaintiffs' individual circumstances"). In *Spencer v. Hartford Financial Services Group, Inc.*, 256 F.R.D. 284, 297 (D. Conn. 2009), another case relied on by Plaintiffs, the District Court certified a RICO class because it found that the defendants had made essentially uniform representations to the putative class, and that common proof of causation existed because the plaintiffs claimed that the defendants' purported fraud resulted in the same specific financial injury for every class member. *Id.* Here, no similar proof of standardized misrepresentations is available to Plaintiffs, and the evidence shows that, even assuming Subscriber Plaintiffs were injured at all, any number of factors other than Aetna's purported fraudulent statements could have caused their alleged injuries. Moreover, unlike in *Spencer*, here there is no common proof of causation and injury:  For the many reasons stated above, the members of the Subscriber Settlement Class cannot demonstrate that Aetna's use of an Ingenix Database for benchmarking purposes caused any injury to all, or even most, of them.

## CONCLUSION

Based on the foregoing,[21] the United Defendants respectfully request that the Court deny the Settling Parties' request for the Court to certify the Subscriber Settlement Class to pursue, and settle, the RICO and Sherman Act claims pled in this case.


Dated:  January 7, 2013                              Respectfully submitted,

    /s/ Michael B. Himmel
Michael B. Himmel, Esq.
Natalie J. Kraner, Esq.
LOWENSTEIN SANDLER LLP

---

[21] Should any of Plaintiffs' claims against the United Defendants survive this Court's ruling on the pending motion to dismiss and this Court certifies the Subscriber Settlement Class on the RICO and Sherman Act claims, the United Defendants reserve the right to make additional arguments against certification of a merits class covering those claims.  In addition to the points referenced in footnote 7, *supra*, those arguments would address manageability challenges, additional flaws in Plaintiffs' causation and injury theories, and various "affirmative" and "negative" defenses that create individualized issues.