# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AETNA UCR LITIGATION | Master Docket No. 07-cv-3541 (SRC) (PS) |
| | MDL No. 2020 |
| This Document Relates to: | |
| ALL CASES | |

## MEMORANDUM OF LAW OF ERISA SUBSCRIBER PLAINTIFFS' OPPOSING PRELIMINARY APPROVAL OF THE SETTLEMENT
(Return Date: January 23, 2013)

**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000

Barry M. Epstein, Esq.
Barbara G. Quackenbos, Esq.
Lynne M. Kizis, Esq.
Eric J. Marcy, Esq.
**Co-Interim Class Counsel**
**For the Adequate Subscriber Plaintiffs**

# TABLE OF CONTENTS

**PAGE**

OVERVIEW OF ADEQUATE ERISA  AND RICO PLAINTIFFS' OPPOSITION TO PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT ........................................ 1

INTRODUCTION ........................................................................................................ 1

LEGAL ARGUMENT .................................................................................................. 3

A.      THE THREE MOVING SUBSCRIBER "REPRESENTATIVE PLAINTIFFS" ARE INADEQUATE ...................................................... 3

     1.      John Seney .................................................................................... 3

     2.      Alan John Silver ........................................................................... 8

     3.      Jeffrey Weintraub ....................................................................... 10

B.      THE COURT LACKS "JURISDICTION" OR "POWER" TO DECIDE THE MOTION FOR CLASS CERTIFICATION AND PRELIMINARY APPROVAL MADE BY JOHN SENEY ..................... 13

C.      MOVING PLAINTIFFS DO NOT SATISFY THE SAFEGUARDS REQUIRED TO PROTECT THE DUE PROCESS RIGHTS OF ABSENT CLASS MEMBERS .......................... 13

     1.      Settlement-Only Classes Are Subject To Heightened Scrutiny And Must Be Scrupulously Reviewed ....................... 14

     2.      Adequacy Requires The Presence Of A Class Representative With A Live –Existing Case Or Controversy Against Defendant ............................................. 15

     3.      Due Process Requires That A Class Representative Has At All Times Actively Participated In The Litigation .................... 16

     4.      A Class Representative Must Have The Same Action As The Class And Have Suffered The Same Injury Claim As Class Members ....................................................................... 18

## **TABLE OF CONTENTS** (cont'd)

PAGE

5. There Must Be An Alignment Between The Class Representative(s) And The Claims Of The Absent Class Members ...................................................................................20

6. Movants Do Not Analyze the Adequacy Of The Proposed Representative Subscriber Plaintiffs To Satisfy Due Process Requirements .........................................................................20

7. The Three Purported Class Representatives And Their Attorneys Cannot Share In Any Class Recovery .......................22

D. THE PROPOSED SETTLEMENT IS SUBJECT TO SCRUPULOUS AND HEIGHTENED SCRUTINY ...............................22

E. IN ADDITION TO BEING PROCEDURALLY VIOLATIVE, THE SETTLEMENT TERMS ARE ONEROUS AND UNCONSCIONABLE AND SHOULD NOT BE PRELIMINARILY APPROVED ..............................................................23

1. There Were No Good Faith Negotiations ...................................24

F. THE NEED FOR PROOFS ON ADEQUACY, ALLOCATIONS, CAPS AND RANGE OF REASONABLENESS UNDER *ZIMMERMAN* FACTORS 2 AND 3 ..........................................................26

G. OPPOSING PLAINTIFFS' EFFORTS TO CONDUCT DUE DILIGENCE, SATISFY ITS FIDUCIARY OBLIGATIONS TO THE CLASS AND TO PROPERLY EVALUATE THE PROPOSED SETTLEMENT ......................................................................30

H. THE ALLOCATIONS, CAPS, AND SETTLEMENT FUNDS ARE ARBITRARY, UNREASONABLE AND UNJUSTIFIABLE AND THE CLAIMS ELIGIBILITY PROVE UP REQUIREMENTS AND REVERSION PROVISIONS ARE UNCONSCIONABLE ..............................................................................33

1. Failure to Conduct Due Diligence on the Amount of Settlement and Allocation Determinations in the Funds ...........33

2. The Unconscionable Requirements to Establish Eligibility Under the Prove Up Fund ........................................................34

3. The Reversion Provisions are Designed to Keep Subscribers Purported 40 Million Dollar Prove Up Fund in

# TABLE OF CONTENTS (cont'd)

**PAGE**

Defendant's General Business Account – Guaranteeing Future Disputes and Litigation. ................................................................40

4.   Arbitrary Caps on Claims based Upon the Date of the Claim .................................................................................................42

5.   The "Assignment" Barrier to Establishing Eligibility – Ambiguous Provisions............................................................................44

6.   The Class Notice Fails For Vagueness As Being Overbroad....................45

CONCLUSION .................................................................................................45

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (3d Cir. 1971)......................................24

*Agostino v. Quest*, 256 F.R.D. 437, (D.N.J. 2009), ...................................................................12

*Beck v. Maximus, Inc.,* 457 F.3d 291 (3d Cir. 2006)..................................................................21

*Clark v. City of Coatesville,* 2007 U.S. Dist. LEXIS 71244 (E.D.Pa. Sept. 25, 2007) ................13

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006).........................................................14

*Dewey v. Volkswagen,* 681 F.3d 170 (3d Cir. 2012) ...................................................................20

*East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395 (1977)................................18

*Fields v. Wise Media, LLC,* 2012 U.S. Dist. LEXIS 178894 (N.D.Cal. Dec. 18, 2012)........passim

*Franco v. CIGNA*, Civil Action No. 2:07-cv-6039 (SRC)(PS), June 30, 2010.....................passim

*Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147 (1982)..............................................18, 19, 20

*Georgine v. Amchem Prods*, 83 F.3d 610 (3d Cir.) *aff'd*, 521 U.S. 591 (1996)...............14, 20, 22

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ..............................................................23, 26, 34

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238 (2000).........................19

*In re Bath and Kitchen Fixtures Antitrust Litig.,* 535 F.3d 161 (3d Cir. 2008)..............................6

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ..............................................................27

*In re Community Bank of Northern Virginia,* 418 F.3d 277 (3d Cir. 2005)...................................24

*In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir. 1979)........24

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768 (3d Cir. 1995) ................14

*In re Pet Foods Prods. Liab, Litig.*, 629 F.3d 333 (3d Cir. 2010).........................................26, 27

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283 (3d Cir. 1998)....................23

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) .........................14, 24, 27, 29

**TABLE OF AUTHORITIES** (cont'd)

**PAGE**

*Johnson v. Manhattan RR. Co.*, 289 U.S. 479 (1933) ...................................................17

*Moore v. Halliburton Co.,* 2004 U.S. Dist. LEXIS 18187 (N.D. Tex. Sept. 9, 2004) ............25, 45

*Newfound Mgmt. Corp. v. Lewis*, 131 F.3d 108 (3d Cir. 1997) ..................................18

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ..........................................................15

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)..................................................20, 23

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985) ................................17

*Pichler v. UNITE,* 228 F.R.D. 230 (E.D. Pa. 2005), *aff'd*, 542 F.3d 380 (3d Cir. 2008),
   *cert. denied*, 556 U.S. 1227 (2009) .........................................................19

*Reynolds v. Benefit Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002).....................................24

*Schering Corp. v. Vitarine Pharm. Inc.,* 889 F.2d 490 (3d Cir. 1989)..........................13

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ...........................................19

*Sosna v. Iowa,* 419 U.S. 393 (1975) .............................................................15, 16, 19

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011) ............................................22

*Taylor v. Sturgell*, 553 U.S. 880 (2008) ......................................................15, 16, 17

*The American Medical Association, et. al. v. United HealthCare Corporation, et. al.*,
   Case1:00-cv-02800-LMM-GWG Doc. 589 Filed 02/03/12......................................34

*Thomas v. SmithKline Beecham, Corp.*, 201 F.R.D. 386 (E.D.Pa. 2001) ......................7

*Wachtel v. Guardian Life Ins. Co.*, 223 F.R.D. 196 (D.N.J. 2004) .........................38, 39

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982)..................................................24

## OVERVIEW OF ADEQUATE ERISA AND RICO PLAINTIFFS' OPPOSITION TO PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT

### INTRODUCTION

On December 7, 2012, Settling Plaintiffs' Counsel and Aetna ("Movants") filed a motion for class certification and preliminary approval of a settlement. Doc. 839.[1] The three defined "Representative Plaintiffs", John Seney, Jeffrey Weintraub and Alan John Silver, who consent to this settlement (Settlement Agreement §1.44, Doc. 839-2, PageID: 43943) do not have ERISA or RICO causes of action and are not adequate.

Subscriber Plaintiffs, Michele Werner, Michele Cooper, Darlery Franco, Paul Smith and Sharon Smith, and individual health care subscriber Carolyn Samit ("Adequate Plaintiffs Opposing Settlement" or "Adequate Plaintiffs"), oppose the settlement submitted for preliminary approval. This "Settlement Agreement" was entered into by Movants even though Aetna had identified the Settling Plaintiffs as inadequate or dismissed or both.

