## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AETNA UCR LITIGATION, | Master File No. 07-3541(SRC)(PS) |
| | MDL NO. 2020 |
| This Document Relates To: ALL CASES | |

-------------------------------------------------------------------------------------------------------------

### MEMORANDUM OF LAW IN RESPONSE TO EPSTEIN OPPOSITION TO PRELIMINARY APPROVAL OF THE SETTLEMENT

-------------------------------------------------------------------------------------------------------------

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068

Settlement Class Counsel

## <u>TABLE OF CONTENTS</u>

Table Of Authorities ...................................................................................................ii

Preliminary Statement .................................................................................................1

Legal Argument

I    The Subscriber Plaintiffs Are Adequate ...............................................................3

       a)    <u>Mr. Seney is an Adequate Plaintiff</u> ....................................................3

       b)    <u>The Silvers Are Adequate Plaintiffs</u> ..................................................8

       c)    <u>Mr. Weintraub is an Adequate Plaintiff</u> .............................................10

II    Mr. Epstein's Accusations Concerning Lack Of Due Diligence, "Secret Negotiations,"
And Refusal To Produce Documents Are Baseless .................................................14

       a)    The Settlement Was the Result of Due Diligence on the Part
of Settlement Class Counsel and There Were No "Secret Negotiations" .................14

       b)    Mr. Epstein Is Not Entitled to Settlement Class Counsel's
<u>Thought Processes on The Calculation of the Settlement Amount</u> ..........................15

III    The Proposed Settlement Should Be Preliminarily Approved
Because It Is Fair, Reasonable And Adequate ......................................................17

       a)    <u>Plaintiffs Faced Substantial Risks Proceeding to Trial</u>............................18

            1)    <u>The Need to Prove the Invalidity of the Ingenix Databases</u> ........................18

            2)    The Need to Demonstrate Classwide Damages
Based on Aetna's Utilization of the Ingenix Databases
<u>and the non-Ingenix Reimbursement Methodologies</u>...................................19

            3)    <u>The Claims of the Provider Plaintiffs</u> ...........................................19

            4)    <u>The Amount and Calculation of Damages</u>.....................................20

            5)    <u>Exhaustion of Administrative Remedies</u> .......................................22

       b)    The Terms Of The Settlement, Plan Of Allocation,
<u>and Claims Eligibility Rules Are Fair</u>..............................................22

<u>Conclusion</u> .............................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AMA v. United Healthcare*, 2007 U.S. Dist. LEXIS 44196 (S.D.N.Y. June 16, 2007)............... 21

*Coffin v. Bowater, Inc.*, 228 F.R.D. 397 (D.Maine 2005)......................................................... 22

*Fields v. Wise Media, LLC*, 2012 U.S. Dist. LEXIS 178894 (N.D. Cal. Dec. 18, 2012) ............ 24

*Franco v. Connecticut General Life Insurance Co.*, 818 F.Supp.2d 792 (D.N.J. 2011) ............. 19

*Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985), *aff'd* 482 U.S. 656 (1987)............. 6

*Hall v. AT&T Mobility*, 2010 WL 4053547 (D.N.J. Oct. 13, 2010) ........................................... 18

*Hansberry v. Lee*, 311 U.S. 32 (1940) ...................................................................................... 5

*Harrow v. Prudential Insurance Co. of America*, 279 F.3d 244 (3d Cir. 2002)........................... 7

*In re Cendant Corp. Securities Litig.*, 343 F.3d 658 (3d Cir. 2003)......................................... 16

*In re Community Bank of Northern Virginia*, 418 F.3d 277 (3d Cir. 2005) ............................... 16

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ............................... 12

*In re G.M. Corp. Pickup Truck Fuel Tank Products Liability Litigation*,
    55 F.3d 768 (3d Cir. 1999).............................................................................................. 4, 17

*In re Household Intern'l Tax Reduction Plan*, 441 F.3d 500 (7th Cir. 2006) ........................ 7, 22

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
    277 F.R.D. 52 (D.Mass. 2011)............................................................................................. 6

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998).................................. 18

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)......................................... 3

*Johnston v. HBO Film Mgm't, Inc.*, 265 F.3d 178 (3rd Cir. 2001).......................................... 10

*Jones v. Commerce Bancorp, Inc.*, 2007 WL 2085357 (D.N.J. July 16, 2007)....................... 17

*Matsushita Electric Indus. Co. v. Epstein*, 516 U.S. 367 (1996)............................................ 12

*Moore v. Halliburton Co.*, 2004 WL 2092019 (N.D. Tex. Sept. 9, 2004)................................. 25

*Patterson v. Stovall*, 528 F.2d 108 (7th Cir. 1976).................................................................. 12

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ............................................................ 5

*Semtek International Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001)................................. 3

*South Carolina National Bank v. Stone*, 749 F.Supp. 1419 (D.S.C.1990) .............................. 13

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) ................................................ 4

*Taylor v. Sturgell*, 553 U.S. 880 (2008).................................................................................... 5

*TBK Partners, Limited v. Western Union Corp.*, 675 F.2d 456 (2d Cir.1982)........................... 12

*Thomas v. SmithKlein Beecham Corp.*, 201 F.R.D. 386 (E.D.Pa. 2001)............................... 7, 22

*U.S. v. Nobles*, 422 U.S. 225 (1975) ...................................................................................... 16

*West Virginia v. Chas. Pfizer & Co.*,
    314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971).................. 18

*Zimmerman v. Zwicker & Assocs., P.C.*, 2011 WL 65912 (D.N.J. Jan. 10, 2011)...................... 17

**Statutes**

New York General Business Law § 349............................................................................... 10

**Treatises**

*Manual for Complex Litig. Fourth* 21.662 (2012) ................................................................... 17

3 Newberg & Conte, Newberg on Class Actions, § 12.15 (3d ed.1992)..................................... 13

## PRELIMINARY STATEMENT

This is not the first time that Mr. Epstein has objected to – or, in this instance "opposed" – preliminary approval of a UCR settlement worth hundreds of millions of dollars on behalf of hundreds of thousands of class members. In the *United Healthcare* case, Mr. Epstein made the same unsubstantiated accusations and *ad hominem* attacks he makes here against many of the same lead counsel in this case: collusion, reverse auction, absence of good faith negotiations, lack of due diligence, refusal to provide him with documents, and "secret" negotiations with defendants.  Judge McKenna oversaw an unprecedented 11-day evidentiary hearing to try Mr. Epstein's accusations.  The court found no basis whatsoever for Mr. Epstein's accusations and granted preliminary approval of the settlement. *See A.M.A. v. United Healthcare Corp.*, Docket No. 00-2800 (S.D.N.Y.), Docket Entry 436.

