| | |
|---|---|
| **In re AETNA UCR LITIGATION**<br><br>**This Document Relates to:**<br><br>**ALL CASES** | Civil Action No. 07-3541<br>MDL No. 2020<br><br>**SUPPLEMENAL OPINION<br>ADDRESSING OBJECTIONS TO<br>PRELIMINARY CERTIFICATION OF<br>SETTLEMENT CLASSES AND<br>PRELIMINARY APPROVAL OF<br>PROPOSED SETTLEMENT<br>AGREEMENT** |

**Katharine S. Hayden, U.S.D.J.**

This multidistrict litigation arises out of the insurance industry's use of allegedly flawed databases licensed from Ingenix, Inc., a wholly-owned subsidary of UnitedHealth Group. According to the lawsuits against Aetna and similar actions filed against other insurers using Ingenix, medical services rendered by out-of-network providers were systematically under-reimbursed. Several plaintiffs entered into negotiations with Aetna, and, after extensive discovery, motion practice, and 13 in-person mediation sessions, an agreement was reached to settle the matter for $120 million.

The settling parties filed a joint motion for preliminary approval of the settlement agreement, preliminary certification of the settlement classes, and approval of the form and manner of notice to the settlement classes. [D.E. 839.] UnitedHealth Group and Ingenix, and six plaintiffs have opposed this motion. [D.E. 841, 843.] The Court reviewed the parties' submissions and heard from the proponents and opponents during lengthy oral argument on July 15, 2013 and July 23, 2013. [D.E. 883, 891.] Having fully considered the settling parties' joint motion for preliminary approval of the settlement classes, the arguments made in opposition to preliminary approval, and after examining the lengthy docket in this matter, the Court is satisfied that preliminary approval of the proposed settlement classes and class notice provisions is

1

appropriate. The Court's findings and a schedule for the final approval hearing and administration of class notice are set forth in the accompanying order. [D.E. 898 ("Prelim. Approval Order").] This opinion addresses the objections raised by the opponents to the proposed settlement and certification of the proposed classes.

## I. BACKGROUND

Plaintiffs fall into two categories: members of Aetna's healthcare insurance plan ("subscriber plaintiffs") and physician and non-physician out-of-network providers ("provider plaintiffs"). [Compl. ¶¶ 12, 50.][1] These subscribers and providers allege that Aetna used databases licensed from Ingenix to set usual, customary, and reasonable ("UCR") rates for out-of-network services knowing that the data was inherently flawed. Aetna's use of this data resulted in artificially reduced reimbursements to plaintiffs. [*See generally id.* at ¶¶ 5, 8, 10, 150-152.] To that end, plaintiffs allege the existence of "a secret and illegal agreement by Aetna, UnitedHealth Group, Ingenix, and most of the country's largest health insurers to systemically under-reimburse consumers for [out-of-network services]" in violation of ERISA, RICO, and the Sherman Act, as well as state law. [*Id.* at ¶ 5 & Section XIII.]

## II. PROCEDURAL HISTORY

On April 8, 2009, the Judicial Panel on Multidistrict Litigation consolidated *Cooper v. Aetna Health Inc.*, No. 07-3541, which was originally filed in this district and assigned to Judge Faith Hochberg, with *Weintraub v. Ingenix, Inc.*, No. 09-2027, originally filed in the District of

---

[1] In their brief, the UnitedHealth and Ingenix defendants stated that the parties disagree over whether the first or the second consolidated amended complaint is the operative complaint. [D.E. 841 ("United Defs.' Opp.") at 3, n.1.] When probed during oral argument, counsel confirmed that this was a quality control—not substantive—issue. [Prelim. Hr'g Tr. Day 2 at 8:1-9:18.] The factual bases laid out in both complaints are nearly identical. As such, "Compl. ¶ __" refers to the applicable paragraph(s) in both the first and the second consolidated amended complaints – D.E. 219, 319.

Connecticut, under MDL No. 2020. In June of 2009, Judge Hochberg consolidated other related actions filed in this district and instructed the various plaintiffs to file a single consolidated amended complaint under the caption "*In re: Aetna UCR Litigation,* MDL No. 2020." [D.E. 212 ("CMO No. 1").] After the consolidated complaint was filed, Judge Hochberg fielded proposals for choosing a leadership structure for counsel from the several law firms representing the consolidated plaintiffs. Ultimately, Judge Hochberg issued a Case Management Order that empaneled the "Aetna Plaintiffs' Executive Committee" to streamline case management, setting forth the duties of each respective firm. [D.E. 236 ("CMO No. 2").] Under CMO No. 2, Judge Hochberg designated the Carella Byrne law firm to serve as settlement liaison responsible for organizing and coordinating settlement negotiations on behalf of plaintiffs. [*Id.* at ¶ 3.]

Thereafter, the parties continued to litigate the action, with defendants filing a motion to dismiss and plaintiffs filing a motion for class certification – both of which were fully briefed. [*See, e.g.*, D.E. 249, 269-270, 288, 428, 454, 510-511, 548, and 579.] Even while the docket remained active, the parties began to engage in settlement discussions, selecting retired United States District Judge Nicholas H. Politan to serve as a mediator. At his direction, the parties exchanged information about potential damage calculations. [Jan. 14, 2013 Certification of James E. Cecchi ("Cecchi Cert.") at ¶¶ 7-8; Prelim. Hr'g Tr. Day 1 (Cecchi) 13:1-4.] Coincident with the parties' efforts to settle the matter by mediation, Judge Hochberg administratively terminated the motion to dismiss and the motion for class certification, with the caveat that they could be reactivated if the settlement talks became unproductive. [D.E. 595.] Following a status conference held October 18, 2010, Judge Hochberg ordered the parties to refile their motions and held oral argument on the motion to dismiss. [D.E. 622, 624-626, 634-637, 761 (Oral Arg. on 625 motion to dismiss – decision reserved).] Notwithstanding, during this same period Judge

Politan continued to convene in-person mediation sessions in New York and Florida. [Cecchi Cert. at ¶ 9.]

On June 2, 2011, the case was reassigned to Judge Stanley Chesler. [D.E. 777.] The parties jointly represented that they wanted to continue pursuing a settlement and agreed that Judge Chesler should hold any decision on the motion to dismiss in abeyance pending their discussions. [*See* D.E. 868 (Chesler Recusal Opinion) at 1.] For the remainder of 2011, the parties continued to attend in-person mediation conferences with Judge Politan. The 13th and final mediation session took place on December 7, 2011. [Cecchi Cert. at ¶ 9.]

