# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AETNA UCR LITIGATION, | Master File No. 2:07-3541(KSH)(CLW) |
| This Document Relates To: ALL CASES | MDL NO. 2020 |

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO INGENIX, INC.'S AND UNITEDHEALTH GROUP INC.'S MOTION TO DISMISS PLAINTIFFS' SECOND JOINT CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068

TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

ARGUMENT ..............................................................................................3

I.   STANDARD OF REVIEW .................................................................3

II.  PLAINTIFFS HAVE STATED A SHERMAN ACT CLAIM...................4

   A.  Plaintiffs Have Antitrust Standing.........................................4

     a.  Plaintiffs' Price-Fixing Claim Is Subject to a *Per Se* Analysis ............5

     b.  Under a *Per Se* Analysis, Standing Is Clear.....................................6

     c.  Plaintiffs' Antitrust Standing Under the Rule of Reason ...................8

       i.  Plaintiffs' Injury Was of the Type the Antitrust Laws Were Intended to Prevent ...............................................................8

       ii.  Antitrust Injury "Flowed" from  Anticompetitive Conduct .............9

       iii.  Plaintiffs Meet the Market Participant Exception ........................11

     d.  UHG's Other Arguments Do Not Impact Standing and Are Inappropriate for a Fed. R. Civ. P. 12(b)(6) Determination..............13

   B.  Plaintiffs Have Alleged a Plausible Price-Fixing Conspiracy ...............18

     a.  Plaintiffs Have Plausibly Alleged an Agreement ...........................18

     b.  Plaintiffs Plausibly Allege Price-Fixing.........................................20

III. PLAINTIFFS' RICO CLAIMS ARE ADEQUATELY PLEAD..............22

   A.  Plaintiffs Properly Plead RICO Predicate Acts....................................22

   B.  Plaintiffs Adequately Plead UHG's Participation in the Operation or Management of the Affairs of the RICO Enterprise .............................27

   C.  Plaintiffs Adequately Plead RICO Proximate Cause ...........................30

   D.  Plaintiffs Adequately Plead a RICO Conspiracy.................................32

IV. RICO STANDING IS ADEQUATELY PLED ......................................35

V.  WEINTRAUB'S STATE LAW CLAIMS ARE SUFFICIENT ................37

   A.  Claims Are Not Barred By the "Independent Injury Rule"....................37

   B.  Weintraub Has Properly Alleged Violations of GBL §349....................38

   C.  UHG's Other Challenges to Weintraub's State Law Claims Overlook the Conspiracy Allegations.................................................................40

CONCLUSION.............................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AGC v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) ...................................................................6

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Calif.,*
    190 F.3d 1051 (9th Cir. 1999)...................................................13

*Am. Med. Ass'n v. United Healthcare Corp.,*
    588 F. Supp. 2d 432 (S.D.N.Y. 2008) ..................................23, 26

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012)..................................................3, 19

*Arizona v. Maricopa County Med. Soc.,*
    457 U.S. 332 (1982) ...................................................................5

*Batas v. Prudential Ins. Co. of Am.,*
    281 A.D.2d 260 (N.Y. App. Div. 2001)......................................39

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..............................................................3, 18

*Bridge v. Phoenix Bond & Indem. Co.,*
    553 U.S. 639 (2008) .................................................................30

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007)......................................................11

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,*
    429 U.S. 477 (1977) ...................................................................6

*Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.,*
    227 F.3d 62 (3d Cir. 2000) .........................................................8

*Chan v. County of Lancaster,*
    C.A. No. 10-cv-03424, 2012 WL 4510776 (E.D. Pa. Sept. 28, 2012) .............4

*Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.,*
    873 F.Supp. 808 (S.D.N.Y. 1994)..............................................38

*Crimpers Promotions Inc., v. Home Box Office, Inc.*,
    724 F.2d 290 (2d Cir. 1983).......................................................8, 11, 12, 14

*Darrick Enter. v. Mitsubishi Motors Corp.*,
    No. 05-4359 (NLH), 2007 WL 2893366 (D.N.J. Sept. 28, 2007) ............33, 34

*Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.*,
    No. 11 Civ. 2589, 2012 WL 4474587 (S.D.N.Y. Sept. 28, 2012) ..................38

*Ethypharm S.A. France v. Abbott Labs.*,
    707 F.3d 223 (3d Cir. 2013).....................................................................11

*Franco v. Connecticut Gen. Life Ins. Co.*,
    818 F. Supp. 2d 792 (D.N.J. 2011) ...........................................................4

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003)..................................................................20

*Gagliardi v. Equifax Info. Servs., LLC*,
    No. 09-1612, 2011 WL 337331 (W.D. Pa. Feb. 3, 2011) .............................33

*Handeen v. Lemaire*,
    112 F.3d 1339 (8th Cir. 1997)..................................................................27

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
    392 U.S. 481 (1968) ...............................................................................6

*Hedges v. U.S.*,
    404 F.3d 744 (3d Cir. 2005).....................................................................3

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
    253 F. Supp. 2d 262 (D. Conn. 2003).......................................................11

*In re Am. Investors Life Ins. Co. Annuity Mkt'g and Sales Practices Litig.*,
    MDL No. 1712, 2007 WL 2541216 (E.D. Pa. Aug. 29, 2007) ......................36

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) .....................................................18

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010).....................................................22, 27, 29, 30

*In re Korean Air Lines Co., Ltd. Antitrust Litig.*,
   567 F. Supp. 2d 1213 (C.D. Cal. 2008), *aff'd in part, vacated in part*, 642
   F.3d 685 (9th Cir. 2011)............................................................................ 20

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig.*,
   175 F.Supp.2d 593 (S.D.N.Y. 2001) ......................................................... 39

*In re Processed Egg Prods. Antitrust Litig.*,
   MDL No. 2002, 2013 WL 4504768 (E.D. Pa. Aug. 23, 2013) ...................... 28

*In re Sunrise Sec. Litig.*,
   793 F. Supp. 1306 (E.D. Pa. 1992) ............................................................ 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1827, 2012 WL 4808447 (N.D. Cal. Oct. 9, 2012) ...................... 11

*In re WellPoint Out-of-Network "UCR" Rates Litig.*,
   865 F. Supp. 2d 1002 (C. D. Cal. 2011)...................................................... 5

*In re WellPoint Out-of-Network "UCR" Rates Litig.*,
   903 F. Supp. 2d 880 (C. D. Cal 2012) ........................................................ 5

*In re WellPoint Out-of-Network "UCR" Rates Litig.*,
   MDL. 09-2074, slip op. (C. D. Cal. July 19, 2013)................................... 5, 8

*Kaiser Found. Health Plan, Inc. v. Medquist, Inc.*,
   Civil No. 08-4376 (JBS), 2009 WL 961426 (D.N.J. Apr. 8, 2009) ............... 23

*Kashi v. Gratsos*,
   790 F.2d 1050 (2nd Cir. 1986) .................................................................. 40

*Knevelbaard Dairies v. Kraft Foods Inc.*,
   232 F.3d 979 (9th Cir. 2000)..................................................................... 11

*Maio v. Aetna, Inc.*,
   221 F.3d 472 (3d Cir. 2000)....................................................................... 36

*MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*,
   62 F.3d 967 (7th Cir. 1995) ....................................................................... 30

*Mehling v. New York Life Ins. Co.*,
   163 F. Supp. 2d 502 (E.D. Pa. 2001).......................................................... 35

v

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
No. CV 05-6838, 2011 WL 4852314 (C.D. Cal. Oct. 13, 2011)....................36

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
623 N.Y.S.2d 529 (N.Y. 1995)...................................................37

*Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*,
815 F.2d 270 (3d Cir. 1987).......................................................7

*Pace Electronics, Inc. v. Canon Computer Sys., Inc.*,
213 F.3d 118 (3d Cir. 2000).......................................................5

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008)......................................................3

*Plymouth Dealers' Ass'n of No. Cal. v. U.S.*,
279 F.2d 128 (9th Cir. 1960)...............................................15, 21

*Riordan v. Nationwide Mutual Fire Ins. Co.*,
756 F. Supp. 732 (S.D.N.Y. 1990), *aff'd*, 977 F.2d 47 (2d Cir. 1992)............38

*Rolo v. City Investing Co. Liquidating Trust*,
155 F.3d 644 (3d Cir. 1998).....................................................23

*Rose v. Bartle*,
871 F.2d 331 (3d Cir. 1989).....................................................34

*Salinas v. U.S.*,
522 U.S. 52 (1997)..............................................25, 30, 32, 33

*Schrager v. Aldana*,
No. 13-2208, 2013 WL 5273137 (3d Cir. Sept. 19, 2013)...........................31

*Smith v. Berg*,
247 F.3d 532 (3d Cir. 2001)....................................25, 30, 32, 33

*Soule v. Norton*,
299 A.D.2d 827 (N.Y. App. Div. 2002)...........................................40

*St. Germain v. Howard*,
556 F.3d 261 (5th Cir. 2009)...................................................31

*U.S. Horticultural Supply, Inc. v. Scotts Co.,*
    No. A. 03-773, 2004 WL 1529185 (E.D. Pa. Feb. 18, 2004) ......................... 11

