IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AETNA UCR LITIGATION, | Master Docket No.: 07-cv-3541 (SRC)(PS) |
| This Document Relates to: ALL CASES | MDL No.: 2020 |

**OBJECTION TO SETTLEMENT AND REQUEST FOR ATTORNEYS' FEES AND NOTICE OF INTENTION TO APPEAR AT FAIRNESS HEARING**

Barry M. Epstein, Esq.
Barbara G. Quackenbos, Esq.
EPSTEIN & QUACKENBOS
103 Eisenhower Parkway
Suite 102
Roseland, NJ 07068
973-228-4642
Counsel for the Adequate Subscriber Plaintiffs

Non-Settling Adequate Plaintiffs Objections to Judge Hayden's 8/30/13
Opinion Preliminarily Certifying the Aetna R&C Class

THE MOVANTS ARE NOT ADEQUATE OR REPRESENTATIVE

1.    The Court's reference to movants as "representative plaintiffs." Op. 4 is mistaken. The Court discussed non-settling Adequate Plaintiffs (hereinafter "Adequate Plaintiffs") objection that John Seney voluntarily dismissed his complaint. Op. 14-16. The Court relied on the fact that "Seney's identical claim was repled in the amended complaint." Op. 16. Civ.R. 15 provides that "parties" can, under defined circumstances, amend their complaint. It has no provision for a dismissed former party to amend a complaint to which he is no longer a "party". As Adequate Plaintiffs established in their MOL opposing settlement, quoting 3d Circuit cases, " after the dismissal [Seney's] … action [was] no longer… pending in the district court and no further proceedings in the action are proper." Seney's "dispute vanish[ed]." Point B. p13. Respectfully, this Court simply misinterpreted the law in citing Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 505 (2001). Semtek did not hold that a voluntarily dismissed plaintiff could return to the same Court by amending his dismissed complaint. By operation of law-Seney is no longer a party.

2.    The Court found "four subscribers" – John Seney, Jeffrey M. Weintraub, Alan John Silver, and Mary Ellen Silver adequate. Adequate Plaintiffs briefed the inadequacy of John Seney, Alan John Silver and Jeffrey Weintraub. Mary Ellen Silver was not joined as an alleged "representative plaintiff" at that time.

3.    The Adequate Plaintiffs raised a number of due process arguments as to Weintraub and Alan John Silver that also apply to Mary Ellen Silver. As the Supreme Court has held in numerous opinions  the essence of class action due process is the requirement that to be an adequate class representative one must have the same live, actual, existing, justiciable action against the defendant as the class, and has at all times actively participated in the litigation. Opposing brief P. 1-23. Adequate Plaintiffs continue to rely on this precedent. This Court did not discuss the Supreme Court or 3d Circuit and other Circuit Court case law or the learned commentary cited by Adequate Plaintiffs on these due process issues.

Mary Ellen Silver did not even join in the "Settlement Agreement" but was added for this go around. The reason she was not inserted initially has not been disclosed and the promises or representations to obtain her name are also secret. Her attorneys in her unconsolidated case provided some medical records at one point but she was not deposed or otherwise involved and her com[plaint has not

1

been tested. Constitutionally significant for due process inadequacy, neither Ms. Silver nor her attorneys took any part in the action or mediation and are inadequate under established and binding precedent.

THERE WERE NO ARM'S-LENGTH NEGOTIATIONS RESULTING IN A SETTLEMENT

The Court based its decision approving the settlement on the affidavit of James Cecchi, finding that:

> "… according to the settlement liaison [James Cecchi] Judge Politan relayed Aetna's final offer and 'every member of Plaintiffs' Executive Committee' agreed to it, with the exception of counsel for the objectors . [Id. at 15 (citing settlement liaison James Cecchi's Cert.Par. 17).]" Op. 23.

