| | |
|---|---|
| 1  George W. Cochran, Esq. | |
| 2  Ohio Bar No. 0031691 | **RECEIVED** |
| 3  1385 Russell Drive | |
| 4  Streetsboro, Ohio 44241 | |
| 5  Tel: (330) 607-2187 | **FEB 25 2014** |
| 6  Fax: (330) 230-6136 | |
| 7  Email: lawchrist@gmail.com | AT 8:30_____M |
| 8 | WILLIAM T. WALSH |
| 9  *Attorney for Class Member/* | CLERK |
| 10  *Objector Jeffrey D. Cochran* | |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AETNA UCR LITIGATION | Master Docket No. 2:07-cv-3541-KSH-CLW |
| | MDL No. 2020 |
| (APPLIES TO ALL ACTIONS) | |
| | Date: March 18, 2014 |
| | Time: 10:00 a.m. |
| | Dept. Courtroom 10, 19th Floor |
| | Judge: The Hon. Katharine S. Hayden |

**OBJECTION TO CLASS ACTION SETTLEMENT AND REQUEST FOR ATTORNEY'S FEES OF JEFFREY D. COCHRAN**

Class member Jeffrey D. Cochran, 1385 Russell Drive, Apt. 1, Streetsboro, Ohio 44241 ("Cochran") hereby objects to the proposed class action settlement and provision for payment of counsel's fees in this action for the following reasons. Cochran does not intend to attend the fairness hearing scheduled for March 18, 2014, either personally or through counsel.

## I. Settlement Agreement

Cochran joins in Harvey S. Shapiro's objection to the claims procedure for subscribers (DE 922). As noted by Shapiro, requiring claimants to produce information already possessed by Defendants is highly suspect. As highly sophisticated businesses with cutting-edge

1

computer software applications, Defendants are in a far better position to identify the particulars solicited in the Simplified Claim Form. That claimants may request the information from the Settlement Administrator by completing a special form does not lessen the burden. The disclosures required by the "Simplified Claim Form" are anything but simple:

(i) Certification that claimant was an Aetna Plan Member during one or more of the twelve years spanning the class period;

(ii) Identification of Plan or Employer;

(iii) Identification of each year claimant received services or supplies from an out-of-network provider;

(iv) Isolation of each out-of-network charge that resulted in a partially allowed claim.

To receive more than $40 per plan year allowed under the General Settlement Fund, a claimant must undergo more stringent disclosure and documentation requirements to participate in the Subscriber Prove Up Fund. As set forth in the Settlement Agreement:

**(a) Eligibility for the Subscriber Prove-Up Fund**
Claims eligible for payment from the Subscriber Prove-Up Fund are Partially Allowed Claims for which the Subscriber Class Member received and paid a Balance Bill from March 1, 2001 to the Preliminary Approval Date, provided that (i) the Subscriber Class Member did not execute an Assignment of such claim(s) and (ii) the total Balance Bills the Subscriber Class Member actually paid for Covered Services or Supplies are equal to or exceed $200. Subscriber Class Members who assigned a claim for Covered Services or Supplies or did not pay a Balance Bill are not eligible for the Subscriber Prove-Up Fund. If claims are submitted by a Provider Class Member and a Subscriber Class Member on the same Partially Allowed Claims, and both claims are determined to have valid supporting documentation by the Settlement Administrator, only the Subscriber Class Member will receive payment on that Partially Allowed Claim and it will not be eligible for any payment from the Provider Prove-Up Fund nor will it be included in calculating whether the financial threshold for eligibility under Section 10.2(d) has been satisfied by a Provider Class Member.

**(b) Required Proof of Claim Form**
The Subscriber Class Member must submit a completed Proof of Claim Form, in the form attached as Exhibit A and signed under penalty of perjury, to the Settlement Administrator by the Claim Submission Deadline in order to be eligible to receive and to receive payment from the Subscriber Prove-Up Fund. The Proof of Claim Form requires, among other things, identifying information about theSubscriber Class Member, an address to which payments may be sent, the name of the Plan, and the years that the Subscriber Class Member has been a Plan Member.

For each Partially Allowed Claim for which a Subscriber Class Member submits a completed Proof of Claim Form, the Subscriber Class Member must also provide the following

information: a description of the Covered Service or Supply that was partially allowed by the Company; the date of service or purchase of the Covered Service or Supply; the name of the applicable Out-Of-Network Health Care Provider, or Out-Of-Network Health Care Provider Group; the name of the patient; the original billed amount from the Provider for the Covered Service or Supply; the Allowed Amount for that Covered Service or Supply; and the amount paid by the Subscriber Class Member in response to a Balance Bill received for the Partially Allowed Claim.

