UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| IN RE: AETNA UCR LITIGATION, | Master File No. 07-3541 (KSH)(CLW) MDL NO. 2020 |
|---|---|
| This Document Relates To: ALL CASES | **DECLARATION OF STEPHEN A. WEISS IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT** |

STEPHEN A. WEISS, an attorney duly admitted *pro hac vice* to practice in this Court in the above-captioned action, hereby declares pursuant to 28 U.S.C. § 1746:

1.      I submit this Declaration. based upon my personal knowledge of the matters referred to herein, in support of Plaintiffs' motion for final approval of the proposed settelement of this litigation and, specifically, to respond to the Objection of Theodore H. Frank ("Frank Obj.") to the proposed settlement.

2.      I am a founding member and Co-Managing Partner of the law firm Seeger Weiss LLP, and a court-appointed member of the Executive Committee in this multidistrict litigation.

3.      I received a B.A. degree from Brandeis University in 1986 and a J.D. degree from the Benjamin N. Cardozo School of Law in 1990, where I served as Business Editor of the *Cardozo Law Review*, and on whose Board of Overseers I have served continuously since 2001.

4.      I have been actively engaged in the practice of law since 1990, primarily in the areas of complex and class action litigation, with substantial experience in antitrust, consumer fraud, employment, environmental, securities and *qui tam* litigation.  For almost a decade prior to founding the Seeger Weiss firm, I specialized in environmental and other civil litigation at Fried, Frank, Harris, Shriver & Jacobson in New York.

5.     Since founding Seeger Weiss—where I serve as Chair of both the Class Action and *Qui Tam* Practice Groups—I have been appointed to lead or co-lead numerous multidistrict litigations and other class or complex litigation proceedings throughout the United States, including among others:

a. *In re StarLink Corn Prods. Liab. Litig.*, MDL No. 1403 (N.D. Ill.) (Co-Lead Counsel) (resulting in $110 million class recovery);

b. *In re Initial Pub. Offering Secs. Litig.*, MDL No. 1554 (S.D.N.Y.) (Plaintiffs' Steering Committee and Co-Chair of Plaintiffs' Legal Committee) (resulting in $586 million class recovery);

c. *In re Aetna UCR Litig.*, MDL No. 2020 (D.N.J.) (Plaintiffs' Executive Committee) (resulting in pending $120 million recovery);

d. *In re WellPoint, Inc., Out-of-Network "UCR" Rates Litig.*, MDL No. 2074 (C.D. Cal.) (Interim Co-Lead Counsel for Subscriber Class) (currently pending);

e. *In re Vytorin/Zetia Mktg., Sales Practices and Prods. Liab. Litig.*, MDL No. 1938 (D.N.J.) (Co-Liaison Counsel and Member of Executive Committee of Plaintiffs' Steering Committee) (resulting in $42.5 million class recovery);

f. *In re Genetically Modified Rice Litig.*, MDL No. 1811 (E.D. Mo.) (Plaintiffs' Executive Committee) (resulting in $750 million class recovery);

g. *In re Simply Orange Orange Juice Mktg. and Sales Practices Litig.*, MDL No. 2361 (W.D. Mo.) (Co-Lead Counsel) (currently pending);

h. *In re Polyurethane Foam Antitrust Litig.*, MDL No. 2196 (N.D. Ohio) (Plaintiffs' Executive Committee) (currently pending);

i. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1869 (D.D.C.) (Co-Chair of Law and Briefing Committee) (currently pending);

j. *In re Series 7 Broker Qualification Exam Scoring Litig.*, MDL No. 1772 (D.D.C.) (Co-Lead Counsel) (dismissed on governmental immunity grounds);

k. *In re Schering-Plough/Merck Merger Litig.*, No. 2:09-cv-01099 (DMC) (D.N.J.) (Liaison Counsel) (resulting in favorable injunctive settlement);

l. *Larson v. Sprint Nextel*, No. 2:07-cv-05325 (JLL) (D.N.J.) (Co-Lead Counsel) (resulting in $17.5 million recovery);

m. *Milliron v. T-Mobile USA, Inc.*, No. 2:08-cv-4149 (JLL) (D.N.J.) (Co-Lead Counsel) (resulting in $13.5 million recovery); and

n. *In re PPA Prods. Liab. Litig.*, MDL No. 1407 (W.D. Wash.) (Plaintiffs' Steering Committee) (resulting in $174 million recovery).

