**Not for Publication**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AETNA UCR LITIGATION | MDL No. 2020 |
| This document relates to:  ALL CASES | Civ. No. 07-3541 |
| | **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

This matter comes before the Court on three separate motions:  (1) plaintiffs' motion for leave to file a third amended consolidated complaint; (2) defendant Aetna's motion to dismiss the second and third amended consolidated complaint; and (3) the motion brought by defendants UnitedHealth Group, Inc. and Ingenix, Inc. (together, "UHG defendants") to dismiss the second and third amended consolidated complaint.  At issue are plaintiffs' allegations that Aetna[1] failed to reimburse insurance subscribers and health care providers properly for out-of-network medical services ("ONET" or "ONS").  The crux of plaintiffs' allegations is that Aetna—along with the UHG defendants—orchestrated a scheme to artificially reduce and fix "usual, customary, and reasonable" ("UCR") schedules for out-of-network reimbursements using information from a flawed database that was maintained by Ingenix.  Subscribers—and by extension, providers—were allegedly promised a "usual, customary, and reasonable" rate of reimbursement for services rendered by non-participating providers, but were underpaid due to the defendants' intentional

---

[1]      Aetna defendants include Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc., and Aetna Insurance Company of Connecticut (together, "Aetna").

scheme.  Having considered the papers filed and heard oral argument, and for the reasons expressed below, the Court grants plaintiffs' motion to amend; grants in part and denies in part Aetna's motion to dismiss; and grants in part and denies in part UHG defendants' motion to dismiss.

## I.     FACTUAL BACKGROUND

The subscribers here ("insureds" or "subscriber plaintiffs") were insured by Aetna under plans that provided for reimbursement to out-of-network health care providers.  Aetna, like many other health insurers, offers insurance plans that differentiate between coverage for medical treatment from (a) in-network providers who have negotiated discounted rates with the insurer, and (b) out-of-network providers who charge insured consumers their usual, non-discounted rates. The subscriber plaintiffs agreed to pay higher premiums in exchange for that flexibility and the right to obtain out-of-network benefits. (TAC ¶¶ 3-4.)  The portions of ONET charges not paid by Aetna are not credited toward deductibles or out-of-pocket maximums, which limit the total amount a plan member has to pay for medical services over a given time period.  (TAC ¶ 98.)

Aetna agreed to reimburse subscriber plaintiffs for ONET services at the lesser of (a) the billed charge or (b) the UCR amount for that service in the geographic area in which it was performed.  "Because reduced fees are not negotiated with out-of-network providers, Aetna will calculate reimbursement based on the usual, customary and reasonable charge," defined as "the amount customarily charged for the service by other providers in the same Geographic area (often defined as a specific percentile of all charges in the Community)." (TAC ¶¶ 20-21.)

To determine the UCR, Aetna relied (at least in part) on a proprietary database licensed by Ingenix.  Ingenix is a wholly-owned subsidiary of UHG that licenses cost data and "customized fee analyzers" to medical providers, healthcare insurers and automobile liability insurance

companies.  (TAC ¶ 99.)  "Essentially, Ingenix creates 'modules' or uniform pricing schedules, that provide whole dollar payment amounts for each percentile (for instance, the 80th percentile) for given medical procedures in various locations." (TAC ¶ 99.)  Ingenix entered this data market through two acquisitions in the late 1990s:  In 1997, Ingenix acquired Medicode, Inc., which sold a provider charge database known as Medical Data Research ("MDR") and, one year later, Ingenix purchased the Prevailing Health Charges System ("PHCS") database from the Health Insurance Association of America ("HIAA"), a trade group for the insurance industry.  (TAC ¶ 100.)

The PHCS database was developed by HIAA[2] in 1973 to aggregate historical charge data for surgical and anesthesia procedures from data contributors like health insurance companies, third-party payors, and self-insured companies.  (TAC ¶ 101.)  This database later expanded to include data regarding dental, medical and drugs/medical equipment rates.  (TAC ¶ 101.)  The information HIAA compiled consisted of four data points—the date of service, the Current Procedural Terminology ("CPT") code, the billed charge, and the geozip.[3]  (TAC ¶ 108.)  As part of the PHCS sale, members of HIAA, including Aetna and UHG, were permitted to participate in an ongoing "Ingenix PHCS Advisory Committee," which provided for industry input into how Ingenix acquired and managed its data.  (TAC ¶ 331.)  HIAA also entered into a ten-year cooperation agreement with Ingenix, which guaranteed HIAA's continued input into the management of the Ingenix database in the form of a joint "Liaison Committee."  (TAC ¶ 331.)

_____

[2]    HIAA, now known as America's Health Insurance Plans, markets itself as a national association representing providers of health benefits.  (TAC ¶ 103.)  According to plaintiffs, the Board of Directors at AHIP included "executives of Defendants and their Co-Conspirators including, but not limited to, the Chairman, President and CEO of Aetna, the CEOs of WellPoint and UHG, and the president and CEO of Cigna."  (TAC ¶ 104.)

[3]    Plaintiffs allege that Ingenix divided all states into "geozips" composed of "cities and towns sharing three-digits of postal zip codes, which were then grouped together by not only geographical proximity, but also by what Ingenix arbitrarily decided were 'data similarities.'" (TAC ¶ 134.)

When Ingenix acquired both MDR and PHCS, it merged the underlying data.  But because the databases used different methodologies to produce their ultimate outputs, the dollar amounts differed for individual procedure codes at reported percentiles.  (TAC ¶ 114.)  Ingenix allegedly attempted to cure this discrepancy and merge the databases themselves through the "DataSpan" initiative.  DataSpan, plaintiffs claim, was intended to be a "statistically valid" scientific database that "would be subject to peer review of methodology, white papers, documentation of the methodology and results, and periodic external review."  (TAC ¶ 115.)  According to plaintiffs, the DataSpan project uncovered flaws in the databases, but was ultimately shelved after roughly three years.  (TAC ¶ 116.)

Ingenix continued to operate the database (the "Ingenix database" or the "database"), marketed by UHG as the "industry standard," and entered into licensing agreements with health insurers, including Aetna and UHG.  These agreements, among others, allowed Ingenix to (1) "obtain data concerning billing rates and information from those health insurers" and/or (2) "provide UCR information pricing schedules to those same health insurers … for their use in billing ONET services."  (TAC ¶ 118.)  Ingenix offered access to the database at a discounted price to insurers in exchange for their submission of health care cost data—the amount of the discount was based on the amount of data Ingenix accepted and used.  (TAC ¶¶ 118, 335.)  Aetna and UHG were significant contributors.  Their data accounted for approximately 70% of the total submissions during the class period.  (TAC ¶ 337.)

Plaintiffs claim that health insurers, like Aetna, used the Ingenix data to determine UCR rates for ONET "even though Ingenix broadcasts that it is not endorsing, approving or recommending the use of the Ingenix data for UCR rates."  (TAC ¶ 119.)  Specifically, with each production of information, Ingenix states that its data is "provided to subscribers for informational

purposes only" and that it "disclaims any endorsements, approval, or recommendation or particular uses" of the data.  According to Ingenix, "[t]here is neither a stated nor an implied 'reasonable and customary charge' (either actual or derived)."  (TAC ¶ 119.)

Plaintiffs argue, however, that Aetna's use of the database was entirely reflexive:  "Aetna's computer system automatically adjudicates claims for the vast majority of ONET claims.  The Ingenix Database [was] automatically applied" and "[n]o human intervention was necessary to evaluate the individual claims or the accuracy of the UCR provided by Ingenix."  (TAC ¶ 140.) This allegation notwithstanding, plaintiffs themselves suggest a more varied process for determining reimbursement.  Plaintiffs allege that Aetna independently selected the Ingenix Database percentile it would apply when it utilized the Database for ONET reimbursement.  (SAC ¶¶ 323, 344.)  Plaintiffs also allege that they were under-reimbursed for ONET services even when Aetna did not utilize the Ingenix Database at all, including when Aetna utilized Medicare rates (SAC ¶¶ 33, 35, 60, 358, 402, 445; TAC ¶ 172), in-network fee schedules (SAC ¶¶ 33, 60), or in some cases "some other faulty methodology" (SAC ¶ 432; TAC ¶ 307).  In all cases, however, plaintiffs allege that that Aetna "prevented [them] … from knowing … the actual methodologies used … to determine the UCR rate." (SAC ¶ 508; *see also* TAC ¶ 367.)

When the Ingenix Database *was* used to determine ONET reimbursement, plaintiffs claim that the data was flawed upon submission.  Specifically, plaintiffs submit that Aetna and other contributors "scrubbed" the data they contributed to Ingenix by removing the highest charges for particular services.  "From 1980 until the termination of its licensing of the Ingenix Database, without substantial change, Aetna applied certain profiling rules (the 'Profiling Rules') to determine whether or not it would collect and send the charge data for a particular claim to Ingenix. If a claim 'profiles,' it is collected by Aetna as UCR data.  If a claim does not 'profile,' it is not

collected or sent to Ingenix." (TAC ¶ 128.)  Plaintiffs argue that, during all or part of the class period, Aetna "used its profiling rules to pre-edit its charge data to remove valid high charges prior to sending the remaining charges to Ingenix for inclusion" in the Database.[4] (TAC ¶ 129.)

Plaintiffs also take issue with the manner in which Ingenix solicited and collected its data. In arguing that the four data points solicited from insurers were insufficient, plaintiffs contend that the information received "did not identify the provider, the patient (including age and condition), the type of facility where the services were performed, any adjustment factors for cost of living, the specific provider-type performing the services, the provider's usual charge and licensure, the type of facility where the service was performed …, or the prevailing fee or charge level for any provider or service in a particular geographic region." (TAC ¶ 131.)  Additionally, plaintiffs argue that, once Ingenix received the data from its contributors, "it further 'scrubbed' the pooled data to remove high-end values but not low-end so-called outliers[,] so as to lower the percentile amounts used to determine UCR." (TAC ¶ 137.)

Plaintiffs allege that the "end result" of this process was a database that "produced flawed uniform pricing schedules that systematically resulted in the under-reimbursement for ONET by Aetna." (TAC ¶ 151.)  The flaws in this process, according to plaintiffs, include the following: (a) questionable accuracy of the underlying data; (b) no inquiry into whether all of the contributors were using the same criteria and coding accurately and consistently; (c) Ingenix's practice of aggregating data from other codes when there was insufficient charge data to provide a statistically valid sample for a CPT code; (d) a combination of geozips to determine what Ingenix considered

---

[4]     As of 2005, Ingenix required its data contributors to certify with each submission that the data provided was complete and not pre-edited or otherwise manipulated.  Plaintiffs claim that, despite submitting certifications to that effect, Aetna did not change its submission practice and "knew that the certifications were false and misleading."  (TAC ¶ 130.)

to be a "sociodemographic region" when there was no verification for such regions; (e) scrubbing and editing of data by individual data contributors, including Aetna, before the data was sent to Ingenix; (f) further scrubbing and editing of data by Ingenix; (g) the absence of an appropriate statistical methodology, which resulted in data that was inappropriately biased downward; (h) inclusion of charges for procedures in non-comparable geographic areas; (i) failure to segregate procedures performed by providers of the same or similar skill; (j) inclusion of discounted in-network data; and (k) failure to distinguish between the number of medical providers whose charges are reflected.  (TAC ¶ 151.)  These purported flaws notwithstanding, plaintiffs contend that "the uniform pricing schedules created by the Ingenix Database were automatically relied upon to determine UCR rates despite the fact that Ingenix actually informed insurance companies (including Aetna) that it was not endorsing, approving or recommending use of it to determine UCR rates."  (TAC ¶ 147.)

This system of ONET reimbursement eventually became the subject of an investigation by the New York Attorney General.  The NYAG investigative task force determined that health insurers who participated in the Ingenix data collection maintained an incentive to provide artificially low claims information, thus producing a "garbage in, garbage out" effect.  On January 13, 2009, the NYAG issued "Health Care Report: The Consumer Reimbursement System is Code Blue," which concluded that the Ingenix database was an "industry-wide problem," a "rigged system," "fraudulent," and "critically ill."  (TAC ¶ 159.)  The NYAG also found that use of the Ingenix Database resulted in a substantial reduction of reimbursement for ONET care—the report "ultimately revealed that insurers systematically under-reimburse[d] their insured patients for doctors' office visits in New York by 10-28%, and that up to 110 million Americans [were] harmed by" their conduct.  (TAC ¶ 158.)  Aetna and UHG settled with the NYAG for $20 million and $50

million, respectively, and those funds were earmarked for the creation of an independent organization, FAIR, which will own and operate a new database for UCR calculations. (TAC ¶ 163.)

Defendants' conduct also has been challenged in other civil actions. Parallel litigations against related entities have been filed in the District Court of New Jersey in *Franco v. Connecticut General Life Insurance, Co.*, No. 07-6039 (D.N.J.) and in the Central District of California in *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation*, No. 09-2074 (C.D. Cal.). In *Franco*, similarly situated plaintiffs asserted claims against Connecticut General Life Insurance ("Cigna") and the UHG defendants for their role in the alleged scheme to manipulate ONET reimbursements. Judge Chesler partially granted defendants' motion to dismiss in that action, dismissing all of the claims raised by provider plaintiffs and association plaintiffs, several claims raised under ERISA, and all of plaintiffs' antitrust claims. He subsequently denied class certification, and granted summary judgment for Cigna against the plaintiffs' RICO claims and contract-based claims. In *WellPoint*, in a series of three decisions, Judge Gutierrez dismissed with prejudice all of the plaintiffs' antitrust and RICO claims, and a number of the ERISA claims, and on September 3, 2014, denied plaintiffs' motion for class certification.

## II.    PROCEDURAL HISTORY

This action began back in July 2007, when Michele Cooper of Short Hills New Jersey filed a class action complaint against Aetna, acting on behalf of herself and a putative class of similarly situated subscribers to Aetna group health plans. [D.E. 1.] Very soon afterwards, attorneys for Aetna filed a Notice to the Judicial Panel on Multi-District Litigation that *Cooper* might be a tag-along action to *In re Managed Care*, MDL No. 1334, then pending in the Southern District of Florida. This engendered a letter response from Cooper's co-counsel to the MDL Panel providing

a rationale for not considering *Cooper* as a potential tag-along case [D.E.10], which was followed by Aetna's formal motion to transfer [D.E. 32] filed in October 2007.

While this motion was being briefed [D.E. 34, 44], counsel for Cooper filed a first amended complaint in October [D.E. 36] and a second amended complaint in November 2007.  [D.E. 49.] In December 2007, the MDL Panel issued an order [D.E. 63] that denied the motion to transfer on grounds that the multidistrict litigation *In re Managed Care* had consolidated cases that were brought by providers, whereas the *Cooper* litigation was brought on behalf of subscribers.  Also, the order noted, *Cooper* was "similar to other actions currently pending in … New Jersey involving the Ingenix, Inc., system."

