James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Robert J. Axelrod
AXELROD & DEAN LLP
830 Third Avenue, 5th floor
New York, NY 10022
(646) 448-5263

Andrew S. Friedman
BONNETT FAIRBOURN FRIEDMAN &
BALINT PC
2325 E. Camelback Rd., Ste. 300
Phoenix, Arizona 85016
(602) 274-1100

Barry M. Epstein
Barbara Gail Quackenbos
EPSTEIN & QUACKENBOS, P.C.
103 Eisenhower Parkway, Suite 102
Roseland, New Jersey 07068
(973) 228-4642

Christopher Burke
Joseph P. Guglielmo
Amanda Lawrence
SCOTT+SCOTT, LLP
The Chrysler Building
405 Lexington Ave., 40th Floor
New York, NY 10174
(212) 223-6444

Stephen A. Weiss
Diogenes P. Kekatos
James A. O'Brien III
SEEGER WEISS LLP
77 Water St., 26th Fl.
New York, NY 10005
(212) 584-0700

Joe R. Whatley, Jr.
Edith Kallas
WHATLEY KALLAS, LLP
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
(212) 447-7060

Lynne Kizis
Kevin P. Roddy
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
(732) 636-8000

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AETNA UCR LITIGATION,<br><br>This Document Relates To: ALL CASES | Master File No. 07-3541 (KSH)(CLW)<br>MDL NO. 2020<br><br>**FOURTH JOINT CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR <u>JURY TRIAL</u>** |

## TABLE OF CONTENTS

I.     SUMMARY OF PLAINTIFFS' ALLEGATIONS ...................................................1

     A.     Overview of Relevant Facts Concerning Defendant Aetna's Wrongdoing.............1

     B.     Subscriber Plaintiffs' Summary of Allegations .........................................................5

     C.     Provider Plaintiffs' Summary of Allegations .........................................................13

II.     PARTIES ...........................................................................................................................16

     A.     Subscriber Plaintiffs.............................................................................................16

     B.     Provider Plaintiffs ...............................................................................................16

     C.     Aetna Defendants .................................................................................................17

III.     JURISDICTION AND VENUE .......................................................................................18

IV.     AETNA PLANS PROVIDE COVERAGE FOR OUT-OF-NETWORK SERVICES .....18

V.     THE INGENIX DATABASE AND AETNA'S DETERMINATION OF UCR...............19

     A.     The Development of the Ingenix Database............................................................19

     B.     Aetna Used the Ingenix Data Despite the Disclaimer ...........................................23

     C.     Ingenix Contributors, including Aetna, Manipulate Data Before They Provide It to Ingenix ...............................................................................................................24

     D.     Ingenix Used Inadequate Data Points ...................................................................25

     E.     Ingenix Manipulated Modifiers ..........................................................................27

     F.     Ingenix's Flawed Use of Geozips ........................................................................27

     G.     Ingenix Further "Scrubbed" Data Contributed by Data Contributions Like Aetna28

     H.     The Derived Data Was Flawed ............................................................................29

     I.     There Was No Control or Review of Data............................................................30

VI.     INVESTIGATIONS OF INGENIX..................................................................................33

     A.     The New York Attorney General's Investigation and Action ...............................33

     B.     Congress' Investigation and Report......................................................................36

VII.     AETNA UNDERPAID PLAINTIFFS..............................................................................39

     **A.**     Subscriber Plaintiffs Were Underpaid By Aetna ...................................................39

     **B.**     The Provider Plaintiffs Were Underpaid By Aetna ...............................................60

**VIII.**    DEFENDANTS' MISREPRESENTATIONS AND FRAUDULENT CONCEALMENT OF THE TRUTH .......................................................................................................68

**IX.**     CLASS ACTION ALLEGATIONS ........................................................................72

     **A.**     Subscriber Plaintiff Class Actions ......................................................................72

     **B.**     Provider Plaintiffs' Class Allegations .................................................................76

RULE 23(a).....................................................................................................................77

NUMEROSITY ..............................................................................................................77

COMMONALITY ...........................................................................................................77

TYPICALITY ..................................................................................................................78

ADEQUACY ...................................................................................................................78

RULE 23(b)(1)(A) AND (B) ...........................................................................................78

RULE 23(b)(2).................................................................................................................79

RULE 23(b)(3).................................................................................................................79

RULE 23(c)(4).................................................................................................................79

COUNT I .........................................................................................................................80

CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS GOVERNED BY ERISA AND REQUEST FOR DECLARATORY RELIEF (on Behalf of the Subscriber ERISA and New Jersey SEHP Classes)...............................................................80

COUNT II ........................................................................................................................81

BREACH OF PLAN PROVISIONS FOR BENEFITS IN VIOLATION OF ERISA § 502(A)(1)(B) (on Behalf of the Provider Plaintiffs) ...........................................81

COUNT III.......................................................................................................................82

BREACH OF CONTRACT (By Plaintiff Weintraub on Behalf of a Non-ERISA Class Against Aetna ) .......................................................................................................82

JURY TRIAL DEMAND ................................................................................................89

By way of this Fourth Amended Class Action Complaint (the "Amended Complaint"),
and to the best of their knowledge, information and belief, formed upon a reasonable inquiry
under the circumstances, (a) Subscriber Plaintiffs Michele Cooper, Michele Werner, Paul and
Sharon Smith, Carolyn Samit, John Seney, Alan John Silver and Mary Ellen Silver, and Jeffrey
M. Weintraub (together, the "Subscriber Plaintiffs") bring this action on behalf of themselves
and all others similarly situated; (b) Plaintiffs Frank G. Tonrey, M.D., and Carmen M. Kavali,
M.D. (together, the "Provider Plaintiffs") bring this action on behalf of themselves and all others
similarly situated bring this action against Defendants, Aetna Health Inc. PA, Corp., Aetna
Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance
Company, Aetna Health, Inc. and Aetna Insurance Company of Connecticut (collectively
"Aetna").

## I.       SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A.       Overview of Relevant Facts Concerning Defendant Aetna's Wrongdoing

1.       This Amended Complaint combines and reasserts, with certain amendments, all
claims previously asserted by the Plaintiffs in their pending actions related to Aetna's payments
for "out-of-network" ("ONET") healthcare services rendered by non-participating ("nonpar")
providers who do not accept discounted rates and are not included in Aetna's network.[1]
Plaintiffs include the Subscribers who purchased the healthcare services and the Providers
(physicians and non-physician providers) of the healthcare services.  Through the wrongful and

---

[1]       By this Court's Case Management Order No. 1, entered on June 15, 2009, the following
actions, which were originally filed in this District, were consolidated:  *Cooper v. Aetna Health
Inc. PA,* Civil Action No. 07-3541; *Seney v. Aetna Health Inc. PA,* Civil Action No. 09-468; *Am.
Med. Ass'n v. Aetna Health Inc. PA,* Civil Action No. 09-579; *Tisko v. Aetna Health Inc. PA,*
Civil Action No. 09-1577; and *Abraham I. Kozma, P.A. v. Aetna Health Inc. PA,* Civil Action
No. 09-1972.  The above-referenced actions were consolidated by this Court with *Weintraub v.
Ingenix, Inc.,* Civil Action 09-2027, which was transferred to this District by the Judicial Panel
on Multidistrict Litigation pursuant to its Transfer Order dated April 8, 2009, *In re Aetna UCR
Litigation,* MDL No. 2020.

unlawful actions alleged herein, Aetna paid less than it was contractually obligated to pay for the ONET services, injuring both Subscribers and Providers.  In this Amended Complaint, Plaintiffs indicate where claims are made only by certain Plaintiffs.  The filing of this Amended Complaint is not intended to constitute a waiver of any party's rights under *Lexecon v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

2.     The selection and purchase of health insurance is of vital importance to consumers.  According to a survey conducted by the Office of New York's Attorney General, obtaining affordable healthcare is the number one concern of consumers.  *Health Care Report: The Consumer Reimbursement System is Code Blue*, State of New York, Office of the Attorney General, January 13, 2009.  This class action is about a secret and intentionally concealed agreement among health insurers, including Aetna, to depress reimbursements for ONET, thereby raising the cost of healthcare services for consumers and lowering the reimbursement amounts paid to providers.

3.     Many health insurers, including Aetna, offer health insurance plans that differentiate between coverage for medical treatment from (a) in-network providers who have negotiated discounted rates with the insurer, and (b) nonpar providers who charge subscribers their usual, non-discounted rates.  Health insurance plans that permit their subscribers ("Members") to seek medical care from nonpar healthcare providers[2] are more expensive than plans that limit Members to using in-network providers – *i.e.*, they require higher premium payments.

---

[2]     As used herein, the term "healthcare provider" refers to physicians, physician groups, other healthcare provider and healthcare provider groups, hospitals, clinics, and ambulatory and surgical centers.

4.      Members, such as the Subscriber Plaintiffs, pay higher premiums in exchange for the flexibility and right to obtain ONET services.  Healthcare providers who are not in-network, such as the Provider Plaintiffs, agree to treat patients based in part on patients' assignments of their healthcare benefits to the provider.

5.      Health insurers, including Aetna, promise to reimburse Members for ONET at a percentage of the lesser of either (a) the billed amount of their providers, or (b) the usual, customary and reasonable amount ("UCR") charged by providers providing such services in the same or similar geographic area for substantially the same service.

6.      As set forth herein, however, Aetna actually reimbursed its members and nonpar providers who provided services to such members at a *lower* rate.  Aetna did not pay its members' benefit amounts for ONET services according to the terms of the plan documents, which required it to determine first whether the providers' billed amounts were usual, customary and reasonable using a source which reflected accurate UCR amounts.  Rather, Aetna utilized the Ingenix Database to calculate UCR.  As set forth below, the Ingenix Database did not reflect or report accurate UCR amounts, and resulted in underpaid benefits to Aetna's subscribers ("UCR Benefit Reductions").

7.      Aetna's wrongful conduct affected hundreds of thousands of consumers nationwide who had to pay more for ONET services as a result of Aetna's use of the Ingenix Database, and it affected hundreds of thousands of Providers who were reimbursed less for their services.  The primary instrument used to accomplish these underpayments was a database known as the Ingenix Database, maintained by Ingenix, which was wholly owned and operated by UHG, the second largest insurer in the country.  Aetna contracted with Ingenix to contribute claims data to Ingenix and receive from Ingenix uniform pricing schedules which Aetna and

other insurers used to calculate UCR at amounts that were falsely represented as accurate but which were, in fact, substantially below accurate UCR ("UCR Benefit Reductions").

8.  Aetna and other health insurers contracted with Ingenix to (i) contribute their own claims data to Ingenix and/or (ii) receive uniform pricing UCR schedules from Ingenix based on this contributed data.  The uniform pricing schedules generated by Ingenix purportedly reflected the UCR for the services rendered in the patients' geographic area but which were well below accurate and unbiased UCR amounts.  Aetna made UCR Benefit Reductions based on inaccurate and flawed Ingenix data.

9.  The claims data contributed to Ingenix by Aetna and the other insurers was incomplete and inaccurate, and was rigged to artificially deflate average out-of-network charges. Ingenix then further manipulated the data to additionally depress the average out-of-network charges to create the purported UCR data set forth on the schedules generated by Ingenix.  When Aetna utilized Ingenix data, its resulting payments to subscribers and providers were artificially low and substantially below the actual, accurate UCR for similar services, in contravention of Aetna's contractual obligations in health insurance plans for ONET claims.

10.  Aetna hid this scheme or artifice to defraud, including the existence and purpose of the Ingenix Database, through a series of material omissions and misrepresentations.  There is an inherent and irreconcilable conflict of interest in its use of the Ingenix Database, which was operated by United HealthGroup in conjunction with Aetna and other health insurers, to create uniform underpayment of ONET services by all of the major insurance companies in the nation. Because these health insurers had an incentive to reduce the benefits paid to Subscribers and Providers for ONET services, they used the Ingenix Database to  underpay Subscribers and Providers for ONET services.

4

11.     Until news reports detailed the New York Attorney General's investigation, and the accompanying class settlement of the UCR action involving UHC in the Southern District of New York, the process of setting UCRs used to determine reimbursement for ONET services was effectively hidden from consumers who purchased and/or participated in health insurance programs, including providers.   This lack of transparency was facilitated by the following practices:

- In their healthcare plans that cover ONET services, Aetna and other insurers affirmatively represented that they reimbursed according to the UCR rate, which the reasonable consumer understood to literally mean the "usual and customary rate" charged for such services;

- Aetna did not disclose a conflict of interest, *i.e.*, that the Ingenix Database, which was owned by United HealthGroup and operated in cooperation with other health insurers, including Aetna, was used by Aetna to make UCR Benefit Reductions;

- Aetna concealed the fact that the health insurers regularly and intentionally excluded important data points to depress UCRs and under-reimburse for ONET services; and

- Aetna concealed that Ingenix "scrubbed" the data it received from Aetna and other insurers to remove information that would result in higher reimbursement rates.

**B.     Subscriber Plaintiffs' Summary of Allegations**

12.     Throughout the Subscriber Class Periods, the Subscriber Plaintiffs were insured by Aetna and sought benefits for treatments for a variety of medical conditions.  Aetna engaged in an adversarial battle with the Subscriber Plaintiffs, denying coverage for substantial portions of the bills they received from ONET healthcare providers, thereby transferring medical costs to Subscriber Plaintiffs that should have been covered by Aetna's healthcare insurance policies.

13.     Each of the named Subscriber Plaintiffs was a Member of a healthcare insurance plan during the Subscriber Class Periods.  Aetna exercised all discretionary authority and control over the administration of the healthcare insurance plan of each Subscriber Plaintiff, including

the management and disposition of benefits under the terms of the plan. Subscriber Plaintiffs Cooper, Werner, and Weintraub are not currently insured by Aetna, although they were subscribers at the time Aetna underpaid their benefits, as further described herein. Subscriber Plaintiffs Smith, Samit, and Silver continue to be insured by Aetna.

14. As the company that issues, insures and administers these employee benefit plans through which Subscriber Plaintiffs received their healthcare insurance, Aetna was and is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and its governing regulations. Further, due to the role Aetna played in administering the plans of each of the Subscriber Plaintiffs,[3] including by making coverage and benefit decisions and deciding appeals, Aetna assumed the role of a "fiduciary" under ERISA toward each of the Subscriber Plaintiffs.

15. ERISA uses the term "participant" to refer to a subscriber in an employee benefit health plan, while the term "beneficiary" refers to a subscriber's dependents who also are entitled to receive benefits under the plan.

16. Aetna issued an Evidence of Coverage ("EOC" or the "Certificate") to its participants and beneficiaries that set forth the benefits that Aetna promised to provide. According to Aetna's publicly available Internet website designed for use by Aetna Members, Aetna defined a Member as "a subscriber or dependent who is enrolled in and covered by a healthcare plan." *See* www.aetnanavigator.com (Glossary).

17. According to its website, Aetna's Certificate represented a "legal agreement between an individual subscriber or an employer group ('Contract holder') and a health plan that describes the benefits and limitations of the coverage." *Id.*

---

[3]   As described further below, Plaintiff Weintraub's plan with Aetna is not subject to or governed by ERISA.

6

18.     Aetna's website further defines "Health Benefit Plan" as "[t]he health insurance or HMO product offered by a licensed health benefits company that is defined by the benefit contract and represents a set of covered services or expenses accessible through a provider network, if applicable, or direct access to licensed providers and facilities." *Id.*

19.     Under their Aetna healthcare plans, Subscriber Plaintiffs had an express right to receive services from providers who had not entered into contracts with Aetna to accept reduced fees in exchange for greater access to Aetna's Members   For other plans, including certain Health Maintenance Organization ("HMO") plans, Aetna Members may use ONET providers in emergencies, when they are out of their home area, or when no participating provider is qualified or available to perform the medically necessary service. When Aetna Members received ONET, Aetna's payment was based on the lesser of the billed charge or UCR amount for that service in the geographic area in which it was performed.   Aetna used the terms "UCR," "customary and reasonable," and "reasonable charge" interchangeably.   Aetna's website represented that Aetna determines reimbursement for ONET as follows by calculating UCR:

> Out-of-Network.  The use of health care providers who have not contracted with the health plan to provide services.  Members enrolled in preferred provider organizations (PPO) and point-of-service (POS) coverages can go out-of-network for covered services, but will pay additional costs in the form of deductibles and coinsurance and will be subject to benefit and lifetime maximums.  Because reduced fees are not negotiated with out-of-network providers, Aetna will calculate reimbursement based on the usual, customary and reasonable ["UCR"] charge (see definition).  Members are responsible for all charges above UCR in addition to any deductible and coinsurance provisions.

20.     Aetna calculated benefits for ONET based on its determination of the UCR for the services at issue.  Aetna's website defined the "Customary and Reasonable" charge as follows:

> The amount customarily charged for the service by other providers in the same Geographic area (often defined as a specific percentile of all charges in the Community), and the reasonable cost of services for a given patient.  Also called "Usual, Customary, and Reasonable" (UCR).

21.     Aetna also included on its website its standard definition for "Reasonable Charge," as follows:

> The charge for a covered benefit, which is determined by Aetna to be the prevailing charge level, for the service or supply in the geographic area where it is furnished.  Aetna may take into account factors such as the complexity, degree of skill needed, type or specialty of the Provider, range of services provided by a facility, and the prevailing charge in other areas in determining the Reasonable Charge for a service or supply that is unusual or is not often provided in the area or is provided by only a small number of providers in the area.

22.     Aetna treated all of its definitions of UCR in its plans as having identical meanings and applied uniform policies for calculating UCR.

