# Exhibit 12

ATTORNEYS' EYES ONLY

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ) | |
| ) | |
| **IN RE: AETNA UCR LITIGATION** ) | **MDL NO. 2020** |
| ) | **(No. 2:07-CV-3541)** |
| ) | |
| ) | |
| ) | |
| ) | |

**RESPONSIVE EXPERT REPORT OF DR. ANDREW S. JOSKOW**

ATTORNEYS' EYES ONLY

### Table of Contents

I.     Assignment ...................................................................................................4

II.    The Rausser Report...................................................................................4

III.   The Foreman Report ................................................................................5

    A. Dr. Foreman's first proposed method for calculating damages is not supported ...............5

    B. Implementing the second method for calculating damages proposed by Dr. Foreman demonstrates that there was no class-wide impact and that individualized inquiry is needed to assess injury...................................................................6

    C. The "small numbers issues" raised by Dr. Foreman further prove that individualized inquiry is needed to determine appropriate "comparable" charges and the appropriate "but-for" UCR rate for a given class member claim line......................................................9

    D. The hypothetical examples constructed by Dr. Foreman to show the impact of various Ingenix "scrubbing" rules suffer from mathematical errors, and counterexamples can be constructed to show the opposite result ....................................................10

IV.   The Siskin Report ...................................................................................11

    A. As demonstrated in my affirmative report, the "flaws" Dr. Siskin alleged regarding Ingenix's methodology do not result in class-wide impact ...............................11

    B. There is a missing link between Dr. Siskin's allegation regarding Aetna's UCR determination based on the Ingenix database and his proposed "calculation of underpaid plan benefits" ................................................................13

    C. Aetna's "pre-scrubbing" does not necessarily bias downward the upper percentile values produced by Ingenix ....................................................................13

ATTORNEYS' EYES ONLY

D. Ingenix's "common scrubber" rules do not necessarily bias the upper percentile values downward ........................................................................................17

E. One single dental example cannot prove that the Ingenix database systematically understated UCR rates for all claim lines in the purported class......................................18

F. Ingenix's "scrubbing" of high and low charges does not necessarily bias the upper percentile values downward.........................................................................19

G. Ingenix's methodology for creating derived data does not necessarily bias the upper percentile values downward.........................................................................20

H. Dr. Siskin provides no evidence that Aetna's use of Ingenix national data, Aetna's own data, or Medicare data would systematically understate the UCR rates...................21

3

ATTORNEYS' EYES ONLY

## I.    Assignment

1.   I am an economist and Senior Vice President of National Economic Research Associates, Inc.

   ("NERA"). This report supplements the report I submitted in this matter on April 06, 2010.[1]

   My qualifications are stated in my prior report and are not repeated here. I have been asked

   by counsel to review the expert reports of Dr. Gordon Rausser,[2] Dr. Stephen Foreman,[3] and

   Dr. Bernard Siskin[4] submitted in this litigation on April 6, 2010. I address arguments related

   to class certification provided in each of these three reports. The materials I relied upon in

   addition to those listed in my affirmative report are included in **Appendix A**.

## II.    The Rausser Report

2.   In the Rausser Report, Dr. Rausser opines on the possibility of collusion and analyzed

   various factors that he asserts would induce or facilitate coordination. However, Dr. Rausser

   provides no evidence to show whether there is any impact on any class member, nor does he

   provide any independent analysis analyzing whether common evidence could be used to

   prove impact for all members of the purported class. He simply references the other two

   plaintiffs' expert reports (i.e., the Foreman Report and the Siskin Report) and the New York

   Attorney General's investigation as evidence of injury. Although Dr. Rausser asserts that

   "[t]he final determination of both common impact and damages is a data-driven exercise,"[5]

---

[1] Expert Report of Dr. Andrew S. Joskow, April 6, 2010 ("Joskow Report").

[2] Expert Witness Report of Gordon Rausser, Ph.D., In Re: Aetna UCR Litigation, MDL No. 2020 (No. 2:07-CV-3541), April 6, 2010 ("Rausser Report").

[3] Expert Report of Stephen Foreman, Ph.D., JD, MPA, In Re: Aetna UCR Litigation, MDL No. 2020 (No. 07-CV-3541) (FSH)(PS), April 6, 2010 ("Foreman Report").

