# Exhibit 24

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF  NEW JERSEY

3  IN RE: AETNA UCR LITIGATION ° MDL NO. 2020
                                °
4                               ° Master File No.
                                ° 2:07-CV-3541(FSH)
5

6

7

8  ****************************************************

9                   ORAL DEPOSITION OF

10                  FRANK G. TONREY, M.D.

11                  February 22nd, 2010

12  ****************************************************

13

14

15

16        ORAL DEPOSITION OF FRANK G. TONREY, M.D.,

17  produced as a witness at the instance of the Aetna,

18  and duly sworn, was taken in the above-styled and

19  numbered cause on the 22nd of February, 2010, from

20  9:12 a.m. to 5:13 p.m., before Daniel J. Skur,

21  Notary Public and Certified Shorthand Reporter in

22  and for the State of Texas, reported by stenographic

23  means, at the offices of Gibson Dunn & Crutcher,

24  2100 McKinney Avenue, Suite 1100, Dallas, Texas,

25  pursuant to the Federal Rules of Civil Procedure.

10

Frank G. Tonrey, M.D.

1                    P R O C E E D I N G S
2            FRANK G. TONREY, M.D.,
3        having been duly sworn, testified as follows:
4                        (9:12 a.m.)
5                        EXAMINATION
6    BY MR. DOREN:
7        Q.    Good morning, sir.
8        A.    Morning.
9        Q.    Would you please state your full name
10   for the record?
11       A.    Frank G. Tonrey.
12       Q.    And what does the G stand for?
13       A.    Gerald.
14       Q.    And what is your home address?
15       A.    ████████████████████████████
16   ████
17       Q.    And are you currently employed?
18       A.    Yes.
19       Q.    And where do you work?
20       A.    I work out of various facilities in the
21   hospitals in the city of Dallas and Plano.
22       Q.    And do you work as an anesthesiologist
23   at those facilities?
24       A.    I do.

146

1                    Frank G. Tonrey, M.D.

2        A.      I believe that's correct, yeah.

3        Q.      And while you believe that your billed

4    charges are reasonable, do you agree that there are

5    some doctors who submit billed charges above a

6    reasonable level?

7        A.      There may be.  I don't know for a fact.

8        Q.      And as a class representative in this

9    litigation, do you think that doctors who bill above

10   an accurate usual, customary, and reasonable rate

11   should receive their billed charges?

12       A.      I believe they should receive the lesser

13   of the billed charges or an adequate UCR, usual and

14   customary rate.

15       Q.      And do you agree that for out-of-network

16   benefits to be available to plan members, there has

17   to be some constraint on a physician's ability to

18   receive coverage for any amount they choose to bill?

19       A.      Yes, that's generally the market forces

20   will take care of that.

21       Q.      And similarly, recognizing that

22   coverage and -- strike that.

23                    And it's because of those market

24   forces that there is a usual, customary, and

25   reasonable rate that can be determined, correct?

147

1                  Frank G. Tonrey, M.D.

2        A.     Yes.

3        Q.     And it is at that level that a physician

4    should be reimbursed, correct?

5        A.     Yes, after just one submission of a

6    claim, not four appeals.  That's...

7        Q.     Because if a physician could simply bill

8    any amount --

9        A.     Correct.

10       Q.     -- and receive that amount in insurance

11   coverage, insurers could not continue to provide

12   out-of-network benefits, correct?

13       A.     Yes.

14       Q.     And you agree that, in general,

15   out-of-network benefits are an attribute that many

16   plan members find to be important, correct?

17       A.     They pay higher premiums for it, yes.

18       Q.     Do you know how much higher?

19       A.     I think it depends on the plan.

20       Q.     Do you disagree that 125 percent of

21   local Medicare reimbursement reflects usual,

22   customary, and reasonable rates?

23       A.     Yes.

24       Q.     Why do you disagree with that?

25       A.     Medicare rates are -- for my specialty,

305

                    Frank G. Tonrey, M.D.

 1

 2       Q.      Is ▋▋▋▋▋ your friend?

 3       A.      I don't remember what her situation is.

 4   I think she might have been a very seriously ill

 5   lady who had a lot of surgery.

 6       Q.      And my question right now --

 7       A.      She's not my friend.

 8       Q.      And my question is have you ever written

 9   off coinsurance obligations for your friends?

10       A.      Not to my knowledge.  I don't send them

11   a balance bill when they have a discrepancy between

12   what the insurance company will reimburse and I

13   charge.

14       Q.      And when you say you don't send them a

15   "balance bill," do you mean you don't send them a

16   bill?

17       A.      I don't send them a bill unless it's --

18   yes.

19       Q.      So you'll take what the insurance

20   company pays?

21       A.      Right.

22       Q.      But then as a courtesy or a favor to

23   your friends, you won't bill them for any amount

24   beyond that?

25       A.      Correct.

330

1   COUNTY OF DALLAS      )

2   STATE  OF  TEXAS      )

3          I, Daniel J. Skur, Certified Shorthand
     Reporter and Notary Public in and for the State of
4   Texas, do hereby certify that the facts as stated by
     me in the caption hereto are true; that there came
5   before me the aforementioned named person, who was
     by me duly sworn to testify the truth concerning the
6   matters in controversy in this cause; and that the
     examination was reduced to writing by computer
7   transcription under my supervision; that the
     deposition is a true record of the testimony given
8   by the witness.

9                     I further certify that I am neither
     attorney or counsel for, nor related to or employed
10  by, any of the parties to the action in which this
     deposition is taken, and further that I am not a
11  relative or employee of any attorney or counsel
     employed by the parties hereto, or financially
12  interested in the action.

