<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AETNA UCR LITIGATION | MDL No. 2020<br>Civil No.: 07-cv-3541 (KSH) (CLW)<br><br>**<u>OPINION</u>** |

**<u>Katharine S. Hayden, U.S.D.J</u>**

### I.   <u>INTRODUCTION</u>

Before the Court are two motions for certification brought by separate class groups under Fed. R. Civ. P. 23(b)(2) and (b)(3), and defendant Aetna's motions to exclude the testimony of two of plaintiffs' experts.[1]  Each motion has been fully briefed.

This case has been heavily litigated since the plaintiffs first sued Aetna on June 30, 2007, and the parties are familiar with its twists and turns.  After years of discovery and negotiations, this Court preliminarily approved a $120 million global settlement on August 30, 2013.[2]  (D.E. 899.)  But while the plaintiffs' motion for final approval of the settlement was still pending, Aetna filed a notice of termination because the number of settlement "opt-outs" exceeded the cap allowed for in Section 7.3 of the agreement.  (D.E. 960.)  Aetna moved to dismiss the putative class action complaint, and on June 30, 2015, this Court dismissed 13 of the 15 claims in a written opinion.  (D.E. 1024.)

After the upending of the settlement agreement in 2013, dissension grew within the class. Eventually, a group of settlement objectors represented by Barry Epstein, Esq. (hereafter the

---

[1] (D.E. 1076, 1077, 1078, 1079, 1080, 1084, 1085, 1086, 1087, 1091, 1092.)
[2] The settlement was the result of 13 sessions of in-person mediation completed in New York and Florida led by retired United States District Judge Nicholas H. Politan, since deceased. (D.E. 899 at 4.)

"Epstein Plaintiffs") broke away from the plaintiffs, who continued to be represented by an

executive committee created early on in the litigation by a case management order (CMO No. 2,

D.E. 236).[3]  This group (hereafter the "Carella Plaintiffs") filed the fourth amended consolidated

complaint ("FACC") on February 8, 2017, which did not make any material changes to the

surviving claims[4] and is now the operative one.  (D.E. 1046.)

What began as a disagreement over strategy between the plaintiff groups developed into a

full-out rift.  In a letter filed on the docket dated April 18, 2017, the Carella Plaintiffs proposed a

briefing schedule for class certification.  (D.E. 1054.)  Then they docketed another letter seeking

a plaintiffs-only conference with the Court to "resolve certain disputes with Mr. Epstein relating

to basic strategy with respect to Plaintiffs' motion for class certification and with the case in

general that we have been unable to resolve."  (D.E. 1056.)  One week later, they sent an

additional letter to Magistrate Judge Waldor, stating in relevant part that "it would be in

Plaintiffs' best interest to pursue individual settlements to resolve this matter without the time

---

[3] As this Court described the history in an earlier opinion (D.E. 899):

On April 8, 2009, the Judicial Panel on Multidistrict Litigation consolidated *Cooper v. Aetna Health Inc.*, No. 07-3541, which was originally filed in this district and assigned to Judge Faith Hochberg, with *Weintraub v. Ingenix*, No. 09-2027, originally filed in the District of Connecticut, under MDL No. 2020. In June of 2009, Judge Hochberg consolidated other related actions filed in this district and instructed various plaintiffs to file a single consolidated amended complaint under the caption "*In re: Aetna UCR Litigation*, MDL No. 2020." After the consolidated complaint was filed, Judge Hochberg fielded proposals for choosing a leadership structure for counsel from the several law firms representing the consolidated plaintiffs. Ultimately, Judge Hochberg issued a Case Management Order that empaneled the "Aetna Plaintiffs' Executive Committee" to streamline case management, setting forth the duties of each respective firm. [D.E. 236 ("CMO No. 2").] Under CMO No. 2, Judge Hochberg designated the Carella Byrne law firm to serve as settlement liaison responsible for organizing and coordinating settlement negotiations on behalf of plaintiffs.

and expense of further motion practice and potential appeals," and that it is the "combined judgment of the Executive Committee that it does not wish for Mr. Epstein to file his own separate class motion."  (D.E. 1098-1.)  Judge Waldor denied the request, and motion practice continued apace with two plaintiff groups filing separate certification motions on August 10, 2017.  On September 1, 2017, Aetna filed a consolidated opposition brief.  On March 12, 2018, the Court held argument on the motions.[5]

The plaintiffs have asserted three claims: Count I: "Claim for Unpaid Benefits Under Group Plans Governed by ERISA and Request for Declaratory Relief (on Behalf of the Subscriber ERISA and NJ SEHP Classes)"; Count II[6]: "Breach of Plan Provisions for Benefits in Violation of ERISA § 502(a)(1)(B) (on Behalf of the Provider Plaintiffs)"; and Count III: "Breach of Contract (on Behalf of a Non-ERISA Class)." The crux of these claims is Aetna's use of an allegedly flawed database called Ingenix to calculate the reimbursements due to out-of-network ("ONET") a/k/a non-participating ("Non-Par") providers.

Both groups of plaintiffs allege that across all of Aetna's plans, plan language required Aetna to calculate a proper ("UCR" or "usual and customary rate" a/k/a "R&C" or "reasonable

_____

[4] *See* D.E. 1024 at 71 ("The following claims remain viable: (1) count I for unpaid ERISA benefits; (2) count XII for breach of contract, as against Aetna alone.").

[5] Barry Epstein's former law firm continues to be a member of the executive committee. Mr. Epstein's son Roy, a member of the Epstein Law Firm, argued the Epstein group's class certification motion. Though in their opening briefs each group challenged whether the other met the "adequacy of representation" prong in Rule 23(a)(4), at oral argument they ultimately indicated a willingness to work in concert.  *See* Oral Arg. Tr. at 45 ("MR: EPSTEIN:  We are willing to work with the (b)(2). We made a motion in our paper to join the (b)(2)[the Carella Plaintiffs' motion to certify under Rule 23(b)(2). We stand by that motion.").

[6] The plaintiffs added a second unpaid ERISA benefits claim for the proposed Provider Class.

and customary rate") for ONET reimbursements, but instead, Aetna submitted flawed data to the Ingenix database, which resulted in underpayments.  As set forth in the FACC:

> 6. [] Aetna actually reimbursed its members and nonpar providers who provided services to such members at a lower rate. Aetna did not pay its members' benefit amounts for ONET services according to the terms of the plan documents, which required it to determine first whether the providers' billed amounts were usual, customary and reasonable using a source which reflected accurate UCR amounts. Rather, Aetna utilized the Ingenix Database to calculate UCR. As set forth below, the Ingenix Database did not reflect or report accurate UCR amounts, and resulted in underpaid benefits to Aetna's subscribers ("UCR Benefit Reductions").
>
> …
>
> 9. The claims data contributed to Ingenix by Aetna and the other insurers was incomplete and inaccurate, and was rigged to artificially deflate average out-of-network charges. Ingenix then further manipulated the data to additionally depress the average out-of-network charges to create the purported UCR data set forth on the schedules generated by Ingenix. When Aetna utilized Ingenix data, its resulting payments to subscribers and providers were artificially low and substantially below the actual, accurate UCR for similar services, in contravention of Aetna's contractual obligations in health insurance plans for ONET claims.
>
> 10. Aetna hid this scheme or artifice to defraud, including the existence and purpose of the Ingenix Database, through a series of material omissions and misrepresentations. There is an inherent and irreconcilable conflict of interest in its use of the Ingenix Database, which was operated by United HealthGroup in conjunction with Aetna and other health insurers, to create uniform underpayment of ONET services by all of the major insurance companies in the nation. Because these health insurers had an incentive to reduce the benefits paid to Subscribers and Providers for ONET services, they used the Ingenix Database to underpay Subscribers and Providers for ONET services.

(D.E. 1046, "FACC" at 6 ¶¶ 6, 9-10.)

The two groups of plaintiffs differ slightly in how they characterize Aetna's motivations.[7] The Epstein Plaintiffs claim that Aetna nefariously orchestrated a data-filtering scheme (the Aetna Fee Profile) that corrupted the database and skewed the UCR rates downward.  *See* Oral Arg. Tr. at 36 ("We believe that the actions of profiling are so egregious, so violative of plan terms that there are—that it's a clear abuse of discretion. . .").  As the Epstein Plaintiffs put it in

their certification motion:

> Aetna's 30(b)(6) witness admitted that by using an automated computer process, Aetna excluded high charge data from its submissions to a database called Ingenix. Aetna labeled this process "Fee Profile" data. Aetna then used the rigged Ingenix database to underpay Out of Network "Reasonable and Customary" ERISA Benefits ("R&C, or "UCR", or "prevailing fee").

> Under Plan Terms, Plaintiffs were paid lower of their provider's billed charge and the R&C. The R&C is intended to be a market rate for provider services. Aetna's biasing R&C downward is a violation of Plaintiff's Plan Terms, which caused them monetary injury. Aetna's motive is traceable to severe financial troubles commencing in 2001, its stock sunk 65%, and "turnaround" measures initiated. Its medical costs were rising faster than its revenue. The new Chief Executive declared that the stockholders' profits were "most important of all."

(D.E. 1076-1, "Epstein Pls.' Br.," at 5 (internal citations omitted).)

For their part, the Carella Plaintiffs allege that the database was statistically invalid from its creation, though Aetna did contribute to its unreliability by submitting "precooked" data.

> Plaintiffs allege that Aetna used a database of physician charges that was statistically unable to determine UCR, that Ingenix knew it, that Aetna knew it as well but used Ingenix anyway. That is the epitome of a lack of reasonableness.

(D.E. 1085, "Carella Pls.' Reply Br.," at 5.)

Ultimately, however, the basic thrust of both motions is the same. The Ingenix database was flawed, and by using it to calculate UCR for ONET reimbursements, Aetna injured plan members class-wide.

## II.    BACKGROUND

This Court is not the first tribunal to consider the class action theories espoused by these plaintiffs; both groups have advanced nearly identical claims, pursuing them for over a decade in

---

[7]    The groups also disagree in how they think Aetna should have properly calculated UCR: The Epstein Plaintiffs contend that Aetna should have used a "market rate" calculation (*see e.g.*, Epstein Pls.' Br. at 2), and the Carella Plaintiffs maintain that a "statistically valid rate" was necessary (*see e.g.*, Carella Pls.' Br. at 34).

various federal venues.  (*See e.g.*, Epstein Pls.' Br. at 28 ("Indeed, [Barry Epstein] conceived of and brought the first UCR action against United Health Care.").)  It is therefore appropriate, before addressing the merits of those theories, to review some history laid out in the factual background that Aetna has provided the Court through its sworn declarations (which have not been contested by the plaintiffs) that describe the design process of its self-funded health plans,[8] which account for over two-thirds of Aetna's enrollees and a significant percentage of the proposed classes.  Also relevant is an examination of the "cognate"[9] lawsuits where other courts have wrestled with these same issues.

Aetna submitted a declaration from Pam Kehaly, who at the relevant time was employed as Aetna's President of National Accounts.  (D.E. 1121, hereafter "Kehaly Decl.")  As she explains it, Aetna, like other managed care companies, offers a wide variety of health plans and benefits, including those that offer ONET benefits and HMOs ("Health Maintenance Organizations"), which necessarily do not.  (Kehaly Decl. at ¶ 14.)  Significantly, the clear majority of Aetna's plans are "self-funded,"[10] that is to say, the employer and not Aetna retains the financial risk, only having to pay Aetna a monthly fee for administrative services.  (*Id.* at ¶ 23.)  Thus the employers bear the cost of paying claims—often tens of millions of dollars per year—on behalf of their employees.  (*Id.* at ¶ 19.)

---

[8] In April 2010 more than 70 percent of Aetna's plan members were enrolled in self-funded plans, and the percentage was even higher for plans that offered ONET benefits.  (Aetna Br. at 11.)

[9] *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, No. MDL 09-2074 PSG FFMX, 2014 WL 6888549, at *8 (C.D. Cal. Sept. 3, 2014) (referring to the *CIGNA* litigation as a "cognate" case).