Opposing Plaintiffs are the only Subscriber plaintiffs in this matter who are adequate and will protect the due process rights of absent class members. The facts relevant to Aetna's denial of their R&C benefits and their appeals are set

---

[1] All references to "Doc." are the ECF e-filing records in this case, Master Docket No. 07-cv-3541 (SRC) (PS), MDL 2020. References to ECF filing in other cases will be preceded by the Civil Action number for such case.

forth in the FAC ¶ 230-332; 337-354.  For the Court's convenience, the paragraphs are attached as Exh. 1 to the Certification of Barbara Gail Quackenbos ("Quackenbos Cert.").  Opposing Plaintiffs were excluded by Movants from the discussions leading to settlement, in violation of this Court's CMO No. 2, ¶ 3. Doc. 236, PageID:  4687.  This violation continues to date as Movants still refuse to provide the information underlying the settlement.  *See* Certification of Barry M. Epstein, Esq. ("Epstein Cert.") attached to moving papers.  This information, including the amount of damages and percentage allocation to the class is required for Court approval.  *See* pp. 32-38, *infra*.

The 13th and final mediation with the Honorable Nicholas Politan took place on December 7, 2011.  It ended with a rejection of Aetna's last settlement offer. No date was set for continuing the mediation.   Judge Politan died shortly thereafter.  This proposed settlement arose without the benefit of any mediator, after the exclusion of the Adequate Plaintiffs and their counsel.  The proposed settlement did not surface until November 10, 2012, when James Cecchi and Robert Axelrod met with a partner of Wilentz, Goldman & Spitzer in Manasquan, New Jersey and admitted they had concluded a settlement without knowledge or participation of the Wilentz Firm or its clients.   Epstein Cert. at ¶ 7.

The proposed settlement is dramatically worse for the class than the one rejected at the final mediation on December 7, 2011.[2]  Epstein Cert. at ¶ 6.

## LEGAL ARGUMENT

### A. THE THREE MOVING SUBSCRIBER "REPRESENTATIVE PLAINTIFFS" ARE INADEQUATE

1. John Seney[3]

On September 18, 2009, Carella Byrne, in their capacity as attorneys for John Seney, filed a voluntary dismissal of Seney's action against Aetna. Doc. 255.

---

[2] The story is told about a rich, powerful king who visited a wise old clergyman in an obscure village and demanded that the clergyman accept him as a pupil for as long as it took to teach him the essentials of religion.  The clergyman, accepting the challenge, assured the king that he could indeed do this easily and, moreover, accomplish it while standing on one foot.  "The essence of all religion," said the clergyman, "is that which is hateful unto you, do not do unto others; all the rest is commentary."

The essence of class action due process is the requirement of an adequate class representative who has the same live, actual, existing, justiciable action against the defendants as the class, and has at all times actively participated in the litigation.  The essence of civil actions against a health insurer for ERISA benefits can similarly be stated while standing on one foot.  Such actions can only be brought by participants or beneficiaries in ERISA plans who have been denied a benefit and appealed that denial, thereby exhausting their administrative remedies.  RICO plaintiffs must have suffered damages in their business or property by reason of the violative practices.  It is "hateful" for those who do not satisfy due process requirements to compromise the claims of the class.  To do so in secret might require use of the other foot.

[3] This subsection, primarily regarding John Seney, also contains facts and argument pertaining to Jeffrey Weintraub and Alan John Silver.  In addition, separate sections are devoted to Silver and Weintraub.

On September 21, 2009, Judge Hochberg entered an Order dismissing Seney's complaint without prejudice. Doc. 256, PageID: 6007.

On January 17, 2012, Magistrate Judge Patty Shwartz terminated a motion for withdrawal by "George K. Lange, Esq. as counsel for Plaintiff, John Seney, dated January 11, 2012." Doc. 813, PageID: 43358. The Court's Order stated in pertinent part: ". . . and plaintiff John Seney, having been dismissed from this case on September 21, 2009, (Order September 21, 2009, ECF No. 256) . . . IT IS ON THIS 17TH Day of January 2012, ORDERED that the motion for withdrawal of George K. Lange [ECF Nos. 813 and 816] is terminated as unnecessary." Doc. 817, PageID: 43372. Predicated on Judge Shwartz's Order, Carella Byrne and Seeger Weiss also ceased to be counsel for Seney when his action was dismissed on September 21, 2009.

The dismissal of John Seney's action was vetted and discussed by Plaintiffs and Defendant Aetna in advance of the filing on September 18, 2009:

(a)  On August 21, 2009, D. Brian Hufford wrote to Aetna's counsel, Richard J. Doren, with copies to all Plaintiffs' Counsel stating that "we are advised by Mr. Seney's counsel that he will not continue to participate as a plaintiff in this litigation, and, accordingly, no Rule 26(a)(1) disclosure has been served as to this plaintiff." Quackenbos Cert. Exh. 2.

(b)  On August 25, 2009, Mr. Doren, on behalf of Aetna, replied to Mr. Hufford confirming the statements in Mr. Hufford's letter ". . . in which you state that John Seney does not wish to pursue his claims in either *Seney v. Aetna Health, Inc., P.A. Corp.*, Case No. 09-CV-6039 or in MDL 2020." Aetna's counsel further replied to Pomerantz:

> To accommodate the termination of [Seney's] participation in this litigation, **and to eliminate his obligation to provide initial disclosures**, we have drafted the attached Notice of Dismissal, and ask that it be executed and filed with the Court immediately. (emphasis added) Quackenbos Cert. Exh. 3.

(c)     On August 28, 2009, a meet and confer was held, memorialized by a September 1, 2009, email message from Gibson, Dunn to Pomerantz and forwarded the same day to Plaintiffs' counsel on the Aetna MDL Executive Committee. The memorialization stated in part:

> Additionally, on Friday [August 28, 2009], [D. Brian Hufford] and Jim Cecchi stated that the dismissal of plaintiff Seney would be forthcoming. Thank you in advance for your prompt attention to this mater. Quackenbos Cert. Ex. 4.

(d)     On September 9, 2009, Aetna filed its Motion to Dismiss the Joint Consolidated Amended Complaint. A footnote to its summary of grounds for dismissing various counts as to specific plaintiffs, stated in relevant part:

> Aetna's motion to dismiss does not respond to Plaintiff Seney's claims because Seney has stated that he will not continue to participate as a plaintiff in this litigation. Seney has agreed to stipulate to this fact.

Doc. 249-1 at 5 n. 3, PageID: 4818-19.

On December 24, 2009, a Second Joint Consolidated Amended Class Action Complaint ("SAC"), was filed. Doc. 319. It identified John Seney as a Subscriber Plaintiff. *Id.*, ¶¶ 353-358. It was ineffective to revive his complaint. Under clearly established Third Circuit case law, a district court does not retain jurisdiction over a case following a voluntary dismissal. *In re Bath and Kitchen*

*Fixtures Antitrust Litig.*, 535 F.3d 161 (3d Cir. 2008). The Third Circuit held that a voluntary dismissal under Fed.R.Civ.P. 41 is "automatic" and "invites no response from the district court and permits no interference by it." *Id.* at 165.

In *Franco v. CIGNA*, Civil Action No. 2:07-cv-6039 (SRC)(PS), June 30, 2010, the Court applied this precedent in an "Opinion and Order" on CIGNA's motion to strike plaintiff Stephanie Higashi's attempted withdrawal of her notice of voluntary dismissal. The Court explained "this motion turns on the force of Higashi's voluntary notice of dismissal of her claims without prejudice and the effect, if any, of her attempt to withdraw that notice days after it was filed." Civil Action No. 2:07-cv-6039-SAC-PS, Doc. 427, PageID:  12351, filed 6/30/10. As this Court held:

> At the moment it is filed the notice of dismissal
> extinguishes the action and, moreover, deprives the Court
> of jurisdiction over any further proceedings in regard to
> the action. . . . and . . . because it ceased to exist upon
> Higashi's filing of her notice of voluntary dismissal on
> January 8, 2010, all proceedings after that dismissal
> attempting to revive the Higashi Complaint and/or to
> pursue the merits of the Higashi action are null and void.

*Id.* Doc. 427, PageID:  12352. The attempt to "revive" Seney's claim(s) after September 18, 2009 – when Seney filed his Notice of Dismissal – by naming him in the Second Amended Complaint, was "null and void."

On November 8, 2010, (five months after the issuance of this Court's opinion in *Higashi*, and eleven months after the December 24, 2009 filing of the

6

Second Amended Complaint) Plaintiffs filed their Motion for Class Certification, seeking the appointment of "the moving Plaintiffs as class representatives of the respective classes . . ." Doc. 634-1, PageID: 22393, 22397. Neither John Seney or Alan John Silver were identified in that motion as a "moving" or "Subscriber Plaintiff" or for that matter as a plaintiff at all. They were omitted from the pleading because they were not parties in the action. That motion was signed by all plaintiffs' counsel, including James Cecchi and Steven Weiss.[4] The Notice of Motion and the attached Schedule A identify the Subscriber "moving Plaintiffs" as [Wilentz Clients] "Michele Cooper, Michele Werner, Darlery Franco, Paul and Sharon Smith, and Carolyn Samit, and Jeffrey M. Weintraub [Scott+Scott client] (collectively, 'Subscriber Plaintiffs')".