It is what happened next that is most significant. His accusations revealed as the empty bluster they always were, his few allies refusing to participate further, his former firm firmly opposed to his conduct, losing the support of his current firm to continue his objections, and – most importantly – understanding that he would not be entitled to any attorneys' fees, Mr. Epstein took the deal offered  him to withdraw his objections. Although the settlement terms had not changed, Mr. Epstein *supported* the settlement on behalf of his clients at the final fairness hearing.

The Court should not countenance Mr. Epstein's obstructionist tactics to hold up a cash settlement on behalf of subscriber and provider class members worth up to $120 million.[1] Settlement Class Counsel are obligated under Fed. R. Civ. P. 23 to present any settlement they believe is in the best interest of the class as a whole, even if it is not supported by all attorneys

---

[1]     Mr. Epstein does not oppose preliminary approval or certification of the provider class.

for the plaintiffs.  *See* Rule 23, Advisory Committee Notes, at 133 (2008 Ed.) ("class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole").

In every litigation, there is a time to fight and a time to determine whether the action may be resolved on favorable terms.  This is that time.  As set forth below and in Plaintiffs' Memorandum of Law in Support of the Joint Motion for Preliminary Approval, the Settlement presented by the parties represents a fair compromise by parties who understood the strengths and weaknesses of their positions.  Notwithstanding Mr. Epstein's baseless attacks on Plaintiffs and Class Counsel, the Settlement clearly meets the standards of this Circuit warranting preliminary approval.

## LEGAL ARGUMENT

## I

## THE SUBSCRIBER PLAINTIFFS ARE ADEQUATE

**a)**     **Mr. Seney is an Adequate Plaintiff**

Mr. Epstein's assertion that Mr. Seney has no live claims (Epstin Brief at 3-8), and all other arguments flowing from that contention, are completely meritless.  It is true that Mr. Seney dismissed his claim *without prejudice* on September 21, 2009.  However, that does not mean that Mr. Seney's claims are gone forever.  Quite the contrary is true.  "The primary meaning of 'dismissal without prejudice,' we think, is dismissal without barring the plaintiff from returning later, to the same court, with the same underlying claim."  *Semtek International Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001).  That is exactly what Mr. Seney did. He refiled his claims on December 24, 2009 in the Second Joint Consolidated Amended Complaint.  Thus, Mr. Seney's claims were, and are, properly before the Court.[2]

It goes without saying that class-action settlements which are negotiated before class certification are subject to heightened scrutiny.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004).  That said, the heightened scrutiny is directed toward the fairness of the settlement, not class certification, as Mr. Epstein argues.  (Epstein Brief at 14).

> However, in cases such as this, where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, we require district courts to be even "more scrupulous than usual" when examining the fairness of the proposed settlement.  This heightened

---

[2]     Mr. Epstein's reference to the Court's opinion relating to Stephanie Higashi's attempt to withdraw her notice of dismissal in *Franco v. CIGNA* is inapposite.  There, Ms. Higashi attempted to withdraw her notice of voluntary dismissal, not refile her claims with another complaint. Further, the fact that Mr. Seney was not included as a proposed class representative does not mean that he has no claims pending.  It also has no relevance.  Lawyers make litigation decisions all the time and that decision has no bearing on whether he can now serve as a Class Representative in the settlement context.

standard is intended to ensure that class counsel has engaged in sustained advocacy throughout the course of the proceedings, particularly in settlement negotiations, and has protected the interests of all class members.

*Id.* (internal citations omitted).[3]   The certification of settlement classes is judged by the same standards as any other class, except that it is unnecessary for the Court to concern itself with trial management issues with a settlement class, since the point is to not have a trial.   *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 296-304, 322 n. 56 (3d Cir. 2011)(en banc).   Most of Mr. Epstein's arguments are directed toward the adequacy of the class representatives, not the fairness of the Settlement.

Mr. Epstein's contention that Mr. Seney is not an adequate class representative because he has no "live" claims is untrue and bizarre.   Mr. Seney refiled his claims after they were dismissed without prejudice.   He has "live" claims.   There is no Due Process requirement, however, that a plaintiff have "actively participated" in the litigation,[4] certainly not in the sense

---

[3]   The primary substantive concern with settlements in advance of class certification is that the parties, particularly plaintiffs' counsel, may not have adequate information relating to the merits of the case to properly judge its value.   *See In re G.M. Corp. Pickup Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 788-89 (3d Cir. 1999).   Even though the Court has not yet ruled on Plaintiffs' pending motion for class certification, there can be no doubt that there has been extensive discovery with respect to the underlying facts, such that the parties have more than adequate information relating to the merits of the claims and the case's value, even if reasonable minds might differ on those points.   There is also no serious question about the difficult adversarial nature of the settlement negotiations which preceded the settlement.   They were, in fact, unprecedented.   See Cecchi Declaration, ¶ 4.

[4]   Mr. Epstein suggests that a plaintiff *ipso facto* cannot be an adequate class representative if he or she has not been deposed and otherwise participated in discovery.   There is no authority to support that proposition particularly in this context where it was Aetna's decision – in the exercise of its litigation judgment –not to depose Mr. Seney after his claims were refiled in the Second Amended Complaint.   Further, that is a completely separate consideration than whether *counsel* has adequate information to make a reasonable and rational determination as to the merits and settlement value of the case.   There is no reasonable basis for a claim that Settlement Class Counsel did not have adequate information relating to the Class' claims or had not adequately participated in discovery.

that Mr. Epstein suggests, in order to be an adequate class representative.   This is made clear simply by examining the cases Mr. Epstein cites in support of its argument.