Exactly one year after that, the settling plaintiffs and Aetna filed the motion for preliminary approval that is presently before the Court. [D.E. 839 ("Moving Br.").][2]

## III. OVERVIEW OF SETTLEMENT AGREEMENT

### A. Settlement Terms

Aetna, four subscribers – John Seney, Jeffrey M. Weintraub, Alan John Silver, and Mary Ellen Silver, and four out-of-network providers – Dr. Alan Schorr, Dr. Frank Tonrey, Dr. Carmen Kavali, and Brian Mullins, M.S., P.T., have entered into the settlement agreement before the Court. [D.E. 839-2 (hereinafter "Settlement Agreement") at § 1.44; D.E. 847.] Under the terms, Aetna will pay $60 million to a general settlement fund. [Settlement Agreement at § 9.] Attorneys' fees, administration costs, and service payments to the representative plaintiffs will be paid out of the general settlement fund first. [*Id.* at §§ 9.2, 11.][3] Upon timely submission of a

---

[2] Chief Judge Simandle assigned the case to the undersigned after Judge Chesler discovered that he had a disqualifying interest in the litigation that had gone unnoticed. [D.E. 868, 871, 873.]

[3] "If the Court approves the proposed Settlement, Settlement Class Counsel will apply to the Court for an award of attorneys' fees in an amount not to exceed 33 1/3% of the Settlement Fund and reimbursement of expenses not to exceed $3,000,000. Any attorneys' fees and expenses awarded by the Court will be paid from the General Settlement Fund. In addition, Settlement Class Counsel may apply to the Court for the approval of a service fee to each of the

claim form, members of the two settlement classes will be entitled to a pre-determined reimbursement amount from the remainder of the general fund – up to $40 per year that they are eligible, subject to a *pro rata* reduction. In addition to the $60 million in the general settlement fund, Aetna will pay up to an additional $60 million to two prove-up funds -- a subscriber fund ($40 million) and a provider fund ($20 million). [*Id.* at §§ 10.1, 10.2.][4] Members of each of the two proposed settlement classes may elect to seek compensation either from the general settlement fund without supporting documentation, or from the relevant prove-up fund with supporting documentation establishing timely and valid prove-up claims for reimbursement. Aetna agrees to make available to the settlement administrator certain claim information for the relevant class periods to assist claimants in fulfilling the requirements of the prove-up funds. [*See* Class Notice, appended as Exh. F to the Settlement Agreement, at Section VI ("Important Information").] A claimant who does not qualify for payment in one of the prove-up funds, can apply to the general settlement fund. [Settlement Agreement at §§ 10.1(d), 10.2(d); *see also* "NOTE" in Section B of the Subscriber and Provider Claim Forms, appended to Settlement Agreement as Exhs. A & B ("Subscriber/Provider Settlement Claims declared ineligible will be considered for eligibility under the General Settlement Fund"); Class Notice, appended as Exh. F to the Settlement Agreement, at Section VI (same).]

---

Representative Plaintiffs not to exceed $20,000 each." [Notice of Proposed Settlement of Class Action & Final Settlement Hearing, appended as Exh. F to the Settlement Agreement, at Section XII; *see* Prelim. Approval Order at ¶ 21 (setting March 11, 2014 deadline for motion on fees).]

[4] If the general settlement fund is not exhausted after payment of all claims, its remaining funds will be allocated equally between the two funds. If one prove-up fund is exhausted and the other is not, the remaining general settlement funds will be allocated to the exhausted prove-up. If either prove-up fund is not exhausted after all eligible claims are paid, up to $5 million of that fund will be allocated to the other prove-up fund. If either prove-up fund is not exhausted after all of these allocations, any remainder will remain with Aetna. [Settlement Agreement at §§ 10, 10.1(g), 10.2(g); *see also* Notice of Proposed Settlement of Class Action & Final Settlement Hearing, appended as Exh. F to the Settlement Agreement, at Section V(a)(4).]

In exchange, the settlement classes will provide a broad release of claims against Aetna and all other released persons. [Settlement Agreement at § 13.] United and Ingenix are not considered "released persons." [*Id.* at § 1.41.]

### B. Settlement Classes

The proposed settlement identifies two settlement classes:

- **<u>Provider Settlement Class</u>** = "Persons who, at any time from June 3, 2003 through the Preliminary Approval Date, (i) were Out-of-Network Health Care Providers or Out-of-Network Health Care Provider Groups; (ii) provided Covered Services or Supplies to Plan Members; and (iii) whose resulting claims for reimbursement included Partially Allowed Claims." [Settlement Agreement at § 1.37.][5]

- **<u>Subscriber Settlement Class</u>** = "Persons who, at any time from March 1, 2001 through the Preliminary Approval Date, (i) were Plan Members; (ii) received a Covered Service or Supply from an Out-of-Network Heath Care Provider or Out-of-Network Health Care Provider Group; and (iii) whose resulting claims for reimbursement included Partially Allowed Claims." [Settlement Agreement at § 1.50.]

### IV. <u>DISCUSSION & ANALYSIS</u>

In order to determine if preliminary approval of the proposed settlement classes is appropriate, the Court must look to Fed. R. Civ. P. 23. First, the proposed classes have to meet the standard requirements under subsections (a)(1)-(4) (numerosity, commonality, typicality, and

---

[5] All capitalized terms are defined in the agreement. [*See* Settlement Agreement at §§ 1.26, 1.27, 1.14, 1.32, 1.28.] For ease of reference, "Plan Member" means "an individual enrolled in or covered by a Plan Insured or administered by the Company, *id.* at § 1.32, and "Partially Allowed Claim" means "any claim line for a Covered Service or Supply provided to a Plan Member that is not a Denied Claim and for which the Allowed Amount is less than the amount billed by the provider," *id.* at § 1.28; *see also* Prelim. Hr'g Tr. Day 2 (Axelrod) 51:1-6. "Partially Allowed Claims must relate to services provided to a Plan Member by an Out-Of-Network Provider or an Out-Of-Network Provider Group." *Id.* at § 1.28.

adequacy) and subsection (b)(3) (superiority and predominance). Second, the court must determine whether the proposed settlement is "fair, reasonable, and adequate" under subsection (e). *Rodriguez v. Nat'l City Bank*, No. 11-8079, -- F.3d --, 2013 WL 4046385, at *5, 8 (3d Cir. Aug. 12, 2013) (citing *Sullivan v. D.B. Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc)).

United HealthGroup and Ingenix (hereinafter "United defendants") argue that the Court should not approve the proposed subscriber class under RICO and the Sherman Act because the commonality and predominance requirements are not satisfied. Six subscriber plaintiffs who brought ERISA claims against Aetna allege that the settling parties' agreement should not be approved because the plaintiffs representing the subscriber class are inadequate and present claims and issues that are not typical of the absent class members.[6] These same plaintiffs also oppose the Court's entry of the proposed settlement because, according to them, it does not satisfy Rule 23(e)'s fair and reasonable requirement. These arguments will be addressed in turn.