*U.S. v. Andrews,*
    681 F.3d 509 (3d Cir. 2012) ....................................................................... 24

*U.S. v. Goodstein,*
    883 F.2d 1362 (7th Cir. 1989) .................................................................... 25

*U.S. v. Kapp,*
    781 F.2d 1008 (3d Cir. 1986) ..................................................................... 34

*U.S. v. Lothian,*
    976 F.2d 1257 (9th Cir. 1992) .................................................................... 25

*U.S. v. Nat'l Ass'n of Real Estate Bds.,*
    339 U.S. 485 (1950) ................................................................................... 15

*U.S. v. Parise,*
    159 F.3d 790 (3d Cir. 1998) ....................................................................... 30

*Wachtel v. Guardian Life Ins. Co.,*
    223 F.R.D. 196 (D.N.J. 2004) ................................................................... 17

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.,*
    714 F.3d 414 (6th Cir. 2013) ..................................................................... 31

*White v. R.M. Packer Co. Inc.,*
    635 F.3d 571 (1st Cir. 2011) ...................................................................... 18

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 8(d)(3) ................................................................................................ 28
    Rule 9(b) ............................................................................................... 23, 34
    Rule 12 ......................................................................................................... 4
    Rule 12(b)(6) ............................................................................... 3, 4, 16, 19
    Rule 12(g) .................................................................................. 3, 28, 32, 34
    Rule 12(g)(2) ................................................................................................ 4

18 U.S.C.
    §664 .................................................................................................... 25, 26
    §1962(d) ........................................................................................... *passim*

# INTRODUCTION

Plaintiffs (subscribers to healthcare plans maintained by Aetna, Inc. ("Aetna")) Michele Cooper, Michele Werner, Darlery Franco, Sharon Smith, Carolyn Samit, Carolyn Whittington, Jeffrey Weintraub, and Angela Hull (collectively, "Plaintiffs"[1]) hereby respond to the Motion to Dismiss (ECF No. 906-1) ("Mem.") filed by Defendants UnitedHealth Group, Inc. ("United") and Ingenix, Inc. ("Ingenix") (collectively, "UHG" or "Defendants").  For the reasons set forth herein as well as in prior briefing on the same motion (*see* ECF Nos. 269, 270, 625-1, 627), UHG's motion should be denied.

The allegations contained in the Second Joint Consolidated Amended Class Action Complaint (the "SAC")[2] are well known by this Court and concern the use of databases maintained by Ingenix, a wholly owned subsidiary of United, to calculate the "usual, customary and reasonable" ("UCR") rate for out-of-network services ("ONS") obtained by Plaintiffs from medical providers.  As set forth in the SAC, the scheme using the "Ingenix Database" to calculate UCR for ONS was not only in violation of ERISA (as to Aetna), but also violated the Sherman Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO") as well as

---

[1]     Association Plaintiffs voluntarily dismissed this action and are not addressed herein.

[2]     ECF No. 319, filed Dec. 24, 2009.  All "¶__" and "¶¶__" references are to the SAC.

state common law, including New York's General Business Law ("GBL") §349. While Aetna has opted to settle its claims with Plaintiffs, UHG instead raises a host of arguments in an attempt to exonerate itself from conduct that has long been known and shown to be corrupt and collusive.  All UHG's arguments fail.

First, UHG grossly distorts the antitrust allegations in an attempt to show Plaintiffs lack antitrust standing.  In doing so, they overlook Plaintiffs' *per se* antitrust claim, in addition to crucial case law.  The two cited markets (only relevant for a rule of reason analysis) are undoubtedly inextricably intertwined as the Ingenix Database exists *exclusively* for the purpose of generating UCR schedules and reduced ONS reimbursements were precisely the intended consequence of Defendants' conduct.

Plaintiffs have further shown that UHG committed or caused the predicate acts under RICO (including embezzlement or conversion); that UHG knowingly agreed to facilitate a scheme that includes operation and management of a RICO enterprise; *and* that UHG participated in the operation or management of the *enterprise itself*, as opposed to the conduct of its own business affairs. Furthermore, UHG attempts to impose a reliance requirement to RICO that simply does not exist.

In the end, the SAC adequately shows how UHG, as owner of and a major contributor to, the Ingenix Database, was at the center of a scheme to manipulate

the market to reimburse for ONS – a scheme that resulted both in massive damages to Plaintiffs and in the violation of antitrust laws, RICO, and state law.  Thus, UHG's most recent motion to dismiss should be denied.

## ARGUMENT

### I.   STANDARD OF REVIEW

In reviewing a Rule 12(b)(6) motion, a court "'accept[s] all factual allegations as true, constru[ing] the complaint in the light most favorable to the plaintiff . . . .'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). [3] Courts must determine only whether it contains "enough factual matter" to "plausibly suggest[]" that the pleader is entitled to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 557 (2007).

"The defendant bears the burden of showing that no claim has been presented." *Hedges v. U.S.*, 404 F.3d 744, 750 (3d Cir. 2005).  Instead, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts alleged is improbable and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556; *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

In addition, Rule 12(g) precludes UHG from raising certain arguments that it could have asserted in its earlier motions to dismiss but did not.  That rule provides

---

[3]    Unless otherwise indicated, all internal citations are omitted and emphasis is added.

that a party must not make a successive Rule 12 motion raising a defense or objection that was available and omitted from an earlier motion. *See* Fed. R. Civ. P. 12(g)(2); *Chan v. County of Lancaster*, C.A. No. 10-cv-03424, 2012 WL 4510776, at *13 (E.D. Pa. Sept. 28, 2012. While this Court granted UHG leave to file its third motion to dismiss (ECF No. 904), that was for the purpose of addressing new "developments in the applicable case law," not for raising new arguments that were previously available but never presented before.

As discussed below, the Court should decline to consider certain previously available arguments that UHG is abusively presenting for the first time in a ***third*** round of Rule 12(b)(6) motion practice (*see* ECF Nos. 625-1, 804) and almost ***three years*** since the filing of Plaintiffs' last amended complaint.

## II.  PLAINTIFFS HAVE STATED A SHERMAN ACT CLAIM

### A. Plaintiffs Have Antitrust Standing

UHG moves to dismiss Plaintiffs' antitrust claims arising under the Sherman Act for lack of antitrust standing.[4]  That argument fails. First, Plaintiffs have plausibly alleged the elements of antitrust standing on the basis of overcharges for ONS under a *per se* analysis, the sufficiency of which was neither analyzed nor adjudicated in *Franco v. Connecticut Gen. Life Ins. Co.,* 818 F. Supp. 2d 792 (D.N.J. 2011) ("*Franco*") or in *In re WellPoint Out-of-Network "UCR" Rates*

---

[4]     UHG, in addition to Insurers referred to in ¶¶112-13 and 117-18, are referred to as "Insurer Conspirators."

*Litig.,* MDL No. 09-2074-PSG (C.D. Cal).[5]  Second, under the rule of reason, Plaintiffs have standing to bring claims as their antitrust injury was inextricably linked with – and precisely the intended consequence of – Defendants' conduct.

### a.  Plaintiffs' Price-Fixing Claim Is Subject to a *Per Se* Analysis

UHG's arguments concerning Plaintiffs' antitrust standing stem from a fundamental misreading of the SAC.  Plaintiffs bring claims for horizontal price-fixing as a *per se* unlawful restraint of trade under the Sherman Act.  *Arizona v. Maricopa County Med. Soc.,* 457 U.S. 332, 343-44 (1982); *Pace Electronics, Inc. v. Canon Computer Sys., Inc.,* 213 F.3d 118, 123 (3d Cir. 2000).  For a *per se* claim, it is not necessary to define a relevant market, to provide evidence of actual effects on competition, or to show the absence of procompetitive justifications.  *Id.*

Plaintiffs allege horizontal price-fixing, which is clearly subject to a *per se* analysis, by alleging that UHG conspired with its competitors to fix prices that the Insurers reimbursed for ONS.  ¶¶462, 464, 467, 470, 496.  Using the Ingenix Database allowed the Insurers to utilize a single price list for UCR rates to suppress ONS reimbursements.  ¶¶462, 470-71, 476-77, 495.  This is *per se* unlawful.

---

[5]     These decisions are *In re WellPoint Out-of-Network "UCR" Rates Litig.,* 865 F. Supp. 2d 1002 (C. D. Cal. 2011) ("*WellPoint I*"); *In re WellPoint Out-of-Network "UCR" Rates Litig.,* 903 F. Supp. 2d 880 (C. D. Cal 2012) ("*WellPoint II*") and *In re WellPoint Out-of-Network "UCR" Rates Litig.,* MDL. 09-2074, slip op. (C. D. Cal. July 19, 2013) ("*WellPoint III*").

### b.  Under a *Per Se* Analysis, Standing Is Clear

The Supreme Court in *Associated General Contractors, Inc.* ("*AGC*") identified certain factors for determining Clayton Act antitrust standing:  (1) the nature of the alleged injury; (2) directness of the injury; (3) speculative measure of the harm; (4) risk of duplicative recovery; and (5) complexity in apportioning damages. *AGC v. Cal. State Council of Carpenters,* 459 U.S. 519, 545 (1983).  To meet the first prong of the *AGC* test – antitrust injury – plaintiffs must have suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977).