Based on this representation the Court held:

> "… first the Court must apply the legal precepts governing adequacy under Rule 23(e) (2). In that respect, the Court is satisfied that the extensive proceedings, including extensive fact and expert discovery coincident with 13 mediation sessions with a respected mediator, gave counsel on both sides ample opportunity to adequately assess the strengths and weaknesses of their respective positions and facilitated informed negotiations." The Court then quoted In re Ins. Brokerage Antitrust Litig. as 'granting approval to a class action settlement after finding that: the settlement agreement resulted from **extensive arm's- length negotiations and…broad discovery…**'" Op. 24

The Court's factual findings – and thus its conclusions- are not supported by the record. First, there were no arms-length negotiations leading to a settlement. The 13 mediation sessions ended in rejection of Aetna's final offer. Second, it produced no information in addition to what Plaintiffs were able to ascertain through discovery. Third, this failure provides the Court with a basis to conclude they were just a waste of time and not productive of a settlement. Indeed, the facts reveal that Aetna refused to provide a report from its own expert on the amount of the reduction of benefits as a result of its use of Ingenix, Medicare, Tiering (averaging) of mental health providers' charges;

2

Aetna's own data (termed "back room manipulations" by James Cross its Medical Director); Wholesale rather than Retail price for pharmaceuticals. [As noted herein, although Aetna refused to calculate its own computerized data Plaintiffs were able through document discovery to obtain information on Medicare and Tiering reductions in health benefits of $322 million and computerized data to support their expert Dr. Foreman's report of $3.1 Billion Dollars realized through out-of-network benefit reductions during the class period. This amount alone dwarfs the settlement.

The Court's finding "as to broad discovery" was incorrect as it related to obtaining an expert report from Aetna on class damages for R&C reductions. After Mr. Cecchi entered into a settlement agreement, Adequate Plaintiffs sought financial data on which the settlement was based. It was denied by the settling individuals raising the question of whether they ever obtained it. (Epstein certification Exh. 6 and 7 reviewed in detail below identifies the demands for financial data on which the Settling individuals arrived at this settlement.) The Court's conclusion based on the finding of extensive arm's-length negotiations is counter factual:

1. In support of its finding of "extensive arms- length negotiations," the Court found that there was "substantial fact and expert discovery" Id.

   a. Despite this finding the Court did not consider Plaintiffs expert Dr. Foreman's report of $3.1 Billion in benefit reductions through Aetna's R&C plan violations. This had a floor of $322 M from discovered non-Ingenix based R&C reductions for Medicare and mental health benefit tiering. It was based on Aetna claims data for the Class period Doc 843 P.36 (Br p. 30). This is critical unassailable evidence based on Aetna's own records received in discovery that the Court did not consider on its merits. Rather, the Court wrote it off after listening to a brief –fact and exhibit free- oral argument of the adversary Mr. Doren in which he pronounced the total damages for all R&C reductions at $50 Million "soaking wet." Tr. 7/23/13 p.76. Recall, Aetna did not produce an expert damage report.

   b. The Court cited to Mr. Doren's oral argument "Doren argument" and Aetna's reply brief "Aetna reply" at pp. 5-6 on the critical issue of damages from "benefit reductions" and "litigation risks" as its basis to find the settlement damage amount was "adequate." It is respectfully submitted that these findings and the related finding of arms- length negotiations had no basis in the facts of this action or in law.

   c. Neither the Doren argument nor the Aetna reply provide its own calculation of the reduction in benefit payments due to its use of Ingenix. What the

3

Court is presented with are vague unsupported critiques of Foreman's report of the denials of benefits for R&C charges without any expert report providing Aetna's calculations.

d. To find the damages adequate this Court needed evidence, not words. Aetna should be required to present a certified independent audit of the total of these benefit denials on Aetna's books. We respectfully request the Court to so order. The Court's reliance on Mr. Doran's argument has made this essential. The Class Members deserve no less.

e. Aetna knows to the penny what it made. It has not produced it and there is no just reason not to Order it to do so.

2. Aetna's Plan Terms for R&C (Reasonable Charge) provide:

> "The reasonable charge for a service or supply is the lower of the provider's usual charge for furnishing it; and the charge Aetna determines to be the prevailing charge level made for it in the geographic area where it was furnished." Werner Plan: AET – 00292133.