If a Subscriber Class Member executed an Assignment for a Covered Service or Supply, or did not receive and pay a Balance Bill, that Subscriber Class Member may not request payment from the Subscriber Prove-Up Fund for the claim that is subject to such Assignment or for which no Balance Bill was received and paid.

The Subscriber Class Member must attest under penalty of perjury that he or she has not executed an Assignment for any of the Partially Allowed Claims listed on the Proof of Claim Form. Subscriber Class Members must also attest under penalty of perjury that the information provided in the Proof of Claim Form is true and correct. If the Proof of Claim Form is not completed or does not reflect that a Partially Allowed Claim is eligible for reimbursement from the Subscriber Prove-Up Fund, the Subscriber Class Member will not be entitled to payment from the Subscriber Prove-Up Fund.

**(c) Supporting Documentation**
In addition to completing the Proof of Claim Form, to be eligible to receive payment from the Subscriber Prove-Up Fund, each Subscriber Class Member must also provide supporting documentation for each Partially Allowed Claim listed on the Proof of Claim Form. The required supporting documentation includes the following:

> i. a copy of the Balance Bill for the Partially Allowed Claim(s) together with a credit card statement or cancelled check showing the Subscriber Class Member's payment of the Balance Bill for the Partially Allowed Claim(s);
>
> ii. a receipt showing payment of the Balance Bill(s) together with an "Explanation of Benefits" or other document showing the Company's reimbursement for the Partially Allowed Claim(s); or
>
> iii. the Out-of-Network Health Care Provider's or Out-of-Network Health Care Provider Group's business records showing the issuance and the Subscriber Class Member's payment of a Balance Bill for a Partially Allowed Claim.

Documentation for outstanding bills for any amounts other than the difference between the Allowed Amount and the Billed Charge, such as a bill relating to Denied Claims, coinsurance, deductibles, or coordination of benefits, is not valid. If a Subscriber Class Member fails to provide the Settlement Administrator with the required supporting documentation for a particular Partially Allowed Claim, no payments shall be made from the Subscriber Prove-Up Fund with respect to that Partially Allowed Claim, nor will that Partially Allowed Claim be included in the calculation of the aggregate out-of-pocket payments required under Section 10.1(d).

The obvious effect of such obstacles is to *reduce participation in the settlement fund.* Neither is this tactic unique in class action settlements. Similar burdens were criticized in the foreign currency conversion litigation (*Ross, et al. v. American Express Co., et al.,* No. 04-5723, *MDL No. 1409 (S.D.N.Y.)*. Like here, the settlement agreements in *Ross* needlessly

burdened class members because the credit card companies were uniquely positioned to provide the very data requested.

Even if Defendants do not have superior access to the information, it is unrealistic to expect consumers to preserve health insurance records for years or to recall whether they paid out-of-network charges. To make matters worse, some of the out-of-network charges may have been initiated by in-network providers *without the subscriber's knowledge or approval*. The notion that a subscriber will discern the difference upon receipt of the bill is naïve at best. Equally troublesome is the fact that any surplus from the $120,000,000 in Settlement Funds "shall remain with Aetna and will not be paid out under the Settlement." Notice, at 3 (Part V(A)(4)). As a direct consequence of this structural defect, Defendants have a self-serving incentive to minimize claim payouts. Neither can Plaintiffs who anticipate receiving incentive awards of $20,000 each be expected to raise concerns about "fairness".

Connecting these dots is not rocket science. In a study conducted by Mayer Brown LLP for the U.S. Chamber Institute for Legal Reform, researchers concluded that "class actions provide far less benefit to individual class members than proponents of class actions assert."[1] The study noted the surprisingly "miniscule" percentage of the class that actually receives any settlement benefits on a 'claims-made' basis:

> [C]onsumer class actions are almost always resolved on a claims- made basis, and the actual amount of money delivered to class members in such cases almost always is a miniscule percentage of the stated value of the settlement. That is because, in practice, relatively few class members actually make claims in response to class settlements: many class members may not believe it is worth their while to request the (usually very modest) awards to which they might be entitled under a settlement. And the claim-filing process is often burdensome, requiring production of years-old bills or other data to corroborate entitlement to recovery.

---

[1] The Mayer Brown study may be accessed on-line at www.mayerbrown.com/Trial-Lawyer-Protection-Act-WSJ/.