6.      I currently serve on the Board of Directors of the New York State Trial Lawyers Association (http://www.nystla.org/index.cfm?fuseaction=directors&alph=W), as Vice President, First Department, of the New York State Academy of Trial Lawyers (http://www.trialacademy.org/index.cfm?pg=Leadership), and as General Counsel of the Badge of Honor Memorial Foundation, a Washington, D.C.-based not-for-profit organization representing the interests of widows and orphans of fallen police officers and other first responders (http://www.bohmf.org/officers).

7.      I submit this Declaration in order to clarify certain facts and circumstances asserted by Mr. Frank that underlie his Objection.  I do not question Mr. Frank's good faith in asserting these facts and circumstances.  I do believe, however, that he simply misapprehends them.

8.      For example, Mr. Frank asserts on pages 12-17 that the interests of the subclasses comprising this action (*i.e.*, Providers and Subscribers) were not separately represented by independent counsel, and instead were controlled by court-appointed Settlement Counsel, James Cecchi.  This is incorrect.

9.      Although pursuant to Case Management Order No. 2 (CMO-2), this Court appointed an Executive Committee that is ostensibly unitary and appointed Mr. Cecchi as Settlement Counsel, in fact the Executive Committee is comprised of law firms that represent either providers or subscribers, but not both.

10.     Specifically, my firm and the law firm of Scott & Scott represent only the Subscriber Class; whereas the law firms of Whatley Kallas and Pomerantz represent only the Provider Class.  Although all of these firms performed a variety of "common benefit" functions given the presence of numerous liability issues common to both classes, each of the firms were

-3-

present at every juncture of the litigation—including, most notably, multi-year settlement

negotiations—and zealously protected the rights and interests of their respective category of

Plaintiff(s) and absent class members.  Without disclosing the many privileged communications

that occurred by and among the members of the Executive Committee throughout the duration of

this complex litigation, I can attest that there were many, many occasions where counsel for the

Provider Class clashed strenuously with counsel for the Subscriber Class, and vice versa.

11.    Therefore, Mr. Frank is simply misinformed when he asserts that "all class

counsel are subordinated to Mr. Cecchi as Settlement Counsel for both Settlement Classes,"

(Frank Obj. at 16), and that "there can be no confidence in an allocation that results from a

broken process:  that of a single attorney purporting to be a fiduciary for each of two parties with

adverse interests."  Frank Obj. at 17.  The interests of each subclass were represented spiritedly

by their respective counsel, and not in any manner collusively with, or under the control of, Mr.

Cecchi.

12.    Mr. Frank is also well wide of the mark when he insinuates that members of the

Executive Committee violated Fed. R. Civ. P. 23(e)(3) by entering into side deals concerning the

allocation of prospective fees in this case.  Frank Obj. at 7 ("[I]t seems extraordinarily

implausible that [the Executive Committee member firms] have agreed to the settlement and

having their fees determined entirely in the 'sole discretion' of Mr. Cecchi without first reaching

a formal understanding with Mr. Cecchi whether and how much they would be paid.").

13.    Putting aside whether Rule 23(e)(3) requires disclosure by class counsel of fee

deals among them (as the rule itself is opaque on this point), I affirmatively attest that neither I,

nor to the best of my knowledge anybody else, ever formed any agreement with Mr. Cecchi

regarding a fee allocation.  In fact, I do not recall a single conversation, email, or any other

communication by and among any member(s) of the Executive Committee regarding a fee allocation in this case. Any suggestion by Mr. Frank to the contrary is rank and baseless speculation.