Thereafter, Aetna moved to dismiss the second amended complaint.  [D.E. 58.]  The motion was briefed [D.E. 70, 78, and 79] and on February 14, 2008, plaintiffs gave notice that they intended to add a plaintiff who would be seeking injunctive relief, requiring the filing of a third amended complaint.  Ultimately this was done [D.E. 83], and Aetna moved to dismiss in March 2008.  [D.E. 89.]  This motion was fully briefed [D.E. 89-1, 96, and 104.]

Contemporaneously, pretrial orders were filed setting dates for ongoing discovery and any related motions.  In December 2008, Aetna sought an order from the MDL Panel consolidating *Cooper* with a case then pending in the District of Connecticut, *Weintraub v. Ingenix, Inc.*, which also named UnitedHealth Group as a defendant.  In its motion to transfer [D.E. 129], Aetna described the *Cooper* and *Weintraub* plaintiffs as seeking to represent "overlapping classes with millions of common class members …." and argued for the benefits of "a rational, sequenced pretrial program that [would] streamline discovery, minimize witness inconvenience and overall discovery expense, reduce the opportunities for conflicting rulings, preserve judicial resources, and generally permit all parties to benefit from the economies of scale that MDL proceedings

uniquely facilitate." UHG and the *Weintraub* plaintiffs opposed; the *Cooper* plaintiffs responded by proposing to add four other pending cases, three in the District of New Jersey and one in the Southern District of New York. While the parties awaited a ruling from the MDL Panel, plaintiffs sought leave to file a fourth amended complaint, which added new plaintiffs and new allegations. [D.E. 154.]

As of March 2009, the fully briefed motion to dismiss the third amended complaint was pending, various motions directed toward appointment of interim lead counsel were also pending, and an order was signed that permitted a fourth amended complaint [D.E. 164] to be filed. On April 8, 2009, the MDL consolidated the *Cooper* and *Weintraub* litigations. In June 2009, the first Case Management Order was issued in what was now MDL No. 2020, *In re Aetna UCR Litigation*. A consolidated amended complaint was filed on July 1, 2009 [D.E. 219], which was later superseded on December 24, 2009 by the second consolidated amended complaint [D.E. 319]. Defendants moved to dismiss on two separate occasions, but neither motion was adjudicated.

Instead, the parties made known that they were actively engaging in settlement discussions, both directly and in more than ten mediation sessions with the Hon. Nicholas Politan, since deceased. The result was a settlement between the majority of the plaintiffs and Aetna, which this Court preliminarily approved. [D.E. 899.] In the settlement agreement [D.E. 839-2], Aetna reserved the right to terminate settlement if "the aggregate difference between charges billed for Covered Services or Supplies from Out-Of-Network Health Care Providers or to Subscriber Class Members who were mailed the Mailed Notice and submitted Opt-Out requests, and the corresponding Allowed Amount for those Covered Services or Supplies [under the settlement] exceeds $20 million." [D.E. 839-2, Section 7.3(iii).] In what counsel acknowledged was an

unusual and unexpected development, the Opt-Out levels exceeded the agreed upon threshold by hundreds of millions of dollars and Aetna filed a notice of termination.

On July 11, 2014, plaintiffs moved for leave to file a third amended joint consolidated complaint ("TAC") [D.E. 979], which purports to assert the following causes of action: (1) claims for unpaid benefits under group plans covered by ERISA, under which plaintiffs also seek declaratory relief "related to enforcement of the plan terms, and to clarify rights to future benefits"; (2) breach of the plan provisions for benefits in violation of ERISA Section 502(a)(1)(B); (3) failure to provide accurate Evidence of Coverage and Summary Plan Description, under which plaintiffs seek "appropriate relief under ERISA, including declaratory relief, surcharge and profits"; (4) violation of fiduciary duties of loyalty and due care, under which subscriber plaintiffs seek "declaratory relief, removal as a breaching fiduciary, surcharge and profits"; (5) breach of fiduciary duties of loyalty and due care in violation of ERISA Section 404, under which provider and association plaintiffs seek declaratory relief and any other available equitable relief; (6) failure to provide full and fair review of denied claims; (7) declaratory relief relating to Aetna's violation of ERISA; (8) violations of RICO, 18 U.S.C. § 1962(c), based on predicate acts of mail and wire fraud; (9) embezzlement and/or conversion in violation of 18 U.S.C § 664; (10) RICO conspiracy under 18 U.S.C. § 1962(d); (11) violation of Section 1 of the Sherman Act; and by plaintiff Weintraub, (12) violation of New York's General Business Law § 349, which prohibits deceptive acts or practices in the conduct of any business in the state of New York; (13) breach of contract; (14) breach of the implied covenant of good faith and fair dealing; and (15) unjust enrichment.

Aetna and the UHG defendants separately opposed plaintiffs' motion for leave to amend and cross-moved to dismiss most of the claims. [D.E. 995 and D.E. 996, respectively.] UHG and Ingenix move to dismiss all claims raised against Ingenix and UHG (whether in the second

amended complaint or proposed third amended complaint) because neither complaint states a viable claim against them.  Aetna moves to dismiss all causes of action, with the exception of the claims for benefits, maintaining that the arguments set out in its motion all apply with equal force to the second amended consolidated complaint ("SAC") and to the TAC.  The Court held oral argument with regard to these motions on October 27, 2014.

For the reasons that follow, the Court grants plaintiffs' motion for leave to amend and, as to the TAC, grants in part and denies in part Aetna's cross-motion to dismiss, and grants in part and denies in part UHG defendants' cross-motion to dismiss.

## **DISCUSSION**

### III.    **MOTION FOR LEAVE TO AMEND**

Initially, the parties dispute whether the motion for leave to amend should be reviewed under Fed. R. Civ. P. 15(a)(2) or the more demanding Rule 16.

Rule 16(b) requires, among other things, that scheduling orders include a time limit for amended pleadings and, once that time has passed, that the moving-party demonstrate "good cause" for leave to amend.  Citing a pretrial scheduling order dated December 15, 2008, which provides that "[a]ny motion to add claims or defendants shall be filed by April 9, 2009," UHG defendants argue that Rule 16 applies and therefore plaintiffs must show good cause before the amended complaint may be considered.  As plaintiffs argue, however, that "ship has sailed." (Plaintiffs Opp. at 2.)  At the March 18, 2014 conference before this Court, the parties convened to develop the plan for going forward following the collapse of the proposed settlement and the Court directed them to work out dates for motion practice.  The parties agreed on a motion schedule, which contemplated plaintiffs' motion for leave to amend to be filed by June 16, 2014— a deadline later extended, with approval of the Court, to June 30, and then to July 11.  [D.E. 976,

978.] The time has therefore passed to suggest that the motion now before the Court violates a scheduling order entered into over six years ago.  The motion for leave to amend was timely filed under the Court's direction, and its merits will be considered under Rule 15(a)(2), not Rule 16.

The decision to grant or deny leave to amend pleadings under Rule 15(a)(2) is committed to the sound discretion of the Court.  *Gay v. Petstock*, 917 F.2d 768, 772 (3d Cir. 1990).  Leave to amend is freely granted "when justice so requires," but may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Defendants argue that leave to amend should be denied based on the first and last *Foman* criteria— undue delay and futility.

With regard to timeliness, proof of delay alone is insufficient; courts will deny a request for leave to amend only where the delay becomes undue, such as when the amendment will create an "unwarranted burden on the court."  *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984).  Plaintiffs need only "demonstrate that its delay in seeking to amend is satisfactorily explained," *Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990) (citations omitted), and the record here provides satisfactory grounds for plaintiffs' latest application. They filed their second amended consolidated complaint on December 24, 2009, around which time the parties "began a rather long process of settlement discussions, which ultimately led to [a] settlement in principle in February 2012."  (Plaintiffs Br. at 6.)  The settlement agreement was submitted to the Court for preliminary approval in December 2012, but because "of the various objections to the proposed settlement, and Judge Chesler's recusal, final approval of the proposed settlement was not scheduled until March 18, 2014."  (Plaintiffs Br. at 6.)   The settlement was

13

terminated at around the same time, and discussions regarding the litigation's future course of action—including amendments to the then-operative pleading—began almost immediately.  The delay was thus not "undue" and the timeliness of plaintiffs' request is not cause for denial.

Defendants also argue that the proposed amended complaint is "futile" because it fails to state a viable claim for relief.  The Court, in its discretion, will not consider this argument in connection with its review of the motion for leave to amend.  Defendants have cross-moved to dismiss and made clear that all of the arguments apply with equal force to both the second and third amended complaint.  Accordingly, the Court declines to engage in a detailed futility analysis at this juncture. Such arguments are better suited for consideration of defendants' cross motions to dismiss.  *See Strategic Envtl. Partners, LLC v. Bucco,* 2014 WL 3817295 at *2 (D.N.J. Aug. 1, 2014) (Clark, Mag. J.) (preserving futility argument for anticipated motions to dismiss); *Diversified Indus., Inc. v. Vinyl Trends, Inc.*, 2014 WL 1767471 at *1 n.1 (D.N.J. May 1, 2014) (Simandle, J.) (finding, "in the interest of judicial economy and in the absence of prejudice," that the amended counter-claim should be treated as the operative pleading for the purposes of motion to dismiss despite the fact that the Court had not yet granted leave to amend).  The Court therefore grants plaintiffs' motion for leave to amend, and considers defendants' motions to dismiss as directed to the third amended consolidated complaint—the operative pleading in this action, hereinafter referred to as the complaint.[5]

---

[5]     Plaintiffs argue that Rule 12(g) "precludes [d]efendants from raising certain arguments that they could have asserted in their earlier motions to dismiss but did not."  (Plaintiffs Opp. at 8.) Plaintiffs contend that the "rule provides that a party must not make a successive Rule 12 motion raising a defense or objection that was available and omitted from an earlier motion."  (Plaintiffs Opp. at 8.)  Plaintiffs' position is contrary to the law of this circuit, *Knight v. ChoicePoint, Inc.*, 2010 WL 2667410, at *2 (D.N.J. June 28, 2010) (Hillman, J.) (finding that Rule 12(g) does not apply where the court "never reached the merits of Defendants' first motion to dismiss"), and is also inconsistent with the Court's instruction to "attack everything at once."  (UHG Reply Br. at 1) (citing July 29, 2014 Hearing Tr. at 8).

## IV.   STANDING

Plaintiffs are comprised of the following putative classes:  (1) subscriber plaintiffs, individually named and representative of a class that contracted for health insurance plans affected by the alleged under-reimbursement scheme; (2) provider plaintiffs, individually named and representative of a class of out-of-network medical providers that treated members of the subscriber class; and (3) association plaintiffs, including the American Medical Association, American Podiatric Medical Association and the New Jersey Psychological Association, suing individually and on behalf of their members.  Defendants argue that, for varied reasons, all putative classes lack standing to assert certain of the claims they raise.

### 1.   *Subscriber Plaintiffs*

The subscriber plaintiffs here include Michele Cooper, Michele Werner, Darlery Franco, Paul and Sharon Smith, Carolyn Samit, John Seney, Alan John and Mary Ellen Silver, and Jeffrey Weintraub.[6]  All were insured under an Aetna-sponsored insurance plan, and all received care for ONET services.  Of these nine individuals, the UHG defendants contend that plaintiffs Samit, Franco and the Silvers lack standing to pursue their antitrust or RICO claims because they fail to allege out-of-pocket losses resulting from the challenged conduct.

Under both the Sherman Act and RICO, claims may be asserted only if the plaintiff was "injured in his business or property."  *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151 (1987) ("Both RICO and the Clayton Act …. compensate the same type of injury; each requires that a plaintiff show injury 'in his business or property by reason of' a

---

[6]     On July 21, 2011, plaintiff Michele Cooper, through counsel, stipulated to the voluntary dismissal of her claims against UHG and Ingenix in the second amended consolidated complaint. As plaintiffs concede, the "TAC as drafted cannot revive those claims."  As such, the claims she now purports to raise against the UHG defendants are dismissed.

violation."); *Ethypharm S.A. v. Abbott Labs.,* 707 F.3d 223, 232 n.16 (3d Cir. 2013) (antitrust);

*Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (RICO).  This showing requires "proof of a

concrete financial loss and not mere injury to a valuable intangible property interest."  *Maio*, 221

F.3d at 483. The UHG defendants maintain that these subscribers have not sufficiently pled that

they suffered any injury to property or business "because they do not allege making out-of-pocket

payments to their ONET providers by reason of Aetna's supposed under-reimbursement of their

medical claims due to the Ingenix Databases."  (UHG Br. at 34.)  In support, defendants direct the

Court to this district's decision in *Franco*, which relies on *Maio*.

In *Maio*, enrollees in an Aetna health maintenance organization ("HMO") sued Aetna over

its "failure to disclose its restrictive and coercive internal policies and practices, which render[ed]

its advertising, marketing and membership materials false and misleading in violation of RICO."

*Maio*, 221 F.3d at 474.  The insureds alleged that Aetna "engaged in a massive nationwide

fraudulent advertising campaign designed to induce people to enroll in its HMO by representing

that Aetna affirmatively manages its members' health care so as to … raise the quality of care to

a 'level of health care never available under the old fee-for-service system,' when in fact, Aetna

designed undisclosed internal policies to 'improve defendants' profitability at the expense of

quality of care.'"  *Id.* at 474.  With regard to the injury to business or property necessary to confer

standing under RICO, appellants claimed that "each member of the nationwide class paid too much

in premiums for an 'inferior' health care product, i.e., the inferior health insurance they received

from Aetna through its HMO plan."  *Id.* at 484.  Aetna argued that this showing was insufficient

because "the value of appellants' HMO memberships cannot be diminished unless and until

appellees' alleged undisclosed policies actually cause a denial of medical care or some other

benefit to which appellants are entitled."  *Id.* at 486.

The Third Circuit agreed and affirmed the district court's dismissal of plaintiffs' claims for lack of standing. The court found that, because "appellants' property interests in their memberships in Aetna's HMO plan take the form of contractual rights to receive a certain level (quantity and quality) of benefits from Aetna through its participating providers …, it inexorably follows that appellants cannot establish a RICO injury to those property rights (which in turn would cause financial loss in the form of overpayment for inferior health insurance) absent proof that Aetna failed to perform under their parties' contractual arrangement." *Id.* at 490. That failure to perform, the court found, would be evidenced by the "receipt of inadequate, inferior or delayed care, personal injuries resulting therefrom, or Aetna's denial of benefits due under the insurance arrangement." *Id.*

The *Maio* decision was not predicated solely on the absence of an out-of-pocket loss. *See id.* at 483 (finding that the "injury to business or property element of [RICO] *can be* satisfied by allegations and proof of actual monetary loss) (emphasis supplied). Rather, what the court found lacking was, among other things, some concrete, objective basis to find that Aetna failed to perform under the policy by causing inferior care to be provided relative to the price paid. *See id.* at 496. Appellants in *Maio* merely claimed that their health insurance was "inferior"—a conclusion supported only by their "subjective determination that the policies and practices [were] so inherently unsound that they inevitably [would] serve as the impetus for physicians to provide substandard health care to their patients at the point at which the enrollees actually seek treatment." *Id.* at 496.