23.     Aetna often referred to UCR as the "amount allowed." Aetna made clear in its EOCs and EOBs that the Member was financially responsible for the difference between UCR (amount allowed) and the provider's billed charge for ONET services.  For example, Aetna's website states:   "Members are responsible for all charges above UCR in addition to any deductible and coinsurance provisions." *Id.*  The difference between UCR and the billed charge was often referred to in Aetna's EOBs sent to its Members as "excluded expenses." Excluded expenses were not credited toward its Members' annual deductible for ONET services, nor the annual out-of-pocket maximum.

24.     Aetna was obligated to pay accurate UCR to its Members for ONET services consistent with the UCR definition in its health plans.

25.     Aetna failed to comply with its own UCR definition by failing to determine benefits using accurate UCR amounts and thus underpaying its Members for ONET services.

26.     To determine UCR, Aetna primarily relied on the Ingenix Database.  The Ingenix Database was comprised of the Prevailing Healthcare Charges System ("PHCS") and Medical Data Research ("MDR") databases.

27.     In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City, Utah-based provider of healthcare products, including MDR.  In October 1998, Ingenix purchased the PHCS database from the Health Insurance Association of America ("HIAA"), a trade group for the insurance industry.

28.     Aetna was a major contributor of provider charge data to the Ingenix Database. Prior to contributing its data to Ingenix, Aetna deleted valid high charges.  Following receipt of the data from Aetna and other insurers, Ingenix then removed additional valid high charges from all contributors' data.  Ingenix then published the corrupted database and made it available for uploading on its website through licensing agreements entered into with health insurers.  Simply stated, Defendants "cooked the books," and the corruption of the data invalidated its use by Aetna as the basis for determining UCR for ONET.  These actions (in addition to others referenced herein) violated ERISA, a federal law designed to protect group plan participants and beneficiaries.

29.     Aetna's UCR Benefit Reductions leave Aetna Members financially responsible for unpaid amounts that Aetna was obligated to pay under the terms of its healthcare plans. Because the UCR Benefit Reductions were "exclusions" of coverage under the ERISA plans, Aetna had the burden to demonstrate that its exclusions complied with its plan(s) and its legal obligations.  Subscriber Plaintiffs allege that Aetna cannot sustain its burden regarding its UCR Benefit Reductions, and seek unpaid benefits and other relief for themselves and on behalf of ERISA Subscriber Class members.

30.     Aetna made numerous UCR Benefit Reductions for Subscriber Plaintiffs based on practices challenged herein as violations of federal and New Jersey law, including UCR based on manipulated and invalid data from Ingenix.

31.     Aetna was legally obligated to adhere to the specific provisions of its Members' group health plans.  Aetna could not make UCR Benefit Reductions if they were not authorized or accurately disclosed in Aetna Members' Certificates of Coverage and Summary Plan Descriptions ("SPDs")—a document that is designed to describe in layperson's language the material terms, conditions and limitations of the healthcare plan and the terms of which apply to the extent they do not conflict with the health plan or contain terms authorized by, or reflected in, the governing plan documents.  During the Subscriber Class Period, Aetna breached the express terms and conditions of Members' Certificates and SPDs when it made UCR Benefit Reductions.

32.     Subscriber Plaintiffs and Subscriber Class Members challenge Aetna's systemic application of rules and policies in making UCR Benefit Reductions that were not authorized by Aetna Members' Certificates of Coverage and SPDs; its routine violation of its fiduciary duties; and its failure to comply with ERISA, federal claims procedure regulations, federal common law and other applicable law.

33.     Aetna's EOBs reflecting UCR Benefit Reductions did not comply with legal requirements, including federal claims procedure regulations.  The EOBs failed to advise Aetna Members of the specific reasons for the denial(s), the specific plan provisions, and their appeal rights.  Aetna's EOBs reflecting UCR determinations failed to advise the Subscriber Plaintiffs of the method it used to determine UCR.

34.     Various procedural rules that covered Subscriber Plaintiffs' appeals were also violated.   Aetna's substantive and procedural violations prevent Aetna from relying on affirmative defenses to Subscriber Plaintiffs' claims, such as exhaustion or statutes of limitations.

35.     Aetna discouraged appeals by vouching for the accuracy of its UCR Benefit Reductions.  Aetna's conduct toward Subscriber Plaintiffs and Subscriber Class Members clearly

demonstrates that appeals of Aetna's UCR Benefit Reductions were futile.  As shown below, when a provider appealed, Aetna did not provide necessary and critical information and it did not provide the Member with a copy of the appeals decision.

36.     Aetna's failure to reveal critical information during the appeals process made a "full and fair review" unavailable to Aetna Members.  In certain cases, Aetna circumvented the appeals process by handling complaints outside of the formal appeals process and not issuing written decisions.  It also failed to comply with federal claim procedure regulations, including by not providing the "relevant information" subscribers are entitled to receive.  These violations of the ERISA claim procedure regulations affect the standard of review, and should diminish any deference otherwise accorded Aetna as the claims fiduciary.

37.     Subscriber Plaintiffs, on behalf of themselves and all similarly situated Aetna Members, allege that Aetna's UCR Benefit Reductions violated ERISA and breached their contracts with subscribers as described herein.

38.     In addition, Subscriber Plaintiffs Cooper and Samit were Members of health plans subject to particular New Jersey regulations governing small employer and individual health plan ("SEHP") Members ("New Jersey Regulations").  Aetna's UCR Benefit Reductions violated the requirements of New Jersey Regulations, and also violated ERISA.

39.     The protections imposed by the New Jersey Regulations require health insurance companies, including Aetna, to reimburse ONET hospital services provided to SEHP and individual plan Members based on the hospital's billed charge.  New Jersey Regulations prohibit Aetna and other insurers from using fee schedules or other databases to reduce payment to their SEHP and individual plan Members who receive hospital services.  Instead, Aetna was obligated

by law to pay the ONET hospital's billed charge less any applicable coinsurance.  Aetna failed to comply with New Jersey Regulations for SEHP and individual plan Members.

40.     New Jersey Regulations also require that Aetna reimburse ONET medical (non-hospital) services provided to SEHP and individual plan Members at the 80th percentile of the most updated Ingenix fee schedule.  Such payment must be made without other reductions, such as for multiple or bilateral procedures.

41.     Aetna failed to comply with New Jersey Regulations applicable to ONET hospital and medical services to the detriment of Subscriber Plaintiff Cooper and other SEHP Members, and to Subscriber Plaintiff Samit and other individual plan Members.

42.     Although the New Jersey Regulations required insurers to pay UCR based on the updated PHCS database, Aetna misrepresented in its EOB that the database "is the amount which is most often charged for a given service by a Provider within the same geographic area."  For the reasons detailed herein, this statement was false and misleading and Aetna could not comply with this provision of the New Jersey Regulations by using the Ingenix Database.

43.     As described herein, Aetna and other contributors to the Ingenix Database manipulated and submitted charge data used by the Ingenix Database to understate certain percentile amounts.  As a result of their joint and intentional manipulation of the Ingenix Database, Aetna also violated the New Jersey Regulations and their stated purpose – to protect New Jersey consumers of ONET services – was thereby thwarted.  Aetna and Ingenix concealed the manipulation from the New Jersey regulators who enforce the New Jersey Regulations, and from employers and its Members.  In fact, Aetna and Ingenix's manipulations ensured that the 80th percentile of the Ingenix Database was inaccurate and deflated, causing underpaid benefits

to all SEHP and Individual Plan Members as well as Members in its other plans nationwide were underpaid.

44.     Aetna's UCR Benefit Reductions, determined using the manipulated Ingenix Database, violated Aetna's legal obligations, and preclude it from relying on the New Jersey Regulations as a defense to its wrongful use of the invalid Ingenix Database to determine UCR benefits during the Subscriber Class Period.  Aetna should be compelled to pay billed charges to all SEHP and Individual Plan Members whose benefits Aetna determined in violation of the New Jersey Regulations and ERISA.

### C.     Provider Plaintiffs' Summary of Allegations

45.     The Provider Plaintiffs bring this case as a class action on behalf of themselves and all those similarly situated providers, provider groups and ancillary providers (the "Provider Class") who are, or have been ONET providers during the period from June 30, 2003 through the date when Aetna ceased using the Ingenix database (the "Provider Class Period"), alleging violations of ERISA As ONET providers, the Provider Plaintiffs and the Provider Class were harmed by underpayments made by Aetna for ONET that they provided to plan participants and beneficiaries.   These underpayments were pervasive and resulted from systematic operating procedures employed by Aetna, which affect thousands of ONET providers every year.

46.     As alleged herein, INET providers are providers who have signed a contract with a particular managed care entity and receive reimbursement of eligible charges directly from that entity.  INET providers agree to provide healthcare services to plan enrollees at reduced rates in exchange for access to the plan's patient base, among other things.  When visiting an INET provider, plan Members are only responsible for co-payments, co-insurance, and payment for non-covered items (if any) at the time of service.

47.     ONET providers, by contrast, do not have a signed contract with a particular managed care entity.  ONET providers are not required to accept reduced rates for procedures performed.  Rather than require plan Members to pay out of pocket and up front in full for medical services, ONET providers routinely accept an assignment of benefits, which occurs when a plan member authorizes her health benefits plan to remit payment directly to the provider for covered services.

48.     Healthcare insurers may refuse to recognize a patient's assignment and still remit payment to the patient.  Whether or not the healthcare insurer honors the assignment and pays the out-of-network benefit amount to the provider, ONET providers are entitled to bill the patient for the amount of the provider's charge which exceeds the amount the health plan covers.

49.     Thus, in order to determine whether an ONET provider's billed charge was less than the UCR rate, Aetna was obligated to determine whether, in the first instance, the billed rate was the UCR rate.  If it were, the billed charge would not be the lesser of the UCR amount (it would be equivalent to the UCR rate) and should have been paid pursuant to the terms of the plans.  If Aetna determined that the billed charge was higher than the UCR rate it could only do so by comparing the billed charge to a source that represented the accurate UCR amount.

50.     Aetna failed to adhere to the terms of the plans pertaining to the reimbursement of ONET providers based on UCR by refusing, as a matter of policy, to pay billed charges even where they were equivalent to UCR; and reimbursing based on data contained in the Ingenix Database, which did not represent a statistically valid source to calculate UCR reimbursements.

51.     Aetna knew during the Provider Class Periods that the Ingenix Database was not a valid source to pay UCR amounts, because Aetna contributed its own manipulated provider charge data to Ingenix to be included in the Ingenix Database. Aetna failed to disclose critical

14

and material facts about Ingenix data that Aetna used to make out-of-network reimbursement decisions.  Although Aetna was aware of serious, systemic flaws in the Ingenix Database, Aetna concealed these flaws in its communications to ONET providers.  The Ingenix Database, for example, averaged charges from all providers regardless of specialty or specific provider type.  It also failed to consider provider, patient, and procedure specific factors affecting charges.  Aetna deliberately used these known flaws, among others, to diminish reimbursement to ONET providers.  It concealed them in order to prevent ONET providers from effectively challenging or appealing Aetna's improper UCR determinations.

52.    On January 25, 2009, Aetna settled claims by the New York Attorney General concerning its unlawful use of the Ingenix to determine UCR rates.  In a press release issued by Aetna concerning its $20 million settlement with the Attorney General, Donald Liss, Aetna's Senior Regional Medical Director, said: "Aetna …recognize[s] the Attorney General's concern about the *conflicts of interest inherent in the Ingenix databases*.  We welcome a new database to be developed and maintained by a trusted and independent entity," (emphasis added).

53.    Aetna's deceitful and pervasive business practices forced Provider Plaintiffs and the Provider Class to expend significant time and resources towards identifying, disputing and then appealing Aetna's improper reimbursement determinations, oftentimes still resulting in underpayment.  Aetna's conduct violated its legal obligations to the Provider Plaintiffs and the Provider Class, as assignees and beneficiaries of their patients' benefits, and violated federal and state law as described herein, causing Provider Plaintiffs and the Provider Class significant financial harm.

II.     PARTIES

    A.     **Subscriber Plaintiffs**

54.     Plaintiff Michelle Cooper is a citizen of New Jersey, residing in Short Hills, New Jersey.

55.     Plaintiff Michelle Werner is a citizen of Virginia, residing in Arlington, Virginia.

56.     Plaintiffs Paul and Sharon Smith are citizens of Delaware, residing in Townsend, Delaware.

57.     Plaintiff Carolyn Samit is a citizen of New Jersey, residing in East Hanover, New Jersey.

58.     Plaintiff John Seney is a citizen of Ohio, residing in Uhrichsville, Ohio.

59.     Plaintiffs Alan John Silver and Mary Ellen Silver are citizens of California, residing in Oakland, California.

60.     Plaintiff Jeffrey M. Weintraub is a citizen of the District of Columbia, residing presently in the District of Columbia.

61.     As detailed below, the Subscriber Plaintiffs have standing to pursue their claims and jurisdiction and venue are appropriate with regard to each Subscriber Plaintiff in this judicial district.

    B.     **Provider Plaintiffs**

62.     Plaintiff Dr. Kavali is a plastic surgeon with a private practice in Atlanta, Georgia. Dr. Kavali is board certified by the American Board of Plastic Surgery and serves on the staff of Northside Hospital and the Center for Plastic Surgery.  She graduated from Mercer University School of Medicine, was a resident in general surgery at the University of Illinois in Chicago, and completed a plastic surgery fellowship at Wayne State University.  She is a citizen of the state of Georgia and is licensed to practice medicine in Georgia.  At all times pertinent hereto,

Dr. Kavali did not participate in the Aetna physician network and saw Aetna patients only on a non-participating basis.

63.     Plaintiff Dr. Tonrey is an anesthesiologist with a private practice in Dallas, Texas. Dr. Tonrey is board-certified in Anesthesiology and Emergency Medicine.  He graduated from the Georgetown University School of Medicine, and was a resident in anesthesiology at the University of Vermont Medical Center.  Dr. Tonrey is a citizen of the state of Texas, and is licensed to practice medicine in both Arizona and Texas.  At all relevant times, Dr. Tonrey was a nonpar provider vis-à-vis Aetna.

### C.     Aetna Defendants

64.     Defendants Aetna Health Inc. PA, Corp., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, Aetna Health, Inc., and Aetna Insurance Company of Connecticut, offer, insure, underwrite and administer commercial health benefits, including those of Subscriber Plaintiffs referenced above.  Several of the Defendants, including Aetna Health, Inc. and Aetna Life Insurance Company, have offices located in Cranbury, New Jersey, and are licensed to do business in New Jersey.

65.     "Aetna" is a brand name used for products and services provided by one or more of the Aetna group of subsidiaries that offer, underwrite, or administer benefits.  When used in this Amended Complaint, "Aetna" includes all Aetna subsidiaries owned and controlled by any of the named Defendants whose activities are interrelated and intertwined with them.  Due to the manner in which they function, all of the Defendants are functional ERISA fiduciaries and, as such, they must comply with fiduciary standards.  "Aetna" refers to all predecessors, successors and subsidiaries of the named Aetna Defendants to which these allegations pertain.

## III.     JURISDICTION AND VENUE

66.     The Subscriber Plaintiffs and the Provider Plaintiffs assert subject matter jurisdiction for their ERISA claims under 28 U.S.C. § 1331, and 28 U.S.C. § 1332(d).   These claims are brought under federal statutes and necessarily involve adjudication of one or more federal questions.   The amount in controversy, exclusive of interests and costs, exceeds $5 million.

67.     Pursuant to 28 U.S.C. § 1332(d)(2), this Court also has subject matter jurisdiction over all claims alleging a violation of state law. This Court can also exercise supplemental jurisdiction over those state law claims pursuant to 28 U.S.C. § 1367.

68.     This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of this Court, and each Defendant systematically and continuously conducts business in this State, and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction over each of them.

69.     Venue is appropriately laid in this District under 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2) because (a) Aetna resides, is found, has an agent, and transacts business in this District and (b) Aetna conducts a substantial amount of business in this district, including marketing, advertising and selling insurance products, and insures and administers group healthcare insurance plans both inside and outside this District, including from offices located in New Jersey.  As to those actions transferred to this District by the Judicial Panel on Multidistrict Litigation, venue properly lies in this District pursuant to 28 U.S.C. §§ 1391 and 1407.

## IV.     AETNA PLANS PROVIDE COVERAGE FOR OUT-OF-NETWORK SERVICES

70.     Aetna issues documents to all of its participants and beneficiaries that set forth the benefits that Aetna promises to pay its Members.

71.     Like most insurance plans, Aetna's plans typically differentiate between: (a) coverage for medical treatment from in-network providers who have negotiated discounted rates with the insurer, and (b) coverage for treatment from out-of-network providers who charge insureds their usual, non-discounted rates.  Health insurance plans, as part of their contracts with in-network providers, preclude in-network providers from billing insured patients in excess of the contracted-for in-network services.  Conversely, out-of-network providers have no service contracts with the insurance company and thus are not precluded from billing at their usual rates.

72.     When Aetna Members receive ONET services, Aetna's payment is based on a percentage of the lesser of the billed charge or what Aetna describes as the "usual and customary" rate for that service.  Aetna uses the terms "UCR," "usual and customary" and "reasonable charge" interchangeably.

73.     The portion of ONET charges not paid by Aetna are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan Member has to pay for medical services over a given time period.  As detailed below, Aetna utilized the faulty Ingenix Database to price UCR.

## V.     THE INGENIX DATABASE AND AETNA'S DETERMINATION OF UCR

### A.     The Development of the Ingenix Database

74.     Ingenix, a wholly owned subsidiary of UHG, was a self-styled nationwide "health care information company" that sold "customized fee analyzers" to medical providers, healthcare insurers and automobile liability insurance companies.  Essentially, Ingenix created "modules" or uniform pricing schedules, that provided whole dollar payment amounts for each percentile (for instance, the 80th percentile) for given medical procedures in various locations.  All users of the database were given precisely the same dollar amounts at certain percentiles for each particular procedure and area.