[4] Plaintiffs' Expert Report Dated April 6, 2010, Bernard R. Siskin, Ph.D., In Re: Aetna UCR Litigation, MDL No. 2020 (No. 07-CV-3541) (FSH) (PS), April 6, 2010 ("Siskin Report").

[5] Rausser Report, ¶18.

4

ATTORNEYS' EYES ONLY

he has not provided any analysis on whether there exists a formulaic approach to calculating damages in this case.

3.  The focus of my analysis is to determine (a) whether there is common evidence to prove injury on a class-wide basis, and if so, (b) whether calculating the amount of that injury can be done in a formulaic way for the entire proposed class. The Rausser Report, however, focuses on liability issues—whether there was an incentive and ability to engage in a conspiracy—and does not provide any independent analysis of whether there is class-wide proof of impact or a formulaic approach to damages.

## III.  The Foreman Report

### A.  Dr. Foreman's first proposed method for calculating damages is not supported

4.  Dr. Foreman proposes two methods for calculating damages. The first method is to "establish the difference between the billed charge and the allowed amount calculated using the flawed data base."[6] This implies that the appropriate allowed amount "but for" the alleged conduct would always be the same as the billed charge. Of course, it could not be the case that every single provider's billed charge is a usual, customary, and reasonable ("UCR") charge. Whatever the basis for determining usual, customary, and reasonable rates, actual billed charges will vary around those rates. Dr. Foreman provides no basis upon which one could conclude that a provider's billed charge, no matter how high, would be the proper "but for" usual, customary, and reasonable charge. Even a named subscriber plaintiff, Michele Cooper, testified that a "but-for" UCR rate does not necessarily equal the billed charge.[7] Also, a named provider plaintiff, Dr. Tonrey, testified that he is seeking damages based on the difference between the actual UCR rate and a UCR rate that was satisfactory to

---

[6] Foreman Report, ¶10.

[7] See Deposition of Michele Cooper, January 19, 2010, pp. 39-40.

5

ATTORNEYS' EYES ONLY

him, not the difference between his billed charge and the actual UCR rate.[8]  Moreover, the

members' plan specifications instruct Aetna to reimburse the UCR rates on out-of-network

services, not the billed charges.[9]

5.   Dr. Foreman has not established any link between the "but-for" UCR rate and the billed

charge.  In particular, he does not demonstrate with any data analysis why these two

variables would always be equal for all claim lines in the purported class.  Furthermore, as

shown in many examples in my affirmative report, "but-for" UCR rates based on

"comparable" charges that are collected controlling for plaintiffs' alleged "flaws" can be

lower than the billed charges.[10]  Thus, Dr. Foreman's first proposed method for calculating

damages is based on an assumption that is not supported by any evidence.  Although on its

face very simple, Dr. Foreman's first proposed damage methodology would be based on an

inappropriate "but-for" UCR, and thus could not be used to calculate damages on a class-

wide basis.

**B.   Implementing the second method for calculating damages proposed by Dr. Foreman demonstrates that there was no class-wide impact and that individualized inquiry is needed to assess injury**

6.   The second method proposed by Dr. Foreman is to develop a proxy for the "accurate" UCR

"but for" the alleged conduct, using health insurer claims data.[11]  Although Aetna's claims

data were produced to the plaintiffs and should have been available to Dr. Foreman, Dr.

Foreman has not provided any analysis using Aetna's claims data.  Instead, the only data-

based analysis that Dr. Foreman refers to in his report is the analysis conducted in the New

---

[8] See Deposition of Dr. Frank G. Tonrey, February 22, 2010, pp. 144-146.

[9] AET-00296986.

[10] For example, Exhibits 7, 8, 9, 13, and 20 in Joskow Report.

[11] Foreman Report, ¶10.

ATTORNEYS' EYES ONLY

York Attorney General investigation (including the FAIR Health project involving the Upstate Research Group).  Although Dr. Foreman claims that he is "not relying on any data gained or developed from the FAIR Health project or the New York Attorney General investigation in providing this report," nevertheless, he states that the work he performed there provided him with "useful insights into the methods and conduct used by Aetna and other data-contributing organizations to Ingenix."[12]  Because Dr. Foreman has not produced the underlying program code and data used in the New York Attorney General investigation, I cannot review them to provide any direct assessment of the methodology and results.