13                    Given under my hand and seal of
     office on this, the 26th day of February, A.D.,
14  2010.

15

16

17

18          _____
            Daniel J. Skur
19          Notary Public, State of Texas
            My Commission Expires 7/7/2010
20

21

22

23

24

25

# Exhibit 25

1

2              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
3 --------------------------------------X
  DARLERY FRANCO, et al.,
4
                   Plaintiffs,
5
        - against -    CASE NO. 07-CV-6039(SRC)(PS)
6
  CONNECTICUT GENERAL LIFE
7 INSURANCE CO., et al.,
8              Defendants.
  --------------------------------------X
9 In Re:

10 AETNA UCR LITIGATION
   MDL NO. 2020
11
   Master File No.
12 2:07-CV-3541
   --------------------------------------X
13
                TRANSCRIPT OF
14      DEPOSITION OF LEONARD A. NELSON, ESQ.

15

16         TRANSCRIPT of the stenographic

17  notes of the proceedings in the

18  above-entitled matter, as taken by and

19  before TAB PREWETT, a Registered

20  Professional Reporter, a Certified

21  Shorthand Reporter, a Certified LiveNote

22  Reporter, and Notary Public, held at the

23  offices of WHATLEY DRAKE & KALLAS, LLC,

24  1540 Broadway, New York, New York, on

25  Tuesday, June 22, 2010, commencing at 11:45 a.m.

9

```
 1              Leonard A. Nelson
 2    L E O N A R D   A.   N E L S O N,
 3    doing business at the
 4    America Medical Association,
 5    515 North State Street,
 6    Chicago, Illinois  60654,
 7    having been sworn by the notary public to
 8    testify to the truth, testified as follows:
 9    DIRECT EXAMINATION BY MR. DOREN:
10         Q     Would you please state your
11    full name for the record.
12         A     Leonard Arthur Nelson.
13         Q     And what is your home address?
14         A     ████████████████████████
15    ████████  ████████
16         Q     Where are you currently
17    employed?
18         A     At the American Medical
19    Association, 515 North State Street,
20    Chicago, Illinois  60654.
21         Q     And when did you first go to
22    work for the AMA?
23         A     In January of 1998.
24         Q     What is your current position?
25         A     Senior attorney IV, that's
```

48

1              Leonard A. Nelson

2    to 1999?

3         A     So that I am -- so that I

4    understand the question, you are asking

5    going back to before 1999, what was the

6    knowledge of the American Medical

7    Association prior to 1999 as to how

8    insurers determined out-of-network

9    payments?

10        Q     Yes.

11        A     I don't know.

12             MR. AXELROD:  Let me also

13        belatedly object to outside of the

14        scope.

15             MR. DOREN:  We could debate

16        that, but as long as --

17             MR. AXELROD:  I am not

18        instructing him not to answer.  The

19        scope objection is on the record.

20        Q     When did the AMA first learn

21   that the PHCS database was organized by

22   geo zip?

23        A     Either 1999 or 2000.

24        Q     Did the AMA know that,

25   historically, some insurers used

49

1              Leonard A. Nelson

2    compilations of their own claim data to

3    determine out-of-network reimbursement

4    levels?

5         A    I think we do know that.

6         Q    When did the AMA learn that?

7         A    I don't know when we learned

8    that.

9         Q    Has the AMA known that

10   historically?

11             MR. AXELROD:  Objection to the

12        form.

13        A    I mean, what you say, it just

14   seems to me understood generally within the

15   industry.  And I just couldn't give you a

16   year.  When you say "historically," as

17   counsel says, it's a little vague, so I

18   have trouble anticipating it.

19        Q    Has that been something that

20   has been understood generally in the

21   industry throughout your tenure with the

22   AMA?

23             MR. AXELROD:  Objection to the

24        form.

25        A    I think so, yes.

50

1              Leonard A. Nelson

2        Q      Is that something that you

3   understood to be generally understood in

4   the industry prior to your joining the AMA?

5              MR. AXELROD:   Same objection.

6        A      I don't know.

7        Q      Which reminds me, we should

8   review your work history.

9              Could you please summarize for

10  me your formal education?

11       A      Yes, I could.

12       Q      Please proceed.

13       A      Okay.  I graduated from

14  Dartmouth College in 1969 with a degree in

15  physics.  That was my area of -- that was

16  my major.  I then received a master's

17  degree in physics from the University of

18  Illinois.  I received a jurisprudence --

19  doctor of jurisprudence, a JD degree from

20  Harvard Law School in 1974.  That was my

21  formal education.

22       Q      Can you please summarize your

23  full-time employment since graduating from

24  law school?

25       A      Yes, I can.  I started at

65

                    Leonard A. Nelson

1

2        Q      Was the AMA aware of the

3    existence of any aggregated database of

4    billed charge data that was being used by

5    insurers to set reimbursement levels for

6    out-of-network care prior to 1999?

7        A      No.

8        Q      Did the AMA ever object to

9    insurers using their own claim data to set

10   reimbursement levels for out-of-network

11   claims?

12       A      Are you talking about other

13   than filing a lawsuit?

14       Q      Which lawsuit are you referring

15   to?

16       A      The United Health Care suit.

17       Q      Other than filing the United

18   Health Care suit -- well, strike that.

19              Prior to filing the United

20   Health Care suit, did the AMA ever object

21   to insurers using their own claim data to

22   set reimbursement levels for out-of-network

23   claims?

24       A      Not that I know of.  And you

25   understand I would be in a position to

66

1                    Leonard A. Nelson

2    know.

3         Q       In July 2002, in "In Re:

4    Managed Care," the AMA sued Aetna for

5    conspiring in the use of Ingenix to

6    diminish payments, correct?

7         A       No.  I don't know where you are

8    coming from.  I think you are just wrong.

9                 (Exhibit No. 485, Document on

10        the caption for MDL number 1334,

11        second page bearing the caption,

12        "Provider Plaintiffs' Second Amended

13        Consolidated Class Action Complaint,"

14        is marked by the reporter for

15        identification.)