[10] The other type of plan is called a "fully-insured" or "insured" plan.  According to Kehaly: "Insured plans are those in which Aetna assumes all or a majority of the financial risk related to the cost of health care for an employer's plan members. For insured plans, Aetna designs the plan, and the employer pays Aetna a premium." (Kehaly Decl. at ¶ 18.)

In her declaration, Kehaly also provides a summary of Aetna's sales process.  (Kehaly Dec. at ¶¶ 32-58.)   She indicates that Aetna expects that from the beginning of negotiations, employers will maintain an active role in the design of the plan's terms, because how they ultimately decide to pay out benefits is a zero-sum game: extra benefits offered to employees in the plan may translate to vacation weeks taken away elsewhere.  (*Id.* at ¶ 50 ("For self-funded plan sponsors, the impact is simultaneous—that is, for every additional dollar paid for an out-of-network claim, the employer's cost go up a dollar.").)  In many cases, employers even draft their own disclosure materials, and they assume responsibility for communicating with employees about the benefits provided under the plan.  (*Id.* at ¶¶ 37-53.)

Kehaly claims that the sales process typically starts with the employer submitting a Request for Proposal ("RFP") to Aetna.  (*Id.* at ¶ 37.)   As a general rule, RFPs ask for information about Aetna's health plans and their administration, including the source of UCR profiles.  (*Id.* at ¶ 39.) By way of example, Computer Associates International Inc. included the following request in its 2002 RFP: "Please note the source of R&C[reasonable and customary] information (e.g., HIAA, MDR, internally developed, other)."  (*Id.* at ¶ 40.)   This is how Aetna responded:

> Our primary source of reasonable and customary charge data is the Ingenix PHCS (formerly referred to as HIAA data). The profile contains charges covering a six-month period and is updated twice a year. The charges are grouped into approximately 400 geographic areas. We standardly set R&C at the 80th percentile, however, customers may request alternative levels.

(*Id.*)

In other RFPs, Aetna provides actual UCR reimbursement rates for requested procedures in specific geographic areas.  (*Id.* at ¶ 43.)  In one response to a RFP, Aetna provided a chart with

reimbursements at the 80th percentile of Ingenix for 13 different dental procedures in El Paso, Texas.  (*Id.*)

After the initial RFPs are completed, Aetna engages in more detailed negotiations, which may include the employer selecting a methodology for calculating UCR for ONET benefits. Although often set at the 80th percentile of Ingenix, some employers, like the Texas Public School Employee Group, required that Aetna use a custom fee schedule, while others wanted Aetna to use a higher or lower percentile of Ingenix.  (*Id.* at ¶ 46.)  In her declaration, Kehaly offers other examples of employer preferences: Sequent requested that Aetna pay billed charges for all ONET claims; Ithaca College requested that Aetna cover oral surgeons at billed charges because of a lack of oral surgeons in Aetna's provider network in the Ithaca area; and Peninsula United Methodist Homes requested that Aetna use the 90th percentile of Ingenix for one group of its members, and the 80th percentile for others.  (*Id.*)  At times, employers ask Aetna to run analyses to evaluate the potential cost impact of varying from the 80th percentile of Ingenix.  (*Id.* at ¶ 47.)  For self-funded plans, according to Kehaly, "there is a direct relationship between increases in medical costs and overall plan costs," so Aetna's underwriting department maintains a financial rating factor worksheet specific to UCR, which provides estimates of the impact on medical claims costs of changing a plan from one percentile to another percentile of Ingenix, or to another fee schedule altogether.  (*Id.* at ¶ 51.)

In self-funded plans, the scope of Aetna's authority and the role assigned to the Ingenix database in calculating UCR depend on what the individual plan says, and what the individual plan says depends on the employer.  Significantly, according to Kehaly, employers also retain control over who makes the final determination on whether a claim should be paid and on what level.  For example, in 2004, Owens Corning, an employer with a self-funded plan, became the

"claim fiduciary" and final decision-maker on appeal for the plans it offered, but not for the initial appeal. (*Id.* at ¶ 28.) Yet prior to that, Owens-Corning was the decision-maker at all levels of appeal. (*Id.*) Because employers design the plans even when they are not claim fiduciaries, they still play an instrumental role in deciding which claims should be paid in whole or in part above and beyond Aetna's determination. (*Id.*)

Given the nature of self-funded plans, says Kehaly, it is not surprising that employers may dictate the methodologies Aetna uses to calculate ONET benefits, with varying levels of member responsibility for costs under the plans in the form of copays, coinsurance, or deductibles. (*Id.* at ¶ 28.) Because they have a direct financial stake in how the plan operates, employers also endeavor to track the medical costs paid out to beneficiaries. (*Id.* at ¶ 27.) Some require that Aetna send claim data and reports on claim activity directly to them so that they can track it themselves, and others request that Aetna forward claim data to a third-party for aggregation and analysis, such as Ingenix. (*Id.*)

In addition to Kehaly's declaration, Aetna attached to its motion a sworn declaration by Deborah Justo, who at the relevant time was an analyst in Aetna's Provider Data Service and primarily responsible for coordinating claim submissions to the Ingenix database. (D.E. 1120, hereafter "Justo Decl.") In Justo's account, until the mid-1990s, Aetna had used its own claim data for charge distributions, naming it the "Aetna Fee Profile." (Justo Decl. at ¶ 4 ("Aetna Fee Profile data was a data compilation made up of Aetna's own data, organized by CPT Code and location.")) In due course, however, the Health Insurance Association of America ("HIAA") had developed the Prevailing Healthcare Charge System ("PHCS") based on hundreds of millions of claims from over 100 third-party contributors, and in 1996 Aetna began using the PHCS system, in part because it included data from more insurers and was more "robust and covered more

geographic areas than Aetna Fee Profile data." (*Id.* at ¶ 5.)  In 1998, Ingenix, which was owned by UnitedHealth, purchased the PHCS database and Aetna continued to use it.  (*Id.* at ¶ 7)

For a host of reasons, according to Justo, claim data that Aetna received from medical providers might not be profiled, meaning that Aetna would not include it in its Fee Profile or later send it to Ingenix.  Aetna had developed profiling guidelines that aimed to "capture data that accurately reflected provider's billed charges." (Justo Decl. at ¶ 26.)  It established these guidelines when Aetna was solely using its Fee Profile— they were created to exclude from the data compilation claims that "based on [] experience, presented the greatest risk of unreliable, duplicate, or invalid charges," such as claims that had a mismatch for the provider's service address.  (*Id.* at ¶ 28.)  When Aetna began submitting claim data to HIAA, says Justo, "rather than creating a new method for extracting claims from its database, Aetna contributed to HIAA those claims that were extracted for the Aetna Fee Profile, using the [same] profiling guidelines." (*Id.*)  It did not change this practice when Ingenix purchased the PHCS database.  (*Id.* at ¶ 29.)

In 2008, after a court in this district approved a class action settlement in the *Health Net* litigation—one of the earlier cases that dealt with the purported flaws in the Ingenix database[11]— the New York State Attorney General ("NYAG") initiated an industry-wide investigation into allegations that health insurers "unfairly saddled consumers with too much of the cost of out-of-network care."  (D.E. 1099-4, Ex. 12, hereafter "New York Attorney General Report" at 2.)  The investigation specifically concerned allegations that the Ingenix databases skewed UCR rates downward through faulty data collection, poor pooling procedures, and a lack of audits.  (New York Attorney General Report at 2-3.)  In February 2008, the NYAG served subpoenas on the

---

[11] *McCoy v. Health Net, Inc.*, 569 F. Supp.2d 448 (D.N.J. 2008) (decision approving settlement); *Wachtel v. Health Net, Inc.*, 223 F.R.D. 196, 199 (D.N.J. 2004) (decision certifying class.)

major health insurance companies, including Aetna, requesting documents related to UCR

calculations.  (*Id.* at 10.)  The investigation concluded that UnitedHealth had a conflict of interest

in owning and operating the Ingenix database and that other health insurers had a financial

incentive to manipulate the data they provided so that the pooled data skewed ONET

reimbursement rates downward.  (*Id.* at 2.)  Because of the investigation, in 2009 Aetna entered

into an agreement with New York to end its use of Ingenix, and also agreed to contribute $20

million for a new database aggregator.  (D.E. 1099-3, Ex. 11, hereafter "Senate Comm. Report

on Ingenix," at 11.)  Every other major insurance company also entered into an agreement with

the state and ceased using Ingenix.  (*Id.*)

     In the wake of the investigation, putative class actions were filed against other health

insurers who used Ingenix, including one in this district against CIGNA where the court denied

class certification two times and granted summary judgment in favor of the defendant;[12] as well

as one against WellPoint in the Central District of California, where the court similarly denied

class certification twice and granted summary judgment in favor of the defendant.[13]

     In *CIGNA I,* the putative class advanced nearly the same theories that have been asserted

in this case—even using the same experts, Drs. Siskin and Foreman, who were deposed one time

for the plaintiffs' shared use for here and for the *CIGNA* litigation.  *See e.g.*, Epstein Pls.' Br. at

---

[12] *Franco v. CIGNA*, 289 F.R.D. 121 (D.N.J. 2013) (first decision denying class certification (hereafter "*CIGNA I*")); 299 F.R.D. 417 (D.N.J. 2014) (second decision denying class certification (hereafter "*CIGNA II*")); 2014 WL 2861428 (D.N.J. June 24, 2014) (decision granting summary judgment in favor of CIGNA (hereafter "*CIGNA III*")); 647 F. App'x 76 (3d Cir. 2016) (Third Circuit affirming "on the basis of the District Court's well-reasoned opinions")).

29 ("Barry M. Epstein conceived of and filed first actions of UCR violations against United Healthcare, Oxford, and HealthNet in Federal District Courts in New York and New Jersey. Each action settled for hundreds of millions of dollars.").  Initially, the *CIGNA I* court denied class certification because the ERISA claims asserted depended on plan language, and the plaintiffs could not demonstrate that there was uniformity or at least substantial similarity in key plan language as to the entire ERISA class.  *Franco v. CIGNA*, 289 F.R.D. 121 (D.N.J. 2013). According to the court, in the ERISA context these problems were "amplified by the standard of review [abuse of discretion]," and the plaintiffs also failed to advance a colorable theory of injury or damages.  *Id.* at 121, 137.  The "Billed Charge" theory asserted then (and also again here by the Epstein Plaintiffs), according to the *CIGNA I* court, presumed that "having been denied an ONET benefit based on an accurate UCR, as plan terms require, plan members are entitled to an ONET benefit in the amount of the billed charge for the service"—and that contention, in the court's words, is "not plausible"; "simply has no connection to the facts of this case"; and "bears no relation to the plans on which the ERISA claims rely."  *Id.* at 137, 138, 139.

In *CIGNA II*, the court again denied the plaintiffs' class certification motion on largely the same basis.  *See CIGNA II* 299 F.R.D. at 420 ("The motion makes the erroneous assumption that, if Subscriber Plaintiffs succeed in proving at trial that Ingenix was a flawed database, harm to all members of the redefined ERISA and RICO classes necessarily follows.").  During this round, the plaintiffs had narrowed their class definition and attempted to revise their certification

---

[13] *In re WellPoint, Inc., Out-of-Network "UCR" Rates Litig.*, 2014 WL 6888549 (C.D. Cal. Sept. 3, 2014) (first decision denying class certification under nearly identical theories asserted here and in *CIGNA* I, hereafter "*WellPoint I*")); 2015 WL 12744265 (C.D. Cal. Mar. 2, 2015) (second decision denying class certification, hereafter "*WellPoint II*")); 2016 WL 6645789 (C.D. Cal. Jul 19, 2016) (granting summary judgment on remaining ERISA claims in favor of defendants, hereafter "*WellPoint III*")).

arguments. While the Court agreed with the defendants that the renewed motion was in essence

an "untimely motion for reconsideration in disguise," it nevertheless addressed some of the new

arguments. *Id.* In particular, the plaintiffs argued in *CIGNA II* that the differences in plan

language were inconsequential because CIGNA's own 30(b)(6) witness admitted in a deposition

that it was common practice not to take an individualized look at the claim despite language to

the contrary. *Id.* at 425. The court decided that that this argument "runs counter to the settled

jurisprudence that ERISA rights and responsibilities are dictated by plan language," relying on

the rationale of *Lipstein v. United HealthGroup*, 496 F.R.D. 279 (D.N.J. 2013), where then-Chief

Judge Simandle rejected the notion that "liability on an ERISA claim to recover unpaid benefits

can be established based on evaluating a common practice." *CIGNA II* 299 F.R.D. at 425.