> a. Robert J. Axelrod's Corrected Declaration filed on behalf of plaintiffs in support of the motion (Doc. 644) sets forth the identical moving and Subscriber Plaintiffs and proposed classes as in the Notice of Motion:
>
> 110. The following **Plaintiffs bring this motion**:
>
>> **Subscriber Plaintiffs:** Michele Cooper, Michele Werner, Darlery Franco, Paul and Sharon Smith, Carolyn Samit, and Jeffrey M. Weintraub (collectively, 'Subscriber Plaintiffs'); . . .

---

[4] Seney had not exhausted his administrative remedies, as required for named plaintiffs in ERISA class actions. *Thomas v. SmithKline Beecham, Corp.*, 201 F.R.D. 386, 395 (E.D.Pa. 2001). *See* Epstein Cert. at ¶ 9.

111. Subscriber Plaintiffs Werner, Franco, and the Smiths seek to be class representatives of an 'Subscriber ERISA Class,' defined as . . .

112. Subscriber Plaintiffs Cooper and Samit seek to be class representatives of a 'Subscriber New Jersey SEHP and Individual Plan Class,' defined as . . .[5]

114. Each of the Subscriber Plaintiffs **except Weintraub** seeks to be class representatives of a 'Subscriber RICO Section 664 Subclass,' defined as . . . (emphasis added)

115-116 Weintraub sought to be a class representative of a Subscriber "Non-ERISA Class" defined as follows:

> All persons who, are or were, from April 29, 2004 through the present ('Non-ERISA Class Period') Members in any plan insured or administered by Aetna, which was not subject to nor governed by ERISA, who received hospital or medical services or supplies from a Non-par provider for which Aetna (or any third party acting on behalf of Aetna) allowed less than the provider's billed charges in determining benefits.

Doc. 644, PageID: 24571-72.

2. Alan John Silver

On January 12, 2010, Alan John Silver and MaryEllen Silver filed a class action complaint in the U.S. District Court for the Northern District of California. The Silvers' action was transferred to MDL 2020 as a tag-along case. According

---

[5] Representative Subscriber Plaintiffs Cooper, Werner, and Franco, the Smiths and Carolyn Samit have actively participated in this litigation since its inception, including being deposed by Aetna's counsel. They testified as to their R&C claims, the underpaid benefits and appeals denied by Aetna.

to the Silvers' complaint, MaryEllen Silver is insured under a self-insured plan through New York Life Insurance Company that is administered by Aetna. The only benefit denial alleged in the complaint was as to Mrs. Silver's son, Aaron Christopher Silver. He is described as a "covered dependent on Mrs. Silver's policy." Silver Complaint ¶ 156, Case 2:10-cv-00721-SRC-PS, Doc. 1, PageID: 38, Filed 01/12/10. The Silvers specifically advised Aetna that Alan John Silver was a Medicare beneficiary, and that MaryEllen Silver's "coverage was made separate under her name (MaryEllen Silver)" and the Silvers' two sons "are covered under [MaryEllen's] plan." Silver 00321, Quackenbos Cert. Exh. 5. As a consequence, MaryEllen Silver's "Medical Benefits Request" to Aetna lists her as the insured, and gives her ID number. Silver 00322; Quackenbos Cert. Exh. 5. All of the HCFA 1500 claim forms submitted to Aetna at issue in this case list MaryEllen Silver alone as the insured; provide her "insured ID", list her date of birth as the "insured DOB" and otherwise refer to her as the sole insured. Silver 00305-13, Quackenbos Cert. Exh. 5. It is clear that Alan John Silver is a Medicare beneficiary who does not have an ERISA claim. Neither of the Silvers was deposed by Aetna in their tag-along case. Case No. 2:10-cv-00721-SRC-PS, Doc. 1.

Aetna represented to the Court: "Alan John Silver and Ellen Silver have not participated meaningfully in this litigation, and would therefore not be adequate

class representatives." Doc. 673 at 71-72 n. 46, Page ID 28311-12.[6] Due process requires "meaningful participation in the litigation." *See* pp. 16-18, *infra*. Movants were aware of Alan John Silver's inadequacy – and the consequent due process violation posed by his purported representation – when he was defined in the proposed settlement as a representative plaintiff for subscribers.[7]  Contrary to Movants' certification, Alan John Silver is **not** an adequate representative plaintiff for this proposed settlement.

    3.   Jeffrey Weintraub

Jeffrey Weintraub was a subscriber in Aetna's (non-ERISA) student health plan through an Aetna affiliate formerly known as Chickering (now know as Aetna Student Health).  The SAC makes clear that Weintraub is "**not** an ERISA class member." Doc. 319, ¶¶ 729-732, 739-740, 744-748, 757-759, PageID: 7329, 7331-35.

---

[6] Defendant Aetna's November 15, 2010, Opposition to Plaintiffs' Motion for Class Certification (Doc. 673) relied on Plaintiffs' representation to Magistrate Judge Patty Shwartz (Doc. 392) that plaintiffs in tag-along actions, including the Silvers, are **not** seeking to be class representatives.

[7] Mr. Silver's counsel, who signed on to this motion, were likewise inactive. In the more than five years this case has been pending in the District of New Jersey, Silver's counsel never attended a mediation or a court conference or a deposition or drafted a brief section or participated in this action in any way, other than being compelled to provide certain written (document) discovery. Silver's counsel were uninvolved in this litigation until Alan John Silver was suddenly inserted as a "representative plaintiff" in the proposed settlement.

He was identified as a class representative for a national "Non-ERISA Class" for the class period beginning April 29, 2004. The subclass was defined as subscribers in plans not subject to nor governed by ERISA. *Id.* Weintraub Dep. Tr. 88:17-23; 149:17-150:22; 178:13-24, 03/01/10 attached as Quackenbos Cert. Exh. 6. Evidence produced by Aetna made it clear Weintraub's **only** claim arose from Aetna's use of **outdated** Ingenix data. Aetna's legal counsel ordered a reprocessing of claims that had been paid using an outdated version of Ingenix data by an Aetna subsidiary (called Chickering). Ingenix advised the Court on July 3, 2010:

> The result of [Aetna's] reprocessing was, among other things, that Weintraub received a check, either from Aetna or Chickering, for at least the $6.89 reduction Chickering previously had applied. Weintraub acknowledged having received the check.

*See* UnitedHealthGroup Incorporated's and Ingenix Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, Case No. 2:07-cv-03541-FSH-PS, Doc. 472 Filed 07/03/10, page 23. Weintraub confirmed Aetna's representation testifying that he believed he received the check for "$6 and something cents . . . related to a settlement between Aetna and the New York Attorney General." Weintraub Dep. Tr. 149:25-150:11 (Quackenbos Cert. Exh. 6.) This evidence demonstrates that Weintraub's payment was not based on the Ingenix database, but on the use of out-dated Ingenix data.

11

In *Agostino v. Quest*, 256 F.R.D. 437, (D.N.J. 2009), this Court denied class certification on a Medicare Part B class, finding the proposed Representative Plaintiff was not typical or adequate:

> Furthermore, Ms. Cassese's claims are based on a markedly different legal theory than the claims of the Subclasses. . . . *See, Beck*, 457 F.3d at 300 ('A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation.

*Id.* at 478. Weintraub has no claim challenging Aetna's use of the Ingenix database itself was not compliant with plan terms. Weintraub conceded that Aetna did **not** breach the R&C definition in his student plan.

> Q. Sitting here today, do you believe that Aetna's reimbursements under the NYU Student Health Plan reimbursements breached this provision defining reasonable charge?
>
> A. Not based on this definition. No.

Exh. ___, Weintraub Dep. Tr. 63:25-64:6. (Quackenbos Cert., Exh. 6.)

Therefore, one of the central claims in this class action – that Aetna's use of the Ingenix database is invalid – is **not** a claim Weintraub possesses or can assert. It is undisputed that as a student Weintraub has no ERISA or RICO claim. With no existing cause of action, Weintraub is inadequate as a matter of law.

**B.   THE COURT LACKS "JURISDICTION" OR "POWER" TO DECIDE THE MOTION FOR CLASS CERTIFICATION AND PRELIMINARY APPROVAL MADE BY JOHN SENEY**

The Proposed Order submitted by Movants states that "The Court has personal jurisdiction over the Representative Plaintiffs. . . ." Doc. 839.3, PageID: 44007. This statement is inaccurate. As of September 21, 2009, the Court lacked jurisdiction over Seney. As this Court held with regard to Dr. Higashi: A voluntary notice of dismissal "deprives the district court of jurisdiction to decide the merits of the case." *In re Bath and Kitchen*, 535 F.3d at 166 (*quoting* Wright & Miller, *Federal Practice & Procedure* "'After the dismissal, the action no longer is pending in the district court and no further proceedings in the action are proper'"). *See also Schering Corp. v. Vitarine Pharm. Inc.,* 889 F.2d 490, 495 (3d Cir. 1989) (following a voluntary dismissal, the plaintiff's "dispute vanishes"); *Clark v. City of Coatesville,* 2007 U.S. Dist. LEXIS 71244 *4 (E.D.Pa. Sept. 25, 2007). Thus, this Court lacks "jurisdiction" to determine Seney's motion for class certification and for preliminary approval of the settlement.