In *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Supreme Court rejected the virtual representation doctrine, which, if applied, would have had *in personam* judgments bind non-parties who had similar claims.  *See Taylor*, 553 U.S. at 892-907.  The quotation from *Taylor* in Mr. Epstein's brief is nothing more than the Supreme Court stating that class actions are an exception to the general rule that litigation does not bind non-parties.  The quoted passage, in context, reads:

> "It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."  *Hansberry v. Lee,* 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Several exceptions, recognized in this Court's decisions, temper this basic rule. *In a class action*, for example, *a person not named as a party may be bound by a judgment on the merits of the action, if she was adequately represented by a party who actively participated in the litigation*. See *id.,* at 41, 61 S.Ct. 115. In this case, we consider for the first time whether there is a "virtual representation" exception to the general rule against precluding nonparties.

*Taylor*, 553 U.S. at 884 (quotation from Epstein Brief emphasized).  Nowhere does *Taylor* even vaguely touch on the issue of how much discovery a party must participate in to be an adequate a class representative.

Similarly, *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985), has nothing to do with how much discovery a party must participate in to be an adequate a class representative.  The issue in *Shutts* was the minimum due process requirements for absent class members to be bound by a class action judgment.  *See Shutts*, 472 U.S. at 811-812.  In the quotation from *Shutts* in Mr. Epstein's brief, the Supreme Court merely includes as one of those requirements the basic, and unremarkable, proposition that the class representatives must adequately represent the class. *Id.* at 812.  In context, the Supreme Court held:

5

> In this case we hold that a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant. If the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." The notice should describe the action and the plaintiffs' rights in it. Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. *Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.*

*Shutts*, 472 U.S. at 811-12 (internal citations omitted; quotation from Epstein Brief emphasized).

There is no bright-line bar to the late addition of a class representative. *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 277 F.R.D. 52, 60 (D.Mass. 2011) ("*AWP*").

> In general, the Court has wide discretion in allowing a motion to add new class representatives, so long as the proposed representatives have no conflict with the class and are represented by capable counsel. Where replacement of a class representative is necessary, "courts generally allow class counsel time to make reasonable efforts to recruit and identify a new representative." Such discretion protects the interests of the class as a whole, and this Court, in considering settlement of a class action, has an obligation to protect the absent members of the class.

*Id.* at 59 (internal citations omitted)[5]. Indeed, courts have allowed the substitution of a new class representative when an existing class representative has objected to the settlement, and have approved settlements over the objections of class representatives. *Id.* at 60 (citing cases).

---

[5]      In *AWP*, the court did note that the late substitution of a class representative was "troubling". *Id.* However, in further discussion, the court found that under the circumstances, the late addition of a class representative was entirely appropriate, particularly in light of the complexity of the settlement negotiations and approval process. Quoting *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 124 (3d Cir. 1985), *aff'd* 482 U.S. 656 (1987), the *AWP* court noted:

Mr. Epstein further argues that Mr. Seney is not a proper class representative because he did not exhaust his administrative remedies, citing *Thomas v. SmithKlein Beecham Corp.*, 201 F.R.D. 386, 395 (E.D.Pa. 2001).  However, it is not necessary for an ERISA plaintiff to have exhausted his or her administrative remedies in order to pursue a claim, provided that attempting to pursue administrative remedies would be futile.  *See  Harrow v. Prudential Insurance Co. of America*, 279 F.3d 244, 249-50 (3d Cir. 2002); *see also Thomas*, 201 F.R.D. at 395 ("Moreover, 'courts have recognized an exception when resort to the administrative process would be futile.' Given the defendants' apparent uniform interpretation of the plan documents, requiring each of the proposed class members to exhaust his or her administrative remedies would be futile.") (internal citations omitted).[6]   In the class action context, since exhaustion is not a statutory requirement under ERISA, it is within the Court's discretion to require no exhaustion by anyone. *In re Household Intern'l Tax Reduction Plan*, 441 F.3d 500, 502 (7th Cir. 2006) (Posner, J.).  Not requiring  exhaustion  by  anyone,  including  class  representatives,  would  be  particularly

---

We begin by acknowledging the realities of class suits, a sometimes neglected approach in this field. In a massive class action such as the one at hand, it is counsel for the class who has the laboring oar. The class representatives furnish the factual basis to invoke the jurisdiction of the court and provide the outline of the controversy, but the lawyers shape the claims for adjudication by the compilation of factual and expert testimony and the presentation of statistical and documentary evidence.

*AWP*, 277 F.R.D. at 60-61.

[6]     Factors to be considered as to whether exhaustion would be futile include:  (1) whether plaintiff diligently pursued administrative relief; (2) whether plaintiff acted reasonably in seeking immediate judicial review under the circumstances; (3) existence of a fixed policy denying benefits; (4) failure of the insurance company to comply with its own internal administrative procedures; and (5) testimony of plan administrators that any administrative appeal was futile. *Harrow*, 279 F.3d at 250.

appropriate with respect to a settlement class since the parties will not be litigating the issue of whether, in fact, pursuing administrative remedies would be futile.

**b)**     <u>**The Silvers Are Adequate Plaintiffs**</u>

The Silver Plaintiffs are adequate Plaintiffs whose claims are typical of the other absent Settlement Class Members.  While Mr. Epstein is correct that Plaintiff Alan John Silver is a Medicare beneficiary not named under his wife's Aetna-administered policy, the Court is now aware that Mrs. Mary Ellen Silver is also a named class representative who has joined the Settlement.  As Mr. Epstein noted, "Mary Ellen Silver is insured under a self-insured plan through New York Life Insurance Company that is administered by Aetna."  (Epstein Brief at 9)  He concedes that Mrs. Silver is the appropriate Plaintiff to serve as a class representative here.  Plaintiffs concur and have amended their motion to add Mrs. Silver as a named class representative and movant.  Failure to include her originally was simply an oversight.  As the documentary and written discovery (already possessed by Mr. Epstein) makes clear, the Silvers had an Aetna-administered policy, were underpaid by Aetna on their claims, and exhausted their administrative remedies by appealing those determinations. There can be no argument as to their adequacy as class representatives or the typicality of their ERISA claims.