### A. United Defendants' Objection

#### 1. *Rule 23(a)(2) & (b)(3) - Commonality & Predominance Requirements*[7]

"A putative class satisfies Rule 23(a)'s commonality requirement if 'the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'" *Rodriguez,* 2013 WL 4046358, at *8 (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). Recognizing, that "that bar is not a high one," just this month the Third Circuit stated that it has "acknowledged commonality to be present even when not all plaintiffs suffered an actual injury, *Baby Neal,* 43 F.3d at 56, when plaintiffs did not bring identical claims, *In re*

---

[6] The parties do not dispute that the numerosity requirement in Rule 23(a)(1) and the superiority requirement of Rule 23(b)(3) are satisfied. [Prelim. Hr'g Tr. Day 1 28:13-18.]
[7] The commonality and predominance requirements enumerated in Rule 23(a)(2) and (b)(3) tend to overlap significantly and are often discussed together. *Sullivan*, 667 F.3d at 297; *Danvers Motor Co, Inc. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008).

*Prudential*, 148 F.3d 288, 311 (3d Cir. 1998), and, most dramatically, when some plaintiffs' claims may not have been legally viable, *Sullivan*, 667 F.3d at 305-07." *Id.*; *see also id.* ("[T]he focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is 'on whether the defendant's conduct was common as to all of the class members.'") (quoting *Sullivan*, 667 F.3d at 299).

The predominance inquiry of Rule 23(b)(3), while similar to commonality, imposes a "more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." *Sullivan,* 667 F.3d at 297 (citing *In re Ins. Brokerage Antitrust Litig.*, MDL 1663, 579 F.3d 241, 266 (3d Cir. 2009)); *see also In re Ins. Brokerage Antitrust Litig.*, MDL 1663, -- F. Supp. 2d --, 2013 WL 3956378, at *12 (D.N.J. Aug. 1, 2013) (quotation omitted). Third Circuit precedent provides that, as with commonality, "the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Id.* at 198; *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269 (finding that "whether the named plaintiffs and absent class members were proximately injured by the conduct of the [ ] defendants is a question that is capable of proof on a class-wide basis," and that "the element of antitrust injury–that is, the fact of damages—is susceptible of common proof, even if the amount of damage that each plaintiff suffered could not be established by common proof.").

### 2. *Discussion & Analysis*

The settling plaintiffs seek preliminary certification as to all claims pled against Aetna -- including their RICO and Sherman Act claims that are also pled against the non-settling United defendants. As the Court indicates in its accompanying order preliminarily approving the

proposed settlement classes, "there are common issues of law and fact for both settlement classes" that "predominate over questions that may affect only individual members." [D.E. 898 ("Prelim. Approval Order") at ¶¶ 8(b); 9(a).] These issues include: "(i) [w]hether Aetna's use of the Ingenix databases or its other challenged reimbursement practices with respect to out-of-network services and supplies resulted in artificially reduced payments to settlement class members; and (ii) [w]hether Aetna's use of the Ingenix databases or its other challenged reimbursement practices with respect to out-of-network services and supplies violated ERISA, RICO, or the Sherman Act." [*Id.* at ¶¶ 8(b)(i)-(ii); *see also* Prelim. Hr'g Tr. Day 1 (Cecchi) 28:20-29:4.]

The United defendants allege that the proposed subscriber class cannot satisfy the commonality and predominance requirements of Rule 23 for the RICO and Sherman Act claims because they cannot prove injury and causation using class-wide proofs. [United Defs.' Opp. at 1, 8 (citing 15 U.S.C. § 15(a); 18 U.S.C. § 1964(c)); *see also* Prelim. Hr'g Tr. Day 1 (Pace) 56:13-18; 57:2-6.] To that end, the United defendants contend that because the purported injury is that Aetna reimbursed subscriber class members less for out-of-network services when it used the Ingenix database, to be a certifiable class the subscriber plaintiffs would have to use class-wide proofs to show that the Ingenix databases were skewed downward across the board. [United Defs.' Opp. at 1-2.] This, they allege, cannot be done because "to demonstrate under-reimbursement, each plan member would have present *individualized* evidence as to the specific CPT code/Geozip combination and provider charge percentile from the iteration of an Ingenix database that Aetna used for his or her [out-of-network] claim and then compare that to what the plan member contends would be a more accurate corresponding benchmark to satisfy Aetna's health plan obligations." [*Id.* at 2 (emphasis in original); *see also id.* at 8-9, 11 ("To come up

with anything but an 'average' 'probable estimate' that a particular claim was underreimbursed, [plaintiffs' expert] Dr. Siskin would need 'information about the individual and circumstances of the individual." (quoting Siskin Dep. at 60:24-61:21)); *see also* D.E. 886 ("United PowerPoint") at 10-11).] The United defendants conclude that where, as here, individual questions involving causation and damages predominant over common issues class certification is unsuitable. [United Defs.' Opp. at 13-14.]

The settling parties argue that the United defendants do not have standing to challenge the proposed settlement classes because they are not parties to the settlement. [D.E. 850 ("Settling Pls.' Reply to United") at 2-5; D.E. 851 ("Aetna Reply") at 12; Prelim. Hr'g Tr. Day 1 (Guglielmo) 49:3-5; 49:19-50:23 (quoting *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1332 (3d Cir. 1990) ("To establish standing to appeal a settlement, a non-settling defendant may not merely claim an interest in the lawsuit but must show cognizable prejudice to the legal relationship between it and the settling parties.").]

Generally, "[n]on-settling defendants . . . lack standing to object to a partial settlement, because they are ordinarily not affected by such a settlement." *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 2007). An exception, however, is recognized when the non-settling defendant "can demonstrate that they will suffer some formal legal prejudice as a result of the partial settlement." *Id.*; *see also In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 103 (S.D.N.Y. 1997) (citing *Zupnick v. Fogel*, 989 F.2d 93, 98 (2d Cir. 1993)). Indeed, the Third Circuit has recognized that "[t]here is consensus that a non-settling defendant has standing to object to a partial settlement which purports to strip it of a legal claim or cause of action" such as "an action for indemnity or contribution," or to "invalidate [the non-settling defendant's] contract rights." *Id.* (citation omitted).