Here, Plaintiffs have plainly suffered an injury of the type the antitrust laws were designed to curtail. Plaintiffs allege that Defendants engaged in an unlawful and anticompetitive horizontal price-fixing conspiracy.  ¶¶462-64,  495-96. Plaintiffs further allege that, as a result of this agreement, they were under-reimbursed for ONS. ¶¶494, 500.  Allegations of overcharges as a result of price-fixing such as these are the archetypal antitrust injury and give rise to a presumption of Plaintiffs' standing. *See, e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 489 (1968) ("when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of

6

injury and damage within the meaning of § 4"); *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.,* 815 F.2d 270, 276 (3d Cir. 1987) ("the payment of overcharges . . . is unquestionably an antitrust injury").

Moreover, this injury flows directly from UHG's unlawful behavior. Plaintiffs allege that the Insurer Conspirators agreed among themselves to fix ONS reimbursements in order to avoid competing with one another. ¶¶462, 470-72. Where plan terms called for ONS based on UCR, UCR was to be the sole input of the ultimate reimbursement paid to Plaintiffs for ONS. ¶¶4, 127, 208. Accordingly, Defendants effectuated their price-fixing scheme through the use of uniform and downward-skewed UCR schedules. ¶¶129, 198, 491, 494, 500. Using a depressed UCR automatically lowered the ONS reimbursements paid and forced Plaintiffs to pay a higher price for ONS. ¶¶467-68, 470-71, 703. Accordingly, Plaintiffs' injury of over-payment for ONS flows ***directly*** from UHG's unlawful agreement to both fix prices using UCR and not compete on ONS reimbursements. ¶¶493-96.

Finally, under Plaintiffs' *per se* antitrust claim, there is no market participant issue that impedes a showing of antitrust injury. The antitrust injury – overcharges Plaintiffs paid for ONS – occurred in the same market in which the conduct occurred; *i.e.,* the market for ONS. Under a *per se* analysis, anticompetitive effects are presumed, and no market definition for ONS is required. The *WellPoint* and

7

*Franco* decisions dealt exclusively with antitrust standing pursuant to Plaintiffs' rule of reason allegations, and contain no precedent for a finding on antitrust standing pursuant to Plaintiffs' *per se* claims.  *See WellPoint I*, 865 F. Supp. 2d at 1020-23; *WellPoint II*, 903 F. Supp. 2d at 903-08; *WellPoint III*, slip op. at 9-16; and *Franco*, 818 F. Supp. 2d at 829-41.

### c.  Plaintiffs' Antitrust Standing Under the Rule of Reason

Plaintiffs have also plausibly alleged antitrust standing under a Rule of Reason analysis.  Regarding the requirement that Plaintiffs be a "consumer or competitor" in the relevant market, Plaintiffs meet the "non-market participant" exception under *McCready,* 457 U.S. at 484 (market participant requirement is fulfilled if there exists a significant causal connection such that the harm to the plaintiff can be said to be inextricably intertwined with the antitrust conspiracy). The "inextricably intertwined" requirement is met when the antitrust injury is the **intended, foreseeable consequence** of the illegal conduct.  *Crimpers Promotions Inc., v. Home Box Office, Inc.,* 724 F.2d 290, 294-95 (2d Cir. 1983); *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.,* 227 F.3d 62, 77-78 (3d Cir. 2000).

### i.  Plaintiffs' Injury Was of the Type the Antitrust Laws Were Intended to Prevent

Plaintiffs' alleged injury – suppressed ONS reimbursements – is precisely the type of injury that the antitrust laws were designed to curtail.  Plaintiffs allege Defendants agreed to suppress the price of ONS reimbursements by eliminating

competition in the Data Market.  ¶¶479-80.  Where insurance and health care plans call for ONS reimbursements based on UCR, the level at which UCR is set effectively establishes the ONS reimbursements.  ¶¶4, 127, 208.  In order to fix UCRs, the Insurer Conspirators entered into an agreement to control the market of that primary input: the Data Market.  ¶¶475-76.  As a result of their agreement to maintain control over the Data Market, Defendants avoided having to compete with one another on the basis of ONS reimbursements and were consistently able to overcharge for ONS. ¶¶480-82.

### ii.  Antitrust Injury "Flowed" from  Anticompetitive Conduct

Plaintiffs allege that UHG unlawfully conspired to suppress ONS reimbursements. ¶¶458, 467.  Defendants effectuated the agreement by gaining control of – and suppressing competition in – the Data Market, although its control was not the object of the conspiracy. ¶¶475-76.  Any plan calling for ONS to be paid at UCR rates requires a price list of billed charges.  The only practical means of fixing ONS reimbursements was to control UCRs.  This could be done efficiently, and on a national basis, by controlling the Data Market.  The object of the conspiracy was not to monopolize the Data Market, but that was a necessary antecedent to restraining competition for ONS reimbursements. Gaining control of the Data Market was infinitely more practical than figuring out a way to fix reimbursement for every ONS service in the country.

9

Defendants gained control of the Data Market by: developing Ingenix through HIAA/AHIP; ¶¶131-39; 147, 472; selling Ingenix to their competitor, United, and sitting on a Liaison Committee that evaluated Ingenix; ¶¶129-30, 134-35, 180-82; providing flawed, scrubbed data to Ingenix; ¶¶139-40, 151-52; agreeing to reimburse subscribers for ONS based on uniform UCR Schedules; ¶186; agreeing not to provide data to a competing provider; ¶¶183, 186-87, 191, 481-82, 490; agreeing not to enter the profitable Data Market themselves through a non-competition agreement; ¶¶191, 201, 481; agreeing not to improve the accuracy or validity of the charge data; ¶¶154-55, 199, 506; providing flawed data in return for discounts for the suppressed UCR schedules; ¶¶153, 156-59, 183, 188, 190, 464-65, 506; and concealing use of Ingenix for UCR; ¶¶191, 505-08. Potential competitors that might produce UCR schedules to competitively price ONS were foreclosed from the market while attempts at innovation to improve UCR schedules were shut down. ¶¶154-55, 183, 186-87, 191, 199, 481-82, 490, 506.

The Insurer Conspirators' anticompetitive conduct in the Data Market directly accomplished their goal of suppressing ONS reimbursements. ¶¶480, 483-88, 490. By gaining control of the sole input into UCR schedules – the flawed data – the Insurer Conspirators controlled the sole output of the Data Market: UCR pricing lists for ONS reimbursements. ¶¶200, 475. Accordingly, the antitrust

injury, in the form of suppressed ONS reimbursements, flowed directly from the Insurer Conspirators' anticompetitive conduct in the Data Market.

### iii.  Plaintiffs Meet the Market Participant Exception

UHG argues that the market participant exception is "generally limited" to restraints in futures markets linked to physical goods markets (Mem. at 9), but the Supreme Court has refused to engraft such "artificial limitations on the § 4 remedy." *McCready*, 457 U.S. at 472-73.[6]

Plaintiffs need not be market participants where their alleged antitrust injury is "inextricably intertwined" with harm to competition in the relevant market. *See, e.g., Knevelbaard Dairies v. Kraft Foods Inc.*, 232 F.3d 979, 987-89 (9th Cir. 2000); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.,* 253 F. Supp. 2d 262, 273-74 (D. Conn. 2003); *In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. M 07-1827, 2012 WL 4808447 (N.D. Cal. Oct. 9, 2012).  The "inextricably linked" requirement is met when that injury is the "the *precisely intended consequence*" of the unlawful conduct.  *Crimpers,* 724 F.2d at 294; *see also U.S. Horticultural*

---

[6]     The Court in *Broadcom* determined that plaintiffs did not have antitrust standing because Qualcomm had not "*intended to cause harm to Broadcom*" in the relevant markets *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 320 (3d Cir. 2007).   The Court of Appeals' holding in *Carpet Grp.*, *Broadcom*, and *Ethypharm S.A. France v. Abbott Labs.,* 707 F.3d 223, 237 (3d Cir. 2013) demonstrates the Third Circuit applies the market participant exception on a case-by-case basis and not – as Defendants suggest – as a blanket prohibition against non-market participants.

*Supply, Inc. v. Scotts Co.,* No. A. 03-773, 2004 WL 1529185 (E.D. Pa. Feb. 18, 2004).

In *Crimpers*, defendants boycotted plaintiff's trade show. *Crimpers,* 724 F.2d at 294-95. Plaintiff was neither a buyer nor seller of defendants. Defendants' conduct was, however, "inextricably linked" with plaintiff's injury because the failure of the trade show was "the precisely intended consequence of Defendants' boycott." *Id.* at 294.

Here, the restrained Data Market is inextricably linked to ONS reimbursements. UCR price lists move in lockstep with the reduction of ONS reimbursements. Indeed, the Ingenix Database exists ***exclusively*** for the purpose of generating UCR schedules that determine ONS reimbursements. ¶200. Anticompetitive conduct in the Data Market ensures the depression of UCR data because that market exists solely to serve the ONS market. ¶¶186, 475.

Moreover, as in *Crimpers,* Plaintiffs' antitrust injury – depressed ONS reimbursements – was ***precisely the intended consequence*** of Defendants' unlawful agreement. The goal of Defendants' conspiracy was to depress ONS reimbursements. They achieved their goal through the most efficient means of controlling the price of ONS: UCR schedules produced in the Data Market.