The Doren argument asserted:

> "What that 3.1 billion dollar figure is based on is an assumption that any figure that a physician elects to charge for a service is the appropriate figure that should be paid by the plan. Rather than any sort of allowed concept." Tr.1/23/13 p. 75

The Plan language demonstrates Mr. Doren's description is not accurate. Aetna's Plans Provide benefits will be determined based on a binary decision: Aetna pays the "lower" of the provider's billed "charge" or the purported "prevailing charge level made for it in the geographic area in which it was furnished." The amount Aetna allows, A/K/A the "allowed amount," is one of those two "billed charges" less co-pay and other plan reductions applied through Aetna's computer program.

Aetna used the Ingenix database to save $3.1B during the Class Period, by violating these plan terms knowing that Ingenix did not "determine …the prevailing charge level made for it in the geographic area where it was furnished." It was not by accident that both the Doren argument and the Aetna brief pages relied on by the Court, elected not to cite the controlling Plan terms. As discussed below Aetna's reliance on a computer program to determine R&C

4

benefits provides another compelling practical reason for Aetna's use of precise "charge" data. It also bespeaks the ease with which Aetna can – and secretly has – computed class damages. Aetna just has not shared that information with the Plaintiffs or the Court.

3. Aetna automatically determined benefits using a computer program that selected the lower of the providers billed charge or the Ingenix billed charge. The process was called "auto adjudication." (Reply Memo in support of class cert. Doc. 551 page ID 13736 P. 20-21 of 52 (Brief pp. 19-20). As documented in that brief "This program automatically calculates the R&C exclusion using Ingenix or its other non-compliant methodologies without reference to any plan terms. Aetna conceded that, "[s]ince 2001, the vast majority of Aetna's claims have been auto-adjudicated, without involvement of a manual claim processor..." Decl. of Dr. James Cross, June 30, 2010 Par. 83 (Axelrod reply Decl. Exh. 25).

4. The Court also did not mention or consider the evidence on damages cited by Plaintiffs in their brief P. 30-33 and exhibits showing Medicare damages at $226M; Mental health Averaging at $96M Doc. 843 p. 38 (Br. p. 32) for a total of indisputable damages of $322 Million. This was not addressed in the "soaking wet" speech. Neither Aetna's reply nor the Doren argument addressed the Plan violations using Medicare; averaging of the charges of mental health providers; use of the Aetna "back room manipulation" fee schedule or use of Wholesale instead of Retail prices. In addition, neither the Aetna reply nor the Doren argument cited or referred to any so called litigation risks facing Plaintiffs for any of these plan violations requiring Benefits to be paid at R&C rates. The clear inference the Court must make is there are no litigation risks Aetna can conceive of. As a direct result the Court's opinion failed to address Aetna's Plan defalcations totaling $322 M for just Medicare and Mental Health.

5. The Court states settling Plaintiffs "acknowledge...this [Aetna] range of calculations..." Op. 25. The Court, however, failed to acknowledge or consider that in their memorandum objecting to the settlement the non-settling Adequate Plaintiffs documented detailed specific requests for financial data necessary for both the Settling Individuals and the Court to arrive at and evaluate the "range of calculations" Aetna has referenced in this motion. Epstein Certification dated 1/7/13 and Exh.6&7. Without this information demonstrating settling individuals had a basis to know of the "range of calculations," their acknowledgment of the Aetna "range of calculations" is meaningless and intentionally misleading.

5

ADEQUATE PLAINTIFFS REQUEST – THROUGH THE COURT- FINANCIAL DATA FROM SETTLING INDIVIDUALS ON WHICH THE SETTLEMENT WAS BASED

As soon as they learned of the settlement, Adequate Plaintiffs specifically demanded all financial information regarding settling individuals knowledge of the "range of calculations," and related data essential to an informed settlement. To that end on Dec. 10, 2012 they demanded "a copy of all communications and documents between Plaintiffs' counsel and/or Aetna relating to any analysis of the size of the class or the cost of administering the Purported Settlement Agreement; or the potential payment or percentage of recovery by the subscriber class members; or the number of members anticipated to apply; or difficulties in complying with the prove up." (Epstein Cert. Exh.6)

On Dec. 10, 2012 adequate plaintiffs also demanded copies of "communications and documents" used or exchanged by plaintiffs and Aetna showing *inter alia* all "facts or evidence or other basis… for the settlement… analysis of the size of the class or its individual class members…" together with communications regarding exclusion of Wilentz, etc. (Epstein Cert. Exh. 6)