1    *Id.,* at 6-7. If consumer class actions are to fulfill the public policies they are designed
2    to promote (e.g. the effective *private* enforcement of relatively small claims and deterrence
3    of wrongdoing that regulatory agencies are not equipped to police)—rather than merely
4    generating fees and shielding wrongdoers—all needless obstacles must be removed. Given
5    the few recoveries anticipated in the Simplified Claim process, Defendants must afford
6    greater deference to the subscribers' time and resources. To avoid an unjust result, the settling
7    parties should shift the burden of producing information to ensure meaningful class
8    participation. A more reasonable plan would include an appropriate level of *presumptive*
9    *entitlement* for class members unable to determine the particulars of their coverage.
10   Consistent with Objector Shapiro's analysis, Cochran objects to any class action settlement
11   that: (i) rewards Defendants for low participation in the claims process; and (ii) fails to adjust
12   attorneys' fees in line with said participation.

13                                    **II.   Attorney's Fees**

14           If the Court approves the proposed settlement, class counsel will also apply for an award
15   of attorneys' fees in an amount not to exceed 33-1/3% of the Settlement Funds and
16   reimbursement of expenses not to exceed $3,000,000. Any attorneys' fees and expenses awarded
17   by the Court will be paid *entirely* from the General Settlement Fund. In addition, Settlement
18   Class Counsel may apply to the Court for the approval of a service fee to each of the
19   Representative Plaintiffs not to exceed $20,000 each. For several reasons, Cochran objects to the
20   present structure for determining class counsel's fee and intends to supplement his objection
21   once a petition for an award is filed.

22           According to Rule 23(h) of the Federal Rules of Civil Procedure: "In a certified class
23   action, the court may award reasonable attorney's fees and nontaxable costs that are authorized

1   by law or by the parties' agreement." Fed.R.Civ.P. 23(h); see also *Wallace v. Powell*, 288
2   F.R.D. 347 (M.D.Pa. 2012). However, a district court must still conduct a "thorough judicial
3   review of fee applications ... for all class action settlements." *In re Rite Aid Corp. Sec. Litig.*,
4   396 F.3d 294, 299 (3d Cir.2005) (quoting *Prudential*, 148 F.3d at 333 (internal quotations
5   omitted)). In light of the structural nature of fee arrangements in class actions, even honorable
6   class counsel may be compromised by the possibility of a large fee. *In re General Motors
7   Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768 (3rd Cir. 1995).[2]
8   Beyond their ethical obligations to clients, class attorneys owe the entire class a fiduciary duty
9   once the class complaint is filed. See 2 NEWBERG & CONTE Sec. 11.65, at 11-183;
10  *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 (3d.Cir.1973). The large fees garnered by
11  some class lawyers can create the impression of an ethical violation since it may appear that the
12  lawyer has an economic stake in their clients' case.

13        Some commentators blame the system of compensating class action lawyers for
14  creating incentives that diverge markedly and predictably from their clients' interests. The
15  leading critic is Professor Coffee. See John C. Coffee, Jr., Understanding the Plaintiff's
16  Attorney: The Implications of Economic Theory For Private Enforcement of Law Through
17  Class and Derivative Actions, 86 COLUM.L.REV. 669, 671-72 (1986); John C. Coffee,
18  Rescuing the Private Attorney General: Why the Model of the Lawyer As Bounty Hunter Is
19  Not Working, 42 MD.L.REV. 215 (1983); John C. Coffee, The Unfaithful Champion: The
20  Plaintiff as Monitor in Shareholder Litigation 48 LAW & CONTEMP. PROBS. 5 (Summer
21  1985); Kevin M. Clermont & John D. Currivan, Improving on the Contingent Fee, 63
22  CORNELL L.REV. 529 (1978); Murray L. Schwartz & Daniel J.B. Mitchell, An Economic

---

[2] Much of what follows relies on *General Motor's* thorough discussion and analysis of this issue.

Analysis of the Contingency Fee in Personal-Injury Litigation, 22 STAN.L.REV. 1125 (1970).