14.     The fact that the Executive Committee members consented to confer the fee allocation authority to Mr. Cecchi reflects, among other things, their trust in his judgment and sense of fairness and equity in connection with what is at times a subjective and emotional endeavor, let alone one that can lead acrimonious and protracted disputes, often necessitating judicial intervention. Indeed, as courts have long observed, litigation over the amount of attorney's fees awarded " is 'one of the least socially productive types of litigation imaginable.'" *Savino v. Computer Credit, Inc.*, 71 F. Supp. 2d 173, 178 (E.D.N.Y. 1999) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 442 (1983) (Brennan, J., concurring in part)). It is ironic that Mr. Frank tries to cast aspersions on the Executive Committee and Mr. Cecchi for structuring the settlement so that such bickering is minimized, if not eliminated altogether.

15.     Mr. Frank is moreover incorrect when he asserts that Mr. Cecchi's fee allocation authority under Section 11 of the Settlement Agreement "impermissibly divests the district court of its responsibility to determine attorneys' fees." Frank Obj. at 6. Every Plaintiff and Executive Committee member firm is fully cognizant that the allocation of attorney's fees and reimbursement of expenses is ultimately up to this Court.

16.     Indeed, although he eagerly cites the language from Section 11 that confers to the "Settlement Class Counsel" (*i.e.*, Mr. Cecchi) the task of allocating any fee award among class counsel, Mr. Frank neglects to cite the rest of the language from that section that makes abundantly clear what Rule 23(h) clearly contemplates: that any fee and expense award sought by Settlement Class Counsel here shall be made by motion and shall be subject to this Court's

sole discretion: "Settlement Class Counsel shall make a Fee and Cost Application on behalf of all Class Counsel to be heard at the Settlement Hearing seeking an award of Attorneys' Fees plus out-of-pocket expenses and incentive payments for Representative Plaintiffs. Attorneys' Fees and costs consistent with this paragraph *that are approved by the Court* shall be paid by the Settlement Administrator to Settlement Class Counsel out of the General Settlement Fund within ten (10) Business Days of the Effective Date."  Settlement Agreement, ¶ 11 (emphasis added).

17.     Mr. Frank's "fox guarding the henhouse" metaphor (Frank Obj. at 7) is therefore inapposite, as it is plainly this Court—not the Settlement Class Counsel—who will determine how many "chickens" will be awarded to Class Counsel as a result of their labors.  In other words, despite that the Settlement Agreement confers to Settlement Class Counsel the duty to *allocate* any fee award among Class Counsel, the *amount* of any fee award remains solely the province of the Court.  The interests of the Settling Classes (*i.e.*, vis-à-vis the interests of Class Counsel) are therefore protected.

18.     Similarly, Mr. Frank's notion that Mr. Cecchi's authority under Section 11 of the Settlement Agreement somehow creates a "fatal disincentive" (Frank Obj. at 9) to my firm or any other members of the Executive Committee to challenge an unfair settlement is both facile and illogical.

19.     Putting aside the rhetorically farcical premise that my firm or any other member firm of the Executive Committee has functioned as a "vassal" to Mr. Cecchi (Frank Obj. at 9), that premise, even if true, would in no way have diminished the Executive Committee's incentive to seek every last dollar that it could have obtained in settlement from Aetna.  After all, logic dictates that any marginal dollar extracted from Aetna in settlement would have the potential of *enlarging* the aggregate fee award, not *truncating* it.  In this regard, Mr. Frank's

-6-

hopelessly mixed metaphor of "keep[ing] silent rather than rock the boat and alienate the holder

of the pursestrings" mistakes Mr. Cecchi for Aetna.

20.     I declare the foregoing to be true under penalty of perjury.

Dated: New York, New York
        March 11, 2014                                    Stephen A. Weiss