Subscriber plaintiffs here are not alleging injury based on their subjective determination of plan value; they claim to have been harmed by Aetna's underpayment of insurance benefits for ONET services. And while the UHG defendants are correct that plaintiffs Samit, Franco and the

Silvers fail to show that they were forced to pay the difference out-of-pocket, the complaint does allege that they suffered "out-of-pocket losses in the form of higher co-payments" and were harmed "by having overpaid for their health insurance plans … and receiv[ing] policies that were worth less than what they paid." (TAC ¶ 414.) The Court finds that, drawing all inferences in plaintiffs' favor, the subscribers allege an injury that demonstrates—by an objective measure— that Aetna "failed to perform under the parties' contractual arrangement." At this pleading phase, that is sufficient. *See Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) ("[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.").

### 2. *Provider Plaintiffs*

The provider class asserts claims under ERISA for benefits and other relief, and for violations of RICO, 18 U.S.C. §§ 1962(c), 664 and 1962(d). Aetna argues that the provider representatives lack standing to assert these claims.[7]

As to ERISA, provider plaintiffs argue that they may properly maintain a claim under Section 502(a)(1)(B) because they received assignments of benefits from their ONET patients. *See CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 176 n.10 (3d Cir. 2014) ("We adopt the

---

[7]    The Third Circuit's holding in *Nat'l Health Plan Corp. v. Teamsters Local 469*, 585 F. App'x 832, 835 (3d Cir. 2014), bears on the standing issue Aetna raises. Drawing on the Supreme Court's instruction in *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014), the court found that a party's entitlement to bring suit under ERISA is not actually a question of statutory standing. *Id*. at 835. Rather, the court must consider the issue under a "straightforward cause-of-action analysis" to "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id*. (quoting *Lexmark*, 134 S. Ct. at 1387). This Court therefore follows the Third Circuit's guidance in considering whether the alleged assignment here is sufficient to place Mullins, and the provider class by extension, "within the class of plaintiffs whom Congress has authorized to sue." *Id*. at 835 (quoting *Lexmark*, 134 S. Ct. at 1387).

majority position that health care providers may obtain standing to sue by assignment from a plan participant.").  When a provider obtains a valid assignment from an ERISA plan member, the provider is deemed to "stand in the shoes" of the member with respect to the benefits owed and may pursue those benefits in an action against the insurer under Section 502(a)(1)(B).  *Id.* at 178. Accordingly, to show that they fall within the class of individuals entitled to bring suit here, provider plaintiffs are required to demonstrate that they have assignments from ERISA plan members—and that the assignments encompass the ERISA claims pursued.

Citing *CardioNet*, among other authority, plaintiffs argue that provider Brian Mullins, M.S., P.T., as an alleged assignee of his patient's right to insurance reimbursement, is entitled to enforce the terms of the Aetna plans implicated here and recover the ONET benefits allegedly underpaid.[8]  Mullins asserts that he "obtained an assignment of benefits from his patients during the initial patient intake process, through which he is paid directly by Aetna for providing health care to its Members."  (TAC ¶ 303.)  Specifically, Mullins's patients "authorize[d]" their "insurance carrier to make payment directly to Eastern Monmouth Physical Therapy, LLC."[9]

Aetna, relying primarily on this district's decision in *Franco*, argues that this so-called "convenience assignment" is insufficient to assign away any ERISA cause of action asserted here. Aetna maintains that the document merely "allows direct payment to the provider as a

---

[8]     The third amended consolidated complaint makes reference to Abraham I. Kozma, P.A., as an additional provider plaintiff.  This was in error.  Brian Mullins, according to plaintiffs, "is in fact the only current Provider Plaintiff." (Plaintiffs Opp. at 44 n.16.)  Kozma's claims are dismissed.

[9]     The complaint here did not attach or include the terms of this assignment or authorization, but defendants submitted to the Court a copy of the same.  Because this form is the exclusive means for provider plaintiffs' recovery under their ERISA claims, the document is sufficiently "integral to" the complaint to warrant review.  As such, the document is proper for consideration here, and does not necessitate conversion of this motion to one for summary judgment.  See *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

convenience, without transferring any of the underlying rights under the member's plan," rather than "transferring the member's right to benefits and his rights to sue for those benefits under Section 502(a) of ERISA." (Aetna Br. at 35 citing *Franco*, 818 F. Supp. 2d at 807); *see also MHA, LLC v. Aetna Health, Inc.*, 2013 WL 705612, at *8 (D.N.J. Feb. 23, 2013) (Chesler, J.) ("There is simply nothing in the [assignment] language cited by Plaintiff that suggest that the parties intended … a full transfer to take place. Rather, the only reasonable interpretation is that the parties, for convenience, anticipated that provider would be able to receive payment directly from the insurer without the beneficiary relinquishing his or her rights."). Provider plaintiffs, naturally, disagree. They argue that, as in *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.,* 591 F.3d 1337, 1352 (11th Cir. 2009), "assignment of the right to payment is enough to create standing" under Section 502(a). *See also Physicians Multispecialty Group v. Health Care Plan of Horton Homes, Inc.*, 371 F.3d 1291, 1294 (11th Cir. 2004) ("Healthcare provides may acquire derivative standing … by obtaining a written assignment from a beneficiary or 'participant' of his right to payment of benefits.")

The Third Circuit has yet to decide whether assignment of a right to payment is alone sufficient to permit providers to bring ERISA claims against the insurer—though as of the date of this decision, it has been squarely raised in an appeal now pending in *American Chiropractic Ass'n v. American Specialty Health, Inc.* (No. 14-1832) and *North Jersey Brain & Spine Center v. Aetna, Inc.* (No. 14-2101). As Aetna points out, however, the authorization on which Mullins relies fails to support his ERISA claims because it authorizes his patient's insurance carrier "to make payment directly to Eastern Monmouth Physical Therapy, LLC." The language transfers no rights to Mullins himself and Eastern Monmouth Physical Therapy LLC, a distinct legal entity, is not a plaintiff in this action.

In *Desantis v. Kahala Corp. Inc.,* 2008 WL 5156765 (D.N.J. Dec. 9, 2008) (Wolfson, J.), an owner and shareholder of a limited liability company brought an action to remedy a fraud on the company. The court granted defendants' motion to dismiss, finding that the plaintiff lacked standing to pursue claims on the company's behalf because it was a distinct entity not party to the action. Critical to this outcome was the plaintiff's failure to allege that "he, *personally*, purchased any of the rights alleged … in the Complaint; that he is the franchisee under the Franchise Agreement that A Team signed with Cold Stone; that he personally entered into a transfer agreement for the Ocean rights; and, finally, that he entered into the sublease for the Ocean store premise." *Id.* at *3 (emphasis added). Mullins fails to allege ownership of any rights to payment for the ONET care he provided. To the extent validly transferred, those rights belong to Eastern Monmouth Physical Therapy LLC. Accordingly, the ERISA claims Mullins asserts under counts II, III, V and VII are dismissed.

### 3. *Association Plaintiffs*

The association class asserts claims similar to those raised by the provider plaintiffs—for ERISA violations under counts II, V and VII, and for RICO violations under counts VIII through X. The ERISA claims are asserted in a representative capacity, on behalf of each association's provider members, and the RICO claims are asserted by the associations in their individual capacity.

To sue under ERISA in a representative capacity, the association plaintiffs must allege that (1) their members would otherwise have standing to sue in their own right; (2) the interests they seek to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Aetna argues that the association

plaintiffs' claims must be dismissed because they fail to satisfy the first and third requirements under *Hunt*. The Court agrees.

As a threshold matter, the only provider plaintiff in this action, Mullins, has no basis to pursue his claims under ERISA. While plaintiffs maintain that other providers will be joined or rejoined to this action, the Court will not engage in a hypothetical analysis regarding the extent to which they will have standing to pursue ERISA claims later on. The association plaintiffs therefore cannot satisfy the first element under *Hunt*. They also fail to allege that the claims asserted will not require the participation of individual provider members—provider plaintiffs are permitted to sue under ERISA only upon proof of a valid assignment of benefits. Such a finding is necessary to prove that the provider plaintiffs have standing, and therefore also is necessary to show that the association plaintiffs have standing to sue in a representative capacity on the providers' behalf. Resolution of the ERISA claims thus requires "careful examination, on a provider-by-provider basis, of the assignments signed by patients and whether they contain the language required for a valid assignment of ERISA, RICO or antitrust claims to exist." *Franco*, 818 F. Supp. 2d at 813; *see also Am. Chiropractic Ass'n v. Am. Specialty Health, Inc.*, 2014 WL 1301943, at *10 (E.D. Pa. Mar. 27, 2014) (finding that medical association plaintiff's claims under ERISA would require "participation of its members in order to demonstrate … [that] its members had obtained sufficient assignments of their patient's rights and claims under ERISA."). Consequently, the association plaintiffs fail to satisfy the *Hunt* test on both the first and third prongs, and they lack standing to pursue any claims in this action in a representative capacity.

## V.    ERISA NON-BENEFITS CLAIMS

Counts III through VII of the third amended consolidated complaint assert ERISA claims unrelated to benefits. Plaintiffs assert these causes of action against Aetna alone for failure to

provide an accurate explanation of coverage ("EOC") and summary plan description ("SPD") (count III), violation of its fiduciary duties (counts IV and V), and failure to conduct a full and fair review of the subscribers' claims for coverage (counts VI and VII).  Plaintiffs' claims under counts III, VI and VII hinge in part on how far Aetna was required to disclose the methodology underlying its ONET reimbursement, as do some aspects of counts IV and V.  The Court first considers that issue as it relates to all counts.

### 1.  Disclosure Obligations

Plaintiffs argue that "Aetna's disclosure obligations under ERISA include[d] furnishing accurate materials summarizing its group health plans, known as [summary plan description] materials, under 29 U.S.C. § 1022 and supplying accurate EOCs, SPDs and other required information."  (TAC ¶ 465.)  They assert that "Aetna's failure to disclose material information about its ONET Benefit Reductions[,] its contribution of flawed data to Ingenix and its use of such data … violated ERISA, federal regulations and federal common law" and are actionable under 29 U.S.C. § 1132(c).  (TAC ¶ 466.)

In support, plaintiffs first rely on ERISA Section 102, which requires administrators like Aetna to provide plan participants with summary plan descriptions that include certain information listed in subsections (a) and (b) of the provision.  Subsection (a) provides that the SPD shall be "written in a manner calculated to be understood by the average plan participant, and [] be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  Subsection (b) mandates that the SPD contain information related to the plan, including, among other things, "the plan's requirements respecting eligibility for participation and benefits" and "circumstances which may result in disqualification, ineligibility or denial or loss of benefits."  As the courts in *Franco* and *WellPoint* noted, however,

the statute does not "include information concerning the methodology for determining UCR in particular or, more generally, for calculating the amount owed to the participant or beneficiary on an ONET claim." *Franco*, 818 F. Supp. 2d at 821; *see also WellPoint II* 903 F. Supp. 2d at 922, (finding that because the "weight of persuasive authority holding that a health insurer is under no obligation to disclose its UCR methodologies or physician compensation structure, combined with the ERISA Subscribers' failure to point to any authority supporting their position, the Court sees no reason to effectively let the same disclosure requirement in through the back door by requiring insurers to disclose that their 'UCR methodologies are corrupt,' at least where they sufficiently disclose that reimbursements for out-of-network services differ from reimbursements for in-network services, and may be capped according to some reimbursement methodology.") (citations omitted). Plaintiffs' opposition does not dispute the conclusion of either court, and fails to advance any alternative basis for relief. Because plaintiffs identify no authority, either in the language of Section 102 or elsewhere, that supports their expansive interpretation, their claim for non-disclosure is dismissed to the extent it relies on Section 102(a) and (b).

ERISA Section 104(b)(4), the only other statutory provision referenced in count III's disclosure claim, likewise does not support plaintiffs' position. That section imposes a duty to provide only certain types of information: "the latest updated summary[] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." And the final leg of subsection (b)(4)—requiring disclosure of any "instrument under which the plan is established or operated"—does not extend to the deficiencies challenged here regarding UCR or ONET reimbursement data. Rather, the phrase has been interpreted in this district and others to relate only to legal documents governing the plan. *See Morley v. Avaya*, 2006 WL 2226336, at *17 (D.N.J. Aug. 3, 2006)

(Cooper, J.) ("A document 'under which the plan is established or operated' is not just 'any document relating to a plan, but only formal documents that establish or govern the plan.'"); *see also Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 758 (7th Cir. 1999) ("[T]he use of the term 'instruments' implies that the statute reaches only formal legal documents governing a plan."). Plaintiffs provide no authority suggesting that the information they seek, including UCR calculations, is within Section 104(b)(4)'s disclosure requirement, or any other under ERISA, and count III therefore is dismissed.

Plaintiffs further assert in counts VI and VII that Aetna failed to provide a "full and fair review" of denied claims under ERISA Section 503 by "making ONET Benefit Reductions that [were] inconsistent with or unauthorized by the terms of Members' EOCs and SPDs, as well as by failing to disclose data, its methodology and other critical information relating to its ONET Benefit Reductions." In so arguing, however, plaintiffs fail to identify any specific aspect of the statute that they claim Aetna violated.

Section 503 has two requirements: (1) the plan must set forth its "specific reasons" for a denial of benefits; and (2) it must afford participants the opportunity for a full and fair review of a claim denial decision. 29 U.S.C. § 1133. But plaintiffs want this provision to go further and require insurers to explain what information the plan considered in arriving at its decision—in this case, ONET claims reimbursement methodology. This would add significantly to the disclosure requirements already imposed by Section 503 and other ERISA provisions. Much more than the "specific reason" for the insurer's determination, Plaintiffs' theory of liability assumes "that the functional equivalent of a data report on the calculation of UCRs is a necessary component of ERISA's disclosure requirements." *Franco,* 818 F. Supp. 2d at 823. This is contrary to the well-established canon of statutory construction that specific statutory language governs the general—

in light of which it has been held that courts "should not add to the specific disclosure requirements that ERISA already provides." *See Ehlmann v. Kaiser Found. Health Plan of Texas,* 198 F.3d 552, 555 (5th Cir. 2000) ("Given the canon of statutory construction that the specific language in a statute rules the general, this court should not add to the specific disclosure requirements that ERISA already provides."). Because plaintiffs identify no authority supporting their broad vision of Section 503, counts VI and VII are dismissed to the extent based on the failure to disclose the ONET reimbursement methodology.[10]

### 2. *ERISA Fiduciary Duties*

Finally, in counts IV and V, plaintiffs assert claims based on Aetna's alleged breach of its fiduciary duties as administrator under the plan. Specifically, plaintiffs allege that Aetna "violated its fiduciary duties of loyalty and due care by, *inter alia*, making ONET Benefit Reductions that were unauthorized by EOCs and SPDs; failing to inform Aetna Members of flaws in the Ingenix Databases that make their use in calculating UCR reimbursement inappropriate; making false representations regarding its ONET Benefit Reductions; failing to disclose in preauthorizing services that Aetna's ONET reimbursement practices would leave the member financially responsible for the bulk of the 'approved' service; and violating federal and state law." (TAC ¶ 472.) Plaintiffs also allege separately that Aetna breached its fiduciary duties by "sending

---

[10]    Even if this Court were to accept plaintiffs' interpretation of ERISA Section 503 and later find a violation thereof, doubts remain as to how such conduct might be remedied. As then-Judge Alito explained in *Syed v. Hercules, Inc.*, 214 F.3d 155 (3d Cir. 2000), the typical relief "for a violation of § 503 is to remand to the plan administrator so the claimant gets the benefit of a full and fair review." *Id.* at 162. Plaintiffs, however, request no such thing, and fail to respond to defendants' argument in this regard in their opposition to the motions to dismiss. Perhaps this is why the *WellPoint* plaintiffs "appear[ed] to have abandoned [Section 503] as a basis for their nondisclosure claims." *WellPoint II*, 903 F. Supp. 2d at 922.

noncompliant EOBs" to plaintiffs and "using SPDs that did not comply with federal law." (TAC ¶¶ 475-76.)