75.     In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products, which, among other things, sold a provider charge database known as MDR.  In October 1998, Ingenix also purchased the PHCS database from HIAA, a trade group for the insurance industry.

76.     HIAA developed the PHCS database in 1973.  It obtained historical charge data for surgical and anesthesia procedures from numerous data contributors, including health insurance companies, third-party payors, and self-insured companies.  The PHCS databases were later expanded to include data regarding dental (1977), medical (1988), and drugs/medical equipment (1998).

77.     The PHCS database, as described above, was initially created by HIAA, the health insurance industry's main trade association.

78.     HIAA, now known as AHIP, markets itself as a national association representing providers of health benefits in order to advocate on behalf of health insurance plans and to represent the interests of its members so as to "provide a unified voice for the healthcare financing industry . . . ."

79.     Those members included virtually every major health insurer.  The Board of Directors of AHIP included executives of Defendants and other health insurers including, but not limited to, the Chairman, President and CEO of Aetna, the CEOs of Wellpoint and UHG, and the president and CEO of Cigna.

80.     More specifically, various committees within HIAA initially developed and managed the PHCS database – those members made decisions concerning the operation and very design of the database.

81.     HIAA initially created the PHCS as a way to aggregate and compile physician charge data as a service to its members.

82.     HIAA compiled information from its vast pool of member/insurers to create the PHCS which initially pertained to surgical and anesthesia procedures, but within five years of its inception in 1973, began to also include dental, medical, and drugs/medical equipment rates.

83.     The information HIAA compiled (collected from the members/insurers), however, consisted only of four data points:  the date of service, the CPT Code, the billed charge, and the geozip.  This was the only information that HIAA sought from its members to create the PHCS.

84.     In fact, HIAA (via its committees and Board of Directors) consciously decided to limit the amount of information it received from contributors to create the PHCS.  In its own documents, HIAA stated that the data was limited and that even the quality of the data was "questionable."

85.     Once HIAA obtained the "questionable" data, it compiled the various submissions and created the PHCS which it then submitted to its members as a service.  However, HIAA expressly informed insurers that the PHCS was not intended to be used to establish UCR rates.

86.     The PHCS, thus, was built on submissions from health insurance companies but was not designed to determine precise reimbursement amounts – only to provide a general idea about prevailing charges in a given area based upon the admittedly limited data that HIAA collected in order to initially create the PHCS.

87.     HIAA submitted a disclaimer with the data it provided via the PHCS:

The DATA, whether actual charge data, derived charge data conversion factor data or length of stay data, are provided to the LICENSEE for information purposes only.  The HIAA disclaims any endorsement, approval or recommendation of the DATA.  There is neither a stated nor an implied "reasonable and customary" charge, either actual or derived; neither is there a stated nor an implied "reasonable and customary" conversion factor or length of

stay.  Any interpretation and/or use of the DATA by the LICENSEE is solely and exclusively at the discretion of the LICENSEE.  THE LICENSEE MUST NOT represent the DATA in any way other than as expressed in this paragraph.

88.     PHCS was designed to provide limited information about provider charges, and not to determine precise reimbursement amounts.

89.     When Ingenix acquired both MDR and PHCS, it kept them as separate databases, but merged the underlying data.  MDR and PHCS used different methodologies to produce the ultimate output for the respective databases.  As a result, the dollar amounts differed for individual procedure codes at the reported percentiles.

90.     Indeed, Ingenix at one point sought to merge the MDR and PHCS databases into one combined database to be called "DataSpan."  DataSpan was to be a "statistically valid" and scientific database that would be subject to peer review of methodology, white papers, documentation of the methodology and results, and periodic external review.  During the DataSpan initiative (in the 2004-2005 time period), Ingenix undertook extensive studies of the various and apparent flaws in the databases—the very same flaws of which Plaintiffs here complain.

91.     Internal Ingenix senior employees and outside statisticians hired by Ingenix for the DataSpan project all concluded that the MDR and PHCS databases were riddled with these same flaws.  However, the DataSpan project, despite the investment of time and funds by Ingenix, was shelved and the errors in the two databases were never fixed.

92.     The Ingenix Database is marketed by UHG as the "industry standard."  Aetna and other insurers all used the same Ingenix-established UCR rates to reimburse for ONET.

93.     To create the database, Ingenix first entered into licensing agreements with health insurers, including Aetna, to (i) obtain data concerning billing rates and information from those health insurers; and/or to (ii) provide UCR uniform pricing schedules to those same health

insurers, including Aetna, for their use in billing ONET.  Ingenix offers the Ingenix Database to health insurers at a discounted rate if those insurers agree to provide data to Ingenix to create the database.  Contributors receive credits off of their renewal fees based on the data they submit to Ingenix.  Aetna both provides to and receives from Ingenix pricing data used to set UCR rates and reimbursement for ONET.

**B.      Aetna Used the Ingenix Data Despite the Disclaimer**

94.     Aetna used the information received from Ingenix to determine UCR rates for ONET even though Ingenix broadcasts that it is not endorsing, approving or recommending the use of the Ingenix data for UCR rates.  With each production, Ingenix included the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to subscribers for informational purposes only.  Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data.  There is neither a stated nor an implied "reasonable and customary charge" (either actual or derived).

95.     Throughout the relevant period, Aetna was aware of the disclaimer but did not disclose its existence or substance to its Members or ONET providers seeking reimbursement for ONET services or supplies.  Aetna repeatedly represented the Ingenix data other than as described in the disclaimer.  Among other things, Aetna uses both actual and derived data as a "reasonable and customary charge," in direct contravention of the disclaimer and federal and state law.

96.     Despite its own disclaimer, Ingenix also continued to enter into agreements with Aetna whereby the Ingenix Database was used to calculate UCR rates for ONET, which turned out to be artificially low.  Ingenix promised that Aetna and would achieve substantial savings, including a 16:1 return on investment.

C.      **Ingenix Contributors, including Aetna, Manipulate Data Before They Provide It to Ingenix**

97.     Aetna was a significant Data Contributor. It contributed more charges to Ingenix than any other single data contributor.   During the relevant period, UHG and Aetna's data accounted for approximately 70% of the total submissions to the Ingenix Databases.   Aetna's typical semi-annual data submission contained 145 million records.   For certain modules, Aetna's data accounted for one-half of the total submissions.   Indeed, Aetna contributed 121.8 million records in 2001 (representing 12% of the total records contributed to Ingenix); 157.1 million records in 2004 (12% of the total contributed to Ingenix); 286.5 million records in 2006 (19% of the total); and 348.5 million records in 2009 (25% of the total).

98.     For the creation and continued updating of its database, Ingenix relied entirely on accumulating data from its various information providers via its "data contribution program" in which those health insurers that are Ingenix clients submit information about the amounts they happen to have been billed by an undisclosed number of unidentified health care providers for specific "CPT" or "HCPCS" code services.   Ingenix collected this claim-related data twice per year from the data contributors, who either sent the data through the U.S. mails to Ingenix in Utah, or uploaded it onto Ingenix's website via an encrypted file transfer protocol ("FTP") process.   Related communications between Ingenix and the data contributors, including those confirming receipt by Ingenix of the data, were routinely sent to and from an email address, data.contributor@Ingenix.com, located in Utah.   Current Procedure Terminology ("CPT") codes are a system by which the American Medical Association categorizes all medical services by five-digit codes (with an additional two digits for modifiers; Ingenix eliminated all modifiers). Healthcare Common Procedure Coding System ("HCPCS") codes are monitored by CMS, the Centers for Medicare and Medicaid Services, and are based on the CPT system.   The data

Ingenix received has been termed a "convenience sample." Although Ingenix explored using other sources for data—thus recognizing the problems in relying on the contribution program—it never did so.

**D.     Ingenix Used Inadequate Data Points**

99.     After an ONET provider treats an Aetna insured, she submits a standardized claims procedure form to Aetna. Aetna then extracts information from that form to send to Ingenix for inclusion into the Ingenix database.  However, the only information utilized from the claims form were the following four data points:  (a) the date of service; (b) the CPT code; (c) the zip code where the service was provided; and (d) the actual amount billed.

100.     In or around 2005, members of HIAA, including Aetna, discussed submitting more than these four data points because they recognized expressly that the four data points were limited and inadequate as a basis for calculating accurate UCR rates.  Potential data points included provider identification, licensure, specialty, patient age and gender, and type of facility where the service was provided.

101.     Despite this express acknowledgement that the four data points were limited and inadequate, Aetna continued to only submit the four above-listed data points to Ingenix.  In addition, Ingenix only used these four data points in the Ingenix database from all data contributed by all data contributors.

102.     The data submitted by Aetna and other contributors to Ingenix as not all the data contained in their submission forms. Aetna and other contributors "scrubbed," or edited the data they contributed to Ingenix by removing the highest charges, thereby submitting only the lowest claims amounts which results in a lower percentiles.

103.     From 1980 until the termination of its licensing of the Ingenix database, without substantial change, Aetna applied certain profiling rules (the "Profiling Rules") to determine

25

whether or not it would collect and send the charge data for a particular claim to Ingenix.  If a claim "profiles," it is collected by Aetna as UCR data.  If a claim does not "profile," it is not collected or sent to Ingenix by Aetna for use in the Ingenix Database.

104.    During all or part of the relevant period, Aetna used its profiling rules to pre-edit its charge data to remove valid high charges prior to sending the remaining charges to Ingenix for inclusion in the Ingenix Database.

105.    In 2005, Ingenix changed its data contribution forms to require data contributors to certify with each submission that the contributed data was complete and was not pre-edited or otherwise manipulated and that all claims received were being submitted.  These data submission information forms accompanied the semi-annual data contributions and were sent electronically over the Internet by Aetna to Ingenix in Utah, using its email address, data.contribution@Ingenix.com.   At this point, Aetna began to provide those required certifications to Ingenix attesting to the fact that its data submission was complete and not pre-edited.  Aetna knew that the certifications were false and misleading.

106.    Because it only received the four data points on the data contribution forms, Ingenix necessarily used only those four elements (date of service, CPT code, address, and amount billed) to create the Ingenix Database.  These four data points did not identify the provider, the patient (including age and condition), the type of facility where the services were performed, any adjustment factors for cost of living, the specific provider-type performing the services, the provider's usual charge and licensure, the type of facility where the service was performed (*i.e.*, hospital, clinic, doctor's office, nursing home, intensive care unit), any relevant modifier, nor the prevailing fee or charge level for any provider or service in a particular geographic region.

107.    Ingenix knew that it did not collect sufficient or accurate data from its contributors.  In 2004, in conjunction with the DataSpan project, Ingenix suggested that it collect more data points and *all claims data* from contributors—thus eliminating any scrubbing.  Again, this never occurred.  Therefore, because contributors only contribute a pre-selected amount of claims with only four data points, Ingenix itself noted that it cannot possibly be "representative."

### E.    Ingenix Manipulated Modifiers

108.    Ingenix further decreased the amount of specificity provided on the data contribution forms by removing any "modifiers" contained on those forms.  Modifiers consist of a two-digit number that providers add to a five-digit CPT code to signify an alteration of the stated service or otherwise identify the circumstances in which the service was provided.

### F.    Ingenix's Flawed Use of Geozips

109.    The Ingenix Database did not tabulate data according to the specific geographic area where a UCR actually would apply.  Instead, Ingenix divided all states into "geozips" composed of cities and towns sharing three-digits of postal zip codes, which were then grouped together by not only geographical proximity, but also by what Ingenix arbitrarily decided were "data similarities."  These geozips were not medical service areas amendable to cost comparison.

110.    Ingenix recognized the distortions created by the use of geo-zips. Ingenix executives complained that "Geozips are Ingenix derived and not based on any identifiable industry or demographic standards.  They frequently combine urban and rural areas because they are based on 3-digit zip codes."  In one of its Customized Fee Analyzers provided to health insurers, Ingenix states that:

> Because the fee ranges in the Analyzer are based on the first three digits of your geo-zip, you need to assess where your locale stands in relation to others in this three-digit area.  For example, many different three digit areas contain both urban and rural locales with different charging patterns.  Use your judgment to determine how to interpret the fee range for your particular community.

111. Aetna failed to exercise reasonable judgment in determining whether the specific geo-zip applicable to a particular UCR determination is valid, including whether it may contain "urban and rural locales with different charging patterns." Instead, Aetna relied strictly on the geographic groupings provided by the Ingenix Database without taking into account possible different charging patterns within each geo-zip. By doing so, Aetna's UCR rates had no valid basis, did not comply with its plan documents, were unreasonable, and violated applicable law.

### G. Ingenix Further "Scrubbed" Data Contributed by Data Contributions Like Aetna

112. Once Ingenix received data from individual contributors like Aetna (which those insurers themselves had already scrubbed), it further "scrubbed" the pooled data to remove high-end values but not low-end so-called outliers so as to lower the percentile amounts used to determine UCR. Ingenix automatically removed valid data.

113. Ingenix was critical of its own outlier removal process, noting that the database "needs more sophisticated scrubbing parameters for determining outliers." An external statistician hired to study the Ingenix databases likewise concluded that "It is my professional opinion that outliers should not be removed…"

114. Based upon these procedures, Ingenix then produced two cycles of uniform pricing schedules a year that include medical, surgical, anesthesia, dental, and coding system service rates for a given geographic area and CPT code. As updated data became available from Ingenix, Ingenix sent email notifications to Aetna. Aetna uploaded the Ingenix database modules it licensed from a secure Ingenix website onto a computerized claims platform and automatically accessed to determine UCR rates for ONET claims.

115.    Aetna's computer system automatically adjudicates claims for the vast majority of ONET claims.   The Ingenix Database is automatically applied. No human intervention was necessary to evaluate the individual claims or the accuracy of the UCR provided by Ingenix.

**H.    The Derived Data Was Flawed**

116.    The "conversion factor data," which was used to develop the "derived" data, as referred to in the disclaimer are not the same as the actual charge data contributed to Ingenix.

117.    Throughout the relevant time period, derived data was used as the basis for UCR reimbursement for the majority of medical and surgical services nationwide.  Derived data was exclusively used in the MDR database.  Derived data was not specific to a provider, patient or procedure (CPT code).   Rather than setting out rates for healthcare services based on what providers actually charge in the marketplace, derived data uses relative values assigned to each separate medical procedure multiplied by a conversion factor.  These relative values are not the same as Medicare relative values, however.  As a result, there is no relationship between derived data and what providers actually charge in the marketplace.  Moreover, there is no scientific or other support for Aetna using derived data, through its reliance on the Ingenix Database, to set UCR rates for ONET.  Internal Ingenix documents complain that the database is "dependent on the subjective characteristics of relative values developed within Ingenix."

118.    Derived charges do not reflect usual, customary and prevailing charges by actual providers; rather, they are artificial prices that Aetna uses through its reliance on the Ingenix database to understate UCR.

119.    The CPT Codes combined for derived data may represent very diverse procedures ranging from the most simple, including most of the charges, to the complex.  Among other things, for derived charges to provide a valid basis for determining reasonable compensation levels, an adjustment must be made to account for distribution and spread of the common and

less common procedures.   This adjustment requires computation of what statisticians call standard deviations.

120.    Ingenix did not perform this most basic of computations. Because Ingenix failed to consider that some CPT codes have a wider distribution of charges than others, the derived percentiles understate the true upper percentile values for these CPT codes.  This is a particularly significant problem because those CPT codes with a large number of observations tend to be the most common and are grouped with less common procedures with fewer observations.  Thus, the use of derived data, which is improperly calculated, did not comply with Aetna's UCR definitions.

121.    Furthermore, the Ingenix Database skirted statistical demands by using too few a number of charges to calculate UCR.   Provided there were at least nine charges, Ingenix calculated a percentile from the "data."   Statistically, that has been termed as $n=9$.   However, Ingenix long knew that the number nine for "n" was far too low.   Again, a professional statistician hired by Ingenix to analyze the database concluded that n *should equal 100* in order to "provide statistically stable results for Ingenix…."

## I.    <u>There Was No Control or Review of Data</u>

122.    There was no review procedure in place at Aetna to verify the accuracy of the twice-yearly uniform pricing schedules generated by the Ingenix Database.  Instead, the uniform pricing schedules created by the Ingenix Database were automatically relied upon to determine UCR rates despite the fact that Ingenix actually informed insurance companies (including Aetna) that it was not endorsing, approving or recommending use of it to determine UCR rates.

123.    Likewise, Ingenix could not guarantee that all claims received for a particular CPT code service at any given time had been reported, much less accurately reported, by its contributing insurers.   Nor could Ingenix ascertain if the billed amounts that were listed

constitute the unnamed providers' actual billed amounts or a discounted rate required by the agreements one or more of the providers may have had with health care insurers.  Ingenix had no mechanism to enforce or validate the client certificates.  It was simply an honor system.

124.    While Ingenix allegedly attempted to put in place a system of "audits" of data contributors, a genuine audit system never occurred.  Aetna was never audited nor were any of the major contributors of data to Ingenix.  The result is, as stated best by Ingenix, "no control of data and how contributors gather it."

125.    Ingenix never tested its results to determine if its statistical conclusions bore any relationship to the actual high, low, median or 80th percentile of actual marketplace CPT code service rates charged.  Again, Ingenix itself noted that the data was "biased" because no random sampling or testing occurred.