7. The subgroup analyses that I have provided in my affirmative report[13] follow a similar methodology to the one proposed by Dr. Foreman.  I construct various possible "but-for" UCR rates "correcting" for various "flaws" in the Ingenix database as alleged by the plaintiffs.  Consistent with Dr. Foreman's proposal,[14] I collect actual billed charges from Aetna's ACAS data.  The results of my analyses show that there is no class-wide impact from the alleged "flaws."  For each individual class member claim line, the "but-for" UCR rate absent the alleged "flaws" in the Ingenix database could be lower, higher, or the same as the Ingenix-based actual UCR.  For any given combination of alleged flaws, some proposed class members would be injured, some would benefit, and some would be unaffected.  This demonstrates that Dr. Foreman's second proposed method for calculating damages is likely to produce negative or zero damages for a significant number of proposed class members.

8. Furthermore, Dr. Foreman contends that the way Ingenix determines the "comparable" charges is "flawed."  For example, Dr. Foreman states that "[f]or a given CPT code the

---

[12] Foreman Report, ¶61.

[13] Joskow Report, Section V.

[14] Foreman Report, ¶149.

Ingenix rate tables do not differentiate between or among providers based on licensure, specialization, experience, qualifications or specialty."[15]  As another example, Foreman asserts that geozips do not appropriately define the geographic area of medical care markets.[16]  However, in order to arrive at a damage calculation algorithm that is "exactly the same for each class member,"[17] Dr. Foreman ignores these "flaws."  He proposes the "but-for" UCR to be calculated at the "CPT/geographic combination" level[18]—this would not take into account provider "licensure, specialization, experience, qualifications or specialty" that he alleges should have been taken into account by Ingenix.  He also suggests that "for purposes of damage calculation the geozip can be used,"[19] even though he alleges that geozips are inappropriate to be used as the geographic area of medical care markets.  Thus, his proposed damages calculation methodology would still suffer from various "flaws" alleged by him and by plaintiffs.  The "but-for" world analyses in my affirmative report, on the other hand, provide illustrative attempts to "correct" for these various "flaws."  Furthermore, as discussed in my affirmative report,[20] individualized inquiry is needed to assess which characteristics should be accounted for and how they should be accounted for in determining appropriate "comparable" charges and the appropriate "but-for" UCR rate for a given class member claim line.  Even Dr. Foreman himself seems to acknowledge the need for individualized inquiry by his proposal to use an alternative geographic area definition— "[a]lternatively, the data may permit identification of more appropriate geographic areas as

---

[15] Foreman Report, ¶ 82.

[16] Foreman Report, ¶¶ 122-129.

[17] Foreman Report, ¶158.

[18] Foreman Report, ¶156.

[19] Foreman Report, ¶155.

[20] Joskow Report, Section V.D.

ATTORNEYS' EYES ONLY

representative of communities."[21]  Identification of "more appropriate geographic areas"
would require individualized inquiry.

C.   The "small numbers issues" raised by Dr. Foreman further prove that individualized
      inquiry is needed to determine appropriate "comparable" charges and the
      appropriate "but-for" UCR rate for a given class member claim line

9.   Dr. Foreman asserts that when there are fewer than 80 billed charge claims records in a
      geozip/procedure code combination, the percentile values calculated by Ingenix may suffer
      from "sizable random variation."[22]  It is true that a percentile value calculated based on a
      large number of charges from various providers is generally more statistically reliable than
      one that is calculated based on a few charges from a limited number of providers.[23]
      However, Dr. Foreman has not provided any analysis to show that a UCR rate calculated
      based on data that are subject to the "small numbers issues" would always be biased
      downward.  Dr. Foreman proposes that for the geozip/procedure code combinations that
      contain allegedly "insufficient numbers of claims," the "but-for" UCR rates would be either
      (a) equal to the billed charges, or (b) calculated by "proper application of statistical and
      econometric methodologies based on data from areas that are known to include a sufficient
      number of claims to generate statistically reliable results."[24]  With regard to proposition (a),
      Dr. Foreman has not provided any analysis to show why the "but-for" UCR rates should be
      equal to the billed charges and, as discussed in an earlier section, there is no reason to think
      that they should be.  With regard to proposition (b), Dr. Foreman gives a rather vague
      description of what he proposes.  For example, the definition of an appropriate "area" from

---

[21] Foreman Report, ¶155.