16        Q       Mr. Nelson, I would like to

17   show you what has been marked as

18   Exhibit 485.  It is a document on the

19   caption for MDL number 1334.  And on the

20   second page it bears the caption:

21                "Provider Plaintiffs' Second

22   Amended Consolidated Class Action

23   Complaint?"

24        A       Thank you.

25        Q       And first of all, of course, I

141

1          Leonard A. Nelson

2    transaction that govern, not what the AMA

3    would like to see in that contract that

4    governs.

5          Q     And when you talk about

6    external law, you mean the legal mandates

7    for reimbursement that might apply on some

8    circumstances?

9          A     I don't know how to answer that

10   one.  I mean, there are all sort of laws

11   that may apply in these situations.  There

12   is common law.  There are statutes.  I

13   don't know how to answer that.

14         Q     Right.  Directing your

15   attention to page 299, the next topic in

16   your preparation is why UCR is needed and

17   who uses UCR.

18              Do you have that in front of

19   you?

20         A     I do.

21         Q     And in your opinion, is UCR

22   needed to protect third-party payors

23   against price gougers?

24         A     Does "you" mean Leonard Nelson?

25         Q     Yes.

142

1                     Leonard A. Nelson

2          A     Yes, I think so.

3          Q     And how do you, Leonard Nelson,

4     define "price gougers"?

5          A     A provider of medical services

6     who submits a price that is a wholly out of

7     line with any reasonable way of determining

8     a fair price for that service.

9          Q     And directing your attention --

10    sorry -- strike that.

11               And in your opinion,

12    coverage-based -- I'm sorry --

13    out-of-network coverage based on usual,

14    customary, and reasonable rates is an

15    appropriate way of third-payor payors to

16    protect themselves against price gougers?

17         A     I think so.

18         Q     And directing your attention to

19    page 333300 --

20         A     Yes.

21         Q     -- this is entitled:

22               "Typical UCR contractual

23    requirements."

24               Correct?

25         A     That is.

144

                    Leonard A. Nelson

1

2      Q      And in your opinion, is use of

3  the 80th percentile of the usual fees

4  currently charged by physicians of similar

5  training and experience for the same

6  service within the same specific and

7  limited geographical area an appropriate

8  point within a charge data distribution to

9  set out-of-network reimbursement?

10              MR. AXELROD:  Objection to the

11      form.

12      A      Yes.

13      Q      And you also put in parentheses

14  that the 80th percentile is typically used,

15  correct?

16      A      That is correct.

17      Q      And so, for example, an

18  employer plan sponsor may request that a

19  different percentile be used, correct?

20      A      Not only request, but we have

21  to say and agree.  I mean, we are not --

22  the contract -- no, you know, the fact that

23  the employer may request it is not

24  sufficient.

25              The fact that that's in the

258

1

2                    CERTIFICATE

3          I, TAB PREWETT, A Registered

4    Professional Reporter, Notary Public,

5    Certified LiveNote Reporter, and Certified

6    Shorthand Reporter, do hereby certify that

7    prior to the commencement of the

8    examination LEONARD A. NELSON was sworn by

9    the notary public to testify the truth, the

10   whole truth and nothing but the truth.  I

11   DO FURTHER CERTIFY that the foregoing is a

12   true and accurate transcript of the

13   testimony as taken stenographically by and

14   before me at the time, place and on the

15   date hereinbefore set forth.  I DO FURTHER

16   CERTIFY that I am neither a relative nor

17   employee nor attorney nor counsel of any of

18   the parties to this action, and that I am

19   neither a relative nor employee of such

20   attorney or counsel, and that I am not

21   financially interested in the action.

22   _____
     Notary Public
23   My Commission expires February 9, 2014
     Dated:  June 25, 2010

24

25

# Exhibit 26

1

1

2 IN THE UNITED STATES DISTRICT COURT

3 FOR THE DISTRICT OF NEW JERSEY

4 MDL NO. 220

5 MASTER FILE NO. 2-07-CV-3541

6

7

8 IN RE:  AETNA UCR LITIGATION

9

10

11 ------------------------------------------

12                TRANSCRIPT OF

13        DEPOSITION OF MICHELLE COOPER

14

15        TRANSCRIPT of the stenographic

16 notes of the proceedings in the

17 above-entitled matter, as taken by and

18 before TAB PREWETT, a Registered

19 Professional Reporter, a Certified

20 Shorthand Reporter, a Certified LiveNote

21 Reporter, and Notary Public, held at the

22 Offices of WILENTZ, GOLDMAN & SPITZER P.A.,

23 90 Woodbridge Center Drive, Woodbridge, New

24 Jersey, on Tuesday, January 19, 2010,

25 commencing at 10:20 a.m.

10

1              Michelle Cooper

2              P R O C E E D I N G S

3    M I C H E L L E    C O O P E R,

4    residing at 1 Bruce Path,

5    Short Hills, New Jersey  07078,

6    having been sworn by the notary public to

7    testify to the truth, testified as follows:

8    DIRECT EXAMINATION BY MR. DOREN:

9         Q      Could you please state your

10   full name for the record?

11        A      Sure, it's Michelle Cooper.

12        Q      And while I know you just did

13   it off the record, could you also please

14   state your home address?

15        A      Sure, it's ████████████

16   ████████████████        ████████

17        Q      And what is your date of birth?

18        A      ████████████.

19        Q      Are you currently employed?

20        A      Yes.

21        Q      Where do you work?

22        A      I am self-employed with

23   Coliberate, C-o-l-i-b-e-r-a-t-e, Systems.

24        Q      And how long have -- I'm sorry.

25   Coliberate Systems is the name of your

49

                     Michelle Cooper

1

2    for that service.  Correct?