The *CIGNA II* court also emphasized that the "the ultimate determination on the ERISA

claims requires an evaluation of whether Cigna paid ONET benefits in such a way that abused its

discretion under the plan or breached its fiduciary duties to subscribers." *Id.* at 46. It found that

the diversity in plan language created "a fractured landscape for the ERISA claims of the

putative class" and that there was a "lack of evidence that injury to all class members may be

proven in one stroke." *Id.* at 427. The court took pains to distinguish how the plaintiffs were

approaching the issue at the class certification phase of the litigation with how they originally

framed the allegations in the complaint, which mirrored the more far-reaching conclusions of the

NYAG investigation, and did not track the conclusions of the plaintiffs' own experts.

> In the Complaint, Subscriber Plaintiffs had alleged that a multitude of flaws in the
> Ingenix database resulted in a pool of charge data that was artificially depressed.
> Instead of containing accurate figures reflecting amounts that providers in any
> given geographic area really charge patients, Subscriber Plaintiffs contended, the
> database was manipulated so that, by design, the UCR schedules it generated were
> skewed downward. According to the allegations of the Complaint, the injury
> consisted of an underpayment of benefits, or to put it slightly differently,
> reimbursement for ONET services that was inadequate because Ingenix yielded

UCRs that were lower than the true prevailing fees for services. As Cigna has forcefully argued, "Plaintiffs have long since abandoned their theory that Ingenix suffers from a downward bias." Subscriber Plaintiffs do not contest this assertion, and the Court therefore deems their abandonment of the downward bias theory conceded. This concession confirms that Subscriber Plaintiffs will not, indeed cannot, attempt to establish classwide liability based on any systematic downward bias in Ingenix UCR schedules. No other method has been proffered for establishing that, by virtue of using Ingenix, Cigna consistently underpaid ONET claims.

*Id.* at 428. (internal citations omitted.)

Rather than show systematic downward bias, the plaintiffs assumed that a successful demonstration of a flawed database would amount to "game, set, and match for the ERISA claims of the entire class."  In the court's view, this still failed to establish that the UCR calculations "were improper according to the terms of each plan giving rise to a claim."  *Id.* at 427.

In its subsequent opinion, the court granted summary judgment on the remaining ERISA claims in favor of CIGNA.  At that point in the litigation, "[t]he issue that must be resolved is not whether Ingenix was flawed," but rather "in light of alternative and available methods for determining UCR, coupled with plan language …, Cigna abused its discretion in utilizing the Ingenix database and, as a result of such misconduct, deprived Plaintiffs of the ONET benefits to which the plan entitled them."  *CIGNA III* 2014 WL 2861428 at \*22.  Because the plaintiffs could not show that there was a systematic downward bias in the Ingenix database, the plaintiffs could not show injury.

Around the same time CIGNA was sued, another group sued WellPoint in the Central District of California, where the class certification motion failed on similar theories.  Relying on the rationale of *CIGNA I* and *Lipstein*, the court in *WellPoint* denied class certification under Rule 23(b)(2) and (b)(3) because of the failure to demonstrate commonality under Rule 23(a)(2).

The decision described the plaintiffs' certification attempt as "an effort to weld together the claims of millions of subscribers and providers, which arise out of tens of thousands of WellPoint insurance contracts" that "fragments at the first step, because WellPoint's UCR obligations are governed by its contracts, and the relevant terms of those contracts vary across the proposed classes." *WellPoint I* 2014 WL 6888549 at *3. The court stressed that it must "enforce[e] plan terms as written," based on each plan's "specific terms, requiring an "individualized plan-by-plan review." *Id.* at *7. As in *CIGNA II*, the *WellPoint* court denied the plaintiffs' second class certification motion, focusing on the presence of discretionary "nature and severity clauses" in some plans, and the abuse of discretion standard in general that necessitated plan-by-plan considerations. *WellPoint II* 2015 WL 12744265. Last, as happened in *CIGNA III*, the court granted WellPoint's motion for summary judgment on the remaining ERISA claims, finding that the subscriber plaintiffs failed to show injury-in-fact. *WellPoint III* 2016 WL 6645789 at *1.

Turning to the present lawsuit, the Court is faced with strikingly similar issues to those presented in the *CIGNA* and *WellPoint* decisions. The Epstein Plaintiffs, whose counsel litigated *CIGNA* and represented plaintiffs in the *WellPoint* litigation (as well as in *Lipstein*), are intimately familiar with class certification obstacles. It bears mentioning that the Epstein Plaintiffs did not even reference *CIGNA*, *WellPoint,* or *Lipstein* in their opening brief. The Carella Plaintiffs referenced only *CIGNA.* At oral argument, the Carella Plaintiffs stated that the class definitions they have proposed this time around are the same as those rejected by courts before.

> THE COURT: First, tell me how the proposed classes and identify them for the record, are distinguished from classes that have been rejected or considered before, or raised before as appropriate classes in our prior litigation.

> MR. TAYLOR: The classes that we're proposing, [it is] not the classes themselves that are distinguishable, it's the relief that we're asking on behalf of the class [that is distinguishable].

Oral Arg. Tr. at 6-7.

The Carella Plaintiffs also acknowledged that the nature of the classes they are proposing are no different than those proposed by the Epstein Plaintiffs. *See* Oral Arg. Tr. at 110 ("The only real gap between the plaintiffs' side is what the appropriate remedy. We say reprocess and recalculate.").

This time, the Carella Plaintiffs are proposing four classes: (1) a subscriber ERISA class; (2) a subscriber New York Damages class; and (3) a Non-ERISA class, and (4) a provider Class. (Carella Pls.' Br. at 5.)  John Seney, Alan John Silver, Mary Allen Silver, and Jeffrey M. Weinstraub are the named plaintiffs in the subscriber class, and Frank G. Tonrey, M.D., and Carmen M. Kavali, M.D. are the named plaintiffs in the provider class.  *(Id.)*  They have defined their proposed classes in the following way:

> Subscriber ERISA Class
>
> All persons who were, from July 30, 2001 through August 1, 2011 ("ERISA Class Period"), Members in any group healthcare plan insured or administered by Aetna, subject to ERISA (other than New Jersey small employer plan Members), who received covered hospital or medical services or supplies from an out-of-network healthcare provider (or any provider Aetna considered out-of-network for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed a non-zero amount but less than the provider's billed charge in determining benefits based in whole or in part on information obtained from the Ingenix Database.
>
> Subscriber New York Damages Class
>
> All persons or entities residing in New York who paid premiums for out-of-network health insurance coverage from Aetna and received reimbursement for ONET (out-of-network medical services) between April 29, 2004 and August 1, 2011 based in whole or in part on information obtained from the Ingenix Database.

Non-ERISA Class

All persons who, are or were, from April 29, 2004 through August 1, 2011 ("Non-ERISA Class Period") Members in any plan insured or administered by Aetna, which was not subject to or governed by ERISA, who received covered hospital or medical services or supplies from a out-of-network provider for which Aetna (or any third party acting on behalf of Aetna) allowed a non-zero amount but less than the provider's billed charges in determining benefits based in whole or in part on information obtained from the Ingenix Database.

Provider Class

All persons or entities who (a) were Out-of-Network Health Care Providers or Out-of-Network Health Care Provider Groups; (b) provided Covered Services or Supplies to any participant or beneficiary of any Aetna-insured or -administered health plan (c) which used the Ingenix Database to determine ONET benefits; and (d) whose resulting claims for reimbursement included Partially Allowed Claims based in whole or in part on information obtained from the Ingenix Database, at any time during the period June 3, 2003 through the date that Aetna ceased using the Ingenix Database (August 1, 2011).

(*Id.* at 5-6.)

At bottom, the Carella Plaintiffs argue that because the Ingenix database was a statistically invalid method for calculating UCR, each time Aetna used the database to calculate UCR it was acting unreasonably under ERISA and was thus breaching plan terms. (*Id.* at 7-8.) Their argument is two-fold. First, they allege that there is a common definition of UCR that extends across Aetna's health care plans, making this lawsuit capable of class-wide resolution, which they attempt to establish through excerpts from 47 Aetna health plans purporting to show uniformity in their UCR definitions. (D.E. 1111, Ex. 5, "Carella Plan Exemplars.") Second, they claim that common proof will demonstrate that the use of Ingenix for determining UCR was arbitrary and capricious "because the database, with its manifest shortcomings, was incapable of

17

arriving at reasonable and acceptable rates and Aetna knew[14] that the database was inaccurate

and flawed." (Carella Pls.' Br. at 34.)   At oral argument, counsel for the Carella Plaintiffs

elaborated on their theory in response to the Court's inquiries.

> THE COURT:  The question is not whether or not Aetna's policy was improper. Rather the question is whether the policy is improper according the terms of each plan giving rise to the claim. Or put another way, whether the plaintiffs didn't get what they deserved under the plan?

> MR. TAYLOR:  Okay. Now to circle back. This is circling back to what we were talking about before. It is that the plan terms are as a practical matter uniform. That the plan members were entitled to be reimbursed either the lower of the bill charged or the usual and customary rate. If the Ingenix database does not represent the usual and customary rate, than they—unless they were paid the bill charged, in which case they would be even. But if they were—if the payment was made by reference to the Ingenix database claiming that was usual and customary rates, then they weren't reimbursed in accordance with the usual and customary rates. Because the Ingenix database doesn't represent the usual and customary rates for the service.

> THE COURT:  Because it's flawed we could assume that you were not paid what you were supposed to be paid?

> MR. TAYLOR:  Correct.

Or. Arg. Tr. at 20.

Additionally, this time the Carella Plaintiffs seek equitable relief under Rule 23(b)(2),

alleging that Aetna's systematic use of Ingenix shows that it "acted or refused to act on grounds

that apply generally to the class."  (Carella Pls.' Br. at 34.)  The sought-after relief includes a

---

[14] In their moving brief, the Carella Plaintiffs claim that "[t]ellingly, throughout ten years of litigation, Aetna has never attempted to defend the Ingenix database as a compliant methodology." (Carella Pls.' Br. at 3.)  But Aetna devoted a significant portion of its opposition brief defending its use of Ingenix, and also provided the results of an analysis done by the New Jersey Department of Banking and Insurance ("NJ DOBI") in 2010 that "strongly support[ed] the conclusion that Ingenix fees are based on a reasonable methodology and not arbitrarily suppressed."  (Aetna. Br. at 27.)  In response, the Carella Plaintiffs neither address the NJ DOBI conclusion nor quibble with Aetna's defense of Ingenix, albeit they did note that Aetna's "lengthy argument as to why Ingenix was a reliable database" had created a new disputed issue in the case for 23(a)(2) commonality purposes. (Carella Pls.' Reply. Br. at 5.)

18

"declaration that the use of Ingenix was inappropriate for calculating UCR" and "an injunction requiring the processing of claims free of this offending methodology." (*Id.*)  According to the Carella Plaintiffs, the injunction would be manageable for Aetna because "there are presently valid methods of determining UCR that can be applied across the board that would provide relief for all class members," and it would be manageable for the Court because "there would be no need for separate declarations or injunctions for different class members."  (*Id.*)

This time the Epstein Plaintiffs move to certify two classes: (1) a subscriber class; and (2) a subscriber New Jersey class (non-ERISA). The named plaintiffs are Cooper, Werner, Paul, Smith and Samit.