**C.   MOVING PLAINTIFFS DO NOT SATISFY THE SAFEGUARDS REQUIRED TO PROTECT THE DUE PROCESS RIGHTS OF ABSENT CLASS MEMBERS**

A class action judgment has a preclusive effect on absent class members that often have no idea that litigation is pending – much less that a settlement and release of their past and future claims have been reached. As a result, this Court

maintains a fiduciary responsibility to class members to ensure that all Rule 23 due process and other requirements have been satisfied. *Georgine v. Amchem Prods*, 83 F.3d 610 (3d Cir.) *aff'd*, 521 U.S. 591 (1996).

1.    Settlement-Only Classes Are Subject To Heightened Scrutiny And Must Be Scrupulously Reviewed

The Supreme Court and Third Circuit have repeatedly emphasized that settlement-only class certifications must be scrupulously reviewed for the potential violation(s) of due process rights of absent class members. Where (as here) settlement negotiations precede class certification and settlement approval and class certification are sought simultaneously, district courts must be "even more scrupulous than usual" in evaluating the fairness of the settlement. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) (quoting *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 805 (3d Cir. 1995).

In *In re GMC*, the Third Circuit held that Rule 23(a) is the primary safeguard to ensure absent class members' due process:

> [Rule 23(a)] thus represents a measured response to the issues of how the due process rights of absentee interests can be protected and how absentees' represented status can be reconciled with a litigation system premised on traditional bipolar litigation.

*In re GMC*, 55 F.3d at 785.

In *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006), the court held:

14

> Adequacy is twofold:  the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members.

*Id.* (citations omitted).  A leading treatise on class actions states:

> Rule 23(a)(4), the 'adequacy of representation' requirement, provides that the representative parties must fairly and adequately advance and protect the legal rights of absent class members.  The adequacy of the class is the linchpin to securing preclusive effect of the class proceedings as to absent members; it is their adequate representation that justifies according them the status of parties for purposes of preclusion.  (Citing *Taylor v. Sturgell*, 553 U.S. 880 (2008)).

McLaughlin on Class Actions, § 4.26 at 742-43(2011).

### 2. Adequacy Requires The Presence Of A Class Representative With A Live –Existing Case Or Controversy Against Defendant

A class representative must have a live, existing case or controversy against

the defendant.  *O'Shea v. Littleton*, 414 U.S. 488, 494, 504 (1974) held that:

> There must be . . . [A]n existing case or controversy . . . for adjudication. . . . [i]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.

494.  In *Sosna v. Iowa,* 419 U.S. 393, 402 (1975), the Supreme Court explained the

Article III "live . . . case or controversy" requirement:

> There must not only be a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class action is certified by the District

> Court pursuant to Rule 23, but there must be a live
> controversy at the time this Court reviews the case.

*Sosna* held that a named plaintiff in a class action must show the "real and immediate" threat of injury, and **must be a member of the class which he or she seeks to** represent at the time the class action is certified by the district court. *Id.* at 403. Only when the class representative has satisfied these "**elements of justiciability**" does the focus shift to determine whether the named representative will adequately protect the interests of the class under Rule 23(a). (Emphasis added.)

Seney dismissed his case in 2009, and has no "live" action of any kind that can be considered for class certification or any other purpose. Silver is a Medicare beneficiary with no "live" ERISA or RICO action. Weintraub's only claim was for outdated Ingenix data. He never had or brought an ERISA or RICO case. In violation of due process principles requiring a "live . . . existing" cause of action, none of the named "Representative Plaintiffs" has an ERISA or RICO claim. Indeed, none has any cause of action in this litigation.

### 3. Due Process Requires That A Class Representative Has At All Times Actively Participated In The Litigation

In *Taylor v. Sturgell*, the Supreme Court held:

> In a class action . . . a person not named as a party may
> be bound by a judgment on the merits of the action, if she
> was **adequately represented by a party who actively
> participated in the litigation.**

*Sturgell*, 553 U.S. at 884. (Emphasis added.)

In *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985), the Supreme Court set forth the same imperative:

> Finally, the Due Process Clause of course requires that the **named plaintiff at all times adequately represent the interests** of the absent class members.

*Id.* (Emphasis added.)

Under the Supreme Court's explicit holdings a class member is not bound by a judgment unless class members interests *at all times* adequately represent[ed] by a *party who actively participated in the litigation.* Since, as demonstrated above, there are no representative plaintiffs in the proposed settlement with live ERISA or RICO cases against defendant Aetna, none of the Movants has adequately represented the class by actively participating in the ERISA and RICO actions.

The Silvers in a tag-along case did not actively participate in the class action at any time. As a result, they did not "adequately represent the interests of absent [ERISA and RICO] class members." *Id.*[8] Neither the Silvers or any of the other

---

[8] The Silver action was considered a "later filed action" pursuant to CMO No. 1 (1)(b). Under that provision "cases filed in other districts but transferred here, pursuant to Order of the MDL Panel shall be **consolidated** for pretrial proceedings." Doc. 212, PageID: 4159, Filed 06/16/2009. Pursuant to CMO No. 4, Aetna could take discovery in the tag-along action, but the Silvers were not deposed and could not take discovery of Aetna. Doc. 336, PageID: 7429.

The act of consolidation is ministerial and does **not** merge the plaintiffs, nor the suits into one action. In *Johnson v. Manhattan RR. Co.*, 289 U.S. 479, 496-97 (1933); the Supreme Court held, "consolidation is permitted as a matter of

purported representative subscriber plaintiffs actively participated in the ERISA or

RICO actions.  Therefore, none satisfies due process requirements.

### 4.   A Class Representative Must Have The Same Action As The Class And Have Suffered The Same Injury Claim As Class Members

A class member who does **not** have the same action as the class cannot

adequately represent absent class members.  The class representative must be part

of the class with the same interest and injury as the class members he or she seeks

to represent:

> We have repeatedly held that 'a class representative must
> be part of the class and possess the same interest and
> suffer the same injury' as the class members.

*Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156 (1982) (*citing East Texas*

*Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).  The Court in

*Falcon* ruled that a plaintiff who had been hired (but not promoted) was unable to

represent a class of people who had never been hired in the first place.   The

Supreme Court noted that in *East Texas Motor Freight*, approval of a class action

was plain error because the named plaintiffs were not eligible to represent the class

they purported to represent:

---

convenience and economy in administration, but does not merge the suits into a
single cause, or change the rights of the parties, or make those who are parties in
one suit parties in another." *Newfound Mgmt. Corp. v. Lewis*, 131 F.3d 108, 116
(3d Cir. 1997)  held *Johnson* is the "authoritative statement on the law of
consolidation."

18

> Because at the time the class was certified it was clear
> that the named plaintiffs were not qualified for line-
> driver positions, 'they could have suffered no injury as a
> result of the allegedly discriminatory practices, and they
> were, therefore, simply not eligible to represent a class of
> persons who did allegedly suffer injury.

*Falcon*, 457 U.S. at 156.[9]  *Accord Sosna v. Iowa*, 419 U.S. at 403 ("A litigant must

be a member of the class which he or she seeks to represent *at the time the class*

*action is certified by the district court"*) (emphasis added; citations omitted).

A proposed class representative who has not suffered the same injury as the

class does not have standing to assert a class claim. *Simon v. E. Ky. Welfare Rights*

*Org.*, 426 U.S. 26, 40 n.20 (1976) (a class representative must "allege and show

that they personally have been injured, not that injury has been suffered by other,

unidentified members of the class to which they belong and which they purport to

represent"). *Accord Pichler v. UNITE*, 228 F.R.D. 230, 251-252 (E.D. Pa. 2005),

*aff'd*, 542 F.3d 380 (3d Cir. 2008), *cert. denied*, 556 U.S. 1227 (2009).

As the Supreme Court has recognized, "[ERISA] § 502(a) itself

demonstrates Congress' care in delineating the universe of plaintiffs who may

bring certain civil actions." *Harris Trust & Sav. Bank v. Salomon Smith Barney,*

*Inc.*, 530 U.S. 238, 247 (2000).  One who is not a part of that universe simply

---

[9] In *Falcon,* the Supreme Court further noted that the district court failed "to evaluate carefully
the legitimacy of the named plaintiff's plea that he is a proper class representative under Rule
23(a)," noting that "sometimes it may be necessary for the court to probe behind the pleadings"
to determine the adequacy of the class representative. 457 U.S. at 160.

cannot serve as an adequate class representative of subscribers who have ERISA claims. *See Falcon*, 457 U.S. at 156.