Nevertheless, Mr. Epstein, other than pointing out Mr. Silver's Medicare beneficiary status provides no law or citation explaining to the Court why Mr. Silver would not be an appropriate class representative for any claim brought in this case, relying merely on conclusory allegations.  Indeed, even in light of Mr. Epstein's objection, it is wholly unclear why Mr. Silver would not be an adequate class representative for purposes of Plaintiffs' RICO and Sherman Act claims.

Finally, Mr. Epstein points to a throw-away line in Aetna's Response to Plaintiff's Class Certification Motion (Docket Entry 673 at 71-72 n. 46) to show that Aetna somehow believed that the Silvers were not adequate class representatives because they had not "participated meaningful in this litigation."  Aetna's assertion that they were not meaningfully involved in the litigation was simply untrue.  The Silvers complied with all discovery requests served on them, producing document and written discovery responses five months before Plaintiffs' Motion for Class Certification was filed. These documents, which Mr. Epstein clearly reviewed, provided an obvious basis for their ERISA, Sherman Act and RICO claims.

The fact that the Silvers' claims may have been in a tag-along action does not mean that he is *ipso facto* an inadequate class representative as Mr. Epstein suggests, nor is Aetna's characterization dispositive of anything. (*See* Epstein Br. at 8-10)  The Declaration of Tim Hoffman describe the involvement of the Silvers and their counsel in this litigation.

The Silvers filed their complaint, coordinated with counsel for Aetna regarding the prosecution of their claims, produced documents and responses to interrogatories, and prepared for deposition.  While the Silvers never gave a deposition in this case, this was because Aetna chose not to notice one.

Counsel for the Silvers were not on the appointed Executive Committee, which is why they did not attend mediation sessions, or do certain high-level work in the case. However, they stayed up to date on the status of the negotiations, worked on the discovery related to the Silvers' claims, coordinated that discovery with the Plaintiffs Executive Committee, and did all the work they were asked to do in this litigation.

c)     **Mr. Weintraub is an Adequate Plaintiff**

Mr. Epstein's argument surrounding Plaintiff Jeffrey Weinraub is simply incorrect and a blatant distortion of reality.  While Mr. Epstein suggests that Mr. Weintraub is not an "adequate" representative, the opposite is, in fact, true.  Adequacy centers on whether the named plaintiffs' interests are sufficiently aligned with the interests of the absentees, and the court must determine whether "the representatives' interests conflict with those of the class."  *See, e.g. Johnston v. HBO Film Mgm't, Inc.*, 265 F.3d 178, 185 (3rd Cir. 2001).  Here, there is no conflict between Weintraub and the class.  Indeed, Weintraub is a typical Aetna subscriber who received out-of-network services and who was under-reimbursed for those services due to use of the Ingenix Databases.  Thus, Weintraub's claims are aligned with the interests of other class members in seeking to have Aetna compensate those Aetna subscribers who have been under-reimbursed through the use of the Ingenix Databases or other out-of-network reimbursement policies.

As background, Weintraub obtained insurance from Aetna as a student at New York University.  His claims were *processed* by Chickering, now known as Aetna Student Health.  Chickering, since 2003, has been a fully owned subsidiary of Aetna.  *See* Deposition of Paul Silva, 22:45.  In 2007, Weintraub received a covered service from an Out-of Network Health Care Provider and was under-reimbursed by Aetna for those services.[7]  The Subscriber Settling Class definition thus fully encompasses Mr. Weintraub as it is defined as persons who, from March 1, 2001, were Aetna plan members who received covered services from an out-of-network provider and whose resulting claims was only partially allowed.  Mr. Weintraub fits the definition exactly.

---

[7]     Mr. Weintraub filed his Complaint in April, 2008 in the District of Connecticut, alleging violations of antitrust laws as well as state law claims under New York General Business Law § 349.  Mr. Weintraub is the only Plaintiff to have brought the state law claims.

Mr. Epstein's sole argument to the contrary is that Mr. Weintraub's "only" claim arises from Aetna's use of outdated data.  While it is true that Chickering[8] used outdated data to process certain Aetna claims (including those of Weintraub), that is irrelevant to the discussion of Mr. Weintraub's ability and adequacy to be a settling class representative here.  Chickering used the MDR Database to determine reasonable and customary rates.  In fact, it did so without any research or investigation into the validity of those MDR rates.  As one former Chickering employee stated, "[w]e took it as being a general industry thing that Ingenix was used to determine reasonable and customary rates and did no specific investigation on our own part related to whether or not they were indeed reasonable and customary or not."  Silva Deposition, 38:9-14.  Furthermore, Chickering used the August 2002 MDR data to calculate ONET reimbursement from August 2002 until September of 2007.  *Id.* 101: 13-16.  Thus, in addition to using the MDR data to pay ONET claims, Chickering used an older version of the MDR data and failed to update it every six months to a year.  This fact, however, does not preclude Weintraub from being a settling class representative.

While Aetna has admitted that the use of August 2002 (outdated) MDR data to calculate ONET was inappropriate and has attempted to compensate individuals (including Mr. Weintraub) for that use, it has *never* admitted that use of MDR data *at all* was inappropriate nor has it attempted to compensate individuals such as Mr. Weintraub for that use.  The checks sent to individuals calculated the difference between the use of August 2002 data and whatever MDR data *would have been used* at the time the services were rendered.  Aetna has never attempted to

---

[8]        While this brief uses the name "Chickering," it is important to note that Chickering, from 1998 to  2003, was a third party administrator exclusively for Aetna, and was fully purchased by Aetna in 2003.  When stating "Chickering" after 2003, therefore, it is synonymous with "Aetna." *See, e.g.* Silva Deposition, 87:7-9      In fact, actuaries for both companies were in constant communication, with Aetna having the ultimate "say" on pricing of premiums and claims. *Id.,* 22:5-6; 23:20-22, 24:2-4.20.

reimburse Mr. Weintraub for the difference between the appropriately dated MDR data and the actual usual and customary rate or billed charges.  Mr. Weintraub was not only damaged by the use of outdated data, he was misled as to the actual reasonable and customary amount that should be reimbursed for ONET, and he suffered damages because of Aetna's ongoing conspiracy with Ingenix, United and other health insurers to perpetuate this misconception. Such damages were suffered independently to and distinct from the damages alleged in the case regarding Aetna's admission to using outdated data.  Mr. Weintraub is thus an appropriate settling class member.