The settling parties argue that the United defendants do not have standing because they "have no rights or claims under the settlement that are being impacted, and [because] the settlement and certification of the claims alleged in the complaint, including the RICO and antitrust claims, in no way impact their on-going defenses in this action." [Settling Pls.' Reply to United at 2; *see also* Aetna Reply at 12-13.] The settling parties also perceive "hypocrisy" on the part of the United defendants because in *American Medical Ass'n v. United Healthcare Corp.*, 00-cv-2800, 2009 WL 4403185 (S.D.N.Y. 2009), as part of their $350 million settlement, the United defendants and settling plaintiffs sought and obtained certification of a settlement class that included ERISA, RICO, and antitrust claims involving "identical challenges to the Ingenix database." [*Id.*; *see also* Aetna Reply at 3, 15 (citing *AMA*, slip op. at *3, 6); Prelim. Hr'g Tr. Day 1 (Guglielmo) 49:6-14; 51:13-22.][8]

In response, the United defendants allege that despite not being a member to the settlement, until their motion to dismiss is decided, they are still facing the claims brought by subscriber plaintiffs and thus have a direct interest in any decision by this Court to certify a subscriber settlement class on those claims. [United Defs.' Opp. at 3.] They contend that "[t]his is true even if the subscriber settlement class is certified only for the purposes of settlement since the law is clear that the requirements of Rule 23(b)(3) are very similar as applied to a settlement class and a 'merits' class." [*Id.*; *see also* United PowerPoint at 2 ("The Court 'must resolve all factual and legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action.'") (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008)).] In other words, the United

---

[8] In the alternative, the settling parties argue that the commonality and predominance requirements are satisfied because several common questions of fact and law predominate over individual questions. [*See* Moving Br. at 11-12 (citing *In re Prudential*, 148 F.3d at 314).]

defendants are concerned about the impact that certifying a settlement class may have on a future motion for class certification in the remaining litigation. The settling plaintiffs maintain that "a decision by this Court certifying the RICO and antitrust claims for settlement purposes has no impact whatsoever on the [United] defendants as any defense they may have or have previously raised against certification of the RICO and antitrust claims would still exist even if the Court were to certify such claims as to Aetna." [Settling Pls.' Reply to United at 4 (citing *In re K-Dur Antitrust Litig.,* No. 01-1652, 2007 WL 5297757, at *5, n.7 (D.N.J. Oct. 10, 2007) ("while [ ] non-settling defendants' arguments in opposition to certification of a litigation class may bear upon the class certification issues generally, those defendants lack standing to object to the proposed settlement and to class certification for settlement purposes.").]

### 3. Conclusion

The Rule 23 analysis may include a preliminary inquiry into the merits insofar as the merits of the claims may be relevant to the class certification analysis. *Rodriguez,* -- F.3d --, 2013 WL 4046385, at *5-6. But, the Third Circuit has established the parameters of the Court's review at this stage in the case and commented on its bearing on the merits: "factual findings of the court on a Rule 23 motion are restricted to the question of whether the class may be certified and 'do not bind the factfinder on the merits.'" *Franco v. Cigna*, 289 F.R.D. 121, 130 (D.N.J. 2013) (quoting *Hydrogen Peroxide*, 552 F.3d at 318). Because a determination at this stage does not bind the Court on the merits, preliminarily approval of the subscriber settlement class does not affect the United defendants and therefore they lack standing to object. *See, e.g., Eichenholtz*, 52 F.3d at 482; *In re Sch. Asbestos Litig.*, 921 F.2d at 1332. This is particularly true when issues that would need to be addressed before claims could be certified for litigation class treatment, such as manageability at trial, were not considered when addressing the sufficiency of

the proposed settlement classes. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also* Prelim. Hr'g Tr. Day 1 (Guglielmo) 52:17-18, 23-25.

Moreover, having reviewed the United defendants' injury and causation arguments, the Court is satisfied that it would be more appropriate to consider the viability of plaintiffs' RICO and Sherman Act claims against the United defendants in the context of the pending motion to dismiss.[9] The United defendants shall resubmit all previously filed motion papers and may supplement the submission with any relevant subsequently issued case law. A separate order will be entered that sets forth a schedule for submissions on the motion to dismiss.

### B. ERISA Plaintiffs' Objection to the Proposed Representative Plaintiffs

#### 1. Rule 23(a) Standard for Adequacy of Proposed Representative Plaintiffs

Rule 23(a)(4) provides that to certify a class, a court must find that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Larson v. AT&T Mobility*, LLC, 687 F. 3d 109, 131-132 (3d Cir. 2012) (quoting *Amchem Prods.*, 521 U.S. at 625).[10] "[T]he inquiry has

---

[9] In addition to arguing that the subscriber plaintiffs will not be able to show injury and causation through use of common proofs, the United defendants contend that some members may not have incurred out-of-pocket expenses and some members may have subscribed to self-funded plans. [*See* United Defs' Opp. at 26-30.] The United defendants also argue that the settling parties cannot establish the misrepresentation element of the subscribers' RICO claims. [*Id.* at 30-36.] These issues are also more suitable for consideration in the context of the United defendants' motion to dismiss.

[10] In their supplemental omnibus brief, the objecting plaintiffs refer the Court to the *Larson* decision in a parenthetical that describes the holding as: "vacating the district court approval of a settlement supported by Carella Byrne and Freed & Weiss on the basis of due process rights of absent class members and the possible inadequacy of the class representatives." [D.E. 854 ("Obj. Pls.' Omnibus Br.") at 19, n. 3.] But *Larson* is distinguishable in that the Circuit found the district court abused its discretion in ruling that it would be unreasonable for the cellular provider to undertake a search of its billing records in order to identify class members for individual notice. As to the adequacy of the class representatives, the Circuit commented

two purposes: 'to determine [1] that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, . . . and [2] that there is no conflict between the individual's claims and those asserted on behalf of the class.'" *Id.* (quoting *In re Community Bank of North Virginia,* 622 F.3d 275, 291 (3d Cir. 2010) (ellipsis in original)).  This inquiry is closely tethered to the typicality requirement, *Danvers*, 543 F.3d at 149, which "is designed to align the interests of the class and class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals," *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004).  *See* Fed. R. Civ. P. 23(a)(3) (allowing certification if "the claims or defenses of the representative parties are typical of the claims or defenses of the class").

### 2.  *Discussion & Analysis*

In their opposition brief, six ERISA plaintiffs object to the certification of the subscriber settlement class arguing that the proposed representative plaintiffs – John Seney, Jeffrey Weintraub, Alan John and Mary Ellen Silver – are inadequate because they are subject to unique defenses and therefore cannot satisfy Rule 23's adequacy and typicality requirements. [D.E. 843 ("Obj. Pls.' Opp.").]  These objecting plaintiffs, who include Michele Cooper, Michele Werner, Darlery Franco, Paul and Sharon Smith, and Carolyn Samit, allege that they are "the only subscriber plaintiffs in this matter who are adequate and will protect the due process rights of absent class members."  [*Id.* at 1.]