UHG is simply incorrect that Plaintiffs do not allege an injury in the relevant market that was intertwined with their injuries. Mem. at 10. Plaintiffs allege that

the Insurers' dominance of the Data Market ensured that no competitor could enter and generate accurate UCRs. ¶¶183, 186-87, 191, 201, 479-82, 490, 498.  For example, the SAC explains that Insurer Conspirators shut down purported efforts to produce a more statistically reliable and representative database.  ¶¶140; 154-56.

In UHG's cited case, *Am. Ad. Mgm't,* the Ninth Circuit **granted** summary judgment regarding antitrust standing.   The court reiterated that "[w]hile consumers and competitors are most likely to suffer antitrust injury, there are situations in which other market participants can suffer antitrust injury . . . ." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Calif.*, 190 F.3d 1051, 1057 (9th Cir. 1999). "[I]t is not the status as a consumer or competitor that confers antitrust standing, but ***the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff***." *Id.* at 1058.  Here, Plaintiffs have more than sufficiently pled a demonstrable relationship between UHG's unlawful conduct – control of the Data Market – and Plaintiffs' antitrust injury such that the two are "inextricably linked."

### d.  UHG's Other Arguments Do Not Impact Standing and Are Inappropriate for a Fed. R. Civ. P. 12(b)(6) Determination

UHG further asserts that: (1) Plaintiffs must show that ONS reimbursements would have increased were the Data Market more competitive; (2) that Defendants could use alternative methods for determining ONS; (3) Ingenix's consolidation of power in the Data Market is wholly unilateral; and (4) the use of four data points,

13

in addition to the introduction of Fair Health, weigh against a finding of standing. Mem. at 11-16. UHG's repeated use of these arguments in the present motion not only fails substantively, but also requires the Court to make factual determinations that are inappropriate on a motion to dismiss.

First, Plaintiffs are *not* required to plead facts showing that ONS would be higher if the Data Market was competitive. Rather, Plaintiffs are merely required to show that they were harmed by UHG's conduct in the relevant market. *See Crimpers,* 724 F.2d at 296; *McCready,* 457 U.S. at 489 (plaintiff not required to show that the reduced competition increased the basic market cost of the service involved, only that she was directly hurt by the alleged violation).

Plaintiffs have also plausibly alleged that had the Data Market been competitive and transparent, Insurers would have been forced to compete for subscribers on the basis of ONS. Without their ability to achieve depressed ONS reimbursements, they would not have the conspiratorial incentive to manipulate competitive conditions in the Data Market to Ingenix's benefit. ¶481. Rather, they would have acted in their individual self-interest and sought to differentiate themselves from their competitors on ONS coverage. ¶¶481-82. Absent the conspiracy, the Insurer Conspirators would have been incented to set UCR rates competitively and reimbursements for ONS would have increased. *Id.*

14

Second, the fact that Insurers could choose alternative means of determining ONS reimbursements does not alter Plaintiffs' plausible allegations of a price-fixing agreement. As an initial matter, utilizing a uniform price list is *per se* unlawful price-fixing. *U.S. v. Nat'l Ass'n of Real Estate Bds.,* 339 U.S. 485 (1950) (price schedule of real estate commission rates *per se* unlawful). This is the case even where it is used as a ***starting point of pricing*** and is ***not precisely adhered to***. *See., e.g., Plymouth Dealers' Ass'n of No. Cal. v. U.S.,* 279 F.2d 128 (9th Cir. 1960) (*per se* unlawful to use uniform price list for car sales).

Moreover, the use of alternative means of determining ONS reimbursements is entirely consistent with the conspiracy that Plaintiffs have alleged. Plaintiffs allege Ingenix operates as a cap, or "the maximum price or fee" the Insurers would pay for ONS. ¶¶470, 475. *Maricopa County,* 457 U.S. at 347-48 (medical foundation establishing a maximum fee schedule that doctors agreed to charge for services was price-fixing). It was well known by Insurer Conspirators that the industry standard was "HIAA 80%". Other methods of reimbursements, such as Medicare and in-network schedules, consistently fell below the Ingenix UCR rates. Accordingly, individual insurers' use of either Medicare or in-network rates is not incongruent with Defendants' fixing of ONS reimbursements.

Third, UHG's meagre assertions that the "concentration of power in the Data Market is not the product of concerted action" fails. Mem. at 13. UHG again asks

this Court to make factual determinations concerning Plaintiffs' allegations that are simply inappropriate on a Rule 12(b)(6) motion. Further, UHG conveniently ignores entire swathes of Plaintiffs' factual allegations regarding the concerted action resulting in the Data Market including, *inter alia:*

- From 1973, the Insurer Conspirators belonged to trade association HIAA/AHIP, along with virtually every major health insurer. ¶¶133-34, 137;

- Insurer Conspirators, through HIAA/AHIP, developed PHCS, the largest pool of charge data for medical services in the country. ¶¶131, 138;

- In 1997-1998, the Insurer Conspirators largely eliminated competition in the Data Market, by selling PHCS, through HIAA, to competitor United and its wholly-owned subsidiary, Ingenix, and with Ingenix's purchase of MDR. ¶¶130, 135, 146, 180, 484-90, 506;

- Under the 1998 PHCS sale, HIAA and Ingenix agreed that members would participate in an ongoing Ingenix PHCS Advisory Committee. ¶181;

- A 10-year "Cooperation Agreement" gives the Insurer Conspirators continued input on the database and provided for a Liaison Committee including HIAA members, to "advise and evaluate" Ingenix. ¶182;

- An executive of an Insurer was vice-chair of HIAA and the AHIP Board of Directors includes executives of Defendants; *e.g.,* the Chairman, President and CEO of Aetna, and at least two executive VPs of United. ¶134;

- HIAA members receive a 50% discount for using the database. Ingenix waives all fees for HIAA members contributing data.; ¶¶183, 465;

- As a condition of the PHSC sale, United joined HIAA (but did not have to pay any membership dues). ¶186;

- Insurer Conspirators regularly meet and communicate through HIAA/AHIP and participated in meetings about the Data Market and Ingenix. ¶489;

- In 1997-1998 Ingenix was bound to a Confidentiality Agreement mandating that it not disclose the identity of entities that had contributed data. ¶184;

- In or around 2005, United and the Insurer Conspirators agreed not to make the UCR schedules more representative of actual UCR. ¶¶154-56, 199;

- Aetna and United contribute nearly 70% of data; not contributing data to any competing database. ¶¶58, 151, 191, 497. Competing data providers would need vast amounts of data to compete with Ingenix. Withholding data from competitors perpetuates Ingenix's market power. ¶¶486-88, 498;

- Ingenix has a 20% profit margin, twice United's regular profit margin. ¶201; and

- Confidentiality agreements between Ingenix and Insurer Conspirators hide the existence and use of Ingenix for pricing UCR. Insurer Conspirators never specifically disclose that they use Ingenix. ¶¶183, 191, 203-04, 507-08.

UHG's arguments concerning "four data points" for "25 years" before Ingenix took over PHCS also fail.  Ingenix's use of four data points only had antitrust significance *after* Ingenix acquired market power (in the late 1990s). Only then did the Insurer Conspirators agree not to supply data to competitors and to not compete by opening up a new database.  ¶¶476-79.  Thus, only *after* Ingenix gained market power did the use of four data points (which lead to skewed UCRs) meaningfully impact the Data Market.  Soon after this occurred, Ingenix was sued on this basis. *See., e.g., Wachtel v. Guardian Life Ins. Co.*, 223 F.R.D. 196, 198 (D.N.J. 2004).

Finally, the introduction of the Fair Health Database to replace Ingenix does not undermine Plaintiffs' allegations concerning a prior antitrust conspiracy.

Mem. at 14-15. Fair Health was not intended to abate anticompetitive conditions in the Data Market.  Fair Health was introduced to bring transparency, objectivity and reliability.   Fair Health could not, however, immediately redress the years of competitive breakdowns that had occurred in the Data Market. The introduction of Fair Health also says nothing about the competitive conditions that existed **before** its introduction.[7]

### B.  Plaintiffs Have Alleged a Plausible Price-Fixing Conspiracy

### a.  Plaintiffs Have Plausibly Alleged an Agreement

In order to survive a Fed.R.Civ.P. 12(b)(6) motion to dismiss, Plaintiffs must "plausibly" allege the existence of a price-fixing conspiracy.  This "does not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556.  The pleadings need only contain "enough factual matter (taken as true) to suggest that an agreement was made." *Id.*  Here, Plaintiffs have plausibly alleged that Defendants engaged in an anticompetitive conspiracy to suppress ONS. ¶¶462-64, 495-96.

---

[7]  UHG's cited cases again do not support their argument. *White* was a decision on a motion for summary judgment, on a fully developed evidentiary record. *See White v. R.M. Packer Co. Inc.,* 635 F.3d 571, 581 (1st Cir. 2011).  In *GPU,* plaintiffs failed to allege any "historically unprecedented" market shifts indicative of a conspiracy. *In re Graphics Processing Units Antitrust Litig.,* 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007).  Here, Plaintiffs allege that Conspirators' conduct represented a massive shift in the consolidation of the Data Market and the way UCR schedules were developed and ONS reimbursements paid.