On Dec. 11, 2012, counsel for Adequate Plaintiffs emailed Messrs. Cecchi and Axelrod requesting additional damage calculations, stating: "Attached is a document requesting damage calculations that you obtained or used or were aware of during your secret negotiations with Aetna. We seek information with regard to the amount of benefit reductions Aetna imposed on the subscriber class by using Medicare; its own fee schedule…use of "tiering" [averaging] so as to reduce mental health benefits… Aetna's use of average wholesale price for drugs sold at retail; and Aetna's benefit reductions resulting from the use of Ingenix." The request also demanded: …the amount of reduction from billed charges that Aetna provided to you or that you used or estimated or that you calculated or were aware of or raised during your negotiation on behalf of the subscriber class. Kindly be specific as to the damages claimed or discussed as part of your secret negotiations." (Epstein Exh. 7)

The Settling Individuals refused to provide any of the information and they have not provided it to the Court. It is essential for a reasoned analysis of the fairness of this "settlement."

6

AETNA'S FINAL OFFER AT MEDIATION (WHICH IS IDENTICAL TO THE AMOUNT THIS COURT IS ASKED TO APPROVE) WAS UNANIMOUSLY REJECTED BY PLAINTIFFS AND IS NO MORE ACCEPTABLE NOW.

Every member of the Plaintiffs' executive committee expressly rejected Aetna's final offer at mediation which the Court is now being asked to approve. The Court also has before it, but did not reference, the affidavit of B. Epstein which averred:

Wilentz [B. Epstein and B. Quackenbos] had participated in all 13 mediation sessions including the last one with Judge Politan on December 7, 2011. At that time, Aetna's final offer was rejected by Plaintiffs' counsel, Pomerantz, Whatley, Scott and Scott, Wilentz, Carella Byrne and Seeger Weiss. All of these counsel participated in this and the prior unsuccessful mediation efforts. On Dec 7, 2011, Joseph Whatley speaking on behalf of his firm and the Pomerantz attorneys Robert Axelrod and Brian Hufford, rejected Aetna's offer, advising mediator Judge Politan that $20 million for providers was too little. Chris Burke representing Subscriber Weintraub, referring to the proposed $120 million, said "Aetna is carrying the joke too far." The mediation ended and all the parties left.

The Court did not quote from the transcript of the argument before it in which Ms. Quackenbos represented: "There was a concluded mediation that we were very much a part of around the table when Judge Politan as I referred to earlier, gave us Aetna's offer and it was rejected by everyone around that table." T 7/23/13 at 58: 12-16.

Mr. Epstein represented in Court:

> "Mr. Epstein: What happened on December 7th I remember clearly. Judge Politan came out and read a paper, which I believe was either written or dictated to him by Aetna and it had a settlement on it. That was rejected. One of the attorneys said, 20 million dollars for the providers is too little. That attorney is here in court. Another attorney that was there said Aetna is carrying the joke too far, in rejecting the settlement that's actually been presented here. Those two lawyers are here in court. The settlement then–the negotiations ended." T63:2-12. "…Your Honor…there's no doubt that we are hearing things here that just did not occur….We had explicit rejections of the offer which is basically accepted now." T65:6-14.

7

> "The Court: The position that you are taking is that as the last mediation session a settlement that is substantially, at least to the number, was rejected by everybody including yourselves and now is here again. " T66:4-8
>
> "Mr. Epstein: Exactly. 20 million for the providers, 40 million for the subscribers. It was the exact numbers. They put it back on the table. And Mr. Cecchi, in secret ... in violation of an order accepted it. And then he tried to press it." T66:9-13
>
> "The Court: Are you disagreeing with Mr. Cecchi's representation that you and Ms. Quackenbos were adamant and of one as to rejecting it entirely? Or are you saying, as one of everybody in the room in a chorus said, no, and there was no issue about your being stronger or different from anybody else?" T66: 14-19.
>
> "Mr. Epstein: I would state that under oath."
>
> [Meaning on the stand. In fact Mr. Epstein had stated this under oath in the affidavit quoted above that identified Mr. Whatley and Mr. Burke and their precise rejection statements .]