Economic models have shown how conventional methods of calculating class action fee awards give class counsel incentives to act earlier than their clients would deem optimal. *See* Coffee, Understanding the Plaintiff's Attorney, 86 COLUM.L.REV. at 688. Because, under a percentage of recovery award mechanism, the attorneys will only enjoy a relatively small portion of whatever incremental award they can extract from the defendant, the defendant can pressure the plaintiffs' attorney into early settlement by threatening to expend large sums on dilatory tactics that would run the expenses up beyond what plaintiffs' attorneys can expect to profit. *Id.* at 690. Coffee also blames the principal-agent problem endemic to class actions for creating a situation where the defendants and plaintiffs can collusively settle litigation in a manner that is adverse to the class's interest: "At its worst, the settlement process may amount to a covert exchange of a cheap settlement for a high award of attorney's fees. Although courts have long recognized this danger and have developed some procedural safeguards intended to prevent collusive settlements, these reforms are far from adequate to the task." *Id.* at 714 n. 121 (citing cases).

Concerns about the vigor of class counsel's prosecution of class claims is buttressed by the legacy of *Prandini v. National Tea Co.*, 557 F.2d 1015, 1021 (3d Cir.1977). In *Prandini,* the Third Circuit recognized the potential for attorney-class conflicts where the fees, while ostensibly stemming from a separate agreement, were negotiated simultaneously. The Court characterized simultaneity of fee and settlement negotiations as a "situation ... having, in practical effect, one fund divided between the attorney and client." *Id.* To respond to this danger of collusion between the class counsel and defendant, *Prandini* and the Third Circuit Task Force Report on court-awarded attorneys' fees disapproved fee discussions until after the achievement

1   and approval of settlement. See *Prandini*, 557 F.2d at 1021; Court Awarded Attorney's Fees,
2   Report of the Third Circuit Task Force, 108 F.R.D. 238, 266 (1985) [hereinafter Task Force].

3   In the present case, it is unclear from the record whether simultaneous negotiations in fact transpired. However, close scrutiny requires more than blind reliance on the parties' representations. The Court in *General Motors* was "loathe to place such dispositive weight on the parties' self-serving remarks". Id. Even if present counsel did not agree to the fee cap until after reaching a settlement agreement, the Task Force recommends postponing fee negotiations until the settlement is *judicially approved*. Though *Evans v. Jeff D.*, 475 U.S. 717, 734-38, 106 S.Ct. 1531, 1541-43, 89 L.Ed.2d 747 (1986), overruled *Prandini's* strict rule prohibiting simultaneous negotiations, many of the concerns remain.

11   Clearly, the divergence in financial incentives presented here creates the "danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red carpet treatment for fees," *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir.1991). This generates an especially acute need for close judicial scrutiny of fee arrangements that implicate this concern. See *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 224 (2d Cir.1987) ("The test to be applied is whether, at the time a fee sharing agreement is reached, class counsel are placed in a position that might endanger the fair representation of their clients and whether they will be compensated on some basis other than for legal services performed."); *Piambino v. Bailey*, 757 F.2d at 1139 ("Because of the potential for a collusive settlement, a sellout of a highly meritorious claim, or a settlement that ignores the interests of minority classes members, the district judge has a heavy duty to ensure that ... the fee awarded plaintiffs' counsel is entirely appropriate.").

23   Cochran does not dispute that courts commonly award attorneys' fees as a percentage of

the fund recovered. See *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541 n. 16, 79 L.Ed.2d 891 (1984); *In re Smithkline Beckman Corp. Secur. Litig.*, 751 F.Supp. 525 (E.D.Pa.1990). Courts use the percentage of recovery method on the theory that the class would be unjustly enriched if it did not compensate the counsel responsible for generating the valuable fund bestowed on the class. See *Task Force*, 108 F.R.D. at 250. Because these cases are not presumed to serve the public interest (as evidenced by the lack of a fee statute), there is no social policy reason that demands an "adequate" fee. Instead, the court apportions the fund between the class and its counsel in a manner that rewards counsel for success and penalizes it for failure. In general, as the size of the settlement fund increases the percentage of the award decreases. See *Prudential*, 148 F.3d at 339. "The basis for this inverse relationship is the belief that ' [i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.' " Id. (citing *In re First Fid. Bancorporation Sec. Litig.*, 750 F.Supp. 160, 164 n. 1 (D.N.J.1990)). One court noted fee awards have ranged from 19% to 45% of the settlement fund. *In re Smithkline Beckman Corp. Secur. Litig.*, at 533.

The Third Circuit has instructed a district court to consider ten factors when undertaking a percentage-of-recovery analysis: (1) the size of the fund created and the number of beneficiaries; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; (7) awards in similar cases; (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time

counsel was retained; and (10) any innovative settlement terms. *In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir.2009) (citations omitted). The award factors, however, " ' need not be applied in a formulaic way' " because each case is different, " 'and in certain cases, one factor may outweigh the rest.' " *Rite Aid*, 396 F.3d at 301 (quoting *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n. 1 (3d Cir.2000)).