To the extent plaintiffs assert these claims on the basis of Aetna's non-disclosure of ONET-related information, counts IV and V are dismissed.  ERISA Section 404, on which plaintiffs rely, requires fiduciaries to discharge their duties according to the "prudent man" standard.  29 U.S.C. § 1104(a)(1)(B).  With regard to disclosure obligations, the Third Circuit has interpreted this standard to require plan fiduciaries to provide only "those material facts, known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection." *Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Secs.,Inc.,* 93 F.3d 1171, 1182 (3d Cir. 1996).  The test for determining materiality asks whether there is a substantial likelihood that the omission of information "would mislead a reasonable employee in making an adequately informed [] decision." *Jordan v. Fed. Express Corp.,* 116 F.3d 1005, 1015 (3d Cir. 1997).

Applying this standard, the court in *Franco* dismissed plaintiffs' claim for breach of fiduciary duty for failure to disclose, finding that "[p]laintiffs have not cited, nor has the Court's independent research uncovered, any binding authority holding that the fiduciary duty of disclosure under ERISA requires that a plan fiduciary disclose the data the plan uses to determine what constitutes the UCR or prevailing fee for a service." *Franco,* 818 F. Supp. 2d at 822.  The *WellPoint* court held the same when it found that "courts which have considered the scope of an ERISA fiduciary's disclosure obligations in similar contexts have overwhelmingly concluded that they do not extend to disclosure of UCR methodology or physician reimbursement schedules and that courts 'should not add to the specific disclosure requirements that ERISA already provides.'" *WellPoint II*, 903 F. Supp. 2d at 921 (citing *Weiss v. CIGNA Healthcare, Inc.*, 972 F. Supp. 748, 754 (S.D.N.Y. 1997) ("Had Congress seen fit to require the affirmative disclosure of physician

compensation arrangements, it could certainly have done so in ERISA §§ 101-111.  The general

fiduciary obligations set forth in ERISA § 404 [also] do not refer to the disclosure of information

to Plan participants, and it would be inappropriate to infer an unlimited disclosure obligation on

the basis of general provisions that say nothing about such duties.")).

Even assuming that this information was material, and potentially ripe for disclosure,

plaintiffs still fail to satisfy the remainder of the Third Circuit's framework for review.

Specifically, they fail to allege how the absence of such information affected their ability to make

an "adequately informed decision."  Plaintiffs do not allege that knowledge of this information

would have permitted them to make more prudent choices with regard to their ERISA health

plan—and even that assumes that their employer provided plaintiffs with plan options.   Nor do

they allege that "their ability to make an informed decision about whether to seek treatment from

an in-network provider or [out-of-network provider]" would have been aided by their knowledge

of Aetna's ONET reimbursement practices.  *Franco*, 818 F. Supp. 2d at 822.  As the *Franco* court

points out, subscriber plaintiffs already were aware of the differences between in-network and out-

of-network coverage, and this Court agrees that plaintiffs have failed to allege how Aetna's "failure

to provide even more information gives rise to an actionable violation of ERISA § 404."  *Id.* at

822.

Looking past plaintiffs' allegations regarding the failure to disclose ONET information,

the fiduciary duty claim essentially is reduced to the allegation that Aetna "ma[de] ONET Benefit

Reductions that were unauthorized by EOCs and SPDs."  (TAC ¶ 472.)  Viewed in this light,

plaintiffs' claim for breach of fiduciary duty is indistinguishable from their claim for benefits and

must therefore be dismissed.  *See Chang v. Life Ins. Co. of N. Am.,* 2008 WL 2478379, at *4

(D.N.J. Jun. 17, 2008) (Brown, J.) (dismissing 502(a)(3) claim as duplicative of 502(a)(1)(B) claim

because the former "appears to be nothing more than an attempt to couch the request for relief it had previously set forth [in the 502(a)(1)(B) count] in the language of equity."). Section 502(a)(3), the statutory vehicle for plaintiffs' fiduciary duty claim, is a civil enforcement "catch all" that provides only equitable relief for injuries not remedied elsewhere in Section 502. *See Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). In *Varity*, the Supreme Court stated that when fashioning "appropriate equitable relief" under Section 502(a)(3), courts must "keep in mind the special nature and purpose of employee benefit plans, and … expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief." *Id.* at 515 (internal citations omitted).

Plaintiffs' claim for breach of fiduciary duties is revealed as duplicative of their claim for benefits under Section 502(a)(1)(B) because they cannot identify with any degree of specificity what equitable relief they want. Plaintiffs had asserted claims for injunctive and other prospective relief, but abandoned them when Aetna stopped using the Ingenix database for ONET reimbursement during the course of this litigation. Plaintiffs now challenge past alleged misconduct alone and assert generally that "[d]eclaratory relief is still available, and still beneficial." However, plaintiffs cannot avoid dismissal merely by labelling their claim for unpaid benefits as one for prospective, equitable relief. They fail to adequately distinguish their claim under Section 502(a)(3) from their claim for benefits under Section 502(a)(1)(B), and as a consequence counts IV and V are dismissed.

## VI.    PLAINTIFF FRANCO'S STATUTE OF LIMITATIONS

In its motion to dismiss, Aetna does not challenge the merits of plaintiffs' claims for ERISA benefits under Section 502(a)(1)(b). It does, however, argue that plaintiff Franco's claims are barred by the language of her plan, which establishes a contractual limitations period of three years

(Walsh Dec., Ex. 3 ("No action shall be brought after the expiration of (3) years after the time written submission of claim is required to be furnished.")) and requires that written proof of loss be furnished within 90 days after the occurrence of a covered incident.[11]   Franco's surgery took place on February 2, 2004, and proof of loss was required to be furnished to Aetna no later than May 3, 2004.  Under this timeline, Franco was obligated to file her lawsuit by May 2007.  While the Court assumes that Franco's time to bring suit likely was tolled by the pendency of the *Cooper* putative class action, that litigation was not filed until July 2007, two months after the expiration of her contractual limitations period.  Franco joined that action in November 2007, and Aetna now argues that her claims must be dismissed as untimely under the Supreme Court's decision in *Heimeshoff v. Hartford Life & Accident Ins. Co.*,  571 U.S. __, 134 S.Ct. 604 (2013).

At issue in *Heimeshoff* was an ERISA plan that contained an identical contractual limitations period.  The limitations provision provided that "[l]egal action cannot be taken against The Hartford … [more than] 3 years after the time written proof of loss is required to be furnished according to the terms of the policy."  *Id.* at 609.  The Court found this provision to be enforceable and held that, "[a]bsent a controlling statute to the contrary, a participant and a plan may agree by contract to a particular limitations period, even one that starts to run before the cause of action accrues, as long as the period is reasonable."  *Id.* at 610.

The limitations period governing Franco's plan—three years from the time her claim was due—is substantially identical to that in *Heimeshoff,* and no controlling statute prevents the provision from otherwise taking effect.  As such, and under *Heimeshoff,* the provision is enforceable on its face and renders Franco's claim for ERISA benefits time barred.  While

---

[11]      Darlery Franco is a named plaintiff both here and in *Franco v. Connecticut General Life Insurance, Co.*, No. 07-6039 (D.N.J.).  She raises claims against Aetna in this action, and asserted similar claims against Cigna in the *Franco* litigation.

plaintiffs ignore the Supreme Court's decision, they attempt to get around the contractual limitations provision in Franco's plan by arguing, as plaintiffs did in *Heimeshoff*, that the contractual limitations period should be tolled during the internal review process.  *Id.* at 610 ("Because proof of loss is due before a participant can exhaust internal review, Heimeshoff contends that this limitations provision runs afoul of the general rule that statutes of limitations commence upon accrual of the cause of action.").  However, the Supreme Court rejected that same argument, finding that such an approach would run afoul of the Court's obligation to enforce ERISA plans as drafted, and that a specific tolling provision in the ERISA regulations (inapplicable here and in *Heimeshoff*) would be rendered superfluous by a blanket tolling period during the entire internal review process.

Plaintiffs attempt to salvage Franco's claim by relying on decisions of the Third Circuit that pre-date *Heimeshoff* and deal with statutes of limitations on ERISA plans, rather than contractual limitations provisions like those at issue here.  *See Romero v. Allstate Corp.*, 404 F.3d 212, 221 (3d Cir. 2005) (finding that the clock on the "applicable statute of limitations began to tick … [only] after a claim for benefits due under an ERISA plan has been made and formally denied."); *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 520 (3d Cir. 2007) (same).  The difference is critical.  As the Supreme Court in *Heimeshoff* observed, the language of "[t]he plan, in short, is at the center of ERISA" and "once a plan is established, the administrator's duty is to see that the plan is maintained "'pursuant to [that] written instrument.'" *Heimeshoff,* 134 S.Ct. at 612 (quoting 29 U.S.C. § 1102(a)(1)).  That duty extends to the district court on review.  *See, e.g. Bellas v. CBS, Inc.,* 221 F.3d 517 (3d Cir. 2000) ("This court is required to enforce the Plan as written unless it can find a provision of ERISA that contains a contrary directive.").   Franco's plan specified a time period within which a lawsuit must be filed that was deemed reasonable by

the Supreme Court in *Heimeshoff.*  She failed to comply with that requirement, and her ERISA claims in counts I, III, IV and VI are dismissed.

## VII.  SHERMAN ACT SECTION 1

Section 1 of the Sherman Act prohibits agreements in restraint of trade.  15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade … is declared to be illegal.").  Though the plain language of the statute "would make illegal every agreement in restraint of trade," it has been interpreted to bar only unreasonable restraints.  *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 208-09 (3d Cir. 2012), *vacated on other grounds by Upsher-Smith Labs., Inc. v. La. Wholesale Drug Co.*, 133 S. Ct. 2849 (2013).  At the same time, however, Section 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade …[,] only restraints effected by a contract, combination, or conspiracy."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984)).  To plead a claim under Sherman Act section 1, plaintiffs must allege (1) an agreement (2) imposing an unreasonable restraint of trade within a relevant product market (3) resulting in injury "of the type the antitrust laws were intended to prevent and … that flows from that which makes defendants' acts unlawful."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315-16 (3d Cir. 2010).

According to the third amended consolidated complaint, "[t]he combination or conspiracy alleged … consisted of a continuing agreement, understanding or concert of action by the Defendants and their other Co-Conspirators, the substantial terms of which were to fix and depress ONET reimbursements." (TAC ¶ 544.)  All defendants seek dismissal of this claim based on plaintiffs' purported failure to satisfy any of the above elements.

### 1. *Have Plaintiffs Alleged an Anticompetitive Agreement?*

To state a claim under Section 1 of the Sherman Act, plaintiffs must first demonstrate the existence of a "contract, combination or conspiracy." This element requires "some form of concerted action," which the Third Circuit has defined to include either a "unity of purpose or a common design and understanding or a meeting of the minds" or "a conscious commitment to a common scheme." *Burtch v. Milberg Factors*, 662 F.3d 212 (3d Cir. 2011). At the heart of this element is "the existence of an agreement." *Id.* at 221 (citing *Howard Hess Dental Lab. Inc. v. Dentsply Int'l., Inc.,* 602 F.3d 237, 254 (3d Cir. 2010) ("Section 1 claims are limited to combinations, contracts and conspiracies and thus always require the existence of an agreement.")). Plaintiffs claim to have plausibly alleged that, on a "date unknown, but … at least as early as January 1, 1998, and continuing through August 1, 2011" (TAC ¶ 543), defendants "agreed to fix and depress ONET reimbursements" and that they did so by "agreeing to use Ingenix UCR price schedules, which they manipulated to determine ONET reimbursements." (Plaintiffs Opp. at 11.)

As a threshold matter, however, the complaint has no direct, factual allegations supporting the existence of an agreement or conspiracy either to fix the "price" of ONET reimbursement or to create a flawed database. *See Burtch,* 662 F.3d at 225 ("Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."). To the contrary, plaintiffs' allegations undermine such a finding. They argue that they have plausibly pleaded an agreement to fix the "price" of ONET reimbursements—that Aetna, UHG and their co-conspirators manipulated the data each submitted to Ingenix, that Ingenix scrubbed that data further to skew downward the UCR schedules, and that this was accomplished by all with the singular "purpose" of "establish[ing] an artificially low range of UCRs." (Plaintiffs

Opp. at 12.)  But plaintiffs acknowledge that the outputs on which defendants Aetna and UHG allegedly relied were ranges of provider charge amounts expressed in percentiles—not actual amounts to reimburse—and they fail to allege facts about an agreement to fix at a stated level either the percentile range of provider charges or the specific reimbursement amount.  Rather, as defendants argue, plaintiffs could not allege that the *actual amounts* to be reimbursed were fixed because they also allege that variations in each plan's out-of-pocket obligations required that Aetna reimburse different ONET amounts under different plan terms regardless of the underlying UCR. *See, e.g.* TAC ¶¶ 204 (Cooper is responsible for 30% of the UCR amount as a coinsurance payment), 213-15 (Werner is responsible for 40% of the UCR amount), 301 (Weintraub is responsible for 50% of the UCR amount).  Plaintiffs also fail to reconcile their (conclusory) allegations regarding agreement to fix the "price" of ONET reimbursement with their assertions that insurers were using methods of reimbursement *other than* the Ingenix database, such as reimbursements "based on a percentage of the Medicare fee schedule" (TAC ¶ 172), "some other faulty methodology"  (TAC ¶ 307), or "other improper pricing methods."  (TAC ¶¶ 484, 485.)