126.    The end result was a database that produced flawed uniform pricing schedules that resulted in the under-reimbursement for ONET by Aetna.  The flaws in the database were pervasive and included:

(a)    questionable accuracy of underlying data;

(b)    no inquiry into whether all of the contributors were using the same criteria and coding (as well as aggregating) accurately and consistently;

(c)    a procedure whereby when there was insufficient charge data to provide a statistically valid sample for a CPT code, Ingenix aggregated data from other codes to create what it unilaterally determined to be a sufficient sample;

(d)    a combination of geo-zips to determine what Ingenix considered to be a "sociodemographic region" where there was no verification for such regions;

(e)    The scrubbing and editing of data by individual data contributors, including Aetna, before the data were sent to Ingenix;

(f)    the further scrubbing and editing of data by Ingenix that removed so-called outliers in a statistically improper manner;

(g)    the absence of appropriate statistical methodology (including sampling, data editing or data estimation) resulting in data that were inappropriately biased downward;

(h)    the inclusion of charges for procedures in non-comparable geographic areas;

(i)    the failure to segregate procedures performed by providers of the same or similar skill;

(j)    the inclusion of discounted in-network data into the Ingenix database; and

(k)    the failure to distinguish between the number of medical providers whose charges are reflected.

127.    As the staff report of the Senate Committee on Commerce, Science, and Transportation, "*Underpayments to Consumers by the Health Insurance Industry*" (June 24, 2009) ("Senate Report"), concluded:

> Although the insurance industry represented the Ingenix data as accurate and objective, subsequent investigations have revealed that the reliability of the Ingenix data was fatally undermined by faulty statistical methods and a fundamental conflict of interest. . . . In testimony before the Senate Commerce Committee in March 2009, UHG Company's CEO publicly expressed his regret that there was a conflict of interest inherent in his company's relationship with Ingenix. . . .

> Evidence collected during private litigation and the New York Attorney General's investigation demonstrated how the less-than-arms-length relationship between Ingenix and the insurance industry led to reimbursement practices that cost American consumers billions of dollars. Insurers that contributed charge data to Ingenix often "scrubbed" their data to remove high charges. Ingenix then used its own statistical "scrubbing" methods to remove valid high charges from their calculations.

## VI.     INVESTIGATIONS OF INGENIX

### A.     The New York Attorney General's Investigation and Action

128.     During 2007 and 2008, the NYAG performed a preliminary investigation into how health insurers computed ONET reimbursement rates.  On February 13, 2008, the NYAG "Healthcare Industry Taskforce" launched an industry-wide investigation into allegations that insurers were under-reimbursing for ONET.  The investigation centered on Defendants and several other health insurers, and particularly on Ingenix.

129.     After six months of investigation that included document review, data analysis, and interviews, the NYAG found that the Ingenix Database reduced the rate at which insurers paid for out-of-network care.  As a result, the NYAG's office expanded its investigation by issuing subpoenas seeking documents from more than a dozen health insurers, including UHG, WellPoint, and other health insurers.

130.     The NYAG found that those documents revealed a shocking lack of transparency and accuracy in the industry's use of the Ingenix Database.  The NYAG found that insurers, such as WellPoint, obfuscate their policy language by promising to reimburse based on usual and customary rates but, instead, reimbursing based on schedules compiled by one of their own: UHG via Ingenix.

131.     The NYAG further found that this conflict of interest was entirely hidden from consumers because Defendants and other health insurers pretend an independent database underlies their UCRs for ONET when, in reality, the schedules themselves, created in a well of conflicts, are unreliable and inadequate.  The result is that consumers are "tricked" into having to pay more for medical care than they had anticipated, leading to unexpected healthcare debts.

132.     The NYAG determined that health insurers, who have a financial incentive to do so, first provide flawed data and then receive flawed data to determine UCRs for ONET that are

understated and artificially low, or, as the head of the NYAG's investigative task force stated, "garbage in, garbage out."

133.    To test the accuracy of the Ingenix Database, the NYAG's office collected and analyzed millions of healthcare bills from a variety of sources, including over a million bills from ordinary doctors' office visits within the state of New York.  It then compared these actual bills to the UCRs produced by the Ingenix Database for that geographic area.  This enabled the NYAG's office to compare the rate that the Ingenix Database indicated should be paid for a particular medical service in a particular region with the rate that the doctors in that region actually charged.  The comparison ultimately revealed that insurers under-reimbursed their insured patients for doctors' office visits in New York state by 10%-28%, and that up to 110 million Americans had been harmed, to the tune of hundreds of millions of dollars in losses for consumers and providers nationwide.

134.    Upon completing its investigation, the NYAG's office summarized its central findings in a January 13, 2009 document entitled "Health Care Report:  The Consumer Reimbursement System is Code Blue" ("the NYAG Report").  The NYAG Report found that the Ingenix Database and the insurers' participation in and use of Ingenix was:

> (a)    "an industry-wide problem";
>
> (b)    "a ***rigged system***";
>
> (c)    "fraudulent";
>
> (d)    used to advance the interests of the insurers;
>
> (e)    "critically ill"; and
>
> (f)    operated as a "***black box***" to consumers, who are left in the dark as to "what reimbursement rate to expect from the insurer."

135.    According to the Attorney General:

The responsible consumer reads the plan documents and sees a thicket of words. One term seems intelligible: the "usual and customary rate" of a similar physician for a similar service in a similar area. That sounds reasonable. The consumer makes the leap out-of-network and submits the bill to the insurer, only to be told the consumer will not be fully reimbursed because the doctor's charge exceeded the usual and customary rate. The fog of ignorance continues, thanks to the insurer. The physician-patient relationship is undermined, as the physician has been branded a charlatan whose bills are inflated. No one's interests here are advanced, except perhaps when next time, the consumer decides to stay in network for fear of what bills may accrue for out-of-network care. The interests advanced in that event are those of the insurer, whether by accident or design.

*Id.*

136.    In discussing where the blame for this under-reimbursement scheme should lie, the Attorney General explained: "[T]he fault cannot be laid on Ingenix alone. All industry members have benefited unfairly at the expense of consumers over the past ten years, and they continue to benefit unfairly from a rigged system day after day." *Id.* Aetna, as a significant beneficiary of the Ingenix Database, should therefore be held accountable for its use of the database to under-reimburse the Subscriber and Provider Plaintiffs and the Classes.

137.    Simultaneous with the release of the NYAG's findings, UHG, the owner of the Ingenix Database, settled claims centering on the Ingenix Database and UCR reimbursements with the NYAG and the AMA, among others. As part of the NYAG settlement, UHG agreed to pay the NYAG approximately $50 million. These funds were earmarked for the creation of an independent non-profit organization, FAIR, which will own and operate a new database to be used for UCR determinations.

138.    Although the first, UHG was not the only insurer to settle claims with the NYAG concerning the use of Ingenix data. Indeed, the use of Ingenix is so widespread that many insurers, including Aetna, settled similar claims with the Attorney General in what has become an historic effort to overhaul the nation's out-of-network healthcare reimbursement system. Namely, on January 15, 2009, the NYAG announced a settlement with Aetna for $20 million; on

February 4, 2009, the NYAG announced a settlement with MVP Health Care, Inc. for $535,000; on February 10, 2009, the NYAG announced a settlement with Independent Health for $475,000 and HealthNow New York, Inc. for $212,500; on February 17, 2009, the NYAG announced a settlement with CIGNA for $10 million; on February 18, 2009, the NYAG announced a settlement with WellPoint, Inc. for $10 million; on March 3, 2009, the NYAG announced a settlement with Guardian Life Insurance Company of America for $500,000; and on March 5, 2009, the NYAG announced a settlement with Excellus Health Plan for $775,000 and Capital District's Physician Health Plan for $300,000.  The funds from each of these settlements will also be paid to FAIR.

139.   In a press release issued by Aetna concerning its $20 million settlement with the NYAG, Donald Liss, Aetna's Senior Regional Medical Director, said: "Aetna shares and welcomes Attorney General Cuomo's interest in transparency, and we commend the Attorney General and his staff for establishing an independent process that is transparent and helps consumers make more informed health care purchasing decisions.  We also recognize the Attorney General's concern about the conflicts of interest inherent in the Ingenix databases.  We welcome a new database to be developed and maintained by a trusted and independent entity."

### B.   Congress' Investigation and Report

140.   Congress also actively investigated the use of the Ingenix Database in setting UCR amounts.  The Senate Committee on Commerce, Science, and Transportation held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?"  The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers

for ONET; specifically, how the industry calculates the UCR rates for out-of-network non-MD healthcare providers.[4]

141.    At the March 31, 2009 hearing, Senator and Committee Chairman John D. Rockefeller, IV, speaking for the majority of the Senate Committee, explained why they believed the insurance industry's practices were "deceptive."  Mr. Rockefeller noted that more than 100 million Americans paid for health insurance that would give "them the option of going outside of their provider networks for care," but that the insurance companies were not living up to their end of the bargain:

> Let's be very clear about this.  The insurers aren't letting their policyholders see non-network doctors out of the goodness of their hearts.  Consumers are paying for this option - through higher premiums and higher cost sharing.  There are many reasons American consumers decide to pay the extra money for health insurance with an out-of-network option.  One New York consumer we heard from last week, Dr. Mary Jerome, said she paid extra for the "peace of mind" that she could get the best care available when she really needed it.
>
> What we learned at our first hearing was that while consumers held up their side of the bargain, the insurers did not.  The insurance industry promised to base their out-of-network payments on what they call the "usual, customary, and reasonable" cost of medical care in a particular area.  Thanks to the New York investigation and other lawsuits, we now know that the insurance companies were not delivering what they promised.

142.    Senator Rockefeller specifically addressed the New York Attorney General's findings as to the insurance industry's use of the Ingenix's Database to pay far less than the UCR amounts:

---

[6]    The statements and archived webcast are available at http://commerce.senate.gov/public/index.cfm?p=Hearings&ContentRecord_id=4edbd03a-bf22-4783-87db-dfd57d980123&ContentType_id=14f995b9-dfa5-407a-9d35-56cc7152a7ed&Group_id=b06c39af-e033-4cba-9221de668ca1978a&MonthDisplay=3&YearDisplay=2009 (Mar. 26, 2009 hearing) (last accessed Feb. 8, 2017) and http://commerce.senate.gov/public/index.cfm?p=Hearings&Content Record_id=63b0f558-ec43-4ab8-82f0-070bcc699e38&ContentType_id=14f995b9-dfa5-407a-9d3556cc7152a7ed&Group_id=b06c39af-e033-4cba-221de668ca1978a &MonthDisplay=3&YearDisplay=2009 (Mar. 31, 2009 hearing) (last accessed Feb. 8, 2017).

In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates. A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates. Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers. For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying. The source of the skewed data was Dr. Slavitt's company, Ingenix.

143.    The Senate Committee issued its Report on June 24, 2009.[5]  It quoted the president and CEO of Horizon Blue Cross Blue Shield of New Jersey as stating "'We know of no alternative sources of national health care charge databases.'"  The Senate Report characterized the "insurance companies' method of calculating usual and customary costs [as] . . . 'the great black box of the healthcare industry.'"  It also quoted the New York Attorney General's office as stating that "'this [is] essentially a closed-loop system of the health insurance industry collecting the information among itself, pooling the information together, all relying on the same rate information, a system that is impenetrable to the consumer.'"

144.    In light of the insurance industry's fraudulent use of the Ingenix Database in setting UCR rates, the Senate Committee evaluated whether more federal oversight and regulation of the insurance industry was necessary. At present, the only and appropriate avenue of redress for insureds and their health care providers, such as Subscriber and Provider Plaintiffs and the Classes, is through the courts.

---

[5]    The Report is available at http://www.cascacolorado.com/wp-content/uploads/2009/06/62409UnderpaymentstoConsumersbytheHealthInsuranceIndustryReport.pdf (last visited Feb. 8, 2017).

## VII.  AETNA UNDERPAID PLAINTIFFS

### A.  Subscriber Plaintiffs Were Underpaid By Aetna

#### 1.  The Subscriber Plaintiffs' Group Health Plans

145.  Subscriber Plaintiffs Werner, Smith and Silver's benefits were determined under standard Aetna healthcare plans governed by ERISA.  Subscriber Plaintiff Cooper's benefits were determined under Aetna SEHP in New Jersey.  Plaintiff Samit's individual plan was determined under an identical regulation applied to SEHP plans in New Jersey.  SEHP plans are governed by ERISA and are also subject to a New Jersey SEHP regulation, N.J.A.C. § 11:21-7.13(a) (the "SEHP Regulation").  Individual plans are governed by the New Jersey Regulations but are not subject to ERISA.

146.  Subscriber Plaintiffs allege that Aetna relied on flawed and inappropriate data for making UCR determinations for ONET benefits as a result of its use of the Ingenix Database and reimbursing based on a percentage of the Medicare fee schedule.  By relying on such improper data and unauthorized methodologies for making UCR determinations, Aetna breached its duties as set forth in its ERISA-governed plans and, as a result, it should be required to reimburse its Members who received reduced ONET benefits up to billed charges.

147.  With respect to Cooper and Samit, the New Jersey Regulations impose additional requirements beyond those required under ERISA.  New Jersey adopted the SEHP and individual plan Regulations in an effort to ensure that all Members of such plans, who were not in a position to negotiate the best benefit packages from insurers, would receive a minimum level of benefits.  The New Jersey Regulations specified, among other things, that Aetna's UCR determinations be equal to or greater than the 80th percentile of the most updated version of the Ingenix database.  It also requires Aetna to pay out-of-network hospital services based on billed charges.  In incorporating the Ingenix database into the New Jersey Regulations applicable to

small employer plan and individual plan Members, the New Jersey Regulators were not told of the inherent flaws and inadequacies of the Ingenix database.

148.    For Members of the New Jersey small employer plans, Aetna breached ERISA by violating its obligations under the SEHP Regulation, including, as detailed below, by imposing other reductions that went beyond the reported numbers from the 80th percentile of the Ingenix Database (such as reductions for performing multiple procedures on the same day), and failing to pay 100% of billed charges for hospital services.  Moreover, Aetna intentionally manipulated its contributions to Ingenix for use in the Ingenix Database to achieve reported numbers that were lower than what should have been reported and used for setting UCR under the New Jersey Regulation, thereby violating ERISA.

## 2.    Subscriber Plaintiff Michelle Cooper

149.    From May 2001 until November 2003, Plaintiff Michele Cooper was a beneficiary in an Aetna health plan through her New York employer, Xanboo, Inc.

150.    From November 2003 through September 30, 2005, Plaintiff Michele Cooper was a beneficiary in a New Jersey group plan through her husband's employer, Rosenberg & Associates, which was fully insured and administered by Aetna. Pursuant to the terms of the plan, both she and her husband were covered as Aetna Members.

151.    Aetna produced a detail of Cooper's claim lines at AET-04300044-57.

152.    Because Cooper's health insurance was provided as an employee benefit, Cooper's claims are brought under ERISA. In addition, because Cooper was for part of the Class Period insured by a small employer plan under New Jersey law, Aetna was also required to comply with the SEHP regulations.

153.    As to her SEHP plan, Aetna defined the "usual and customary charge (a/k/a UCR or R&C) it used to establish reimbursement for ONET providers as follows:

With respect to Network services and supplies, the negotiated agreement. With respect to non-network benefits, an amount that is not more than the usual and customary charge for the service or supply as We Determine, based on a standard approved by the Board. The Board will decide a standard for what is Reasonable and Customary for the Non-Network benefits under the contract. **The chosen standard is the amount which is most often charged for a given service by a Provider within the same geographic area**.

154.    The term "standard approved by the Board" in Cooper's UCR definition refers to the SEHP nonpar regulation.

155.    Throughout the Class Period, Cooper and her husband received UCR Benefit Reductions from Aetna.

156.    Regardless of which Aetna plan she was in – her New York ERISA plan or her New Jersey SEHP ERISA plan – Aetna determined UCR in identical fashion.

157.    Aetna's UCR determinations resulted from the same methodology applied in the same way across all of the different Aetna plans she had from 2001 through 2006.

158.    In a September 6, 2001 EOB when Cooper (*nee* Bitensky) was a member of a 2001 Patriot XV QPOS plan, Aetna determined UCR, disallowed $25.00 as above UCR, and used note 0120 to mean "this portion of this expense which is greater than the reasonable and customary charge is not covered under your plan."

159.    In a July 2, 2002 EOB, when Cooper (*nee* Bitensky) was a member of a different plan (Charter QPOS), Aetna determined UCR, disallowed $1,775.00 and used note 0120 to mean:  "this portion of this expense which is greater than the reasonable and customary charge is not covered under your plan."

160.    For each ONET service, Aetna sent a "Statement of Payments" to the provider which reflected the check number check date; check amount; date of service; member responsibility and a message about how the payment was calculated.  For example, for the

Statement of Payments sent to Dr. Chu, Cooper's eye doctor, Aetna indicated that Aetna's allowed amount was based on "HIAA at the 80th percentile."

161.     For every UCR reduction Aetna made during the Class Period, Aetna should have the Statement of Payments indicating when Ingenix ("HIAA") was used by Aetna.

162.     Aetna told Cooper's ONET provider (Dr. Chu) that it disallowed $25.00 of his $175 billed charge for 11/18/02 eye exam based on HIAA, and that the $25 amount above UCR was Cooper's responsibility.

163.     For the exact same service (November 18, 2002 eye exam), Aetna's EOB dated March 20, 2003 advised Cooper (*nee* Bitensky) that she was "not responsible" for the unpaid $25.00 above UCR.

164.     Aetna's 3/20/2003 EOB referred to Cooper's plan as a "Flex QPOS plan."

165.     Often the same provider would receive virtually identical information on an EOB from one year to another even though Cooper's health plan had changed.  For example, on May 8, 2002, Dr. Stuart Springer received an EOB from Aetna for Cooper (*nee* Bitensky) was then in a Patriot XV QPOS plan.  Aetna disallowed $50 from Dr. Springer's billed charge of $445, and used note 0120:  "This portion of this expense which is greater than the reasonable and customary charge is not covered under your plan."