[22] Foreman Report, ¶¶130–131.

[23] Joskow Report, ¶80.

[24] Foreman Report, ¶10.

which to collect a "sufficient" number of claims to generate "statistically reliable" results based on "proper application of statistical and econometric methodologies" might be different for each class member claim line. This suggests that an actual application of Dr. Foreman's proposed "but-for" UCR construction would require individualized inquiry.

10. Because many of the examples discussed in my affirmative report are based on more than 80 "comparable" claim lines, they would be considered to contain a "sufficient" number of claim lines and would not suffer from the "small numbers issues" as defined by Dr. Foreman. For those examples that are based on a smaller number of "comparable" claim lines, I have discussed the implications and possible approaches in ¶¶79–80 of my affirmative report. In particular, the small data samples in the "but for" scenarios discussed in my report arise *directly* from the data segregation that the plaintiffs propose in their complaint. In order to construct a "but-for" UCR rate that is consistent with this statement and avoids the "issues" that Dr. Foreman asserts, individualized inquiry would be required. Whatever small sample concerns Dr. Foreman has with regard to Ingenix would simply be exacerbated by the data segregation suggested by the plaintiffs in this case.

**D. The hypothetical examples constructed by Dr. Foreman to show the impact of various Ingenix "scrubbing" rules suffer from mathematical errors, and counterexamples can be constructed to show the opposite result**

11. In Exhibit C of his report, Dr. Foreman constructs one hypothetical example for each of three methods that are allegedly used by Ingenix—the high low screen, the mean to median data rejection, and the relative value imputation. As detailed in **Appendix B** of this report, I find that each of these hypothetical examples suffers from mathematical errors. By simply correcting these errors,[25] I find that applying the high low screen rule can result in no change

---

[25] I find multiple errors in each example in Exhibit C of the Foreman Report. For some errors, there might be more than one way of correcting the error. See Appendix B of my report.

in the 80th percentile of the billed charges in the hypothetical example constructed by Dr. Foreman. Applying the mean to median ratio rule would result in a $5 drop in the 80th percentile value, not a $50 drop as he calculated.

12. Furthermore, I can construct counterexamples to show that even assuming that plaintiffs' allegations are true (i.e., Ingenix did apply the "scrubbing" rules and construct derived charges in the way described by Dr. Foreman), applying these methods would not necessarily lead to a lower 80th percentile value than if the rules were not applied. I have already provided a counterexample that shows that using derived charges can lead to an increase in the 80th percentile value in Section VI.C of my affirmative report. Here I construct counterexamples for the high low screen rule and the mean to median ratio rule in **Appendix C** of this report. My hypothetical examples demonstrate that applying the high low screen rule or the mean to median ratio rule can increase the 80th percentile value, and thus increase the allowed amount, when compared to the scenarios where the rule is not applied.

## IV. The Siskin Report

### A. As demonstrated in my affirmative report, the "flaws" Dr. Siskin alleged regarding Ingenix's methodology do not result in class-wide impact

13. Dr. Siskin states that "[t]o assess a reasonable charge for a particular medical service, one must rely on actual charges billed by similar providers for reasonably similar services performed for similar patients (age, etc.) in a relevant geographic area."[26] He contends that the Ingenix database is not appropriate to use for this purpose because its underlying methodology is "flawed,"[27] and that Ingenix fails to collect information specific to the

---

[26] Siskin Report, p. 5.

[27] Siskin Report, p. 6.

ATTORNEYS' EYES ONLY

patient (e.g., age, health condition), the service (i.e., type of service, place of service, modifier), or the doctor (e.g., qualifications, specialty), so that one would not be able to use the information to calculate the appropriate UCR rate.[28]

14. With respect to his criticisms of the data fields collected by Ingenix, Dr. Siskin does not offer a methodology that could account for the various factors he describes, nor does he offer a methodology that could demonstrate, through class-wide proof, that all class members were injured by a failure to account for the factors that he describes.  For example, Dr. Siskin asserts that Ingenix should group charges based on certain patient characteristics, such as age.[29]  However, he provides no proposed methodology on how this would be done. Also, Dr. Siskin asserts that a database should take into account "significant differences in medical market area,"[30] but he offers no suggestion on how exactly one should define the relevant medical market area, whether the relevant medical market area would always be different from the geographic area definition Ingenix uses (geozip), and whether the difference, if any, would have a class-wide impact on the UCR rate.