3         A     Correct.

4         Q     And do you agree that your

5    health insurer should not be required to

6    pay whatever rate the doctor sets as

7    what -- however it is they value their

8    services?

9         A     Sure.

10        Q     They should only have to pay,

11   you know, what in broader analysis is a

12   usual, customary, and reasonable rate?

13        A     Depends upon how you are going

14   to define "broader."

15        Q     I understand.  In other words

16   an accurately calculated, usual, customary,

17   and reasonable rate?

18        A     Which is not present the way

19   they are calculating.

20        Q     I assure you, if I am trying to

21   discuss your allegations about what is or

22   what is not appropriate in current UCR

23   allegations, I will be direct with you.

24        A     Okay.

25        Q     My question is that:

50

1              Michelle Cooper

2              You agree that a health insurer

3    should not be bound by whatever rate a

4    provider selects, correct?

5         A     Correct.

6         Q     And why not?

7         A     It's not reasonable.

8         Q     It just a unilateral number

9    potentially, correct?

10        A     Correct.

11        Q     And the health plan that you

12   have enrolled in contemplates not the full

13   billed charges will be paid, but rather a

14   reasonable and customary amount will be

15   paid, correct?

16        A     Correct.

17        Q     And that's what you expected

18   when you enrolled in it?

19        A     Reasonable and customary, yes.

20        Q     And that's what you relied upon

21   when you enrolled in the plan?

22        A     Correct.

23        Q     You did not rely upon receiving

24   whatever rate the provider unilaterally

25   selects?

303

1

2                    CERTIFICATE

3          I, TAB PREWETT, A Registered

4   Professional Reporter, Notary Public,

5   Certified LiveNote Reporter, and Certified

6   Shorthand Reporter, do hereby certify that

7   prior to the commencement of the

8   examination MICHELLE COOPER was sworn by

9   the notary public to testify the truth, the

10  whole truth and nothing but the truth.  I

11  DO FURTHER CERTIFY that the foregoing is a

12  true and accurate transcript of the

13  testimony as taken stenographically by and

14  before me at the time, place and on the

15  date hereinbefore set forth.  I DO FURTHER

16  CERTIFY that I am neither a relative nor

17  employee nor attorney nor counsel of any of

18  the parties to this action, and that I am

19  neither a relative nor employee of such

20  attorney or counsel, and that I am not

21  financially interested in the action.

22  _____
    Notary Public
23  My Commission expires February 9, 2014
    Dated:  January 27, 2010

24

25

# Exhibit 27

1

1        UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
2

3    -------------------------------
     IN RE:  AETNA UCR LITIGATION        MDL. No. 2020
4

5    This Document Relates To:          Master Case No.
     ALL CASES                          2:07-3541(FSH)(PS)
6    -------------------------------

7

8

9        30(B)(6) DEPOSITION OF AETNA BY:

10            JAMES D. CROSS, M.D.

11            DATE:  MARCH 23, 2010

12                 HELD AT:

13            SHIPMAN & GOODWIN, LLP
              ONE CONSTITUTION PLAZA
14            HARTFORD, CONNECTICUT

15                 -  -  -

16

17

18

19   Reporter:  Sandra V. Semevolos, RMR, CRR, LSR #74

20

21

22

23

24

25   Job No. NJ247694

7

1          (Deposition commenced at 10:05 a.m.)

2          MR. SIGLER:  We will read and sign.

3               JAMES D. CROSS, M.D., of █████████

4     ███████████████████████████████████████████

5     █████████████, being first duly sworn,

6          deposes and states as follows:

7          DIRECT EXAMINATION BY MR. AXELROD:

8     Q.    Good morning.  Would you state your name for

9  the record, please?

10    A.    James Cross.

11    Q.    And what is your home address?

12    A.    ████████████████████████████████████

13  ████████████████████████████

14    Q.    What is your work address?

15    A.    151 Farmington Avenue, in Hartford,

16  Connecticut.

17    Q.    So you live in Fort Lauderdale, but you work

18  in Farmington, Connecticut; is that correct?

19    A.    Well, I have -- I'm a work-at-home

20  officially.

21    Q.    I see.

22    A.    But I have a visitor's office here in

23  Hartford, and I use Hartford as my business location

24  so that the mail and everything goes to Hartford.

25    Q.    But otherwise, your office is in your home?

80

1      A.      Well, I wouldn't characterize it as whether

2   it's legitimate or not legitimate.  I think it's a

3   methodology that's used to help support when there

4   isn't enough occurrences within a geographic region.

5   And based on the references, the methodology that's

6   used to do that derived data, that it's an actuarily,

7   I suppose, or statistically appropriate way to present

8   the data.

9   BY MR. AXELROD:

10     Q.      Well, I understand that you wouldn't

11  characterize it that way, but I'm asking you to.  I'm

12  asking you how you would characterize, one way or the

13  other, the use of derived data.

14              MR. SIGLER:  Same objection.

15     A.      I think it's a part of the product, and it's

16  an acceptable component of the product for

17  presentation of how the data comes to us from a use of

18  the data as a reasonable and customary source.

19  BY MR. AXELROD:

20     Q.      Acceptable to whom?

21              MR. SIGLER:  Same objection.

22     A.      Acceptable to Aetna.

23  BY MR. AXELROD:

24     Q.      Do you know whether someone at Aetna made

25  any study of derived data and decided that the use of

81

1   derived data was acceptable to Aetna?

2       A.    Not that I know of.

3       Q.    So your testimony is that because you think

4   that the use of derived data had been acceptable to

5   Aetna, then that's the basis for your testimony that

6   it's legitimate?

7                MR. SIGLER:  Objection,

8   mischaracterizes his testimony and form.