Subscriber ERISA class

All persons who were, from July 30, 2001 through August 1, 2011 ("ERISA Class Period"), Members in any group healthcare plan insured or administered by Aetna, subject to ERISA (other than New Jersey small employer plan Members), who received covered hospital or medical services or supplies from an out-of-network healthcare provider (or any provider Aetna considered out-of-network for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed a nonzero amount but less than the provider's billed charge in determining benefits based in whole or in part on information obtained from the Ingenix Database.

Subscriber New Jersey SEHP and Individual Plan Class

All persons who were, from July 30, 2001 through August 1, 2011 ("New Jersey SEHP and Individual Plan Class Period") Members in any New Jersey small group healthcare plan insured or administered by Aetna, subject to ERISA, and Members of Individual Plans insured or administered by Aetna not subject to ERISA who received covered hospital or medical services or supplies from an out-of-network healthcare provider (or any provider Aetna considered out-of-network for purposes of paying benefits) for which Aetna (or any third party acting on behalf of Aetna) allowed a non-zero amount less than the provider's billed charge in determining benefits based in whole or in part on information obtained from the Ingenix Database.

Unlike the Carella Plaintiffs, the Epstein Plaintiffs move for class certification under Rule 23(b)(3).  As counsel for the Epstein Plaintiffs put it at oral argument, they "have a different

theory of the case" than the other putative class.  Oral Arg. Tr. at 35.  They argue that Aetna

designed a scheme called "Fee Profile" (the Aetna Fee Profile described above) that

masqueraded as ordinary data filtering but was in fact a deliberate method used to screen out

high-charge data before it made its way to Ingenix, "biasing [the database downward]," and

deflating UCR reimbursements.  (Epstein Pls.' Br. at 5, 14 ("Aetna Senior Management

'Covered Up' its Illicit 'do not profile' scheme.. . . [s]enior management falsified that it 'shut

down' the Fee profile manipulation.").)  Simply put, according to the Epstein Plaintiffs, Aetna

"rigged" Ingenix and profited from it.  (*See* Epstein Pl's. Reply Br. at 2 ("Aetna's high charge

'profiling' is no mere 'inaccuracy.' It's fraudulent.").)

## III.   DISCUSSION

"The class action is an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." *Wal–Mart Stores v. Dukes,* 564 U.S. 338 (2011).

To invoke this exception, every putative class action must satisfy the four requirements of Rule

23(a) and the requirements of either Rule 23(b)(1), (2), or (3).  *See* Fed. R. Civ. P. 23(a)–(b). To

satisfy Rule 23(a),

> (1) the class must be "so numerous that joinder of all members is impracticable"
> (numerosity); (2) there must be "questions of law or fact common to the class"
> (commonality); (3) "the claims or defenses of the representative parties" must be
> "typical of the claims or defenses of the class" (typicality); and (4) the named
> plaintiffs must "fairly and adequately protect the interests of the class" (adequacy
> of representation, or simply adequacy).

Fed. R. Civ. P. 23(a).

The party seeking certification bears the burden of establishing each element of Rule 23

by a preponderance of the evidence.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d

Cir. 2008), as amended (Jan. 16, 2009).  The Third Circuit has emphasized that "[a]ctual, not

presumed[,] conformance with Rule 23 requirements is essential."  *Id.* at 326. To determine

whether there is actual conformance with Rule 23, a district court must conduct a "rigorous analysis" of the evidence and arguments put forth.

ERISA § 502(a)(1)(B) authorizes a plan participant or beneficiary to bring a claim to recover benefits due under plan terms.  29 U.S.C. § 1132(a)(1)(B).  To prevail, the plaintiffs must establish that each member of the class "has a right to benefits that is legally enforceable against the plan, and that the plan administrator improperly denied those benefits." *Fleisher v. Standard Ins. Co.,* 679 F.3d 116, 120 (3d Cir. 2012).

The plaintiffs have conceded that an arbitrary and capricious standard applies to their ERISA claims.  (*See* Oral Arg. Tr. at 64.)  Under that standard, a court may only overturn a decision of the plan administrator if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Miller v. Am. Airlines, Inc.*, 632 F.3d, 837, 845 (3d Cir. 2011). Substantial evidence is "sufficient evidence for a reasonable person to agree with the decision." *Courson v. Bert Bell NFL Player Retirement*, 214 F.3d 136, 142 (3d Cir. 2000).

Aetna does not challenge the numerosity, typicality, or adequacy of representation factors in Rule 23(a).  Because these factors have not been contested and are not essential to the decision, the Court does not express its opinion on whether the proposed classes have satisfied these prongs by a preponderance of the evidence.

A.  *Commonality 23(a)(2)*

The Court will start with the commonality prong in Rule 23(a)(2), which applies with equal force to both groups of plaintiffs.  Commonality is defined by 23(a)(2) as "questions of law or fact . . . common to the class."  Both groups have posited the "one stroke theory" of commonality endorsed by the Supreme Court in *Dukes*: "Their claims must depend upon a common contention ... that it is capable of class-wide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011).

While traditionally 23(a)(2) has not been a difficult requirement for class actions, it is now widely agreed that *Dukes* transformed the commonality analysis.[15]  Under *Dukes,* "[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350.  The Third Circuit has made clear that "proof of the essential elements of the cause of action" must be common to the class.  *Hohider v. UPS, Inc.*, 574 F.3d 169, 197 (3d Cir. 2009).

Because the remaining causes of action consist of ERISA and contract claims, the Court must begin with the terms of the relevant plans, to determine if the "essential elements of the cause of action" are common throughout the class. The Carella Plaintiffs state without equivocation that Aetna's UCR definition is uniform across all its plans, which easily allows them to satisfy the commonality requirement.  (*See* Carella Pls.' Br. at 5 ("The Plan language is the same for plans Aetna insures (fully-insured plans) and administers (self-funded plans).").)  As support for this, they draw from the report written by their expert statistician, Dr. Siskin, which gives one common UCR definition:

Aetna defines R&C in relevant part as:

- Only that part of a charge which is reasonable is covered. The reasonable charge for a service or supply is the lowest of:
- The provider's usual charge for furnishing it; and

---

[15] Robert H. Klonoff, *The Decline of Class Actions*, 90 Wash. U.L. Rev. 729, 773–74 (2013) ("Prior to the Supreme Court's 2011 opinion in *Dukes*... Courts were very liberal in finding a question of law or fact that qualified. Indeed, in cases involving Rule 23(b)(3), which requires that common issues predominate over individual issues, defendants often chose to focus solely on predominance and frequently stipulated to commonality… The Supreme Court's *Dukes* decision appears to have given new meaning to commonality.")

- The charge Aetna determines to be appropriate, based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges
- For the service or supply are made; and
- The charge Aetna determines to be the prevailing charge level made for it in the geographic area where it is furnished. In determining the reasonable charge for service or supply that is:
- Unusual; or
- Not often provided in the area
- Or provided by only a small number of providers in the area;

Aetna may take into account factors such as:

- The complexity;
- The degree of skill needed;
- The type of specialty of the provider the range of services or supplies provided by a facility; and the prevailing charge in other areas.

(D.E. 1111, hereafter "Siskin Report," at 4-5.)

Along with citing to Dr. Siskin's definition, the Carella Plaintiffs argue that their plan exemplars also "clearly demonstrat[e] the uniformity of Aetna's definition of UCR."  (Carella Pls.' Br. at 5-6) (*citing* Carella Plan Exemplars.)  But beyond these conclusory assertions, the Carella Plaintiffs do not say much more about uniformity.  In fact, they seem to take the position (and counsel has stated at oral argument) that in the event of a trial, the Court is responsible for deciding whether the hundreds of plans implicated in this lawsuit are functionally the same, using the principles of contract law.

> THE COURT: Okay, thank you for that clarification. One of the things that I'm sure all of us had to have in the back of our minds is how a trial would work. So all that could be at the end of a lot of our argument, because you have clarified for me this is my theory, this is what I'm offering and I'm prepared to defend. It is just helpful to me as a trial judge to give me some idea of what would happen next if I agree with you.

> MR. TAYLOR: Absolutely. As far as the plaintiffs' side is concerned we'll put in evidence about from the plaintiffs' claims. Evidence about the plan terms.

> THE COURT: How? Just how?

MR. TAYLOR: Well, in terms of introducing the plan terms? Those were produced in discovery.

THE COURT: Right.

MR. TAYLOR: They could go in through discovery, through the witnesses. It could be stipulated to.

THE COURT: All right, so how many plan terms would we be looking at? Because one of the eternal themes of the defendants and, in fact, something alluded to in reported decisions, most specifically I guess Judge Simandle and Chesler, are the contracts rule and the contracts are different, and this shoves aside a lot of the other arguments that the plaintiff could make because it makes class certification wrong. So if we're having a trial, do you agree that there are different plan terms between and among your groups?

MR. TAYLOR: No, we don't agree to that.

THE COURT: Tell me why.

MR. TAYLOR: Well, as part of our papers that we submitted the relevant plan terms, there is Exhibit 5 to Mr. Cecchi's declaration, and it sets forth the definition on what Aetna is supposed to consider, how they are supposed to pay out of network claims. And the language that is in all of these plans is substantially the same. It requires Aetna to pay the lower of either the bill charged or some slight variation on the theme of the usual charges for the same providers in the same geographic area.

THE COURT: Now, would that be a judicial determination? I'm beginning to feel like I've got some patent lawyers here, where I have to do claim construction, people are fighting about what a sentence means. Before we went forward in a trial, would I have to make a judicial determination that whatever constellation of words are used, or is used in the various plans, because Aetna would be contesting this I'm sure. I make a determination that, in fact, those are all saying the same thing, or would that be a jury question, a factfinder's question? What are we talking about?

MR. TAYLOR: I think, your Honor, you would be following whatever the usual rules for contract construction are. If it's unambiguous then the Court makes a call what it means. If it's ambiguous then you, the Court, would take whatever parole evidence would be necessary in order to explain the plan terms. So that—

THE COURT: I would have an extra step though, right? I would not only have to say what the plan terms are, but have to say on all of these plan terms essentially say the same thing, right?

MR. TAYLOR: Correct. Correct.

Oral Arg. Tr. at 8-10.

In their reply brief, the Carella Plaintiffs reiterate this line of argument:

> Further, the plan terms for out-of-network benefits do not vary materially from plan to plan, notwithstanding Aetna's arguments to the contrary. Indeed, despite Aetna's lengthy argument as to individual variations in plan language, nowhere does Aetna explain where or how the standard used for paying ONET claims in one plan is materially different from the language in some other plan such that the application of the standard in the first plan would lead to a different result from the application of the standard from the second plan. Repeating the mantra over and over again that the plan terms vary does not make it so.

> In fact, the Subscriber Plaintiffs' plan language is remarkably similar, using "reasonable and customary," "usual and customary," and "prevailing." These terms are synonymous. *See* Cecchi Dec., Ex. 5 (Aetna Plans' UCR Definitions). The Provider Plaintiff's plan terms are, as a practical matter, uniform. Aetna's contention that plan terms vary is false. If it were true, Aetna would not have treated these plans identically by reimbursing all of them exactly the same, apparently without complaint by any of its plan sponsors.

(Carella Pls.' Reply Br. at 3.)

For the Epstein Plaintiffs, uniformity in plan language is not an essential component of their theory of Rule 23(b)(2) commonality. They maintain that any variation in plan language is superficial and overridden by Aetna's other conduct; they seem to suggest (with some caveats) that plan language should not be considered by the Court at all.  First, they argue that it is inappropriate for the Court to deal with *CIGNA's* holdings about plan variations, stating that "[a]ll *Cigna* references must be stricken from [Aetna's] brief," because they are "non-precedential."  (Epstein Pls.' Reply Br. at 1.)  Second, they respond to Aetna beating the drum about plan language by arguing that this case really "boils down to proof of injury and damages," and not the definition of UCR.  (*Id.* at 6.)  At oral argument, counsel for the Epstein Plaintiffs clarified this position:

> The theory that the Carella plaintiffs put forth of whether contributed data versus the statistical database actually created injury. It's hypothetical. The real question is, did the actions of Aetna create injury and cause damage to the subscriber

> plaintiffs. And in this case, and that's how we distinguish and we see a clearly distinguished between this case and the Cigna case and the other cases WellPoint and etc., that Aetna's actions here are so markedly different and actually created injury.