Here, for the reasons previously expressed, neither Seney, Silver or Weintraub are part of the class or have suffered the same injury or have the same interest as the ERISA and RICO class members. They lack standing to be an ERISA or RICO Representative Plaintiff.

5.     <u>There Must Be An Alignment Between The Class Representative(s) And The Claims Of The Absent Class Members</u>

"Adequacy" requires an alignment of interests and incentives between the class representative(s) and the class members. In *Dewey v. Volkswagen*, 681 F.3d 170 (3d Cir. 2012), the Third Circuit recently overturned a settlement because there were no representative plaintiffs representing the interests of the "residual" group (those individuals whose damage was speculative and future). *Id.* at 181-190. *See also Georgine v. Amchem Prods., Inc.,* 83 F.3d at 630; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). Here, for the reasons expressed, the interests of Seney, Silver and Weintraub did not align with the interests of the ERISA and RICO class.

6.     <u>Movants Do Not Analyze the Adequacy Of The Proposed Representative Subscriber Plaintiffs To Satisfy Due Process Requirements</u>

Movants' brief in support of the proposed settlement presents no facts or arguments addressing the due process adequacy of their proposed "Representative

Plaintiffs". Movants merely recite their names – Seney, Weintraub and Silver – and mouth the requirements without any facts or record citations. Movants state they have "typical" claims and will "fairly and adequately protect the interest of the class" because they "share common interests with respect to their challenges to Aetna's reimbursement practices." Doc. 839-1 at 11, PageID: 43916. The applicable due process precedents were not cited to this Court. Tellingly, the fact that the Representative Plaintiffs do not have ERISA or RICO causes of action was not disclosed to the Court. None of these purported representatives has a valid claim and none is adequate.

Movants curiously cite *Beck v. Maximus, Inc.,* 457 F.3d 291, 295 (3d Cir. 2006) for the Rule 23(a)(4) adequacy standard. Doc. 839-1, PageID: 43917. *Beck* reversed and remanded a class certification decision for a more thorough consideration of the asserted defense to plaintiff's claim and her possible inadequacy as a class representative.[10] 457 F.3d at 301.

---

[10] In *Beck,* the plaintiff's employer was sent the challenged collection letter in error. She coincidentally had the same name as the actual debtor who was the intended target of the letter. The defendant objected to certification, noting that a defense unique to her claim (a defense of bona fide error) could preclude her recovery on class claims and thereby render her representation of the class inadequate. 457 F.3d. at 301.

7.     The Three Purported Class Representatives And Their Attorneys Cannot Share In Any Class Recovery

Since Seney, Silver, and Weintraub are not part of the ERISA or RICO class and cannot share in any class recovery for those claims.  The effort to settle the ERISA and RICO class actions (for a generous fee) must be rejected.

**D.     THE PROPOSED SETTLEMENT IS SUBJECT TO SCRUPULOUS AND HEIGHTENED SCRUTINY**

The Third Circuit recognizes that settlement negotiations occurring prior to a class certification determination pose the "possibility of negotiation from a position of weakness by the attorney who purports to represent the class." *In re GMC*, 55 F.3d at 788 (citations omitted.)  Pre-certification settlement negotiations by a subset of counsel deny "other plaintiffs' counsel information that is necessary for them to make an effective evaluation of the fairness of any settlement that results" – exactly as occurred here.  55 F.3d at 788.

Delaying class certification until a motion for preliminary approval of a settlement increases the "principal danger of collusion." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 336-37 (3d Cir. 2011).  It therefore requires "heightened attention." *Amchem,* 521 U.S. at 620.  The Supreme Court has observed the availability of a legal fee may diminish advocacy:

> In a strictly rational world, plaintiffs' counsel would always press for the limit of what the defense would pay. But with an enormous fee within counsel's grasp, zeal for

the client may relax sooner than it would in a case
brought on behalf of one claimant.

*Ortiz*, 527 U.S. at 853 n. 30.

## E.   IN ADDITION TO BEING PROCEDURALLY VIOLATIVE, THE SETTLEMENT TERMS ARE ONEROUS AND UNCONSCIONABLE AND SHOULD NOT BE PRELIMINARILY APPROVED

This Court has the discretion to employ procedures that will enable it to
evaluate the fairness of a settlement. *In re Community Bank of Northern Virginia*,
418 F.3d 277, 318 (3d Cir. 2005) (noting court must exercise its fiduciary duty to
ensure the procedural fairness of a settlement). This Court may wish to apply the
three criteria the *Zimmerman* Court set forth for analyzing whether preliminary
approval of a settlement is appropriate:   1) is it the result of good faith
negotiations?; 2) are there obvious deficiencies?; and 3) does the settlement fall
within the range of reason? 2011 U.S. Dist. LEXIS 2161 *7.

The proposed settlement fails under *Zimmerman*, and also fails under the
final approval facts cited in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), as
supplemented by *In re Prudential Ins. Co. of Am. Sales Practice Litig*, 148 F.3d
283, 323 (3d Cir. 1998). It would be a waste of a substantial effort as well as
imposing unnecessary cost and confusion to the class to send out notice as to a
preliminary settlement that cannot be finally approved under *Girsch*. In *Fields v.*
*Wise Media, LLC*, 2012 U.S. Dist. LEXIS 178894 (N.D.Cal. Dec. 18, 2012), Judge
Alsup elucidated 13 factors that should be considered in determining whether to

grant preliminary approval to the settlement. Those factors also weigh strongly against approval of the proposed settlement.

1.   There Were No Good Faith Negotiations

There were no good faith negotiations because the Representative Plaintiffs for Subscribers were inadequate as detailed herein. The Adequate Plaintiffs were excluded from the table. This left only dramatically inadequate plaintiffs who, by definition, could not engage in good faith negotiations.

Here, Movants' deliberate violation of this Court's order precludes a finding that the proposed settlement is the result of "good faith" negotiations by the parties. Movants intentionally violated CMO No. 2. Doc. 236, PageID: 4687; *see*, *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir. 1979) (invalidating negotiation of a settlement in violation of a court order); *In re Warfarin*, 391 F.3d at 525 (adequate structural protections where CMO was adhered to); *In re Community Bank of Northern Virginia,* 418 F.3d at 320 n.37 (3d Cir. 2005); *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir. 1971); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *Reynolds v. Benefit Nat'l Bank*, 288 F.3d 277, 282-283 (7th Cir. 2002) (defining a "reverse auction" as a defendant selecting the most ineffectual class counsel to negotiate the cheapest settlement in the hopes that the district court will approve it).

Significantly, two of the law firms (Scott+Scott and Pomerantz) that participated in Movants' violation of CMO No. 2 in this case – were themselves excluded from settlement discussions in *Moore v. Halliburton Co.,* 2004 U.S. Dist. LEXIS 18187 (N.D. Tex. Sept. 9, 2004). They argued that their exclusion from settlement discussions was a violation of due process. Even in the absence of an Order comparable to CMO No. 2, the Court invalidated the settlement and noted that the class was deprived of the expertise and perspective of the lead plaintiffs who were excluded from the decision-making process:

> The Court is dismayed that Lead Counsel here felt at liberty to exclude any of the Lead Plaintiffs from significant involvement in material activities in the case, which settlement surely is. No one can know how active involvement of [the excluded plaintiff] in the negotiations might have affected the outcome of the negotiations.

2004 U.S. Dist. LEXIS 18187 at 26-27.

Because Movants intentionally violated CMO No. 2, there were no good faith negotiations as a matter of law. Movants submit no factual or record evidence to support their conclusory assertion that their negotiations were in "good faith." Given Movants' distortion that a mediator was involved – when Judge Politan predeceased the proposed settlement by almost a year – Movants' assertions cannot be presumed to be accurate. Similarly, Movants' assertions of

25

"no collusion" and arms length negotiations are unsupported by the record and are not certified.

## F. THE NEED FOR PROOFS ON ADEQUACY, ALLOCATIONS, CAPS AND RANGE OF REASONABLENESS UNDER *ZIMMERMAN* FACTORS 2 AND 3

To obtain preliminary approval of this settlement Movants must present proofs demonstrating that the settlement fund is adequate, the allocations and caps are fair and the settlement is within the range of reasonableness. *In re Pet Foods Prods. Liab. Litig.*, 629 F.3d 333, 354-55 (3d Cir. 2010); *see also Girsh*, 521 F.2d at 156-57.

Movants' brief states it has produced "massive amounts of claims data". Movants' Brief, at p. 3, Doc. 839-1, PageID:  43908.   This data, available on Aetna's computerized system, was not quantified and presented to this Court in Aetna's brief requesting preliminary approval.   Movants have not quantified damages or presented this or any other proof or basis to establish the adequacy of the fund or the justification for the allocations and caps set forth in the proposed settlement.   After learning of the settlement – and being asked to join in it because they were the only adequate Subscriber Representative Plaintiffs in the action – Adequate Plaintiffs' specifically requested information disclosing how Movants arrived at their proposed settlement fund, allocations, and caps.   Movants refused to provide it.   Epstein Cert. ¶¶ 13-15, 18, 22, 24-28; EPSTEIN 2-9.