Mr. Epstein also concentrates on the fact that Mr. Weintraub did not bring ERISA claims against Defendants as his student health plan was a non-ERISA plan.  This fact, while true, does not limit Mr. Weintraub's ability to release *all* claims provided they arise out of the same factual predicate as settled class claims.  *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) ("[A] court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint.") (*quoting Patterson v. Stovall*, 528 F.2d 108, 110 n. 2 (7th Cir. 1976)).  As the Supreme Court has observed, in order to accomplish a full and effective settlement and thereby "prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action."  *Matsushita Electric Indus. Co. v. Epstein*, 516 U.S. 367, 376-77 (1996) (internal citations omitted).  Indeed, it is not unusual for releases in class actions to cover not only the claims that have at one time or another actually been alleged, as here, but also "all claims that might be asserted in connection with the action." *TBK Partners, Limited v. Western Union Corp.*, 675 F.2d 456, 459 (2d Cir.1982) (affirming class

action release that barred class members from pursuing appraisal proceedings in state court even if those claims could not have been asserted in the federal class action).  As summarized in the leading treatise on class actions, a "release of claims may refer to all claims raised in a pending action, or it may refer to all claims, both potential and actual, that may have been raised in the pending action...." 3 Newberg & Conte, Newberg on Class Actions, § 12.15 at 12–41 (3d ed.1992). *See also, e.g., South Carolina National Bank v. Stone*, 749 F.Supp. 1419, 1435 (D.S.C.1990) ("Plaintiffs and each member of the Plaintiff Class defined in this Final Judgment shall be deemed to have released . . . all complaints and claims . . . alleged in, or which could have been raised in, this action").

Therefore, Mr. Weintraub is able to release all claims in the complaint (ERISA and non-ERISA) and even those not raised in the Complaint provided they arise from the same set of facts.  All claims in the Complaint arise from the facts set forth therein:  that Defendants provided insufficient reimbursement for out-of-network services by using the Ingenix Database and/or certain reimbursement policies and inadequately disclosing such use.  Thus, Weintraub may release any and all claims alleged (or not alleged) in the Complaint as he is a highly adequate class representative.

As is set forth in Plaintiffs' moving papers, all of the proposed Subscriber Class representatives are both typical and adequate.  Each of them had out-of-network claims denied or reduced by Aetna using the Ingenix database.  Those are the claims shares with other Subscriber Class members which give rise to ERISA and RICO claims.

## II

### MR. EPSTEIN'S ACCUSATIONS CONCERNING LACK OF DUE DILIGENCE, "SECRET NEGOTIATIONS," AND REFUSAL TO PRODUCE DOCUMENTS ARE BASELESS

**a)** **The Settlement Was the Result of Due Diligence on the Part of Settlement Class Counsel and There Were No "Secret Negotiations"**

In April, 2009, Judge Hochberg, who was then overseeing this action, stated on the record that this case should be resolved by settlement. (Cecchi Dec. ¶ 5) Soon after Judge Hochberg appointed a Plaintiffs' Executive Committee on July 31, 2009, efforts to mediate began. *Id.* ¶ 6. Mr. Epstein and other members of his firm participated in each of the 13 mediation sessions before the Hon. Nicholas H. Politan (ret.). *Id.* ¶ 9.[9]

The first two mediation days occurred on January 9 and 10, 2010, at which time it was agreed that the parties would exchange information about potential damages calculations. *Id.* ¶ 7. Mr. Epstein opposed the Executive Committee's decision to work with a consultant and testifying expert to construct a database to approximate the difference between the UCR amount and the amount based on Ingenix. This database was designed to provide Plaintiffs with a reasonable alternative damages methodology to what Mr. Epstein referred to as the "delta": the simple difference between the billed amount and the allowed amount. *Id.* Mr. Epstein was fully aware of all positions of the Executive Committee and all the results of Plaintiffs' consultants and experts. *Id.* ¶ 7-8.

The last in-person mediation session with Judge Politan occurred on December 7, 2011. *Id.*, ¶ 13. Mr. Epstein, present throughout this meeting, called the Court and made an oral

---

[9] In fact, during 13 mediation sessions, Mr. Epstein often brought no less than four separate lawyers from his firm to the mediation, while no counsel for plaintiffs brought more than two from each firm (and often only one). Cecchi Decl. ¶ 9.

motion to stay the mediation. *Id.* ¶ 15. The Court heard argument from the parties and directed that mediation proceed. *Id.*

Thereafter, at the January 2011 mediation session, Judge Politan made a final mediator's proposal to the parties. Every member of Plaintiffs' Executive Committee, except Mr. Epstein, accepted it, subject to further negotiation. *Id.* ¶ 17. Thereafter, Settlement Class Counsel, under Judge Politan's guidance, worked to document the proposed Settlement.

A draft of the settlement agreement was shared with Mr. Epstein, before all terms were agreed to, belying his assertion that he only learned of a fully formed agreement. *Id.*, ¶ 20. AT that time, Mr. Epstein was invited to return to the negotiations. *Id.* Mr. Epstein refused, and, instead explicitly indicated that he did not want to negotiate at all. His accusations that Class Counsel intentionally violated CMO-2 are baseless and belied by his overt efforts to derail the 2-year-long mediation process.