### i.  **John Seney**

On July 31, 2009, Seney's case was consolidated into MDL 2020 under CMO No. 1. [D.E. 212; *see, supra*, p. 2-3.]  On September 18, 2009, Seney filed a notice of voluntary

---

without ruling in *Larson* that because the representatives were no longer subscribers of the cellular service they may not be well-suited to represent those class members who remain subscribers of the service.

dismissal and on September 21, 2009 Judge Hochberg "dismissed [Seney's claims] *without prejudice* in accordance with Fed. R. Civ. P. 41(a)(1)(A)(i)." [D.E. 255, 256 (emphasis added).] On December 24, 2009, Seney was named as a subscriber plaintiff in "Section II – Parties" of the second amended consolidated complaint and his specific claims against the defendants were described in paragraphs 353 through 358. [D.E. 319.]

Reminding the Court of its "fiduciary responsibility to class members to ensure that all Rule 23 due process and other requirements have been satisfied," the objecting plaintiffs allege that representative Seney is inadequate because his case was dismissed in 2009 and therefore he "has no 'live' action of any kind that can be considered for class certification or any other purpose." [Obj. Pls.' Opp. at 14, 16; *see also* Prelim. Hr'g Tr. Day 1 (Quackenbos) 19:6-20:10.] The settling parties contend that Seney "rejoined the litigation in the second amended complaint" and therefore "has a live complaint" and is "adequate to represent the interests of the subscriber class" as "[h]e was a subscriber. . . [and] [h]e's complaining about under reimbursement [ ] using Ingenix database." [Prelim. Hr'g Tr. Day 1 (Cecchi) 16:16-17:5; *see also* D.E. 848 ("Settling Pls.' Reply to Obj. Pls.") at 3.] In response, the objecting plaintiffs maintain that Seney's "attempted rejoining . . . by inserting his name in the second amended class action complaint . . . did not effectively join him" as "[t]he only way [he] could have come back to life was had he served and filed a new summons and complaint" and "[h]e did not do so." [Prelim. Hr'g Tr. Day 1 (Quackenbos) 19:10-18; D.E. 896 ("Quackenbos PowerPoint") at 4; Obj. Pls.' Opp. at 5-6.] Consequently, the objecting plaintiffs assert that this Court does not have jurisdiction over Seney. [Obj. Pls.' Opp. at 13.]

The Court is not persuaded by the objecting plaintiffs' attempt to characterize Seney as an inadequate representative based on the hyper-technical argument that the Court voluntarily

dismissed his claims *without* prejudice, when Seney's identical claim was repled in the amended complaint filed after these multi-district actions were consolidated.[11] *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001) ("The primary meaning of 'dismissal without prejudice,' we think, is dismissal without barring the plaintiff from returning later, to the same court, with the same underlying claim."). As with the other members of the subscriber class, Seney alleges that he was under-reimbursed for out-of-network services because of Aetna's use of Ingenix and other challenged reimbursement practices. [*See* Second Am. Compl. at ¶¶ 353-358; Moving Br. at 11-12; Prelim. Hr'g Tr. Day 1 (Cecchi) 17:3-5.] Because there is no conflict between Seney's claims and those asserted on behalf of the class, and because the objecting plaintiffs have failed to provide evidence suggesting Seney is unable or unwilling to represent the claims of the class, the Court remains satisfied that he is an adequate representative for the subscriber class. [*See Larson,* 687 F.3d at 132; Prelim. Approval Order at ¶ 8(c)(1).]

The objecting plaintiffs argue that Seney is also an inadequate representative of the absent class members because he did not exhaust his administrative remedies. [Obj. Pls.' Opp. at 7, n.4.] During the preliminary hearing, the settling plaintiffs stated that "the fact [Seney has] not exhausted makes him the best [representative] [b]ecause most of the classes are not exhausted and indeed we argued throughout the litigation that exhaustion was not a requirement in this settlement context." [Prelim. Hr'g Tr. Day 1 (Cecchi) 16:20-25.] In its reply submission, Aetna properly points out that the crux of a settlement agreement is that parties will forgo claims and defenses in order to avoid further litigation. To that end, Aetna stated that it has "agreed, for settlement purposes, to settle with and provide compensation to subscribers in this case

---

[11] The Court notes that, in their capacity as "members" of the Executive Committee, counsel for the objecting plaintiffs were signatories to the second amended consolidated complaint that explicitly included Seney's allegations. [Second Am. Compl. at p. 201.]

regardless of whether they exhausted administrative remedies," and has "also agreed to forego other defenses under its settlement with respect to numerous other subscribers, including many defenses that would apply to the non-settling subscriber plaintiffs who refer to themselves throughout their brief as the 'adequate subscriber plaintiffs.'" [Aetna Reply Br. at 2; *see id.* at 11 (not only are these challenges an "about-face from the positions [the objectors took] when litigating their own claims, but [they] also miss the fundamental point: Aetna has many defenses to liability with respect to *all* of the named plaintiffs, and settlement class members, but has entered into the settlement in order to avoid a protracted and costly litigation of all of those unique issues.") (quoting *In re Prudential*, 148 F.3d at 318 ("avoidance of a 'long, arduous' trial on the merits weighs in favor of approving settlement")).]

The Court is persuaded that Seney's lack of exhaustion is of no moment here, where a majority of the absent class members have likely not sought the appropriate administrative remedies and because Aetna has waived certain defenses, including exhaustion, in the spirit of settlement.

### ii.  Jeffrey Weintraub

As a student at New York University, Weintraub was insured under Aetna's student health plan, which was processed by an affiliate formerly known as Chickering (now known as Aetna Student Health).  [Settling Pls.' Reply to Obj. Pls. at 10; Second Am. Compl. at ¶ 359.]  In 2007, he received a covered service from an out-of-network provider and filed suit against defendants alleging that he was under-reimbursed by Aetna for those services.  [*Id.*; Second. Am. Compl. at ¶ 361; *see also, supra,* at p. 2 (explaining that on April 8, 2009, *Weintraub v. Ingenix, Inc.*, No. 09-2027 – originally filed in the District of Connecticut, was consolidated with *Cooper v. Aetna Health Inc.* under MDL No. 2020).]