UHG asserts that Plaintiffs must show that Defendants' anticompetitive conduct did not "'stem[s] from [an] independent business decision.'"  Mem. at 20. On a motion to dismiss under Rule 12(b)(6), however, Plaintiffs "need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment." *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 184 (2d Cir. 2012), *cert. denied,* 133 S. Ct. 846, 184 L. Ed. 2d 655 (U.S. 2013).

Moreover, the fact that the Insurers *may* have had independent motives to use Ingenix also does *not* rule out the existence of a conspiracy. Courts may not dismiss allegations merely because an alternative, less plausible version of events exists.  But on a Fed. R. Civ. P. 12(b)(6) motion "it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives…[that is] a task for the factfinder." *Id.*  Moreover, the SAC alleges that the Insurers Conspirators – competitors on all other aspects of insurance and all other plan terms – were motivated to ensure that they did not have to compete on the basis of ONS reimbursements.  ¶¶475-76, 481-82.  Plaintiffs have more than met their burden to plead Defendants' individual and collective motivation to collude.

Further, Plaintiffs' allegations of conspiracy are not limited to alleging merely that they are not competing. Mem. at 22. While such contracts constitute additional evidence of Defendants' collusion, the SAC is replete with allegations that plausibly allege the Insurers' organization, communication and collusion, well beyond mere parallel conduct. *See supra,* at 14-16.

Finally, Ingenix has no need to "instruct" the Insurers to utilize the UCR schedules for pricing ONS. Mem. at 22. The SAC alleges that Insurers agreed among themselves to do so. Again, UHG does not dispute that the ***sole*** purpose of Ingenix's production of the UCR Schedules – and the Insurer Conspirators' purchase of them – was for the pricing of ONS. ¶200.

### b. Plaintiffs Plausibly Allege Price-Fixing

UHG's arguments that Plaintiffs have not alleged the requisite "fixing" of anything also fail. UHG is patently incorrect that ONS cannot be fixed. Mem. at 16, 20.[8] Price-fixing can take many forms and may be a fixed component of an overall product or service. *See, e.g., Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133 (9th Cir. 2003) (holding that the setting the support fee – a component of the fee subscribers pay for access to Sandicore – was *per se* illegal); *see also In re Korean Air Lines Co., Ltd. Antitrust Litig.,* 567 F. Supp. 2d 1213, 1214 (C.D.

---

[8] Contrary to the citation to *Franco,* the District of New Jersey did not decide on this issue. The Court only stated in dicta that a lack of allegations on agreed-on percentiles, deductibles, and co-insurance cast doubt on plausibility of price-fixing allegations. *Franco*, 818 F. Supp. 2d at 833 n.17.

Cal. 2008), *aff'd in part, vacated in part*, 642 F.3d 685, 689 (9th Cir. 2011) (claims against "primary competitors in the air passenger market," for agreeing to "set fares or components of fares for air transportation services").

UHG also cannot escape antitrust liability simply because they set a maximum price, were able to choose a percentile of the Ingenix database, or use a non-Ingenix method to price ONS. Mem. at 16, 18-19. First, utilizing a maximum price schedule constitutes unlawful price-fixing. Second, pricing schedules may specify a range and need not be absolutely adhered to, in order to effectuate a price-fix. *See Plymouth Dealers,* 279 F.2d at 130-33.

Finally, the fact that certain providers may be in-network with one insurer and out-of-network with another, is irrelevant to whether Defendants fixed ONS reimbursements. Mem. at 20. Plaintiffs do not allege that Insurer Conspirators coordinated to "fix the prices paid for medical services." *Id.* Rather, Plaintiffs allege that Insurer Conspirators conspired to fix ONS reimbursements ***based on UCR***. The network-status of any individual provider is entirely irrelevant to whether Defendants agreed to fix ONS reimbursements by using depressed UCR schedules. ¶¶470, 494. For these reasons, Plaintiffs have sufficiently alleged violations of the Sherman Act by UHG.

21

### III.   PLAINTIFFS' RICO CLAIMS ARE ADEQUATELY PLEAD

Arguing that the RICO claims lack merit, UHG presses contentions, recycled from briefs in similar litigation, that contradict controlling precedent. UHG narrowly construes RICO law, disregarding the command that RICO's "'terms are to be "liberally construed to effectuate its remedial purposes."'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 366 (3d Cir. 2010).  UHG also betrays a startling unfamiliarity with both RICO law and the facts of this case.[9]

### A.   Plaintiffs Properly Plead RICO Predicate Acts

UHG correctly notes that each §1962(c) defendant must be responsible for at least two predicate acts.  Mem. at 23.  But UHG mistakenly argues that no allegations show that UHG committed predicate acts.  *See* ¶610 ("***Defendants*** . . . has [sic] committed numerous predicate acts . . . including . . . by mailing or causing to be mailed . . . various materials and information"); ¶643 ("***UHG and/or Ingenix*** . . . has [sic] committed numerous predicate acts . . . ." including "transmitting, causing to be transmitted . . . misleading data for use in the Ingenix databases.").[10]

---

[9]   In addition, because many of UHG's RICO arguments were previously addressed in Plaintiffs' November 2, 2010 response to Defendants' October 26, 2010 motion to dismiss (*see* ECF No. 625-1; ECF No. 627 at 15-29), Plaintiffs hereby incorporate by reference that response.

[10]   Elsewhere, the SAC sets forth well-pleaded allegations that are incorporated by reference into ¶¶610 and 643 and that, both independently and collectively with those paragraphs, plausibly suggest that UHG committed, or caused to be

UHG mentions in passing that Plaintiffs "must satisfy Rule 9(b)[]," and in a footnote cites Rule 9(b)'s particularity requirements.  Mem. at 24 & n.12.  But UHG does not argue that Plaintiffs fail to comply with this aspect of 9(b), [11] other than to contend (immaterially) that UHG's direct involvement in the predicate acts is not alleged.  Mem. at 24.  At any rate, because the allegations include predicate acts that do not involve fraud, ¶¶610, 612-13, 627, 639, 643, 647, 667, they need not comply with 9(b).  *Wellpoint II*, 903 F. Supp. 2d at 913-14; *Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 442-43 (S.D.N.Y. 2008).

The argument that Plaintiffs must allege that UHG "committed" two predicate acts is unpersuasive.  Mem. at 23-24.  Not only have Plaintiffs shown that UHG "committed" two predicated acts as noted above, but RICO law broadly

---

committed, predicate acts involving the transmitting of information or materials over the mails and wires in furtherance of the scheme to defraud.  ¶¶ 147, 150-57, 161-63, 168-70, 235-367, 477, 506, 604, 634, 636, 639, 643-44, 655; RICO Case Statement ("RCS") (ECF No. 271) 7, 12-97.

[11]   Even were this issue properly raised, although wire and mail RICO allegations involving fraud must meet with Rule 9(b)'s particularity requirement, that rule is relaxed in cases of corporate fraud, *see Kaiser Found. Health Plan, Inc. v. Medquist, Inc.*, Civil No. 08-4376 (JBS), 2009 WL 961426, at *6-7 (D.N.J. Apr. 8, 2009), or, where, as here, the allegations involve numerous transactions over an extended period of time. *See In re Sunrise Sec. Litig.*, 793 F. Supp. 1306, 1312 (E.D. Pa. 1992).  Also, because the allegations inject the requisite amount of precision and substantiation, they suffice.  *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998).  In any event, the SAC complies with Rule 9(b)'s particularity requirement by specifying the date, place, and time of the fraud carried out through the predicate acts that were reasonably foreseeable due to UHG's actions. ¶¶6-63, 142-204, 235-367; RCS at 12-97; *cf Wellpoint I*, 865 F. Supp. 2d at 1036-37.

allows a plaintiff to allege that a RICO defendant ***knowingly caused the predicate acts to be committed***. *U.S. v. Andrews*, 681 F.3d 509, 529 (3d Cir. 2012).

Here, the well-pleaded allegations plausibly suggest that UHG, through the creation and licensing of the Ingenix Database to Aetna and others, the collection or submission of manipulated data, and Ingenix's dissemination of the scrubbed data to other conspirators for use in the under-reimbursement scheme, committed or caused to be committed, numerous predicate acts, including the mailing of misleading documents regarding the processing of Plaintiffs' ONS claims, and the transmission of "materially false or misleading data for use in the Ingenix database." ¶¶147-57, 235-367, 477, 506, 604-10, 612, 620, 627, 631, 634, 639-41, 643-45, 655, 696; RCS at 12-15.  These predicate acts were reasonably foreseeable to UHG.  Thus, contrary to UHG's argument, Plaintiffs are not required to allege that UHG ***committed*** two predicate acts (even though they have alleged that), and they plausibly suggest that UHG caused the commission of predicate acts.