Aetna also had definitive knowledge that its last offer was rejected. No Aetna lawyer or business executive present at the Dec. 7, 2011 mediation signed an affidavit that their offer had been accepted by the Plaintiffs. The reason is obvious. We have not seen it but it is certain that Aetna has a written report of what happened at that final mediation confirming its offer was not accepted. In his oral argument – which followed Ms. Quackenbos and Mr. Epstein's, Mr. Doren did not state that the settlement was accepted at the Dec. 7, 2011 final mediation session. He stayed far away from Aetna's concert with the Court Appointed Liaison to violate the Court's Order requiring immediate notification of all parties of settlement discussions. Here, Aetna conspired to exclude all adequate subscriber Plaintiffs.

This evidence is inconsistent with the critical finding made by the Court that the 13 mediations constituted "arms-length" negotiations that resulted in a settlement on which it based preliminary approval of the settlement. The facts are that 13 mediation sessions resulted in no settlement. The Court referenced

8

Mr. Doran's oral argument, Op.25 but not the fact that Mr. Doran's argument failed to confirm that Aetna's offer was accepted on Dec. 7, 2011 or that it was a mediator's proposal. By not supporting it Mr. Doren confirmed it did not happen. It is respectfully requested that the Court reject final approval on these facts. If the Court feels it needs more information on the CMO 2 violation and the surrounding circumstances, we request it to conduct a hearing at which the involved parties will testify.

THE COURT INCORRECTLY CONCLUDED THAT THE INVALIDITY OF THE INGENIX DATBASE WAS "HEAVILY CONTESTED" WHEN IT WAS NOT CONTESTED AT ALL AND $120 MILLION WAS NOT AVAILABLE TO THE CLAIMANTS

The Court found that "In addition to challenging the negotiations between the settling parties, the objecting plaintiffs complain that the recovery available to the claimants -- $120 million – does not adequately capture Aetna's potential exposure [Prelim. Hr'g Tr. Day 2 (Quackenbos) 15:4-16:2; 16:16-17; Obj. Pls.' Opp. at 28-30]. On that point, the Court notes that the invalidity of the Ingenix database as well as the amount of damages resulting from it are heavily contested issues." Op. 24. [the Court next turns to the expert testimony on the amount of damages - which we have quoted and discussed herein]

In this discussion on the "Ingenix database...invalidity [and] the amount of damages from using it..." the Court improperly disregarded the evidence, briefing and oral argument on two critical issues. First, the invalidity of Ingenix was not "heavily contested." (1) Neither Aetna or Ingenix presented any Expert testimony in support of the Ingenix database as adequate for R&C. (2) Ingenix was one of several methods used by Aetna including Medicare, tiering for mental health; its own "back room manipulations" and use of wholesale rather than retail prices for medical supplies that have been briefed herein. These were not mentioned or considered in the opinion. (3) "120 million" was not "available to the claimants." $40 M was nominally available to subscribers and $20M to providers – all subject to prove up that was onerous and unnecessary. The Court received a limited response on the reasons for the onerous prove up consisting of argument (not facts) from R. Axelrod a lawyer for dismissed providers with clearly inadequate assignments – who with J. Whatley and B. Hufford had rejected this settlement as inadequate; - and argument from J. Cecchi who formerly was local counsel for a voluntarily dismissed client (Seney) and who violated a Court Order in his position as liaison. Op. 26-27. [Note: there is no discussion of Mr. Cecchi's violation of his liaison position in the opinion.] The Court refers to Mr. Cecchi as "settlement counsel" although he has no client and CMO 2 appointed him as liaison counsel which is the antithesis of settlement counsel. He was required to disclose settlement

9

overtures to all Plaintiff's attorneys so that they could settle the action if warranted – not to secretly settle without compliance with the Court's Order.

        Respectfully Submitted.

**EPSTEIN & QUACKENBPOS PC**
103 Eisenhower Parkway, Suite 102
Roseland, NJ  07068
Telephone: (973) 228-4642
By: /s/ *Barry M. Epstein*
Barry M. Epstein, Esq.
Barbara G. Quackenbos
**Counsel For Adequate Plaintiffs**
**Objecting To The Preliminary**
**Approval Of The Proposed Settlement**