Here, class counsel has agreed not to petition for a fee greater than one-third of the Settlement Funds. However, given the obstacles to participation previously discussed and Defendants' recapture of the residuary, class counsel's ultimate fee may easily surpass 50% of actual benefits paid to the class. Such uncertainty undermines the reasonableness of class counsel's request. As explained in *In Re Baby Products Antitrust Litigation*:

> We add today that **one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class.** In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards. (emphasis added)

Id. The Court reasoned that fees based on the entire settlement amount, rather than individual distributions, create a potential conflict of interest between absent class members and their counsel. "Arrangements such as [these] . . . decouple class counsel's financial incentives from those of the class....They potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class." *Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223, 1224 (2000) (denial of *cert.*) (O'Connor, J.) (discussing a percentage fee calculated against the entire settlement fund even though a significant portion would revert to the defendant). Where a district court has reason to believe that counsel has not met its responsibility to seek an award that

adequately prioritizes direct benefit to the class, it is appropriate to decrease the fee award. *See Masters*, 473 F.3d at 437; *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (stating that although the entire common fund was the appropriate benchmark for attorneys' fees, the percentage of the fund awarded may be decreased "to account for any unusual circumstances").

At the very least, this Court must undergo a reasonable assessment of the settlement's actual value in order to determine the precise percentage represented by the attorneys' fees. It should begin by determining with reasonable accuracy the distribution of funds that will result from the claims process. This may require the Court "to delay a final assessment of the fee award [and] to withhold all or a substantial part of the fee until the distribution process is complete." Federal Judicial Center, Manual for Complex Litigation § 21.71 (4th ed. 2008). Relying on the *Gunter/Prudential* factors and its experience, the Court should next determine whether the level of distribution provided to the class by the settlement reflects a failure of class counsel to represent adequately the interests of the entire class.

### III. Conclusion

For all of the foregoing reasons, Cochran respectfully asks this Court to:

(i) Deny Plaintiffs' motion to approve the class settlement as presented;

(ii) Replace the claims-made approach to fund participation with some type of presumptive entitlement;

(iii) Replace the present structure for determining attorney's fees with one tied to actual benefits to class members;

(iv) Estimate with reasonable accuracy the distribution of funds that will result from the claims process;

(v) Withhold all or a substantial part of class counsel's fee until completion of the distribution process; and

11

(vi) Adjust the fee according to actual participation in the Settlement Funds.

Cochran intends to supplement his objection once class counsel actually petitions the Court for a fee award.

Respectfully submitted,

Jeffrey D. Cochran,
By his attorney,

*[signature]*

George W. Cochran, Esq.
1385 Russell Drive
Streetsboro, Ohio 44241
Tel: (330) 607-2187
Fax: (330) 230-6136
Email: lawchrist@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2014, I mailed the foregoing objection by First Class U.S. mail, postage prepaid, to the following addresses:

*Counsel for the Settlement Class*

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, NJ 07068

D. Brian Hufford
Robeli J. Axelrod
POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP
600 Third Avenue
New York, NY 10016

1. Joe R. Whatley, Jr.
2. Edith M. Kallas
3. WHATLEY KALLAS, LLC
4. 380 Madison Avenue, 23rd Fl.
5. New York, NY 10017
6. 
7. Stephen A. Weiss
8. SEEGER WEISS LLP
9. 77 Water Street, 26th Floor
10. New York, NY 10005
11. 
12. Christopher Burke
13. Joseph P. Guglielmo
14. SCOTT + SCOTT LLP
15. 405 Lexington Ave, 40th Floor
16. New York, NY 10174
17. 
18. *Defense Counsel*
19. 
20. Richard J. Doren
21. GillSON, DUNN & CRUTCHER LLP
22. 333 South Grand Avenue
23. Los Angeles, CA 90071
24. 
25. Geoffrey M. Sigler
26. GIBSON, DUNN & CRUTCHER LLP
27. 1050 Connecticut Ave., NW
28. Washington, D.C. 20036
29. 
30. 
31. 
32. 
33. 
34. 

_____
George W. Cochran

Doe Walker
1355 Russell Dr
Steelton

U.S. District Court Clerk
District Court of New Jersey
402 E. State St. #2020
Trenton, N.J. 08608

RECEIVED
FEB 27 2014
AT 8:30