Plaintiffs' remaining, circumstantial allegations are also deficient.  They assert that following its purchase of the databases, Ingenix permitted Aetna and its co-conspirators to participate in the maintenance of the database (TAC ¶¶ 326-28); that Ingenix agreed to a ten-year cooperation agreement, and gave HIAA members a say in the operation of the database through the "Ingenix PHCS Advisory Committee" (TAC ¶ 331); that "flaws" in the database were uncovered by the "Dataspan" project, including the revelation that submissions consisted of only four data points (TAC ¶¶ 341-42); that, around this time, "members of HIAA/AHIP" discussed these same alleged flaws (TAC ¶ 342); and that, despite knowing the "Ingenix UCR schedules did not represent accurate UCRs," defendants Aetna, UHG and their alleged co-conspirators each used

34

the Ingenix schedules to determine ONET reimbursements. (TAC ¶¶ 345-47.)  But while plaintiffs alleged that defendants had opportunities to confer, this alone does not plausibly create the inference that defendants took that opportunity.  *See American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295-96 (11th Cir. 2010) ("As for Plaintiffs' allegation that a conspiracy may be inferred from Defendants' participation in trade associations and other professional groups, it was well-settled before *Twombly* that participation in trade organizations provides no indication of conspiracy."); *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir.1988) ("A trade association by its nature involves collective action by competitors. Nonetheless, a trade association is not by its nature a 'walking conspiracy' .... [T]he establishment and monitoring of trade standards is a legitimate and beneficial function of trade associations."); *Venture Tech., Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41, 45 (2d Cir. 1982), *cert. denied*, 459 U.S. 1007 (1982) ("[F]requent meetings between the alleged conspirators ... will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement.").

Viewed as a whole, the complaint sets out a series of independent actions taken by Aetna, UHG and Ingenix without factual allegations that tie together what they did.  Unilateral action, "regardless of the motivation, is not a violation of Section 1."  *Burch*, 662 F.3d at 221.  As the Third Circuit has long held, "in order to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition, and in order to enforce the Sherman Act's requirement of an agreement, the Supreme Court has required that a '[Section 1] plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently.'"  *In re Ins. Brokerage*, 618 F.3d at 321 (quoting *Twombly*, 550 U.S. at 554).  "Parallel conduct is, of course, consistent with the existence of an agreement; in many cases where an agreement exists,

parallel conduct—such as setting prices at the same level—is precisely the concerted action that is the conspiracy's object." *In re Ins. Brokerage,* 618 F.3d at 321.  But as the Supreme Court has consistently held, parallel conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly,* 550 U.S. at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.")

The pleadings here show that defendants' conduct is just as easily explained by reference to their own self-interest.  As to Aetna and UHG, plaintiffs explicitly alleged that the insurers were "incentivized to provide flawed claims data that result in lower UCR rates in order to pay lower reimbursements for ONET."  (TAC ¶ 365.)  For these entities, lower insurer inputs resulted in lower Ingenix outputs, which, taken together, likely resulted in higher insurer profits.  And Ingenix had a similar motive to engage in this conduct separate and apart from the alleged conspiracy— according to plaintiffs, "Ingenix had an incentive" to avoid preventing or investigating the risk of flawed data "because, by turning a blind eye to the quality and reliability of the data submitted to it, and then manipulating the data to support artificially low UCR rates, Ingenix supported its parent company by assisting UHG to perpetuate low reimbursement rates."  (TAC ¶ 365.)  This desire to please extended to Aetna as well—in fact, all of Ingenix's insurer customers stood to benefit from lower ONET reimbursement, and Ingenix therefore could benefit derivatively in offering (and charging for) the flawed product.  *See American Dental Ass'n*, 605 F.3d at 1295 ("The use of automated systems that bundle and downcode may just as easily have developed from independent action in a competitive environment as it would from an illegal conspiracy, because

each insurer would have an economic interest in decreasing physicians' costs and increasing profits.").

A claim of antitrust conspiracy predicated on parallel conduct must be dismissed "if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior." *In re Ins. Brokerage,* 618 F.3d at 326. These defendants' individual economic motivation to engage in the activity alleged is glaring and unavoidable—the insurers, to effect a direct cost savings by lowering their reimbursement obligations, and Ingenix, both to please its parent company and safeguard its "dominant market position" by stamping industry approval on artificially low provider charge data. The strength of these independent incentives seriously weakens the reasonable inference of "conspiracy," and under *Twombly* exposes plaintiffs' claims to dismissal claims in the absence of evidence tending to "rule out the possibility that the defendants were acting independently." *Twombly,* 550 U.S. at 554.

To identify this kind of evidence, the Third Circuit instructs that "at least three types of facts, often referred to as 'plus factors,' … tend to demonstrate the existence of a conspiracy: (1) evidence that the defendant had a motive to enter a price fixing conspiracy; (2) evidence that the defendant acted contrary to its own interests; and (3) evidence implying a traditional conspiracy." *Burtch*, 662 F.3d at 226 (quoting *In re Ins. Brokerage*, 618 F.3d at 321-22.). While the Court likely can infer that the defendants had a motive to join forces to fix and depress ONET reimbursement—at least in the sense they could achieve together, and maybe more effectively, what they desired individually—the Third Circuit has "cautioned" that this first factor may "simply restate that (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." *Id.* at 226; *see also White v. R.M. Packer Co.,* 635 F.3d 571, 582 (1st Cir.

2011) ("Taking as a given that all of the defendants had motive to conspire with one another to earn high profits, all such a motive shows is that the defendants could reasonably expect to earn higher profits by keeping prices at a supracompetitive level through parallel pricing practices."). Consequently, the Court attaches little weight to the first plus factor.

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004), defined the kind of evidence required for the second plus factor:  "Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market."  In their motion papers, plaintiffs argue that the "[third amended consolidated complaint] explains how the insurers acted against their economic self-interest in using the Ingenix UCR price schedules," but tellingly they fail to identify which allegations provide that explanation.  Having thoroughly reviewed the latest iteration of plaintiffs' complaint, the Court is satisfied that while detailed allegations set forth each defendant's individual interest in depressing ONET reimbursement, that very specificity cuts against, rather than supports, a finding that the defendants were acting contrary to their own interest.

Finally, the complaint fails to allege traditional hallmarks of a conspiracy—the third plus factor under *Burch*.  As a threshold matter, the complaint does not allege any direct or indirect "assurances of common action" among the defendants.  *See Burch*, 662 F.3d at 230 (citing *In re Ins. Brokerage*, 618 F.3d at 322).  In fact, the reverse appears to be the case.  According to plaintiffs, during the class period Ingenix sought to merge the MDR and PHCS data into a combined database called "DataSpan," which was intended to be a "statistically valid" and "scientific database subject to peer review of methodology, white papers, documentation of the methodology and results, and periodic external review."  (TAC ¶ 115.)  Plaintiffs allege that, in connection with this initiative, Ingenix consulted with its employees and outside statisticians from

2004 to 2006 and determined that the databases were flawed for some of the same reasons identified in this litigation.  This begs the question—why would Ingenix "invest[] … time and funds" to uncover flaws that it purportedly caused (and desired) to exist in the first place?  While, as plaintiffs allege, the program was "inexplicably shut down" after a period of approximately three years with no reforms ever implemented, the very fact of DataSpan's existence during the class period suggests the absence of a conspiracy.

The complaint also fails to allege another common hallmark of antitrust agreement—a sensible timeline of the conspiracy itself.  Plaintiffs provide no clear indication about when the conspiracy or agreement first arose, or which individuals were involved in its formation.  *See Burtch,* 662 F.3d at 225-26 (affirming dismissal where "none of the[] allegations specify a time or place that an actual agreement to fix credit terms occurred," or "indicate that any particular individuals or [defendants] made such an agreement"); *see also Twombly*, 550 U.S. at 565 n.10 (explaining that plaintiff's failure to allege a "specific time, place or person involved in the alleged conspiracies" left "no clue as to which of the [defendants] supposedly agreed, or when and where the illicit agreements took place").  The complaint also fails to explain why some of the conduct happened well before and well after the alleged conspiracy.  For example, plaintiffs argue that the Ingenix database was flawed because it was centered around only four data points, but the complaint itself alleges that these same data points have been in use since 1973—decades before the inception of the alleged agreement to restrain here.  (TAC ¶¶ 339-340.)  Similarly, plaintiffs complain about Ingenix's use of three-digit geozips to define the geographic areas for which it provided ranges of provider charge data.  (TAC ¶ 134.)  But, as defendants point out, FAIR Health, the non-profit entity whose database replaced the defendant's, "continues to use three-digit geozips, three years after the databases were divested from Ingenix."  (Aetna Br. at 14.)

39

Taken together, plaintiffs' allegations corresponding to the Third Circuit's "plus factors" do not advance their theory. Antitrust allegations "must be placed in a context that raises a suggestion of a precedent agreement, not merely parallel conduct that could just as well be independent action." *In re Ins. Brokerage,* 618 F.3d at 322. While defendants' actions may have resulted in underpayment for out-of-network services, the complaint fails to plausibly allege that their actions were undertaken collectively, and their claims under Section 1 of the Sherman Act therefore are dismissed.

### 2. Per Se *Treatment?*

Even assuming an agreement to fix and depress ONET reimbursement was adequately pled, its object would not qualify for *per se* treatment—the only theory of liability alleged here. Plaintiffs once included Sherman Act claims under *both* rule of reason and *per se* analysis, but have since abandoned the rule of reason theory.[12] Now they assert that defendants Aetna, Ingenix, and UHG acted in concert to artificially suppress reimbursement for ONET services, and that such conduct amounted to price-fixing—traditionally a *per se* violation of Section 1 of the Sherman Act.

In evaluating whether an agreement constitutes an "unreasonable restraint of trade"—and thus, a presumptive violation of Section 1 of the Sherman Act—courts typically use one of two forms of analysis. Under the traditional "rule of reason" analysis, the "factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.,* 530 F.3d 204, 218 (3d Cir. 2008). The plaintiff

---

[12] This strategy, as plaintiffs are aware, is not without risk. If this Court "determines that the restraint at issue is sufficiently different from the per se archetypes to require application of the rule of reason," the plaintiffs' claim must be dismissed. *See In re Ins. Brokerage*, 618 F.3d at 317.

bears the initial burden of demonstrating that the alleged agreement caused an "adverse, anticompetitive effect within the relevant geographic market," and, if that burden is carried, the court must then decide "whether the anticompetitive effects of the practice are justified by any countervailing pro-competitive benefits." *In re Ins. Brokerage*, 618 F.3d at 315-16. Judicial application of this standard has, however, shown that "some classes of restraints have redeeming competitive benefits so rarely that their condemnation does not require application of the full-fledge rule of reason"—a paradigmatic example of which is a "horizontal agreement[] among competitors to fix prices." *Id*. at 316 (quotations and citations omitted).

Restraints of trade like price-fixing arrangements "are ordinarily condemned as a matter of law under an 'illegal *per se*' approach because the probability that these practices are anticompetitive is so high; a *per se* rule is applied when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" *Nat'l Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 100 (1984). Because application of the *per se* rule forecloses an analysis of the purpose and effects of a restraint, a "per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (internal citations omitted). Courts have thus expressed "reluctance to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not *immediately obvious*." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis supplied); *see also Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001) ("[P]er se rules of illegality are the exception to antitrust analysis and are only employed in certain recognized categories.").

Plaintiffs claim to state a price-fixing agreement warranting *per se* treatment on the basis of their allegation that defendants "agreed to fix and depress ONET reimbursements" through use of the Ingenix database.   But while labelling such conduct as an agreement to fix *price*, plaintiffs actually fail to allege that the price of any product or service has been fixed or restrained.  Instead, they allege that "Aetna paid less than it was contractually obligated to pay for" out-of-network benefits.  (TAC ¶ 1; *see also* TAC ¶ 10 ("When Aetna and other Insurance Conspirators utilized False UCRs to calculate ONET reimbursements, the resulting payments to subscribers and providers were artificially low.")

As many courts have noted, however, the price of health insurance is the premium.  *See, e.g., Ironworkers Local Union 68 v. AstraZeneca Pharms., LP,* 634 F.3d 1352 (11th Cir. 2011) ("In general, health insurers enter into a contractual bargain with enrollees in which, in exchange for their service—assuming the risk of payment for enrollees' future health care costs—they receive a 'premium,' an up-front fee that represents the price of the insurance policy."); *see also United States v. IBM,* 517 U.S. 843, 879 (1996) (Kennedy, J., dissenting) ("Premiums, *i.e.,* the price of insurance, depend on risk of loss, and value of the goods is only one component factor of risk.")  Plaintiffs seem to accept this categorization.  In describing the differences among common health insurance plans, they allege that "[h]ealth insurance plans that permit insured individuals [] to seek medical care from out-of-network providers are *more expensive* than plans that limit Members to care provided by in-network providers – *i.e.,* they require *higher premium payments.*" (TAC ¶ 3.)  But, plaintiffs do not allege that the premium charged for their health insurance plans has been fixed by any action undertaken by the conspiracy alleged.  Rather, they allege a *cost to the seller* was fraudulently restrained, which resulted in a *product* that was worth less than anticipated.   Equating such conduct with price-fixing—concerted action for the purpose of

"raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce"—stretches the bounds of *per se* treatment beyond its intended limits.

To support their contention that *per se* treatment is warranted, plaintiffs rely on the Supreme Court's decision in *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643 (1980) and *Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133 (9th Cir. 2003), both of which are distinguishable. In *Catalano*, plaintiffs challenged the defendant beer retailers' concerted refusal to extend interest-free credit to their purchasers. Treating this conduct as a *per se* price-fixing agreement, the Court found that "credit terms must be characterized as an inseparable part of the price"—finding it "virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time." *Id.* at 648. In *Freeman*, the Ninth Circuit considered a price-fixing agreement regarding real estate listing databases that were maintained and serviced by real estate associations. The associations charged fees for that effort, and thereafter licensed the databases to real estate agents and agencies for a subscription fee. Following consolidation of all databases covering San Diego County into an entity called Sandicor, the associations agreed among themselves to fix the price for their support services at supracompetitive levels. Sandicor used this predetermined price directly in setting the subscription fee for use of the new database. "Subscribers [did not] pay the associations for support services directly; they [paid] only Sandicor's [subscription fee], and Sandicor then return[ed] part of that fee as a support fee to the associations." *Id.* at 1141. The Ninth Circuit found that the *associations* engaged in price fixing, and that the plaintiffs were permitted to sue under an exception to the indirect purchaser rule. Significantly, in so holding, the court found clear "evidence that Sandicor not only considered its costs in setting [the subscription fee] but, in

fact, priced near cost and thus may have passed on the inflated support fees almost dollar for dollar." *Id.* at 1145.