166.     On July 2, 2002, Aetna sent an EOB to Dr. Springer but noted that Cooper (nee Bitensky was in a "Charter QPOS plan."  Aetna disallowed $1,775.00 from Dr. Springer's billed charge of $6,500.00 and again used note 0120:  "This portion of this expense which is greater than the reasonable and customary charge is not covered under your plan."

167.   Aetna used the same note 0120 ("This portion of this expense which is greater than the reasonable and customary charge is not covered under your plan") when Aetna disallowed more than $1,200.00 when the Coopers were covered in a New Jersey small plan.

168.   Aetna decided UCR in a uniform manner for the Coopers from 2001 through 2008, regardless of their employer. Aetna's EOBs reflected the same note 0120 "This portion of this expense which is greater than the reasonable and customary charge is not covered under your plan" across all of the Coopers' different Aetna plans in New York and New Jersey.

169.    The same methodology and the same note 0120 was used throughout the Class Period, and it did not matter which type of ERISA health plan a member had.

170.   Aetna told Ms. Cooper on March 20, 2003 that she had no financial responsibility for the unpaid amount above UCR, while Aetna told her doctor on May 29, 2003 that Ms. Cooper was financially responsible for the unpaid amount above UCR.

171.   The Coopers paid substantial amounts left unpaid by Aetna's UCR Benefit Reductions.

172.   On January 3, 2005, Justin Cooper received healthcare services from an ONET provider billed at over $5,505.00. Aetna sent him an EOB dated May 13, 2005, disallowing a total of $1,269.00 for the four procedures. Aetna used Code 0120 as the reason for the disallowances, which was defined by Aetna on the EOB as: "This portion of the expense which is greater than the reasonable and customary charge is not covered under your plan."

173.   The Coopers were financially responsible for the amounts disallowed by Aetna as UCR Benefit Reductions during the Class Period, amounting to thousands of dollars.   For example, due to unpaid amounts above UCR (along with coinsurance and deductible amounts she was responsible for), Aetna paid less than half of the total bill ($2,265.20 of the total

$5,505.00).  According to the 1/3/2005 EOB, after Aetna's UCR determinations, the Coopers' "total responsibility" was $3,239.80.

174.    On the front page of its 1/3/2005 EOB, Aetna encouraged the Coopers to consult Aetna's secure website at www.aetnanavigator.com.  Aetna's website "Glossary" provided a uniform definition of "UCR" as an amount "customarily charged for the service by other providers in the same geographic area," (also referred to as the "prevailing charge level") arrived at by considering "factors such as the complexity, degree of skill needed, type or specialty of the Provider, range of services provided by a facility, and the prevailing charge in other areas in determining the Reasonable Charge for a service or supply that is unusual or is not often provided in the area or is provided by only a small number of providers in the area."

175.    On the back of the 1/3/2005 EOB, Aetna stated that an appeal of any adverse benefit decision could be made by telephone or in writing.

176.    In EOBs dated June 1, 2005, July 6, 2005, August 17 and 25, 2005, Aetna again disallowed amounts with Code 0120 indicating that the billed charge was "greater than the reasonable and customary charge."   For these four EOBs alone, Aetna disallowed over $150 on the basis that it determined UCR at an amount less than the ONET provider's billed charge.

177.    Each of the EOBs informed Cooper that all unpaid amounts (including the amount determined to be greater than Aetna's UCR amount) were her responsibility.

178.    During the Class Period, the Coopers were financially responsible for unpaid amounts in excess of the UCR determined by Aetna.  Under her SEHP Plan, Cooper had an individual $1,000 annual deductible for nonpar services. Her individual annual out-of-pocket maximum was $3,000 for nonpar. The Coopers' annual family deductible for nonpar services was $2.000, while their family out-of-pocket limit was $6,000. The Coopers' coinsurance for

nonpar services (once the deductible was met) was 30% of the UCR.  Once the individual or family out-of-pocket maximum was satisfied, then the Coopers no longer had any obligation to pay coinsurance for the remainder of the year, and Aetna was required to pay 100% of UCR.

### 3.    Cooper's Exhaustion of Administrative Remedies

179.    Michele Cooper made many phone calls to contest Aetna's UCR determinations throughout the Class Period.

180.    Following Aetna's disallowance based on UCR, the Coopers' ONET provider, Manhattan Nuclear Cardiology, appealed Aetna's determination by letter dated September 14, 2005**.** The appeal stated:  "Our charges are not over and above usual and customary for this area." It also stated that "[t]he patient will be responsible for any amounts you do not allow."

181.    By letter dated September 26, 2005, Aetna denied the Coopers' appeal stating that Aetna had processed the claims correctly and was not providing any additional amounts.  Aetna stated it was upholding its prior usual and customary rates:

> Based on our review of available information, including the member's policy, the company is not modifying its previous determination. The above listed claim was previously processed correctly according to the member's QPOS plan. According to Aetna's guidelines, the usual and customary rate for A4641 is $125.00; for J1245 is $35.00, for 78492 is $3501.00 and for 93015 is $450.00. A total of $1970.80 was applied to the member's out-of-network deductible and co-insurance. Therefore, no additional payment will be made with respect to the above listed claim(s).

182.    On November 8, 2005, the nonpar provider billed the Coopers for the total unpaid portion of the bill in the amount of $3,239.80.

183.    Aetna's payment almost two years after the Coopers' prior unsuccessful appeal, was independent of the Coopers' appeal.  Aetna's unrelated payment does not change the facts of their unsuccessful appeal, their exhaustion of administrative remedies, and the futility of UCR appeals to Aetna.

184.    Cooper has made numerous out-of-pocket payments to ONET providers reflecting the disallowed amounts above Aetna's determination of UCR.  If Aetna had paid UCR fairly and in accordance with its plan terms, Coopers would have received higher benefits and would have fewer out-of-pocket payments to make.

185.    Cooper seeks to represent a class of Aetna Members in SEHP plans subject to the New Jersey Regulation for unpaid benefits and other relief for herself and the New Jersey SEHP Class, defined herein.

### 4.    Plaintiff Werner's ERISA Plan

186.    During the Class Period, Werner was a member of a group plan governed by ERISA. Her group plan was sponsored by her employer, the American Psychiatric Association, and was fully insured and administered by Aetna. Werner was in a family plan along with her husband and children.

187.    During the Class Period, Werner received medical services from an ONET provider for whom Werner was financially responsible, and paid. Werner's payments to her ONET provider exceeded $6,233.50. Of that amount, approximately half represented coinsurance and/or deductible amounts, and at least $2,973.60 was the unpaid difference between UCR and the ONET provider's billed charge.

188.    Aetna produced a detail of Werner's claim lines at AET-04300031-43.

189.    For example, Werner received services on, respectively, February 1, 8, 15 and 22, 2006. The ONET provider billed $135 for each service. Aetna mailed Werner EOBs dated April 4, 2006 relating to each of those services. They reflected that Aetna disallowed $15 for each service as being above UCR, leaving an allowed amount representing UCR of $120.  Aetna therefore only paid $72, or 60% of the UCR amount. The EOB further identified "Total Plaintiff

Responsibility" as $252, which represented, for each of the four services, the $48 coinsurance (40% of the UCR amount of $120), plus the $15 difference between the billed charge ($135) and UCR ($120). In each instance, Aetna's EOB used the following remark to explain its payment:

> Your plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided. In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas. Aetna's determination of the prevailing charge does not suggest your provider's fee is not reasonable and proper. Your provider may bill you for this amount. If there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number, or by writing to the address, shown on this statement.

Aetna's EOB referred Werner to its website, aetnanavigator.com."

190.    Werner received further treatments from her ONET provider in September 2006. In an EOB from Aetna dated October 17, 2006, Aetna reduced the UCR for this treatment as $72 (reduced from $120).  Aetna then calculated its share of UCR as $43.20 (60% of $72).  The reduced UCR left Werner financially responsible for the unpaid $63 per treatment, along with $28.80 (40% of UCR of $72).  As to each $135 charge, therefore, Aetna was responsible for $43.20, leaving Werner responsible for $91.80. Thus, for the four services in September 2006, Werner's financial responsibility ("Total Patient Responsibility") was calculated by Aetna as $367.20.

191.    Aetna did not explain why the UCR for the same common procedure code was reduced from $120 in the first half of 2006 to $72.

192.    Werner continued to receive ongoing treatment from her ONET provider, who in October 2006 increased the billed charge to $140 per treatment. According to various EOBs, Aetna mailed to Werner in the fall of 2006, Aetna again determined UCR of $72, disallowing $68 of each $140 charge as being in excess of UCR, using the same explanatory code which represented that the billed charges exceeded "prevailing" rates. Some examples of EOBs

reporting such UCR reductions are dated, respectively, October 17, 2006, January 20, 2007, February 14, 2007, April 24, 2007, May 8, 2007.  Each such Aetna's UCR reduction.

193.    Werner also received UCR determinations from Aetna for other services. On March 21, 2006, for example, Werner and her child both received dental services from an ONET dentist. In an EOB dated April I, 2006, Aetna determined UCR regarding three of the dental services provided for Werner, leaving $32 unpaid as allegedly in excess of a reasonable charge. In the same EOB, Aetna determined UCR for three services rendered to Werner's minor child, leaving $20 unpaid as allegedly in excess of a reasonable charge. The total amount of $96 was identified by the EOB as "Total Patient Responsibility." To describe its UCR determinations, Aetna used the following remark:

> You are covered for expenses at a level set by your plan sponsor. The charge for services exceeds that amount. You are responsible for the amount indicated. If you have additional information we should consider, please let us know.

### 5.    Werner's Exhaustion of Administrative Remedies

194.    Werner unsuccessfully appealed Aetna's UCR reductions. These internal appeals were fully exhausted and Aetna declined to pay any more money.

195.    For example, on January 29, 2007, Werner appealed Aetna's UCR determinations for services she received from ONET providers from November 1, 2006 through December 27, 2006 and separately complained of Aetna's policy reducing payment to ONET licensed social workers ("LCSWs") and psychologists. Werner attached to her appeal a copy of Aetna's new policy which she had noticed buried in the middle of Aetna's website.

196.    Aetna's new payment policy which reduced payments to Werner is called "tiering."

197.   Aetna did not disclose its new "tiering" methodology in Michele Werner's health plan.

198.   Under its "tiering" policy, Aetna disallowed an additional 40% of the UCR amount (which for some time was $48 per visit) for each behavioral health visit to Werner's nonpar provider who was a licensed LCSW.

199.   On May 9 2007, Aetna denied Werner's first appeal. Aetna stated that it was "upholding the previous benefit decision to deny the portion of your claim that exceeds what we have determined to be the reasonable charge." Aetna claimed that the rate paid to Werner's ONET provider "was based on Reasonable Charges taking into consideration her type of specialty and her licensure." It stated: "In order to determine the reasonable charge, we refer to statistical profiles of physicians' charges for the same or similar services in a geographic area."

200.   In its appeal denial, Aetna stated that "[t]he benefit payment" for the ONET service "will be determined according ... to the reasonable charge defined in the Glossary of the Booklet-Certificate," adding that the Glossary defines "Reasonable Charge" as follows:

Reasonable Charge:

Only that part of a charge which is reasonable is covered.  The reasonable charge for a service or supply is the lowest of:

- the provider's usual charge for furnishing it; and
- the charge Aetna determines to be appropriate, based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and
- the charge Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished.

In determining the reasonable charge for a service or supply that is:

- unusual; or
- not often provided in the areas; or
- provided by only a small number of providers in the area;

Aetna may take into account factors, such as:

- the complexity;
- the degree of skill needed;
- the type of specialty of the provider;
- the range of services or supplies provided by a facility; and
- the prevailing charge in other areas.

201.    Aetna explained its tiering policy in Werner's appeal as follows:

Effective with dates of service September 1, 2006 and after, a three tiered approach has been implemented for determining the allowed amount for out-of-network behavioral health services rendered by Nonparticipating providers. This approach takes into consideration the licensure and/or education of the rendering provider. As your Attachment A shows, Aetna changed its non-participating behavioral health provider reimbursement policy, which is not directly tied to any particular member plan design. This change in policy is not a change to your plan. The amount of $434 that you seek does not take into consideration the above information.

202.    Aetna's first level appeal denial also stated that "[a]t your request, we will give you free of charge access to copies of all documents, records, and other information about your claim for benefits, including the specific rule, guideline, protocol, or other similar criterion that was used in making the decision, and the names of any clinical reviewers if applicable. Werner's EOC contains the same representation (which is required by ERISA).

203.    On May 17, 2007, Werner requested a second level appeal, contesting Aetna's determination of UCR. Werner contested how Aetna computed UCR, stating: "Aetna had failed to provide evidence that the reimbursement that they are allowing ($72) is in fact a reasonable reimbursement for the service provided in the Washington, DC metro area."

204.    Werner also disputed Aetna's reduction of UCR for LCSW services by 40%, stating: "Aetna has failed to demonstrate that this new reimbursement policy for non-network behavioral health providers is a reasonable reimbursement rate. The fact that it has been implemented for in-network providers is not a demonstration that the methodology is reasonable.

205.     The second level appeal challenged Aetna's failure to notify Members of the mental health policy change, calling it "a material change to my healthcare policy and one that neither my plan nor its participants received notification of, and adding that "I only found your notice after extensive web research." Werner's second level appeal further challenged Aetna's "sharp reduction in reimbursement for non-network behavioral health services."

206.     Werner's second level appeal specifically requested copies of the following documents:

Disclosure of all documents related to how Aetna calculates the reasonable charge for the type of service provided and licensure of the provider (LCSW) in the Washington, DC area, including market analysis, comparative data, and methodology in determining what is a reasonable charge;

all relevant documents that Aetna sent to plan Members notifying plan Members of the change in the UCR determination for non-network behavioral health providers including letters; distribution methods, dates, etc.;

documentation from the master plan of the American Psychiatric Foundation (both 2006 and 2007) that demonstrates disclosure of your new reimbursement policy for non-network behavioral health providers; and

data on Aetna's behavioral health network in the Washington, DC metro area, the number of providers that participate in the network by licensure, including the percentage of providers in the area that participate in Aetna's network.

207.     Aetna did not provide Werner with the information she requested in her second level appeal.

208.     On June 6, 2007, Aetna denied Werner's second level appeal, stating as follows:

Aetna determines the extent of the plan's liability through use of the Ingenix Prevailing Health Care Charges System (PHCS). The PHCS is a statistical profile of provider's charges that has been developed for this purpose. The Ingenix PHCS collects provider charge data from more than 150 major contributors including commercial insurance companies and third party administrators. Data is collected for all 50 states, the District of Columbia, Puerto Rico and the Virgin Islands. Since physicians' fees reflect differing costs of doing business in various parts of the country, the PHCS recognizes these regional differences and uses the first three digits of the United States Postal Service zip codes to divide the charges into

population areas based on cost-similar and geographically adjacent areas. There are 281 zip code areas for surgery and anesthesia and 334 for medicine, pathology and laboratory.

Fee information for the most recent twelve (12) month period is used as the basis for the profile which is the basic tool for reasonable and customary (R&C) determinations. The profile is updated semi-annually. At the time of the update, the latest information is released to all claim-paying personnel.

209.    Aetna's second level appeal denial failed to acknowledge that Aetna did not provide documents that were specifically requested by Werner during the appeal process.

210.    Aetna's second level appeal denial stated that it was Aetna's final decision."

211.    On July 2, 2007, Werner again requested documents from Aetna, including the "documents, records, and other information about my claim, specific rules, guidelines, protocols, and other similar criteria that were used in making the decision." It also asked Aetna to produce the "data from your PHCS system as you reference in your [second level appeal denial] letter."

212.    Once again, Aetna failed to provide Werner with the requested documents as well as the requested Ingenix data that Aetna claimed it had used to determine her UCR benefits.

213.    Following her unsuccessful appeals to Aetna, Werner contacted the Bureau of Insurance for the Commonwealth of Virginia ("VA DOI") with copies of her appeals.

214.    In response to Ms. Werner's complaint, on July 6, 2007 the Managed Care Ombudsman for the Commonwealth of Virginia, sent Werner a letter stating that he had reviewed information supplied by Aetna and "there was no consistent explanation that clearly explained how your claims were paid."

215.    In his July 6th letter, Managed Care Ombudsman Bridenstine also stated:

Although you were not successful in your appeal efforts, you provided a significant amount of information and I regret that Aetna was unable to provide a reasonable explanation for the methodology it used to determine the amount of money it would pay for your claims.

216.    On July 31, 2007, Aetna's Overpayment Recovery Unit in New Albany, Ohio sent letters to both Werner and her nonpar alleging that Aetna had overpaid Ms. Werner's claims by $222.50.  Aetna stated if Ms. Werner did not refund the overpayment of $222.50 to Aetna by August 21, 2007, "we will refer the overpayment to a recovery service."

217.    After a "cease and desist" letter from the Virginia DOI to Aetna, Aetna suspended its overpayment recovery actions, which included a referral to a collection agency.

218.    In a letter dated September 27, 2007, Aetna admitted to the Virginia DOT that the provider charges in the Ingenix Database cannot be distinguished by the provider's type of license. In fact, for any behavioral health code, the charges in the Ingenix data could all reflect charges of LCSWs without any charge for a psychologist or psychiatrist.

219.    During the Class Period, Aetna failed to notify Aetna Members (including Werner) and their employers (including Werner's then employer, the American Psychiatric Association) that nonpar behavioral health benefits were being reduced and that a tiering approach would reduce UCR payments by 20% for psychologists and by 40% for other behavioral health professionals such as LCSWs.