15. As discussed in ¶¶38–41 of my affirmative report, Aetna's ACAS claims data contain various factors that Dr. Siskin and plaintiffs contend should be taken into consideration in calculating the appropriate UCR rate.  I use Aetna's ACAS claims data in my analyses and have accounted for various combinations of those factors in constructing various possible "but-for" worlds to illustrate the potential variation in impact resulting from adopting Dr. Siskin's proposed disaggregated approach.[31]  The results of my analyses demonstrate that

---

[28] Siskin Report, pp. 5–6, 8–10.

[29] Siskin Report, p. 6.

[30] Siskin Report, p. 5.

[31] Joskow Report, Section V.

ATTORNEYS' EYES ONLY

such constructed "but-for" UCR rates would not necessarily be higher than the actual UCR rates based on the Ingenix database.

**B.    There is a missing link between Dr. Siskin's allegation regarding Aetna's UCR determination based on the Ingenix database and his proposed "calculation of underpaid plan benefits"**

16.    Although Dr. Siskin alleges that Aetna's UCR determination based on the Ingenix's database is "flawed" because of various factors that the Ingenix database failed to control for, he does not actually conduct such a "but-for" UCR analysis using actual charge data controlling for various factors he himself had proposed.  On the other hand, he suggests in his discussion regarding the "calculation of underpaid plan benefits" that one should calculate damages using a methodology where the allowed amount is subtracted from the billed amount, which implies that the "but-for" UCR rate would always be equal to the billed charge.[32]  Like Dr. Foreman, Dr. Siskin does not establish any link between the "but-for" UCR rate and the billed charge.  As discussed earlier in this report, the assumption of equality between the "but-for" UCR rate and the billed charge is not supported by any evidence.

**C.    Aetna's "pre-scrubbing" does not necessarily bias downward the upper percentile values produced by Ingenix**

17.    Dr. Siskin alleges that Aetna "pre-scrubs" its claims data according to various profiling rules before submitting the data to Ingenix, and that this "removes valid high charges and biases downward the Upper Percentile values in the collected data."[33]

18.    Dr. Siskin refers to information on two purported Aetna profiling guidelines regarding auto-adjudicated claims.  He describes two of these guidelines as stating, "Charges that exceed

---

[32] Dr. Siskin stated that "[a]ssuming Aetna maintains historically its electronic database which processed claims Aetna should be able to calculate and reimburse underpaid plan benefits resulting from use of the Ingenix database or other invalid R&C payment using its computerized system to reprocess claims by subtracting the invalid R&C payment from billed charges."  Siskin Report, p. 34.

[33] Siskin Report, p. 15.

ATTORNEYS' EYES ONLY

prevailing will be reduced and not profiled with action codes 617 or 657. Charges that exceed prevailing but are within plan prevailing fee liberalization will be accepted but not profiled with action code 605."[34] However, Aetna personnel have testified that Aetna did not actually apply any profiling rules that would result in the exclusion of all auto-adjudicated claims where the billed charge exceeds the prevailing rate.[35] Even Dr. Siskin appears to acknowledge this when he states that "Aetna contends that its profiling rules did not automatically remove all claims in which the billed charge exceeded R&C from the data set it used to contribute to Ingenix."[36] Testimony in this litigation indicates that there is no causal relationship between the fact that a claim line's billed charge exceeds the prevailing fee and Aetna's decision on whether to profile the claim line or not.[37] Instead, there could be various reasons why a claim line might not be profiled by Aetna—for example, issues with the associated zip code[38]—and even Dr. Siskin acknowledges that "[i]t is appropriate for a Data Contributor to edit out data errors."[39]

19. Whether the information quoted by Dr. Siskin accurately describes Aetna's profiling guidelines can be tested by examining the data produced by Aetna in this case, because those data indicate the action codes assigned to each claim line. When I review the data, I observe that the data are consistent with the testimony of Aetna's witnesses and inconsistent with the description of profiling guidelines that are quoted by Dr. Siskin. I have looked at Aetna's

---

[34] Siskin Report, p. 16. Dr. Siskin did not specify a source document for these rules.