9       A.    Well, according to the benefit plan, we are

10  responsible for determining the reasonable and

11  customary charge, so we are actually the ones who have

12  to decide what the legitimate source or the reasonable

13  source or the appropriate source of that reasonable

14  and customary data is, so we purchased that source of

15  reasonable and customary data from Ingenix, and we are

16  aware of their assurances of what the product is about

17  and how it works and what it represents.  And in

18  purchasing that, I think we feel that that is an

19  appropriate source for reasonable and customary data.

20      Q.    So --

21      A.    They --

22      Q.    Sorry, go ahead.

23      A.    And the fact that there is derived data

24  means that in those circumstances which are unusual, I

25  would say that there is a methodology to do derived

84

1    is reasonable, is understandable, is comparable with

2    other charges that are submitted for various

3    procedures, that they have some relativity to each

4    other, that any ordinary person would think that given

5    whatever standards there are about what the relative

6    values of a particular procedure are and what the

7    local charges are of a particular procedure, that

8    those amounts are reasonable, rational and

9    understandable and not out of the ordinary.

10        Q.    Fair enough.  And how does derived data lead

11   to a fee that is comparable with other procedures or

12   with local charges?

13             MR. SIGLER:  Objection, form and

14   foundation.

15        A.    Honestly, I don't know the specifics of how

16   the derived data are obtained.  I can't testify to how

17   that's done.

18   BY MR. AXELROD:

19        Q.    So what is the basis, if at all, for your

20   testimony that when Aetna uses derived data, it's

21   making a reasonable reimbursement determination?

22             MR. SIGLER:  Same objection.

23        A.    Other than what I've already stated, that

24   it's part of the product, and we purchased the

25   product, and we are comfortable with what the product

85

1   is as it's been purchased and presented.

2   BY MR. AXELROD:

3       Q.    What is the definition, in your mind, of

4   "customary"?

5               MR. SIGLER:  Objection, calls for a

6   legal conclusion and form.

7       A.    Again, I think it's what I stated about

8   reasonable.  The benefit language says reasonable and

9   customary, usual and customary.  The idea that it's

10  common within a range that one would find acceptable

11  and appropriate and sort of customary within that --

12  in that geography and sort of something that is, you

13  know, sort of generally accepted.

14  BY MR. AXELROD:

15      Q.    Do derived data take into account

16  geographical differences?

17      A.    I honestly don't know for sure.  My

18  understanding was that it's a broader geographic

19  consideration.  Other than that, I don't know.

20      Q.    Well, you testified when I asked you about

21  the meaning of "customary" that it took into account

22  certain geographical differences or at least

23  geography.  That was your testimony.

24              So how would derived data, if at all, be

25  used to take into account geography, which you

100

1   General.

2      Q.   So still today you believe that the Ingenix

3   database is still a legitimate tool for making

4   reimbursement determinations?

5               MR. SIGLER:  Objection, calls for a

6   legal conclusion.  Objection, lack of foundation, form

7   and scope.

8      A.   We continue to use the Ingenix database as

9   our source for usual and customary data, and we

10  consider it an appropriate source, as we have always

11  thought.

12  BY MR. AXELROD:

13     Q.   Why did you direct that The Aetna Fee

14  Profile be terminated?

15     A.   It's my belief that if you are going to use

16  charge data, the more charge data you have available

17  to the database, the more legitimate or more accurate

18  the calculations are in terms of a percentile.  So

19  Aetna's membership in a particular geography may be

20  minimal.  We may have a significant membership in

21  certain geographic areas and not so much in others.

22              So the whole point of having a third party

23  collect the charge data and pool it makes the pool of

24  data, the end number, so to speak, larger, so that

25  there is more likely to be true charge data, nine and

101

1   greater, in each geographic region if it's pooled

2   information.

3           So if you put Blue Cross/Blue Shield data

4   and the five largest insurance companies' data and

5   another 100 smaller companies' data into a pool, and

6   you derive a database that that's how the legitimate

7   charge data or the real charge data are accumulated,

8   then you get a, in my mind, a more accurate, a better

9   reflection of that pool of charge data.

10          So when we use an Aetna specific profile,

11  it's more limited in terms of what our geographic

12  experience or data would show.  So in some instances,

13  because we have a fairly large membership, and we have

14  a significant membership in certain geographies, you

15  know, the pool of data might be perfectly legitimate,

16  or perfectly reasonable to use, but it's more limited

17  than what a third-party pool of information would

18  have.  So I think it's more important for us to use

19  the larger database for charge data than just our own

20  internal data.

21          It's rare that we don't have to -- it's rare

22  that we don't find the data in the Ingenix database.

23  And for those unusual circumstances where there is no

24  data, I think the better process for us is to do the

25  comparisons and do the, sort of a manual look at

102

1    what's being submitted and what's being billed and

2    what we can compare it to than it is to just use the

3    data that's within Aetna itself.

4            So the progression of how we've been moving,

5    in terms of what data we use, is to use the Ingenix

6    database.

7        Q.    When you nonetheless made reimbursement

8    determinations using The Aetna Fee Profile, did you do

9    so where there were less than nine data points?

10           MR. SIGLER:  Objection, lack of

11   foundation.

12       A.    You know, I don't know the detail on The

13   Aetna Fee Profile as to what the number would need to

14   be to use it, but again, where we felt comfortable

15   with that data in terms of its frequency, we did use

16   it.  I would not be able to tell you the detail of

17   that.

18   BY MR. AXELROD:

19       Q.    When you said feel comfortable with using

20   it, what was the basis for Aetna feeling comfortable

21   with using The Aetna Fee Profile data for a particular

22   reimbursement?

23           MR. SIGLER:  Objection, lack of

24   foundation.