Oral Arg. Tr. at 37.

Third, the Epstein Plaintiffs note that "Aetna treated R&C Plan Language variations as the same and fungible," and they contend that Aetna's 30(b)(6) witness "admitted Ingenix determined 'usual and customary benefits,'" which was "common knowledge within Aetna," implying that common practice should supersede plan language. (Epstein Pls.' Br. at 3.)

In opposing, Aetna unsurprisingly focuses on plan diversity. Because the plaintiffs' operative complaint asserts ERISA and breach of contract claims, and each plan is governed by its own language, Aetna argues that the supposed common questions require plan-specific inquiries that will turn on each plan's distinctive language. In short, according to Aetna, the differences here parallel the plan variation that prompted the denial of class certification in *CIGNA* and *WellPoint*. Aetna contends that the plaintiffs are required to prove under § 502(a)(1)(B) of ERISA that benefits are due them "under the terms of the plan," therefore the "extensive individualized issues driving Plaintiffs' claims, along with their inability to determine on a class-wide basis whether any benefits would be due, show that Plaintiffs have not met their burden to demonstrate commonality by a preponderance of the evidence." (Aetna Br. at 44.)

At oral argument, Aetna's counsel used the plaintiffs' exemplars to show that even under the terms of those plans there were material differences that precluded class certification.

> MR. DOREN: Your Honor, what I've handed up is a series of excerpts from Plaintiffs Exhibit--, you heard it referenced. It's Mr. Cecchi's declaration five and Epstein declaration Exhibit Six. This is a historic document—the two of them pulled together back when they were working together. There were about 100 thousand pages of plan documents produced by Aetna. Plaintiffs went through it and hand selected 47 plans in order to show that Aetna's language is uniform and always subject to the same interpretation. And what I did, your Honor, I went

through and selected samples from that so that we weren't dealing with the full exhibit. But your Honor may want to just peruse that in your spare time, to get a feel for some these other claims plans.  But with that, let me explain what we have here. And keeping in mind that what we have here is plaintiffs hand selected set of plans that presumably make their best case on why a class can be treated, and that it can be handled on a class-wide basis.

Oral Arg. Tr. at 58.

After careful review of the 47 plan exemplars, the Court agrees with Aetna that the varied nature of the terms poses insurmountable odds against class certification.  As Aetna has repeatedly and appropriately noted, there are plans included in the plaintiffs' exemplars that *require* the plan administrator to use the Ingenix database when calculating UCR, such as the Penske 2006 Plan:

> Reasonable and customary charges refer to the amounts providers charge for services and represent an acceptable range for the same or similar services or supplies within your geographic area. These limits are set by the Health Insurance Association of America (Ingenix). You are responsible to pay any charges in excess of R&C charges. These charges are in addition to any applicable annual deductibles, copays, or coinsurance under your medical option. In addition the amounts you pay above R&C charges do not apply toward your out of pocket limit. … If you are enrolled in one of these medical options, R&C charges do not apply to UCR language.

(Carella Plan Exemplars at 2-3, "Penske 2006 Plan.")

Not only does the Penske 2006 Plan mandate that Ingenix be used to set the UCR reimbursement rate, but it also says that the rate only has to represent an "acceptable range"— not a specific number—but a range that the plan administrator has discretion to interpret.  Moreover, the Associated Luxury Hotels and International Holdings 2001 Plan says the following about Ingenix:

> Aetna determines the extent of the plan's liability through use of the Ingenix Prevailing HealthCare Charges System (PHCS). The PHCS is a statistical profile of provider's charges that has been developed for this purpose. The Ingenix PHCS collects provider charge data from more than 150 major contributors including commercial insurance companies and third party administrators. Data is collected

27

for all 50 states, the District of Columbia, Puerto Rico and the Virgin Islands. Since physicians' fees reflect differing costs of doing business in various parts of the country, the PHCS recognizes these regional differences and uses the first three digits of the United States Postal Service zip codes to divide the charges into population areas based on cost-similar and geographically adjacent areas.

(*Id.* at 11, "Associated Luxury Hotels and International Holdings 2001 Plan.)

A plan requirement to use Ingenix, as the *CIGNA II* court has acknowledged, may not *per se* immunize Aetna from ERISA liability, but it "nevertheless [should] be considered as a relevant factor," and "it might very well be the case that where a governing regulation required that Ingenix be used, an ONET determination would be subject to less scrutiny than a situation in which the governing plan did not specify the source of data to be used." *CIGNA II* 299 F.R.D. at 426.

The *CIGNA II* court noted that the plaintiffs had failed to "address how the Court could manage liability questions at trial in light of these plan variations as to the data the administrator may or must consider." *Id.* at 427. The same applies here. Though it is certainly true, as the Carella Plaintiffs point out, that when plan terms are unambiguous, actions taken by the plan administrator inconsistent with those terms should be considered arbitrary, Aetna's rejoinder (the converse of the previous statement) is also true: "actions reasonably consistent with unambiguous plan language are not arbitrary." (Aetna Br. at 37) (quoting *Bill Gray Enters., Inc. Emp. Health & Welfare Plan v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001.)) Two exemplar plans, the Penske 2006 Plan and the Associated Luxury Hotels and International Holdings 2001 Plan, demonstrate plan language—in part designed by employers—that require the plan administrator to use Ingenix to calculate UCR, presenting a *sui generis* issue that forecloses the possibility of class-wide treatment.

28

From other examplars the Court is satisfied that the varied language propels a plan-by-plan and sometimes even a claim-by-claim analysis.  For instance, the self-funded plan of Putnam Northern Westchester Counties provides "that a database, not necessarily Ingenix, shall be used and will be based on nationally obtained recognized survey data," or alternatively, "on data received from an insurance company which as a major portion of its business is involved in the adjudication in health care claims." (Carella Plan Exemplars at 10, "2003 Municipal Cooperative Health Benefit plan for Putnam/ Northern Westchester.")  At first blush this suggests that Ingenix could qualify under such a definition—but, once again, this presents a preliminary question for the Court to decide on a plan-by-plan basis.

In addition, there are plans in the exemplars that contain what other courts have called "nature and severity" clauses, such as the Castle Oil Corp 6/1/2002 Plan, which provides in relevant part that "Aetna may take into account factors, such as: the complexity; the degree of skill needed; the type of specialty of the provider; the range of services or supplies provided by a facility; and the prevailing charge in other areas." (*Id.* at 12, "Castle Oil Corp 6/1/2002 Plan.)  In order for the Court to reach the conclusion that plan members were injured by Aetna's abuse of discretion under this plan, it would have to first figure out if Aetna properly took into consideration these factors given the particular claim it was reimbursing.  For other plans, the terms instruct the plan administrator to reimburse "at the usual and customary or an agreed upon rate," like the 2006 Sony Pictures Plan.  (*Id.* at 8, "2006 Sony Pictures Plan.)  If Aetna's use of Ingenix was an abuse of discretion under this plan the Court would first have to decide what the usual and customary rate actually was; then whether the reimbursement amount produced by Ingenix fell below that rate; and finally, whether the difference in the reimbursement, if there was one, was reached arbitrarily and capriciously by the plan administrator.  As explained in

29

*CIGNA II*, class-wide adjudication of these issues at trial would require the court "to conduct mini-trials to establish the elements of the ERISA claims for unpaid benefits… in light of the nuances of each plan's instructions to the administrator." *CIGNA II* 299 F.R.D. at 433.

Even the named plaintiffs' plans contain material differences that would require plan-specific analysis. Cooper's plan provides that UCR is the "amount which is most often charged for a given service by a provider within the same geographic area." *Id.* at 1, "5/1/2004 – Rosenberg and Associates Plan.") While the plaintiffs claim that Aetna automatically breaches plan terms when the ONET reimbursement level is set at the 80th percentile of Ingenix, it would still be left for the Court to decide whether that Ingenix amount is less than what is "most often charged" in the geographic area, which, as Aetna has pointed out at oral argument, could reasonably be interpreted as the 51st percentile of charges. *See* Oral Arg. Tr. at 63-64 ("Looking at the Washington Post Plan. You see there they refer the amount typically charged for the same service or supplied by other providers. Again, typically charged is not saying eight out of ten times.").

And, despite plaintiffs' suggestions to the contrary, none of the plan exemplars mandates the use of a database that is "statistically reliable" or "statistically valid"; none requires the use of a correct "market rate." As the Carella Plaintiffs said themselves, this is an ERISA case and not a tort action, so it is plan language that is paramount. *See e.g.*, Carella Pls.' Reply Br. at 1 ("This is not a product liability action, where the defendant is not liable if there was no better alternative design. This is an ERISA action[].") To belabor the points made in *CIGNA* and *WellPoint*, the relevant question is not whether there is some hypothetically correct UCR that Ingenix calculations should have calculated but never did, but rather, using the deferential abuse of

discretion standard, whether the UCR calculation resulted in underpayment pursuant to the specific terms of the plan for each of the class members.

The Court agrees with Aetna that the plaintiffs have turned the commonality question inside out.  The plaintiffs are asking the Court to assume that the commonality prong is met because of their contention that the Ingenix database was flawed, and that common evidence could prove that is flawed.  *See Carella Pls.' Reply Br.* at 2 ("It is the use of the Ingenix Database to make UCR determinations that was a violation of ERISA, not which percentile was used. Whether the 80th or 90th or some other percentile was used, it would still be a percentile of an unreliable set of numbers.").  But that approach skips the preliminary inquiry of whether class members were underpaid at all, as well as its necessary corollary: underpaid from what hypothetically flawless/market-rate/statistically reliable number? The Court cannot begin to answer these prerequisite questions without engaging in a plan-by-plan analysis.  Rule 23(a) charges the plaintiffs with the burden of establishing by a preponderance of the evidence that there are relevant questions that will "generate common answers apt to drive the resolution of the litigation," and whether Ingenix was based on an unreliable set of numbers does not generate the yes-no answer that will help resolve this case, because it sidesteps the ERISA-mandated primacy of plan terms.  Seen this way, the *Lipstein* court's commonality analysis still rings true:

> Contrary to Plaintiffs' argument, the Court cannot ignore the specific plan language regarding coordination of benefits with Medicare, because Defendants' policy is only impermissible if it conflicts with the language of the particular plan or if it is otherwise arbitrary and capricious. The question is not whether the plans expressly require Defendants' policy, but whether, in each circumstance, the policy is a permissible interpretation of each plan. Likewise, the question is not whether United's policy is improper; rather, the question is whether United's policy is improper according to the terms of *each* plan giving rise to a claim. These inquiries cannot be completed without the Court's careful attention to the plan language and likely would not lead to the same answer for each claimant. Plaintiffs' deceptively simple question will require individual determinations based on different plans at different points in time where United enjoyed different

31

amounts of discretion and could yield a kaleidoscope of "yeses" and "nos" across the class.

*Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 290 (D.N.J. 2013).

In an effort to overcome their plan diversity problem, the plaintiffs have provided a welter of isolated excerpts from Aetna's emails and depositions purporting to be "smoking gun" admissions revealing that plan language was irrelevant.  *See e.g.*, Epstein Pls.' Br. at 20 ("Aetna's use of Ingenix was common to all plans regardless of language.")  Even the Carella Plaintiffs have argued that there are uniform practices that transcend plan terms:

> Common proof demonstrates that Aetna's UCR determinations are based on uniform practices, including its use of the Ingenix database. As Deborah Justo, an Aetna Provider Data Services unit analyst, stated in a July 2008 e-mail message: "The Ingenix data is the primary source for R&C . . . based benefit determinations." Ex. 6.

(Carella Pls.' Br. at 6.)