In *Pet Foods*, the Third Circuit rejected and remanded a settlement that was approved by the District Court, for failure of the settling parties to provide proofs that would allow the court to evaluate how  allocations and caps were established in their proposed settlement.  The Court held:

> We have explained that "in cases primarily seeking monetary relief," district courts should compare "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing . . . with the amount of the proposed settlement." *Gen. Motors Corp.*, 55 F.3d at 806 (quoting Manual for Complex Litigation (Second) § 30.44, at 252 (1985)); *Prudential*, 148 F.3d at 322. "This figure should generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside." *Gen. Motors Corp.*, 55 F.3d at 806. . . .
>
> If available, this information would have enabled the court to make **the required value comparisons and generate a range of reasonableness to determine the adequacy of the settlement amount.** *Cf. Warfarin*, 391 F.3d at 538 (settlement fund represented 33% of available damages); *Cendant*, 264 F.3d at 241 (settlement represented 36-37% of damages). . . .
>
> On remand, the settling parties should either produce the relevant information or demonstrate that it is unavailable or that producing it would be unfeasible.

*In re Pet Food Products Liability Litigation*, 629 F.3d at 354-356.  (Emphasis added.)

On  subsequent  appeal,  after  remand,  the  court  obtained  the  relevant information from the settling parties, and was able to determine that the settlement

provided "a 43.6% percent recovery for product purchase claims. . . ." The Court concluded that such a recovery was within the required "range of reasonableness" and thereby approved the settlement. *In re Pet Food,* 2011 U.S. Dist. LEXIS 38181, *56 (D.N.J. April 5, 2011).

Notwithstanding their failure to identify, quantify and disclose the amount of damages upon which this purported settlement is based, the settlement proponents claim the proposed settlement falls within the range of reason because there "are significant funds available to members of both settlement classes." (Movants' Brief, Doc. 839-1, PageID: 43920). Movants do not support this assertion nor provide any factual support for it. A finding of "significant funds" requires comparison to the total amount of damages. Here, Aetna has had the exact damage amounts at its disposal, but no numbers are presented here, rendering the proposed settlement fatally deficient.

As set forth in the proposed settlement agreement, "released claims include, without limitation, any claims challenging the use of the Ingenix database, a percentage of Medicare, Fair Health, Inc., average wholesale price ("AWP"), adjustments for assistant surgeon charges, adjustment for co-surgeon charges, adjustments based upon multiple surgical procedures, and behavioral health tiering policies." Doc. 839-2, PageID: 43942-43, 43975-77, §§1.42, 13.1 Omitted from

the specified release obligations, but included in the general release description, is Aetna's use of its own internal database to determine R&C.

Neither Settling Plaintiffs nor Defendant provide any evidence, expert or otherwise, to establish a range of reasonableness for the Court's consideration of the settlement fund itself or the basis upon which allocations and caps were established. A court is required to evaluate proofs which set forth the methodology utilized by the expert to determine the figures and a determination that the estimate proposed by the expert is reasonable. *Warfarin*, 391 F.3d at 538. The obligation of performing due diligence must be performed by these fiduciaries:

> Has class counsel performed due diligence (discovery and investigation) to learn the strength and best-case dollar amount of the class claim, including preparation of a final expert class damage report? Please remember that when one undertakes to act as a fiduciary on behalf of others (here, the proposed class), one must always perform adequate due diligence before acting.

*Fields*, 2012 U.S. Dist. LEXIS 178894 * 3.

Moreover, there is overwhelming difficulty, created by the prove-up and reversion provisions, in determining how much money class members will receive creating doubt the class can obtain the funds allocated. The reversion demonstrates Aetna has no intention of providing the bulk of these funds to subscribers. The damage analysis must include a calculation of the probable reversion to Aetna and diminution of the funds allocated to Subscribers.

Plaintiffs' expert Dr. Foreman calculated damages of use of Ingenix to be $3.1 billion on a "billed charge" analysis. Even under Dr. Foreman's conservative calculations based on an "accurate allowed amount" analysis, determine damages to be $2.09 billion. Quackenbos Cert. Exhs. 7-8, Table 42. Aetna has the capability within its own data to determine the exact amount of billed charge damages. Quackenbos Cert. Exh. 11-17. For settlement purposes, Movants are required to analyze and present a reasonable range of upper and lower levels of recovery and consider the amount of anticipated "reversion" to determine if the settlement is fair.

**G.   OPPOSING PLAINTIFFS' EFFORTS TO CONDUCT DUE DILIGENCE, SATISFY ITS FIDUCIARY OBLIGATIONS TO THE CLASS AND TO PROPERLY EVALUATE THE PROPOSED SETTLEMENT**

After learning of the settlement, Wilentz sought to obtain damage information underlying the proposed settlement from the Movants. On December 10, 2012, in an effort to perform due diligence and fulfill the fiduciary obligations to the ERISA Subscriber Class and adequate named subscriber plaintiffs, counsel sought all of the Movants communications "relating to any analysis of the size of the class or the cost of administering the Purported Settlement Agreement; or the potential payment or percentage recovery by the Subscriber Class or individual class members; or  the number of members anticipated to apply; or difficulties in

complying with the prove-up; or any other critiques (good or bad) of the 12/7/12

Settlement Agreement." Epstein Cert. ¶ 25; *see also* EPSTEIN 6.

Additionally, by email dated December 11, 2012, Wilentz sent a "Fiduciary

ERISA Class Representatives Request for Data on Damages to Settling Plaintiffs."

Epstein Cert. ¶ 26; *see also* EPSTEIN 7.   On that date Wilentz once again

requested damage calculations, stating:

> Attached is a document requesting damage calculations
> that you obtained or used or were aware of during your
> secret negotiations with Aetna.   We seek information
> with regard to the amount of benefit reductions Aetna
> imposed on the subscriber class by using Medicare; its
> own fee schedule . . . use of "tiering" so as to reduce
> mental health benefits . . . Aetna's use of average
> wholesale price for drugs sold at retail; and Aetna's
> benefit reductions resulting from use of Ingenix. . . . 6.
> <u>Request for damages information by Fiduciary</u>
> <u>Subscriber Class Representatives</u>.   As part of your due
> diligence in evaluating the settlement you entered into
> without Fiduciary Representative Subscribers and their
> fiduciary counsel, please provide the amount of reduction
> from billed charges that Aetna provided to you or that
> you used or estimated or that you calculated or were
> aware of or raised during your negotiation on behalf of
> the subscriber class for the class period.   Kindly be
> specific as to the damages claimed or discussed as part of
> your secret negotiations.

*Id.*

The December 11, 2012, document included an analysis of Plaintiffs'

existing discovery of Aetna's use of ". . . Medicare which its documents admit did

not comply with plan terms and its [Aetna] witness called unethical." *Id.*   The

31

Medicare methodology alone would reduce R&C payments <u>below</u> Ingenix charge data by approximately $226 million over the years 2003-2011. *Id.* and Quackenbos Cert. Exh. 18.

That December 11, 2012 document also included an analysis of discovery which demonstrated that Aetna used "tiering" or "averaging" for mental health benefits beginning in September of 2006 to reduce R&C ONET benefit payments for behavioral health care services. *Id.* and Quackenbos Cert. Exh. 19. Aetna's own "savings" analysis projected additional savings over and above Ingenix charge data to be 19.2 to 20 million dollars a year commencing in 2006 tolling $96 million for the class period. *Id.* and Quackenbos Cert. Exh. 19. **Aetna did not contest that both of these methods are non-compliant with plan terms. The $332 million dollars of reduced benefits from these benefit underpayments alone dwarfs the settlement.**[11]

Despite Adequate Plaintiffs' requests for Settling Plaintiffs' Due Diligence damage analysis, Settling Plaintiffs have refused to provide any damage information supporting their claim that the settlement amount is adequate or an

---

[11] Additionally, the December 11, 2012 Adequate Plaintiffs' due diligence document noted that additional damages would occur from use of "Aetna's own fee schedule which its medical director James Cross called "back room manipulations" and from Defendant's use of average wholesale price for medications. It included a request for Settling Plaintiffs due diligence damage assessments on these issues. Epstein Cert. ¶ 26; EPSTEIN 7; Quackenbos Cert. Exh. 20.

analysis of the probable recovery by the class as well as any estimation of the total number of class members.

**H. THE ALLOCATIONS, CAPS, AND SETTLEMENT FUNDS ARE ARBITRARY, UNREASONABLE AND UNJUSTIFIABLE AND THE CLAIMS ELIGIBILITY PROVE UP REQUIREMENTS AND REVERSION PROVISIONS ARE UNCONSCIONABLE**

Aside from failing to disclose the amount and the percentage of overall damages that will be available for distribution to the class, the proposed settlement sets up allocations and caps that have not been explained, justified, or based in a measured assessment of the class claims. Section § 9, of the agreement provides a General Settlement Fund of 60 Million which members submit a claim if the member can demonstrate allowed amount payments less than the billed charge. The member may seek compensation of a maximum of $40.00 per covered year without the need of the difficult prove up process. That fund will also pay the costs of administration, legal fees and legal costs, which will substantially reduce it. Whatever remains will be distributed equally between the Subscriber and Provider Prove Up Funds, subject to the reversionary provisions found in those funds. Doc. 839-2, PageID: 43956-59.