**b)     Mr. Epstein Is Not Entitled to Settlement Class Counsel's
Thought Processes on The Calculation of the Settlement Amount**

Mr. Epstein also complains that Settlement Class Counsel refused to provide him with any documents or communications relating to their calculation of damages on behalf of the Class as part of the settlement. (Epstein Brief at 30-33).

This argument fails for numerous reasons, including the fact that Mr. Epstein has all the relevant documents. As set forth in the Cecchi Declaration ¶ 20, Mr. Epstein was privy to *all* of the data, damage calculations and analysis developed by plaintiffs' leadership team during the litigation and two-year mediation of this case. Those analyses included highly sophisticated models produced by plaintiffs' consulting expert (Frank Cohen) and plaintiffs' testifying expert (Stephen Foreman) both of which were shared with the mediator and – obviously – Mr. Epstein.

Mr. Epstein would not be entitled to documents reflecting Settlement Class Counsel's though processes because they are core work product.  The work product doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."  *In re Cendant Corp. Securities Litig.*, 343 F.3d 658, 661-62 (3d Cir. 2003) (*quoting U.S. v. Nobles*, 422 U.S. 225, 238 and n.11 (1975)).  Mr. Epstein is asking for documents and communications reflecting the mental processes of Settlement Class Counsel as to their calculation of damages based upon documents and expert reports produced in discovery. Those documents are privileged and Mr. Epstein is not entitled to them.

Separate and apart from the fact that the information Mr. Epstein requests is privileged, he has no absolute right to have discovery with respect to the settlement.  *In re Community Bank of Northern Virginia*, 418 F.3d 277, 316 (3d Cir. 2005).  Rather, a person challenging a class action settlement is entitled only to such information as is necessary to support their contentions by means of argument to the Court.  *Id.*  In the instant case, Mr. Epstein has all of the same discovery as Settlement Class Counsel.  He does not need Settlement Class Counsel's thought processes to make his own independent determination whether the Settlement is fair, reasonable and adequate.  If he believes that the Settlement is inadequate or unfair, he can make whatever arguments he deems appropriate.

## III

## THE PROPOSED SETTLEMENT SHOULD BE PRELIMINARILY APPROVED BECAUSE IT IS FAIR, REASONABLE AND ADEQUATE

Preliminary approval of a proposed class action is a two-step process. The first step is preliminary approval of the fairness of the settlement, and an order that notice be given to settlement class members. *G.M. Trucks*, 55 F.3d at 785; *Jones v. Commerce Bancorp, Inc.*, 2007 WL 2085357 (D.N.J. July 16, 2007). "Preliminary approval is not binding, and it is granted unless a proposed settlement is obviously deficient." *Jones*, 2007 WL 2085357 at *2. *See Manual for Complex Litig. Fourth* 21.662 (2012) ("At the stage of preliminary approval, the questions are simpler, and the court is not expected to, and probably should not, engage in analysis as rigorous as is appropriate for final approval.").

Mr. Epstein relies on *Zimmerman v. Zwicker & Assocs., P.C.*, 2011 WL 65912 (D.N.J. Jan. 10, 2011), a factually distinguishable decision from Magistrate Judge Schneider. *Zimmerman* was a debt collection case in which plaintiff's counsel attempted to settle all claims on behalf of 800,000 consumers in return for no classwide relief of any kind (only a *cy pres* payment of $32,000 to United Way). Indeed, the Court characterized the relief there as a "phantom benefit."

In direct contrast, the classwide relief in Aetna is up to $120 million in cash. This relief will be made available to the subscriber and provider class members in three separate funds, including a general fund which requires only the completion of a claim form and where eligibility is based on the number of years a subscriber was an Aetna plan member or a provider provided ONET services to an Aetna plan member.

17

a)      **Plaintiffs Faced Substantial Risks Proceeding to Trial**

Against this very substantial relief available to class members now, Class Counsel acknowledge the risks they face were they continue to litigate, which justify proceeding with the settlement.  "[A] settlement is, by its very nature, a compromise that naturally involves mutual concessions."  *Hall v. AT&T Mobility*, 2010 WL 4053547, at * 8 (D.N.J. Oct. 13, 2010).  "[A]fter all, a settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998).  The fairness of a settlement must be weighed against "the realistic, rather than theoretical potential for recovery after trial." *Sullivan*, 667 F.3d at 323.  "No matter how confident one may be of the outcome of litigation, such confidence is often misplaced."  *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971).  Discussion of a handful of what Class Counsel consider in their judgment to be the major litigation risks in this action should suffice for this purpose.

1)      **The Need to Prove the Invalidity of the Ingenix Databases**

Challenges to the Ingenix databases to make UCR determinations have a long history. Two of the cases, *Health Net* and *United Healthcare* were settled, and others, including *CIGNA*, *Wellpoint*, and *Horizon*, continue. But at no time has any court made a substantive ruling that the Ingenix databases were statistically flawed and invalid to make UCR determinations.  Even the settlement with the New York Attorney General's Office eliminating Ingenix and establishing the FAIR database, in conjunction with the *United Healthcare* settlement, did not represent such a judicial finding.

### 2)   The Need to Demonstrate Classwide Damages Based on Aetna's Utilization of the Ingenix Databases and the non-Ingenix Reimbursement Methodologies

While the need to demonstrate classwide proof of damages does not mean that all members must be damaged, it does mean that proof of damages must be shown. Class Counsel believe they have made an adequate case for classwide damages. Nonetheless, they recognize that some health plan subscribers who utilized out-of-network services may not have been damaged at all, either because they were paid at billed charges or because their billed charge amount was equivalent to the allowed amount as determined by the Ingenix databases. The Ingenix databases likely did not under-reimburse ONET services across the board or for common office procedures; they were much more likely to under-reimburse for less common but more expensive specialized medical services.

This issue is compounded with respect to the non-Ingenix reimbursement methodologies, since these methodologies were used in a subset of the total number of reimbursed claims. However, under the Settlement all members of the Classes will be able to make claims and obtain recovery resulting from the artificial depression in ONS which were based on both Ingenix and non-Ingenix reimbursement issues.