The objecting plaintiffs contend that Weintraub is not an adequate subscriber representative because he did not bring ERISA claims against defendants, as his student health plan was a non-ERISA plan. [Obj. Pls.' Opp. at 10, 12; *see also* Quackenbos PowerPoint at 4.] The settling plaintiffs respond that "[t]his fact, while true, does not limit Weintraub's ability to release *all* claims provided they arise out of the same factual predicate as settled class claims." [Settling Pls.' Reply to Obj. Pls. at 12; Prelim. Hr'g Tr. Day 1 (Cecchi) 27:10-14.] In light of Weintraub's allegations, the Court remains satisfied that he falls squarely within the subscriber class, which includes persons who, at any time from March 1, 2001 through the preliminary approval date, were plan members, received a covered service from an out-of-network provider, and whose resulting claim was only partially allowed. [Settlement Agreement at § 1.50; Prelim. Hr'g Tr. Day 1 (Cecchi) 17:19-23.]

The objecting plaintiffs also allege that Weintraub's only claim arose out of Aetna's use of *outdated* Ingenix data and not the use of the Ingenix database itself. [Obj. Pls.' Opp. at 11-12.] Settling plaintiffs correctly point out that Weintraub also alleges that he was "misled as to the actual reasonable and customary amount that should be reimbursed for out-of-network services, and he suffered damages because of Aetna's ongoing conspiracy with Ingenix, United and other health insurers to perpetuate this misconception." [Settling Pls.' Reply to Obj. Pls. at 11-12; *see also* Prelim. Hr'g Tr. Day 1 (Cecchi) 27:3-9 ("Indeed, he did complain about outdated data. But he also complained about the mere fact that Ingenix database with the underlying data used to adjudicate his claim was inappropriate.").][12]

---

[12] The objecting plaintiffs also indicate that Weintraub got $6.89 through a settlement between Aetna and the New York Attorney General as a result of Aetna's use of outdated data. [Obj. Pls.' Opp. at 11; Prelim. Hr'g Tr. Day 1 (Quackenbos) 22:17-19.] In response, the settling plaintiffs point out that the six dollars represented the difference between the use of *outdated* data and whatever data "*would have been used* at the time the services were rendered" – not for

Because the objecting plaintiffs have failed to show how Weintraub's interests conflict with those of absent class members or that he in unable or unwilling to represent the class vigorously, the Court remains satisfied that he is an adequate representative for the subscriber class. [Prelim. Approval Order at §§ 8(c)-(d).]

### iii.    Alan John Silver & Mary Ellen Silver

In January, 2010, the Silvers, who are husband and wife, filed a complaint in the Northern District of California against Aetna, United, and Ingenix on behalf of a class of Aetna subscribers injured by a secret and illegal agreement among defendants to manipulate and use flawed data to set artificially low reimbursement rates for out-of-network services. Their action was transferred to this district under MDL 2020. *See Silver et al. v. Aetna Health Inc.*, *et al.*, N.D. Cal. No. 10-cv-143; D.N.J. No. 10-cv-721 [D.E. 1]. The plan at issue was initially obtained through Alan John Silver's employer, New York Life Insurance Company, which is administered by Aetna. [*Id.* at ¶ 153.] The complaint alleges that Aetna systemically under-reimbursed the Silvers for their son's out-of-network medical treatments in 2008 and 2009. [*Id.* at ¶¶ 156-158.] The Silvers formally complained to Aetna regarding its under-reimbursement and appealed its denial of benefits in 2009. [*Id.* at ¶¶ 158-160.]

The objecting plaintiffs allege that Alan John Silver is inadequate because he is a Medicare beneficiary who does not have an ERISA claim. [Obj. Pls.' Opp. at 9.] As with Weintraub, Alan John Silver's lack of an ERISA claim does not limit his ability to release all claims since his allegations fall squarely within the subscriber class definition. [Settlement Agreement at § 1.50.] To be sure, the Silvers' claim -- that they were injured by Aetna's

---

Aetna's use of the Ingenix database itself. [Settling Pls.' Reply to Obj. Pls. at 11 (emphasis in original); *see id.* ("Aetna has never attempted to reimburse Mr. Weintraub for the difference between the appropriately dated [ ] data and the actual usual and customary rate or billed charge.").]

systemic under-reimbursement for out-of-network services resulting from its use of Ingenix -- is typical of the class they seek to represent. [Prelim. Approval. Order at §§ 8(c)-(d).]

The objecting plaintiffs also argue that Mary Ellen Silver is inadequate because she is a "tag-along plaintiff" added in as a subscriber representative "at the last minute on reply." [Obj. Pls.' Opp. at 8-10; Quackenbos PowerPoint at 4; Prelim. Hr'g Tr. Day 1 (Quackenbos) 20:20-23.] The Court agrees with the settling plaintiffs' observation that because a majority of MDLs resolve by way of settlement in the transferee district, it would defeat the underlying purpose of MDL to foreclose "tag-along" plaintiffs such as the Silvers from being parties to the settlement agreement. [*See* Prelim. Hr'g Tr. Day 1 (Cecchi) 25:5-21.]

Finally, relying on a previous representation from Aetna, the objecting plaintiffs contend that the Silvers "have not participated meaningfully in this litigation, and would therefore not be adequate class representatives." [Obj. Pls.' Opp. at 9-10, 17, 20-22, 46 (citing D.E. 673 at pp. 71-72, n. 46); Obj. Pls.' Omnibus Br. at 7; Prelim. Hr'g Tr. Day 1 (Quackenbos) 21:20-22:7.] As with its waiver of the exhaustion requirement Aetna states that the objecting plaintiffs "miss the fundamental point" when they cherry-pick sound bites from its earlier opposition to class certification. Aetna "has many defenses to liability with respect to *all* of the named plaintiffs, and settlement class members, but has entered into the settlement in order to avoid a protracted and costly litigation of all of those unique issues." [Aetna Reply Br. at 11; Prelim. Hr'g Tr. Day 2 (Doren) 77:13-17.] Also in response, the settling plaintiffs state that any suggestion that the Silvers were not actively involved in this action is incorrect; "[t]he Silvers complied with all discovery requests served on them, producing document and written discovery responses five months before plaintiffs' motion for class certification was filed," and "prepared for deposition"

despite the fact that "Aetna chose not to notice one." [Settling Pls.' Reply to Obj. Pls. at 9; *see also* Prelim. Hr'g Tr. Day 1 (Cecchi) 17:14-16; Prelim. Hr'g Tr. Day 2 (Doren) 81:20-22.][13]

### 3. Conclusion

The Court is not persuaded by these challenges to the adequacy and typicality of the representative subscriber plaintiffs. The objecting plaintiffs have failed to show that the proposed representatives do not have the ability and the incentive to represent the class vigorously and/or that their interests are in conflict with the absent class members. *See Larson,* 687 F.3d at 132.

### C. ERISA Plaintiffs' Objection to the Adequacy of the Proposed Settlement

As noted above, once the court determines that the proposed settlement classes meet the standard requirements under Rule 23(a) and (b), it must then determine whether the proposed settlement is "fair, reasonable, and adequate" under subsection (e). *Rodriguez,* -- F.3d --, 2013 WL 4046385, at *4 (citing *Sullivan*, 667 F.3d at 296).