Next, UHG sets up a straw man by arguing that Plaintiffs must allege that UHG (rather than just Aetna) had ***direct involvement*** in the misrepresentations sent by Aetna to Plaintiffs or must have had ***direct contact*** with Plaintiffs, and then knocks him down with the contention that they had no such involvement or contact with Plaintiffs. Mem. at 24.  That rationale, however, ignores UHG's involvement in the other alleged predicate acts that the SAC plausibly suggests.  It also ignores

the point discussed above that, even absent personal involvement in the predicate acts, UHG is liable for knowingly causing the commission of a predicate act, which the allegations plausibly suggest and which UHG does not address or dispute.[12]

In addition, UHG sidesteps the fact that UHG remains liable under 18 U.S.C. §1962(d) regardless of whether *UHG* committed RICO predicate acts. *Salinas v. U.S.*, 522 U.S. 52, 65 (1997) (RICO conspirator need only agree to further or facilitate scheme); *Smith v. Berg*, 247 F.3d 532, 537-38 (3d Cir. 2001). In this respect, UHG does not dispute that Aetna and other conspirators committed the requisite predicate acts (for purposes of alleging a substantive RICO violation as part of a §1962(d) conspiracy).  Mem. at 23-25.

Plaintiffs also have adequately pled their embezzlement or conversion claim under 18 U.S.C. §664 as to UHG.  UHG nonetheless contends that Plaintiffs fail to allege that UHG "possessed the [plan] assets."  Mem. at 25.  But a §664 *conversion* claim need not plead the defendant had "possession of the [plan] assets."  *U.S. v. Goodstein*, 883 F.2d 1362, 1371 (7th Cir. 1989) ("lawful

---

[12]    UHG seizes on *WellPoint I*, 865 F. Supp. 2d at 1035-36, where the court held that two predicate acts were not alleged against UHG because there were no allegations that UHG had a "role in crafting the false or misleading statements" sent to subscribers. Mem. at 24. As UHG does here, *WellPoint I* overlooked controlling precedent, 865 F. Supp. 2d at 1035-36, set forth above, holding that RICO defendants need not be personally involved in predicate acts, where, as here, they caused their commission or the predicate acts committed by others were reasonably foreseeable. *U.S. v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992).

25

possession and access [to plan funds] . . . [are not] essential element[s] of conversion under section 664"). In any event, the allegations plausibly suggest that UHG committed the predicate acts, or caused their commission, and that the scheme resulted in the conversion of plan assets for their own use or another's use.[13] ¶¶147, 150-57, 161-63, 168-70, 235-367, 477, 506, 604, 610, 634, 636, 639, 643-44, 657-93; RCS at 5-8, 12-100. The SAC's allegations plausibly suggest that UHG's manipulation and dissemination of, or reliance upon, the data (for purposes of under-reimbursing Plaintiffs) resulted in the conversion of plan assets to the use of others. ¶¶115-16, 129-204, 661-92.[14] Indeed, Plaintiffs' allegations are supported by rulings with nearly identical allegations. *See Am. Med. Ass'n*, 588 F. Supp. 2d at 444; *compare Am. Med. Ass'n*, Fourth Am. Compl., 2007 WL 7330395, ¶¶378-96 (S.D.N.Y. July 10, 2007) *with* ¶¶661-92.

---

[13] Section 664, which UHG fails to quote, imposes civil RICO liability for "[a]ny person who embezzles, steals*, or unlawfully and willfully abstracts or converts to his own use or to the use of another*, any of the moneys . . . or other assets of any employee welfare benefit plan . . . ." 18 U.S.C. §664.

[14] UHG's reliance on *Franco*, 818 F. Supp. 2d at 828, *WellPoint II*, 903 F. Supp. 2d at 917 n.6, and *WellPoint I*, 865 F. Supp. 2d at 1035-36, for their holdings that the plaintiffs in those cases did not state a RICO embezzlement claim is unpersuasive for the reasons stated above. *Franco* and *WellPoint I* and *II*— interlocutory rulings that have not yet been reviewed on appeal—overlooked that RICO does not require that a defendant "possess" or have "access to" the plan funds for purposes of a conversion claim, and also ignored that RICO law renders liable a defendant who, as here, causes the commission of RICO acts which result in the unauthorized diversion of plan funds to the use of another.

**B.    Plaintiffs Adequately Plead UHG's Participation in the Operation or Management of the Affairs of the RICO Enterprise**

Misframing the issue, UHG argues that Plaintiffs fail to show that UHG knowingly conducted or participated in the conduct of the enterprise's affairs, as opposed to UHG's own business affairs.  Mem. at 25-28.  Specifically, UHG narrowly asserts that there are no allegations that "Ingenix or UHG directed" the other defendants or conspirators "to do anything."  *Id.* at 26.  To **direct others** in the enterprise, however, is not necessary.  Rather, "to conduct or participate directly or indirectly in the conduct of such enterprise's affairs, . . . one must **participate in the operation or management** of the enterprise itself" or "merely play[] **some part in the direction of the affairs**."  *Franco*, 818 F. Supp. 2d at 827; *see Ins. Brokerage Antitrust Litig.*, 618 F.3d at 371; *see also Handeen v. Lemaire*, 112 F.3d 1339, 1348 (8th Cir. 1997) ("it is not necessary that a RICO defendant have wielded control over the enterprise, but the plaintiff 'must prove **some part** in the *direction* . . . of the enterprise's affairs'").

Indeed, UHG's argument has been rejected by the only two decisions that have addressed this same issue on nearly the same set of facts.  *See WellPoint II*, 903 F. Supp. 2d at 912; *Franco*, 818 F. Supp. 2d at 827 (argument that Cigna must "exercise control over Ingenix . . . misses the point of *Reves*, which did not limit RICO liability to performers who pulled all of the strings").

Thus, UHG's argument that the allegations reflect only UHG's conduct of its *own* business affairs, and not the operation or management of the enterprise, fails.  As in *WellPoint II* and *Franco*, the allegations here plausibly suggest that UHG had a role in the direction of the enterprise's affairs or participated in the operation or management of the enterprise.[15]  Among other things, Ingenix owned the flawed database and collected the scrubbed data that it further manipulated and disseminated to Aetna and other insurer co-conspirators, as part of the ONS benefits underpayment scheme.  UHG, in turn, owned Ingenix and, along with Aetna and other co-conspirators, was itself a vital contributor of scrubbed data and used the data (further manipulated by Ingenix) to under-reimburse Plaintiffs.  *See* ¶¶115-16, 146-47, 150, 152, 154-57, 162-69, 178-79, 188-91, 601-10, 628-43; *see also* ¶151 (UHG's and Aetna's data accounted for approximately 70% of data contributed to Ingenix Database).

---

[15]   UHG also argues that Plaintiffs concede that Aetna sometimes did not even use the Ingenix Database when reimbursing ONS claims.  Mem. at 26.  That argument, though, is barred by Rule 12(g) because it was previously available but never raised by UHG in earlier motions to dismiss.  ECF No. 625-1 at 27-29; ECF No. 804; *supra* at 5.  Also, that argument relies upon *non-RICO* related allegations, which pertain to Plaintiffs' ERISA allegations and are not at issue here.  *See* Mem. at 26 (citing ¶¶33, 60, 398, 401, 403, 411, 413, 414); *see also* ¶¶398, 411, 413, 534-77, 584-96.  It also ignores that "Rule 8(d)(3) . . . expressly allows a party to plead inconsistent claims, and [an allegedly] 'contradictory statements of fact are allowable' in a complaint 'when the pleader is legitimately in doubt about the facts in question.'"  *In re Processed Egg Prods. Antitrust Litig.*, MDL No. 2002, 2013 WL 4504768, at *2 (E.D. Pa. Aug. 23, 2013).

The Third Circuit and other courts have rejected the argument that such activities involve the innocent conduct of one's own business affairs. *See*, *e.g.*, *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 378 ("'[I]f defendants band together to commit [violations] they cannot accomplish alone . . . then they cumulatively are conducting the association-in-fact ***enterprise's*** affairs, and not [simply] their ***own*** affairs.' . . . Here, defendants' alleged collaboration in the . . . enterprise, most notably the bid rigging, allowed them to deceive insurance purchasers in a way not likely without such collusion") (emphasis in original). The SAC plausibly suggests UHG's operation of the enterprise and that the scheme depended upon the collaborative and interdependent efforts of Defendants and benefitted them collectively: pre-scrubbed data supplied by, manipulated by, and relied upon by UHG was crucial so as to represent the validity and cost-efficiency of the Ingenix Database to customers, and "the Ingenix Database could not have been successfully marketed as the 'industry standard' for UCR pricing" without the participation of UHG in the scheme's affairs. ¶¶146, 602, 608, 641.[16] UHG was

---

[16]   UHG cites *WellPoint II* for its holding that the submission of scrubbed data does not show RICO conduct. Mem. at 27. But *Wellpoint II* held that the allegations adequately pleaded UHG's participation in RICO conduct. 903 F. Supp. 2d at 912. In any event, in ruling as to another defendant in that case, and contrary to this Court's decision in *Franco*, 818 F. Supp. 2d at 827, *WellPoint II* erroneously held that "the submission of [WellPoint's] own data does not plausibly show that WellPoint controlled the other members in the . . . enterprise." *WellPoint II*, 903 F. Supp. 2d at 912. As noted above, a RICO defendant need not have "controlled" others in order to have participated in the conduct of the

"'plainly integral to carrying out' the enterprise's activities," *U.S. v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998), and "part of the enterprise itself," *MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995).