Plaintiffs maintain that these cases stand for the proposition that "agreements to fix any term of sale that affects the price that the customer must pay"—in this case, the cost of the insurance premium—"are *per se* unlawful."   But in both *Catalano* and *Freeman*, the restraint of trade had a direct and unmistakable impact—in *Freeman*, likely dollar-for-dollar—on the price charged.   Here, even accepting plaintiffs' allegation that the defendants collectively sought to fix and depress ONET reimbursements, the complaint fails to allege that such conduct was undertaken to standardize or fix some aspect of the insurance premium for each plan.   Unlike the price of beer in *Catalano* and the price for subscription services in *Freeman,* health insurance premiums are not simply dictated by common economic forces like cost and market demand.   Rather, the "price" of insurance is informed by a "technical actuarial analysis" that necessarily considers "future losses and expenses, which in turn takes into account predicted claims costs, the uncertainty of predicted claims, the insurer's predicted income from investments of premiums received, projected administrative expenses, tax considerations and a profit margin." *Franco,* 818 F. Supp. 2d at 833 (citing *AstraZeneca*, 634 F.3d at 1365 n.26).   The insurer may also adjust that "price" upon the insured's renewal of his policy "to reflect such factors as increases in healthcare costs, increases in the use of health care, costs borne from new technologies, changes in enrollment, changes in regulations, or to adjust actuarial assumptions based on actual experience from the past year." *AstraZeneca*, 634 F.3d at 1365 n.26

Given this complexity in determining the premium charged, the Court concludes that the connection between defendants' alleged conduct and the premium charged is too attenuated to support a finding of price-fixing.   Further, it is significant that the Court has to make this analysis

on a conceptual basis, because plaintiffs have failed to provide factual allegations to establish a connection.  Going along with their invitation that the Court use a "more flexible" *per se* rule would disregard the Third Circuit's long-standing "hesitance to extend the per se rule to new categories of antitrust claims." *Eichorn*, 248 F.3d at 143.  Plaintiffs' failure to allege a price-fixing agreement warranting *per se* treatment therefore serves as an additional basis for dismissal of their antitrust claims.

## VIII.   RICO CLAIMS

Plaintiffs also claim that defendants' conduct violated the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c).  Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  To plead a RICO claim under this section, "the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *In re Ins. Brokerage*, 618 F.3d at 362.  Because this claim is grounded in fraud, the cause of action must be stated with the specificity required by Rule 9(b). *See Lum v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir. 2004) ("Where, as here, plaintiffs rely on mail and wire fraud as a basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that [such allegations] be pled with specificity.")

Plaintiffs contend that defendants undertook an "elaborate fraudulent scheme" to underpay for ONET services rendered to the subscriber plaintiffs and that such conduct constitutes a RICO violation under Section 1962(c).  (TAC ¶ 374.)  The complaint alleges a two-stage process.  First, the insurer defendants and conspirators used "the U.S. mails and interstate wire facilities" to transmit the allegedly flawed data to Ingenix "in order to create the false UCR amounts arrived at

by the Defendants and to under-reimburse [plaintiffs] for ONET claims." (TAC ¶ 374.) Second, the resulting pricing schedules were provided by Ingenix to the defendants "through the U.S. mails or electronically over interstate wire facilities," and such information was used by defendants to reimburse plaintiffs for ONET claims. (TAC ¶ 374.) Plaintiffs argue that the third amended consolidated complaint plausibly alleges that defendants operated this scheme to defraud them, distinct from the other ordinary commercial dealings each defendant conducted, from approximately 2001 to 2009. (TAC ¶ 377.)

### 1. Have Plaintiffs Alleged the Existence of an Enterprise?

Plaintiffs must first demonstrate the existence of a RICO enterprise. Section 1962(c) provides that an "enterprise" includes "any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiffs provide three alternate enterprise theories: (1) "single-entity" enterprises, consisting of defendants Aetna, UHG and Ingenix standing alone (TAC ¶ 403); (2) a bilateral association-in-fact enterprise comprised of Aetna and Ingenix (TAC ¶ 402); and (3) an association-in-fact enterprise comprised of Aetna, UHG and Ingenix. (TAC ¶ 376). The Court addresses each in turn.

### A. Single-Entity Enterprises

Defendants argue that plaintiffs' so-called "single-entity" enterprises fail as a matter of law because they violate RICO's "separateness" requirement, pursuant to which a plaintiff must "allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161-62 (2001). The Court agrees.

In *Cedric Kushner Promotions*, plaintiff sued Don King, the president and sole shareholder of Don King Productions, a corporation, claiming that King had conducted the corporation's affairs in part through a RICO "pattern"—"through the alleged commission of at least two instances of fraud and other RICO predicate crimes." *Cedric Kushner Promotions,* 533 U.S. at 161. In affirming the district court's dismissal, the Second Circuit held that King was an employee of the corporation and, as acting within the scope of his employment, "was part of, not separate from, the corporation." *Id.* at 161. The Supreme Court reversed, finding that the "corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." *Id.* at 158. Underlying its holding was the "distinctiveness" requirement for a RICO enterprise, pursuant to which "one must allege and prove the existence of two distinct entities." *Id.* at 162.

The distinctiveness requirement has long been recognized by courts of this Circuit. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.,* 46 F.3d 258, 268 (3d Cir. 1995) ("[A] claim simply against one corporation as both 'person' and 'enterprise' is not sufficient.") Applying this principle, the court in *Ass'n of New Jersey Chiropractors v. Aetna, Inc.*, 2011 WL 2489954 (D.N.J. Jun. 20, 2011) (Pisano, J.) found that "[b]ecause a corporate entity may not be both the person and the RICO enterprise …, a corporation must associate with others to form an enterprise that is sufficiently distinct from itself" to be liable as a defendant under section 1962(c). *Id.* at *6. The court then found that the enterprise alleged, "consisting of Aetna Inc., several of its subsidiaries and affiliates, and third-parties acting as Aetna's agents" was "not sufficient to fulfill the distinctiveness requirement of § 1962(c)." *Id.* at *6. This reasoning is persuasive. Plaintiffs advance identical theories here, each of which violates the Third Circuit's distinctiveness

requirement.   Consequently, plaintiffs' RICO claims are dismissed to the extent they rely on single-entity enterprises.

### B.  Association-in-fact Enterprises

Plaintiffs do, however, adequately plead both an association-in-fact enterprise comprised of Aetna, UHG and Ingenix, and a bilateral enterprise comprised of Aetna and Ingenix.  To state a RICO association-in-fact enterprise, plaintiffs must demonstrate the existence of a "continuing unit that functions with a common purpose."  *See Boyle v. United States*, 556 U.S. 938, 948 (2009).  Interpreting this standard, the Third Circuit has found that "the RICO statute defines an 'enterprise' broadly, such that the 'enterprise' element of a Section 1962(c) claim can be satisfied by showing a 'structure,' that is, a [1] common 'purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose.'"  *In re Ins. Brokerage*, 618 F.3d at 368 (quoting *Boyle*, 556 U.S. at 945).  After *Boyle,* "an association-in-fact enterprise need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent from the group's pattern of racketeering activity."  *Id.* at 368.

Under *Boyle,* the Court finds plaintiffs' allegations sufficient to state a RICO enterprise here, either as an association-in-fact enterprise consisting of Aetna, UHG and Ingenix, or, alternatively, a bilateral enterprise comprised of Aetna and Ingenix.  The enterprise, plaintiffs allege, collectively sought to achieve a dual purpose:  (1) "to create a mechanism through which Aetna, UHG and the Insurer Conspirators could under-reimburse subscribers … for Nonpar services through use of flawed and invalid data" (TAC ¶ 503) and (2) to increase insurer profits by deceptively underpaying ONET benefits to their policy holders.  And the conduct attendant to defendants' realization of these goals demonstrates the existence of enterprise relationships.  The

defendants allegedly "became beneficiaries of [each other's] scrubbed data in the future, after it was processed (and further scrubbed) by Ingenix" and had opportunities to interact regarding their collective purpose through their participations in trade associations, which allegedly played a role in the "management" of Ingenix. (Plaintiffs Br. at 16-17, 36-37.) Finally, as in *Franco*, the enterprise alleged has demonstrated sufficient longevity to allow its associates to accomplish their alleged intended purpose as it "came into existence in 1998." *Id.* at 826. The Court finds these allegations sufficient to satisfy *Boyle*'s "low threshold" for pleading the existence of an association-in-fact.

### 2. Did Defendants "Conduct" the Affairs of the Enterprise?

Proof of the entity's structure, however, is not alone sufficient to state a claim under Section 1962(c). Plaintiffs also must show that each defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." This has been described as "a very difficult test to satisfy," *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003), because mere association with an enterprise does not violate the statute. *See In re Ins. Brokerage*, 618 F.3d at 370-71. Rather, the "conduct or participate" element requires a defendant to "have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993); *see also Schmidt v. Fleet Bank,* 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998) ("There is a substantial difference between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under *Reves* because 'the test is not involvement but control.") (internal quotation marks omitted). *Reves* held that plaintiffs must allege that the defendant "participated in the operation [and] management of the enterprise itself" or played "some part in directing the enterprise's affairs." *Id.*

This requires a "showing that the defendant[] conducted or participated in the conduct of the '*enterprises'* affairs,' not just [its] *own* affairs." *Id.* at 185 (emphasis in original).

Plaintiffs claim to satisfy this element through their allegations that "Ingenix owned the Database, it directed the manner of the submission of the data from Defendants and Co-Conspirators, it collected the scrubbed data that it further manipulated and disseminated …, and it controlled 75-85% of the data market.  UHG, in turn, owned Ingenix, and both it and Aetna were vital contributors of scrubbed data and used the data … to under-reimburse Subscribers." (Plaintiffs Opp. at 34.)   Plaintiffs also allege that "Aetna's and UHG's memberships in HIAA/AHIP and positions on HIAA/AHIP's board of directors, gave them additional awareness as to the nature and scope of the scheme and allowed them, through HIAA/AHIP's representatives on the Ingenix Liaison Committee, to participate in the making of decisions concerning the direction and use of the Database as well." (TAC ¶ 393).

Aetna and UHG argue that plaintiffs parrot the statutory language of Section 1962(c), but fail to offer any factual allegations sufficient to suggest that either of them participated in the operation or management of any enterprise.  The Court agrees.  With regard to defendants' submission of flawed data for use in the Ingenix database, plaintiffs point only to Aetna's and UHG's commercial interactions with Ingenix, and assert that such contributions were vital to the enterprise's common purpose.  But providing goods or services to an alleged RICO enterprise is insufficient to compel liability.  *See Reves,* 507 U.S. at 179; *University of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534 (3d Cir. 1993) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO.")  And as in *WellPoint I,* "submission of [their] own data does not plausibly show that [Aetna or UHG] controlled the other members in the associated-in-fact enterprise."  *WellPoint I,*

865 F. Supp. 2d at 1034.  In fact, "all it really establishes is that [each insurer] was acting on its own when submitting data to the Ingenix database." *Id.* at 1034.

Plaintiffs argue that the conduct of each defendant was "integral" to the enterprise's operation, and that Aetna and UHG were "vital contributors" of data and thus necessary to the scheme alleged.  They claim to find support in the Third Circuit's decision in *In re Ins. Brokerage*, which considered, among other things, RICO claims arising out of a bid-rotation scheme whereby "insurers furnished purposefully uncompetitive sham bids on policies in order to facilitate the steering of business to other insurer-partners, on the understanding that the other insurers would later reciprocate."  The Third Circuit found that, with regard to the conduct element, "if defendants band together to commit [violations] they cannot accomplish alone … then they cumulatively are conducting the association-in-fact *enterprise's* affairs, and not [simply] their *own* affairs."  *In re Ins. Brokerage*, 618 F.3d 300 (quoting Gregory P. Joseph, Civil RICO: A Definitive Guide 106, at 74 (3d ed. 2010)) (emphasis in original).  On that basis, the court found that "defendants' alleged collaboration in the Marsh-centered enterprise, most notably the bid rigging, allowed them to deceive insurance purchasers in a way not likely without such collusion."

The decision in *In re Ins. Brokerage* is plainly distinguishable.  Plaintiffs here allege a scheme that, at its essence, consists of two stages of activity: (1) multiple insurers submit artificially low provider cost data, thus incrementally decreasing the final output they expect to receive and ultimately rely upon; and (2) Ingenix then scrubs that same data to remove high-end outliers, thus decreasing the final output once more and only to the extent desired.  Viewed in this light, the Court fails to see how an elimination of either stage of conduct would bring about failure of the enterprise overall.  The conduct alleged aided the goals of the enterprise only incrementally, and each defendant was free to take such action with or without assistance.  Plaintiffs emphasize

the significant amount of contributions made by Aetna and UHG to show that their conduct was "vital" to the organization's purpose, but from that fact the Court infers that each insurer could (individually) reduce ONET reimbursements on a significant—though still incremental—basis. Taken together, and assuming the truth of plaintiffs' allegations, the Court finds that the defendants achieved collectively nothing that would have been impossible to achieve individually.  And for that reason, plaintiffs' allegations regarding defendants' conduct are insufficient to show that any defendant controlled or directed the alleged RICO enterprise here.

Their allegations regarding the insurer defendants' business relationships with Ingenix fare no better.  Plaintiffs submit in their opposition that the third amended complaint alleges "HIAA representatives were on the Ingenix 'Liaison Committee,' … that Aetna and UHG were members of HIAA/AHIP … that an advisory committee composed of HIAA members was also created … and that these committees participated in the management of the Ingenix Database."  (Plaintiffs Opp. at 36-37.)  They also allege that Aetna and UHG executives were members of the board of directors of the HIAA/AHIP for an unspecified period of time.  Plaintiffs' focus in this line of argument thus concerns only defendants' membership and participation in the HIAA/AHIP organization—but, as plaintiffs represented to the court in *WellPoint*, this is an organization in which "virtually every major health insurer in the United States" is a member.  *See WellPoint III,* at *21 ("[T]here is a difference between alleging that WellPoint is an HIAA member and that HIAA members were on the Advisory and Liaison Committees, and specifically alleging that WellPoint was on the Advisory and Liaison Committees.")  Accepting plaintiffs' allegations as true, they at best demonstrate that Aetna and UHG, among others, were members in some unidentified capacity of two committees that played some unidentified role in the Ingenix database's maintenance and operation.  After nearly eight years of discovery, the pleadings

critically lack non-conclusory indications that either insurer participated (in any capacity) in the decision-making or direction of a RICO enterprise

To show that Ingenix directed the operations of this enterprise, plaintiffs allege as follows: "[t]he scheme involved Ingenix's obtaining of scrubbed data from Defendants and Co-Conspirators; in return for this submission of the data, Ingenix, after scrubbing the data, disseminated to Defendants and conspirators the false uniform pricing schedules, and gave higher discounted pricing (or subscription) rates to those who supplied Ingenix with greater amounts of data." (TAC ¶ 384.)  But plaintiffs' allegation that Ingenix "played an active and crucial role in directing the submission of the data from Aetna, UHG and the Insurer Conspirators," only describes how Ingenix conducted its otherwise legitimate business operations.[13]  *See United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013) (plaintiffs must allege that the defendants engaged in a degree of cooperation "that fell outside the bounds of the parties' normal commercial relationships.")  As Ingenix argues, "[its] development and licensing of database products reflects only Ingenix's conduct of its *own* business affairs, not the operation of some hypothetical RICO enterprise." (UHG Br. at 30) (emphasis in original.)  What is missing is some—any—indication that Ingenix guided the alleged scheme *to defraud insureds*.  Plaintiffs fail to allege, for example, that Ingenix

---

[13]       For this reason, plaintiffs' lower/upper rung theory of control also fails.  Plaintiffs allege in the alternative that Aetna participated in the conduct of the RICO enterprise as a lower-rung participant under the direction of Ingenix.  Specifically, plaintiffs maintain that Aetna acted under Ingenix's direction "because Ingenix (1) knew the data submitted by Aetna was flawed and that the pricing schedules disseminated by Ingenix were used by Defendants and Insurer Conspirators to reimburse subscribers for ONET benefits, but (2) nonetheless tacitly approved the submission of such data to it … and sought the Defendants' reliance upon its pricing schedules to under-reimburse subscribers." (TAC ¶ 386.)  Knowledge and "tacit approval" of another's conduct does not amount to direction by "upper management," and, with no other factual allegations in support, the Court rejects plaintiffs alternate theory of liability.

instructed the insurers as to the manner in which they should submit *flawed* data, that insurers were provided greater or different incentives to submit *flawed* data, or that the insurers were disciplined for utilizing other methodologies in determining ONET reimbursement.