220.    During the Class Period, Aetna failed to provide documents and information about its claim policies (including payment policy changes), including but not limited to the appeals process.

### 6.    Smith Plaintiffs' ERISA Plan and Exhaustion

221.    Paul and Sharon Smith were subscribers in a fully insured employer plan.

222.    The Smiths' Aetna health plan defined Reasonable Charge as: "an amount that is not more than the usual or customary charge for the service or supply a as determined by This

Plan, based on a standard which is most often charged for a given service by a Provider within the same geographic area."

223.    Aetna made UCR Benefit Reductions adversely affecting the Smiths.

224.    For example, when Paul and Sharon Smith obtained medical services for sinus conditions from ONET provider Dr. Jordan Josephson and Aetna did not pay hundreds or thousands as above UCR.

225.    Sharon and Paul Smith are financially responsible for the amounts disallowed by Aetna as UCR Benefit Reductions.

226.    Between 2007 and 2009, the Smiths paid Dr. Josephson over $7,000 out of pocket due to Aetna's UCR Benefit Reductions as to them.   These include UCR reductions based on Ingenix.

227.    Aetna also refused to consider certain appeals on the basis that the Smiths were engaged in litigation with Aetna.

### 7.    Plaintiff Samit's Individual Plan

228.    Carolyn Samit resides in East Hanover, New Jersey. She is a member of a fully insured individual plan with Aetna. She experienced many UCR Benefit Reductions by Aetna, including for the infusion of drugs needed to keep her alive.

229.    Ms. Samit is both an Aetna subscriber and a Medicare beneficiary.

230.    Under her individual plan policy, Aetna defines R&C (UCR) (U&C) for individuals with two health plans (such as Ms. Samit) as:

> An amount that is not more than the usual or customary charge for the service or supply as determined by Us, based on a standard which is most often charged for a given service by a Provider within the same geographic area.

231.   On EOBs sent by Aetna to Ms. Samit, UCR reductions were explained with the following uniform explanation:

> Your plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided. In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas. Aetna's determination of the prevailing charge does not suggest your provider's fee is not reasonable and proper. Your provider may bill you for this amount. If there is additional information that should be brought to our attention or questions on this reduction, please contact us at the telephone number, or by writing to the address, shown on this statement.

232.   On December 29. 2008, Ms. Samit appealed Aetna's UCR Benefit Reductions for drugs and drug supplies determined between September 1, 2007 and August 29, 2008.

233.   On January 13, 2009, Aetna denied Ms. Samit's appeal.

234.   In response to specific questions about the data used to determine UCR. Aetna stated merely that it believed its data was correct.

235.   Aetna explained its UCR amounts for various drugs and supplies, and upheld its determinations, leaving Ms. Samit financially responsible for over $6,000 for the period between September I, 2007 and August 29, 2008.

236.   Aetna admitted that it used Ingenix and that when UCR is less than the ONET provider's charge, the "Covered Person may be held liable for the full amount of the billed charge."

237.   Aetna represented to Ms. Samit that it uses the Ingenix "profile" as the "basic tool for reasonable and customary (R&C) determinations" and that the "profile" reflects "for each procedure within each of the population areas, the dollar value of the charge representing the 80th percentile. This charge is the one, which is at least as great as 80% of all charges recorded in that area for a given procedure."

238.    Aetna further represented to Ms. Samit:

PHCS (comprised of members from accident and health insurance firms) holds insurance forums, promotes insurance industry issues, and publishes statistical studies, law digests and information on insurance regulations. PHCS also compiled and distributes profile information submitted from its member insurance carriers.

239.    Aetna vouched for the Ingenix Database information, stating:

PHCS profiles are collected from multiple insurance carriers. There are 150 data contributors, which include commercial insurance companies, third party administrators, Blue Cross and Blue Shield, and some self-insured groups. As a result, PHCS profiles are based on a larger number of charges. This larger information base provides a more accurate representation of the prevailing fee for a procedure within a specific expense area.

240.    The information Aetna provided to Ms. Samit in her appeal is false and misleading. Ingenix PHCS was not a "statistical study."

241.    Ingenix PHCS was not an "accurate representation of the prevailing fee for a procedure within a specific expense area."

242.    Aetna did not tell Ms. Samit that Aetna is the single largest data contributor to the Ingenix database, and that it failed to submit millions of valid high charges to Ingenix which it did not "profile" as demonstrated herein.

243.    Although Ms. Samit had specifically requested "a copy of all data that was used in the above UCR determinations", Aetna failed to provide any.

244.    Ms. Samit requested that Aetna provide her with "any known analyses that Aetna has performed about its cost savings from use of the data/method."

245.    Aetna refused Ms. Samit's request, and failed to provide the requested information.

### 8.    Plaintiffs Silvers' ERISA Plan

246.    Each of the Silvers is the beneficiary of a self-insured plan, which is administered by Aetna, provided through Mr. Silver's employment with New York Life Insurance Company.

247.    According to the Silvers' health plan, they are entitled to recover UCR charges for benefits provided.  In determining the UCR charge, the insurer is to consider the type of service or supply that was provided, the skill required or complexity involved, the specialty of the provider, and the prevailing charge level for the service in the geographic area where it was furnished.

248.    Aetna determines all claims under the Silvers' plan and decides all appeals.  Thus, Aetna is a fiduciary and is responsible for the payment of additional benefits occasioned by a breach of its fiduciary duty.

249.    The Silvers' son, Aaron Christopher Silver, is a covered dependent under the Silvers' plan.  He has a chronic anxiety conditions that requires ongoing therapy to be provided on an ONET basis.  Aetna has chronically and routinely denied payment for his ONET claims, though the cost of such treatment should have been paid by Aetna under the term of the Silvers' plan.

250.    Although Aetna denied compensation for most of the costs of treatment for the Silvers' son's anxiety condition, it agreed to pay UCR for certain therapy sessions.  The UCR amounts that Aetna calculated for such sessions were unreasonably low, in violation of the terms of the Silvers' plan.

251.    The Silvers formally complained to Aetna regarding its denial of, and reimbursement at unreasonably low rates for, ONET benefits for her son's medically necessary treatments in 2008 and 2009.

252.    The Silvers appealed the denial of benefits in June 2009.  In July 2009, Aetna denied their appeal and stated that no additional benefits were due.

253.    The Silvers filed a second appeal in December 2009, which was also denied.

### 9.    Plaintiff Seney

254.    Subscriber Plaintiff Seney received ONET coverage in 2005 when he was settled in a group health plan through his employer, Owens Coming, which was fully insured and administered by Aetna.  Pursuant to the terms of the Aetna plan, he was covered as an Aetna Member.

255.    Aetna relied on flawed and inappropriate data for making UCR determinations for ONET benefits as a result of its use of the Ingenix Database.  By relying on such improper data for making UCR determinations, Aetna breached its duties as set forth in its ERISA-governed plans and, as a result, it should be required to reimburse its Members who received reduced ONET benefits up to billed charges.

256.    Seney received UCR Benefit Reductions from Aetna in 2005 when he received health care services from an ONET provider.  A claim was submitted to Aetna on Seney's behalf in compliance with the terms of his health care plan, seeking payment of benefits as required under the Aetna contract.

257.    Seney subsequently received an EOB from Aetna concerning these health care services.  In the EOB, Aetna reported that it had excluded certain billed amounts.  Seney remained liable for the unpaid portion of the bill.

258.    Seney has made out-of-pocket payments to ONET providers that were in excess of the applicable deductible and coinsurance under his Aetna plan.  These sums were paid by Seney due to Aetna's improper ONET Benefit Reductions as detailed herein.

259.    The EOBs sent by Aetna regarding its ONET Benefit Reductions during the Subscriber Class Period did not comply with legal requirements, including federal claims procedure regulations.  The EOBs failed to advise Aetna Members of the specific reasons for the denial, the specific plan provisions, and their appeal rights.  Aetna's EOBs reflecting UCR determinations failed to advise Seney of the data Aetna used to calculate UCR.  Examples of Aetna's omissions of required disclosure on EOBs include the following:

- Absent or inadequate "Notes" describing Aetna's benefit reductions and failure to provide the required "specific" reasons for the disallowed amounts above UCR;

- The particular fee schedule or data or methodology used to determine UCR;

- Incomplete information about the appeal process and appeal rights;

- The characteristics (resulting in the invalidity) of the Ingenix Databases used to determine UCR;

- The disclaimer that accompanies Ingenix data;

- Aetna's manipulations of the data contributed to the Ingenix Database, and Ingenix's manipulations of the data from all contributors;

### 10.    Plaintiff Weintraub

260.    Plaintiff Jeffrey M. Weintraub is a resident of the District of Columbia.  During the Class Period, Plaintiff Weintraub participated in a "Student Health Insurance Program" sponsored by his University in New York and defined as an "Aetna Open Choice PPO," underwritten by Aetna Life Insurance Company which is not subject to nor governed by ERISA. As discussed further herein, Plaintiff Weintraub is not an ERISA class member.

261.    As a member of this Aetna health plan, Plaintiff Weintraub was provided a "Guide to Student Health Insurance and Healthcare at New York University" that sets forth the basics of Plaintiff Weintraub's Plan.  That document contains a Glossary where "Reasonable

Charge" is defined as "[o]nly that part of a charge which is reasonable is covered.  The reasonable charge for a service or supply is the lowest of:  the provider's usual charge for furnishing it; and the charge Aetna determines to be appropriate; based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and the care Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished."

262.    Plaintiff Weintraub was further provided with a "Student Health Insurance Handbook" that contains a "Summary of Benefits" section.  In that section, it is set forth that Plaintiff Weintraub was to be reimbursed 50% of the Reasonable Charge for certain ONS.
In December, 2007, Plaintiff Weintraub visited an ONET physician in New York, New York and submitted the claim through his health care plan.  Plaintiff Weintraub was reimbursed 50% of an amount *less than* the actual charge because Aetna determined the "Reasonable Charge" to be a lesser amount.  Plaintiff Weintraub was forced to pay the remainder.

### B.    The Provider Plaintiffs Were Underpaid By Aetna

#### 1.    Dr. Frank G. Tonrey

263.    Plaintiff Dr. Tonrey is an anesthesiologist with a private practice in Dallas, TX.  He is licensed to practice medicine in Texas and Arizona, and is board-certified in Anesthesiology and Emergency Medicine.

264.    At all relevant times, Dr. Tonrey did not participate in Aetna's physicians' networks.  Throughout the Provider Class Period, Dr. Tonrey provided out-of-network healthcare services to Aetna plan enrollees.  As an independent physician, Dr. Tonrey has not been permitted to participate in Aetna's networks; at the same time, he is being penalized for being an out-of-network provider through Aetna's wrongful ONET payment practices.

265.     As an anesthesiologist, Dr. Tonrey administers anesthesia and manages the medical care of patients before, during, and after surgery.   Dr. Tonrey is called upon by surgeons, not patients, to assist in surgical procedures.

266.     At all relevant times, Dr. Tonrey obtained valid assignments of benefits from his patients through the facility intake process.  Although the assignments were obtained through the hospitals at which he provided services, they specified that the patients authorized payment of medical benefits directly to the provider of services to the patient  – *i.e.*, Dr. Tonrey – and that they assigned all benefits, including causes of action and the right to enforce payment to such provider.

267.     The assignment stated in relevant part: "**Assignment of Benefits.** In executing this assignment of benefits, I am directing the health insurance carrier or other health benefit plan providing my coverage . . . to pay the hospital *and/or hospital-based physicians* directly for the services the hospital *and/or hospital-based physicians* provided to the patient during this admission.  In return for the services rendered and to be rendered by the hospital *and/or hospital-based physicians*, I hereby irrevocably assign and transfer to the hospital *and/or hospital-based physicians* all right, title, and interest in all benefits payable for the healthcare rendered, which are provided in any and all insurance policies and health benefit plans from which I am entitled [to] services or [from which] I am entitled to recover. . . . Hospital-based physicians include but are not limited to: Emergency Department Physicians . . . Anesthesiologists."

268.     Dr. Tonrey was paid directly by Aetna pursuant to such assignments.

269.     Throughout the relevant Class Periods, Dr. Tonrey utilized a CMS 1500 form (or its equivalent), to submit claims for payment to Aetna.   He indicated the existence of an assignment in box 13 in the CMS 1500 form. Dr. Tonrey's claims were routinely submitted

electronically.  Once an electronic claim was submitted it passed through a clearinghouse before reaching Aetna.  All of Dr. Tonrey's claims were submitted to Aetna using CPT codes, ICD-9 codes, and modifiers, as necessary.  Dr. Tonrey did not find out his compensation from Aetna for services rendered until after he performed a procedure on his patient and after he submitted a claim for payment to Aetna.

270.    At all relevant times, Dr. Tonrey expected to be reimbursed by Aetna at the current UCR rate.  While providing services to Aetna patients, Dr. Tonrey was repeatedly subjected to reductions in reimbursements based on Aetna's representations that his bills are in excess of UCR amounts.  In making these improper determinations, Aetna relied on the flawed and inadequate Ingenix in calculating what it considered to be the usual, customary and reasonable amount, a database that utterly failed to identify proper UCR rates.

271.    Rather than simply pay Dr. Tonrey the lesser of his billed charges or proper UCR rates, Aetna instead routinely and deliberately reimbursed his claims at below UCR levels, requiring him to exhaust significant amounts of time and energy first identifying and then appealing improperly reimbursed claims.

272.    Aetna unlawfully diminished Dr. Tonrey's compensation by improperly calculating UCR rates and then misapplying these rates to his claims.  Dr. Tonrey's EOBs and Remittance Advices state that "[t]he member's plan provides benefits for covered expenses at the reasonable charge as determined by Aetna, for the service in the geographic area where it is provided."  Nowhere on the EOBs or Remittance Advices did Aetna discuss or identify how it actually calculated UCR.  The EOBs did not specify whether Ingenix data or some other methodology was used in these calculations.  However, in appeals correspondence sent to Dr. Tonrey, Aetna revealed that "[t]o determine the recognized charge, we refer to statistical profiles

of physicians' charges for the same or similar services in a geographic area.  We use Ingenix Prevailing Healthcare Charges System (PHCS), formerly HIAA, an outside data sources for these profiles.  Ingenix PHCS is a nationally recognized source for data used to establish prevailing reasonable and customary fees.  Aetna sets the recognized charge fee at the 80th percentile of Ingenix PHCS data unless otherwise specified by the plan sponsor."  Through the use of Ingenix, among other improper pricing methods, Aetna has been able to derive improper rates using faulty data, and apply them to Nonpar claims in order to diminish lawful reimbursement.

273.    By way of examples, in an explanation of benefits form in which Dr. Tonrey submitted a charge of $250.00 for CPT code 99140 (anesthesia complicated by emergency conditions) Aetna paid $6.00 as the UCR amount, stating: "The member's plan provides benefits for covered expenses at the reasonable charge as determined by Aetna, for the service in the geographical area where it is provided.  In certain circumstances, especially where the service is unusual or not often provided in the geographical area, the reasonable charge may be determined by considering other factors, including the prevailing charge on other areas."  Six dollars is not the usual, customary, and reasonable charge for CPT code 99140 in Dr. Tonrey's geographical area, nor, on information and belief, did Aetna perform any examination whether the service was unusual in the area where it was provided.

274.    Dr. Tonrey appealed this under-reimbursement and Aetna refused to allow any additional payment.  Its "explanation" was particularly uninformative: "The claim id# [ ] was sent for a rates review and the issue has been resolved. Rates Resolution: This claim was processed as non-par.  With action code 735. All network identification numbers in EPDB are termed.  Please consult with you [sic] provider contract coordinator for clarification."  Aetna

provided no explanation to Dr. Tonrey for what a "rates review" consisted of, what "action code 735" was, and what "network identification numbers in EPDB" meant. Aetna's provider contract coordinator worked with in-network providers, not out-of-network providers like Dr. Tonrey. Most significantly, there was no indication of who within Aetna, if anyone, made the decision to uphold the under-reimbursement, and whether there was any physician involved, as compared to an automated generation of a boilerplate letter denying the appeal.

275.    Aetna made the identical under-reimbursement of CPT code 99140 using by way of "explanation" slightly different language with the identical result: "The member's plan provided benefits for covered expenses at the plan's recognized percentile level of charges received by Aetna for the same service." Dr. Tonrey appealed this under-reimbursement as well.

276.    Aetna's wrongful conduct described above has forced Dr. Tonrey to exhaust significant time and resources identifying and then appealing unlawfully reimbursed claims. Upon identifying an improper payment for a claim, Dr. Tonrey promptly appealed Aetna's determination by sending a formal letter asking Aetna to reprocess the claim for additional payment. In addition to sending these appeals letters, Dr. Tonrey made telephone calls to Aetna to appeal the insurer's wrongful determinations. Dr. Tonrey exhausted administrative appeals available through Aetna (a level-two appeal being voluntary under Aetna's appellate structure) without succeeding in obtaining full and proper reimbursement for his services, leaving a lawsuit as the only alternative.

### 2.    Dr. Carmen Kavali

277.    Effective July 15, 2005, Dr. Kavali entered into a Specialist Physician Agreement with Aetna and, as a result, became a member of the Aetna provider network. On June 27, 2007, Dr. Kavali sent a certified letter notifying Aetna that she was terminating the contract and that

she understood the termination would become effective ninety days after Aetna's receipt of the letter.  As a result, in early October 2007, Dr. Kavali was no longer a participant in the Aetna network and thus, with respect to Aetna, had the status of a non-participating physician thereafter.