[35] See Deposition of Deborah S. Justo (rough transcript), March 25, 2010, pp. 193-194, and 217. See also Deposition of Sharon Chilcott, *Re: Renee McCoy v. Health Net and Wachtel v. Health Net,* Civil Action No. 2:03-cv-1801 (FHS)(PS), April 14th, 2005, pp. 44-45.

[36] Siskin Report, p. 16.

[37] See Deposition of Deborah S. Justo (rough transcript), March 25, 2010, pp. 168, 217.

[38] See Deposition of Deborah S. Justo (rough transcript), March 25, 2010, p. 175.

[39] Siskin Report, p. 15.

ATTORNEYS' EYES ONLY

ACAS data for CPT 99213 (office/outpatient visit) and CPT 92065 (vision therapy) adjudicated between February 15, 2004 and August 15, 2004—the same datasets that I investigated in my affirmative report, section VI.A.[40]  I find that for CPT 99213, among auto-adjudicated claim lines where the billed charge is higher than the UCR rate based on the Ingenix database: only 5.15% contain the 6xx action codes (605, 617, or 657) listed in the auto-adjudication profiling guidelines that Dr. Siskin quotes in his report, and thus would not be profiled; while 60.78% contain the corresponding 5xx action codes (505, 517, or 557), and thus would be profiled.[41, 42]  For CPT 92065, among auto-adjudicated claim lines where the billed charge is higher than the UCR rate based on the Ingenix database: only 4.18% contain the 6xx action codes (605, 617, or 657) listed in the auto-adjudication profiling guidelines that Dr. Siskin quotes in his report, and thus would not be profiled; while 59.58% contain the corresponding 5xx action codes (505, 517, or 557), and thus would be profiled.[43]  My findings show that few auto-adjudicated claim lines where the billed charge exceeds the prevailing fee contain any of the specified 6xx action codes (605, 617, or 657), and most auto-adjudicated claim lines where the billed charge exceeds the prevailing fee contain a 5xx action code, which indicates that the claim line would be profiled, and thus support Aetna

---

[40] Similar to the profiling rule analysis I did in Section VI.A of my affirmative report, I limit the data to include only records that: a) have a non-zero billed amount, b) have no modifiers on the claim line, c) have units equal to one, d) are not facility charges, and e) are adjudicated within one year of the date of service associated with the claim line.

[41] The first digit in the three-digit action code discussed here indicates whether the claim line would be profiled (when the first digit is "5") or would not be profiled (when the first digit is "6"). See AET-00487035 (Exhibit 13 of Justo Deposition).  Also, see Deposition of Deborah S. Justo (rough transcript), March 25, 2010, pp. 174-180.

[42] The rest contain either no action codes (25.09%) or other action codes (8.98%).

[43] The rest contain either no action codes (35.89%) or other action codes (0.35%).

ATTORNEYS' EYES ONLY

personnel's testimony that the information quoted by Dr. Siskin does not accurately describe the profiling rules that were actually applied to auto-adjudicated claim lines. [44]

20. Regarding the two profiling rules that Dr. Siskin alleges are applied to Aetna's manually adjudicated claims ("Do not profile situations where Edit 410 displays—submitted charge is less than half the prevailing fee. Do not profile situations where Edit 401 displays—submitted charge exceeds prevailing fee by 150%)"[45] that are referenced as Aetna's 150% and 50% rules in my affirmative report, I have discussed and analyzed these two rules in Section VI.A of my affirmative report. As discussed there, both the 150% rule and the 50% rule were dropped from the manual adjudication guidelines in 2005. When these rules were applied, they were only applied to manually adjudicated claims. My analyses—both the hypothetical examples and examples using Aetna's ACAS data—show that there is no class-wide impact from the application of these two rules on the distribution of billed charges in Aetna's contribution data. The 80th percentile value could increase, decrease, or stay the same compared to the 80th percentile value if these two rules were not applied. Furthermore, the effect of these two rules on Ingenix's upper percentile values is indeterminate, because Aetna is only one of the data contributors to Ingenix, such that the final effect of these two Aetna rules on Ingenix's upper percentile values would depend on the relative weight of Aetna's data contribution in that particular geozip/procedure code combination and also the distribution of charges in Aetna's data as compared to that of the other data contributors'

---

[44] Similarly, Aetna applies some 6xx action codes to auto-adjudicated claim lines where the billed charge does not exceed the corresponding Ingenix rate and auto-adjudicated claim lines that were not reimbursed based on the Ingenix database, such that they would not be profiled. For these types of claim lines for CPT 92065, 8.69% contain a 6xx series action code and thus would not be profiled. For these types of claim lines for CPT 99213, 7.09% contain a 6xx series action code and thus would not be profiled.