25       A.    I would just be speculating if I told you

306

1                    C E R T I F I C A T E

2    STATE OF CONNECTICUT

3            I, SANDRA V. SEMEVOLOS, a Registered Merit
     Reporter/Notary Public within and for the State of
4    Connecticut, do hereby certify that I reported the
     deposition of JAMES D. CROSS, M.D. on MARCH 23, 2010,
5    at the offices of SHIPMAN & GOODWIN, LLP, ONE
     CONSTITUTION PLAZA, HARTFORD, CONNECTICUT.

6
             I further certify that the above-named
7    deponent was by me first duly sworn to testify to the
     truth, the whole truth and nothing but the truth
8    concerning his/her knowledge in the matter of the case
     IN RE:  AETNA UCR LITIGATION, This Document Relates
9    To:  ALL CASES, now pending in the UNITED STATES
     DISTRICT COURT, for the DISTRICT OF NEW JERSEY.

10
             I further certify that the within testimony
11   was taken by me stenographically and reduced to
     typewritten form under my direction by means of
12   COMPUTER ASSISTED TRANSCRIPTION; and I further certify
     that said deposition is a true record of the testimony
13   given by said witness.

14           I further certify that I am neither counsel
     for, related to, nor employed by any of the parties to
15   the action in which this deposition was taken; and
     further, that I am not a relative or employee of any
16   attorney or counsel employed by the parties hereto,
     nor financially or otherwise interested in the outcome
17   of the action.

18
             WITNESS my hand and seal this 1st day of
19   April, 2010.

20

21   _____
     Sandra V. Semevolos, RMR/CRR
22   Notary Public
     My Commission Expires:  September 30, 2010
23   License Registration Number:  74

24

25

# Exhibit 28

Page 1

1                UNITED STATES DISTRICT COURT

                    DISTRICT OF NEW JERSEY

2

3        -------------------------------

         IN RE:  AETNA UCR LITIGATION       MDL. No. 2020

4

5        This Transcript Relates To:       Master Case No.

         ALL CASES                         2:07-3541(FSH)(PS)

6        -------------------------------

7

8

9             DEPOSITION OF RODERICK LEE MARTIN

10                  DATE:  JULY 1, 2010

11                     HELD AT:

12               MURTHA CULLINA, LLP

             CITYPLACE I, 185 ASYLUM STREET

13               HARTFORD, CONNECTICUT

14                      - - -

15

16

17

18   Reporter:  Sandra V. Semevolos, RMR, CRR, LSR #74

19

20

21

22

23

24

25       Job No. NJ265408

Page 6

1          (Deposition commenced at 10:04 a.m.)

2              RODERICK LEE MARTIN of ███████████

3    ████████████████████████████   ██████████

4          being first duly sworn, deposes and states

5          as follows:

6          DIRECT EXAMINATION BY MR. GUGLIELMO:

7      Q.    Good morning.

8      A.    Good morning.

9      Q.    My name is Joseph Guglielmo.  I'm an

10    attorney with the law firm of Scott & Scott.  I

11    represent one of the Plaintiffs in the action today.

12              Can you please state your full name and

13    address for the record?

14      A.    Roderick Lee Martin.  I live at ██████████

15    ████████████████████████████████████.

16      Q.    Mr. Martin, I'm going to be asking you some

17    questions today.  If you don't understand a question

18    that I ask, please indicate, otherwise I'll assume you

19    understand the questions.

20              I need you to provide verbal responses to

21    the questions that I ask so that the court reporter

22    can take down the information.  Likewise, with respect

23    to my questions, I'd just appreciate if you could let

24    me finish the question before you answer, and I'll

25    also oblige and let you finish your response.  This

Page 100

1    recollection as to what the output was or the results

2    were.

3    BY MR. GUGLIELMO:

4        Q.    And do you know whether you ever provided

5    that report to the extent it was run to Ms. Jensen?

6                    MS. WALSH:  Objection.

7        A.    I don't know.

8                    MR. GUGLIELMO:  Mr. Martin, I'm going

9    to mark as Exhibit 7 a document bearing Bates Numbers

10   AET 00905155 through 159.

11                       (Exhibit 7, Document bearing Bates

12                       Numbers AET 00905155 through AET

13                       00905159, marked for identification.)

14                    MR. GUGLIELMO:  For the record, the top

15   of the first page of this document is an e-mail from

16   Deborah Justo to Beth Lilick, Roderick Martin dated

17   March 1, 2005.

18                       (Pause.)

19   BY MR. GUGLIELMO:

20       Q.    Mr. Martin, have you had a chance to take a

21   look at Exhibit 7?

22       A.    Yes.

23       Q.    With respect to the subject matter of the

24   e-mail string, re R&C savings, do you have an

25   understanding of what is being discussed in this

Page 101

1    e-mail string?

2                    MS. WALSH:  Objection.

3         A.    Yes.

4    BY MR. GUGLIELMO:

5         Q.    Can you tell me what your understanding is?

6         A.    There was, as mentioned in the third e-mail

7    from the bottom, second to last page, the claim

8    department cost containment report, that was a report

9    that was in place, had been in place, as noted here,

10   for many, many years that was attempting to capture

11   what we referred to as R&C savings, meaning reductions

12   from billed charges to R&C payment amounts.

13                   There was, based on this request for

14   proposal, information for a proposal, something from

15   Hewitt.  I don't recall specifically what it related

16   to, but they were providing this information and

17   basically we caught wind of it.  There was some

18   questioning about the data, the results, the

19   year-to-year change, and through the chain, I guess,

20   it got to me, and I got involved because I was running

21   also some R&C savings reports, I believe, at the time,

22   again, attempting to capture the R&C savings.  But the

23   issue here is that the reports that had been in

24   existence for many years, apparently there was no

25   owner, and they basically became outdated and were

Page 102

1    providing what we thought was inaccurate data,

2    commingling savings from a few different policies in

3    place as opposed to it just being R&C related.