The Epstein Plaintiffs cleave to this "uniform practice" theory too, although with more conspiratorial overtones:

> MR. EPSTEIN: It's important because Ms. Justo has a conflict of interest. Ms. Justo has been directly involved with the tracking reports that had gone back and forth between Beth Lilith and Heather Kennedy, all part of Aetna big profits, which was national accounts, which is headed up by Pamela Kehaly. That is conflict of interests. It runs directly up to Dr. Cross, who hired the accountant Rodrick Martin. Who prepared and changed the name of these tracking reports MP and NT savings reports.

Oral Arg. Tr. at 134.

At oral argument, the Court asked what evidence there was to support these characterizations, and counsel for the Carella Plaintiffs stated that he could not at the moment cite to the "chapter and verse" in the record, but nevertheless stood by them.

> THE COURT: So you're saying that we have a 30(b)(6) witness, whose testimony would carry a lot of weight in terms of what went on. Saying, if we had an out of network provider or subscriber asking for money we did the same thing that we

did no matter who was sponsored of the plan, where that person worked. We just simply looked at it, sent the information to Ingenix and paid it according to Ingenix?

MR. TAYLOR: Exactly so. And that also addresses all of these individual factors that Mr. Doren was talking about, that you need to look at this and you need to look at this and this. They didn't look at it. They just put it in to the computer and ran it through Ingenix and got their answers-- totally an automated claims processing.

THE COURT: Okay. Since we're talking a little bit about not so much generics, but what's in the record and we're trying to do our rigorous analysis here.

MR. TAYLOR: Yes.

THE COURT: Tell me exactly what evidence supports what you just said. Who said what and when and so on.

MR. TAYLOR: Well, it's in the deposition testimony and certifications that were attached.

THE COURT: By whom? You will not make me go to boxes to figure out who said what. You're talking about your 30(b)(6) witness?

MR. TAYLOR: Yes. I can't tell you chapter and verse standing here today which witness and which exhibit and which exhibits and what line—page and line. But if your Honor wants—

THE COURT: I'm not asking you page and line. I just want to know when there was an assertion much as I would want to know if I'm deciding whether or not there's a summary judgment issue here— are you permitted to go further and make the claim—

MR. TAYLOR: Sure.

THE COURT:  That irrespective of differences in plan languages— I'm that talking about the exhibit Mr. Doren used, irrespective of that. We have in this record evidence that Aetna may are read it, but they were propelled by the out-of-network as the deal to do what they did in every single—

MR. TAYLOR: Correct.

THE COURT: So it's really immaterial, you could make your finding whatever it said it was treated the same way and therefore we jumped over that hurdle?

MR. TAYLOR: Correct.

33

> THE COURT: Okay. So I would want to know what the evidence is that, in fact, supports that somewhat sweeping statement. I'm not challenging it, but it's an important statement and I would need to know what the evidence is.
>
> MR. TAYLOR: Would, your Honor, like a letter as to that?
>
> THE COURT: Sure, that's fine.

Oral Arg. Tr. 100-01.

The Court has yet to receive that cogent summary of the competent evidence in the record establishing the plaintiffs' sweeping allegations.  On the contrary, as is evident from the briefing, the plaintiffs have only succeeded in patching together a series of helter-skelter (at times inscrutable) anecdotes from testimony and correspondence that fall well short of discharging their burden.  Markedly, nearly all of these "smoking gun" excerpts are furnished without explanation or context—and quite bluntly, accusations without evidence are not enough for the Court to depart from ERISA's well-settled practice of focusing on plan language.  And, as detailed above, this is not the plaintiffs' first time lodging these theories—similar attempts were made and summarily rejected in *CIGNA II*:

> Throughout their briefs, Subscriber Plaintiffs presuppose the existence of a "Standard UCR Definition" in Cigna plans. The record before the Court is sparse on proof that Cigna either formally adopted a "standard" definition of UCR or in practice used the same or substantially similar language across plans. Apart from the three plans of the named Subscriber Plaintiffs, Plaintiffs proffer two pieces of evidence: an internal email exchange among Cigna employees which discusses the term "reasonable and customary" as generally meaning the amount charged by most providers for a service in a given geographical area and a manual presented to call center employees concerning how to handle calls about claims, which instructed that the terms "reasonable and customary" or UCR had such a meaning. These proofs, however, do not establish any uniformity among plans as to actual plan language, on which the § 502(a)(1)(B) claims must necessarily be based.

*CIGNA II* 289 F.R.D. at 135.

34

Aside from the snippets of deposition testimony and email correspondence, the Carella

Plaintiffs offer the *Health Net* opinion as case law support for their Rule 23(a)(2) argument:

> These questions satisfy the commonality test, as Judge Hochberg recognized in
> approving the *Health Net* settlement. There she concluded that the ERISA classes
> had "easily met" the commonality test because they were "based on common
> operative facts and questions of law" concerning the allegation of "a systematic
> course of conduct in interpreting contracts of insurance in an improper,
> undisclosed, and self-serving way in contravention of the plans and of [the
> defendant's] fiduciary duty to beneficiaries who chose to use out-of-network
> providers."

(Carella Pls.' Br. at 15) (internal citations omitted.)

But there is adequate justification for not adopting wholesale the *Health Net* rationale

based on the factual differences alone; in fact *WellPoint I* did just that. *See WellPoint I* 2014 WL

6888549, at *11 (distinguishing the case because "the [*Health Net*] court made a factual finding

that there were no substantial differences between the definitions of UCR used in the plans at

issue.")  And as Aetna has pointed out, the *Health Net* litigation involved issues that are not

implicated here: the intentional use of outdated Ingenix data; scripted messages to members to

cover up the use of such data; and a business dominated by fully-insured plans.  But beyond

factual distinctions, above all *Health Net* was decided prior to the Supreme Court's decision in

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), so the Rule 23 standard applied then (that

the court should not look to the merits during the class certification phase), is no longer good

law.  Further, as previously noted by Judge Chesler in the *CIGNA II* decision, there are special

manageability factors afoot when class actions are postured for trial as opposed to settlement.

*See CIGNA II* 399 F.R.D. at 431 (highlighting that "when no trial of the class action is

anticipated, manageability issues that might have been presented by differences or

inconsistencies among putative class members' claims drop out of the certification analysis").

For these reasons, the Court agrees with Aetna that *Health Net* is inapposite.

Like the *WellPoint I* plaintiffs*,* these plaintiffs "criticize Ingenix in a vacuum, not only in

isolation from governing plan language but also from the availability of other data sources for

supplying UCR." *WellPoint I* 2014 WL 6888549 at *10.   And as the court found in *CIGNA II*,

this Court finds that even if the plaintiffs could show that "Ingenix was flawed," that would be

"patently insufficient to demonstrate underpayment of benefits … across class membership" and

"would not establish even a prima facie ERISA claim." *CIGNA II*, 299 F.R.D. at 429.   Once

again, there is no good reason to abandon the sound analysis of *Lipstein*:

> Plaintiffs are correct that the question they seek to resolve could have a simple yes
> or no answer, but they ignore the reality that in order to make that determination
> the Court would need to make at least as many individual determinations as there
> are plans at issue across the broad class, after analyzing each plan's language and
> potentially other evidence relevant to each claim. Plaintiffs bring "breach of
> contract claims," which, by Plaintiffs' admission, require the Court to consider
> "the contract language governing United's obligations regarding making benefit
> determinations when it is secondary to Medicare, and whether United's actions
> breached those obligations."

*Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 289–90 (D.N.J. 2013) (internal citations
omitted.)

Under the ERISA claims asserted by the plaintiffs, they must establish that each member

of the class "has a right to benefits that is legally enforceable against the plan, and that the plan

administrator improperly denied those benefits."  Yet the plethora of diverse contractual

standards involved in this case drives the Court into highly individualized inquiries.  This

prevents the analysis from ever reaching the issue of whether Ingenix was a flawed database, and

keeps this putative class action from ever getting resolved in "one stroke." As a result, the Court

finds that neither class certification motion can survive rigorous analysis under Rule 23(a)(2).

**B.**      *Rule 23(b)(3) Class*

For completeness, the Court addresses whether the plaintiffs can satisfy Rule 23(b),

beginning with the Epstein Plaintiffs' arguments for 23(b)(3) certification.  Under Rule 23(b), a

class seeking certification must meet the requirements of 23(b)(1), (b)(2), or (b)(3).  Rule

23(b)(3) provides in relevant part:

> A class action may be maintained if ... the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).

Rule 23(b)(3)'s predominance element actually incorporates the commonality requirement of Rule 23(a).  *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 528 (3d Cir. 2004); *Lipstein*, 296 F.R.D. at 292-93 (noting that "the standard for predominance is 'even more demanding' than Rule 23(a) commonality").  This is because predominance "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Products v. Windsor*, 521 U.S. 591, 623 (1991).

The Epstein Plaintiffs' Rule 23(b)(3) argument consists of three sub-points.  First, they contend that plan language shows that class-wide injury could be tried with common evidence.  Second, they claim that the Aetna Fee Profile represents the overarching "center" of the lawsuit and is more prevalent and important than individual plan variations. Third, because of the alleged Fee Profile scheme, the Epstein Plaintiffs argue that they can demonstrate that injury can be proven with common evidence, and have offered three damages models that they say are fully consistent with their theory of liability.

Unpacking the first contention, as the Epstein Plaintiffs explain it the diversity in plan language is almost beside the point.  They focus on what they call the "fixed rule" or the "the operative language" in Aetna's UCR definitions, where they say that plan terms always instruct the administrator to pay the "lowest of" three options:  (1) the Ingenix-calculated reasonable and customary rate; (2) the prevailing charge; or (3) the usual charge.  Because the plaintiffs' class definition only includes situations where the UCR was calculated by Ingenix, this argument goes, the "lowest of" operative language means that claims were necessarily paid out at a lower

rate than both the prevailing and usual charges.  As a result, class members were injured, says the

Epstein Plaintiffs, because Ingenix was roundly suppressed when Aetna pre-scrubbed the data

using its Fee Profile, and injury can be shown because the suppressed rate was less than what the

class member would have been reimbursed if the prevailing or usual rate were used instead of

Ingenix.  As the Epstein Plaintiffs put it in their reply brief:

> In Aetna's "administering benefits in accordance with plans" if UC or CF were in
> fact "lower", "lesser" or "lowest", it would have in fact been the lowest limit--
> Ingenix R&C would not have been paid. This is a mathematical and legal
> imperative. Plan language dictates that when Ingenix R&C was paid, UC and CF
> were in fact adjudicated as higher than Ingenix R&C. Injury exists, "if one
> assume[d]…Ingenix rates were suppressed" because UC and CF (and BC) were
> higher than the actual "suppressed" Ingenix R&C paid.

(Epstein Pls.' Reply Br. at 8.)

Counsel for the Epstein Plaintiffs' elaborated on this theory at oral argument:

> If Aetna paid— this goes to the question of injury and whether we could have
> injury under all these so-called disparate plan terms. If Aetna pays the lowest of
> these three things. And let's say they pay—the third bullet prevailing charge level.
> That means by definition the other two— the usual charge is higher. It means that
> the cost factors is higher. So if we were paid, number 3, ten dollars, well, numbers
> one and two were more than ten dollars. Which means that if were supposed to be
> paid more than ten dollars because we were underpaid because held as high
> charges we suffered injury. The subscribers were injured.

Oral Arg. Tr. at 137-38.

After considering this argument (along with the others), the Court finds that the Epstein

Plaintiffs' class certification motion cannot survive 23(b)(3) scrutiny because individualized

issues still predominate on the matters of liability and damages.  In arguing that they should

represent the class, the Carella Plaintiffs did not mince words.

> [T]he Epstein Plaintiffs appear to be requesting certification of a Rule 23(b)(3)
> class, one that seeks to recover damages equal to the difference between what the
> class member was charged and the billed charge for the service. Though
> somewhat revised, this is the very same argument that Mr. Epstein advanced not
> once, but twice, in the analogous in *Cigna* litigation, each time with resounding
> failure. Wresting the ship's wheel from Plaintiff's counsel so they can then steer

> the ship into the iceberg for a third time is unlikely to bring about a different
> result for the Mr. Epstein and his clients (and Plaintiffs do not care to go down
> with the ship).