1. Failure to Conduct Due Diligence on the Amount of Settlement and Allocation Determinations in the Funds

Settling Plaintiffs and Defendant have not provided an analysis of the cost for the payment of Attorneys' Fees, Notice, and Administration that come out of

the General Settlement Fund. There is nothing in the record for the Court to properly assess whether this General Settlement Fund is adequate, whether the allocations and caps are fair and the settlement is within the range of reasonableness. *In Re: Pet Food Products Liability Litigation*, 629 F.3d at 354-55; *see also Girsh*, 521 F.2d at 156-57 (factors 8 and 9). Experience has shown that costs of Settlement Administration alone will consume a substantial percentage of the proposed settlement funds. For example, in *The American Medical Association, et. al. v. United HealthCare Corporation, et. al.*, the Settlement Administrator was paid in excess of seven million dollars. Case 1:00-cv-02800-LMM-GWG Document 589 Filed 02/03/12 Page 3 of 4, at ¶ 10.

The unreasonable and problematic arbitrary amounts, allocations, caps, impossible claim requirements, and the reversionary provisions in the Subscriber Prove Up Fund are not explained or justified.

### 2. The Unconscionable Requirements to Establish Eligibility Under the Prove Up Fund

§ 10. **Prove-Up Funds** – 60 million dollars – will revert to Aetna if not proved-up by Subscribers and Providers subject to the prove-up fund provisions. Doc. 839-2 PageID: 43959. The notable provision regarding reversion is "[t]he Company will retain any funds not allocated to either Prove-Up Fund after the payment of all timely and valid claims." The Subscriber Prove Up Fund creates impossible barriers to establish eligibility for a claim. The Prove Up process set

34

forth in the "settlement agreement" is  designed to result in the funds being reverted back to Aetna:

> § 10.1. Subscriber Prove-Up Fund – "The $40 million available to pay Subscriber Prove-Up Claims <u>will not be submitted to the Escrow Account</u> established for the General Settlement Fund, <u>but rather will remain unsegregated</u> [sic] and in the possession of the Company until the Parties submit the Settlement Administrator's final report to the Court as described in Section 12.5." [Emphasis added].

Doc. 839-2, PageID: 43960.

§ 10.1(a). – Begins setting forth the burdens that Subscribers will have to meet to establish an eligible claim, which involve:  1)  Proof of receipt and payment of a balance bill;  2)  Proof that an assignment was not executed. Doc. 839-2, PageID: 43961.

§10.1(b). – Required Proof of Claim Form – the Subscriber must provide: 1)  Description and date of service;  2)  Patient and Provider;  3)  Original billed amount;  4)  Allowed Amount;  5)  Amount paid in response to balance bill;  6) If an assignment was executed or a balance bill was not received the claim is not eligible;  7)  Attestation under "penalty of perjury, that an assignment was not executed and the information in the claim is true and correct. Doc. 839-2, PageID: 43961-62.

§10.1(c). – Required "supporting documentation" include: 1)  A balance bill with a credit card statement or cancelled check;  2)  A receipt showing

35

payment with an "Explanation of Benefits" or other document showing Aetna's reimbursement for the Partially Allowed Claim(s); 3) or the Provider's business records showing payment of a balance bill; 4) Documentation confirming that the outstanding amounts do not relate to denied Claims, coinsurance, deductibles, or coordination of benefits. Failure to provide the required "supporting documents will result in the claim not being eligible and not being included in calculating the aggregate out-of-pocket payments required under Section 10.1(d)." Doc. 839-2, PageID: 43963.

Most members will have great (or more likely insurmountable) difficulty in being able to produce all of the information and records required. Most will be unable to swear under oath to detailed information as to services that may have occurred years ago.

This settlement requires claim proofs and detailed records that are not set forth or required by Aetna's plan terms. The Prove Up here requires getting business records from providers that are undefined.[12] The term balance bill does not exist in any plan and is not a prerequisite for receiving benefits under Aetna's plans. The Prove-Up process here discriminates against subscribers who cannot pay their providers (in addition to insurance payments).

---

[12] The doctor may be out of business; in a new practice; retired; dead; never sent balance bills; had a nurse or collector call, etc.

The complexity demanded by such a Prove Up is offensive and punitive. Few if any Subscribers will be able to satisfy this kind of detailed information for medical services which may have occurred years ago, over time, with multiple Explanations of Benefits ("EOBS"), and with the kind of confusing Reason Codes set forth in EOBs.[13]

The Prove Up process places the burden on the Subscriber to: 1) interpret the byzantine insurance calculations and Reason Codes found on Explanation of Benefits (for the miniscule number of subscribers who still have them); 2) calculate Defendant's application of deductibles, co-insurance, coordination of benefits, denied claims; 3) obtain detailed documents associated with services that occurred years ago, and which may have occurred over time; and 4) swear to accuracy of the detailed information and documents "under penalty of perjury." Such onerous requirements are unconscionable and the "settlement" should not be approved for this reason alone.   Anyone who has had out of network medical

---

[13] Consider Hurricane Sandy or Hurricane Katrina or Hurricane Irene or Midwest tornadoes or fire victims as well as the elderly or disabled or those who have moved.  As a practical matter, no  Subscriber would realistically keep and have access to the detailed records and information that are being required to establish eligibility in this proposed settlement. The class period goes back 11 years.   The burden to prove eligibility is designed to and will virtually guarantee the substantial "reversion" of funds.  This type of overreach is proof positive the class was not adequately represented.  It should be noted that "Reversion" is an understatement, since the funds never leave Defendant's "un-segregated" account in the first instance.

services knows the impossibility of the proposed settlement's claims eligibility "Prove Up" system. Doc. 839-2, PageID: 43960-63.

The Prove Up here is particularly offensive because discovery has shown that Defendant can retrieve all of the information from its "massive production of claims data" consisting of data it has available on its own system. Aetna has the ability to reprocess non-participating health care provider service claims based upon claim line data which can account for the details for every claim in the system and every unnecessary piece of proof it is requiring of insureds. Traceski Dep. Tr. 265:20-266:25, 7/8/10 (Quackenbos Cert., Exh. 9), Oglesby Dep. Tr. 5:4-6:25, 7/2/10; (Quackenbos Cert., Exh. 10), Werner Family Medical Claims, AET-04300031-42; (Quackenbos Cert., Exh. 11), Werner Family Dental Claims, AET-04300043; (Quackenbos Cert., Exh. 12), Cooper Family Claims, AET-04300044-57; (Quackenbos Cert., Exh. 13), Sharon Smith Claims, AET-04300058-67; (Quackenbos Cert., Exh. 14), Samit Claims, AET-04300068-139; (Quackenbos Cert., Exh. 15), Darlery Franco Claims, AET-04300140-143; (Quackenbos Cert., Exh. 16), Paul Smith Claims AET-04300144 (Quackenbos Cert., Exh. 17.)

In *Wachtel v. Guardian Life Ins. Co.*, (*"Health Net"*), Judge Hochberg found:

> If Health Net is found liable, Health Net could be required to use its computerized system to reprocess those claims as to which a reduction method was applied that was held to be undisclosed or otherwise improper.[37]

> *See Selby*, 197 F.R.D. at 59 (explaining that class action was the superior method of adjudication where an injunction could issue requiring the reprocessing of claims, resulting in proper payment without further court action).
>
> > [37] Health Net has already demonstrated its ability to use its computer system to determine beneficiaries affected by particular claims practices.

*Wachtel v. Guardian Life Ins. Co.*, 223 F.R.D. 196, 214 (D.N.J. 2004), **59 Aetna has produced detailed spreadsheets for the ERISA Subscriber Class Representatives its R&C payments, reductions off of billed charges, deductions for proper co-pays, co-insurance, and deductibles. Quackenbos Cert., Exhs. 11-17. Instead of Aetna reprocessing the claims based upon its complete records, Movants created an insurmountable process for Subscribers to prove eligibility for the Prove Up fund. Compelling Subscribers to recreate detailed records and confusing calculations of benefits goes beyond burdensome. This prove up process is designed to and will limit payouts to injured Subscribers and will deter Subscribers from submitting claims in the first place.

Again, serious consideration by the court must be given to the "NOTICE REGARDING FACTORS TO BE EVALUATED FOR ANY PROPOSED CLASS SETTLEMENT" which flags the problems presented by Reversions and burdensome claim procedures:

**CLAIM PROCEDURE.**

A settlement that imposes a claim procedure rather than cutting checks to class members for the appropriate amount may impose too much of a burden on class members, especially if the claim procedure is onerous, or the period for submitting is too short, or there is a likelihood of class members treating the notice envelope as junk mail. <u>The best approach is to calculate settlement checks from defendant's records (plus due diligence performed by counsel)</u> and to send the checks to the class members along with a notice that cashing the checks will be deemed acceptance of the release and all other terms of the settlement.