### 3)   The Claims of the Provider Plaintiffs

In the *CIGNA* action, the Court dismissed the ERISA and RICO claims brought by the Provider Plaintiffs based on the argument that they did not have standing notwithstanding that they had assignments from their patients and therefore stepped in the shoes of their patients. *Franco v. Connecticut General Life Insurance Co.*, 818 F.Supp.2d 792, 807-12 (D.N.J. 2011). Because *Aetna* is an MDL action, it cannot be filed in another circuit that has already ruled favorably on the assignment issue in other cases, as in *CIGNA*, since any such action would be transferred to this Court. The sole alternative is to appeal at the end of the case.

Moreover, Judge Hochberg dismissed the Provider Plaintiffs' claims in light of Aetna's assertions that they were released in MDL-1334. This issue is currently on appeal in the Eleventh Circuit in the *Wellpoint* action, another UCR action. The appeal will likely decide the issue in Aetna, were there not to be a settlement, and in *CIGNA*.[10]

  **4)**    **The Amount and Calculation of Damages**

Also at issue is how damages are to be calculated. Conceding here the need to interpret "byzantine insurance calculations," Mr. Epstein contends that damages resulting from Aetna's use of the flawed and inadequate Ingenix databases to make UCR determinations (presuming these flaws and inadequacies can be proved at trial) can be determined simply by subtracting the allowed amount from the initial billed charge. The issue, however, is whether the billed charge is the UCR amount, especially on a classwide basis. Without conceding the impropriety of this methodology, Class Counsel developed an alternative one, based not on billed charges but on correcting certain of the flaws of the Ingenix databases. This methodology would more closely adhere to any difference between Ingenix and FAIR than Ingenix and billed charges. Nonetheless, there is no guarantee that even this methodology would be accepted by the Court at trial.[11]

---

[10]  Judge Moreno entered an order on January 10, 2013 requiring the Provider Plaintiffs to withdraw their ERISA claims in *CIGNA*. *In re Managed Care Litigation*, Docket No. 00-1334 (S.D.Fla), Docket Entry 6363. When Plaintiffs do not withdraw the claims, are held in contempt, and are sanctioned, they will appeal to the Eleventh Circuit.

[11]  Mr. Epstein made the same argument in *United Healthcare*, and it was rejected. 2009 U.S. Dist. LEXIS 112634, at *28 ("Opponents argue that the contractual arrangement between UHC and its subscribers requires that, if the UCR determinations are shown to be flawed, UHC is required to pay the full billed charges. . . . [The Court] must note that opponents' stated theory is very far from self-evidently correct. The more intuitively correct theory would reimburse claimants in the amount in which they were actually damaged, i.e. the amount by which their UCR payment fell short of what may be demonstrated to be a properly calculated UCR.").

There are several other issues that cloud the award of damages, however they are calculated. *First*, it is an open question whether Plaintiffs would be able to obtain any recovery at all from Aetna when it acted as the plan administrator in self-funded plans, since benefits were paid from the employer, not Aetna itself. *See AMA v. United Healthcare*, 2007 U.S. Dist. LEXIS 44196 (S.D.N.Y. June 16, 2007) (granting summary judgment to UHC on issue of its lack of liability in self-funded plans when UHC was not the designated administrator). The proposed settlement, however, provides relief to class members notwithstanding the type of plan they had.

*Second*, it is questionable whether subscriber plaintiffs could obtain any recovery at trial unless they were balance billed from their providers, and unless provider plaintiffs submitted balance bills to their patients. *Id.* at *60-61 ("Plaintiffs argue that both deprivation of contract expectations and harm to the relationship between patients and out-of-network providers constitute injuries-in-fact for purposes of showing standing. To satisfy the standing requirement, however, a plaintiff must have injury-in-fact that is 'distinct and palpable.'"). The proposed settlement provides relief to class members who may make claims in the general fund without proving the existence of receiving or sending balance bills.

*Third*, it is possible that the Court could have ruled that Subscriber Class members had to have had an out-of-pocket loss, *e.g.*, actually paid a balance bill, as opposed simply to being under-reimbursed as a result of the use of the Ingenix database. Such a ruling would have greatly reduced the size of the Subscriber Class.

*Fourth,* the Court could hold that the proper remedy under an ERISA benefits claim, as here, is not damages at all – which is not available under ERISA – but either the return of benefits or a remand to the plan administrator for recalculation of benefits. Should the Court choose to remand (presuming Plaintiffs are entitled to any relief), the award of benefits would

await Aetna's recalculations on remand, a process that would be expected to take many months and might result in little or no actual benefit payments.

     **5)**     **Exhaustion of Administrative Remedies**

An additional undecided issue is how the Court would deal with Plaintiffs and Class members' exhaustion of administrative remedies.  This is an open issue that the Third Circuit has not definitively decided .  As is set forth above, there is substantial authority that no one needs to exhaust administrative remedies, or that only the named plaintiffs need to exhaust administrative remedies.  *See, e.g., Household Intern'l*, 441 F.3d at 502; *Thomas*, 201 F.R.D. at 395.  There is authority holding that all class members also need to have exhausted their administrative remedies.  *See Coffin v. Bowater, Inc.*, 228 F.R.D. 397, 404 (D.Maine 2005).  Thus, while the weight of authority holds that absent class members do not need to exhaust their administrative remedies, none of that authority is binding on the Court and if the Court did not believe that authority to be persuasive, there is authority to support a contrary finding.

**b)**     **The Terms of The Settlement, Plan Of Allocation,**
              **and Claims Eligibility Rules Are Fair**

The Epstein opposition does not challenge the value of the $60 million General Fund or any of its claims procedures. The statement that there is no mention of the amount of attorneys' fees to be paid out of the General Fund is demonstrably false: the Settlement and the Notice must – and does – set this information out. The fact that notice and claims administration costs must also be paid out of the General Fund, which is also fully disclosed in the Notice, does not, standing alone, make the Settlement unfair or unreasonable, and Mr. Epstein provides no authority for such a specious suggestion.

It is evident, however, that Mr. Epstein simply dislikes the very existence of the two subscriber and provider "prove-up" funds, and that any funds may revert to Aetna if not claimed.