The same ERISA plaintiffs who object to the subscriber representatives also oppose approval of the proposed settlement because they allege that the terms of the settlement are onerous and unconscionable. [Obj. Pls.' Opp. at 23-44.] Their primary argument is that the settlement does not afford sufficient monetary relief to subscriber class members, either because the total funds are not large enough or because the documentation requirements to participate in the prove-up funds are unreasonable. [*Id* ]

---

[13] In response to the argument that the Silvers' counsel was similarly inactive, Obj. Pls.' Opp. at 10, n.7, the settling plaintiffs state that while counsel for the Silvers did not attend mediation sessions because they were not appointed to the Executive Committee, they "stayed up to date on the status of the negotiations, worked on the discovery related to the Silvers' claims, coordinated that discovery with the Plaintiffs' Executive Committee, and did all the work they were asked to do in this litigation," Settling Pls.' Reply. to Obj. Pls. at 9.

### 1. *Rule 23(e) Standard for Adequacy of Proposed Settlement*

"Review of a proposed class action settlement is a two-step process: preliminary approval and a subsequent fairness hearing." *Jones v. Commerce Bancorp, Inc.*, No. 05-5600, 2007 WL 2085357, at *2 (D.N.J. 2007) (Kugler, J.) (citation omitted). "Preliminary approval is not binding, and it is granted unless a proposed settlement is obviously deficient." *Id.* Indeed, "[p]reliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are not obvious deficiencies and the settlement falls within the range of reason." *Zimmerman v. Zwicker & Assoc., P.C.,* No. 09-3095, 2011 WL 65912, at *2 (D.N.J. Jan. 10, 2011) (Schneider, J.)[14] (citing *Jones,* 2007 WL 2085357, at *2); *see also In re Nasdaq,* 176 F.R.D. at 102 ("Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.") (citing *Manual for Complex Litigation*, Third at § 30.41 (West 1995)).

### 2. *Discussion & Analysis*

Challenging preliminary approval of the proposed agreement, the objecting plaintiffs, who are now represented by the firm of Epstein & Quackenbos, P.C., allege that the settlement was not the result of good faith negotiations because it was reached "without the benefit of any mediator, after the exclusion of the adequate plaintiffs and their counsel," in violation of CMO

---

[14] As the settling plaintiffs point out, the objectors' reliance on *Zimmerman* to support their substantive argument that the relief here is mythical is misplaced. In *Zimmerman*, plaintiff's attorney attempted to settle all claims on behalf of 800,000 consumers in return for a *cy pres* payment of $32,000 to United Way rather than seeking class-wide relief of any kind.

No. 2. [Obj. Pls.' Opp. at 2; Obj. Pls.' Omnibus Br. at 5-6.][15] These attorneys (hereafter "counsel for the objectors") allege that at the last mediation session, Aetna's final offer "was unanimously rejected by plaintiffs' counsel, including both counsel for providers and counsel for subscribers." [Obj. Pls.' Omnibus Br. at 2-3; *see also* Prelim. Hr'g Tr. Day 2 (Quackenbos) 11:10-16.] The gravamen of their objection is that the settling parties cut them out and secretly negotiated, in violation of CMO No. 2. In response, the court-appointed settlement liaison points out that at the last in-person mediation, counsel for the objectors called Judge Chesler to make an oral motion to stay the mediation, which was denied. [Settling Pls.' Reply to Obj. Pls. at 14-15 (citing Cecchi Cert. ¶¶ 13, 15).] Moreover, after Judge Chesler ordered the mediation to proceed, according to the settlement liaison Judge Politan relayed Aetna's final offer and "[e]very member of Plaintiffs' Executive Committee" agreed to it, with the exception of counsel for the objectors. [*Id.* at 15 (citing Cecchi Cert ¶ 17).] At oral argument, counsel for the objectors stated that after the final mediation session they did not learn of a possible settlement with Aetna until November 10, 2012 at which time they were told the settlement "was going ahead with or without" them. [Prelim. Hr'g Tr. Day 2 (Quackenbos) 11:17-24; 12:8-17.] The exclusion of counsel for the objectors resulted, they allege, in settlement funds that are arbitrary, unjustified, and unconscionable in that they can revert back to Aetna. [Obj. Pls.' Opp. at 26-33.]

---

[15] At the preliminary hearing, Barry Epstein and Barbara Quackenbos indicated that they had recently left the Wilentz firm and opened up their own office. After the hearing, Epstein and Quackenbos filed consent orders granting substitution of counsel for the six objecting plaintiffs. [D.E. 894-895.] During the second day of the preliminary hearing, Epstein moved to replace the Wilentz firm on the Aetna Plaintiffs' Executive Committee. [Prelim. Hr'g Day 2 (Epstein) 7:7-12.] In response, Kevin Roddy, on behalf of the Wilentz firm, pointed out that in CMO No. 2 Judge Hochberg ordered that the Wilentz firm serve on the Executive Committee as an entity - rather than appointing Epstein and Quackenbos personally. [*Id.* (Roddy) 86:2-11.] Roddy also stated that the Wilentz firm "wholeheartedly supports the settlement" and argued that any modifications to CMO No. 2 would not be appropriate for disposition on an oral motion. [*Id.* 86:12-20; *see also* D.E. 892.] The Court agrees.

Internecine warfare among counsel augurs a fight over legal fees, but first the Court must apply the legal precepts governing adequacy under Rule 23(e)(2). In that respect, the Court is satisfied that the extensive proceedings, including substantial fact and expert discovery coincident with 13 negotiation sessions with a respected and experienced mediator, gave counsel on both sides ample opportunity to adequately assess the strengths of their respective positions and facilitated serious and informed negotiations. *See In re Ins. Brokerage Antitrust Litig.*, MDL 1663, 2007 WL 2589950, at *2-3 (D.N.J. Sept. 4, 2007) (Brown, C.J.), *aff'd* 579 F.3d 241 (3d Cir. 2009) (quoting preliminary approval order at 7-8) (granting preliminary approval to a class action settlement after finding that: "(a) the settlement agreement resulted from extensive arm's-length negotiations and was concluded only after class counsel had conducted broad discovery and the settling parties had consulted independent experts about the issues raised by the complaints, and (b) the settlement agreement is sufficiently fair, reasonable and adequate to warrant sending notice of the action and settlement agreement to settlement class members and holding a full hearing on the settlement.").