UHG's contention that Plaintiffs fail to allege a nexus between UHG's conduct of the enterprise's affairs and a pattern of racketeering falls short. Mem. at 27-28. As discussed above, the allegations plausibly suggest that UHG committed predicate acts or caused their commission, and that these actions were the means through which it conducted the enterprise's affairs.[17]

### C. Plaintiffs Adequately Plead RICO Proximate Cause

UHG's insistence that Plaintiffs must "show" that someone relied upon the misrepresentations in order to show RICO proximate cause is misguided. Mem. at 28. The Supreme Court and numerous circuit courts have held that "reliance" is *not* an element of a RICO §1962(c) claim. *Bridge v. Phoenix Bond & Indem. Co.*,

---

enterprise, and *WellPoint II*, disregarding the correct test, failed to address whether the defendants there, by, *inter alia*, submitting scrubbed data and relying upon it to under-reimburse subscribers as part of the scheme, had participated in the operation or management of the enterprise's affairs. *See Ins. Brokerage Antitrust Litig.*, 618 F.3d at 378 ("by allegedly supplying the sham bids, Marsh's insurer-partners are also adequately alleged to have 'operated' the enterprise within the meaning of *Reves*").

[17] UHG also ignores that, for purposes of the §1962(d) conspiracy claim, UHG can be liable even if UHG did not participate in the operation of the enterprise's affairs. *Salinas*, 522 U.S. at 65; *Smith*, 247 F.3d at 537-38. In this regard, UHG does not address or dispute that others, including Defendant Aetna, participated in the conduct of the enterprise's affairs (for purposes of alleging a substantive RICO violation as part of the §1962(d) conspiracy claim). *See* Mem. at 25-28.

553 U.S. 639, 653-61 (2008); *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 419-20 (6th Cir. 2013); *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009).   Indeed, the Third Circuit has never recognized any such "reliance" element.   Instead, it has applied a three-factor test for addressing the RICO proximate cause issue. *See Schrager v. Aldana*, No. 13-2208, 2013 WL 5273137, at *2 (3d Cir. Sept. 19, 2013).  UHG ignores this test.

Even if "reliance" were an element of a RICO claim, the allegations show that Plaintiffs relied to their detriment on misrepresentations.  ¶¶ 235-367, 612-16, 619-20, 644-55.  Contrary to the argument that the misrepresentations did not directly injure Plaintiffs, the allegations plausibly suggest that the misrepresentations — sent through the mails or via wire transmissions that UHG caused to be committed — lulled Plaintiffs into a sense of complacency and prevented them from challenging the under-reimbursement payments, and thereby directly caused their injuries.  ¶¶605, 610-16, 619-20, 644-55.  UHG also ignores that, irrespective of reliance on, or direct injury resulting from, misrepresentations, as an alternative ground, Plaintiffs plausibly suggest direct injury as a result of other predicate acts, including those involving the transmission of flawed data between Defendants for use in the Ingenix Database and to underpay Plaintiffs —

31

which UHG committed or caused to be committed.  ¶¶147, 151-52, 156-57, 604, 607-08, 620, 627, 631, 634, 636, 639-41, 643, 655.[18]

Putting all this to one side, UHG simply ignores that, for purposes of §1962(d), UHG can be liable for conspiracy even if UHG did not proximately cause Plaintiffs' injuries.  *See Salinas*, 522 U.S. at 65; *Smith*, 247 F.3d at 537-38.[19]

### D.    Plaintiffs Adequately Plead a RICO Conspiracy

UHG's argument that a RICO conspiracy cannot exist because Plaintiffs fail to "adequately plead a substantive RICO violation, even as to Aetna" is meritless. Mem. at 31.  Although a substantive violation must support a RICO conspiracy, as discussed above, Plaintiffs have alleged such a violation as to all Defendants. UHG addresses only whether ***UHG*** committed a substantive RICO violation, not whether Aetna has done so – a material omission.  Mem. at 23-30.  Because UHG does not address whether Aetna committed a substantive RICO violation (which

---

[18]    UHG cites *WellPoint II*'s holding that the plaintiffs there failed to allege proximate cause because they had not shown that they "selected insurance policies based on WellPoint's misrepresentations . . . ."  903 F. Supp. 2d at 915.  *See* Mem. at 29.  In so holding, *WellPoint II* wrongly imposed a direct reliance requirement, requiring that the plaintiffs must have purchased health insurance based on misrepresentations.  The court thereby disregarded Supreme Court precedent and imposed its own theory of the plaintiffs' case, which had nothing to do with reliance on what benefits coverage was precisely marketed but, rather, challenged a fraudulent scheme to systematically underpay ONS benefits.

[19]    UHG also relies on the timing of Aetna's misrepresentations for purposes of challenging Plaintiffs' RICO proximate cause allegations.  Mem. at 29-30. Because that argument was previously available but not raised in UHG's earlier motions to dismiss, it is barred by Rule 12(g).

Plaintiffs allege), irrespective of whether UHG committed such a violation (which at any rate Plaintiffs also adequately allege), UHG may be held liable for a RICO conspiracy violation. *See Gagliardi v. Equifax Info. Servs., LLC*, No. 09-1612, 2011 WL 337331, at *6 & n.8 (W.D. Pa. Feb. 3, 2011); *Darrick Enter. v. Mitsubishi Motors Corp.*, No. 05-4359 (NLH), 2007 WL 2893366, at *22 (D.N.J. Sept. 28, 2007).[20]

Equally incorrect is the argument that Plaintiffs must plead "an agreement to violate RICO's §1962 substantive provisions."  Mem. at 31; *see also id*. (complaint must allege "agreement . . . to lie to Subscribers or embezzle funds").  For purposes of a RICO §1962(d) conspiracy claim, the SAC need only plausibly suggest that UHG knowingly agreed to facilitate a scheme that includes the operation or management of a RICO enterprise. *Salinas*, 522 U.S. at 61-66; *Smith*, 247 F.3d at 537-38.[21]  Because it does not address or apply the correct RICO conspiracy test, and because Plaintiffs need not allege an agreement to violate a

---

[20]    UHG, in a footnote, contends that it has addressed whether Aetna has committed a substantive violation.  Mem. at 31 n.15.  UHG, for instance, argues that Plaintiffs failed to comply with 9(b) as to Aetna's misrepresentations and failed to allege Aetna's participation in RICO conduct, *see id*., but as discussed above, UHG's brief contains no arguments on those issues. *See supra* at 24; Mem. at 24 & n.12, 25-28.  To the extent UHG slips these conclusory arguments in this footnote (n.15), such undeveloped arguments raised in footnotes are not deemed preserved.

[21]    The cases that UHG cites for the §1962(d) argument consist of district court decisions and *dictum* in an unpublished Third Circuit opinion that all rely upon pre-*Salinas* and pre-*Smith v. Berg* decisions.  Mem. at 31, 32.

substantive RICO provision or to commit a predicate act to allege a RICO conspiracy, UHG's §1962(d) arguments fail. *See* Mem. at 31-32.

UHG contends that Plaintiffs fail to "explain when, where, or how this supposed RICO conspiracy was created or maintained." Mem. at 32. That argument was previously available but not raised before, *see* ECF No. 625-1 at 29-30; ECF No. 804, and is barred by Rule 12(g). At any rate, this argument impermissibly attempts to impose a Rule 9(b) "particularity" standard on a RICO conspiracy claim. *See Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir. 1989). Besides recognizing the *Salinas* and *Smith* RICO conspiracy law, this Court has stated that a conspiracy claim need only "contain supportive factual allegations sufficient to 'describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy.'" *Darrick Enters.*, 2007 WL 2893366, at *22 (citing *Rose*, 871 F.2d at 366). And "the existence of a conspiracy can be inferred 'from . . . [the] facts and circumstances . . . .'" *U.S. v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986). Because UHG fails to address any of the RICO conspiracy standards, UHG's arguments on that issue fail.[22]

---

[22]      Even if UHG argued the correct law, the allegations here plausibly suggest, and support the reasonable inference, that UHG knew about and agreed to facilitate the requisite scheme to defraud, and they amply describe the composition of the conspiracy, its objectives and UHG's role.  ¶¶1, 5-10, 30, 32, 59, 115, 146-48, 151-56, 163, 180, 181, 189, 191, 202-03, 400, 426, 476-79, 480-84, 485, 488, 490, 502-08; RCS 116-19.

## IV.   RICO STANDING IS ADEQUATELY PLED

UHG argues that five of the Plaintiffs (Hull, Samit, Smith, Franco, and Whittington) fail to show "out-of-pocket payments to O[NS] providers" for purposes of RICO and antitrust standing.  Mem. at 33-34.  The SAC alleges that all subscribers suffered a RICO injury due to Defendants' RICO violations in the form of an "underpa[yment] [of] benefits," in violation of Aetna's contractual obligations to subscribers.  ¶¶1, 3-4, 620; *see also* ¶¶229, 316, 327-34, 339-52. That plausibly suggests a concrete financial loss for RICO purposes.