The Seventh Circuit's decision in *United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.* is instructive in evaluating the alleged conduct of all entities here.  There the plaintiff, an employee benefit plan, sued on behalf of a similarly situated class in a RICO action in which it alleged that Walgreen Company ("Walgreens") and Par Pharmaceutical Companies, a drug manufacturer, engaged in a scheme to defraud insurers by "filling prescriptions for several generic drugs with a dosage form that differed from, and was more expensive than, the dosage form prescribed to the customer." *Id.* at 850.  Par produced two different generic prescription drugs that, because of their high price and consequent unpopularity in the market, received a higher rate of reimbursement from insurers and other third-party payors.  Realizing that pharmacies stood to profit from this payment structure, Par tried to convince Walgreens to use its products even though they were more expensive.  Par's "presentations [to the pharmacies] implied (at the least) that the pharmacies could legally fill prescriptions written for one dosage form with an alternative dosage form without seeking approval from the prescribing physician, a suggestion that directly contravened the FDA's position that the tablets and capsules are not bioequivalent." *Id.* at 852.  Walgreens eventually "reconfigured its internal computer systems so that all prescriptions" were automatically filled with Par's drugs "regardless of the dosage form actually prescribed." *Id.*  This practice continued

for some time and, attracting scrutiny from a number of states' attorneys general and the Justice Department, was later described as "false and deceptive" by the Illinois Department of Health.[14]

In its RICO claims plaintiff alleged that Walgreens and Par "conducted an association-in-fact RICO enterprise for the purpose of overcharging insurers by switching dosage forms of [Par's drugs]." *Id.* at 853. The district court granted defendants' motion to dismiss after concluding that plaintiff failed to allege sufficiently that Walgreens and Par conducted the affairs of the alleged enterprise and the Seventh Circuit affirmed. Despite noting that the plaintiff alleged detailed communications between the entities regarding Par's proposal, that both entities engaged in conduct which seemingly benefited the alleged enterprise—namely, "that Par manufactured the expensive dosage forms and that Walgreens rigged its internal computer systems automatically to switch" prescriptions to Par's product—the court nonetheless found that "nothing in the complaint reveals how one might infer that these communications or actions were undertaken on behalf of the *enterprise* as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests." *Id.* at 854-55. This type of interaction "show[ed] only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes of improperly filling [Par's prescriptions]." *Id.* at 855-56. The court thus concluded that, without some indication that the "cooperation" alleged "exceeded that inherent in every commercial transaction between a drug manufacturer and pharmacy," it could not plausibly infer that "Walgreens and Par were conducting the enterprise's affairs."

This case likewise has a history of investigation, findings, and action by state regulatory authorities—here the New York Attorney General. But as the Seventh Circuit held, "RICO does

---

[14]     As here, Walgreens' conduct resulted in substantial penalty. In 2008, Walgreens paid $35 million to the federal government, 46 states, and Puerto Rico to settle claims under the False Claims Act and related state laws.

not penalize parallel, uncoordinated fraud," even where the complaint "describe[d] conduct that might plausibly state a claim for fraud (among other things) against either defendant." *Id.* at 855. These plaintiffs have not made factual allegations demonstrating that any defendant knowingly "conducted or participated in the conduct of the '*enterprise's* affairs,' [as opposed to its] *own* affairs," and that it "did so through a pattern of racketeering activity." *In re Ins. Brokerage*, 618 F.3d at 371-72 (quoting *Reves*, 507 U.S. at 185) (emphasis in original). This deficiency is fatal to plaintiffs' RICO claims, particularly where, even in the absence of coordination, each defendant maintained an independent incentive to engage in the conduct alleged. *See* Section VIII(1), *supra.*

### 3. Were Plaintiffs' Injuries Caused by the Alleged Predicate Acts?

Even assuming that defendants were conducting the affairs of the alleged enterprise, plaintiffs fail to show that the scheme proximately caused their alleged harm. A cause of action for RICO violation may be stated only by a person "injured in his business or property by reason of a" RICO predicate act. This phrase—"by reason of"—has been held to require proof that "a RICO predicate offense 'not only was a 'but for' cause of [their] injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).

Plaintiffs allege that their RICO injury was overpaying for health insurance due to false reimbursement rates for ONET services:

> Subscriber Plaintiffs were underpaid or under-reimbursed for ONET benefits paid to them as a direct result of the Defendants' pattern of racketeering activity, and thereby suffered direct consequential and concrete financial loss flowing from the injury to their business or property (their health insurance plans) by having overpaid for their health insurance plans (the ONET component of which became compromised and diminished in value as a direct result of Defendants' systematic underpayment scheme) and received policies that were worth less than what they paid.

(TAC ¶ 414.)  They argue that the predicate acts of mail and wire fraud causing this harm consisted of "the transmission of data for use in the Ingenix Database … and related communications including between Aetna's offices in Minnesota or Wisconsin and Ingenix's offices in Utah." (TAC ¶ 405.)[15]

In connection with the causation requirement, the parties first dispute the extent to which plaintiffs must demonstrate reliance, an issue addressed by the Supreme Court in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), which dealt with a bid-rigging scheme to obtain tax liens.  The taxing authority in *Bridge* periodically held auctions for liens on unpaid taxes, and interested purchasers would bid an amount that they were willing to accept from the delinquent taxpayer to clear the lien.  Because there frequently were ties for the winning bid—multiple parties willing to accept nothing from the taxpayer to clear the lien—a rotating system was created, in connection with which bidders were required to affirm that the bids were submitted in their own name and that no agent or related entity had submitted a competing bid on their behalf.  Losing bidders filed a RICO action when it became apparent that the defendants were filing fraudulent affidavits.

At issue was whether the losing bidders themselves were required to demonstrate that they relied on the affidavits in dispute.  The Court answered this question in the negative.  Rejecting defendants' position that first-party reliance was an express element of a RICO claim, the Court found that "a person [could] be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations."  *Bridge*, 553 U.S. at 649.  Notwithstanding, "none of this is to

---

[15]     As defendants point out, this "theory of predicate acts is different from Plaintiffs' theory in their Second Amended Complaint, in which Plaintiffs alleged that various communications to plan members—such as UCR determinations and explanations of benefits (EOBs)—formed the predicate acts giving rise to RICO liability."  (Aetna Br. at 19.)

say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentation." *Id.* at 658 (emphasis in original). Significantly, the Court found that "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Id.* at 658-59 ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation.").

Interpreting *Bridge*, the *WellPoint* court found that it was dealing with "a case where proof of reliance, and likely first-party reliance, is a 'mile post on the road to causation.'" *WellPoint II,* at 903 F. Supp. 2d at 915; *see also WellPoint III,* at \*25 ("[B]ecause Plaintiffs still allege the RICO injury that the Subscriber Plaintiffs overpaid for health insurance coverage due to false reimbursement rates, this requires a showing that *someone* relied on misrepresentations about reimbursement rates.") (emphasis in original). *WellPoint II* and *III* held that plaintiffs failed to show reliance—either first- or third-party—and dismissed plaintiffs' RICO claims on that basis. *See WellPoint III,* at \*25 ("Plaintiffs have failed to plead that someone relied on Defendants' misrepresentations and therefore cannot sustain a cause of action as to mail fraud.").

Applying these holdings, defendants argue that because plaintiffs fail to allege reliance in any fashion, they cannot prove that their RICO injury was proximately caused by the alleged scheme to defraud. This argument goes too far. In *Wallace v. Midwest Fin. & Mortg. Servs.,* 714 F.3d 414, 419-22 (6th Cir. 2013), the court noted that, "[f]or RICO purposes, reliance and proximate cause remain distinct—if frequently overlapping—concepts." *Id.* at 420. And while reliance is "'often used to prove … the element of causation,' that does not mean it is the only way to do so, nor does that 'transform reliance itself into an element of the cause of action." *Id.* at 420

(quoting *Bridge*, 553 U.S. at 659); *see also Bridge,* 553 U.S. at 658-59 ("[T]he complete absence of reliance *may* prevent the plaintiff from establishing proximate cause.") (emphasis supplied).

In an industry where the end consumer generally has no choice but to enter, with little say in the selection process, it strikes the Court as overly harsh to conclude, as defendants insist, that first-party reliance should be incorporated as a necessary "mile post" in the Court's causation analysis. And, given the nature of the scheme at issue (if capable of proof), the same may be true with regard to defendants' argument that the absence of third-party reliance now defeats proximate cause. The Court need not decide, however, because the causal chain is too attenuated to support a finding of proximate causation, separate and apart from the issue of reliance.

As the Supreme Court explained in *Bridge*, proximate cause is a "flexible concept" that demands "some direct relation between the injury asserted and the injurious conduct alleged." *Bridge*, 553 U.S. at 654. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiffs' injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). "[A] link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi*, 559 U.S. at 9. The direct-relation requirement, the Court found, "avoids the difficulties associated with attempting to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors; prevents courts from having to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury …; and recognizes the fact that directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Bridge*, 553 U.S. at 654-55 (internal quotations and citations omitted).

Plaintiffs claim defendants' racketeering conduct injured them because they were under-reimbursed for ONET benefits and, consequently, received health insurance plans that were worth less than what they paid.  To show that such harm was proximately caused by defendants' racketeering conduct, plaintiffs must first establish several distinct steps.

First, they must demonstrate that the Ingenix database was the basis on which defendants' calculated the ONET reimbursement.  But while plaintiffs allege that this purported scheme involved "use of the Ingenix Database to provide false, artificially low reimbursement amounts for ONET," they make no showing that defendants exclusively relied on this methodology for reimbursement.[16]  What is more, plaintiffs allege that, in determining ONET amounts, the insurer defendants at times "reimbursed based on a percentage of the Medicare fee schedule" (TAC ¶ 172), or "some other faulty methodology" (TAC ¶ 307), or "other improper pricing methods." (TAC ¶ 484, 485).  And even where the database was used to determine ONET reimbursements, the insurers were free to make independent decisions about reimbursements.  The Ingenix database "reported not the amounts to be reimbursed, but a range of provider charge amounts expressed in terms of 'percentiles'" (Aetna Br. at 12), and plaintiffs make no allegation that the insurers relied on the same percentile in all cases.[17]  Plaintiffs must also demonstrate that the amount defendants

---

[16]     In granting plaintiffs' motion for leave to amend, the Court is limited to the third amended consolidated complaint for the purposes of this analysis, *see W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank,* 712 F.3d 165, 172 (3d Cir. 2013), which asserts that the Ingenix database was "automatically applied" to determine ONET reimbursement—a conclusory allegation that sidesteps what was laid out in the second amended consolidated complaint.  Plaintiffs previously alleged in great detail the extent to which defendants used other methodologies to determine ONET amounts, such as Medicare rates (SAC ¶¶ 33, 35, 60, 358, 402, 445), in-network fee schedules (SAC ¶¶ 33, 60), or unidentified means ("some other faulty methodology" SAC ¶432). On those facts, the Court would have no trouble in finding that the causal chain was broken.

[17]     Defendants also point out that, because of variations in reimbursement terms of certain Aetna health plans, Aetna necessarily "reimburses different amounts under different plan terms, separate and apart from variations in the UCR amount."  (Aetna Br. at 12 (citing TAC ¶¶ 204 (Cooper is responsible for 30% of the UCR amount as a coinsurance payment), 213-15 (Werner is

chose to reimburse was incorrect—and, as Aetna argues, that it was incorrect "in a way that made the payment lower than it should have been if Aetna had used some hypothetical 'True UCR' database." (Aetna Br. at 23.) Finally, plaintiffs must demonstrate that the subscribers were balance billed for any uncovered amounts. (TAC ¶ 568 ("Aetna's agreements … state that the Member is financially responsible for the difference between the allowed expenses and provider's billed charge for ONET.").) Plaintiffs argue that this step is irrelevant to the Court's consideration of proximate cause and claim that the argument "preposterously posits that RICO proximate cause depends not on a direct injury from predicate acts but on the actions of a third party." (Plaintiffs Opp. at 28.) But such third party conduct becomes relevant where it has the potential to disrupt the causal chain, and it stands to reason that if the subscribers here were not billed for the difference owed, they suffered no actionable harm.

Seen in its best light, plaintiffs' causal chain depends on layered contingencies, similar to *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), in which the City asserted RICO mail and wire fraud claims against Hemi Group, an online cigarette retailer. While not required to collect taxes on its sales, Hemi Group did have to submit customer information to the states into which its wares were shipped. The City claimed that Hemi failed to file those statements with the State of New York, and alleged that such failure caused the loss of tens of millions of dollars in unrecovered cigarette taxes. In considering whether the City's injury occurred "by reason of" the defendant's alleged racketeering activity, the Court characterized the causal chain as follows: "Without the reports from Hemi, the State could not pass on the information to the City, even if it

---

responsible for 40% of the UCR amount), 301 (Weintraub is responsible for 50% of the UCR amount)).) Such factual allegations highlight the difficulty in ascertaining the extent of harm suffered—a pertinent issue in the proximate cause analysis. *See Schrager*, 542 F. App'x at 104 (finding "the ease of apportioning damages among other plaintiffs affected by the alleged violation" a point of consideration in analyzing proximate cause.).

had been so inclined. Some of the customers legally obligated to pay the cigarette tax to the City failed to do so. Because the City did not receive the customer information, the City could not determine which customers had failed to pay the tax. The City thus could not pursue those customers for payment. The City thereby was injured in the amount of the portion of back taxes that were never collected." *Id.* at 2.  Finding such a theory "too indirect" and "anything but straightforward," the Court held that the City "ha[d] no RICO claim" on that basis.  In so holding, the Court was persuaded in part by the fact that "independent factors [] accounted for [the plaintiff's] injury"—specifically, that "[t]he City's theory of liability rest[ed] on the independent actions of third and even fourth parties." *Id.* at 3.