278.    Since early October 2007, Dr. Kavali treated patients with coverage under plans covered or administered by Aetna on an out-of-network basis.  As a matter of course, Dr. Kavali obtained from all of her patients an assignment of benefits that authorizes payment of insurance benefits directly to Dr. Kavali, pursuant to which Aetna paid Dr. Kavali directly for services provided to enrollees in Aetna's health care plans.  Before Dr. Kavali performed a procedure for these patients, her office staff contacted Aetna to confirm coverage, inquired about the basis upon which payment to her would be made, and asked for the amount of the payment so that the patient's share of the cost could be calculated.  Aetna, however, refused to explain the basis upon which payment will be made and did not disclose the amount that Dr. Kavali would receive. Indeed, Aetna would not even confirm whether or not the payment will be based upon the usual and customary rate.  The only information that Aetna typically would disclose was the amount of the patient's co-insurance, the out of network deductible, and how much of the deductible was satisfied.

279.    Once Dr. Kavali provided medical services to an Aetna patient, she sent a bill to Aetna using a CMS 1500 form or its electronic equivalent describing the services with the appropriate CPT coding and informing Aetna of her charge for each service.  In each instance, Dr. Kavali expected to be compensated for her services at the lesser of her billed charges or the amount provided under the patient's plan, which was the usual, customary and reasonable rate.

280.    Upon receipt of Dr. Kavali's bill, Aetna sent an EOB setting out the amount it paid for each of the services that were provided.  Aetna gave various explanations for its decision not to pay the billed amount, such as that the "member's plan provides benefits for covered services at the prevailing charge level, as determined by Aetna, made for the service in the geographical area where it is provided" or that "payment [is] made according to allowable expenses for member's plan, less deductible and co-insurance."

281.    When Dr. Kavali or her staff asked Aetna for a better or more complete explanation for why she was paid less than her billed charges (or the basis for the so-called UCR amount), no such explanation has been provided.  To the contrary, Aetna was evasive or attempted to keep secret the basis upon which her bills were discounted and, as a result, prevented Dr. Kavali from learning the methodology it used in calculating the amounts she was paid for rendering out of network services.  However, based upon the reasons appearing on the EOBs and her knowledge of the relevant facts, Dr. Kavali believes that Aetna reduced her bills based the applicable UCR rate as reflected in the Ingenix Database.

282.    By way of examples, in an explanation of benefits form in which Dr. Kavali submitted a charge of $202.00 for CPT code 99213-25 (office visit of low complexity unrelated to another procedure performed on the same day) Aetna paid $100.00 as the UCR amount, stating: "The member's plan provides benefits for covered expenses at the reasonable charge as determined by Aetna, for the service in the geographical area where it is provided.  In certain circumstances, especially where the service is unusual or not often provided in the geographical area, the reasonable charge may be determined by considering other factors, including the prevailing charge on other areas."

283.   In an explanation of benefits form in which Dr. Kavali submitted a charge of $499.00 for CPT code 99205 (office visit of high complexity) and Aetna under-reimbursed by $213.00, stating: "The member's plan provides benefits for covered expenses at the prevailing charge level, as determined by Aetna,  made for the service in the geographical area where it is provided.  In determining the amount of a charge that is covered we may consider other factors including the prevailing charge in other areas."

284.   Demonstrating the arbitrary and capricious nature of Aetna's under-reimbursement determinations, in another explanation of benefits form in which Dr. Kavali submitted a charge of $499.00 for CPT code 99205, Aetna under-reimbursed by $173.00 rather than $213.00.   In yet another explanation of benefits form in which Dr. Kavali submitted a charge of $499.00 for CPT code 99205, Aetna under-reimbursed by $199.00.   In another explanation of benefits form in which Dr. Kavali submitted a charge of $499.00 for CPT code 99205, Aetna under-reimbursed by $180.00.   In another explanation of benefits form in which Dr. Kavali submitted a charge of $499.00 for CPT code 99205, Aetna under-reimbursed by $119.00.

285.   In an explanation of benefits form in which Dr. Kavali submitted a charge of $280.00 for CPT code 99214 (office visit of moderate complexity) Aetna under-reimbursed by $130.00.

286.   In an explanation of benefits form in which Dr. Kavali submitted a charge of $475.00 for CPT code 12021 (closure of wound with packing), Aetna under-reimbursed by $75.00.

287.   In an explanation of benefits form in which Dr. Kavali submitted a charge of $5,600 under CPT code 19318-80 (unilateral breast reduction, assistant surgeon), Aetna under-

reimbursed Dr. Kavali by $4,560.00, specifying the above prevailing charge level.  In another explanation of benefits form in  which Dr. Kavali submitted a charge of $5,600 under CPT code 19318-80, Aetna under-reimbursed Dr. Kavali by $4,494.20 rather than $4,560.00.

288.   By using the Ingenix Database to calculate the amount she received for her services, Aetna improperly and unlawfully diminished the compensation to which Dr. Kavali was entitled.  Because she was unable to collect from her patients the full amount of her billed charges, Dr. Kavali was injured as a direct and proximate result of Aetna's improper conduct.

289.   The EOBs issued by Aetna relating to the out of network patients treated by Dr. Kavali contain an address and provide a telephone number to call "for questions about this claim."  Dr. Kavali and her staff have telephoned Aetna to Complain about the amount of compensation paid for particular services without success in obtaining additional payment.

290.   Any further appeal to Aetna regarding the amount of her compensation would have been futile(as well as unnecessary under Aetna's appellate requirements) as Aetna did not disclose and, indeed, concealed its use of the Ingenix Database to diminish payments based upon UCR rates and routinely asserted that it was paying the proper amount due under the patient's plan.  Further, it would have been inconsistent with Aetna's scheme to disclose to physicians such as Dr. Kavali as part of any appeal process that it was manipulating the calculation of UCR rates or to provide additional compensation to physicians as such additional payments would have constituted an admission of its improper conduct.

## VIII.   DEFENDANTS' MISREPRESENTATIONS AND FRAUDULENT CONCEALMENT OF THE TRUTH

291.   To calculate their reimbursement amounts for ONET, Defendants used the Ingenix Database to determine their UCR rates.  The Ingenix Database functioned as a data-laundering mechanism: Ingenix utilized billing information provided by its parent company

(UHG) and other health insurance companies, including Aetna, to calculate UCR rates that health insurers, including the entities that provided the data, then relied on and used to reimburse ONET claims.

292.    The effect of Defendants' unlawful conduct and misrepresentations on consumers, including Subscriber and Provider Plaintiffs, was profound.   Overall out-of-pocket costs of healthcare insurance and choice of provider are the two most important aspects of healthcare to consumers.   Defendants' misrepresentations affect both of these aspects of healthcare since Defendants represent through their advertising and plan contracts that they would permit their Members to choose between in-network and out-of-network providers and that Members would be reimbursed based on the UCR for ONET.   Nevertheless, Defendants did not reimburse for ONET based on the UCR, instead utilizing reimbursement rates that they knew was artificially deflated, thereby increasing the costs to consumers of using ONET and deterring consumers from freely choosing between in-network and out-of-network providers.   By affirmatively misrepresenting the extent to which they would reimburse for ONET and the extent to which consumers could choose between in-network and out-of-network providers, and by failing to disclose that reimbursement for ONET is calculated based on False UCRs, Defendants deceived Subscriber and Provider Plaintiffs and the other members of the Classes.

293.    The relationships among Aetna and other contributors to the Ingenix database are rife with inherent conflicts of interests against insureds, including Class members, that inhibit the construction of a rigorously defined and audited database necessary to determine fair and accurate UCR rates.  Insurers, such as Aetna, who have a contract with Ingenix, are incentivized to provide flawed claims data that result in lower UCR rates in order to pay lower reimbursements for ONET.   As the Senate Report observed, "UHG and the other insurance

companies that contributed data to Ingenix and purchased Ingenix products had a strong financial interest in keeping reimbursement rates low." Furthermore, Ingenix offered insurance companies that provided data to Ingenix, such as Aetna, a discounted rate for use of the database, thereby creating further incentive to provide flawed data, and highlighting the collusive and unfair nature of this unlawful scheme. Neither Aetna, other contributors to Ingenix, nor Ingenix, had any incentive to prevent or investigate the risk of biased, inaccurate data. Ingenix had an incentive to do the opposite because, by turning a blind eye to the quality and reliability of the data submitted to it, and then manipulating the data to support artificially low UCR rates, Ingenix supported its parent company by assisting UHG to perpetuate low reimbursement rates for out-of-network claims (up to 10% of total claims submitted to UHG) and maintained its dominant market position as the data provider for its health insurance company clients/participants.

294. Aetna, other contributors to the Ingenix database, and Ingenix actively concealed, and caused others to conceal, information about the true UCR rates for ONET, including the fact that UCR rates used by Aetna were deliberately understated, knowing the success of the high-profit scheme was jeopardized if anyone disclosed the significantly higher true average costs. Aetna not only used the Ingenix Database as a "black box" such that Members of Aetna's health plans, including Plaintiffs, had no ability to determine precisely how Aetna determined UCR rates, but Aetna did not disclose that it either uses Ingenix to calculate the UCR rate or that Ingenix is wholly owned by a participating insurance company (UHG).

295. Aetna concealed its fraudulent conduct from Subscriber and Provider Plaintiffs and the members of the Classes (as set forth herein). Aetna prevented Subscriber and Provider Plaintiffs and the members of the Classes from knowing or discovering the actual methodology used by Ingenix to determine the UCR rate. As the Senate Report summarized the testimony of

Dr. Nancy Nielson, the President of the AMA: "when doctors asked insurers how they had calculated their 'usual and customary' rates, they were told that information was 'proprietary.'" Moreover, the fraudulent conduct alleged herein was of such a nature as to be self-concealing.

296.    Among consumer decisions, the selection and purchase of health insurance is of vital importance.  When considering health insurance policies, consumers are entitled to accurate information.  In addition, and especially considering the skyrocketing cost of insuring oneself and one's family, consumers are entitled to the full value of their premiums.

297.    Aetna has inflicted significant financial harm on its Members.  Overall healthcare costs in the United States comprise over fifteen percent of the country's Gross Domestic Product. A significant percentage of claims submitted to Defendants and other health insurers are for ONET.  Subscriber Plaintiffs and members of the Subscriber Classes paid for out-of-network coverage, obtained services from providers outside of the Aetna network, and had the right to reimbursement under the terms of their policies, including a fair and accurate calculation.

298.    Any applicable statutes of limitations were tolled by Aetna's knowing and active concealment and denial of the facts alleged herein.

299.    Aetna was under a continuing duty to disclose to Subscriber and Provider Plaintiffs and the Classes the fact that their reimbursement rates for out-of-network medical expenses were based on UCR rates that bore no relationship to the actual charges for those medical expenses.  Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the UCR rates, Aetna is estopped from relying on any statutes of limitations.

## IX.    CLASS ACTION ALLEGATIONS

### A.    Subscriber Plaintiff Class Actions

**Class Definitions**

300.    Subscriber Plaintiffs Cooper, Werner, Smith, Seney, and Silver bring this action

on their own behalf and on behalf of an "Subscriber ERISA Class," defined as:

> All persons who were, from July 30, 2001 through August 1, 2011 ("ERISA
> Class Period"), Members in any group healthcare plan insured or administered
> by Aetna, subject to ERISA (other than New Jersey small employer plan
> Members), who received covered hospital or medical services or supplies from
> an out-of-network healthcare provider (or any provider Aetna considered out-of-
> network for purposes of paying benefits) for which Aetna (or any third party
> acting on behalf of Aetna) allowed a non-zero amount but less than the
> provider's billed charge in determining benefits based in whole or in part on
> information obtained from the Ingenix Database.

301.    Subscriber Plaintiffs Cooper and Samit bring this action on their own behalf and

on behalf of a "Subscriber New Jersey SEHP and Individual Plan Class," defined as:

> All persons who were, from July 30, 2001 through August 1, 2011 ("New Jersey
> SEHP and Individual Plan Class Period") Members in any New Jersey small
> group healthcare plan insured or administered by Aetna, subject to ERISA, and
> Members of Individual Plans insured or administered by Aetna not subject to
> ERISA who received covered hospital or medical services or supplies from an
> out-of-network healthcare provider (or any provider Aetna considered out-of-
> network for purposes of paying benefits) for which Aetna (or any third party
> acting on behalf of Aetna) allowed a non-zero amount less than the provider's
> billed charge in determining benefits based in whole or in part on information
> obtained from the Ingenix Database.

302.    Additionally Plaintiff Weintraub further brings this action on his own behalf and

on behalf of a "Subscriber New York Damages Class," defined as:

> All persons or entities residing in New York who paid premiums for out-of-
> network health insurance coverage from Aetna and received reimbursement for
> ONET between April 29, 2004 and August 1, 2011 based in whole or in part on
> information obtained from the Ingenix Database.

303.    Plaintiff Weintraub brings this action on his own behalf and on behalf of a "Non-

ERISA Class" defined as follows:

All persons who, are or were, from April 29, 2004 through August 1, 2011 ("Non-ERISA Class Period") Members in any plan insured or administered by Aetna, which was not subject to or governed by ERISA, who received covered hospital or medical services or supplies from a out-of-network provider for which Aetna (or any third party acting on behalf of Aetna) allowed a non-zero amount but less than the provider's billed charges in determining benefits based in whole or in part on information obtained from the Ingenix Database.

304.    Excluded from the every Class or Subclass that may be further defined by the Court are any judge(s) or justice(s) to whom this action is assigned, as well as any relative of such judge(s) or justice(s) within the third degree of relationship, and the spouse of any such person.

**Common Class Claims, Issues and Defenses for the Subscriber Classes**

305.    The following common class claims, issues and defenses for Subscriber Plaintiffs and the Subscriber Classes arise for the defined Class Periods:

(a)      Whether Aetna's use of the Ingenix Databases to calculate UCR in determining ONET reimbursement breached Aetna's legal obligations under its Members' group health plans;

(b)      Whether Aetna's UCR Benefit Reductions described in this Amended Complaint violated ERISA, or other applicable law;

(c)      Whether ERISA requires each Class Member to prove exhaustion or otherwise provide a basis for excusing exhaustion; or other relief;

(d)      Whether Class Members (including those who assigned claims) may recover unpaid benefits;

(e)      Whether interest should be added to the payment of unpaid benefits under ERISA;

(f)      The standard of review applicable to review Aetna's UCR Benefit Reductions and whether the standard is less deferential than otherwise due to Aetna's violation of federal claim procedure regulations;

(g)      The identity and scope of the ERISA and non-ERISA plans subject to this Amended Complaint;

(h)      Whether Aetna violated its legal duties owed to its Members when it made its UCR Benefit Reductions or otherwise engaged in the conduct alleged in this Amended Complaint;

(i)      Whether Aetna's EOBs and other communications with its Members violated ERISA claim procedure regulations or other applicable law;

(j)      Whether the Court's interpretation of the ERISA plans at issue must be guided by the state regulators' interpretation of such plans;

(k)      What are the applicable statute of limitations periods for the claims of Class members and whether Defendants' concealment of material facts bars Aetna from asserting any statute of limitations defense;

(l)      Whether Aetna and other insurers' manipulation of, and the structural deficiencies in, the Ingenix Databases prevent Aetna from relying on the New Jersey Regulation as a defense;

(m)      Whether Aetna Members in New Jersey SEHP and individual plans are entitled to receive unpaid amounts for all ONET hospital or medical services or supplies for which Aetna underpaid in violation of the SEHP and individual plan Regulations.

**Additional Subscriber Class Action Allegations**

306.    The members of the Classes are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of hundreds of thousands of Aetna

Members in commercial group health plans insured, offered, or administered by Aetna. The precise number of members in the Class is within Aetna's custody and control. Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied for the Class. For example, there are over 500,000 Aetna Members in New Jersey alone. Nationwide, there are hundreds of thousands of Aetna Members in ERISA and non-ERISA group health plans subject to the allegations of this Amended Complaint.

307. Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class, including the class action claims, issues and defenses listed above.

308. The named Subscriber Plaintiffs' claims are typical of the claims of the Class members because, as a result of the conduct alleged herein, Aetna has breached its statutory and contractual obligations to the Subscriber Plaintiffs and the Subscriber Class through and by uniform patterns or practices as described above.

309. Subscriber Plaintiffs Cooper, Werner, Smith, Weintraub, Seney and Silver, will fairly and adequately protect the interests of the members of the Subscriber Classes, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class action litigation and in the prosecution of ERISA claims and have no interests antagonistic to or in conflict with those of the Class. For these reasons, the Subscriber Plaintiffs are adequate class representatives.

310. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Aetna.

311.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, because the unpaid benefits denied Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them. Aetna maintains computerized claims information that enables it to calculate unpaid amounts resulting from ONET Benefit Reductions for Class Members. Given the uniform policy and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

### B.    Provider Plaintiffs' Class Allegations

**Provider Class Definitions**

312.    The Provider Plaintiffs bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.  The requirements of subparts 23(a) and (b)(1), (b)(2), (b)(3) and Rule 23(c)(4), as it may be applied, of the Federal Rules of Civil Procedure are met.  The individual Provider Plaintiff(s) bring this class action on behalf of a class ("the Provider Class"), defined as:

> All persons or entities who (a) were Out-of-Network Health Care Providers or Out-of-Network Health Care Provider Groups; (b) provided Covered Services or Supplies to any participant or beneficiary of any Aetna-insured or -administered health plan (c) which used the Ingenix Database to determine ONET benefits; and (d) whose resulting claims for reimbursement included Partially Allowed Claims based in whole or in part on information obtained from the Ingenix Database, at any time during the period June 3, 2003 through the date that Aetna ceased using the Ingenix Database (August 1, 2011).

## RULE 23(a)

### Numerosity

313.    The Provider Class includes thousands of ONET healthcare providers throughout the United States and is therefore so large to make joinder of all members impracticable within the meaning of Fed. R. Civ. P. 23(a)(1).