[45] Siskin Report, p. 16.

data for that particular geozip/procedure code combination. Dr. Siskin does not offer any data analysis, and thus cannot contradict these conclusions.

**D.   Ingenix's "common scrubber" rules do not necessarily bias the upper percentile values downward**

21. Dr. Siskin discusses a hypothetical example of applying one "common scrubber" rule that is allegedly used by Ingenix[46] and uses this example to support his conclusion that Ingenix's "common scrubber" procedure would eliminate valid high charges, "thereby skewing downward the Upper Percentile values in the final Ingenix data."[47] Dr. Siskin uses this single hypothetical as a basis for concluding that there was class-wide injury. As I show below, a hypothetical that results in the opposite outcome can be found, showing that a single hypothetical is not a methodology for proving class-wide injury.

22. For purposes of the analysis in this section, I assume that Ingenix applies a high formula rule ("Flag if charge is > RV x per 80 x hifct")[48] in the way that Dr. Siskin claims, i.e., "Ingenix eliminates a contributed charge if it exceeds the product of the relative value for that CPT code multiplied by the 80th percentile for the combined data in the CPT code range (the 'per 80') multiplied by an arbitrary high factor number (hifct) determined by Ingenix."[49] I also assume that Ingenix applies a low formula rule ("Flag if charge is < RV x per 50 x lowfct").[50] Although Dr. Siskin lists this low formula rule in his report, he does not show the implications and possible results of this low formula rule if applied by Ingenix. Also, although the high low formula rule illustrated in the Siskin Report seems to refer to the same

---

[46] Siskin Report, pp. 22–23.

[47] Siskin Report, p. 24.

[48] Siskin Report, p. 21.

[49] Siskin Report, p. 22.

[50] Siskin Report, p. 21.

rule as the "high low screen rule" illustrated in Dr. Foreman's report, the detailed terms of the rules differ.[51]

23. I construct a hypothetical example (Example 3) in **Appendix C** that shows that the application of the high low formula rule does not necessarily skew the upper percentile values downward. The 80th percentile value can increase or stay the same after application of the high low formula rule. My example demonstrates that the result of Dr. Siskin's single hypothetical cannot be generalized to all class members in the purported class for the purposes of showing class-wide injury.

**E.   One single dental example cannot prove that the Ingenix database systematically understated UCR rates for all claim lines in the purported class**

24. The only example based on actual (as opposed to hypothetical) charges in Dr. Siskin's report is a survey of periodontists' charges conducted by a CIGNA subscriber named Jill Faddis in 2001. Ms. Faddis surveyed eleven periodontists and one dentist "in her geographic area,"[52] and claims that most of the periodontists' charges that she surveyed are higher than the corresponding Ingenix upper percentile values.

25. Even if I assume Ms. Faddis' allegation is valid—that Ingenix did underestimate the upper percentile values for that particular claim line in that particular geozip/procedure code combination during that particular data cycle—this one example does not prove that Ingenix underestimates the upper percentile values for all claim lines for all class members for all geozip/procedure code combinations during the entire class period. On the contrary, in my affirmative report, I have shown with many examples based on actual billed charges from

---

[51] Dr. Foreman applies a Tukey methodology of identifying the outliers. See Exhibit C of the Foreman Report.

[52] See Siskin Report, p.24. Also, see Supplemental Expert Report of Bernard, R. Siskin, Ph.D., *Wachtel, et al. v. Guardian Life Ins. Co, et al.*, Civ Docket No. 01-4183 and *McCoy v. Health Net, et al.*, Civ Docket No. 03-1801, June 15, 2006, ("Siskin 2006 Health Net Report"), footnote 14. The Siskin Report uses the same dental example as the one used in his 2006 Health Net Report, but this footnote is missing.

ATTORNEYS' EYES ONLY

Aetna's ACAS data that there was no injury for many class members, thus it is unlikely that there is a class-wide impact.