4         Q.    Is it your understanding in or about the

5    2005 time frame that you were creating R&C savings

6    reports?

7                    MS. WALSH:  Objection.

8         A.    I was creating a savings report that

9    incorporated savings from a number of policies,

10   including R&C.

11   BY MR. GUGLIELMO:

12        Q.    And so specifically, what categories of

13   savings were you including in the savings report that

14   you were creating in or about 2005?

15                   MS. WALSH:  Objection.

16        A.    Generally it was savings related to, as

17   discussed earlier, reimbursement policies and clinical

18   policies.

19   BY MR. GUGLIELMO:

20        Q.    And would R&C savings be categorized as a

21   reimbursement policy?

22                   MS. WALSH:  Objection.

23        A.    Loosely, yes.

24   BY MR. GUGLIELMO:

25        Q.    Could it also be categorized as a clinical

Page 144

```
 1              C E R T I F I C A T E
 2   STATE OF CONNECTICUT
 3           I, SANDRA V. SEMEVOLOS, a Registered Merit
     Reporter/Notary Public within and for the State of
 4   Connecticut, do hereby certify that I reported the
     deposition of RODERICK LEE MARTIN on JULY 1, 2010, at
 5   the offices of MURTHA CULLINA, LLP, CITYPLACE I, 185
     ASYLUM STREET, HARTFORD, CONNECTICUT.
 6
             I further certify that the above-named
 7   deponent was by me first duly sworn to testify to the
     truth, the whole truth and nothing but the truth
 8   concerning his/her knowledge in the matter of the case
     IN RE:  AETNA UCR LITIGATION, This Transcript Relates
 9   To:  ALL CASES, now pending in the UNITED STATES
     DISTRICT COURT, for the DISTRICT OF NEW JERSEY.
10
             I further certify that the within testimony
11   was taken by me stenographically and reduced to
     typewritten form under my direction by means of
12   COMPUTER ASSISTED TRANSCRIPTION; and I further certify
     that said deposition is a true record of the testimony
13   given by said witness.
14           I further certify that I am neither counsel
     for, related to, nor employed by any of the parties to
15   the action in which this deposition was taken; and
     further, that I am not a relative or employee of any
16   attorney or counsel employed by the parties hereto,
     nor financially or otherwise interested in the outcome
17   of the action.
18
             WITNESS my hand and seal this 8th day of
19   July, 2010.
20
21   _____
     Sandra V. Semevolos, RMR/CRR
22   Notary Public
     My Commission Expires:  September 30, 2010
23   License Registration Number:  74
24
25
```

# Exhibit 29

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF NEW JERSEY
3    MDL NO. 220
     MASTER FILE NO. 2-07-CV-3541
4

5

6    IN RE:   AETNA UCR LITIGATION

7

8    ----------------------------------------
9
10              CONFIDENTIAL TRANSCRIPT OF
                DEPOSITION OF SHARON SMITH
11

12

13              TRANSCRIPT of the stenographic

14    notes of the proceedings in the

15    above-entitled matter, as taken by and

16    before TAB PREWETT, a Registered

17    Professional Reporter, a Certified

18    Shorthand Reporter, a Certified LiveNote

19    Reporter, and Notary Public, held at the

20    Offices of WILENTZ, GOLDMAN & SPITZER P.A.,

21    90 Woodbridge Center Drive, Woodbridge, New

22    Jersey, on Thursday, January 21, 2010,

23    commencing at 10:20 a.m.

24

25

                                                             5

 1                    Sharon Smith

 2              P R O C E E D I N G S

 3      S H A R O N    S M I T H,

 4      residing at ███████████████████████

 5      ███████████████████████████,

 6      having been sworn by the notary public to

 7      testify to the truth, testified as follows:

 8      DIRECT EXAMINATION BY MR. EVANS:

 9           Q      Can you please state your full

10      name for the record?

11           A      Sharon Lee Smith.

12           Q      What is your current address?

13           A      ███████████████████████████

14      ██████████████████████

15           Q      Could you provide us with your

16      date of birth, please?

17           A      ███████████████

18           Q      Have you ever had your

19      deposition taken before?

20           A      No.

21           Q      I would like to just explain

22      some of the procedures that we follow.

23      First of all, you have been sworn under

24      oath.

25                    Do you understand that?

            Elisa Dreier Reporting Corp.  (212) 557-5558
              950 Third Avenue, New York, NY 10022

1                Sharon Smith

2    specialist, so I have no one to compare his

3    prices to.

4         Q      Does Dr. ███████ break down

5    for you what you owe as a co-pay and the

6    deductible or coinsurance for each

7    procedure?

8         A      Well, what I see is from Aetna,

9    when they say, you know, how much they will

10   pay and then they won't pay.

11               Dr. ███████ I know we owe

12   him thousands and thousands of dollars.

13   And he understands that my husband is -- we

14   are on social security.  And, you know, I

15   try to pay as much as I can if we get

16   extra.

17               But Dr. ███████ is a very

18   kind and compassionate and understanding

19   doctor that cares very much about his

20   patients.  And he works with us on it.

21        Q      Does he send you bills for the

22   amounts that he says you owe?

23        A      No, I don't recall receiving a

24   bill.

25        Q      And does he make attempts to

        Elisa Dreier Reporting Corp.  (212) 557-5558
          950 Third Avenue, New York, NY 10022

82

                    Sharon Smith

1

2    collect the amounts he says he's owed for

3    instance, through collection agencies?

4         A     Never.  That is out of

5    character for him.

6         Q     Besides Dr. ██████████  are

7    there any other out-of-network providers

8    for whose service you are seeking to get

9    paid in this litigation?

10        A     I don't have any other

11   out-of-network doctors, no.

12              MR. EVANS:  I am going to take

13         a brief break and see what else we are

14         going to want to ask you and probably

15         wrap it up quickly after that.