(Carella Pls.' Br. at 24.)

In sum, the Epstein Plaintiffs' "operative language" argument presupposes that a

systematic depression of the Ingenix database has been established with competent evidence.  As

Aetna's counsel stated at oral argument:

> Now, we heard a lot about Ms. Justo and Aetna scrubbing and everything else.
> And I'm going to get sucked into answering some of that. But what you didn't
> hear is that they have any evidence. Now mind you, they have had all the Ingenix
> contribution data for eleven years. They have had all of the Aetna claim data for
> eleven years. They've had the Aetna claim adjudication logic for eleven years.
> And yet no one has presented any evidence to you that has shown a statistical
> analysis, speaking of statistically reliable, that shows that in fact Ingenix was
> depressed much less that it was depressed by anything Aetna did to data.

Oral Arg. Tr. 147.

As other courts have recognized, the plaintiffs cannot simply brush aside highly

individualized issues by latching on to generalized allegations about the defendant's improper

behavior.  In *Hohider v. United Parcel Service*, Inc., 574 F.3d 169 (3d Cir. 2009), for example,

the Third Circuit held that a class cannot be certified where an essential element of the plaintiffs'

claim is not subject to common proof, even if some other elements can be proven through

common evidence.  In that case the district court had certified a class of employees alleging a

pattern and practice of unlawful discrimination under the Americans with Disabilities Act

("ADA.")  While the question of whether the class members were "qualified" under the ADA

required an individual inquiry, the court nevertheless certified a class "to determine whether UPS

engaged in a pattern or practice of unlawful discrimination," leaving to a later stage the

"qualified" issue.  *Hohider* 574 F.3d at 176-77.  The Third Circuit reversed, explaining that the

assessment of whether class members were qualified under the ADA was an essential element of

39

liability on the claim, which precluded class certification, notwithstanding that "proof of the existence of the alleged policies" was subject to class-wide proof.  *Id.* at 184-85, 196-97.

In a similar way, the Epstein Plaintiffs are asking this Court to ignore essential elements of their ERISA claims that are not subject to common proof and focus instead on Aetna's Fee Profile.  But that is not enough.  *See e.g.*, *Hydrogen Peroxide* 552 F.3d at 313 (reversing the district court's grant of class certification on predominance grounds even though the conspiracy element of the plaintiffs' antitrust claim was subject to common proof because it could not be shown that injury-in-fact could be established); *see also Opperman v. Allstate N.J. Ins. Co.*, 2009 WL 3818063, at *8 (D.N.J. Nov. 13, 2009) (denying class certification when plaintiffs alleged "misconduct [that] applies generally to all claimants," because there was no showing that ascertainable loss could be tried using common evidence.).  Uniformly, the courts in *CIGNA, WellPoint,* and *Lipstein* found that the amorphous notion of Ingenix as a flawed database cannot, standing alone, certify a class.  Attributing nefarious intent behind Aetna's conduct does not alter the analysis.  The relevant question is not whether Aetna was motivated by greed or animus or a conflict of interest but whether its "decision [awarding benefits] is supported by substantial evidence and based upon a reasonable interpretation of the plan's terms."  *Bill Gray Enters., Inc. Emp. Health & Welfare Plan v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001).

Moreover, the Epstein Plaintiffs cannot demonstrate that an essential element of their ERISA claim—injury—is capable of proof at trial through common evidence.  Competent record evidence establishing that Aetna's actions caused the systematic downward bias of Ingenix is missing.  The *CIGNA II* court framed the problem well:

> Subscriber Plaintiffs argue that determining class damages is as simple as reprocessing the Ingenix-based ONET claims of class members in an automated way to calculate the difference between the Ingenix-based reimbursement and the provider's billed charge for the service. They contend that Cigna's computerized

40

system maintains detailed claims data for nearly the entire Class Period that includes the information necessary to calculate the amount of damages: the member's identifying information, the provider of the service, billed charge, and any applicable member responsibility for the service, such as deductible, co-payment and coinsurance. Subscriber Plaintiffs, no doubt, have demonstrated the components for some hypothetical damages methodology. The question is, what factual basis is there for the formula they maintain governs each class member's right to relief? The standard method Subscriber Plaintiffs have proposed to ascertain damages without the need to look at the circumstances of each ONET claim depends on the assumption that, having been denied an ONET benefit based on an accurate UCR, as plan terms require, plan members are entitled to an ONET benefit in the amount of the billed charge for the service. They argue that all plans establish two possible measures of the allowed amount on an ONET claim—the billed charge or the "normal charge made by most providers or such service or supply in the geographic area where the service is received."

…

[E]ven assuming that Subscriber Plaintiffs had demonstrated that the language used in their plans' ONET benefit provisions was used widely by Cigna, such that an appropriate damages model could be designed according to that language, they could not persuade this Court that their theory of classwide proof is plausible. The plans in the record, that is, the named Plaintiffs' plans, do not use the term "billed charge."

*CIGNA II* 289 F.R.D. 121 at 137, 138.

As the parties are well aware, the plaintiffs cannot establish liability by merely asserting that Ingenix was a flawed and corrupted database as a conceptual matter: the ERISA claims require them to show injury as an element of liability, even if issues regarding calculation of damages may be left for later.  As the Third Circuit has said, "[p]roof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)."  *Newton v. Merrill Lynch*, 259 F.3d 154, 188 (3d Cir. 2001). Yet the Epstein Plaintiffs have failed to present any plausible model of damages to prove injury at trial.  In their opening brief, they offered three models: (1) "Tracking Model"; (2) "Billed Charge Model"; and (3) "Accurate Amount Model."  (Epstein Pls.' Br. at 18.)  It seems from their reply brief, however, that the Epstein Plaintiffs are only pressing the first model, noting that "no

alternative [theory] is needed," because Aetna's own tracking mechanism "constitutes irrefutable common proof" and offers "exact damages." (Epstein Pls.' Reply Br. at 10.) As they describe it, "Aetna's own documented Fee Profile 'Tracking' Reports calculated injury and damages for each subscriber to the penny—obviating any individual inquiry." (Epstein Pls.' Br. at 22.) The Tracking Model can be summarized as follows: because Aetna kept reports that tabulated the cost savings between UCR claim payouts and the full billed charges of those claims, Aetna only has to reverse engineer the tables in order to calculate damages in this case.

This model fails for the same reasons the *CIGNA II* court noted above: it is predicated on documents representing a comparison between full billed charges and UCR payments, and under plan terms no member of the class is entitled to that difference. The tracking table says nothing about whether the UCR reimbursement was proper or improper according to plan terms under the abuse of discretion standard; it merely calculates the difference between what is paid against the billed charge for the claim. As illustrated by Aetna's counsel at oral argument, a simple example exposes the ill-fit: If a physician bills $1,000 and an improper UCR is calculated to be $750, and neither the subscriber nor the provider contest that amount, then the Aetna tracking table would show a savings of $250 (the damages amount under the Tracking Model). But if for the sake of argument the proper (market-rate) calculation of UCR should have been $780, the tracking table would say nothing about that hypothetical injury—it is, in short, untethered from plan language.

To the extent that the Epstein Plaintiffs are still pursuing the "Billed Charge" model (which is really just a variant of its "Tracking" model), the Court must reject it. What proves fatal, as Aetna and the Carella Plaintiffs have both argued, is that nowhere does the plan mandate that a member is entitled to the billed charge. In an ERISA claim for benefits, Aetna can only be

held liable for the obligations it breached under the relevant plans, which must be the difference between an improper UCR and a proper UCR (either market or statistically valid), and certainly not the difference between the UCR and the full billed charge. As counsel for the Carella Plaintiffs said at oral argument, "Mr. Epstein's damages model theory doesn't match the claims language or liability theory." Or. Arg. Tr. at 103.

Finally, turning to the "Accurate Amount" model, the Epstein Plaintiffs propose "a damages method that calculates a market rate R&C," apparently with data put together by the plaintiffs' expert Dr. Foreman. (Epstein Pls.' Br. at 19.) They initially stated in their opening brief that "Dr. Foreman measured damage based on his examination of Aetna's actual books and records," and that "he added up the savings in R&C payments as between 2 and 3.1 billion dollars," which suggests that Dr. Foreman endorsed a downward bias theory of the database. (*Id.*) At oral argument, however, counsel seemed to downplay their dependence on Dr. Foreman.

> THE COURT: Well, the reason that I asked this is, I'm assuming that the Epstein plaintiffs, or the Epstein theory will be using the same experts as the Carella group, correct?
>
> MR. EPSTEIN: Yes.
>
> THE COURT: Okay.
>
> MR. EPSTEIN: We are less reliant on Dr. Foreman. We cite Dr. Foreman for some evidence where we looked at the data that— Dr. Foreman collected data of Aetna and Cigna, and he separately listed those data in different charts. And listed the top 50 charges from both Aetna and Cigna.

Oral Arg. Tr. at 42.

In *CIGNA II*, the court noted that Dr. Foreman had "long since abandoned the theory of systematic downward bias." This Court sees no good reason to resurrect a theory he has left behind. *CIGNA II*, 299 F.R.D. at 420.

For the above reasons, the Court finds that the Epstein Plaintiffs' motion for class certification fails to satisfy the predominance requirement of Rule 23(b)(3).

### C. Rule 23(b)(2) Class

The Carella plaintiffs' decision to switch gears and move for certification exclusively under 23(b)(2) is of recent origin.  As their attorney put it: "The relief that was requested on behalf of the classes before was the payment of damages under Rule 23(b)(3). What we are proposing [now] is injunctive and declaratory relief under []Rule 23(b)(2), requesting that Aetna reprocess all of the out of network claims in accordance with an actual UCR calculation."  Oral Arg. Tr. 7.  In order to prevail under Rule 23(b)(2), the plaintiffs must show by a preponderance of the evidence that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  At oral argument, the Court asked the Carella Plaintiffs why they were altering course at this stage:

> THE COURT: Okay. And just getting behind things. Why did the plaintiffs not go for a (b)(2) ab initio?
>
> MR. TAYLOR: It's always been in the complaint, but based upon, you know, the track record from the beginning of the case and, you know, there's been a lot of water under the bridge since—
>
> THE COURT: There's been a tsunami under the bridge. There have been bridges too far and bridges far apart and now we're back to the stream I guess.
>
> MR. TAYLOR: Back to where we are. And after looking at everything, we determined that the (b)(2) classes were appropriate relief that we should move for to give something to the class.

Oral Arg. Tr. at 23.

As they explain it in their opening brief, the sought-after relief includes a "declaration that the use of Ingenix was inappropriate for calculating UCR and an injunction requiring the processing of claims free of this offending methodology[]."  (Carella Pls.' Br. at 34.)  Further,

44

they contend that any payment of money that would result from such an injunction should be treated as "incidental" because the "direct relief is to reprocess the claims. And that might yield—that incidentally may yield the payment of money, but it's not an order to pay money. It's an order to reprocess claims." Oral Arg. Tr. at 22.

As support for this "retrospective injunction," the plaintiffs primarily rely on *Meidl v. Aetna*, 2017 WL 1831916 (D. Conn. May 4, 2017), where the court certified a (b)(2) class that requested an injunction ordering Aetna to reprocess and recalculate past claims. In *Meidl*, the plaintiffs claimed that Aetna improperly denied them health coverage for a distinctive type of brain therapy to treat depression. *Id*. at *1. Aetna's plans provided an "experimental" exclusion for certain types of treatments, particularly those not generally accepted within the medical community, and because Aetna considered this type of therapy to fall into that experimental category, there was no coverage. The plaintiffs asserted both an ERISA claim for benefits and a breach of fiduciary duty claim against Aetna, seeking under 23(b)(2) "an order requiring Aetna to reprocess [the] claims under a policy that accurately reflects the medical community's acceptance of the particular treatment." *Id*. at *2. Aetna opposed by arguing that the plaintiffs lacked standing because they could not establish a likelihood of future injury. The court disagreed with Aetna, finding that the plaintiffs had standing to pursue a retrospective injunction. As the court stated:

> The court concludes that Meidl has established standing to pursue a retrospective injunction, namely, the reprocessing order, because (1) he has alleged an "injury in fact," in the form of deprivation of the health insurance benefits to which he alleges he was entitled, and (2) there is a "causal connection between this injury and the conduct complained of," namely, the defendants' refusal to cover TMS, and (3) it is "likely as opposed to merely speculative that this injury will be redressed by" the reprocessing order Meidl seeks.