*See Fields*, 2012 U.S. Dist. LEXIS 178894 at *5-6. (Emphasis added.)

3.   <u>The Reversion Provisions are Designed to Keep Subscribers Purported 40 Million Dollar Prove Up Fund in Defendant's General Business Account – Guaranteeing Future Disputes and Litigation.</u>

The reversion provisions in of themselves require rejection of this proposed settlement.   Keeping this "fund" in an "un-segregated account" and imposing impossible barriers to eligibility is designed for one purpose – and only one purpose – to keep money in Aetna's pocket.

This proposed settlement goes further in arbitrarily establishing "caps" on distribution of funds left over when one fund is not exhausted.  The "settlement" caps limit the transfer from either fund with remaining money – to 5 million dollars, to the unsatisfied fund.

§10.1(g).   "Treatment of Any Remaining Balance" – the "settlement" provides:

> In the event that the Subscriber Prove-Up Fund is not
> exhausted after all claims have been paid under the
> methodology described in Section 10.1(e), and if the
> eligible claims submitted to the Provider Prove-Up Fund
> exceed the amount allocated to it described in Section
> 10.2, an amount equal to the lesser of (i) such excess or
> (ii) $5 million of such remainder in the Subscriber Prove-
> Up Fund will be credited to the Provider Prove-Up Fund.
> Subject to this potential credit to the Provider Prove-Up
> Fund, <u>the Company will retain any and all funds related
> to the Subscriber Prove-Up Fund after the payment of all
> timely and valid Subscriber Prove-Up Claims.</u>

Doc. 839-2, PageID: 43965 (emphasis added). The Provider Prove Up fund
contains a similar provision capping the transfer of any remaining funds to the
Subscriber Prove Up Fund. §10.2(g). There is no rational basis for the
"Treatment of Any Remaining Balance" provision, §10.1(g) and §10.2(g) other
than to minimize Defendant's settlement payment to the class. Doc. 839-2,
PageID: 43965, 43970-71. Should there be any money remaining in one of the
Prove Up funds and an insufficient amount is available in the other fund, the entire
balance in the one fund should be applied to the other. These provisions provide
the opportunity for funds to remain in Aetna's "un-segregated" account.

Red flags should go up and careful scrutiny to should be given to any class
settlement, such as this one, where most settlement funds are reversionary.

### REVERSIONS.

> A settlement that allows for a reversion of settlement
> funds to the defendant(s) is a red flag, for it runs the risk
> of an illusory settlement, especially when combined with

a requirement to submit claims that may lead to a shortfall in claim submissions.

*Fields*, 2012 U.S. Dist. LEXIS 178894 at *5.  This "settlement" is completely illusory and designed to make claims eligibility for Prove Up funds virtually impossible to insure a "shortfall in claims submissions."

Having complicated and impossible Prove Up requirements (for almost all subscribers), the proposed settlement here ensures ongoing disputes or claims administration which will unduly prolong the claims administration process.

4.    Arbitrary Caps on Claims based Upon the Date of the Claim

There is no rational or justifiable basis for capping the percentage recovery of a claim based upon the date the services were rendered.  In fact, the 3% limitation of claims occurring after August 20, 2011 is especially problematic as, under the impossible current requirements for proof of Prove Up eligibility the more recent claims by members are more likely to have the documentation necessary to meet the barriers imposed by the Prove Up the proposed settlement.

Section § 10.1(e), of the agreement "Calculation of Payments From The Subscriber Prove-Up Fund" provides that for claims between March 1, 2001 and August 19, 2011, payment would be the lesser of "(i) the Balance Bill paid by the Subscriber Class Member for that Covered Service or Supply or (ii) 5% of the Allowed Amount."  For claims between August 20, 2011 to the preliminary approval date the payment would be the lesser of "(i) the Balance Bill paid by the

Subscriber Class Member or (ii) 3% of the Allowed Amount for that Partially Allowed Claim." Doc. 839-2, Page ID: 43964-65. There is no rational justification for paying those who have more recent claims less.

Even after putting a Subscriber through this impossible process, the payment amount to each is virtually nil. It amounts to the proverbial drop in the bucket.

| **Hypothetical Subscriber Class Member's Prove Up Under the Proposed Settlement** | |
| --- | --- |
| Assume the billed charge for the ONET service is: | $600 |
| Assume that Aetna's initial Allowed Amount was: | $200 |
| Assume the class member paid the unpaid difference between the billed charge and the initial Allowed Amount: | $400 |
| Aetna would pay the "lesser" of the amount the class member paid or 5% of Aetna's initial Allowed Amount for such claim. Settlement § 10.1(e).[14] The subscriber class member would receive *only $10* instead of the $400 he actually paid the provider. Instead of paying subscribers back who prove they paid the unpaid difference to their out-of-network provider, because 5% of Aetna's initial Allowed Amount is $10 (5% of $200 equals $10). This amount could be further reduced on a *pro rata* basis. | |

The format of this settlement is an onerous claim submission process followed by a reversion to Aetna of unspent funds.

---

[14] For claims paid after August 20, 2011, the payment percentage of Aetna's initial allowance drops to 3%. No explanation has been provided (in the settlement or otherwise) for this drop.

5.    The "Assignment" Barrier to Establishing Eligibility – Ambiguous
       Provisions

It should be noted that the provisions requiring proof of the existence of or

lack of an "assignment" is also an  artificial barrier to being eligible.   The

agreement fails to even define assignment.   A mere authorization for direct

payment is not the equivalent of a legal assignment of all legal rights.   *See*

*generally*, *Franco v. CIGNA*, Case 2:07-cv-06039-SRC–PS, Doc. 638, PageID:

25498-99, Filed 09/23/11.   Authorizing Aetna to use its records to determine

whether an assignment exists is also unsatisfactory.   Aetna's computer data as to

"assignments" is nothing more than confirmation of an authorization for direct

payment.  Expecting Subscribers to know what documents they may have signed

years earlier at the time of service or to understand the scope of what constitutes an

"assignment" or authorization given to a particular provider, is an insurmountable

barrier to swear to "under the penalty of perjury."  The ambiguous nature of the

assignment provisions contained in this "settlement" will create disputes and

difficulties in resolving Subscriber Prove Ups.

This class notice is extremely vague and is not likely to be understood by a

supermajority of class members.   The notice is also defective, since it does not

explain it was negotiated by excluding all adequate ERISA and RICO class

representatives and their attorneys or that the purported class representatives do not

44

have valid claims and are inadequate. It also omits Aetna's reversionary interest as well as other important information about the proposed settlement.

      6.    <u>The Class Notice Fails For Vagueness As Being Overbroad</u>

     Finally, the release in the proposed settlement is extremely broad. It includes the "could have been brought" language that the *Fields* Court derided as "too vague." 2012 U.S. Dist. LEXIS 178894 at *4. The Court in *Moore v. Halliburton* singled out the breadth of the release in that proposed settlement as very troubling. 2004 U.S. Dist. LEXIS 1817 at *29. This Court rejected preliminary approval of a settlement in *Zimmerman* based on a broad release. 2011 U.S. Dist. LEXIS 2161. In fact, it is very similar to the overly broad release in this proposed settlement. Compare the Halliburton release of all claims "alleged or that could have been alleged" with the release negotiated by Aetna here: "The Releasors further agree to abandon forever and discharge *any and all claims that were or could have been alleged* in the Actions against the Released Persons . . . ." Settlement at § 13.1(b) (emphasis added). Doc. 839-2, PageID: 43976.

## CONCLUSION

     The proposed settlement entered into by Movants includes plaintiffs that Aetna had identified as inadequate or dismissed or both. None of the Subscriber "Representative Plaintiffs" defined in ¶ 1.47 of the proposed settlement agreement have an ERISA or RICO cause of action (or any other cause of action) in this class

action and none is adequate. The settlement violates the due process rights of absent class members. Moving party, John Seney's complaint was voluntarily dismissed in 2009 depriving the Court of jurisdiction to approve the proposed settlement. Alan John Silver is a Medicare beneficiary who does not assert a viable claim here. Jeffrey Weintraub is a non-ERISA beneficiary who was paid in full by Aetna (remedying its use of outdated data) and does not have a valid claim here. It was consummated in direct violation of CMO No. 2 by excluding all of the adequate Subscriber Plaintiffs. In addition, the terms of the proposed settlement are onerous and unconscionable, and cannot satisfy the three *Zimmerman* factors. For the foregoing reasons and those documented in the brief, the proposed settlement cannot be preliminarily approved.

Respectfully Submitted,

**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000

By:    /s/ *Barry M. Epstein*
Barry M. Epstein, Esq.
Barbara G. Quackenbos, Esq.
Lynne M. Kizis, Esq.
Eric J. Marcy, Esq.
**Co-Interim Class Counsel**
**For the Adequate Subscriber Plaintiffs**

Dated:  January 7, 2012

46