He would rather checks be sent to everyone and no claims administration occur. (Epstein Brief at 40).  Mr. Epstein is entitled to his opinion, but his opinion also does not render the Settlement unfair and unworthy of preliminary approval.

Mr. Epstein labors mightily to show that the eligibility requirements for the prove-up funds create "impossible barriers." (Epstein Brief at 34). Reviewing the text of the Settlement Agreement, he asserts that Aetna can retrieve all the information he believes is being required of claimants and suggests that this represents a deficiency in the Settlement.

The problem is that it is evident that Mr. Epstein has not reviewed the entirety of the Settlement Agreement, which includes the exhibits.  He ignores the Subscriber Claim Form, exhibit A to the Settlement Agreement. This form sets out, for example, the types of evidence that will be accepted by the claims administrator and they were heavily negotiated by the parties. A balance bill is any written bill regardless of how it was presented to the subscriber (that is, in person, by mail, or otherwise).  It may, in fact, be the bill presented to the subscriber when the service was rendered and prior to any reimbursement claim made to or paid by Aetna. It may come from the provider's office, or from any source, and proof of any payment may be in any number of forms (cancelled check, credit card statement, or provider's business records showing partial payment, among others).  It does not have to come solely because a subscriber kept all bills from all providers for the entire period they were plan members with Aetna.

Mr. Epstein also ignores that Class Counsel succeeded in obtaining from Aetna the precise data availability of which he complains. He appears to have missed the language appearing in section VI of the Notice, "How Will the Settlement Funds Be Allocated," under "Important Notice" (in bold): "Aetna has made available to the Claims Administrator certain

claims information within the class periods. You may request such information from the Claims Administrator and use it to complete your claim form."

Mr. Epstein further complains about the proof of the existence of an assignment, says that it is not defined, and contends that it represents an "artificial barrier" to eligibility.  (Epstein Brief at 44). However, it is evident again that Mr. Epstein has not read the Settlement papers carefully. "Assignment" is defined, in section VI of the Notice: "'Assignment' means a Plan Member's election to permit an Out-of-Network Health Care Provider or Provider Group to bill and receive reimbursement from Aetna directly."

The Provider Claim Form, Exh. B, also sets out the types of evidence that may be accepted to prove an assignment. Significantly, a Provider need not submit any form of assignment whatsoever; an attestation that an assignment exists, and that it is contained in Aetna's claims systems (that is, the Provider represented he had an assignment on the HCFA or CMS 1500 form when he made a claim) is sufficient proof.

The burden on the subscriber claimant is even easier.  Pursuant to the Subscriber Claim Form, Exh. A, Subscriber claimants need provide no documentation at all concerning assignments.  They do not have to demonstrate, for example, that they did *not* assign their claim to a provider.  If they make a claim, and their claim is otherwise deemed eligible, they will share in the settlement fund(s). The only exception is when a provider claimant proves he had an assignment for the same claim.  Under that limited circumstance, the provider with the assigned claim is entitled to make a claim if his claim is otherwise deemed eligible.

In criticizing the release as "overbroad," Mr. Epstein mischaracterizes the holdings in the cases he cites and misrepresents the terms of the release.  He cites *Fields v. Wise Media, LLC*, 2012 U.S. Dist. LEXIS 178894 (N.D. Cal. Dec. 18, 2012), without disclosing to the Court that

*Fields* is not, in fact, a decision at all but a "Notice" issued by the court for "the guidance of counsel" representing factors that "will typically be considered." He omits reference to the fact that in *Moore v. Halliburton Co.,* 2004 WL 2092019 (N.D. Tex. Sept. 9, 2004), the proposed release would extinguish claims that did not even relate to the claims in that action, unlike here.

The release language in the Settlement Agreement, at ¶ 1.42, is limited to claims *both* relating to the conduct and facts referred to or alleged in the Complaint *and* limited to the date the Court enters the Preliminary Approval Order. The release then goes on to specify the Ingenix databases and examples of non-Ingenix methodologies, and explicitly carves out claims when providers were INET for any period of time, including when they had a contract with an Aetna rental network.

The explanation for the 5%/3% distinction is simple: it takes into account the existence of and use of the FAIR database and the calculation of damages based on a UCR methodology utilizing this accepted tool. It is another aspect of the allocation of the subscriber and provider funds negotiated by the parties. And no class member need make a claim limited to it, because the general fund is based on the number of plan years and not the specific methodology in use.

Finally, Mr. Epstein criticizes the Notice as "extremely vague," and omits "Aetna's reversionary interest. (Epstein Brief at 44-45). While we have no idea of what Mr. Epstein means by "vague" since he does not himself explain what he means, the fact that the subscriber and provider prove up funds are reversionary are disclosed in the Notice, at section V(a)(4): "If the Subscriber and/or Provider Settlement Fund is not exhausted after all claims have been made, any leftover amounts in that Fund shall remain with Aetna and will not be paid out under the Settlement."

## CONCLUSION

For the foregoing reasons, the Parties respectfully ask the Court to certify the proposed

Classes, preliminarily approve the Settlement, and approve the form and manner of notice to the

Classes.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
*Settlement Class Counsel*

By: ____/s/ James E. Cecchi_____
JAMES E. CECCHI

Dated:  January 14, 2013

D. Brian Hufford
Robert J. Axelrod
POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP
600 Third Avenue
New York, NY 10016

*Chair of Plaintiffs' Executive Committee*

Joe R. Whatley, Jr.
Edith Kallas
WHATLEY KALLAS, LLC
380 Madison Avenue, 23rd Floor
New York, NY 10017

*Attorneys for Provider Class*

Stephen A. Weiss
SEEGER WEISS LLP
One William Street
New York, NY 10004

Christopher Burke
Joseph P. Guglielmo
SCOTT+SCOTT, ATTORNEYS AT LAW
LLP
The Chrysler Building
405 Lexington Ave., 40th Floor
New York, NY 10174
(212) 223-6444

*Attorneys for Subscriber Class*