In addition to challenging the negotiations between the settling parties, the objecting plaintiffs complain that the recovery available to the claimants -- $120 million -- does not adequately capture Aetna's potential exposure. [Prelim. Hr'g Tr. Day 2 (Quackenbos) 15:4-16:2; 16:16-17; Obj. Pls.' Opp. at 28-30.]

On that point, the Court notes that the invalidity of the Ingenix database as well as the amount of damages resulting from using it are heavily contested issues. By the end of the discovery period, both parties had collected calculations and opinions from various experts. On one hand, the objectors indicate that one of their experts, Dr. Foreman, calculated Aetna's potential exposure to be between 2 and 3.1 billion dollars. [Prelim. Hr'g Tr. Day 2 (Quackenbos)

15:5-8.] On the other hand, Aetna contends that making modifications to Dr. Foreman's calculation to address critiques presented by defense experts would reduce the damages calculation to $52 million. [Aetna Reply. Br. 5-6; *see also* Prelim. Hr'g Tr. Day 2 (Doren) 75:12-77:10.] Acknowledging this range of calculations, the settling parties point out that to fully assess the adequacy of the settlement fund, the Court must also consider the risks plaintiffs' face if they proceed with litigation. Among those risks are the effect of Judge Chesler's recent denial of a materially identical motion for class certification on a litigation class in *Franco v. Cigna*, 289 F.R.D. 121 (D.N.J. 2013) and the fact that the injunctive relief here was Aetna's agreement with the New York Attorney General to stop using the Ingenix database. [Prelim. Hr'g Tr. Day 2 (Doren) 72:4-19; 82:22-83:2.][16]

Without doubt, both sides face challenges if they continue to litigate. The Court is satisfied that the funds available to claimants under the proposed settlement agreement fall within the range of reason. [*See* Prelim. Approval Order at ¶¶ 4-5.]

The objecting plaintiffs' final argument regarding the adequacy of the proposed settlement is that the prove-up funds documentation requirements and the existence of the reversionary provision make it problematical that the claimants will ever obtain the funds allocated. [Obj. Pls.' Opp. at 29.] In this regard, the objectors argue that because the class period goes back 11 years claimants will have "great or more likely insurmountable difficulty"

---

[16] *See also* Press Release, *Attorney General Cuomo Announces Expansion of Historic Health Insurance Reform: Aetna Will End Relationship With Company That Manipulated Rates To Overcharge Patients By Hundreds of Millions of Dollars* (Jan. 15, 2009), available at http://www.ag.ny.gov/press-release/attorney-general-cuomo-announces-expansion-historic-health-insurance-reform-aetna-will. (last visited Aug. 30, 2013).

producing the information required - "virtually guarant[ing] the substantial 'reversion' of funds." [*Id.* at 36-37, n.13, 39.][17]

During the preliminary fairness hearing, counsel for the objecting plaintiffs used hypotheticals to illuminate the difficulty claimants may have obtaining relief from one of the prove-up funds. [Prelim. Hr'g Tr. Day 2 (Quackenbos) 18:3-24:5; Quackenbos PowerPoint at 14-20.] The Court asked counsel for the settling plaintiffs to elaborate on what, if any, appeals process would be available for claimants denied recovery under one of the prove-up funds as a result of lack of or insufficient documentation. [Prelim. Hr'g Tr. Day 2 (Court) 24:6-9.] Counsel explained that in the event that the settlement administrator denies a claim, he or she would send a deficiency letter "specifying exactly what the deficiency is and what needs to be done in order to cure the deficiency." [*Id.* (Axelrod) 24:13-19.] Upon receipt of these deficiency letters, claimants have a certain amount of time to cure the deficiency before the final adjudication is made. [*Id.* 24:19-23.] The notice provision also indicates that claimants unable to locate the requisite documentation can query Aetna's database, which contains relevant claim information from the class periods. [*Id.* (Cecchi) 28:6-12; *see also* Class Notice at Section VI.] Finally, if a claimant is unable or unwilling to submit the documentation required under one of the prove-up funds, they have the option of seeking relief under the general settlement fund.[18] [*Id.* (Cecchi)

---

[17] Objecting plaintiffs also make a cursory attack on the notice provision as it relates to claimants ability to recover under this settlement: "part of what propels people to come forward is a readily understandable notice and a clear sense of what they are likely to get out of the settlement, and we believe that the settlement is deficient on those grounds." [Prelim. Hr'g Tr. Day 2 (Quackenbos) 17:8-11.] After reviewing the proposed class notice documents, the Court is persuaded that the content of the notices is sufficient to "apprise [the] interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 254 (D.N.J. 2000); *see also* Moving Br. at 18-19.

[18] The objecting plaintiffs argue that the ability to recover from the general fund is inadequate because after attorneys' fees and costs, the general fund will be depleted to approximately $15 million. [Prelim. Hr'g Tr. Day 2 (Quackenbos) 15:21-16:2.] The settling plaintiffs object to this

45:1-2; *see also* Settlement Agreement at §§ 10.1(d), 10.2(d); *see also* "NOTE" in Section B of the Subscriber and Provider Claim Forms; Class Notice at Section VI (same).] The Court also inquired about the discretion given to the settlement administrator in charge of adjudicating the claims submitted. Counsel represented that the settlement administrator is appointed with the goal of paying valid claims and is very sensitive to individual circumstances rather than simply "making sure that the T's or I's are crossed and dotted." [Prelim. Hr'g Tr. Day 2 (Axelrod) 30:21-31:16.][19] In this regard, the settling parties point out that this is one, among other, features of this settlement that distinguish it from that reached in *McCoy v. Healthnet*, No. 03-1801 – where the insurer is the claims administrator. [*Id.* (Cecchi) 45:15-18 ("the idea from this settlement's perspective is not to deny valid claims, it's to pay valid claims. Again, I can't comment about *HealthNet*, but here the claims administrator will administer not Aetna.").]

In light of counsel's representations, the Court is satisfied that the requirements for seeking reimbursement under the terms of the settlement are not so onerous as to violate due process or render recovery a myth. [Prelim. Hr'g Tr. Day 2 (Court) 39:15-17; 77:21-78:1.]

### 3. Conclusion

Based on the foregoing, the Court is satisfied that the proposed settlement warrants preliminary approval as it falls within the range of reason and is the result of serious, informed negotiations.

**Date:** August 30, 2013

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

---

calculation and point out that the settlement and notice provisions limit attorneys' fees to 33% of the settlement. [*Id.* (Cecchi) 48:3-4.] But the ultimate fee determination is left to the Court's discretion.

[19] An additional safeguard is a provision in the settlement agreement that stipulates that the parties must "submit a joint report to the Court on the status of the claims received and determinations by the Settlement Administrator as to the completeness and validity of the claims, as well as the amounts to be paid." Settlement Agreement at § 12.5(d).