UHG mischaracterizes the RICO injury issue as concerning whether Plaintiffs made any "out-of pocket payments to their O[NS] providers" as a result of the RICO scheme.  Mem. at 33.  On the contrary, the correct RICO injury (or "out-of-pocket loss") here is the difference in value between the health plans that were promised (which had an ONS benefits component) and the health plans that were received (*i.e.*, whose ONS benefits component was rendered overpriced or overvalued because ONS benefits were systematically underpaid by reason of the flawed Ingenix-based UCR determinations and as a result of Defendants' misconduct).  Plaintiffs plausibly suggest a RICO injury when they were underpaid ONS benefits by Defendants — the point at which they suffered an out-of-pocket loss in the form of overpaying for their health insurance plans.  *See*, *e.g.*, *Mehling v. New York Life Ins. Co.*, 163 F. Supp. 2d 502, 507 (E.D. Pa. 2001) ("[F]or the

35

Individual RICO Plaintiffs in this case to establish RICO standing under *Maio*, they must show that Defendants failed to perform their contractual obligations."). [23]

The argument that Plaintiffs must allege that they made bill payments to providers thus ignores the out-of-pocket losses that Plaintiffs suffered due to the RICO scheme (in violation of Defendants' contractual obligations) and the resulting diminution of value to their health insurance policies. [24]  The Court should reject this attempt to move the legal goal posts on Plaintiffs.

---

[23]     *See also Negrete v. Allianz Life Ins. Co. of N. Am.*, No. CV 05-6838, 2011 WL 4852314, at *8, 10 (C.D. Cal. Oct. 13, 2011) (noting that "out-of-pocket measure of [RICO] damages is 'the difference in actual value between what the plaintiff gave and what [they] received,'" and that "plaintiffs . . . assert immediate and tangible out-of-pocket losses in the form of overpayments for financial products due to fraudulent misrepresentations by [defendant]"); *In re Am. Investors Life Ins. Co. Annuity Mkt'g and Sales Practices Litig.*, MDL No. 1712, 2007 WL 2541216, at *24-26 (E.D. Pa. Aug. 29, 2007) ("plaintiffs' injury [under RICO] therefore consists of the difference in value between the annuities that they were promised (those without deferral periods and surrender charges) and the annuities that they actually received (those with deferral periods and surrender charges.")).

[24]     *Franco* (*see* Mem. at 33), does not set forth the correct test for pleading a RICO injury. It narrowly frames the issue as concerning whether the plaintiffs incurred an out-of-pocket expense in the form of an actual payment of a provider's bill. *See Franco*, 818 F. Supp. 2d at 824. In so holding, Judge Chesler overlooked the reasoning of *Maio v. Aetna, Inc.,* 221 F.3d 472 (3d Cir. 2000), that a RICO injury requires "proof that Aetna failed to perform under the parties' contractual arrangement." *Id.* at 490. In this respect, by focusing on whether the plaintiffs paid a bill, *Franco* did not address the material issue of whether, by under-reimbursing the plaintiffs for ONS services, Cigna violated the plaintiffs' contractual right to receive reimbursement for those services at accurate UCR rates and thereby caused a diminution in value of plaintiffs' health care insurance plans (*i.e.*, a concrete financial loss or RICO injury).

## V.    WEINTRAUB'S STATE LAW CLAIMS ARE SUFFICIENT

### A. Claims Are Not Barred By the "Independent Injury Rule"

UHG argues that Weintraub's state law claims for violation of New York GBL §349, breach of the implied covenant of good faith and fair dealing, and unjust enrichment are duplicative of his breach of contract claim and thus barred by the so-called "Independent Injury Rule."  But here, Weintraub *has* alleged an injury separate from a breach of contract.  His breach of contract claim against Aetna is narrowly focused on whether Aetna breached the terms of its plan contracts by failing to provide coverage for ONS as promised.  *See* ¶¶729, 740.  By contrast, his other state law claims more broadly challenge UHG's deceptive and unlawful conduct in conspiring with Aetna to artificially deflate reimbursement for ONS.  Similarly, the remedies sought for Weintraub's state law claims are more comprehensive than those available for a breach of contract claim.  The SAC allegations thus are sufficient.

Moreover, GBL §349 claims are proper where "the acts or practices have a broader impact on consumers at large" than a traditional two-party contract dispute.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 623 N.Y.S.2d 529, 532 (N.Y. 1995).  Here, the SAC alleges that UHG's unlawful collusion results in artificially low reimbursements for millions of health

insurance customers. *See, e.g.,* ¶207.[25]   Similarly, a viable breach of contract claim does not preclude implied covenant and unjust enrichment claims where such claims arise from different facts, involve different obligations, and seek damages different from a breach of contract claim against that same defendant. *See Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.,* 873 F.Supp. 808, 816 (S.D.N.Y. 1994) (allowing implied covenant claim to proceed despite dismissal of contract claim); *Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.,* No. 11 Civ. 2589, 2012 WL 4474587, at *6 (S.D.N.Y. Sept. 28, 2012) (making misleading statements about contract performance violates implied covenant even where no term is breached).  Here, Weintraub's state law claims seek to address a broad conspiracy that includes conduct that was not governed by his contract with Aetna, and he seeks relief that goes beyond contract damages.  The "Independent Injury Rule" does not apply.

### B.  Weintraub Has Properly Alleged Violations of GBL §349

UHG argues that Weintraub has not adequately stated a claim under GBL §349 because he does not allege that he was harmed by any deceptive practices

---

[25] This is nothing like the "garden variety" breach of contract claims discussed in the *Bono* case cited by UHG.  *See* Mem. at 34.  The mere fact that a defendant's deceptive practices may also occasion a breach of contract does not serve to bar a GBL §349 claim.  *See Riordan v. Nationwide Mutual Fire Ins. Co.,* 756 F. Supp. 732, 739 (S.D.N.Y. 1990) (deceptive "policy and practice" regarding payment of insurance claims actionable under both theories of liability), *aff'd*, 977 F.2d 47, 52 (2d Cir. 1992).

directed at New York consumers.  However, Weintraub *does* clearly allege that he and others were deceived in New York.  ¶¶359-61, 725-26.  Weintraub further alleges that UHG conspired with Aetna to ensure that the flawed Ingenix Database was utilized in New York, purposefully directing its unlawful conduct there. ¶¶180-204, 206, 720-21, 724-25.

UHG's additional argument that Weintraub fails to identify any duty by UHG to disclose their scheme to under-reimburse for ONS ignores the breadth of GBL §349.   In fact, material deception under GBL §349 has been broadly construed to include the secret use of an intentionally flawed insurance model to determine the amount that policyholders have to pay.  *See, e.g.*, *Batas v. Prudential Ins. Co. of Am.*, 281 A.D.2d 260, 262 (N.Y. App. Div. 2001).  Moreover, UHG had a plain duty under GBL §349 to refrain from such deceptive conduct, especially since liability under the statute need not arise "directly out of a commercial transaction between a plaintiff consumer and a defendant seller."   *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig.*, 175 F.Supp.2d 593, 630-31 (S.D.N.Y. 2001).  The allegations in the SAC are more than sufficient to state a GBL §349 claim against UHG.

## C. UHG's Other Challenges to Weintraub's State Law Claims Overlook the Conspiracy Allegations

All of UHG's arguments attacking Weintraub's state law claims fail as they ignore UHG's liability as a co-conspirator. Under New York law, conspiracy is not a separate cause of action but a theory of liability pursuant to which co-conspirators who engage in common action for a common purpose are held responsible for the wrongs of another. *See Kashi v. Gratsos*, 790 F.2d 1050, 1054-55 (2nd Cir. 1986). Here, Weintraub has pled all of the elements of a conspiracy against UHG. Because these allegations are sufficient to hold UHG liable for each of these claims, as well as for the GBL §349 claim,[26] the Court should reject UHG's arguments.[27]

## CONCLUSION

For the reasons set forth herein and in Plaintiffs' previous briefing on UHG's Motion to Dismiss, that Motion to Dismiss should be denied in its entirety.

Dated: December 2, 2013                    Respectfully submitted,

                                           CARELLA, BYRNE, CECCHI,
                                           OLSTEIN, BRODY & AGNELLO

                                           By:   /s/ James E. Cecchi

---

[26]    New York courts have recognized that conspiracy principles may be applied to hold third parties liable for violations of GBL §349. *See Soule v. Norton*, 299 A.D.2d 827, 829 (N.Y. App. Div. 2002).

[27]    None of the cases cited by UHG involve a situation, like the one at bar, in which a defendant stands accused of assisting a co-conspirator in violating a plaintiff's clear legal rights. Mem. at 37.

James E. Cecchi

D. Brian Hufford
Robert J. Axelrod
POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP
600 Third Avenue
New York, NY 10016

*Chair of Plaintiffs' Executive Committee*

Joe R. Whatley, Jr.
Edith M. Kallas
WHATLEY KALLAS, LLC
380 Madison Avenue, 23rd Floor
New York, NY 10017

*Attorneys for Proposed Provider Class*

Stephen A. Weiss
SEEGER WEISS LLP
77 Water Street
New York, NY 10005

Christopher Burke
Joseph P. Guglielmo
SCOTT+SCOTT, ATTORNEYS AT
LAW, LLP
The Chrysler Building
405 Lexington Ave., 40th Floor
New York, NY 10174
(212) 223-6444

*Attorneys for Proposed Subscriber Class*