Such is the case here.  Plaintiffs' theory of causation rests on independent action in at least two critical links of the chain.  First, the insurers would each need to determine they would strictly use the Ingenix database in making their ONET reimbursements.  This is an assumption the Court may not freely make given the presence of contrary findings in the pleadings themselves.  And second, the out-of-network physicians would need to bill subscribers for the balance owed on their services in all cases—an expectation plaintiffs offer no meaningful allegations about.  As such, plaintiffs have not presented an adequate case for proximate cause and, based on all the foregoing, the RICO claims are dismissed.[18]

---

[18]     Aetna also claims that the "indirectness" of this causal chain supports a finding that the association plaintiffs lack standing under RICO, and that the provider plaintiffs lack standing under both RICO and Section 1 of the Sherman Act.  *See* Aetna Br. at 42 (arguing that the association plaintiffs' "daisy chain" of causation "comes nowhere close to establishing RICO standing); Aetna Br. at 38 ("Derivative claims based on injuries from economic ripples emanating from the challenged conduct are insufficient to confer antitrust or RICO standing.").  Because the Court has decided that the substantive counts fail on the merits—RICO, in part due to the remote chain of causation—it need not consider whether the directness or indirectness of the injury prevents standing here.

### 4.   *Alternative Predicate Acts: Embezzlement or Conversion, 18 U.S.C. § 664*

Plaintiffs argue that, in addition to the mail and wire fraud grounds, they state predicate acts of "embezzlement or conversion" under 18 U.S.C. § 664.  This section imposes civil RICO liability for "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts to his own use or to the use of another, any of the moneys … or other assets of any employee welfare benefit plan."  18 U.S.C. § 664.  This alternative theory of liability fails for the same reasons set forth by the district court decisions in *Franco*, *WellPoint II*, and *WellPoint III*.

Embezzlement involves the conversion or misappropriation of funds belonging to another, and its elements include:  (1) the unauthorized (2) taking or appropriation (3) of benefit plan funds (4) with specific criminal intent.  *See Mehling v. N.Y. Life Ins. Co.,* 163 F. Supp. 2d 502, 508 (E.D. Pa. 2001) (citing *United States v. Adreen*, 628 F.2d 1236, 1241 (9th Cir. 1980)).  Plaintiffs maintain that Aetna's conduct satisfies the required elements because its under-reimbursements wrongfully converted the assets of the ONET subscribers.  "The plan funds that Aetna and Ingenix unlawfully converted and diverted to their use or to the use of another were those plan funds specifically earmarked as guaranteed benefits for Aetna Members, for which Aetna and Ingenix, through the predicate acts, made or knowingly caused to be made a false payment on claims for reimbursement of out-of-network charges."  (TAC ¶ 522.)  Aetna and Ingenix "caused these funds to be withheld or diverted for their own financial gain or to the use of another, and Aetna benefitted from the revenues generated from its administration (either as plan administrator or claim administrator) of certain of Aetna's Healthcare plans."  (TAC ¶ 522.)  Plaintiffs also claim that, with regard to self-funded plans, Aetna was able to extract additional administrative fees and, through its use of the Ingenix database, "improperly cause self-funded plans to keep rather than pay what the policies required to be paid."  (TAC ¶ 523.)

Even drawing all inferences in plaintiffs' favor, however, these allegations state only that the insurer defendants denied them ONET payments to which they may have been entitled. The "common thread" uniting violations of § 664 is that "the defendant, at some stage of the game, has taken another person's property or caused it to be taken, knowing that the other person would not have wanted that to be done." *Andreen,* 628 F.2d at 1241 (quoting *United States v. Silverman*, 430 F.2d 106, 126-27 (2d Cir. 1970)). Under this standard, plaintiffs' allegations that the insurer defendants "decreased [their] own expenses, albeit improperly," *WellPoint II,* 903 F. Supp. 2d at 917, are insufficient. Plaintiffs have not, for example, alleged that the subscriber plaintiffs "paid their premiums into a trust with the understanding that the funds paid in were reserved for ONS reimbursements, or that [the insurer defendants'] decision to artificially reduce [their] ONS payments somehow resulted in the improper diversion of moneys from any such funds." *Id.* at 917.

And while plaintiffs allege funds were "earmarked" for ONET subscribers, the funds in dispute belong to the *defendants*, not the plaintiffs or some other person or entity. To succeed, the plaintiffs would be required to allege that the funds were "earmarked for an intended recipient" out of plan assets, not the insurer's assets, and then were directed for an alternate purpose. *WellPoint III*, *28-29 (citing *United States v. Whiting*, 471 F.3d 792, 800 (7th Cir. 2006) (holding that contributions withheld from employee paychecks and delivered to the employee's benefit plans were plan assets, not company assets, for purposes of § 664 embezzlement)). Because plaintiffs fail to allege that "the earmarked funds were … converted from the *beneficiaries'* assets"—as opposed to Aetna's own assets—the claim for embezzlement and conversion must be dismissed. *WellPoint III,* at 29. To permit a cause of action for embezzlement on these facts

would "open the door to an embezzlement claim every time a participant brought a run-of-the-mill action for nonpayment of benefits under ERISA." *WellPoint II*, 903 F. Supp. 2d at 917.

### 5.   *RICO Conspiracy, 18 U.S.C. § 1962(d)*

Finally, plaintiffs argue that the complaint plausibly suggests that the defendants knew about and agreed to the requisite scheme to defraud, thus giving rise to a RICO § 1962(d) conspiracy claim.  This requires plaintiffs to allege facts sufficient to support the inference that the UHG defendants agreed to facilitate a scheme that includes the operation or management of a RICO enterprise.

As the Third Circuit has made clear, however, a claim under § 1962(d) "must be dismissed if the complaint does not adequately allege an endeavor[,] which, if completed would satisfy all of the elements of a substantive [RICO] offense." *In re Ins. Brokerage,* 618 F.3d at 373 (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).  Having found that the complaint fails to state an underlying RICO violation, the Court dismisses plaintiffs' conspiracy claim under § 1962(d).

## IX.   STATE LAW CLAIMS

Along with the federal claims under RICO and the Sherman Act, plaintiff Weintraub also raises four claims against all defendants under New York state law:  (1) breach of contract; (2) violation of Gen. Bus. Law § 349; (3) breach of the implied covenant of good faith and fair dealing; and (4) unjust enrichment.  The UHG defendants move to dismiss, Aetna does not.

### 1.   *Breach of Contract as Against UHG Defendants (Count XIII)*

Weintraub participated in an individual and family health plan offered by New York University.  It was issued and administered by Aetna, but not subject to or governed by ERISA.  The plan differentiated between in-network and out-of-network services, promised to reimburse

65

50% of the "reasonable charge" for ONET services, and defined "reasonable charge" as the lower of "the provider's usual charge for furnishing it; and the charge Aetna determines to be appropriate; based on factors such as the cost of providing the same or similar service or supply and the manner in which charges for the service or supply are made; and the care Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished." (TAC ¶ 566.) After receiving treatment from an ONET provider in December 2007, Weintraub claims that "Aetna failed to comply with the terms of [its agreement] … by making reimbursement determinations for ONET that had the effect of covering less than the stated percentage of either the providers' actual charges or the UCR without valid data to support such determinations, rather relying on the flawed and artificially deflated data provided by Ingenix." (TAC ¶ 573.) To survive dismissal on this claim, the complaint must allege facts plausibly establishing (1) the existence of a contract between Weintraub and the defendants, (2) adequate performance of the contract, (3) breach of the contract by the defendants, and (4) damages resulting from that breach. *See Brooklyn 13th St. Holding Corp. v. Nextel of New York, Inc.*, 495 F. App'x 112, 113 (2d Cir. 2012).

The Weintraub claim fails to plead any of the required elements as to Ingenix or UHG, but attempts to correct this deficiency by arguing that the UHG defendants may be held liable as *co-conspirators* for the alleged breach committed by Aetna. This would require proof of (1) a "corrupt agreement" between the parties; (2) an overt act; (3) "intentional participation in furtherance of a plan or purpose"; and (4) the resulting damage. *See Kashi v. Gratsos*, 790 F.2d 1050, 1054-55 (2d Cir. 1986). Apart from referring to a collection of paragraphs in the third amended complaint, Weintraub makes no effort to explain this theory of conspiracy liability for breach of contract. The Court found the referenced allegations insufficient to state an agreement in restraint of trade, Section VII(1), *supra*, insufficient to state a RICO conspiracy, Section VIII(2), *supra*, and now

finds them insufficient to state an agreement in furtherance of a breach of contract.  Consequently, count XIII is dismissed as against UHG and Ingenix, but is preserved as against Aetna.

### 2. *Independent Injury Rule*

To plausibly state the remaining state law claims—violation of GBL § 349, breach of the implied covenant of good faith and fair dealing, and unjust enrichment—the complaint must allege an injury separate and apart from any damages flowing from the alleged breach.  *See, Spagnola v. Cubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) ("Although a monetary loss is a sufficient injury to satisfy the requirement under *§ 349*, that loss must be independent of the loss caused by the alleged breach of contract.") (emphasis supplied); *Harris v. Provident Life and Accident Insurance Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law … does not recognize a separate cause of action for *breach of the implied covenant of good faith and fair dealing* when a breach of contract claim, based upon the same facts, is also pled.") (emphasis supplied); *Law Debenture v. Maverick Tube Corp.*, 2008 WL 4615896, at *12-13 (S.D.N.Y. Oct. 15, 2008) (surveying cases and concluding that, under New York law, "a claim for *unjust enrichment*, even against a third party, cannot proceed when there is an express agreement between two parties governing the subject matter of the dispute") (emphasis supplied).

The Weintraub claim fails to differentiate, alleging that the breach occurred because "Aetna failed to comply with the terms of [its agreement] with Plaintiff Weintraub … by making reimbursement determinations for ONET that had the effect of covering less than the stated percentage of either the providers' actual charges or the UCR data without valid data to support such determinations, rather relying on the flawed and artificially deflated data provided by Ingenix." (TAC ¶ 573.)  The complaint thereafter does little more than restate these allegations in describing Weintraub's remaining state law claims.  In identifying the injury caused by the alleged

violation of GBL § 349, Weintraub merely states that he "suffered and continue[s] to suffer injury, including in particular, the overpayment of out-of-pocket expenses related to ONET."

The same applies to the implied covenant and unjust enrichment claims.  New York law is clear in that "[a] claim for breach of the covenant of good faith and fair dealing will be duplicative of a breach of contract claim where they are based on the same allegations or where the same conduct is the predicate for both claims."  *Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.*, 2012 WL 3679319, at *4 (E.D.N.Y. Aug. 22, 2012).   The implied covenant claim is supported only by Aetna's "fail[ure] to reimburse ONET based on actual UCRs" (TAC ¶ 580.) Similarly, a claim for unjust enrichment is "unavailable where … an express contract covers the subject matter."  *Karmilowicz v. Hartford Fin. Servs. Group*, 494 Fed. App'x 153, 157 (2d Cir. 2012).  Given the primary basis for his unjust enrichment claim—that defendants "benefited from their intentional under-reimbursement for ONET"—the Court finds that Weintraub's agreement with Aetna definitively "covers the subject matter here."  This finding compels dismissal as against both Aetna and non-party UHG defendants.  *See AQ Asset Mgt., LLC v. Levine*, 119 A.D.3d 457, 462 (1st Dep't 2014 (dismissing claims for unjust enrichment "because a valid contract (the SPA) covers the subject matter of the claims …. notwithstanding that ASA and Zimmerman were not parties to the SPA"); *see also Law Debenture*, 2008 WL 4615896, at *12-13 ("[A] claim for unjust enrichment, *even against a third party*, cannot proceed when there is an express agreement between two parties governing the subject matter of the dispute.") (emphasis added).

## X.    DISMISSAL WITH OR WITHOUT PREJUDICE

Having concluded that plaintiffs have failed to state a claim upon which relief could be granted with respect to some of the causes of action asserted, the Court must next determine

whether to dismiss those causes of action with or without prejudice.  To properly do so, a recap is in order.

Plaintiffs assert fifteen causes of action that essentially fall into one of four categories: ERISA claims, both for benefits and other violations, RICO claims, antitrust claims, and state law claims.  The claims for ERISA benefits, against Aetna alone, appear in counts I and II with the former asserted by insurance subscribers and the latter raised by provider and association plaintiffs. Aetna does not move to dismiss these claims, but because this Court finds that the providers currently named (and the association plaintiffs, by extension) do not have standing to assert ERISA claims count II is dismissed.  The remaining ERISA claims—for varied violations, procedural and otherwise—are asserted by all plaintiffs in counts III through VII and are dismissed on their merits. Counts VIII through X raise the RICO violations.  These claims are asserted by the subscribers, providers and associations (in their individual capacity), and also are dismissed on their merits. The antitrust claim, asserted by the subscriber plaintiffs only, is asserted in count XI and is dismissed on its merits.  Finally, counts XII through XV raise state law claims asserted by plaintiff Weintraub alone—violation of GBL § 349, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, respectively.  Weintraub's claim for breach of contract in count XIII is raised against all defendants.  Aetna does not move to dismiss that claim, and it is dismissed as against UHG and Ingenix only.  The remaining state law claims are dismissed on their merits as to all defendants.

A court may, in exercise of its discretion, dismiss claims with prejudice and thus refuse leave to amend if amendment would be futile.  *See Alston v. Parker,* 363 F.3d 229, 235 (3d Cir. 2004).  This is particularly true when a plaintiff has had multiple opportunities to improve the pleadings.  This action started nearly eight years ago and plaintiffs have amended their pleadings

six times since then.  According to plaintiffs, the complaint on which this Court now rules "is based upon facts learned in discovery and is intended to narrow and focus the claims set forth in the original complaint based upon the evidence adduced in discovery, and to adjust the allegations in the complaint to existing law."  Fact discovery closed nearly five years ago on July 19, 2010 and, on October 31, 2011, Judge Chesler ordered that "no further discovery may be conducted." Plaintiffs recognized this fact in representing to the Court that adoption of the third amended complaint would "not cause any significant change in the expenditure of resources for trial preparation because both parties will prepare for trial based upon existing discovery." (Plaintiffs Br. at 4.)

The Court now holds plaintiffs to that representation, and dismisses their claims with prejudice.  Limited exception, however, is made for certain claims asserted by provider plaintiffs. In a letter to the Court, dated November 10, 2014 [D.E. 1014], plaintiffs' counsel indicated their intent to reinstate the claims of certain provider plaintiffs dismissed earlier in this action due to an order issued by Judge Federico A. Moreno in the Southern District of Florida, which held that their participation in this suit violated an injunction arising from a 2003 settlement of another case.  To the extent these providers may be properly added to this action, plaintiffs may so move following entry of the order accompanying this opinion.  However, this leave to amend extends only to the claim now asserted in count II of the third amended consolidated complaint.   Provider plaintiffs' remaining claims under ERISA and RICO were dismissed on their merits and may not be restated going forward.  Furthermore, the association plaintiffs previously enjoined by Judge Moreno's order may not attempt to reinstate their claims here—they lack representative standing for the reasons expressed in this opinion, and the claims they assert in their individual capacities are dismissed on the merits.

## XI.    CONCLUSION

For the foregoing reasons, and having granted plaintiffs motion for leave to amend, the Court grants in part and denies in part the motions to dismiss filed by defendants Aetna, UHG and Ingenix.  The following claims remain viable:  (1) count I for unpaid ERISA benefits; (2) count XII for breach of contract, as against Aetna alone.

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

Date:  June 30, 2015