### Commonality

314.    Pursuant to Fed. R. Civ. P. 23(a)(2), there are questions of law or fact common to all Provider Class members, including, but not limited to, the following:

(a)    Whether the amounts paid to the Provider Class were fixed, artificially maintained, and/or stabilized by Defendant and others;

(b)    Whether Aetna's use of the Ingenix database to determine UCR s violated ERISA;

(c)    Whether Aetna's UCR Benefit Reductions violated ERISA;

(d)    Whether Aetna's use of the Ingenix database itself resulted in lower UCR determinations than were otherwise available based on appropriate information;

(e)    Whether Aetna's failure to properly disclose the specific reason for UCR and ONET pricing methods in its EOBs and EOPs as well as failure to disclose material information (including the offer to disclose the relevant evidence) violated ERISA and its accompanying regulations;

(f)    Whether ERISA requires each Provider ERISA member to prove exhaustion or futility;

(g)    The proper measure of damages sustained by the Provider Class as a result of the conduct alleged; and

(h)    Whether interest should be added to the payment of unpaid benefits.

## Typicality

315.    The claims of the Provider Plaintiffs are typical of the claims of the Provider

Classes, within the meaning of Fed. R. Civ. P. 23(a)(3), and are based on and arise out of the

same uniform and standard illegal practices of the Defendant alleged by the Provider Plaintiffs.

The proposed Provider Class representatives state claims for which relief can be granted that are

typical of the claims of absent Provider Class members.  If litigated individually, the claims of

each Provider Class member would require proof of the same material and substantive facts, rely

upon the same remedial theories, and seek the same relief.

## Adequacy

316.    The Provider Plaintiffs are committed to pursuing this action and are prepared to

serve the proposed Class in a representative capacity with all of the obligations and duties

material thereto.  The Provider Plaintiffs will fairly and adequately represent the interests of the

members of the class within the meaning of Fed. R. Civ. P. 23(a)(4) and have no interests

adverse to, or which directly and irrevocably conflict with, the interests of the other Provider

Class members.

317.    The Provider Plaintiffs have retained competent counsel experienced in class

action litigation.  Said counsel will adequately prosecute this action, and will assert, protect and

otherwise well represent the named Provider Class representatives and absent Provider Class

members.

## RULE 23(b)(1)(A) AND (B)

318.    The prosecution of separate actions by individual Provider Class members would

create a risk of adjudication with respect to individual Provider Class members which would, as

a practical matter, be dispositive of the interests of other members of the Provider Class who are

not parties to this action, or could substantially impair or impede their ability to protect their interests.

319.   The prosecution of separate actions by individual members of the Provider Class would create a risk of inconsistent of varying adjudications with respect to individual members of the Provider Class which would establish incompatible rights within the Provider Class.

**RULE 23(b)(2)**

320.   Aetna's actions are generally applicable to the Provider Class as a whole, and the Individual Plaintiffs seek equitable remedies with respect to the Provider Class as a whole, within the meaning of Fed. R. Civ. P. 23(b)(2).

**RULE 23(b)(3)**

321.   The common questions of law and fact enumerated above predominate over individual questions, and a class action is a superior method for the fair and efficient adjudication of this controversy, within the meaning of Fed. R. Civ. P. 23(b)(3).  Common or general proof will be used for each Provider Class member to establish each element of their ERISA claims. Additionally, proceeding as a class action is superior to other available methods of adjudication. The likelihood that individual members of the Provider Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation since the cost of litigation far exceeds what any one Provider Class member has at stake.

**RULE 23(c)(4)**

322.   Issues of liability may be certified for resolution under Rule 23(c)(4) with regard to the substantive claims in order to materially advance the litigation as a whole.

<u>COUNT I</u>
**CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS GOVERNED BY
ERISA AND REQUEST FOR DECLARATORY RELIEF**
**(on Behalf of the Subscriber ERISA and New Jersey SEHP Classes)**

323.    Plaintiffs repeat the allegations set forth in the above paragraphs as if fully set forth therein.

324.    Aetna must pay benefits to Aetna Members that are insured by, funded by or administered by Aetna pursuant to the terms of their ERISA plans and in compliance with applicable federal and state laws.

325.    Aetna violated its legal obligations under ERISA-governed plans and federal common law each time it made the ONET Benefit Reductions described in this Amended Complaint, including violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

326.    In certain self-insured plans which are sometimes designated Administrative Services Only or "ASO," Aetna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

327.    Where Aetna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Aetna is liable for underpaid benefits to Subscriber Plaintiffs and members of the class in both fully insured and ASO ERISA health plans.

328.    Aetna further violated its obligations under ERISA when it failed to comply with applicable state law, such as by making ONET Benefit Reductions that were inconsistent with New Jersey SEHP regulations. These regulations require Aetna to pay provider charges using the most updated Ingenix data at the 80th percentile for the geographic area where the service occurred and further require Aetna to pay hospital services based on the billed charge, without using a database. Aetna systemically violated these regulations, including by using Outdated

Data from inapplicable geographic areas, reducing payment for multiple procedures or assistant surgeons, and using Ingenix data to price hospital UCR. Aetna's violations resulted in systematic underpayment to New Jersey SEHP Members for hospital and medical services.

329.    Aetna's omissions and lack of disclosure to its Members violated its legal obligations. Aetna violated obligations each time it engaged in conduct that discouraged or penalized its Members' use of ONET providers, such as by making ONET Benefit Reductions. Aetna, as the party which exercised all discretionary authority and control over the administration of the plan of each Subscriber Plaintiffs, including the management and disposition of benefits under the terms of the plan, owed a fiduciary duty to Subscriber Plaintiffs and each putative class member.

330.    Aetna breached its fiduciary duties to Subscriber Plaintiffs and each member of the Subscriber Class by failing to pay proper ONET benefits without justification. Aetna therefore owes – and should be ordered to pay – the benefits that were improperly denied based on the policies detailed herein. Subscriber Plaintiffs, on their own behalf and on behalf of the members of the ERISA and New Jersey SEHP Classes, seek unpaid benefits, recalculated deductible and coinsurance amounts and interest back to the date their claims were originally submitted to Aetna. Plaintiff Sharon Smith also sues for declaratory relief related to enforcement of the plan terms, and to clarify rights to future benefits. Subscriber Plaintiffs request attorneys' fees, costs, prejudgment interest and other appropriate relief against Aetna.

## COUNT II
## BREACH OF PLAN PROVISIONS FOR
## BENEFITS IN VIOLATION OF ERISA § 502(A)(1)(B)
### (on Behalf of the Provider Plaintiffs)

331.    Plaintiffs repeat the allegations set forth in the above paragraphs as if fully set forth therein.

332.     The Provider Plaintiffs have standing to pursue these claims as assignees of their patients' out-of-network benefits claims and as beneficiaries.

333.     During the Class Period, Aetna breached its plan provisions for benefits by underpaying UCR and other out-of-network reimbursement amounts covered by ERISA healthcare plans to Provider Plaintiffs in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

334.     Aetna's use of the inaccurate and biased Ingenix database resulted in UCR Benefit Reductions that breached its obligations under its health plans, resulting in financial harm to Providers who rendered ONET services to Aetna subscribers.

335.     Under the terms of its health plans, Aetna administers benefits.

336.     In certain self-insured plans which are sometimes designated ASO, Aetna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to benefits.

337.     Where Aetna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Aetna is liable for underpaid benefits to the Provider Plaintiffs in both fully insured and ASO ERISA health plans.

338.     Pursuant to 29 U.S.C. § 1132(a)(l)(B), Provider Plaintiffs are entitled to recovery for unpaid benefits and declaratory relief relating to Aetna's violation of the terms of its health care plans.

## <u>COUNT III</u>
## <u>BREACH OF CONTRACT</u>
### (By Plaintiff Weintraub on Behalf of a Non-ERISA Class Against Aetna )

339.     Plaintiffs repeat the allegations set forth in the above paragraphs as if fully set forth therein.

340. During times relevant to the Complaint, Plaintiff Weintraub has been a member of an individual and family health plan issued and administered by Aetna.  Specifically, during the Class Period, Plaintiff Weintraub participated in a "Student Health Insurance Program" sponsored by his University and defined as an "Aetna Open Choice PPO", underwritten by Aetna Life Insurance Company which was not subject to nor governed by ERISA.

341. Aetna issued standard form contract documents for its individual and family plans (the "Agreements") to Plaintiff Weintraub and its other non-ERISA Members setting forth the benefits Aetna agreed to provide members as well as the costs to the members of the plans.

342. The Agreements are uniform contracts that utilize the same definitions even across different health plans.  The Agreements are one-sided adhesive contracts.  Such contracts are presented on a take it or leave it basis and are not subject to negotiation or alteration by individual members.

343. The Agreements provide non-ERISA Members like Plaintiff Weintraub with an express right to receive treatment from out-of-network providers.  Aetna refers to these providers as "non-participating," "non-contracting," "non-network," "non-PPO" and/or "out-of-network" providers.  Services by "in-network" providers are reimbursed at discounted rates negotiated between the healthcare provider and Aetna.  Aetna promises in the Agreements to reimburse its members for services by out-of-network providers at a percentage of the lesser of: (i) the actual, billed charge, or (ii) the UCR for the services in the geographic area in which the services were performed.

344. Plaintiff Weintraub was provided a "Guide to Student Health Insurance and Healthcare at New York University" that sets forth the terms of his Plan.  That document contains a Glossary where "Reasonable Charge" is defined as "[o]nly that part of a charge which

is reasonable is covered.  The reasonable charge for a service or supply is the lowest of: the provider's usual charge for furnishing it; and the charge Aetna determines to be appropriate; based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made; and the care Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished."

345.    Plaintiff Weintraub was further provided with a "Student Health Insurance Handbook" that contains a "Summary of Benefits" section.  In that section, Aetna promised to reimburse Plaintiff Weintraub 50% of the Reasonable Charge for ONET.

346.    Aetna's Agreements, and its other written communications with its non ERISA Members, state that the Member is financially responsible for the difference between the allowed expense and the provider's billed charge for ONET.  For example, the Agreements explicitly state that "Covered Medical Expenses" only include charges that are not in excess of the "Reasonable Charge."

347.    Once a member receives ONET, Aetna provides an EOB that describes the division of payment for the service.  The EOBs state the amount the Non-par charged for the service, the amount allowed, and after stating the percentage and portion of the amount allowed that Aetna will pay, states the balance, which the EOBs describe as "Your Responsibility."

348.    Thus, the portions of ONET charges not paid by Aetna are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan member has to pay for medical services over a given time period.  Such costs are borne entirely by Members such as Plaintiff Weintraub.

349.    In December, 2007, Plaintiff Weintraub obtained ONET from an ONET provider in New York City and submitted the claim for the services to Aetna.  Aetna reimbursed Plaintiff

Weintraub less than the agreed-upon percentage of either the provider's actual charges or the Reasonable Charge.  This reimbursement determination resulted in Plaintiff being obligated to pay not only his deductible, but also that part of the provider's billed charge that exceeded the reimbursement amount determined by Aetna.

350.    Plaintiff Weintraub and the other members of the Non-ERISA Class complied with their obligations under their Agreements with Aetna.

351.    Nevertheless, Aetna failed to comply with the terms of the Agreements with Plaintiff Weintraub and the other Non-ERISA Class Members by making reimbursement determinations for ONET that had the effect of covering less than the stated percentage of either the providers' actual charges or the UCR without valid data to support such determinations, rather relying on the flawed and artificially deflated data provided by Ingenix.  Aetna's conduct thus contravenes the express terms of the Agreements and constitutes a breach of its contracts. Such conduct also prevents Aetna's members from obtaining the benefits of the reimbursements they reasonably expect to receive pursuant to the terms of the Agreements in violation of the covenant of good faith and fair dealing.

352.    As a consequence of Aetna and other insurers' actions, Plaintiff Weintraub and the other members of the proposed Non-ERISA Class were reimbursed for ONET in amounts less than what they should have been paid under their Agreements.

## PRESERVED CLAIMS

353.    Plaintiffs' failure to re-plead any allegations and claims that were contained in their Third Joint Consolidated Amended Class Action Complaint and Demand for Jury Trial and which this Court dismissed in its Opinion (ECF No. 1024) and Order (ECF No. 1025) issued on June 30, 2015, shall not be deemed or construed as a waiver of those allegations and claims for

purposes of appeal given that all claims that were dismissed were dismissed with prejudice. Plaintiffs expressly preserve all such dismissed allegations and claims. *See United States ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 516-17 (3d Cir. 2007).

**WHEREFORE**, Provider Plaintiffs and the Provider Class demand judgment in their favor against Aetna as follows:

(a)     Certifying the Provider Class as set forth in this Complaint, and appointing the individual Provider Plaintiffs as representatives for these classes;

(b)     Declaring that Aetna breached the terms of its Members' plans with regard to out-of-network benefits in its Members' health plans, and thereby awarding damages to Provider Plaintiffs for unpaid benefits in ERISA plans to Provider Plaintiffs, as well as awarding declaratory relief with respect to Aetna's violations of ERISA;

(c)     Awarding Provider Plaintiffs and the Provider Class the costs and disbursements of this action, including reasonable attorneys' fees, costs and expenses in amounts to be determined by the Court;

(d)     Ordering Aetna to recalculate and issue unpaid benefits to Provider Plaintiffs and Provider Class members that were underpaid as a result of Aetna's improper UCR determinations;

(e)     Awarding prejudgment interest to the Provider Plaintiffs; and

(f)     Granting such other and further relief as is just and proper.

**WHEREFORE**, Subscriber Plaintiffs and the Classes they represent demand judgment in their favor against Aetna as follows:

(a)     Certifying the ERISA Class, the New Jersey SEHP and Individual Plan Class, and the New York Subscribers Classes as set forth in this Amended Complaint, and

appointing named Subscriber Plaintiffs as Class representatives for the ERISA Class, appointing Plaintiffs Cooper and Samit as Class representatives for the New Jersey SEHP and Individual Plan Class, appointing Plaintiff Weintraub as Class representative for the New York Subscriber Damages Class, and appointing all named Provider Plaintiffs as Class representatives for the Provider Class.

(b)     Declaring that Aetna breached the terms of its EOCs and SPDs and awarding unpaid benefits to Subscriber Plaintiffs and the members of the ERISA and New Jersey SEHP and Individual Plan Classes, as well as awarding injunctive and declaratory relief to prevent Aetna from continuing to profit from its UCR Benefit Reductions that are undisclosed and unauthorized by its health plans;

(c)     Ordering Aetna to reprocess without using Ingenix data all of the claims that reflected UCR Benefit Reductions based in whole or in part on the inaccurate Ingenix database during the Class Period, plus interest;

(d)     Ordering Aetna to recalculate deductibles and coinsurance amounts consistent with the reprocessed amounts rather than the UCR Benefit Reductions based in whole or in part on Ingenix data;

(e)     Awarding prejudgment interest; and

(f)     Granting such other and further relief as is just and proper.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
*Counsel for Plaintiffs*


By:___/s/ James E. Cecchi_____
         JAMES E. CECCHI

Dated: February 8, 2017

87

Robert J. Axelrod
AXELROD & DEAN LLP
830 Third Avenue, 5th floor
New York, NY 10022
(646) 448-5263

Andrew S. Friedman
BONNETT  FAIRBOURN  FRIEDMAN  &
BALINT PC
2325 E. Camelback Rd., Ste. 300
Phoenix, Arizona 85016
(602) 274-1100

Barry M. Epstein
Barbara Gail Quackenbos
EPSTEIN & QUACKENBOS, P.C.
103 Eisenhower Parkway, Suite 102
Roseland, New Jersey 07068
(973) 228-4642

Christopher Burke
Joseph P. Guglielmo
Amanda Lawrence
SCOTT+SCOTT, LLP
The Chrysler Building
405 Lexington Ave., 40th Floor
New York, NY 10174
(212) 223-6444

Stephen A. Weiss
Diogenes P. Kekatos
James A. O'Brien III
SEEGER WEISS LLP
77 Water St., 26th Fl.
New York, NY 10005
(212) 584-0700

Joe R. Whatley, Jr.
Edith Kallas
WHATLEY KALLAS, LLP
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
(212) 447-7060

Lynne Kizis
Kevin P. Roddy
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
(732) 636-8000

## JURY TRIAL DEMAND

All Plaintiffs demand a jury trial for all claims so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
*Counsel for Plaintiffs*

By:    /s/ James E. Cecchi
JAMES E. CECCHI

Dated: February 8, 2017

Robert J. Axelrod
AXELROD & DEAN LLP
830 Third Avenue, 5th floor
New York, NY 10022
(646) 448-5263

Andrew S. Friedman
BONNETT FAIRBOURN FRIEDMAN &
BALINT PC
2325 E. Camelback Rd., Ste. 300
Phoenix, Arizona 85016
(602) 274-1100

Barry M. Epstein
Barbara Gail Quackenbos
EPSTEIN & QUACKENBOS, P.C.
103 Eisenhower Parkway, Suite 102
Roseland, New Jersey 07068
(973) 228-4642

Christopher Burke
Joseph P. Guglielmo
Amanda F. Lawrence
SCOTT+SCOTT, LLP
The Chrysler Building
405 Lexington Ave., 40th Floor
New York, NY 10174
(212) 223-6444

Stephen A. Weiss
Diogenes P. Kekatos
James A. O'Brien III
SEEGER WEISS LLP
77 Water St., 26th Fl.
New York, NY 10005
(212) 584-0700

Joe R. Whatley, Jr.
Edith Kallas
WHATLEY KALLAS, LLP
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
(212) 447-7060

Lynne Kizis
Kevin P. Roddy
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
(732) 636-8000