**F.   Ingenix's "scrubbing" of high and low charges does not necessarily bias the upper percentile values downward**

26. Dr. Siskin claims that "Ingenix's scrubbing of some charges on the low end is not balanced by its scrubbing of charges on the high end.  Even if Ingenix edits out more low than high charges, the scrubbing of high charges still skews the database downward."[53]  He uses two hypothetical examples, the same ones he used in his 2006 Health Net Report, to support this conclusion.[54]

27. However, even assuming as true that Ingenix does "scrub" high and low charges, the result from Dr. Siskin's two hypothetical examples cannot be generalized to all claim lines in the purported class.  The two counterexamples in Section VI.B of my affirmative report show that when an equal number of charges are "scrubbed" from each end, the resulting upper percentile values could stay the same; even if more charges are "scrubbed" from the high end than from the lower end, the resulting upper percentile values could still stay the same.[55]  Moreover, in some cases where more charges are "scrubbed" from the low than the high end, the resulting upper percentile value can even rise, as shown in Example 3 in **Appendix C** of this report.  Given the presence of counter hypothetical examples, Dr. Siskin's hypothetical examples are not a basis for concluding that Ingenix's alleged "scrubbing" of high and low charges would have a class-wide impact.

---

[53] Siskin Report, p. 26.

[54] Siskin Report, pp. 27–28.  Siskin 2006 Health Net Report, pp. 21–22.

[55] Joskow Report, pp. 79–80.

ATTORNEYS' EYES ONLY

### G. Ingenix's methodology for creating derived data does not necessarily bias the upper percentile values downward

28. Dr. Siskin claims that Ingenix's methodology for creating derived data is "flawed" in terms of "combining data without proper standardization,"[56] such that it biases the upper percentile values downward.[57] To support this claim, he discusses two hypothetical examples, the same as those used in his 2006 Health Net Report,[58] both of which show that using derived charges can result in a lower 80th percentile value.[59] Dr. Siskin's particular concern is that standardizing based on relative value, without considering relative standard deviation, could lead to derived percentiles that understate true percentiles.

29. However, despite the result from Dr. Siskin's two hypothetical examples, other examples can be found that contradict his result. Dr. Siskin's hypothetical examples show that using derived charges can result in lower 80th percentile values when only the relative value of two CPTs is considered. The counterexample in Section VI.C of my affirmative report demonstrates that when only considering relative values one can also arrive at a result that would lead to an increase in the 80th percentile value when derived charges are used. As a result, Ingenix's methodology for creating derived data using combined data may result in a higher 80th percentile value than if the data were not combined.[60] Again, Dr. Siskin is using one hypothetical as a methodology for concluding that there is class-wide injury resulting from the use of derived data. The presence of a counter example shows that use of a single

---

[56] Siskin Report, p. 31.

[57] Siskin Report, p. 30.

[58] Siskin 2006 Health Net Report, pp. 26–27.

[59] Siskin Report, pp. 27–28.

[60] Joskow Report, pp. 80–82.

hypothetical is not a basis for concluding that Ingenix's methodology for creating derived data would lead to class-wide impact.

**H.   Dr. Siskin provides no evidence that Aetna's use of Ingenix national data, Aetna's own data, or Medicare data would systematically understate the UCR rates**

30. Dr. Siskin claims that Aetna uses Ingenix national data to calculate UCR rates when Ingenix actual data in a particular geographic area are not available and this would be inappropriate because "an unadjusted national number cannot satisfy the geography-specific definition of R&C."[61]  He also claims that it is inappropriate for Aetna to use other data sources, such as the Aetna Market Fee Schedule data or Medicare data, to determine the UCR when no Ingenix data were available.[62]  Putting aside the merits issues of whether Aetna has in fact used the Ingenix national data or other data in the way that Dr. Siskin describes and whether it is legal for Aetna to use those data in that way, Dr. Siskin has not provided any evidence to show that the UCR rates would be any different "but-for" the alleged conduct, nor has he provided any analysis to prove that UCR rates were systematically understated from Aetna's use of the Ingenix national data or other data.

---

[61] Siskin Report, p. 33.

[62] Siskin Report, p. 34.

ATTORNEYS' EYES ONLY

_____

Andrew Joskow

Signed on April 30, 2010

22