16              (There was a discussion and

17         break off the record.)

18              (Exhibit No. Aetna 50, Second

19         Joint Consolidated Amended Class

20         Action Complaint and Demand for Jury

21         Trial, is marked by the reporter for

22         identification.)

23        Q     We can go back on the record.

24              Ms. Smith, I am passing to you

25   what has been marked as Aetna Exhibit 50.

133

```
 1

 2                    CERTIFICATE

 3          I, TAB PREWETT, A Registered

 4    Professional Reporter, Notary Public,

 5    Certified LiveNote Reporter, and Certified

 6    Shorthand Reporter, do hereby certify that

 7    prior to the commencement of the

 8    examination SHARON SMITH was sworn by the

 9    notary public to testify the truth, the

10    whole truth and nothing but the truth.  I

11    DO FURTHER CERTIFY that the foregoing is a

12    true and accurate transcript of the

13    testimony as taken stenographically by and

14    before me at the time, place and on the

15    date hereinbefore set forth.  I DO FURTHER

16    CERTIFY that I am neither a relative nor

17    employee nor attorney nor counsel of any of

18    the parties to this action, and that I am

19    neither a relative nor employee of such

20    attorney or counsel, and that I am not

21    financially interested in the action.

22    _____
      Notary Public
23    My Commission expires February 9, 2014
      Dated:  January 30, 2010
24

25
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

# Exhibit 30

Page 1

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
MDL NO. 220
MASTER FILE NO. 2-07-CV-3541



IN RE:  AETNA UCR LITIGATION


-----------------------------------------


                TRANSCRIPT OF
          DEPOSITION OF DARLERY FRANCO
```

TRANSCRIPT of the stenographic

notes of the proceedings in the

above-entitled matter, as taken by and

before TAB PREWETT, a Registered

Professional Reporter, a Certified

Shorthand Reporter, a Certified LiveNote

Reporter, and Notary Public, held at the

Offices of WILENTZ, GOLDMAN & SPITZER P.A.,

90 Woodbridge Center Drive, Woodbridge, New

Jersey, on Friday, January 22, 2010,

commencing at 10:20 a.m.

Page 6

1              Darlery Franco

2          P R O C E E D I N G S

3    D A R L E R Y    F R A N C O,

4    residing at ██████████████████████,

5    ████████████,

6    ████████████████████  ████████,

7    having been sworn by the notary public to

8    testify to the truth, testified as follows:

9    DIRECT EXAMINATION BY MR. DOREN:

10         Q    Good morning, Ms. Franco.

11         A    Good morning.

12         Q    Could you please state your

13   complete name for the record?

14         A    Darlery Franco, Dar-ledy or

15   Darlery Franco.

16         Q    Your full name is Darlery --

17         A    It's just a Spanish versus

18   English pronunciation.

19         Q    Rolling the R, got it.  Thank

20   you.  What's your home address?

21         A    It's ███████████████,

22   ██████████████████████  ████████.

23         Q    What is your date of birth?

24         A    ████████████  ██████.

25         Q    And as we were introduced off

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 102

1              Darlery Franco

2    the day of surgery?

3         A     I don't recall.

4         Q     You don't know whether you had

5    or not?

6         A     No, I don't.

7         Q     Have you met Dr. Valauri again

8    since your surgeries?

9         A     No.

10        Q     So the only time you would have

11   seen him would have almost literally been

12   in the surgical theater?

13        A     Yes, the hospital.

14        Q     Has Dr. Valauri sent any bills

15   to you?

16        A     I think they have been part of

17   Dr. Rose's bills.

18        Q     So to the extent Dr. Valauri

19   has billed any amounts to you, it would

20   have been included in Dr. Rose's bills?

21        A     I think so.  Yes.

22        Q     And if it wasn't included in

23   Dr. Rose's bills, then Dr. Valauri has not

24   billed you any amounts?

25              MR. MARCY:  Objection to the

1            Darlery Franco

2       form.  You can answer the question.

3       Q      Let me re-ask the question.

4              Other than what might be

5    included in Dr. Rose's invoices, are you

6    aware of any other bills being sent to you

7    by Dr. Valauri?

8       A      No, I'm not.

9       Q      Have you paid Dr. Valauri any

10   money related to either/or any surgery in

11   which he assisted Dr. Rose?

12      A      I never met with his office

13   directly.  Any additional payments I made,

14   I made through Dr. Rose's offices; and I'm

15   not sure how they were applied.

16      Q      Whether Dr. Rose shared some of

17   that money with Dr. Valauri.

18      A      Correct.

19      Q      But, again, unless he did --

20   you haven't made any payments to

21   Dr. Valauri, correct?

22      A      Correct.

23      Q      Ms. Franco, I would like to

24   show you what has been marked as Aetna

25   Exhibit 120.  It's a single-page document

Page 133

1

2                    CERTIFICATE

3          I, TAB PREWETT, A Registered

4    Professional Reporter, Notary Public,

5    Certified LiveNote Reporter, and Certified

6    Shorthand Reporter, do hereby certify that

7    prior to the commencement of the

8    examination DARLERY FRANCO was sworn by the

9    notary public to testify the truth, the

10   whole truth and nothing but the truth.  I

11   DO FURTHER CERTIFY that the foregoing is a

12   true and accurate transcript of the

13   testimony as taken stenographically by and

14   before me at the time, place and on the

15   date hereinbefore set forth.  I DO FURTHER

16   CERTIFY that I am neither a relative nor

17   employee nor attorney nor counsel of any of

18   the parties to this action, and that I am

19   neither a relative nor employee of such

20   attorney or counsel, and that I am not

21   financially interested in the action.

22   _____
     Notary Public
23   My Commission expires February 9, 2014
     Dated:  January 31, 2010
24

25