*Id*. at *6.

As for the merits of (b)(2) certification, the *Meidl* court found that "the facts fit the situation":

> [T]he defendants have "acted," by creating and applying [the experimental treatment provision of the plan], or "refused to act," by refusing to cover [the experimental treatment], "on grounds that apply generally to the class, so that injunctive relief" in the form of an order to reprocess all claims without regard to

45

> [the experimental treatment provision of the plan], would be "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

*Id*. at *20.

Last, the court discussed why the reprocessing of past claims is not properly treated as monetary relief:

> Rather than seeking payment, a reprocessing claim simply seeks that claims be reprocessed via a lawful method, despite the fact that certain class members may receive no payment even after the reprocessing. The fact that certain class members may end up receiving payment—after this case is closed, as a result of the reprocessing--is too attenuated to treat the reprocessing itself as a form of monetary damages.

*Id*. at *21.

After reviewing the *Meidl* decision and the plaintiffs' other arguments for equitable relief, the Court agrees with the Epstein Plaintiffs and Aetna that a Rule 23(b)(2) class just does not fit under these facts. First, from the outset, this lawsuit was quite evidently about money damages, which can best be viewed through the prism of the claims that remain in the operative complaint (an ERISA 502(a)(1)(b) claim for benefits and breach of contract claim), as well as the complained-of-injuries (underpayments). Second, an injunction would not provide indivisible relief to all class members—the plan-by-plan minefield featured in the 23(a)(2) analysis did  not suddenly disappear when Aetna changed the relief it was seeking. And, strikingly, the plaintiffs have refused to confront Aetna's prediction that most class members would end up owing their plan sponsors money after the reprocessing took place.

At oral argument, counsel for the Epstein Plaintiffs effectively summarized the reasons why (b)(2) relief is incongruous under the plaintiffs' theory of liability:

> THE COURT: Now, from your point of view how is this theory of harm and resolution or reparation amicable to the theory of the Carella plaintiffs? Could I say that this is like an aggravated level of behavior, or are you saying it's mutually exclusive?
>
> MR. EPSTEIN: I believe it's mutually exclusive. I believe there's several different levels of differences between our theory of the case and the Carella plaintiffs' theory of the case. In terms of manageability. Just looking at that one. An injunction will require this Court under Rule 65 to supervise that injunction and to

come up with terms and etc. our theory of the case doesn't require that. The tracking reports already added up. We think the Carella theory of the case is improper under ERISA. We think that under ERISA 502(a)(1)(b) is the proper claim for benefits, which is a claim for damages under Barry and Great West (ph), is the proper section for this case to proceed. And not under 502(a)(3), which is really under those same cases-- a safety net.

The issue is whether the defendant acted in the same way towards all of the class members. And whether the court could issue an indivisible injunction to all of the class members. So, for example, we just look at Great West, the Supreme Court says that, 502(a)(3) is a catchall provision, that acts as a safety net for-- for an appropriate equitable relief for injuries caused by violations that 502 does not elsewhere adequately remedy. I'll note that in this Court's June 15th opinion, the Court held that the claims for fiduciary duty, to the extent that the fiduciary duty existed they were merged into the claim for benefits. The case law that the Carella plaintiffs are citing, Meidl, those are cases that involve fiduciary duty, not claims for money damages. 502(a)(1)(b) is a claim for money damages. For example, in Meidl the question was whether certain investigative therapies-- I'm not going to be arguing for the Aetna defendants. But the claim for-- the case was about whether or not a person should be covered for investigative therapy. If they were covered they got money.

THE COURT: Yes.

MR. EPSTEIN: But the question was coverage. And if you carefully read the opinion the court was looking at the fiduciary duty. It was a 50-- without saying it, the court was essentially calling it a 502(a)(3) case. And the case we have before us is a 502(a)(1)(b) case, which is the proper place for (b)(3). I would also say that one of the other divides is that in contexts of an injunction you would normally use an injunction where money damages are inadequate. Here money damages are adequate. That's what we're looking for and what everybody wants-- are the money damages. And so in concept an injunction is inappropriate. And I think that's actually encompassed in ERISA.

Oral Arg. Tr. 38-40.

The plaintiffs' ERISA 502(a)(1)(B) claim for benefits and breach of contract claim are

quintessential actions for damages. As the Supreme Court explained in *Great-West Life &*

*Annuity Ins. Co. v. Knudson*:

Here, petitioners seek, in essence, to impose personal liability on respondents for a contractual obligation to pay money—relief that was not typically available in equity. A claim for money due and owing under a contract is quintessentially an action at law. Almost invariably ... suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the

> plaintiff are suits for money damages, as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty. And [m]oney damages are, of course, the classic form of *legal* relief.

534 U.S. 204, 2010 (2002) (internal citations and quotations omitted); *see also* n. 1 ("Without this rule of construction, a statutory limitation to injunctive relief would be meaningless, since any claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction.").

The Carella Plaintiffs themselves undercut any suggestion that they are seeking equitable remedies. At oral argument, counsel differentiated the present litigation from asbestos MDLs by describing their case as characteristically "economic" in nature. Oral Arg. Tr. 108. In the Carella Plaintiffs' opening brief, they called Dr. Foreman their "damages expert" and one of their proposed classes the "Subscriber New York Damages Class." (Carella Br. 4, 1.) As mentioned above, the cascade of plan-by-plan inquiries that defeated certification under 23(a)(2) likewise apply—perhaps even more so—to injunctive relief. The Third Circuit noted this problem in *Holhider*: "Liability for incidental damage should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations." *Hohider*, 574 F.3d at 200 (internal citations omitted.) Of course the *WellPoint I* and *Lipstein* courts also rebuffed the plaintiffs' attempts to certify (b)(2) classes. *See e.g., WellPoint I* 2014 WL 6888549 at *22. ("Certification under Rule 23(b)(2) would also be inappropriate. Due to the variation among WellPoint's ERISA plans, there is no single injunction or declaratory judgment [that] would provide relief to each member of the class[es]."); *see also Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 292 (D.N.J. 2013) ("Merely answering the question of whether a single injunction could provide class-wide relief would require individualized, plan-by-plan determinations, because this case is, at its heart, a contract dispute. Probing behind the pleadings before deciding the certification question, as the Court is permitted to do, the Court is confident that a single

injunction could not provide relief to the class.").  And this Court acknowledged in its 2014

opinion that the plaintiffs had discarded their claims for injunctive relief:

> Plaintiffs' claim for breach of fiduciary duties is revealed as duplicative of their claim for benefits under Section 502(a)(1)(B) because they cannot identify with any degree of specificity what equitable relief they want. Plaintiffs had asserted claims for injunctive and other prospective relief, but abandoned them when Aetna stopped using the Ingenix database for ONET reimbursement during the course of this litigation. Plaintiffs now challenge past alleged misconduct alone and assert generally that "[d]eclaratory relief is still available, and still beneficial." However, plaintiffs cannot avoid dismissal merely by labelling their claim for unpaid benefits as one for prospective, equitable relief. They fail to adequately distinguish their claim under Section 502(a)(3) from their claim for benefits under Section 502(a)(1)(B), and as a consequence counts IV and V are dismissed.

(D.E. 1024 at 29.)

The Carella Plaintiffs have failed to challenge Aetna's contention that "large segments of

the putative class actually received greater reimbursements from the use of the Ingenix database

they now attack," and that "many class members would be due lower benefits and therefore

would owe money if Aetna were ordered to reprocess their claims using any alternative

benchmark."  (Aetna Br. at 2, 53.)  This undermines the plaintiffs' assurance that "there would

be no need for separate declarations or injunctions for different class members." (Carella Pls.'

Br. at 30.)  For their part, the plaintiffs argue that Aetna's calculation is mere "speculation" and

insist that class members would not be exposed to liability because Aetna has not asserted any

counterclaims.  (*See* Carella Pls.' Reply Br. at 1 ("Thus, the worst a class member could do with

reprocessing the ONET claims is to break even.").)

At oral argument, however, counsel was not so certain that an injunction could provide

relief to the entire class without the Court having to carve out winners and losers.

> THE COURT: Where it may have been in the reply brief-- I'm not sure. I thought that Aetna said, when push comes to shove around 50 percent of the benefits paid were on the mark. Am I right about that?

MR. TAYLOR: Yes.

MR. DOREN: You are correct, your Honor.

THE COURT: Now, I would assume that within that 50 percent are break even and overpaid?

MR. TAYLOR: Well, for present purposes we could-- let's assume that.

THE COURT: Okay.

MR. TAYLOR: For those people they don't get anything back. They don't get more money.

THE COURT: Well, do they owe more money?

MR. TAYLOR: They don't owe any more money, Aetna doesn't have a counterclaim to recover any money back. They have no affirmative claims. So anybody that would be in that situation they would stand pat.

THE COURT: Okay. Now, I'm the one that's standing there and fashioning this relief, that would have to be a term of the injunction, correct? To the extent that the recalculations winds up with a negative as it were, or a positive on Aetna's side, that specific member of the class is immunized from having to pay back Aetna?

MR. TAYLOR: Yes, that would be probably something that should be in the order. Yes.

Oral Arg. Tr. at 14-15.

Taken together, all of the plan-by-plan issues regarding injury and damages that plagued the Epstein Plaintiffs' (b)(3) certification also doom the (b)(2) motion. Because "this case is, at its heart, a contract [and ERISA] dispute." *Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 292 (D.N.J. 2013). The plaintiffs cannot bypass individualized inquiries by recasting the nature of the relief they are seeking. In fact, a single injunction ordering Aetna to reprocess the claims could potentially expose class members to liability from employers or otherwise violate the terms of some of the plans. *Meidl* is, finally, an inappropriate analog: this Court is not faced

with the binary question of whether class members' treatment should have been covered or not. Rather, it is faced with a multi-factor analysis, where "each individual class member would be entitled to a different injunction or declaratory injunction against the defendant," and "each class member would be entitled to an individualized award of monetary damages," attributes of a putative class that the Supreme Court has said prevents certification under (b)(2).  *Dukes 564 U.S. 338* at 360.  Thus the Court finds that the Carella Plaintiffs fail to meet the 23(b)(2) certification requirements.

## IV.   <u>CONCLUSION</u>

In their opening brief, the Carella Plaintiffs suggest that this case presents an "unusual predicament" and a "peculiar situation." (Carella Pls.' Br. at 3.)  This case is neither, as the foregoing discussion demonstrates.  For the past decade, various attempts have been made to crowbar the conclusions of the NYAG investigation of Ingenix into a viable class action lawsuit.[16]  Yet, in the end, the same individualized issues that led other courts to deny certification apply: class action treatment is improper because in practice[17] this case could never be tried in court with common evidence.  For all the reasons stated above, the Court denies class certification as to both groups.  Consequently, Aetna's motions to exclude the plaintiffs' experts are moot.  An appropriate order will be issued.

---

[16] To be sure, the allegations that Ingenix was the secret profit engine of Aetna seem like a particularly fat-fetched theory in light of its heavy reliance on self-funded plan sponsors who pay out the claims.

[17] The Carella Plaintiffs bring Yogi Berra into the discussion by quoting his observation that "In theory there's no difference between theory and practice. In practice there is." (Reply Br. at 1, n.1.)  A better fit is his more famous quote:  "It's déjà vu all over again."